# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE,** | § § § § § § § § § | |
| *Plaintiffs*, | § | |
| v. | § § | CIVIL ACTION NO. 2:24-CV-00089-Z |
| **BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND,** in his official capacity as Attorney General of the United States, *and* **STEVEN M. DETTELBACH,** in his official capacity as Director of ATF, | § § § § § § § § § | |
| *Defendants.* | § § | |

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Although purporting to update federal regulations to align with recently amended federal firearms statutes, the regulations promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") of the U.S. Department of Justice on April 19, 2024, entitled "Definition of 'Engaged in the Business' as a Dealer in Firearms" ("Rule"), 89 Fed. Reg. 28968, go far beyond the subtle change Congress made to the law. Instead, they subject hundreds of thousands of law-abiding gun owners to *presumptions of criminal guilt* for all manner of innocuous activities related to the statutorily authorized and constitutionally protected private sale of firearms. Moreover, in an

1

obvious attempt to preclude timely judicial review, Defendants have accelerated the effective date of their latest edict to a mere *30 days* from publication in the Federal Register, contrary to past practice.[1] *Cf.* 83 Fed. Reg. 66514 (90 days for bump stock rule); 87 Fed. Reg. 24652 (120 days for "frame or receiver" rule); 88 Fed. Reg. 6478 (120 days for pistol stabilizing brace rule). Because of the urgency created by Defendants own actions, and because the new regulations threaten to turn otherwise law-abiding Americans into felons overnight, Plaintiffs seek a temporary restraining order and/or preliminary injunction to preserve the status quo and prevent Defendants from enforcing the Rule against lawful gun owners and collectors. If a temporary restraining order and/or preliminary injunction is not granted, the Rule will become effective on May 20, 2024.

---

[1] ATF intends to "further update [its] guidance once it issues this Rule." 89 Fed. Reg.at 28971. However, as explained below, the Rule exceeds ATF's statutory authority and is contrary to law, and the First, Second, Fourth, and Fifth Amendments. Any "further" guidance based off these regulations would likewise be unlawful and irreparably harm Plaintiffs.

2

# TABLE OF CONTENTS

Table of Contents ...................................................................................................................3

Table of Authorities ............................................................................................................. 4

Introduction ..........................................................................................................................10

Background and Facts ......................................................................................................... 11

   A.   Statutory History .......................................................................................................... 11

   B.   Enactment of the BSCA .............................................................................................14

   C.   The Rule .......................................................................................................................15

Standard ................................................................................................................................17

   A.   Plaintiffs Are Likely to Succeed on the Merits. ......................................................17

      I.    The Rule Violates the Administrative Procedure Act ("APA") by Enacting Arbitrary and Capricious Edicts, Abusing ATF Discretion, Contravening the Statute, Violating Constitutional Rights, and Exceeding ATF Authority. .........................................................17

      II.    The Rule's Three Sets of Presumptions Are Unlawful, Arbitrary, and Overbroad. .... 26

         A.   The EIB Presumptions Are Flawed. ......................................................... 29

         B.   The PEP Presumptions Are Flawed. ........................................................ 30

         C.   The Rule's Opposite Presumptions Eviscerate the Statute's Safe Harbor. ............32

      III.    The Rule's "Former Licensee Inventory" Is Atextual Revisionism that Contravenes the Statute. .......................................................................................................................33

      IV.    The Rule Violates the Second Amendment. .................................................................35

      V.    The Rule Violates the Fourth Amendment. .................................................................38

      VI.    The Rule Violates the Separation of Powers. ............................................................ 40

   B.   Plaintiffs Will Suffer Irreparable Harm if the Rule Takes Effect. ....................................42

   C.   The Balance of Equities and Public Interest Overwhelmingly Favor Plaintiffs. ................43

Conclusion ........................................................................................................................... 44

# TABLE OF AUTHORITIES

Cases

18 U.S.C. § 921(a)(21)(C) ............................................................................................ passim

*ACLU v. FCC,*
    823 F.2d 1554 (D.C. Cir. 1987) ....................................................................... 18, 19

*Adams Fruit Co. v. Barrett,*
    494 U.S. 638 (1990) ..................................................................................................18

*Altman v. County of Santa Clara,*
    464 F. Supp. 3d 1106 (N.D. Cal. 2020)..................................................................37

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) (Barrett, J., concurring) ...................................................19

*Career Colleges & Sch. of Tex. v. U.S Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024)....................................................................................27

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
    2024 U.S. App. LEXIS 8152 (5th Cir. Apr. 4, 2024)...............................................25

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir. 2023)................................................................................... 42

*Chem. Mfrs. Ass'n v. DOT,*
    105 F.3d 702 (D.C. Cir. 1997) .................................................................................25

*City of Arlington v. FCC,*
    569 U.S. 290 (2013) .................................................................................................. 17

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015) ..................................................................................................39

*Def. Distributed v. U.S. Dep't of State,*
    865 F.3d 211 (5th Cir. 2017) (Elrod, J. dissenting)...............................................43

*Dig. Realty Trust, Inc. v. Somers,*
    583 U.S. 149 (2018)...................................................................................................18

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................................................. 36

4

*Dobrova v. Holder*,
    607 F.3d 297 (2d Cir. 2010) ................................................................ 20

*El Paso Elec. Co. v. FERC*,
    76 F.4th 352 (5th Cir. 2023) ................................................................27

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................................37

*Garland v. Gonzalez*,
    142 S. Ct. 2057 (2022) ....................................................................

*Gordon v. NovaStar Mortg., Inc.*,
    524 F.3d 1175 (11th Cir.) *revised on other grounds*, 529 F.3d 1026 (11th Cir. 2008) ...................41

*Humana, Inc. v. Jacobson*,
    804 F.2d 1390 (5th Cir. 1986) ................................................................ 42

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ................................................................17

*Kaneshiro v. United States*,
    445 F.2d 1266 (9th Cir. 1971) ................................................................ 11

*Katz v. United States*,
    389 U.S. 347 (1967) ................................................................39

*Kole v. Village of Norridge*,
    No. 11 C 3871, 2017 WL 5128989 (N.D. Ill. Nov. 6, 2017) ................................................36

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ................................................................17

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) ................................................................43

*Lynchburg Range & Training, LLC v. Northam*,
    105 Va. Cir. 159, 3 (2020) ................................................................36

*Maralex Res., Inc. v. Barnhardt*,
    913 F.3d 1189 (10th Cir. 2019) ................................................................18

*Martinez v. Larose*,
    968 F.3d 555 (6th Cir. 2020) ................................................................21

*Martinez v. Tyson Foods, Inc.*,
    533 F. Supp. 3d 386 (N.D. Tex. 2021) ................................................................41

*Missouri v. Biden*,
   83 F.4th 350 (5th Cir. 2023) ...........................................................................................

*Mock v. Garland*,
   75 F.4th 563 (5th Cir. 2023) ................................................................................... 42

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ........................................................................................... passim

*Netflix, Inc. v. Babin*,
   88 F.4th 1080 (5th Cir. 2023) ................................................................................... 44

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................................. 43

*NRA of Am., Inc. v. BATFE*,
   No. 3:23-CV-1471-L, 2024 U.S. Dist. LEXIS 57557 (N.D. Tex. Mar. 29, 2024) ..................... 43

*Peabody Twentymile Mining, LLC v. Sec'y of Labor*,
   931 F.3d 992 (10th Cir. 2019) ..................................................................................... 30

*Pol'y & Rsch., LLC v. HHS*,
   313 F. Supp. 3d 62 (D.D.C. 2018) ............................................................................... 18

*Reese v. BATFE*,
   647 F. Supp. 3d 508 (W.D. La. 2022) .......................................................................... 37

*Teixeira v. County of Alameda*
   873 F.3d 670 (9th Cir. 2017) ..................................................................................... 37

*Teixeira v. County of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ..................................................................................... 37

*United States v. Biswell*,
   406 U.S. 311 (1972) ................................................................................................. 39

*United States v. Brenner*,
   481 F. App'x 124 (5th Cir. 2012) ............................................................................... 28

*United States v. Davis*,
   139 S. Ct. 2319 (2019) ............................................................................................. 40

*United States v. Gross*,
   313 F. Supp. 1330 (S.D. Ind. 1970) ....................................................................... 11, 12

*United States v. Koutsostamatis*,
   956 F.3d 301 (5th Cir. 2020) ......................................................................... 29

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010), *abrogated on other grounds as recognized by Range v. Att'y Gen. U.S.*,
   69 F.4th 96 (3d Cir. 2023) ............................................................................. 37

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ...................................................................................... 17

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ................................................................................. 17, 41

*Valley v. Rapides Parish Sch. Bd.*,
   118 F.3d 1047 (5th Cir. 1997) ....................................................................... 43

*VanDerStok v. Garland*,
   86 F.4th 179 (5th Cir. 2023) ..................................................................... 26, 42

*VanDerStok v. Garland*, No. 23-10718, 2023 U.S. App. LEXIS 26499, at *6 (5th Cir. Oct. 2, 2023) ...................................................................................................... 43

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) .................................................................................. 27

*Wilgar Land Co. v. Dir., OWCP*,
   85 F.4th 828 (6th Cir. 2023) .......................................................................... 30

*Wis. Central Ltd. v. United States*,
   138 S. Ct. 2067 (2018) .................................................................................. 41

## Statutes

18 U.S.C. § 1469(a) ...........................................................................................27

18 U.S.C. § 3142(e)(2) ......................................................................................27

18 U.S.C. § 921(a)(22) .......................................................................................15,

18 U.S.C. § 926(a) ........................................................................................18, 27

35 U.S.C. § 282(a) .............................................................................................27

38 U.S.C. § 1118 ...............................................................................................27

Act of Apr. 29, 1968, Pub. L. No. 90-351, 1968 U.S.C.C.A.N. 2112, 2201 (to be codified at 18 U.S.C § 921(a) (11) ...........................................................................................................12

