

# NO UNIVERSAL REGISTRATION CHECKS

Docket No. ATF 2022R-17
Definition of "Engaged in the Business" as a Dealer in Firearms

Gun Owners of America
and
Gun Owners Foundation

8001 Forbes Place, Suite 202
Springfield, VA 22151






## Table of Contents

**December 2023**
Gun Owners of America
Gun Owners Foundation
Tennessee Firearms Association
Virginia Citizens Defense League



**INTRODUCTION** ................................................................... 1

**BACKGROUND** ..................................................................... 2
STATUTORY HISTORY.......................................................... 2
ENACTMENT OF BIPARTISAN SAFER COMMUNITIES ACT.. 6
ATF'S NOTICE OF PROPOSED RULEMAKING ........................... 6

**ATF'S REVISIONS CONFLICT WITH STATUTORY TEXT**........... 8
RULE DEFINES WHAT IS ALREADY DEFINED.......................... 8
ATF IGNORES STATUTORY REQUIREMENTS ......................... 11
ATF EDITS OUT "PROOF OF PROFIT".................................. 19
POOR DEFINITION OF "PERSONAL COLLECTION" .............. 24
ATF REWRITES DEFINITION OF "RESPONSIBLE PERSON" ... 28
ATF RULES FOR FORMER LICENSEES CONFLICT ................... 31

**"PRESUMPTIONS" PENALIZE INNOCUOUS CONDUCT** ......... 34
ATF'S "PRESUMPTIONS" CONFLICT WITH STATUTE ........... 34
ATF'S PRESUMPTIONS ARE ARBITRARY.................................. 37
"PREDOMINANTLY EARN A PROFIT" PRESUMPTIONS ......... 42
ILLOGICAL OPPOSING PRESUMPTIONS ................................... 47

**ATF EXCEEDS STATUTORY AUTHORITY, INVENTS CRIMES** .. 51
NO FEDERAL "ATTEMPT" CRIME ................................ 51
NO "CONSPIRACY" CHARGES ...................................... 54
ATF IS TRYING TO MISLEAD CRIMINAL JURIES ................... 56
ATF'S CATCH-22: REQUIRING & DENYING LICENSURE ...... 58

**ATF'S STATUTORY REVISIONS VIOLATE CONSTITUTION**...... 60
RULE VIOLATES THE FIRST AMENDMENT ............................. 60
RULE VIOLATES THE SECOND AMENDMENT ......................... 62
RULE VIOLATES THE FOURTH AMENDMENT......................... 66
OTHER CONSTITUTIONAL CONCERNS ................................... 69
ATF UNDERESTIMATES REGULATORY BURDEN, COST ...... 70

**NOTICE AND COMMENT PERIOD** ............................................. 80

**FLIP-FLOPPING UNDERMINES NEW RULE** ............................. 81

**CONCLUSION** ........................................................................ 83

## I.    Introduction

On September 8, 2023, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") published a "Notice of Proposed Rulemaking" in the Federal Register, entitled "Definition of Engaged in the Business as a Dealer in Firearms," 2022R-17, 88 FR 61993 ("NPRM").  ATF has sought public comment on its proposal by December 7, 2023.  These comments are submitted on behalf of Gun Owners of America, Inc., Gun Owners Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, Inc., and Virginia Citizens Defense League (together, "Commenters").

**Gun Owners of America, Inc.** ("GOA") is organized and operated as a nonprofit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code ("IRC").  GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners and has become one of the nation's leading Second Amendment advocacy organizations, with more than two million members and supporters nationwide.  **Gun Owners Foundation** ("GOF") is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the IRC.  GOF is supported by gun owners across the country.  **Tennessee Firearms Association** ("TFA") is organized and operated as a nonprofit membership organization that is exempt from federal income taxation under Section 501(c)(4) of the IRC.  TFA was formed in 1995 and incorporated in 1996 to restore, preserve and defend the rights of all citizens as protected by Second Amendment and the Tennessee Constitution.  TFA is the leading Second Amendment advocacy organization based in Tennessee.  **Tennessee Firearms Foundation, Inc.** ("TFF") is organized in Tennessee and operated as a nonprofit organization that is exempt from federal income taxation under Section 501(c)(3) of the IRC.  TFF was incorporated in 2023 to preserve,

1

protect and defend the Constitutionally protected rights of gun owners, including promoting and developing a greater understanding and awareness regarding the importance and benefits of firearms ownership. **Virginia Citizens Defense League** ("VCDL") is a nonprofit, nonpartisan organization, exempt from federal income taxation under Section 501(c)(4) of the IRC. VCDL is focused on a single issue – protecting and restoring the right to keep and bear arms.

Commenters submit these comments in response to ATF's request for public comment. As detailed below, the NPRM is arbitrary and capricious, contrary to law, and contrary to constitutional right. While purporting "to implement" the Bipartisan Safer Communities Act ("BSCA"), which became effective June 25, 2022, the NPRM in reality seeks to effect yet another unilateral policy change to implement the radical political agenda of a rabidly anti-gun administration, without any input from Congress. The NPRM should be repudiated and withdrawn, and Commenters stand ready to challenge any illegal and unconstitutional final rule that is finalized based on this flawed proposal.

## II.   Background

### A. Statutory History

Historically, the Federal Firearms Act of 1938 defined "dealer" to mean "any person engaged in the business of selling firearms or ammunition...."[1] In one of the only cases to interpret that phrase under the Federal Firearms Act, the Ninth Circuit discussed "shipment of guns to Tokyo," noting that the "guns were sold in two separate installments to two different people" and that the defendants "procure[d] … possible buyers for the guns," which supported a "finding that appellants were 'engaged in the business of selling firearms'...." *Kaneshiro v. United States*, 445 F.2d 1266, 1270 (9th Cir. 1971).

---

[1] https://tinyurl.com/2xeccfu4.

Congress later repealed the Federal Firearms Act, finding that "it had not provided adequate license fees or proper standards for the granting or denial of licenses and that this had led to licenses being issued to unqualified persons." *United States v. Gross*, 313 F. Supp. 1330, 1332 (S.D. Ind. 1970). However, in recodifying the Act's definition of "dealer" into the new Gun Control Act of 1968 ("GCA"), Congress defined the term "in somewhat the same manner as that definition appears in [the Federal Firearms Act]. *See* U.S. Code, Cong. & Admin. News, 90th Cong., 2d Sess., 1968, Vol. 2, p. 2201.[2]

Thus, the GCA defined "dealer" to mean "any person engaged in the business of selling firearms or ammunition at wholesale or retail"[3] but, like the FFA, did not further define what it meant to be "engaged in the business." That determination was left, for a time, to judicial interpretation, which resulted in varying holdings. For example, the district court in *Gross* held the definition required "no minimum number of sales, dollar volume of sales, or number of employees" to be considered "engaged in the business," but that "there should be no doubt in the minds of men of common intelligence that 'dealer' means one that is engaged in *any* business of selling, repairing or pawning firearms and that 'business' is that which occupies the time, attention and labor of men for the purpose of livelihood or profit." *Gross*, 313 F. Supp. at 1333.[4]

---

[2] https://tinyurl.com/4hp9yaxw.
[3] https://tinyurl.com/ykhzskhf.
[4] *See also United States v. Swinton*, 521 F.2d 1255 (10th Cir. 1975) (finding the sale of only one firearm and not making a profit to be sufficient); *United States v. Huffman*, 518 F.2d 80, 81 (4th Cir. 1975) (holding that the government "must show a willingness to deal, a profit motive, and a greater degree of activity than occasional sales by a hobbyist" but that the defendant need not actually have made a profit); *United States v. King*, 532 F.2d 505, 510 (5th Cir. 1976) ("'Dealing in firearms' is commonly understood as selling and/or trading in firearms, as well as acquiring firearms for sale by purchase and/or trade" while "'[b]usiness' is commonly understood to mean an activity engaging some of one's time, attention and effort and performed in expectation of profit or other benefit."); *United States v. Shirling*, 572 F.2d 532, 534 (5th Cir. 1978) ("We think the better reasoned view is that expectations of profit are not determinative of whether one is engaged

In 1979, ATF issued a notice of proposed rulemaking which proposed to define "engaged in the business," on the theory that the phrase was "not defined in the law or the regulations."  *See* 44 FR 75186, Advance Notice of Proposed Rulemaking (Dec. 19, 1979).  But in its proposal to define that phrase, ATF failed to identify a single court that had trouble defining or applying the phrase.  To the contrary, ATF's proposal acknowledged that "courts have continually found that the current situation is adequate for enforcement purposes...."  *Id.* at 75187.  On March 31, 1980, ATF extended the comment period for 30 days, *see* 45 FR 20930,[5] but no action was taken thereafter.  In other words, ATF ultimately decided not to define the phrase "engaged in the business."

In 1986, the McClure-Volkmer Firearm Owners' Protection Act ("FOPA"), Pub. L. No. 99-308, 100 Stat. 449, added a definition of "engaged in the business" to the statute – "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells  all or part of his personal collection of firearms."  FOPA further defined the term "with the principal objective of livelihood and profit" to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection."  FOPA was amended shortly thereafter, clarifying that "proof of profit" was not required "as to a person who engages

---

in the business of selling firearms."); *United States v. Day*, 476 F.2d 562, 567 (6th Cir. 1973) (affirming a conviction over "four separate sales over two months").
[5] https://tinyurl.com/6ywekaav.

in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism."[6]

As the Senate Committee on the Judiciary reported regarding the "engaged in the business" definition contained in the bill that would eventually become FOPA, "[l]ower courts have applied two different, but similar tests for 'engaging in the business.' Neither is especially clear, and both can be applied to a hobbyist to whom profit is a secondary objective." *See* 98th Congress, 2d Sess., Report 98-583 at 9, Aug. 8, 1984.[7] After laying out those two judicially-created tests, the report explained that Congress' intent was to "**substantially narrow** these broad parameters by requiring that the person undertake such activities as part of a 'regular course of trade or business with the principal objective of livelihood and profit.'" *Id.* (emphasis added).

On October 29, 1986, ATF adopted a Temporary Rule, 51 FR 39612, to implement FOPA, and invited comments.[8] Under the Temporary Rule, the phrase "engaged in the business" was defined to mirror FOPA's statutory language. On March 31, 1988, ATF adopted the regulatory definitions with no changes. *See* 53 FR 10480.[9] Importantly here, as to the definition of "engaged in the business," a commenter had requested "the definition list examples illustrating when a license is required," but **ATF declined to add examples** "since the definition adequately addresses this concern by expressly delineating the activity requiring licensing from that of a firearms collector not subject to licensing." *Id.* at 10481. But apparently that was then, and this is now.

---

[6] Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 (1986).

[7] https://tinyurl.com/4864jjjy.

[8] https://tinyurl.com/mrxftava.

[9] https://tinyurl.com/u9nyfveb.

### B.  Enactment of the Bipartisan Safer Communities Act

Thus, for more than half a century, from FOPA's addition of definitions in 1986 until enactment of the BSCA last year, 18 U.S.C. § 921(a)(21)(C) has stated, in part, that "engaged in the business" meant "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business **with the principal objective of livelihood and profit** through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."  Further, 18 U.S.C. § 921(a)(22) defined the term "with the principal objective of livelihood and profit" to mean an "intent underlying the sale or disposition of firearms is predominantly one of **obtaining livelihood and pecuniary gain**, as opposed to other intents, such as improving or liquidating a personal firearms collection...."

The BSCA amended this definition of "engaged in the business," replacing Section 921(a)(21)(C)'s phrase "with the principal objective of livelihood and profit" with the phrase "to **predominantly earn a profit**...."[10]  Due to that change in terminology, 18 U.S.C. § 921(a)(22) was also modified, replacing the language "obtaining livelihood and pecuniary gain" with the singular intent of "**obtaining pecuniary gain**...."

### C.  ATF's Notice of Proposed Rulemaking

Following enactment of the BSCA, President Biden issued an Executive Order directing the Attorney General, *inter alia*, to "clarify the definition of who is engaged in the business of

---

[10] There is one case that uses this language from the amended BSCA: "The Court finds that the definitions enacted by Congress provide ample detail for Defendants to have notice, and for the jury to separate lawful conduct from unlawful conduct."  *United States v. Deare*, 2023 U.S. Dist. LEXIS 128640, at *6 (W.D. La. July 25, 2023).

dealing in firearms, and thus required to become Federal firearms licensees (FFLs), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law." 88 FR at 16527-28. Purportedly acting pursuant to this directive, the Department of Justice announced the NPRM on August 31, 2023, claiming that its proposed revisions "conform[] ATF's regulations to the new BSCA definition and further clarify[] the conduct that presumptively requires a license under that revised definition."[11] But while some of the NPRM's proposed revisions simply amend various regulations to mirror the newly enacted federal statutory language, others fabricate entirely new provisions of administrative "law" that contravene and effectively nullify the very statutes they claim to implement. Specifically, in order to match the BSCA's new statutory definitions, the NPRM proposes to amend the regulatory definition of "engaged in the business," and provide an updated regulatory definition of "to predominantly earn a profit." Further, the NPRM proposes to move the existing regulatory definition of "terrorism" to a new location to better reflect its use in BSCA definitions.

Beyond that, the NPRM's proposals unmoor from the statute. The NPRM proposes to amend the definitions of "dealer," "purchase," and "sale" to include new and different language from the underlying statutory text, all to purportedly "clarify" a purported mass confusion among members of the firearm industry that does not exist. The NPRM then fabricates a total of 14 categories of "presumptions," any one of which will *presume* statutory violations under certain facts, and all of which operate to shift the burden of proof from ATF to the accused. Many of these "presumptions" plainly conflict with the statute, as they recast innocuous conduct as business

---

[11] *Justice Department Proposes New Regulation to Update Definition of "Engaged in the Business" as a Firearms Dealer*, <u>ATF</u> (Aug. 31, 2023), <u>https://tinyurl.com/yhef8n5e</u>.

activity warranting licensure – *i.e.*, the very ill Congress sought to address by providing statutory definitions.

Beyond these unprecedented "presumptions," the NPRM adds new definitions for "personal firearms collection" and "responsible person," each with their own defects, before concluding with statutorily untethered directives as to how former FFLs and their responsible persons may liquidate their business inventories and how current FFLs may maintain records of transfers between licensees.  For the reasons that follow, Commenters explain that the NPRM should be withdrawn and scrapped, because the majority of its proposed promulgations either remove statutory protections or create additional liabilities on gun owners that are not found in the law.  To the extent that ATF wishes to promulgate regulations that simply mirror the unambiguous statutory text, that is all it has the authority to do.

## III.   The NPRM's Revisions Blatantly Conflict with the Statutory Text

### D. The NPRM Impermissibly "Defines" That Which Is Already Defined and "Clarifies" That Which Is Unambiguous

The NPRM advances a litany of regulatory revisions purportedly "clarifying," "defining," "setting forth," and "adding" to terms that are already defined and fully explained by statute. NPRM at 61997.  But at the outset, ATF only has statutory authority to "prescribe … such rules and regulations as are *necessary* to carry out the provisions of this chapter."  18 U.S.C. § 926(a) (emphasis added).  Terms already defined by statute cannot be further defined (*i.e.*, changed) by regulation.  Rather, "the need to rewrite clear provisions of the statute should have alerted [ATF] that it had taken a wrong interpretive turn."  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Because many of the terms that the NPRM proposes to define – "dealer," "engaged in the

business," "to predominantly earn a profit," and "responsible person" – *already are defined* by statute, ATF must accept the congressionally provided definition of these existing terms.

In the face of congressionally enacted definitions, "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms. Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always 'give effect to the unambiguously expressed intent of Congress.'" *Util. Air Regul. Grp.*, 573 U.S. at 325-26. As the Tenth Circuit explains, "[w]hen the Supreme Court has discussed the exercise of agency discretion 'in the interstices created by statutory silence,' it has done so **only when 'considering undefined terms in a statute**....'" *Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, 1201 (10th Cir. 2019) (emphasis added). Here, the statute is far from silent. It specifically defines terms such as "engaged in the business," and it further defines what it means to "predominately earn a profit." ATF thus has no authority to "define" more narrowly or more expansively (*i.e.*, rewrite) those statutory definitions to add its own regulatory gloss (or smear).

Next, ATF is not permitted to provide plain meaning, dictionary definitions for clear and unambiguous statutory terminology, even if such terms are not further defined. For example, the NPRM purports to define, "based on common dictionary definitions," a "sale" as "the act of providing [something] in exchange for something of value." *Id.* at 61998, 62020. Likewise, the NPRM defines "purchase" as "the act of obtaining [something] in exchange for something of value." *Id.* at 62020. Finally, apparently divining further ambiguity in its own definition, the NPRM purports to define "something of value." *Id.* at 62020-21. The NPRM claims "[t]his should help clarify" the various terminology. *Id.* at 61998.

But as the NPRM makes clear, these definitions are nothing more than "consistent with the common meaning" of these words and phrases. *Id.* at 61999 nn.44, 45. ATF has identified no

9

ambiguity in the words "purchase" or "sale," or the phrase "something of value."  ATF has not explained why a person of common understanding cannot comprehend these simple statutory words.  Yet agencies do not have free reign to layer definition upon definition, needlessly adding complexity to the Code of Federal Regulations without having identified any statutory ambiguity that needs to be resolved in the first place.  *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 642 (1990) ("As a general rule of statutory construction, where the terms of a statute are unambiguous, judicial inquiry is complete."); *ACLU v. FCC*, 823 F.2d 1554, 1568 (D.C. Cir. 1987) ("the statute speaks with crystalline clarity. It provides a precise definition … for the exact term the Commission now seeks to redefine. … From the face of the statute then, we are left with no ambiguity and thus no need … for clarification."); 18 U.S.C. § 926(a) (only regulations "necessary to carry out the provisions of this chapter").  This is especially true when, as here, there is no indication that Congress intended the agency to have any role to play.[12]

Finally, even if there were some grievous ambiguities in the statutory definitions that Congress provided, many of the NPRM's definitions simply add language to the statute rather than resolve some ambiguity or explain some nuance in greater detail.  *See, e.g.*, NPRM at 62004

---

[12] The likelihood of abuse here is hardly speculative.  For example, the NPRM **defines** the statutory words "purchase" and "sale" to include transmission of "something of value," and **further defines** "something of value" to include "any other medium of exchange or valuable consideration."  *Id.* at 62020-21.  The NPRM then **further defines** "medium of exchange" to include "something commonly accepted in exchange for goods and services and recognized as representing a standard of value," and **further defines** "valuable consideration" as "an equivalent or compensation having value that is given for something (as money, marriage, services) acquired or promised and that may consist either in some right, interest, profit, or benefit accruing to one party or some responsibility, forbearance, detriment, or loss exercised by or falling upon the other party."  *Id.* at 61999 n.51.  At bottom, ATF claims that an ordinary person cannot possibly understand the simple statutory word "sale," but expects that same person to understand the word "forbearance" (contained in ATF's definition of a definition of a definition) without further definition.  ATF has taken something unambiguous and made it ambiguous.  Regulation for the sake of regulation, it would seem.

