UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, et al, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.2:24-CV-00089-Z |
| | § | |
| BUREAU OF ALCOHOL, TOBACCO, | § | |
| FIREARMS AND EXPLOSIVES, et al, | § | |
| Defendants. | § | |

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY RELIEF

## TABLE OF CONTENTS

Plaintiffs' Reply In Support Of Motion For Preliminary Relief ........................................1

Table of Contents ....................................................................................................... 2

Table Of Authorities ................................................................................................. 4

   I.    Plaintiffs Have Standing and Will Suffer Irreparable Harm.................................1

      A.    Texas Has Standing and Faces Irreparable Harm. ........................................1

      A.    B. Tormey Has Standing and Faces Irreparable Harm. ................................. 2

      B.    C. The Organizational Plaintiffs Have Standing.........................................5

   II.    Venue Is Proper. ......................................................................................7

   III.    Plaintiffs Are Likely to Succeed on the Merits.......................................7

      A.    The Rule Conflicts with the Statute. ...................................................7

      B.    The Rule's Presumptions Are Invalid on Their Face. .............................12

         1.    The Statute Restricts ATF's Authority to Establish Presumptions of Criminality.....12

         2.    The EIB Presumptions Are Unlawful. ..................................................15

         3.    The PEP Presumptions Are Unlawful. .................................................16

         4.    The Rule's "Not Presumed" Language Waters Down the Statute. ........................17

      C.    The Rule's Provisions for "Former Licensees" Violate the Statute...........................18

   IV.    The Rule Violates the Second Amendment. ..................................................19

   V.    The Rule Violates the Fourth Amendment........................................................21

VI.   Relief Should Not be Limited to the Parties. ..................................................... 22

VII.   The Balance of Equities Favors a Stay. ........................................................... 24

Conclusion .................................................................................................................... 24

Certificate of Service ...................................................................................................27

TABLE OF AUTHORITIES

**Cases**

*Abramski v. United States,*
    573 U.S. 169, 191 (2014) ............................................................................................14

*Am. Civ. Rts. Union v. Martinez-Rivera,*
    166 F. Supp. 3d 779, 804 (W.D. Tex. 2015) ............................................................. 6

*BRAIDWOOD MANAGEMENT, INCORPORATED v. EEOC,*
    70 F.4th 914, 926, 928 (5th Cir. 2023) .......................................................................3

*Bryan v. United States,*
    524 U.S. 184, 191 (1998) ............................................................................................ 4

*Career Colls. & Sch. of Tex. v. United States Dep't of Educ.,*
    98 F.4th 220, 250 (5th Cir. 2024) .........................................................................15,23

*Cargill v. BATFE,*
    2023 U.S. Dist. LEXIS 166989, at *14 (W.D. Tex. Sept. 20, 2023) .........................5

*Collins v. Yellen,*
    141 S. Ct. 1761, 1779 (2021) .....................................................................................1

*Czyzewski v. Jevic Holding Corp.,*
    580 U.S. 451, 137 S. Ct. 973, 983, 197 L.Ed.2d 398 (2017) ....................................1

*Disability Rts. Wis., Inc. v. Walworth County Bd. of Supervisors,*
    522 F.3d 796, 802 (7th Cir. 2008) ............................................................................. 6

*District of Columbia v. Heller,* 554 U.S. 570, 626-27 (2008) ............................................21

*Enter. Int'l Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
    762 F.2d 464, 472 (5th Cir. 1985) ............................................................................ 2

*Fairmont Cash Mgmt., L.L.C. v. James,*
    858 F.3d 356, 362 (5th Cir. 2017) ............................................................................ 4

*Grayned v. City of Rockford,*
    408 U.S. 104, 108 (1972) .................................................................................. passim

*Holland Livestock Ranch v. United States,*
    714 F.2d 90, 92 (9th Cir. 1983) ...............................................................................13

*HollyFrontier Cheyenne Refinery, LLC v. Renewabler Fuels Ass'n,*
    141 S. Ct. 2172, 2180 (2021)............................................................................ 14, 15

*Idaho Mining Ass'n v. Browner,*
    90 F. Supp. 2d 1078, 1098-99 (D. Idaho 2000) .......................................................13

*In re NTE Conn., LLC,*
    26 F.4th 980, 990– 91 (D.C. Cir. 2022).................................................................. 2

*James v. Hegar,*
    86 F.4th 1076, 1081 (5th Cir. 2023) .................................................................. 2

*Lane v. United States,*
    612 F. Supp. 3d 659, 666 (N.D.T.X. 2020)......................................................18

*Marszalek v. Kelly,*
    2021 U.S. Dist. LEXIS 107613, at *10-11 (N.D. Ill. June 9, 2021)...................... 6

*Maryland Shall Issue, Inc. v. Moore,* 86 F.4th 1038, 1043 (4th Cir. 2023),..................... 20

*N. A. A. C. P. v. ALABAMA,*
    357 U.S. 449, 462 (1958) .................................................................................. 6

*N.Y. State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111, 2126 (2022) ........................... 20

*Nat'l Council of La Raza v. Cegavske,*
    800 F.3d 1032, 1041 (9th Cir. 2015) .................................................................. 6

*Natl. Rifle Assn. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives,*
    No. 3:23-CV-1471-L, 2024 WL 1349307, at *9 (N.D. Tex. Mar. 29, 2024)............................ 2

*Peyote Way Church of God, Inc. v. Smith,*
    742 F.2d 193, 198 (5th Cir. 1984)......................................................................3

*Republic Aviation Corp. v. NLRB,*
    324 U.S. 793, 798 (1945).................................................................................12

*Sackett v. EPA,*
    566 U.S. 120, 127 (2012) .................................................................................3

*Texas v. United States,*
    809 F.3d 134, 155 (5th Cir. 2015)....................................................................1, 2

*Soc'y of Separationists, Inc. v. Herman,*
    959 F.2d 1283, 1285 (5th Cir. 1992) .................................................................. 2

*Speech First, Inc. v. Shrum,*
    92 F.4th 947, 949-50 (10th Cir. 2024) .............................................................. 6

*Texas v. U.S.,*
    50 F.4th 498, 518 (5th Cir. 2022) .....................................................................1

*TransUnion, LLC v. Ramirez,*
    141 S. Ct. 2190.................................................................................................1

*Tyler v. Hennepin County,*
    598 U. S. 631, 636 (2023) ..............................................................................1

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590, 600 (2016) ...................................................................................................3

*U.S. Steel Corp v. Astrue*,
   495 F.3d 1272, 1284 (11th Cir. 2007) ...................................................................13

*United States v. Apel*,
   571 U.S. 359, 369 (2014) ...................................................................................................14

