```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE NORTHERN DISTRICT OF TEXAS

 3                          AMARILLO DIVISION

 4   STATE OF TEXAS, STATE OF        )  2:24-cv-00089-Z
     LOUISIANA, STATE OF            )
 5   MISSISSIPPI, STATE OF UTAH,    )
     JEFFREY W. TORMEY, GUN         )
 6   OWNERS OF AMERICA, INC.,       )  Thursday, May 16, 2024
     GUN OWNERS FOUNDATION,         )  11:05 a.m. - 1:13 p.m.
 7   TENNESSEE FIREARMS             )
     ASSOCIATION, AND VIRGINIA      )
 8   CITIZENS DEFENSE LEAGUE,       )
                                    )
 9              Plaintiffs,         )  MOTION HEARING
     VS.                            )
10   BUREAU OF ALCOHOL, TOBACCO,    )
     FIREARMS AND EXPLOSIVES,       )
11   UNITED STATES DEPARTMENT OF    )
     JUSTICE, MERRICK GARLAND,      )
12   in his official capacity as    )
     Attorney General of the        )
13   United States, and STEVEN      )
     M. DETTELBACH, in his          )
14   official capacity as           )
     Director of ATF,               )
15                                  )
                Defendants.         )
16

17                    TRANSCRIPT OF PROCEEDINGS

18            BEFORE THE HONORABLE MATTHEW J. KACSMARYK

19                  UNITED STATES DISTRICT JUDGE

20

21   COURT REPORTER:          SHAYNA MONTGOMERY, CSR, RMR, CRR
                              United States Court Reporter
22                            205 SE 5th Ave, Room 133
                              Amarillo, Texas 79101
23                            (806) 468-3816

24
     Proceedings reported by mechanical stenography and transcript
25   produced by computer.
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF STATE OF TEXAS:

 3           OFFICE OF THE TEXAS ATTORNEY GENERAL
             SPECIAL LITIGATION DIVISION
 4           BY:  GARRETT M. GREENE, ESQ.
             -and-
 5           BY:  KATHLEEN T. HUNKER, ESQ.
             209 West 14th Street
 6           Austin, Texas 78711
             (512) 936-2917
 7

 8   FOR THE PLAINTIFFS GUN OWNERS OF AMERICA, GUN OWNERS
     FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, VIRGINIA CITIZENS
 9   DEFENSE LEAGUE AND JEFFREY TORMEY:

10           STAMBOULIEH LAW, PLLC
             BY:  STEPHEN STAMBOULIEH, ESQ.
11           P.O. Box 428
             Olive Branch, Mississippi 38654
12           (601) 852-3440

13

14   FOR THE DEFENDANTS:

15           DEPARTMENT OF JUSTICE-CIVIL
             FEDERAL PROGRAMS BRANCH
16           BY:  JEREMY S.B. NEWMAN, ESQ.
             -and-
17           BY:  KERI LANE BERMAN, ESQ.
             -and-
18           BY:  ZACHARY SHERWOOD, ESQ.
             1100 L Street NW
19           Washington, DC 20005
             (202) 532-3114
20           (202) 305-7538
             (202) 616-8467
21

22

23

24

25
```

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

1                      P R O C E E D I N G S

2              THE COURT:  The Court calls Civil Action Number

3    2:24-cv-089-Z, State of Texas, et al. vs. Bureau of Alcohol,

4    Tobacco, Firearms and Explosives, et al., for a hearing on

5    pending motions, specifically the pending motion for a

6    temporary restraining order.

7              Are the parties ready to proceed?

8              MR. GREENE:  The state is ready, Your Honor.

9              THE COURT:  Okay.  And if you will identify the

10   attorneys representing which states and which parties, we'll

11   make that part of the record, and I'll also ask which attorneys

12   are taking which parts of the argument.

13             MR. GREENE:  So Garrett Greene for the state of

14   Texas.  I'll be initially presenting on Texas's standing, and

15   then I'll talk about some of the merits.  Some of the more

16   specific aspects as they pertain to the individual plaintiffs

17   and the organizational plaintiffs will be handled by my

18   co-counsel, if you'd like to introduce yourself.

19             MR. STAMBOULIEH:  Stephen Stamboulieh for Gun Owners

20   of America, Gun Owners Foundation, Tennessee Firearms

21   Association, Virginia Citizens Defense League and Jeffrey

22   Tormey.  And I will pick up where my co-counsel has left off

23   and address the private plaintiffs' individual specifications,

24   Your Honor.

25             THE COURT:  Okay.  And then I see we have a third

```
 1   attorney.
 2              Will you be taking any portion of the argument?
 3              MS. HUNKER:  Your Honor, my name is Kathleen Hunker
 4   from the Office of Attorney General.  I will not be speaking
 5   unless it's perhaps for some additional matters outside of the
 6   TRO or PI hearing.
 7              THE COURT:  Okay.  So which state?  I'm assuming
 8   Texas?
 9              MS. HUNKER:  That's correct, Your Honor.
10              THE COURT:  Okay.  And for the defendants, who do we
11   have from the Department of Justice Federal Programs Division
12   and who will be taking which portion of the argument?
13              MR. NEWMAN:  Your Honor, Jeremy Newman from the U.S.
14   Department of Justice.  I'll be taking much of the -- of the
15   merits, except for certain issues with the presumptions and the
16   personal collection/safe harbor, which my colleague will
17   handle.
18              MS. BERMAN:  Keri Berman from the Department of
19   Justice, Your Honor, and as Mr. Newman just said, I'll be
20   answering any questions about the presumption specifically, as
21   well as the safe harbor and its interaction with the rule.
22              THE COURT:  Okay.  And --
23              MR. SHERWOOD:  Zachary Sherwood, Your Honor, and I'll
24   be addressing questions of standing for all of the plaintiffs:
25   state, individual and organizational.
```

```
 1                THE COURT:  Okay.  So this Court abides a
 2    one-attorney-one-microphone rule to avoid cross-talk and to
 3    make life easier for the court reporter.  And I just want to
 4    make clear to the parties that we are here to adjudicate the
 5    temporary restraining order portion of this case.  I understand
 6    that many of the arguments bleed into factors relevant to
 7    preliminary and permanent injunction, but given the timing of
 8    the final rule and the expedited briefing schedule, we are here
 9    today to decide whether a temporary restraining order will
10    issue.
11                I understand that a lot of the arguments overlap, so
12    that's without prejudice to you making arguments that will
13    otherwise apply to the preliminary and permanent injunction,
14    but understand that's the purpose of the hearing today, is to
15    adjudicate the restraining -- the temporary restraining order
16    that has been requested by plaintiffs, opposed by defendants.
17                I have your briefing, the motion -- I've got the
18    complaint in Document Number 1.  I've got the motion for TRO
19    and/or preliminary injunction in Document 16, and then the
20    Department of Justice opposition in Document Number 31.  And
21    then yesterday I received the reply and one amicus brief.  So
22    if you are referencing any of those documents or the agency
23    administrative record, please call attention to the particular
24    section because we had to put this together on a pretty short
25    timeline.  So for record purposes and clarity to the Court,
```

1    please use ECF document numbers and page numbers if you are

2    requesting the Court read particular parts of any of the

3    briefing.

4              So this Court issued an order instructing the parties

5    on specific questions from the Court.  I anticipate that you'll

6    address those in your presentation to the Court.  There are 45

7    minutes per side.  And does the state of Texas or any of the

8    other plaintiffs request any of that time be held back for

9    rebuttal?

10             MR. GREENE:  The state of Texas requests 15 minutes

11   for rebuttal, Your Honor.  Additionally, as I go up to speak,

12   if I could have a cutoff time of 20 minutes to ensure that my

13   co-counsel has enough time to address the individual and

14   organizational plans, that would be appreciated.

15             (Pause in proceedings.)

16             THE COURT:  And a warning about running out of time,

17   at five minutes, at two minutes, sometimes people request that.

18   Is Texas or any of the plaintiffs' attorneys requesting a

19   warning?

20             MR. GREENE:  A two-minute warning would be great,

21   Your Honor.

22             THE COURT:  Okay.  And for the Department of Justice?

23             (Pause in proceedings.)

24             MR. NEWMAN:  I think we'd like probably about 20 --

25   if you could give me a warning when I've gone to 20 minutes,

```
1    not necessarily a cutoff, but at that point I'll probably try
2    to wrap up soon and pass it along to Ms. Berman.  And we'd like
3    to -- similarly, when there's ten minutes left in the total
4    argument, a warning for her so that she can ensure that
5    Mr. Sherwood has enough time.
6              THE COURT:  Okay.  And for that final warning, a
7    five-minute warning, will that suffice?
8              MR. NEWMAN:  Yes, thank you.
9              THE COURT:  Okay.  So I'll instruct my law clerk to
10   my immediate right to serve as timekeeper, and I'll try to be
11   disciplined about giving you those time markings.
12             Some simple housekeeping, you may speak from the
13   lectern or counsel table but please abide the
14   one-attorney-one-microphone rule.  When addressing the Court,
15   you may use any materials assembled there, but if you're
16   requesting projection on the screen, for the Court's use please
17   signal to the CRD that you're requesting access to courtroom
18   technology, we can make that available.  Anything that displays
19   on that screen will display on our screens here at the bench,
20   and I'll just ask that any courtroom technology be set to a
21   silent mode so that we're not interrupted by any beeping
22   sounds.
23             So today, as I stated at the outset, we are
24   adjudicating specifically the plaintiffs' motion for temporary
25   restraining order, and there are particular questions that
```

1    issued by order of the Court.  I'll admonish counsel for both

2    plaintiffs and defendants to address those questions during

3    your presentation, and because I previously served in the

4    appellate division of the Department of Justice, you can expect

5    constant interruption.  So this was -- this was a bit of a

6    crash course when I started as a baby AUSA, but I had a nice,

7    lovely outline and I was ready to make the presentation and I

8    got interrupted immediately after I announced my name and

9    title.

10            So this is without prejudice to either side.  I just

11   wanted to warn you that this will feel more like an appellate

12   argument, and if I'm interrupting you, it's not because you're

13   doing a poor job, it's just my disposition.  I'm more of an

14   appellate attorney than a trial attorney.  So please forgive

15   the rudeness of that, but it's so that we can get the questions

16   answered for purposes of the Court's ruling and order to

17   follow.

18            So with that, I'll allow the movant to begin.  We'll

19   start the clock, and it's my understanding, Mr. Greene, you're

20   the first attorney to speak.

21            MR. GREENE:  Yes, Your Honor.  May I approach the

22   podium?

23            THE COURT:  You may.

24            MR. GREENE:  As stated earlier, my name is Garrett

25   Greene.  I represent the state of Texas.  I'm going to talk a

1    little bit about standing first, the state's standing, and then

2    how the final rule contravenes the exact statute that it's

3    supposed to clarify.  I'll also talk generally about some of

4    the presumptions and their problems, specifically as it ties

5    into their degradation or evisceration of the safe harbor

6    that's found in the statute, and then I'll also talk a little

7    bit about some of the constitutional concerns, namely, the

8    second amendment.

9         And so as initial matter, the state has standing here

10   and stands to suffer irreparable harm if this rule goes into

11   effect.  As we've pled, Texas does have a state sales tax that

12   applies to the sale of firearms at gun shows.  This is a

13   typical kind of direct pocketbook injury that the state stands

14   to suffer.  We don't really have to speculate about how many

15   folks might leave the marketplace because ATF tells us that, in

16   their estimation, 10 percent of unlicensed dealers will either

17   be unwilling or unable to get their FFLs and will be forced to

18   exit the marketplace.

19        Not only is this a direct injury to the state but

20   it's irreparable.  As Your Honor knows, we can't recoup any

21   money from the United States government.  Any sales lost in the

22   interim or when this rule goes into effect will never be able

23   to be recovered by the state.

