UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.* §<br>    *Plaintiffs*, §<br>v. §<br> §<br>BUREAU OF ALCOHOL, TOBACCO, §<br>FIREARMS AND EXPLOSIVES, *et al.* §<br>    *Defendants*. § | <br><br><br><br>CIVIL ACTION NO.2:24-CV-00089-Z<br> |

**PLAINTIFF TEXAS' SUPPLEMENTAL BRIEFING IN SUPPORT OF STANDING**

Pursuant to this Court's order, ECF No. 45, Texas submits the following briefing "explaining and evidencing" its "basis for standing." *Id*.

**A.  Texas Has Standing.**

Article III standing requires an injury in fact that is traceable to the defendant's conduct and redressable with a court order. *See, e.g., TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Texas satisfies each element.

**I.  Texas will suffer direct economic harm if the Final Rule goes into effect because the State will lose tax revenue.**

Monetary harm "obvious[ly]" qualifies as injury that confers standing. *TransUnion LLC*, 594 U.S. at 425. Texas stands to suffer direct harm to its State fisc from the Final Rule in the form of a pocketbook injury—"a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). For standing purposes, the exact cost is irrelevant. *See Texas v. United States* (DAPA), 809 F.3d 134, 155 (5th Cir. 2015). Indeed, the Court has made clear that even "a single dollar" of harm is enough. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021). A future injury "may suffice if the

threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

The Final Rule is expected to reduce the number of people who buy and sell firearms, period. The Final Rule estimates that its implementation will reduce gun sales. *See* 89 Fed. Reg. 29,054 (contemplating 10% of currently unlicensed dealers leaving the market altogether). Between the weekend of this filing and the end of July 2024 alone, Texas has 58 gun shows calendared.[1] Texas collects 6.25 percent state tax on taxable items sold—including guns sold at gun shows.[2] Unlicensed dealers exiting the market will inevitably result in less gun sales, and thus less tax revenue collected by the state. *See generally* ECF No. 37-1. This is not speculative. The effects of the Final Rule are being realized by gun show promoters witnessing a significant drop in gun show attendance, vendor participation, and the overall willingness of private individuals to buy, sell, and trade firearms. *See* Declaration of Darwin Doebeker ¶¶17–21 ("Ex. A"). Gun clubs expect a similar decline in sales from both licensed and unlicensed sellers of firearms. *See* Declaration of Robyn M. Sandoval ¶¶11–14, 17 ("Ex. B"). Naturally, this decline in consumer traffic and activity will lead to a reduction in taxable transactions between vendors and consumers, reducing sales and use tax revenue for the State of Texas. Ex. A ¶22; Ex. B¶¶ 15, 18; Declaration of Murl E. Miller (May 31, 2024) ("Ex. C") ¶¶14–15. This decline in consumer traffic and activity also leads to a loss of additional state and local tax revenues, including motor fuels taxes, entertainment taxes, alcoholic beverage taxes, and hotel taxes, because of the decreased consumption of these taxable goods and services by promoters, vendors, and attendees. Ex. C¶ 14–15. But this is no surprise. Rather, the

---

[1] https://gunshowtrader.com/gunshows/texas-gun-shows/.
[2] https://comptroller.texas.gov/taxes/publications/96-211.php#:~:text=You%20must%20collect%20sales%20or,tax%20on%20your%20taxable%20sales.

ATF admitted this was the expected effect of the Final Rule. 89 Fed. Reg. at 29,054 (10% of unlicensed sellers likely to be either "unwilling or *unable* to become licensed as an FFL as a result of the [R]ule") (emphasis added).

Now, Defendants argue that the "10%" figure cited in the rule is actually "2.5%."

> [W]hat the ATF actually explained was, in using subject matter experts, there's a universe of unlicensed sellers currently selling firearms. And ATF estimated only 25 percent of that universe would actually be impacted by the rule, i.e., unlicensed sellers who might be engaged in the business under the rule. And of that 25 percent subset, 10 percent of that group of people would then, according to ATF's estimates, **leave the market for firearms**. So it's 10 percent of a 20 percent figure, so 2.5 percent, a much smaller figure than what Texas cites.

