**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

STATE OF TEXAS, *et al.*,

      Plaintiffs,

  v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

      Defendants.

Case No. 2:24-cv-00089-Z

## DEFENDANTS' RESPONSE TO PLAINTIFFS' SUPPLEMENTAL BRIEFING ON STANDING

**TABLE OF CONTENTS**

INTRODUCTION..............................................................................................................1

LEGAL STANDARD .....................................................................................................1

I.      The State Plaintiffs Fail To Establish That They Have Standing ..........................2

        A.      The State Plaintiffs' Asserted Revenue-Related Injury Does Not Confer
                Standing...................................................................................................2

        B.      The Rule's Incidental Effect On Utah's Background Check Procedures Also
                Does Not Confer Standing.....................................................................11

II.     Tormey's Supplemental Filings Show That He Lacks Standing..........................13

III.    The Organizational Plaintiffs' Supplemental Filings Fail To Establish That They
        Have Associational Standing ................................................................................17

CONCLUSION ............................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ......................................................................................... 7, 8

*Barber v. Bryant,*
  860 F.3d 345 (5th Cir. 2017) .................................................................................. 2, 9, 19

*Braidwood Mgmt., Inc. v. EEOC,*
  70 F.4th 914 (5th Cir. 2023) ............................................................................................ 17

*Cacchillo v. Insmed, Inc.,*
  638 F.3d 401 (2d Cir. 2011) ............................................................................................ 20

*Campaign Legal Ctr. v. Scott,*
  49 F.4th 931 (5th Cir. 2022) .............................................................................................. 2

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ................................................................................... 2, 12, 13, 16

*Do No Harm v. Pfizer Inc.,*
  96 F.4th 106 (2nd Cir. 2024) ........................................................................................... 19

*Draper v. Healey,*
  827 F.3d 1 (1st Cir. 2016) ................................................................................................ 19

*El Paso Cnty. v. Trump,*
  982 F.3d 332 (5th Cir. 2020) .................................................................................. *passim*

*Florida v. Mellon,*
  273 U.S. 12 (1927) .................................................................................................. 4, 6, 8

*Food & Water Watch, Inc. v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) ........................................................................................ 21

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,*
  695 F.3d 330 (5th Cir. 2012) ........................................................................................... 18

*Gray v. White,*
  18 F.4th 463 (5th Cir. 2021) ............................................................................................ 20

*Iowa ex rel. Miller v. Block,*
  771 F.2d 347 (8th Cir. 1985) ............................................................................................. 5

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ........................................................................................................... 1

*Murphy v. Amarillo Nat'l Bank,*
   No. 2:20-cv-48-Z, 2021 WL 40779 (N.D. Tex. Jan. 5, 2021) ....................................... 7

*OCA-Great Houston v. Texas,*
   867 F.3d 604 (5th Cir. 2017) ....................................................................................... 18

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.,*
   418 F.3d 535 (5th Cir. 2005) ....................................................................................... 19

*Pennsylvania v. Kleppe,*
   533 F.2d 668 (D.C. Cir. 1976) ....................................................................................... 5

*Printz v. United States,*
   521 U.S. 898 (1997) ..................................................................................................... 12

*Raines v. Byrd,*
   521 U.S. 811 (1997) ....................................................................................................... 2

*Religious Sister of Mercy v. Becerra,*
   55 F.4th 583 (8th Cir. 2022) ....................................................................................... 19

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) .................................................................................... 1, 2

*Speech First, Inc. v. Shrum,*
   92 F.4th 947 (10th Cir. 2024) ..................................................................................... 19

*Summers v. Earth Island Institute,*
   555 U.S. 488 (2009) ................................................................................................ 19, 20

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ............................................................................................. *passim*

*Texas v. ATF,*
   -- F. Supp. 3d --, 2023 WL 7116844 (S.D. Tex. Oct. 27, 2023),
   *appeal filed*, No. 23-40685 (5th Cir. Dec. 1, 2023) .................................................. 18

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ..................................................................................................... 11

*Tucker v. SAS Inst., Inc.,*
   462 F. Supp. 2d 715 (N.D. Tex. 2006) .......................................................................... 9

*United States v. All Funds in the Acct. Prop. of Futures, Inc.,*
   820 F. Supp. 2d 1305 (S.D. Fla. 2011) ....................................................................... 20

*United States v. King,*
   735 F.3d 1098 (9th Cir. 2013) ..................................................................................... 15

*United States v. Nadirashvili,*
    655 F.3d 114 (2d Cir. 2011)............................................................................................16

*United States v. Texas,*
    599 U.S. 670 (2023).................................................................................................1, 2, 4

*Vote.Org v. Callanen,*
    39 F.4th 297 (5th Cir. 2022) .........................................................................................18

*Warth v. Seldin,*
    422 U.S. 490 (1975).......................................................................................................18

*Waskul v. Washtenaw Cty. Cmty. Mental Health,*
    900 F.3d 250 (6th Cir. 2018).....................................................................................19, 20

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................................................2, 3

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992).........................................................................................................6

*Wyoming v. U.S. Dep't of Interior,*
    674 F.3d 1220 (10th Cir. 2012)................................................................................5, 8, 9

*Zimmerman v. City of Austin,*
    881 F.3d 378 (5th Cir. 2018) ...................................................................................12, 13

**Statutes**

18 U.S.C. § 921(a)(21)(C) ........................................................................................................1

18 U.S.C. § 922(t)(1)(A)..........................................................................................................11

**Rules**

Fed. R. Civ. P. 56(c)(4) ..........................................................................................................20

**Regulations**

27 C.F.R. § 478.11 ..................................................................................................................14

27 C.F.R. § 478.13(a) ..............................................................................................................14

27 C.F.R. § 478.13(b) ..............................................................................................................15

28 C.F.R. § 25.6(a)..................................................................................................................11

Final Rule, *Definition of "Engaged in the Business" as a Dealer in Firearms,*
    89 Fed. Reg. 28,968 (Apr. 19, 2024) ....................................................................*passim*

**Other Authorities**

ATF, *Do I Need A License To Buy And Sell Firearms?*,
    https://www.atf.gov/firearms/docs/undefined/atfpublication53102pdf/download (updated
    May 2024)...................................................................................................................................15, 16

Utah Dep't of Pub. Safety, *Instant Web Gun Checks System (Dealers)*,
    https://bci.utah.gov/firearm-transfers/instant-web-gun-check-system-dealers/................................13

