UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.* § <br> Plaintiffs, § <br> v. § <br> § <br> BUREAU OF ALCOHOL, TOBACCO, § <br> FIREARMS AND EXPLOSIVES, *et al.* § <br> Defendants. § | CIVIL ACTION NO.2:24-CV-00089-Z |

**PLAINTIFF TEXAS' REPLY IN SUPPORT OF SUPPLEMENTAL BRIEFING IN SUPPORT OF STANDING**

Texas has standing. Defendants argue that Texas' claim of a pocketbook injury based on a loss of sales tax revenue from guns sold at gun shows is simply too "general" and "speculative" to confer standing. They primarily rely on *El Paso Cnty., Texas v. Trump*, 982 F.3d 332 (5th Cir. 2020), for this proposition. *See* ECF No. 66 at 4–7. Yet this reliance is misplaced. *El Paso* is distinguishable for several reasons.

First, the Plaintiff in *El Paso* was a county, not a state. In other words, "El Paso County [was] not *directly harmed* by the cancellation" of the military base project because "*no part of the $20 million would be paid to the county itself*." *El Paso* 982 F.3d at 338 (emphasis added). Yet here, state sales tax is paid directly *to* Texas. ECF No. 61–3 ¶ 13; Tex. Tax Code § 151.051.[1]

---

[1] Contrary to Defendants' claim that Texas has not asserted the Final Rule "will cause a reduction in tax revenues derived from online firearms sales", ECF No. 66 at 9 n.2, each set of Texas' provided declarations from the Comptroller's office also notes that Texas "collects 6.25% state sales and use tax on *Internet sales*, purchases, and trades of firearms within the state." ECF No. 37–1 ¶13; ECF No. 61–3 ¶ 13 (emphasis added). All of Texas' attached evidence contains detailed discussions of the direct effects of the Final Rule on Texas' state fisc—all of which could not be included within the page limitations of Texas' supplemental briefing on standing. *See* ECF No. 45.

Second, the *El Paso* plaintiff did not allege the challenged federal policy would cost it specific tax revenues. Rather, it asserted generally "that the economy of the county at large will be harmed, resulting in a reduction in general tax revenues for the county." *El Paso*, 982 F.3d at 340. But Texas' injury is not so general. Rather, Texas has provided evidence showing a likely reduction in the collection of a specific type of tax revenue—state sales tax—caused by a reduction in a specific kind of sale—guns—which will be caused by the Final Rule. *See* ECF No. 61-1, 61-2, 61-3; *see also Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022) ("In *El Paso*, we expressly noted that 'the loss of a specific tax revenue' could establish standing"') (quoting *El Paso*, 982 F. 3d at 341).

Above all, the Final Rule's statement against interest cuts against any notion that the specific economic harm to Texas is "incidental." ECF No. 66 at 11. Instead, the loss of sales tax revenue to Texas stems from the Final Rule's intended and *admitted* effect on forcing a certain segment of the taxable population—unlicensed sellers of guns—from the marketplace.[2] *See* 89 Fed. Red. 29,054; Defs.' Resp. to Prelim. Inj. ECF No. 31 ("ATF has exercised its authority to issue regulations. . . to reduce the volume of unlicensed dealing in firearms."); Defs.' Resp. to Pls.' Suppl. Br. on Standing ECF No. 66 at 13 (acknowledging the Final Rule will see a "proportion" of "currently unlicensed persons. . . cease. . . dealing in firearms altogether" because they are either "unwilling or unable" to obtain an FFL) (citations omitted). Like in *Wyoming v. Oklahoma*, 502

---

[2] *See* Cong. Rsch. Serv., IF12679, *The Biden Administration's New Restrictions on Firearms Sales*, (May 29, 2024), https://crsreports.congress.gov/product/pdf/IF/IF12679 ("The [Final Rule] changes may have effects on certain firearms dealers' ability to sell weapons. For one, the *unregulated market for firearm sales may be reduced* because ATF's final rule expands licensure requirements for sellers, increasing the number of firearm transfers that require background checks on the prospective purchaser.") (emphasis added).

U.S. 437 (1992), Defendants' Final Rule "directly affects" Texas' "ability to collect" a specific tax: sales tax. *Id.* at 451. ATF's admission that a certain segment of the taxable population will completely exit the market cements Texas' standing as it shows a "direct link between the state's status as a collector and recipient of revenues and the... action being challenged."). *El Paso*, 982 F.3d at 341 (quotations omitted).[3]

Last, Defendants are critical of Texas' declarations—in part, for failing to "speak on whether the number of firearms sold in Texas" have decreased "overall" (rather than only decreasing at the declarant's gun shows). ECF Nos. 15–16. But Defendants demand more than the law requires. Nothing in Article III jurisprudence requires a plaintiff to divine "with absolute certainty the sequence of events that will lead to [its] redress." *Hisp. Affairs Project v. Perez*, 206 F. Supp. 3d 348, 371 (D.D.C. 2016). Rather, Texas has provided evidence that ATF's Final Rule is having the intended effect of driving down gun sales at gun shows and that at least one person now refuses to sell any guns at these shows because of fear of prosecution. Decl. of Darwin Boedeker ECF No. 61–2 ¶ 24–26.

