IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS, *et al.*,

      Plaintiffs,

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES, *et al.*,

      Defendants.

2:24-CV-089-Z

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion for a Preliminary Injunction ("Motion") (ECF No. 16), filed May 9, 2024. Defendants filed their response ("Response") (ECF No. 31) on May 14, 2024. Having reviewed the briefing and relevant law, the Court **GRANTS** the Motion. Defendants are hereby **ENJOINED** from enforcing the regulations — "Definition of 'Engaged in the Business' as a Dealer in Firearms" (hereinafter "Final Rule") — published at 89 Fed. Reg. 28968 (April 19, 2024) (to be codified at 27 C.F.R. pt. 478) against Plaintiffs Texas, Louisiana, Mississippi, Utah, Jeffrey Tormey ("Tormey"), the Gun Owners of America, Inc. ("GOA"), the Gun Owners Foundation ("GOF"), the Tennessee Firearms Association ("TFA"), and the Virginia Citizens Defense League ("VCDL") pending the resolution of this lawsuit.

### BACKGROUND

The United States Attorney General has authority to enforce the Gun Control Act of 1968 ("GCA") and promulgate regulations necessary to enforce its provisions. 18 U.S.C. § 926(a). Congress and the Attorney General, in turn, delegated GCA administrative and enforcement responsibilities to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 U.S.C. §§ 599A(b)(1), (c)(1); 28 C.F.R. §§ 0.130(a)(1)–(2).

The GCA imposes strict requirements on firearms dealers and severe consequences for violating them. It makes it unlawful for any person — save a licensed dealer — to "engage in the business" of dealing in firearms until he has filed an application with ATF and received a license. 18 U.S.C. § 923(a). It requires dealers to conduct background checks on prospective firearms recipients and to maintain records for tracing purposes. *Id.* §§ 922(t), 922(b)(5), 923(g)(1)(A). And it provides that persons who willfully engage in the business of dealing firearms without a license face imprisonment for up to five years, a fine of up to $250,000, or both. *Id.* §§ 922(a)(1)(A), 924(a)(1)(D), 3571(b)(3). Any firearms involved in such violations may be subject to administrative or civil forfeiture. *Id.* § 924(d)(1).

The Firearms Owners' Protection Act of 1986 ("FOPA") modified the GCA, adding a statutory definition of "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." Pub. L. 99-308, § 101, 100 Stat. 449, 450 (1986). Then in 2022, President Biden signed into law the Bipartisan Safer Communities Act ("BSCA"). The BSCA broadened the definition of "engaged in the business" by eliminating the requirement that a person's "principal objective" of purchasing and reselling firearms must include both "livelihood and profit," replacing it with a requirement to "predominantly earn a profit." 18 U.S.C. § 921(a)(21)(C). However, the BSCA did not alter FOPA's exclusions for "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.*

On April 19, 2024, ATF promulgated a Final Rule to "provide clarity to persons who remain unsure of whether they are *engaged in the business* as a dealer in firearms with

the *predominant intent* of obtaining pecuniary gain." 89 Fed. Reg. at 28968 (emphasis added). To that end, it clarifies "that firearms dealing may occur wherever, or through whatever medium, qualifying . . . activities are conducted." *Id.* This includes "a gun show or event, flea market, auction house, or gun range or club; at one's home; by mail order; over the internet; [and] through . . . other electronic means (*e.g.*, an online broker, online auction, text messaging service, social media raffle, or website) . . . ." *Id.* at 28973–74. And it clarifies that "a single firearm transaction or *offer* to engage in a transaction" may require a license. *Id.* at 29091 (emphasis added).

Four States, a handful of organizations, and an individual citizen argue that the Final Rule violates the Administrative Procedure Act ("APA") and the Constitution. In their view, the Final Rule is (1) arbitrary and capricious; (2) in excess of ATF's lawful authority; (3) an abuse of ATF's discretion; (4) in contravention of the BSCA; and (5) violative of the Second and Fourth Amendments. *See generally* ECF No. 16. And Plaintiffs aver that they will suffer irreparable harm if the Final Rule takes effect. *Id.* at 2. Defendants respond that (1) Plaintiffs do not have standing, and (2) even if they did, their claims fail on the merits. ECF No. 31 at 25, 36.

