UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE,<br><br>            *Plaintiffs,*<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF,<br><br>            *Defendants.* | CIVIL ACTION NO.2:24-cv-00089-Z |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Index of Authorities ........................................................................................................ iv

Introduction .......................................................................................................................1

Background .......................................................................................................................2

   I.    Statutory History. ................................................................................................ 2

   II.   Enactment of the Bipartisan Safer Communities Act. ...................................... 4

   III.  The Rule. ............................................................................................................ 4

   IV.  This Case. ...........................................................................................................5

Standard ...........................................................................................................................7

Argument ..........................................................................................................................7

   I.    Plaintiffs have standing. ......................................................................................7

      A.   Tormey Has Standing. ................................................................................. 8

      B.   GOA Has Standing. ..................................................................................... 9

      C.   GOF Has Standing....................................................................................10

      D.   TFA Has Standing. .................................................................................... 11

      E.   VCDL Has Standing. ................................................................................ 11

      F.   Texas, Louisiana, Mississippi, and Utah Have Standing.........................12

   II.   The rule violates the administrative procedure act. ....................................... 13

      A.   The Rule Is Contrary to the Statute and Therefore Exceeds Statutory Authority...................................................................................................... 13

        i.   The Rule Contravenes the Statutory Requirement that "Engaging in the Business" Comprises Multiple Purchases and Resales. .........................14

        ii.   The Rule Contravenes the Statutory Requirement that "Engaging in the Business" Requires Earning Profit. ...................................................... 20

        iii.  The Rule's Contrived "Former Licensee Inventory" Edicts Violate the Statute. ................................................................................................ 22

        iv.  The Rule Eviscerates the Statute's Safe Harbor. .................................. 26

        v.   ATF May Not Redefine What Congress Has Defined. ........................... 30

        vi.  ATF May Not Define Simple, Unambiguous Statutory Words. ...............31

B.    The Final Rule's "Presumptions" Conflict with the Statute, Are Arbitrary and Capricious, Constitute an Abuse of Discretion, and Are Not in Accordance with Law..................................................................32

C.    The Rule of Lenity Resolves Any Lingering Ambiguity in Favor of Plaintiffs..........36

III.    The rule violates the Private Plaintiffs' constitutional rights .......................................38

A.    The Rule Violates the Second Amendment...............................................................38

i.    The Rule Regulates Conduct Presumptively Protected by the Second Amendment. ............................................................................................39

ii.    The Founders Never Required Licensure for Private Citizens to Engage in Private, Noncommercial Sales of Personal Firearms. ..........................................42

B.    The Rule Violates the Fourth Amendment. ..............................................................43

C.    The Rule Is Void for Vagueness, in Violation of the Fifth Amendment....................45

D.    The Rule Violates the Contitutional Separation of Powers. .....................................48

Conclusion .................................................................................................................................. 49

# INDEX OF AUTHORITIES

**Cases**

*ACLU v. FCC,*
   823 F.2d 1554 (D.C. Cir. 1987) ........................................................................ 30, 31

*Adams Fruit Co. v. Barrett,*
   494 U.S. 638 (1990) ............................................................................................ 30

*Amazon.com, Inc. v. Comm'r,*
   934 F.3d 976 (9th Cir. 2019) ............................................................................ 32

*Andrews v. State,*
   50 Tenn. 165 (Tenn. 1871) ................................................................................ 40

*Blue Ocean Inst. v. Gutierrez,*
   585 F. Supp. 2d 36 (D.D.C. 2008) ...................................................................... 7

*BP Am. Prod. Co. v. Burton,*
   549 U.S. 84 (2006) ............................................................................................. 15

*Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.,*
   98 F.4th 220 (5th Cir. 2024) ................................................................ 33, 34, 48

*Cargill v. Garland,*
   57 F.4th 447 (5th Cir. 2023), aff'd, Garland v. Cargill, 602 U.S. 406 (2024) ...................... 36

*Chem. Mfrs. Ass'n v. DOT,*
   105 F.3d 702 (D.C. Cir. 1997) .......................................................................... 36

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) .......................................................................................... 13

*City of Los Angeles v. Patel,*
   576 U.S. 409 (2015) .......................................................................................... 44

*Clark v. Scouffas,*
   2000 U.S. Dist. LEXIS 633 (N.D. Ill. Jan. 18, 2000) .................................. 22, 23

*Connecticut Nat'l Bank v. Germain,*
   503 U.S. 249 (1992) .......................................................................................... 32

*Crandon v. United States,*
   494 U.S. 152 (1990) .......................................................................................... 38

*Data Mktg. P'ship, LP v. United States DOL,*
   45 F.4th 846 (5th Cir. 2022) ............................................................................... 7

*Deville v. Marcantel,*
   567 F.3d 156 (5th Cir. 2009) .............................................................................. 7

*Dig. Realty Trust, Inc. v. Somers,*
   583 U.S. 149 (2018) .......................................................................................... 30

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................................................39, 40, 41

*District of Columbia v. Heller,*
    No. 07-290 (Feb. 11, 2008) ...................................................45

*El Paso Elec. Co. v. FERC,*
    76 F.4th 352 (5th Cir. 2023) ................................................34

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) .............................................................23

*Ex parte Uniroyal Tire Co.,*
    779 So. 2d 227 (Ala. 2000) ..................................................17

*Exela Enter. Solutions, Inc. v. NLRB,*
    32 F.4th 436 (5th Cir. 2022) ................................................33

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) .............................................................13

*Florida v. Becerra,*
    544 F. Supp. 3d 1241 (M.D. Fla. 2021) ..............................12

*Florida v. Jardines,*
    569 U.S. 1 (2013) ..................................................................44

*Forrest Gen. Hosp. v. Azar,*
    926 F.3d 221 (5th Cir. 2019) ...............................................13

*Fouts v. Bonta,*
    2024 U.S. Dist. LEXIS 31528 (S.D. Cal. Feb. 23, 2024) ....41

*Gardner v. Grandolsky,*
    585 F.3d 786 (3d Cir. 2009) ................................................31

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) .............................................................48

*Hoffman Estates v. Flipside, Hoffman Estates,*
    455 U.S. 489 (1982) .............................................................37

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ...............................................................9

*Inhance Techs., L.L.C. v. U.S. EPA,*
    96 F.4th 888 (5th Cir. 2024) ...............................................13

*Jackson v. City & County of San Francisco,*
    576 U.S. 1013 (2015) ...........................................................42

*Johnson v. United States,*
    576 U.S. 591 (2015) .............................................................48

*Kaneshiro v. United States*,
  445 F.2d 1266 (9th Cir. 1971) ................................................................................ 2

*Katz v. United States*,
  389 U.S. 347 (1967) ............................................................................................... 43

*Kisor v. Wilkie*,
  588 U.S. 558 (2019) ............................................................................................... 36

*Kolender v. Lawson*,
  461 U.S. 352 (1983) ............................................................................................... 47

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ............................................................................................... 13

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004) ................................................................................................... 38

*Licon v. Ledezma*,
  638 F.3d 1303 (10th Cir. 2011) ............................................................................. 31

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ...................................................................................... 7, 37

*Louisiana v. Biden*,
  No. 2:24-CV-00406, 2024 U.S. Dist. LEXIS 115999 (W.D. La. 2024) ................. 12

*Luis v. United States*,
  578 U.S. 5 (2016) ................................................................................................... 39

*Maralex Res., Inc. v. Barnhardt*,
  913 F.3d 1189 (10th Cir. 2019) ............................................................................. 30

*Maryland v. EPA*,
  958 F.3d 1185 (D.C. Cir. 2020) ............................................................................. 48

*McRorey v. Garland*,
  99 F.4th 831 (5th Cir. 2024) ................................................................................. 40

*Minnesota v. Carter*,
  525 U.S. 83 (1998) ................................................................................................. 44

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ........................................................................................... passim

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
  2024 U.S. Dist. LEXIS 131012 (N.D. Tex. July 23, 2024) ................................... 38

*Nat'l Rifle Ass'n v. Brady*,
  914 F.2d 475 (4th Cir. 1990) ................................................................................. 31

*Natl. Infusion Ctr. Assn. v. Becerra*,
  116 F.4th 488 (5th Cir. 2024) ............................................................................... 13

*New York v. Yellen,*
    15 F.4th 569 (2d Cir. 2021) ...................................................................12

*Nguyen v. Bonta,*
    2024 U.S. Dist. LEXIS 45512 (S.D. Cal. Mar. 11, 2024) ...........................39

*NRDC v. Nat'l Highway Traffic Safety Admin.,*
    894 F.3d 95 (2d. Cir. 2018) ..................................................................13

*Republic Aviation Corp. v. NLRB,*
    324 US 793 (1945) .............................................................................34

*Rest. Law Ctr. v. United States DOL,*
    2024 U.S. App. LEXIS 21449, *15 (5th Cir. 2024).........................30, 41

*Rigby v. Jennings,*
    630 F. Supp. 3d 602 (D. Del. 2022) .....................................................41

*Sessions v. Dimaya,*
    584 U.S. 148 (2018) ............................................................................ 48

*Shell Offshore Inc. v. Babbitt,*
    238 F.3d 622 (5th Cir. 2001)..................................................................7

*Six Dimensions, Inc. v. Perficient, Inc.,*
    969 F.3d 219 (5th Cir. 2020) ..................................................................7

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ................................................................. 8

*Stenberg v. Carhart,*
    530 U.S. 914, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000) ...................... 30

*Tex. Med. Ass'n v. HHS,*
    587 F. Supp. 3d 528 (E.D. Tex. 2022) .................................................. 24

*Texaco Inc. v. Duhe,*
    274 F.3d 911 (5th Cir. 2001).................................................................. 24

*Texas v. Rettig,*
    987 F.3d 518 (5th Cir. 2021) ........................................................... 8, 9

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021)..............................................................................12

*Trout Point Lodge, Ltd. v. Handshoe,*
    729 F.3d 481 (5th Cir. 2013) ................................................................32

*United States v. Belmont,*
    831 F.3d 1098 (8th Cir. 2016) ..............................................................16

*United States v. Biswell,*
    406 U.S. 311 (1972) .............................................................................45

*United States v. Brenner*,
    481 F. App'x 124 (5th Cir. 2012) .........................................................................32

*United States v. Davis*,
    588 U.S. 445 (2019) ...............................................................................45, 48, 49

*United States v. Duffey*,
    92 F.4th 304 (5th Cir. 2024) ...............................................................................15

*United States v. Flores*,
    652 F. Supp. 3d 796 n.14 (S.D. Tex. Jan. 23, 2023) ...........................................22

*United States v. Gross*,
    313 F. Supp. 1330 (S.D. Ind. 1970) .......................................................................2

*United States v. Gross*,
    451 F.2d 1355 (7th Cir. 1971) .............................................................................17

*United States v. Hicks*,
    649 F. Supp. 3d 357 (W.D. Tex. 2023) ...........................................................39, 41

*United States v. Idarecis*,
    1998 U.S. App. LEXIS 25991 (2d Cir. 1998) .......................................................29

*United States v. King*,
    735 F.3d 1098 (9th Cir. 2013) .............................................................................16

*United States v. Marzzarella*,
    614 F.3d 85 n.8 (3d Cir. 2010) ............................................................................41

*United States v. Nadirashvili*,
    655 F.3d 114 (2d Cir. 2011) ................................................................................16

*United States v. Pulungan*,
    569 F.3d 326 (7th Cir. 2009) ...............................................................................47

*United States v. Rahimi*,
    144 S. Ct. 1889 (2024) .............................................................................39, 41, 42

*United States v. Rahimi*,
    61 F.4th 443 n.5 ..................................................................................................41

*United States v. Shirling*,
    572 F.2d 532 (5th Cir. 1978) ...........................................................................18, 22

*United States v. Strunk*,
    551 F. App'x 245 (5th Cir. 2014) ........................................................................22

*United States v. Tarr*,
    589 F.2d 55 (1st Cir. 1978) .................................................................................16

*United States v. Thompson/Ctr. Arms Co.*,
    504 U.S. 505 n.10 (1992) ....................................................................................38

*United States v. Tyson,*
653 F.3d 192 (3d Cir. 2011) ....................................................................20, 21

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014)...............................................................13, 21, 24, 37

*Util. Solid Waste Activities Grp. v. EPA,*
2001 U.S. App. LEXIS 1187 (D.C. Cir. 2001) ...................................... 13

*VanDerStok v. Garland,*
86 F.4th 179 n.26 (5th Cir. 2023)..........................................30, 38, 46, 48

*Wages & White Lion Invs., L.L.C. v. FDA,*
16 F.4th 1130 (5th Cir. 2021) ...............................................................23

*Wis. Cent. Ltd. v. United States,*
585 U.S. 274 (2018) ..............................................................................49

*Wyoming v. Oklahoma,*
502 U.S. 437 (1992)...............................................................................12

**Constitutional Provisions & Statutes**

5 U.S.C.

§ 706 ...................................................................................................31

§ 706(2)(A) ...........................................................................................7

18 U.S.C.

§ 921 ...................................................................................................33

§ 921(a) ..............................................................................................30

§ 921(a)(3) ..........................................................................................29

§ 921(a)(11) ...................................................................................16, 30

§ 921(a)(13) ...................................................................................28, 29

§ 921(a)(21) ...............................................................................16, 21, 26

§ 921(a)(21)(C) .............................................................................. passim

§ 921(a)(22) ................................................................................... passim

§ 922(a)(1)(A) ....................................................................................22, 23

§ 922(g)(8) ..........................................................................................42

§ 923(c) ..........................................................................................22, 24

§ 923(g)(1)(A) .....................................................................................23

§ 923(j) ...............................................................................................31

§ 926(a) ...............................................................................23, 30, 33, 35

§ 1466.................................................................................................33

§ 1466 ...................................................................................................................33

§ 1469(a) .............................................................................................................33

§ 3142(e)(2) .........................................................................................................33

35 U.S.C. § 282(a) .................................................................................................33

38 U.S.C. § 1118 ...................................................................................................33

**Rules & Regulations**

27 C.F.R. § 478.23(b) ............................................................................................43

27 CFR § 478.11 ................................................................................................... 29

51 Fed. Reg. 39612 (Oct. 29, 1986) ....................................................................... 4

Fed. R. Civ. P. 56(a) ...............................................................................................7

53 Fed. Reg. 10480 (Mar. 31, 1988) ...................................................................... 4

53 Fed. Reg. 10480 (Mar. 31, 1998) .....................................................................33

89 Fed. Reg. 28968 (Apr. 19, 2024) .............................................................. passim

**Other Authorities**

Firearms Owners' Protection Act of 1986, Pub. L. No. 99-308, § 1, 100 Stat. 449, 449 .............. 28

## INTRODUCTION

Although purporting to update federal regulations to align with recently amended federal firearms statutes, a rule promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on April 19, 2024, entitled "Definition of 'Engaged in the Business' as a Dealer in Firearms" ("Rule"), 89 Fed. Reg. 28968, goes far beyond the subtle change Congress made to the law in the 2022 Bipartisan Safer Communities Act ("BSCA"). Instead, under the guise of "clarify[ing]" existing statutes, the Rule redefines the landscape of American gun ownership, seeking to radically expand Congress's definition of who is considered to be "engaged in the business" of dealing in firearms. Stretching the modest language adjustments made by Congress, the Rule purports to craft new definitions for terms Congress already defined, establish vague new standards in direct conflict with the unambiguous statutory text, and subject hundreds of thousands of law-abiding gun owners to *presumptions of criminal guilt* for all manner of innocuous activities related to the statutorily authorized and constitutionally protected private sale of firearms. This sweeping reinterpretation of well-settled statutory definitions will turn everyday gun owners into arms dealers overnight.