Firearms Owners' Protection Act, Pub. L. 99-308, 100 Stat. 450. (1986) ...................................13

## Rules & Regulations

Bipartisan Safer Communities Act Conforming Regulations,
89 Fed. Reg. 28622 (April 19,2024)................................................................................. 20

Bump-Stock-Type Devices, 83 Fed. Reg. 66514 (Dec. 26. 2018)
(to be codified at 27 C.F.R pts. 447, 478, & 479) ...................................................... 42

Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480 (March 31, 1988)
(to be codified at 27 C.F.R pts. 72, 178 and 179)..........................................................14

Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480 (March 31, 1988)
(to be codified at 27 C.F.R pts 72,178 & 179)............................................................ 28

Commerce in Firearms and Ammunition; Temporary Rule,
51 Fed. Reg. 39612 (Oct. 29, 1986) .................................................................................14

Dealer in Firearms, 89 Fed. Reg. 28968, 28972 (April 19, 2024)
(to be codified 27 C.F.R. pt. 478)........................................................................... passim

Definition of "Engaged in the Business" as a Dealer in Firearms,
88 Fed. Reg. 61993 61999 nn.44, 45(Sept. 8, 2023)
(to be codified at 27 C.F.R pt 478)......................................................... 19, 23, 24, 28

Definition of the Phrase "Engaged in the Business,"
45 Fed. Reg. 20930 (March 31, 1980) (to be codified at 27 C.F.R. pt. 178) .............................13

Definition of the Phrase "Engaged in the Business,"44 Fed. Reg. 75186 (Dec. 19, 1979)
(to be codified at 27 C.F.R. pt. 178) .................................................................................12

Factoring Criteria for Firearms with Attached "Stabilizing Braces,"
88 Fed. Reg. 6478 (Jan. 31, 2023) (to be codified at 27 C.F.R. pts. 478 & 479)...................... 42

## Other Authorities

98th Congress, 2d Sess., Report 98-583 at 9, Aug. 8, 1984...........................................................14

Antonin Scalia & Bryan A. Garner,
Reading Law: The Interpretation of Legal Texts 56 (2012) .......................................................41

Benjamin Hardy et al., *Illegal Guns Sales Led to Fatal ATF Raid on Airport Director Malinowski's Home, Affidavit Says*, <u>Ark. Times</u> (Mar. 21, 2024) ................................................................ 42

David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 Harv. L. Rev. F. 230, 235 (2014) ................................................................................................................. 38

## INTRODUCTION

ATF's Rule redefines the landscape of American gun ownership. Under the guise of clarifying existing statutes, the ATF is poised to radically expand the definition of who is considered to be "engaged in the business" of dealing firearms. The Rule stretches the modest language adjustments made by Congress in the 2022 Bipartisan Safer Communities Act ("BSCA") into a broad, catch-all dragnet that threatens to ensnare countless ordinary citizens. This sweeping reinterpretation of well-settled statutory definitions will turn everyday gun owners into de facto arms dealers overnight.

Indeed, the Rule establishes a broad and ambiguous framework that potentially categorizes ordinary individuals as firearm dealers if they engage in even minimal activities such as selling a single firearm, offering to sell a firearm, advertising sales informally, or documenting transactions for personal record-keeping. This expansive interpretation by ATF not only stretches the statutory language beyond its reasonable bounds, but it also imposes severe civil, administrative, and criminal penalties on individuals without providing clear, objective criteria for compliance.

For instance, the Rule posits that selling firearms with the "intent to predominantly earn a profit" now falls under the purview of activities requiring a Federal Firearms License ("FFL"), regardless of whether such sales are infrequent or merely incidental to personal gun ownership. This is a significant and unfounded expansion from the congressionally mandated definitions, which still demand a "course" of "repetitive" buying and selling to qualify as being "engaged in the business." The Rule also introduces presumptions that could criminalize lawful transactions and chill constitutionally protected conduct through the vague threat of "administrative action." ATF cannot provide a rational basis for such a sweeping change—much less a cogent theory for

10

how its omnibus rulemaking comports with the statutory text.

The Rule does not represent reasoned (much less lawful) decision making. To the contrary, it is no more than an agency power-grab, attempting to severely restrict private firearms transactions—effectively creating a de facto national gun registry by mandating that individuals wishing to sell almost any firearm, for any reason, must obtain an FFL.

## BACKGROUND AND FACTS

### A. Statutory History

Historically, the Federal Firearms Act of 1938 defined "dealer" to mean "any person engaged in the business of selling firearms or ammunition. . . ." In one of the only cases to interpret that phrase under the Federal Firearms Act, the Ninth Circuit discussed "shipment of guns to Tokyo," noting that the "guns were sold in two separate installments to two different people" and that the defendants "procure[d] … possible buyers for the guns," which supported a "finding that appellants were 'engaged in the business of selling firearms'. . . . " *Kaneshiro v. United States*, 445 F.2d 1266, 1270 (9th Cir. 1971).

Congress later repealed the Federal Firearms Act, finding that "it had not provided adequate license fees or proper standards for the granting or denial of licenses and that this had led to licenses being issued to unqualified persons." *United States v. Gross*, 313 F. Supp. 1330, 1332 (S.D. Ind. 1970). But in recodifying the Act's definition of "dealer" into the new Gun Control Act of 1968 ("GCA"), Congress defined the term "in somewhat the same manner as that definition appears

in [the Federal Firearms Act]. *See* Act of Apr. 29, 1968, Pub. L. No. 90-351, 1968 U.S.C.C.A.N. 2112, 2201 (to be codified at 18 U.S.C § 921(a) (11)).[2]

Thus, the GCA defined "dealer" to mean "any person engaged in the business of selling firearms or ammunition at wholesale or retail" but, like the FFA, did not further define what it meant to be "engaged in the business." That determination was left, for a time, to judicial interpretation, which resulted in varying holdings. For example, the district court in *Gross* held the definition required "no minimum number of sales, dollar volume of sales, or number of employees" to be considered "engaged in the business," but that "there should be no doubt in the minds of men of common intelligence that 'dealer' means one that is engaged in *any* business of selling, repairing or pawning firearms and that 'business' is that which occupies the time, attention and labor of men for the purpose of livelihood or profit." *Gross*, 313 F. Supp. at 1333.

In 1979, ATF issued a notice of proposed rulemaking which proposed to define "engaged in the business," on the theory that the phrase was "not defined in the law or the regulations." *See* Definition of the Phrase "Engaged in the Business," 44 Fed. Reg. 75186 (Dec. 19, 1979) (to be codified at 27 C.F.R. pt. 178). But in its proposal to define that phrase, ATF failed to identify a single court that had trouble defining or applying the phrase. To the contrary, ATF's proposal acknowledged that "courts have continually found that the current situation is adequate for enforcement purposes. . . . " *Id.* at 75187. On March 31, 1980, ATF extended the comment period for 30 days, *see* Definition of the Phrase "Engaged in the Business," 45 Fed. Reg. 20930 (March

---

[2]

https://www.westlaw.com/Document/IC70AEF6063EA11D9B7CECED691859821/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0

31, 1980) (to be codified at 27 C.F.R. pt. 178),[3] but no action was taken from that point. In other words, ATF ultimately decided not to define the phrase "engaged in the business."

In 1986, the McClure-Volkmer Firearms Owners' Protection Act ("FOPA"), added a definition of "engaged in the business" to the statute – "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." Firearms Owners' Protection Act, Pub. L. 99-308, 100 Stat. 450. (1986). FOPA further defined "with the principal objective of livelihood and profit" to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." FOPA was amended soon after, clarifying that "proof of profit" was not required "as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.*

As the Senate Committee on the Judiciary reported regarding the "engaged in the business" definition contained in the bill that would eventually become FOPA, "[l]ower courts have applied two different, but similar tests for 'engaging in the business.' Neither is especially clear, and both can be applied to a hobbyist to whom profit is a secondary objective." *See* 98th

---

[3] https://archives.federalregister.gov/issue_slice/1980/3/31/20912-20982.pdf.

Congress, 2d Sess., Report 98-583 at 9, Aug. 8, 1984.[4] After laying out those two judicially created tests, the report explained that Congress' intent was to "**substantially narrow** these broad parameters by requiring that the person undertake such activities as part of a 'regular course of trade or business with the principal objective of livelihood and profit.'" *Id.* (emphasis added).

On October 29, 1986, ATF adopted a Temporary Rule to implement FOPA, and invited comments.[5] Commerce in Firearms and Ammunition; Temporary Rule, 51 Fed. Reg. 39612 (Oct. 29, 1986) Under the Temporary Rule, the phrase "engaged in the business" was defined to mirror FOPA's statutory language. On March 31, 1988, ATF adopted the regulatory definitions with no changes. *See* Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480 (March 31, 1988) (to be codified at 27 C.F.R pts. 72, 178 and 179).[6] Importantly here, as to the definition of "engaged in the business," a commenter had requested "the definition list examples illustrating when a license is required," but **ATF declined to add examples** "since the definition adequately addresses this concern by expressly delineating the activity requiring licensing from that of a firearms collector not subject to licensing." *Id.* at 10481.

## B.  Enactment of the BSCA

Thus, for several decades from FOPA's addition of definitions in 1986 until enactment of the BSCA last year, 18 U.S.C. § 921(a)(21)(C) has stated, in part, that "engaged in the business"

---

[4]https://books.google.com/books?id=WjaxxKw8ixcC&pg=RA2-PA77&lpg=RA2-PA77&dq=%22The+purpose+of+S.+914,+as+reported%22&source=bl&ots=C1ruIFGR-k&sig=ACfU3U0_AZISnBWMe6mumA0Grt7SxuRA3w&hl=en&sa=X&ved=2ahUKEwj9ttiAgvCFAxXa8MkDHbyzBSoQ6AF6BAgKEAM#v=onepage&q=%22The%20purpose%20of%20S.%20914%2C%20as%20reported%22&f=false.