(adding the phrase "and business practice" to the statutory definition of "responsible person"); *id.* at 62016 (emphasis added) (admitting the NPRM is legislating because it "establishes … *legally binding requirements*").  Moreover, even to the extent some further elucidation of the statute were necessary, the rule of lenity requires that ambiguous criminal laws be construed in favor of the criminal defendant.[13]  In other words, when in doubt, ATF must construe the statute to conclude that a person is *not* unlawfully dealing – a mandate the NPRM fails to respect, as it is expansively designed to sweep up hundreds of thousands of persons into the federal definition of "dealer" by accusing them of being unlawfully "engaged in the business."

### E.  The NPRM Ignores the Statutory Requirements for Being "Engaged in the Business"

The NPRM recounts that, in 1979, ATF decided against "establish[ing]n a threshold number of firearm sales every year to serve as a baseline for when a person would qualify as a dealer."  *Id.* at 61994.  According to ATF, this was on the theory that a person could simply stay below the threshold[14] and "avoid[] obtaining a license...."  *Id.*; *see also id.* at 62000 ("structure[15]

---

[13] *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 469 (5th Cir. 2023); at 473 (Ho, J., concurring) ("it is not enough to conclude that a criminal statute *should* cover a particular act.  The statute must *clearly* and *unambiguously* cover the act.") (emphasis original); *Hardin v. BATFE*, 65 F.4th 895, 901 (6th Cir. 2023); *see also United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 4 (1st Cir. 1997) (noting that "courts should interpret the same language in the same section of the same statute uniformly, regardless of whether the impetus for interpretation is criminal or civil");

[14] This is a bit like saying that it would be ill advised to post a speed limit *because drivers might actually follow the law*.

[15] ATF's use of the word "structure" is problematic, because the idea of "structuring" transactions has no antecedent in administering the GCA or the NFA.  Rather, "structuring" is a term used in the financial and banking industry with regard to attempting to hide large cash deposits.  Those areas uniformly contain an underlying statute that proscribes evading mandatory cash reporting at financial institutions, specifically using the wording "structuring."  *See* 31 U.S.C § 5324(a)(3).  No similar crime exists here, and ATF cannot read one into the statute any more than it was permissible

their transactions to avoid a minimum threshold by spreading out their sales over time"). Thus, the NPRM repeatedly takes the position that "there is no specific threshold number of firearms purchased or sold that triggers the licensure requirement." *Id.* at 61995. Rather, ATF claims that "even a single firearm transaction, or offer to engage in a transaction [*i.e.*, no transaction], when combined with other evidence, may be sufficient to require a license." *Id.* at 62000. According to ATF, this conclusion – that a person may be engaged in the business without ever acquiring or selling a single firearm – somehow flows from the statute. Hardly.

Because the NPRM purports to "clarify" a statute, "[w]e start, of course, with the statutory text," *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006), and "if the statutory text is unambiguous, no further inquiry is necessary." *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010). The statutory definition of "engaged in the business … as applied to a dealer in firearms," is:

> a person who devotes time, attention, and labor to dealing in **firearms** as a **regular course** of trade or business to predominantly earn a profit through the **repetitive purchase** **and** **resale** of firearms, but such term shall not include a person who makes occasional **sales, exchanges, or purchases** of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms. [18 U.S.C. § 921(a)(21)(C) (emphases added).]

Contrary to ATF's claim that a person can be engaged in the business without ever consummating any actual business, the statutory text contains at least six clear indicators that more is required, any one of which is sufficient to repudiate ATF's claims made in the NPRM – 1) use of "firearms," in the plural; 2) "regular course," contemplating a series of events; 3) "repetitive," meaning more than once; 4) requiring actual "purchase and *re*sale," which 5) provides a contemporaneous

---

to attempt to do so in the "frame or receiver" rule. *See* 87 FR at 24692 ("In sum, persons cannot undermine these requirements and prohibitions by working with others or structuring transactions to avoid the appearance that they are not commercially manufacturing and distributing firearms.").

conjunctive requirement; and 6) exempting "sales, exchanges, or purchases," in the plural. Individually and together, these terms unequivocally reject the NPRM's suggestions that "there is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms," and that "even a single firearm transaction, or offer to engage in a transaction [without any actual transaction], when combined with other evidence, may be sufficient to require a license."  NPRM at 62000.

### 1.  The Statutory Scheme Discusses "Firearms" in the Plural

First, the statute contemplates business conduct involving more than one firearm transaction (and certainly more than zero) – the "term 'dealer' means … any person engaged in the business of selling *firearms* at wholesale or retail."  18 U.S.C. § 921(a)(11) (emphasis added). Further, a dealer is "a person who devotes time, attention, and labor to dealing in *firearms*."  18 U.S.C. § 921(a)(21)(C) (emphasis added).  The word "firearms" appears repeatedly throughout the statute, obviously denoting dealing in more than one "firearm."

### 2.  A "Regular Course" Is a Series of Events Demonstrating an Activity Is Occurring

Contrary to the NPRM's claim that even a single firearm transaction (or offer for sale without any transaction) can suffice to demonstrate business intent and require licensure, the statute requires a putative dealer's conduct to be part of a "regular course of trade or business."  18 U.S.C. § 921(a)(21)(C).   Naturally, this phrase refers to a series of events demonstrating an overarching business purpose and mindset.  Courts construing the word "regular" in other contexts have observed:

> "Regular" has been defined as "steady or *uniform in course, practice, or occurrence*: not subject to unexplained or irrational variation: steadily pursued; orderly, methodical"; even as "returning, *recurring, or received at stated, fixed or uniform intervals* …; functioning at proper intervals."  *Webster's Third New*

**13**

*International Dictionary of the English Language Unabridged* 1913 (1971) (emphasis added). Clearly, the word, "regular" in the phrase "regular course of the taxpayer's trade or business" refers to an *ongoing* business concern.  [*Ex parte Uniroyal Tire Co.*, 779 So. 2d 227, 236 (Ala. 2000) (emphases in original).]

Similar to the word "regular," the word "course" means "the path over which something moves or extends" or "moving in a path from point to point,"[16] again clearly denoting something more than a static event at one moment in time.

In contrast, isolated events – like a mere offer to sell or even a single completed transaction – do not evince regularity or a course of business.  For example, in the "regular course" of making breakfast, one might expect to crack an egg.  However, a cracked egg on its own is insufficient to infer a broader course of conduct; eggs can crack when inadvertently dropped, after all.  But when one cracks eggs in some melted butter, places slices of bread in the toaster, and pours a glass of orange juice, a pattern begins to emerge that evinces a "regular course" of conduct – making breakfast.  A single firearm transaction – like a single cracked egg – is logically insufficient to show a "regular course of trade or business."[17]

### 3.  "Repetitive" Obviously Means More than Once

If the statute was not clear enough already, in order to be "engaged in the business" as a dealer in firearms, one must also engage in the "*repetitive* purchase and resale of firearms."  18 U.S.C. § 921(a)(21)(C) (emphasis added).  Of course, repetition means more than once, that is, "the act or an instance of repeating" something "such as a push-up" that is "usually counted."[18] Doing a single pushup is not repetitive; nor does it evince that a person is seriously intending to

---

[16] *Course*, Merriam-Webster,  https://tinyurl.com/53hnbvmj (last visited Oct. 27, 2023).
[17] *See United States v. Gross*, 451 F.2d 1355 (7th Cir. 1971) ("The reasonable reader would conclude that … a single isolated sale did not constitute engaging in the 'business of selling firearms.'").
[18] *Repetition*, Merriam-Webster, https://tinyurl.com/mun5hawv (last visited Oct. 27, 2023).

engage in exercise.  Talking about doing pushups provides even less evidence still.  Yet the NPRM maintains that "there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement.  Similarly, there is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms."  NPRM at 62021.  These irreconcilable statements resolve in favor of the statute – purchases and resales must be *repetitive*.

For example, an ordinary gun owner who peruses online ads and happens upon a great deal on a firearm (or perhaps even a group of firearms), even if he purchases and then resells that firearm *with the intent to profit*, still does not constitute a firearms dealer, because his activity is a one-off – far from "repetitive," and certainly not a "regular course" of activity.  Indeed, Congress expressly intended its "legislation to limit Federal regulation to those involved in *more* than isolated activities."  S. Rep. No. 98-583, at 6 (1984) (emphasis added).

### 4.  Actual Dealers Must "Purchase and Resell" Firearms

Although by now perhaps beating a dead horse, the statute also mandates that a crucial component of being "engaged in the business" is the repetitive "purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C).  Thus, firearms must be purchased "***and***" resold – a conjunctive requirement – a far cry from the NPRM's claim that "there is no minimum threshold number of firearms purchased ***or*** sold that triggers the licensure requirement."  NPRM at 62021 (emphasis added).

For starters, sales alone are not enough, nor are mere purchases of firearms.[19]  Both elements must be present.  Moreover, as discussed in the next section, there must be more than one

---

[19] ATF erroneously claims that a former licensee can be charged with unlawful dealing based on **purchases made during** the period of licensure and **sales made after** the license expired, was revoked, or was relinquished.  NPRM at 62022 ("a former licensee … who resells any such inventory … is subject to the presumptions … that apply to a person who repetitively purchased

**15**

"purchase" and more than one "resale" – more than two each, in fact.  To be sure, ATF points to at least one jurisdiction that has prosecuted someone for unlicensed dealing without any evidence of any sales having taken place.  *See* NPRM at 61998 n.38 (noting only that "defendant texted photos of firearms for sale to his customer and discussed prices"); *see also id.* at 62000 (citing to *United States v. King*, 735 F.3d 1098, 1107 n.8 (9th Cir. 2013).  But such precedent is clearly wrong – failing to require a "resale" in addition to a "purchase" (never mind requiring each to be "repetitive") reads the word "resale" right out of the statute.

### 5. A "Resale" Is Something More than a "Sale," and Is Done Contemporaneously

The statute is not done with providing indications that the NPRM's approach is misguided.  Notably, the statute does not require merely "purchases" and "sales" – something any gun owner might do.  Rather, the text mandates "resale" – meaning "the act of selling something again" such as "buying used cars for resale to overseas markets."[20]  Thus, embedded within the word "resale"

---

those firearms for the purpose of resale"); *see also id.* at 62006 ("While 18 U.S.C. 921(a)(21)(C) allows an unlicensed person to 'sell all or part of his personal collection' without being considered 'engaged in the business,' in this context, these firearms were purchased by the former licensee as business inventory and were not accumulated by that person for study, comparison, exhibition, or for a hobby.").  This is nonsense.  *During* the period of time a person was licensed, he was *legally authorized* to be "engaged in the business," including purchasing firearms for the purpose of resale.  Simply selling those firearms (half the statutory requirement) *after* licensure is insufficient, because a criminal charge cannot be based in part on activity that the statute expressly permits.  In fact, the NPRM admits that at least one court has held as much.  *Id.* at 62003 n.81 (citing *United States v. Shuman*, 861 F.2d 1234, 1238 (11th Cir. 1988) (finding "no proof of firearms purchases" and explaining that no liability attaches for simply liquidating former business inventory); *cf. id.* at 62006 (contrasting a person who would "continue to acquire more firearms for resale … after license termination").  ATF maligns the possibility that former licensees may liquidate their inventory, calling this permissible activity a "problem" pejoratively classifying it as a "'fire-sale loophole.'"  *Id.* at n.102.  But ATF proves too much.  Another way of saying "loophole" is "lawful activity."  If ATF wants to close a perceived loophole, it should ask Congress to do so.

[20] *Resale*, Cambridge Dictionary, https://tinyurl.com/mrxspent (last visited Oct. 27, 2023).

is a contemporaneity requirement, instructing that firearm purchases and resales must be linked together within a short enough timeframe of each other to constitute business activity.

The NPRM purports to define "sale" to "include[e] … derivative terms" like "resale," defining both to be "the act of providing a firearm in exchange for something of value." *Id.* at 62020. But as noted, selling something is *not* the definition of "resale." If the words "sale" and "resale" were synonymous, they would not be different words. Rather, the prefix "re" is added to words and "used with the meaning 'again' or 'again and again' to indicate repetition."[21] *See* Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal Texts 69, 101 (2012). The NPRM's definition of a "resale" as nothing more than a "sale" thus defies the meaning of words.[22]

Congress's choice of wording was deliberate. For example, no one would say that a collector who buys rare cars, maintains and enjoys them in his garage, and subsequently offers them at auction decades later has been "buying used cars for resale to overseas markets." Likewise, no firearm dealer (at least none that wants to stay in business) purchases large quantities of firearms only to hold them in inventory for a long period of time, as does a firearm collector or even investor. Whereas a private collector might purchase large numbers of firearms (even of the same make and model) with the intent that they increase in long-term value, a dealer's profit incentives are much more short-term, out of necessity. Take, for example, a rare coin dealer that charges a "margin" on each product sold, with the price determined not by the dealer's basis in that product, but in the

---

[21] *Re*, Dictionary.com, https://tinyurl.com/2vkwxmvf (last visited Nov. 10, 2023).
[22] *See* Lewis Carroll, Through the Looking Glass (1871) ("When *I* use a word," Humpty Dumpty said in rather a scornful tone, "it means just what I choose it to mean—neither more nor less." "The question is," said Alice, "whether you CAN make words mean so many different things." "The question is," said Humpty Dumpty, "which is to be master—that's all.'").

*replacement cost* of obtaining another one in the marketplace.[23]   No one would allege that an investor, who purchases coins and holds them for a period of time until they (hopefully) appreciate in value, is "engaged in the business" of dealing in coins.   Likewise, while a firearm collector or investor might purchase firearms and hope to *sell* them for a profit one day in the future (turn $10 into $100), a dealer who is "engaged in the business" purchases firearms to *resell* them as soon as possible (turn $10 into $20), and then turn around and buy more.   In other words, the statute clearly does not cover nearly as much innocent behavior as the NPRM purports to outlaw.

### 6.  The Statute Exempts Non-Business "Sales, Exchanges, or Purchases" in the Plural

Finally, the statute contains explicit exceptions – a statutory safe harbor – to being "engaged in the business" based on the "occasional *sales, exchanges, or purchases* of firearm*s* for the enhancement of a personal collection or for a hobby."[24]  18 U.S.C. § 921(a)(21)(C) (emphasis added).   Notably, each of these terms is plural, accommodating multiple sales, multiple exchanges, or multiple purchases without rising to the level of "dealing."   Indeed, no one could amass a "collection" – another plural word meaning "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby"[25] – without accumulating multiple firearms, and probably getting rid of some as well.   Indeed, Congress was well aware that "[m]any firearm hobbyists sell or trade firearms from their collections," S. Rep. No. 98-583, at 8, and Congress never intended for such conduct to require licensure.

---

[23] Ellis Davidson, *Replacement Cost vs. Market Value*, Chron, https://tinyurl.com/5fj3tkaa (last visited Oct. 27, 2023).

[24] To be sure, the statutory safe harbor is *not the only* way to engage in firearms transactions without being "engaged in the business."  If that were so, then the statute would say that anyone who is not within the safe harbor provisions is required to obtain a license.

[25] *Collection*, Merriam-Webster, https://tinyurl.com/2552xmrc (last visited Oct. 27, 2023).

In sum, the plain text of the statute contains no fewer than six different indications that ATF's notion in the NPRM – that a person can be dealer without ever purchasing or reselling a single firearm – is bunkum.

## F. The NPRM Impermissibly Edits "Proof of Profit" Out of the Statute, Claiming that Someone Can Be a Dealer Without Ever Making a "Purchase" or "Resale"

As explained above, the NPRM unlawfully removes the requirement that a person *actually make* purchases and sales in order to be engaged in the business.  And the NPRM improperly interprets the clear statutory text so that *even one* such transaction might require licensure.  As discussed here, the NPRM also ignores the clear statutory requirement of profit.

The NPRM notes that the BCSA amended the text of 18 U.S.C. § 921(a)(21), replacing the language "principal objective of livelihood and profit" with the phrase "to predominantly earn a profit."  NPRM at 61993.[26]  Under the NPRM's repetition of that statutory language, one acts "to predominantly earn a profit" when:

> [T]he intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.  [18 U.S.C. § 921(a)(22).]

---

[26] The BCSA also made a corresponding change to the definition of "to predominantly earn a profit" in Section 921(a)(22), replacing the phrase "predominantly one of obtaining livelihood and pecuniary gain" with "predominantly one of obtaining pecuniary gain."  Thus, the NPRM proposes to add a definition of "to predominantly earn a profit" to 27 C.F.R. § 478.11 that mirrors that statutory definition in Section 921(a)(22).  NPRM at 61996.

Under the plain text of the statute, then, "proof of profit" is "not … required" **only** in cases where the prohibited activity is "for criminal purposes or terrorism."[27]  18 U.S.C. § 921(a)(22).  A natural corollary to that language is that "proof of profit" is "required" in all other cases.[28]  *See Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration in original) ("[Where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *see also*  Scalia & Garner, *supra*, at 107, 167 ("The expression of one thing implies the exclusion of others" and "[t]he text must be construed as a whole.").  After all, if Congress had intended to do away with requiring proof of profit *in all cases*, Congress certainly could have done so.[29]

Yet without skipping a beat, the NPRM purports to "clarify that a person may have the predominant intent to profit *even if the person does not actually obtain pecuniary gain from selling or disposing of firearms*."  *Id.* at 62005 (emphasis added); *see also id.* at 62021 ("a person may have the intent to profit even if the person does not actually obtain pecuniary gain...."); *id.* at 62002 (statute "does not require that a firearm actually to [sic] be sold").  ATF offers the further gibberish justification that "the 'repetitive purchase and resale of firearms' is the means through which the

---

[27] Whereas the statute states that "proof of profit shall not be required" when it comes to "criminal purposes or terrorism," the NPRM changes this language to "proof of profit, **including the intent to profit**, shall not be required...."  *Id.* at 62021 (emphasis added).  ATF has no authority to supplement the statutory text to suit its policy goals.

[28] As defined by 18 U.S.C. § 921(a)(11)(A) (dealing as selling versus dealing as gunsmithing).

[29] Prior to FOPA, there was a circuit split as to whether Section 922(a)(1) required profit at all.  *See United States v. Swinton*, 521 F.2d 1255, 1258 (10th Cir. 1975) (detailing the circuit split and siding with the no-profit camp, holding "Section 922(a)(1) does not require that the Government establish that a person engaged in the business of dealing in firearms make a profit.").  Thus, the FOPA definition "was added to the firearms statute by Congress in 1986, to resolve [the] circuit split...."  *United States v. Graham*, 305 F.3d 1094, 1101 (10th Cir. 2002).

person intends to engage in the business even if those firearms are not actually repetitively purchased and resold." *Id.* at 62002. Aside from being impenetrable gobbledygook, this claim directly conflicts with the statute, which exempts the requirement of proof of profit *only* for those engaged in "criminal purposes or terrorism." 18 U.S.C. § 921(a)(22). Thus, rather than conforming its regulations to the statutory text, the NPRM rewrites the statute to water down FOPA's stringent standard.