*United States v. Shan*,
   361 F. App'x 182 (2d Cir. 2010) ...................................................................................10

*United States v. Shirling*,
   572 F.2d 532 (5th Cir. 1978) ...........................................................................................10

*United States v. Valdes*,
   681 F. App'x 874 (11th Cir. 2017) ...................................................................................10

*United States v. Wilmoth*,
   636 F.2d 123 (5th Cir. 1981) ...........................................................................................10

*Wis. Gas Co. v. FERC*,
   758 F.2d 669, 674 (D.C. Cir. 1985) ...................................................................................2

## Constitutional Provisions & Statutes

5 U.S.C. § 705 ...................................................................................................................24

18 U.S.C. § 921(a)(13). ...................................................................................................24

18 U.S.C. § 926(a) ...................................................................................................................8, 12

27 C.F.R. § 478 ...................................................................................................................24

18 U.S.C. § 921(a)(21)(C) ...................................................................................................24

18 U.S.C. § 926(a) ...................................................................................................................24

## Rules & Regulations

89 Fed. Reg 29051 ...................................................................................................................19

Fed. Reg 29054 ...................................................................................................................1

I.      **Plaintiffs Have Standing and Will Suffer Irreparable Harm.**

      **A.  Texas Has Standing and Faces Irreparable Harm.**

Monetary harm is an injury that confers standing. *See Tyler v. Hennepin County*, 598 U. S. 631, 636 (2023); *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190 at 2204 (2021). Texas stands to suffer direct harm from the Rule in the form of a pocketbook injury. A pocketbook injury "is a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). For standing purposes, the exact cost is irrelevant. *Texas v. U.S.*, 50 F.4th 498, 518 (5th Cir. 2022); *see Texas v. United States* (DAPA), 809 F.3d 134, 155 (5th Cir. 2015) (holding that Texas established injury in fact without precisely quantifying the costs of issuing driver's licenses to DAPA beneficiaries). "[A] loss of even a small amount of money is ordinarily an 'injury.' " *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 137 S. Ct. 973, 983, 197 L.Ed.2d 398 (2017).

The Rule is expected to reduce the amount of people who sell firearms, period. The Rule estimates that its implementation will reduce gun sales. *See* 89 Fed. Reg. 29,054 (contemplating 10% of currently unlicensed dealers leaving the market altogether). Texas has a sales tax that applies to the sale of firearms at gun shows.  Between the effective date of the Rule and just July 2024, Texas has 58 gun shows calendared.[1] Texas collects 6.25 percent state tax on taxable items sold— including guns sold at gun shows.[2] Unlicensed dealers exiting the market will inevitably result in less gun sales, and thus less sales tax collected by the state. *See generally* Exhibit A, Declaration of Murl E. Miller. This is not speculative. The ATF has told us as much.  Fed. Reg. 29,054 (10% of unlicensed sellers likely to be either "unwilling or *unable* to become licensed as an FFL as a result

---

[1] https://gunshowtrader.com/gunshows/texas-gun-shows/.
[2] https://comptroller.texas.gov/taxes/publications/96-211.php#:~:text=You%20must%20collect%20sales%20or,tax%20on%20your%20taxable%20sales.

of the [R]ule") (emphasis added).

In determining whether costs are irreparable, the key inquiry is "not so much the magnitude but the irreparability." *Texas v. EPA*, 829 F.3d at 433–34 (quoting *Enter. Int'l Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)). Even purely economic costs may count as irreparable harm "where they cannot be recovered 'in the ordinary course of litigation.' " *Id*. at 434 & n.41 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *see also, e.g., In re NTE Conn., LLC*, 26 F.4th 980, 990–91 (D.C. Cir. 2022) ("We have recognized that financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." (cleaned up)).

Without a stay of the Rule, Texas will suffer irreparable harm from the illegal Rule. The remedy of damages against the United States is unavailable to Texas, so the Rule's effect on the State sales tax revenue—both on items like tickets to gun shows and the firearms sold at those shows—"are unrecoverable because of the government-defendant's sovereign immunity from monetary damages. . . ." *Natl. Rifle Assn. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 3:23-CV-1471-L, 2024 WL 1349307, at *9 (N.D. Tex. Mar. 29, 2024).

### A.       B.       Tormey Has Standing and Faces Irreparable Harm.

For starters, Defendants misrepresent the standard for pre-enforcement challenges, claiming Plaintiffs "must demonstrate … a real and immediate threat of *repeated injury* in the future," as if to say Plaintiffs cannot bring a pre-enforcement challenge at all.  Opp. 13 (quoting *James v. Hegar*, 86 F.4th 1076, 1081 (5th Cir. 2023) (emphasis added)).  But *James* concerned claims for prospective relief based *solely* on past injuries, 86 F.4th at 1082, quoting "repeated injury" language from *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992), which clearly limited Defendants' cherrypicked standard to "obtain[ing] equitable relief for past wrongs."

In contrast, it is black-letter law that a person "need not[] … disobey the law and await his prosecution before challenging its unconstitutionality." *Peyote Way Church of God, Inc. v. Smith*, 742 F.2d 193, 198 (5th Cir. 1984).[3] Rather, one need only "show a 'genuine threat' of enforcement," and "even a 'public[] announce[ment]' to enforce a statute and *one prior proceeding* are sufficient for standing." *BRAIDWOOD MANAGEMENT, INCORPORATED v. EEOC*, 70 F.4th 914, 926, 928 (5th Cir. 2023) (citation omitted, alterations in original, emphasis added). Of course, Defendants have announced their intent to enforce their new Rule and the GCA generally. And although entirely unnecessary, Plaintiffs *have* identified one prior enforcement proceeding targeting conduct falling squarely within the Rule's ambit. *See* Declaration of Erich M. Pratt ¶¶ 32-40, ECF #1-2 (detailing the prosecution, GOA defense, and repeat acquittal of GOA member Robert Arwady). Plaintiff Tormey, also a GOA member, has every reason to believe ATF would enforce its Rule against him.