24        THE COURT:  Okay.  So that's my first question.  On

25   standing, I discern that you alleged a pocketbook injury, as

1    you describe it in your briefing and here today.  But at gun
2    shows, could you explain how those taxes are collected so I can
3    better understand how revenue may be lost.  If gun shows
4    primarily involve commercial gun sales, are these not
5    FFL-licensed dealers who generate that revenue?  So how does
6    this affect the state's tax revenue when the majority, if not
7    all, commercial gun sales involve persons who are already
8    required to register and license as an FFL?
9            MR. GREENE:  It's true, Your Honor, that would be the
10   majority of those people that are selling at those gun shows,
11   but there still are a good amount of people that are unlicensed
12   and operate at those gun shows.  Now, that precise number is
13   especially difficult to quantify and it wasn't for lack of
14   trying on our part, but I think that the fact that we can look
15   at how many gun shows Texas has just between May and July when
16   this rule comes into effect combined with the fact that the
17   state has many more gun shows in the year than any other state
18   that would be suffering any kind of pocketbook injury from
19   this.  My point being that if any state would ever have any
20   kind of pocketbook or direct injury from a loss of sales tax
21   revenue, it would be the state of Texas.
22           And again, it wasn't for lack of trying and
23   quantifying.  We talked to a lot of folks at the comptroller's
24   office.  They're not able to put a hard and fast number on
25   who -- who's an unlicensed seller and who's an FFL that's

1    selling at these gun shows.  Our position is that we don't

2    necessarily have to parse out that specifically.  We think that

3    it's enough to show that, generally speaking, the ATF has given

4    us a number, the number's at least 10 percent, maybe more in

5    the rule that will exit the marketplace and result in a --

6    inevitably result in loss of sales tax to Texas.

7            And as far as not being able to put a precise number

8    on it, I'd point the Court to the DAPA case in the Fifth

9    Circuit where, you know, Texas was able to establish an injury

10   in fact.  They couldn't exactly quantify the amount of costs

11   that would go into providing driver's licenses for the DAPA

12   recipients but still --

13           THE COURT:  Judge Brantley Starr was the attorney

14   representing the state of Texas at the time and I'm familiar

15   with the DAPA case.

16           Let me read you a section of Texas vs. United States.

17   That's always problematic for counsel at table because there

18   are about 40 or 50 cases that appear as Texas vs. United

19   States, but here I'm referring specifically to the case

20   appearing at 50 F.4th 498.  So this is a Fifth Circuit case

21   from 2022.  Here, the Court is taking inventory of the Supreme

22   Court's recent jurisprudence on standing which pushes back on

23   the use of Massachusetts vs. EPA and in summary is restricting

24   the state of Texas specifically to a narrower category of

25   argument and evidence to prove standing in a case alleging loss

1    of tax revenue or economic harm.

2           And this is what the Fifth Circuit wrote:  Quote,

3    "Texas does not allege a tax injury, let alone a generic one.

4    It identifies expenditures in providing emergency medical

5    services, social services and public education for illegal

6    aliens.  In El Paso, we expressly noted that the loss of

7    specific tax revenue could establish standing.  Specific social

8    services, likewise, will suffice.  In other cases regarding DHS

9    programs, we have specifically recognized the state's

10   obligation to subsidize additional aliens' health care and

11   education costs as injury in fact.  It may be true that

12   standing theories based on social service costs could spur

13   policy-oriented litigation.  However, our precedent rejects the

14   significance of this risk."

15          Specific to this Court's injury-in-fact inquiry, how

16   do you distinguish this case from the DHS program and precedent

17   in that Texas vs. United States case from the Fifth Circuit?

18          MR. GREENE:  I'd say that this case is

19   distinguishable.  At top of mind, this is in at least one way

20   where in that case it doesn't appear to me that the DHS had

21   provide -- provided hard and fast numbers, basically.  These

22   are the people that are going to require these kinds of

23   services.  We're not talking about just general social services

24   here.  We're talking about the fact that people will exit the

25   marketplace.  Unlicensed sellers will exit the marketplace.

1   That is a fact.  We don't have to speculate it.  ATF has told

2   us that and common sense would tell you that.

3           And we're not operating under the umbrella of just

4   some amorphous, you know, social tax injury.  We collect sales

5   tax on gun shows.  Texas has a lot of gun shows and people are

6   going to leave the market, and we believe that that is adequate

7   for us to show standing.

8           THE COURT:  Okay.  So in another case filed in a

9   different circuit plaintiffs made a similar argument but

10  supplied to the Court, probably from a comptroller or similar

11  office, receipts to various gun shows, the tickets and the

12  revenue generated from those receipts.  They're -- and here I'm

13  specifically referring to the case filed in United States

14  District Court for the Eastern District of Arkansas, Delta

15  Division, case 2:24-cv-088-JM, and that briefing included

16  exhibits reflecting specific data on Internet sales of firearms

17  and any attendant taxes.

18          There are also declarations from persons affiliated

19  with gun shows, the ticketing revenue generated from that.

20  They also referenced the increased resources and expenditures

21  required to run background checks.  And I believe that relates

22  to the ATF Form 4473 that is required of FFL licensees selling

23  guns at gun shows.  That was identified as an increase

24  administrative cost.  They identified specific not-for-profit

25  corporations and how that generated revenue for a biannual gun

1    show, giving that data to the Court.  And then only after

2    marshalling that evidence do they make what could be

3    characterized as a similar pocketbook injury argument.

4            Why was Texas unable to marshal similar evidence when

5    it is such a prominent gun show state?

6            MR. GREENE:  Yes, Your Honor.  I can't speak to how

7    the other states were able to come up with the evidence that

8    they did.  I know on our end that particularly in this kind of

9    case where the normal turnaround time between when the rule is

10   promulgated and effective is 90 days, 120 days.  In this case

11   we had 30 days, and we've done the best that we've been able to

12   be comfortable with putting in front of this Court and

13   representing to this Court in the amount of time that we've

14   had.  And again, we've had folks -- good folks, long-tenured

15   folks at the comptroller's working on this, and what we

16   provided to the Court is what we feel comfortable representing

17   given the short turnaround time.

18           THE COURT:  Okay.  Is there any revenue to Texas

19   generated from any public contracting with municipalities?  I'm

20   not familiar with how the financing is structured and which

21   governmental entities take a receipt or revenue.  If the city

22   of Dallas leases the Kay Bailey Hutchison Convention Center to

23   the Dallas gun show, is there any state of Texas component to

24   that event that generates revenue to the state of Texas, not

25   just the city of Dallas?  How would that be structured and how

1    does Texas state law intersect with various municipal laws on

2    gun shows and who takes revenue from that event?

3          MR. GREENE:  So, Your Honor, just initially I'll tell

4    you, again with the quick turnaround time, we haven't had a ton

5    of time to explore this issue and brief this issue.  I will

6    tell you that I do know there are local tax components to the

7    general overarching structure of the way Texas collects its

8    state sales tax, but I can't stand up here and represent to the

9    Court that I know every in and out of how exactly that

10   operates.

11         THE COURT:  Okay.  So by my own recollection of

12   living in a -- in a city like Dallas, there are gun ordinances

13   prominently displayed on all convention properties, whether

14   it's in Dallas or Fort Worth or Austin.  I think it's

15   ironically the 30.06 ordinance that allows different venues and

16   property owners to exclude firearms from their premise.  Yet,

17   that convention center hosts a gun show where people are

18   walking in and out of a building with that ordinance displayed

19   but they are carrying firearms of various types.  So I would

20   assume that there is some interplay between the state of Texas

21   and the municipality and the rules that govern a gun show.  I

22   just didn't see it in your briefing.

23         Is that something that could be supplied by

24   supplemental briefing?

25         MR. GREENE:  It absolutely could, Your Honor.  That's

1    something that we could do.

2        THE COURT:  Okay.  Now, your brief does not mention

3    the standing basis for Louisiana, Mississippi or Utah, and I do

4    understand we were all operating on an expedited briefing

5    schedule.  Are you here to argue for those states and how they

6    have standing to sue?

7        MR. GREENE:  I'm here today, Your Honor, just talking

8    about Texas's standing.

9        THE COURT:  Okay.  So the only thing I saw in the

10   plaintiffs' briefing relative to those states was the assertion

11   of their sovereign status, and as you know, in two or three

12   consecutive Supreme Court terms Texas specifically has

13   struggled to argue standing by invocation of sovereignty.  The

14   Supreme Court is requiring more and more particular findings

15   from district courts, the circuits.  Massachusetts vs. EPA has

16   been narrowed but not overruled.  In summary, that recent case

17   law, including several cases reported as Texas vs. United

18   States, has winnowed the economic injury and fact analysis to

19   the public fisc and what can be proven from financial records

20   kept by offices like the comptroller and then interference with

21   enforcement of state law.

22        I know that's a very high-gloss summary, but if I had

23   to summarize the most recent Supreme Court terms in Texas vs.

24   United States styled cases, the Supreme Court is telling Texas

25   and this Court that economic injury and fact is best proved

1   using the public-fisc-type arguments that I see in that

2   Arkansas case that I referenced and in arguing that the federal

3   rule challenged operates to interfere with state enforcement,

4   so fisc and enforcement.

5          Where do I find that in your briefing or your

6   argument today?  Either of those two categories.

7          MR. GREENE:  We're not -- the public fisc and the

8   kind of state interference -- or the interference with the

9   states' duties aren't in our briefing because we've alleged a

10  direct injury as opposed to some type of quasi-sovereign

11  interest.  So that's why those aren't in the briefing.

12         THE COURT:  Okay.  And explain anything -- anything

13  else that you intended to explain to this Court in support of

14  direct injury.  I have the pocketbook injury argument in the

15  papers.  I've heard a similar argument today.  Is there

16  anything else that can prove to this Court the direct injury,

17  even if it might come in supplemental briefing to follow?

18         MR. GREENE:  So I -- again, I'm not -- outside of the

19  direct injury, and I want to reiterate, we think it is

20  sufficient, although we can't exactly quantify it only because

21  we've been told by the ATF -- this is kind of unique

22  circumstance.  They said these are the amount of people that

23  are going to be leaving the market.  So I really think that

24  that cuts through a lot of the concerns maybe with some of the

25  other cases where we're dealing a little -- in a bit more of a

 1    speculative realm.

 2           Second of all, we can explore the public fisc

 3    standpoint.  Again, I'm not going to stand up here and

 4    represent to the Court that, you know, I know all the ins and

 5    outs of state and local tax law, outside of what we've

 6    presented in the briefing and the declaration from the

 7    comptroller, but those are certainly potential avenues that --

 8    as Your Honor stated, that those other states were able to

 9    present and it would lend confidence to me that given time for

10    supplemental briefing, Texas would be able to make similar

11    arguments.

12           THE COURT:  Well, and I don't know which way the

13    volume or quantity cuts.  Arkansas is a much smaller state.  I

14    think in that case they referenced two gun shows.  It could be

15    that just the volume cuts against expedited briefing such that

16    Texas can't marshal it on short notice or that bureaucrats

17    require more time.