TRO Hearing Tr. (5/16/2024) 32:24–33:8 (emphasis added).

But this argument centers on the *extent* of the harm, not the harm itself. Whether the number of unlicensed sellers leaving the marketplace is 90%,[3] 10%, or 2.5%, there is no minimum amount of tax revenue that must be lost by Texas before it is considered an economic injury sufficient to confer standing. *See Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 600 (5th Cir. 2023) ("Stringently insisting on a precise dollar figure reflects an exactitude our law does not require."); *see also Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("a few pennies" is enough). In fact, by arguing the *extent* of the harm, Defendants concede that there will be at least *some* harm to Texas. In other words, it is "certainly impending," *Susan B. Anthony List*, 573 U.S. at 158, that people *will* "leave the market for firearms." TRO Hearing Tr. (5/16/2024) 33:6; *see also* Ex. A ¶¶ 10–15, 17–21; Ex. B ¶¶ 8–13, 17, 19–20; Ex. C ¶ 15.

---

[3] *See* Ex. A ¶ 16 ("My experience leads me to believe that this 10% estimate is conservative, and sales could decrease by an even greater percentage.").

Aside from ATF's admissions, this certainty is also borne out in the declaration of Darwin Boedeker—a gun show promoter and avid gun show attendee who does not currently possess an FFL. Ex. A ¶23. He states that be believes the Final Rule's estimate of 10% to be conservative, and that gun sales could decrease by an even greater percentage. *Id*. ¶16; *see also* Ex. B ¶16. Mr. Boedeker, like many others, has bought and sold guns at gun shows but now states that he will no longer buy or sell guns at gun shows because of the Final Rule—either because of the financial burden of obtaining an FFL, the threat of criminal prosecution, or both. Ex. A ¶24–26. That even *one* person refuses to buy or sell *one* gun at *one* gun show because of the Final Rule—depriving Texas of the 6.25% sales tax that would normally be collected on that transaction—is enough to give Texas standing. *See Uzuegbunam*, 592 U.S. at 291.

## II. The injury to Texas is "fairly" traceable to the Final Rule and a favorable judgment from this Court will "likely" redress the harm.

A plaintiff's injury must be "fairly" traceable to the defendant, and it must be "likely" redressable by the relief that the plaintiff seeks. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). When it comes to the "inherently imprecise" task of discerning traceability, "common sense" and "basic economics" are "useful tool[s]." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (Kavanaugh, J.). But for the Final Rule taking effect, Texas would not suffer a loss to its State fisc because unlicensed sellers and other potential purchasers of firearms would not be forced from the marketplace. *See* Ex. A ¶¶18–19, 21–22, 26; Ex. B¶¶ 8–13, 17, 19–20. *See generally* Ex. C.

*United States v. Texas*, 599 U.S. 670 (2023), does not affect the analysis of Texas' standing here. There, Texas and Louisiana challenged an immigration policy that prioritized which aliens were to be arrested and removed from the country. *Texas*, 599 U.S. at 673. Texas and Louisiana claimed

4

that the Department of Homeland Security's Guidelines violated "federal statutes that purportedly require[d] [DHS] to arrest *more* criminal noncitizens pending their removal." *Id*. at 673–74. The states asserted that "they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Texas*, 599 U.S. at 674. The Court ultimately held that Texas and Louisiana lacked standing to sue. *Texas*, 599 U.S. at 681. In a footnote, the Court noted that "when a State asserts" that a federal law has produced only "indirect effects on state revenues" the "State's claim for standing can become more attenuated." *Texas*, 599 U.S. at 680 n.3.