## INTRODUCTION

Plaintiffs seek a preliminary injunction against a Final Rule[1] promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that implements a change made by the Bipartisan Safer Communities Act (BSCA) to the Gun Control Act's (GCA) definition of being "engaged in the business" of dealing in firearms, *see* 18 U.S.C. § 921(a)(21)(C).   But Plaintiffs' case suffers from a fundamental jurisdictional flaw: Even with the benefit of supplemental briefing, they fail to clearly show that they have Article III standing to obtain such extraordinary relief.  The revenue-related injury the State Plaintiffs assert is not legally cognizable, and they fail in any event to demonstrate that such an incidental economic harm will even materialize in the first place.  The firearms-related conduct that Plaintiff Tormey intends to engage in still does not constitute being "engaged in the business" of dealing firearms under the Rule's interpretation of the GCA, nor has he shown that there is a substantial risk that the Rule will be enforced against him specifically.  He therefore lacks standing to bring a pre-enforcement challenge against the Rule.  And the organizational plaintiffs cannot establish associational standing based on hearsay self-descriptions of their unnamed members.

Standing is not "merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to be adjudicated." *United States v. Texas*, 599 U.S. 670, 675 (2023) (citation omitted).  It is "an indispensable part" of Plaintiffs' case.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Plaintiffs have failed to make the requisite showing of standing here.  The Court should accordingly deny their Motion for Preliminary Injunction.

## LEGAL STANDARD

"A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020).  To have Article III standing, "a

---

[1] Final Rule, *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Rule").

plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Id.* at 330. An injury confers standing only if it is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("Allegations of *possible* future injury are not sufficient." (cleaned up)). The alleged injury must also be "legally and judicially cognizable," meaning that the "dispute" in question must be one "traditionally thought to be capable of resolution through the judicial process." *United States v. Texas*, 599 U.S. at 676 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).

"Plaintiffs always have the burden to establish standing," and they must do so "with the manner and degree of evidence required at the successive stages of litigation." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (citation omitted). "Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,'" a plaintiff seeking one thus must "make a 'clear showing' that they have standing." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). And absent that clear showing, a federal court "ha[s] no jurisdiction to reach the merits" of the plaintiff's claims. *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 935 (5th Cir. 2022); *cf. El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020) ("The Article III standing requirement serves to prevent the judicial process from being used to usurp the powers of the political branches and confines the federal courts to a properly judicial role." (citations omitted)).

## I.     The State Plaintiffs Fail To Establish That They Have Standing

### A.     The State Plaintiffs' Asserted Revenue-Related Injury Does Not Confer Standing

Four states, led by Texas, challenge the Rule on multiple grounds, and they all base their standing to do so principally on the assertion that each "stands to suffer direct harm" to their respective "State fisc[s]" as a result of the Rule's anticipated impact on firearms sales. Pl. Texas's

2

Suppl. Br. in Supp. of Standing 1, ECF No. 61 ("Tex. Suppl. Br."); *see* Pl. Louisiana's Suppl. Br. in Supp. of Standing 2, ECF No. 59 ("La. Suppl. Br.") ("Louisiana, much like Texas, stands to suffer a direct 'pocketbook injury' from the Final Rule."); Pl. Mississippi's Suppl. Br. in Supp. of Standing 1, ECF No. 62 ("Miss. Suppl. Br.") (same); Pl. Utah's Suppl. Br. on Standing 1, ECF No. 64 ("Utah Suppl. Br.") (same).

The State Plaintiffs' asserted "pocketbook injury" hinges on the following chain of contingencies: (1) the Rule will reduce the number of people who sell firearms; (2) that expected decrease in the number of sellers will, in turn, "inevitably result in less gun sales" in each state; and (3) because each State Plaintiff collects sales tax on "taxable items sold— including guns," a reduction in gun sales will result in "less tax revenue collected." Tex. Suppl. Br. at 2. The State Plaintiffs' arguments, moreover, focus almost exclusively on how the Rule will affect sales taxes derived from firearms sales at gun shows held in each state. *See, e.g., id.* at 7 (contending that "Texas stands to suffer direct pocketbook injury because of the . . . effect . . . the Final Rule will have on unlicensed sellers at gun shows"); La. Suppl. Br. at 4 ("A decline in the number of unlicensed dealers at Louisiana's gun shows will inevitably result in less gun sales . . . .").[2] But such incidental downstream effects of a federal policy on state tax revenues do not ordinarily qualify as judicially cognizable injuries for purposes of standing. And the State Plaintiffs' asserted revenue-related injury fails on its own terms in any event because Plaintiffs do not clearly show that they will suffer a decline in revenues derived from firearms sales in the aggregate.

---

[2] Texas also appears to base its revenue-related injury on a purported decrease in other "taxable transactions" that occur at or in relation to gun shows. *See* Tex. Suppl. Br. at 2 (asserting that a "decline in consumer traffic and activity" at gun shows will lead to a "reduction in taxable transactions between vendors and consumers" and a "loss of additional state and local tax revenues, including motor fuels taxes, entertainment taxes, alcoholic beverage taxes, and hotel taxes"). Louisiana and Mississippi (but not Texas or Utah) further assert in their respective briefs that the Rule will cause a reduction in tax revenues derived from online firearms sales. *See* La. Suppl. Br. at 3; Miss. Suppl. Br. at 3.

To start, the Supreme Court long ago explained that a State may sue the federal government only if it has suffered a "*direct* injury" as a result of a federal action or policy. *Florida v. Mellon*, 273 U.S. 12, 18 (1927). In *Florida v. Mellon*, Florida challenged the constitutionality of a federal inheritance tax, and it argued that the tax would cause the State financial harm by "inducing potential taxpayers to withdraw property" and diminishing its tax base. *Id.* at 17-18. But the Court rejected that theory of standing, explaining that Florida needed to show a "direct injury," and that any harm caused by the tax was "purely speculative, and, at most, only remote and indirect." *Id.* at 18. The Court reiterated this same principle just last year when it observed that because "federal policies frequently generate indirect effects on state revenues or state spending," when a State "asserts . . . that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Texas*, 599 U.S. at 680 n.3 (2023); *see id.* ("[F]ederal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer.").