---

[3] Nor do Defendants' out-of-circuit cases help their cause. ECF No. 66 at 11 n. 3. All involved general and attenuated harm that is different in kind from the loss of the collection of a specific type of tax revenue—state sales tax—caused by a reduction in a specific kind of sale—guns. *See Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1231–34 (10th Cir. 2012) (state alleged that "restrictions on snowmobile access" in national parks caused economic harm without providing any "underlying evidence to support [that] claim," and the court still did "not foreclose the argument that reduced tax revenues can provide a state with Article III standing."); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (state alleged that "but for the Secretary's implementation of [certain] disaster relief programs, agricultural production will suffer, which will dislocate agriculturally-based industries, forcing unemployment up and state tax revenues down"); *Pennsylvania v. Kleppe*, 533 F.2d 668, 671–72, n.14 (D.C. Cir. 1976) (state alleged in "sketchy and uncertain" terms that without federal assistance in rebuilding hurricane-damaged businesses, state would lose "tax revenues"). Also, *Kleppe* and *Block* were both suits to *compel* government action. Namely, to force an agency to release disaster funds. *See Block*, 771 F.2d at 348; *Kleppe*, 533 F.2d at 670. The harm to the States' general tax base came from natural disasters, not government action. Here, the Final Rule's intended and *admitted* effect is to force a certain segment of the taxable population—unlicensed sellers of guns—from the marketplace.

Beyond that, basic economics and logic tell us that a Final Rule that reduces the number of sellers at gun shows will inevitably reduce sales transactions at those shows. The reduction in the number of vendors directly affects the supply of firearms available for sale, which in turn diminishes consumer turnout and purchasing activity. This predictable sequence of events aligns with common economic principles: fewer vendors lead to fewer sales, resulting in a direct impact on the sales tax revenue generated at these events. Thus, Texas' declarations are not speculative but reflect a logical and economically sound assessment of the Final Rule's impact. *See United Transp. Union v. I.C.C.,* 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (noting how "courts routinely credit" the application of "basic economic logic" to find standing).

And unlike grocery stores that operate continuously, gun shows are periodic events with concentrated economic activity. The loss of vendors at gun shows reduces transactions during these limited events. Indeed, the loss of vendors can[4]—and will, lead to these specific, large, periodic, economic boons to Texas' fisc diminishing and going away completely. *See generally* Decl. of Darwin Boedeker ECF No. 61–1. In other words, while Defendants' theory that "even with the Final Rule in effect, roughly the same number of firearms will be sold in Texas" is certainly "possible," (as are most things) ECF No. 66 at 14, it "defies basic common sense," *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (Kavanaugh, J.), when faced with the unique economic environment gun shows provide to the state, coupled with the very real and intended chilling effect the Final Rule has on unlicensed sellers at these shows. *See* Decl. of Darwin Boedeker, ECF No. 61–1 ¶ 21 ("The reduction in the number of lawful vendors and persons who

---

[4] News Release: *MT Gun Show Cancelled–BATFE Regulation*, Montana Shooting Sports Association (last accessed Jun. 10, 2024), https://www.mtssa.org/mt-gun-show-cancelled-batfe-regulation/ (shows canceled "because of the new regulation by the Biden administration and the [ATF] redefining what 'engaged in business' is for selling one or more firearms"').

normally purchase, sell, and trade firearms at gun shows is directly attributable to the threat of enforcement actions of ATF through the Final Rule.").

To be sure, a state's standing should be properly scrutinized. But Article III standing is not an insurmountable hurdle to legal redress. No matter how high Defendants wish to have the standing bar set, "[i]njury-in-fact is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.). *See. e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752 (2019) (holding that New York had standing to challenge a census question because the question could lead to lower participation in the census, which could lead to a population undercount, which could lead to New York receiving less funding from the federal government). And the pocketbook injury like the one Texas alleges is "a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021).

## CONCLUSION

For these reasons, this Court should continue to find Texas has standing and stay the effective date of the Final Rule under §705.

5

| | |
|---|---|
| Date: June 10, 2024 | Respectfully submitted. |
| **KEN PAXTON**<br>Attorney General | */s/Garrrett Greene*<br>**GARRETT GREENE**<br>Special Counsel<br>Texas Bar No. 24096217 |
| **BRENT WEBSTER**<br>First Assistant Attorney General | |
| **RALPH MOLINA**<br>Deputy Attorney General for Legal Strategy | **KATHLEEN T. HUNKER**<br>Special Counsel<br>Texas Bar No. 24118415 |
| **RYAN D. WALTERS**<br>Chief, Special Litigation Division | OFFICE OF THE ATTORNEY GENERAL OF TEXAS<br>Special Litigation Division<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-2548<br>Tel.: (512) 463-2100<br>garrett.greene@oag.texas.gov<br>kathleen.hunker@oag.texas.gov |
| | **COUNSEL FOR PLAINTIFF STATE OF TEXAS** |

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of this document was filed electronically (via CM/ECF) on June 10, 2024.

*/s/Garrrett Greene*
**GARRETT GREENE**