On May 9, 2024, Plaintiffs moved for a temporary restraining order ("TRO"). ECF No. 16. After reviewing briefing and conducting a hearing, this Court granted a TRO — but not as to all Plaintiffs. ECF No. 44. Observing that Louisiana, Mississippi, and Utah's demonstration of standing fell short, this Court excluded them from the TRO's reach and ordered supplemental briefing. ECF No. 60. Defendants responded to that supplemental briefing on June 7, 2024. ECF No. 66.

### LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must show (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted;

(3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest. *Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023); *Air Prod. & Chemicals, Inc. v. Gen. Servs. Admin.*, No. 2:23-CV-147-Z, 2023 WL 7272115, at *2 (N.D. Tex. Nov. 2, 2023).

The first two factors are most critical, and the latter two merge when the government is an opposing party. *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020); *Nken v. Holder*, 556 U.S. 418, 435 (2009). That said, no factor has a "fixed quantitative value." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023). On the contrary, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* In sum, "[t]he decision to grant or deny [relief] lies within the sound discretion of the trial court . . . ." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

ANALYSIS

I.     All Plaintiffs have standing.

"Article III standing is a threshold issue." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013). As such, the Court addresses it before moving on to the merits. *See Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 525 (5th Cir. 2008) ("[B]efore considering any other matters raised by the parties, [the Court is] obliged to resolve the standing question as a threshold matter of jurisdiction.") (internal marks omitted).

To have standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). And such an injury must be "concrete, particularized, and actual or imminent . . . ." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008); *Texas v. Biden*, 589 F. Supp. 3d 595, 611 (N.D. Tex. 2022).

### A.  Plaintiff States

Texas, Louisiana, Mississippi, and Utah all plead a "pocketbook injury" — "a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 461 (2017). Each State illustrates that the Final Rule will prohibit otherwise eligible persons from obtaining a Federal Firearms License ("FFL"), thereby reducing total attendance and sales at gun shows. This is not speculative. *See* ECF Nos. 61-1 at 2 (Declaration of Darwin Boedeker) (describing a "30% loss in reservations and attendance at [Boedeker's] shows" and "a loss of about $150,000 over the last six weeks" due to a reduction in "attendance, sales of tables, and people coming to sell" firearms); 37 at 7–8; 59 at 2–3; 62 at 3; 64 at 5–6. Indeed, the Final Rule itself recognizes — and anticipates — this effect. *See* 89 Fed. Reg. at 29054 (providing an estimate "of the proportion of those sellers who are likely to be either unwilling *or unable* to become licensed as an FFL as a result of the [Final Rule]") (emphasis added). And because each State collects a sales tax applicable to gun show admission fees, floor space fees, rental fees, parking fees, and — of course — the sale of firearms, each State will sustain financial losses.[1] ECF Nos. 37 at 7; 59 at 3; 62 at 2; 64 at 5.

Although the foregoing is itself a sufficient injury, the States specify that even taxable gun sales by persons *without* an FFL will be reduced as well. *See* ECF No. 59-1 at 6 ("Many websites allow lawful sales of firearms by persons who are not required to be an FFL."). Those sales are taxed. *See* ECF No. 62-1 at 1–2 ("Internet sellers . . . are required to register to collect Mississippi use tax on behalf of their Mississippi customers."). Louisiana, for example, collects a 4.45 percent sales tax on internet sales, purchases, and trades of firearms. ECF No. 59-1 at 6. As such, the Final Rule injures the States by — at the very least — (1) reducing taxable

---

[1] *See* Taxes — Fairs, Festivals, Markets, and Shows, https://comptroller.texas.gov/taxes/publications/96-211.php#:~:t ext=You%20must%20collect%20sales%20or,tax%20on%20your%20taxable%20sales.

sales by persons *with* FFLs, and (2) reducing taxable sales by persons *without* FFLs. Both results shrink the firearms market, lower attendance at gun shows, and deny the States taxable revenue.