Indeed, the Rule establishes a broad and ambiguous framework that potentially classifies ordinary individuals as firearm dealers if they engage in even minimal activities such as selling a single firearm, advertising sales informally, or documenting transactions through personal recordkeeping. This expansive interpretation not only stretches the statutory language beyond its reasonable bounds, but also it imposes severe civil, administrative, and criminal penalties on individuals without providing clear, objective criteria for compliance. The Rule does not represent reasoned (much less lawful) decision-making. To the contrary, it is no more than an agency power-grab, attempting to severely restrict private firearms transactions – effectively creating a de facto national gun registry by implementing something like a universal background check – mandating that individuals wishing to sell almost any firearm, for any reason, must obtain an FFL. This Court previously enjoined the Rule, which should now be vacated.

## BACKGROUND

### I.    STATUTORY HISTORY.

Historically, the Federal Firearms Act of 1938 ("FFA") defined "dealer" to mean "any person engaged in the business of selling firearms or ammunition...."[1] In one of the only cases to interpret that phrase under the FFA, the Ninth Circuit discussed "shipment of guns to Tokyo," noting that the "guns were sold in two separate installments to two different people" and that the defendants "procure[d] . . . possible buyers for the guns," which supported a "finding that appellants were 'engaged in the business of selling firearms'....'" *Kaneshiro v. United States*, 445 F.2d 1266, 1270 (9th Cir. 1971). Congress later repealed the FFA, finding that "it had not provided adequate license fees or proper standards for the granting or denial of licenses and that this had led to licenses being issued to unqualified persons." *United States v. Gross*, 313 F. Supp. 1330, 1332 (S.D. Ind. 1970). Yet in recodifying the Act's definition of "dealer" into the new Gun Control Act of 1968 ("GCA"), Congress defined the term "in somewhat the same manner" as before. *See* U.S. Code, Cong. & Admin. News, 90th Cong., 2d Sess., 1968, Vol. 2, p. 2201.[2]

Thus, Congress defined "dealer" in the GCA to mean "any person engaged in the business of selling firearms or ammunition at wholesale or retail" but, like in the FFA, did not further define the phrase "engaged in the business." That determination was left, for a time, to judicial interpretation, which resulted in varying holdings. For example, the district court in *Gross* held the definition required "no minimum number of sales, dollar volume of sales, or number of employees" to be considered "engaged in the business," but that "'dealer' means one that is engaged in *any* business of selling, repairing or pawning firearms . . . which occupies the time, attention and labor of men for the purpose of livelihood or profit." *Gross*, 313 F. Supp. at 1333.

In 1979, ATF issued a notice of proposed rulemaking which proposed to define "engaged in the business," on the theory that the phrase was "not defined in the law or the regulations." *See* 44 Fed. Reg 75186, Advance Notice of Proposed Rulemaking (Dec. 19, 1979). Even so, ATF

---

[1] Pub. L . §52 Ch. 850 1250-1252 (1938), https://tinyurl.com/2xeccfu4.
[2] 1968 U.S.C.C.A.N. 2112, https://tinyurl.com/4hp9yaxw.

acknowledged that "courts have continually found that the current situation is adequate for enforcement purposes…." *Id.* at 75187. Ultimately, no action was taken, as ATF decided not to define the phrase "engaged in the business" at that time.

In 1986, the McClure-Volkmer Firearms Owners' Protection Act ("FOPA"), Pub. L. No. 99- 308, 100 Stat. 449, added a statutory definition of "engaged in the business":

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

FOPA further defined "with the principal objective of livelihood and profit" to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." FOPA was amended soon after, clarifying that "proof of profit" was not required "as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 (1986).

As the Senate Committee on the Judiciary reported regarding the "engaged in the business" definition contained in the bill that would eventually become FOPA, "[l]ower courts have applied two different, but similar tests for 'engaging in the business.' Neither is especially clear, and both can be applied to a hobbyist to whom profit is a secondary objective." *See* 98th Congress, 2d Sess., Report 98-583 at 9, Aug. 8, 1984. After laying out those two judicially created tests, the report explained that Congress' intent was to "*substantially narrow* these broad parameters by requiring that the person undertake such activities as part of a 'regular course of trade or business with the principal objective of livelihood and profit.'" *Id.* (emphasis added) (expressing Congress's intent to avoid past situations where "hobbyists have been charged and convicted for technically violating the broad reading which courts have given this phrase").

On October 29, 1986, ATF adopted a Temporary Rule to implement FOPA, and invited comments. Commerce in Firearms and Ammunition; Temporary Rule, 51 Fed. Reg. 39612 (Oct.

29, 1986) Under the Temporary Rule, the phrase "engaged in the business" was defined to mirror FOPA's statutory language. On March 31, 1988, ATF adopted the regulatory definitions with no changes. *See* Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480 (Mar. 31, 1988) (to be codified at 27 C.F.R pts. 72, 178 and 179). Importantly here, as to the definition of "engaged in the business," a commenter had requested "the definition list examples illustrating when a license is required," but ATF **declined to add examples** "since the definition adequately addresses this concern by expressly delineating the activity requiring licensing from that of a firearms collector not subject to licensing." *Id.* at 10481.

## II.     ENACTMENT OF THE BIPARTISAN SAFER COMMUNITIES ACT.

From FOPA's enactment in 1986 until enactment of the BSCA last year, 18 U.S.C. § 921(a)(21)(C) and ATF's implementing regulations have remained unchanged. Then, in 2022, Congress tweaked the definition of "engaged in the business" in the BSCA, replacing Section 921(a)(21)(C)'s phrase "with the principal objective of livelihood and profit" with the phrase "to **predominantly earn a profit**…." Due to that change in terminology, 18 U.S.C. § 921(a)(22) was also modified, replacing the language "obtaining livelihood and pecuniary gain" with the singular intent of "**obtaining pecuniary gain**…."

## III.    THE RULE.

On March 14, 2023, following enactment of the BSCA, President Biden issued an Executive Order directing the Attorney General, among other things, to "(i) clarify the definition of who is engaged in the business of dealing in firearms . . . in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking….; [and] (ii) prevent former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms." Appendix ("Appx.") 005.[3]   Purportedly acting

---

[3] Per L.R. 56.6, the materials supporting this Motion are included in their entirety in an appendix, with the exception of the Administrative Record ("AR"). Since this Court is in possession of the entire AR, Dkt. 81, and since the AR includes more than 15,000 pages, Appx. 644, only the specific portions of the AR cited to in support of this Motion are included in the Appendix.

pursuant to this directive, the DOJ announced a notice of proposed rulemaking ("NPRM") on August 31, 2023, claiming that its proposed revisions "conform[] ATF's regulations to the new BSCA definition and further clarify[] the conduct that presumptively requires a license…."[4]

But while some of the proposed revisions in the NPRM mirrored the newly enacted statutory language, others fabricated entirely new provisions that contravene and effectively nullify long-extant provisions. Plaintiffs identified numerous defects in the NPRM in their public comments. *See* Public Comment of Gun Owners of America, Inc. et al. (Dec. 2023) ("GOA Comment") (Appx. 267); Public Comment of State Attorneys General (Dec. 7, 2023) ("States' Comment") (Appx 353). Although the Rule acknowledged some of Plaintiffs' comments and made several changes, Plaintiffs' concerns were largely opposed by ATF.

Promulgated on April 19, 2024, the Rule purports to do two things: (1) implement the BSCA and (2) "provide additional guidance on what it means to be engaged in the business as a 'dealer….'" Appx. 006. But the Rule, for the most part, has nothing to do with the BSCA. Rather, it represents an ATF wish list of how it would like the statute to operate. For example, the Rule revises the existing definitions of *dealer*, *engaged in the business*, and *principal objective of livelihood and profit*. And it adds definitions of *personal collection (or personal collection of firearms, or personal firearms collection)*, *former licensee inventory*, *predominantly earn a profit*, *responsible person*, and *terrorism*. None of this was changed by Congress in the BCSA.

## IV.    THIS CASE.

On May 1, 2024, twelve days after the Rule's promulgation, Plaintiffs Texas, Louisiana, Mississippi, Utah, Gun Owners of America, Inc., Gun Owners Foundation, Tennessee Firearms Association, Virginia Citizens Defense League, and Jeffrey W. Tormey filed their Complaint for Declaratory and Injunctive Relief. *See generally* Appx. 158–205. Plaintiffs alleged that the Rule

---

[4] Press Release, *Bureau of Alcohol, Tobacco, Firearms and Explosives, Justice Department Proposes New Regulation to Update Definition of 'Engaged in the Business' as a Firearms Dealer* (Aug. 31, 2023), https://www.atf.gov/news/press-releases/justice-department-proposes-new-regulation-update-definition-engaged-business-firearms.

violates the Administrative Procedure Act ("APA") as contrary to statute and exceeding the authority granted by Congress because, *inter alia*, it "revises and adds definitions that are already defined by statute." Appx. 180. Plaintiffs further alleged that the Rule violates the APA because it is arbitrary, capricious, an abuse of discretion, and not in accordance with law because, while purporting to interpret the GCA, it departs from the statute's text in numerous ways. Appx. 183–84.In that same vein, Plaintiffs challenged the Rule's creation of "presumptions" found nowhere in the GCA which would "prove" that a person is unlawfully "engaged in the business" or acting with intent to earn a profit. Appx. 185. Plaintiffs also alleged that the Rule is contrary to the Second, Fourth, and Fifth Amendments, and Article I, Sections 1 and 7 of the U.S. Constitution, and also that the Rule violates the APA on these grounds as contrary to constitutional right, power, privilege, or immunity. Appx. 186, 189, 194, 196– 203.

On May 2, 2024, Plaintiffs filed their Motion for Temporary Restraining Order and/or Preliminary Injunction. *See* Appx. 220-266. After expedited briefing, this Court held oral argument on Plaintiffs' Motion on May 16, 2024. Thereafter, the Court granted Plaintiffs' Motion for a Temporary Restraining Order in part, and issued an Order on May 19, 2024. *See* Appx. 395–408. That same day, the Court ordered Plaintiffs, individually, to submit supplemental briefing on standing. Appx. 408. Plaintiffs filed their supplemental briefs on May 31, 2024, Appx. 410–14 (Jeffrey Tormey), 418–23, (Tennessee Firarms Association), 432–37 (Gun Owners of America), 447–52 (Gun Owners Foundation), 453–58 (Virginia Citizen's Defense League), 463–69 (Louisiana), 477– 86 (Texas), and on June 2, 2024, 497–502 (Mississippi), 505–15 (Utah). Defendants responded on June 7, 2024. Appx. 516–44.

Thereafter, the Court granted Plaintiffs' Motion for Preliminary Injunction on June 11, 2024, enjoining Defendants from enforcing the Rule against Plaintiffs "pending resolution of this lawsuit." Appx. 545–65. Defendants appealed this Court's ruling on July 2, 2024. Appx. 566.

## STANDARD

Summary judgment is appropriate where the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 224 (5th Cir. 2020). When considering a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Deville v. Marcantel*, 567 F.3d 156, 163-64 (5th Cir. 2009). In the context of a challenge to an agency action under the APA, "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). In other words, in evaluating an APA case on summary judgment, courts apply the standard of review from the APA. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001). That standard requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, promulgated in excess of statutory authority. 5 U.S.C. § 706(2)(A)–(D). Under the APA, "'the reviewing court'—not the agency whose action it reviews—is to 'decide *all* relevant questions of law' and 'interpret . . . statutory provisions.'" *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2265 (2024) (citation omitted) (emphasis in original). Likewise, "agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 2261. (emphasis in original). In this Circuit, in a successful challenge under the APA, the "default rule is that vacatur is the appropriate remedy." *Data Mktg. P'ship, LP v. United States DOL*, 45 F.4th 846, 859 (5th Cir. 2022).

## ARGUMENT

### I.   PLAINTIFFS HAVE STANDING.

As this Court already found, "all Plaintiffs – the States, Tormey, and the firearm organizations – have standing." Appx. 558. Plaintiffs therefore reiterate only the most salient facts in support of standing here. Together, Plaintiffs' allegations show they (1) have suffered "an injury

in fact," (2) that their injuries are fairly traceable to the Rule, and (3) that "a favorable decision" can redress their injuries. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). And, of course, "[i]f one plaintiff has standing for a claim, then Article III is satisfied as to all plaintiffs." *Texas v. Rettig*, 987 F.3d 518, 528 (5th Cir. 2021).

### A. Tormey Has Standing.

An "avid gun owner," Tormey is a member of Plaintiffs Gun Owners of America, Inc. ("GOA"), Tennessee Firearms Association ("TFA"), and Virginia Citizens Defense League ("VCDL"). Appx. 202 ¶2. He maintains a "large personal collection of firearms" accumulated over "more than four decades," and over the years has sold "at least a couple, or even several, firearms per year, through various mediums" in furtherance of his collection. Appx. 207 ¶¶3, 4, 9. He even has "purchased a table at certain gun shows, in order to facilitate enhancing [his] collection." Appx. 207 ¶8. Tormey "considers 'all the guns [he owns,] including [his] "self-defense" firearms, part of [his] "personal collection" of firearms.'" Appx. 411. He "'not infrequently find[s] himself] changing the type and model' of firearms he carries for personal protection" and consequently will occasionally "decide[] to sell" certain "personal self-defense firearms." Appx. 412. Tormey "desires and intends to continue to 'sell firearms in an effort to upgrade and enhance' his collection of 'self-defense firearms'" without being subject to the Rule's various "presumptions" that he is engaging in felonious activity, and potentially requiring him to affirmatively prove that he is *not* engaged in the business. *Id.*; Appx. 208 ¶14. Yet at minimum, the Rule's third "engaged in the business" presumption and its second "predominantly earn a profit" presumption could reach Tormey's conduct, as does the Rule's warning that "even a single firearm transaction or offer to engage in a transaction" may constitute "engaging in the business." Appx. 124. Indeed, even as a lawyer, Tormey finds many parts of the Rule so "vague[] and ambiguous" that he cannot determine whether his conduct is permissible. Appx. 208 ¶15. The Rule also declares that Tormey's "'self-defense' firearms" – which form a good part of his collection and

many of his sales – are not part of his "personal collection," and thus that sales of such firearms no longer qualify under the statute's explicit safe harbor. *Id*. ¶13; Appx. 416–17 ¶¶4-5, 8.