[5] https://archives.federalregister.gov/issue_slice/1986/10/29/39607-39634.pdf.

[6] https://archives.federalregister.gov/issue_slice/1988/3/31/10460-10512.pdf.

meant "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business **with the principal objective of livelihood and profit** through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." Further, 18 U.S.C. § 921(a)(22) defined "with the principal objective of livelihood and profit" to mean an "intent underlying the sale or disposition of firearms is predominantly one of **obtaining livelihood and pecuniary gain**, as opposed to other intents, such as improving or liquidating a personal firearms collection. . . . " The BSCA amended this definition of "engaged in the business," replacing Section 921(a)(21)(C)'s phrase "with the principal objective of livelihood and profit" with the phrase "to **predominantly earn a profit**. . . . " Due to that change in terminology, 18 U.S.C. § 921(a)(22) was also modified, replacing the language "obtaining livelihood and pecuniary gain" with the singular intent of "**obtaining pecuniary gain**. . . . "

## C. The Rule

On March 14, 2023, following enactment of the BSCA, President Biden issued an Executive Order directing the Attorney General, among other things, to "(i) clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal firearms licensees ("FFLs"), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law; [and] (ii) prevent former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms." Definition of

15

"Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28968, 28972 (April 19, 2024) (to be codified 27 C.F.R. pt. 478).

Purportedly acting pursuant to this directive, the DOJ announced the notice of proposed rulemaking ("NPRM") on August 31, 2023, claiming that its proposed revisions "conform[] ATF's regulations to the new BSCA definition and further clarify[] the conduct that presumptively requires a license under that revised definition."[7]

But while some of the proposed revisions in the NPRM amended various regulations to mirror the newly enacted federal statutory language, others fabricated entirely new provisions that contravene and effectively nullify the very statutes they claim to implement. Plaintiffs identified these atextual provisions as well as several other defects in their public comments to the NPRM. *See* Public Comment of Gun Owners of America, Inc. et al. (Dec. 2023) ("Ex. A"); Public Comment of State Attorneys General (Dec. 7, 2023) ("Ex. B.").[8]

The Rule purports to do two things: (1) implement the BSCA and (2) "provide additional guidance on what it means to be engaged in the business as a 'dealer....'" 89 Fed. Reg. at 28973. But the Rule, for the most part, has nothing to do with the BSCA. Rather, for the most part the Rule represents an ATF wish list of how it would like the statute to operate. For example, the Rule revises the existing definitions of *dealer*, *engaged in the business*, and *principal objective of livelihood and profit*. And it adds definitions of *personal collection (or personal collection of firearms, or personal*

---

[7] https://atf.gov/news/pr/justice-department-proposes-new-regulation-update-definition-engaged-business-firearms.

[8] https://dojmt.gov/wp-content/uploads/Comment-Letter-to-ATF-88-Fed-Reg-61993-Filed.pdf.

*firearms collection), former licensee inventory, predominantly earn a profit, responsible person*, and *terrorism*.

## STANDARD

For a preliminary injunction, Plaintiffs must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*,647 F.3d 585, 595 (5th Cir. 2011). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The standard is the same for a temporary restraining order. *Janvey*, 647 F.3d. at 595.

### D.  Plaintiffs Are Likely to Succeed on the Merits.

### I.  The **Rule Violates the Administrative Procedure Act ("APA") by Enacting Arbitrary and Capricious Edicts, Abusing ATF Discretion, Contravening the Statute, Violating Constitutional Rights, and Exceeding ATF Authority.**

Because administrative agencies are creatures of statute, they possess only the authority that Congress has provided. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). And it is a core principle of American law that an agency may not rewrite statutory terms to suit its own sense of how the law should operate. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). When agencies exceed their statutory authority, those actions are unlawful and *ultra vires*. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). ATF flouts its limited function at every step.

First, the Rule defines several terms, including "dealer," "engaged in the business," and

"to predominately earn a profit." But Congress *already* defined these terms in the statute, and ATF has no authority to alter that text and thereby expand, contract, or alter the statutory meaning. Ex. A at 8-11. To the contrary, ATF only has statutory authority to "prescribe … such rules and regulations as are *necessary* to carry out the provisions of this chapter." 18 U.S.C. § 926(a) (emphasis added). ATF disagrees. It claims that "the fact that Congress generally defined the term . . . does not mean that the Department lacks the authority to further define that term." 89 Fed. Reg. at 29011. But "[t]he statute's unambiguous … definition … precludes the [agency] from more expansively interpreting that term." *Dig. Realty Trust, Inc. v. Somers*, 583 U.S. 149, 169 (2018); *see also ACLU v. FCC*, 823 F.2d 1554, 1568 (D.C. Cir. 1987) ("the statute speaks with crystalline clarity. It provides a precise definition … for the exact term the Commission now seeks to redefine. … From the face of the statute then, we are left with no ambiguity and thus no need … for clarification."); *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) ("an agency acts arbitrarily and capriciously if it acts in a manner that is contrary to … a congressional statute."); *Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, 1201 (10th Cir. 2019) ("agency discretion 'in the interstices created by statutory silence'" applies "only when 'considering undefined terms in a statute . . . .'"); *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 642 (1990) ("where the terms of a statute are unambiguous, judicial inquiry is complete."); 89 Fed. Reg. at 29010 (admitting that, in the past, ATF has only "provided regulatory definitions of terms that Congress did not define in the statute").

Second, the Final Rule seeks to create and then resolve ambiguity in the statute where none

exists, excising ordinary words[9] like "purchase" and "sale" and defining them "consistent with the[ir] *common meaning. . . .* " 89 Fed. Reg. 28974 . . . " Definition of "Engaged in the Business" as a Dealer in Firearms, 88 Fed. Reg. 61993, 61999 nn. 49, 50..44, 45 (Sept. 8, 2023) (to be codified at 27 C.F.R. pt 478). But ATF does not explain what ambiguity exists in these terms, or why ordinary people cannot understand them. *ACLU*, 823 F.2d at 1568 ("we are left with no ambiguity and thus no need … for clarification."). Elsewhere the Final Rule *refuses to define* commonplace terms, stating that "readers should use the *ordinary meaning. . . .* "89 Fed. Reg. at 28992. ATF provides no reason for these inconsistent approaches. And as Plaintiffs noted in comments (Ex. A. at 10 n.12), ATF's attempt to define simple words often backfires spectacularly – for example, starting with the easily understood word "sale," defining it to include "something of value," defining that to include "valuable consideration," and then defining that to include "forbearance" (89 Fed. Reg at 28975 n.56) – a word that likely is not easily comprehended by many. But that is what the Final Rule does – take something simple and complicate it to the point of incomprehensibility. As with past ATF rulemakings, this is a feature, not a bug.

Third, the Rule conflicts with the Rule of lenity. Neither the NPRM nor the Rule ever claims any part of the statute is in any way ambiguous, seeks deference, or invokes *Chevron*. Yet ATF still feels the need to use nearly a ream of paper in order to "clarif[y]" (89 Fed. Reg. 28968) just what the statute means. *See also* 89 Fed. Reg at 28973 ("in light of the BSCA's changes . . . *and*

---

[9] Courts have rejected this acontextual, surgical approach many times before. *See, e.g.*, *Missouri v. Biden*, 83 F.4th 350, 382-83 (5th Cir. 2023) ("reading … in 'context, not in isolation'"); *Garland v. Gonzalez*, 142 S. Ct. 2057, 2074 (2022) (rejecting "rigidly segmenting each word in the clause, defining each in isolation, and adding those definitions together," as "this Court has cautioned against such a piecemeal approach to statutory interpretation"); *Biden v. Nebraska*, 143 S. Ct. 2355, 2382 (2023) (Barrett, J., concurring) ("a vacuum is no home for a textualist. Instead, we stressed that the "meaning" of a word or phrase "may only become evident when placed in *context*.").

*to provide additional guidance*"). In fact, the Rule expressly anticipates that it is not ATF's last word on the subject, and that ATF will continue to "*further update* [its] guidance once it issues this Rule. 89 Fed. Reg. at 28971.[10] But criminal statutes (or those that carry criminal penalties[11]) may not be vague or unclear. They should not require hundreds of pages of "additional guidance" to understand. Or any pages, for that matter. Ordinary people should be able to read and comprehend what is proscribed. That ATF believes the Rule to be necessary means that ATF believes the statute fails to provide fair notice without the Rule. *See Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010) ("if the statutory text is unambiguous, no further inquiry is necessary"). And if the statute is suddenly now (after decades) so grievously ambiguous that ATF must step in, the Rule of lenity dictates any ambiguities be resolved in favor of the gun owner (*i.e.*, <u>against</u> licensure – the opposite of what the Rule does). *See* 89 Fed. Reg. at 29005 (arguing lenity does not apply by focusing on the Rule, not the statute).

Fourth, the Rule conflicts with the statute on its face. ATF claims that only a *single sale* of a single firearm must be considered "engaged in the business." *But see* 89 Fed. Reg. at 29028–29. *But see* 89 Fed. Reg. at 29021 ("buying and selling *more than one* firearm"). In fact, the Rule later says that "*no actual sales are required* if the intent element is met. . . . " *Id.* This reasoning is impossible to square with the statute, which requires not only intent, but also action – the "repetitive purchase and resale of firearms." *Cf.* Fed. Reg. at 29045 (seeking to expand the

---

[10] On the same date ATF published the Rule, it also published a Rule done without notice-and-comment, purportedly making "noncontroversial … conforming regulations" related to being engaged in the business. Bipartisan Safer Communities Act Conforming Regulations, 89 Fed. Reg. 28622 (April 19,2024). This seems to be the "other firearm provisions" referenced in 89 Fed. Reg. at 28984 n.114, but it is unclear if this is the "further update" referenced in 89 Fed. Reg. at 28971.