In support of ATF's claim that no proof of profit is *ever* necessary, the NPRM cites a number of federal cases that ATF claims have reached similar conclusions. NPRM at 62005 (citing *United States v. Focia*, 869 F.3d 1269, 1282 (11th Cir. 2017)); *id.* n.93 (citing *United States v. Valdes*, 681 F. App'x 874, 877 (11th Cir. 2017); *United States v. Wilmoth*, 636 F.2d 123, 125 (5th Cir. Unit A Feb. 1981); *United States v. King*, 735 F.3d 1098, 1107 n.8 (9th Cir. 2013); *United States v. Allah*, 130 F.3d 33, 43-44 (2d Cir. 1997); *United States v. Mastro*, 570 F. Supp. 1388, 1391 (E.D. Pa. 1983) (collecting cases); *United States v. Shirling*, 572 F.2d 532, 534 (5th Cir. 1978)). ATF claims that "[n]either the pre-BSCA definition … nor the post-BSCA definition … require the government to prove that the defendant actually profited...." *Id.*

But these seven cases hardly evince the consensus the NPRM claims. For starters, three of these cases predate *both* the "pre-BSCA" and "post-BSCA definition," having been decided before there was *any* statutory mention of "profit" as it relates to firearm dealing. *See Wilmoth*, 636 F.2d 123 (1981); *Mastro*, 570 F. Supp. 1388 (1983); *Shirling*, 572 F.2d 532 (1978). Indeed, the Firearms Owners' Protection Act **of 1986** ("FOPA"), Pub. L. No. 99-308, 100 Stat. 449, 450, defined for the first time the phrase "engaged in the business," which had previously been "subject to judicial interpretation." *United States v. Schumann*, 861 F.2d 1234, 1237 n.2 (11th Cir. 1988).

Accordingly, pre-1986 cases interpreting a previously undefined statutory phrase cannot shed light on the meaning of a modern definition that did not then exist.

Next, two of ATF's cases do not say anything close to what the NPRM claims. *Focia*, for example, never held that proof of profit is not required, because such proof was never at issue in that case. 869 F.3d at 1280 ("the exact percentage of income … is not the test"). Nor did *Allah*, which in fact said that selling firearms need not "be a *significant* source of income." 130 F.3d at 44 (emphasis added). On the contrary, both of these cases indicate that the government had shown the defendants profited.

The NPRM's remaining cases, *Valdes* and *King*, offer a slender reed to support the NPRM's blatant statutory revisionism. ATF cites *Valdes* for the proposition that "the government does not need to show that the defendant 'necessarily made a profit from dealing.'" NPRM at 62005 n.93. But *Valdes* was quoting *Wilmoth*, one of the pre-FOPA cases already discussed, which was decided in 1981 which, again, was prior to the statute even mentioning "profit." *See Valdes*, 681 F. App'x at 877 (citing *Wilmoth*, 636 F.2d at 125). Moreover, such a cursory quotation had no bearing on the outcome of the case, as it was clear that *the defendant in Valdes had been profiting* left and right. *See id.* at 878 (noting that the defendant had "called her activity a 'hustle,'" "sold a high volume of firearms—600 in 7 years," and "handed out business cards").

As for *King*, it is true that the Ninth Circuit observed that "there was no evidence that King successfully sold any firearms," 735 F.3d at 1102, but it did so with the caveat that "[t]wo of the twenty-four firearms ordered on behalf of [the business King effectively ran], … *were never located or accounted for*." *Id.* at n.4 (emphasis added); *id.* (noting that "King also sold ammunition and magazines for $1,700 in cash to a man he arranged to meet in a grocery store parking lot."). King's unlicensed business conduct was particularly brazen, with an extensive history of

purporting to act on an FFL's behalf, forging documents, purchasing inventory, and otherwise managing the FFL's affairs. *See id.* at 1101-03. Significantly, because King had "failed to preserve his sufficiency-of-evidence challenge," the Ninth Circuit only "appl[ied] plain-error review," concluding only that "[t]here [wa]s ample evidence in the record from which a reasonable jury *could have drawn* th[e] conclusion" that he had dealt in firearms without a license. *Id.* at 1106 (emphasis added).

Consequently, the *King* court's observation, relegated to a footnote which ATF now elevates to the level of divinely inspired text, "that Section 922(a)(1)(A) *does not require an actual sale of firearms*," was not central to the court's plain-error review. Moreover, the authority the *King* court cited for that proposition, *United States v. Nadirashvili*, 655 F.3d 114, 120 (2d Cir. 2011), itself cited *United States v. Carter*, 801 F.2d 78, 82 (2d Cir. 1986),[30] which itself quoted *United States v. Berry*, 644 F.2d 1034, 1037 (5th Cir. 1981). Although perhaps well-hidden by the NPRM's string citation, all roads seemingly lead to pre-FOPA, pre-"profit" cases.

On the contrary, the statutory text and context clearly require proof of profit in all cases that are not "criminal purposes or terrorism." This understanding – that **actual "sales" must occur _and_** that the government is **required to show proof of "profit"** from those sales) is confirmed by FOPA's legislative history. In Senate Report 98-583, the Senate Judiciary Committee summarized the various pre-FOPA tests applied by the courts, including one holding that "anyone who 'has guns on hand' or can obtain them and is willing to sell has so engaged." *Id.* at 8. However, the Senate Committee noted that "S. 914 would substantially narrow these broad parameters by requiring that the person undertake such activities as part of a 'regular course of trade or business

---

[30] *Carter* did not even disclaim a requirement of proof of profit; indeed, the defendant had made multiple sales. 801 F.2d at 80-82.

**23**

with the principal objective of livelihood and profit.'"  *Id.*; *see also* House Report 99-495[31] ("This definition, which does not follow the case law, is likely to have a serious weakening effect on the GCA.").  FOPA thus was a deliberate departure from the case law on which the NPRM relies, and the Ninth Circuit's continued reliance in *King* on the pre-FOPA standard is clearly erroneous.

To the extent that ATF wishes to nationalize a pre-FOPA approach advanced by, at most, only one or two outlier courts, the NPRM is the inappropriate vehicle to advance such policy goals, as it is the duty of Congress to set nationwide legislative policy, the duty of the judiciary to interpret such legislation, and the duty of the Supreme Court to address issues of interpretive uniformity among the circuits.  *See* U.S. Const. art. I, § 1; *Patchak v. Zinke*, 138 S. Ct. 897, 904 (2018); *Bousley v. United States*, 523 U.S. 614, 618 (1998).  At bottom, "the role of the agencies remains basically to execute legislative policy; they are no more authorized than are the courts to rewrite acts of Congress."  *Talley v. Matthews*, 550 F.2d 911, 919 (4th Cir. 1977).

## G. The NPRM's Definition of "Personal Collection" Impermissibly Erodes Statutory Protections for Non-Business Conduct

Following the NPRM's atextual, revisionist theme, the NPRM purports to "clarify" a statute that already is clear on its face.  The statutory definition of "dealer" expressly excludes from attendant licensing requirements "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."  18 U.S.C. § 921(a)(21)(C).  Thus, a plain reading of the statute makes clear that three safe harbors exist:

1. "occasional sales, exchanges, or purchases of firearms *for the enhancement of a personal collection*";

2. "occasional sales, exchanges, or purchases of firearms … *for a hobby*."; or

---

[31] https://tinyurl.com/2s47zmbj.

3.  "a person … *who sells all or part of his personal collection of firearms*."[32]

By use of two "or's" and two "for's," Congress clearly intended a broad range of conduct to fall outside the statutory definition of "dealer."

In contrast, the NPRM proposes to define "personal collection" and related phrasings like "personal collection of firearms" and "personal firearms collection" as "[p]ersonal firearms that a person accumulates for study, comparison, exhibition, or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, or skeet, target, or competition shooting)."  NPRM at 62021.  This proposed definition's syntax and limiting language contradict the statutory language it purports to "clarify."

First, the NPRM impermissibly excises the word "hobby" from the statute, and tucks it away within the definition of "personal collection," meaning a "hobby" is no longer its own *separate* safe harbor.  *But see* NPRM at 62004 (treating "collection" and "hobby" as distinct "exclu[sions]," showing that ATF apparently is confused about its own NPRM).  But an agency cannot override a deliberate separation of phrases in a statute by combining them into a novel jumble, because Congress clearly intended these phrases to mean different things.  Indeed, "every word and every provision is to be given effect....  None should be ignored.  *None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence*."  Scalia & Garner, *supra*, at 174 (emphasis added) (discussing the surplusage canon of statutory interpretation).

Second, the NPRM impermissibly limits the contexts in which a "personal collection" of firearms may exist.  The NPRM defines a "personal collection" as the accumulation of firearms

---

[32] This could be one, ten, or a thousand.

only "for study, comparison, exhibition, or for a hobby" (all recreational type purposes), to the exclusion of other contexts that undoubtedly also apply to the "personal collection" of firearms discussed in the statute. NPRM at 62021. For example, an accumulation of firearms for long-term investment purposes constitutes a "personal collection," and not business activity where a license is required, in much the same way that the accumulation of securities in one's 401(k) does not make one a professional stock trader. Moreover, millions of Americans "accumulat[e]" personal firearms for a variety of purposes unrelated to "study, comparison, exhibition, or for a hobby." For example, many gun owners possess "arms" for self-defense, the purpose of contributing "to the security of a free State"[33] or, if at some point it becomes necessary, for refreshing "the tree of liberty."[34] ATF cannot claim that a personal collection of firearms for these purposes is not in fact a "personal collection," just because the NPRM seeks to recast the statutory phrase in entirely recreational terms.

Moreover, the NPRM limits the contexts of personal collecting to "noncommercial, recreational activities for personal enjoyment." NPRM at 62021. But, for example, receiving instruction on the use of firearms for self-defense and "the imposition of proper discipline and training" hardly can be characterized as "recreational"[35] activities, yet they are perfectly valid (if not paramount) reasons to acquire firearms. *District of Columbia v. Heller*, 554 U.S. 570, 597 (2008) (discussing the meaning of a well-regulated militia); *see also id.* at 599 ("The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting.").

---

[33] U.S. Const. amend. II.

[34] Letter from Thomas Jefferson to William Smith (Nov. 13, 1787), https://tinyurl.com/26u4hfz8.

[35] *See Recreation*, Merriam-Webster, https://tinyurl.com/yz22454a (last visited Nov. 1, 2023) (defining the term as "a means of refreshment or diversion" and finding it synonymous to "fun and games").

To the extent that the NPRM purports to exclude from a "personal collection" those firearms owned for self-defense, such a reading would in fact render the statute unconstitutional. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2143 (2022) (noting that arms "in 'common use' for self-defense today" are among those arms which the Second Amendment protects).

Third, regardless of whether the NPRM's "*e.g.*," parenthetical applies to just a "hobby" or the entire phrase "study, comparison, exhibition, or for a hobby," the NPRM necessarily limits personal collections to those that are "noncommercial, recreational activities for personal enjoyment, such as hunting, or skeet, target, or competition shooting." NPRM at 62021. Moreover, the NPRM does not use the word "includes" in the definition of "personal collection," indicating that "study, comparison, exhibition, or for a hobby" might be the only purposes included. *See* Scalia & Garner, *supra*, at 93 (providing under the omitted-case canon that "[n]othing is to be added to what the text states or reasonably implies.... That is, a matter not covered is to be treated as not covered."); *see also id.* at 199 ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned (*ejusdem generis*).""). Accordingly, the NPRM's proposed definition apparently fails to consider the exercise of Second Amendment rights (not "a hobby" and certainly not merely "for personal enjoyment") as legitimate non-dealer activity.

Fourth and finally, the NPRM provides that the "term [personal collection] shall not include any firearm purchased for the purpose of resale or made [sic] with the predominant intent to earn a profit." NPRM at 62021. But the statute does not say that, nor does it support such a reductionist reading of mere "purpose" or "predominant intent" when the statute requires a multitude of other elements to constitute business activity. *See* 18 U.S.C. § 921(a)(21)(C) (requiring not merely "any firearm purchased for the purpose of resale," but instead "a regular course of trade or business"

and "the repetitive purchase and resale of firearms" to be "engaged in the business"). Finally, by imposing a disjunctive condition ("purchased for the purpose of resale *or* made with the predominant intent to earn a profit"), the NPRM negates the required statutory conjunction and instead allows *either* condition to require licensure.

All told, the statute supports none of the NPRM's proposed revisions to the plain, unambiguous meaning of "personal collection."

## H. The NPRM Improperly Rewrites the Statutory Definition of "Responsible Person"

The statute defines a "responsible person," without actually naming the term, as "in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association." 18 U.S.C. § 923(d)(1)(B). Congress created this definition in the narrow context of requiring FFL applicants to not be "prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (n)." *Id.* Although Congress certainly had ample opportunity to revise this statute during the BSCA's drafting, it did not do so.

Enter ATF. The NPRM "proposes to add a regulatory definition of the term 'responsible person'" which ATF claims "comes from" elsewhere in the statute. NPRM at 62004. However, the NPRM's proposed definition *counterfeits new language not found in the statute* and adds it directly to the regulatory definition. *Compare* 18 U.S.C. § 923(d)(1)(B) ("in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association"), *with* NPRM at 62022 (emphasis added to denote additions) ("Any individual

possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, **and business practices** of a corporation, partnership, or association, **insofar as they pertain to firearms**.").

Clearly, this regulatory definition is intended to, and has the effect of, watering the statutory language down in order to cover more people and conduct than Congress authorized – otherwise, the NPRM would simply copy and paste the existing statutory definition.  To illustrate, while the "management" and "policies" of an organization contemplate individuals with some form of managerial control, almost anyone can "indirectly … cause the direction of … business practices," NPRM at 62022, because "business practices" are entirely amorphous.  A "practice" simply is the "actual performance" of something, or even "a repeated or customary action,"[36] regardless of whether such an action is permitted by or contrary to the "management" or "policies" of the organization.  For example, a lawyer retained to provide regulatory advice to an FFL can "indirectly … cause the direction of … business practices" of a gun store, but clearly does not become a "responsible person."  So can gun store clerks, who direct "business practices" each time they perform their job duties, whether in accordance with store policy or not.

To be sure, the NPRM anticipates this objection and makes the hollow assurance that "this definition would not include store clerks or cashiers who cannot make *management or policy* decisions with respect to firearms … even if their clerical duties include buying or selling firearms for the business."  *Id.* at 62005 (emphasis added).  But this example simply parrots the existing statutory definition and *does not address* the effects of the newly added "business practices" language.  And, regardless of whatever this assurance may be worth (not much), the text of the amended regulation ultimately will control.  *See Tex. Child.'s Hosp. v. Azar*, 315 F. Supp. 3d 322,

---

[36] *Practice*, Merriam-Webster, https://tinyurl.com/bd8wrsvf (last visited Oct. 31, 2023).

334 (D.D.C. 2018) (citation omitted) ("the preamble to a statute or rule may be used to help inform the proper interpretation of an ambiguous text.  The preamble cannot, however, be used to contradict the text of the statute or rule at issue."); *Hearn v. W. Conf. of Teamsters Pension Tr. Fund*, 68 F.3d 301, 304 (9th Cir. 1995) (observing that "legislative history – no matter how clear – can't override statutory text"); *see also* Scalia & Garner, *supra*, at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").

To make matters worse, the NPRM does not offer any explanation for the apparent necessity of amending the existing statute to include this language – something ATF has no authority to do in the first place.  Instead, the NPRM obliquely states that the purpose of this redefinition is "[t]o accompany" all the other changes made in the NPRM.  NPRM at 62004.  It appears, then, that ATF's only justification is that ATF *already has usurped* the legislative power from Congress.  *See id.* ("This definition … has long been reflected on the application for license (Form 7) and other ATF publications since enactment of a similar definition in the Safe Explosives Act in 2002.").  But the "similar definition" in the Safe Explosives Act mirrors 18 U.S.C. § 923(d)(1)(B), providing no more support for ATF's statutory revisionism than does the GCA licensing definition.  *See* 18 U.S.C. § 841(s).  In other words, Congress has not once – but twice – declined include the so-called "business practices" that the NPRM now seeks to add to its regulation.

Finally, the NPRM's definitional rewrite risks codifying one of ATF compliance inspectors' favorite methods of FFL revocation, wherein they claim someone from outside the company – like a spouse – is in fact a "responsible person" whose unlicensed status warrants revocation of a license, in the face of an otherwise spotless compliance record.  *See, e.g.*, *MEW Sporting Goods, LLC v. Johansen*, 992 F. Supp. 2d 665 (N.D. W. Va. 2014) (holding that the FFL applicant's wife

was a responsible person because she handled the day-to-day operations of the gun-sales business while the applicant worked a different full-time job); *see also Gossard v. Fronczak*, 206 F. Supp. 3d 1053 (D. Md. 2016) (holding that the FFL applicant's willful failure to list a landlord as a responsible person permitted ATF to deny the FFL application).

## I.   The NPRM's Rules for Former Licensees Conflict with the Statute

As discussed in more detail below, the NPRM creates the sort of Catch-22 situation where ATF proposes first to demand a gun owner to obtain a firearms license in order to sell a few personal firearms, but then deny that person the very same license, on the theory that the person previously had been unlawfully engaged in the business. *See* Section IV(D), *infra*; NPRM at 62008, 62009, 62003 n.83, 61999-62000. This sadly ironic situation is further magnified in the case of a former licensee whose license is either relinquished or revoked.

As the NPRM explains, one of the "presumptions that a person is 'engaged in the business'" occurs when "a former licensee … sells or offers for sale firearms that were in the business inventory … at the time the license was terminated (*i.e.*, license revocation) … and *were not transferred* to a personal collection...." NPRM at 61999, 62001 (emphasis added). Alternatively, the NPRM creates another two dealing presumptions if "a former licensee … sells or offers for sale firearms that *were transferred* to a personal collection" with "intent to willfully evade the restrictions placed on licensees" and/or "*one year has [not] passed* from the date of transfer to the personal collection." *Id.* at 62001 (emphasis added). In the case of "willfully evading," the NPRM claims that "that firearm **_always_** legally remains part of the business inventory."[37] *Id.* at 61995 (emphasis added). In other words:

---

[37] ATF provides no citation for this claim. Nor is it logical, because once a former licensee is no longer licensed, there is no "business inventory" because there is no "business."

1. Former inventory not transferred to a personal collection **may never be transferred**;

2. Former inventory that was unlawfully transferred **may never be transferred**; and

3. Former inventory that was transferred **cannot be transferred for one year**.

These absurd rules put persons whose licenses are revoked or relinquished in untenable positions that Congress clearly never intended.