Defendants finally admit that "[p]otential future enforcement [can] amount[] to an Article III injury," but they dispute Tormey's standing "on multiple fronts." Opp. 13. Defendants are incorrect on each. First, Defendants claim Tormey has no "'serious intention to engage in conduct' that is actually 'proscribed' by the Rule[]" because they assert that Tormey's conduct *definitively* "does not rise to the level of being 'engaged in the business.'" Opp. 14. But Defendants' nonbinding (and convenient) opinion in this litigation presents no bar to federal prosecution generally. Moreover, Tormey has "bought, sold, and traded firearms" for "many

---

[3] *See also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) ("parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties'"); *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (plaintiff need not "wait for the Agency to drop the hammer").

years" as part of his "large personal collection," and he has "even previously purchased a table at certain gun shows, in order to facilitate enhancing [his] collection."  Declaration of Jeffrey W. Tormey ¶¶8, 4, 8.  This is precisely the sort of conduct that falls under several of the Rule's presumptions, including EIB (1), (3), and PEP (ii).[4]  *See* 89 FR 29091.  Finally, Defendants claim that "such occasional 'purely private and non-commercial' sales … *do not* qualify as being 'engaged in the business,'" but they cannot square their new position with the Rule's text, which provides that "even a single firearm transaction or offer to engage in a transaction" may suffice.  Opp. 14; 89 FR 29091.

Next, Defendants deny any "credible threat" of enforcement but discuss only the prospect of *criminal liability*, Opp. 16, 16-17, a puzzling departure from the Rule's assurances that it does "not apply in any criminal proceedings."  89 FR 28969.  Moreover, "willful" violations also expose people to *civil liability* at a much lower standard than that used in criminal cases.  *See, e.g.*, *Bryan v. United States*, 524 U.S. 184, 191 (1998) (noting "in the criminal context, a 'willful' act is one undertaken with a 'bad purpose'").  Defendants then cite Tormey's "professed uncertainty" under the Rule as an apparent defense against willfulness.  Opp. 17.  But this has never been the case, as "knowledge of the particular regulation violated is not required...."  *Fairmont Cash Mgmt., L.L.C. v. James*, 858 F.3d 356, 362 (5th Cir. 2017).  Dispensing with similar arguments against pre-enforcement standing in a challenge to ATF's "zero tolerance" FFL revocation policy, another Texas district court recently observed that "[i]f a plaintiff can establish that it is an 'object' of the

---

[4] Even if Tormey (or anyone else) ultimately prevails defending against an enforcement action, that does not mean he would not be harmed.  Rather, "the general rule of thumb is that the 'nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm.'"  *Mock v. Garland*, 2023 U.S. Dist. LEXIS 178809, at *21 (N.D. Tex. Oct. 2, 2023).

agency regulation at issue, 'there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it.'" *Cargill v. BATFE*, 2023 U.S. Dist. LEXIS 166989, at *14 (W.D. Tex. Sept. 20, 2023) (alteration in original).  As a gun owner and frequent buyer and seller, Tormey clearly is an object of the Rule "sufficient to establish standing in this case."  *Id.* at *15.

### B. C.    The Organizational Plaintiffs Have Standing.

Similarly, the organizational Plaintiffs have standing to assert the interests of their members and supporters.  Claiming "the organizational plaintiffs collectively identify only two [such persons] with any degree of specificity," Opp. 18, Defendants ignore those TFA and VCDL members and supporters who have contacted their respective organizations and who "have in the past bought and resold firearms, and wish to do so in the future without being improperly labeled as a 'dealer'...."  Declaration of C. Richard Archie ¶10, ECF #1-3; *see also* Declaration of Philip Van Cleave ¶10, ECF #1-4.  As a result of the Rule, these persons now face unprecedented application of *state law* covering gun dealers, in addition to *zoning restrictions* that will necessitate "obtain[ing] a separate premises" for licensure.  Declaration of C. Richard Archie ¶6, ECF #1-3; Declaration of Philip Van Cleave ¶12, ECF #1-4. That VCDL, and TFA did not name names, or detail specific conversations they have had with specific persons, does not mean that they have not communicated with and sufficiently described how they have members who will be harmed by the Rule.

As for GOA, Defendants acknowledge the former FFL whose retirement savings are now frozen in unsellable inventory, but they demand the person be *named*.  Opp. 19; *see* Declaration of Erich M. Pratt ¶¶17-31, ECF #1-2.  But the law on representational standing imposes no such naming requirement, which would only expose GOA members to government scrutiny by the very same Defendants who demand to know "the frequency of their members' purported firearms sales;

the number of firearms sold during those transactions; the types of firearms being sold," and more – perhaps for harassment, intimidation, or even prosecution. Opp. 20. But "[c]ompelled disclosure of membership in an organization engaged in advocacy of particular beliefs is" an "effective … restraint on freedom of association," *N. A. A. C. P. v. ALABAMA*, 357 U.S. 449, 462 (1958), and "[a] plaintiff is not required to name names in a complaint in order to properly allege injury in fact to its members." *Am. Civ. Rts. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 804 (W.D. Tex. 2015); *accord Disability Rts. Wis., Inc. v. Walworth County Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949-50 (10th Cir. 2024); *Marszalek v. Kelly*, 2021 U.S. Dist. LEXIS 107613, at \*10-11 (N.D. Ill. June 9, 2021). Rather, it is enough merely to identify harmed members and supporters, as Plaintiffs clearly have done.

Defendants then claim GOA's former FFL member faces *no harm* anyway, because (i) "the member *might* dispose of their firearms at some point in the future" (*but see* Declaration of Erich M. Pratt ¶22, ECF #1-2 ("this lifetime of accumulated inventory largely constitutes their retirement")), (ii) "ATF *might* deem such a disposition as being 'engaged in the business' under the Rule" (*but see id.* ¶35 (ATF did so for Arwady)),(iii) and "the member *might potentially* face civil or even criminal sanctions as a result" (*but see id.* – Arwady already did). Opp. 19. In other words, "[t]he chances are not remote or speculative that ATF might pursue this GOA member for merely doing what the law allows...." Declaration of Erich M. Pratt ¶31, ECF #1-2.[5]

---

[5] Defendants also claim that "the Rule expressly provides that once one year has passed after the transfer of firearms from business inventory to a personal collection" GOA's "former licensee will generally 'no longer be presumed to be engaged in the business....'" Opp. 19. But the Rule simultaneously claims that, if one purchases firearms *during* licensure and then sells them *after* licensure, *that* is 'engaging in the business.' Compl. ¶56. That is precisely the fact pattern described regarding this GOA member.

Finally, although lumping standing and irreparable harm into the same title, Defendants do not dispute irreparable harm separately, but rather attach their objections to their standing argument. *See* Opp. 13-20. So, if Plaintiffs *do* have standing (they do), Defendants appear to concede that harm necessarily flows from the Rule.