18           So this is not a criticism.  I'm just wondering if --

19    in your preparation for this argument if you were able to

20    marshal any additional facts --

21           MR. GREENE:  To Your Honor's point --

22           THE COURT:  -- even on proffer.

23           MR. GREENE:  Yeah.  To Your Honor's point, I've seen

24    the briefing Your Honor's referring to and I think that

25    combined all the states in those cases probably had just about

```
 1    as many gun shows as Texas has in just a couple months.  So to
 2    your point, it has -- it has not been for lack of trying.
 3    We've had really good folks working on this.  Again, it really
 4    comes back to the fact that this rule is on such a fast track,
 5    and as we argue in the papers, an apparent attempt to evade any
 6    kind of judicial review, that we simply haven't been able to
 7    marshal those specifics for the Court.
 8             THE COURT:  Okay.  Understood.  And -- okay.  So
 9    you're at that two-minute mark.
10             MR. GREENE:  Okay.
11             THE COURT:  I want to address in that two minutes
12    that remain what I think is most relevant, and you can tell
13    this Court is concerned about standing, not because you did a
14    poor job but because the Supreme Court keeps pushing back on
15    this point of standing.
16             Irreparable injury.  So you argue that plaintiffs are
17    threatened with enforcement actions for engaging in
18    noncommercial conduct that is lawful under the statute.  Could
19    you provide a few examples to the Court of that noncommercial
20    conduct?
21             MR. GREENE:  I could, Your Honor.  I may defer that
22    to my counsel who has more intimate understandings of the
23    individual plaintiffs and the organizational plaintiffs.  I
24    think he probably has more intimate knowledge of that.  I'd be
25    happy --
```

```
 1              THE COURT:  Okay.  So let's table that for either
 2    Ms. Hunker or Mr. Stamboulieh, and let me ask this question.
 3    What part of the final rule, in your view, is most responsible
 4    for generating compliance costs for Texas?  So is it running 10
 5    percent more background checks and the apparatus that goes with
 6    generating those ATF Form 4473s?  What, in your view, is the
 7    most expensive part of the compliance costs inflicted on Texas?
 8              MR. GREENE:  So, Your Honor, I don't know that we
 9    explicitly claim that Texas will suffer any loss of compliance
10    loss.
11              THE COURT:  So it's just the loss of tax revenue?
12              MR. GREENE:  That's correct.  It's the loss of tax
13    revenue, and the states that I think they've made that
14    argument, that compliance cost arguments, the -- some -- I
15    think there's two or three states that do their own individual
16    background checks.  I think those kinds of arguments are more
17    germane to that structure because they're arguing that it's
18    going to increase their -- the state level of the background
19    checks that they're going to have to process.
20              THE COURT:  Understood.  And where can I find the ATF
21    statement, admission, statement against interest, whatever you
22    want to characterize it as that quantifies this 10 percent
23    number?  I believe it's in your reply brief, but we had
24    sentencing hearings and competency hearings this week and
25    that's probably the brief I had the least time to read.  So
```

1    where might I find that ATF 10 percent number?

2              MR. GREENE:  It's in the 89 Fed.Reg. at 29054.

3              THE COURT:  Okay.

4              MR. GREENE:  And again, that should be in the reply,

5    but that -- that, I believe, is the page number that that's on.

6              THE COURT:  That's extremely precise and therefore

7    helpful.

8              Okay.  So let's -- I have your argument.  I have your

9    briefing.  I know it was all done on an expedited schedule and

10   I appreciate the midnight oil you burned to do that.  If the

11   questions seemed hard, it's just because the Supreme Court has

12   recently set forth a more stringent standard for some of these

13   standing questions.

14             So you may return to counsel table.  I'll turn now to

15   the GOA counsel.

16             MR. STAMBOULIEH:  May I approach the podium, Your

17   Honor?

18             THE COURT:  You may approach.

19             And for record purposes and to refine the Court's

20   questions, please state which parties you represent and which

21   arguments you seek to address.

22             MR. STAMBOULIEH:  Yes, Your Honor.  May I proceed?

23             THE COURT:  You may proceed.

24             MR. STAMBOULIEH:  My name is Stephen Stamboulieh.  I

25   represent Gun Owners of America, Gun Owners Foundation, the

1    other private plaintiffs and the individual plaintiff Jeffrey

2    Tormey.  Mr. Tormey is actually here in the audience today,

3    Your Honor.

4              Your Honor, so what I did is I took your order.  I

5    printed out what you -- what the Court -- what I understood the

6    Court to want and I went through our briefing.  Now, this is

7    obviously before we filed the briefing last night because I

8    didn't have a printer in my hotel room, but I rearranged what

9    we had argued, how it violated the APA, how it was arbitrary

10   and capricious.  And I'd be more than happy if the Court would

11   like to hear that --

12             THE COURT:  Well, that's my very next note is the APA

13   claims.

14             MR. STAMBOULIEH:  Perfect.  Perfect.

15             THE COURT:  So if that is in your itinerary, I'll let

16   you take it up in whatever turn you prepared.  So please

17   proceed.

18             MR. STAMBOULIEH:  Thank you, Your Honor.

19             So our position is that it violates the APA as it

20   rewrites the statute.  In one of the instances, the ATF claims

21   that -- it's on page -- page ID 606 from ECF 31.  The ATF

22   claims the rule doesn't actually make any changes to the

23   statutory scheme or introduce additional uncertainty for

24   potentially regulated parties.  It's just simply not true.  It

25   adds a number of things, personal -- it redefines personal

1    collection to take out something from a self-defense firearm.

2            So me personally, I don't have a gun collection.  I

3    have self-defense anti-tyranny arms.  That's all that I have.

4    So you might look at this and say well, that's a nice Savage

5    model 30.06, even it's your deer-hunting gun.  It's actually

6    not a deer-hunting gun; it's more like a sniper's rifle.  It's

7    just things that I see it being used as.  So if I go to try to

8    sell my firearms, they're -- ATF is going to say well, Stephen,

9    you didn't sell any of your personal collection because we've

10   rewritten the statute to say personal collection doesn't

11   include self-defense-type firearms.  This is absolutely not

12   what the statute says.  If Congress wanted to change the

13   Bipartisan Safer Communities Act to include some kind of

14   distinction between a museum piece and Stephen's cheap sniper

15   rifle, that's something that Congress should do, but they

16   didn't do that.

17           So you'll also notice, Judge, in the Bipartisan Safer

18   Communities Act they don't talk about the presumptions.  They

19   don't talk about any type of presumption actually about it

20   being engaged in the business.  If a person presumptive -- I'm

21   sorry.  A person is presumptively engaged in the business if he

22   offers for sale or demonstrates a willingness and an ability to

23   purchase and resell firearms, but the statute requires actual

24   repetitive and a conjunctive purchase and resale, not merely

25   offers or a willingness to sell something.

1    THE COURT:  So I have a chart that I made for the

2    hearing.  So the Bipartisan Safer Communities Act, which I

3    think all of us can refer to the abbreviation from this point

4    forward, the BSCA at 21(c) uses that terminology, "through the

5    repetitive purchase and resale of firearms," and then the final

6    rule which further defines the term "engaged in the business"

7    as a dealer in firearms to specify that it could include a

8    single firearm transaction or even a mere offer to engage in a

9    transaction.  So that's at 28976, and further specifies that no

10   minimum number of firearms to actually be sold to be engaged in

11   the business for purposes of the licensure requirement.  That's

12   at 29021.

13        So is this the distinction that you're teasing out

14   with this argument?

15        MR. STAMBOULIEH:  Yes, Your Honor, that's -- that's

16   one of the problems is that the statute is very clear in what

17   it's seeking to make people have to be licensed for, and it's

18   to engage in dealing in firearms as a regular course of trade

19   or business to predominantly earn a profit through the

20   repetitive purchase and resale of firearms.  The ATF took that,

21   ran with it, said that they needed to clarify what that meant

22   after Congress just wrote this and then added all of these

23   extra things where they're now going to presume in civil and

24   administrative-type hearings but not in criminal hearings --

25   I'm sorry, not in criminal trials, that's what they say, but

1    they can still use it in a criminal trial for a judge to

2    instruct the jury.  So it's kind of like the same thing really.

3         So they're going to use these presumptions, these,

4    quote, "rebuttable presumptions" now that my clients or whoever

5    is going to come in and say well, the ATF says I'm engaged in

6    the business, I have to come up with some kind of evidence --

7    reliable evidence, whatever that means and whoever gets to

8    determine what that means, to prove my innocence in America, to

9    show the ATF I'm not actually engaged in the business, I'm

10   going to have to come up with some kind of evidence.

11        Hopefully, it's not anything that they say I'm not

12   allowed to keep like records except for tax purposes, but most

13   people that sell firearms are going to keep some kind of

14   records of it.  I know that in the times that I've sold my own

15   guns I've kept records of it.  It's not that I'm engaged in the

16   business because I'm a lawyer.  I'm not engaged in the business

17   of selling guns, but just for my own sake I'll keep a bill of

18   sale.  It's not required for tax purposes, but it does make me

19   feel better.

20        THE COURT:  Okay.  So I understand that argument and

21   I understand that definition and your argument that the final

22   rule changes in some way what Congress had always understood

23   "engaged in the business" to mean.  What APA administrative

24   theory does that sound in?  Is it arbitrary and capricious?

25   Just a straightforward conflict with statutory text?  What

1    is -- give me the taxonomy for that argument.

2          MR. STAMBOULIEH:  So I think it's just a straight-up

3    arbitrary and capricious standard, Your Honor.  Unfortunately,

4    for me, I have been in depositions all last week and out of the

5    country the week before that, so I'm trying to get really up to

6    speed really quickly on this.  But typically what we see with

7    the ATF is that they are -- in this case specifically is that

8    it's arbitrary and capricious.  It purports to track the

9    statute but then its broadens it in certain areas; it narrows

10   it in other certain areas, for instance, the redefinition of

11   "personal collection" or at least stripping out my ability to

12   sell guns that I own for self-defense and making that into

13   basically a nothing, which is not what the statute says.

14         THE COURT:  Okay.  And so I worked for the Department

15   of Justice, I served as an AUSA, and I preside over Article III

16   sentencings and criminal trials involving all the relevant

17   firearm sections, so 924, 922.  Where -- where do you perceive

18   potential abuse on the criminal side?  So I understand the

19   civil and administrative arguments.  The Court is here to

20   adjudicate primarily those arguments.  Is there any overreach

21   into those statutes or is this primarily about civil

22   forfeiture, fines?  You mentioned criminal once.  I just want

23   to make certain that I don't miss an argument that you have

24   regarding potential criminal liability.

25         MR. STAMBOULIEH:  Yes, Your Honor.  Well, what I

1    think this final rule does is it blows the doors off the house

2    and allows the ATF to basically make any type of case they

3    want.  They can obviously do administrative and civil work

4    because their presumptions are going to be right there and it's

5    really easy to go in and say well, Judge, he didn't provide me

6    with any reliable evidence.  Well, who says it's not reliable?

7    Well, we say it's not reliable.

8              THE COURT:  So it's that -- it's that inversion of

9    presumption.

10             MR. STAMBOULIEH:  Absolutely.  That's a big problem.

11   And then, of course, we have in the criminal context -- I mean,

12   the rule is flooded with people being prosecuted for being

13   engaged in the business.  There's no need for this rule.  It's

14   not like the ATF -- like the frame or receiver case where they

15   came to -- where a court in the -- I think it was the Northern

16   District of California, Judge Donato said well, I'm going to

17   take this lower receiver and it's actually -- if we apply the

18   ATF's regulations, it doesn't qualify as a firearm, the lower

19   receiver on AR-15, and that's why the ATF came back and said

20   oh, we should change these regulations to meet what the modern

21   definition of what a firearm is.

22             We don't have any of that here.  We have Congress

23   changing the statute and then the ATF running as fast as they

24   can to try to get this much expanded in some areas and then a

25   much narrower in other areas rule passed to make it --

1   basically, what they're trying to do is make as many people as

2   can be to be licensed, is what President Biden wants to do to

3   mandate more people get background checks.  You know, and I

4   know what Heller says about the conditions and qualifications

5   on the commercial sale of arms, but if I sell a gun to your

6   court reporter as a private sale, it's not a commercial sale;

7   it's a private sale.  I've already had the commercial sale at

8   the FFL.

9            THE COURT:  Okay.  So let's turn to another tension

10  that you highlight in your briefing between the BSCA as

11  codified and the final rule that followed.

12           So here, I believe -- this is actually an amendment

13  to Section 921 of the Criminal Code.  BCS -- or BSCA states,

14  quote, "Proof of profit shall not be required as to a person

15  who engages in the regular and repetitive purchase and

16  disposition of firearms for criminal purposes or terrorism."

17  And the final rule that -- and this is the text that you

18  juxtapose -- states "Actual profit is not a requirement of the

19  statute, it is only the predominant intent to earn a profit

20  through the repetitive purchase and resale of firearms that is

21  required."  That's 89 F.R. at 29045, so two-nine-O-four-five.

22           So explain to me the administrative law argument.  I

23  believe it's also in this vein of arbitrary and capricious, but

24  I don't want to put words in your mouth.  How would you

25  characterize your argument vis-à-vis those two provisions, what

1    the BCSCA codified and then what the final rule says?