Despite the footnote, *Texas* turned mostly on the conclusion that "federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions." *Id.* at 680. In fact, the Court stressed that the decision was "narrow and simply maintains the longstanding jurisprudential status quo." *Texas*, 599 U.S. at 686. Standing was improper in the case because of "both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 684; *see also id.* at 677 ("The States have not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions. On the contrary, this Court has previously ruled that a plaintiff lacks standing to bring such a suit."). Yet far from the "highly unusual" lawsuit at issue in that case—here, Texas alleges a "prototypical" pocketbook injury that "obvious[ly]" qualifies as an injury that confers standing. *Collins*, 141 S. Ct. at 1779; *TransUnion LLC*, 594 U.S. at 425.

What's more, nothing in *Texas* holds that indirect effects on a State's fisc can never establish standing. The most it offered was that "the State's claim for standing *can* become more

5

attenuated." *Texas*, 599 U.S. at 680 n.3 (emphasis added). It primarily cited two cases to make this point. In the first, a State challenged the United States' participation in a war. *Com. of Massachusetts v. Laird*, 400 U.S. 886, 890 (1970) (Douglas, J., dissenting).[4] In the second, a State's financial injury was based on "pur[e] speculat[ion]" that a challenged law would "induc[e] potential taxpayers to withdraw property from the state, thereby diminishing the subjects upon which the state power of taxation may operate." *State of Fla. v. Mellon*, 273 U.S. 12, 17–18 (1927).

That is not the case here. Rather than asserting some speculative downstream harm from the loss of general tax revenue, Texas alleges a "direct injury in the form of a loss of *specific tax revenues*." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992);[5] Ex. C¶¶ 14–15 (sales and use tax), (motor fuels tax), (entertainment tax), (alcoholic beverages tax), (hotel tax).

In fact, the Supreme Court recently blessed some States' claims for standing under a far more tenuous threat of pocketbook harm. In *Department of Commerce v. New York*, a question arose about whether States had standing to sue the federal government over a question about citizenship status on the census because (1) "*some*" noncitizens might choose not to respond to the census questionnaire in light of the question and (2) "*if* noncitizen households are undercounted by as

---

[4] It is difficult to draw many conclusions from *Laird*, as it involved a summary denial of a State's motion for leave to file a complaint. Additionally, Justice Douglas's dissent does not seem to address state standing in terms of direct economic injury. Rather, it considered standing from the perspective of the State acting as parens patriae, 400 U.S. at 887–91—a theory of standing Texas does not assert here.

[5] In *Wyoming*, the Court distinguished cases where States challenge actions that allegedly injure their "economy," which, in turn, "cause[] a decline in *general* tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (emphasis added). That describes *Florida v. Mellon*. Florida speculated that a federal inheritance tax would prompt taxpayers to take independent action—"withdraw[ing] property from the state"—which might result in less overall property to tax. *Mellon*, 273 U.S. at 17–18. Such an "indirect" effect on Florida's general tax revenues did not establish standing. *Id.* at 18. Here, however, Texas asserts the loss of a specific tax revenues that will be caused by implementation of the Final Rule.

*little as 2%* . . . [the States] will lose out on federal funds that are distributed on the basis of state population." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2563, 2565 (2019) (emphasis added). The Supreme Court held that plaintiffs had standing to challenge the reinstatement of a citizenship question on the decennial census because there was a "sufficient likelihood" that reinstating the question "would result in noncitizen households responding to the census at lower rates than other groups, which in turn would cause them to be undercounted and lead to many of [plaintiffs'] asserted injuries." 139 S. Ct. at 2565. The Court rejected the federal government's argument that this theory of harm was too attenuated for standing because it ultimately depended on the voluntary actions of third parties-the noncitizen households. *Id.* at 2566. Rather, the Court held that plaintiffs had shown that these third parties "will likely react in predictable ways to the citizenship question" based on their "historically" lower response rates. *Id.* This was not "mere speculation." *Id.* It was a reasonable assessment based on "predictable effect of Government action." *Id.*

So too here, Texas stands to suffer direct pocketbook injury because of the entirely "predictable [and admitted] effect," *id.* at 2566, the Final Rule will have on unlicensed sellers at gun shows and individuals who are in the market of buying firearms. *See* 89 Fed. Reg. 29,054; Ex. A ¶¶ 10–15, 17–21, 24–26; Ex. B ¶¶ 8–13, 17, 19–20; Ex. C ¶¶ 10–15; *see also Texas v. Becerra*, 577 F. Supp. 3d 527, 560 (N.D. Tex. 2021) ("That the plaintiffs have brought forth specific evidence and examples of how they *will* be harmed . . . distinguishes this case from others where a third party's actions *might* have hurt the plaintiff.") (emphasis added).