The Fifth Circuit, too, has applied this bedrock principle to reject state standing premised on a "loss of general tax revenues as an indirect result of federal policy." *El Paso Cnty.*, 982 F.3d at 339. In *El Paso County*, the plaintiff county challenged the Department of Defense's reallocation of $20 million in federal funds to build a wall at the United States-Mexico border, a sum that had originally been earmarked for a construction project at a local military base. *Id.* at 337-38. And the county based its standing on the "economic injury" and attendant "loss of general tax revenues" caused by the cancellation of the military base project. *Id.* at 338-39. More specifically, the county claimed that the project's cancellation would reduce its tax revenues because "a $20 million construction project within the county would necessarily generate taxes through workers staying at hotels, buying supplies, and spending money at local establishments." *Id.* at 338. But the Fifth Circuit concluded that such "incidental and attenuated harm" to "general tax revenue" was "insufficient to grant a state or county standing." *Id.* at 341. As the court noted, "federal policies will inevitably have an economic impact

4

on local governments." *Id.* at 340.  Consequently, the court explained, "[i]f every local government could sue to challenge any federal expenditure at a military base, the courts 'would cease to function as courts of law and would be cast in the role of general complaint bureaus.'"  *Id.* at 341 (citation omitted).  The court thus concluded that Article III and Supreme Court precedent require state and local government plaintiffs to demonstrate "more than an incidental economic impact" of a federal policy on "general tax revenues" to establish a cognizable injury in fact. *Id.* at 340-41; *see id.* at 340 ("A direct link, such as the loss of a specific tax revenue, is necessary to demonstrate standing.").[3]

The revenue-related harms the State Plaintiffs assert in this case cannot be meaningfully distinguished from the incidental revenue-related harms that were deemed inadequate to confer state standing in *El Paso County*.  The State Plaintiffs claim, at bottom, that the Rule will reduce certain types of economic activity in their respective states—specifically, various transactions and expenditures related to gun shows (compared to the various transactions and expenditures related to a local construction project at issue in *El Paso County*)—which will in turn cause a reduction in general tax revenues—specifically, sales taxes assessed on a variety of goods, including firearms sold at gun shows (compared to the local taxes assessed on hotel stays, supply purchases, and expenditures at local establishments in *El Paso County*).  Indeed, Texas bases its asserted "pocketbook" injury in part on the "reduction in taxable transactions between vendors and consumers" at gun shows and the "decreased consumption" by gun show "promoters, vendors, and attendees" of fuel, entertainment, alcohol, and

---

[3] Other circuits have similarly rejected claims of state standing based on a federal policy's downstream impact on general tax revenues. *See Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (describing a claim that a federal regulation would have "solely a 'generalized impact' on the economy of a state or a state's general tax revenues" as a "generalized grievance" that is insufficient to establish an injury in fact); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (rejecting state standing premised on an assertion that administration of a federal program would injure a state due to "increased responsibility for the welfare and support of its affected citizens while its available tax revenues are declining."); *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) ("[T]he unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing.").

hotel stays that the Rule will purportedly cause. That is the very sort of "incidental economic impact" and reduction in "general tax revenues" that the *El Paso County* court deemed "inadequate" for state standing. 982 F.3d at 340.

Relying on *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), Texas and the other State Plaintiffs suggest that their revenue-related injury is sufficient to confer standing because they assert a "direct injury in the form of a loss of *specific tax revenues*." Tex. Suppl. Br. at 6 (quoting *Wyoming*, 502 U.S at 448); *see* La. Suppl. Br. at 4 (quoting the same). In *Wyoming*, Oklahoma adopted discriminatory regulations with the avowed purpose of reducing purchases of coal from Wyoming and, by extension, Wyoming's collection of a severance tax on that coal. *Wyoming*, 502 U.S. at 443. Here, by contrast, the State Plaintiffs do not and could not claim that the Rule targets or discriminates against them directly; they assert, at most, that the Rule will have indirect downstream effects on their general sales tax revenues. And the Fifth Circuit has already rejected comparisons to *Wyoming* on the basis of such an "incidental economic impact." *El Paso Cnty.*, 982 F.3d at 340; *see id.* at 339-40 (discussing *Wyoming*). Indeed, Texas's own description of *Mellon* illustrates that its theory of standing is no different from Florida's or El Paso County's. *Compare* Tex. Suppl. Br. at 6 n.5 ("Florida speculated that a federal inheritance tax would prompt taxpayers to take independent action—'withdraw[ing] property from the state'—which might result in less overall property to tax." (quoting *Mellon*, 273 U.S. at 17-18)), *with* "[The State Plaintiffs] speculate[] that [the Rule] w[ill] prompt [firearms sellers] to take independent action—withdrawing [from the firearms market]—which might result in [fewer] overall [goods] to tax."

To the extent the State Plaintiffs argue that their revenue-related injury is sufficiently "specific" because they assert that the Rule will cause at least one firearm sale at a gun show to not go forward, thereby depriving a state of the "sales tax that would normally be collected on that transaction," *id.* at 4, such a limitless theory of state standing cannot be squared with the practical realities of federal-state

relations and the separation-of-powers principles that Article III undergirds. *See El Paso Cnty.*, 982 F.3d at 341 ("The Article III standing requirement 'serves to prevent the judicial process from being used to usurp the powers of the political branches' . . . ." (citation omitted)); *cf. Murphy v. Amarillo Nat'l Bank*, No. 2:20-cv-48-Z, 2021 WL 40779, at *3 (N.D. Tex. Jan. 5, 2021) ("[F]ederal courts must decide cases and controversies rather than act as roving philosopher kings passing judgment on the validity of the nation's laws."). Indeed, because virtually any federal action could conceivably have some incidental effect on state finances, the State Plaintiffs' theory of standing would allow them to challenge nearly every federal policy to which their elected leaders object. Article III's standing requirements are not so boundless. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J.) ("Are we really going to say that any federal regulation of individuals . . . that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court?").