Lastly, traceability and redressability "typically overlap" when a plaintiff challenges government action. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (Kavanaugh, J.). Here, the States establish that the Final Rule will result in losses to State fiscs. *See, e.g.*, ECF Nos. 59-1 at 6 (Declaration of Lucius L. Morris II of the Louisiana Department of Revenue); 62-1 at 1 (Declaration of Gregory I. Duke of the Mississippi Department of Revenue); 61-3 at 2 (Declaration of Murl E. Miller of the Office of the Texas Comptroller). That is a "real, immediate, and direct" injury. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). Moreover, enjoining the Final Rule — a but-for cause of the States' lost revenue — will redress that injury. *See Carpenters Indus. Council v. Zinke*, 854 F.3d at 6 n.1 ("After all, if a government action causes an injury, enjoining the action usually will redress that injury.").

Defendants respond with several arguments. First, they argue that Plaintiff States' pled injuries are foreclosed by *United States v. Texas*, 599 U.S. 670 (2023). But that case merely held that a "State's claim for standing *can* become more attenuated" when it asserts "that a federal law has produced only . . . indirect effects" on "state revenues or state spending." *Texas*, 599 U.S. at 680, n.3 (2023) (emphasis added). "Can" does not mean "does." Rather, *Texas* counsels that — in evaluating standing — a fact-specific, case-by-case inquiry is appropriate. The Supreme Court acknowledged as much about its decision. *See id.* at 683 ("The Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo.").

Defendants next cite *El Paso Cnty, Texas v. Trump* for the proposition that "incidental and attenuated harm" to "general tax revenue" is "insufficient to grant a state or county standing." 982 F.3d 332, 341 (5th Cir. 2020); ECF No. 66 at 10. There, the Fifth Circuit explained that "[a]

direct link, such as the loss of a *specific* tax revenue, is necessary . . . ." *El Paso Cnty.*, 982 F.3d at 340 (emphasis added). But that is what Plaintiff States provide. In line with cases like *Wyoming v. Oklahoma*, they allege "a direct injury in the form of a loss of *specific* tax revenues." 502 U.S. 437, 438 (1992) (emphasis added). Those tax revenues include, first and foremost, the sales and use taxes levied against firearms transactions (both at gun shows and via e-commerce) — but also motor fuels taxes, entertainment taxes, alcoholic beverages taxes, hotel taxes, and more. ECF Nos. 61-3 at 4–5 (Declaration of Murl E. Miller of the Office of the Texas Comptroller); 59-1 at 6 (Declaration of Lucius L. Morris II of the Louisiana Department of Revenue); 62-1 at 1 (Declaration of Gregory I. Duke of the Mississippi Department of Revenue); 64 at 5 (State of Utah's Brief on Standing).

Lastly, Defendants object that Plaintiff Texas's evidence merely suggests "that firearms sales *at certain gun shows* decreased compared to previous shows, which the promoter attributes to vendors' confusion regarding the [Final] Rule's scope." ECF No. 66 at 16 (emphasis in original). As such, the evidence "does not . . . speak to whether the number of firearms *sold in Texas overall* — including by FFLs and unlicensed sellers unimpacted by the Rule — decreased as well." *Id.* (emphasis in original). But how Texas — or any State, entity, or organization — could possibly demonstrate that is unclear. Indeed, the nature of many unlicensed sales is that they go *unreported*. In any event, a demonstration of omniscience is not required for Article III standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about."). Rather, courts "have found standing based on a 'substantial risk' that the harm will occur . . . ." *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2747 (2010)). Plaintiff States meet their burden.

### B. Plaintiff Tormey

Challenging the potential future enforcement of a regulation requires a plaintiff to show (1) "an intention to engage in a course of conduct" that is "arguably proscribed" by the regulation and (2) that "the threat of future enforcement . . . is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014). Tormey is a gun owner who possesses a "large personal collection of firearms" that he "accumulated over many years." ECF No. 53 at 1. He pleads that he has "bought, sold, and traded firearms" and "previously purchased a table at certain gun shows, in order to facilitate enhancing [his] collection." ECF No. 16-3 at 3. He frequently changes the "model of firearm [he] carr[ies] for personal protection" due to the rapid changes in firearms technology. ECF No. 53-1 at 2. And he fears the Final Rule presumes "that much of his perfectly lawful conduct is in fact felonious, foisting on him the burden to prove his innocence for conduct that the statute already expressly declares to be lawful." ECF No. 53 at 2.