### B. GOA Has Standing.

GOA is a nonprofit membership organization dedicated to preserving and defending the Second Amendment rights of gun owners. Appx. 211 ¶4. Among its "more than 2 million members and supporters across the country," GOA has members who reside within the Northern District of Texas and are subject to the Rule. *Id*. GOA's members "overwhelmingly support GOA['s] . . . involvement in [this] litigation . . . ." Appx. 212 ¶8. In addition to Tormey, GOA identified one member[5] who, as a former FFL recently revoked under ATF's "zero tolerance" policy, is a "former licensee" with "former licensee inventory" under the Rule. Appx. 214–15. This member, following ATF instructions, transferred "around a million dollars[']" worth of firearms from their business inventory to their personal collection prior to license termination. Appx. 215 ¶¶22, 21. These firearms, which constitute the member's retirement savings, now cannot be sold without triggering the Rule's "presumptions." Appx 215. ¶22. And in addition to the threat of prosecution against members like Tormey and the former FFL, GOA also named Robert Arwady,

---

[5] In opposition to Plaintiffs' standing, Defendants objected that certain of the organizations' members and supporters were identified *but not named* in the pleadings. Appx. 597–99. But as this Court already found, naming is not a requirement of representational standing. Appx. 556–57 (also noting that Plaintiffs' declarations *did* name certain members). Indeed, to require naming of and participation by those being represented by Plaintiffs would eviscerate the concept of representational standing, which permits litigation "*on behalf of*" others. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In their supplemental brief on standing, Defendants recast their objection as against purported "hearsay," asserting that, "even assuming associational standing does not necessarily require identifying members by name," Plaintiffs still must provide "sufficient evidence" by submitting "'individual affidavits'" – *i.e.*, name their members. Appx. 538–42. Defendants argue that "[t]he organizational plaintiffs' hearsay declarations certainly would not establish associational standing at the summary judgment stage." Appx. 541. Yet aside from their citation to cases standing for various general propositions, Defendants do not appear to have found a single legal authority to support their assertion that representational standing requires numerous affidavits by named members. Even so, Plaintiffs now submit several declarations from members of the organizational Plaintiffs who previously were identified and described, but not named. *See* Appx. 710–17.

a GOA member who was prosecuted for selling personally transferred firearms as a "former licensee." Appx. 217–18 ¶¶32-36.

GOA subsequently identified a member seeking to acquire, use, and sell *only* self-defense firearms, who sometimes lists firearms for sale on "social media," and whose sales sometimes "generate a profit." Appx. 439–40 ¶¶4-5, 8-9. Many of the Rule's presumptions would seem to apply to this otherwise-lawful activity. Another GOA member wishes to liquidate a "large collection of [inherited] firearms" at a series of upcoming gun shows (a presumptive no-no under the Rule), activities that the Rule wrongly considers to be "resale." Appx. 441–42 ¶¶13-14, 17, 20. Another GOA member wishes to sell some like-new self-defense firearms from a "sizeable collection" at "a local gun show," where the member in the past has rented a table. Appx. 442–43 ¶¶25-27. Under the Rule, this member would have to affirmatively prove that they are *not* a dealer. Another GOA member occasionally buys and sells firearms from a personal collection and happens to maintain "a digital spreadsheet of information on their extensive collection," including tracking purchase and sale prices for various firearms. Appx. 443–44 ¶¶30-39. Each of these GOA members engages in conduct that is perfectly lawful under the statute, but which the Rule now presumes to be felonious. Finally, GOA spoke with one of its members who recently reported visits from ATF agents claiming the member is engaged in the business, based on a small number of sales during the past year that "were never to make a profit." Appx. 445 ¶¶41-43. In other words, the Rule is being enforced against GOA members.

### C. GOF Has Standing.

Although admittedly not a traditional "membership" organization, GOF has standing under the "indicia of membership" test. GOF is a nonprofit corporation supported by gun owners nationwide, including within the Northern District of Texas, using donations sourced from such persons to fund various activities such as litigation (including this case specifically) on behalf of gun owners. Appx. 211 ¶5. GOF regularly communicates with and receives input from its supporters, and sends them quarterly newsletters to describe its advocacy efforts. Appx. 448; Appx.

439 ¶3; Appx. 211 ¶3. GOF identified one supporter who, as a YouTube creator not "engaged in the business" or intending to profit, nevertheless cannot acquire firearms for video reviews without violating the Rule's "presumption" regarding repetitive sales soon after purchase. Appx. 212.

### D. TFA Has Standing.

In addition to Tormey, TFA identified and/or named two board members, three non-FFL members, and one former FFL (voluntary expiry) who wish to continue occasionally selling firearms (including self-defense firearms) from their personal collections without fear of enforcement under the Rule. Appx. 425–26. TFA also identified two former FFLs (now revoked) who now are flatly ineligible from ever holding FFLs again and therefore could not comply with the Rule's demand of licensure even if they tried, and who nevertheless wish to continue to buy and sell firearms from their personal collections. Appx. 426–27 ¶8; *see* Appx. 653–60 (license denial on the basis of previously having been engaged in the business). Each of these identified members believes the Rule is incomprehensibly vague, giving them "a great deal of uncertainty as to whether they would be required to obtain a license." Appx. 427–28 ¶¶13, 15.

### E. VCDL Has Standing.

In addition to Tormey, VCDL identified one member who "maintains a private collection of firearms . . . primarily for self-defense," who "frequently purchases" and "occasionally sells" such firearms, does so by posting flyers and making online ads, and sometimes mentions that they will have additional firearms for sale in the future. Appx. 460–61. This member also "maintains a spreadsheet" tracking, among other things, the prices of purchases and sales. Appx. 461. This conduct, although lawful under the statute, presumptively runs afoul of the Rule's reinterpretation of the statutory safe harbor, the flyer and spreadsheet profit "presumptions," and the future interest "engaged in the business" "presumption." Appx. 461–62. Because of this, the member has no choice but to "cease all private sales," should the Rule take effect. Appx. 461. Another VCDL member is concerned that, even if they become federally licensed to avoid the vague threats made

by the Rule, the State of Virginia may not permit licensure, because it operates under a different standard than what the Rule creates. Appx. 462.

### F. Texas, Louisiana, Mississippi, and Utah Have Standing.

Finally, the States stand to suffer a direct injury to their fiscs based on a decrease in tax revenue from reduced gun show attendance and decreased sales by FFLs and non-FFLs alike. In other words, as the States have shown, the Rule shrinks the firearms market, lowers attendance at gun shows, and denies the States taxable revenue. *See* Appx. 463–68; 477–85; 497–501, 505–14; *see also* Appx. 475; 503–04; Appx. 494 ¶ 13; Appx. 368–69; Appx. 465; Appx. 498; Appx. 509–10.This kind of monetary harm "obvious[ly]" qualifies as injury that confers standing. *TransUnion LLC v. Ramirez,* 594 U.S. 413,425 (2021). Indeed, courts have repeatedly held that states have standing to challenge federal policies that cause them to lose specific tax revenues. *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992); *see also Louisiana v. Biden*, No. 2:24-CV-00406, U.S. Dist. LEXIS 115999, at *27–28 (W.D. La. July 1, 2024) ("Plaintiff States have sufficiently alleged that they have and will suffer an injury-in-fact that is actual and imminent based on their allegations of loss of specific tax revenues."); *New York v. Yellen*, 15 F.4th 569, 576 (2d Cir. 2021); *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1254 (M.D. Fla. 2021) ("Florida. . . suffers a concrete economic injury resulting from reduced revenue and increased unemployment spending.").

This harm is not speculative. *See* Appx. 488 (Declaration of Darwin Boedeker) (describing a "30% loss in reservations and attendance at [Boedeker's] shows" and "a loss of about $150,000 over the last six weeks" due to a reduction in "attendance, sales of tables, and people coming to sell" firearms); Appx. 368–69; Appx. 464–65; Appx. 498–99; Appx. 509–10. Rather, these results are the predictable effect of the Rule. Indeed, the admitted aim of the Rule is to force a certain segment of the taxable population—unlicensed sellers of guns—from the marketplace. Appx. 087 (10% of unlicensed sellers likely to be either "unwilling or *unable* to become licensed as an FFL as a result of the [R]ule") (emphasis added). In other words, but for the Rule taking effect, the States would not suffer a loss to their fiscs since unlicensed sellers and other potential purchasers of

firearms would not be forced from the marketplace. *See Natl. Infusion Ctr. Assn. v. Becerra*, 116 F.4th 488, 499 (5th Cir. 2024) (finding traceability based on changing "incentives" that are likely to make third parties act in 'predictable ways.'") (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024)). For that reason, vacatur of the Rule will redress the injury. *See Carpenters Indus. Council v. Zinke*, 854 F.3d at 6 n.1.

## II.    THE RULE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT.

### A.  The Rule Is Contrary to the Statute and Therefore Exceeds Statutory Authority.

Because administrative agencies are creatures of statute, they possess only the authority that Congress provides. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").[6] *See also Inhance Techs., L.L.C. v. U.S. EPA*, 96 F.4th 888, 893 (5th Cir. 2024) (an agency "must point to explicit Congressional authority justifying [its] decisions."). And it is a core principle of American law that an agency may not rewrite statutory terms to suit its own sense of how the law should operate. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). *See also Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019) ("The Constitution, after all, vests lawmaking power in Congress. How much lawmaking power? 'All,' declares the Constitution's first substantive word."). When agencies exceed their statutory authority, those actions are unlawful and *ultra vires. See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). ATF flouts its limited function at every step.

---

[6] *But see* Appx. 764 (claiming an "*inherent* power" of agencies to create "presumptions"). *Cf. Util. Solid Waste Activities Grp. v. EPA*, 2001 U.S. App. LEXIS 1187, *10 (D.C. Cir. 2001) ("Our court has never recognized . . . an 'inherent power' in the rulemaking context, and we decline to do so now."); *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95 (2d. Cir. 2018) ("we considered an agency's claim that it possessed . . . 'inherent power . . . .' We rejected this contention 'in light of the well-established principle that an agency literally has no power to act unless and until Congress confers power upon it.'").

i.   **The Rule Contravenes the Statutory Requirement that "Engaging in the Business" Comprises Multiple Purchases and Resales.**

As this Court held, "the Final Rule clashes with the text" by "assert[ing] that there is no minimum number of firearms to actually be sold to be engaged in the business," but rather that a "single firearm transaction – or even a mere offer to engage in a transaction – may suffice." Appx. 559. (cleaned up). Of course, the statute "severely undercut[s]" Defendants' reading, repeatedly employing plural, sequential, and conjunctive language which "flatly contradicts" the notion that one may deal in firearms without ever completing a transaction. Appx. 559–60;*see* 18 U.S.C. § 921(a)(21)(C). This is by far the most natural reading of Section 922(a)(21)(C), which ultimately seeks to determine whether a person is "engaged in the business" of "dealing in firearms." In order to make that finding, a person (i) must deal in firearms "as a regular course of trade or business," (ii) must deal in firearms "to predominantly earn a profit," and (iii) must deal in firearms "through the repetitive purchase and resale of firearms." *Id.* And he must "devote[] time, attention, and labor" to dealing in firearms. *Id.*

Defendants read the statute quite differently. According to them, the statute revolves entirely around a person's intent, because the statutory phrase "through the repetitive purchase and resale of firearms" is not a distinct factor informing whether a person is "dealing in firearms." Rather, Defendants consider "through the repetitive purchase and resale of firearms" merely to be a *nested prepositional phrase*[7] – one which modifies "only the intent element" of "predominantly earn[ing] a profit" that immediately proceeds it. Appx. 054. Thus, Defendants conclude that "the phrase 'repetitive purchase and resale of firearms' refers to the method, or modus operandi, by which a person intends to engage in the firearms business . . . no actual sales are required if the intent element is met and the person's conduct demonstrates their devotion of time, attention, and

---

[7] *See Prepositional Phrases*, Writelike, https://tinyurl.com/4fwa7w4y (last visited Oct. 8, 2024).

labor to dealing in firearms as a regular course of trade or business."[8] *Id.*; *see also* Appx. 757 ("[T]his phrase as a whole means that a person has the predominant intent of obtaining pecuniary gain by repetitively purchasing and reselling firearms."). With this grammatical sleight of hand, Defendants exempt themselves from having to prove much of the statute's operative language.

But because the Rule purports to "clarify" a statute, "[w]e start, of course, with the statutory text," *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006), and "[i]f the statutory text is unambiguous, our inquiry begins and ends with the text." *United States v. Duffey*, 92 F.4th 304, 310 (5th Cir. 2024). The statutory definition of "engaged in the business . . . as applied to a dealer in firearms," is:

> a person who devotes time, attention, and labor to dealing in **firearms** as a **regular course** of trade or business to predominantly earn a profit through the **repetitive purchase and resale** of firearms, but such term shall not include a person who makes occasional **sales, exchanges, or purchases** of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms. [18 U.S.C. § 921(a)(21)(C) (emphases added).]

Contrary to ATF's claim that a person can be "engaged in the business" without ever consummating any *actual* business, the statutory text contains numerous (at least nine) clear indicators that more is required, any one of which is sufficient to repudiate the Rule's expansion of criminal liability.