[11] *See* 89 Fed. Reg. 29013 ("The Department acknowledges … that failure to comply with the licensing requirement can have criminal implications . . . . ").

statutory text so that it is enough if a person "is engaging, *or intends to engage*, in 'the repetitive purchase and resale of firearms'"). Although acknowledging Plaintiffs' point that the statute requires *multiple* purchases *and* resales (89 Fed. Reg. at 29020–21), noting the "six [statutory] indicators" that ATF has got it wrong (Ex. A at 12-18), the Rule doubles down and claims there is no "minimum number of firearms to actually be sold." 89 Fed. Reg. at 29021. And in response to Plaintiffs' focus on the "particular words or phrases in the statute," ATF demurs that "the statutory language must be considered as a whole." *Id.* But it is ATF which ignores the whole text, ignoring the element of *sales* and focusing exclusively on the profit "*intent* underlying the sale."[12] 89 Fed. Reg. at 29042. *See Martinez v. Larose*, 968 F.3d 555, 561 n.5 (6th Cir. 2020) (when "the plain text of the statute provides the answer, we need not examine the structure"). A person can have all the intent in the world, but if he never actually *does* anything (repetitive purchase and resale), the statute does not render him "engaged in the business."[13] As Plaintiffs explained in their comments, there is no federal "attempt" crime for being an unlicensed dealer. Ex. A at 51-53; *cf.* 89 Fed. Reg. at 29045 ("a person may repeatedly advertise and display firearms for sale … but never actually find a buyer").

Fifth and similarly, the Rule conflicts with the statute by claiming that the government *need not demonstrate actual profit*, but only the *intent* to profit. 89 Fed. Reg. at 29045. On the contrary, the statute says that "proof of profit" is "not … required" only in cases of "criminal purposes or

---

[12] Elsewhere, the Rule admits these are separate elements, conceding that "intent to profit … is only one element of being engaged in the business." 89 Fed. Reg. at 29041; *see also* 89 Fed. Reg. at 29045 (same).

[13] The statute says that a person must act "to predominantly earn a profit through the repetitive purchase and resale of firearms. . . ." 18 U.S.C. § 921(a)(21)(C). Congress' use of the word "through" is instructive, because it explains *how* a person acts to earn a profit – "repetitive purchase and resale." By focusing exclusively on intent to profit (absent any actual transactions), ATF entirely eliminates a requirement to prove the crime.

terrorism." 18 U.S.C. § 921(a)(22). The obvious corollary is that proof of profit *is* required in other cases. Ex. A at 19-24 (explaining that none of ATF's cited cases support its claim that only proof of intent is required). The Rule acknowledges the point (89 Fed. Reg. at 29042) but disagrees, rejecting the "negative implication" principle, and focusing on the statutory use of "to predominantly earn a profit" meaning "intent underlying the sale." 89 Fed. Reg. at 29042-. But the fact that "intent" appears *in the definition* (explaining what *type* of profit is unlawful) does not mean that intent is all that is required with respect to profit. Rather, that definition in Section 921(a)(22) is meant to distinguish between profit that is permissible and profit that shows a person "engaged in the business." Either way, *profit is required – because actual sales are required*. This Court should reject ATF's creative attempt to avoid proving *multiple* elements of the crime.

Sixth, on top of watering down numerous requirements to prove the crime of being unlawfully "engaged in the business," the Rule also seeks to undermine the safe harbor provisions contained in Section 921(a)(21)(C), which states that a person is *definitively not* engaged in the business if he "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or … sells all or part of his personal collection of firearms." As GOA's Comments explained (Ex. A at 24–28), this language contains three separate safe harbors: firearm transacting done (i) "for the enhancement of a personal collection" or (ii) "for a hobby," or (iii) "sell[ing] all or part of [a] personal collection. . . ." The Rule, however, combines harbors (i) and (ii) into a single definition, defining "personal collection" to *include* firearms acquired "for a hobby." 89 Fed. Reg. at 29090. The Rule acknowledges "conflating" the separate provisions (89 Fed. Reg. at 29037), and agrees that a "'hobby … has a meaning independent of the term 'collection,'" but argues that "this combined definition" somehow sufficiently accounts

for both concepts (89 Fed. Reg. at 29039).

But more problematic still is the Rule's constrictive definition of just what constitutes a "personal collection," seeking to collapse and confine that expansive term to just "study, comparison, exhibition" and "noncommercial, recreational activities for personal enjoyment." 89 Fed. Reg. at 29038. And although GOA noted that this restrictive reading would exclude a collection purchased for "long-term investment purposes" or Second Amendment "'arms' for self-defense" (Ex. A at 26), the Rule doubles down, claiming there to be one "misconception in common: that any person who amasses multiple firearms without a license and without criminal purpose has, by definition, a 'personal collection,' or is a 'collector' under the statute." 89 Fed. Reg. at 29037. According to ATF, this is "akin to saying that any person … with change in their pockets … has a coin collection. . . ." 89 Fed. Reg. at 29038. To that end, the Rule now says that "personal collection … _shall not include_ firearms accumulated primarily for personal protection."[14] 89 Fed. Reg. at 29090. But as ATF recognizes, "personal protection" is the reason that most people acquire firearms in the first place (89 Fed. Reg. at 29036), meaning the Rule construes the statutory safe harbors _so that they do not apply to most gun owners_. And in concocting its narrow definition of "personal collection," ATF employed the narrowest definition of "collection" it could find. _See_ 88 Fed. Reg at 62004 n. 88.85. This conflicts with the Rule's general focus on using "the common meaning" of words. 89 Fed. Reg. at 28974 nn.49-50. Indeed, Congress intended "personal collection" to be broad and generally applicable. Other definitions of "collection"

---

[14] The Rule drops a note that "nothing … preclud[es] a person from lawfully _acquiring_ firearms for self-protection or other lawful personal use" (89 Fed. Reg. at 29090), in stark contrast to the safe harbor which deals with "_sales_, _exchanges_, [and] purchases."

23

include "a group of objects or an amount of material accumulated in one location,"[15] a far broader understanding that encompasses firearms purchased for self-defense by ordinary people. The Rule fails to explain why the narrow definition should be adopted, rather than the broader. Under the Rule, a person who keeps a collection of firearms for self-defense, or as a safeguard against tyranny, has no statutory safe harbor to sell those firearms. This is clearly not what Congress intended.

Seventh, the Rule is hopelessly vague, in violation of both the Due Process Clause and the APA. ATF disagrees, claiming that the Rule is not vague because its definitions "are based on standard dictionary definitions and decades of case law. . . . " 89 Fed. Reg. at 29016. Yet many of ATF's series of "presumptions" related to unlawful dealing act indiscriminately, sweeping in a host of lawful conduct,[16] failing to differentiate between lawful and unlawful,[17] and threatening *everyone* (including countless law-abiding gun owners) with a *presumption* that they are committing felonious acts unless they "rebut the presumptions" with "reliable evidence to the contrary."[18]

---

[15] *Collection*, Dictionary.com, https://www.dictionary.com/browse/collection (last visited Apr. 30, 2024).

[16] For example, under the NPRM, selling a firearm that was new in its original box carried the automatic presumption that a person was unlawfully dealing firearms. 88 Fed. Reg. at 62001. Once commenters pointed out that behavior is quite ordinary, noting "ATF's lack of understanding of the firearms community" (89 Fed. Reg. at 29031), the Rule now creates a safe harbor within a presumption, saying that new-in-box firearms sold *after one year* do not qualify for the presumption. 89 Fed. Reg. at 29091. However, ATF immediately walks back that safe harbor, stating that it does not apply if a person "intentionally stockpiles" firearms "with an intent to evade the one-year turnover. . . ." 89 Fed. Reg. at 29016. In other words, ATF *presumes a person is dealing, except to the extent that he is not, except to the extent that he is* – a presumption, within a safe harbor, within a presumption, within a statute. And gun owners must read the preamble of the Rule (not just the Rule itself) in order to figure out if they engaged in felonious behavior. *Id.*

[17] After claiming that everyone who keeps track of money when they purchase and sell firearms has a presumptively unlawful profit motivation (88 Fed. Reg. at 62022), the Rule now provides that this only applies to "firearms repetitively purchased for resale." 89 Fed. Reg. at 29048, 29091. This makes little sense, as it ties profit motivation (one element of the crime) to repetitive purchase and resale (a different element of the crime). The Rule is clear as mud.

[18] *See, e.g.*, 89 Fed. Reg. at 29048 (because the Rule creates a regime where federal law now both *requires* records and *prohibits* records of firearm purchases and sales, gun owners must now show that the records

The Rule acknowledges[19] this point, noting "[a] general sentiment from commenters opposed to the proposed presumptions is that they are overbroad, [and] would capture too many permissible sales by collectors. . . . "[20] 89 Fed. Reg. at 29023. But the Rule does little to alleviate those legitimate concerns, instead repeatedly demurring that, even if the Rule captures otherwise lawful conduct, "the presumptions are rebuttable" and "refuted by reliable evidence" provided by the accused. 89 Fed. Reg. at 29016, 29024, 29031-29033, 29045, 29047-29050. No doubt, this right to engage in self-defense is a cold comfort to law-abiding gun owners who find themselves on the wrong end of an ATF cease-and-desist letter, administrative action, forfeiture notice, or even a criminal charge that should have never been brought in the first place.[21] Persons whose conduct is *law-abiding* should not be forced – in any sort of proceeding – to present "reliable evidence" to

---

they keep are "recorded for tax purposes" in order to *disprove* the presumption that they have an unlawful profit motivation).

[19] Initially, ATF claims that the Rule is not vague because it "does not purport to include every possible scenario." 89 Fed. Reg. at 28991; *see also* 89 Fed. Reg. at 28992 ("address every conceivable scenario"). But Plaintiffs never claimed the Rule addresses *too little*, but instead that it sweeps in *too much* – assuming for the sake of bureaucratic expediency that all manner of innocent conduct is unlawful *until proven otherwise*.