As a preliminary matter, ATF's presumptions *for non-licensees* conflict with the statutory text, which on its face applies only to "*licensees*." Indeed, 18 U.S.C. § 923(c) is clear that a license "shall entitle **the licensee**" to engage in various activities, clarifying that a "**license[e]** [may] ... maintain[] and dispos[e] of a personal collection," and that "**a licensee** ... [may] dispose[]" of such firearms " within one year after its transfer from his business inventory into such **licensee's** personal collection." *See also* NPRM at 61995 (using the term "licensee" eleven times to describe Section 923(c)'s requirements). Notably, none of these provisions applies to an *unlicensed person* who happened to *formerly* have held a federal firearms license.[38] Nor do ATF's attempts to apply these requirements to non-licensees make any sense.

First, no longer being licensed, a former licensee no longer can "transfer" a firearm from business inventory to a personal collection, even if that should have occurred at the time of revocation or relinquishment. And as for a revoked licensee, such person may not ever become licensed again, even if for the sole purpose to transfer the alleged "business inventory" firearms to a personal collection. *See* Senate Report 98-583 at 13 (envisioning that only a "*licensee* would be

---

[38] The NPRM's proposal to apply these requirements to "responsible persons" is doubly problematic. *See* NPRM at 61993, 62001, 62003. Notably, the statute includes what ATF calls "responsible persons" **only** in its discussion of who must be eligible to possess firearms when defining "the applicant" to include "a corporation, partnership, or association." 18 U.S.C. § 923(d)(1)(B). The statute certainly imposes no restrictions on what the responsible person of a former licensee may do with firearms.

required to re-transfer any such firearms into his inventory, then transfer them at his premises with appropriate recording.").

Second, while transfers to a personal collection to evade the GCA might support a criminal charge (for the *prior* activity), they do not demonstrate that a former licensee *continues* to be engaged in the business.  Nor does a purportedly unlawful prior transfer somehow permanently taint a firearm and restrict a lawful future transfer.

Third, there plainly is no statutory requirement that a *former* licensee wait one year before disposing of firearms in a personal collection.  Rather, Section 923(c) requires that such a transfer be made only after a *licensee* transfers the firearm *back* to its "business inventory," and out again in its "bound volume."  A former licensee does not have "business inventory," nor is such person required by any law to keep a "bound volume."  Thus, the statute clearly does not regulate activities by unlicensed persons, even if they previously were licensed.

For the first and second groups of former licensees whose licensees were revoked — and who by law may never again qualify for a license (18 U.S.C. § 923(d)(1)(C)) – there would be literally no way for such persons to liquidate their former inventory that was not transferred to a personal collection to ATF's satisfaction.  Unable to obtain a license to do so, ATF's absurd rule would create an untouchable class of firearms that *literally may not be transferred under any circumstance* (other than, perhaps, giving them away for free, as gifts).[39]

The ridiculous situation imposed by the NPRM on former licensees, then, is contrary to ATF's promise to "address[] the lawful ways in which former licensees … **_may liquidate_** business

---

[39] In such a situation, a former licensee could not even safely sell its firearms at a loss.  *See United States v. Shipley*, 546 F. App'x 450, 454 (5th Cir. 2013) ("while a conviction requires that the defendant had the 'principal objective' of making a profit, but it does not require that he succeeded in that endeavor."); *United States v. Beecham*, 1993 U.S. App. LEXIS 13050, at *3 (4th Cir. June 2, 1993) (government "need not prove … that he necessarily made a profit from it").

inventory." *Id.* at 61993.  In reality, the NPRM actually declares that, in certain situations, former licenses ***may not liquidate*** their inventory at all.[40]  This absurd rule that certain firearms may never be transferred may also constitute an unconstitutional taking without compensation.

## IV. The NPRM's Civil "Presumptions" Are Arbitrary and Capricious, Contrary to Law, Unrepresentative of Business Activity or Profit Motive, and Would Penalize Innocuous Conduct

The NPRM proposes a staggering number of so-called "presumptions" which, once levied against an accused, will saddle gun owners with unprecedented obligations to affirmatively *prove* that they are *not* violating statutory prohibitions which carry both civil and criminal penalties. ATF's "presumptions" bifurcate into six "engaged in the business" presumptions and eight "to predominantly earn a profit" sub-presumptions.  NPRM at 62021-22.  Although acknowledging the "totality of circumstances" and "fact-specific inquiry" necessitated by statute, *id.* at 62000, 62021, the NPRM nonetheless taints all sorts of innocuous types of conduct with assumed illegality, without any regard for consideration of the whole picture of any given case.  ATF's "presumptions" undermine the statute, are entirely arbitrary, and should not be promulgated.

### J. ATF's "Presumptions" Conflict with the Statute and Judicial Precedents

As a preliminary matter, the notion that there are various actions a person can take which "presumptively" prove she is unlawfully "engaged in the business" is a concept found nowhere in the statutes Congress enacted.  Yet Congress is no stranger to such civil presumptions, and thus perfectly competent to enact such provisions when it so desires.  *See, e.g.*, 18 U.S.C. § 1469(a)

---

[40] ATF apparently believes these provisions are necessary to "prevent former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms."  NPRM at 61996.  But ATF forgets that being "engaged in the business" requires both "purchase ***and*** resale of firearms."  Simply disposing of inventory held during licensure, by definition, cannot possibly constitute "purchase" of firearms, when no new firearms are acquired.

(creating a criminal presumption that obscene material was transported in interstate commerce); 18 U.S.C. § 3142(e)(2) (creating a criminal presumption of pretrial detention if the defendant has been convicted of certain enumerated offenses); 35 U.S.C. § 282(a) ("A patent shall be presumed valid."); 38 U.S.C. § 1118 (creating a civil presumption of service connection for certain illnesses associated with service in the Gulf War for purposes of VA compensation). Thus, with no statutory authority creating (or authorizing ATF to create) legal presumptions of statutory guilt, the NPRM fails even to clear the starting gate, because ATF simply has no authority to water down the text in order to make it easier for its bureaucrats to harass gun owners.

Interestingly enough, ATF previously appears to have recognized that it lacks the authority to do what the NPRM proposes to do. On March 31, 1988, ATF adopted the current regulatory definitions. *See* 53 FR 10480. In so doing, ATF engaged with a commenter who had requested that "the definition list examples illustrating when a license is required," but declining to create such a list "since the definition adequately addresses this concern by expressly delineating the activity requiring licensing from that of a firearms collector not subject to licensing." *Id.* at 10481. In other words, the NPRM does the very thing that ATF in 1988 claimed the statute did not allow.

What is more, the NPRM repeatedly acknowledges that the "engaged in the business" inquiry is a "fact-specific inquiry," and that "the established approach … is to look at the totality of circumstances." NPRM at 62000, 62021. Indeed, numerous courts have said as much. *See* NPRM at 61995 n.20 (citing *United States v. Brenner*, 481 F. App'x 124, 127 (5th Cir. 2012) ("jury must examine all circumstances … without the aid of a 'bright-line rule'")); *United States v. Bailey*, 123 F.3d 1381, 1392 (11th Cir. 1997) ("finder of fact must examine the intent of the actor and all circumstances surrounding the acts alleged....")); *see also* NPRM at 61995 (citing *United States v.*

35

*Tyson*, 653 F.3d 192, 200-01 (3d Cir. 2011) ("the importance of any one of these considerations is subject to the idiosyncratic nature of the fact pattern")).

The NPRM violates these principles, creating a prohibited "bright-line rule" whereby certain conduct or activity – by itself – is presumed to constitute a federal offense. By permitting a finding that a person is "engaged in the business" based solely on any one of many factors, the NPRM impermissibly fails to require consideration of "the intent of the actor" and "the totality of circumstances," instead presuming intent based on a single factor. *See id.* at 62001 ("[a]ny one or a combination of the circumstances above gives rise to a presumption"). This is precisely what the case law *says not to do*. There is no authority in either the statute or judicial precedent for the idea that ATF may show a person is "engaged in the business" by glomming on to a single data point and claiming that it, by itself, is sufficient.[41]

Simply put, each of the cases ATF references listed a variety of factors that – taken together in various combinations – were considered sufficient to demonstrate unlawful dealing. The NPRM now claims that *any one* of the items from *any one* of those lists – by itself – is sufficient. Worse still, the NPRM uses imprecise language. For example, although claiming (albeit, wrongly) that certain "specific activities demonstrat[e]" that a person is "***presumptively*** … 'engaged in the business,'" the NPRM then includes something of a Freudian slip, treating that alleged *presumption* as in fact being *conclusive* – claiming that anyone who meets a presumption is "***thus require[d]*** to obtain a dealer's license...." *Id.* at 61996 (emphasis added). Of course, a person cannot be required to obtain a dealer's license even if presumed to be – but in fact not actually

---

[41] By way of analogy, what the NPRM does is take a court case that says "We have a door, we have a windshield, we have an engine, we have a steering wheel, and we have four tires. We reasonably can conclude that this is a car," and translate that into a test that says "whenever there is a door, we *presume* it is a car."

being – engaged in the business.  *Cf. id.* at 61999 (conceding that such a person is only "highly likely to be 'engaged in the business'").  But even aside from these overarching defects with the NPRM's "presumptions," the presumptions themselves should be withdrawn because they are arbitrary standards which will chill and prevent entirely innocent and perfectly lawful activity that Congress designed the statute to permit.

### K.  The "Engaged in the Business" Presumptions Are Overwhelmingly Arbitrary

First, the NPRM provides that "[a] person shall be presumed to be engaged in the business of dealing in firearms … when the person … [s]ells or offers for sale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and sell additional firearms."  NPRM at 62021.  Under the plain text of this presumption, the mere offer to sell one firearm to a friend and the *suggestion* that another future sale *could* occur would suffice to presumptively require federal licensure.  Indeed, a casual firearm owner's innocent remark that "Yeah, I might consider selling that rifle if I can find something to replace it," heard by the wrong ears, could "otherwise demonstrate[] a *willingness and ability* to purchase and sell additional firearms."  *Id.* (emphasis added).  To the contrary, the statute does not criminalize this sort of innocent conduct by gun owners.

Second, the NPRM presumes unlicensed dealing whenever a person "[s]pends more money or its equivalent on purchases of firearms for the purpose of resale than the person's reported gross taxable income during the applicable period of time."  *Id.*  But such a standard fails to consider the numerous circumstances in which one may have a low – or no – gross taxable income, therefore exposing any purchase "for the purpose of resale" – which is not forbidden by statute – to the presumption of unlicensed dealing.  For example, purchasing a firearm on the first day of the year

and subsequently losing one's job could create a condition where "more money" was spent on firearms than gross taxable income, at least until a new job was found.

Next, the phrase "the applicable period of time" is entirely ambiguous in scope – for example, most people do not earn any gross taxable income five minutes before and five minutes after purchasing a new gun.  But hyperbole aside, some workers are paid weekly, some bi-weekly, and some monthly, while some receive quarterly sales commissions.  What is to stop ATF from ignoring a large commission check earned December 31 of the prior year, and claiming that a March 15 firearm purchaser has had *no income at all for the entire quarter*?  The potential for abuse of this absurd "applicable period of time" language is not hard to see.

A firearm purchase made while living off one's savings or retirement accounts would also qualify under ATF's ridiculous standard, because a person making withdrawals from a savings account or Roth IRA has no taxable income at all.  So too would a purchase made using Social Security or VA disability benefits, or even a settlement from an injury (none of which are taxable).  At bottom, millions of Americans have no taxable income,[42] or even gross income, and a "presumption" that they engage in the business if they buy and sell a few guns is entirely untethered to reality.

Moreover, this presumption's qualification that such purchases be "for the purpose of resale" must comport with the statute, which requires "the *repetitive* purchase and resale of firearms," in the plural, and exempts certain personal "sales, exchanges, or purchases of firearms,"

---

[42] Howard Gleckman, *TPC: The Number of Those Who Don't Pay Federal Income Tax Drops to Pre-Pandemic Levels*, Tax Pol'y Ctr. (Oct. 27, 2022), https://tinyurl.com/yryyvu99 ("About 30 million households, or about 16.5 percent, will pay neither federal income tax nor payroll taxes this year.").

also in the plural.  18 U.S.C. § 921(a)(21)(C) (emphasis added).  In other words, resales must be numerous, in contrast to the presumption which contemplates the mere "purpose of resale."

Third, the NPRM presumes unlicensed dealing upon the mere "[r]epetitive[] … offer[] for sale" of firearms, *inter alia*, "imported in violation of law."  NPRM at 62021.  Although not listed as an example in the NPRM, there is no reason this presumption would not apply, on its face, to alleged violations of 18 U.S.C. § 922(r), which implicates countless imported braced pistols that ATF magically now claims are "semiautomatic rifles" and which ATF alleges should not have been imported.  *See* 88 FR 6478.  In other words, the mere offer to sell more than one braced pistol – which number in the tens of millions nationwide[43] – could suffice to presumptively establish unlicensed dealing under the NPRM.  But again, even a repetitive "purchase[] for the purpose of resale" or "s[ale] or offer[] for sale" is insufficient as a matter of law when the statute requires both "the repetitive purchase *and* resale of firearms."  18 U.S.C. § 921(a)(21)(C).  It is also worth mentioning that the presumption that any sale of a firearm with the "serial number removed, obliterated, or altered" constitutes dealing, (NPRM at 62021), fails to consider that 18 U.S.C. § 922(k) recently was struck down by at least one federal district court.  *See United States v. Price*, 635 F. Supp. 3d 455 (S.D. W. Va. 2022).  At bottom, the NPRM offers no explanation how possession of certain purportedly unlawful firearms (stolen guns, serial numbers removed, import violations), in addition to constituting its own separate crime, *also* constitutes unlawful dealing. The statute certainly draws no connection between them.

Fourth, the NPRM presumes unlicensed dealing each time someone "[r]epetitively sells or offers for sale" firearms:

---

[43] William J. Krouse, *Handguns, Stabilizing Braces, and Related Components*, Cong. Rsch. Serv., https://tinyurl.com/ycxdhxvr (Apr. 19, 2021).

1) "[w]ithin 30 days after the person purchased the firearms,"

2) "[t]hat are new, or like new in their original packaging, or are

3) "[o]f the same or similar kind … and type."  NPRM at 62021.

But any number of innocuous circumstances reveal just how misguided and overbroad this presumption is.  As for the "30 days" presumption, ATF appears to base its arbitrary timeframe entirely on *a minority of* retailers' return windows.  *Id.* at 62003 n.80.  But as the NPRM itself admits, *most retailers allow no returns at all*.  *Id.* (acknowledging that, "while many retailers do not allow firearm returns,[44] some" do).  As a result, the NPRM will in fact *presume* unlawful activity when people sell a couple firearms within a month of purchasing them.  Of course, there are any number of reasons a person might want to get rid of a recently acquired firearm – regret of having overspent one's means, a firearm that did not fulfill needs or expectations, the need for the firearm (perhaps a hunting trip) has passed, *etc.*[45]  None of these people is unlawfully dealing.  Doing further damage this presumption's focus on the timing of sales, the Third Circuit has

---

[44] *See, e.g.*, *Sportsman's Warehouse – Return Policy*, Sportsman's Warehouse, https://tinyurl.com/3h6pc3kz (last visited Oct. 31, 2023) (emphasis added) (announcing that "[t]he following items *cannot be returned*: … *Firearms*, Ammunition, … and related products"); *Shipping & Returns*, Buds Gun Shop, https://tinyurl.com/2c34usdv (last visited Oct. 31, 2023) ("Once a new firearm is transferred to you, it is considered used, even if un-fired. Consequently, we cannot accept returns on firearms once they have been transferred into your possession.").

[45] For example, without specific firearm models available to examine in person, one may discover poor ergonomics only after they have purchased and received a firearm from an online retailer with a "no returns" policy.  In such a case, one will have no recourse but to sell the firearm to another soon after initial receipt.  Likewise, innocuous circumstances such as simply falling on hard times, voluntary liquidation due to mental-health concerns, or even involuntary liquidation due to becoming a prohibited person under state or federal law, could see individuals conducting multiple sales practically contemporaneously with previous purchases.  The perverseness of a regulation mandating such people to retain their firearms until they become licensed (an impossibility for the felon) cannot be understated.

explained that the dealing "inquiry is not limited to … the timing of the sales." *United States v. Palmieri*, 21 F.3d 1265, 1268 (3d Cir. 1994).

As for the NPRM's like-new or original-packaging presumption, this bizarre edict will punish collectors and casual firearm owners alike for their diligence in maintaining original boxes, warnings, manuals, and even factory-included safety accessories. Indeed, many people who are in no way "dealers" under the statute sell firearms secondhand, advertising them as "new in box," or "never fired," and therefore in "collector's condition." Other gun owners are more interested in collecting firearms than shooting them. Moreover, this presumption contains no temporal limitation, so the requirement of "repetitive" sale or offer of sale of "new in box" firearms ostensibly could be satisfied *years* apart (*i.e.*, a listing for "original 1986 Glock 17, Gen 1, new in box!"). The NPRM thus shows ATF's extreme disconnect from the reality of the behavior of ordinary, law-abiding gun owners who are in no way "engaged in the business."

ATF's "same or similar kind … and type" presumption suffers from similar real-world defects. Contrary to ATF's claim, collectors *routinely* purchase multiple examples of the same kind (make, model, etc.) and type (rifle, pistol, etc.) of firearm, such as C&R collectors of military surplus arms. The eventual sales of these firearms – often after years or even decades of appreciation – cannot reasonably be presumed to be "dealing." For example, if one purchased 20 surplus rifles a decade ago as an investment, shot them little but admired them much, while hoping they would increase in value, even the repetitive sale of the same "type" of firearm now would not constitute "dealing," as it simply would be the earning of a return on one's hobby investment. Moreover, with no limiting principle as to what is "similar" enough to constitute a "similar kind" or "similar … type" of firearm, this presumption opens the door to arbitrary and discriminatory enforcement where a Glock and a Steyr could be considered "similar" enough "makes" just for

being Austrian and polymer, if one squints hard enough. And, because this presumption reads the conjunctive initial "purchase" requirement right out of the statute, even a son offering his father's inherited collection for sale would be swept up in the NPRM's presumption of unlicensed dealing. *See* NPRM at 62021 (contemplating only the repetitive sale or offer of sale of firearms without any acquisition). Like the others, this "presumption" offers no guiding principle to delineate between unlawful and perfectly innocent conduct.[46]

### L. The NPRM's "Predominantly Earn a Profit" Presumptions Are Overwhelmingly Arbitrary

Next, although acknowledging that the intent to profit "is a fact-specific inquiry," the NPRM proposes eight presumptions that purportedly establish "the intent to predominantly earn a profit from the sale or disposition of firearms" – **without the consideration of any other facts**. NPRM at 62021. However, just like the NPRM's "engaged in the business" presumptions, these sub-presumptions are also defective for implicating far too much innocuous conduct.