## II.    Venue Is Proper.

Curiously arguing that this case does not belong in this Court, Defendants make a claim of improper venue that is premised entirely on their claims that no plaintiff has standing. Opp. 21-22. Indeed, Defendants apparently recognize that Plaintiff Tormey resides within this district, that GOA and GOF have members within this district, and that it is entirely appropriate for the State of Texas to litigate *in Texas*. Not to mention, VCDL and TFA have at least one member (Tormey) in this district, and potentially others. Thus, in order to claim improper venue, Defendants first must eliminate every plaintiff from this case. And if there is a case with no plaintiffs, determining the appropriate venue hardly seems worthwhile. Indeed, other than objecting to venue, Defendants do not bother to identify *to where* this case should be transferred. Again, that is because so long as any of the above plaintiffs remain in this suit, venue is proper in this district.

## III.    Plaintiffs Are Likely to Succeed on the Merits.

### A.  The Rule Conflicts with the Statute.

Defendants offer a series of seven reasons why the Rule does not violate the statute. None is persuasive.

First, Plaintiffs explained that ATF has no authority to define statutory terms that Congress expressly defined. Defendants respond that they alone get to "determine what regulations are in fact 'necessary'" and "here, ATF concluded that this Rule was necessary." Opp. 23. On

the contrary, 18 U.S.C. Section 926(a) severely limits ATF's authority to regulate at all – a delib-

erate choice by Congress.  Defendants next claim that they enacted the Rule "to provide 'clarity'"

and that, since Plaintiffs have demanded clarity, they must accept the Rule.  *Id.*  Operating on the

principle that 'more is better,' Defendants posit that hundreds of pages of rulemaking *must be*

clearer than no rulemaking at all.  Defendants claim that, "without the benefit of the Rule, Plaintiffs

would have *less* guidance and clarity regarding how the GCA operates, not more."  *Id.*  This is the

sort of logic that appeals only to bureaucrats.

Defendants also claim to have enacted the Rule to "improve public safety."  *Id.*  But they

cite no authority for the notion that agencies are free to edit statutes at will in order to effectuate

such lofty goals.  Lastly, Defendants concede Plaintiffs' cases, which say that *agencies cannot define*

*words that Congress already defined*.  *Id.*  Defendants' only response is that their "rule is consistent

with the GCA's text."  *Id.*  On the contrary, the Rule is *different from* the statute – of that there can

be no doubt, as the Rule adds countless words to definitions that Congress already provided.  What

is different, by definition, cannot be the same.

Second, Defendants claim that they were permitted to incomprehensibly define common

words that ordinary people can easily understand.  Opp. 23-24.  Defendants ignore Plaintiffs' cases

on this point, and instead demur that the Rule was meant "to 'clarify'" certain terms.  Opp. 24.

But again, ambiguity is required for ATF to act – and Defendants never claim the statute is in any

way unclear or ambiguous.  Nor can Defendants make such a claim, as the Supreme Court is abun-

dantly clear that "laws must provide explicit standards for those who apply them."  *Grayned v.*

*City of Rockford*, 408 U.S. 104, 108 (1972).

Indeed, Defendants' third point undermines their second.  They claim that the rule of lenity does not apply *because the statute is not ambiguous*.  Opp. 24.  But if there is no ambiguity, then there was nothing for the Rule to "clarify."  Defendants cannot have it both ways.

Fourth, Defendants object to Plaintiffs' claim that the statute requires *actual* profit be derived from *actual* purchases and *actual* resales.  Opp. 24-26.  Rejecting Plaintiffs' "negative implication" principle (that, because no profit is required in terrorism cases, then profit must be required in other cases), Defendants opine that mere "intent" to profit is enough.  Opp. 25.  But in reaching that conclusion, Defendants focus entirely on the definition in Section 921(a)(22) (defining impermissible types of profit) and ignore the definition of "engaged in the business" found in Section 921(a)(21) – which *ties profit to a course of conduct comprised of a series of activities*.  *Id.*  It would make no sense for Congress to relieve ATF of the burden to prove profit in *certain* cases, if Defendants are correct that they need *never* prove profit in any case.

Fifth, after claiming no profit is required (only intent), Defendants claim that "multiple successful purchases and [re]sales of firearms" are not required.  Opp. 26.  Rather, Defendants again claim that the statutory phrase – "to predominantly earn a profit through the repetitive purchase and resale of firearms" – "as a whole means that" intent is enough to fulfill all its parts,

"regardless of whether a person's" intent "successfully results in actual sales and actual profit."[6] *Id.* Defendants thus transform the statute Congress enacted – which requires a series of actions and results – into a pure intent crime, where a person *does not actually have to do anything* (including ever even putting hands on a firearm).

Curiously, Defendants admit that the first part of the statutory definition – "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business" – in fact "refers to action, not intent." *Id.* But Defendants do not explain (i) how a person can be considered "engaged in the business" without ever transacting business, (ii) how a person can be "dealing in firearms" without ever purchasing or reselling a firearm, or (iii) how a person can be engaged in a "regular course of trade or business" based only on hopes and dreams. In sum, the statute that Congress enacted has been entirely changed by the Rule.

Sixth, responding to Plaintiffs' criticism that the Rule's definition of "personal collection" as far too narrow, Defendants respond that "the phrase 'personal collection or for a hobby' cannot be read to mean any firearms that a person possesses for any lawful purpose." Opp. 28. Purporting

---

[6] Defendants rely on only one outlier case where no firearms were actually sold, *U.S. v. KING*, 735 F.3d 1098 (9th Cir. 2013). In *King*, the defendant, an immigrant, helped an immigrant friend obtain an FFL, and then "misappropriated the company's business account, using falsified documentation to set up credit accounts and order firearms from manufacturers and wholesalers behind his purported partner's back." *Id.* at 1102, 1106-07. But even if *King* supports dealing without sales, King had acquired numerous firearms (*id.* at 1103) – clearly then attempting to sell them. The Rule goes further, however, saying that neither sales *nor even purchases* is required. ATF's remaining cases all involved *actual* sales. *See, e.g.*, *United States v. Valdes*, 681 F. App'x 874 (11th Cir. 2017) (600 sales); *United States v. Wilmoth*, 636 F.2d 123 (5th Cir. 1981) (4 sales); *United States v. Shan*, 361 F. App'x 182 (2d Cir. 2010) (2 sales); *United States v. Murphy*, 852 F.2d 1 (1st Cir. 1988) (sale of 102 rifles); *United States v. Mastro*, 570 F. Supp. 1388 (E.D. Pa. 1983) ("approximately three dozen" sales); *United States v. Shirling*, 572 F.2d 532 (5th Cir. 1978) (2 sales).

to derive this limitation from "dictionary definitions" of "collection," Defendants narrow "collection" to nothing more than "an assembly of objects or specimens for the purposes of education, research, or interest."  Opp. 27.  But just because Defendants have found *a* dictionary definition does not mean it is the *best* definition for the job.  On the contrary, the more natural reading of "personal collection" uses the definition Plaintiffs proposed – basically, any group of objects accumulated in one place.  This, unsurprisingly, would apply to the ordinary gun owner[7] with a "collection" of firearms accumulated for any purpose at all.  But Defendants reject the notion that Congress intended the statute to broadly apply and to ordinary people, instead creating a new regime where the GCA's safe harbor provision applies only to museum curators.