2              MR. STAMBOULIEH:  Well, as I understand what the BCA

3    codifies is it requires profit in the statute versus what the

4    final rule does, is it stripped the requirement to have a

5    profit and they say that it's only based off of do you have an

6    intent to profit.  And I think that's wrong, obviously, because

7    if the statute requires profit and in the -- the inverse of

8    that is they say for purposes of crime and terrorism that there

9    has to be no profit shown for those, so that would lead me to

10   believe that there's a absolute requirement for the government

11   or whoever's prosecuting me in order to show that I made a

12   profit when I sold these firearms or my client made a profit

13   when I sold these firearms.

14             So I think it's definitely arbitrary and capricious

15   to keep removing what Congress wrote in the statute.  They're

16   black-letter law.  They're not allowed to do that.

17             THE COURT:  Okay.  Understood.  I have your argument,

18   and we are, unfortunately, at your time.

19             MR. STAMBOULIEH:  Sorry.

20             THE COURT:  I have your briefing.  And I believe at

21   this point we'll pivot to defendants --

22             MR. STAMBOULIEH:  Thank you.

23             THE COURT:  -- and then I understand the plaintiffs

24   to hold back 15 minutes.  So you can reorder your outlines and

25   prepare for that.

 1          We're going to take a brief five-minute break to

 2   allow defendants to set up at the podium if necessary.  I will

 3   reorganize my notes for the questions to the government and

 4   then we'll be back.  The hearing will resume promptly at 11:56.

 5   So we can take whatever breaks are necessary and allow the

 6   government to reconfigure their space, and then I will

 7   reconfigure my space for questions specific to the government's

 8   briefing.

 9          (Off the record at 11:51 a.m.)

10          (On the record at 12:00 p.m.)

11          THE COURT:  And we're back on the record in Civil

12   Case 2:24-cr-089-Z.

13          The government may proceed with their first argument

14   and first attorney.

15          MR. NEWMAN:  Your Honor, before we begin, can -- we

16   decided to rearrange the order and the timing.  Can I go over

17   that with you, please?

18          THE COURT:  Yeah, please.

19          MR. NEWMAN:  So Mr. Sherwood is going to start,

20   addressing standing and irreparable harm, and he'd like 15

21   minutes to do that.  Then, next, I'm going to address most of

22   the merits issues other than the presumptions and I'd like 20

23   minutes, and then Ms. Berman will close, addressing the

24   presumptions and she'd like ten minutes.

25          THE COURT:  Okay.  We'll plan accordingly, and where

```
 1    would you like your warnings for those three segments?
 2              MR. NEWMAN:  Maybe two minutes on each of those.
 3    That would be great.
 4              THE COURT:  Okay.
 5              MR. NEWMAN:  Thank you.
 6              THE COURT:  I'll interrupt you at that point.
 7              So let's begin with Mr. Sherwood, and you may do so
 8    from counsel table or the lectern, whatever is most
 9    comfortable.
10              (Pause in proceedings.)
11              THE COURT:  You may proceed.
12              MR. SHERWOOD:  All right.  Good morning, Your Honor.
13    Zach Sherwood for the United States.
14              In light of what you were addressing with the
15    plaintiffs, we thought we would start with standing first,
16    especially since because the plaintiffs here failed to
17    establish standing, the Court need not address the merits of
18    this case, especially -- and that's a fundamental flaw,
19    especially in light of the extraordinary relief being sought.
20    And I'll start with why the state plaintiffs here have failed
21    to allege, prove standing in their initial motion and have
22    failed to revive it in their reply.  I didn't have an
23    opportunity to respond to those reply arguments, obviously, in
24    light of just the ordering of briefing, but I'm happy to
25    address some of the points that you raised.
```

1          To start, Louisiana, Mississippi and Utah don't even

2    make an effort to assert any sort of standing.  That's their

3    burden as plaintiffs to be in this case.  So I think it's, in

4    our view, safe to say that that issue has been conceded for

5    those three states.  What you discussed was Texas specifically,

6    and in their complaint Texas didn't allege any of these harms.

7    They only start bringing up pocketbook injuries that you were

8    discussing in the reply, and those failed to establish standing

9    for a number of reasons.

10          To start, that pocketbook injury depends on a chain

11   of contingencies, namely, currently unlicensed sellers who were

12   selling firearms believing that they're going to be impacted by

13   the rule and therefore leaving the market which would therefore

14   reduce firearm sales overall which would then therefore reduce

15   tax revenues on said firearm sales, all undefined, nonspecific

16   links in that chain.

17          But most -- but even starting with Texas's premise

18   that -- about numbers and figures, the number 10 percent was

19   thrown around.  That number comes from the final rule itself,

20   its cost-benefit analysis, but the 10 percent figure is not

21   how -- or Texas misconstrues that figure.  The analysis that

22   went into reaching that figure can be found on 89 Fed. Register

23   29071 through -72, which is part of the cost-benefit analysis

24   section of the final rule.  And what ATF actually explained

25   was, in using subject matter experts, there's a universe of

1   unlicensed sellers currently selling firearms.  And ATF

2   estimated only 25 percent of that universe would actually be

3   impacted by the rule, i.e., unlicensed sellers who might be

4   engaged in the business under the rule.  And of that 25 percent

5   subset, 10 percent of that group of people would then,

6   according to ATF's estimates, leave the market for firearms.

7   So it's 10 percent of a 20 percent figure, so 2.5 percent, a

8   much smaller figure than what Texas cites.

9          Crucially, too, we're talking about currently

10  unlicensed firearm sellers, and in the grand scheme of things,

11  ATF also cites to the fact that the average unlicensed firearm

12  seller that they used in this analysis had at most three

13  listings on Armslist, the online website where firearms are

14  sold.  So the pool of firearms or the amount of firearms in

15  question here is also tiny.  And that's important because that

16  goes to Your Honor's concerns about Texas just not having any

17  sort of hard and fast number.  They can't even -- and it's not

18  even just a matter of quantifying, it's a matter of whether

19  Texas will even suffer the pocketbook injury that they allege

20  at all.  It's completely speculative and not sufficient to

21  establish an injury in fact for purposes of standing.

22          In addition to being too speculative, there's also

23  the issue, I think, based on the case that you cite, Your

24  Honor, Texas v. United States, the Fifth Circuit case about

25  whether these sort of incidental downstream effects on state

1    revenues from a federal policy that regulates someone else

2    other than states is even a legally cognizable injury.  In our

3    view, it's not.  The Supreme Court held in Florida v. Mellon in

4    1927 that a state challenge to a federal inheritance tax was

5    not a legally-cognizable injury because it didn't cause the

6    sort of direct injury requisite for standing.

7         Last year in United -- or Texas v. United -- or

8    excuse me, United States v. Texas in the Supreme Court, 2023

9    involving immigration enforcement priorities, Justice Kavanaugh

10   for a majority noted as well and citing Florida v. Mellon that

11   states that are challenging federal policies that have an

12   indirect effect on state revenues are the very sort of indirect

13   injuries that make standing claims particularly attenuated, and

14   that's what Texas is doing here.

15        So the type of injury they're claiming is not even

16   legally cognizable, but even assuming that you start getting

17   into what are the numbers, what are the figures, any

18   specificity whatsoever, Texas's theory of standing fails on its

19   own terms.  Like I said, it requires a chain of contingencies,

20   all of which would involve some degree of speculation.  For

21   instance, even if there were a marginal decline in the number

22   of firearms vendors who choose to leave the market entirely,

23   that by no means dictates that the number of firearms sold in

24   the firearms market is going to decrease in equal measure, if

25   at all.  Those interested in purchasing firearms are very

1  likely, if not expected, to simply go elsewhere, whether it be

2  to unlicensed vendors who are not impacted by the rule or

3  federal firearms licensees who often -- who constitute a much

4  larger portion of the market to begin with.

5          So even if there's a dip in vendors doesn't mean that

6  the number of firearm sales taking place will decrease, so any

7  concern about a dip in tax revenues from firearm sales is

8  wholly speculative.

9          THE COURT:  Okay.  So I have your argument on the

10  state of Texas, its basis for standing or lack thereof.

11          Let's turn to -- I believe it's the -- another

12  plaintiff who does have an affiliation with one of the

13  organizations but also has an individual declaration on file,

14  so this is Mr. Tormey.

15          MR. SHERWOOD:  Yes, Your Honor.

16          THE COURT:  In your brief at page 14, you say the

17  conduct described in Tormey's declaration does not rise to the

18  level of being engaged in business and would not subject him to

19  any enforcement action.  Tormey avers that he, quote,

20  "presently has a large personal collection of firearms that

21  he's accumulated over many years as a collector and hobbyist."

22  And in summary, that paragraph of your brief argues he is not

23  able to bring a pre-enforcement challenge, he lacks the

24  standing and he's outside the ambit of the rule, the final

25  rule.

1          Could you clarify why Mr. Tormey lacks standing

2     according to that paragraph and that analysis?

3          MR. SHERWOOD:  Yes, Your Honor.

4          So Mr. Tormey's bringing a pre-enforcement challenge

5     to the rule, and in the Susan B. Anthony list, the standing

6     standard articulated there requires that a plaintiff allege --

7     or have a serious intention of engaging in a course of conduct

8     that is prescribed by -- prescribed is used in that context

9     because irrational sanction's at issue.  Here, it's really, as

10    Mr. Tormey asserted, a serious intention to engage in conduct

11    that's going to be implicated by the rule at all such that he

12    can claim an injury from it.  We say no, and then he must also

13    allege as well that there's a credible or substantial risk of

14    enforcement, which he also has failed to allege, but

15    specifically on why his conduct's not encompassed by the rule.

16         What we have to work with as parties in this matter

17    is what Mr. Tormey has stated in his declaration, and the

18    conduct that is stated there is not the type of conduct that

19    would implicate the rule which targets unlicensed individuals

20    engaged in the selling of firearms for -- principally for

21    profit.  Mr. Tormey --

22         THE COURT:  So let's turn to that declaration.

23         So this is Exhibit C, Document 16-3, and specifically

24    paragraphs 10, 12 and 13 of the declaration.  And because he is

25    specifically identified in your opposition brief, the table and

1    in this paragraph on page 14, I want to make certain I

2    understand the government's argument why this final rule could

3    not be construed in a way that would injure Mr. Tormey or bring

4    him in the ambit of pre-enforcement challenges.

5           Paragraph 10 of that declaration states "I have

6    occasionally bought and sold firearms through private sales.

7    I've never engaged in the business of dealing in firearms.

8    Thus, I do not hold nor have I ever held a federal firearms

9    license, FFL, in order to engage in my purely private and

10   noncommercial activities."

11          Paragraph 12, "However, ATF recently defined 'engaged

12   in the business' to make portions of my perfectly lawful

13   activity seem suspect under the new regulations being enacted."

14          And then paragraph 13, "For example, various of the

15   final rule's definitions are written so broadly that they cover

16   conduct Congress left lawful under the statute or are written

17   so narrowly that they eviscerate explicit statutory protections

18   for personal collections as mine," and then he concludes that

19   "The rule arbitrarily defines 'collection' so narrowly that I'm

20   not certain my firearms qualify."

21          So using paragraphs 10, 12 and 13 as a summary of

22   Mr. Tormey's possession and use of firearms, explain to this

23   Court why the final rule doesn't trigger liability.

24          MR. SHERWOOD:  Yes, Your Honor.

25          So I think the analysis would be -- and this emulates

1    the Susan B. Anthony list analysis when assessing whether the

2    conduct alleged is encompassed by the law being challenged.

3    You have to look at the text of the rule and compare it to the

4    conduct being alleged.  And here, Mr. Tormey alleges that he

5    has a personal collection of firearms that he uses for hunting,

6    target shooting, which under the rule qualifies for the

7    personal collection definition, and he occasionally sells

8    firearms from that personal collection to enhance that personal

9    collection.  He says in the declaration that he does so to free

10   up funds to get better firearms.  And that type of conduct

11   under the rule itself is not encompassed in the engaged in the

12   business definition, nor does it even -- nor does it trigger

13   any of -- and by result of that doesn't even trigger any of the

14   presumptions that would bring the engagement as a --

15           THE COURT:  Can you point to the personal collection

16   language in the published final rule that would give the

17   plaintiff that assurance?