Finally, because Texas challenges government action, "[c]ausation and redressability typically overlap as two sides of a causation coin." *El Paso Cnty. v. Trump*, 408 F. Supp. 3d 840, 852 (W.D. Tex. 2019) (citation omitted). So in the same way Texas' pocketbook injury is "fairly traceable" to

7

the implementation of the Final Rule, Texas has shown that its injury is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. 330. "After all, if a government action causes an injury, enjoining the action usually will redress that injury." *El Paso Cnty. v. Trump*, 408 F. Supp. 3d 840, 852 (W.D. Tex. 2019) (citation omitted). That is true here. The harm to Texas' State fisc through the loss of tax revenue stems directly from the ATF's pending enforcement of the federal firearms statutes as "clarified" by the illegal Final Rule. Ex. A ¶18–19, 21–22. In other words, all the economic harm to Texas will be prevented—and thus remedied, by a postponement—and ultimately a vacatur, of the Final Rule. 5 U.S.C. § 705; § 706.

## B. Since Texas has Standing, all Plaintiffs Have Standing. And Relief Afforded Under 5 U.S.C. § 705 Should not be Limited to the Parties.

Because Texas has shown standing, all plaintiffs have standing. *See McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once [courts] determine that at least one plaintiff has standing, [courts] need not consider whether the remaining plaintiffs have standing to maintain the suit."). And relief afforded to the plaintiffs should not be limited to the parties before this Court. *See* ECF No. 37 at 22–24. The specific relief afforded under § 705 means that relief granted to one plaintiff necessarily applies to everyone because it stops the challenged rule from taking effect. *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("Nothing in the text of [§]705. . . suggests that either preliminary or ultimate relief under the APA" must be "party-restricted"). Even states where the Final Rule is in effect should be included in this relief, since "[c]ourts — including the Supreme Court—routinely stay already-effective agency action under Section 705." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D.

Tex. 2022), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023) (collecting cases).

## CONCLUSION

For these reasons, this Court should continue to find, ECF No. 44 at 5, that Texas has established standing—especially at this stage of the litigation. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) ("At the preliminary injunction stage, the movant must clearly show *only* that each element of standing is *likely* to obtain in the case at hand.") (emphasis added); *cf. Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors). Beyond that, this Court should grant preliminary relief to all parties—even if they are not before this Court—by postponing the effective date of the Final Rule under §705.

| | |
|---|---|
| Date: May 31, 2024 | Respectfully submitted. |
| **KEN PAXTON**<br>Attorney General | */s/Garrrett Greene*<br>**GARRETT GREENE**<br>Special Counsel<br>Texas Bar No. 24096217 |
| **BRENT WEBSTER**<br>First Assistant Attorney General | |
| | **KATHLEEN T. HUNKER**<br>Special Counsel<br>Texas Bar No. 24118415 |
| **RALPH MOLINA**<br>Deputy Attorney General for Legal Strategy | |
| **RYAN D. WALTERS**<br>Chief, Special Litigation Division | OFFICE OF THE ATTORNEY GENERAL OF TEXAS<br>Special Litigation Division<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-2548<br>Tel.: (512) 463-2100<br>garrett.greene@oag.texas.gov<br>kathleen.hunker@oag.texas.gov |
| | **COUNSEL FOR PLAINTIFF STATE OF TEXAS** |

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of this document was filed electronically (via CM/ECF) on May 31, 2024.

*/s/Garrrett Greene*
**GARRETT GREENE**

10