The State Plaintiffs' revenue-related theory of injury cannot confer standing here in any event because that theory fails on its own terms. The State Plaintiffs' asserted injury is that "[u]nlicensed dealers exiting the market" in response to the Rule "will inevitably result in less gun sales, and thus less tax revenue collected by the state[s]." Tex. Suppl. Br. at 2; *see* La. Suppl. Br. at 3 ("Fewer gun sales in the state will result in less revenue from Louisiana's sales and use tax."); Miss. Suppl. Br. at 1 ("Mississippi will likely lose state sales-tax revenue collected from retail sales of firearms if the Final Rule takes effect."). But this bare assertion rests on a flawed premise. As the State Plaintiffs note, the Rule itself predicts that a small proportion of currently "unlicensed persons who would be considered 'engaged in the business' under th[e] [R]ule" will be "unwilling or unable" to obtain a federal firearms license and "will instead choose to cease their dealing in firearms altogether." Rule, 89 Fed. Reg. at 29,072; *see* Tex. Suppl. Br. at 2 (asserting, inaccurately, that the Rule "contemplat[es] 10 [percent] of

currently unlicensed dealers leaving the market altogether").[4]  But even if the Rule marginally reduces

the number of *individuals* who sell firearms, that by no means compels the conclusion that the number

of *firearms* sold will decrease in equal measure, or even at all.  To the contrary, it is entirely possible, if

not expected, that those wanting to purchase firearms will just go elsewhere, including to federal

firearms licensees (FFLs), to do so.  By way of illustration, if a mom-and-pop grocer closes down, that

does not mean that fewer groceries will be sold (and fewer sales taxes collected) in the surrounding

community; residents will just buy their groceries at other stores, whether that be another small grocer

or a supermarket.  This same principle naturally applies to other retail goods that consumers want to

buy, including firearms.  It is entirely possible, then, that even with the Rule in effect, roughly the same

number of firearms will be sold in Texas, Louisiana, Mississippi, and Utah, just from a marginally

smaller pool of sellers, such that the decrease in sales tax revenues that the State Plaintiffs assert here

never materializes.  The Rule, in fact, contemplates this very outcome.  *See* Rule, 89 Fed. Reg. at 29,066

("[T]he overall number of firearm transactions are unlikely to be affected [by the Rule].").

---

[4] Plaintiffs repeatedly assert that the Rule "estimates that ten percent of currently unlicensed sellers are likely to quit selling firearms after the [R]ule takes effect."  Miss. Suppl. Br. at 2; *see* Tex. Suppl. Br. at 2.  But they misconstrue the figure they cite.  The Rule summarizes the methods used by the Department of Justice to calculate "the population impacted by" the Rule.  Rule, 89 Fed. Reg. at 29,054.  According to the Department's "subject matter expert-derived estimate," approximately 25 percent of currently unlicensed sellers are estimated "to be engaged in the business" under Rule, and it was further estimated that roughly 10 percent of *those sellers* are "likely to be either unwilling or unable to become licensed."  *Id.*; *see id.* at 29,066 ("[O]f the individual[s] or new entities affected by this [R]ule, the Department estimates . . . that 10 percent of *affected individuals* (or potential entities) may opt to stop selling firearms." (emphasis added)).  So, the Rule actually estimates that the number of currently unlicensed firearms sellers will drop by roughly 2.5 percent (i.e., 10 percent of 25 percent), a substantially smaller decrease than what Plaintiffs assert.  Texas suggests that this 2.5 percent figure is somehow irrelevant because it only concerns the "*extent*" of its asserted harm.  Tex. Suppl. Br. at 3.  But even setting aside the importance of accuracy for its own sake, that the number of firearms sellers will decrease by much less than what Texas claims, combined with the fact that those sellers sell comparatively few firearms in general, *see* Fed. Reg. at 29,071, makes it substantially harder for Texas and the other State Plaintiffs to clearly demonstrate that the number of firearms sold in the aggregate will actually decrease and, by extension, the loss of tax revenues they assert will actually occur.  *See Wyoming*, 674 F.3d at 1233 (finding no state standing where the plaintiffs "ha[d] not shown" that the federal rules they were challenging "have or will result in lost revenue").

The State Plaintiffs' supplemental declarations do not make their asserted revenue-related injury any less speculative.[5]  Texas, Louisiana, and Mississippi each submitted a declaration from a state tax official.  *See* ECF Nos. 59-1, 61-3, 62-1.  And each of those officials generally declares that the Rule will reduce firearms sales at gun shows held in their respective state and, by extension, reduce sales tax revenues derived from such sales and other gun show-related transactions.  *See, e.g.*, Decl. of Lucius L. Morris II 6, ECF No. 59-1.  But other than describing the particular tax rates their respective states assess on firearms sales, the state tax officials provide no additional "underlying evidence to support [their] claim that a reduction in revenue even exists," or will in fact occur.  *Wyoming*, 674 F.3d at 1232 (finding no state standing).  They instead repeat the conclusory assertions about the Rule's purported impact on state tax revenues that the State Plaintiffs make in their supplemental briefs, just in the form of a declaration—e.g., "the Final Rule is expected to decrease the sale of firearms by unlicensed vendors and persons by 10%," which will "make it less likely" for "firearm customers to attend a gun show . . . to purchase, sell, or trade their firearms legally," which will in turn "cause [the State Plaintiffs] to experience a loss of State and local sales and use tax revenue," Decl. of Murl E. Miller ¶¶ 9-10, ECF No. 61-3.  *See Wyoming*, 674 F.3d at 1232 (concluding that "conclusory statement[s]" in an affidavit "d[id] not demonstrate . . . standing").

Texas is the only State Plaintiff that even attempts to offer more than such mere speculation from a state tax official.[6]  But Texas's additional declarations still fail to clearly show that it will suffer the decrease in sales tax revenue it asserts.  For instance, the declaration from a gun show promoter

---

[5] Despite the Court's Order instructing each plaintiff to "submit supplemental briefing explaining *and evidencing* their basis for standing," Order, ECF No. 45 (emphasis added), Utah did not submit any declarations or other evidence to support the standing-related arguments it advances in its supplemental brief.  *See Tucker v. SAS Inst., Inc.*, 462 F. Supp. 2d 715, 723 (N.D. Tex. 2006) ("[B]riefs themselves . . . are not evidence.").  Utah has thus failed to meet its burden of clearly showing that it has standing to seek a preliminary injunction here.  *See Barber*, 860 F.3d at 352.