In response, Defendants contend that Tormey's intended conduct "does not . . . rise to the level of being 'engaged in the business.'" ECF No. 66 at 20; *see also* Tr. at 36: 18–21 ("[Tormey's conduct] is not the type of conduct that would implicate the [Final Rule] which targets unlicensed individuals engaged in the selling of firearms . . . principally for profit."). In support of that contention, they cite the Final Rule's definition of "engaged in the business": "[a] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." ECF No. 66 at 20 (citing 89 Fed. Reg. at 29091). From that, they conclude that "occasionally sell[ing] a small number of personal-protection firearms to upgrade to newer models do[es] not meet [the] multi-element standard." ECF No. 66 at 21–22.

But for the reasons explained *infra*, the Court disagrees. *See* Part II(A). Moreover, Defendants fail to clarify which element Tormey has not met. Instead, they assure Tormey that "a fact-specific inquiry" governs whether someone is "engaged in the business of dealing." *Id.* at 22. Given Defendants' subsequent reiteration that "a person can be engaged in the business of dealing without necessarily having completed multiple firearms sales," the promise of a "fact-specific inquiry" is cold comfort. *Id.* at 21–22.

Defendants next argue that Tormey fails to illustrate that the "threat of future enforcement" against him is "substantial." *Id.* at 22 (citing *Susan B. Anthony List*, 573 U.S. at 164). But that case "treated the threat of future enforcement as case- and fact-specific, understanding that evaluating threats . . . cannot be neatly reduced to a rigid formula." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 928 (5th Cir. 2023). The Fifth Circuit in *Braidwood* counsels that "even a 'public[] announce[ment]' to enforce a statute and one prior proceeding are sufficient for standing." *Id.* (quoting *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019)). Here, Defendants announced their intent to enforce the Final Rule. ECF No. 37 at 9. And Plaintiffs have identified a prior enforcement proceeding "targeting conduct falling squarely within the [Final] Rule's ambit." *Id.*; *e.g.*, ECF No. 16-4 at 8–9 (Declaration of Erich M. Pratt).

Defendants respond that (1) the identified prior enforcement proceeding "involved very different circumstances than those set forth in Tormey's declarations," and (2) the Fifth Circuit in *Braidwood* only found standing "where there was a prior enforcement action *and* the plaintiffs were unquestionably 'breaking' the agency guidance they were challenging." ECF No. 66 at 23 (emphasis in original). Neither argument succeeds. First, the prior enforcement proceeding involved a man — Mr. Arwady — who voluntarily surrendered his FFL after having been prosecuted by ATF but acquitted on all charges. ECF No. 16-4 at 8. He then "sold those personally

owned firearms to other private parties" to liquidate his collection and recoup his investment. *Id.* In doing so, Mr. Arwady did more than the law required: he paid for a transfer from his local FFL to the buyer's FFL and ensured proper paperwork and background checks for each firearm and buyer, respectively. *Id.* at 9. Nevertheless, ATF charged him with being "engaged in the business" without a license, arrested him, "put him in federal lockup, and seized his lifetime of collected firearms." *Id.* After the government brought the case to trial, the jury unanimously voted — again — to acquit him of all charges. *Id.* As such, Mr. Arwady's case and that of Tormey are relevantly similar in at least three ways: (1) neither held, nor hold, an FFL; (2) both intended, or intend, to sell firearms from a "personal collection"; and (3) Mr. Arwady was charged under — and Tormey challenges — similar "engaged in the business" language. ECF No. 44 at 6.

Second, Defendants misconstrue *Braidwood*. They characterize the Fifth Circuit as having found — via independent factual analysis — that "the plaintiffs were unquestionably 'breaking' the agency guidance they were challenging." ECF No. 66 at 23. Not quite. The court in *Braidwood* merely recognized that the plaintiffs "*admit* they are breaking [the] guidance" and "posit statutory . . . issues with the laws under which they are *at risk* of being prosecuted." *Braidwood*, 70 F.4th at 926 (emphasis added). But even if the *Braidwood* court had made such a finding, the opinion nowhere suggests that the "threat of enforcement" analysis *requires* this Court to find an actual violation. It suffices that the threat against Tormey is "substantial." *Susan B. Anthony List*, 573 U.S. at 164. And Defendants do not deny — nor could they — that such an enforcement would result in irreparable injury if it occurred.