For starters, the phrase "**dealing in firearms**" denotes commercial activity. A "deal" means "to transact business," and is "an act of buying and selling; the purchase and exchange of something for profit," while a "dealer" is "a person who purchases goods or property for sale to others, a retailer." Black's Law Dictionary at 427 (Deluxe 8th ed. 2004). Second and likewise, with

---

[8] Yet out of hundreds of examples of prosecutions for engaged in the business referenced in the administrative record, Plaintiffs have identified (at most) only one potential instance (Appx. 649) of a defendant being prosecuted for selling *one* firearm, where he "told the buyer that he and the other person could supply the buyer with pistols, rifles and ammunition." *See* https://storage.courtlistener.com/recap/gov.uscourts.prd.142497/gov.uscourts.prd.142497.89.0 .pdf. In contrast, every other prosecution discussed in the record references *multiple firearms* being sold through *multiple transactions* (ranging from six, Appx. 648, to 920, Appx. 650, to 2,000 firearms, Appx. 661).

respect to being "**engaged in the business**," one common understanding of "business" is "commercial transactions," and "engage" means "to take part in." Black's Law Dictionary at 211. In other words, to "engage in the business" one must "take part in commercial transactions," the very thing Defendants claim is *not* required. Both "dealing" and "engaging" are words of action, not planning (the statute does not say "engages *or intends to engage* in the business"). *See United States v. Tarr*, 589 F.2d 55, 59 (1st Cir. 1978) ("'dealing' connotes a regular course of conduct carried on over a period of time or, at least, on more than one or two unrelated occasions."); *United States v. Belmont*, 831 F.3d 1098, 1102 (8th Cir. 2016) (referencing an ATF explosives Ruling 75-31, which concluded that "the term 'engaged in the business'" found in 18 U.S. Code § 842 "is generally interpreted to imply an element of continuity or habitual practice as against a single act or occasional participation"). The plain text thus undermines the Rule's claim that a person can be a dealer "even if they have not yet sold a firearm." Appx. 614. But not only does the statute make clear that *some* commercial activity must occur, it also provides several clues showing that *multiple* of each sort of transaction must occur.[9]

Third, the statute repeatedly uses the word "**firearms**" in the plural. 18 U.S.C. §§ 921(a)(11), (21), (22). This clearly contemplates business conduct involving more than one firearm transaction, and certainly more than zero. *See Tarr*, 589 F.2d at 59 (concluding that "ordinarily one sale will not be sufficient," because "[t]he words 'to engage in the business of' strongly imply more than one isolated sale or transaction"). Had Congress intended to capture just

---

[9] Plaintiffs are aware of only one case upholding a prosecution where no actual sales occurred. But in that case, *United States v. King*, 735 F.3d 1098 (9th Cir. 2013),where defendant was masquerading as an FFL, utilizing forged documents, and offering firearms for sale, and whose relevant analysis is relegated to a single footnote which was not central to the court's "plain error" review, the Ninth Circuit relied on. *United States v. Nadirashvili*, 655 F.3d 114 (2d Cir. 2011), which, in turn, relied on pre-FOPA cases that cannot inform the meaning of the current statute. Aside from that, Plaintiffs are not aware of any post-FOPA decision finding that a person can be "engaged in the business" without making actual sales. Indeed, even the pre-FOPA cases on the topic typically involved defendants who had engaged in multiple transactions. *See* Appx. 685 (WilmerHale memorandum to Everytown for Gun Safety discussing how *Nadirashvili* ignored FOPA and how *King* is "in tension with the statute . . . .")

*one* firearm sale within its definition, it certainly could have done so. The statute thus undermines the Rule's claim that there is no "minimum number of firearms purchased or resold that triggers the licensing requirement." Appx. 009.

Fourth, the statute requires a putative dealer's conduct to be part of a "**regular course of trade or business**." 18 U.S.C. § 921(a)(21)(C). Naturally, this phrase refers to a series of events demonstrating an overarching business purpose and mindset. Another court construing the word "regular" in other contexts observed:

> "Regular" has been defined as "steady or *uniform in course, practice, or occurrence*: not subject to unexplained or irrational variation: steadily pursued; orderly, methodical"; even as "returning, *recurring, or received at stated, fixed or uniform intervals* …; functioning at proper intervals." *Webster's Third New International Dictionary of the English Language Unabridged* 1913 (1971) (emphasis added). Clearly, the word, "regular" in the phrase "regular course of the taxpayer's trade or business" refers to an *ongoing* business concern. [*Ex parte Uniroyal Tire Co.*, 779 So. 2d 227, 236 (Ala. 2000) (emphases in original).]

Similar to the word "regular," the word "course" means "the path over which something moves or extends" or "moving in a path from point to point,"[10] again clearly denoting something more than a static event at one moment in time. *See also* Black's Law Dictionary at 378 (defining "course of dealing" as "an established pattern of conduct between parties in a series of transactions (*e.g.*, multiple sales of goods over a period of years"). In contrast, isolated events – like a mere offer to sell or even a single transaction – do not evince regularity or a course of business.[11] *See United States v. Gross*, 451 F.2d 1355, 1358 (7th Cir. 1971) ("The reasonable reader would conclude that . . . a single isolated sale did not constitute engaging in the 'business of selling firearms.'").

Fifth, the statute requires that one must engage in the "*repetitive* purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C) (emphasis added). Of course, repetition means more than

---

[10] *Course*, Merriam-Webster, https://tinyurl.com/53hnbvmj (last visited Oct. 8, 2024).

[11] For example, in the "regular course" of making breakfast, one might expect to crack an egg. However, a cracked egg on its own is insufficient to infer a broader course of conduct; eggs can crack when inadvertently dropped, after all. But when one cracks eggs in some melted butter, places slices of bread in the toaster, and pours a glass of orange juice, a pattern begins to emerge that evinces a "regular course" of conduct – making breakfast. A single firearm transaction – like a single cracked egg – is insufficient to show a "regular course of trade or business."

once, that is, "the act or an instance of repeating" something "such as a push-up" that is "usually counted."[12] Doing a single pushup is not repetitive; nor does it evince that a person is seriously intending to engage in exercise. *Talking about* doing pushups provides even less evidence still. Again, the statute's plain language forecloses the Rule's claim that "there is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms."[13] 89 Fed. Reg. at 28976.

Sixth, the statute requires the repetitive "**purchase and resale** of firearms." 18 U.S.C. § 921(a)(21)(C). Thus, firearms must be purchased "and" resold – a conjunctive requirement – and a far cry from the Rule's claim that there is no "minimum number of firearms purchased or resold that triggers the licensing requirement." Appx. 009 (emphasis added). To be sure, *prior to FOPA*, courts found that "Congress didn't say anything about buying," and so "you can be a dealer just by selling." *United States v. Shirling*, 572 F.2d 532, 533 (5th Cir. 1978). But disagreeing with that standard, Congress eight years later deliberately added both purchase and resale to the statute and, "[i]f possible, every word and every provision is to be given effect . . . . None should be ignored." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) (discussing the surplusage canon).

Seventh, the statute does not require mere "purchases" followed by "sales" – something any gun owner might do. Rather, the text mandates "**resale**" – meaning "the act of selling something again" such as "buying used cars for resale to overseas markets."[14] Necessarily embedded within the word "resale" is a contemporaneity requirement, instructing that firearm

---

[12] *Repetition*, Merriam-Webster, https://tinyurl.com/mun5hawv (last visited Oct. 8, 2024).

[13] In fact, even if someone purchases and resells a firearm *with the intent to profit*, he still does not constitute a firearms dealer, because his activity is a one-off – far from "repetitive," and certainly not a "regular course" of activity. Indeed, Congress expressly intended its "legislation to limit Federal regulation to those involved in *more* than isolated activities." S. Rep. No. 98-583, at 6 (1984) (emphasis added).

[14] *Resale*, Cambridge Dictionary, https://tinyurl.com/mrxspent (last visited Oct. 8, 2024); *see also* Black's Law Dictionary at 1332 ("a retailer's selling of goods, previously purchased from a manufacturer or wholesaler . . . .").

purchases and resales must be linked together within a short enough timeframe of each other to reasonably constitute business activity.[15] Rejecting this principle, the Rule loosely defines "resale" to "mean[] selling a firearm, including a stolen firearm, after it was previously sold . . . ." Appx. 123. Thus, the Rule considers the sale of any firearm a person did not himself manufacture to be a "resale," irrespective of the contemporaneity of their sale to their original purchase. In other words, the Rule considers both the collector who sells a used firearm after 20 years, and the would-be dealer seeking a quick profit, to be 'resellers.' But while the latter case may be a *resale*, the former is just a *sale*. Indeed, the statute treats "sales" and "resales" differently, expressly protecting "occasional sales" and "exchanges" of firearms "for the enhancement of a personal collection or for a hobby," in addition to those who "sell[] all or part of [a] personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). While the Rule purports that these firearm sales would be "resales" by virtue of their previously having been sold "by the original manufacturer or any other person," the statute declines to label them as such. Rather, they are "sales" and "exchanges." Firearms sold from a "personal collection" are not "resold."

Eighth, the statute contains explicit exceptions – a **statutory safe harbor** – to being "engaged in the business" based on the "occasional *sales, exchanges, or purchases* of firearms for the enhancement of a personal collection or for a hobby."[16] 18 U.S.C. § 921(a)(21)(C) (emphasis added). Notably, each of these terms is plural, accommodating multiple sales, multiple exchanges, and multiple purchases without rising to the level of "dealing." Indeed, no one could amass a

---

[15] No one would say that a collector who buys rare cars, maintains and enjoys them in his garage, and subsequently offers them at auction decades later has been "buying used cars for resale to overseas markets." Likewise, no firearm dealer (at least none that want to stay in business) purchases large quantities of firearms only to hold them in inventory for a long period of time, as does a firearm collector. Whereas a private collector might purchase large numbers of firearms (even of the same make and model) with the intent that they increase in long-term value, a dealer's profit incentives are short-term, out of necessity. "Resale" therefore constitutes a business term of art, one that carries a particular meaning within the statute which does not extend to just any subsequent sale.

[16] To be sure, the statutory safe harbor is not the only way to conduct firearms transactions without being "engaged in the business." If that were so, then the statute would say that anyone who is not within the safe harbor provisions is required to obtain a license.

"collection" – another plural word denoting several items – without accumulating multiple firearms, and probably getting rid of some as well. Indeed, Congress was well aware that "[m]any firearm hobbyists sell or trade firearms from their collections," S. Rep. No. 98-583, at 8, and Congress never intended for such innocuous conduct to require licensure.

Ninth, contrary to Defendants' contention that "intent" is all that matters, the statutory definition of "to predominantly earn a profit" – which delineates between permissible and impermissible intents – describes "the intent **underlying the sale or disposition** of firearms." 18 U.S.C. § 921(a)(22) (emphasis added). By Congress's use of the phrase "underlying the sale or disposition," there naturally must be an "underlying . . . sale or disposition." After all, how can there be no "sale or disposition," but nevertheless there be "intent underlying" it? If Congress had meant for "intent" to trump actual purchases and resales, it would have said "the intent underlying the *intended or proposed* sale or disposition." *See United States v. Tyson*, 653 F.3d 192, 200 (3d Cir. 2011) (emphasis added) ("a defendant engages in the business of dealing in firearms when his principal motivation is economic (*i.e.*, 'obtaining livelihood' and 'profit') *and he pursues this objective* through the repetitive purchase and resale of firearms.").

The statutory text overwhelmingly and unequivocally forecloses the Rule's suggestions that "there is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms," and that "[e]ven a single firearm transaction, or offer to engage in a transaction [without any actual transaction], when combined with other evidence, may be sufficient to require a license." Appx. 009.

### ii. The Rule Contravenes the Statutory Requirement that "Engaging in the Business" Requires Earning Profit.

This Court preliminarily rejected Defendants' claim that "actual profit is not a requirement of the statute" and that a person can be engaged in the business even if he "never actually find[s] a buyer." Appx. 560; Appx. 078. As the Court noted, the statute explicitly provides that "proof of profit is not required" in cases involving "criminal purposes or terrorism" (Section 921(a)(22)),

and thus "the negative corollary is obvious . . . [profit] *is* required for all other cases." Appx. 560. As the Court explained, the fact that the statute discusses intent "does not necessitate – or even suggest – that intent is *all* that is required. . . . Action is needed, too." *Id.*

Unsurprisingly, Defendants disagree. Reading the statute to require no actual *sales*, they naturally conclude that actual *profit* is similarly unnecessary (since no actual commercial activity must occur). *See* Appx. 617–18. As Defendants explain it, "the statute specifically defines the phrase 'to predominantly earn a profit' to refer to *intent*, not actual profit . . . ." Appx. 756. Defendants' interpretation might make sense – had Congress omitted the words that come after. Indeed, the definition does not merely "refer to intent" in a vacuum, but rather to "the intent *underlying the sale or disposition of firearms*." This language requires an actual event, not a planned, anticipated, attempted, or hoped "sale or disposition."

Defendants also resist application of the "negative implication" canon, wherein "the thing specified . . . can reasonably be thought to be an expression of all that shares in the grant or prohibition involved." <u>Reading Law</u> at 107; 167 ("Context is a primary determinant of meaning"); and 195 (discussing the associated-words canon, or *noscitur a sociis*). Rather, Defendants assert that "*intent to profit* is not required when the purpose of firearms transactions is criminal purposes or terrorism." Appx. 756; *see also* Appx. 618 ("*i.e.*, proof of *intent to profit*"). But that *plainly is not what the statute says*. The statute says that "*proof of profit* shall not be required" – not that "*intent to profit* is not required." Defendants' "need to rewrite clear provisions of the statute should have alerted [the agency] that it had taken a wrong interpretive turn." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).[17]

To be sure, before enactment of FOPA, the Fifth Circuit upheld a jury instruction noting that "the [then-existing] definition doesn't say anything about making a profit. You can be a dealer in firearms and sell them for less than you paid for them," such as by "holding yourself out as being

---

[17] Defendants' interpretation of Section 921(a)(22) to describe profit motive but require no actual profit also overlooks Section 921(a)(21), which ties profit to a course of conduct comprised of a series of repeat actions.

a source of firearms." *United States v. Shirling*, 572 F.2d 532, 533 (5th Cir. 1978). Although Defendants desire that this pre-FOPA standard continue to apply without change (*see* Appx. 124, adopting that very language in a presumption), that clearly is not what Congress intended. Rather, Congress intended that FOPA "substantially narrow" the existing application of the statute, so that it could no longer "be applied to a hobbyist to whom profit is a secondary objective." 98th Congress, 2d Sess., Report 98-583 at 9, Aug. 8, 1984. *See also* Appx. 695 (WilmerHale memo acknowledging that Congress "declined to adopt" a standard which would apply to someone who "held himself out as a source of firearms").

A decision by another Texas federal district court confirms this Court's conclusion that the statute requires actual sales and actual profit, explaining that "[t]he government can only convict a defendant of this offense by showing that he *sold guns* at wholesale or retail *for profit* (or to facilitate crimes)." *United States v. Flores*, 652 F. Supp. 3d 796, 799 n.14 (S.D. Tex. Jan. 23, 2023) (emphasis added). *See also United States v. Strunk*, 551 F. App'x 245, 245-46 (5th Cir. 2014) (unpublished) ("Strunk . . . engaged in a regular course of selling firearms," and "retained money collected on the sale of others' firearms."); *Clark v. Scouffas*, 2000 U.S. Dist. LEXIS 633, at *7-8 (N.D. Ill. Jan. 18, 2000) (applicant did not qualify as a dealer when he "'sold' only three pistols . . . [f]rom the years 1990 to 1999," and "[n]o profit was made . . . ."); Appx. 788 (BSCA sponsors noting that the language "does not provide for a specific . . . amount of profit," but rather relates to "the underlying substance of the sale as it relates to a series of transactions over a period of time").