[20] Often, rather than acknowledge the lack of clarity in the NPRM, ATF first blames the public for failing to understand– but then quietly amends the Rule. For example, ATF accuses commenters of having a "misconception in common" about what constitutes a "personal collection," but nevertheless "has revised" the language in the Rule. 89 Fed. Reg. at 29038. *See also* 89 Fed. Reg. at 29016 ("The Department disagrees.... Nonetheless … the Department has revised those presumptions"); 89 Fed. Reg. at 29046-47 (same); 89 Fed. Reg. at 29038-39 ("The Department disagrees.... At the same time, the Department recognizes. . . . To make this point clear, the definition … has been revised"); 89 Fed. Reg. at 29048 ("The Department disagrees.... However, to further clarify this point. . . ."); 89 Fed. Reg. at 29049-50 (same).

[21] Rather than inspiring confidence, the Rule delivers a hollow promise – that the Rule's presumptions *shall not* apply in criminal cases, *except to the extent they may. See, e.g.*, 89 Fed. Reg. at 28969 (suggesting presumptions "may be useful to judges … to instruct juries regarding permissible inferences"). But "[p]resumptions, especially in administrative proceedings that may generate institution-destroying liability, cannot be a matter of Department *ipse dixit*." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 2024 U.S. App. LEXIS 8152, at *61 (5th Cir. Apr. 4, 2024); *see also Chem. Mfrs. Ass'n v. DOT*, 105 F.3d 702, 705 (D.C. Cir. 1997) ("unlike a legislative body, which is free to adopt presumptions for policy reasons, … an agency may only establish a presumption if there is a sound and rational connection between the proved and inferred facts.").

defend themselves, merely because ATF cannot formulate a rule which can distinguish between lawful and unlawful conduct, and for the sake of expediency assumes everything is unlawful.[22]

Writing in concurrence in *VanDerStok v. Garland*, Judge Oldham rejected a similar tactic attempted in ATF's last attempt to make felons out of millions of Americans (those who own firearms with pistol stabilizing braces). Although seeming to acknowledge the vagueness of that rulemaking:

> ATF also argues that it could provide sufficient guidance in individual cases: Where 'persons remain uncertain' as to the exact scope of the Rule, 'they may submit a voluntary request to ATF for a classification.' ... *But this does nothing to cure the Final Rule's vagueness.* As important as the Fifth Amendment's guarantee of fair notice to individuals is the Amendment's prohibition against 'arbitrary enforcement' by government officials. ... It is thus of no use for ATF to say that it will tell ordinary people what they can do. *The law exists to tell both the people and government officials what they can do.* [*Id.* at 209 (Oldham, J., concurring).]

*VanDerStok v. Garland*, 86 F.4th 179, 209 (5th Cir. 2023)

## II.    The **Rule's Three Sets of Presumptions Are Unlawful, Arbitrary, and Overbroad.**

Aside from these many textual and APA conflicts in the Rule's numerous definitions, the Rule also creates three sets of so-called "rebuttable presumptions" that stand in obvious direct conflict with the statute. First, the Rule claims there to be five indicators that a person is

---

[22] Such elevation of expediency over justice also characterizes ATF's "zero tolerance" FFL revocation policy, which automatically *presumes* certain regulatory violations to be willful, bypassing statutory revocation procedures to close more gun dealers (and seize more records) than ever before. As GOA commented, the Rule must be understood in its greater context. *See* Ex. A at 83 ("all evidence points to the creation of an illegal (not to mention unconstitutional) federal registry of almost all gun owners nationwide"). Likewise, the Rule creates a Catch-22, where "ATF will *require* a person obtain a license in order to sell firearms, only then to *deny* that person the very license that ATF demanded be obtained." *Id.* at 58; *cf.* 89 Fed. Reg. at 29013 (acknowledging "license denial or revocation proceedings for willful violations," yet the Rule's entire premise is that thousands of gun owners are illegally engaging in the business (*i.e.*, willfully violating the law)) ATF's only response is that "ATF would need to have evidence," 89 Fed. Reg. at 28996, apparently claiming that it is unlikely that ATF would ever know that a person had been violating the new requirements contained in the Rule.

presumptively "engaged in the business as a dealer." 89 Fed. Reg. at 29091 ("EIB presumptions"). Second, the Rule claims that there are seven indicators that a person "has the intent to predominantly earn a profit." 89 Fed. Reg. at 29091–92 ("PEP presumptions"). Third, the Rule claims that there are six categories of "conduct that does not support a presumption" that a person is engaged in illegal activity. 89 Fed. Reg. at 29092. Lastly, the Rule says a person may use "reliable evidence … to rebut any presumption" from the first two categories.[23] *Id.*

ATF's presumptions are tied to civil and criminal implications that threaten to upend the entire system of private gun sales. ATF's assurance that these presumptions rest on its "experience" is of no matter, because "[p]resumptions, especially in administrative proceedings that may generate institution-destroying liability, cannot be a matter of [agency] *ipse dixit.*" *Career Colleges & Sch. of Tex. v. U.S Dep't of Educ.*, 98 F.4th 220, 251 (5th Cir. 2024). The problems with these various sets of presumptions are many. For starters, there is nothing in the statutes Congress enacted[24] that creates or permits the creation of such presumptions of unlawful activity.[25] As noted

---

[23] The Rule claims that all of these presumptions are permissible because of ATF's "enforcement efforts, regulatory functions, knowledge of existing case law, and subject-matter expertise. . . ." 89 Fed. Reg. at 28975; *see also* 89 Fed. Reg. at 28981 (citing "ATF's experience"). In other words, 'we know best' is ATF's rationale for subjecting countless gun owners to high-stakes enforcement actions. On the contrary, "the argument for agency expertise and judgment does not get [the ATF] very far," as "falling back on unexplained claims of agency expertise does not carry the [ATF's] burden" under the APA. *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023).

[24] Congress knows how to create such presumptions when it wants. *See, e.g.*, 18 U.S.C. § 1469(a); 18 U.S.C. § 3142(e)(2); 35 U.S.C. § 282(a); 38 U.S.C. § 1118.

[25] In response to the many comments that ATF lacked authority to promulgate presumptions in the first place (89 Fed. Reg. at 29011-12), the Rule notes that ATF may "promulgate regulations necessary to enforce the provisions of the GCA, and a regulation that clarifies when a license is required is such a regulation." 89 Fed. Reg. at 29012; *see* 18 U.S.C. § 926(a). But that means the presumptions are *necessary* to comprehend the statute, yet Congress never enacted them. *See* Ex. A at 8-11. Had Congress intended to authorize an action so significant, it would have done so expressly. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (providing under the major questions doctrine that agency actions with "'economic and political significance' … provide a 'reason to hesitate before concluding that Congress' meant to confer such authority").

above, these presumptions sweep into their ambit a whole host of *lawful* activity, tainting all sorts of innocuous conduct with presumed criminality – something the Rule repeatedly acknowledges. In order to combat such a wrongful allegation of unlawful dealing, the Rule saddles gun owners with the unprecedented obligation to affirmatively *demonstrate* that they are *not* violating the statute. The presumptions thus fundamentally alter the statute, which previously required ATF to prove unlawful dealing before bringing action, to now permitting ATF to make presumptions in order to begin proceedings and later force the gun owner to defend (or else).

Nor is there any ambiguity in the statutory text requiring the presumptions, something ATF previously has acknowledged. Expressly declining to "list examples" of prohibited conduct in 1998, ATF claimed that "the [statutory] definition adequately addresses this concern by expressly delineating the activity requiring licensing from that of a firearms collector not subject to licensing." Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480, 10481 (March 31, 1988) (to be codified at 27 C.F.R. pts 72,178 & 179). The Rule gives no reason that the same statute is now inadequate. The Fifth Circuit, too, has rejected the approach taken in the Rule, explaining that a charge of unlawful dealing requires "examin[ation of] <u>all circumstances</u> … without the aid of a 'bright-line rule.'" *United States v. Brenner*, 481 F. App'x 124, 127 (5th Cir. 2012) (emphasis added); *see also* 89 Fed. Reg. at 29016 ("the determination of whether a person is engaged in the business is a fact-specific inquiry."). But the Rule creates such bright-line rules anyway, under which a person is *presumed* to be dealing based on a single data point,[26] and *without examination* of other facts (which presumably must then be offered as "reliable evidence" in rebuttal).

---

[26] The NRPM, in fact, accidentally said the quiet part out loud, treating the purported "presumptions" as conclusive, and opining that anyone falling into any of the presumptions is "thus require[d]" to obtain a license. 88 Fed. Reg. at 61996.

A. **The EIB Presumptions Are Flawed.**

In addition to this cornucopia of general, overarching problems with the Rule's presumptions, the specifics of the presumptions themselves are arbitrary – either indistinguishable from lawful conduct, or in direct conflict with the statutory text. *See generally* Ex. A at 37-42. Numerous examples bear out these realities. The first EIB presumption states that a person is presumptively EIB if he "offers for sale" or "demonstrates a willingness and ability to purchase and resell" firearms. 89 Fed. Reg. at 29091. But as noted above, the statute requires *actual* purchases *and* resales, not merely offers or willingness. The second EIB presumption also conflicts with the statute, making presumptively unlawful anyone who "purchases ... *or* ... resells" various types of firearms. But again, the statute says "purchase *and* resale."[27] The third EIB presumption, reselling firearms "within 30 days after ... purchase[]," fails to acknowledge that, because of the uniquely personal nature of carrying a firearm for self-defense, gun owners *routinely* purchase and then resell firearms that do not fit their body type, do not feel good in the hand, do not function reliably, *etc.* Ex. A at 39-40. ATF acknowledges these "common scenarios," but opines without explanation that this could only reasonably happen once. 89 Fed. Reg. at 29031. This third EIB presumption also makes presumptively unlawful selling firearms "new or like new in their original packaging" or of "the same make and model," unless the firearms have been held by the owner for more than a year.[28] But this rule, in which the right to dispose of one's property does not fully vest for one year, is not even fixed in stone. Rather, the Rule's preamble (not the Rule itself) states

---

[27] "In statutory interpretation, we have three obligations: '(1) Read the statute; (2) read the statute; (3) read the statute!' Henry J. Friendly, Benchmarks 202 (1967) (attributing the treble commandment to Justice Frankfurter)." *United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020).