First, the NPRM presumes all advertising, marketing, or promotion of a "firearms business" displays an intent to predominantly earn a profit. NPRM at 62021. But that is not the presumption the NPRM *actually* creates. Rather, the NPRM claims that merely "advertis[ing] or **post[ing] firearms for sale**, including **on any website**" shows that a person intends to profit. *Id.* (emphasis added). Under this presumption, then, anyone who wishes to sell even *one* firearm from their personal collection, and who posts a sale listing on an online forum, whether public or private, will be presumed to have a business-related profit motive. This is absurd. As ATF readily acknowledges, **most private sales** of firearms these days **involve online mediums** (*i.e.*, online

---

[46] The NPRM's misguided rules that apply to "former licensees" and their "responsible persons" are addressed *supra*, and are not discussed further here.

postings).  *Id.* at 62008.  Many of them involve transfers through licensed dealers (such as sales across state lines that occur between private parties on GunBroker or ArmsList).  Either way, the fact that a person posts grandad's shotgun for sale in a hometown forum does not an unlawful firearms dealer make.

Second, the NPRM presumes anyone who "[p]urchases, rents, or otherwise secures or sets aside permanent or temporary physical space to display or store firearms they offer for sale" must have the intent to predominantly earn a profit.  NPRM at 62021-22.  However, this presumption is in outright conflict with the statutory protection for those who wish to "sell[] all or part of [their] personal collection of firearms" at a public location, like a gun show.  18 U.S.C. § 921(a)(21)(C).  Indeed, some of the best places to liquidate such a personal collection would be public gatherings *designed* to facilitate firearm transactions.  ATF cannot presume statutory violations from conduct that the statute explicitly protects.  Not to mention, literally every person who possesses firearms "sets aside … physical space to … display or store [their] firearms," such as a "display case" (*id.* at 62021-22), home gun safe, or even tucked in a nightstand drawer.  A dentist who keeps a couple firearms in his office for self-defense has set aside "part … of a business premises."  *Id.* at 62022.  The NPRM's foolish and uncabined presumption would turn literally every gun owner who has ever sold a gun into an unlicensed firearms dealer.

Third, the NPRM presumes anyone who "[m]akes or maintains records, in any form, to document, track, or calculate profits and losses from firearms purchases and sales" must have the intent to predominantly earn a profit.  NPRM at 62022.  If the others did not already, this presumption borders on the inane, if not the insane.  Indeed, many firearm owners maintain documentary evidence of their firearm collections, records of modifications, receipts of purchases, and bills of sale, purely for organizational or accounting purposes which have nothing to do with

dealing or profiting from business activity. Should ATF come across a collector's spreadsheet,[47] for example, such documentation automatically would support a presumption of a GCA violation that the unwitting collector would be forced to rebut, at their own cost, should ATF initiate an administrative enforcement action (or seek to invoke its presumptions in a criminal case). Worse yet, ATF speaks out of both sides of its mouth, because ATF in fact *recommends* that people maintain documentation of their firearm purchases and sales, even providing an official booklet to do so.[48] It is beyond hypocritical for an agency that desires records of every firearm transfer[49] to claim that such records in the hands of law-abiding gun owners somehow constitute evidence of criminal activity.

Fourth, the NPRM presumes anyone who "[p]urchases or otherwise secures merchant services as a business (*e.g.*, credit card transaction services, digital wallet for business) through which the person *makes or offers to make payments for firearms* transactions" has the intent to predominantly earn a profit. NPRM at 62022 (emphasis added). As worded, then, this presumption appears to target *buyers* of firearms who *make* electronic payments, rather than purported *dealers* who *accept* electronic payments when they sell guns. *See id.* (emphasis added) ("the person *makes or offers to make* payments"). Yet when discussing this language "make payments," the NPRM confusingly references a case involving a defendant selling firearms (*i.e.*, *accepting* payments). *See id.* at 62005 n.97 (citing *United States v. Dettra*, 2000 U.S. App. LEXIS

---

[47] Even a licensed collector of curios and relics (FFL 03) would risk liability under this presumption, because they are in fact *required* by ATF to maintain such documentation. However, the NPRM will presume that even *these* FFLs simply have the *wrong* FFL (collector, not dealer).

[48] *See Personal Firearms Record*, ATF, https://tinyurl.com/7b48hfhc (last visited Oct. 31, 2023).

[49] *See* Houston Keene, *Texas Congressman Introduces Anti-Gun Registry Bill as ATF Cracks Down on Gun Stores*, Fox News (Mar. 1, 2023, 1:09 PM), https://tinyurl.com/4u6992vb (reporting on GOA's discovery that "ATF had processed and digitized over 50,000,000 'out of business' records of gun dealers in FY 2021" and that "ATF has reached a point where it has converted nearly one billion records … into a single, centralized, and searchable national gun registry").

33715, at *2 (6th Cir. Dec. 15, 2000)).  In other words, it is entirely unclear who ATF is trying to target with this presumption.  But either way, the presumption swings too far.

For starters, if the presumption is interpreted as written (making a dealer out of anyone who *makes electronic payments* for firearms using a business account), that would cover any business that employs armed guards or otherwise purchases firearms for non-dealing business purposes (*e.g.*, the Boy Scouts purchasing .22lr rifles for instructional purposes).  Alternatively, to the extent that this presumption is designed to target firearm sellers who *accept electronic payments* through a business account, the dentist discussed *supra* might choose to sell one of his firearms to a patient after striking up a conversation about their common hobby.  Should the dentist add that cost to the total bill, and accept payment by credit card, ATF would presume him intending to profit from the sale, even though the dentist has not remotely "engaged in the business" either under the totality of the circumstances or the statute's plain text.  Indeed, any ordinary gun owner with a small business[50] PayPal account – which permits payment via credit card[51] – who accepts payment for an unrelated firearm sale could irrationally be argued to constitute a "merchant service[] as a business" "secure[d]" to accept "payments for firearms transactions."  NPRM at 62022.  When every small eBay seller must worry about becoming a presumptive "dealer" should they sell a personal firearm, perhaps the NPRM has strayed a bit too far.

Fifth, the NPRM presumes anyone who "[f]ormally or informally purchases, hires, or otherwise secures business security services … to protect business assets or transactions that include firearms" must have the intent to predominantly earn a profit.  ATF is once again off the

---

[50] "Small business" may be a low bar these days, when PayPal must report total annual "goods and services" payments in excess of $600 to the IRS.  *See Will PayPal Report My Sales to the IRS?*, <u>PayPal</u>, <u>https://tinyurl.com/2s43jjdp</u> (last visited Nov. 2, 2023).

[51] *See* Meena Thiruvengadam, *Boost Your Rewards by Using PayPal with Your Credit Cards*, <u>Points Guy</u> (Mar. 24, 2020), <u>https://tinyurl.com/muan9fsr</u>.

rails. Corporations and other business entities may own firearms without having remotely anything to do with the business of firearm dealing. For example, an armored truck or security guard company no doubt has a warehouse/central location where employees' work firearms are stored. If the company then has some monitored security cameras installed to secure those firearms – and one day sells its old firearms to a dealer so it can then buy new ones – that company would become an unlawful dealer under this "presumption." Is every Sheriff's department with a security system now a presumptive unlicensed firearms dealer when it trades in old duty guns?

Sixth, the NPRM presumes anyone who "[f]ormally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes or offers to make firearms transactions" is presumptively intending to earn a profit. NPRM at 62022. But again, the case ATF references involved an entirely more damning fact pattern than the "presumption" the NPRM creates. ATF's cited case involved a defendant who "possessed a federal firearms license … allowed the FFL to lapse," continued to "advertis[e] that 101 Outdoors sold … guns and ammunition," and had "twelve guns on display, some of which had price tags on them," had "a sign advertising guns and ammo," later had "fifteen to twenty long guns … displayed" outside and "several more long guns and a few handguns" displayed for sale inside and, on another date, had even more and new guns on display and said "he would be having an auction [and] selling rifles, shotguns, and some handguns." *United States v. Gray*, 470 F. App'x at 468, 469-70 (6th Cir. 2012) (recounting how no fewer than eight different ATF informants and undercover agents had purchased firearms from Gray over a period of many months, and discussed Gray obtaining more firearms to sell them). In stark contrast to the *Gray* case, the NPRM's presumption would apply to the owner of an antique store who decides to sell her grandfather's WWI-era firearm, and figures

that the best place to offer it for sale is at her store.  Such person clearly is not "engaged in the business," but the NPRM would lead to that presumption.

Finally, the NPRM's eighth presumption of profit intent is for anyone who "purchases a business insurance policy, including any riders that cover firearms inventory."  NPRM at 62022. Once again, this overbroad presumption would cover the armed guard company, or the Boy Scouts, should they purchase insurance to protect their corporate firearm collection against loss, and then later dispose of, sell, trade, or upgrade one or more firearms.

In short, the NPRM's "presumptions" certainly could, in some instances, demonstrate that a person is selling firearms with the intent to make a profit.  Problematically, though, each of ATF's presumptions swing far too broadly, sweeping up all manner of innocent conduct and presuming that countless gun owners are seeking to profit and thus engaged in the business based on perfectly innocent activity.  That is why courts have uniformly engaged in "fact-specific inquiries" of "the totality of circumstances," without being bound by the sort of "bright-line rule[s]" that the NPRM proposes to create.  For this reason (and the numerous others provided above), the NPRM's unlawful "presumptions" should be withdrawn.

## M. The NPRM's Illogical Opposing Presumptions Contravene the Statute

Instead of "assist[ing] persons in understanding" federal law or "clarify[ing] when persons are not 'engaged in the business,'" NPRM at 61993, the NPRM does nothing to benefit gun owners.  Rather, the NPRM rewrites the statute, replacing its unambiguous protections with contradictory language preferred by ATF.  After labeling various innocuous conduct as "presumptively" violative of federal law, the NPRM reframes the statute's explicit safe-harbor provisions as merely establishing the *absence* of the presumptions ATF just invented.  *See id.* at 62021.  But there is a massive difference between being ***declared not*** in violation of federal law

(*i.e.*, the statute), versus being ***presumed not*** in violation of federal law, versus ***not being presumed*** in violation of federal law (what the NPRM says). Indeed, the NPRM waters down the statutory protections to the greatest extent possible, replacing the bright line safe harbors Congress enacted with a promise that a person merely will not be presumed to be breaking the law if he engages in certain activities. The NPRM's regulatory rewrite conflicts with the plain text of the statute.

The statute provides that a "dealer in firearms … ***shall not include*** a person who makes occasional sales, exchanges, or purchases of firearms [i] for the enhancement of a personal collection or [ii] for a hobby, or [iii] who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C) (emphasis added). This statutory safe harbor affirmatively declares that certain persons are *not* "dealers" – not by omission, not by presumption, but by express exemption.

In stark contrast, the NPRM provides:

> Where a person's conduct does not otherwise demonstrate a predominant intent to earn a profit, the person ***shall not be presumed*** to be engaged in the business of dealing in firearms when the person transfers firearms only as bona fide gifts, or occasionally sells firearms only to obtain more valuable, desirable, or useful firearms for the person's personal collection or hobby. [NPRM at 62021 (emphasis added).]

This provision is defective for several reasons besides ATF's general lack of authority to legislate. First, it neuters the statute's "shall not include" – an unequivocal statement – to a mere "shall not be presumed." The meaning has changed, the protection has changed, and the burden of proof has changed.

Second, there is a significant difference between being "presumed not" something and being "not presumed" something. The former is closer to the statutory formula; "presumed not" at least affords an individual a protection that the government must overcome. The latter is the NPRM's formula; "not presumed" merely exempts an individual from a burden that normally must be overcome. Of course, even a "presumed not" formula would not be sufficient, as the statute is

48

definitive and forecloses being "engaged in the business" under its exceptions.  In other words, the NPRM is not just one – but two – degrees removed from the statutory text.  *See* NPRM at 62001 (certain facts "*not likely to be sufficient to support* a presumption" of dealing).  This is no drafting error; the NPRM admits that the conduct of those who fall under the statutory exemption is "not *likely* to be sufficient to support a presumption that a person is engaging in the business of dealing in firearms," NPRM at 62001 (emphasis added), implying one could still be "engaged in the business" even if one's conduct falls squarely under the NPRM's purported safe-harbor provisions. *See id.* at 62002 (referencing "the rebuttable presumptions set forth above," presumably including the opposing presumptions).  On the contrary, the statute does not express or imply any such thing.

Third, the NPRM's "shall not be presumed" examples misstate and therefore alter fundamentally the statutory safe-harbor provisions.  In part, the NPRM states that a "person shall not be presumed to be engaged in the business of dealing in firearms when the person transfers firearms only as bona fide gifts."  NPRM at 62021.  In other words, the NPRM asserts that there is <u>no presumption of legality</u> *in one's favor* <u>even if they give a bona fide gift</u> – just that there is no presumption of illegality.  But this claim totally mischaracterizes the law and in fact contradicts ATF's own statements on its Form 4473 – that giving a bona fide gift is *conclusively lawful*.[52] Moreover, while the statute provides that 'if you do this, then you are not breaking the law,' the NPRM revises this statement to 'if you do this, then we will not assume you are breaking the law.' Apparently, according to the NPRM, there is a way to "demonstrate a predominant intent to earn a profit" by giving a "bona fide gift"—because presumptions may be rebutted.  NPRM at 62021. In no universe (except ATF's) can this be true.

---

[52] *Firearms Transaction Record*, <u>ATF</u> 4 (Aug. 2023), https://tinyurl.com/47xsnvwy ("A person is also the actual transferee/buyer if he/she is legitimately purchasing the firearm as a bona fide gift for a third party.").

Similarly, the NPRM disclaims any presumption of legality in one's favor when a person "occasionally sells firearms only to obtain more valuable, desirable, or useful firearms for the person's personal collection or hobby." *Id.* On the contrary, like giving a bona fide gift, this conduct is also *conclusively lawful* – Congress said so. 18 U.S.C. § 921(a)(21)(C) (emphasis added) (providing that "such term *shall not include* a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby").

To make matters worse, the NPRM neuters the statute even further by editing "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection," 18 U.S.C. § 921(a)(21)(C), to mean the "occasional[] s[ale]" of "firearms **only to** obtain more valuable, desirable, or useful firearms for the person's personal collection." NPRM at 62021 (emphasis added). As the statute acknowledges, there are more ways to enhance one's collection than "occasionally sell[ing]" firearms, such as by "exchang[ing]" them. Indeed, one could enhance their collection by bartering or trading firearms, or by selling firearms to fund modifications to existing firearms – neither of which falls under the NPRM's absolute language that the occasional sale of firearms must be "**only to** obtain more valuable, desirable, or useful firearms for the person's personal collection or hobby." *Id.*

Finally, the NPRM ignores entirely the statutory safe harbor for "a person … who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C); *cf.* NPRM at 62021 (omitting any mention of this permissible activity). Of course, the statute takes precedence. At bottom, the NPRM's non-presumptions – like its novel presumptions – are illogical, contradictory, and violate the plain text of the statute they purport to implement.

## V.    The NPRM Exceeds Statutory and Constitutional Authority to Invent New Crimes that Congress Never Enacted

As the Supreme Court has recognized time and again, "Congress has only limited authority over crime." *Taylor v. United States*, 579 U.S. 301, 311 (2016).  Without a plenary police power, Congress must invoke an enumerated power, like commerce or taxation, to proscribe conduct.  If Congress is so limited, then agencies are limited even more.  In fact, bureaucrats are entirely prohibited from creating new federal crimes.  *See Whitman v. United States*, 574 U.S. 1003, 1004 (2014) (Scalia, J., respecting denial of certiorari).[53]  Rather, as "creatures of statutory authority," agencies have "no power to act … unless and until Congress confers power upon [them]." *Friends of the Crystal River v. EPA*, 35 F.3d 1073, 1080 (6th Cir. 1994).  ATF certainly has no authority to proscribe more conduct in the NPRM than Congress did in the statute.

### N. There Is No Federal "Attempt" Crime for "Engaging in the Business"

Contrary to this basic constitutional axiom, the NPRM effectively creates "attempt" liability out of whole cloth.  NPRM at 62000 (emphasis added) ("Thus, even a[n] … <u>offer to engage</u> in a transaction, when combined with other evidence, may be sufficient to require a license."); *cf.* 18 U.S.C. § 922(a)(1)(A) (emphasis added) (criminalizing "<u>engag[ing]</u> in the business of … dealing in firearms" without a license).  But "[t]here is no general federal 'attempt' statute.  A defendant therefore can only be found guilty of an attempt to commit a federal offense if the statute defining the offense also *expressly proscribes* an attempt." *United States v. Hopkins*, 703 F.2d 1102, 1104 (9th Cir. 1983) (emphasis added).

---

[53] "[T]he norm [is] that legislatures, not executive officers, define crimes.  When King James I tried to create new crimes by royal command, the judges responded that "the King cannot create any offence by his prohibition or proclamation, which was not an offence before." *Id.*

Importantly, 18 U.S.C. § 922(a)(6) provides only one "attempt" crime with respect to firearm transactions,[54] making it a crime for "any person in connection with [an] … attempted acquisition of any firearm or ammunition from a [licensee] [to] knowingly to make" a materially false statement to deceive a licensee.  In contrast, 18 U.S.C. § 923(a) states that "[n]o person shall engage in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has … received a license…."  Emphasis added.  And 18 U.S.C. § 921(a)(21)(C), in turn, discusses how a person engages in that business – through "the repetitive purchase and resale of firearms" – not merely "an offer to engage."  Thus, the statutes make no mention of an "attempt" to be "engaged in the business," and provide no indication that mere discussion of firearm transactions (without any actual purchases or sales) constitutes dealing, and therefore authorize no "attempt" liability.  *See Hopkins*, 703 F.2d at 1104.  Certainly, Congress knew perfectly well how to create attempt crimes for firearm transactions (*see* 18 U.S.C. § 922(a)(6)), and Congress certainly could have done so for unlawful dealing, but Congress did not.

Nevertheless, the NPRM relies on *United States v. King*, 735 F.3d 1098 (9th Cir. 2013), for the proposition that engaging in the business of "dealing in firearms" does not even require one actual sale to be made.  NPRM at 62005 n.93.  In *King*, the Ninth Circuit stated that the defendant "attempted to sell one firearm to a tenant in MHPS's office building and offered to provide another

---

[54] To be sure, there are other "attempt" crimes in Title 18, but none relate to the subject matter of the NPRM.  For instance, 18 U.S.C. § 924(h) criminalizes the "[w]hoever knowingly receives or transfers a firearm or ammunition, or attempts or conspires to do so, knowing or having reasonable cause to believe that [it] will be used to commit" certain crimes.  Likewise, 18 U.S.C. § 924(k) criminalizes attempt or conspiracy to "smuggle or knowingly bring[] into the United States a firearm or ammunition … with intent to engage in or promote [certain] conduct…."  Finally, 18 U.S.C. §§ 924(g)(4) and (n) criminalize additional attempts involving crossing state and international lines to commit crimes.  *See also* 18 U.S.C. § 922(q)(3)(A) (attempt to discharge a firearm in a school zone).

to his building manager." 735 F.3d at 1107.  In a footnote, the court cited to a Second Circuit case which restated a previous holding that "the government's burden under Section 922(a)(1)(A) is to prove that the defendant has guns on hand or is ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers."  *Id.* at n.8 (alteration in original) (quoting *United States v. Nadirashvili*, 655 F.3d 114, 120 (2d Cir. 2011)).