Defendants claim to find further support for their narrow reading of "personal collection" in the GCA's definition of a collector of "curio and relic" firearms, defined as "any person who acquires, holds, or disposes of firearms as curios or relics...."  *Id.*  But this is not the narrow language Defendants claim.  Rather, it applies to anyone who acquires a certain type of firearm.  Likewise, a "personal collection" applies to anyone who "collects" firearms "personally" (*i.e.*, not for business purposes).[8]

_____

[7] Disputing that the statutory safe harbor was meant to apply to ordinary people doing ordinary things, Defendants opine that "firearms accumulated primarily for personal protection [do not] fit with … the ordinary meaning of 'collection'...."  Opp. 28-29.  Defendants promise that people may "acquire and use firearms for self-defense," but may not sell them under the statutory safe harbor.  To be sure, Defendants reassure "that does not mean that a person is necessarily engaged in the business of dealing when he sells a firearm that he acquired for personal protection."  Opp. 29.  Of course, the statutory safe harbor is unambiguous that people selling firearms they acquired for self-defense definitively are not engaged in the business.

[8] Plaintiffs also criticized the rule for lumping two separate statutory safe harbor provisions ("personal collection or for a hobby") into a single definition of "personal collection," thereby watering down the statute.  MPI 22-23.  Defendants do not respond to that argument.

Seventh, Defendants argue that the Rule is not vague because it sets forth "specific circumstances" and "specific types of conduct" that give rise to a presumption that a person either is or is not unlawfully engaged in the business.  Opp. 30.  According to Defendants, these examples are "quite clear," and "Plaintiffs simply list provisions of the Rule with which they disagree." *Id.* But the entire point of a "presumption" is that it may be true – or it may not be true.  And <u>when such a presumption broadly sweeps in large swaths of perfectly innocent conduct, it is impossible to know which side of the line one is on</u> – not to mention when *multiple* presumptions are involved. Defendants finally admit as much, arguing that "even if … there could be some borderline cases in which it might be difficult to determine how the rule applies," that "is true of almost any statute or rule...."  Opp. 31.  But Plaintiffs do not pick nits about cases at the margin, focusing on the one percent of hard cases and ignoring the rest.  Rather, the opposite is true – the Rule "presumes" illegality in the vast majority of cases where the conduct is perfectly lawful.  *See* ECF #7-2 at 24-26.

### B.  The Rule's Presumptions Are Invalid on Their Face.

#### 1.  The Statute Restricts ATF's Authority to Establish Presumptions of Criminality.

Claiming that the Rule's presumptions "help effectuate the GCA" by accomplishing gobs of good things (Opp. 32), Defendants point to a series of cases they claim support the broad authority of agencies to create presumptions.  None is helpful.  Whereas the GCA permits ATF to enact *only* regulations "*necessary* to carry out the provisions," 18 U.S.C. Section 926(a), the Supreme Court noted in *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945), that Congress had "left to the Board the work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms."  Congress

provided no similar broad grant of authority to ATF to define and apply "engaged in the business" here.

No matter, say Defendants, because they have the "*inherent* power" to create presumptions "regardless of whether the statute explicitly addresses presumptions." Opp. 33 (citing no authority for this).[9]  *But see Holland Livestock Ranch v. United States*, 714 F.2d 90, 92 (9th Cir. 1983) (a "presumption cannot stand where it is not needed" and cautioning that "[p]resumptions should not replace proof needlessly").  On the contrary, by claiming "general authority to promulgate regulations to effectuate its administration of the statutes it is charged with administering," the Rule blatantly rewrites the express Congressional limitation on its authority found in Section 926(a).

There is also one inconvenient truth behind Defendants' insistence of their authority to formulate presumptions – such administrative creations seem uniformly to rest on the application of *Chevron* deference (or deference by another name).  *See, e.g.*, *Idaho Mining Ass'n v. Browner*, 90 F. Supp. 2d 1078, 1098-99 (D. Idaho 2000) ("the rebuttable presumption is merely an interpretation of existing regulations and that the Court's analysis should therefore by guided by *Chevron*.").  But again, ATF has not made any explicit claim to deference here, or otherwise

---

[9] Similarly, in *U.S. Steel Corp v. Astrue*, 495 F.3d 1272, 1284 (11th Cir. 2007), the court allowed the Social Security Administration to use a "rebuttable presumption" in response to "to the difficulty of locating records" which "can date back fifty to sixty years...."  *See also USX Corp. v. Barnhart*, 395 F.3d 161, 172 (3d Cir. 2004) (same); *COLE v. U.S. DEPT. OF AGRICULTURE*, 33 F.3d 1263, 1269 (11th Cir. 1994) ("The reason for the presumption is also apparent ... it would be difficult for the government to trace and identify the producer who initially sold the over-quota tobacco.").  No similar impossibility exists here, as neither ATF nor the courts have had any difficulty applying the statute for many decades without any presumptions at all.  *See* Compl. ¶37 ("*ATF declined to add examples*" in 1988, stating "the definition adequately addresses this concern....").  ATF's sudden reversal – at the President's behest – is by definition 'capricious.'

claimed the statute to be ambiguous and in need of presumptions in order to apply it. Indeed, to the extent that Defendants were to make such a claim to deference, it would not hold water, because the "engaged in the business" statute is one that carries criminal penalties. *See Abramski v. United States*, 573 U.S. 169, 191 (2014) ("criminal laws are for courts, not for the Government, to construe. We think ATF's old position no more relevant than its current one – which is to say, not relevant at all."); *United States v. Apel*, 571 U.S. 359, 369 (2014) ("we have never held that the Government's reading of a criminal statute is entitled to any deference."); *HollyFrontier Cheyenne Refinery, LLC v. Renewabler Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021) ("the government does not … ask [for deference] here…. We therefore decline to consider whether any deference might be due….").

Although acknowledging that being "engaged in the business" requires a "fact-specific inquiry considering the totality of the circumstances" – *i.e.*, not something easily determined by reliance on a single presumption based on a single fact – Defendants claim that the Rule somehow requires consideration of "the totality of the circumstances, including the presumptions and any rebuttal evidence." Opp. 34. On the contrary, the Rule's presumptions – by design and intent – permit a person to be assumed to be deemed unlawfully dealing based on meeting *any one* of ATF's arbitrary criteria (and nothing more). Such presumptions are the antithesis of a "totality of the circumstances" review – by definition, they represent a shortcut around such review.