18           MR. SHERWOOD:  So in Section 478.11, the new rule

19   defines "personal collection" to include personal firearms that

20   a person accumulates for study, comparison, exhibition and then

21   parentheses for example, and as relevant here -- or sorry, the

22   focus would be here is on the hobby, which in parentheticals

23   includes firearms that are used for non-creational,

24   recreational activities for personal enjoyment, such as

25   hunting, skeet target or competition shooting, which is what

1   Mr. Tormey states in his declaration is what he uses his

2   firearms for.

3           So again, we're talking about a personal collection

4   of firearms, and occasional sales from that personal collection

5   does not fall under the engaged in the business definition

6   under the rule.  And because that is so, Mr. Tormey would not

7   be impacted by the rule and could presumably -- at least based

8   on what we're working with in the declaration would not suffer

9   any sort of concrete injury of fact.

10          THE COURT:  But going back to the plaintiffs'

11  argument regarding the rule's construction of the phrase

12  "engaged in the business" and then the intent requirement, if

13  you were to put the personal collection section of the final

14  rule alongside this language which is at 29021, there is no

15  minimum number of firearms to actually be sold to be engaged in

16  the business, and then even earlier at 28976, "A single firearm

17  transaction or even a mere offer to engage in transaction may

18  suffice."  And then, finally, what we talked about earlier in

19  the hearing, the intent analysis, and this is construing the

20  language now codified in the Criminal Code 921(a)(22), "Actual

21  profit is not a requirement of the statute; it is only the

22  predominant intent to earn a profit through the repetitive

23  purchase and resale of firearms that is required."

24          Mr. Tormey does state elsewhere in the declaration

25  that he's enhancing the collection, which I assume requires

1    that he make some profit sale by sale.

2          How is a plaintiff so situated to construe the

3    government's reading of personal collection against the final

4    rule's new readings of engaged in the business?

5          MR. SHERWOOD:  Well, Your Honor, the -- what I can

6    speak to at least is what Mr. Tormey is alleging, for one, the

7    enhancement of a personal firearms collection is expressly

8    exempted from the engaged-in-the-business definition, both in

9    the statute and as reflected in the rule.  So even if profit,

10   profit meaning more money was earned than what was bought --

11   than what the firearm was bought for, that particular type of

12   sale is just not encompassed in the engaged-in-the-business

13   rule itself.

14         And sales from the -- Your Honor referenced the

15   potential for one transaction to rise to the

16   engaged-in-the-business rule, that just establishes that

17   there's no threshold amount that triggers the rule, but here

18   again we're still in personal collection definition land.  And

19   crucially, too, nothing in Mr. Tormey's declaration indicates

20   that the sales he is engaging in are predominantly for earning

21   a profit, and that is the type of conduct that the Bipartisan

22   Safer Communities Act, as implemented -- or sorry, as

23   interpreted by the rule is meant to target.

24         So sales out of personal collections that are not for

25   profit, which that's what Mr. Tormey states in his declaration,

1    these are private sales that are noncommercial for the

2    enhancement of his personal collection, the type of conduct

3    that doesn't fall under the engaged in the business does not

4    remotely implicate the presumptions that are meant to target

5    individuals who are engaged in purchasing firearms to then

6    resell for profit.  And that's just not what Mr. Tormey is

7    addressing here, and for that reason does not suffer an injury

8    in fact, especially at this early stage.  And that's what's

9    crucial as well.

10          In order to get the extraordinary relief being

11    requested, you have to have a serious intention to engage in

12    conduct that is actually implicated by the rule.  And there's

13    cases that -- in the Fifth Circuit, for example, as well that I

14    think we cite in our brief where the type of conduct at issue,

15    there was no concrete steps taken to actually engage in the

16    conduct that might have potentially triggered the rule being

17    challenged.  So speculation about like what might happen if I

18    were to engage in this type of conduct or what I think I might

19    want to do in the future is just not sufficient in order to

20    enjoin or at least obtain prospective relief against a statute.

21          THE COURT:  And understanding that there are various

22    levels of authority within the Department of Justice to speak

23    on behalf of that department and the United States government

24    or generally, if I were to take your statement construing

25    personal collection against the language used by Mr. Tormey and

1    order the government to place that alongside any ATF notices or

2    DOJ notices to clarify for would-be plaintiffs that the

3    Department of Justice -- neither the Department of Justice,

4    neither the Bureau of Alcohol, Tobacco and Firearms will ever

5    construe such a personal collection, would the government be

6    willing to do that or is that something this Court has

7    authority to do?

8              MR. SHERWOOD:  Your Honor, I --

9              THE COURT:  I know that's --

10             MR. SHERWOOD:  I would have to --

11             THE COURT:  -- probably -- you're probably too far

12   down --

13             MR. SHERWOOD:  Yeah, trial attorney territory.

14             THE COURT:  -- this trail to comply -- I understand,

15   but this has happened in other cases where Department of

16   Justice Federal Programs Division attorneys essentially use and

17   has applied argument to pary a facial challenge.  They assure

18   the Court that it'll never be construed the way plaintiffs are

19   construing it, and I've ordered the department and the relevant

20   agency to put that construction into whatever notices that are

21   being distributed.

22             If -- you know, if I'm persuaded that your

23   construction is correct and that potential pre-enforcement

24   plaintiffs like Mr. Tormey are outside any reasonable

25   construction of the statute alongside the final rule,

1    specifically the personal collection paragraph alongside the

2    engaged in business paragraphs, that might allay concerns that

3    this rule could be used in the way imagined in the plaintiffs'

4    briefing.  Is that -- is that reasonable -- if the construction

5    is that reasonable, then why not publish that alongside the

6    rule that you're posting and delivering and even advertising by

7    White House press release?

8              MR. SHERWOOD:  So, Your Honor, I think it -- I guess

9    two points initially.  First, what it can say is that in

10   response to would it be reasonable to establish that the type

11   of conduct at issue in Mr. Tormey's declaration is subject to

12   the construction that it just offered you, what I can say is

13   that we're basing that on the facts that we currently have in

14   the declaration, and we would not have advanced this argument

15   that his conduct is not implicated by the rule if we didn't

16   think as much.  Now, that said, further factual development,

17   future events could completely change circumstances, and I

18   think part of our argument is the lack of specificity and the

19   subjective nature of it.  That --

20             THE COURT:  It's like a -- I'm asking you if you

21   would publish a negative writ of attainder or something, like I

22   understand, you know, there's procedural problems with it.  But

23   if the government is so confident that the personal collection

24   clause may be read alongside the final rules' further

25   definition of engaged in the business, then this Court can

1    simply order ATF to publish that construction as part of this

2    Court's relief granted, if relief is granted.

3         MR. SHERWOOD:  And, Your Honor, that would certainly

4    be an available avenue of relief, and I can say I know

5    currently ATF, prior to the implementation of this rule, has

6    offered guidance to and routinely offers guidance to firearms

7    owners about how they should conform their conduct.  Federal

8    firearms laws and regulations, and guidance on what this rule

9    will have on gun owners is certainly to be expected or could be

10   ordered by the Court for clarity.  And I think that was one of

11   the purposes of this rule -- or indeed was one of the purposes

12   of this rule was to provide individuals like Mr. Tormey with

13   the clarity about whether their conduct is encompassed by

14   federal firearms laws requiring dealers to get a license.

15        THE COURT:  Okay.  So we're at the end of your time,

16   but I do -- I'll extend that time.  Your little red light is

17   on.  I wish we had one of the stoplights on the lectern there,

18   but the red light is on but I'll ask one more question.

19        Is there another section of the published final rule,

20   in addition to this personal collection definition, that could

21   allay the concerns of gun-owning plaintiffs that this -- this

22   redefinition of engaged in the business or this further

23   clarification, whatever terminology you prefer, doesn't read

24   into criminality every gun owner with a collection of firearms?

25   Like is there another F.R. section that I should look to to

1    give additional support to your construction?

2           MR. SHERWOOD:  I would -- I think it'd be best,

3    especially since he's coming up to the lectern next, to my

4    colleague Mr. Newman who's much more familiar with the

5    intricacies of the rule and can definitely speak to --

6           THE COURT:  Okay.

7           MR. SHERWOOD:  -- those types of the -- the

8    interactions between the different sections.

9           THE COURT:  Okay.  I think Mr. Newman knows the first

10   question he'll receive.

11          MR. SHERWOOD:  Thank you.

12          THE COURT:  So thank you, Mr. Sherwood.

13          Mr. Newman, you may approach the lectern.  You have

14   20 minutes on the clock and will receive a two-minute warning.

15          MR. NEWMAN:  Sure.  Thank you very much, Your Honor.

16          So the answer to your question is yes, and the -- so

17   I'm going to address your specific point, but the overall point

18   I want to make is that the baseline definition of engaged in

19   the business of dealing in this rule is essentially word for

20   word the same as the statute.  And that's in Section 478.13(a),

21   which is on page 29091.  I'm going to read that to you right

22   now.

23          The heading is "Definition of Engaged in the Business

24   as a Dealer and Firearms Other than a Gunsmith or a Pawnbroker.

25   Definition.  A person who devotes time, attention and labor to

1    dealing in firearms as a regular course of trade or business to
2    predominantly earn a profit through the repetitive purchase and
3    resale of firearms."  And, Your Honor, here's the key language.
4    "The term shall not include a person who makes occasional
5    sales, exchanges or purchases of firearms for the enhancement
6    of a personal collection or for a hobby or who sells all or
7    part of the personal collection of firearms."

8         That is essentially the -- I think it breaks up a
9    sentence, but other than that it's the same word for word as
10   the statute.  And it says very clear that if you are -- if you
11   are enhancing a personal collection or liquidating a personal
12   collection, using the same language as the statute, that --
13   that shall not be included in being engaged in the business of
14   dealing firearms.

15        And then when you go to the next subsection,
16   subsection (b), which is the one that you asked Mr. Sherwood
17   about, it says that it's a fact-specific inquiry whether
18   someone's engaged in the business.  And it says "For example,
19   even a single firearm transaction or offer to engage in a
20   transaction, when combined with other evidence, e.g., where a
21   person represents to others a willingness and ability to
22   purchase more firearms for resale may require a license."

23        And what that's -- what that's really addressing is
24   you got to look at all the facts.  There's not a numerical
25   threshold.  It's not like if you're below this number you're

1    good, if you're above this number you're not good because you
2    need to look at the facts.  And there have been cases where
3    someone has been selling a single firearm and essentially
4    saying look, I can -- I've got an inventory.  I've got more
5    firearms you can -- I can sell you.  I can -- I can get more
6    firearms for you.  Whatever you need, I can get it.  And cases
7    have upheld convictions in those instances, and that's --
8    that's really what -- what that part of the rule is getting at.
9            But it doesn't -- it doesn't undermine the clear
10   exclusion for personal collection activity, which matches word
11   for word the language of the statute.  And really, overall,
12   this -- this rule starts from the baseline definition of the
13   statute and then clarifies in a number of ways how the rule --
14   how the statute applies in certain circumstances, all in ways
15   that are consistent with the statutory text.
16           So an important example that I'll leave for
17   Ms. Berman is the presumptions.  But bracketing that aside, it
18   clarifies the application in the statute in a number of other
19   ways.  For example, in 47 -- 478.13(a), being engaged in the
20   business does not include estate-type auctions because the
21   auctioneer doesn't actually acquire or dispose of the firearms.
22   Another example is in the definition of purchase and sales,
23   which is in 478.11, that clarifies that purchasing and selling
24   includes exchanging for anything of value, not just cash.
25   That's consistent with dictionary definitions and it's also

1    consistent with case law holding that people have engaged in

2    the business of dealing when exchanging firearms for something

3    other than money.  For example, when criminal gangs trade guns

4    for drugs, that's still engaging in the business.  And so

5    that's -- that's a clarification that is entirely consistent

6    with statutory text.