[6] Because Louisiana's and Mississippi's conclusory declarations from state tax officials do not "evidenc[e]" the revenue-related injury they assert, Order, ECF No. 45, they too have failed to clearly demonstrate that they have standing to seek preliminary injunctive relief.  *See Barber*, 860 F.3d at 352.

suggests that firearms sales *at certain gun shows* decreased compared to previous shows, which the promoter attributes to vendors' confusion regarding the Rule's scope. *See* Decl. of Darwin Boedeker at 2-3, ECF No. 61-1. Yet the promoter does not, and could not, speak to whether the number of firearms *sold in Texas overall*—including by FFLs and unlicensed sellers unimpacted by the Rule—decreased as well, such that Texas can claim to have suffered a corresponding loss of sales tax revenue. Relatedly, the gun show promoter claims that because of the Rule, he "ha[s] passed on—and will continue to pass on—opportunities to buy and sell guns *at the gun shows* [he] attend[s]," *id.* ¶ 26 (emphasis added), but he says nothing about whether he will buy and sell firearms elsewhere (and thus pay sales taxes on any such purchases), or whether the gun show attendees to whom he would have otherwise sold firearms will do the same (and thus pay sales taxes too).

The declaration from the President and CEO of a women's gun club similarly makes the conclusory assertion that the Rule will "reduce[] the number of firearm purchases that women will make," resulting in lost sales tax revenue for Texas. Decl. of Robyn M. Sandoval ¶ 14, ECF No. 61-2. But such a conclusion relies on a number of assumptions—that club members actually collect sales tax on their occasional private sales of firearms; that those members do not, for whatever reason, simply return their "ill-fitting purchase[s]" to the seller for a refund or more suitable replacement, *id.* ¶ 11; and that the CEO's expectations about how other independent actors will respond to the Rule actually come to fruition—that are no less speculative than Texas's other conclusory assertions regarding its revenue-related injury. That injury, in sum, is simply too "conjectural" and hypothetical" to satisfy Article III. *Susan B. Anthony List*, 573 U.S. at 158.

A final point: even if Texas's additional declarations establish that *it* has standing, that does not mean that any of the other State Plaintiffs have standing as well, such that they can be included in any preliminary injunctive relief. *See* La. Suppl. Br. at 6 ("Because Texas has shown standing, Louisiana and all plaintiffs in this matter should also have standing."); Utah Suppl. Br. at 2-3 (arguing the same).

In *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), the Supreme Court held that federal courts lack authority to award relief to parties without standing. *TransUnion* involved a class action in which the Court held that some class members had standing while others did not. *See* 594 U.S. at 439. The Court then concluded that lower courts had erred in awarding relief to all class members, including those who lacked standing. *Id.* at 442. And the Court made clear it was articulating a general rule that applied to all federal civil cases, explaining that "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Id.* at 431 (citation omitted). It is true that if at least one plaintiff has standing, then a federal action can proceed and need not be dismissed outright for lack of jurisdiction. But as *TransUnion* underscored, a federal court cannot award distinct relief to a party—such as injunctive relief preventing the federal government from enforcing a regulation within a particular state—unless that party meets its burden of establishing standing. At the temporary restraining order (TRO) stage, the Court properly excluded from relief the parties that it concluded had not demonstrated their standing to sue, and it should continue to do so here.

### B.     The Rule's Incidental Effect On Utah's Background Check Procedures Also Does Not Confer Standing

Utah, in addition to asserting that the Rule will "cause [it] to suffer a pocketbook injury by reducing its tax revenues from firearm sales," now advances the wholly new argument that the Rule will further "injure[]" the State "by requiring it to perform additional background checks that federal law doesn't require."[7]  Utah Suppl. Br. at 1. As explained above, Utah did not submit any evidence supporting either asserted injury. Yet even assuming that such a deficiency is not sufficient on its own

---

[7] Federal law requires FFLs to run a background check through the FBI's National Instant Background Check System (NICS) before transferring a firearm to a prospective purchaser. *See* 18 U.S.C. § 922(t)(1)(A). While FFLs ordinarily contact the federal government directly to perform background checks, federal regulations permit states to voluntarily serve as the point of contact for those background checks. *See* 28 C.F.R. § 25.6(a) (noting that FFLs may initiate background checks in some instances by contacting a state Point of Contact); *id.* § 25.2 (defining "POC (Point of Contact)"). Utah is one such point of contact state.

to preclude Utah from establishing standing here, Utah's alternative background check theory of standing fails for several independent reasons.

First, the expected increase in the number of private sellers obtaining a federal firearms license is a direct consequence of the BSCA's broadening of the definition of being "engaged in the business," *see* Opp'n to Pls.' Mot. for TRO and/or Prelim. Inj. 5-6, ECF No. 31 ("Defs.' Opp'n"), meaning that any corresponding increase in mandatory background checks for firearms purchases is largely traceable to that statute—which Plaintiffs do not challenge—rather than the Rule.  Relatedly, Utah fails to explain how it will differentiate between background checks that are lawfully required by the BSCA or are voluntarily conducted by sellers (whether licensed or otherwise) who simply want to ensure that they are not transferring a firearm to a prohibited person, and those that are purportedly compelled "unnecessary[ily] and unlawful[ly]" by the Rule.  Utah Suppl. Br. at 8.

Second, any "increased workload" that Utah takes on as a result of the Rule would be a consequence of its own voluntary decision to take responsibility for conducting firearms-related background checks itself.  *See Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("[S]tanding cannot be conferred by a self-inflicted injury.").  While States are permitted to conduct federal background checks through NICS themselves, they are not required to do so; indeed, during a period when federal law mandated that state and local officials conduct background checks, the Supreme Court held that such requirements were impermissible.  *See Printz v. United States*, 521 U.S. 898, 933 (1997)).  Thus, if changes to federal firearms laws naturally require a greater number of background checks, and if a State elects to conduct those background checks itself (rather than having FFLs contact the NICS directly), any burden incurred by the State as a result of that voluntary arrangement is the sort of "self-inflicted injury" that fails to confer standing. *Zimmerman*, 881 F.3d at 389; *cf. Clapper*, 568 U.S. at 418 (concluding that "respondents' self-inflicted injuries" were "not fairly traceable to" the government activity being challenged and thus "d[id] not give rise to standing").