### C. Plaintiff Organizations

Under the doctrine of associational standing, an association may bring suit on behalf of its members when (1) those members would otherwise have standing to sue; (2) the interests it seeks

to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. Appx. 189, 195 (5th Cir. 2012) (citing *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010)).

Here, three organizations (GOA, TFA, and VCDL) count Tormey — who has standing — as a member. ECF No.16-3 at 2. Moreover, TFA and VCDL have provided declarations evidencing that they have specific members "who will be impacted [by the Final Rule] because they have . . . bought and resold firearms, and wish to do so in the future without being improperly labeled as a 'dealer' in firearms." ECF No. 16-5 at 3 (Declaration of C. Richard Archie); ECF No. 16-6 at 3–4 (Declaration of Philip Van Cleave). The same holds true for GOF. *See* ECF No. 16-4 at 4 (Declaration of Erich M. Pratt). And the GOA describes a former FFL whose retirement savings are now frozen in unsellable inventory. ECF Nos. 37 at 11; 16-4 at 8.

Defendants respond that GOF "is not the sort of membership organization that can invoke such standing in the first place." ECF No. 66 at 24–25. And indeed, "a non-membership organization . . . cannot contend that it has associational standing." *Vote.org v. Callanen*, 39 F.4th 297, 303 n.2 (5th Cir. 2022). However, an association without traditional members may establish standing "by proving that it has 'indicia of membership' . . . ." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977)); *see also Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 435 (D.C. Cir. 2002) ("In determining whether an organization that has no members in the traditional sense may nonetheless assert associational standing, the question is whether the organization is the functional equivalent of a traditional membership organization.").

As described in Plaintiffs' Complaint, GOF is "a nonprofit legal defense and educational foundation" that is "supported by gun owners across the country." ECF No. 1 at 4. It litigates cases "throughout the country on behalf of [its] members and supporters." ECF No. 56 at 4. GOF members receive information about its activities through a quarterly newsletter and regular emails about its activities. *Id.* at 3. They regularly communicate their views to GOF about issues on which GOF should focus. *Id.* And they voluntarily fund GOF. *Id.* Indeed, because GOF is a nonprofit organization, it receives *all* its funding from supporters. *Id.* The foregoing, together, suffice for GOF's associational standing. *See Funeral Consumers All.*, 695 F.3d at 344 n.9 ("The organization must represent the individuals it claims as members and provide 'the means by which [those individuals] express their collective views and protect their collective interests.'") (quoting *Hunt*, 432 U.S. at 345); *see also id.* (recognizing that "financ[ing] the organization's activities, including the case's litigation costs" constitutes an "indicia of membership").

Defendants next argue that the organizations must identify their members by *name* to have associational standing. *See* ECF No. 31 at 33 ("[The organizational Plaintiffs] cannot establish standing based on an unnamed member."). But Defendants' purported support, *Summers v. Earth Island Institute*, did not consider impermissible reliance on anonymous or pseudonymous declarations to establish standing.[2] 555 U.S. 488, 495 (2009). Rather, it considered the plaintiffs' failure "to allege that *any* particular . . . sale or other project claimed to be unlawfully subject to the regulations [would] impede a specific and concrete plan" of the plaintiffs. *Id.* (emphasis in original). Nor has the Supreme Court adopted a "naming requirement" — such as the one proposed by Defendants — in the wake of *Summers. See, e.g., Students for Fair Admissions, Inc. v. Harvard*,

---

[2] The Tenth Circuit recognized that "[a]nonymity was not even an issue before the Supreme Court in *Summers*." *Speech First, Inc. v. Shrum,* 92 F.4th 947, 949 (10th Cir. 2024). "Although one might read language in that opinion to require that only persons identified by their legal names can have standing, that was clearly not the intent of the Court." *Id.* "The opinion provided no hint, much less an emphatic statement, that it was abrogating decades of precedent." *Id.*

600 U.S. 181, 200–01 (2023) (holding that an organization had standing "when it filed suit" where it "identified" individual harmed members but did not provide their names).