### iii.    The Rule's Contrived "Former Licensee Inventory" Edicts Violate the Statute.

As for dealer licensing, the GCA distinguishes between two types of individuals: "licensed dealers," and those who are not.[18] These provisions operate in the present tense; those who currently are licensed dealers are subject to certain obligations and may engage in certain activities,

---

[18] *See, e.g.*, 18 U.S.C. § 923(c) ("licensed . . . dealer" and "licensee"); 18 U.S.C. § 922(a)(1)(A) ("any person except a . . . licensed dealer").

while those who are not licensed are free from these obligations but face certain limitations on their conduct.[19] Nowhere in these statutes did Congress contemplate – much less create – any ongoing stain of licensure for so-called "former licensees." ATF has previously conceded as much, noting in an industry circular that FFLs "who continue to sell firearms after the revocation, expiration, or surrender of their license are *subject to the same rules as persons who have never been licensed . . . .*" Appx. 789–90.

Yet while neither recognizing that prior position nor offering an explanation as to why it was wrong,[20] the Rule now creates "new term[s]" including "former licensee" (Appx. 002), claiming that this new terminology and its attendant rules will "*help*[21] address the problem of licensees who improperly liquidate their business inventory of firearms . . . after their license is terminated . . . ." *Id.* (emphasis added). Accordingly, the Rule creates the extra-statutory term "former licensee inventory" to describe firearms "that were in the business inventory of a licensee at the time the license was terminated" (Appx. 123), before purporting to establish rules governing the disposition of such firearms and "presumptions" applying only to "former licensees." Appx. 123–24. None of this comports with the statute.

At the outset, all "former licensee" Rule provisions fail for lack of statutory basis. Indeed, "[n]othing is to be added to what the text states or reasonably implies . . . . That is, a matter not covered is to be treated as not covered." <u>Reading Law</u> at 93. The concept of "former licensees," their "inventory," and their "presumptions" simply does not exist in the statute, and to expand a penal law to reach previously uncovered persons and conduct requires something more than

---

[19] *See, e.g.*, 18 U.S.C. § 923(g)(1)(A) ("Each . . . licensed dealer shall maintain such records . . . of firearms . . . ."); 18 U.S.C. § 922(a)(1)(A) ("It shall be unlawful[] for any person[] except a . . . licensed dealer, to engage in the business of . . . dealing in firearms . . . .").

[20] *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1141 (5th Cir. 2021) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), for the holding that, "[w]hen an agency changes its existing position, it . . . must at least display awareness that it is changing position and show that there are good reasons for the new policy.").

[21] ATF does not have statutory authority to promulgate rules and regulations just because they are "help[ful]." Rather, "[t]he Attorney General may prescribe only such rules and regulations as are *necessary* to carry out the provisions of this chapter . . . ." 18 U.S.C. § 926(a) (emphasis added).

Executive fiat. Accordingly, "the Rule adds several key words not in the statute [and] . . . thus impermissibly 'rewrite[s] statutory language by ascribing additional, material terms.'" *Tex. Med. Ass'n v. HHS*, 587 F. Supp. 3d 528, 542 (E.D. Tex. 2022) (quoting *Texaco Inc. v. Duhe*, 274 F.3d 911, 920 (5th Cir. 2001)). No matter Defendants' perceived "problem," nor how allegedly "help[ful]" their regulatory solution, it is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

In addition, the Rule's categorical treatment of "former licensee" firearms suffers from specific defects. First, under the Rule, if firearms were lawfully transferred to a personal collection prior to license termination, they may not be sold until "[o]ne year has passed…." Appx. 124. But the statute contains no such requirement, as it applies only to "any firearm . . . disposed of *by a licensee* within one year after its transfer from his business inventory" to his "personal collection of firearms." 18 U.S.C. § 923(c) (emphasis added). Suffice it to say, a "former licensee" cannot simultaneously be "a licensee" to whom this restriction applies. Defendants' only justification is that it is "reasonable" for the Rule's "presumption" to assume that a former licensee selling remaining inventory is "engaged in the business." Appx. 773. On the contrary, the Rule's presumption is not "reasonable"; rather, it is foreclosed by the text. If a "former licensee" sells inventory previously acquired *while licensed to do just that*, there can be no crime, because those firearms are merely being "sold" off – not "purchased" and "resold" by a licensee, as the statute requires.[22] *See* 18 U.S.C. § 921(a)(21)(C).

Second, under the Rule, if a "former licensee" transferred firearms to a personal collection prior to license termination, but did so "to willfully evade" federal law, then such firearms may never be transferred. 89 Fed. Reg. at 29091. But while that past conduct may have been unlawful,

---

[22] For one GOA member, such inventory "largely constitutes their retirement" (Appx. 215) and, at least as of the date Plaintiffs filed their complaint, was "now frozen" and "unsellable." Appx. 555. And another GOA member was unsuccessfully prosecuted under this untenable theory. Appx. 217–218 ¶¶32-40.

the mere possession of firearms that previously were unlawfully transferred does not taint the firearms themselves or support a presumption that unlawful dealing continues. In response, Defendants offer nothing more than their own assurances that the Rule is "manifestly sensible," "patently clear," and a "common-sense interpretation." Appx. 774. This Court has already rejected a similar "'just trust us' . . . 'ipse dixit.'" Appx. 563.

Third, the Rule creates an impossible category of firearms that "were in the business inventory at the time the license was terminated," but were never transferred to a personal collection. Appx. 124. According to the Rule, these firearms remain forever in purgatory, and any attempt to transfer them leads to the presumption of unlawful dealing, on the theory that they were "purchase[d]" while engaging in the business with "resale[s]" occurring after licensure. Appx. 084; Appx 123. But again, *lawful* firearm acquisitions *while licensed* cannot form the predicate acts for *unlawful* dealing while *unlicensed*. Defendants dispute that the Rule considers "[p]urchas[es] . . . while licensed" to constitute "unlicensed dealing," claiming instead that the "circumstances as a whole" can show unlawful dealing. Appx. 774. But that is simply another way of saying the same thing. The "circumstances as a whole" must include consideration of "purchases while licensed" – *or else there are no "purchases"* required by the statute. In other words, unless there are "purchases" *made subsequent to licensure*, the statutory prerequisites (both "purchases" *and* "resales") cannot be met.

On this front, the Rule concedes that "the former licensee . . . [is] placed in a difficult situation" attempting to sell firearms that remained in inventory, but ultimately claims that "former licensees" cannot "unjustly profit from their illegal actions." Appx. 084; *see also* Appx. 068 (lamenting that *former licensees* cannot be "immune" from the provisions governing *licensees*). But this is a policy choice that only Congress, not ATF, has the purview to make. The Rule attempts to bridge the gap created in the NPRM by digging a deeper hole, now fabricating a "'winding down' period" of "30 days of termination of license" during which a "former licensee" can still liquidate inventory. Appx. 085. Of course, after that newly-minted grace period has expired, Defendants admit that a "former licensee[] . . . cannot easily sell" firearms he possesses "without . . . engaging

in the unlicensed business of dealing . . . ." *Id.* This cannot possibly be the law, and it is not, because the statute authorizes none of the Rule's "former licensee" diktats.

### iv.    The Rule Eviscerates the Statute's Safe Harbor.

Rejecting the notion that the statute's safe harbor provision protects only museum curators, this Court previously concluded that "the Final Rule arbitrarily eviscerates Section 921(a)(21)(C)'s safe harbor" by excluding from its ambit "firearms accumulated primarily for personal protection." Op. 17 (rejecting Defendants' claim that the statute "provides *no safe harbor at all* for the majority of gun owners," "two-thirds of [whom] report owning firearms primarily for 'defense' or 'protection'"). *See* Appx. 069. That conclusion was correct, for several reasons.

First, the statute expressly states that "engaged in the business . . . ***shall not include*** a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21) (emphasis added); *see also* (a)(22) (distinguishing impermissible profit motivation from "other intents, such as improving or liquidating a personal firearms collection"). But where the statute establishes a definitive "shall not include," the Rule provides only that a person "***shall not be presumed*** to be engaged in the business . . . ***when reliable evidence shows***" transactions "to liquidate (without restocking) all or part of the person's personal collection." Appx. 125 (emphasis added). Of course, "shall not be presumed" is far from the definitive protection the statute provides, and the statute requires no affirmative evidentiary showing to fall within the safe harbor.

Second, the statute allows: (i) "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection," (ii) "occasional sales, exchanges, or purchases of firearms . . . for a hobby," and (iii) "sell[ing] all or part of [a] personal collection." 18 U.S.C. § 921(a)(21)(C). Appx. 123. But the Rule boils these down to a single definition of "personal collection" that includes "firearms that a person accumulates for study, comparison,

exhibition . . . or for a hobby," and claims that "the term shall not include" "any firearm purchased for . . . financial gain" and "firearms accumulated primarily for personal protection." *Id.*[23]

For starters, the Rule seeks to roll the statutory phrase "for a hobby" into the definition of "personal collection," as if Congress's disjunctive exemptions were redundant. On the contrary, "every word and every provision is to be given effect . . . . None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." Reading Law at 174. Congress clearly intended that a person could make occasional purchases and sales "as a hobby" without becoming licensed, entirely *separate* from occasional purchases and sales "for the enhancement of a personal collection."

Likewise, by claiming that a gun collector can *never* be motivated by "financial gain," the Rule seeks to prohibit firearm purchases for long-term investment which, although they may eventually be sold, would not be "resold" as by a dealer. A gun owner who invests in antique military firearms instead of a 401k, and then decades later sells a few to fund a vacation, is not engaged in the business. *See* Appx. 065.

Finally, and most importantly, by claiming that a "personal collection" does not include firearms purchased for "personal protection," the Rule rewrites the statutory safe harbor so that it does not apply to ordinary people doing ordinary things. *See, e.g.*, Appx. 416–17 ¶¶ 4-8 (discussing how "many (if not most)" of his personal firearms are owned for "self-defense," and how he has in the past and intends in the future to dispose of some such firearms in private sales).[24] As this Court explained, the narrow, specialized definition of "collection" adopted by the Rule is far less "consonant with 'common meaning'" than broader, more general definitions of "collection" to include "'a number of . . . objects . . . collected . . . according to some unifying principle.'" Appx.

---

[23] The Rule acknowledges "conflating" the distinct provisions (*id.* at 29037), and agrees that a "'hobby . . . has a meaning independent of the term 'collection,''" but claims that "this combined definition" somehow sufficiently accounts for both concepts (*id.* at 29039).

[24] Although ATF has repeatedly promised that nothing Tormey has done or has planned is unlawful (Appx. 745–46; Appx. 537) under the Rule, that is a far cry from the statute's explicit safe harbor.

561. Nothing in the colloquial understanding of the word "collection" limits the term to certain forms of activity, or otherwise precludes the possibility that one may collect firearms for self-defense. Rather, a collection may be maintained with some unifying theme in mind, for "*some* purpose,"[25] or perhaps for no purpose at all.[26]

Not only does common meaning support Plaintiffs, but also Congress explicitly intended the statutory safe harbor to reach "personal protection" arms. In fact, FOPA's preamble expressly states that "additional legislation is required to reaffirm the intent of the Congress . . . that 'it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of . . . ***personal protection*** . . . .'" Firearms Owners' Protection Act of 1986, Pub. L. No. 99-308, § 1, 100 Stat. 449, 449 (emphasis added). *See* Reading Law at 217-20 (discussing the "prefatory-materials canon," where "[a] preamble, purpose clause, or recital is a permissible indicator of meaning," which "can shed light on the meaning of the operative provisions that follow"). Here, Congress announced its intent that the statute protects the *very same thing* that the Rule claims it does not reach, using the *very same words* the Rule claims are not included.

With plain meaning and clear legislative intent against them, Defendants latch on to the statutory phrase "curios or relics" in a last-ditch attempt to save their narrow reading. Claiming "[t]he Rule's definition of 'personal collection' is . . . consistent with the GCA's definition of 'collector,'" Defendants appear to limit the meaning of "personal collection of firearms" in Section 921(a)(21)(C) to only those "firearms [that are] curios or relics" in Section 921(a)(13), on the theory that Section 921(a)(13) separately defines "collector." *See* Appx. 758–59 (claiming "[t]here is no

---

[25] *Collection*, Dictionary.com, https://tinyurl.com/27jm8xf8 (last visited Oct. 11, 2024) (emphasis added) ("[A] group of objects or an amount of material accumulated in one location, especially for *some purpose* or as a result of some process . . . .").
[26] *See* Hoarders (A&E 2009).

case authority to suggest that there is a distinction between the definition of a collector and of a collection in the statute"[27]); *see also* Appx. 621. This curious theory fails for any number of reasons.

First and most obviously, Section 921(a)(21)(C) applies without qualification to "firearms," which 18 U.S.C. § 921(a)(3) defines broadly to include "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon . . . .'"" Had Congress intended to limit a "personal collection" to only "curios or relics," it could have specified "personal collection of firearms *as curios or relics*" in the safe harbor.

Second, the statute's "curios or relics" language – which creates an optional license for "collectors" to acquire "curios or relics" without having to go through a dealer or submit to a background check – narrows the type of *firearms* subject to its provisions, not the type of *collector*. *Cf.* 18 U.S.C. § 921(a)(13) (emphasis added) (applying to firearms "*as curios or relics*, as the Attorney General [has] by regulation define[d]" as "[f]irearms which are of special interest to collectors," 27 CFR § 478.11); with *id.* (emphasis added) (broadly defining "collector" as "*any person who acquires, holds, or disposes*"). If Section 921(a)(13) is relied on for anything, its sweepingly broad conception of "collector" in fact bolsters the Court's natural reading of "personal collection."

Third, the Rule itself dispels Defendants' claim, listing "collecting curios and relics" as merely one "*e.g.*" example of what constitutes a "personal collection." Appx. 123. Cleary, even the Rule anticipates that a "personal collection" can encompass something more than "collecting" "curios and relics."[28]

---

[27] For this proposition, Defendants rely on *United States v. Idarecis*, 1998 U.S. App. LEXIS 25991 (2d Cir. 1998), an unpublished decision which involved a "plain error" review of a "novel claim" that was "not raised below," where the court found that the absence of legal authority on the difference between "collector" and "collection" meant that the district court could not have committed plain error. *Id.* at *10–11. *Idarecis* did not, as Defendants apparently believe, conduct any statutory analysis, much less conclude that the statutory terms are coextensive.

[28] Even if Defendants' narrowing of "personal collection" limited to the statute's "curios or relics" usage of "collector" were correct, that reading would only reach two of the statute's three safe harbors. Indeed, Section 921(a)(13) is silent as to firearms acquired "for a hobby."