[28] ATF added this part in response to GOA's criticism that this presumption, along with the fourth presumption on selling "the same make and model," contained no "temporal limitation." Exhibit A at 41.

that the one-year safe harbor does not apply if a person "intentionally stockpiles" firearms and then waits one year to resell them. 89 Fed. Reg. at 29016. In other words, the presumption applies, unless it does not, except to the extent that it does. No ordinary person could even uncover these nuanced details hidden in the Rule's preamble,[29] much less decipher whether their conduct is lawful.

### B.  The PEP Presumptions Are Flawed.

Like the EIB presumptions, the Rule's PEP presumptions are flawed. Each assumes that certain forms of behavior or activity constitute an unlawful *intent* to earn a profit (unless proven otherwise). But as noted above, ATF fails to recognize that the statute requires *actual* profit from *actual* purchases and resales, *and* that the intent underlying that profit come from an impermissible motivation. *See supra* at 22–23. But even so, the first and second PEP presumptions[30] take these defects one step further, implicating those who "[r]epetitively or continuously … post firearms [online] for resale" or secure for value "space to display firearms … for resale. . . . " 89 Fed. Reg. at 29091. But because the Rule defines "resale" not as a business term of art[31] but as any sale of "a

---

[29] *See Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992, 998 (10th Cir. 2019) ("the limitations that appear in the preamble do not appear in the language of the regulation, and we refuse to engraft those limitations onto the language."). *See also Wilgar Land Co. v. Dir., OWCP*, 85 F.4th 828, 837 (6th Cir. 2023) ("While a preamble's interpretation of regulations may help clarify any ambiguity in them, an agency cannot use preambles to add substantive duties that the regulations themselves do not contain.").

[30] The NPRM would have dinged a gun owner for posting even a single firearm for sale to an online forum. *See* Ex. A at 42-43. The Rule thus now adds the words "repetitively or continuously." 89 Fed. Reg. at 29047, 29091; *see also* 89 Fed. Reg. at 29047 (admitting that people "who wish to dispose of all or part of a personal collection, or 'trade up' … are likely to occasionally offer for resale firearms from their personal collection online").

[31] Indeed, "embedded within the word 'resale' is a contemporaneity requirement, instructing that firearm purchases and resales must be linked together within a short enough timeframe of each other to constitute business activity. … Take, for example, a rare coin dealer that charges a 'margin' on each product sold, with the price determined not by the dealer's basis in that product, but in the *replacement cost* of obtaining another one in the marketplace." Exhibit A at 16-18. This reading of the term is the only one that makes sense in

firearm … after it was previously sold" (89 Fed. Reg. at 29090), these PEP presumptions eviscerate the statute's explicit protection of people "who sell[] all or part of [their] personal collection of firearms," who often do so incrementally (*i.e.*, listing firearms "repetitively") and with help from gun-show venues. 18 U.S.C. § 921(a)(21)(C); *see* Ex. A at 43. The same issues plague the third presumption, which punishes diligent recordkeeping once the Rule's loose "resale" definition takes effect. 89 Fed. Reg. at 29091; *cf.* Ex. A at 43-44.

Next, the fourth PEP presumption implicates businesses that "secure[] merchant services … through which the person intends to repetitively accept payments for firearms transactions." 89 Fed. Reg. at 29091. As GOA commented, this presumption could apply to anyone, with any sort of business, who allows a person to pay for a firearm through the business. Ex. A at 45. And just "repetitively accept[ing] payments" for firearm sales does not make someone a dealer – for example, someone who sells off an inherited collection. By demurring that "[p]rivate citizens generally do not sign up for credit card processing services" (89 Fed. Reg. at 29049) the Rule misses this nuance entirely – that the presumption reaches businesses *unrelated to firearms* that may accept payments for firearms.[32, 33]

---

context. The Rule's definition, by contrast, merely defines the word "resale" in a vacuum. Indeed, the Rule's all-encompassing "resale" definition places its PEP presumptions in direct conflict with its opposite presumptions, one of which purports to "not … presume[]" EIB when one liquidates their personal collection. Fed. Reg. at 29092. The Rule never attempts to reconcile this conflict.

[32] But by acknowledging that this presumption does not necessarily make a person a dealer (89 Fed. Reg. at 29049), it is unclear why such conduct must be a presumption in the first place. Further unclear is how a presumption can admittedly sweep up lawful activity while simultaneously not being "overbroad." *See id.*

[33] The Rule also ignores current technology, like Cash App, Venmo, PayPal, and Apple Pay which, contrary to what ATF believes, allows "private citizens" to accept credit cards through commonly used smartphone apps.

The fifth PEP presumption affects businesses that "secure[] business security services … to protect firearms assets and repetitive firearms transactions." 89 Fed. Reg. at 29091. But such overbroad wording means security companies whose premises have security systems, and who routinely buy and sell firearms for use in the regular course of their business – like Brink's and GardaWorld – would be forced to defend against charges of unlawful dealing. It appears Plaintiffs' comments fell on deaf ears. Ex. A at 45-46. The Rule's sixth PEP presumption fails for similar reasons, reaching security companies that purchase and sell firearms for employee use.

C. **The** Rule's Opposite Presumptions Eviscerate the Statute's Safe Harbor.

After sweeping all manner of lawful conduct into its atextual EIB and PEP presumptions, the Rule adds insult to injury by reducing explicit statutory safe harbors into mere instances where "[a] person shall not be presumed to be engaged in the business," but only if "reliable evidence" so indicates. *Compare* FR 29092 (providing seven total 'opposite' presumptions), *with* Ex. A at 40–47. In stark contrast, the statute provides that a "dealer" definitively (not presumptively) "*shall not include* a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby. . . . " 18 U.S.C. § 921(a)(21)(C) (emphasis added). The Rule neuters this exemption, claiming "[a] person shall not be presumed to be engaged in the business … when reliable evidence shows that the person is only reselling or otherwise transferring firearms … [o]ccasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection. . . . " 89 Fed. Reg. at 29092. In other words, the Rule reads the statute two degrees removed from its text. As Plaintiff GOA commented, "there is a massive difference between being ***declared not*** in violation of federal law (*i.e.*, the statute), versus being ***presumed not*** in violation of federal law, versus ***not being presumed*** in violation of federal law

(what the [Rule] says)." Ex. A at 47-48. Indeed, "[t]he meaning has changed, the protection has changed, and the burden of proof has changed." *Id.* at 48.[34] ATF has no authority to revise the statute to its watered-down liking.

**III.    The Rule's "Former Licensee Inventory" Is Atextual Revisionism that Contravenes the Statute.**

As for licensure as a dealer in firearms, there are two types of individuals under the Gun Control Act – those who *are* licensed dealers, and those who *are not* (everyone else). 18 U.S.C. § 923(c); Ex. A at 32. Not so, according to the Rule. Rather, the Rule purports to create a 'third rail' of "former licensee," purports to establish and define "a new term" ATF calls "former licensee inventory" (89 Fed. Reg. at 28969, 29090), and purports to create special rules that apply to firearms owned by formerly licensed (*i.e.*, *unlicensed*) persons, but which do not apply to the public at large. The Rule also creates various "presumptions" of dealing that apply only to *former* licensees. 89 Fed. Reg. at 29091. The Rule claims this all is necessary to deal with "the problem of licensees who improperly liquidate their business inventory … after their license is terminated. . . ." 89 Fed. Reg. at 28969. The only problem is that the statutory text supports none of this. *See* Ex. A at 31-34.

Focusing on *whether, how, and when* firearms were transferred to a personal collection before becoming unlicensed, the Rule creates – out of whole cloth – several idiosyncratic categories of firearms owned by "former licensees." First, the Rule says that, if firearms were lawfully

---

[34] The Rule insists that "[a]gencies may adopt evidentiary presumptions provided that the presumptions shift the burden of production, not the burden of persuasion [*i.e.*, proof]. . . ." 89 Fed. Reg. at 29007. But the Rule simultaneously demands "reliable evidence" for an opposite presumption to apply. *Id.* No doubt, this "reliable evidence" will not come from the government. Rather, in the real world, an accused will have to *prove their own compliance* with the statute to avoid liability.

transferred to a personal collection *prior* to license termination, they may not be sold until "[o]ne year has passed." 89 Fed. Reg. at 29091 (EIB presumption #5(ii)). But the statute contains no such requirement. Rather, Section 923(c) by its plain text applies only to "any firearm … disposed of *by a licensee* within one year after its transfer from his business inventory." (Emphasis added.) ATF has no authority to expand this requirement to "*former* licensees." Second, under the Rule, if a licensee transferred firearms to a personal collection *prior* to license termination, but did so "to willfully evade" federal law, then such firearms *may never be transferred* by the "former licensee." 89 Fed. Reg. at 29091 (EIB presumption #5(i)). But while that past conduct may have been unlawful, the mere possession of firearms that *previously* were unlawfully transferred does not taint the firearms themselves or support a presumption that unlawful dealing continues. Third, the Rule creates an impossible category of firearms that "were in the business inventory at the time the license was terminated" and were never transferred to a personal collection. 89 Fed. Reg. at 29091. According to the Rule, these firearms remain forever in purgatory, and any attempt to transfer them leads to the presumption of unlawful dealing. *Id.* ATF's theory here is that the EIB "purchase[s]" occurred while licensed, while the EIB "resale[s]" occurred after licensure. 89 Fed. Reg. at 29051, 29090. On the contrary, as GOA explained, purchases *while licensed to engage in the business* cannot serve as a predicate offense for a charge of *unlicensed* dealing. Ex. A at 31-34. Rather, if a "former licensee" merely sells inventory acquired while licensed to do just that, the statute permits that activity. 18 U.S.C. § 921(a)(21)(C). GOA also pointed out the untenable situation created by these presumptions, such that certain firearms *can never change ownership*. Ex. A at 32-33.