However, in *Nadirashvili*, those defendants were convicted of, among other things, "engaging in a domestic firearms trafficking conspiracy, in violation of 18 U.S.C. § 922(a)(1)(A) and (o), of firearms trafficking (or aiding and abetting thereof), in violation of 18 U.S.C. § 922(a)(1)(A)...."  655 F.3d at 118-19.  *Nadirashvili* is silent as to whether any defendant sold any firearm, noting only that they had "succeeded in procuring eight guns" (actual purchases) so they could fulfill orders.  *Id.* at 120.  And in *King*, while the defendant did not sell even one firearm, the Ninth Circuit held that the defendant's conviction "rested on King's activities that rose to the level of 'engaging in the business of firearms dealing'—i.e., ordering, receiving, transporting, and attempting to sell firearms," 735 F.3d at 1106, again referencing in part an "attempt" at selling firearms, but not an actual sale.

In contrast, the statute clearly requires the "repetitive purchase and resale of firearms" rather than the mere claim of being a general source for guns, without any actual sales.  18 U.S.C. § 921(a)(21)(C).  The cases on which ATF relies all trace their authorities back to pre-FOPA, pre-"profit" cases interpreting the meaning of "engaged in the business" prior to more recent congressional amendments.  *See, e.g.*, *Nadirashvili*, 655 F.3d at 120 (citing *United States v. Berry*, 644 F.2d 1034, 1037 (5th Cir. 1981)).  At bottom, neither the statute, nor the few cases the NPRM references, authorize the imposition of "attempt" liability for engaging in the business where Congress has indicated that none should exist.

### O. Similarly, "Conspiracy" Charges Are Unavailable for Most Conduct the NPRM Seeks to Prohibit

In addition to foreclosing "attempt" liability for "engaging in the business," the statute also forecloses other inchoate liability for most of the conduct that is targeted by the NPRM.

For example, the NPRM cites a past conspiracy prosecution, claiming that the continued acquisition of firearms by former licensees has "resulted in numerous firearms being sold … to potentially prohibited persons without any ability to trace those firearms if later used in crime." NPRM at 62006; *id.* at n.103. As a preliminary matter, this passage's apparent Freudian slip – that ordinary Americans purchasing firearms are "*potentially prohibited persons*" as opposed to *presumptively law-abiding persons* – betrays an overarching contempt for gun owners that permeates the entire NPRM.

But more importantly, the cited conspiracy case represents an outlier circumstance where a defendant and multiple unnamed coconspirators were alleged to have continued selling firearms following FFL surrender. *See* Indictment, *United States v. Wyatt*, No. 1:16-cr-00057-MSK (D. Colo. Feb. 8, 2016), ECF No. 1 (charging two counts conspiracy under 18 U.S.C. § 371 for dealing in firearms without a license). Such uncommon cases aside, conspiracy liability would not attach in practically any of the circumstances contemplated by the NPRM, for two reasons.

First, Congress has displayed an intent to proscribe only certain specific inchoate conduct relating to firearms, via narrowly drafted conspiracy statutes. *See* 18 U.S.C. § 924(h) (imposing attempt and conspiracy liability for the knowing receipt or transfer of a firearm for the commission of certain crimes); § 924(k) (imposing attempt and conspiracy liability for the knowing smuggling into and out of the United States a firearm for the commission of certain crimes); § 924(o) (imposing conspiracy liability for conduct proscribed by § 924(c)). Because Congress has enacted

*specific* conspiracy statutes in federal firearms laws, Congress implicitly has excluded application of *general* conspiracy statutes in these circumstances. *See* Scalia & Garner, *supra*, at 183 ("If there is a conflict between a general provision and a specific provision, the specific provision prevails...."); *id.* at 107 ("The expression of one thing implies the exclusion of others...."); *id.* at 327 ("Repeals by implication are disfavored....  But a provision that flatly contradicts an earlier-enacted provision repeals it."); *see also* Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683, 701 (enacting 18 U.S.C. § 371, the general conspiracy statute, decades before more specific conspiracy statutes amending the Gun Control Act of 1968 would be enacted).  In other words, there is no unbounded ability to bring conspiracy charges based on GCA crimes.

Second, a purported "dealer's" firearm sale to an unwitting buyer would fail to satisfy the basic elements of a conspiracy.  As the Eleventh Circuit has observed, "[t]he elements of a conspiracy under 18 U.S.C. § 371 are (1) an agreement *among two or more persons to achieve an unlawful objective*; (2) *knowing and voluntary participation in the agreement*; and (3) an overt act by a conspirator in furtherance of the agreement."  *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003) (emphases added).  In contrast, the NPRM's "engaged in the business" and "predominantly earn a profit" presumptions target purported dealers that sell firearms, but not the innocent buyers who merely purchase firearms in  what they believe to be private sales.  Indeed, a potential buyer is unlikely to know anything about a seller's *other* offers to sell, repetitive purchases, purchase and resale frequency, maintenance of records, use of security services, or any other fact patterns outlined in the NPRM's presumptions.  Accordingly, even assuming these presumptions are valid (they are not), these buyers could not "know[] and voluntary[ily] participat[e]" in an agreement, let alone agree "to achieve an unlawful objective" when they are

entirely unaware of a firearm seller's alleged need for licensure.  Without these elements present, there can be no conspiracy arising from an innocuous firearm sale.

At bottom, without attempt or conspiracy charges available, the NPRM has no possible avenue to rewrite the statutory text "purchase and resale" to claim that neither is required.

### P.  Despite ATF's Assurances to the Contrary, the NPRM's Presumptions Will Mislead Criminal Juries

The NPRM's proposal of civil presumptions (and criminal permissive inferences) marks a worrying trend in ATF's recent enforcement philosophy.  Rather than "help[ing] unlicensed persons" interpret federal law, NPRM at 62000, these presumptions operate to stack the deck against gun owners[55] in much the same way that ATF's new "zero-tolerance" FFL revocation policy stacks the deck against licensed dealers.  *See, e.g.*, Complaint ¶ 263, *Morehouse Enters., LLC v. BATFE*, No. 3:23-cv-00129-PDW-ARS (D.N.D. July 11, 2023), ECF No. 1 (emphasis added) ("ATF's AAP takes the position that, regardless of whether there are actually any facts to establish 'willfulness,' *ATF will presume* that certain violations establish willfulness and 'shall result in a revocation recommendation….'").  Thus, putting the two policies together, ATF now claims that **just about everyone "presumptively" needs a license, and just about every license "presumptively" should be revoked**.

The NPRM's civil presumptions are an obvious pretext to maximize criminal convictions for "engaging in the business" based on a thin set of facts.  By definition, these presumptions mean

---

[55] Indeed, ATF's claimed efforts to "help the public" always seem to *hurt* the public (what are the odds?) by expanding the reach of criminal laws to implicate more and more conduct that ATF previously promised was entirely lawful.  *See, e.g.*, 88 FR 6478 (expanding liability for felonies via mass reclassification of braced pistols as short-barreled rifles); 87 FR 24652 (expanding liability for felonies via redefinition of when an unfinished frame or receiver becomes a firearm); 83 FR 66514 (expanding liability for felonies via reclassification of firearm parts as machine guns).

the government wins "absent reliable evidence to the contrary."  NPRM at 62000.  And while disclaiming their direct application in criminal cases, the NPRM then immediately provides the thinly veiled suggestion that these presumptions may serve as backdoor "reasonable permissive inferences" in criminal cases.  *Id.* at 62000; *see also id.* at 62001 ("shall not apply to criminal cases" but "may be useful to courts in criminal cases").  Such "inferences" would "'allow[] … the trier of fact to infer' that an element of a crime is met once basic facts have been proven beyond a reasonable doubt."  *Id.* at 62000 n.60; *see also id.* at 62005 (noting that ATF's presumptions that purportedly do not apply in criminal cases nevertheless come from "ATF's experience … conducting criminal investigations").

*Au contraire.*  As the NPRM acknowledges, whether unlicensed conduct rises to the level of engaging in the business is a "fact-specific inquiry" requiring examination of "all circumstances surrounding the acts" in question.  *Id.* at 62021, 61995.  This totality-of-the-circumstances approach is wholly incompatible with the NPRM's fanciful evidentiary shortcuts.  Indeed, of the 11 cases the NPRM cites in its footnote discussion of criminal inferences, *id.* at 62000 n.60, *not a single one* supports the use of presumptions in an "engaged in the business" analysis, where a single data point essentially would suffice to satisfy an inherently multifactor test.[56]  On the contrary, an appropriate jury instruction in an "engaged in the business" prosecution simply would

---

[56] *See Francis v. Franklin*, 471 U.S. 307 (1985) (malice murder); *Cnty. Ct. of Ulster Cnty. v. Allen*, 442 U.S. 140 (1979) (firearm possession); *Baghdad v. Att'y Gen. of the U.S.*, 50 F.4th 386 (3d Cir. 2022) (shoplifting); *Patton v. Mullin*, 425 F.3d 788 (10th Cir. 2005) (murder); *United States v. Warren*, 25 F.3d 890 (9th Cir. 1994) (murder); *United States v. Washington*, 819 F.2d 221 (9th Cir. 1987) (murder and assault with a deadly weapon); *Lannon v. Hogan*, 719 F.2d 518 (1st Cir. 1983) (murder); *United States v. Gaines*, 690 F.2d 849 (11th Cir. 1982) (false income tax return); *United States v. Antonoff*, 424 F. App'x 846 (11th Cir. 2011) (false statements by a prohibited person in connection with acquisition of a firearm); *United States v. McCowan*, 469 F.3d 386 (5th Cir. 2006) (possession of a firearm with an obliterated serial number); *United States v. Stanford*, 2012 U.S. Dist. LEXIS 52607 (D. Kan. Apr. 16, 2012) (possession of a firearm by a prohibited person).

be that the jury should consider *all the facts*.  Rather than suggesting the use of presumptions as permissive inferences in a criminal case, the NPRM at most could have (i) provided a list (as numerous courts have provided in their opinions) of the various types of factors that legitimately can play into an "engaged in the business" determination, (ii) noted that such conduct involves a tremendous amount of gray area that cannot be resolved by unyielding regulation, and (iii) concluded that each case is to be decided on its own unique facts and circumstances.

### Q. The NPRM Creates a Catch-22, Both Requiring and Denying Licensure

The NPRM seeks to require between 24,540 and 328,296 persons to obtain a federal firearms license, on the grounds that they *currently* constitute "unlicensed persons that [sic] may be considered engaged in the business...."  NPRM at 62008, 62009.  Yet at the same time, ATF claims that it will "den[y] a firearms license application … on the basis that the applicant was presumed under this rule to have willfully engaged in the business of dealing in firearms without a license."  *Id.* at 62003 n.83; *see also id.* at 61999 ("deny licenses to persons who willfully engaged in the business of dealing in firearms without a license").

Apparently, the irony of this sort of "heads I win, tails you lose" situation is lost on ATF. Indeed, the NPRM both acknowledges and deliberately creates a Catch-22 situation where ATF will *require* a person obtain a license in order to sell firearms, only then to *deny* that person the very license that ATF demanded be obtained.  *See id.* at 62000 n.58.  The NPRM thus permits ATF to conclude that hundreds of thousands of Americans may not sell a firearm without obtaining a license that ATF will not issue, based on the misguided theory that the very same course of conduct (which occurred prior to and thus without notice of ATF's new standard) *both requires a person*

*to, and precludes a person from*, obtaining a license.  But as the maxim goes, the law will not require an impossibility.[57]

The NPRM also would have the effect of leaving a person denied a license (on the grounds that he had unlawfully engaged in the business) in the position of having to pay hefty legal fees to (a) participate in an ATF administrative hearing and, assuming ATF affirmed its denial, (b) seek relief in federal court pursuant to Section 923(f).  These hefty costs would be incurred before ever having obtained a license and thus before ever being able to go into business and make a "livelihood and profit."  This is something few if any applicants reasonably could afford – especially those at the margin, who sell only a few personal firearms, but who would now be declared dealers under the NPRM.

Moreover, such a determination by ATF, denying a license on the grounds that a person had previously been engaged in the business unlawfully, would not come after a legal determination by a jury (such as a criminal conviction), a judge (such as a de novo review of license revocation under Section 923(f)), or even a formal adjudication (such as an ATF revocation hearing).  Rather an ATF determination under the NPRM that a person is not qualified for a license to sell guns, because he previously sold some guns, would be an entirely arbitrary and informal decision made by ATF bureaucrats exercising unbridled discretion.  ATF cannot possibly justify the NPRM's unfairly imposing a new licensure requirement on hundreds of thousands of persons, and then claim that none of them is eligible for a license.

---

[57]  Whereas other alleged violations (such as a dealer "willfully" failing to keep records) arguably might preclude future licensure, no license is required to keep shoddy records.  In contrast, here the license is required to engage in the business of dealing in firearms.  *See Haynes v. United States*, 390 U.S. 85 (1968) (dismissing a criminal charge for failure to register an NFA item possessed by a convicted felon who could not possess an NFA item).

## VI.    The NPRM's Proposed Statutory Revisions Violate the Constitution

### R.  The NPRM Violates the First Amendment

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech."  Contrary to this clear proscription, the NPRM contends that even so much as engaging in speech can be prosecuted as "engaging in the business" of dealing in firearms.  *See* NPRM at 62000 n.62.  In that footnote, the NPRM cites to *United States* v. *Nadirashvili,* 655 F.3d 114, 120-21 (2d Cir. 2011), for the proposition that co-defendants "knew [the defendant] held himself out generally as a source of firearms, and was ready to procure them for customers."  But a rule that states individuals can be prosecuted – not for selling firearms without a license but for engaging in speech about selling firearms – violates the First Amendment.

On the contrary, "[a]n offer to sell firearms or ammunition is speech that 'does no more than propose a commercial transaction.'  Such an offer is, therefore, commercial speech within the meaning of the First Amendment."  *Nordyke v. Santa Clara Cnty.*, 110 F.3d 707, 710 (9th Cir. 1997) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 762 (1976)).  Of course, "commercial speech, like other varieties, is protected."  *Va. State Bd. of Pharmacy*, 425 U.S. at 770.  Imagine a person attempting to decide whether to obtain an ATF license and become "engaged in the business" of importing firearms from abroad.  Were he to approach a friend who owned several retail gun stores, explain his overseas contacts, and discuss (and perhaps even agree) to import certain firearms at certain prices to be sold at retail – all in order to verify that licensure is worthwhile – ATF could accuse him, under the NPRM, of having unlawfully "engaged in the business," even though *no actual transaction* had occurred prior to the planned obtaining of a license.  *See id.* at 1193 ("hold[ing] [himself] out as a source of firearms" and "is ready and able to procure them for the purpose of selling them from [time] to

time to such persons as might be accepted as customers").  *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980) ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity.").

Worse yet, the NPRM adds a number of "presumptions" that assume mere speech, by itself, can presumptively render someone "engaged in the business" of dealing in firearms, which no doubt will be used against the speaker in some type of legal proceeding:

- Engaged in business presumption 1 – "offers for sale" and "represent[ations] to potential buyers"
- Engaged in business presumptions 4, 5, 6 – "offers for sale"
- Predominantly earn a profit presumption 1 – "advertises, markets, or otherwise promotes"
- Predominantly earn a profit presumption 3 – "makes or maintains records, in any form"
- Predominantly earn a profit presumption 6 – "offers to make firearms transactions" [NPRM at 62021, 62022.]

At least one court already has held that a governmental action that "prohibit[s] offers to sell guns" under certain circumstances (in that case, at fairgrounds) is "an unconstitutional infringement of commercial free speech rights."  *Nordyke v. King*, 319 F.3d 1185, 1191 (9th Cir. 2003) (discussing *Nordyke v. Santa Clara Cnty.*, 110 F.3d 707 (9th Cir. 1997)).  The NPRM operates the same way – it prohibits and penalizes protected commercial speech – including mere offers – unless individuals first obtain government licenses.  *See Lovell v. City of Griffin*, 303 U.S. 444 (1938).  Such an abridgment of speech violates the First Amendment.

**S.  The NPRM Violates the Second Amendment**

**1.  The NPRM Fails Even to Mention the Second Amendment, Let Alone Analyze the Constitutionality of Its Statutory Revisions Under the Supreme Court's Required Analytical Framework**

Despite addressing a variety of issues related to firearms, the NPRM entirely fails to mention the Second Amendment even once.  Thus, the NPRM does not address the requirement in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022), to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  This absolutist language contains no qualification or limitation constraining who may exercise the right, which arms may be owned and carried, where the right may be exercised, or for what purposes.  Accordingly, the right presumptively belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," presumptively protects all locations, and presumptively covers all "lawful purposes."  *District of Columbia v. Heller*, 554 U.S. 570, 581, 582 (2008); *Bruen*, 142 S. Ct. at 2134; *Heller*, 554 U.S. at 624.

As the U.S. Supreme Court explained in *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important governmental interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  142 S. Ct. at 2126.  Because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *id.* at 2136, the relevant historical time period for analysis is that of the Founding

era.  *See id.* ("[W]e must … guard against giving postenactment history more weight than it can rightly bear."); *id.* at 2137 ("[T]o the extent later history contradicts what the text says, the text controls."); *id.* ("[P]ostratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text."); *id.* ("[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'"); *id.* (treating 19th-century evidence "as mere confirmation of what the Court thought had already been established"); *id.* ("[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."); *id.* at 2154 n.28 ("We will not address any of the 20th-century historical evidence brought to bear.... As with … late-19th-century evidence, the 20th-century evidence … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."); *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258-59 (2020) (rejecting examples of 19th century-era laws even from "more than 30 States" as failing to "establish an early American tradition").

## 2.  There Is No Enduring Early American Tradition of Requiring Licensure of Gun Sellers

As of 1791, there was no broad and enduring historical tradition of government regulation, or even licensing of firearms manufacturers, wholesalers, or dealers.  Indeed, as of 1791, there was no historical tradition of government regulation of the commercial sales of firearms at all.  Certainly, there is no historical tradition of government bureaucrats requiring licenses or limiting the ability of persons to offer "arms" for sale.  Likewise, as of 1868 (even though that is not a relevant time period here), there was no historical tradition of government regulation or even

licensing of firearms manufacturers, wholesalers, or dealers.  Such regulation is a uniquely 20th-century invention that our Founders never would have accepted.