Claiming that Plaintiffs may not even dispute ATF's authority to create presumptions, Defendants assert that the only challenge Plaintiffs may levy is "'the heavy burden of demonstrating that there is no rational connection between the fact proved and the ultimate fact to be presumed.'" Opp. 33 (citation omitted). And, opining that "none of the presumptions suffers from a failure of explanation," Defendants assert that each of them is "either supported by case

law … or other evidence demonstrating that a rational nexus exists." *Id.*  But as Plaintiffs explained, merely because another court once found a certain fact to be relevant (during a *totality of the circumstances* review in a particular case) does not give ATF carte blanche to hone in on that factor as *alone* creating a presumption of illegality, with nothing more.

As the Fifth Circuit has held, even if permissible, "presumptions in the law result when 'proof of one fact renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of the inferred fact....'"  *Career Colls. & Sch. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 250 (5th Cir. 2024).  Although Defendants claim the Rule's presumptions are "common sense, confirmed by decades of ATF's enforcement experience" (Opp. 34), this is nothing more than the "ipse dixit" that the Fifth Circuit prohibits.  98 F.4th at 251.

### 2.  The EIB Presumptions Are Unlawful.

Defendants' naked appeal to "common sense" does not a reasoned decisionmaking process make.  For starters, many of the presumptions directly conflict with the statute they purport to implement.  *See* Compl. ¶¶102-09; MPI 26-33.  Additionally, many of the Rule's presumptions do not meet the Fifth Circuit's standard above – *i.e.*, they sweep in far more lawful conduct than unlawful, meaning it cannot possibly be the case that the existence of facts to prove one of ATF's presumptions "renders the existence of [unlawful dealing] *so probable* that it is sensible and timesaving to assume [its] truth...."  *Career Colls. & Sch. of Tex.*, 98 F.4th at 250.

Defendants respond first that the Rule's presumptions do not violate the statute.  Opp. 35-36.  Again, disputing that "the statute requires actual sales," Defendants opine that, either way, the "presumption does not render the specified conduct a violation … but rather presumes" a violation "pending reliable evidence to the contrary."  Opp. 36.  But the opportunity to defend oneself is no answer.  Plaintiffs do not seek the right to defend themselves from an improper charge – they want

never to be improperly charged in the first place.

Second, Defendants seek to rehabilitate the presumption of dealing if a person "resell[s] firearms within 30 days of purchase...." Op. 36. Defendants' only justification for this presumption is that "many firearms sellers allow returns within 30 days...." Op. 37. Yet even the NPRM acknowledged that "many" retailers allow no returns on firearms, while only "some" do. 88 Fed. Reg. 62003 n.80. Indeed, Plaintiff GOA's comments further explained how most gun sellers do not allow returns, giving examples. ECF #16-1 at 40. Don't worry, say Defendants, because again, anyone charged with this presumption "may present … rebuttal evidence...." Opp. 37. As noted above, this is no answer.

Defendants also defend the Rule's new-in-box presumption, claiming it does not create a "presumption, within a safe harbor, within a presumption, within a statute." Opp. 37; ECF #7-2 at 24. Rather, Defendants say, if a person "intentionally" evades the statute, but waits a year in doing so, the presumption does not apply at all and "the factfinder would [need to] consider all the relevant facts. Opp. 37. In other words, under the Rule, the clear law-breaker *falls outside the presumption*, while the innocent gun owner who loses his job and sells a few new guns to pay the mortgage *is presumed a felon* and must defend himself. It would seem that the Rule's absurdity continues to grow.

### 3. The PEP Presumptions Are Unlawful.

Again disputing that the statute requires no actual profit (only intent), Defendants claim that their PEP presumptions are both lawful and "sensible." Opp. 37-40. First, Defendants deny that the Rule takes the explicit statutory safe harbor, and waters it down into the mere opportunity to defend oneself. Defendants claim that "Plaintiffs misapprehend the structure of the statute" – but then make Plaintiffs' point for them – pointing out that, although the statute says that unlawful

dealing definitively "*shall* not include" certain conduct, the Rule instead allows that "evidence of such conduct *can* rebut the presumptions." Opp. 38 (emphasis added). But again, the statutory safe harbor does not require a person to provide "evidence" to prove his innocence. Rather, it declares unequivocally that he is not breaking the law.

Next, Defendants callously concede that the Rule's purportedly "common-sense" PEP presumptions "may capture some individuals" who are engaged in perfectly lawful activity, but demur "that is why the presumptions are rebuttable." Opp. 38. But again, it is no answer to say that any errors at the outset may be corrected on the back end (that is, if a person is able to assemble and present evidence to prove his innocence).

Finally, Defendants object for two additional reasons, largely on the theory that the PEP presumptions are "common-sense," that they will not sweep up as much lawful activity as Plaintiffs claim, and that either way, innocent people will be offered the opportunity to prove their innocence. Opp. 39-40. Each of these arguments has been addressed above.

### 4.   The Rule's "Not Presumed" Language Waters Down the Statute.

Disputing that the Rule waters down the statutory safe harbor language, Defendants claim that "the Rule tracks the statute exactly...." Opp. 40-41. But Defendants then concede that the Rule also "added conduct that satisfies this statutory exclusion as conduct that cannot be presumed to be engaged in the business." Opp. 41. In other words, by "add[ing]" language, the Rule *does more than* "track the statute exactly."

Indeed, whereas the statute offers clear protection – *i.e.*, 'if you do this, you conclusively are *not* a dealer' – the Rule waters this down to "conduct that cannot be presumed" – *i.e.*, 'if you do this, *we won't assume* you're dealing – but you may still be.' Defendants offer no cognizable theory as to why the Rule's "not presumed" language is helpful, when the statute already provides

far more robust protection through its safe harbor language.

## C. The Rule's Provisions for "Former Licensees" Violate the Statute.

Defendants' insistence that the statute permits regulation of so-called "former licensees" is incoherent. Unable to cite any statute for the creation of such a class of individuals, Defendants simply assert that "former licensees are an inherent feature of the GCA's licensing scheme." Opp. 41. But in the same breath, Defendants then concede that "a former licensee is [governed] *in the same ways and to the same extent as anyone else who is not currently licensed*." *Id.* (emphasis added). In other words, any distinction between 'former licensees' and 'ordinary people' is something that the Rule contrives out of whole cloth.[10] Accordingly, Defendants' suggestion that "the Rule actually … provide[s] [former licensees] with a way to dispose of their inventory lawfully" is nothing short of bureaucratic paternalism. *Id.* "Former licensees" can do all that non-licensees do – without the need for a Rule no one asked for, which provides additional limitations, not greater freedoms.