7            Another example is in the definition of dealer, which

8    is in 478.11 as well, and it basically indicates that purchase

9    and sales activity is treated the same regardless of where it

10   takes place.  If it takes place in a brick and mortar store, at

11   a gun show, online, by mail order, it's all treated the same,

12   and again, that is consistent with the statute which is based

13   on the nature of the activity and the intent, not where it

14   occurs.  So the overall architecture of the rule is to start

15   from the baseline of the statutory text and then clarify in a

16   way consistent with the statutory text how it operates in

17   various circumstances.

18           Now, that's within ATF's regulatory authority.

19   Congress granted the attorney general and ATF the authority to

20   prescribe, quote, "such rules and regulations as are necessary

21   to carry out the provisions of this chapter."  That's 18 U.S.C.

22   926.  And the Fourth Circuit in NRA v. Brady, which we've cited

23   in our briefs, said that this confers discretion on ATF about

24   determining when rules are necessary.

25           Here, ATF articulated several reasons why the rule

1    was necessary, again to clarify, the application of the statute
2    to deter unlicensed dealing and -- and also to promote
3    compliance with the statute, by making things clear to promote
4    compliance with the statute.  And ATF expressed the view well
5    supported with facts about how this -- promoting compliance
6    will also promote public safety because this is a -- the
7    statute is meant to keep dangerous individuals from getting
8    firearms and -- and enable tracing of firearms when they're
9    recovered from crime scenes.  And as ATF explained, "Enhancing
10   compliance with the GCA's licensing provision will mean that
11   more transactions fall within this regime which allows for
12   background checks and allows for tracing using the records that
13   firearms dealers maintain."

14            THE COURT:  Okay.  So I have your argument and your
15   brief on that point.

16            Let me give you a hypothetical ripped from the
17   headlines, to use the old Law & Order TV show language.  Not
18   ripped from the headlines, ripped from the docket of this
19   Court.  So on Tuesday this Court sentenced a defendant who
20   entered a plea agreement and the underlying facts involved the
21   sale of 76 firearms and two counts from the Criminal Code,
22   922(a)(6), 924(a)(2).  The case, if you're interested, is
23   Burgess, 2:23-cr-071-Z-BR-02.  So this was a scenario where the
24   husband was a convicted felon and the wife made a series of
25   purchases otherwise lawful, except that the plea agreement, the

1    factual resume, the PSR all reflected that it was done to

2    purposely evade his convicted felon status.

3              How would the very same couple avoid criminal charges

4    or even just civil or administrative penalties where there

5    isn't a convicted felon?  Is marshalling the personal

6    collection clauses and these other clauses that you've pointed

7    out sufficient to deter ATF investigation where law enforcement

8    discerns that somebody has now moved 76 firearms?  I imagine

9    that could be construed as a personal collection, but there's

10   obviously some structuring to avoid Party A's convicted felon

11   status.  How would that same couple, Party A/Party B, avoid

12   criminal, civil or administrative liability where Party A is

13   not a convicted felon?

14             MR. NEWMAN:  So the -- I think the -- the question

15   again goes back to the -- the baseline definition of the -- and

16   the rule which matches the statute, which is does this person

17   devote time, attention and labor to dealing in firearms as a

18   regular course of trade or business to predominantly earn a

19   profit through repetitive sale and resale.  And it's a

20   fact-specific inquiry.  You know, it's -- I think it's clear

21   that if somebody is selling a large number of firearms, such as

22   76 firearms, that is -- that is conduct that often fits within

23   the statutory definition.  But if -- if there -- if there is a

24   reason for that --

25             THE COURT:  And there is an estate provision --

```
 1              MR. NEWMAN:  Yes.

 2              THE COURT:  -- in the rule that makes clear this

 3    isn't -- you don't implicate liability simply by selling 76

 4    firearms that happen to be a personal collection at death.  So

 5    there's the estate provision.

 6              Anything else that could persuade this Court that the

 7    hypothetical Party A and Party B could avoid liability where

 8    the identified clauses make clear and state, at least, you

 9    know, as read by the ATF, that there's no minimum number of

10    firearms to actually be sold, that a single firearm transaction

11    may suffice, and now we have an additional reading of

12    predominant intent construing the terrorism and criminal

13    purpose clause of BC -- BSCA as codified at 921(a)(22)?

14              What -- what is a Court to do, what is a grand jury

15    to do if we have this hypothetical Party A and Party B, one

16    party declares it a personal collection, the other marshals

17    this new final rule to say it doesn't matter, here, we discern

18    a predominant intent to earn a profit, and by the way, grand

19    jury, there's no minimum number and even a single transaction

20    suffices?

21              MR. NEWMAN:  So first of all, I would say if -- if it

22    is -- if it's actually liquidation of a personal collection,

23    that is -- that is not treated under the rule as being engaged

24    in the business.  I read you one provision at the start,

25    478.13(a).  It's also in 478.13(e) at 4, which says that
```

1   liquidating a personal collection is -- both is not presumed to

2   be engaged in the business and can be used to rebut a

3   presumption if a presumption applies.  And the reason that that

4   is mentioned in multiple parts of the rule is essentially is a

5   belt-and-suspenders approach to make sure that it's clear that

6   if it actually falls within the personal collection provision,

7   that it's not treated as being engaged in the business of

8   dealing.

9          THE COURT:  But if you're -- and I don't know, I

10  don't recall a section of the final rule addressing this

11  question.  How is liquidation defined?

12         MR. NEWMAN:  So liquidation -- liquidation is -- I

13  believe it's defined as selling without -- without restocking.

14  So in other words, if -- so the personal collection in the

15  statute, if you -- you can make occasion sales and purchases to

16  enhance your personal collection or you can liquidate all or

17  part -- you can sell all or part of a personal collection.

18         So the difference between the two is that for selling

19  all or part there's no occasional limitation, but there is if

20  you're enhancing.  So that's why -- so that's why the rule

21  treats liquidation without restocking as different because it's

22  not subject to that occasional limitation.

23         THE COURT:  And would you agree with your DOJ

24  colleague that plaintiff Tormey, at least on the face of his

25  declaration, satisfies all of those exemptions and clauses that

```
 1   construe personal collections to avoid liability where there
 2   are occasional sales to enhance a collection?
 3              MR. NEWMAN:  Yes, I would based on the facts in his
 4   declaration.
 5              THE COURT:  Okay.
 6              MR. NEWMAN:  And I also wanted to address the -- the
 7   issue of the term "to predominantly earn a profit," and
 8   plaintiffs had made the argument that that requires actual
 9   profit, not just intent.  But this is actually a specifically
10   defined term in the statute.  This is 18 U.S.C. 922(a)(22).
11   The term "to predominantly earn a profit" means that the intent
12   underlying the sale or disposition of firearms is predominantly
13   one of obtaining pecuniary gain as opposed to other intents,
14   such as improving or liquidating a personal firearms
15   collection.  And so the -- so it's very clear predominantly to
16   earn a profit means the intent is predominantly one of
17   obtaining pecuniary gain.
18              And then their argument is based on the second part
19   of that definition and the negative implication canon, which
20   says "Provided that proof of profit shall not be required as to
21   a person who engages in the regular and repetitive purchase and
22   disposition of firearms for criminal purposes or terrorism."
23   And their negative implication argument is well, it says proof
24   of profit is not required for -- for criminal purposes or
25   terrorism, so therefore you should assume that there is -- that
```

1    there is a requirement of actual profit elsewhere.

2              But I think that that takes the negative implication

3    canon too far because --

4              THE COURT:  Okay.  So Justice Scalia was my professor

5    in law school --

6              MR. NEWMAN:  Yeah.

7              THE COURT:  -- and for days we had canon versus

8    canon, which is a little bit like finding a Thomas Jefferson

9    quote to rebut Thomas Jefferson.

10             Tell me your canon that counters the plaintiffs'

11   negative implication canon.

12             MR. NEWMAN:  The specific governs the general and --

13   and provisions with -- phrases within a provision should be

14   read in harmony and not to conflict with each other.

15             THE COURT:  Okay.

16             MR. NEWMAN:  Here, it says specifically "To

17   predominantly earn a profit means that the intent underlying

18   the sale or disposition is predominantly one of obtaining

19   pecuniary gain."  You can't use the negative implication canon

20   to mean that another provision in the same subsection means

21   exactly the opposite of what it specifically says.

22             THE COURT:  Okay.  I have your canon.  I have your

23   argument on that.  You may continue.

24             MR. NEWMAN:  Okay, great.  Next, I'll move to the

25   second amendment.

1          The rule's consistent with the second amendment, and

2    in Heller, the Supreme Court affirmed the qualifications on the

3    commercial sale of arms are presumptively lawful.  And in

4    Bruen, the Supreme Court clarified that it's consistent with

5    the second amendment to require someone to undergo a background

6    check and get a license before carrying a firearm, which is

7    specifically a textural right in the second amendment, the

8    right to bear arms.  And in McCrory, the Fifth Circuit very

9    recently held that even a background check regime that imposed

10   a two-week delay on obtaining a firearm didn't violate the

11   second amendment.

12          These rulings flow from the text of the second

13   amendment, which guarantees a right to keep and bear arms,

14   meaning to have or carry a weapon.  But the rule doesn't

15   prohibit anyone from having a weapon or carrying a weapon.  It

16   just reaffirms the GCA's -- I'm sorry, the Gun Control Act's

17   common sense requirement that a person needs to obtain a

18   license before engaging in the business of dealing firearms.

19   And both before and after Bruen, every court to consider the

20   question has held that a licensing requirement for dealing

21   firearms does not violate the second amendment.

22          THE COURT:  Okay.  I have that argument.

23          I want to make certain for any purposivist who is

24   lurking at the Fifth Circuit or beyond that I have the correct

25   listing of statutes that might reflect a congressional purpose.

1    So 1934 National Firearms Act, 1938 Federal Firearms Act, 1968

2    Gun Control Act, 1986 Firearms Owners Protection Act, and then

3    what we are discussing today, the 2022 Bipartisan Safer

4    Communities Act, all of which had prolonged deliberation about

5    private sales, gun show loopholes, things of that nature.

6           Is there any other statute specific to firearm

7    regulation that this Court should look to?

8           MR. NEWMAN:  The only other one would be the 1993

9    Brady Act which established the background check regime, and

10    that just -- that just shows how the dealing regime interacts

11    with the background check regime to -- to ensure that dangerous

12    individuals don't get firearms.

13           THE COURT:  And did I correctly identify the form of

14    that paperwork?  Is that the 4473?

15           MR. NEWMAN:  I believe -- yes, Form 4473.

16           THE COURT:  But it interfaces with an FBI database,

17    is that correct?

18           MR. NEWMAN:  So yes.  It -- the -- and the -- and the

19    dealer actually uses that to ensure that -- you know, to ensure

20    that the person is not prohibited from dealing firearms.

21           THE COURT:  So in addressing the second amendment

22    arguments, I just wanted to make certain I had all the

23    congressional enactments relevant to any congressional design

24    for licensure, FFL and the rest.  So I should add to that list

25    the '93 Brady Act?

```
1              MR. NEWMAN:  Yes.

2              THE COURT:  Okay.  Understood.  I have your argument.

3    You are at your time, so I'll turn to Ms. Berman next.

4              MR. NEWMAN:  All right.  And sorry, I'm just going to

5    borrow a minute from Ms. Berman --

6              THE COURT:  Okay.  That's fine.

7              MR. NEWMAN:  -- and I just want to make one more

8    point, which was that we don't think that the Court should

9    order any relief, but if it does, we believe that that relief

10   should be limited to the extent necessary to redress any

11   irreparable harm of any plaintiffs that you believe have

12   standing.  And, you know, you mentioned the rulings from the

13   Supreme Court about standing.  I think the writing's also on

14   the wall at the Supreme Court that universal injunctions and

15   universal remedies should be narrowed as well.

16             THE COURT:  Okay.

17             MR. NEWMAN:  Thank you.

18             THE COURT:  I have your argument.  Thank you.

19             And, Ms. Berman, you may proceed.  You have ten

20   minutes on the clock and you may approach the lectern.  I'll

21   give you a two-minute warning.

22             MS. BERMAN:  Thank you, Your Honor.

23             THE COURT:  Ten and two's a little close for

24   bookends --

25             MS. BERMAN:  Yes.
```

1          THE COURT:  -- but I promise you a warning.

2          MS. BERMAN:  Good afternoon, Your Honor.  I'm happy

3     to answer your questions, but if it pleases the Court, I have

4     one clarification I wanted to make.