Third, Utah makes no effort to "evidenc[e]," Order, ECF No 45, the "increased workload" it claims it will suffer, Utah Suppl. Br. at 7, or to explain whether that increased workload actually amounts to a cognizable injury. FFLs in Utah, for instance, are able to submit "instant" background checks "via the internet any hour of any day,"[8] and Utah offers no evidence indicating whether an uptick in the number of background checks will tangibly burden this largely automated system. Utah also collects a fee on the background checks it conducts, yet "assumes" in its supplemental brief that such checks "are cost neutral." Utah Suppl. Br. at 9. But if an increase in background checks actually results in Utah earning money through fees—and there is no evidence to the contrary—it is difficult to see how such a fiscal *benefit* can amount to an *injury* in fact. Utah's unsupported assertions of "*possible* future injury" are not sufficient to establish standing. *Clapper*, 568 U.S. at 409 (citation omitted).

## II.    Tormey's Supplemental Filings Show That He Lacks Standing

Tormey contends that he has standing to challenge the Rule based on the risk that the federal government will rely on the Rule to bring an enforcement action against him and subject him to legal sanctions. *See* Suppl. Br. of Jeffrey W. Tormey 3, ECF No. 53 ("Tormey Suppl. Br."). To have standing to challenge the potential future enforcement of a statute or regulation, however, a plaintiff must show "an intention to engage in a course of conduct" that is "arguably proscribed" by that statute or regulation, and that "the threat of future enforcement . . . is substantial." *Susan B. Anthony List*, 573 U.S. at 161-64. And Tormey fails to satisfy multiple elements of this standard.

First, Tormey once again fails to "establish a serious intention to engage in conduct proscribed by law." *Zimmerman*, 881 F.3d at 389.[9] To have standing to bring his pre-enforcement challenge here, Tormey must intend to engage in conduct that would constitute being "engaged in the business" of

---

[8] Utah Dep't of Pub. Safety, *Instant Web Gun Checks System (Dealers)*, https://bci.utah.gov/firearm-transfers/instant-web-gun-check-system-dealers/ (last visited June 5, 2024).

[9] In the Court's discussion of Tormey's standing in its TRO opinion, the Court did not analyze whether Tormey had shown an intention to engage in conduct that is "proscribed" by the Rule. *See* Mem. Op. & Order 6, ECF No. 44.

dealing firearms under the Rule's interpretation of the GCA, which would then subject him to potential legal sanctions if he did not obtain a federal firearms license. Yet Tormey's declarations make plain that his intended firearms-related conduct *does not*, in fact, rise to the level of being "engaged in the business." In his initial declaration, Tormey stated that he is "a collector and a hobbyist" who engages in multiple shooting-related hobbies, "including recreation, competitive shooting, hunting, and training," and who has sold "at least a couple, or even several, firearms per year . . . in order to enhance the collection of firearms that [he] own[s]." Decl. of Jeffrey W. Tormey ¶¶ 4, 5, 9, ECF No. 16-3 ("Tormey Decl."). Yet as Defendants explained in their opposition brief, *see* Defs.' Opp'n at 14-15, such activity falls comfortably within the provision that excludes from the Rule's definition of "engaged in the business" "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby." Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)); *see also id.* at 29,090 (27 C.F.R. § 478.11) (defining "[p]ersonal collection" to include "[p]ersonal firearms that a person accumulates for study, comparison, exhibition . . . or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)").

Tormey now asserts in his supplemental declaration that he recently sold a firearm that he used for personal protection, and that he is also considering selling additional "self-defense" firearms to upgrade to newer models. Suppl. Decl. of Jeffrey W. Tormey ¶¶ 7-8, ECF No. 53-1 ("Suppl. Tormey Decl."). But this conduct likewise does not constitute being "engaged in the business" of dealing firearms under the Rule's interpretation of the GCA. That is because the Rule defines engaging in the business to mean "[a] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)). And Tormey's statements

that he occasionally sells a small number of personal-protection firearms to upgrade to newer models do not meet this multi-element standard.[10]

In contending otherwise, Tormey states that "ATF cannot even say for certain that *one* such sale of a self-defense firearm does not constitute being 'engaged in the business.'"  Suppl. Tormey Decl. ¶ 10.  Tormey misunderstands the Rule, however.  In providing that a "fact-specific inquiry" governs whether someone is engaged in the business of dealing, the Rule states:

> For example, even a single firearm transaction or offer to engage in a transaction, when combined with other evidence (*e.g.,* where a person represents to others a willingness and ability to purchase more firearms for resale), may require a license; whereas, a single isolated firearm transaction without such evidence would not require a license.

Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(b)).

ATF explained that this part of the Rule was supported by ample case law upholding convictions for unlicensed dealing where few, if any, completed firearms sales occurred, but there was nonetheless evidence of significant dealing activity.  *See id.* at 28,976 & n.67.  For example, in *United States v. King*, 735 F.3d 1098 (9th Cir. 2013), the defendant "secured" an "office" to run a firearms business "and incorporated an entity called McMinnville Hunting and Police Supply."  735 F.3d at 1101.  He also began submitting forged credit applications to "multiple firearms suppliers" to obtain at least "nineteen . . . firearms . . . as well as magazines and thousands of rounds of ammunition."  *Id.* at 1102.  Despite there being "no evidence that [the defendant] successfully sold any firearms," *id.*, the Ninth Circuit upheld his conviction for unlicensed dealing, reasoning that 18 U.S.C. § 922(a)(1)(A) "does not require an actual sale of firearms," *id.* at 1107 n.8.  In another case cited by ATF, the

---

[10] ATF has published guidance to help members of the public understand whether they are engaged in the business of dealing firearms under federal law.  *See* ATF, *Do I Need A License To Buy And Sell Firearms?*,    https://www.atf.gov/firearms/docs/undefined/atfpublication53102pdf/download (updated May 2024).  That guidance provides the example of someone who owns "three handguns for self-protection at home and decides that she no longer wants two of them," so she "eventually resells the two handguns to a private collector," and it explains that such a person "would not have needed a license because these facts do not also include conduct indicating that she was devoting time, attention, and labor to dealing as a regular course of trade or business."  *Id.* at 22.

government produced significant evidence of a "weapons trafficking ring," in which the participants "discussed how to obtain and ship 'grenades,' 'warheads,' 'missiles,' and 'launchers'"; created price lists for such weapons; and "had a number of phone conversations in which they spoke about setting up a deal involving" firearms, including machine guns. *United States v. Nadirashvili*, 655 F.3d 114, 117-18 (2d Cir. 2011). And the Second Circuit upheld the convictions of two defendants for aiding and abetting unlicensed firearms dealing, explaining that rather than having to prove that the defendants "were aware that [a co-participant] was actually engaged in multiple [firearms] transactions," the government needed to prove that the defendants were aware that the co-participant "held himself out as a source of firearms and was ready to procure them for his customers." *Id.* at 120-21 (cleaned up).