Moreover, Defendants may be correct that some other Circuits require a named member. *See* ECF No. 66 at 25 (arguing that cases from the First, Second, and Sixth Circuits establish that unnamed members are insufficient for associational standing). But this Circuit does not. *See, e.g.*, *Hancock Cnty. Bd. of Sup'rs,* 487 F. Appx. at 195 (upholding the use of anonymous declarations); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (accepting anonymous declarations); *Chamber of Com. of U.S.A. v. Consumer Fin. Prot. Bureau*, No. 6:22-CV-00381, 2023 WL 5835951, at *6 (E.D. Tex. Sept. 8, 2023) ("[D]efendants argue that no plaintiff has shown that an 'identified member' suffers harm because some plaintiffs have used pseudonyms . . . . That argument fails."); *id.* (finding that anonymous declarations "credibly show that plaintiffs have identified members . . . currently suffering cognizable harm").

Lastly, Defendants argue that, "[r]ather than providing declarations from members themselves, the organizations each filed a supplemental declaration from one of its leaders" that merely "summarizes statements made by other non-declarants . . . who purportedly 'fear' that the [Final] Rule will affect them in some way." ECF No. 66 at 25. This objection fails for two reasons. First, it is factually inaccurate. In TFA's case, for example, it filed a declaration from C. Richard Archie, who is both a director *and a member* of the TFA. *See* ECF No. 54-1 at 1 ("I make these statements in my capacity as a director of the [TFA], *of which I am also a member*.") (emphasis added). As with many organizations of this sort, there is no expectation that a leader will not also be a member — if anything, the opposite assumption holds. Second, the declarations provide concreteness and detail, not mere fears that the Final Rule will affect the declarants in *some* way. *See, e.g.*, *id.* at 4–5 (explaining that the Final Rule's examples, exceptions, and presumptions make

13

it unclear how personal collections of firearms will be treated, thereby discouraging the altering, amending, improving, or selling of parts of the collection); 55-1 at 2 (describing a gun owner's concern that selling firearms from his personal collection will require him "to rebut th[e] presumption" of having an "intent to predominantly earn a profit," pursuant to 89 Fed. Reg. at 29091); 57-1 at 2.

The foregoing analyses establish that all Plaintiffs — the States, Tormey, and the firearm organizations — have standing. Having addressed that "threshold inquiry," this Court now moves to the merits analysis. *See Cibolo Waste, Inc.*, 718 F.3d at 473.

## II.    Plaintiffs are substantially likely to prevail on their APA claim.

Judicial review under the APA is limited to the administrative record. 5 U.S.C. § 706. "[A]gencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions." *Clean Water Action v. U.S. Env't Prot. Agency*, 936 F.3d 308, 313 n.10 (5th Cir. 2019); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). As such, courts are compelled to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority . . . ." 5 U.S.C. § 706(2)(A), (C).

The "arbitrary and capricious" standard asks a court to consider whether the agency "has relied on factors which Congress has not intended . . . , entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence[,]" or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

14

As this is a question of statutory interpretation, the Court begins with the text. *United States v. Lauderdale Cnty., Miss.*, 914 F.3d 960, 961 (5th Cir. 2019); *Air Prod. & Chemicals, Inc. v. Gen. Servs. Admin.*, No. 2:23-CV-147-Z, 2023 WL 7272115, at *7 (N.D. Tex. Nov. 2, 2023). Here, the Final Rule clashes with the text of the BSCA in at least three ways. First, it asserts that there is no "minimum number of firearms to actually be sold to be 'engaged in the business'" for the purposes of the licensing requirement. 89 Fed. Reg. at 29021. "[A] single firearm transaction" — or even a mere *offer* to engage in a transaction — may suffice. *Id.* at 28976.

> [W]hile selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity, neither the courts nor the Department have recognized a set minimum number of firearms purchased or resold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. *Even a single firearm transaction*, or offer to engage in a transaction, when combined with other evidence, *may be sufficient to require a license*.

89 Fed. Reg. at 28976 (emphasis added).

But the BSCA says otherwise:

The term "engaged in the business" means . . .

***

> as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through *the repetitive purchase and resale of firearms*, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C) (emphasis added).

Defendants' proffered interpretation is severely undercut by Section 921(a)(21)(C)'s use of (1) "firearms," in the plural; (2) the phrase "regular course," clearly contemplating a series of events; (3) "repetitive," meaning more than once; and (4) the Section's exemption of "sales,

exchanges, or purchases" in the plural. 18 U.S.C. § 921(a)(21)(C). So too does Section 921(a)(21)(C) require the "purchase *and* resale" of firearms — a conjunctive requirement that flatly contradicts Defendants' assertion that "there is no minimum threshold number of firearms purchased *or* sold that triggers the licensing requirement." 89 Fed. Reg. at 29091 (emphasis added).