### v.    ATF May Not Redefine What Congress Has Defined.

The Rule defines several terms, including "dealer," "engaged in the business," and "to predominately earn a profit."[29] But Congress *already* defined these terms, and it is black letter law that ATF has no authority to alter that text and thereby expand, contract, or alter the statutory meaning. *Cf.* Appx. 123 with 18 U.S.C. §921(a)(11); Appx. 124 with § 921(a) (21)(C) and (22). To the contrary, ATF only has authority to "prescribe . . . such rules and regulations as are *necessary* to carry out the" GCA. 18 U.S.C. § 926(a) (emphasis added).

ATF disagrees, claiming that "the fact that Congress generally defined the term . . . does not mean that the Department lacks the authority to *further define* that term." Appx. 044 (emphasis added). Oh, yes it does. Indeed, "[t]he statute's unambiguous . . . definition . . . precludes the [agency] from more expansively interpreting that term." *Dig. Realty Trust, Inc. v. Somers*, 583 U.S. 149, 169 (2018); *see also Stenberg v. Carhart*, 530 U.S. 914, 942, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000) ("When a statute includes an explicit definition, we must follow that definition . . . ."); *ACLU v. FCC*, 823 F.2d 1554, 1568 (D.C. Cir. 1987) ("the statute speaks with crystalline clarity. It provides a precise definition . . . for the exact term the Commission now seeks to redefine. . . . From the face of the statute then, we are left with no ambiguity and thus no need . . . for clarification."); *Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, 1201 (10th Cir. 2019) ("agency discretion 'in the interstices created by statutory silence'" applies "only when 'considering undefined terms in a statute....'"); *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 642 (1990) ("where the terms of a statute are unambiguous, judicial inquiry is complete."); Appx. 043 (admitting that, in the past, ATF has only "provided regulatory definitions of terms that Congress did not define in the statute").[30]

---

[29] To be sure, Plaintiffs' broader challenge here overlaps in part with their challenges to the specific content included ATF's expanded definitions of "engaged in the business" and "predominantly earn a profit." *See* Sections II. A. i and ii, *supra*. Each provides reasons to reject the Rule.

[30] In contrast, where Congress "did not define" certain terms, "the ordinary meaning . . . controls." *Rest. Law Ctr. v. United States DOL*, 2024 U.S. App. LEXIS 21449, *15 (5th Cir. 2024); *Vanderstok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023).

In response, Defendants rely on *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990), claiming that they get to "determine what regulations are in fact 'necessary'" and here, ATF concluded that this Rule was necessary…." Appx. 754. Or, again, "'just trust us.'" Appx. 563. But unlike the Rule's definitions here, *NRA* involved the statutory terms "business premises" (§922(c)) and "gun show or event" (§923(j)), neither of which is defined in the GCA. Defendants' citations to *Gardner v. Grandolsky*, 585 F.3d 786, 792 (3d Cir. 2009) and *Licon v. Ledezma*, 638 F.3d 1303, 1308 (10th Cir. 2011), are equally inapposite, because they involved whether an agency acted "arbitrar[ily" or "capricious[ly]." *See* 5 U.S.C. §706. Neither case stands for the proposition that a purported "unquestionably valid regulatory objective[]" (Appx. 754) permits an agency to act "contrary to law" by *altering the statutory text*.

### vi.    ATF May Not Define Simple, Unambiguous Statutory Words.

The Rule seeks to create and then resolve ambiguity in the statute where none exists, excising simple, ordinary words like "purchase" and "sale" and defining them "consistent with the[ir] *common meaning*…." Appx. 133 nn.44, 45. But ATF does not explain what ambiguity exists in these terms, or why ordinary people cannot understand them. *ACLU*, 823 F.2d at 1568 ("we are left with no ambiguity and thus no need … for clarification."). For whatever reason, the Rule elsewhere *refuses to define* commonplace terms, stating that "readers should use the *ordinary meaning*…." Appx. 025. ATF provides no reason for its inconsistent approaches.[31] Worse still, ATF's attempt to define simple words often backfires spectacularly – for example, starting with the easily understood word "sale," defining it to include "something of value," defining *that* to include "valuable consideration," and then defining *that* to include "forbearance" (Appx. 008 n.56) – a word that likely is not easily comprehended by many. This is a pattern within the Rule – start with something simple, and make it clear as mud.

---

[31] Ironically, with respect to the clear, simple words the Rule *does not* define, Defendants object that "Plaintiffs do not explain why it would be necessary for ATF to provide further elucidation of these words." Appx. 755 n.14. But that is the whole point – it is not necessary *in either case*.

Yet "[t]he task of statutory interpretation begins and, if possible, ends with the language of the statute." *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486-87 (5th Cir. 2013). And "[w]hen the words of a statute are unambiguous, then, th[e] first canon is also the last: 'judicial inquiry is complete.'" *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). Indeed, "[i]f the regulation is unambiguous, its plain meaning governs." *Amazon.com, Inc. v. Comm'r*, 934 F.3d 976, 984 (9th Cir. 2019). The fact that "parties have frequently tried to evade the GCA's licensing requirements" (Appx. 755) does not make the statute ambiguous, or require ATF to explain its clear terms more clearly.

### B. The Final Rule's "Presumptions" Conflict with the Statute, Are Arbitrary and Capricious, Constitute an Abuse of Discretion, and Are Not in Accordance with Law.

As this Court already observed, "the Final Rule creates sets of presumptions" which are "highly problematic" because they "requir[e] that firearm owners prove innocence rather than the government prove guilt." Appx. 562; *see also* Appx. 124–25 (creating five "engaged in the business" presumptions, seven "predominantly earn a profit" sub-presumptions, and six categories of "conduct that does not support a presumption"). Despite acknowledging that whether someone is "engaged in the business" is a "fact-specific inquiry" (Appx. 124), the Rule ultimately distills the highly fact-specific case law it cites down to *single factors*, factors whose sole satisfaction is used to presume satisfaction of *all elements* of the statute. *See, e.g.*, Appx. 057.[32] *Cf. United States v. Brenner*, 481 F. App'x 124, 127 (5th Cir. 2012) (unpublished) (statute requires "examin[ation of] all circumstances . . . without the aid of a 'bright-line rule.'").

---

[32] In other words, the cases read as if "we have a door, we have a windshield, we have an engine, we have a steering wheel, and we have four tires. We reasonably can conclude that this is an automobile." In contrast, the Rule simply provides that "whenever there is a door, we *presume* it is a car," even though it might in fact be a house. When criminal liability hangs in the balance, such regulatory shortcutting cannot stand. Indeed, in the same breath, the Rule claims "[t]he rebuttable presumptions . . . shall not apply to any criminal case, *although they may be useful to courts in criminal cases* . . . ." Appx. 125 (emphasis added).

Unsurprisingly, Congress never authorized Defendants' imposition of "presumptions" in the first place.[33] *See* 18 U.S.C. § 926(a) (only "necessary" regulations). Something is "necessary" if it is "absolutely needed : required" or "compulsory."[34] Defendants cannot claim that these "presumptions" are "required" to "carry out" enforcement of the Gun Control Act, as the statute has been enforced for decades without them. Rather, Defendants posit these "presumptions" merely will "*help* unlicensed persons, industry operations personnel, and others determine when a person is likely 'engaged in the business' . . . ." Appx. 009 (emphasis added). But 'helpfulness' is not 'necessity.' Certainly, Defendants never explain why the Rule's presumptions are suddenly "necessary" to "determine" the meaning of statutory provisions which have existed for nearly four decades. *See* 53 Fed. Reg. 10480, 10481 (Mar. 31, 1998) (ATF previously refusing to give examples of "engaged in the business" because the statute "expressly delineat[es] the activity requiring licensing . . . .").

In response, Defendants claim a broad authority to enact any sort of presumptions they wish, to "help effectuate the GCA," so long as there is a "rational nexus between the fact found and the facts to be presumed." Appx. 763. But the Fifth Circuit recently used no such test in *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024), *reh'g en banc denied*, 2024 U.S. App. LEXIS 14308 (5th Cir. June 12, 2024). Rather, it was enough to note that the rule there, which also established atextual "rebuttable presumptions," likewise involved "decisions [that] are highly fact-specific" and therefore "too discrete to justify a universal presumption." *Id.* at 250. *Cf.*

---

[33] That Congress declined to create the Rule's "presumptions" only further confirms that ATF has contravened the statute. Indeed, Congress is no stranger to creating civil presumptions, and thus is perfectly competent to enact such provisions when it so desires. *See, e.g.*, 18 U.S.C. § 1469(a); 18 U.S.C. § 3142(e)(2); 35 U.S.C. § 282(a); 38 U.S.C. § 1118. Perhaps most tellingly, in 18 U.S.C. § 1466, Congress used the term "engaged in the business" as pertains to selling "obscene matter," and further created a "*rebuttable presumption*" whenever certain quantities of material are made available. *See also* Appx. 699 (WilmerHale memo conceding that Congress could have done the same in Section 921 but "chose not to."). Thus, "[w]e do not read Congress' silence as an invitation to graft onto the statute an otherwise absent" provision. *Exela Enter. Solutions, Inc. v. NLRB*, 32 F.4th 436, 442 (5th Cir. 2022).

[34] *Necessary*, Merriam-Webster, https://tinyurl.com/mr4cdcnz (last visited Oct. 15, 2024).

Appx. 124 ("Whether a person is engaged in the business . . . is a fact-specific inquiry."). Accordingly, the Fifth Circuit held that "[t]he Department's attempt to substitute its unexplained 'experience' . . . justifying the presumptions is arbitrary and capricious." *Career Colls.*, 98 F.4th at 250-51; *see also El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023). *Cf.* Appx. 008 (invoking "enforcement efforts, regulatory functions, knowledge of existing case law, and subject-matter expertise"). Indeed, "[p]resumptions, especially in administrative proceedings that may generate institution-destroying liability, cannot be a matter of Department *ipse dixit*." *Career Colls.*, 98 F.4th at 251.

But even if Defendants' mere 'rationality' standard controlled (it does not), the Rule itself undermines any factual "nexus" to its own presumptions. Indeed, while seeking to support the presumptions included in the NPRM, ATF created a "working group" of senior employees who "researched and vetted approximately 1,211 criminal investigations . . . to document those that would support the presumptions." Appx. 651 Undermining the presumptions ATF proposed, the working group reported that "*no instances* were discovered during the research process" for "PEP #8 (business insurance)" (*id.*), a presumption that somehow made its way into the NPRM (even though not ultimately adopted in the Rule). In other words, ATF proposed saddling the gun-owning public with a regulatory fact pattern that apparently *has literally never occurred*. And as for the presumptions that were adopted in the Rule, *nearly half of them* were found to correlate with actual criminal cases at a rate of *one percent or less*. Appx. 652. One of the presumptions (securing a business license) was found to have occurred a whopping total of *one time* – out of 1,211 cases (.0008). *Id.* Three others occurred only *two times* (.0016). *Id.* This is hardly a "nexus" of any sort, much less one that establishes "rationality between what is proved and what is inferred." *Republic Aviation Corp. v. NLRB*, 324 US 793, 804-05 (1945). On the contrary, most of the Rule's presumptions appear to be entirely random occurrences that rarely if ever occur repeatably in criminal cases. This is hardly worth creating an expansive federal regulatory scheme.

Yet despite the stark lack of data to support its presumptions, the Rule claims that ATF "has observed through its . . . knowledge of existing case law, and subject-matter expertise that

persons who are engaged in certain . . . activities *are more likely than not* to be 'engaged in the business' of dealing in firearms . . . ." Appx. 008 (emphasis added). How a less-than-one-percent correlation constitutes "more likely than not," the Rule does not say. Nor does ATF explain how it extrapolated its limited data set of "criminal investigations" (presumably the worst of the worst) to the universe of gun owners, and determined that certain activities "more likely than not" constitute dealing (such as selling "new or like new" firearms).[35] Indeed, Plaintiffs' declarations provide numerous examples of law-abiding people doing innocuous things that the Rule presumes to be felonious.

Acknowledging comments that the presumptions are "overbroad, [and] would capture too many permissible sales by collectors," Appx. 056, the Rule repeatedly demurs that, even if the Rule does reach lawful conduct, "the presumptions are rebuttable" and "refuted by reliable evidence" provided by the *accused*. Appx. 049, 057, 064–65, 078, 080–33. It would seem that ATF does not believe its own story that certain conduct renders a person "more likely than not" engaged in the business. Indeed, simply because he has purchased tables at gun shows (Appx. 207 ¶8), Tormey is presumed to have a profit intent (PEP presumption ii), as is GOA's member who maintains records of his collection (Appx. 443–44 ¶¶30-37; PEP presumption iii); *see also* Appx. 248–51 (giving more specifics about how certain presumptions are overbroad and sweep up innocuous conduct). Defendants fail to reconcile the Rule's claim that these persons are "more likely than not" engaged in the business (Appx. 008) with promises by DOJ lawyers (Appx. 542) that they are not.

In addition to their general overbreadth, "several presumptions conflict with the statutory text." Indeed, unlike the statute, EIB presumption 1 requires no actual sales or purchases – just "offers" and "willingness." Appx. 124; *cf*. 18 U.S.C. § 1466 (defining "engaged in the business" of selling "obscene matter" to include not only "selling" but also "intent to distribute" and "offering for sale," quite unlike the statute here). EIB presumption 2 allows "purchases" *or* "res[al]es,"

---

[35] Apart from purporting to require that there be a factual "nexus" to its presumptions, ATF never begins to explain how it determined it was "*necessary*" (18 U.S.C. § 926(a)) to craft presumptions with such a correlation rate to any real-world activity.

whereas the statute requires both. *Id*. And focusing only on "res[al]es," EIB presumptions 3, 4, and 5 are entirely detached from the statutory requirement that there be repeated "purchases." *Id*. Likewise, the Rule's PEP presumptions each assume that certain forms of behavior or activity constitute an unlawful *intent* to earn a profit (unless proven otherwise). But ATF fails to recognize that the statute requires *actual* profit from *actual* purchases and resales, *and* that the intent underlying that profit come from an impermissible motivation. Indeed, presumptions are only "appropriate when proof of one fact renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of [the inferred] fact . . . until the adversary disproves it." *Chem. Mfrs. Ass'n v. DOT*, 105 F.3d 702, 705 (D.C. Cir. 1997) (cleaned up). How proof of one fact – when countless equally if not more probable innocuous explanations exist – can render the other elements of the statute "so probable" as to warrant presuming them, Defendants do not say.[36]

### C.  The Rule of Lenity Resolves Any Lingering Ambiguity in Favor of Plaintiffs.

Even if this Court finds any part of the statute ambiguous after utilizing "all available tools of statutory interpretation," then the rule of lenity would apply. *Cargill v. Garland*, 57 F.4th 447, 470, 469 (5th Cir. 2023), *aff'd*, *Garland v. Cargill*, 602 U.S. 406 (2024); *see also Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (a court "must exhaust all the traditional tools of construction" and "[o]nly when that legal toolkit is empty" may alternative approaches be considered). Demanding resolution of ambiguity against the government, lenity thus "upholds due process by safeguarding individual liberty in the face of ambiguous laws," and "fortifies the separation of powers . . . .'"