The Rule acknowledges and notes that "the former licensee … [is] placed in a difficult situation," but ultimately discounts the problem so that "such persons [cannot] unjustly profit from their illegal actions." 89 Fed. Reg. at 29051; *see also* 89 Fed. Reg. at 29035 (lamenting that *former* licensees cannot be "immune" from the provisions governing licensees). The Rule attempts to bridge the gap by digging the hole deeper, fabricating a new "reasonable 'winding down' period" of "30 days of termination of license" during which a "former licensee" can still liquidate inventory in certain ways.[35] FR 29052. But after that period has expired, ATF is finally forced to admit that a "former licensee[] …. cannot easily sell" firearms he possesses "without … engaging in the unlicensed business of dealing. . . ." *Id.* This cannot be the law.[36]

## IV. The **Rule Violates the Second Amendment.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." This "unqualified command" contains no limitation as to who may exercise the right, what arms may be owned or carried, where the right may be exercised, or for what purpose. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). The right therefore belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," presumptively protects

---

[35] Within 30 days of license termination or as otherwise approved, a former licensee either must transfer their firearms inventory (1) to another licensee, or (2) to a responsible person of the former licensee, but "such transfer … does not negate the fact that the firearms were repetitively purchased, and were purchased with the predominant intent to earn a profit by repetitive purchase and resale." 89 Fed. Reg. at 29092. The Rule never addresses the statutory basis for the 30-day liquidation requirement. *See* 89 Fed. Reg. at 29051-53; *cf.* Ex. A at 33.

[36] FFL revocations have exploded 3,040% since the ATF announced its "zero tolerance" policy, where it identified five "qualifying violations which . . . "will result in ATF issuing a notice of revocation . . . " for the FFL's license to be a dealer. *See Enhanced Regulatory Enforcement Policy*, ATF, https://www.atf.gov/rules-and-regulations/enhanced-regulatory-enforcement-phttps://www.atf.gov/rules-and-regulations/enhanced-regulatory-enforcement-policy olicy

all locations, and presumptively covers all "lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 581-582 (2008); *Bruen*, 597 U.S. at 31; *Heller*, 554 U.S. at 624. And "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, … the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17.

Here, Plaintiffs enjoy a presumption of constitutional protection under the Second Amendment's plain text. By exposing Plaintiffs to civil and criminal liability for engaging in the purchase and sale of firearms – natural prerequisites to keeping and bearing them – the Rule regulates conduct that the Second Amendment clearly protects.[37] *See, e.g.*, *Lynchburg Range & Training, LLC v. Northam*, 105 Va. Cir. 159, 3 (2020)(observing "the right to keep and bear arms 'inclu[des] the otherwise lawful possession, carrying, transportation, sale, or transfer of firearms'"); *Kole v. Village of Norridge*, No. 11 C 3871, 2017 WL 5128989, at *10 (N.D. Ill. Nov. 6, 2017) (citing "Thomas Jefferson … 'Our citizens have always been free to make, vend, and export arms.'"). Defendants therefore bear the burden of proving a widespread, Founding-era tradition of regulation distinctly similar[38] to the Rule. *See Bruen*, 597 U.S. at 26. Indeed, "the core Second

---

[37] Moreover, any *Heller* dicta on which Defendants may rely is inapposite. GOA already addressed the inapplicability of *Heller*'s dicta on "conditions and qualifications on the commercial sale of arms," explaining that *Heller* had invited future challenges to its assumed traditions and that *Bruen* had made no exceptions to use of its rigorous standard. Ex. A at 65, 66. Plus, private sales are not commercial at all, rendering *Heller*'s dicta doubly inapplicable. *Id.* at 66.

[38] The Rule claimed that it need only show "relevantly" similar history, omitting any mention of *Bruen*'s discussion of *distinct* similarity or why the Rule's perceived societal ills would qualify for a loosening in analogical stringency. 89 Fed. Reg. at 29002.

Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.*" Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (internal quotation marks omitted). To this end, courts have held the ability to sell a firearm is protected under the Second Amendment. *See, e.g.*, *Reese v. BATFE*, 647 F. Supp. 3d 508, 521 (W.D. La. 2022); *Altman v. County of Santa Clara*, 464 F. Supp. 3d 1106, 1125 (N.D. Cal. 2020); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), *abrogated on other grounds as recognized by Range v. Att'y Gen. U.S.*, 69 F.4th 96 (3d Cir. 2023).

Based on the historical analysis provided in the Rule, Defendants have already failed. First, the Rule identified a 1794 law that "made it unlawful *for a limited period*" to *export* weapons from the United States. 89 Fed. Reg. at 29002 (emphasis added). But exportation of arms to *foreigners* bears no resemblance to restrictions on citizen-to-citizen transfers and fails *Bruen*'s "how" and "why" metrics. *See Bruen*, 597 U.S. at 29. Moreover, "short lived" and "transitory" "restrictions deserve little weight." *Id.* at 69. Second, the Rule cited the Ninth Circuit's decision in *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017), for the proposition that colonial governments placed "restrictions on the commercial sale of firearms." 89 Fed. Reg. at 29003. But the page the Rule cited only discussed prohibitions on the provision of arms *to Indians* (not then considered part of the community), another inapposite historical concern. *See Teixeira*, 873 F.3d at 685. Third, the Rule cited 1805 Massachusetts and 1821 Maine barrel "proving" laws, which fail *Bruen*'s "how" and "why" as product *quality control* measures, not attempts to impose *dealer* licenses on individuals. 89 Fed. Reg. at 29003. Fourth, the Rule cited multiple state laws that regulated the storage of gunpowder for fire safety, another "how" and "why" mismatch. 89 Fed. Reg. at 29003

nn.151-152. Finally, the Rule cited just *two* laws from 1875 and 1879 that required licensing of arms dealers. *Id.*. Of course, "19th-century evidence [i]s 'treated as mere confirmation of what the Court thought had already been established'" and "cannot overcome or alter th[e] text" when inconsistent with earlier history. *Bruen*, 597 U.S. at 37, 36. All told, the Rule's analogues are too few, too late, and too dissimilar to support Defendants' historically unprecedented action today.

Requiring such licensure of hundreds of thousands of ordinary Americans merely to sell personal firearms cannot comport with early American historical tradition. In fact, in 1777, when it appeared the British were poised to win the American Revolution, British Colonel Undersecretary William Knox drafted a plan called *What Is Fit to Be Done with America?* to prevent any future rebellions. David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 Harv. L. Rev. F. 230, 235 (2014). In relevant part, the plan stated, "the Arms of all the People should be taken away … nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence." *Id.* In other words, the licensing of gun sellers is a uniquely 20th-century invention without a historical analogue. ATF fails to shoulder its burden showing otherwise. Thus, the Rule violates the Second Amendment.

## V.    The **Rule Violates the Fourth Amendment.**

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." By requiring untold thousands of gun owners to seek licensure in order to avoid criminal liability when

selling portions of their personal collections, the Rule unconstitutionally subjects all these new, home-based licensees to the GCA's warrantless inspection regime. *See* Ex. A at 66-69. That is because, when deployed *en masse*, the GCA's purported constitutional basis for conducting warrantless administrative searches must fail. Indeed, as the Supreme Court observed, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357 (1967). Consequently, the so-called "highly regulated industry" exception to the warrant requirement must be, and "has always been[,] a _narrow_ exception" that cannot "swallow the Rule." *City of Los Angeles v. Patel*, 576 U.S. 409, 424-425 (2015) (emphasis added).

But the Rule does just that. Moreover, the "highly regulated industry" exception's constitutional validity remains suspect after *Bruen*, as the Supreme Court conceded in *United States v. Biswell*, that "[f]ederal regulation of the interstate traffic in firearms is _not as deeply rooted_ in history as is governmental control" of other traditionally regulated industries. *United States v. Biswell*, 406 U.S. 311, 315 (1972) (emphasis added). Thus, after *Bruen*, the modern Court would probably not decide *Biswell* similarly today. Ex. A at 68. Because of that lack of historical example, the Rule cannot purport to apply the "highly regulated industry" exception to hundreds of thousands of ordinary Americans who have no desire or intent to enter the industry at all.

ATF failed to respond to GOA on this issue. *See* 89 Fed. Reg. at 29003-04. Conceding "more persons who are already engaged in the business of dealing in firearms [must] becom[e] licensed" (89 Fed. Reg. 28968), the Rule implicitly admitted there *could* be Fourth Amendment issues for home-based licensees. *See* 89 Fed. Reg. at 29004 ("'An expectation of privacy in commercial premises … is different from, and indeed less than, a similar expectation in an

individual's home.'"). Even so, the Rule doubled down, engaging in *Katz* circularity by claiming "every applicant for a license is made aware of ATF's right of entry into their premises and examination of their records ... thus there can be no reasonable expectation of privacy. . . ."[39] *Id.* In other words, according to the Rule, if the government announces 'no privacy' in any given area of life, the public can no longer expect privacy, and the Fourth Amendment has nothing to say. The highly regulated industry exception to the Fourth Amendment is of questionable continuing validity when it comes to the Second Amendment. Even so, the Rule cannot use that "narrow exception" to extend federal licensing to hundreds of thousands of ordinary Americans who happen to sell a few personal firearms.