Absent clear evidence that firearms licensing schemes for individuals seeking to sell personally owned firearms are part of a broad and enduring historical tradition of firearms regulation as of 1791, ATF is not authorized to require the licensure of anyone to engage in activities that are protected by the Second Amendment.  At a minimum, the historical tradition certainly does not support the government requiring an individual selling a firearm, even for a profit, to become licensed as an FFL.  For that simple reason – that there is no broad and enduring historical tradition supporting the challenged agency action – the proposed rule is constitutionally invalid.

Rather, during the Founding Era, manufacturers and dealers in firearms (usually called "gunsmiths") were ubiquitous and entirely unregulated.  In fact, gunsmiths were practically as widespread in the decades following the Founding as FFLs are today, evincing a widespread early (and now modern) American tradition of domestic production and sale with "vast numbers of gunsmiths in this country's first three centuries."  Frank M. Sellers, <u>American Gunsmiths</u> 4 (2d ed. 2008).  In the year 1850, the first official industrial census of its kind recorded over 3,800 active gunsmiths across the country, relative to a free population of just shy of 20 million,[58] yielding a rate of approximately one per 5,260 persons.  *Id.* at 6.  In comparison, ATF reported 66,853 dealer

---

[58] *See* https://tinyurl.com/44vz97kf (reporting 19,553,068 "Whites" and 434,495 freed slaves who ostensibly could access firearms in 1850).

and manufacturer FFLs as of 2020,[59] relative to a population of about 334 million,[60] yielding a remarkably similar proportion of 5,007 persons per each modern equivalent of "gunsmith."[61]

The NPRM would upset that historical balance.  ATF assumes that "based on the best, very conservative assessment," there may be "328,296 unlicensed individuals" that "may be engaged in the business with an intent to profit."  NPRM at 62009.  In short, ATF seeks to increase – involuntarily – the FFL rolls by a factor of almost *five*, putting the ratio of FFLs to Americans at 1 dealer per 870 persons.  Even under ATF's numbers, such unprecedented regulatory action would implicate a massive number of firearm transactions and impose lifetime record retention requirements for FFLs (courtesy of ATF's last omnibus rulemaking, 87 FR 24652).

This extra-statutory and unconstitutional requirement dovetails with the ATF Director's recently professed desire for "universal background checks," as all firearms sold through FFLs require a background check be performed.[62]  But this nation's early history supports no such thing.

ATF may counter with *Heller*'s dicta that "nothing in our opinion should be taken to cast doubt on … laws imposing conditions and qualifications on the commercial sale of arms."  *Heller*, 554 U.S. at 626-27.  But *Heller* never claimed (nor could it, without rendering a disfavored

---

[59] *See* https://tinyurl.com/22fv63u3 at 21 (reporting 52,799 dealers and 14,054 manufacturers in 2020).
[60] *See* https://tinyurl.com/2rvpcycx (reporting a total resident population of 334,735,155 in 2020).
[61] It is likely that, during the Founding Era, the per capita rate of "gunsmiths" was even greater than in 1850 as, prior to the Industrial Revolution, the production of firearms was a laborious and time-consuming process.  *See, e.g.*, https://tinyurl.com/ycyaxx5w (describing the painstaking process of forging rifle barrels by hand and the individual fitment of other components).  One source contains a list of many thousands of such gunsmiths during that era, in a time that the population numbered fewer than 4 million.  *See generally* Sellers, back cover, *supra* (containing "[o]ver 20,000 listings of individual manufacturers, trademarks, gunsmiths, and other trade names" from early American history and onwards); *see also* https://tinyurl.com/4zwxnxy4 (reporting a population of 3.9 million in 1790).
[62] *See* https://tinyurl.com/bdcddcna ("I think it would be helpful if we had universal background checks in this country. I think that's something that makes some sense.").

advisory opinion) that such regulations were conclusively lawful.  Rather, *Heller* invited future challenges even to its dicta, to test their assumed (but not truly known) historical traditions.  *Id.* at 635 ("there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.").  Similarly, *Bruen* prohibited governmental avoidance of its affirmative obligation to prove the constitutionality of its firearm regulations by stating and restating that "[o]nly if" history supports such regulations "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  142 S. Ct. at 2126.

Regardless of *Heller*'s dicta, private sales between nonlicensees are not commercial in nature.  In fact, these firearms already have been sold on the commercial market at least once. When an individual sells a personally owned firearm that he purchased, it does not fall within the "commercial sale of arms," and mere invocation of that talismanic chant does nothing to shield ATF's regulation (or even the statute) from proper Second Amendment analysis.  The NPRM improperly fails to conduct that required analysis.

### T.  The NPRM Violates the Fourth Amendment

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Once an individual receives an FFL, however, the ATF reserves the right to "enter during business hours" without a warrant, "the premises, including places of storage, of any … licensed dealer for the purpose of inspecting or examining the records, documents, ammunition and firearms."  27 C.F.R. § 478.23(b).  The ATF can conduct this inspection without a warrant and entirely without notice

"not more than once during any 12-month period," or "any time with respect to records relating to a firearm involved in a criminal investigation that is traced to the licensee." *Id.*

For individuals who were required, under the NPRM, to apply for and received an FFL so they could sell personal collections without being unjustly prosecuted for being "engaged in the business," this warrantless search poses constitutional issues. First, the "licensed premises" for these individuals and their FFL most likely will be their home. Moreover, the firearms ATF will claim to be part of their "business inventory" most likely will be their personal collection of firearms. This means that the ATF is entitled, at least once per year, to make a warrantless search of the homes of hundreds of thousands of gun owners, to inspect their personally owned firearms. Second, because an FFL requires that a licensee maintain business hours (for the ATF to be able to "enter during business hours" for inspection, *see* 27 C.F.R. § 478.23(a)), this means that this new FFL must keep his home open for business every week in order to comply with the ATF's regulations. Third, the new FFL would be required to keep a multitude of records, including Forms 4473 and acquisition and disposition books, forever, or until the FFL goes out of business, at which time, this person would have to send all of those records to ATF. This sort of compelled backdoor access to countless Americans' "houses, papers, and effects" – in response to their exercise of Second Amendment rights – violates the Fourth Amendment.

Indeed, the NPRM's radical expansion of the population of firearm dealers would undermine the very purported constitutional exception that ATF enjoys in conducting warrantless administrative searches under the Gun Control Act. That is because the constitutional norm for governmental searches is the warrant requirement, and "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357 (1967).

As the Supreme Court has asserted, a narrow exception to the Fourth Amendment's otherwise sweeping warrant requirement is the administrative search of a so-called "highly regulated industry." *City of Los Angeles v. Patel*, 576 U.S. 409, 424 (2015).  But not just any commercial industry will suffice – only those "industries that 'have *such a history of government oversight* that no reasonable expectation of privacy … could exist for a proprietor over the stock of such an enterprise'" can be considered "highly regulated" under the Fourth Amendment.  *Id.* (emphasis added) (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978)).  But that narrow exception is supposed to be just that – ***narrow*** – unlike the sweeping new scheme of "administrative" searches created by the NPRM.

To be sure, the Supreme Court has identified "firearms dealing" as one such highly regulated industry, albeit in a decades-old decision that did not place the same emphasis on Founding-era traditions that the Court does now.  *See United States v. Biswell*, 406 U.S. 311, 315 (1972) (conceding that "[f]ederal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control of the liquor industry....").  But there is no "history of government oversight" that could remove a "reasonable expectation of privacy" in one's *private* firearm sales (let alone a pre-1938 history of government oversight of firearm sales to begin with).  *Patel*, 576 U.S. at 424.  As the NPRM now seeks to insert ATF jurisdiction into hundreds of thousands of ordinary American homes, it is highly unlikely that any court could justify ATF's administrative compliance inspections of the same under this "narrow" exception.

In short, requiring untold thousands (if not millions) of gun owners to become licensed dealers, each purportedly subject to narrowly excepted administrative searches, not only would contravene early historical tradition, but also it would flip the general warrant requirement on its head.  *Id.* (quoting *Barlow's, Inc.*, 436 U.S. at 313) ("Moreover, "[t]he clear import of our cases is

that the closely regulated industry … is the exception.").  Indeed, the NPRM's unilateral expansion of firearm dealers to astronomical proportions "would permit what has always been a narrow exception to swallow the rule."  *Id.* at 424-25.  The Fourth Amendment permits no such thing.

## U.  The NPRM Poses Other Constitutional Concerns

The NPRM's novel requirements also implicate the Fifth Amendment's Takings Clause. "Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'"  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982).  There is no question that individuals have property rights in the firearms they own.  But under the NPRM, gun owners lose one of the most important "sticks" from their "bundle of rights" in their personal property, as their right to dispose of their personal property is severely diminished.  Instead, they will either not be able to sell freely their personally owned firearms, or they will need to become licensed by the ATF as an FFL.[63]  In this dilemma, should the individual choose not to become licensed and thus not permitted to sell his firearm, he will be stuck with a firearm he does not want. Alternatively, if that individual chooses to become licensed, then he will be forced to do all the things ATF requires to become licensed, including paying a fee, keeping records forever, and of course, allowing government agents to inspect his firearm collection at least once per year under the guise of a "compliance inspection," a cost greatly exceeding the one or two firearms he wishes to sell  Because the NPRM interferes with gun owners' rights to dispose of their personal property as they so desire, such a rule would constitute a taking in violation of the Fifth Amendment to the U.S. Constitution.

---

[63] Of course, the Supreme Court has already found it "intolerable that one constitutional right should have to be surrendered in order to assert another," *Simmons v. United States*, 390 U.S. 377, 393-394 (1968), and gun owners cannot be forced to choose which of their rights to exercise.

Worse still, by requiring hundreds of thousands of persons to become licensed in order to sell their own firearms, but then claiming ATF can deny them a license on the same basis, the NPRM leave these persons entirely unable to dispossess themselves of their firearms (short of giving them away, perhaps).  *See* Section IV.D, *supra*.  The same is true for "former licensees" who ATF puts in the position of being entirely unable to dispose of former "business inventory."  *See* Section II.F, *supra*.  For either of these classes of persons, the NPRM entirely seizes the market value of their property, claiming it cannot be sold in the marketplace.

Finally, the NPRM will result in legal impossibilities.  Indeed, some localities' zoning requirements entirely preclude home-based FFLs entirely.  *See Fattahi v. BATF*, 186 F. Supp. 2d 656, 658 n.2 (E.D. Va. 2002) ("Item 24 of the application reads: 'The business to be conducted under the Federal firearms license is not prohibited by State or local law at the premises shown in Item 5.  This includes compliance with zoning ordinances.'  Item 5 of the application is entitled 'business address.'"); *see also Morgan v. United States DOJ*, 473 F. Supp. 2d 756, 775 (E.D. Mich. 2007) (upholding denial of renewal of home-based FFL due to zoning requirements).  The NPRM entirely upends and changes the rules of firearm ownership, requiring licenses from countless persons who have no intent to "engage in the business," yet making it impossible for them to actually become licensed, and thus raising serious Fifth Amendment takings concerns.

## V. The NPRM Grossly Underestimates Its Regulatory Burden and Will Saddle Gun Owners with Exorbitant Compliance Costs

In addition to being legally erroneous, the NPRM is also *factually* off base.  The NPRM's estimated compliance costs are predicated on entirely arbitrary assumptions and cherrypicked standards, omitting mention of the significant regulatory burdens that await newly minted FFLs.  Moreover, these deleterious effects will be widespread.  The NPRM acknowledges that "this

rulemaking, if finalized, may result in additional unlicensed persons becoming FFLs...."  NPRM at 62007.  That is certainly putting it mildly.  Indeed, the NPRM presumes that practically anyone who has ever sold or will sell a firearm may need to be licensed, as discussed *supra*, and therefore implicates hundreds of thousands – if not millions – of gun owners.  Several key defects bear emphasis.

First, the NPRM provides an unreliable estimate of the total affected population. Beginning by bemoaning FOPA's prohibition on ATF creating a national gun registry, the NPRM claims that "there is no definitive information" and thus it is "difficult for ATF to precisely estimate the population."  NPRM at 62008.  Thus, the NPRM uses two different methodologies to suggest an immense range of between "24,540 or 328,296" unlicensed persons currently "engaging in the business."  *Id.* at 62009.  ATF's first method samples a meager 1.2%[64] of a *snapshot* of online private-sale listings on *one* website, ArmsList, to extrapolate a nationwide number of private sellers needing licensure.  Based on 1.2% of private ArmsList listings at only one point in time, ATF calculated an average of 2.51 listings per seller.  *Id.* at 62008; *id.* at n.112.  Dividing this average to obtain over 12,000 unlicensed sellers on ArmsList at that time, ATF then doubled this figure to obtain over 24,000 unlicensed sellers online, nationwide.  ATF's source?  "Just trust us." *See id.* at 62008 (estimating ArmsList's apparent 50% online market share based, in part, on ATF's own "subject matter expert … opinion," whatever that means).  ATF then applies two further layers of shoddy "just trust us" estimation, first to assume that the online private-sale market accounts for 25% of all private sales, and then to assume that 25% of all private sales are "engaged in the business" sales.  *Id.* (applying unverifiable "professional judgment" and a "best, very conservative

---

[64] ATF sampled 379 out of 30,806 "private party" sales at the time.  NPRM at 62008.  ATF generated this "379" sample size using an online calculator with a 95% confidence level and a confidence interval of 5.  *Id.* at n.111.

assessment" with no citations whatsoever).  Besides layer upon layer of guesswork, there is no telling (1) how many of the 30,806 ArmsList listings were, for example, selling inherited firearms (*i.e.*, definitively not engaging in the business at all), (2) whether any of the 30,806 listings were misclassified as "private" while actually being by licensed dealers, (3) whether the 30,806 listings at one point in time would be representative of the typical number of listings at any given time (*i.e.*, gun sales usually spike around the holidays, and during times of political uncertainty), (4) whether the average of 2.51 listings per seller was skewed by a minority of extreme outliers (sellers who may actually be engaged in the business, offering dozens or hundreds of firearms)[65] with the median listings per seller being much lower, or (5) whether the sample size of 379 is a representative sample.

Moreover, ATF's lower-bound estimate is predicated on an anemic sample size of 379. Based on an online calculator designed for survey evaluation (*i.e.*, binary yes/no answers),[66] the NPRM applies an arbitrary and utterly meaningless confidence interval of "5" to justify a conveniently small sample size.  But a confidence interval cannot be calculated without knowing the standard deviation of a sample,[67] which the NPRM omits entirely.  All told, ATF's lower bound cannot possibly provide a reliable estimate.

---

[65] Or those sellers not engaging in the business pursuant to a statutory safe harbor, like those liquidating a personal collection all at once.  *See* 18 U.S.C. § 921(a)(21)(C).

[66] *See Sample Size Calculator*, <u>Creative Rsch. Sys.</u>, <u>https://tinyurl.com/2p9jrpyp</u> (last visited Nov. 6, 2023) ("You can use it to determine how many people you need to interview in order to get results that reflect the target population as precisely as needed.").

> For example, if you use a confidence interval of 4 and 47% percent of your sample picks an answer you can be "sure" that if you had asked the question of the entire relevant population between 43% (47-4) and 51% (47+4) would have picked that answer.

*Id.*

[67] *See* Rebecca Bevans, *Understanding Confidence Intervals: Easy Examples & Formulas*, <u>Scribbr</u>, <u>https://tinyurl.com/bhbusnfm</u> (June 22, 2023).

ATF's upper bound fares no better.  Calculating "a second possible estimate using information from a published survey," the NPRM derives a figure of 1,310,000 possible unlicensed persons "selling, trading, or bartering firearms," of which 25% are engaging in the business "based on the best, very conservative assessment from SME experts" using their "professional judgment" and "limited available information."  NPRM at 62008, 62009; *see also id.* at 62008 n.116 (citing the survey).  But upon closer examination, this survey also bases its conclusions on a small sample size of just 2,072 gun-owning respondents, providing questionable representativeness.[68]  Moreover, by analyzing outdated 2015 survey data, this study fails to account for the massive increases in the rates of American gun ownership in recent years.  *See* NPRM at 62008 (assuming a 22 percent gun ownership rate among adults as of 2015).  Indeed, "[m]ore than 5 million adults became first-time gun owners between January 2020 and April 2021 compared to 2.4 million in 2019," necessarily expanding the private-sale market by an untold margin.[69]  Consequently, the NPRM's estimates are utterly unreliable, and a final rule implementing such statutory revisions would harm a significant number of gun owners who are not taken into account by the NPRM.

Indeed, as of 2020, Gallup reported that not 22 percent of adults own a firearm, but rather a whopping 32 percent.[70]  Even based solely on that more recent datum, ATF's estimate must change dramatically – from 1.31 million potential unlicensed sellers to 1.91 million (258.3 million adults, 32 percent of whom own a firearm (82.7 million), 5 percent of whom transferred (4.13

---

[68] Deborah Azrael et al., *The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey*, 3 Russell Sage Found. J. Soc. Scis., no. 5, Oct. 2017, at 38, 41, https://tinyurl.com/ydavrjhw.
[69] Edward Helmore, *Gun Purchases Accelerated in the US from 2020 to 2021, Study Reveals*, Guardian (Dec. 20, 2021, 5:00 PM), https://tinyurl.com/2p876hss.
[70]    L. Saad, *What Percentage of Americans Own Guns?*, Gallup (Nov. 13, 2020), https://tinyurl.com/yw8769sn; *see also For Most U.S. Gun Owners, Protection Is the Main Reason They Own a Gun*, Pew Rsch. Ctr. (Aug. 16, 2023), https://tinyurl.com/mr3zw2yu (reporting the same 32 percent figure as of August of 2023).

million), and where (1) 71 percent of whom sold a gun (2.93 million), 51 percent of whom sold through "various mediums" (1.5 million), and where (2) 10 percent of whom traded or bartered (413k), together adding up to 1.91 million).  Based on ATF's estimate that 25 percent of these persons must now be licensed (NPRM at 62009), <u>the NPRM could affect more than 478,000 people – far greater than ATF's estimate of 328,296.</u>  In other words, ATF's estimate (using its own methodology) is off – at minimum – by 45 percent.  But what's another 150,000 FFLs amongst friends?

Second, the NPRM underestimates the costs associated with preparing an FFL application to comply with the proposed rule.  The NPRM assumes, without citation to any authority, that "the opportunity costs of acquiring a license would be based on … free time or 'leisure time,'" using an entirely speculative "leisure wage" of $16 per hour.  NPRM at 62009.  Of course, the purported purpose of this proposed rule is to "clarify" when someone is "engaged in the business" of dealing in firearms, not "engaged in leisure time."  With that in mind, it would be more appropriate to use (at minimum) Americans' "average hourly earnings" of $34.[71]  Again, ATF's estimates are off by more than 100 percent.