Defendants then advance three reasons why their statutory revisionism should survive. None is availing. First, Defendants claim their one-year rule is permissible because it is "reasonable" to assume a former licensee attempting to sell their remaining inventory must be "engaged in the business." Opp. 42. *But see* Declaration of Erich M. Pratt ¶22, ECF #1-2 ("This member reports that this lifetime of accumulated inventory largely constitutes their retirement."). On the contrary, it is no more "reasonable" to presume a former licensee is breaking the law than

---

[10] In a now-common refrain, Defendants accuse Plaintiffs of "misunderstand[ing]" the Rule, only to admit that what Plaintiffs say is technically true. Opp. 35, 38, 42. Of course, as another judge in this district has noted, "[t]echnically correct is the best kind of correct…." *Lane v. United States*, 612 F. Supp. 3d 659, 666 (N.D.T.X. 2020).

any other unlicensed person.  Left without any statute authorizing their latest edict, Defendants simply demur that "[t]he rational nexus supporting this presumption is based on ATF's *common-sense* interpretation of the GCA."  Opp. 42.  But as Plaintiffs already explained, statutory revisionism is anything but "common-sense."

Second, Defendants defend their effective sales ban on 'willful evaders' by citing nothing more than their own opinions that the Rule is "manifestly sensible," "patently clear," and yet another "common-sense interpretation."  Opp. 43.  But absent statutory text authorizing Defendants' action, a thesaurus cannot save the Rule.

Third, Defendants claim Plaintiffs' observation that firearms never transferred to business inventory "remain forever in purgatory" is "inaccurate," but their only defense is the atextual 30-day transfer window created by the Rule.  Opp. 43.  Plus, it would seem that, outside this window, Plaintiffs' concerns are vindicated, and *certain firearms may never be transferred*.  Finally, Defendants dispute that "[p]urchasing inventory while licensed does not in any sense 'serve as a predicate offense for a charge of *unlicensed* dealing,'" but that is exactly what the Rule states.  *See* 89 Fed. Reg. 29051 ("Because this inventory consists of firearms repetitively purchased for resale with predominant intent to profit, it was clearly purchased as part of a regular course of business or trade."), 29090 ("they were purchased repetitively before the license was terminated as part of a licensee's business inventory with the predominant intent to earn a profit.").

## IV.    The Rule Violates the Second Amendment.

Requiring licensure for incidental, private transactions in firearms would violate the Second Amendment. Courts routinely hold that the exercise of the right to keep and bear arms necessarily requires the incidental acquisition and disposition of firearms.  The Rule expands "engaging in the business" so broadly that it essentially requires a license for ordinary persons doing ordinary things

merely to exercise their Second Amendment rights, thereby infringing a right that "shall not be infringed." While the Second Amendment explicitly protects the right to "keep and bear arms," the only way to exercise the right "is to get one, either through sale, rental, or gift," *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023), or through private manufacture. Therefore, if a person's ability to acquire and dispose of firearms is restricted, that person's right to keep and bear arms is hindered – *i.e.*, infringed. *See id.* at 1044 n.8.

As the Supreme Court has recently explained, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, … the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). No such historical showing can be made here.

ATF's opposition seeks historical analogues in all the wrong places. *See* ECF No. 31 at 46–47; n.31. Contrary to Defendants' claim of historical similarity, in 1794, Congress temporarily restricted the export of arms and matériel in order to *enhance the arming of America*, at a time when war with Great Britain loomed. Likewise, the colonies restricted arms trade with Indians to reduce the threat from hostile tribes. As for Massachusetts' barrel proving law, this was a product quality-control measure. And the various laws concerning gunpowder were enacted to prevent widespread fire damage to cities caused by volatile, rudimentary compounds no longer in widespread use. None of these laws parallels the "how" and the "why" of the Rule's radical expansion of the GCA's licensing requirement. *Bruen*, 597 U.S. at 29.

To be sure, the Supreme Court said in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding ... laws imposing conditions and qualifications on the commercial

sale of arms," which are "presumptively lawful regulatory measures." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008).  But this language in *Heller* was dicta, and it does not even apply in the non-commercial context.  Rather, if anything, by singling out conditions on the commercial sale of arms, this language in *Heller* indicates that conditions on non-commercial sales of firearms are constitutionally suspect.  Nor are dealer licensing laws a "longstanding" type of statute, but instead largely arose in the 20th century and cannot form a early national tradition under *Bruen's* stringent standard.

## V.    The Rule Violates the Fourth Amendment.

 Defendants attack Plaintiffs' standing to challenge the Rule on Fourth Amendment grounds, noting that "nothing in Tormey's declaration indicates that he intends to seek a federal firearms license." ECF No. 31 at 62. On the other hand, if Mr. Tormey would like to engage in the same activities as he has for years, licensure is his only option. Yet the Rule presents him with the Hobson's choice of foregoing exercising his Second Amendment rights, or obtaining an FFL and being subject to warrantless invasions of his home (a Fourth Amendment violation).  Yet it is axiomatic that one constitutional right cannot be conditioned on another. Moreover, if Mr. Tormey continues his current activity, and does not obtain a license, he could be criminally charged—which would also involve government intrusion into his home. Beyond Tormey's obvious standing, it is likely that several GOA and VCDL members and supporters will be forced to become licensed to continue carrying on with their lives.  Indeed, the organizational Plaintiffs' declarations directly anticipate, assume, and allege that numerous of their members will become licensed. *See generally* Dec. of Erich Pratt ¶ 14; Dec. of Philip Van Cleave ¶¶ 5,6; see also ¶ 11 ("once licensed as dealers"); ¶ 13 (same).

        Rather than engage with Plaintiffs' argument about the "heavily regulated industry"

exception to the Fourth Amendment's warrant requirement, Defendants simply allege that the exemption exists. Opp. 48-49. But Plaintiffs never disputed that. Rather, their argument is that, if the Rule is permitted to force hundreds of thousands (or potentially more) Americans to become federally licensed dealers merely to engage in protected Second Amendment activity, this "narrow" Fourth Amendment "exception" would swallow the rule. To the extent the Rule seeks to make dealers out of countless ordinary Americans, it cannot be sustained by any Fourth Amendment exception, and thus violates the warrant requirement.

### VI.    Relief Should Not be Limited to the Parties.

This Court should stay enforcement of the Final Rule nationwide pending a decision on the merits. The APA allows a reviewing court to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). "'When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh,* 878 F.2d 484, 495 n. 21 (D.C.Cir.1989)); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 (2020) (explaining that, when "a provision is declared invalid," it "cannot be lawfully enforced against others").