5          THE COURT:  Okay.  Please go.

6          MS. BERMAN:  From reading the plaintiffs' reply, and

7     I think they would have gotten into this if they had made it to

8     talking about the safe harbor in their time, we got the

9     impression that they view the statute itself in criminal

10    applications as not having any burden on the criminal defendant

11    if they want to get into the safe harbor, and that is not

12    correct in our understanding.

13          I would point the Court to United States vs. Brannon,

14    which is a new case from the Fifth Circuit.  It's 98 F.4th 636.

15    It's from about two weeks ago.  And in that case the Fifth

16    Circuit is reaffirming the standing law that exceptions to

17    statutory definitions are generally matters for affirmative

18    defenses, especially when the elements constituting the offense

19    may be defined accurately without any reference to the

20    exceptions.  And the older case, United States vs. Wise, that

21    that case is citing says the well-established rule of criminal

22    statutory construction that an exception set forth in a

23    distinct clause or provision should be construed as an

24    affirmative defense and not an essential element of the crime.

25          So as you'll see if you look at the statute that

1    we're dealing with, the safe harbor is distinct from the actual

2    elements of being engaged in the business.  And the plaintiffs

3    may dispute that that applies in noncriminal context, but it

4    clearly applies in a criminal context and it wouldn't make

5    sense for the burden on the ATF to be higher in a

6    administrative or civil context.

7            And since I was looking at this last night, I did

8    find two cases since the BSCA amendment that specifically found

9    that the burden could be on the plaintiffs -- or sorry, the

10   defendant in this instance because it's criminal defendant, but

11   the position that the plaintiffs are taking to present evidence

12   that they were falling into the safe harbor.  And that would be

13   United States vs. Strukov.  That one's unpublished.  It's 2024

14   U.S. District Lexis 62166.

15           THE COURT:  They don't give you Westlaw?  You have to

16   use Lexis?

17           MS. BERMAN:  I use it because it's easier to get on

18   to the case cites, yeah.

19           THE COURT:  Understand.

20           MS. BERMAN:  And then United States vs. King, which

21   is 646 F.Supp. 3d 603.

22           So in both of those cases the Court said that the

23   criminal defendant could overcome the finding that they were

24   engaged in the business if they were to present evidence that

25   they fell into the statutory safe harbor.

1          So we would argue that that applies not only to

2    criminal proceedings but to the other types of proceedings.  In

3    the brief we represented that the statutory safe harbor is the

4    same as in the statute in the regulation.  Plaintiff said that

5    it actually imposes a burden to show by reliable evidence that

6    they fall into the safe harbor.  We don't believe that that's

7    any different than what the statute requires.  So it is not

8    inconsistent with the statute.  There just isn't a body of law

9    to definitively say that it also applies in this context.

10          THE COURT:  I imagine that's because most of the time

11   the district court and circuit court are dealing with criminal

12   cases.

13          MS. BERMAN:  I would imagine so, Your Honor.

14          THE COURT:  Okay.  All right.  So I have your safe

15   harbor argument.  You may proceed with the remainder of your

16   argument.

17          MS. BERMAN:  Yes, Your Honor.  Thank you.

18          So for the plaintiffs' specific objections to the

19   presumptions, they primarily appear to be just disagreement

20   with what the ATF has determined.  They don't actually address

21   the fact that presumptions are generally permissible for

22   administrative agencies to put in place when they're exercising

23   their regulatory authority.  We cited a bunch of cases for that

24   proposition.

25          The plaintiffs said in their reply brief that the

1    presumptions have to be necessary.  We would push back on that

2    because the requirement of things being necessary to require --

3    be necessary for the purpose of regulating is only part of this

4    particular statute, and as my colleague described, ATF has

5    determined that regulating is necessary in this case under the

6    authority that they have under 18 U.S.C. 926.

7            So their authority to include presumptions within

8    what they've determined are necessary regulations would be

9    within their inherent authority.  And as it was mentioned in

10   our brief, there is a presumption of regularity for rulemaking,

11   which is why the plaintiffs have to show that it's arbitrary

12   and capricious or ultra virilism and whatever else they want to

13   challenge it with.  But as the cases we cited showed,

14   regulatory presumptions made in this authority are permissible

15   if there is a rational nexus between the facts proven and the

16   facts presumed.

17           The plaintiffs have the burden to show that each of

18   the presumptions is irrational, not just that they think it

19   doesn't work all the time, not just that it might accidentally

20   sweep in people who can't eventually be convicted or not

21   convicted if it's a administrative or civil proceeding.  But

22   their argument for the most part is that they find that the

23   presumptions aren't perfect, not that they find that they're

24   irrational.  They don't actually challenge for maybe any of the

25   presumptions but none that I can think of off the top of my

1    head that the connection that's being drawn is improper or that

2    it's irrational.  They just say it's overbroad, which is not

3    something that -- or maybe underinclusive for some of them.

4         But that's not something that the presumptions have

5    to contend with at that level of perfection.  They are saying

6    that there is a rational nexus between the two facts, and

7    certainly in this statute -- or in this regulation the party

8    that is to be regulated has the opportunity to rebut that to

9    say in my unique situation, in the totality of the

10   circumstances, I don't actually -- I'm not engaged in the

11   business.  This presumption may fit me, but it's wrong in this

12   particular instance.  And that being true doesn't render --

13        THE COURT:  And is that argument strengthened by the

14   clauses referenced in Mr. Sherwood's argument where -- and I

15   believe Mr. Newman made reference to some of these provisions

16   too.  There are many parts of the final rule that reference

17   fact-intensive or case-specific inquiries, that that's often

18   baked into the cake of some of these clauses that we've

19   discussed, is that argument strengthened by the multiple

20   references to fact-specific inquiry?

21        MS. BERMAN:  I believe so, Your Honor.  And one of

22   the -- one of the --

23        THE COURT:  And you're at two minutes --

24        MS. BERMAN:  Thank you.

25        THE COURT:  -- believe it or not.

1          MS. BERMAN:  Sorry.  One of the points that the
2    plaintiffs made based on the career colleges case, which is a
3    case that among other things recognizes that presumptions work
4    the way that we stated that they do, that it has to be a
5    rational nexus.  They said based on that case that the agency
6    presumptions can't be based on ipse dixit.
7          And as we've shown throughout our briefs but also if
8    you look in the rules, there's a lot to justify these
9    presumptions.  There's many cases in the past before the BSCA
10   was passed that found -- that convicted on the basis of the
11   same type of information.  There's also the experience of the
12   agency but not standing by itself.  And then there is just
13   common sense reading of the statute and what it requires.
14         So there's a lot to back up these presumptions, and
15   they are just presumptions.  They are rebuttable.  They're
16   rebuttable by a lot of different types of evidence, which is
17   specifically laid out in the rule for guidance.  As we were
18   discussing, there might be more guidance.  But in general,
19   there is -- it's not so dire as the plaintiffs are painting it
20   to be.  There are a lot of opportunities if people are
21   genuinely in a unique situation that doesn't fit with these
22   very rational and well-supported presumptions.  They have the
23   opportunity not to be found to have any liability.
24         THE COURT:  So that would certainly -- that must
25   be -- that argument must be laid alongside an AP argument for

1    arbitrary and capriciousness and the rationality of the rule

2    and all that.  How does that work in the constitutional context

3    where arguments about overbreadth apply with greater force?

4           MS. BERMAN:  Well, Your Honor, for the reasons that

5    we stated in our brief, we don't think there are any

6    constitutional implications of this rule, but I would say that

7    again, given that the Supreme Court as well as many courts of

8    appeal have held that presumptions are permissible without

9    holding that they have to be so narrowly tailored to never fail

10   to catch someone who should be caught or to catch someone who

11   shouldn't be caught, I don't think that's a significant

12   consideration in this particular rule.

13          THE COURT:  Okay.  As you might imagine, that's your

14   time --

15          MS. BERMAN:  Okay.  Thank you very much, Your Honor.

16          THE COURT:  -- marker.  Thank you for your argument.

17          And here, the plaintiffs have held back 15 minutes

18   for rebuttal.  Who will take that 15 minutes or is there a

19   combination of attorneys?

20          MR. GREENE:  Your Honor, I'll request ten minutes and

21   then my co-counsel consists of five minutes.

22          THE COURT:  Okay.  So you may proceed.

23          MR. GREENE:  May I approach the podium?

24          THE COURT:  You may approach.

25          And, Mr. Greene, were you requesting a warning or do

1    you just want the red light?

2            MR. GREENE:  Red light's fine.

3            THE COURT:  Okay.  You may proceed.

4            MR. GREENE:  So regarding the presumptions, I just --

5    I do want to say that the problem with the presumptions is that

6    they cut against the safe harbor of the statute, and the entire

7    point of the safe harbor is -- is so that someone isn't

8    charged, not so that they can defend themselves maybe after

9    they're charged.

10           And I do want to talk a little about authority.  I

11   know -- I think one of my friends on the other side mentioned

12   926(a), which says that the attorney general may prescribe only

13   such rules and regulations as are necessary to carry out

14   provisions of this chapter.  I would direct the Court to, I

15   believe, the previous version of that same sentence that

16   appeared in the Firearm Owners Protection Act and I believe it

17   was Section 106.  And that prior language said that the

18   secretary may prescribe such rules and regulations as he deems

19   reasonably necessary to carry out the provisions of this

20   chapter.  So Congress has explicitly delegated to the ATF the

21   ability to limit the regulations that they put into effect.

22   It's limited that language, so that was prior -- that was found

23   in the Firearm Owners Protection Act before.

24           I also -- I do also want to talk about some of the

25   second amendment concerns.  And so exercise of the right to

1    keep and bear arms requires that the incidental acquisition of

2    arms, you have to be able to acquire the arms to exercise the

3    right.  And so this kind of acquisition and disposition of

4    firearms is obviously ancillary to the exercise of the right.

5    And the problem that ATF's briefing faces is looking for

6    historical analogs, as according to Bruen, in all the wrong

7    places.  I think they cite a 1794 restriction of arms and

8    materials.  That was to enhance the arming of America at a time

9    when the war with Great Britain threatened.  They cite to some

10   cases where the colonists had restricted arms trade with

11   Indians.  That was to reduce a threat from hostile tribes.

12   Various proving laws and safety laws for gun powder were

13   enacted, but none of those laws parallels the how and the why

14   of how the -- how or why the burdens are being imposed on

15   second amendment exercises in this particular case.

16          And I will say, you know, we heard a lot about Heller

17   and commercial regulations and licensing.  And first of all,

18   that language was dicta in Heller.  But beyond that, if

19   anything, it tells us that those same restrictions would be

20   constitutionally suspect in a noncommercial context, which is

21   what we're talking about here, incidental private sales.  It's

22   not commercial con -- con -- commercial transactions just

23   because the ATF's broad rule says it's commercial transactions.

24          And then I did want to touch a little bit on the

25   interaction of the presumptions with the safe harbors in the

 1   statute.

 2           So there's a couple of different presumptions.  They

 3   engaged in the business presumptions and the proof of profit --

 4   predominantly earn a profit.

 5           Okay.  So --

 6           THE COURT:  And that was -- I was trying to pull the

 7   best case on presumptions.  I think the government cited United

 8   States Steel Corp., is that correct, for the general rule that

 9   agencies may establish presumptions as long as there's a

10   rational nexus?

11           MR. GREENE:  I think so, Your Honor.  I can't speak

12   exactly --

13           THE COURT:  You don't -- you don't need to recall it,

14   but I was trying to find the best case for that proposition.

15   But go ahead.

16           MR. GREENE:  Well, we would -- on that point, we

17   argue that -- I'm not aware of -- you know, especially in light

18   of the very limited authority under 926(a) that the attorney

19   general has been given, it doesn't seem likely that there would

20   be any kind of inherent ability of the ATF to create out of

21   whole cloth presumptions that aren't in the statute here.