ATF sensibly relied on this case law to conclude that under longstanding judicial interpretations of the GCA, a person can be engaged in the business of dealing without necessarily having completed multiple firearms sales. Yet that conclusion by no means supports Tormey's bare assertion that ATF would deem the mere sale of a single firearm for the purpose of upgrading to a newer model as amounting to being engaged in the business of dealing firearms too.[11]

Tormey's declarations and supplemental brief also fail to show that the "threat of future enforcement" of the Rule against him "is substantial." *Susan B. Anthony List*, 573 U.S. at 164. Tormey argues that a substantial risk of enforcement exists because he "fear[s]" that ATF might "presume" under the Rule that his "perfectly lawful" firearms-related conduct is "felonious." Tormey Suppl. Br. at 1-2. But as discussed, the conduct Tormey has described does not fall within any presumption articulated in the Rule, and Tormey "cannot manufacture standing" through such a subjective fear of "hypothetical future harm" that is far from "certainly impending." *Clapper*, 568 U.S. at 416.

---

[11] ATF's guidance explains that "nothing" in the Rule "precludes a person from lawfully acquiring firearms for self-protection or other lawful personal use, *or making isolated sales of such firearms* without devoting time, attention, and labor to dealing in firearms as a regular course of trade or business." ATF, *Do I Need A License To Buy And Sell Firearms?* at 32 (emphasis added).

16

At the TRO stage, the Court found a substantial threat of enforcement against Tormey existed after citing "a prior enforcement proceeding" discussed in another Plaintiff's declaration.  Mem. Op. & Order at 6 (citing Decl. of Erich M. Pratt at 8-9, ECF No. 16-4 ("Pratt Decl.")).  According to the declaration, that prior enforcement proceeding (a prosecution of Robert G. Arwady) was initiated in 2014, a decade before ATF promulgated the Rule and eight years before Congress amended the GCA via the BSCA.  *See* Pratt Decl. ¶ 32.  That proceeding also involved very different circumstances than those set forth in Tormey's declarations; specifically, Arwady was charged with dealing firearms without a license after he voluntarily surrendered his federal firearms license and later sold off his former "business inventory."  *Id.* ¶¶ 33-34.  A single example of a prosecution brought several years before the Rule was promulgated and under significantly different circumstances cannot show that there is a substantial risk that the federal government will invoke the Rule to bring an enforcement action against Tormey specifically, especially where his firearms-related conduct does not even constitute being "engaged in the business" of dealing firearms under the Rule's plain terms.  *Cf. Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023) (finding standing in the pre-enforcement challenge context where there was a prior enforcement action *and* the plaintiffs were unquestionably "breaking" the agency guidance they were challenging).

## III.   The Organizational Plaintiffs' Supplemental Filings Fail To Establish That They Have Associational Standing

For the reasons explained in Defendants' opposition brief, the four organizational plaintiffs in this case—Gun Owners of America, Inc. (GOA), Gun Owners Foundation (GOF), Tennessee Firearms Association (TFA), and Virginia Citizens Defense League (VCDL)—all lack associational standing to bring suit on behalf of their purported members.  *See* Defs.' Opp'n at 18-20.  And their supplemental filings do not cure that fundamental jurisdictional flaw.

As a threshold matter, GOF lacks associational standing because, as explained in Defendants' opposition brief, it is not the sort of membership organization that can invoke such standing in the

first place. *See* Defs.' Opp'n at 18 n.11; *see also Vote.Org v. Callanen*, 39 F.4th 297, 303 n.2 (5th Cir. 2022) ("Because it is a non-membership organization, Vote.org cannot contend that it has associational standing."). GOF concedes in its supplemental brief that it is "not a traditional membership association," but it contends that it nonetheless has "indicia of membership" sufficient to confer associational standing, principally because its "supporters" fund the organization and "communicat[e] their views . . . about issues on which GOF should focus." Suppl. Br. of Gun Owners Foundation 1-2, ECF No. 56. To satisfy the "indicia of membership" standard, however, an organization's members must "elect leadership, serve as the organization's leadership, *and* finance the organization's activities." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) (emphasis added). And GOF, at most, satisfies only the third requirement. GOF therefore fails to establish that it is an "appropriate representative" of its supporters such that it can claim standing on their behalf. *Warth v. Seldin*, 422 U.S. 490, 511 (1975).[12]

As for the other three organizational plaintiffs, they suggest in their supplemental briefs that they have already "adequately demonstrated [their] standing" based on Tormey being a member of each organization. Suppl. Br. of Gun Owners of America, Inc. 1, ECF No. 55 ("GOA Suppl. Br."); *see* Suppl. Br. of Tennessee Firearms Association 2, ECF No. 54; Suppl. Br. of Virginia Citizens Defense League 2, ECF No. 57. But as explained above and in Defendants' opposition brief, Tormey lacks standing to challenge the Rule in his own right and thus cannot serve as the basis for associational standing. *See OCA-Great Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (noting that associational standing requires an organization's members to have standing themselves).

---

[12] Another federal court in Texas recently found in another matter that GOF "ha[d] not satisfied the indicia of membership test as is required to have standing for a preliminary injunction." *Texas v. ATF*, -- F. Supp. 3d --, 2023 WL 7116844, at *8 (S.D. Tex. Oct. 27, 2023), *appeal filed*, No. 23-40685 (5th Cir. Dec. 1, 2023).

GOA, TFA, and VCDL are not saved by their supplemental filings. Each organization attempts to bolster its claim that it has associational standing with a supplemental declaration describing "conversations" between the organization and unnamed members who purport to be "directly impacted" by the Rule. GOA Suppl. Br. at 1-2; *see* ECF Nos. 54-1, 55-1, 57-1. Defendants respectfully disagree with the Court's conclusion at the TRO stage that the organizations can establish associational standing based on unnamed members, *see* Mem. Op. & Order at 7. *See Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 113 (2nd Cir. 2024) (concluding that *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), "and the precedent upon which it relies, support the view that an association cannot just *describe* the characteristics of specific members with cognizable injuries; it must identify at least one by name"); *see also Religious Sister of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022) (holding that an organizational plaintiff "lack[ed] associational standing to sue on behalf of unnamed members"); *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (explaining in the preliminary injunction context that an organizational plaintiff "must show that one of its *named members*" has standing (emphasis added)); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) ("[T]he Supreme Court has said that an affidavit provided by an association to establish standing is insufficient unless it names an injured individual."). *But see Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024).