Second, the Final Rule suggests that "actual profit is not a requirement of the statute — it is only the predominant *intent* to earn a profit through the repetitive purchase and resale of firearms that is required." *Id.* at 29045. In other words, "a person may repeatedly advertise and display firearms for sale, and therefore demonstrate a predominant intent to earn a profit from repeatedly reselling the firearms purchased, but never actually find a buyer." *Id.* But Section (a)(22) of the BSCA provides:

> The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for *criminal purposes or terrorism*.

18 U.S.C § 921(a)(22) (emphasis added).

The negative corollary is obvious: while proof of profit is *not* required "for criminal purposes or terrorism," it *is* required for all other cases. *See Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 694 (5th Cir. 2020) ("[T]he canon of *Expressio Unius Est Exclusio Alterius* . . . provides that expressing one item of [an] associated group or series excludes another left unmentioned.") (internal marks omitted). Moreover, the mere fact that the word "intent" appears in the Section does not necessitate — or even suggest — that intent is *all* that is required. Rather, the Section's usage of "intent" serves to distinguish the *type* of intent contemplated: "one of obtaining pecuniary gain." 18 U.S.C § 921(a)(22). Action is needed, too.

Third, the Final Rule arbitrarily eviscerates Section 921(a)(21)(C)'s safe harbor provision.[3] That provision reads:

> The term "engaged in the business" . . . shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C). Nothing in the foregoing text suggests that the term "personal collection" does not include firearms accumulated primarily for personal protection — yet that is exactly what the Final Rule asserts. *See* 89 Fed. Reg. at 29090 ("[T]he term [personal collection] shall not include firearms accumulated . . . for personal protection[.]"). Nor can Defendants' position be supported by its *own* interpretative policy of implementing terms' "common meaning." *See id.* at 28974 ("This definition is consistent with the common meaning of 'purchase,' . . . . This definition is consistent with the common meaning of 'sale[.]'"). Here, Plaintiffs' reading of the Section 921(a)(21)(C) terminology "personal collection" is more consonant with "common meaning." *See Collection*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) ("[A] number of objects or persons or a quantity of a substance that has been collected or has collected often according to some unifying principle . . . ."); *see also Collection*, WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY (1940) ("That which is collected; as: a gathering or assemblage of objects or of persons; an accumulation of specimens of a certain class . . . .").

Yet Defendants maintain their interpretation despite acknowledging that "two-thirds of Americans report owning firearms primarily for 'defense' or 'protection'" — thereby necessitating the absurdity that the statute's safe harbor provision provides *no safe harbor at all* for the majority

---

[3] Defendants themselves recognize the accuracy of the phrase "safe harbor provision" and utilize it several times throughout the Final Rule. *See, e.g.*, 89 Fed. Reg. at 29025 ("The proposed rule explicitly recognized the GCA's 'safe harbor' provision that a person is not engaged in the business if the person makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby.").

of gun owners. 89 Fed. Reg. at 29036. Such an interpretation is untenable given the provision's logical statutory role. *See* A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012) ("[T]he whole-text canon . . . calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical *and logical relation of its many parts*," as "[t]he entirety of the document thus provides the context for each of its parts.") (emphasis added); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (holding that courts must look to "the language and design of the statute as a whole"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a[] harmonious whole.").

Lastly, the Final Rule creates sets of presumptions indicating (1) "when a person has the intent to 'predominantly earn a profit'" and (2) "that someone is 'engaged in the business.'" 89 Fed. Reg. at 28968–69. But these presumptions are highly problematic for at least two reasons. First, they flip the statute on its head by requiring that firearm owners prove innocence rather than the government prove guilt. *See id.* at 29024 ("[T]he presumptions are rebuttable, so in the event a civil or administrative proceeding is brought, and a presumption is raised, *it can be rebutted with reliable evidence to the contrary*.") (emphasis added). Second, several presumptions conflict with the statutory text. Two of them, for example, provide that a person is presumptively "engaged in the business" if he "demonstrates a willingness and ability to purchase and resell" firearms or "purchases . . . *or* . . . resells" firearms. *Id.* at 29091 (emphasis added). But as discussed *supra*, a mere willingness is not enough — there must also be prohibited acts. *See* 18 U.S.C. § 921(a)(21)(C) ("through the *repetitive purchase and resale of firearms*") (emphasis added). Nor is purchasing *or* reselling sufficient — the statute provides a conjunctive. *See id.* ("purchas[ing] *and* res[elling]") (emphasis added).