---

[36] Interestingly enough, ATF's creation of "presumptions" appears to have come at the behest of the radical anti-gun group "Everytown for Gun Safety." In a March 9, 2023 proposal predating publication of the Rule's NPRM by some six months, Everytown urged that ATF "promulgate substantive rulemaking that makes clear" when one is "*presumptively engaged in the business*." Appx. 646 (emphasis added); *see also* Appx. 647 (emphasis added) (claiming that "advertising firearms for sale at gun shows . . . creates a *presumption* that a person is engaged in the business"). ATF's apparent ties to anti-gun interest groups then continued with the law firm WilmerHale, which provided a lengthy analysis of ATF's purported authority to create presumptions, some four months prior to the Rule's effective date. Appx. 662–74. If ATF is effectuating the political will of private actors, this Court has all the more reason to view the Rule's edicts with the greatest skepticism.

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2286 (2024) (Gorsuch, J., concurring) (citations omitted).

For its part, the Rule never claimed any part of the statute to be ambiguous or sought now-repudiated *Chevron* deference. Even so, ATF used nearly a ream of paper in order to "clarif[y]" (Appx. 001) just what it is that the statute means. *See also* Appx. 006 ("to provide additional guidance"); *cf. Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498 (1982) ("insist[ing] that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."). Why exactly it takes such a complex and convoluted Rule to "clarify" such a purportedly simple and unambiguous statutory text – Defendants never say.[37] Nor do Defendants explain why a statute (and mirror regulation) that existed unmolested for nearly four decades suddenly now require so much "clarify[ing]" and "updat[ing]." *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 323-24 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate . . . we typically greet its announcement with a measure of skepticism.").

Defendants' only response is that Plaintiffs "invoke the rule of lenity in the abstract, but they identify no 'grievous ambiguity' that the Rule construes against potential criminal defendants."[38] Appx. 755. But that is because Plaintiffs believe the statute is clear – purchases are required; sales are required; profit is required. The plain text demonstrates these realities, in nearly a dozen ways. The structure and context of the statute confirm it. This Court has already found it. Appx. 559–60.

Nevertheless, the Rule imposes licensure on those that the text does not. *See* Appx. 124 (establishing presumptions of required licensure in myriad contexts); Appx. 125 (reducing explicit

---

[37] In fact, the Rule anticipates that it is not ATF's last word on the subject, and that the agency will continue to "*further update* [its] guidance once it issues this final rule." 89 Fed. Reg. at 28971.

[38] The Rule also disclaimed application of lenity, but missed wide of the mark. After acknowledging that lenity applies when there is a "'grievous ambiguity or uncertainty' *in the statute*," the Rule asserts that "*[t]his rule* does not require 'a guess' as to what conduct satisfies being 'engaged in the business.'" Appx. 038. But an agency's *regulatory* policy choice from among multiple possible meanings of an ambiguous *statute* is no saving grace.

statutory safe harbors to "rebuttal evidence" for use against its presumptions). To the extent that ATF's erroneous constructions of the statute are even to be entertained, all that would mean is that the statute has more than one possible meaning. And "we construe ambiguous statutes against imposing criminal liability[39]— precisely what ATF has done here." *VanDerStok v. Garland*, 86 F.4th 179, 196 n.26 (5th Cir. 2023). *See also Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 2024 U.S. Dist. LEXIS 131012, at *62 n.118 (N.D. Tex. July 23, 2024) (granting summary judgment for plaintiffs on "unambiguous[]" statutory definition, but "[i]f it were ambiguous, the rule of lenity would surely apply for the same reasons agreed to by a majority of the en banc *Cargill* panel."). To do anything else would "replac[e] the doctrine of lenity with a doctrine of severity." *Crandon v. United States*, 494 U.S. 152, 178 (1990) (Scalia, J., concurring).

## III.   THE RULE VIOLATES THE PRIVATE PLAINTIFFS' CONSTITUTIONAL RIGHTS

### A. The Rule Violates the Second Amendment.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." This absolutist language contains no qualification or limitation constraining who may exercise the right, which arms may be owned and carried, how they may be acquired or disposed (or in what number), where the right may be exercised, or for what purposes. Accordingly, the right presumptively belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," presumptively extends to all locations, and presumptively covers all "lawful purposes."

---

[39] *See* Appx. 046 ("The Department acknowledges . . . that failure to comply with the licensing requirement can have criminal implications . . . ."). But the government is required to apply *one interpretation* of a statute, uniformly, across civil and criminal contexts: "The rule of lenity . . . is a rule of statutory construction whose purpose is to help give authoritative meaning to statutory language. It is not a rule of administration calling for courts to refrain in criminal cases from applying statutory language that would have been held to apply if challenged in civil litigation." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 n.10 (1992); *see also Leocal v. Ashcroft*, 543 U.S. 1 (2004).

*District of Columbia v. Heller*, 554 U.S. 570, 581, 582, 624 (2008); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 32 (2022).

Indeed, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and a challenged firearm regulation is presumed unconstitutional. *Bruen*, 597 U.S. at 24. To that end, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" via examination of the Founding-era "principles that underpin our regulatory tradition." *Id.* at 26; *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024). And "only" if the government "justif[ies] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation . . . may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* Defendants thus far have failed to bear their historical burden, and no Founding-era history exists to support the Rule on summary judgment.

### i. The Rule Regulates Conduct Presumptively Protected by the Second Amendment.

First, it is beyond question that the Second Amendment protects Plaintiffs' "proposed course of conduct." *Bruen*, 597 U.S. at 32. Plaintiffs are "ordinary, law-abiding, adult citizens" (*i.e.*, members of "the people") who own, use, and at times purchase and privately sell firearms (*i.e.*, "keep . . . Arms"). *Id.*; Appx. 160–62 ¶¶12-16. By axiom, it would be impossible to "keep . . . Arms," much less "bear" them, unless the Second Amendment protected threshold acts like purchase and sale – natural prerequisites to exercising the right. Numerous courts have found as much. *See* Appx. 190–91 ¶137 n.11; *United States v. Hicks*, 649 F. Supp. 3d 357, 359-60 (W.D. Tex. 2023); *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise."); *Nguyen v. Bonta*, 2024 U.S. Dist. LEXIS 45512, at *17 (S.D. Cal. Mar. 11, 2024) ("the proper question . . . is not the extent of interference with the Second Amendment right," "but

instead whether the regulation historically would have been tolerated"); *Andrews v. State*, 50 Tenn. 165, 178 (Tenn. 1871).[40]

Properly understood, then, *Bruen* imposes nothing more than a minimal subject-matter qualifier: is a challenged regulation a *firearm regulation*, or not? *See Bruen*, 597 U.S. at 17. Because the Rule purports to require federal licensure – on pain of criminal penalties – should Plaintiffs engage in previously unregulated private, noncommercial transactions of personal firearms, Defendants cannot deny that the Rule is a *firearm* regulation subject to historical analysis.

Defendants' prior attempts to circumvent the Second Amendment's plain text are unavailing. First, Defendants invoked *Heller*'s dicta on "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms" to claim that requiring commercial licensure of private gun owners "raises no constitutional concern" at all.[41]Appx. 775; Appx. 035. But

---

[40] *But see McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("The right to 'keep and bear' can implicate the right to purchase. . . . But such an implication is not the same thing as being covered by the plain text of the amendment."). Notwithstanding that the Fifth Circuit concluded that "the right to purchase" is not within the "plain text," it reiterated that "'acquiring firearms to protect one's hearth and home' is a 'core Second Amendment guarantee.' . . . Even under our reading of *Bruen*, the Second Amendment extends protection to acquisition." *McRorey* at, 838 n.18.

[41] For starters, Defendants seek to whitewash the Rule as nothing more than "[a] requirement that firearms dealers be licensed," and applying only to "the commercial dealing of firearms." Appx. 775 and n.23. But that puts the cart before the horse, because this case involves *just who* constitutes a dealer under the statute. Indeed, the Rule does not apply to existing firearms dealers, who often have a storefront, purchase firearms at wholesale, and sell them at retail. Rather, the Rule sweeps broadly against tens of thousands (if not hundreds of thousands, Appx. 193 ¶149 n.12) of unlicensed persons, many of whom wish merely to privately sell a few personally owned firearms. By removing "personal protection" firearms from the statutory safe harbor (Appx. 123), the Rule opens the possibility of licensure for those who own firearms for "self-defense" – what the Supreme Court has termed the "core lawful purpose" of the Second Amendment. *Heller*, 554 U.S. at 630. It is *this* unprecedented application of the licensing statute that Plaintiffs challenge. In fact, the Rule unabashedly seeks to "move as close to universal background checks as possible" without going through Congress. *FACT SHEET: Biden-Harris Administration Takes Another Life-Saving Step to Keep Guns Out of Dangerous Hands*, White House (Aug. 31, 2023), https://tinyurl.com/bdzz7ufh. The Rule itself acknowledges its intimidation tactics "will result in more persons . . . becoming licensed," who "will conduct more background checks" to grow ATF's universal registry, while also "deter[ring] others" from selling a firearm in the first place. Appx. 001; *see also* Appx. 351.

Defendants' Rule is neither "longstanding"[42] nor a "commercial" regulation. Federal licensure even of *commercial dealers* did not arise until the Federal Firearms Act of 1938, nearly 150 years after the Second Amendment was ratified. *See Fouts v. Bonta*, 2024 U.S. Dist. LEXIS 31528, at *6 (S.D. Cal. Feb. 23, 2024) (after *Bruen*, "a statute enacted in 1923 is no longer given a pass for being 'longstanding'"). Nor are Plaintiffs' *private* sales of personal firearms commercial in nature – even if they were, that does not make regulations constitutional. *Rigby v. Jennings*, 630 F. Supp. 3d 602, 613 (D. Del. 2022) ("not every regulation on the commercial sale of arms is presumptively lawful"); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) ("If there were somehow a categorical exception for [commercial regulations] . . . there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*."); *Kole v. Village of Norridge*, 2017 U.S. Dist. LEXIS 178248, at *30 (N.D. Ill. Oct. 27, 2017); *United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023) ("according to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms. What a marvelous, Second Amendment loophole!"). Indeed, *Heller* expressly invited such future challenges (554 U.S. at 635) and *Bruen* made no exceptions to its historical framework (597 U.S. at 17, 24).

Second, Defendants claimed that background checks are constitutional as a general matter, and that, in comparison, "[a] requirement that firearms dealers be licensed has an even more attenuated relationship to the right protected by the Second Amendment's text." Appx. 775. But *Bruen* never "affirmed the constitutionality" (*id.*) of shall-issue public carry licensing regimes' background checks, because the Court had no occasion to rule on other states' licensing regimes at all. *See United States v. Rahimi*, 61 F.4th 443, 451 n.5 (rejecting the very same argument, when previously made by the government) (overruled on other grounds by *United States v. Rahimi*, 144 S. Ct. 1889 (2024). Moreover, most of the shall-issue regimes the Court identified for comparative purposes are entirely voluntary regimes within otherwise "constitutional carry" or "open carry"

---

[42] *See also Rest. Law Ctr.*, 2024 U.S. App. LEXIS 21449, at *21 ("Nor can we permit agency practice to defeat a statute's text by adverse possession.") (punctuation omitted, citation omitted).

jurisdictions that do not condition the right to carry on a background check in the first place. *See Bruen*, 597 U.S. at 13 n.1. How an opt-in permit system supports the Rule's punitive and coercive licensing expansion, Defendants do not explain.

Ultimately, Defendants noted that "Plaintiffs do not and cannot claim that the Rule functionally bans any firearm sales." Appx. 776. But that is not the test. *Bruen* made clear – ad nauseam – that the Second Amendment's textual and historical standard applies to mere firearm "regulation[s]" – not just "functional[] bans" or absolute deprivations of the right. *Bruen*, 597 U.S. at 17; *see also Jackson v. City & County of San Francisco*, 576 U.S. 1013, 1016 (2015) (Thomas, J., dissenting from denial of certiorari) (noting that "nothing in . . . *Heller* suggested that a law must rise to the level of the absolute prohibition" to be unconstitutional). At bottom, the Second Amendment presumptively protects the purchase and sale of firearms – whether personal and noncommercial, as here, or otherwise. Without these necessary predicate acts, one will be hard-pressed to "keep" or "bear" arms.

### ii.    The Founders Never Required Licensure for Private Citizens to Engage in Private, Noncommercial Sales of Personal Firearms.

At the outset, Defendants misconstrue the historical inquiry, offering purported analogues only in support of the most general of propositions – that Founding-era governments sometimes "regulated firearms commerce" in disparate ways. Appx. 777. But "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring).[43] Whether the government can regulate *firearms commerce* in the

---

[43] Defendants insist that historical laws generally evincing *some* commercial regulation somehow support the Rule's specific regulation here. But that would be akin to *Rahimi* seeking 'public safety' laws to support the specific prohibition of 18 U.S.C. § 922(g)(8), a "level of generality" which the Court rejected. Instead, "the Court settle[d] on just the right level of generality: 'Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms.'" *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring). The specificity with which the Court identified the historical principle in *Rahimi* sets the stringency of Defendants' burden here.

first place is not at issue here, nor is the constitutionality of licensing *commercial* sellers.[44] *See Bruen*, 597 U.S. at 29 ("a green truck and a green hat are relevantly similar if one's metric is 'things that are green.'"). Rather, Defendants must show that the Founders sought to license *private, noncommercial* sellers who occasionally sold and traded personal firearms – that which the Rule attempts today. Defendants cannot.

Indeed, both in the Rule and in prior briefing, Defendants proffered the same sorts of historical laws – safety regulations on rudimentary and volatile gunpowder, a short-lived export ban intended to make it *easier* for Americans to acquire arms domestically, quality-control measures in firearm barrel manufacturing, and restrictions on the provision of arms to non-citizens. *Cf.* Appx. 035–36; Appx. 777–78; *see also* Appx. 192 ¶¶139-43 (already dispensing with these analogues). None bears any resemblance to the Rule's expansive extension of commercial licensing requirements to private gun owners making personal sales, and no such law ever existed. Consequently, the Rule violates the Second Amendment.

## B. The Rule Violates the Fourth Amendment.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Thus, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357 (1967). Requiring (at least) tens of thousands of gun owners to seek federal licensure,[45] the Rule unconstitutionally subjects each new licensee to warrantless ATF inspections of their private homes and personal gun collections (27 C.F.R. § 478.23(b); Appx. 194 ¶¶155-56). This massive expansion of ATF's powers simply cannot be justified under the "highly regulated industry"

---

[44] Even so, Plaintiffs do not concede the constitutionality of requiring even commercial firearm sellers to obtain a government permission slip to engage in constitutionally protected commerce.

[45] While the Rule provides various 'guesstimates' of the affected population, it seems that ATF is anything but sure just how many gun owners will be subject to the Rule. Of the affected population, one of ATF's purported "subject matter experts" said "I honestly have no opinion on this as I have no clue . . . ." Appx. 708–09.

exception to the warrant requirement, a regime whose purported constitutionality derives from its narrow application. Indeed, this "has always been a narrow exception" that cannot "swallow the Rule." *City of Los Angeles v. Patel*, 576 U.S. 409, 424-25 (2015). Yet the Rule does just that, blowing the doors off the "highly regulated industry" exception and granting ATF *carte blanche* to invade the private homes of countless thousands of American gun owners who have no desire or intent to enter the industry at all.

Ironically, Defendants appear to appreciate the gravity of the Rule's invasion of Plaintiffs' privacy. Responding to public comments, the Rule acknowledged that "[p]roperty used for commercial purposes is treated differently for Fourth Amendment purposes from residential property. 'An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home.'" Appx. 037 (quoting *Minnesota v. Carter*, 525 U.S. 83, 90 (1998)). Indeed, "when it comes to the Fourth Amendment, the home is first among equals," *Florida v. Jardines*, 569 U.S. 1, 6 (2013), and "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ." *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972). Yet as Plaintiffs explained, "[f]or most forced to obtain an FFL by the Final Rule, [the business] 'premises' is the private home," and the "'business inventory' is their personal collection of firearms." Appx. 194. The Rule thus sanctions warrantless invasions by ATF into the most sacred of places.[46]

---

[46] To make matters worse, ATF has a history of paying non-licensees home visits. In Delaware, for example, a homeowner published "[a] live video feed from his doorbell camera show[ing] three armed men wearing tactical vests, t-shirts and jeans. Two appeared to be ATF agents. . . . None wore body cameras. . . . The agent said they were verifying that people who bought multiple firearms still had the guns in their possession." Lee Williams, *ATF Conduct Surprise Inspection at Man's Home Without Warrant*, AmmoLand (July 19, 2022), https://tinyurl.com/2bzdrujy; *see also* Elizabeth Lawrence, *Video: Armed ATF Agents Going Door-to-Door to Confiscate Gun Devices*, Am. Military News (May 10, 2023), https://tinyurl.com/4m8bc67f. Contentious scenes like this, among others will only become more commonplace under the Rule. *See also* Eduardo Medina, *What Set the A.T.F. and an Airport Leader on the Path to a Deadly Encounter?*, N.Y. Times (May 24, 2024), https://tinyurl.com/2s4fyya5 (recounting ATF raid of Bryan Malinowksi, former Director of the Bill and Hillary Clinton National Airport, who was shot and killed by ATF agents serving a warrant at his home while investigating unlicensed dealing in firearms).

It seems unlikely that the "highly regulated industry" exception – which applies to places like mines and junkyards – was ever intended to apply within the home. What is more, the continuing validity of this exception is highly suspect after *Bruen*, under which the government would need to prove a historical tradition of government agents entering the private homes of Founding-era gun owners. Unsurprisingly, no such tradition existed among a generation still reeling from the general warrants abusively employed by agents of the Crown. In fact, quite to the contrary, the Revolution was specifically precipitated by British efforts to "inspect" (seize) the colonists' arms.[47]

As the Supreme Court explained in *United States v. Biswell*, 406 U.S. 311, 315 (1972), "[f]ederal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control" of other traditionally regulated industries. It thus is far from certain that the post-*Bruen* Court would decide *Biswell* similarly today, and even less likely that it would sanction the Rule's vast expansion of a "narrow exception" to the private homes and firearm collections of untold thousands of American gun owners. Accordingly, the Rule violates the Fourth Amendment.

### C. The Rule Is Void for Vagueness, in Violation of the Fifth Amendment.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." The Due Process Clause requires that criminal laws "give ordinary people fair warning about what the law demands of them." *United States v. Davis*, 588 U.S. 445, 448 (2019). To be sure, "whether a person is engaged in the business as a dealer under . . . this section is a fact-specific inquiry." 89 Fed. Reg. at 29091. But under the hopelessly vague Rule, there are no clear standards that one could employ to accurately make this determination.

---

[47] *See* Brief Amicus Curiae of Gun Owners of America, Inc., et al. in *District of Columbia v. Heller*, No. 07-290 (Feb. 11, 2008), https://tinyurl.com/bdfn6zm3.

Where to start? Contrary to the statute, which requires multiple purchases and multiple resales of multiple firearms, the Rule claims "there is no minimum threshold number of firearms purchased *or* sold that triggers the licensing requirement," positing that "even a single firearm transaction or offer to engage in a transaction" (*i.e.*, without any actual transaction) "may" require a license. Appx. 124. And whereas "[a]ction is needed" under the statute (Appx. 563), the Rule paints a murky line of merely "holding [one]self out as a dealer" or "offer[ing] to engage in a transaction, when combined with other [unstated] evidence." Appx. 009–10. Likewise, although the statute requires a person make real profit from real sales of firearms, the Rule allows that a person merely *intend* to profit from *intended* activities. *Cf.* Appx. 124; 18 U.S.C. § 921(a)(22); Appx. 560; Reading Law at 107. Further, whereas the statute flatly says that persons who sell firearms "for the enhancement of a personal collection" are not dealers, the Rule waters this down to "shall not be presumed" to be dealers (but still might be, of course). *Cf.* 18 U.S.C. § 921(a)(21)(C); Appx. 125. And according to the Rule, this all depends on whether a particular gun was owned for "personal protection" as opposed to for "a hobby" or for "study."[48] 89 Fed. Reg. at 29090. How one is supposed to navigate between these two extremes – especially given that many people have multiple reasons for owning firearms – the Rule does not say. And even worse, the Rule also creates an entirely "new term" of "former licensee inventory" – placing certain formerly licensed persons in a perpetual purgatory between actual statutory "licensee" and the unlicensed general public. Appx. *002*; *see also* Appx. 555. ("GOA describes a former FFL whose retirement savings are now frozen in unsellable inventory.").

The Rule's "presumptions" only muddy the waters even further. Indeed, the Rule creates a cornucopia of "not exhaustive" "presumptions" that "may" apply (or may not) to certain activities, which may (or may not) show that a person is engaged in the business, and which must

---

[48] As Judge Oldham stated in another ATF final rule challenge, "[e]ven if 'some conduct [] clearly falls within the provision's grasp,' a law can still be vulnerable to a vagueness challenge. With its nonexclusive list of eight factors and lack of concrete examples, the Rule produces 'more unpredictability and arbitrariness than the Due Process Clause tolerates.'" *VanDerStok v. Garland*, 86 F.4th 179, 209 (5th Cir. 2023) (Oldham, J., concurring) (citation omitted).

be overcome by a showing of "reliable evidence to the contrary" – whatever that meansAppx. 124–25. How such indeterminate language can place the public on notice of what individuals can and cannot do – especially in light of the warning that *more* "may be considered" behind closed doors – Defendants never explain. Appx. *125. See United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009) ("[a] designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian regimes."). The Rule's "presumptions" therefore invite quintessential "arbitrary and discriminatory enforcement" in violation of due process. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

The Rule's "presumptions" also sweep up all manner of lawful conduct. For example, the Rule purports to protect sales of new-in-box firearms so long as they are sold after a year[49] of ownership (an atextual and arbitrary timeframe), devising a safe harbor for such activity within one "presumption." Appx. 124. But Defendants immediately walk back that safe harbor, stating in the Rule's *preamble* that it does not apply if a person "intentionally stockpiles" firearms "with an intent to evade the one-year turnover . . . ." Appx. 049. In other words, ATF presumes a person is dealing, except to the extent that he is not, except to the extent that he is – hardly a bright line.

Responding to public commenters' concerns that the "presumptions" are "overbroad, [and] would capture too many permissible sales by collectors," Appx. 056, the Rule repeatedly demurs that, even if the Rule does reach lawful conduct, "the presumptions are rebuttable" and "refuted by reliable evidence" provided by the *accused*. Appx. 049, 057, 064–66, 078, 080–83. In other words: 'no harm, no foul, because you can always defend yourself.' But the Rule never defines what Defendants consider "reliable" evidence to be, and so in a civil enforcement context, that too

---

[49] For GOA's member who has a YouTube channel focused on reviewing firearms, repeat sales of near-new firearms after the review is done would make this person "presumed" engaged in the business under the Rule, even though profit from firearm sales is clearly not the objective. Appx. 446 ¶47.

will be in the eye of the beholder – ATF, of course.[50] But "[t]he law exists to tell both the people *and* government officials what they can do," *VanDerStok*, 86 F.4th at 209 (Oldham, J., concurring), not to force those who are law-abiding to defend their lawful conduct with "reliable" evidence.

Adding insult to injury, the Rule provides that these "not exhaustive" lists of "presumptions" "shall not apply to any criminal case" – except, of course, to the extent "they may be useful to courts in criminal cases." Appx. 125. But "statutes are not chameleons, acquiring different meanings when presented in different contexts." *Maryland v. EPA*, 958 F.3d 1185, 1202 (D.C. Cir. 2020). And "[p]resumptions, especially in administrative proceedings that may generate institution-destroying liability, cannot be a matter of Department *ipse dixit*." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 251 (5th Cir. 2024). Such rampant guesswork is a feature (not a bug) of the Rule,[51] which deprives Plaintiffs of fair notice of what the law demands of them and therefore violates the Fifth Amendment.

### D. The Rule Violates the Contitutional Separation of Powers.

Article I, § 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." Article I, § 7, cl. 2, in turn, mandates that "[e]very Bill . . . shall have passed the House of Representatives and the Senate" and "shall . . . be presented to the President of the United States . . . before it become a Law . . . ." Together ensuring a separation of powers, these provisions "requir[e] that Congress, rather than the executive . . . branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018); *see also United States v. Davis*, 588 U.S. 445, 447-48 (2019) ("Only the people's elected representatives in Congress have the power to write new federal criminal laws."). In violation of this doctrine, the Rule openly admits

---

[50] *But see Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis . . . .").

[51] And even if this Court were to find "[e]ach of the uncertainties in the [Rule] . . . tolerable in isolation, . . . 'their sum makes a task . . . which at best could be only guesswork.'" *Johnson v. United States*, 576 U.S. 591, 602 (2015).

that its regulatory changes are not just "in light of the BSCA's changes" but also "to provide *additional* guidance" beyond any statutory grant of authority. Appx. 006 (emphasis added). The reason this "additional guidance" is needed? The Rule claims that "*advancements* in manufacturing . . . and distribution technology . . . and *changes* in the marketplace for firearms . . . have *created a need for further clarity* in the regulatory definition of 'dealer.'" *Id.* (emphasis added). But even if that were so, then "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018).

Consistent with ATF's blatant admission that the Rule is designed to update (*i.e.*, rewrite) the statute, Plaintiffs' Complaint details the numerous ways the Rule conflicts with the statute that Congress wrote. Plaintiffs were entitled to have Congress weigh in before their statutory duties and obligations were altered. The Rule thus violates the constitutional separation of powers.

## CONCLUSION

For the reasons stated, the Court should grant Plaintiffs' Motion for Summary Judgment, vacate the Rule, and permanently enjoin its enforcement.

Date: October 22, 2024

Respectfully submitted.

KEN PAXTON
Attorney General

/s/Garrett Greene
GARRETT GREENE
Special Counsel
Texas Bar No. 24096217

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

KATHLEEN HUNKER
Special Counsel
Texas Bar No. 24118415

AUSTIN KINGHORN
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 463-2100
garrett.greene@oag.texas.gov
kathleen.hunker@oag.texas.gov

COUNSEL FOR PLAINTIFF STATE OF TEXAS

LYNN FITCH
Attorney General of Mississippi

LIZ MURRILL
Attorney General of Louisiana

/s/Justin L. Matheny
JUSTIN L. MATHENY
Deputy Solicitor General
MS Bar No. 100754
OFFICE OF THE ATTORNEY GENERAL
P.O Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-3680
Facsimile: (601) 359-2003
justin.matheny@ago.ms.gov

/s/ Kelsey L. Smith
KELSEY L. SMITH
Deputy Solicitor General
Texas Bar No. 24117070
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Telephone: (225) 428-7432
smithkel@ag.louisiana.gov

COUNSEL FOR PLAINTIFF STATE OF LOUISIANA

COUNSEL FOR PLAINTIFF STATE OF
MISSISSIPPI

Sean D. Reyes
Utah Attorney General

*/s/ Andrew Dymek*
**Andrew Dymek**
Assistant Solicitor General*

Utah Office Of The Attorney General
Office of the Utah Attorney General
160 East 300 South, Fifth Floor
Salt Lake City, Utah 84114-2320
Telephone: (801) 366-0533
adymek@agutah.gov

**Counsel for Plaintiff State Of Utah**

Schulman, LeRoy & Bennett PC

*/s/ John I. Harris III*
**John I. Harris III**
Tennessee Bar No. 12099
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
Telephone: (615) 244-6670 Ext. 111
Facsimile: (615) 254-5407
jharris@slblawfirm.com

**Counsel for Jeffery W. Tormey, Gun Owners Of America, Gun Owners Foundation, Tennessee Firearms Association, And Virginia Citizens Defense League**

Stamboulieh Law, PLLC

*/s/ Stephen D. Stamboulieh*
**Stephen D. Stamboulieh**
NDTX#: 102784MS
Mississippi Bar No. 102784
P.O. Box 428
Olive Branch, Mississippi 38654
Telephone: (601) 852-3440
stephen@sdslaw.us

**Counsel for Jeffery W. Tormey, Gun Owners Of America, Gun Owners Foundation, Tennessee Firearms Association, And Virginia Citizens Defense League**

Barnett Howard & Williams PLLC

*/s/ Brandon W. Barnett*
**Brandon W. Barnett**
Texas Bar No. 24053088
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
Telephone: (817) 993-9249
Facsimile: (817) 697-4388
barnett@bhwlawfirm.com

**Local Counsel for Jeffery W. Tormey, Gun Owners Of America, Gun Owners Foundation, Tennessee Firearms Association, And Virginia Citizens Defense League**

## Certificate Of Service

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 22, 2024 and that all counsel of record were served by CM/ECF.

*/s/ Garrett Greene*
Garrett Greene

51