## VI.    The **Rule Violates the Separation of Powers.**

Article I, Sections 1 and 7 of the Constitution explain the way the legislative power is exercised and bills become law. And as the Supreme Court recently reminded in *United States v. Davis*, "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019) Violating that principle, the Rule charts a different course, allegedly promulgated "in light of the BSCA's changes to the GCA *and to provide additional guidance*. . . ."89 Fed. Reg. at 28973 (emphasis added). ATF claims that "advancements in manufacturing ... and distribution technology ... and changes in the marketplace for firearms ... have *created a need for further clarity* in the regulatory definition of 'dealer.'" *Id.* (emphasis added).

In other words, ATF believes the law needs updating *beyond* what the BSCA accomplished.

---

[39] This is also somewhat of a strawman, reframing the privacy issue to the contents of records rather than the fact that a home is being searched.

But even if so, that is the job of the people's representatives in Congress – not unelected bureaucrats. *See* 89 Fed. Reg. at 29010. Indeed, "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law." *Wis. Central Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018); *see also Martinez v. Tyson Foods, Inc.*, 533 F. Supp. 3d 386, 393 (N.D. Tex. 2021) (citation omitted) ("We do not inquire what the legislature meant; we ask only what the statute means."); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325-28 (2014) ("[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms . . . . to suit its own sense of how the statute should operate[,] . . . [which] should have alerted [it] that it had taken a wrong interpretive turn."). Agencies cannot edit statutes at will, either to fit their own policy agendas, or to give meaning to some alleged "purpose" or "intent" that bureaucrats believe they have divined from a prior Congressional enactment. *See Gordon v. NovaStar Mortg., Inc.*, 524 F.3d 1175, 1188 (11th Cir.) ("[w]e interpret and apply statutes, not congressional purposes"), *revised on other grounds*, 529 F.3d 1026 (11th Cir. 2008); Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 56 (2012) ("purpose must be derived from the text, not from . . . an assumption about the legal drafter's desires"). Moreover, the fact that Congress so recently enacted the BSCA – choosing *not* to provide the "additional guidance" or "further clarity" the Rule claims to provide – confirms that ATF has wandered off the congressionally chartered path.[40]

---

[40] Two of the BSCA's most ardent supporters – Senators Cornyn and Tillis – provide further confirmation that the Rule contravenes congressional intent. Indeed, both Senators "plan to oppose the new rule using the Congressional Review Act" and have announced that "the vast majority of this rule has nothing to do with the BSCA. . . . " Zachary Folk, *Biden Closes 'Gun Show Loophole' – Here's What to Know and When*

41

The Rule does not exist in a vacuum. Rather, it is the latest of a series of ATF attempts to amend congressionally enacted statutes (without involvement of Congress) at the behest of presidential administrations. *See* Bump-Stock-Type Devices, 83 Fed. Reg. 66514 (Dec. 26. 2018) (to be codified at 27 C.F.R pts. 447, 478, & 479); 87 FR 24652 (unfinished frames and receivers); Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478 (Jan. 31, 2023) (to be codified at 27 C.F.R. pts. 478 & 479) And each time Congress cracks the door, ATF kicks it in.[41] Yet each time the ATF has pulled such shenanigans, the Fifth Circuit has struck down the Rule. *See Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (bump stocks); *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023) (unfinished frames and receivers); *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023) (pistol stabilizing braces). Likewise, this Court should strike down ATF's most recent attempt to amend federal gun laws without involving Congress.

### E. Plaintiffs Will Suffer Irreparable Harm if the Rule Takes Effect.

By virtue of the Rule's numerous statutory and constitutional defects, Plaintiffs suffer a variety of irreparable harms that necessitate injunctive relief. Here, Plaintiffs need not even "demonstrate that harm is inevitable and irreparable," but only that there is "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Plaintiffs more than meet this standard. First, under the Rule, Plaintiffs are threatened with administrative

---

*Rule Comes into Effect*, Forbes, https://www.forbes.com/sites/zacharyfolk/2024/04/11/biden-closes-gun-show-loophole-heres-what-to-know-and-when-rule-comes-into-effect/?sh=89dcf6a19ed8 (Apr. 11, 2024).

[41] *See, e.g.*, Benjamin Hardy et al., *Illegal Guns Sales Led to Fatal ATF Raid on Airport Director Malinowski's Home, Affidavit Says*, Ark. Times (Mar. 21, 2024), https://arktimes.com/arkansas-blog/2024/03/21/judge-unseals-documents-in-malinowski-case (reporting on ATF's fatal dawn raid of the home of an Arkansas airport executive accused of "engaging in the business"). It would appear that, by promulgating the Rule, ATF desires to increase the frequency of these sorts of interactions.

and even criminal enforcement actions for engaging in noncommercial conduct that is entirely lawful under the statute. Plaintiffs likewise cannot dispose of firearms from their personal collections for fear of being presumed engaged in the business. *See* Tormey Dec. ¶ 18. Nor can so-called "former licensees," whose "inventory" now constitutes frozen assets incapable of seeing a realization of value. *See* Pratt Dec. ¶ 22–24. These compliance costs, in addition to the costs accrued by those now seeking licensure to avoid liability, "are unrecoverable because of the government-defendant's sovereign immunity from monetary damages. . . ." *NRA of Am., Inc. v. BATFE*, No. 3:23-CV-1471-L, 2024 U.S. Dist. LEXIS 57557, at *25 (N.D. Tex. Mar. 29, 2024). Such "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Id.*; *see also Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) ("complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs."). Second, because the Rule also violates the Second, Fourth, and Fifth Amendments, "irreparable harm occurs whenever a constitutional right is deprived, even for a short period of time." *Def. Distributed v. U.S. Dep't of State*, 865 F.3d 211, 214 (5th Cir. 2017) (Elrod, J. dissenting)

### F.  The Balance of Equities and Public Interest Overwhelmingly Favor Plaintiffs.

When the government is a party, the balance-of-equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A court therefore must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). As the Fifth Circuit held in *VanDerStok v. Garland*, No. 23-10718, 2023 U.S. App. LEXIS 26499, at *6 (5th Cir. Oct. 2, 2023), "both the balance of equities and the public

interest weigh in favor of allowing orderly judicial review of the Rule before anyone shuts down their businesses or sends them to jail." Given that the Rule seeks to upend this Nation's tradition of private sales, and to make what was once lawful behavior uncertain and illegal, the balance of equities tips sharply in Plaintiffs' favor, requiring an injunction to maintain the status quo. Finally, the vindication of constitutional rights is always in the public interest. *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1100 (5th Cir. 2023) ("Our precedent similarly establishes that injunctions protecting First Amendment rights 'are always in the public interest.'"); *see also Bruen*, 597 U.S. at 70 (Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

## CONCLUSION

For the foregoing reasons, this Court should temporarily enjoin Defendants from enforcing the Rule.

44

Date: May 2, 2024

Respectfully submitted.

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**RYAN D. WALTERS**
Chief, Special Litigation Division

*/s/Garrrett Greene*
**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217

**KATHLEEN T. HUNKER**
Special Counsel
Texas Bar No. 24118415

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
garrett.greene@oag.texas.gov
kathleen.hunker@oag.texas.gov

**COUNSEL FOR PLAINTIFF STATE OF TEXAS**

**LYNN FITCH**
Attorney General of Mississippi

*/s/Justin L. Matheny*
**JUSTIN L. MATHENY** (MS Bar 100754)
Deputy Solictor General
**OFFICE OF THE ATTORNEY GENERAL**
P.O Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
Fax: (601) 359-2003
justin.matheny@ago.ms.gov

**COUNSEL FOR PLAINTIFF STATE OF MISSISSIPPI**

**ELIZABETH B. MURRILL**
Attorney General

*/s/J. Benjamin Aguiñaga*
**J. BENJAMIN AGUIÑAGA***
Solicitor General

**LOUISIANA DEPARTMENT OF JUSTICE**
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel: (225) 506-3746
aguinagab@ag.louisiana.gov

**COUNSEL FOR PLAINTIFF THE STATE OF LOUISIANA**
*Admission To NDTX Pending

| | |
|---|---|
| SEAN D. REYES<br>Utah Attorney General<br><br>*/S/ Andrew Dymek*<br>ANDREW DYMEK*<br>Assistant Solicitor General<br><br>UTAH OFFICE OF THE ATTORNEY GENERAL<br>350 North State Street, #230<br>P.O. Box 142320<br>Salt Lake City, Ut 84114-2320<br>Tel.: 801-366-0533<br>adymek@agutah.gov<br><br>COUNSEL FOR PLAINTIFF STATE OF UTAH<br>*Admission To NDTX Pending | */s/ Stephen D. Stamboulieh*<br>STEPHEN D. STAMBOULIEH<br><br>STAMBOULIEH LAW, PLLC<br>NDTX#: 102784MS<br>MS Bar No. 102784<br>P.O. Box 428<br>Olive Branch, MS  38654<br>(601) 852-3440<br>stephen@sdslaw.us<br><br>COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE |
| */s/ John I. Harris III**<br>JOHN I. HARRIS III (TN # 12099)<br><br>SCHULMAN, LEROY & BENNETT PC<br>3310 West End Avenue, Suite 460<br>Nashville, Tennessee 37203<br>(615) 244 6670 Ext. 111<br>Fax (615) 254-5407<br>jharris@slblawfirm.com<br><br>COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE<br>*Admission to NDTX pending | */s/ Brandon W. Barnett*<br>BRANDON W. BARNETT<br>Texas Bar No. 24053088<br><br>BARNETT HOWARD & WILLIAMS PLLC<br>930 W. 1st St., Suite 202<br>Fort Worth, Texas 76102<br>817-993-9249 (T)<br>817-697-4388 (F)<br>barnett@bhwlawfirm.com<br><br>LOCAL COUNSEL, COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE |

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 2, 2024 and that all parties will be served with the Original Complaint via certified mail and process server.

*/s/Garrrett Greene*
**GARRETT GREENE**