Third, the NPRM claims the hourly burdens of completing a Form 7 and conducting a licensing inspection are one hour and three hours, respectively (along with another 1.5 hours to obtain fingerprints and photographs).  *Id.* at 62010.  On the contrary, these figures are ridiculously low estimates, especially considering the sheer amount of close reading one must do to both understand fully and complete accurately an application (the Form 7 is 12 pages, just by itself).  Indeed, ATF expects new licensees to read and understand hundreds of pages of federal laws and

---

[71] *Economic News Release: Table B-3*, <u>U.S. Bureau Lab. Stat.</u>, <u>https://tinyurl.com/ycyz5dup</u> (Nov. 3, 2023).

regulations, which ATF attempts to coerce new licensees into acknowledging via signature prior to issuance of an FFL, attesting that they have read and understand every nuance of federal gun laws and regulations.[72]  Licensees thus have no choice but to read these voluminous documents, as the failure to abide by regulations may establish "willfulness" at a future license revocation proceeding (or, worse yet, criminal charges).[73]  For example, ATF's "Federal Firearms Regulations Reference Guide"[74] is a whopping 237 pages, consisting of more than 200,000 words.  Even skipping some significant portion of that (such as the sections dealing with firearm imports), even a first read would require a new licensee to expend dozens of hours just to get a feel for ATF's mountain of regulations.[75]  Even reading half of the FFL Guide would take an estimated 22 hours (100,000 words, at 75 words per minute).  Adding even this conservative figure to ATF's ridiculously low estimate, a new licensee would spend upwards of **27.5 hours** to obtain a license and merely obtain a feel for the laws by which he or she must abide.  Again, ATF is off by at least 400 percent.

Based on more accurate figures, then, the "cost for an unlicensed person … to become a Tyle 01 FFL" should be estimated (*at least*) at **$1,165** – not $318, the number given in the NPRM. *Id.* at 62011.  This reflects 27.5 hours of work, at an average hourly earnings rate of $34 per hour ($935), added together with ATF's estimate of $230 of item costs (application fee, fingerprints, photographs).

---

[72] *Federal Firearms Licensee Quick Reference and Best Practices Guide*, ATF, https://tinyurl.com/4b69nd7d (Dec. 2021) (linking a 237-page document distributed to new FFLs).
[73] *See Firearms Compliance Inspections*, ATF, https://tinyurl.com/556hzuz4 (Oct. 2, 2023).
[74] *Federal Firearms Regulations Reference Guide*, ATF (2014), https://tinyurl.com/mhsfssdv.
[75] *See Reading Speed Statistics*, WordsRated (Nov. 8, 2021), https://tinyurl.com/ycbe7mx8 ("The average reading rate for advanced scientific or technical is 6 pages per hour, which equates to 75 words per minute.").

Fourth, the NPRM utterly fails to account for the significant regulatory burdens FFLs will incur *subsequent to licensure*. Indeed, as the NPRM acknowledges, all FFLs must "maintain a business premises at which ATF can inspect their records and inventory, and that otherwise complies with local zoning restrictions." NPRM at 61998 n.41. Although not provided by regulation, the Form 7 requires applicants provide – and subsequently maintain – "at least one hour" of "Operation and/or Availability of Business" every week.[76] As a result, the NPRM's compliance estimate is off by an astounding 52 hours annually, at minimum (one hour per week), even for new licensees who ATF estimates will perform only "3 … firearm sales every year" (NPRM at 62011 tbl.5). ATF takes these "open" hours seriously; they establish *when* compliance inspections may occur. Should a licensee fail to accommodate an unannounced compliance inspector during the availability window listed on the licensee's Form 7, such failure will be "considered a willful violation of the GCA and ATF will pursue revocation of the license."[77] In other words, for at least 52 hours a year, newly minted licensees must make themselves available at their licensed premises (to the exclusion of other activities) for possible inspection. That's another average of **$1,768** annually that the NPRM entirely fails to take into account ($34/hr x 52 hours). Of course, ATF's estimate for "recurring costs to maintain an FFL" including renewals, 4473s, A&D records, and compliance inspections uses the deflated "leisure" rate of $16 per hour. NPRM at 62011 tbl.5. Using a more realistic $34, that's another $70 per year (at minimum).[78]

---

[76] *Application for Federal Firearms License*, ATF, https://tinyurl.com/2yetkzjp (Oct. 2020).

[77] *Supra* note 73.

[78] This number was arrived at by taking ATF's number, $10,781,256 (62011 tbl.5) and dividing by the 328,296 FFLs who must bear it, for an annual maintenance cost of $32.84 per FFL (ATF estimate). Using a $34 average hourly wage instead of a $16 leisure wage results in an $69.79 annual maintenance cost.

All told, ATF estimates an upward bound of "$104.4 million" for the first-year costs of obtaining licensure (328,296 persons at $318 per license).  NPRM at 62011.  But when using more accurate figures (478,000 persons at $1,165 per license), the resulting number is staggering – more than half a billion dollars (**$556.7 million**) – *at least*.

And whereas ATF estimates *ongoing* costs at about $10.8 million per year for the first two years and $43 million every third year (when licenses must be renewed) (NPRM at 62012 tbl.7), neither takes into account the time spent holding regular business hours but otherwise twiddling thumbs.  More accurately, then, the NPRM costs not $10.8 million per year in ongoing costs but *at least* $33.3 million per year (478,000 licensees, not 328,296, at $34 per hour, not $16) for paperwork and inspections (Table 5), plus another $845 million (478,000 x $1,768) for holding regular business hours, for a total of **$878 million per year** in years 1 and 2 of ongoing costs. These numbers are astronomically larger than what ATF estimates in the NPRM.

Fifth, the NPRM threatens an astronomical increase in staffing resources and processing time.  As of 2022, there were "136,563 active federal firearms licensees (FFLs) and 43,494 firearms licenses issued (to include renewals)," with 52,910 active Type 01 dealers in total.[79]  At its most conservative, the NPRM estimates a 46% increase in dealers nationwide,[80] and at its most liberal (yet still "the best, very conservative assessment," NPRM at 62009), the NPRM estimates a dizzying *620% increase* in total dealers.[81]  But using the more accurate 478,000 number estimated, *supra*, **the NPRM would cause a 903% increase in the number of FFL dealers**.

---

[79] *Fact Sheet - Facts and Figures for Fiscal Year 2022*, ATF (Jan. 2023), https://tinyurl.com/4bajrn2y.
[80] Adding 24,540 new dealers to the existing 52,910.
[81] Adding 328,296 new dealers to the existing 52,910.

To process all this new paperwork, "ATF estimates that it would take on average 8.5 hours to process a Form 7 application" at a net loss of $353 per application, *id.* at 62013, so it could cost the government **$168 million** ($353 x 478,000) to process applications from all unlicensed "dealers" the NPRM contemplates.  Moreover, at 8.5 hours of processing time per application (NPRM at 62013), it would take **four million man-hours to process these newly-mandated applications** – meaning more than two thousand additional full-time ATF employees doing nothing but application processing all year.[82]  Even assuming a less-than-100% compliance rate, the NPRM proposes an exorbitant expenditure of taxpayer dollars that is untenable under ATF's current budget.  Talk about mission creep.

The NPRM also references IOI time to perform qualification and compliance inspections, at $312 per inspection, and inspection 8 percent of licensees per year.  *Id.* at 62014.  Using the number of 478,000 new licensees, that is **another $12 million per year**.  Peanuts, in comparison to ATF's other misses.

Sixth and finally, the NPRM ignores the numerous other costs associated with the NPRM's compelled licensing scheme,[83] as ATF's entire analysis assumes that the only true cost for applicants is the application itself.  This proposition is nothing short of laughable.  Indeed, claiming that "it would cost an unlicensed person $318 in terms of time spent and fees paid to apply under a Form 7 to become a Type 01 FFL," *id.* at 62011, would be like claiming that the cost to become

---

[82] Assuming 40 hours per week for 50 weeks with 2 weeks' vacation.

[83] This includes immense regulatory costs that no doubt will be incurred at the state level.  While ATF claims "[t]his regulation will not have substantial direct effects on the States," NPRM at 62016, many states license FFLs themselves (*see, e.g.*, 18 Pa.C.S. § 6113(a)), separately from the federal licensing scheme.  With a potential 903% increase in the number of FFL dealers nationwide, *supra*, many states will shoulder a massive burden, in turn.  Contrary to the Attorney General's claim otherwise, "federalism implications" abound and the NPRM should have included a federalism summary impact statement analyzing how hundreds of thousands of new licensees will affect state regulatory agencies.  *Id.* at 62017.

a lawyer in the U.S. District Court for the District of Columbia is just $213[84] – if one omits the costs of a bachelor's degree, a law degree, bar exam preparation, state bar licensing, and then office-related costs, malpractice insurance, and a Lexis subscription.   On the contrary, other necessary startup costs and considerations for FFLs include, at minimum, zoning compliance (and attendant issues obtaining zoning approval for residential FFLs), attorney drafting of articles of incorporation or other legal advice, business licensing, business registration, tax implications, CPA and other tax professional fees, general liability insurance, security systems with monitoring, child safety locks, and even additional security if the licensee's residence is listed publicly as a licensed premises.   Commenters do not begin to estimate these costs here, but it is safe to say that obtaining and maintaining an FFL is no easy feat.   By failing to consider the true cost of "engaging in the business," the NPRM grossly underestimates its true effects on gun owners nationwide.

**Total Costs (Undiscounted)**

| Year | Gov't and Private | Private Costs Only |
|------|-------------------|--------------------|
| 1 | $1,602,700,000.00 | $1,434,700,000.00[85] |
| 2 | $890,000,000.00 | $878,000,000.00[86] |
| 3 | $890,000,000.00 | $878,000,000.00[87] |
| 4 | $1,058,000,000.00 | $902,300,000.00[88] |
| 5 | $890,000,000.00 | $878,000,000.00 |
| 6 | $890,000,000.00 | $878,000,000.00 |
| 7 | $1,058,000,000.00 | $902,300,000.00 |
| 8 | $890,000,000.00 | $878,000,000.00 |
| 9 | $890,000,000.00 | $878,000,000.00 |
| 10 | $1,058,000,000.00 | $902,300,000.00 |
| | **$10,116,700,000.00** | **$9,409,600,000.00** |

---

[84] *Application for Admission*, U.S. Dist. & Bankr. Cts. for D.C. (May 2023), https://tinyurl.com/3ecj7xph.
[85] Including $556.7 million for initial licensure, $878 million for maintenance, and $168 million to process licenses.
[86] Including $878 million for maintenance and $12 million for inspections.
[87] Including $878 million for maintenance and $12 million for inspections.
[88] Including $878 million for maintenance, $12 million for inspections, and $168 million to process licenses.

The above estimate, based on more realistic inputs than those found in the NPRM, demonstrates the sheer absurdity of what ATF is proposing, and shows that the NPRM, if finalized, would cause literally billions of dollars of damage to the economy.  Eclipsing ATF's highest estimate by a factor of 32 (compare NPRM at 62015 tbl.13 with estimate above), the NPRM's unlawful and unconstitutional provisions simply cannot be promulgated.

Based on this stunningly massive regulatory cost, ATF comes to the unsurprising conclusion that "the costs to become and FFL could have an impact on … overall profit from firearms transactions."  NPRM at 62017.  Indeed, ATF estimates that "the persons impacted by this rule will primarily be those who transact in low volume repetitive firearm sales," and that these new dealers will sell an average of *only three firearms per year*.  *Id.* at 62017, 62011 tbl.5 (claiming that this number is used "for purposes of this economic analysis only").  Of course – "for purposes of this economic analysis only" – that means that the total regulatory cost per firearm sold (14.3 million firearms, assuming 478,000 dealers each sell 3 firearms per year over 10 years) is $705.  And including only private (not public) costs that are borne by licensees only, under the NPRM, **the average licensee will need to make a profit of at least $656 per firearm sold, just to break even**.  That is, quite simply, impossible.

## VII.  Any Final Rule that Departs from the NPRM's Proposals Must Undergo a Separate Notice and Comment Period

To the extent that the ATF chooses to limit itself to acting with the scope of its statutory authority, it might be permissible to promulgate a regulation that simply mirrors the language enacted by Congress (as ATF has done repeatedly in the past).  However, given that the NPRM purports to include regulations that either have no basis in the statute, or flatly attempt to expand the statute beyond its breaking point, ATF needs to withdraw the proposed rule in its entirety and

try again.  Moreover, any Final Rule that recognizes the legion of flaws in the NPRM, and promulgates any language *other than strict fidelity to the statutory text*, would violate the APA's logical outgrowth rule, because "fair notice" of the proposals adopted in any eventual Final rule is required.  *See Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2012) (citing *Long Island Care*, 551 U.S. at 174).  *See Mock v. Garland*, 75 F.4th 563, 583 (5th Cir. 2023) ("If interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period, then the rule is deemed to constitute a logical outgrowth of the proposed rule.").  Since these Commenters can conceive of no legitimate regulation other than one which mirrors the statutes Congress actually enacted, any subsequent alternative proposal by ATF must go through the APA's notice and comment process.

## VIII. ATF's Characteristic Flip-Flopping on Significant Policies Further Undermines the NPRM

Interestingly enough, the NPRM represents a dramatic policy shift on the part of ATF which, in the past has sought to *dramatically reduce* the rolls of FFLs, but which now seeks to *exponentially expand* them.  It is unreasonable to expect the regulated public to keep up with ATF's latest about face, continuing its trend of "frequent reversals on major policy issues...." *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 461 (6th Cir. 2021) (vacated by grant of *en banc* review).

In the 1990s, the Clinton Administration engaged on a mission to eliminate so-called "kitchen table FFLs" that possessed a license but either did not "engage in the business" of selling firearms, or sold so few firearms for family and friends that the ATF did not want to deal with them.  As The Free Beacon reported:

> In 1994, ATF officials complained that many FFLs were not actually "engaged in the business" and oversight of the small sellers was cumbersome, if not impossible.

**81**

"Probably 70 percent of the people holding licenses shouldn't hold them," one ATF spokesperson told the *Times*. "Most applicants declare that they intend to buy and sell guns as a primary livelihood, but in reality, the firearms bureau says, most people want to buy guns at wholesale prices for personal use," the paper added.[89]

Thus, ATF's agenda to put tens of thousands of dealers out of business was a direct result of then-President Clinton's directive to the Secretary of the Treasury which claimed, among other things that, while "there [were] in excess of 287,000 Federal firearms licensees," "only about 30 percent of these are bona fide storefront gun dealers," while "40 percent of the licensees conduct no business at all," and that the "remaining 30 percent of licensees engage in a limited level of business...."[90]

President Clinton's war on the gun industry was successful, "result[ing] in the number of licensed dealers dropping from about 252,000 in 1993 to about 55,000 in 2014" – a reduction of nearly 80 percent.[91]   Now, years after ATF sought to destroy the home-based FFL, it is now demanding that virtually every seller of firearms become a licensed dealer.[92]   Of course, as the Supreme Court has noted, "when the government … speaks out of both sides of its mouth, no one should be surprised if its latest utterance isn't the most convincing one." *Bittner v. United States*, 143 S. Ct. 713, 722 (2023).

---

[89] Stephen Gutowski, *Obama Gun Action Reverses Course on Clinton Admin Policy*, Wash. Free Beacon (Jan. 6, 2016), https://tinyurl.com/4t9n5hxx.

[90] *Memorandum on Gun Dealer Licensing*, Am. Presidency Project (Aug. 11, 1993), https://tinyurl.com/35xb6hnn.

[91] *See* Gutowski, *supra* note 89.

[92] *See FACT SHEET: New Executive Actions to Reduce Gun Violence and Make Our Communities Safer*, White House (Jan. 4, 2016), https://tinyurl.com/4hhw8h85 ("Today, the Administration took action to ensure that anyone who is 'engaged in the business' of selling firearms is licensed and conducts background checks on their customers....   There is no specific threshold number of firearms purchased or sold that triggers the licensure requirement. But it is important to note that even a few transactions, when combined with other evidence, can be sufficient to establish that a person is 'engaged in the business.'").

## IX.   Conclusion

This NPRM must be withdrawn.  But unauthorized and unconstitutional as this proposed rule may be, it cannot be viewed in a vacuum.  Rather, the NPRM is yet another step towards this and every anti-Second Amendment administration's ultimate goal – a *de facto* national gun registry that subverts, circumvents, and effectively repeals the Firearms Owners' Protection Act.[93]  From forcing almost everyone who sells a gun to become a federally licensed dealer,[94] to "mov[ing] as close to universal background checks as possible" by routing every firearm transaction through such dealers,[95] to requiring licensed dealers to preserve transaction records indefinitely and ultimately serve them up to ATF,[96] to subsequently forcing as many dealers out of business as possible[97] to expedite the receipt of such records and bottleneck firearms commerce,[98] all evidence points to the creation of an illegal (not to mention unconstitutional) federal registry of almost all gun owners nationwide.[99]  This NPRM will (and no doubt was designed to) only accelerate the

---

[93] *See* 18 U.S.C. § 926(a) (emphasis added) (prohibiting the creation of "**any** system of registration of firearms, firearms owners, or firearms transactions or dispositions").

[94] As the legend of a map would say, "you are here" with this NPRM.

[95] *FACT SHEET: Biden-Harris Administration Takes Another Life-Saving Step to Keep Guns Out of Dangerous Hands*, White House (Aug. 31, 2023), https://tinyurl.com/bdzz7ufh; *see also* 87 FR 24652 (reclassifying unfinished frames and receivers as "firearms" subject to serialization and dealer transfers).

[96] *See* 87 FR at 24746 ("Licensees shall retain each Form 4473 until business or licensed activity is discontinued...."); 27 C.F.R. § 478.127 ("Where discontinuance of the business is absolute, the records shall be delivered within 30 days … to the ATF Out-of-Business Records Center....").

[97] *See Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety*, White House (June 23, 2021), https://tinyurl.com/mvv975c8 (establishing "zero tolerance" for various inadvertent dealer errors); Complaint, *Morehouse Enters., LLC v. BATFE*, No. 3:23-cv-00129-PDW-ARS (D.N.D. July 11, 2023), ECF No. 1 (detailing ATF's weaponization of this "zero tolerance" revocation policy in retaliation against one dealer that dared to sue ATF).

[98] *See* 27 C.F.R. § 478.127.

[99] Keene, *supra* note 49 (reporting on GOA's discovery that "ATF had processed and digitized over 50,000,000 'out of business' records of gun dealers in FY 2021" and that "ATF has reached a point where it has converted nearly one billion records … into a single, centralized, and searchable national gun registry").

mass registration already well underway – so that, when the next anti-gun President feels the time is right, all that will need be done is to "from the files, obtain form 4473"[100] and begin the confiscation *en masse*.



For the reasons stated, the Notice of Proposed Rulemaking should be withdrawn.

Sincerely yours,

Robert J. Olson
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

---

[100] <u>Red Dawn</u> (Valkyrie Films 1984).

**84**