Motions to stay agency actions are reviewed under the same standards used to review requests for preliminary injunctive relief. *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing 5 U.S.C. § 705); s*ee also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors).

Under Section 705, a court "may issue all necessary and appropriate process to postpone

the effective date of an agency action or to preserve status or rights pending conclusion of the review proceeding." 5 U.S.C. § 705. "Nothing in the text of Section 705" suggests that preliminary relief "needs to be limited to" the parties before the court. *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).

To be sure, relief under Section 705 is different than the relief sought in a "nationwide injunction." While "[a] stay [of an agency action] pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one ... [due to both having] the practical effect of preventing some action before the legality of that action has been conclusively determined," *Nken v. Holder*, 556 U.S. 418, 428 (2009), "a stay achieves this result by temporarily suspending the source of authority to act—the order or judgment in question—not by directing an actor's conduct." *Id.* at 428–29.

"In the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay [under section 705] is the temporary form of vacatur." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023). "Under 5 U.S.C. § 705, [courts] may, under 'certain conditions[,] ... and to the extent necessary to prevent irreparable injury, ... issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (quoting 5 U.S.C. § 705).

That is the relief Plaintiffs seek here. The Rule cannot be salvaged and should be stayed in its entirety—which this Court has the express authority to do. *See* 5 U.S.C. § 705; *see also* Jonathan Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1014 (2018) ("[T]he APA does give the judiciary a unique power that it lacks when reviewing the constitutionality of statutes: Reviewing

courts may formally vacate an agency's rule or order, rather than merely enjoining officials from enforcing it.").

**VII.    The Balance of Equities Favors a Stay.**

This novel rule presents a stark departure from the longstanding status quo that more fully protected Second Amendment rights. Until now, Defendants adopted the Congressional definitions of terms such as "engaged in the business" rather than attempting to expand those definitions beyond what Congress already included. *See* 27 C.F.R. § 478. That makes sense. Federal law limits Defendants' authority to draft rules and regulations to only those that "are necessary to carry out provisions of this chapter." 18 U.S.C. § 926(a). And Congress was explicit in what they allowed Defendants to define. *See* 18 U.S.C. § 921(a)(13). That is why the definitions Defendants previously adopted for 18 U.S.C. § 921(a)(21)(C) precisely mirrored what Congress wrote. *See* 27 C.F.R. § 478.

There is no harm to ATF in being prevented from enforcing an illegal rule, and there is no public interest in violating Second Amendment rights.

CONCLUSION

For these reasons, Plaintiffs ask this Court to stay ATF's Rule under 5 U.S.C. § 705.

Date: May 15, 2024                          Respectfully submitted.

**KEN PAXTON**                              */s/Garrrett Greene*
Attorney General                           **GARRETT GREENE**
                                           Special Counsel
                                           Texas Bar No. 24096217
**BRENT WEBSTER**
First Assistant Attorney General
                                           **KATHLEEN T. HUNKER**
**RALPH MOLINA**                            Special Counsel
Deputy Attorney General for Legal Strategy  Texas Bar No. 24118415

**RYAN D. WALTERS**                         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Chief, Special Litigation Division          Special Litigation Division
                                           P.O. Box 12548, Capitol Station
                                           Austin, Texas 78711-2548
                                           Tel.: (512) 463-2100
                                           garrett.greene@oag.texas.gov
                                           kathleen.hunker@oag.texas.gov

                                           **COUNSEL FOR PLAINTIFF STATE OF TEXAS**

**LYNN FITCH**                              **ELIZABETH B. MURRILL**
Attorney General of Mississippi            Attorney General

*/s/Justin L. Matheny*                      */s/J. Benjamin Aguiñaga*
**JUSTIN L. MATHENY** (MS Bar 100754)       **J. BENJAMIN AGUIÑAGA***
Deputy Solicitor General                    Solicitor General
**OFFICE OF THE ATTORNEY GENERAL**
P.O Box 220                                 **LOUISIANA DEPARTMENT OF JUSTICE**
Jackson, MS 39205-0220                      1885 N. Third Street
Tel: (601) 359-3680                         Baton Rouge, Louisiana 70802
Fax: (601) 359-2003                         Tel: (225) 506-3746
justin.matheny@ago.ms.gov                   aguinagab@ag.louisiana.gov

**COUNSEL FOR PLAINTIFF STATE OF MIS-**     **COUNSEL FOR PLAINTIFF THE STATE OF LOUISI-**
**SISSIPPI**                                 **ANA**
                                           *Admission To NDTX Pending

SEAN D. REYES
Utah Attorney General

*/S/ Andrew Dymek*
ANDREW DYMEK*
Assistant Solicitor General

UTAH OFFICE OF THE ATTORNEY GEN-
ERAL
350 North State Street, #230
P.O. Box 142320
Salt Lake City, Ut 84114-2320
Tel.: 801-366-0533
adymek@agutah.gov

COUNSEL FOR PLAINTIFF STATE OF UTAH
*Admission To NDTX Pending

*/s/ John I. Harris III*
JOHN I. HARRIS III (TN # 12099)

SCHULMAN, LEROY & BENNETT PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

COUNSEL FOR JEFFERY W. TORMEY, GUN
OWNERS OF AMERICA, GUN OWNERS
FOUNDATION, TENNESSEE FIREARMS AS-
SOCIATION, AND VIRGINIA CITIZENS DE-
FENSE LEAGUE
*Admission to NDTX pending

*/s/ Stephen D. Stamboulieh*
STEPHEN D. STAMBOULIEH

STAMBOULIEH LAW, PLLC
NDTX#: 102784MS
MS Bar No. 102784
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

COUNSEL FOR JEFFERY W. TORMEY, GUN OWN-
ERS OF AMERICA, GUN OWNERS FOUNDATION,
TENNESSEE FIREARMS ASSOCIATION, AND VIR-
GINIA CITIZENS DEFENSE LEAGUE

*/s/ Brandon W. Barnett*
BRANDON W. BARNETT
Texas Bar No. 24053088

BARNETT HOWARD & WILLIAMS PLLC
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
817-993-9249 (T)
817-697-4388 (F)
barnett@bhwlawfirm.com

LOCAL COUNSEL, COUNSEL FOR JEFFERY W.
TORMEY, GUN OWNERS OF AMERICA, GUN
OWNERS FOUNDATION, TENNESSEE FIREARMS
ASSOCIATION, AND VIRGINIA CITIZENS DE-
FENSE LEAGUE

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 15, 2024 and that all parties will be served with the Original Complaint via certified mail and process server.

*/s/Garrrett Greene*
**GARRETT GREENE**