22           And as we cite in our briefing, there's also the

23   potential based on I believe it's one or two cases that

24   presumptions themselves may, in fact, be creatures of the

25   Chevron doctrine, which if it would even survive the next

1    Supreme Court look at that, it wouldn't apply -- Chevron

2    deference doesn't apply because the GCA that's being

3    interpreted has criminal applications.

4            So there are a number of different problems with the

5    presumptions, not the least of which is that they operate to

6    all but completely eviscerate the safe harbors of the statute,

7    the safe harbors being 921(a)(21), subsection (C).  For

8    example -- I'll give the Court an example.  The rule states

9    that "A person shall not be presumed to be engaged in the

10   business" -- and I'll paraphrase a little bit -- "when reliable

11   evidence shows that the person is only reselling or otherwise

12   transferring firearms occasionally to obtain more valuable,

13   desirable or useful firearms for the person's personal

14   collection."  And that's 89 Fed.Reg. 29092.

15           The problem is this reinterpretation completely

16   shifts the statutory safe harbor from a -- it's a definitive

17   exemption into a conditional presumption, and that's our main

18   gripes with these presumptions, is that they're flipping the

19   safe harbors on its head.  And so to the extent that the ATF

20   does have this inherent authority to create presumptions, they

21   certainly don't have any authority to eviscerate a plainly

22   unambiguous safe harbor that Congress has enacted.

23           And -- and then I would just point this Court to --

24   as far as a separation of powers issue, you know, the ATF has

25   cited, you know, different policy goals, safety, the Brady Gun

1   Violence 1993 that -- how it interacts with gun dealing, and
2   those are all fair and good policy goals.  It's just not the
3   role of the ATF to try to promulgate and put into statutes
4   those policy goals.  And I would just direct the Court to some
5   recent judicial decisions where the ATF has promulgated rules
6   that attempted to basically amend federal gun laws without
7   congressional involvement, whether it's the bump stock cases or
8   the unfinished frames and receivers.  I believe that's Cargill
9   v. Garland and VanDerStok v. Garland.
10          And just another point on the presumptions, you know,
11  the engaged in the business definition, I believe -- I don't
12  have the exact cite to the rule, but it requires the totality
13  of the circumstances, fact-specific inquiry.  But the very
14  antithesis of a fact-specific totality of the circumstances
15  inquiry is looking at one single presumption on a
16  non-exhaustive list and just going from there and presuming
17  that somebody is engaged in the business.  That's not totality
18  of the circumstances, and citing to cases where the courts have
19  happened to find that one of the myriad of factors in a
20  totality of circumstances applies to that particular defendant
21  and is worthy of -- you know, suitable to be granted as being a
22  presumption is incorrect in our opinion.
23          And just on the point of relief, and not to jump the
24  gun, but on universal -- pun not intended -- but universal
25  injunctions, as this Court knows, there's a distinct difference

 1    between the relief afforded under 705 and then a typical, you

 2    know, quote, unquote, "national injunction" whereas, you know,

 3    a national injunction is perhaps permissible in certain

 4    circumstances, maybe in like the immigration context, for

 5    instance.  Generally, relief should be constrained to being

 6    within the parties before the Court.  However, 705 of the APA

 7    and ultimately 706 gives this Court the express authority to

 8    stay and ultimately set aside agency action.  There's no way to

 9    do that in a piecemeal fashion because the ultimate goal of a

10    705 stay as a 706 vacatur, which makes it as though the rule

11    never existed, and there's no way to have that parsed out

12    piecemeal amongst the states.

13         And unless the Court has any other further questions

14    to me, I'll yield my time to the Court.

15         THE COURT:  Okay.  Thank you, Mr. Greene.

16         And I believe five minutes to Mr. Stamboulieh.

17         MR. STAMBOULIEH:  May I proceed, Your Honor?

18         THE COURT:  You may.

19         MR. STAMBOULIEH:  Just want to touch on a couple

20    points that DOJ raised.  Excuse me.  I lost my voice somehow.

21    They say that Tormey lacks standing, and Your Honor read

22    through Mr. Tormey's affidav -- his declaration.  I would also

23    point the Court to Number 8.  He's attended local gun shows for

24    many years, has bought, sold and traded firearms at various

25    times for various reasons and had previously purchased a table

1    at certain gun shows in order to facilitate enhancing his

2    collection.  And also Number 11, he says that he intends -- he

3    believes his activities have always been lawful and he wished

4    to continue to alter, improve or even be able to liquidate his

5    personal collection.

6             And I think, Your Honor, this is where the problem

7    with the ATF rule comes back into play.  Mr. Tormey, who's

8    sitting behind me, he's a gun guy, has lots of guns.  I don't

9    want to testify for him, but I know if I filed another

10   affidavit he would talk about these personal collection

11   firearms being a lot of self-defense firearms, which would then

12   strip it outside of the personal collection.

13             THE COURT:  And explain to me using the text of the

14   statute or the final rule --

15             MR. STAMBOULIEH:  May I get my --

16             THE COURT:  Yes, absolutely, and it won't be deducted

17   from your time because I've now been called by both the

18   government and the plaintiffs to construe this personal

19   collection language against the engaged in business language

20   appearing in the final rules.  So make your case --

21             MR. STAMBOULIEH:  Sure.

22             THE COURT:  -- on why the government's argument

23   doesn't allay concerns that there are safe harbors expressly

24   and then there is safety in personal collection definitions.

25             MR. STAMBOULIEH:  Sure.  If we flip to page 29090 of

1    the Federal Register, in the second column it talks about

2    personal collection.  And in the bottom of that definition, it

3    says "The term shall not include firearms accumulated primarily

4    for personal protection."  Well, for gun people like Mr. Tormey

5    and for people like me that have firearms collections like the

6    way that we used to talk about them before this rule, this rule

7    changes it to where if I wanted to sell one of my guns that was

8    a gun that I had for every day carry or even two or three of

9    those guns that I carried all the time, I'm excluded from the

10   safe harbor of the statute that says well, I'm entitled to sell

11   my personal collection because that's the guns -- those are the

12   guns that I carry, the guns that I use for self-defense.

13           And the same thing with Mr. Tormey, if we were to

14   file another affidavit, these guns are not just guns that he

15   uses as part of exhibition, training, things like that.  These

16   are guns that he uses for self-defense, that he carries for

17   self-defense.  And I think that changes -- and I heard what

18   Mr. Sherwood -- I think -- I hope it was Mr. Sherwood say up

19   here that these are the facts that they know them now from this

20   declaration when Your Honor was asking him about ordering that

21   instruction from the ATF.  Obviously, the ATF didn't have to

22   put in here and it serves no purpose about taking out guns that

23   I own for self-defense outside of the personal collection safe

24   harbor in the statute.  It makes no sense.

25           THE COURT:  So what canon would you use to make that

1    point?

2              MR. STAMBOULIEH:  Your Honor, I think everyone here

3    is smarter than me, so I don't know exactly what I would --

4    what canon I would say to use.

5              THE COURT:  Well, there is a Bryan Garner book of

6    canons.  I think he did it with Justice Scalia, and you can

7    kind of run through the table and mix and match --

8              MR. STAMBOULIEH:  Is that "Reading Law"?

9              THE COURT:  I think that's right.

10             MR. STAMBOULIEH:  Yes.  My co-counsel tells me I

11   should read that.  I should read that.

12             THE COURT:  Well, bring it with you next time.

13             MR. STAMBOULIEH:  Yes, sir.

14             And then one other -- I think it was Mr. Newman that

15   talked about that the ATF routinely offers guidance.  The

16   problem with that is that the ATF's guidance changes all the

17   time, and I think this Court could just look at the previous

18   history of ATF litigation with the bump stock rule, with the

19   pistol brace rule, with the framer/receiver rule.  They say how

20   they issue guidance, they issue guidance, and then at the end

21   they come back and say well, you can't really rely on that,

22   we're going to rescind all that guidance, and oh, by the way,

23   here's a nice shiny new rule for you to go forth and litigate

24   on.

25             And, Your Honor, other than that, beyond those two

```
 1    points, I don't have anything further unless the Court has any
 2    questions.
 3              THE COURT:  Well, I wanted to make certain that I
 4    have the correct inventory of firearms-specific federal
 5    legislation.  If this Court takes a purposivist bend towards
 6    construing a congressional design or trajectory, have I
 7    identified now all the statutes?  And because I do intend to
 8    review those statutes through the lens of both the government's
 9    brief and your brief and see how this issue of private sales
10    have been treated.  Not to discern legislative intent because
11    Justice Scalia would be upset if any of us did that, but -- but
12    more to discern whether the rulemaking process, whether any
13    contemporaneous documents reflect that the question was asked
14    and answered by the Article I branch.
15              MR. STAMBOULIEH:  I believe Your Honor's recitation
16    of the statutes was correct.  I would also say -- and I can't
17    remember if it's in our opening brief or the government's
18    opposition that it says that FOPA was also amended shortly
19    thereafter to include some other thing that slips my mind right
20    now.
21              THE COURT:  So I need to make certain -- that's the
22    '86 Act.
23              MR. STAMBOULIEH:  Yes, sir.
24              THE COURT:  I want to make certain that I don't miss
25    any amendments subsequent to that act.
```

```
1              MR. STAMBOULIEH:  And then there's one other one
2   introduced yesterday and I know it's not part -- it's not part
3   of anything yet, but Senator Cornyn and Senator Tillis
4   introduced a resolution under the continue -- Congressional
5   Review Act, along with 43 senators to basically stop the ATF's
6   rule claiming that the ATF went too far and did a bunch of
7   other things, but --
8              THE COURT:  Okay.
9              MR. STAMBOULIEH:  -- it's on his website.
10             THE COURT:  I will add that to the end of the list.
11             MR. STAMBOULIEH:  Thank you, sir.
12             THE COURT:  So thank you for your argument.
13             So I know that everybody was working on a short
14   deadline.  So if I appeared aggressive in my questioning, it's
15   only because I wanted to get as many questions presented and
16   answered when all of us are up against the clock.  As I stated
17   at the outset of this hearing, specific to the requested relief
18   of a temporary restraining order, I know this rule takes effect
19   on Monday.  So the first thing for this Court to consider under
20   Rule 65 is a temporary restraining order.
21             I may, as part of this Court's order to follow,
22   require supplemental briefing on a couple questions that were
23   raised.  So I'll instruct the parties to monitor your ECF
24   accounts should the Court deem supplemental briefing necessary.
25   I know that the government is traveling to a different circuit
```

1    immediately after this hearing and may have to do that from a

2    hotel room.  All of you are printing stuff from hotel rooms, so

3    I know -- I don't want to further impose on counsel, but if

4    this Court does require select supplemental briefing, I'll do

5    so by written order and it'll appear through ECF/PACER.  I'll

6    try to give page limits so that nobody feels compelled to write

7    a law review article but simply only to answer the question.

8         So I have your briefing, I have your arguments.

9    Thank you for working expeditiously to advise this Court on all

10   the relevant regs and cases and everything else.  I think you

11   did an exceptional job under pretty tight constraints.  So

12   thank you for the briefing and the argument.  You'll have my

13   order as soon as possible.

14        And with that, this Court stands adjourned for the

15   remainder of the day.  Counsel are excused and I wish you good

16   luck in your next hearings.

17        (The proceedings adjourned at 1:13 p.m.)

18                              ----

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

1          C E R T I F I C A T E

2          I, Shayna Montgomery, United States Court Reporter for

3     the United States District Court in and for the Northern

4     District of Texas, Amarillo Division, hereby certify that the

5     above and foregoing contains a true and correct transcription

6     of the proceedings in the above entitled and numbered cause.

7

8          WITNESS MY HAND on this 17th day of May, 2024.

9

10                        /s/Shayna Montgomery
                          SHAYNA MONTGOMERY, CSR, RMR, CRR
11                        United States Court Reporter
                          205 SE 5th Ave, Room 133
12                        Amarillo, Texas 79101
                          (806) 468-3816

13

14

15

16

17

18

19

20

21

22

23

24

25