Yet even assuming associational standing does not necessarily require identifying members by name, the organizational plaintiffs still must clearly show with sufficient evidence that they have such standing. *See Barber*, 860 F.3d at 352; *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 546 (5th Cir. 2005) ("The plaintiff has the burden of introducing sufficient evidence to justify the grant of a preliminary injunction."). They fail to do so here. Rather than providing declarations from members themselves, the organizations each filed a supplemental declaration from one of its leaders, in which that leader merely summarizes statements made by other non-declarants—namely, unidentified members who purportedly "fear" that the Rule will affect them in some way. Suppl. Decl. of Erich

M. Pratt ¶ 3, ECF No. 55-1 ("Suppl. Pratt Decl."); *see, e.g., id.* ¶ 4 ("GOA spoke to one member . . . ."); Suppl. Decl. of Philip Van Cleave ¶ 4, ECF No. 57-1 ("Suppl. Van Cleave Decl.") ("VCDL recently spoke to one member and supporter . . . ."); Suppl. Decl. of C. Richard Archie ¶ 13, ECF No. 54-1 ("Suppl. Archie Decl.") (stating that "[e]very TFA member" the leader "ha[s] talked to . . . have expressed concerns" about the Rule).[13]  And the organizational plaintiffs contend that such summaries of their unnamed members' statements establish that those members will, in fact, be "harmed by" the Rule.  Suppl. GOA Br. at 4.  But "[t]his, of course, is the purest form of inadmissible hearsay." *United States v. All Funds in the Acct. Prop. of Futures, Inc.*, 820 F. Supp. 2d 1305, 1332 (S.D. Fla. 2011); *see Gray v. White*, 18 F.4th 463, 470 (5th Cir. 2021) (defining hearsay).  The Supreme Court has stressed, moreover, that such "self-descriptions" of an organization's membership cannot be accepted in lieu of "individual affidavits" when determining whether an organization has associational standing. *Summers*, 555 U.S. at 498-99

The organizational plaintiffs' hearsay declarations certainly would not establish associational standing at the summary judgment stage.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose [summary judgment] must . . . set out facts that would be admissible in evidence . . . .").  The declarations would likewise fail to establish standing at the preliminary injunction stage in other circuits.  *See Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) ("When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.'" (citation omitted)); *Waskul*, 900 F.3d at 255 n.3 ("[W]here a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.'" (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)).  And they fail to

---

[13] TFA appears to provide the last names of a few of its members, *see* Suppl. Archie Decl. ¶¶ 6-7, but goes no further in identifying them.

properly establish associational standing here too, especially in light of the extraordinary relief Plaintiffs seek.

In any event, GOA's, TFA's, and VCDL's supplemental declarations fail to establish standing for much the same reasons that Tormey's declarations do: The organizational plaintiffs do not clearly show that any of their members have standing to bring a pre-enforcement challenge against the Rule in their own right. Although the unnamed members described in the supplemental declarations face different factual circumstances, none of the declarations describes conduct that is reasonably likely to trigger enforcement under the Rule. *See Susan B. Anthony List*, 573 U.S. at 162 (requiring that a plaintiff bringing a pre-enforcement challenge intend to engage in conduct that is "proscribed" by the statute or regulation "they wish to challenge"). GOA, for instance, describes one unnamed member who "[o]ccasionally . . . sells firearms from their collection in order to make room for new firearms or to replace firearms," Suppl. Pratt Decl. ¶ 7, which, as with Tormey, does not rise to being "engaged in the business" of dealing firearms. Another unnamed GOA member purportedly "wishes to liquidate portions of" a "large collection of firearms" he inherited from a "late relative." *Id.* ¶ 13-14. But the Rule expressly provides that "liquidat[ing] firearms . . . [t]hat are inherited" is conduct that is *not presumed* to amount to being engaged in the business. Rule, 89 Fed. Reg. at 29,092. And TFA's supplemental declaration simply states that its member-declarant and other members "intend to change or improve their personal collection" of firearms "through the future acquisition and disposition of firearms" without providing any other details suggesting that such conduct even remotely falls under the Rule's "engaged in the business" definition. Suppl. Archie Decl. ¶¶ 6-7; *see id.* ¶ 3 (stating that the declarant-member buys and sells guns to improve his collection "and not for any commercial or business purpose"). Furthermore, none of the organizations' unnamed members asserts that they are facing any imminent threat of an enforcement action pursuant to the Rule. *See*

21

*Susan B. Anthony List*, 573 U.S. at 164.[14]  Because the organizational plaintiffs fail to identify members with standing to sue in their own right, they lack associational standing here.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Preliminary Injunction because, among other reasons, Plaintiffs lack standing.

DATED: June 7, 2024                         Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            BRIGHAM J. BOWEN
                                            Assistant Director, Federal Programs Branch

                                            */s/ Zachary W. Sherwood*
                                            ZACHARY W. SHERWOOD
                                            (IN Bar No. 37147-49)
                                            JEREMY S.B. NEWMAN
                                            KERI L. BERMAN
                                            Trial Attorneys
                                            Civil Division, Federal Programs Branch
                                            U.S. Department of Justice
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Phone: (202) 616-8467
                                            Fax: (202) 616-8470
                                            Email: zachary.w.sherwood@usdoj.gov

                                            *Attorneys for Defendant*

---

[14] GOA asserts in its supplemental declaration that "[i]t . . . seems apparent that the ATF is enforcing [the Rule] against" one of its unnamed members. Suppl. Pratt Decl. ¶ 43.  But that member apparently received a warning letter from ATF "shortly after" the BSCA "was passed," which occurred back in 2022, and was purportedly "visit[ed]" by ATF in "early May 2024," which was before the Rule's May 20, 2024 effective date.  *Id.* ¶¶ 41-42.  This alleged enforcement action thus cannot be attributed to the Rule.

<u>**CERTIFICATE OF SERVICE**</u>

On June 7, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Zachary W. Sherwood*