18

Plaintiffs understandably fear that these presumptions will trigger civil or criminal penalties for conduct deemed lawful just yesterday. Nevertheless, ATF avers that its "knowledge of existing case law" and "subject-matter expertise" will prevent misuse or abuse of the presumptions. 89 Fed. Reg. at 28975. In other words, "just trust us." But "[p]resumptions, especially in administrative proceedings that may generate institution-destroying liability, cannot be a matter of Department *ipse dixit*." *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 251 (5th Cir. 2024). As such, Defendants' assurances fall short.

For the foregoing reasons, Plaintiffs are substantially likely to succeed on the merits of their APA claim. Accordingly, further analysis of their other claims — including their constitutional ones — is unnecessary at this time. *See VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 659 F. Supp. 3d 736, 741 (N.D. Tex. 2023) ("To obtain a preliminary injunction, . . . movants must show that they are likely to succeed on the merits of *at least one* of their claims.") (emphasis added); *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). "The Court defers ruling on the remaining Counts, which should not be construed as an indication of the Court's view of their merits." *Texas v. United States*, 515 F. Supp. 3d 627, 632 (S.D. Tex. 2021).

### III.   Plaintiffs face irreparable injury and are favored by the equities and public interest.

"In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 348 (5th Cir. 2022); *VanDerStok v. Garland*, 625 F. Supp. 3d 570, 582 (N.D. Tex. 2022). Irreparable harm must also be concrete, non-speculative, and more than *de minimis*. *Daniels Health Scis., L.L.C.*, 710 F.3d at 586. Lastly, "[t]he government's and the public's interests merge when the government is a party." *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023).

19

That Plaintiffs would suffer irreparable injury absent an injunction is hard to dispute. Plaintiff States face the irreparable injury of revenue loss. *Wages & White Lion Invs.*, 16 F.4th 1130, 1142 (5th Cir. 2021). The particular amount of that revenue loss is of limited relevance. *See Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) ("In determining whether costs are irreparable, the key inquiry is 'not so much the magnitude but the irreparability.'") (quoting *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016)). Indeed, "[e]ven purely economic costs may count as irreparable harm 'where they cannot be recovered in the ordinary course of litigation.'" *Id.* (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Other Plaintiffs face both civil and criminal enforcement actions for engaging in conduct that the BSCA permits but the Final Rule impermissibly forbids. They cannot engage in lawful, noncommercial conduct without fear of prosecution. They cannot collect firearms for personal defense while enjoying statutory protection. Nor can they dispose of firearms from their personal collections for fear of being presumed "engaged in the business." ECF No. 16 at 43. And Plaintiffs' monetary costs — as well as those accrued by persons seeking licensure to avoid liability — "are unrecoverable because of the government–defendant's sovereign immunity from monetary damages[.]" *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:23-CV-1471-L, 2024 WL 1349307, at *9 (N.D. Tex. Mar. 29, 2024); *see also Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs[.]")

Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021). And as this Court's analysis makes clear, Defendants' Final Rule is almost certainly violative of — at the least — the APA. As such, "both

the balance of equities and the public interest weigh in favor of allowing orderly judicial review of the Rule before anyone shuts down their businesses or sends them to jail." *VanDerStok v. Garland*, 2023 U.S. App. LEXIS 26499, at *6 (5th Cir. Oct. 2, 2023).

CONCLUSION

Plaintiffs' Motion for a preliminary injunction is **GRANTED**. Defendants are hereby **ENJOINED** from enforcing the regulations — "Definition of 'Engaged in the Business' as a Dealer in Firearms" — published at 89 Fed. Reg. 28968 (April 19, 2024) (to be codified at 27 C.F.R. pt. 478) against all Plaintiffs pending the resolution of this lawsuit.

**SO ORDERED**.

June 11, 2024

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE