# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

STATE OF TEXAS ET AL.,
    *PLAINTIFF*,

V.

No. 2:24-CV-00089-Z

BUREAU OF ALCOHOL, TOBACCO, FIREARMS
AND EXPLOSIVES ET AL.,
    *DEFENDANTS*.

## APPENDIX TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Final Rule ...................................................................................Appx.001–126

NPRM ........................................................................................Appx.127–157

Complaint ..................................................................................Appx.158–205

Declaration of J. Tormey ...........................................................Appx.206–209

Declaration of E. Pratt ..............................................................Appx.210–219

Plaintiffs' PI/TRO......................................................................Appx.220–266

GOA Comment...........................................................................App.267–352

States Attorney Generals Comment ...........................................Appx.353–361

Plaintiffs' Reply in Support of Preliminary Injunction/TRO .....App.362–394

Memorandum and Opinion re Plaintiffs' TRO ...........................Appx.395–408

Order re Supplemental Briefing on Standing .............................Appx.409

Supplemental Brief of J. Tormey on Standing. ..........................Appx.410–414

Supplemental Declaration of J. Tormey .....................................Appx.415–417

Supplemental Brief of Tennessee Firearms Association on Standing ......................Appx.418–423

Supplemental Declaration of Richard Archie .............................Appx.424–431

Supplemental Brief of GOA on Standing ...................................Appx.432–446

Supplemental Brief of GOF on Standing ......................................................Appx.447–452

Supplemental Brief of VCDL on Standing ................................................Appx.453–458

Supplemental Declaration of Philip Van Cleave ......................................Appx.459–462

Supplemental Brief of Louisiana on Standing ..........................................Appx.463–469

Declaration of Lucius Morris II ................................................................Appx.470–476

Supplemental Brief of Texas on Standing................................................Appx.477–486

Declaration of Darwin Boedeker..............................................................Appx.487–490

Declaration of Murl Miller........................................................................Appx.491–496

Supplemental Brief of Mississippi on Standing ......................................Appx.497–502

Supplemental Declaration of Gregory I. Duke ........................................Appx.503–504

Supplemental Brief of Utah on Standing ..................................................Appx.505–515

Defendants' Response to Plaintiffs' Supplemental Briefing on Standing ................Appx.516–544

Order Granting Preliminary Injunction ....................................................Appx.545–565

Defendants' Notice of Appeal ..................................................................Appx.566–568

DOJ Opening Brief (5th Cir. No. 24-10612) ..........................................Appx.569–643

Administrative Record Received by Court ................................................Appx.644–645

Administrative Record Excerpts (1) ........................................................Appx.646–709

Declaration of John Crump........................................................................Appx.710–712

Declaration of Mark Davis ........................................................................Appx.713–715

Declaration of Richard Hughes ................................................................Appx.716–717

Opposition to Plaintiffs' Motion for TRO/PI ..........................................Appx.718–787

Administrative Record Excerpts (2) ........................................................Appx.788–790

Date: October 22, 2024

Respectfully submitted.

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

*/s/Garrett Greene*
**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217

**KATHLEEN HUNKER**
Special Counsel
Texas Bar No. 24118415

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 463-2100
garrett.greene@oag.texas.gov
kathleen.hunker@oag.texas.gov

**COUNSEL FOR PLAINTIFF STATE OF TEXAS**

LYNN FITCH
Attorney General of Mississippi

*/s/Justin L. Matheny*
**JUSTIN L. MATHENY**
Deputy Solictor General
MS Bar No. 100754
OFFICE OF THE ATTORNEY GENERAL
P.O Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-3680
Facsimile: (601) 359-2003
justin.matheny@ago.ms.gov

**COUNSEL FOR PLAINTIFF STATE OF MISSISSIPPI**

LIZ MURRILL
Attorney General of Louisiana

*/s/ Kelsey L. Smith*
**KELSEY L. SMITH**
Deputy Solicitor General
Texas Bar No. 24117070
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Telephone: (225) 428-7432
smithkel@ag.louisiana.gov

**COUNSEL FOR PLAINTIFF STATE OF LOUISIANA**

SEAN D. REYES
Utah Attorney General

*/s/ Andrew Dymek*
**ANDREW DYMEK**
Assistant Solicitor General*

UTAH OFFICE OF THE ATTORNEY GENERAL
Office of the Utah Attorney General
160 East 300 South, Fifth Floor
Salt Lake City, Utah 84114-2320
Telephone: (801) 366-0533
adymek@agutah.gov

**COUNSEL FOR PLAINTIFF STATE OF UTAH**


SCHULMAN, LEROY & BENNETT PC

*/s/ John I. Harris III*
**JOHN I. HARRIS III**
Tennessee Bar No. 12099
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
Telephone: (615) 244-6670 Ext. 111
Facsimile: (615) 254-5407
jharris@slblawfirm.com

**COUNSEL FOR JEFFERY W. TORMEY, GUN
OWNERS OF AMERICA, GUN OWNERS
FOUNDATION, TENNESSEE FIREARMS
ASSOCIATION, AND VIRGINIA CITIZENS
DEFENSE LEAGUE**

STAMBOULIEH LAW, PLLC

*/s/ Stephen D. Stamboulieh*
**STEPHEN D. STAMBOULIEH**
NDTX#: 102784MS
Mississippi Bar No. 102784
P.O. Box 428
Olive Branch, Mississippi 38654
Telephone: (601) 852-3440
stephen@sdslaw.us

**COUNSEL FOR JEFFERY W. TORMEY, GUN
OWNERS OF AMERICA, GUN OWNERS
FOUNDATION, TENNESSEE FIREARMS
ASSOCIATION, AND VIRGINIA CITIZENS
DEFENSE LEAGUE**


BARNETT HOWARD & WILLIAMS PLLC

*/s/ Brandon W. Barnett*
**BRANDON W. BARNETT**
Texas Bar No. 24053088
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
Telephone: (817) 993-9249
Facsimile: (817) 697-4388
barnett@bhwlawfirm.com

**LOCAL COUNSEL FOR JEFFERY W. TORMEY,
GUN OWNERS OF AMERICA, GUN OWNERS
FOUNDATION, TENNESSEE FIREARMS
ASSOCIATION, AND VIRGINIA CITIZENS
DEFENSE LEAGUE**

## DEPARTMENT OF JUSTICE

**Bureau of Alcohol, Tobacco, Firearms, and Explosives**

**27 CFR Part 478**

**[Docket No. ATF 2022R–17; AG Order No. 5920–2024]**

**RIN 1140–AA58**

### Definition of "Engaged in the Business" as a Dealer in Firearms

**AGENCY:** Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** The Department of Justice ("Department") is amending Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") regulations to implement the provisions of the Bipartisan Safer Communities Act that broaden the definition of when a person is considered "engaged in the business" ("EIB") as a dealer in firearms other than a gunsmith or pawnbroker. This final rule incorporates the BSCA's definitions of "predominantly earn a profit" ("PEP") and "terrorism," and amends the regulatory definitions of "principal objective of livelihood and profit" and "engaged in the business" to ensure each conforms with the BSCA's statutory changes and can be relied upon by the public. The rule also clarifies what it means for a person to be "engaged in the business" of dealing in firearms and to have the intent to "predominantly earn a profit" from the sale or disposition of firearms. In addition, it clarifies the term "dealer" and defines the term "responsible person." These clarifications and definitions assist persons in understanding when they are required to have a license to deal in firearms. Consistent with the Gun Control Act ("GCA") and existing regulations, the rule also defines the term "personal collection" to clarify when persons are not "engaged in the business" because they make only occasional sales to enhance a personal collection or for a hobby, or if the firearms they sell are all or part of a personal collection. This rule further addresses the procedures that former licensees, and responsible persons acting on behalf of such licensees, must follow when they liquidate business inventory upon revocation or other termination of their license. Finally, the rule clarifies that a licensee transferring a firearm to another licensee must do so by following the verification and recordkeeping procedures in the regulations, rather than by using a Firearms Transaction Record, ATF Form 4473.

**DATES:** This rule is effective May 20, 2024.

**FOR FURTHER INFORMATION CONTACT:** Helen Koppe, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Department of Justice, 99 New York Ave. NE, Washington DC 20226; telephone: (202) 648–7070 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

I. Executive Summary
II. Background
III. Notice of Proposed Rulemaking
IV. Analysis of Comments and Department Responses
V. Final Rule
VI. Statutory and Executive Order Review

### I. Executive Summary

This rulemaking finalizes the proposed rule implementing the provisions of the Bipartisan Safer Communities Act, Public Law 117–159, sec. 12002, 136 Stat. 1313, 1324 (2022) ("BSCA"), that amended the definition of "engaged in the business" in the GCA at 18 U.S.C. 921(a)(21)(C), as well as the Department's plan in response to Executive Order 14092 of March 14, 2023 (Reducing Gun Violence and Making Our Communities Safer), 88 FR 16527 (Mar. 17, 2023). Section 12002 of the BSCA broadened the definition of "engaged in the business" under 18 U.S.C. 921(a)(21)(C) by eliminating the requirement that a person's "principal objective" of purchasing and reselling firearms must include both "livelihood and profit" and replacing it with a requirement that the person must intend "to predominantly earn a profit." The BSCA therefore removed the requirement to consider income for "livelihood" when determining that a person is "engaged in the business" of dealing in firearms at wholesale or retail. The definition of "to predominantly earn a profit" now focuses only on whether the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain. These regulations implement this statutory change and provide clarity to persons who remain unsure of whether they are engaged in the business as a dealer in firearms with the predominant intent of obtaining pecuniary gain. This rulemaking will result in more persons who are already engaged in the business of dealing in firearms becoming licensed and deter others from engaging in the business of dealing in firearms without a license. As more persons become licensed under this rule, those licensees will conduct more background checks to prevent prohibited persons from purchasing or receiving firearms, consistent with the longstanding requirements of the GCA for persons who are engaged in the business of dealing in firearms. Those additional licensees will also respond to trace requests when those firearms are later found at a crime scene. At the same time, neither the BSCA nor this rule purports to require every private sale of a firearm to be processed through a licensed dealer. Individuals may continue to engage in intrastate private sales without a license, provided that such individuals are not "engaged in the business" and the transactions are otherwise compliant with law.

This final rule accomplishes these important public safety goals of the GCA, as amended by the BSCA, in several ways. First, the rule finalizes an amendment to the regulatory definition of "dealer" to clarify that firearms dealing may occur wherever, or through whatever medium, qualifying domestic or international activities are conducted.

Second, the rule finalizes an amendment to the regulatory definition of "engaged in the business" to define the terms "purchase" and "sale" as they apply to dealers to include any method of payment or medium of exchange for a firearm, including services or illicit forms of payment (e.g., controlled substances). For further clarity, this final rule defines the term "resale" to mean "selling a firearm, including a stolen firearm, after it was previously sold by the original manufacturer or any other person." This change aligns the regulatory text with the intent element in 18 U.S.C. 921(a)(21)(C) and makes clear that the term "resale" refers to the sale of a firearm, including a stolen firearm, any time after any prior sale has occurred.

Third, because performing services can also be a medium of exchange for firearms, the rule finalizes an amendment to existing regulations that codifies ATF's historical exclusion for auctioneers who provide only auction services on commission to assist in liquidating firearms at an "estate-type" auction.

Fourth, the rule clarifies who is required to be licensed as a wholesale or retail firearms dealer by finalizing a list of specific activities demonstrating when an unlicensed person's buying and reselling of firearms presumptively rises to the level of being "engaged in the business" as a dealer. It also finalizes a separate set of presumptions indicating when a person has the intent "to predominantly earn a profit"

ATF 015280

APPX.001

through the repetitive purchase and resale of firearms. The activities described in these presumptions are not an exclusive list of activities that may indicate that someone is "engaged in the business" or intends "to predominantly earn a profit." These presumptions will provide clarification and guidance to persons who are potentially subject to the license requirement and will apply in administrative and civil proceedings. The presumptions will be used, for example, to help a fact finder determine in civil asset forfeiture proceedings whether seized firearms should be forfeited to the Government and in administrative licensing proceedings to determine whether to deny or revoke a Federal firearms license. These presumptions do not apply in any criminal proceedings but may be useful to judges in such proceedings when, for example, they decide how to instruct juries regarding permissible inferences.

At the same time, the final rule expressly recognizes that individuals who purchase firearms for the enhancement of a personal collection or a legitimate hobby are permitted by the GCA to occasionally buy and sell firearms for those purposes, or occasionally resell to a licensee or to a family member for lawful purposes, without the need to obtain a license. It also makes clear that persons may liquidate all or part of a personal collection, liquidate firearms that are inherited, or liquidate pursuant to a court order, without the need to obtain a license. Evidence of these activities may also be used to rebut the presumptions discussed above in a civil or administrative proceeding. Relatedly, the rule finalizes the proposed definition of the term "personal collection" (or "personal collection of firearms" or "personal firearms collection") to reflect common definitions of the terms "collection" and "hobby." While firearms accumulated primarily for personal protection are not included in the definition of "personal collection," the final rule makes clear that nothing in this rule shall be construed as precluding a person from lawfully acquiring a firearm for self-protection or other lawful personal use.

Finally, to help address the problem of licensees who improperly liquidate their business inventory of firearms without performing required background checks or maintaining required records after their license is terminated (*e.g.,* revocation, denial of renewal, expiration, or voluntary surrender), the rule finalizes the proposed regulations on discontinuing business. These regulations clarify the statutory requirements under 18 U.S.C.

923(c) regarding "former licensee inventory"—a new term defined to mean those firearms that remain in the possession of a former licensee (or a "responsible person" of the former licensee, as also defined in the rule) at the time the license is terminated. The rule also finalizes an amendment to the regulations that makes clear that a licensee who transfers a firearm to another licensee is required to do so by following the licensee verification and recordkeeping procedures in the regulations, rather than by using a Firearms Transaction Record, ATF Form 4473 ("Form 4473").

## II. Background

### Subsections in Section II

A. Advance Notice of Proposed Rulemaking (1979)
B. Firearms Owners' Protection Act of 1986
C. Executive Action To Reduce Gun Violence (2016)
D. Bipartisan Safer Communities Act (2022)
E. Executive Order 14092 (2023)

The Attorney General is responsible for enforcing the GCA. This responsibility includes the authority to promulgate regulations necessary to enforce the provisions of the GCA. *See* 18 U.S.C. 926(a). Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA to the Director of ATF ("Director"), subject to the direction of the Attorney General and the Deputy Attorney General. *See* 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)–(2); Treasury Department Order No. 221, sec. (1), (2)(d), 37 FR 11696, 11696–97 (June 10, 1972). Accordingly, the Department and ATF have promulgated regulations necessary to implement the GCA. *See* 27 CFR part 478.

The GCA, at 18 U.S.C. 922(a)(1)(A), makes it unlawful for any person, except a licensed dealer, to "engage in the business" of dealing in firearms.[1] The GCA further provides that no person shall engage in the business of dealing in firearms until the person has filed an application with ATF and received a license to do so. 18 U.S.C. 923(a). The required application must contain information necessary to determine eligibility for licensing and must include a photograph, fingerprints of the applicant, and a license fee for each place in which the applicant is to

do business. 18 U.S.C. 923(a). The fee for dealers in firearms other than destructive devices is currently set by the GCA at $200 for the first three-year period and $90 for a renewal period of three years. 18 U.S.C. 923(a)(3)(B); 27 CFR 478.42(c)(2). Among other items, the Application for Federal Firearms License, ATF Form 7 (5310.12)/7CR (5310.16) ("Form 7"), requires the applicant to include a completed Federal Bureau of Investigation ("FBI") Form FD–258 ("Fingerprint Card") and a photograph for all responsible persons, including sole proprietors. *See* ATF Form 7, Instruction 6.

Significantly, under the GCA since 1998, once licensed, firearms dealers have been required to conduct background checks on prospective firearm recipients through the FBI's National Instant Criminal Background Check System ("NICS") to prevent prohibited persons from receiving firearms. *See* 18 U.S.C. 922(t). They have also been required to maintain firearms transaction records for crime gun tracing purposes. *See* 18 U.S.C. 922(b)(5); 923(g)(1)(A). Persons who willfully engage in the business of dealing in firearms without a license are subject to a term of imprisonment of up to five years, a fine of up to $250,000, or both. 18 U.S.C. 922(a)(1)(A); 924(a)(1)(D); 3571(b)(3). Any firearms involved or used in any such willful violation may be subject to administrative or civil seizure and forfeiture. *See* 18 U.S.C. 924(d)(1). In addition, ATF may deny license applications submitted by persons who have willfully engaged in the business of dealing in firearms without a license, 18 U.S.C. 923(d)(1)(C), and ATF may revoke or deny renewal of a license if a licensee has aided and abetted others in willfully engaging in the business of dealing in firearms without a license, 18 U.S.C. 923(e)–(f).

### A. Advance Notice of Proposed Rulemaking (1979)

The term "dealer" is defined by the GCA, 18 U.S.C. 921(a)(11)(A), and 27 CFR 478.11, and includes "any person engaged in the business of selling firearms at wholesale or retail." However, as originally enacted, Congress did not define the term "engaged in the business" in the GCA.[2] Nor did ATF define the term "engaged in the business" in the original GCA implementing regulations.[3] ATF published an Advance Notice of Proposed Rulemaking ("ANPRM") in

---

[1] Persons who engage in the business of manufacturing or importing firearms must also be licensed. 18 U.S.C. 922(a)(1)(A), 923(a). Once licensed, importers and manufacturers may also engage in the business of dealing, but only at their licensed premises and only in the same type of firearms their license authorizes them to import or manufacture. *See* 27 CFR 478.41(b).

[2] *See generally* Public Law 90–618, 82 Stat. 1213 (1968).

[3] 33 FR 18555 (Dec. 14, 1968).

ATF 015281

APPX.002

the **Federal Register** in 1979 in an effort to "develop a workable, commonly understood definition of ['engaged in the business']." *See* 44 FR 75186, 75186–87 (Dec. 19, 1979) ("1979 ANPRM"); 45 FR 20930 (Mar. 31, 1980) (extending the comment period for 30 more days). The ANPRM specifically referenced the lack of a common understanding of "engaged in the business" by the courts and requested comments from the public and industry on how the term should be defined and the feasibility and desirability of defining it. 1979 ANPRM at 75186–87.

ATF received 844 comments in response, of which approximately 551, or 65.3 percent, were in favor of ATF defining "engaged in the business." [4] This included approximately 324 firearms dealers in favor of defining the term. However, at the time, ATF believed that none of the suggested definitions appeared "to be broad enough to cover all possible circumstances and still be narrow enough to be of real benefit in any particular case." [5] One possible definition ATF considered would have established a threshold number of firearms sales per year to serve as a baseline for when a person would qualify as a dealer. The suggested threshold numbers ranged from "more than one" to "more than 100" per year. ATF did not adopt a numerical threshold because it would have potentially interfered with tracing firearms by persons who avoided obtaining a license (and therefore kept no records) by selling firearms under the minimum threshold.[6] Ultimately, ATF decided not to proceed further with rulemaking at that time. Congress also had not yet acted on then-proposed legislation—the McClure-Volkmer bill (discussed below)—which, among other provisions, would have defined "engaged in the business." [7] For additional reasons why the Department has not adopted a minimum number of sales, see Section III.D of this preamble.

*B. Firearms Owners' Protection Act of 1986*

Approximately six years later, the McClure-Volkmer bill was enacted as part of the Firearms Owners' Protection Act ("FOPA"), Public Law 99–308, 100 Stat. 449 (1986). FOPA added a

statutory definition of "engaged in the business" to the GCA. As applied to a person selling firearms at wholesale or retail, it defined the term "engaged in the business" in 18 U.S.C. 921(a)(21)(C) as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." [8] The term excluded "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." [9] FOPA further defined the term "with the principal objective of livelihood and profit" to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." [10] Congress amended FOPA's definition of "with the principal objective of livelihood and profit" a few months later, clarifying that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." [11]

The legislative history of FOPA reflects that the statutory definitions' purposes were to clarify that individuals who make only occasional firearms sales for a hobby to enhance their personal collection are not required to obtain a license and to benefit law enforcement "by establishing clearer standards for investigative officers and assisting in the prosecution of persons truly intending to flout the law." [12] The legislative history also reveals that Congress did not intend to limit the licensing requirement only to persons for whom selling or disposing of firearms is a principal source of income or a principal business activity. The Committee Report stated that "this provision would not remove the necessity for licensing from part-time businesses or individuals whose principal income comes from sources other than firearms, but whose main objective with regard to firearm transfers is profit, rather than hobby." [13] Thus, for

example, "[a] sporting goods or retail store which derived only a part of its income from firearm sales, but handled such sales for the 'principal objective of livelihood and profit,' would still require a license." [14]

Two years after its enactment, FOPA's definition of "engaged in the business" was incorporated into ATF's implementing regulations at 27 CFR 178.11 (now § 478.11) in the term "Dealer in firearms other than a gunsmith or a pawnbroker." [15] At the same time, consistent with the statutory text and legislative history, ATF amended the regulatory definition of "dealer" to clarify that the term includes "any person who engages in such business or occupation on a part-time basis." [16]

With respect to "personal collections," FOPA included a provision, codified at 18 U.S.C. 923(c), that expressly authorized licensees to maintain and dispose of private firearms collections separately from their business operations. However, under FOPA, as amended, the "personal collection" provision was and remains subject to three limitations.

First, if a licensee records the disposition (*i.e.,* transfer) of any firearm from their business inventory into a personal collection, that firearm legally remains part of the licensee's business inventory until one year has elapsed after the transfer date. Should the licensee wish to sell or otherwise dispose of any such "personal" firearm during that one-year period, the licensee must re-transfer the applicable firearm back into the business inventory.[17] A subsequent transfer from the business inventory would then be subject to the recordkeeping and background check requirements of the GCA applicable to all other firearms in the business inventory. *See* 27 CFR 478.125(e); 478.102(a).

Second, if a licensee acquires a firearm for, or disposes of any firearm from, a personal collection for the purpose of willfully evading the restrictions placed upon licensees under the GCA, that firearm is deemed part of the business inventory. Thus, as explained in FOPA's legislative history, "circuitous transfers are not exempt from otherwise applicable licensee requirements." [18]

---

[4] Memorandum for Assistant Director, Regulatory Enforcement, ATF, from Chief, Regulations and Procedures Division, ATF, *Re: Evaluation of Comments Received Concerning a Definition of the Phrase "Engaged in the Business," Notice No. 331,* at 1–2 (June 9, 1980); *id.* at attach. 1.

[5] *Id.* at 2.

[6] *See id.*.

[7] *Id.* at 4.

[8] Public Law 99–308, sec. 101, 100 Stat. at 450.

[9] *Id.*

[10] *Id.*

[11] Public Law 99–360, sec. 1(b), 100 Stat. 766, 766 (1986).

[12] S. Rep. No. 98–583, at 8 (1984).

[13] *Id.* The Committee Report further explained that a statutory reference to pawnbrokers in the definition of "engaged in the business" was deleted because "all pawnbrokers whose business includes

the taking of any firearm as security for the repayment of money would automatically be a 'dealer.' " *Id.* at 9.

[14] *Id.* at 8.

[15] 27 CFR 178.11 (1988).

[16] *Id.*

[17] 27 CFR 478.125a(a); *see also* S. Rep. No. 98–583, at 13.

[18] S. Rep. No. 98–583, at 13.

Third, even when a licensee has made a bona fide transfer of a firearm from their personal collection, section 923(c) requires the licensee to record the description of the firearm in a bound volume along with the name, place of residence, and date of birth of an individual transferee, or if a corporation or other business entity, the transferee's identity and principal and local places of business.[19] ATF incorporated these statutory provisions into its FOPA implementing regulations in 1988.[20]

As explained in the NPRM, courts interpreting the FOPA definition of "engaged in the business" found a number of factors relevant to assessing whether a person met that definition. 88 FR 61995. For example, in one leading case, the U.S. Court of Appeals for the Third Circuit listed the following nonexclusive factors for consideration to determine whether the defendant's principal objective was livelihood and profit (*i.e.,* economic): (1) quantity and frequency of the sales; (2) location of the sales; (3) conditions under which the sales occurred; (4) defendant's behavior before, during, and after the sales; (5) price charged for the weapons and the characteristics of the firearms sold; and (6) intent of the seller at the time of the sales. *United States* v. *Tyson,* 653 F.3d 192, 200–01 (3d Cir. 2011). In a separate case, the Third Circuit stated, "[a]lthough the definition explicitly refers to economic interests as the principal purpose, and repetitiveness as the *modus operandi,* it does not establish a specific quantity or frequency requirement. In determining whether one is engaged in the business of dealing in firearms, the finder of fact must examine the intent of the actor and all circumstances surrounding the acts alleged to constitute engaging in business. This inquiry is not limited to the number of weapons sold or the timing of the sales." *United States* v. *Palmieri,* 21 F.3d 1265, 1268 (3d Cir.), *vacated on other grounds,* 513 U.S. 957 (1994).[21]

### C. Executive Action To Reduce Gun Violence (2016)

On January 4, 2016, President Obama announced several executive actions to reduce gun violence and to make communities across the United States safer. Those actions included two clarifications by ATF of "principles" relating to licensees, consistent with relevant court rulings: (1) that a person can be engaged in the business of dealing in firearms regardless of the location in which firearm transactions are conducted, and (2) that there is no specific threshold number of firearms purchased or sold that triggers the licensure requirement.[22]

To provide this clarification, ATF published in 2016, and updated in 2023, a guidance document entitled *Do I Need a License to Buy and Sell Firearms?,* ATF Publication 5310.2.[23] The guidance assists unlicensed persons in understanding whether they will likely need to obtain a license as a dealer in firearms. Since its original publication in 2016, the guidance has explained that "there is no specific threshold number of firearms purchased or sold that triggers the licensure requirement."[24] ATF intends to further update the guidance once it issues this final rule.

### D. Bipartisan Safer Communities Act (2022)

Over 35 years after FOPA's enactment, and 29 years after passage of the Brady Handgun Violence Protection

Act of 1993 (Brady Act),[25] on June 25, 2022, President Biden signed into law the BSCA. Section 12002 of the BSCA broadened the definition of "engaged in the business" under 18 U.S.C. 921(a)(21)(C) by eliminating the requirement that a person's "principal objective" of purchasing and reselling firearms must include both "livelihood and profit" and replacing it with a requirement that the person must deal in firearms "to predominantly earn a profit." The GCA now provides that, as applied to a wholesale or retail dealer in firearms, the term "engaged in the business" means "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." However, the BSCA definition did not alter the longstanding FOPA exclusions for "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. 921(a)(21)(C).

These BSCA amendments were enacted after tragic mass shootings at a grocery store in Buffalo, New York; at an elementary school in Uvalde, Texas; and between Midland and Odessa, Texas.[26] In the third incident, the perpetrator had previously been adjudicated by a court as a mental defective and was prohibited from possessing firearms under 18 U.S.C. 922(g)(4).[27] After being denied a firearm from a licensed sporting goods store, he circumvented the NICS background check process by purchasing the AR–15 variant rifle he used in the shooting from an unlicensed individual without having to undergo a

[19] *See* 18 U.S.C. 923(c).

[20] *See* 53 FR 10480 (Mar. 31, 1988); 27 CFR 178.125a (1988) (now § 478.125a). The existing regulations, 27 CFR 478.125(e) and 478.125a, which require dealers to record the purchase of all firearms in their business bound books, record the transfer of firearms to their personal collection, and demonstrate that personal firearms obtained before licensing have been held at least one year prior to their disposition as personal firearms, were upheld by the Fourth Circuit in *National Rifle Ass'n* v. *Brady,* 914 F.2d 475, 482–83 (4th Cir. 1990).

[21] *See also United States* v. *Brenner,* 481 F. App'x 124, 127 (5th Cir. 2012) ("Needless to say, in determining the character and intent of firearms transactions, the jury must examine all circumstances surrounding the transaction, without the aid of a 'bright-line rule.'" (quoting *Palmieri,* 21 F.3d at 1269)); *United States* v. *Bailey,* 123 F.3d

1381, 1392 (11th Cir. 1997) ("In determining whether one is engaged in the business of dealing in firearms, the finder of fact must examine the intent of the actor and all circumstances surrounding the acts alleged to constitute engaging in business." (quoting *Palmieri,* 21 F.3d at 1268)); *United States* v. *Nadirashvili,* 655 F.3d 114, 119 (2d Cir. 2011) ("[T]he government need not prove that dealing in firearms was the defendant's primary business. Nor is there a 'magic number' of sales that need be specifically proven. Rather, the statute reaches those who hold themselves out as a source of firearms. Consequently, the government need only prove that the defendant has guns on hand or is ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers." (quoting *United States* v. *Carter,* 801 F.2d 78, 81–82 (2d Cir. 1986))).

[22] *See* Press Release, The White House *FACT SHEET: New Executive Actions to Reduce Gun Violence and Make Our Communities Safer* (Jan. 4, 2016), *https://obamawhitehouse.archives.gov/the-press-office/2016/01/04/fact-sheet-new-executive-actions-reduce-gun-violence-and-make-our.*

[23] *See generally* ATF, *Do I Need a License to Buy and Sell Firearms?* (Jan. 2016), *https://www.govinfo.gov/content/pkg/GOVPUB-J38-PURL-gpo125446/pdf/GOVPUB-J38-PURL-gpo125446.pdf;* ATF, *Do I Need a License to Buy and Sell Firearms?* (Aug. 2023), *https://www.atf.gov/file/100871/download.*

[24] ATF, *Do I Need a License to Buy and Sell Firearms?* 5 (Jan. 2016), *https://www.govinfo.gov/content/pkg/GOVPUB-J38-PURL-gpo125446/pdf/GOVPUB-J38-PURL-gpo125446.pdf.*

[25] Public Law 103–159, 107 Stat. 1536 (1993). The Brady Act created NICS, which became operational on November 30, 1998.

[26] *Buffalo Supermarket Shooting Gunman Kills 10 at Buffalo Supermarket in Racist Attack,* N.Y. Times (May 14, 2022), *https://www.nytimes.com/live/2022/05/14/nyregion/buffalo-shooting;* Mark Osborne et al., *At Least 19 Children, 2 Teachers Dead After Shooting at Texas Elementary School,* ABC News (May 25, 2022), *https://abcnews.go.com/US/texas-elementary-school-reports-active-shooter-campus/story?id=84940951;* Acacia Coronado & Alex Samuels, *Death Toll in Midland-Odessa Mass Shooting Climbs to Eight, Including the Shooter,* Texas Tribune (Aug. 31, 2019), *https://www.texastribune.org/2019/08/31/odessa-and-midland-shooting-30-victims-reports-say/.*

[27] Press Release, DOJ, *Man Who Sold Midland/Odessa Shooter AR–15 Used in Massacre Sentenced for Unlicensed Firearms Dealing* (Jan. 7, 2021), *https://www.justice.gov/usao-ndtx/pr/man-who-sold-midlandodessa-shooter-ar-15-used-massacre-sentenced-unlicensed-firearms; Prison for Man Who Sold Texas Shooter Seth Ator AR–15 Used in Midland-Odessa Massacre,* CBS News (Jan. 7, 2021), *https://www.cbsnews.com/texas/news/prison-for-man-sold-texas-shooter-seth-ator-ar-15-midland-odessa-massacre/.*

background check.[28] The private seller later pled guilty to dealing in firearms without a license and to filing a false tax return due to his failure to report that major source of income.[29]

According to the Congressional Research Service ("CRS"), the BSCA's sponsors believed that "there was confusion about the GCA's definition of 'engaged in the business,' as it pertained to individuals who bought and resold firearms repetitively for profit, but possibly not as the principal source of their livelihood." [30] CRS has explained that the sponsors "maintain[ed] that [the BSCA's] changes clarify who should be licensed, eliminating a 'gray' area in the law, ensuring that one aspect of firearms commerce is more adequately regulated." [31]

As now defined by the BSCA, the term "to predominantly earn a profit" means that "the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms

collection." 18 U.S.C. 921(a)(22). The statutory definition further provides that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.* In the BSCA, Congress amended "engaged in the business" only with respect to dealers in firearms; it did not amend the various definitions of "engaged in the business" in 18 U.S.C. 921(a)(21) with respect to licensed gunsmiths, manufacturers, or importers.[32]

### E. Executive Order 14092 (2023)

On March 14, 2023, President Biden issued Executive Order 14092, "Reducing Gun Violence and Making Our Communities Safer." That order requires the Attorney General to submit a report to the President describing actions taken to implement the BSCA and to "develop and implement a plan to: (i) clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal firearms licensees (FFLs), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law; [and] (ii) prevent former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms." [33]

### III. Notice of Proposed Rulemaking

*Subsections in Section III*

    A. Definition of "Dealer"
    B. Definition of "Engaged in the Business"—"Purchase" and "Sale"
    C. Definition of "Engaged in the Business" as Applied to Auctioneers
    D. Presumptions That a Person is "Engaged in the Business"
    E. Definition of "Personal Collection," "Personal Collection of Firearms," and "Personal Firearms Collection"
    F. Definition of "Responsible Person"
    G. Definition of "Predominantly Earn a Profit"
    H. Disposition of Business Inventory After Termination of License
    I. Transfer of Firearms Between FFLs and Form 4473

On September 8, 2023, the Department published in the **Federal**

**Register** a notice of proposed rulemaking ("NPRM") entitled "Definition of 'Engaged in the Business' as a Dealer in Firearms," 88 FR 61993, proposing changes to various regulations in 27 CFR part 478. The comment period for the proposed rule concluded on December 7, 2023.

To implement the new statutory language in the BSCA, the NPRM proposed to amend paragraph (c) of the regulatory definition of "engaged in the business," 27 CFR 478.11 (now paragraph (3) of § 478.11 and cross-referenced definition in § 478.13), pertaining to a "dealer in firearms other than a gunsmith or pawnbroker," to conform with 18 U.S.C. 921(a)(21)(C) by removing the phrase "with the principal objective of livelihood and profit" and replacing it with the phrase "to predominantly earn a profit." The rule also proposed to amend § 478.11 to conform with new 18 U.S.C. 921(a)(22) by adding the statutory definition of "predominantly earn a profit" as a new regulatory definition. Additionally, the rule proposed to move the regulatory definition of "terrorism," which currently exists in the regulations under the definition of "principal objective of livelihood and profit," to a new location. This is because the statutory definitions of "to predominantly earn a profit" (18 U.S.C. 921(a)(22)) and "with the principal objective of livelihood and profit" (18 U.S.C. 921(a)(23)) both provide that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism" and include identical definitions of "terrorism."

To further implement the BSCA's changes to the GCA, the rule proposed to clarify when a person is "engaged in the business" as a dealer in firearms at wholesale or retail by: (a) clarifying the definition of "dealer"; (b) defining the terms "purchase" and "sale" as they apply to dealers; (c) clarifying when a person would not be engaged in the business of dealing in firearms as an auctioneer; (d) clarifying when a person is purchasing firearms for, and selling firearms from, a personal collection; (e) setting forth conduct that is presumed to constitute "engaging in the business" of dealing in firearms and presumed to demonstrate the intent to "predominantly earn a profit" from the sale or disposition of firearms, absent reliable evidence to the contrary; (f) adding a single definition for the terms "personal collection," "personal firearms collection," and "personal collection of firearms"; (g) adding a definition for the term "responsible person"; (h) clarifying that the intent to

---

[28] Press Release, DOJ, *Man Who Sold Midland/Odessa Shooter AR–15 Used in Massacre Sentenced for Unlicensed Firearms Dealing* (Jan. 7, 2021), *https://www.justice.gov/usao-ndtx/pr/man-who-sold-midlandodessa-shooter-ar-15-used-massacre-sentenced-unlicensed-firearms.*

[29] *Id.*

[30] William J. Krouse, Cong. Rsch. Serv., IF12197, *Firearms Dealers "Engaged in the Business"* 2 (2022), *https://crsreports.congress.gov/product/pdf/IF/IF12197.*

[31] *Id.; see also* 168 Cong. Rec. H5906 (daily ed. June 24, 2022) (statement of Rep. Jackson Lee) ("[O]ur bill would . . . further strengthen the background check process by clarifying who is engaged in the business of selling firearms and, as a result, is required to run background checks."); 168 Cong. Rec. S3055 (daily ed. June 22, 2022) (statement of Sen. Murphy) ("We clarify in this bill the definition of a federally licensed gun dealer to make sure that everybody who should be licensed as a gun owner is. In one of the mass shootings in Texas, the individual who carried out the crime was mentally ill. He was a prohibited purchaser. He shouldn't have been able to buy a gun. He was actually denied a sale when he went to a bricks-and-mortar gun store, but he found a way around the background check system because he went online and found a seller there who would transfer a gun to him without a background check. It turned out that seller was, in fact, engaged in the business, but didn't believe the definition applied to him because the definition is admittedly confusing. So we simplified that definition and hope that will result—and I believe it will result—in more of these frequent online gun sellers registering, as they should, as federally licensed gun dealers which then requires them to perform background checks."); Letter for Director, ATF, et al., from Sens. John Cornyn and Thom Tillis at 2–3 (Nov. 1, 2022) ("Cornyn/Tillis Letter") ("The BSCA provides more clarity to the industry for when someone must obtain a federal firearms dealers license. In Midland and Odessa, Texas, for example, the shooter—who at the time was prohibited from possessing or owning a firearm under federal law—purchased a firearm from an unlicensed firearms dealer."); Comments on the Rule from 17 U.S. Senators and 149 Representatives, p.4 (Nov. 30 and Dec. 1, 2023).

[32] The BSCA retained the existing term "with the principal objective of livelihood and profit," which still applies to persons engaged in the business as manufacturers, gunsmiths, and importers. That definition became 18 U.S.C. 921(a)(23), and Congress renumbered other definitions in section 921 accordingly.

[33] *Reducing Gun Violence and Making Our Communities Safer,* E.O. 14092, secs. 2, 3(a)(i)–(ii), 88 FR 16527, 16527–28 (Mar. 14, 2023).

**Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations    **28973**

''predominantly earn a profit'' does not require the person to have received pecuniary gain, and that intent does not have to be shown when a person purchases or sells a firearm for criminal or terrorism purposes; (i) addressing how former licensees, and responsible persons acting on behalf of former licensees, must lawfully liquidate business inventory upon revocation or other termination of their license; and (j) clarifying that licensees must follow the verification and recordkeeping procedures in 27 CFR 478.94 and subpart H of 27 CFR part 478, rather than using a Form 4473 when firearms are transferred to other licensees, including transfers by a licensed sole proprietor to that person's personal collection.

### A. Definition of ''Dealer''

The NPRM noted that, in enacting the BSCA, Congress expanded the definition of ''engaged in the business'' ''as applied to a dealer in firearms,'' as noted above. 18 U.S.C. 921(a)(21)(C). Consistent with the text and purpose of the GCA, ATF regulations have long defined the term ''dealer'' to include persons engaged in the business of selling firearms at wholesale or retail, or as a gunsmith or pawnbroker, on a part-time basis. 27 CFR 478.11 (definition of ''dealer''). The NPRM explained that, due to the BSCA amendments, as well as continual confusion and non-compliance before and after the BSCA was passed, the Department has further considered what it means to be a ''dealer'' engaged in the firearms business in light of new technologies, mediums of exchange, and forums in which firearms are bought and sold with the predominant intent of obtaining pecuniary gain.

The NPRM further stated that, since 1968, advancements in manufacturing (e.g., 3D printing) and distribution technology (e.g., internet sales) and changes in the marketplace for firearms and related products (e.g., large-scale gun shows) have changed the various ways individuals shop for firearms, and therefore have created a need for further clarity in the regulatory definition of ''dealer.'' [34] The proliferation of new communications technologies and e-commerce has made it simple for persons intending to make a profit to advertise and sell firearms to a large potential market at minimal cost and with minimal effort, using a variety of means, and often as a part-time activity.

The proliferation of sales at larger-scale gun shows, flea markets, similar events, and online has also altered the marketplace since the GCA was enacted in 1968.

Therefore, in light of the BSCA's changes to the GCA and to provide additional guidance on what it means to be engaged in the business as a ''dealer'' within the diverse modern marketplace for firearms, the NPRM proposed to amend the regulatory definition of ''dealer'' in 27 CFR 478.11 to clarify that firearms dealing may occur wherever, or through whatever medium, qualifying activities are conducted. This includes at any domestic or international public or private marketplace or premises. The proposed definition would provide nonexclusive examples of such existing marketplaces: a gun show [35] or event,[36] flea market,[37] auction house,[38] or gun range or club; at one's home; by mail

---

[34] See Cornyn/Tillis Letter at 3 (''Our legislation aims at preventing someone who is disqualified from owning or possessing a firearm from shopping around for an unlicensed firearm dealer.'').

[35] See ATF, FFL Newsletter: Federal Firearms Licensee Information Service 9 (July 2017), https://www.atf.gov/firearms/docs/newsletter/federal-firearms-newsletter-july-2017/download (gun show guidelines); ATF, Important Notice to Dealers and Other Participants at This Gun Show, ATF Information 5300.23A 1 (Sept. 2021) https://www.atf.gov/firearms/docs/guide/important-notice-dealers-and-other-participants-gun-shows-atf-i-530023a/download (licensees may only sell firearms at qualifying gun shows within the State in which their licensed business premises is located); Rev. Rul. 69–59 (IRS RRU), 1969–1 C.B. 360, 1969 WL 18703 (''[A] licensee may not sell firearms or ammunition at a gun show held on premises other than those covered by his license. He may, however, have a booth or table at such a gun show at which he displays his wares and takes orders for them, provided that the sale and delivery of the firearms or ammunition are to be lawfully effected from his licensed business premises only and his records properly reflect such transactions.'').

[36] See, e.g., ATF, How May a Licensee Participate in the Raffling of Firearms by an Unlicensed Organization?, https://www.atf.gov/firearms/qa/how-may-licensee-participate-raffling-firearms-unlicensed-organization (last reviewed May 22, 2020); ATF, FFL Newsletter: Federal Firearms Licensee Information Service 8–9 (June 2021), https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensee-ffl-newsletter-june-2021/download (addressing conduct of business at firearm raffles); Letter for Pheasants Forever, from Acting Chief, Firearms Programs Division, ATF at 1–2 (July 9, 1999) (addressing nonprofit fundraising banquets); ATF, FFL Newsletter 4–5 (Feb. 1999), https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-february-1999/download (addressing dinner banquets).

[37] See ATF, FFL Newsletter: Federal Firearms Licensee Information Service 5–6 (June 2010), https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-june-2010 (flea market guidelines); see also United States v. Allman, 119 F. App'x. 751, 754 (6th Cir. 2005) (''Illegal gun transactions at flea markets are not atypical.''); United States v. Orum, 106 F. App'x 972 (6th Cir. 2004) (defendant illegally displayed and sold firearms at flea markets and gun shows).

[38] See Selling Firearms – Legally: A Q&A with the ATF, Auctioneer, June 2010, at 22–27.

order; [39] over the internet; [40] through the use of other electronic means (e.g., an online broker,[41] online auction,[42] text messaging service,[43] social media

---

[39] See, e.g., United States v. Buss, 461 F. Supp. 1016 (W.D. Pa. 1978) (upholding jury verdict that defendant engaged in the business of dealing in firearms without a license through mail order sales).

[40] See ATF, FFL Newsletter: Federal Firearms License Information Service 8 (June 2021), https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensee-ffl-newsletter-june-2021/download (addressing internet sales of firearms); ATF Intelligence Assessment, Firearms and internet Transactions (Feb. 9, 2016); Mayors Against Illegal Guns, Felon Seeks Firearm, No Strings Attached: How Dangerous People Evade Background Checks and Buy Illegal Guns Online 14 (Sept. 2013), https://www.nyc.gov/html/om/pdf/2013/felon_seeks_firearm.pdf; Mayor Michael Bloomberg, City of New York, Point, Click, Fire: An Investigation of Illegal Online Gun Sales 2 (Dec. 2011)); United States v. Focia, 869 F.3d 1269, 1274 (11th Cir. 2017) (affirming defendant's conviction for engaging in the business without a license by dealing firearms through the ''Dark Web'').

[41] A broker who actually purchases the firearms from the manufacturer, importer, or distributor, accepts payment for the firearms from the buyer, and has them shipped to the buyer from a licensee, must be licensed as a dealer because they are repetitively purchasing and reselling their firearms to predominantly earn a profit. Although individual dealers may sell firearms through online services sometimes called ''brokers,'' like a magazine or catalog company that only advertises firearms listed by known sellers and processes orders for them for direct shipment from the distributor to their buyers, these ''brokers'' are not themselves considered ''dealers.'' This is because these online ''brokers'' do not purchase the firearms for consideration, but only collect a commission or fee for providing contracted services to market and process the transaction for the seller. See ATF, FFL Newsletter: Federal Firearms Licensee Information Service 3 (Sept. 2016), https://www.atf.gov/firearms/docs/newsletter/ffl-newsletter-september-2016/download; ATF, 2 FFL Newsletter: Federal Firearms Licensee Information Service 6–7 (Mar. 2013), https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-march-2013-volume-2/download; see also Fulkerson v. Lynch, 261 F. Supp. 3d 779, 783–86, 788–89 (W.D. Ky. 2017) (denying summary judgment to applicant whose license was denied by ATF for previously willfully engaging in the business of dealing without a license as an online broker and granting summary judgement to the Government).

[42] See, e.g., Press Release, DOJ, Minnesota Man Indicted for Dealing Firearms Without a License (Feb. 18, 2016), https://www.justice.gov/opa/pr/minnesota-man-indicted-dealing-firearms-without-license (defendant dealt in firearms through websites such as GunBroker.com, an online auction website).

[43] See, e.g., Press Release, DOJ, Odenton, Maryland Man Exiled to 8 Years in Prison for Firearms Trafficking Conspiracy (Apr. 27, 2017), https://www.justice.gov/usao-md/pr/odenton-maryland-man-exiled-8-years-prison-firearms-trafficking-conspiracy (defendant texted photos of firearms for sale to his customer and discussed prices).

ATF 015285

raffle,[44] or website [45]); or at any other domestic or international public or private marketplace or premises. Many of these examples were referenced by courts, even before the BSCA expansion, as well as in ATF regulatory materials and common, publicly available sources. These examples in the NPRM were designed to clarify that firearms dealing requires a license in whatever place or through whatever medium the firearms are purchased and sold, including the internet and locations other than a traditional brick and mortar store.[46] However, regardless of the medium through or location at which a dealer buys and sells firearms, to obtain a license under the GCA, the dealer must still have a fixed premises in a State from which to conduct business subject to the license and comply with all applicable State and local laws regarding the conduct of such business.[47] 18 U.S.C. 922(b)(2); 923(d)(1)(E)–(F).

The NPRM explained that, even though an applicant must have a business premises in a particular State to obtain a license, under the GCA, firearms purchases or sales requiring a license in the United States may involve conduct outside of the United States. Specifically, 18 U.S.C. 922(a)(1)(A) has long prohibited any person without a license from shipping, transporting, or receiving any firearm in foreign commerce while in the course of being engaged in the business of dealing in firearms,[48] and 18 U.S.C. 924(n) prohibits travelling from a foreign country to a State in furtherance of conduct that constitutes a violation of section 922(a)(1)(A).

The NPRM further noted that, as recently amended by the BSCA, the GCA now expressly prohibits a person from smuggling or knowingly taking a firearm out of the United States with intent to engage in conduct that would constitute a felony for which the person may be prosecuted in a court in the United States if the conduct had occurred within the United States. 18 U.S.C. 924(k)(2). Willfully engaging in the business of dealing in firearms without a license is an offense punishable by more than one year in prison, *see* 18 U.S.C. 924(a)(1)(D), and constitutes a felony. Therefore, unlicensed persons who purchase firearms in the United States and smuggle or take them out of the United States (or conspire or attempt to do so) for resale in another country are now engaging in conduct that is unlawful under the GCA. Consistent with the BSCA's new prohibition, 18 U.S.C. 924(k)(2), and the longstanding

prohibition on "ship[ping], transport[ing], or receiv[ing] any firearm in interstate or foreign commerce" without a license, 18 U.S.C. 922(a)(1)(A), the rule proposed to clarify in the definition of "dealer" that purchases or sales of firearms as a wholesale or retail dealer may occur either domestically or internationally.

*B. Definition of Engaged in the Business—"Purchase" and "Sale"*

To further clarify the regulatory definition of a dealer "engaged in the business" with the predominant intent of earning a profit through the repetitive purchase and resale of firearms in 27 CFR 478.11, the NPRM also proposed to define, based on common dictionary definitions and relevant case law, the terms "purchase" and "sale" (and derivative terms thereof, such as "purchases," "purchasing," "purchased," and "sells," "selling," or "sold"). Specifically, the rule proposed to define "purchase" (and derivative terms thereof) as "the act of obtaining a firearm in exchange for something of value," [49] and the term "sale" (and derivative terms thereof, including "resale") as "the act of providing a firearm in exchange for something of value." [50] The term "something of value" was proposed to include money, credit, personal property (*e.g.*, another firearm [51] or ammunition [52]), a service,[53] a controlled substance,[54] or any other

[44] *See* ATF, *FFL Newsletter: Federal Firearms Licensee Information Service* 9 (June 2021), *https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensee-ffl-newsletter-june-2021/download* ("Social media gun raffles are gaining popularity on the internet. In most instances, the sponsor of the event is not a Federal firearms licensee, but will enlist the aid of a licensee to facilitate the transfer of the firearm to the raffle winner. Often, the sponsoring organization arranges to have the firearm shipped from a distributor to a licensed third party and never takes physical possession of the firearm. If the organization's practice of raffling firearms rises to the level of being engaged in the business of dealing in firearms, the organization must obtain a Federal firearms license.").

[45] *See, e.g.,* Press Release, DOJ, *Snapchat Gun Dealer Convicted of Unlawfully Manufacturing and Selling Firearms* (Oct. 4, 2022), *https://www.justice.gov/usao-edca/pr/snapchat-gun-dealer-convicted-unlawfully-manufacturing-and-selling-firearms*; Press Release, DOJ, *Sebring Resident Sentenced to Prison for Unlawfully Dealing Firearms on Facebook* (Nov. 7, 2016), *https://www.justice.gov/usao-sdfl/pr/sebring-resident-sentenced-prison-unlawfully-dealing-firearms-facebook.*

[46] *See* Letter for Outside Counsel to National Association of Arms Shows, from Chief, Firearms and Explosives Division, ATF, *Re: Request for Advisory Opinion on Licensing for Certain Gun Show Sellers* at 1 (Feb. 17, 2017) ("Anyone who is engaged in the business of buying and selling firearms, regardless of the location(s) at which those transactions occur is required to have a Federal firearms license. ATF will issue a license to persons who intend to conduct their business primarily at gun shows, over the internet, or by mail order, so long as they otherwise meet the eligibility criteria established by law. This includes the requirement that they maintain a business premises at which ATF can inspect their records and inventory, and that otherwise complies with local zoning restrictions."); Letter for Dan Coats, U.S. Senator, from Deputy Director, ATF, at 1–2 (Aug. 22, 1990) (an FFL cannot be issued at a table or booth at a temporary flea market); ATF Internal Memorandum #23264 (June 15, 1983) (same).

[47] *See Abramski v. United States,* 573 U.S. 169, 172 (2014) ("The statute establishes a detailed scheme to enable the dealer to verify, at the point of sale, whether a potential buyer may lawfully own

a gun. Section 922(c) brings the would-be purchaser onto the dealer's 'business premises' by prohibiting, except in limited circumstances, the sale of a firearm 'to a person who does not appear in person' at that location."); *National Rifle Ass'n,* 914 F. 2d at 480 (explaining that FOPA did not eliminate the requirement that a licensee have a business premises from which to conduct business "which exists so that regulatory authorities will know where the inventory and records of a licensee can be found"); *Meester v. Romero,* No. CIV86, 2013 WL 3872946 (D. Neb. July 25, 2013) (upholding ATF's denial of license in part because the applicant failed to "have 'premises from which he conducts business subject to license,'" in violation of 18 U.S.C. 923(d)(1)(E)).

[48] *See, e.g., United States v. Baptiste,* 607 F. App'x 950, 953 (11th Cir. 2015) (upholding section 922(a)(1) conviction where firearms purchased in the United States were to be resold in Haiti); *United States v. Murphy,* 852 F.2d 1, 7–8 (1st Cir. 1988) (same with firearms to be resold in Ireland); *United States v. Hernandez,* 662 F.2d 289, 291 (5th Cir. 1981) (same with firearms to be resold in Mexico). *But see United States v. Mowad,* 641 F.2d 1067 (2d Cir. 1981) (reversing conviction for purchasing firearms for resale in Lebanon on the basis that there was no mention of exporting firearms in the GCA or any suggestion of congressional concern about firearm violence in other countries).

[49] This definition is consistent with the common meaning of "purchase," which is "to obtain (as merchandise) by paying money or its equivalent." Webster's Third New International Dictionary 1844 (1971); *see also Purchase,* Black's Law Dictionary 1491 (11th ed. 2019) ("Webster's Third") ("The acquisition of an interest in real or personal property by sale, discount, negotiation, mortgage, pledge, lien, issue, reissue, gift, or any other voluntary transaction.").

[50] This definition is consistent with the common meaning of "sale," which is "a contract transferring the absolute or general ownership of property from one person or corporate body to another for a price (as a sum of money or any other consideration)." Webster's Third at 2003. The related term "resale" means "the act of selling again." *Id.* at 1929.

[51] *See, e.g., United States v. Brenner,* 481 F. App'x, 125–26 (5th Cir. 2012) (defendant unlicensed dealer sold a stolen firearm traded to him for another firearm); *United States v. Gross,* 451 F.2d 1355, 1356, 1360 (7th Cir. 1971) (defendant "had traded firearms [for other firearms] with the object of profit in mind").

[52] *See, e.g., United States v. Huffman,* 518 F.2d 80, 81 (4th Cir. 1975) (defendant traded large quantities of ammunition in exchange for firearms).

[53] *See, e.g., United States v. 57 Miscellaneous Firearms,* 422 F. Supp. 1066, 1070–71 (W.D. Mo. 1976) (defendant obtained the firearms he sold or offered for sale in exchange for carpentry work he performed).

[54] *See, e.g., United States v. Schaal,* 340 F.3d 196, 197 (4th Cir. 2003) (defendants traded many of their stolen firearms for drugs); *Johnson v. Johns,* No. 10-CV–904(SJF), 2013 WL 504446, at *1 (E.D.N.Y. Feb. 5, 2013) (on at least one occasion, petitioner, who was engaged in the unlicensed dealing in firearms

medium of exchange [55] or valuable consideration.[56]

Defining these terms to include any method of payment for a firearm would clarify that persons cannot avoid the licensing requirement by, for instance, bartering or providing or receiving services in exchange for firearms with the predominant intent to earn pecuniary gain even where no money is exchanged. It would also clarify that a person must have a license to engage in the business of dealing in firearms even when the medium of payment or consideration is unlawful, such as exchanging illicit drugs or performing illegal acts for firearms, and that it is a distinct crime to do so without a license.

### C. Definition of Engaged in the Business as Applied to Auctioneers

Because the definitions of "purchase" and "sale" broadly include services provided in exchange for firearms, both as defined by common dictionaries and as proposed in the NPRM, the Department further proposed to make clear that certain persons who provide auctioneer services are not required to be licensed as dealers. ATF has long interpreted the statutory definition of "engaged in the business" as excluding auctioneers who provide only auction services on commission by assisting in liquidating firearms at an "estate-type" auction.[57] The new definition in the

___

through straw purchasers, compensated a straw purchaser with cocaine base).

[55] See, e.g., Focia, 869 F.3d at 1274 (defendant sold pistol online to undercover ATF agent for 15 bitcoins).

[56] The term "medium of exchange" generally means "something commonly accepted in exchange for goods and services and recognized as representing a standard of value," Webster's Third at 1403, and "valuable consideration" is "an equivalent or compensation having value that is given for something (as money, marriage, services) acquired or promised and that may consist either in some right, interest, profit, or benefit accruing to one party or some responsibility, forbearance, detriment, or loss exercised by or falling upon the other party," id. at 2530. See, e.g., United States v. Berry, 644 F.2d 1034, 1036 (5th Cir. 1981) (defendant sold firearms in exchange for large industrial batteries to operate his demolition business); United States v. Reminga, 493 F. Supp. 1351, 1357 (W.D. Mich. 1980) (defendant traded his car for three guns that he later sold or traded).

[57] See ATF, Does an Auctioneer Who Is Involved in Firearms Sales Need a Dealer's License?, https://www.atf.gov/firearms/qa/does-auctioneer-who-involved-firearms-sales-need-dealer-license (last reviewed July 10, 2020); ATF, ATF Federal Firearms Regulations Reference Guide, ATF Publication 5300.4, Q&A L1, at 207–08 (2014), https://www.atf.gov/firearms/docs/guide/federal-firearms-regulations-reference-guide-2014-edition-atf-p-53004/download; ATF, FFL Newsletter 3 (May 2001), https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-may-2001/download; ATF Ruling 96–2, Engaging in the Business of Dealing in Firearms (Auctioneers) (Sept. 1996), https://www.atf.gov/file/55456/

BSCA does not alter that interpretation. The Department proposed to incorporate this longstanding interpretation into the regulations while otherwise clarifying the regulatory definition of "engaged in the business."

As the NPRM explained, in this context, the auctioneer is generally providing services only as an agent of the owner or individual executor of an estate who is liquidating a personal collection. The firearms are within the estate's control and the sales are made on the estate's behalf. This limited exclusion from the definition of "engaged in the business" as a dealer is conditioned on the auctioneer not purchasing the firearms or taking them on consignment such that the auctioneer has the exclusive right and authority to sell the firearms at a location, time, and date to be selected by the auctioneer. If the auctioneer were to regularly engage in any of that conduct, the auctioneer would need to have a dealer's license because that person would be engaged in the business of purchasing and reselling firearms to earn a profit. An "estate-type" auction as described above differs from liquidating firearms by means of a "consignment-type" auction, in which the auctioneer is paid to accept firearms into a business inventory and then resells them in lots or over a period of time. In this "consignment-type" auction, the auctioneer generally inventories, evaluates, and tags the firearms for identification.[58] Therefore, under "consignment-type" auctions, an auctioneer would need to be licensed.

### D. Presumptions That a Person Is Engaged in the Business

The NPRM pointed out that the Department has observed through its enforcement efforts, regulatory functions, knowledge of existing case law, and subject-matter expertise that persons who are engaged in certain firearms purchase-and-sale activities are more likely than not to be "engaged in the business" of dealing in firearms at wholesale or retail. These activities have been observed through a variety of criminal, civil, and administrative enforcement actions and proceedings brought by the Department, including: (1) ATF inspections of prospective and existing wholesale and retail dealers of firearms who are, or intend to be,

___

download; ATF, FFL Newsletter 7 (1990), https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-1990-volume-1/download; Letter for Editor, CarPac Publishing Company, from Acting Assistant Director (Regulatory Enforcement), ATF, at 1–2 (July 26, 1979).

[58] ATF Rul. 96–2 at 1.

engaged in the business; [59] (2) criminal investigations and the resulting prosecutions (i.e., cases) of persons who engaged in the business of dealing in firearms without a license; [60] (3) civil and administrative actions under 18 U.S.C. 924(d) to seize and forfeit firearms intended to be sold by persons engaged in the business without a license; [61] (4) ATF cease and desist letters issued to prevent section 922(a)(1)(A) violations; [62] and (5) ATF administrative proceedings under 18 U.S.C. 923 to deny licenses to persons who willfully engaged in the business of dealing in firearms without a license, or to revoke or deny renewal of existing licenses held by licensees who aided and abetted that misconduct.[63] In addition, numerous courts have identified certain activities or factors that are relevant to determining whether a person is "engaged in the business".[64] The rule, therefore, proposed to establish rebuttable presumptions in

___

[59] In Fiscal Year 2022, for example, ATF conducted 11,156 qualification inspections of new applicants for a license, and 6,979 compliance inspections of active licensees. See ATF, Fact Sheet- Facts and Figures for Fiscal Year 2022 (Jan. 2023), https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-figures-fiscal-year-2022.

[60] See footnotes 67 through 80 and 82 through 83, infra. The Department reviewed criminal cases from FY18 to FY23 that it investigated (closed), or is currently investigating (open/pending), involving violations of 18 U.S.C. 922(a)(1)(A) and 923(a).

[61] See, e.g., United States v. Four Hundred Seventy Seven (477) Firearms, 698 F. Supp. 2d 890, 890–91 (E.D. Mich. 2010) (civil forfeiture of firearms intended to be sold from an unlicensed gun store); United States v. One Bushmaster, Model XM15–E2 Rifle, No. 06–CV–156 (WDO), 2006 WL 3497899, at *1 (M.D. Ga. Dec. 5, 2006) (civil forfeiture of firearms intended to be sold by an unlicensed person who acquired an unusually large amount of firearms quickly for the purpose of selling or trading them); United States v. Twenty Seven (27) Assorted Firearms, No. SA–05–CA–407–XR, 2005 WL 2645010, at *1 (W.D. Tex. Oct. 13, 2005) (civil forfeiture of firearms intended to be sold at gun shows without a license).

[62] Over the years, ATF has issued numerous letters warning unlicensed persons not to continue to engage in the business of dealing in firearms without a license, also called "cease and desist" letters. See, e.g., United States v. Kubowski, 85 F. App'x 686, 687 (10th Cir. 2003) (defendant served cease and desist letter after selling five handguns and one rifle to undercover ATF agents).

[63] See, e.g., In the Matter of Scott, Application Nos. 9–93–019–01–PA–05780 and 05781 (Seattle Field Division, Apr. 3, 2018) (denied applicant for license to person who purchased and sold numerous handguns within one month); In the Matter of SELL. Antiques, Application No. 9–87–035–01–PA–00725 (Phoenix Field Division, July 14, 2006) (denied applicant who repetitively sold modern firearms from unlicensed storefront).

[64] See footnote 21, supra, and accompanying text. These cases—like the investigations, administrative actions, letters, and other examples cited in this paragraph—predate the BSCA's enactment but continue to be relevant to determining whether a person is "engaged in the business" because the BSCA expanded the definition of that term to cover additional conduct.

certain contexts to help unlicensed persons, industry operations personnel, and others determine when a person is likely "engaged in the business" requiring a dealer's license.[65]

These rebuttable presumptions would not shift the burden of persuasion in any proceeding from the Government. In addition, while the criteria set forth in the proposed rule may be useful to a court in a criminal proceeding—for example, to inform appropriate jury instructions regarding permissible inferences [66]—the proposed regulatory

text made clear that the presumptions do not apply to criminal proceedings.

The Department considered, but did not propose in the NPRM, an alternative that would have set a minimum numerical threshold of firearms sold by a person within a certain period. That approach was not proposed for several reasons. First, while selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity, neither the courts nor the Department have recognized a set minimum number of firearms purchased or resold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. Even a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license. For example, even under the previous statutory definition, courts have upheld convictions for dealing without a license when few firearms, if any, were actually sold, when other factors were also present, such as the person representing to others a willingness and ability to repetitively purchase firearms for resale. *See, e.g., United States* v. *King*, 735 F.3d 1098, 1107 n.8 (9th Cir. 2013) (upholding conviction where defendant attempted to sell one firearm and represented that he could purchase more for resale and noting that "Section 922(a)(1)(A) does not require an actual sale of firearms").[67] On the other hand, courts

have stated that an isolated firearm transaction would not require a license when other factors were not present.[68] Second, in addition to the tracing concerns expressed by ATF in response to comments on the 1979 ANPRM, a person could structure their transactions to avoid a minimum threshold by spreading out their sales over time. Finally, the Department does not believe there is currently a sufficient evidentiary basis, without consideration of additional factors, to support a specific minimum number of firearms bought or sold for a person to be considered "engaged in the business."

Rather than establishing a minimum threshold number of firearms purchased or sold, the NPRM proposed to clarify that, absent reliable evidence to the contrary, a person would be presumed to be engaged in the business of dealing in firearms when the person: (1) sells or offers for sale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and sell additional firearms; (2) spends more money or its equivalent on purchases of firearms for the purpose of resale than the person's reported taxable gross income during the applicable period of time; (3) repetitively purchases for the purpose of resale, or sells or offers for sale firearms—(A) through straw or sham businesses, or individual straw purchasers or sellers; or (B) that cannot lawfully be purchased or possessed, including: (i) stolen firearms (18 U.S.C. 922(j)); (ii) firearms with the licensee's serial number removed, obliterated, or altered (18 U.S.C. 922(k); 26 U.S.C. 5861(i)); (iii) firearms imported in violation of law (18 U.S.C. 922(l), 22 U.S.C. 2778, or 26 U.S.C. 5844, 5861(k)); or (iv) machineguns or other weapons defined as firearms under 26 U.S.C. 5845(a) that were not properly registered in the National Firearms Registration and Transfer Record (18 U.S.C. 922(o); 26 U.S.C. 5861(d)); (4) repetitively sells or offers for sale firearms—(A) within 30 days after they were purchased; (B) that are new, or like

---

[65] The GCA and implementing regulations already incorporate rebuttable presumptions in other contexts. *See* 18 U.S.C. 922(b)(3) (A "licensed manufacturer, importer or dealer shall be presumed, for purposes of [selling to out of state residents], in the absence of evidence to the contrary, to have had actual knowledge of the States laws and published ordinances of both States"); 27 CFR 478.96(c)(2) (same); *see also* 27 CFR 478.12(d) ("The modular subpart(s) identified in accordance with 478.92 with an importer's or manufacturer's serial number shall be presumed, absent an official determination by the Director or other reliable evidence to the contrary, to be part of the frame or receiver of a weapon or device."); 478.12(f)(1) ("Any such part [previously classified by the Director] that is identified with an importer's or manufacturer's serial number shall be presumed, absent an official determination by the Director or other reliable evidence to the contrary, to be the frame or receiver of the weapon."); 478.92(a)(1)(vi) ("firearms awaiting materials, parts, or equipment repair to be completed are presumed, absent reliable evidence to the contrary, to be in the manufacturing process").

[66] Courts determine which jury instructions are appropriate in the criminal cases before them. While rebuttable presumptions may not be presented to a jury in a criminal case, jury instructions may include, for example, reasonable permissive inferences. *See Francis* v. *Franklin*, 471 U.S. 307, 314 (1985) ("A permissive inference suggests to the jury a possible conclusion to be drawn if the [Government] proves predicate facts, but does not require the jury to draw that conclusion."); *County Court of Ulster County* v. *Allen*, 442 U.S. 140, 166–67 (1979) (upholding jury instruction that gave rise to a permissive inference available only in certain circumstances, rather than a mandatory conclusion); *Baghdad* v. *Att'y Gen. of the U.S.*, 50 F.4th 386, 390 (3d Cir. 2022) ("Unlike mandatory presumptions, permissive inferences . . . do not shift the burden of proof or require any outcome. They are just an 'evidentiary device . . . [that] allows—but *does not require*—the trier of fact to infer' that an element of a crime is met once basic facts have been proven beyond a reasonable doubt."); *Patton* v. *Mullin*, 425 F.3d 788, 803–07 (10th Cir. 2005) (upholding jury instruction that created a permissive inference rather than a rebuttable presumption); *United States* v. *Warren*, 25 F.3d 890, 897 (9th Cir. 1994) (same); *United States* v. *Washington*, 819 F.2d 221, 225–26 (9th Cir. 1987) (same); *Lannon* v. *Hogan*, 719 F.2d 518, 520–25 (1st Cir. 1983) (same); *United States* v. *Gaines*, 690 F.2d 849 (11th Cir. 1982) (same); *cf., e.g., United States* v. *Antonoff*, 424 F. App'x 846, 848 (11th Cir. 2011) (recognizing the permissive inference of current drug use in ATF's definition of "unlawful user" in 27 CFR 478.11 as support for affirming the district court's finding that the defendant's drug use was "contemporaneous and ongoing" for sentencing purposes); *United States* v. *McCowan*, 469 F.3d 386, 392 (5th Cir. 2006) (upholding application of a sentencing enhancement based on the permissive inference of current drug use in 27 CFR 478.11); *United States*

v. *Stanford*, No. 11–10211–01–EFM, 2012 WL 1313503 (D. Kan. Apr. 16, 2012) (holding that evidence of defendant's arrest was admissible by relying, in part, on the definition of "unlawful user" in 27 CFR 478.11).

[67] *See also* ATF Publication 5310.2, *Do I Need a License to Buy and Sell Firearms?*, *https:// www.govinfo.gov/content/pkg/GOVPUB-J38-PURL-gpo125446/pdf/GOVPUB-J38-PURL-gpo125446.pdf* (Jan. 2016), *https://www.govinfo.gov/content/pkg/GOVPUB-J38-PURL-gpo125446/pdf/GOVPUB-J38-PURL-gpo125446.pdf*; *Nadirashvili*, 655 F.3d at 120–21 (holding that, despite defendants' knowledge of only a single firearms transaction, there was sufficient evidence to prove they had aided and abetted unlawfully dealing in firearms without a license because they knew that their co-defendant "held himself 'out generally as a source of firearms' and was ready to procure them for his customer"); *United States* v. *Kevin Shaw*, 361 F. App'x 182, 183 (2d Cir. 2010) (holding that evidence that defendant sold two firearms within roughly a month and acknowledged he had a source of supply for other weapons was sufficient to affirm conviction for dealing firearms without a license); *United States* v. *Zheng Jian Shaw*, 80 F. App'x 31 (9th Cir. 2003) (holding that evidence of sale of weapons in one transaction where the defendant was willing and able to find more weapons for resale was sufficient to affirm conviction); *Murphy*, 852 F.2d at 8 ("[T]his single transaction was sufficiently large in quantity, price and length of negotiation to constitute dealing in firearms.").

[68] *United States* v. *Carter*, 203 F.3d 187, 191 (2d Cir. 2000) ("A conviction under 18 U.S.C. 922(a) ordinarily contemplates more than one isolated gun sale."); *United States* v. *Swinton*, 521 F.2d 1255, 1259 (10th Cir. 1975) ("Swinton's sale [of one firearm] to Agent Knopp, standing alone, without more, would not have been sufficient to establish a violation of Section 922(a)(1). That sale, however, when considered in conjunction with other facts and circumstances related herein, established that Swinton was engaged in the business of dealing in firearms. The unrebutted evidence of the Government established not only that Swinton considered himself to be and held himself out as a dealer, but that, most importantly, he was actively engaged in the business of dealing in guns." (internal citation omitted)).

new in their original packaging; or (C) that are of the same or similar kind (*i.e.,* make/manufacturer, model, caliber/gauge, and action) and type (*i.e.,* the classification of a firearm as a rifle, shotgun, revolver, pistol, frame, receiver, machinegun, silencer, destructive device, or other firearm); (5) as a former licensee (or responsible person acting on behalf of the former licensee), sells or offers for sale firearms that were in the business inventory of such licensee at the time the license was terminated (*i.e.,* license revocation, denial of license renewal, license expiration, or surrender of license), and were not transferred to a personal collection in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a; or (6) as a former licensee (or responsible person acting on behalf of a former licensee), sells or offers for sale firearms that were transferred to a personal collection of such former licensee or responsible person prior to the time the license was terminated, unless: (A) the firearms were received and transferred without any intent to willfully evade the restrictions placed on licensees by chapter 44, title 18, of the United States Code; and (B) one year has passed from the date of transfer to the personal collection.

The proposed rule provided that any one circumstance or a combination of the circumstances set forth above would give rise to a rebuttable presumption that the person is engaged in the business of dealing in firearms and would need to be licensed under the GCA. The activities set forth in these proposed rebuttable presumptions would not be exhaustive of the conduct that may show that, or be considered in determining whether, a person is engaged in the business of dealing in firearms. Further, as previously noted, while the criteria may be useful to courts in criminal prosecutions when instructing juries regarding permissible inferences, the presumptions outlined above would not be applicable to such criminal cases.

At the same time, the Department recognized in the NPRM that certain transactions were not likely to be sufficient to support a presumption that a person is engaging in the business of dealing in firearms. For this reason, the proposed rule also included examples of when a person would not be presumed to be engaged in the business of dealing in firearms. Specifically, under the proposed rule, a person would not be presumed to be engaged in the business when the person transfers firearms only

as bona fide gifts [69] or occasionally [70] sells firearms only to obtain more valuable, desirable, or useful firearms for their personal collection or hobby—unless their conduct also demonstrates a predominant intent to earn a profit.

The NPRM noted that the rebuttable presumptions are supported by the Department's investigative, regulatory, and enforcement experience,[71] as well as conduct that the courts have found to require a license even before the BSCA expanded the definition of "engaged in the business." Moreover, these proposed presumptions are consistent with the case-by-case analytical framework long applied by the courts in determining whether a person has violated 18 U.S.C. 922(a)(1)(A) and 923(a) by engaging in the business of dealing in firearms without a license. The Department observed in the NPRM that the fundamental purposes of the GCA would be severely undermined if persons were allowed to repetitively purchase and resell firearms to predominantly earn a profit without conducting background checks, keeping records, and otherwise complying with the license requirements of the GCA. The Department therefore proposed criteria for when a person is presumed to be "engaged in the business" to strike an appropriate balance that captures persons who should be licensed under the GCA, as amended, without limiting or regulating activity that is truly a hobby or enhancement of a personal collection.

The first proposed presumption—that a person would be presumed to be engaged in the business when the person sells or offers for sale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and sell additional firearms—reflects that the

definition of "engaged in the business" in 18 U.S.C. 921(a)(21)(C) does not require that a firearm actually be sold by a person so long as the person is holding themself out as a dealer. This is because the relevant definition of "engaged in the business," 18 U.S.C. 921(a)(21)(C), defines the phrase by reference to the intent "to predominantly earn a profit through the repetitive purchase and resale of firearms" even if those firearms are not actually repetitively purchased and resold.[72]

The second presumption proposed—that a person is engaged in the business when spending more money or its equivalent on purchases of firearms for the purpose of resale than the person's reported taxable gross income during the applicable period of time—reflects that persons who spend more money or its equivalent on purchases of firearms for resale than their reported gross income are likely to be primarily earning their income from those sales, which is even stronger evidence of an intent to profit than merely supplementing one's income.[73] Alternatively, such persons may be using funds derived from criminal

---

[69] The Department interprets the term "bona fide gift" to mean a firearm given in good faith to another person without expecting any item, service, or anything of value in return. *See* Form 4473, at 4, Instructions to Question 21a. (Actual Transferee/Buyer) ("A gift is not bona fide if another person offered or gave the person . . . money, service(s), or item(s) of value to acquire the firearm for him/her, or if the other person is prohibited by law from receiving or possessing the firearm."); ATF, *FFL Newsletter: Federal Firearms Licensee Information Service 2* (June 2021), *https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensee-ffl-newsletter-june-2021/download* (same).

[70] While the GCA does not define the term "occasional," that term is commonly understood to mean "of irregular occurrence; happening now and then, infrequent." *Occasional,* Collins English Dictionary, *https://www.collinsdictionary.com/us/dictionary/english/occasional* (last visited Apr. 4, 2024) (defining "occasional" in "American English").

[71] See the discussion at the beginning of Section III.D, "Presumptions that a Person is 'Engaged in the Business.'"

[72] *See United States v. Ochoa,* 726 F. App'x 651, 652 (9th Cir. 2018) ("[section] 922(a)(1)(A) reaches those who hold themselves out as sources of firearms."); *United States v. Mulholland,* 702 F. App'x 7, 12 (2d Cir. 2017) ("The definition does not extend to a person who makes occasional sales for a personal collection or hobby, *id.,* and the government need only prove that a person was 'ready and able to procure [firearms] for the purpose of selling them from time to time.'" (quoting *Nadirashvili,* 655 F.3d at 199)); *King,* 735 F.3d at 1107 (defendant attempted to sell one of the 19 firearms he had ordered, and represented to the buyer that he was buying, selling, and trading in firearms and could procure any item in a gun publication at a cheaper price); *Shan,* 361 F. App'x at 183 ("[D]efendant sold two firearms within roughly one month and . . . Shan acknowledged on tape that he had a source of supply for other weapons."); *Shan,* 80 F. App'x at 32 ("[T]he evidence leaves little doubt as to Shan's ability to seek and find weapons for resale"); *Carter,* 801 F.2d at 82 ("[T]he statute reaches 'those who hold themselves out as a source of firearms.'" (quoting *United States v. Vilmonb,* 636 F.2d 123, 125 (5th Cir. 1981)).

[73] *See, e.g., Focia,* 869 F.3d at 1282 ("And finally, despite attempting to obtain Focia's tax returns and Social Security information, agents found no evidence that Focia enjoyed any source of income other than his firearms sales. This evidence overwhelmingly demonstrates that Focia's sales of firearms were no more a hobby than working at Burger King for a living could be described that way."); *United States v. Valdes,* 681 F. App'x 874, 879 (11th Cir. 2017) (defendant who engaged in the business of dealing in firearms without a license did not report income on tax returns from firearms sales online and at gun shows); Press Release, DOJ, *Man Who Sold Midland/Odessa Shooter AR–15 Used in Massacre Sentenced for Unlicensed Firearms Dealing* (Jan. 7, 2021), *https://www.justice.gov/usao-ndtx/pr/man-who-sold-midlandodessa-shooter-ar-15-used-massacre-sentenced-unlicensed-firearms* (defendant convicted of filing a false tax return that concealed his income from firearms sales).

APPX.010

**28978** **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

activities to purchase firearms, for example, including funds provided by a co-conspirator to repetitively purchase and resell the firearms without a license or for other criminal purposes, or funds that were laundered from past illicit firearms transactions. Such illicit and repetitive firearm purchase and sale activities do not require proof of profit for the Government to prove the requisite intent under 18 U.S.C. 921(a)(22), which states that proof of profit is not required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

The first presumption proposed within the third category listed above—that a person would be presumed to be engaged in the business when repetitively purchasing, reselling, or offering to sell firearms through straw or sham businesses or individual straw purchasers or sellers—reflects that persons who conceal their transactions by setting up straw or sham businesses or hiring "middlemen" to conduct transactions on their behalf are often engaged in the business of dealing in firearms without a license.[74]

The second presumption proposed under the third category—that a person would be presumed to be engaged in the business when repetitively purchasing, reselling, or offering to sell firearms that cannot lawfully be possessed—reflects that such firearms are actively sought by criminals and earn higher profits for the illicit dealer. The dealer is therefore taking on additional labor and risk with the intent of increasing profits. Such dealers will often buy and sell stolen firearms[75] and firearms with obliterated serial numbers[76] because such firearms are preferred by both sellers and buyers to avoid background checks and crime gun tracing.[77] They sometimes sell unregistered National Firearms Act ("NFA") weapons[78] and unlawfully

imported firearms because those firearms are more difficult to obtain, cannot be traced through the National Firearms Registration and Transfer Record, and may sell for a substantial profit.[79] Although these presumptions addressing repetitive straw purchase transactions and contraband firearms sales are intended to establish when persons are most likely to have the requisite intent to "predominantly earn a profit" under 18 U.S.C. 921(a)(21)(C), such cases are also supported by 18 U.S.C. 921(a)(22), which does not require the Government to prove an intent to profit where a person repetitively purchases and disposes of firearms for criminal purposes. These presumptions are also implicitly supported by 18 U.S.C. 923(c), which deems any firearm acquired or disposed of with the purpose of willfully evading the restrictions placed on licensed dealers under the GCA to be business inventory, not part of a personal collection. Indeed, concealing the identity of the seller or buyer of a firearm, or the identification of the firearm, undermines the requirements imposed on legitimate dealers to conduct background checks on actual purchasers (18 U.S.C. 922(t)) and maintain transaction records (18 U.S.C. 923(g)(1)–(2)) through which firearms involved in crime can be traced.

The first presumption proposed under the fourth category listed above—repetitive sales or offers for sale of firearms within 30 days from purchase—reflects that firearms for a personal collection are not likely to be repetitively sold within such a short period of time from purchase.[80] That

[74] See Abramski, 573 U.S. at 180 ("[C]onsider what happens in a typical straw purchase. A felon or other person who cannot buy or own a gun still wants to obtain one. (Or, alternatively, a person who could legally buy a firearm wants to conceal his purchase, maybe so he can use the gun for criminal purposes without fear that police officers will later trace it to him."); Bryan v. United States, 524 U.S. 184, 189 (1998) (defendant used straw purchasers to buy pistols in Ohio for resale in New York); Ochoa, 726 F. App'x at 652 ("[W]hile the evidence demonstrated that Ochoa did not purchase and sell the firearms himself, it was sufficient to demonstrate that he had the princip[al] objective of making a profit through the repetitive purchase and sale of firearms, even if those purchases and sales were carried out by others."); United States v. Hosford, 843 F.3d 161, 163 (4th Cir. 2016) (defendant purchased firearms through a straw purchaser who bought them at gun shows); MEIV Sporting Goods, LLC. v. Johansen, 992 F. Supp. 2d 665, 674–75 (N.D.W.V. 2014), aff'd, 594 F. App'x 143 (4th Cir. 2015) (corporate entity disregarded where it was formed to circumvent firearms licensing requirement); King, 735 F.3d at 1106 (defendant felon could not "immunize himself from prosecution" for dealing without a license by "hiding behind a corporate charter" (quotation marks omitted)); United States v. Fleischli, 305 F.3d 643, 652 (7th Cir. 2002) ("In short, a convicted felon who could not have legitimately obtained a manufacturer's or dealer's license may not obtain access to machine guns by setting up a sham corporation."); National Lending Group, L.L.C. v. Mukasey, No. CV 07–0024, 2008 WL 5329888, at *10–11 (D. Ariz. Dec. 19, 2008), aff'd, 365 F. App'x 747 (9th Cir. 2010) (straw ownership of corporate pawn shops); United States v. Paye, 129 F. App'x 567, 570 (11th Cir. 2005) (defendant paid straw purchaser to buy firearms for him to sell); Casanova Guns, Inc. v. Connally, 454 F.2d 1320, 1322 (7th Cir. 1972) ("[I]t is well settled that the fiction of a corporate entity must be disregarded whenever it has been adopted or used to circumvent the provisions of a statute."); XVP Sports, LLC v. Bangs, No. 2:11CV379, 2012 WL 4329258, at *5 (E.D. Va. Sept. 17, 2012) ("unity of interest" existed between

firearm companies controlled by the same person); Virlow LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives, No. 1:06–CV–375, 2008 WL 835828, *3–7 (W.D. Mich. Mar. 28, 2008) (corporate form disregarded where a substantial purpose of the formation of the company was to circumvent the statute restricting issuance of firearms licenses to convicted felons); Press Release, DOJ, Utah Business Owner Convicted of Dealing in Firearms Without a License and Filing False Tax Returns (Sept. 23, 2016), https://www.justice.gov/opa/pr/utah-business-owner-convicted-dealing-firearms-without-license-and-filing-false-tax-returns (defendant illegally sold firearms under the auspices of a company owned by another Utah resident).

[75] See, e.g., United States v. Fields, 608 F. App'x 806, 809 (11th Cir. 2015); United States v. Calcagni, 441 F. App'x 916, 917 (3d Cir. 2011); United States v. Simmons, 485 F.3d 951, 953 (7th Cir. 2007); United States v. Webber, 255 F.3d 523, 524–25 (8th Cir. 2001); Carter, 801 F.2d at 83–84; United States v. Perkins, 633 F.2d 856, 857–58 (8th Cir. 1981); United States v. Kelley, No. 22C2780, 2023 WL 2525366, at *1 (N.D. Ill. 2023); United States v. Logan, 532 F. Supp. 3d 725, 726 (D. Minn. 2021); United States v. Southern, 32 F. Supp. 2d 933, 937 (E.D. Mich. 1998).

[76] See, e.g., United States v. Ilarraza, 963 F.3d 1, 6 (1st Cir. 2020); Fields, 608 F. App'x at 809; United States v. Barrero, 578 F. App'x 884, 886 (11th Cir. 2014); Brenner, 481 F. App'x at 126; United States v. Teleguz, 492 F.3d 80, 82 (1st Cir. 2007); United States v. Bostic, 371 F.3d 865, 869 (6th Cir. 2004); United States v. Kitchen, 87 F. App'x 244, 245 (3d Cir. 2004); United States v. Ortiz, 318 F.3d 1030, 1035 (11th Cir. 2003); United States v. Rosa, 123 F.3d 94, 96 (2d Cir. 1997); United States v. Twitty, 72 F.3d 228, 234 n.2 (1st Cir. 1995); United States v. Collins, 957 F.2d 72, 73 (2d Cir. 1992); United States v. Hannah, No. CRIM.A.05–86, 2005 WL 1532534, at *3 (E.D. Pa. 2005).

[77] See Twitty, 72 F.3d at 234 n.2 (defendant resold firearms with obliterated serial numbers, which were "probably designed in part to increase the selling price of the weapons"); Brenner, 481 Fed. App'x at 126 (firearm traded to defendant was stolen); Hannah, 2005 WL 1532534, at *3 (holding that the defendant engaged in the business of dealing in firearms without a license in part because, on two occasions, "the defendant informed the buyers to obliterate the serial numbers so he would not 'get in trouble' ").

[78] The National Firearms Act of 1934, 26 U.S.C. 5801 et seq., regulates certain firearms, including short-barreled rifles and shotguns, machineguns, silencers, and destructive devices. NFA provisions still refer to the "Secretary of the Treasury." See generally 26 U.S.C. ch. 53. However, the Homeland Security Act of 2002, Public Law 107–296, 116 Stat.

2135, transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). Thus, this final rule refers to the Attorney General throughout.

[79] See, e.g., United States v. Fridley, 43 F. App'x 830, 831–32 (6th Cir. 2002) (defendant purchased and resold unregistered machineguns); United States v. Idarecis, 164 F.3d 620, 1998 WL 716568, at *1 (2d Cir. 1998) (unpublished table decision) (defendant converted rifles to machineguns and obliterated the serial numbers on the firearms he sold).

[80] See, e.g., Press Release, DOJ, Minnesota Man Indicted for Dealing Firearms Without a License (Feb. 18, 2016), https://www.justice.gov/opa/pr/minnesota-man-indicted-dealing-firearms-without-license (defendant sold firearms he purchased through online websites, and the average time he actually possessed a gun before offering it for sale was only nine days); Press Release, DOJ, Ex-Pasadena Police Lieutenant Sentenced to One Year in Federal Prison for Unlicensed Selling of Firearms and Lying on ATF Form (Feb. 25, 2019), https://www.justice.gov/usao-cdca/pr/ex-pasadena-police-lieutenant-sentenced-one-year-federal-prison-unlicensed-selling (defendant resold 79 firearms within six days after he purchased them); United States v. D'Agostino, No. 10–20449, 2011 WL

APPX.011

conduct is more consistent with treatment as business inventory.[81] Likewise, under the second and third presumptions proposed under this category, the Department has observed through its investigative and regulatory experience that persons who repetitively sell firearms in new condition or in like-new condition in their original packaging,[82] or firearms of

the same or similar kind and type,[83] are not as likely to be repetitively selling such firearms from a personal collection. In contrast with sales from a personal collection, persons engaged in the business who are selling from a business inventory can earn the greatest profit by selling firearms in the best (*i.e.*, in a new) condition, or by selling the particular makes and models of firearms that their customers most want.

The presumption proposed under the fifth category listed above—that a former licensee, or responsible person acting on behalf of such former licensee, is engaged in the business when they sell or offer for sale firearms that were in business inventory upon license termination—recognizes that the licensee likely intended to predominantly earn a profit from the repetitive purchase and resale of those firearms, not to acquire the firearms as a ''personal collection'' or otherwise as a personal firearm. Consistent with the GCA's plain language under section 921(a)(21)(C), this presumption recognizes that former licensees who thereafter intend to predominantly earn a profit from selling firearms that they had previously purchased for resale can still be ''engaging in the business'' after termination of their license. The GCA does not authorize former licensees to continue to be ''engaged in the business'' without a license even if the firearms were purchased while the person had a license.

The final presumption proposed—that a former licensee (or responsible person acting on behalf of the former licensee) is engaged in the business when they sell or offer for sale firearms that were transferred to the personal inventory of

such former licensee or responsible person prior to the time the license was terminated, unless the firearms were received and transferred without any intent to willfully evade the restrictions placed on licensees by chapter 44 of title 18 and one year has passed since the transfer—is consistent with 18 U.S.C. 923(c) of the GCA, which deems firearms transferred from a licensee's business inventory to their personal collection or otherwise as a personal firearm as business inventory until one year after the transfer.[84] This provision indicates a congressional determination that one year is a sufficient period for a former licensee to wait before a firearm that is purchased for personal use can be considered part of a personal collection or otherwise as a personal firearm, as opposed to business inventory being resold for profit.

In the NPRM, the Department noted that these presumptions may be rebutted in an administrative or civil proceeding with reliable evidence demonstrating that a person is not ''engaged in the business'' of dealing in firearms.[85] If, for example, there is reliable evidence that an individual purchased a few collectible firearms from a licensed dealer where ''all sales are final'' and then resold those firearms back to the licensee within 30 days because the purchaser was not satisfied, the presumption that the unlicensed reseller is engaged in the business (arising from the evidence of repetitive sales or offers for sale of firearms within 30 days from purchase) may be rebutted.

[81] Further support for this 30-day presumption comes from the fact that, while many retailers do not allow firearm returns, some retailers and manufacturers do allow a 30-day period within which a customer who is dissatisfied with a firearm purchased for a personal collection or hobby can return or exchange the firearm. Dissatisfied personal collectors and hobbyists—persons not intending to engage in the business—are more likely to return new firearms rather than to incur the cost, time, and expense to resell them within that period of time. *See, e.g.,* Learn about the 30 Day Money Back Guarantee: *How to Return Your Firearm,* Walther Arms, *https://waltherarms.com/connect/guarantee#* (last visited Apr. 4, 2024); *Retail Policies,* Center Target Sports, *https://centertargetsports.com/retail-range/* (last visited Feb. 29, 2024) (''When you purchase any gun from Center Target Sports, we guarantee your satisfaction. Use your gun for up to 30 days and if for any reason you're not happy with your purchase, return it to us within 30 days and receive a store credit for the FULL purchase price.''); *Warranty & Return Policy,* Century Arms (Mar. 6, 2019), *https://www.centuryarms.com/media/wysiwyg/Warranty_and_Return_v02162021.pdf* (''Customer has 30 days to return surplus firearms, ammunition, parts, and accessories for repair/replacement if the firearm does not meet the advertised condition.''); *I Love You PEW 30 Day Firearm Guarantee,* Alphadog Firearms, *https://alphadogfirearms.com/i-love-you-pew/* (last visited Feb. 29, 2024) (''Original purchaser has 30 calendar days to return any new firearm purchased for store credit.''); *Return Exceptions Policy,* Big 5 Sporting Goods, *https://www.big5sportinggoods.com/static/big5/pdfs/Customer-Service-RETURN-EXCEPTIONS-POLICY-4.pdf* (last visited Feb. 29, 2024) (''Firearm purchases must be returned to the same store at which they were purchased. No refunds or exchanges unless returned in the original condition within thirty (30) days from the date of release.''); *Returns, Transfers & Consignments,* DFW Gun Range & Academy, *https://www.dfwgun.com/membership/store-policies.html* (last visited Feb. 29, 2024) (30-day return policy); *Return Policy,* RifleGear, *https://www.riflegear.com/t-returns.aspx* (last visited Feb. 29, 2024) (30-day return policy); *Gun-Buyer Remorse Is a Thing of the Past,* Stoddard's Range and Guns, *https://stoddardsguns.com/stoddards-commitment/* (last visited Feb. 29, 2024) (30-day return policy); *Palmetto State Armory's Hassle-Free Return Policy,* AskHandle, *https://www.askhandle.com/blog/palmetto-state-armory-return-policy* (last visited Feb. 29, 2024) (30-day return policy); *Instructions for Returns/Repairs,* Rock River Arms, *https://www.rockriverarms.com/index.cfm?fuseaction=page.display&page_id=34* (last visited Feb. 29, 2024) (30-day return policy); *''No Regrets'' Policy,* Granite State Indoor Range, *https://www.granitestaterange.com/our-pro-shop/* (last visited Apr. 4, 2024) (30-day return policy).

[82] *See, e.g., Carter,* 203 F.3d at 189 & n.1 (defendant admitted to willfully shipping and

219008, at *3 (E.D. Mich. Jan. 20, 2011) (some of the weapons defendant sold at gun shows were purchased ''a short time earlier''); *United States* v. *One Assortment of 89 Firearms,* 511 F. Supp. 133, 137 (D.S.C. 1980) (''That several sales of firearms occur in a reasonably short space of time is evidence of dealing in firearms.'').

transporting 11 handguns in the course of engaging in the business of dealing in firearms without a license that were contained in their original boxes); *Brenner,* 481 F. App'x at 127 (defendant frequently referred to firearms as ''coming in'' and ''brand new''); *United States* v. *Van Buren,* 593 F.2d 125, 126 (9th Cir. 1979) (defendant's ''gun displays were atypical of those of a collector because he exhibited many new weapons, some in the manufacturers' boxes''); *United States* v. *Powell,* 513 F.2d 1249, 1250 (8th Cir. 1975) (defendant acquired and sold six ''new'' or ''like new'' shotguns over several months); *United States* v. *Posey,* 501 F.2d 998, 1002 (6th Cir. 1974) (defendant offered firearms for sale, some of them in their original boxes); *United States* v. *Day,* 476 F.2d 562, 564, 567 (6th Cir. 1973) (60 of the 96 guns to be sold by defendant were new handguns still in the manufacturer's original packages).

[83] *See, e.g.,* Press Release, DOJ, *FFL Sentenced for Selling Guns to Unlicensed Dealers* (May 27, 2022), *https://www.justice.gov/usao-ndtx/pr/ffl-sentenced-selling-guns-unlicensed-dealers* (defendant regularly sold large quantities of identical firearms to unlicensed associates who sold them without a license); *Shipley,* 546 F. App'x at 453 (defendant sold mass-produced firearms of similar make and model that were ''not likely to be part of a personal collection'').

[84] Even if one year has passed from the date of transfer, business inventory transferred to a personal collection or otherwise as a personal firearm of a former licensee (or responsible person acting on behalf of that licensee) prior to termination of the license cannot be treated as part of a personal collection or as a personal firearm if the licensee received or transferred those firearms with the intent to willfully evade the restrictions placed upon licensees by the GCA (*e.g.,* willful violations as cited in a notice of license revocation or denial of renewal). This is because, under section 923(c), any firearm acquired or disposed of with intent to willfully evade the restrictions placed upon licensees by the GCA is automatically business inventory. Therefore, because the firearms are statutorily deemed to be business inventory under either of these circumstances, a former licensee (or responsible person acting on behalf of such licensee) who sells such firearms is presumed to be engaged in the business, requiring a license.

[85] An example of an administrative proceeding where rebuttable evidence might be introduced would be where ATF denied a firearms license application, pursuant to 18 U.S.C. 923(d)(1)(C) and (f)(2), on the basis that the applicant was presumed under this rule to have willfully engaged in the business of dealing in firearms without a license. An example of a civil case would be an asset forfeiture proceeding, brought in a district court pursuant to 18 U.S.C. 924(d)(1), on the basis that the seized firearms were intended to be involved in willful conduct presumed to be engaging in the business without a license under this rule.

ATF 015291

APPX.012

Similarly, the presumption that a person who repetitively resells firearms of the same make and model within one year of their purchase is "engaged in the business" could be rebutted based on evidence that the person is a collector who occasionally sells one specific kind and type of curio or relic firearm to buy another one in better condition to "trade-up" or enhance the seller's personal collection.[86] Another example in which evidence may rebut the presumption would be the occasional sale, loan, or trade of an almost-new firearm in its original packaging to a family member for lawful purposes, such as for their use in hunting, without the intent to earn a profit or to circumvent the requirements placed on licensees.[87]

*E. Definition of "Personal Collection," "Personal Collection of Firearms," and "Personal Firearms Collection"*

The NPRM explained that the statutory definition of "engaged in the business" excludes "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. 921(a)(21)(C). To clarify this definitional exclusion, the proposed rule would: (1) add a single definition for the terms "personal collection," "personal collection of firearms," and "personal firearms collection"; (2) explain how those terms apply to licensees; and (3) make clear that licensees must follow the verification and recordkeeping procedures in 27 CFR 478.94 and subpart H, rather than using ATF Form 4473, when they acquire firearms from other licensees, including a sole proprietor who transfers a firearm to their personal collection or otherwise as a personal firearm in accordance with 27 CFR 478.125a.

Specifically, the NPRM proposed to define "personal collection," "personal collection of firearms," and "personal firearms collection" as "personal firearms that a person accumulates for study, comparison, exhibition, or for a hobby (*e.g.,* noncommercial, recreational activities for personal

enjoyment such as hunting, or skeet, target, or competition shooting)." This reflects a common definition of the terms "collection" and "hobby." [88] The phrase "or for a hobby" was adopted from 18 U.S.C. 921(a)(21)(C), which excludes from the definition of "engaged in the business" firearms acquired "for" a hobby. The NPRM also expressly excluded from the definition of "personal collection" "any firearm purchased for resale or made with the predominant intent to earn a profit." 18 U.S.C. 921(a)(21)(C).

The NPRM further explained that, under the GCA, 18 U.S.C. 923(c), and its implementing regulations, 27 CFR 478.125(e) and 478.125a, a licensee who acquires firearms for a personal collection is subject to certain additional requirements before the firearms can become part of a "personal collection." [89] Accordingly, the proposed rule further explained how that term would apply to firearms acquired by a licensee (*i.e.,* a person engaged in the business as a licensed manufacturer, licensed importer, or licensed dealer under the GCA), by defining "personal collection," "personal collection of firearms," or "personal firearms collection," when applied to licensees, to include only firearms that were: (1) acquired or transferred without the intent to willfully evade the restrictions placed upon licensees by chapter 44, title 18, United States Code; [90] (2) recorded by

the licensee as an acquisition and disposition in the licensee's acquisition and disposition record in accordance with 27 CFR 478.122(a), 478.123(a), or 478.125(e) (unless acquired prior to licensure and not intended for sale); [91] (3) recorded as a disposition from the licensee's business inventory to their personal collection in accordance with 27 CFR 478.122(a), 478.123(a), or 478.125(e); (4) stored separately from, and not commingled with the business inventory, and appropriately identified as "not for sale" (*e.g.,* by attaching a tag), if on the business premises; [92] and (5) maintained in such personal collection (whether on or off the business premises) for at least one year from the date the firearm was so transferred, in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a.[93] These proposed parameters to define the term "personal collection" as applied to licensees reflect the statutory and regulatory requirements for personal collections in 18 U.S.C. 923(c) and 27

---

[86] *See Palmieri,* 21 F.3d at 1269 ("The fact finder must determine whether the transactions constitute hobby-related sales or engagement in the business of dealing from the nature of the sales and in light of their circumstances.").

[87] *See, e.g., Clark* v. *Scouffas,* No. 99–C–4863, 2000 WL 91411, at *3 (N.D. Ill. Jan. 19, 2000) (license applicant was not a "dealer" who was "engaged in the business" as defined under section 921(a)(21)(C) where he only sold a total of three .38 Special pistols—two to himself, and one to his wife—without any intent to profit).

[88] *See* Webster's Third at 444, 1075, 1686 (defining the term "personal" to include "of or relating to a particular person," "collection" to include "an assembly of objects or specimens for the purposes of education, research, or interest", and "hobby" as "a specialized pursuit . . . that is outside one's regular occupation and that one finds particularly interesting and enjoys doing"); *Personal,* Merriam-Webster, *https://www.merriam-webster.com/dictionary/personal* (last visited Mar. 1, 2024) (defining the term "personal" to include "of, relating to, or affecting a particular person"); *Collection,* Merriam-Webster, *https://www.merriam-webster.com/dictionary/collection* (last visited Mar. 1, 2024) (defining "collection" to include "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby"); *Hobby,* Merriam-Webster, *https://www.merriam-webster.com/dictionary/hobby* (last visited Mar. 1, 2024) (defining "hobby" as a "pursuit outside one's regular occupation engaged in especially for relaxation"); *see also Idarecis,* 164 F.3d 620, 1998 WL 716568, at *4 ("There is no case authority to suggest that there is a distinction between the definition of a collector and of a [personal] collection in the statute.").

[89] The GCA, 18 U.S.C. 923(c), and its implementing regulations, also require that all firearms "disposed of" from a licensee's personal collection, including firearms acquired before the licensee became licensed, that are held for at least one year and that are sold or otherwise disposed of, must be recorded as an acquisition and disposition in a personal firearms record. *See* 18 U.S.C. 923(c); 27 CFR 478.125a(a)(4).

[90] *See* ATF, *May a Licensee Create a Personal Collection to Avoid the Recordkeeping and NICS*

*Background Check Requirements of the GCA?, https://www.atf.gov/firearms/qa/may-licensee-create-personal-collection-avoid-recordkeeping-and-nics-background-check* (last reviewed July 15, 2020).

[91] *See* ATF, *Does a Licensee Have to Record Firearms Acquired Prior to Obtaining the License in Their Acquisition and Disposition Record?, https://www.atf.gov/firearms/qa/does-licensee-have-record-firearms-acquired-prior-obtaining-license-their-acquisition* (last reviewed July 15, 2020); ATF, *ATF Federal Firearms Regulations Reference Guide,* ATF P 5300.4, Q&A (F2) at 201 (2014) ("All firearms acquired after obtaining a firearms license must be recorded as an acquisition in the acquisition and disposition record as business inventory."); ATF, *FFL Newsletter: Federal Firearms Licensee Information Service* 7 (Feb. 2011), *https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-february-2011/download* ("There may be occasions where a firearms dealer utilizes his license to acquire firearms for his personal collection. Such firearms must be entered in his permanent acquisition records and subsequently be recorded as a disposition to himself in his private capacity."); ATF, *FFL Newsletter: Federal Firearms Licensee Information Service* 7 (Mar. 2006), *https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-march-2006/download* ("[E]ven if a dealer acquires a firearm from a licensee by completing an ATF Form 4473, the firearm must be entered in the transferee dealer's records as an acquisition.").

[92] *See* ATF, *May a Licensee Store Personal Firearms at the Business Premises?, https://www.atf.gov/firearms/qa/may-licensee-store-personal-firearms-business-premises* (last reviewed July 15, 2020); ATF, *FFL Newsletter: Federal Firearms Licensee Information Service* 7 (Feb. 2011), *https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-february-2011/download;* ATF Industry Circular 72–30, *Identification of Personal Firearms on Licensed Premises Not Offered for Sale* (Oct. 10, 1972).

[93] *See* ATF, *May a Licensee Maintain a Personal Collection of Firearms? How Can They Do So?, https://www.atf.gov/firearms/qa/may-licensee-maintain-personal-collection-firearms-how-can-they-do-so* (last reviewed July 15, 2020).

CFR 478.122(a), 478.123(a), 478.125(e), and 478.125a.[94] To implement these changes, the rule also proposed to make conforming changes by adding references in 27 CFR 478.125a to the provisions that relate to the acquisition and disposition recordkeeping requirements for importers and manufacturers.

*F. Definition of "Responsible Person"*

The NPRM also proposed to add a regulatory definition of the term "responsible person" in 27 CFR 478.11, to mean "[a]ny individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of a sole proprietorship, corporation, company, partnership, or association, insofar as they pertain to firearms." This definition comes from 18 U.S.C. 923(d)(1)(B) and has long been reflected on the application for license (Form 7) and other ATF publications since enactment of a similar definition in the Safe Explosives Act in 2002.[95] This definition would exclude, for example, store clerks or cashiers who cannot make management or policy decisions with respect to firearms (*e.g.,* what company or store-wide policies and controls to adopt, which firearms are bought and sold by the business, and who is hired to buy and sell the firearms), even if their duties include buying or selling firearms for the business.

*G. Definition of "Predominantly Earn a Profit"*

The NPRM also explained that the BSCA broadened the definition of "engaged in the business" as a dealer by substituting "to predominantly earn a profit" for "with the principal objective of livelihood or profit." 18 U.S.C. 921(a)(21)(C). It also defined the term "to predominantly earn a profit." 18 U.S.C. 921(a)(22). The NPRM proposed to incorporate these statutory changes, as discussed above.

The NPRM proposed to further implement the BSCA's amendments by: (1) clarifying that the "proof of profit" proviso—*i.e.,* the BSCA's provision that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism"—also excludes intent to profit, thus making clear that it is not necessary for the Federal Government to prove that a person intended to make a profit if the person was dealing in firearms for criminal purposes or terrorism; (2) clarifying that a person may have the predominant intent to profit even if the person does not actually obtain pecuniary gain from selling or disposing of firearms; and (3) establishing a presumption in civil and administrative proceedings that certain conduct demonstrates the requisite intent to "predominantly earn a profit," absent reliable evidence to the contrary.

These proposed regulatory amendments are consistent with the plain language of the GCA. Neither the pre-BSCA definition of "with the principal objective of livelihood and profit" nor the post-BSCA definition of "to predominantly earn a profit" requires the Government to prove that the defendant actually profited from firearms transactions. *See* 18 U.S.C. 921(a)(22), (a)(23) (referring to "the intent underlying the sale or disposition of firearms"); *Focia,* 869 F.3d at 1282 ("The exact percentage of income obtained through the sales is not the test; rather, . . . the statute focuses on the defendant's motivation in engaging in the sales.").[96]

ATF's experience also establishes that certain conduct related to the sale or disposition of firearms presumptively demonstrates a primary motivation to earn a profit. In addition to conducting criminal investigations of unlicensed firearms businesses under 18 U.S.C. 922(a)(1)(A), ATF has for many decades observed through qualification and compliance inspections how dealers who sell or dispose of firearms demonstrate a predominant intent to obtain pecuniary gain, as opposed to

other intents, such as improving or liquidating a personal collection.

Based on this decades-long body of experience, the proposed rule provided that, absent reliable evidence to the contrary, a person may be presumed to have the intent to "predominantly earn a profit" when the person: (1) advertises, markets, or otherwise promotes a firearms business (*e.g.,* advertises or posts firearms for sale, including on any website; establishes a website for selling or offering for sale their firearms; makes available business cards; or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally;[97] (2) purchases, rents, or otherwise secures or sets aside permanent or temporary physical space to display or store firearms they offer for sale, including part or all of a business premises, table or space at a gun show, or display case;[98] (3) makes or maintains records, in any form, to document, track, or calculate profits and losses from firearms purchases and sales;[99] (4) purchases or otherwise secures merchant services as a business (*e.g.,* credit card transaction services, digital wallet for business) through

---

[94] The existing regulations, 27 CFR 478.125(e) and 478.125a—which require licensees to record the purchase of all firearms in their business bound books, record the transfer of firearms to their personal collection, and demonstrate that personal firearms obtained before licensing have been held at least one year prior to their disposition as personal firearms—were upheld by the Fourth Circuit in *National Rifle Ass'n,* 914 F.2d at 482–83.

[95] *See* 18 U.S.C. 841(s); *Application for Federal Firearms License,* ATF Form 7, Definition 3 (5300.12) (Oct. 2020); *Gilbert v. ATF,* 306 F. Supp. 3d 776, 781 (D. Md. 2018); *Gossard v. Fronczak,* 206 F. Supp. 3d 1053, 1064–65 (D. Md. 2016), *aff'd,* 701 F. App'x 266 (4th Cir. 2017); ATF, *FFL Newsletter: Federal Firearms Licensee Information Service* 6 (Sept. 2011), *https://www.atf.gov/files/docs/newsletter/federal-firearms-licensees-newsletter-september-2011/download.*

[96] *See also Valdes,* 681 F. App'x at 877 (the government does not need to show that the defendant "necessarily made a profit from dealing" (quoting *Wilmoth,* 636 F.2d at 125)); *United States v. Mastro,* 570 F. Supp. 1388, 1391 (E.D. Pa. 1983) ("[T]he government need not show that defendant made or expected to make a profit." (citing cases)); *United States v. Shirling,* 572 F.2d 532, 534 (5th Cir. 1978) ("The statute is not aimed narrowly at those who profit from the sale of firearms, but rather broadly at those who hold themselves out as a source of firearms."); *cf. King,* 735 F.3d at 1107 n.8 (section 922(a)(1)(A) does not require an actual sale of firearms).

[97] *See, e.g., United States v. Caldwell,* 790 F. App'x 797, 799 (7th Cir. 2019) (defendant placed 192 advertisements on a website devoted to gun sales); *Valdes,* 681 F. App'x at 878 (defendant handed out business card); *United States v. Pegg,* 542 F. App'x 328 (5th Cir. 2013) (defendant sometimes advertised firearms for sale in the local newspaper); *United States v. Crudgington,* 469 F. App'x 823, 824 (11th Cir. 2012) (defendant advertised firearms for sale in local papers, and tagged them with prices); *United States v. Dettra,* No. 99–3667, 2000 WL 1872046, at *2 (6th Cir. Dec. 15, 2000) ("Dettra's use of printed business cards and his acceptance of credit payment provide further reason to infer that he was conducting his firearms activity as a profitable trade or business, and not merely as a hobby."); *United States v. Norman,* No. 4–10CR00059–JLH, 2011 WL 2678821, at *3 (E.D. Ark. 2011) (defendant placed advertisements in local newspaper and on a website).

[98] *See, e.g., United States v. Vilkening,* 485 F.2d 234, 235 (8th Cir. 1973) (defendant set up a glass display case and displayed for sale numerous ordinary long guns and handguns that were not curios or relics); *United States v. Jackson,* 352 F. Supp. 672, 676 (S.D. Ohio 1972), *aff'd,* 480 F.2d 927 (6th Cir. 1973) (defendant set up glass display case, displaying numerous long guns and handguns for sale that were not curios or relics); Press Release, DOJ, *Asheville Man Sentenced for Dealing Firearms Without a License* (Jan. 20, 2017), *https://www.justice.gov/usao-wdnc/pr/asheville-man-sentenced-dealing-firearms-without-license-0* (defendant sold firearms without a license from his military surplus store).

[99] *See, e.g., United States v. White,* 175 F. App'x 941, 942 (9th Cir. 2006) ("Appellant also created a list of all the firearms he remembers selling and the person to whom he sold the firearms."); *Dettra,* 2000 WL 1872046, at *2 ("Dettra carefully recorded the cost of each firearm he acquired, enabling him to later determine the amount needed to sell the item in a profitable manner."); *United States v. Angelini,* 607 F.2d 1305, 1307 (9th Cir. 1979) (defendant kept sales slips or invoices).

**28982** **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

which the person makes or offers to make payments for firearms transactions;[100] (5) formally or informally purchases, hires, or otherwise secures business security services (e.g., a central station-monitored security system registered to a business[101] or guards for security[102]) to protect business assets or transactions that include firearms; (6) formally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes or offers to make firearms transactions;[103] (7) secures or applies for a State or local business license to purchase for resale or to sell merchandise that includes firearms; or (8) purchases a business insurance policy, including any riders that cover firearms inventory.[104] Any of these firearms-business-related activities justifies a rebuttable presumption that the person has the requisite intent to

predominantly earn a profit from reselling or disposing of firearms.

The NPRM noted that these rebuttable presumptions concerning an intent "to predominantly earn a profit" are independent of the set of presumptions described above regarding conduct that presumptively shows a person is "engaged in the business." This second set of presumptions that addresses only intent "to predominantly earn a profit" would be used to independently establish the requisite intent to profit in a particular proceeding. As with the "engaged in the business" presumptions, the activities set forth in these intent presumptions would not be exhaustive of the conduct that may show that, or be considered in determining whether, a person actually has the requisite intent "to predominantly earn a profit." There are many other fact patterns that would not fall within the specific conduct that presumptively requires a license under this rule but that reveal one or more preparatory steps that presumptively demonstrate an intent to predominantly earn a profit from firearms transactions. Again, none of these presumptions would apply to criminal prosecutions, but could be useful to courts in criminal cases, for example, to inform appropriate jury instructions regarding permissible inferences. These presumptions would be supported by the Department's investigative and regulatory efforts and experience as well as conduct that the courts have relied upon in determining whether a person was required to be licensed as a dealer in firearms even before the BSCA expanded the definition.

### H. Disposition of Business Inventory After Termination of License

The NPRM next explained that one public safety issue that ATF has encountered over the years relates to former licensees who have liquidated their business inventory of firearms without performing background checks or maintaining required records after their license was revoked, denied renewal, or otherwise terminated (e.g., license expiration or surrender of license). Some former licensees have transferred their business inventory of firearms to a "personal collection" and then sold them without performing background checks or recordkeeping.[105]

Sometimes former licensees even continue to acquire more firearms for resale ("restocking") after license termination. These activities have resulted in numerous firearms being sold without background checks by former licensees (including those whose licenses have been revoked or denied due to willful violations of the GCA) to potentially prohibited persons without any ability to trace those firearms if later used in crime.[106]

The NPRM proposed to revise the regulation's sections on discontinuing business, 27 CFR 478.57 and 478.78, to clarify how the prohibitions on engaging in the business of dealing in firearms without a license in 18 U.S.C 922(a)(1)(A) and 923(a) apply with respect to the sale of firearms that remain in the possession of a former licensee (or a responsible person of the former licensee) as business inventory at the time the license is terminated. Firearms that were in the business inventory of a former licensee at the time the license was terminated (i.e., license revocation, denial of license renewal, license expiration, or surrender of license) and that remain in the possession of the licensee (or a responsible person acting on behalf of the former licensee) are not part of a "personal collection." While 18 U.S.C. 921(a)(21)(C) allows an unlicensed person to "sell all or part of his personal collection" without being considered "engaged in the business," in this context, these firearms were purchased

---

[100] See, e.g., King, 735 F.3d at 1106–07 (defendant "incorporated and funded a firearms business 'on behalf' of a friend whose American citizenship enabled business to obtain Federal firearms license" and then "misappropriated company's business account, using falsified documentation to set up credit accounts and order firearms from manufacturers and wholesalers"); Dettra, 2000 WL 1872046, at *2 ("Dettra's . . . acceptance of credit payment provide[s] further reason to infer that he was conducting his firearms activity as a profitable trade or business, and not merely as a hobby.").

[101] Numerous jurisdictions require all persons with alarms or security systems designed to seek a police response to be registered with or obtain a permit from local police and pay the requisite fee. See, e.g., Albemarle County (Virginia) Code sec. 12–102(A); Arlington County (Virginia) Code sec. 33–10(A); Cincinnati (Ohio) City Ord. Ch. 807–1–A4 (2); City of Coronado (California) Code sec. 40.42.050; Irvine (California) Code sec. 4–19–105; Kansas City (Missouri) Code sec. 50–333(a); Larimer County (Colorado) Security Alarm Ord. 09142010O001 sec. 3(A); Lincoln (Nebraska) Mun. Code sec. 5.56.030(a); Los Angeles (California) Mun. Code sec. 103.206(b); Loudoun County (Virginia) Code sec. 655.03(a); Mobile (Alabama) Code sec. 39–62(g)(1); Montgomery County (Maryland) Code sec. 3A–3; Prince William County (Virginia) Code sec. 2.5.25(a); Rio Rancho (New Mexico) Mun. Code sec. 97.04(A); Scottsdale (Arizona) Code sec. 3–10(a); Tempe (Arizona) Code sec. 22–76(a); Washington County (Oregon) Code sec. 8.12.040; West Palm Beach (Florida) Code sec. 46–32(a); Wilmington (Delaware) Code sec. 10–38(c); Woburn (Massachusetts) Code sec. 8–31. Due to the value of the inventory and assets they protect, for-profit businesses are more likely to maintain, register, and pay for these types of alarms rather than individuals seeking to protect personal property.

[102] See, e.g., United States v. De La Paz-Rentas, 613 F.3d 18, 22–23 (1st Cir. 2010) (defendant was hired as bodyguard for protection in an unlawful firearms transaction).

[103] See, e.g., United States v. Gray, 470 F. App'x at 469 (defendant sold firearms through his sporting goods store, advertised his business using signs and flyers, and displayed guns for sale, some with tags).

[104] See, e.g., United States v. Kish, 424 F. App'x 398, 404 (6th Cir. 2011) (defendant could only have 200 firearms on display because of insurance policy limitations).

[105] See, e.g., Annie Linskey, Closed Store Is a Source of Guns, Baltimore Sun (Apr. 15, 2008), https://www.baltimoresun.com/news/bs-xpm-2008-04-15-0804150118-story.html (after revocation of license, a dealer transferred around 700 guns to his "personal collection" and continued to sell them without recordkeeping). The problem of licensees liquidating their business inventory of firearms as

firearms from their "personal collections" without background checks or recordkeeping has been referred to by some advocacy groups and Members of Congress as the "fire-sale loophole." See Dan McCue, Booker Bill Takes Aim at Gun Fire Sale Loophole, The Well News (Sept. 9, 2022), https://www.thewellnews.com/guns/booker-bill-takes-aim-at-gun-fire-sale-loophole/; Shira Toeplitz, Ackerman Proposes Gun-Control Bill to Close 'Firesale Loophole', Politico: On Congress Blog (Jan. 12, 2011), https://www.politico.com/blogs/on-congress/2011/01/ackerman-proposes-gun-control-bill-to-close-firesale-loophole-032289.

[106] See, e.g., Dettra, 2000 WL 1872046, at *2 (defendant continued to deal in firearms after license revocation); Press Release, DOJ, Gunsmoke Gun Shop Owner and Former Discovery Channel Star Indicted and Arrested for Conspiracy, Dealing in Firearms without a License and Tax Related Charges (Feb. 11, 2016), https://www.justice.gov/opa/pr/gunsmoke-gun-shop-owner-and-former-discovery-channel-star-indicted-and-arrested-conspiracy (defendant continued to deal in firearms at a different address after he surrendered his FFL due to his violations of the Federal firearms laws and regulations); Kish, 424 F. App'x at 405 (defendant continued to sell firearms after revocation of license); Gilbert v. Bangs, 813 F. Supp. 2d 669, 672 (D. Md. 2011), aff'd 481 F. App'x 52 (4th Cir. 2012) (license denied to applicant who willfully engaged in the business after license revocation); ATF Letter to AUSA (Mar. 13, 1998) (advising that seized firearms offered for sale were not deemed to be part of a "personal collection" after surrender of license).

by the former licensee as business inventory and were not accumulated by that person for study, comparison, exhibition, or for a hobby. Accordingly, a former licensee who sells business inventory after their license is terminated could be unlawfully engaging in the business of dealing in firearms without a license.

Under the proposals to revise 27 CFR 478.57 (discontinuance of business) and 478.78 (operations by licensee after notice), once a license has been terminated (*i.e.,* license revocation, denial of license renewal, license expiration, or surrender of license), the former licensee would have 30 days, or such additional period designated by the Director for good cause, to either: (1) liquidate any remaining business inventory by selling or otherwise disposing of the firearms to a licensed importer, licensed manufacturer, or licensed dealer for sale, auction, or pawn redemption in accordance with part 478 of the regulations; [107] or (2) transfer the remaining business inventory to the "personal inventory of the former licensee" (or a responsible person of the former licensee) provided the recipient is not prohibited by law from receiving or possessing firearms. The term "personal inventory of the former licensee" was proposed to clarify that such firearms are not part of a "personal collection" within the meaning of 18 U.S.C. 921(a)(21)(C). Except for the sale of remaining inventory to a licensee within the 30-day period (or designated additional period), a former licensee (or responsible person of such licensee) who resells any such inventory, including business inventory transferred to "personal inventory," would be subject to the same presumptions in 27 CFR 478.11 (definition of "engaged in the business" as a dealer other than a gunsmith or pawnbroker) that apply to a person who repetitively purchased those firearms for the purpose of resale.

The 30-day period from license termination for a former licensee to transfer the firearms either to another licensee or to a personal collection parallels the period of time for record disposition after license termination in

the GCA, 18 U.S.C. 923(g)(4), and is a reasonable period for that person to wind down operations after discontinuance of business without acquiring new firearms.[108] That period of liquidation was proposed to be extendable by the Director for good cause, such as to allow pawn redemptions if required by State, local, or Tribal law.

Also, the NPRM proposed to make clear in the definition of "personal collection" in 27 CFR 478.11 that firearms transferred by a former licensee to a personal collection prior to the license termination would not be considered part of a personal collection unless one year had passed from the date the firearm was transferred into the personal collection before the license was terminated. This proposal would give effect to 18 U.S.C. 923(c), which requires that all firearms acquired by a licensee be maintained as part of a personal collection for a period of at least one year before they lose their status as business inventory. Former licensees (or responsible persons) who sell business inventory within one year after transfer to a personal collection would be presumed to be engaging in the business of dealing in those firearms because the firearms are not yet considered part of a "personal collection." *See* § 478.13(b)(5).

Moreover, under the proposed rule, a former licensee would not be permitted to continue to engage in the business of importing, manufacturing, or dealing in firearms by importing or manufacturing additional firearms for purposes of sale or distribution, or purchasing additional firearms for resale (*i.e.,* "restocking") without a license. Therefore, a former licensee (or responsible person) would be subject to the same presumptions in 27 CFR 478.11 (definition of "engaged in the business" as a dealer other than a gunsmith or pawnbroker) that apply to persons who sell firearms that were repetitively purchased with the predominant intent to earn a profit and any sales by such a person will be closely scrutinized by the Department on a case-by-case basis.

### I. Transfer of Firearms Between FFLs and Form 4473

Finally, to ensure the traceability of all firearms acquired by licensees from other licensees, the NPRM proposed to make clear that licensees cannot satisfy their obligations under 18 U.S.C. 923(g)(1)(A) by completing a Form 4473

when selling or otherwise disposing of firearms to another licensed importer, licensed manufacturer, or licensed dealer, or disposing of a curio or relic to a licensed collector, including a sole proprietor licensee who transfers the firearm to their personal collection or otherwise as a personal firearm in accordance with 27 CFR 478.125a.[109] Form 4473 was not intended for use by licensees when transferring firearms to other licensees or by a sole proprietor transferring to their personal collection or otherwise as a personal firearm.

Pursuant to 18 U.S.C. 926(a)(1) and 27 CFR 478.94, 478.122(b), 478.123(b), and 478.125(e), when a licensee transfers a firearm to another licensee, the transferor must first verify the recipient's identity and license status by examining a certified copy of the recipient's license and recording the transfer as a disposition to that licensee in the bound book record. In turn, the recipient licensee would record the receipt as an acquisition in their bound book record. *See* 27 CFR part 478, subpart H. The NPRM explained that if a recipient licensee were to complete a Form 4473 for the purchase of a firearm, but not record that receipt in their bound book record, asserting it is a "personal firearm," then tracing efforts pursuant to the GCA could be hampered if the firearm was later used in a crime.

However, this clarification that FFLs may not satisfy their obligations by completing a Form 4473 to transfer firearms between themselves would not include dispositions by a licensed legal entity such as a corporation, company (to include a limited liability company), or partnership, to the personal collection of a responsible person of such an entity. This is because, when a responsible person acquires a firearm for their personal collection from the business entity holding the license, they are not acting on behalf of the licensee, even if the entity in which they are employed holds a Federal firearms license.[110] Such an entity, including a

---

[107] Consistent with its dictionary definition, the term "liquidate" in this context means to sell or otherwise dispose of a firearms inventory without acquiring additional firearms for the inventory (*i.e.,* "restocking"). *See Liquidate,* Merriam-Webster, *https://www.merriam-webster.com/dictionary/liquidate* (last visited Mar. 4, 2024) (defining "liquidate" as "to convert (assets) into cash"); *see also, e.g., Bremer,* 481 F. App'x at 127 (defendant former licensee was not liquidating a personal collection where all of the indictment-charged firearms were acquired after his license had not been renewed).

[108] *See also* 27 CFR 478.57 (requiring the owner of a discontinued or succeeded business to notify ATF of such discontinuance or succession within 30 days); 27 CFR 478.127 (requiring discontinued businesses to turn in records within 30 days).

[109] *See* ATF, *FFL Newsletter: Federal Firearms License Information Service* 7 (Mar. 2006), *https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-march-2006/download* ("A dealer who purchases a firearm from another licensee should advise the transferor licensee of his or her licensed status so the transferor licensee's records may accurately reflect that this is a transaction between licensees. An ATF Form 4473 should not be completed for such a transaction, because this form is used only for a disposition to a nonlicensee.").

[110] *See* ATF Ruling 2010–1, *Temporary Assignment of a Firearm by an FFL to an Unlicensed Employee* (May 20, 2010), *https://www.atf.gov/firearms/docs/ruling/2010-1-temporary-assignment-firearm-ffl-unlicensed-employee/download* (permanently assigning a
Continued

corporation, company, or partnership, would therefore have to use a Form 4473, NICS check, and disposition record entry when transferring a firearm to one of its individual officers (or partners, in the case of a partnership, or members, in the case of a limited liability company) for their personal use.[111]

## IV. Analysis of Comments and Department Responses

*Subsections in Section IV*

A. Issues Raised in Support of the Rule
B. Issues Raised in Opposition to the Rule
C. Concerns With Specific Provided Provisions
D. Concerns With the Economic Analysis

In response to the NPRM, ATF received nearly 388,000 comments. Of these, there were nearly 258,000 comments that expressed support for the proposed rule, or approximately two thirds of the total number of comments. Of these, over 252,000 (or approximately 98 percent) were submitted by individuals as form letters, *i.e.,* identical text that is often supplied by organizations or found online and recommended to be submitted to the agency as a comment.[112] There were nearly 99,000 comments opposed to the rule, or approximately 26 percent of the total number of comments, of which over 80,000 (or approximately 81 percent) were submitted as form letters.[113] The commenters' grounds for support and opposition, along with

specific concerns and suggestions, are discussed below.

ATF also received some comments and recommendations on issues that are outside the scope of this rulemaking, such as comments asking ATF to implement provisions of the BSCA other than the definition of "engaged in the business," [114] and comments not addressing issues presented in the proposed rule. Comments and recommendations that were outside the scope of this rulemaking, or received after the comment period deadline, are not addressed in this final rule.[115]

### A. Issues Raised in Support of the Rule

As noted, nearly 258,000 commenters expressed support for the NPRM, including through form letters submitted as part of mass mail campaigns. The majority provided specific reasons why they supported the proposed rule. ATF received supporting comments from a wide variety of individuals and organizations, such as multiple city and State officials, including almost half of the States' attorneys general; Members of Congress; [116] teachers and teacher organizations; doctors, national medical organizations, and hospitals; victim advocate organizations; clergy and religious organizations; firearm owners; student and parent organizations; military veterans and active duty members; persons with law enforcement backgrounds; and various firearm control advocacy organizations, among many others. As discussed below, numerous commenters raised particular reasons they consider the rule necessary, as well as suggestions regarding the Department's proposed amendments to ATF regulations.

### 1. General Support for the Rule

Comments Received

Commenters supported the rule for a wide variety of reasons. The vast majority of supportive commenters expressed overall relief that this rule was forthcoming, were in support of the provisions as at least a beginning toward needed increases in public safety, and indicated that the rule was well designed. For example, one commenter stated, "I wholeheartedly support the proposed amendments," while another added, "I am thrilled that the ATF is taking action to tighten background checks." Another commenter said, "[w]ow. What a well thought out and thorough set of rules ................ I support the rules set out as written." A fourth commenter, an organization, said, "[i]t is important to note that the various parts of the Proposed Rule are carefully integrated and work together to bring clarity, balance, and enforceability to the GCA's implementing regulations after BSCA amended the GCA—and we urge ATF to preserve each and every provision through to final publication."

Those who commented about their public safety concerns added that this rule would help reduce gun violence, prevent prohibited persons from obtaining firearms, make communities safer, and save lives of both private citizens and police personnel, all of which they considered essential. The overall sentiment, as succinctly summed up in one of the form letters submitted by many thousands in support of the regulation, was, "we must do what we can to stop gun violence." One commenter stated that moving beyond guidance to rulemaking is "absolutely essential" to ensure those selling firearms for profit are conducting background checks that are essential for public safety. One veteran and gun owner stated, "I have great respect for the challenging but important role the [ATF] plays to ensure firearms are properly sold to and remain in the hands of owners who can both *legally and safely* own a firearm. Public Safety is paramount for me and will always supersede any perceived infringement on my Second Amendment Rights." Another commenter stated that numerous avenues must be taken to help protect Americans and emphasized that the number of mass shootings, suicides by gun, domestic violence deaths by firearms, and all the other shooting deaths "are out of control, and appalling." Many other commenters also expressed their concern for public safety, for keeping prohibited persons from having firearms, and the resulting need for this rule, stating for example,

---

[111] *See* ATF, *Does an Officer or Employee of an Entity That Holds a Federal Firearms License, Such as a Corporation, Have to Undergo a NICS Check When Acquiring a Firearm for Their Own Personal Collection?, https://www.atf.gov/firearms/qa/does-officer-or-employee-entity-holds-federal-firearms-license-such-corporation-have-undergo* (last visited May 22, 2020); ATF, *2 FFL Newsletter: Federal Firearms Licensee Information Service* 4 (Sept. 2013), *https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-september-2013-volume-2/download.*

[112] There were four form letter campaigns in support of the rule and five form letter campaigns in opposition to the rule. Altogether, form letters totaled 332,000 comments, or about 86 percent. The vast majority of these form letter submissions included the name and city/state of the commenter. However, thousands also included personal stories, information, and concerns in addition to the form letter text. For example, at least one of these form letters had more than 1,000 variations (identified by a text analytics program and subsequent manual review) due to commenter additions and changes.

[113] In addition to the number of comments in support or in opposition to the rule, for about 1,000 comments, the commenters' positions could not be determined. About nearly 30,000 comments were identified by a text analytics program as duplicate submissions, some in support and some in opposition to the rulemaking.

[114] The Department is incorporating other firearm provisions of the BSCA into ATF regulations through a separate rulemaking, a direct final rule entitled "Bipartisan Safer Communities Act Conforming Regulations."

[115] *See Thompson* v. *Clark,* 741 F.2d 401, 408 (D.C. Cir. 1984) ("[The Administrative Procedure Act] has never been interpreted to require the agency to respond to every comment, or to analyze every issue or alternative raised by the comments, no matter how insubstantial."); *cf. Home Box Off., Inc.* v. *FCC,* 567 F.2d 9, 35 n.58 (D.C. Cir. 1977) ("[O]nly comments which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule cast doubt on the reasonableness of a position taken by the agency.").

[116] ATF received two letters from Members of the United States House of Representatives in support of the rule, one dated December 1, 2023, with 149 signatories, and another dated December 7, 2023, with seven signatories. ATF received one letter in support from Members of the United States Senate, dated November 30, 2023, with 17 signatories.

ATF 015296

APPX.017

"[a]lthough no single action will eliminate gun violence, this rule, which will have an especial impact on reducing gun access to those who are most interested in using it for ill, is essential to saving lives in our country."

Many of the commenters believed that the proposed rule would increase public safety. One commenter stated, for example, that "broadening the language [as Congress did in the statute] and strengthening this particular regulation will help to serve as a strong foundation for potential reforms in the future." Numerous other commenters stated that they considered the rule's provisions to be necessary, but only modest or starting steps toward much-needed public safety measures. For example, one commenter stated, "[t]he standards in the proposed [rule] are such a modest beginning to the action needed to eliminate gun violence in our society." A further commenter added, "if [the rule] could save even one life, wouldn't that be worth it? Please do not let another opportunity pass to do something to make our country safer!"

Military veteran groups in support of gun safety stressed that veterans' unique and valuable understanding of guns comes from the three basic pillars of military gun culture: (1) training, (2) safety, and (3) accountability—concepts they said are often lacking in civilian gun culture and laws. They added that this rule will keep guns out of the hands of dangerous individuals by ensuring that those prohibited by Federal law from purchasing firearms cannot use gun shows or internet sites to avoid our nation's background check laws— people who could be a danger not just to others, but to themselves. Additionally, these veteran groups pointed out that veterans are 2.3 times more likely to die by suicide, and 71 percent of veteran suicides are by gun (compared to about half of nonveteran suicides). Furthermore, they said, guns are 90 percent effective in causing a death by suicide, while all other lethal means combined are less than 5 percent effective. They concluded, "[t]his rule will save veterans lives; but it must be done now."

Healthcare and physicians' organizations called gun violence a public health epidemic and urged that ATF issue the rule because it would reduce or prevent firearm-related injuries and death. Several teacher organizations and religious organizations of different denominations expressed similar views, as did multiple parent and student-led organizations. One commenter stated, "Gun violence is among our nation's most significant public health problems.

Indeed, gun violence is the leading cause of death of children and teens. The impact of gun violence is not only death and injury, but also the long-term psychological toll that gun-related incidents inflict on those who survive shootings, as well as on the friends and family members of the injured, killed or impacted." They added that the proposed rule is vital and must be finalized. One commenter summarized, "[t]his ruling can help to address the horrific epidemic of gun violence in this country." Another commenter agreed, observing that "[g]un violence needs to be treated as the public health issue that it is. We owe our children a safe environment in schools as well as places of worship, stores and other public spaces."

*Department Response*

The Department acknowledges the commenters' support and agrees that the final rule will increase public safety, as further explained below. *See* Section IV.A.6 and Department Response in Section IV.B.2 of this preamble.

2. Changes Are Consistent With Law

*Comments Received*

A number of commenters believed the proposed rule's approach was fair and consistent with current law. For example, one commenter stated that the "proposed rule balances regulatory oversight and individual rights" and "ensures that responsible gun enthusiasts can engage in legal sales without unnecessary burdens while addressing concerns related to unlicensed firearms dealing." Several other commenters stated that promulgating this rule would not be forcing new law onto people and that the rule falls in line with the new gun laws that have already been established. As another commenter added, under the proposed rule, gun sellers will be no more exposed to criminal liability than they are currently for engaging in unlicensed business dealings; "they will just have a much clearer sense of what conduct does and does not fall within that prohibition."

Some commenters said the current process for acquiring firearms from licensed dealers is working, is not burdensome, and should be applied more broadly. For example, one gun owner commented that she could "attest to how fast a background check can take after completing an online sale and then going to pick up the gun through a local dealer" and that "[n]o one is being inconvenienced by doing a [background] check." A sport trap shooter agreed, commenting that, "I

don't understand why there is something wrong with [this] process in the eyes of the [National Rifle Association] and others." Another commenter added that this rule still easily allows law-abiding people to obtain a gun if they go through the appropriate process. Some State attorneys general agreed, specifically mentioning that ATF's "predominantly earn a profit" presumptions are consistent with commercial, for-profit enterprises and are inconsistent with "other intents, such as improving or liquidating a personal firearms collection," that Congress intended to exempt.

*Department Response*

The Department acknowledges commenters' support for the proposed rule and agrees that the rule is fully consistent with the GCA. The presumptions in the rule are based on the text and structure of the GCA as well as decades of post-FOPA case law interpreting the GCA. Additionally, the presumptions in the rule are consistent with the purpose of the GCA, as amended by the BSCA.

3. Changes Are Consistent With Statutory Authority

*Comments Received*

Other comments in support of the proposed rule emphasized that the proposed rule, which clarifies who must be licensed as a dealer and perform background checks, is fully within the Department's and ATF's statutory authority. Two sets of congressional commenters from both the House and Senate explained that ATF has interpreted the BSCA amendments to the GCA "pursuant to the authority that Congress has long and consistently delegated to the Department of Justice and ATF to enforce our federal firearms laws—including the Gun Control Act of 1968 and now BSCA." The commenters added, "[t]he proposed rule is appropriately based on investigative efforts and regulatory action that ATF has undertaken for decades and Congress' recognition that ATF can, and must, address the modern firearms marketplace, including the conditions under which guns are bought and sold. Claims that ATF has overstepped or even usurped Congress' legislative powers are inapposite. ATF has, time and again, implemented the laws that Congress has passed, including those related to licensing requirements and procedures, as well as background checks. ATF's proposed rule is no different."

Another set of commenters (some State attorneys general) added, "[t]he proposed rule is an exercise of ATF's inherent authority to amend its own regulations to implement the broadened definition of 'engaged in the business' promulgated by Congress in the BSCA. It is a function explicitly authorized by 18 U.S.C. 926(a), as clarifying a definition within the rule is a 'rule[ ] [or] regulation necessary to carry out the provisions' of the [GCA]. ATF's regulatory authority under the GCA plays a critical role in protecting the public from gun violence and has been repeatedly reaffirmed by federal courts in the decades since the GCA's passage." In support, the commenters cited cases in which courts have recognized ATF's expertise and authority to promulgate regulations.

Additional commenters noted that the proposed regulatory changes are fully within ATF's lawful authority and that the proposed rule is, as stated by one commenter, "in fact necessary for ATF to be able to implement and enforce the new law that Congress has put on the books." Citing multiple ATF firearms regulations, this commenter also pointed out that ATF has for decades exercised its authority to promulgate and revise regulations implementing and enforcing the GCA, including by issuing and updating detailed regulatory definitions.

Department Response

The Department acknowledges commenters' support for the proposed rule and agrees that the rule is fully consistent with the Department's and ATF's statutory authority.

4. Enhances Public Safety by Expanding Background Checks

Comments Received

Many commenters opined that the proposed rule would improve public safety by expanding background checks for firearms purchasers. One commenter declared that, "[a]s a US citizen, I would like to feel safer knowing at least the steps of background checks through the FBI database were done before a person could obtain a weapon." Another commented that the danger from unlicensed dealers is great because, according to several recent studies cited by the commenter: (1) over one million ads for firearms are posted each year that would not legally require the seller to conduct a background check for the purchase to be completed; (2) 80 percent of firearms purchased for criminal purposes come from sellers without a license; (3) firearms sold at gun shows are used disproportionately to commit

crimes; and (4) 96 percent of inmates convicted of gun offenses were prohibited from having a firearm when they acquired one from an unlicensed seller. Another commenter summed up the current societal situation in their comment using information from a Centers for Disease Control and Prevention ("CDC") database: "[e]very day, an average of around 120 people in the United States are killed by gunfire and more than 200 are shot and wounded. Firearms are now the leading cause of death for American children and teens."

Most supporters thought that the rule provided a fair approach that would increase safety. One commenter declared that the proposal "is the very minimum our federal government can do to not only protect innocent victims from gun violence but also to protect law abiding gun owners from being tarred with the same brush as irresponsible gun owners." A self-described firearm owner commented, "I whole heartedly support the rule to expand background checks" because "this will make our communities that much safer."

Other commenters believed that the proposed rule was a step in the right direction. One commenter stated, "[m]others everywhere are begging you to support background checks." They added that background checks certainly will not be the only solution to the multifaceted problem of gun violence, but said they are a step in ensuring people have the right accountability to keep guns away from those who mean to do harm. Another commenter said there is no downside to background checks that help prevent troubled and misguided persons from acquiring over-powered guns.

Many commenters expressed frustration with the current state of affairs and expressed support for expanding background checks and compliance with the law. One commenter stated that it should not be easier to buy a high-speed rifle than get a driver's license. Another commenter explained, "I manage volunteer programs and people have to complete a background check before they can help a child learn to read or assist an older adult. We should require this same level of scrutiny for anyone looking to purchase a weapon." Another commenter stated, "[g]uns are too serious to be privy to simple loopholes . . . . we can't just turn a blind eye to gaps in our legal system." Several other commenters expressed that there was never a valid policy reason for what the commenters called "the gun-show loopholes." The commenters used this

term to refer to a pre-BSCA interpretation of the definition of "engaged in the business" that many unlicensed dealers believe allows them to make unlicensed sales online and at gun shows. (See the Department Response at Section IV.C.16 of this preamble for explanation of the GCA provisions on this subject). The commenters stated that these "loopholes" are shameful, there is no downside to strict background checks, and people should do the right thing by requiring more background checks. Another commenter emphasized, "[i]t really is beyond time that we consider the rights of non gun-toting citizens, too."

Another commenter said that the regulation goes directly to the "loopholes" people have been trying to close for years, referring to guns offered for sale online or at gun shows. Similarly, a commenter said that, while background checks might be imperfect, they are certainly safer than not performing them. One commenter simply stated that background checks are excellent and that, "[a]nyone who doesn't want one, should likely not be car[ry]ing a gun." Another commenter highlighted the public's opinion on the issue and referred to a recent Fox News poll showing that 87 percent of Americans support requiring criminal background checks on all gun buyers. A health research organization commented on the danger from not doing background checks, saying that experts estimate that nearly one in nine people who seek out firearms online would not pass a background check.

Most commenters cited safety concerns as a basis for their support of the BSCA's changes narrowing the background check gap, as implemented through the rule. One professional physicians' organization commented that private firearm sales conducted at gun shows or over the internet should be subject to the same background check requirements as firearm sales by federally licensed firearms dealers. They added that this would make children, their families, and their communities safer. Another commenter stated that reducing impulsive purchases and requiring time necessary to conduct background checks can save lives and spare family members grief.

One commenter provided a real-world example of what is currently happening without background checks for sales at gun shows, describing an experience they had at a recent gun show: "[a]s he was filling out the paperwork someone approached him and told him [they] had the same gun [for sale] and a background check would not be

required [to buy it]—he could walk out with it that day." Another commenter stated, "[h]onest, law abiding, gun owners are NOT afraid of accountability and pro-active requirements."

Department Response

The Department acknowledges the commenters' support for the proposed rule. The GCA and these implementing regulations are designed to improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring firearms and allowing law enforcement officers to trace firearms involved in crime. By clarifying the circumstances in which persons are engaged in the business of dealing in firearms under the GCA and required to become a Federal firearms licensee, this regulation will result in more NICS background checks being run on prospective firearms purchasers. Not only will fewer prohibited persons obtain firearms from FFLs, but notifications that NICS denied a firearm transfer will be made by NICS to State, local, and Tribal law enforcement agencies within 24 hours to help them prevent gun crime.[117] In sum, the rule will help implement the provisions and goals of the GCA, as amended by the BSCA. At the same time, as explained more below, the rule does not require or implement universal background checks for private firearm sales between individuals. The rule affects only persons engaged in the business of dealing in firearms, including manufacturers and importers who deal in the firearms they manufacture or import.

5. Creates Universal Background Checks

Comments Received

Many commenters indicated a belief that the proposed rule created a universal background check requirement or expressed support for such a development. For example, one commenter stated, "[b]ackground checks have been shown to stop some who should not have firearms from acquiring them," adding that, in "order to make [background checks] more effective, they must be systematically and carefully applied nationwide." Likewise, another commenter said that instituting universal background checks "is a no-brainer" and should have been done long ago. Similarly, commenters said the current situation "is madness" and "[u]niversal backgrounds checks are the very least and most obvious of interventions." Several other

commenters stated that they fully support making background checks mandatory for gun buyers, that they support not just expanded background firearms checks, but indeed universal background checks, and that background checks should be required for all gun purchasers, every time, and similar variations. Many commenters expressed support for requiring background checks for all sales/transfers of firearms, including sales between private citizens.

Some commenters wanted to see a stronger, quicker approach to resolving the issue. One commenter said, "[g]un laws as they stand are incredibly too relaxed and need to be amended," and "I strongly feel that universal background checks are critical and need to be done now." Other commenters agreed that it is long overdue to pass universal background checks for gun ownership and they should be instituted now as the least that we should be doing. Likewise, a commenter requested that, hopefully, Congress would eventually move to a universal background check on all gun sales in the near future. Another commenter added that, since gun sales by legal dealers have required background checks for decades, these same requirements should apply to all gun sales.

A few commenters thought that implementing universal background checks was a minimally intrusive method of implementing change. For example, one commenter stated, "[u]niversal background checks make sense. It doesn't take away a responsible gun owner's right but it provides a means to track those that should not own guns."

A few commenters suggested additional actions that could be implemented. For example, one suggested regular checks at multi-year intervals in addition to universal background checks for all purchasers. Another commenter suggested adding mandatory waiting periods for every gun sale. And another suggested universal background checks for ammunition sales, as well.

Department Response

The Department acknowledges the commenters' support for the proposed rule and agrees that the BSCA expands the definition of "engaged in the business." As a result, the rule's implementation of that expansion will increase the number of background checks to prevent prohibited persons from obtaining firearms under the provisions of the GCA, as amended by the BSCA. However, the Department disagrees with commenters who believe

this rule will result in "universal background checks." The concept of "universal background checks" is not defined in Federal law, but is commonly understood to require persons to run background checks whenever a private, unlicensed person transfers a firearm to another, and some States have imposed this requirement.[118] Congress has not passed a law to require universal background checks, and this rule does not require unlicensed individuals who are not engaged in the business of manufacturing, importing, or dealing in firearms to run background checks for private firearm sales between individuals. Congress decided that only persons engaged in the business of manufacturing, importing, or dealing in firearms must obtain a license and run NICS background checks on firearm transferees. Nonetheless, by clarifying the meaning of "engaged in the business," the rule will make clear that licensees must run NICS background checks when they transfer firearms at gun shows, over the internet, and by other means.

6. Enhances Public Safety by Allowing More Crime Guns To Be Traced

Comments Received

Several commenters believed that the current state of affairs, in which unlicensed dealers are selling firearms without making records, has a negative impact on crime gun tracing. One commenter opined that the rule can provide law enforcement with better tools to track and trace firearms used in crimes, aiding in their efforts to protect our communities. A law enforcement organization commented that the proposed rule would "enable law enforcement to investigate guns recovered at crime scenes. With more gun sellers required to become licensed dealers, more information will be available to law enforcement aiding in completing the investigations. Law enforcement will be better equipped to identify and follow leads in criminal investigations and solve more crimes." Another commenter said, "the absence of background checks means no sales records, hampering crime gun tracing." Finally, one group commented that aggregate firearm trace data can help identify patterns and trends that are valuable for understanding and combatting the trafficking of firearms into criminal hands, and more comprehensive transaction recordkeeping, like the rule will require,

---

[117] 18 U.S.C. 925B.

[118] Michael Martinez, *'Universal Background Check:' What Does It Mean?*, CNN (Jan. 28, 2013), *https://www.cnn.com/2013/01/14/us/universal-background-checks/index.html.*

would help increase the aggregate amount of information available for tracing.

### Department Response

The Department acknowledges commenters' support for the proposed rule and agrees that the rule will help Federal, State, local, and Tribal law enforcement solve crimes involving firearms through crime gun tracing. Under the GCA, "dealers must store, and law enforcement officers may obtain, information about a gun buyer's identity. That information helps to fight serious crime. When police officers retrieve a gun at a crime scene, they can trace it to the buyer and consider him as a suspect." *Abramski*, 573 U.S. at 182 (internal citations omitted). As more persons become licensed, the transaction records maintained by those dealers will allow law enforcement to trace more firearms involved in crime [119] and to apprehend more violent offenders who misuse firearms.

### 7. Prevents Unlicensed Dealers From Exploiting Loopholes

#### Comments Received

Thousands of commenters in support of the rule expressed their desire to close gaps in the clarity of "engaged in the business" that, in their view, had been enabling people to deal in firearms without a license or prohibited persons to acquire firearms from unlicensed dealers. One set of commenters said that the rule "will help close loopholes in our background check system that have, for decades, been exploited by bad actors like gun traffickers, straw purchasers, and other prohibited persons, including domestic abusers and convicted felons." Another commenter said, "I can't think of any reasonable argument for continuing to allow loopholes that allow individuals to acquire guns outside the well-established, affordable, and reasonable process that applies to all other purchases." One of the form letters submitted by many commenters stated that, "[a]nyone offering guns for sale online or at a gun show is presumed to be trying to make a profit and should therefore be licensed and run a background check on their customers." Other commenters simply stated that we need to be closing the loopholes in the system and do so once and for all.

Another commenter shared this example: "[i]t was as easy as going to a flea market or pawn shop. Fifteen minutes or less and he had another gun

for his collection." A third commenter observed that "[g]uns sold without background checks in all cases are like the old days of the Wild West" and that gun shows "are a huge source for gun traffickers and people looking to avoid scrutiny."

Some commenters were concerned that the current state of affairs is unjust. One commenter stated that they believe the proposed rule is necessary in fairness to the brick-and-mortar businesses and the up-front online retailers. Similarly, another commenter said that "[c]losing loopholes so that commercial transactions that have previously evaded background checks [can no longer do so] is simply consistency; this is a very good idea, and I wholeheartedly support it." Additionally, a commenter thought that "[t]here shouldn't be venues where background checks can be skirted. If a firearm changes hands, it benefits society to ensure that the hands accepting that firearm are going to handle it safely."

Several commenters highlighted the fact that dealing as a licensee had integral advantages. For example, one commenter said the proposed rule expands the range of people required to have a license to sell a firearm, which makes neighborhoods safer because citizens know the firearms are being sold by a trusted merchant. Another commenter expressed that people should be happier to see firearms coming from a reputable source, rather than some "flipper" who might not have safety-checked the item. A dealer will stand behind an item and can be held accountable if there is an issue, they added.

Some commenters appreciated the Department's balanced approach. One commenter stated, "[o]f course anyone selling firearms should be licensed & appropriately conducting background checks! Most responsible gun-owners agree on this point. Thank you for seeking to make our communities safer!" One group commented that, by clarifying who is not considered to be "engaged in the business," ATF has protected the ability of genuine hobbyists and collectors to transact firearms without fear of breaking the law. Another commenter added, "I support this idea because this does not infringe on any rights, in my opinion, but rather stops back yard or home-based individuals from buying firearms then selling these items for a profit within a quick time frame."

#### Department Response

The Department acknowledges the commenters' support for the proposed

rule and agrees that the rule will result in more persons who are engaged in the business of dealing in firearms, regardless of location, becoming licensed as required under the GCA, as amended by the BSCA. Once licensed, those persons will be required to abide by the recordkeeping and background check requirements of the GCA. The Department also agrees that promoting compliance with the licensing requirements of the GCA, as passed by Congress, is another benefit of the rule. As more persons dealing in firearms become licensed under this rule, there will be more fairness in the firearms marketplace. Licensed dealers are at a competitive disadvantage when, for example, similar firearms are being sold at a nearby table at a gun show by a seller who is engaged in the business of dealing in firearms but is not following the requirements that licensed dealers must follow. However, the Department disagrees with the comment that offering guns for sale online or at a gun show necessarily means the person must be licensed. This rule also recognizes that persons may, for example, occasionally offer firearms for sale to enhance or liquidate their personal collections even if a profit is sought from those sales.

### 8. Closes the Gun Show/Online Loophole

#### Comments Received

Several commenters voiced support for closing what they referred to as the "gun show loophole," by which commenters meant a situation in which many sellers dealing in firearms offer them for sale at gun shows without becoming licensed or subjecting purchasers to background checks. For example, one commenter simply requested that the government please stop criminals from easily buying guns at gun shows without a background check. Another commenter expressed that Americans cannot allow individuals with violent histories to purchase a gun at a gun show or online without their background being investigated. A mother and gun owner added that she is relieved to hear that ATF is moving forward on closing the gun show loopholes. As a final example, one commenter stated that the "only reason this loophole exists is to create a method for criminals & people with histories of violence to procure guns, there are no other reasons."

Many supporters of the rule believed that it would resolve a long-standing inequity. As one commenter stated, "[f]or decades, gun sellers have exploited loopholes in federal law that

---

[119] *See Definition of "Frame or Receiver" and Identification of Firearms*, 87 FR 24652, 24659 (Apr. 26, 2022).

let them sell guns online and at gun shows without conducting background checks. It's a recipe for disaster that worsens our country's gun violence crisis." Another commenter made the following comparison: "[a]llowing unlicensed sellers to operate alongside licensed dealers at gun shows is akin to allowing some airline passengers to board without going through security—it's inconsistent and unsafe." Another commenter said that it shouldn't be as easy to purchase a gun online or at a gun show as it is to purchase a pair of shoes. Other commenters stated that our current reality is one in which firearms can be too easily acquired without background checks, notably through online platforms and at gun shows, and that the loophole that allows legal purchase of firearms at gun shows is a tragedy. A licensee commented with the following example from his 20 years of selling firearms: "[t]here are 100s of guns sold at every gun show with no background check whatsoever. I see the same dealers at every show with tables full of guns selling to anyone with cash. I have had people who were denied in the NICS background check [I had conducted,] only to see them walk out with a gun. I beg of you to change the law to where EVERYONE at gun shows has to do background checks."

Some commenters believed the rule presented a balanced approach. One commenter stated that closing the gun show loophole is a "common-sense measure" and doesn't infringe on the rights of responsible gun owners; rather, it ensures that background checks are conducted for all firearm purchases, regardless of where they take place. Additionally, a commenter said that the "proposal laid out does not appear overly cumbersome for currently licensed dealers or citizens looking to liquidate guns from their personal collection" and that "[c]losing the 'gun show loophole' and requiring a record of firearms sold limits the possibility of nefarious characters obtaining weapons while increasing and promoting responsible gun ownership." Another commenter agreed, describing the rule as a modest, common-sense measure to close some of the huge loopholes that buyers and sellers use to get around our necessary and otherwise effective system of background checks.

Another commenter, while supporting this aspect of the rule, also recommended that ATF provide popular online marketplaces, such as Armslist and GunBroker, with materials and guidance once the rule is finalized to ensure their users understand their obligations to obtain Federal firearms

licenses and conduct background checks before dealing in firearms.

Department Response

The Department acknowledges the commenters' support for the proposed rule and agrees that, as a result of this rule, there will be greater compliance with the law and more individuals who engage in the business of dealing in firearms at gun shows and online will become licensed under the GCA and therefore run background checks. ATF has updated its guidance in light of the BSCA and intends to further update the guidance to ensure that persons who operate at gun shows and online understand the relevant licensing obligations. *See* Section II.C of this preamble. The Department also notes that the term "gun show loophole" is a misnomer in that there is no statutory exemption under the GCA for unlicensed persons to engage in the business of dealing in firearms at a gun show, or at any other venue. As this rule clarifies, all persons who engage in the business of dealing in firearms must be licensed (and, once licensed, conduct background checks), regardless of location.

9. Reduces Firearms Trafficking

Comments Received

Some commenters thought the proposed rule could have a positive impact on reducing illegal firearms trafficking. One commenter said that firearm transfers must be regulated to prevent criminals from obtaining weapons and unscrupulous arms dealers from trafficking weapons that fuel violence here and in Mexico. Another commenter thought the rule would cause a reduction in trafficking because gun traffickers are "masquerading as hobbyists or collectors." Other commenters stated that firearm rules or legislation may be very different between neighboring States, thus enabling trafficking. For example, one commenter, relying on a news story, stated that, "[b]ecause Massachusetts has universal background checks and Maine does not, Maine is a top 'source state' for crime guns in Massachusetts" and that "[c]riminals come to Maine to get the guns in private sales that they cannot get in Massachusetts or in other states with universal background checks." Another commenter stated that creating additional regulations on how firearms are sold will reduce the number of firearms that are trafficked and that the rule will decrease the number of guns trafficked between State lines. Commenters who participated in one of

the form letter campaigns stated that guns purchased in unlicensed sales often end up trafficked across State lines, recovered at crime scenes in major cities, and used against police officers, which contributes to the gun violence epidemic plaguing our country. Such commenters also added that guns sold without background checks—both online and at gun shows—are a huge source for gun traffickers and people trying to avoid such checks.

Department Response

The Department acknowledges the commenters' support for the proposed rule and agrees that the rule will help reduce firearms trafficking. Many ATF criminal gun trafficking investigations reveal that guns used in crimes involve close-to-retail diversions of guns from legal firearms commerce into the hands of criminals, including straw purchases from FFLs, trafficking by FFLs, and illegal transfers by unlicensed sellers.[120] As more persons become licensed as a result of the BSCA's amendments to the meaning of "engaged in the business," the multiple sales forms, out-of-business records, demand letter records, theft and loss reports, and trace weapons provided to ATF by those dealers during criminal investigations will provide law enforcement with additional crucial crime gun intelligence. Law enforcement can use this information to better target limited resources to pursue illicit firearms traffickers nationally and internationally.[121]

10. Closes Liquidation Loophole for Former Licensees

Comments Received

Some commenters supported the proposed rule's clarification as to how the GCA applies to firearm sales and former dealers. For example, one commenter stated that dealers who have lost their licenses should never be allowed to sell guns again. Similarly, another commenter said that they support the rule because it "goes a step beyond [previous liquidation provisions] and does not allow any dealers who had their licenses revoked to sell, trade, or distribute firearms to the public."

[120] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis, Volume Two, Part III: Crime Guns Recovered and Traced Within the United States and Its Territories* 41 (Mar. 27, 2024), *https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download*.

[121] *See* 18 U.S.C. 923(g)(3)–(7); ATF Form 3310.4 (Dec. 2021) (multiple handgun sales); ATF Form 3310.11 (Oct. 2020) (theft-loss report); ATF Form 3310.12 (Feb. 2024) (multiple sales of certain rifles).

ATF 015301

APPX.022

## Department Response

The Department acknowledges the commenters' support for the proposed rule and agrees that the rule will reduce the number of firearms in the business inventory of a former licensee that are sold improperly, *i.e.,* without background checks and associated recordkeeping. However, the Department is not adopting the suggestion to bar former dealers from ever selling guns again. Rather, former dealers are prohibited from engaging in the business of dealing in firearms, unless they once again become licensed.

## 11. Establishes Better Standards for Who Should Become Licensed

### Comments Received

Several commenters appreciated the transparency established by the proposed rule. For example, one commenter stated, "I strongly support this proposed regulation because it sets a clear, common-sense standard for when gun sellers must become licensed dealers and run background checks" and builds on the BSCA passed by Congress. Multiple commenters and those associated with certain form letters said that they believe that anyone offering guns for sale online or at a gun show is trying to make a profit and should therefore be licensed, adding that they supported the rule's clarifying provisions. One group of parents whose children were victims of a mass shooting stated that they recognized that "the intent of the proposed rule is not to be punitive." They added, "[w]e support ATF maintaining an evaluation of the totality of the circumstances when determining if one is 'engaged in the business' rather than establishing a minimum standard of how many firearms bought or sold constitutes a licensure." Other commenters supported the clarifying provisions because they do more to ensure that sellers engaged in the business are treated alike. For example, one commenter stated that it "simply makes no sense for some gun dealers/sellers to be exempt from the same standards that apply to licensed dealers."

### Department Response

The Department acknowledges commenters' support for the proposed rule and agrees that the rule will provide needed clarity to persons who are unsure whether they must become licensed under the GCA based on their firearms purchase and resale activities. Although this rule does not set forth a presumption that any person offering guns for sale online or at a gun show is engaged in the business, it does set forth

several actions that give rise to a presumption that persons engaging in those activities, including online or at gun shows, are engaged in the business.

## 12. Consistent With Second Amendment Rights

### Comments Received

Many supporters recognized that the proposal did not conflict with an individual's Second Amendment rights. One commenter stated that the rule is an important clarification in how gun laws are enforced in the United States, and it does not infringe upon the rights of citizens to "keep and bear arms" because "[a]nyone wanting to transfer a firearm can still do so under this rule by using an existing federally-licensed firearms dealer." In another commenter's opinion, the "right to bear arms is still alive and well even with reasonable rules set in place." Another commenter stated that gun advocates will argue that taking away these loopholes endangers their Second Amendment rights and that this is a false argument. This commenter added that, "[a]ny American citizen who wants to purchase a firearm online for self-protection or hunting and who has a clean mental health and criminal record has nothing to fear from common sense restrictions to online gun sales." Other commenters stated that this rule will make all citizens of the United States safer without disrupting or infringing upon Second Amendment rights.

Many commenters thought that firearm ownership comes with certain responsibilities and that this rule helps ensure that those who are not able to be responsible are less able to get firearms. Several commenters stated that the rule would not limit Second Amendment rights but would increase safety. For example, one commenter stated that the proposed rule "in no way infringes on our rights for gun ownership but instead makes it safer for all of us to own and purchase guns responsibly." Another commenter stated, "[g]un ownership is a protected right but it is also a privilege reserved for those who can handle the responsibility." Other firearm owners commented that they are firm believers in their Second Amendment rights and feel strongly that those rights were conferred on individuals with responsible gun ownership in mind, and that they grew up being taught respect for guns.

### Department Response

The Department agrees that this rule is fully consistent with the Second Amendment. This rule implements the provisions of the GCA, as amended by

the BSCA, that require persons who are engaged in the business of dealing in firearms to be licensed. The Supreme Court has emphasized that its recent Second Amendment opinions "should not be taken to cast doubt on laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia* v. *Heller,* 554 U.S. 570, 626–27 & n.26 (2008); *see also Bruen* v. *N.Y. State Rifle & Pistol Ass'n,* 597 U.S. 1, 80–81 (2022) (Kavanaugh, J., concurring, joined by Roberts, C.J.) (same). *See* Section IV.B.8.c of this preamble for more discussion on this topic.

### B. Issues Raised in Opposition to the Rule

As noted, nearly 99,000 commenters expressed opposition to the NPRM, including through form letters submitted as part of mass mail campaigns. ATF received comments from a variety of interested parties, including FFL retailers and manufacturers; legal organizations that represent licensees; firearm sporting organizations; gun owner and gun collector organizations; more than half of States' attorneys general; Members of Congress; [122] firearm owners; active-duty military members and veterans; various firearm advocacy organizations; gun enthusiasts; and people with law enforcement backgrounds. As discussed below, numerous commenters raised various concerns about the Department's proposed amendments to ATF regulations. The topics included constitutional and statutory authority concerns; issues with the clarity and effect of the proposed definitions, presumptions, changes to procedures upon discontinuation of business, and concerns about the public safety goals of the Department in promulgating this rule.

### 1. Lack of Clarity

#### Comments Received

Many commenters opposed the rule on the grounds that it was vague or lacked clarity. Most of these commenters made statements to that effect without providing an explanation or examples. Some explained that they found the entire rule to be confusing, stating, "[t]he language and grammar of

---

[122] ATF received two letters from Members of the United States House of Representatives in opposition to the rule, one dated October 12, 2023, with four signatories, and another received on December 7, 2023, with nine signatories. ATF received three letters in opposition from Members of the United States Senate, one dated September 21, 2023, with seven signatories, and two received December 7, 2023, one with two signatories and one with one signatory.

the entire preamble is intentionally misleading and confusing unless the reader is an attorney,'' ''the regulations are exceedingly confusing to me, and I consider myself to be a learned man,'' and ''this rule is so vague that people trying to be right will never know exactly what would make them need to be a dealer.''

Some commenters, however, were more specific. Some of these commenters gave examples of particular parts of the rule they found vague, for example: ''the proposed definitions are replete with the use of the term 'may' with respect to being engaged in the business as a dealer in firearms''; the rule ''leaves the interpretation of 'occasional' subjective in nature''; the word ''repetitively'' used in the fourth EIB presumption is ambiguous and could be interpreted as ''selling any number of firearms that is more than one''; ''it states 'even a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license.' No examples are provided''; the rule ''creates confusion by attempting to clarify the term 'dealer' and how it applies to auctioneers''; and the presumption that a person is a dealer when that person '''sells or offers for sale firearms, and also represents to potential buyers or otherwise demonstrate a willingness and ability to purchase and sell additional firearms' is vague and would likely include even harmless banter between buyer and seller of a single firearm regarding additional purchases these individuals with to make some time in the future.'' One commenter argued that, ''[t]he apparent fines and jail time are draconian relative to the vagueness of the application of the proposed rule.'' At least one commenter asked that the Department qualify ''repetitively'' with a time limit so that a firearms owner who is likely to sell a firearm more than once in their lifetime or even over a five-year period would not be inadvertently captured under the presumptions. And, at least one commenter took the position that ''of course, repetition means more than once.''

Some other commenters focused on the impacts of the provisions they stated were vague. One commenter said it appears that the ''intent of this law is to force all sales through an FFL as you otherwise are never sure the sale is lawful.'' A couple of commenters mentioned that ''four times in the proposed rule the ATF provide[d] a list of 'rebuttable presumption[s]' or other factors and then conclude[d] by noting that the list is 'not exhaustive' '' and that

the proposed rule is ''unlikely'' to cover selling one's gun to an immediate family member—but leaves open the possibility that ATF could change its mind. ''This makes compliance both difficult and inconsistent,'' one of these commenters added. ''When definitions are vague in this manner, it leaves far too much opportunity for unlawful or unjust 'interpretation' or inconsistent implementation and enforcement,'' they concluded. The commenter further explained that the proposed rule's lack of clarity ''places citizens who wish to abide by laws . . . in the unreasonable position of having their lawfulness in a gray area. In this way, an unelected official of ATF seems to have discretion to arrest persons, seize property, or take other 'enforcement actions' somewhat arbitrarily. Additionally, even if courts later overturn that ATF officer's decision, the hardship faced by the law[-]abiding citizens due to those circumstances (lost wages, attorney fees, reputational damage, emotional stress and trauma, etc.) are unreasonable.''

Other commenters were concerned about what they described as the ambiguity of the statutory definitions, which ATF proposed to include verbatim in the regulation. One commenter stated, ''[t]he new definitions, such as 'predominantly earn a profit' and 'terrorism,' may lead to differing interpretations and legal challenges.'' Another stated, ''[t]he proposed rule is riddled with ambiguous and imprecise terms such as 'predominantly earn a profit' and 'principal objective of livelihood and profit.' This lack of clarity is unacceptable and can lead to arbitrary enforcement and interpretation, jeopardizing the rights of law-abiding citizens.''

One commenter suggested that additional education will be necessary because the rule is hard to understand. ''While I appreciate the intention to assist individuals in understanding when they are required to have a license to deal in firearms, the proposed changes, as they currently stand, create more questions than answers. The need for comprehensive education and outreach efforts to inform the public about these changes is evident.''

Department Response

The Department disagrees that the rule is vague or lacks clarity. The rule implements the BSCA by setting forth specific conduct that is presumed to be ''engag[ing] in the business'' of dealing in firearms or acting with a predominant intent to earn a profit under the GCA. This rule provides persons who may be unclear how the statute applies to them

with greater clarity as to what conduct implicates the statute, even though the rule does not purport to include every possible scenario. Many thousands of commenters stated that they believe this rulemaking provides much needed clarity to help ensure that persons who are prohibited from receiving or possessing firearms do not receive them.

The Department acknowledges commenters' concerns that the presumptions are not exhaustive of all of the conduct that may show that, or be considered in determining whether, a person is engaged in the business of dealing in firearms or has a predominant intent to earn a profit. However, there are numerous and various fact patterns that could fall within the statutory definition of being ''engaged in the business'' of dealing in firearms under 18 U.S.C. 921(a)(21)(C). This rule cannot possibly describe every potential scenario. It is important to note the presumptions are designed to improve clarity and consistency, though, as presumptions, they are not conclusive findings and may be rebutted. The conduct that presumptively falls within the definition of ''engaged in the business'' represents common fact patterns that the Department has seen during numerous criminal investigations, regulatory enforcement actions, and criminal prosecutions, and which the Federal courts have recognized as strong indicators of engaging in the business of dealing in firearms even prior to the BSCA's expanded definition. In other words, these presumptions represent situations that have been observed and tested repeatedly over decades as conduct that is indicative of whether a person is engaged in the business or has a predominant intent to earn pecuniary gain from the sale or disposition of firearms. The Department therefore disagrees that the rule, which provides additional clarification about what the statute requires, is vague or will result in inconsistent or unfair implementation and enforcement.

The Department also disagrees that the rule is confusing or overly complex. The Department acknowledges that the preamble to the proposed rule was long and included significant discussions and legal case citations in support of the Department's proposed regulatory changes. However, the rule changes the regulatory definition of what it means to be ''engaged in the business'' as a dealer in firearms to match the statutory definition as amended by the BSCA and provides additional detail to aid persons in understanding what conduct is likely to meet that definition. This includes addressing particular contexts, such as

auctioneers, and licensees who cease to be licensed. The rule does this by defining certain terms and describing specific, identifiable conduct in specific rebuttable presumptions. These definitions are based on statutory language, standard dictionary definitions, and Federal court opinions.

Based on concerns identified in the public comments, this final rule has further refined some definitions and presumptions to help collectors and hobbyists better understand when they are enhancing or liquidating a personal collection without the need for a license. For example, in response to one of the specific comments on the first EIB presumption, the Department has added a parenthetical after "represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms" to explain that it means "(*i.e.,* to be a source of additional firearms for resale)." This presumption, like the others, is based on ATF's criminal and regulatory enforcement experience and the case law cited in both the proposed rule and this final rule.

The Department does not agree with commenters that the rule's use of the term "may" in the regulatory definition of "engaged in the business" does not provide firearms sellers with sufficient clarity as to who is required to be licensed. While the presumptions in the rule are intended to provide clarity to persons who resell firearms, the Department cannot establish bright-line rules that address every conceivable scenario. For example, while the regulatory text states that "[s]elling large numbers of firearms . . . may be highly indicative of business activity," that will not always be the case, depending on the circumstances. This is why the regulatory text uses the word "may" at times and expressly states that activities set forth in the rebuttable presumptions are not exhaustive of the evidence or conduct that may be considered in determining whether a person is engaged in the business of dealing in firearms or in determining the more limited question of whether a person has the intent to predominantly earn a profit through the repetitive purchase and resale of firearms.

The Department does not agree with commenters that the undefined terms in the rule are vague. In the absence of specific definitions, readers should use the ordinary meaning of these statutory terms and other words in the regulatory text. This includes the definition of the term "occasional," which means "infrequent," or "of irregular

occurrence,"[123] and the term "repetitively" as it applies to a person engaged in the business as a dealer, which means that a person intends to or actually does purchase and resell firearms again. With regard to the comment that the term "repetitive" should be limited to a period of time, again, this term, like the term "occasional," should be read consistently with its ordinary meaning.[124] Consistent with that ordinary meaning, a person is less likely to be understood as "repetitively" selling firearms if they do so twice over five years than if they do so several times over a short period. With regard to statutory terms, such as "to predominantly earn a profit" and "terrorism," those definitions were added to the GCA by the BSCA. The Department is now adding them into ATF regulations so that the regulatory text conforms to the statute.

The Department disagrees that no examples were provided in the proposed rule to explain the statement, "even a single firearm transaction or offer to engage in a transaction, when combined with other evidence, (*e.g.,* where a person represents to others a willingness to acquire more firearms for resale or offers more firearms for sale) may require a license." 88 FR 62021. That regulatory text itself included an example: "(*e.g.,* where a person represents to others a willingness to acquire more firearms for resale or offers more firearms for sale)." *Id.* This distinguishes a person engaged in the business of dealing in firearms from a person who makes only a single isolated firearm transaction without such other evidence, and who would not ordinarily require a license, as the case law demonstrates.[125] To further clarify this example, the Department has added the following clause to the regulatory text, "whereas, a single isolated firearm transaction without such evidence

would not require a license." § 478.13(b).

The Department disagrees that ATF's enforcement of the rule would be arbitrary. The rule clarifies the meaning of statutory terms and identifies common scenarios under which persons are presumptively engaged in the business, allowing for uniform application and understanding.

The Department also disagrees that the rule creates confusion as to how the term "dealer" applies to auctioneers. As described in Section III.C of this preamble, the proposed and final regulatory text explains that firearms dealing may occur anywhere, including by online auction, and establishes by regulation ATF's longstanding interpretations that distinguish between estate-type and consignment-type auctions.

The Department agrees with commenters that undertaking additional outreach efforts would be beneficial to further explain the amendments made to the GCA by the BSCA and how this rule implements those changes. The Department plans to do so. As one example, in response to the BSCA, ATF already updated its guidance entitled *Do I Need a License to Buy and Sell Firearms?*[126] and intends to further update the guidance to include additional details that conform with this final rule.

### 2. Does Not Enhance Public Safety

Comments Received

Other commenters opposed the rule on the grounds that it will not enhance public safety. The majority of comments on this topic argued that criminals are the people putting public safety at risk, and that they are not going to abide by the BSCA and the proposed regulation or purchase firearms through FFLs. As a result, they stated, the proposed rule will do nothing to affect public safety, while imposing a burden on law-abiding citizens. One commenter stated, "[p]rivate firearm sales and transfers happen among law-abiding people and are not in any way part of the unreasonable public safety risk that gun prohibition advocates claim. Therefore, this rule does nothing to address the unlawful acts of the criminals that pose a true and actual threat to public safety." Another stated, "there is very little public safety i[f] this rule is enacted. The criminal element in society simply will ignore it, and the lawful gun owners will be greatly affected with the burden of complying

---

[123] *See Occasional,* Collins English Dictionary, *https://www.collinsdictionary.com/us/dictionary/ english/occasional* (last visited Feb. 29, 2024) (defining "occasional" in "American English").

[124] *See, e.g., Repetitive,* Merriam-Webster Dictionary, *https://www.merriam-webster.com/ dictionary/repetitive* (last visited Apr. 1, 2024) ("containing repetition"); *Repetition,* Merriam-Webster Dictionary, *https://www.merriam-webster.com/dictionary/repetition* (last visited Apr. 1, 2024) ("the act or instance of repeating or being repeated").

[125] *See* footnote 72; *cf.* S. Rep. No. 98–583, at 63 (1984) (The statute does "not require that the sale or disposition of firearms be or be intended as, a principal source of income or a principal business activity. Nor does it apply to isolated sales, unless of course, such sales are part of a regular course of business with the principal objective of livelihood and profit.").

[126] ATF Publication 5310.2, *Do I Need a License to Buy and Sell Firearms?* (Aug. 2023), *https:// www.atf.gov/file/100871/download.*

with the rule. Time and effort[ ] and money will have to be expended by gun owners for no appreciable benefit." A third commenter stated there is no evidence to support a correlation with public safety, asserting, "[t]he proposed rule change lacks empirical evidence to substantiate its assumed benefit of improved public safety. Numerous studies, including those published in peer-reviewed journals [citing a journal article], have found that the correlation between gun control measures and reduction in gun violence is negligible. This suggests that the rule change is a reactive measure rather than a well-considered evidence-based policy." Another commenter said that, if ATF wants to do something to promote gun safety, it should be actively involved with industry experts to develop standards in education and safe ownership instead of issuing the rule.

Other commenters suggested that issuing the regulation will "only serve to create a black market in firearms sales, while doing nothing to actually stop crime," asked "how this helps with cartels and organized crime, when most of those people are already under a class that shouldn't have guns anyway (*i.e.* illegal)," and argued that the rule "will create criminals out of lawful gun owners, while dangerous criminals like drug dealers and gang members could not care less." They added that the rule will make the public less safe because law-abiding gun owners will face more hurdles while criminals will keep doing what they are doing. Another commenter stated that, "[o]n the whole[,] gun owners are more law abiding[,] not less. We purposely avoid breaking any law that may affect our ability to own firearms, even laws we may not agree with. So this affects a population that is less likely to be a problem and does nothing to discourage the criminal population."

Several commenters stated that criminals receive their firearms from sources other than FFLs. For example, one commenter said: "Federal studies have repeatedly found that persons imprisoned for firearm crimes get their firearms mostly through theft, the black market, or family members or friends." They stated, "less than one percent get guns at gun shows [citing a report]." Another commenter said that a study conducted by ATF, which reportedly concludes that less than 1 percent of guns used in crimes were acquired by other means (*i.e.,* through private sales), indicates that this rule would not be effective in preventing criminals from obtaining firearms. And a couple of commenters stated that the source of danger comes from outside the country,

asserting, for example, "This rule will not make anyone safer. America has enemies across the globe. Who will do everything they can to attack us. When [our] border is wide open, America is significantly less safe because our border is open. Guns that will come from across the border will not be known to the ATF. Close the border to truly secure our nation." Another commenter said the rule will only encourage more back-alley deals and the proliferation of unsafe, hand-made, and 3D-printed firearms to evade the regulatory provisions.

Department Response

The Department disagrees that this rule will not enhance public safety or lacks empirical evidence to support it. In enacting the BSCA, Congress determined that there were persons who were engaged in the business of dealing in firearms at wholesale or retail who should have been licensed under existing law.[127] Congress therefore amended the GCA to clarify that those persons must be licensed. This rule implements that amendment to the GCA. The result will be that more persons who are engaged in the business of dealing in firearms will become licensed, run NICS background checks, and maintain transaction records through which firearms involved in crime can be traced. *See* Section VI.A.2 of this preamble. One empirical indication of support for this anticipated increase is that after the original publication of the guidance *Do I Need a License to Buy and Sell Firearms?,* ATF Publication 5310.2, in January 2016, there was a modest increase of approximately 567 license applications (based on Federal Firearms Licensing Center ("FFLC") records). In addition, around 242,000 commenters stated that they believe this rulemaking will increase public safety and provided data on that point. Additional empirical evidence that public safety will be enhanced includes the following:

*More Background Checks:* As explained previously, the amended regulations will increase the number of background checks performed because more dealers will become licensed and run background checks on their customers. With additional background checks being run by licensed dealers, more prohibited persons will be denied firearms, consistent with the plain language and intent of the GCA, as amended by the Brady Act and the BSCA. Since the inception of NICS in 1998, the FBI has denied at least 2,172,372 transfers due to background

checks, and in 2022 alone, it denied 131,865.[128] From among the transfers denied in 2022, 60,470 potential transferees were convicted of a crime punishable by imprisonment for a term exceeding one year; [129] 12,867 were under indictment or information for such a crime; 8,851 were fugitives from justice; and 10,756 had been convicted of a misdemeanor crime of domestic violence.[130]

These NICS denials prevented the receipt and possible misuse of a firearm by a prohibited person. Additionally, since the passage of the BSCA's provision on enhanced background checks for juveniles, 18 U.S.C. 922(t)(1)(C)(iii), the FBI has conducted more than 200,000 enhanced checks, resulting in at least 527 potentially dangerous juveniles being denied firearms as of the first week of January 2024.[131] And, as a result of the NICS Denial Notification Act, codified at 18 U.S.C. 925B, these denials will be reported within 24 hours directly to State, local, and Tribal law enforcement authorities, which can then take appropriate action. Because more persons will become licensed under the BSCA and this rule, more enhanced juvenile checks will be conducted and more denials will be reported to State, local, and Tribal law enforcement, resulting in fewer firearms being transferred to prohibited persons and faster investigation of denials and recovery of transferred firearms as appropriate.

*More Crime Gun Traces:* With more licensed dealers, law enforcement will have increased ability to trace firearms involved in crime through required records, including out-of-business records. Between 2017 and 2021, law enforcement agencies nationally and internationally submitted a total of 1,922,577 crime guns to ATF for tracing, with 460,024 submitted in 2021. During that period, the number of traces increased each year, resulting in a 36 percent rise over the five years from

---

[127] *See* footnotes 30 and 31, *supra.*

[128] FBI, Crim. Just. Info. Servs. Div., *National Instant Criminal Background Check System 2022 Operational Report* 14, *https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view.*

[129] *See* 18 U.S.C. 921(a)(20) (defining "crime punishable by imprisonment for a term exceeding one year").

[130] FBI, Crim. Just. Info. Servs. Div., *National Instant Criminal Background Check System 2022 Operational Report* 32, *https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view.*

[131] Press Release, DOJ, *Justice Department Marks More Than 500 Illegal Firearm Purchases Stopped by New Enhanced Background Checks* (Jan. 5, 2024), *https://www.justice.gov/opa/pr/justice-department-marks-more-500-illegal-firearm-purchases-stopped-new-enhanced-background.*

**28994** **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

2017 to 2021.[132] ATF was able to determine the first retail purchaser in 77 percent of those requests, providing law enforcement with crucial leads and an increasing capability to solve gun crimes in their respective jurisdictions throughout the United States and abroad.[133]

In response to the comment alleging that few criminals (1 percent) acquire firearms at gun shows, the most recent ATF report on firearms commerce—the National Firearms Commerce and Trafficking Assessment, Volume Two, Part III—reveals that, between 2017 and 2021, 41,810 crime guns were traced to licensees at gun shows, reflecting a 19 percent increase during that time.[134] While the figure from 2021 represents only 3 percent of the total number of crime guns traced, "this figure does not represent the total percentage of recovered crime guns that were sold at a gun show during the study period as private citizens and unlicensed dealers sell firearms at gun show venues." ATF has no ability to trace crime guns to the numerous unlicensed dealers at gun shows, and therefore, "[n]ational data . . . [is] not available on unregulated firearms transfers at gun shows." [135] The low figure, therefore, does not suggest that few crime guns are sold at gun shows—to the contrary, it demonstrates law enforcement agencies' limited ability to trace crime guns that are purchased at those venues. As more unlicensed gun show dealers become licensed, law enforcement will be able to trace more firearms subsequently involved in crime that were sold at gun shows to help solve those crimes.

*Better Crime Gun Intelligence:* All licensed dealers are required to report multiple sales of handguns occurring within five consecutive business days, report thefts or losses of firearms from their inventory or collection, and respond to trace requests.[136] Certain dealers are required to report multiple sales of certain rifles to ATF occurring within five consecutive business days, and respond to demand letters with records that report transactions where there is a short "time-to-crime." [137]

From this information, ATF is able to provide law enforcement agencies throughout the United States with key crime gun intelligence showing firearm trafficking patterns.[138] In addition to crucial intelligence provided directly to law enforcement in their respective jurisdictions, comprehensive data gathered from licensee sources was used to compile the *National Firearms Commerce and Trafficking Assessment, Volume II,* regarding the criminal use of firearms that have been diverted from lawful commerce. This assessment allows law enforcement to better focus their limited resources on dangerous criminals and enhances policymakers' ability to create strategies to better stem the flow of crime guns to their jurisdictions.[139] For example, stolen firearms play an indirect role in trafficking and diversion to the underground firearm markets used by prohibited persons, juveniles, and other individuals seeking to buy firearms without going through a background check. From 2017 to 2021, licensees reported being the victims of 3,103 larcenies, 2,154 burglaries, and 138 robberies.[140] This data was further broken down over time by license type, business premises type, State, quantity of firearms stolen, weapon type, caliber, time-to-crime, time-to-recovery, recovery location, and age and gender of ultimate possessor.[141] This information will help reduce thefts from licensees

and, therefore, reduce firearms trafficking.[142] ATF does not receive the same detailed information about thefts from non-licensee dealers who do not submit FFL Theft/Loss Reports (ATF Form 3310.11) to ATF, but ATF is aware that thefts from non-licensees constitute a significantly higher number of thefts and thus are a larger contributor to firearms trafficking.[143] Increasing the number of dealers who are licensed will help reduce firearms trafficking by providing more of this kind of detailed information as well.

The Department acknowledges that there are criminals who are currently engaged in the business of trafficking in firearms for profit who will not become licensed, notwithstanding the requirements in the GCA (as amended by the BSCA) and this rule. But the fact that some persons purposely violate Federal law is appropriately addressed through enforcement, and it is not a reason to refrain from providing further clarity to increase compliance among those dealing in firearms. The penalties for engaging in the business of dealing in firearms without a license have long been set forth in the GCA, and this rulemaking does not purport to change them. The illicit market in firearms already exists, and nothing in this rule furthers that market. By providing further clarity about who is required to become licensed, this rule will help law-abiding persons comply with the law and will also help ATF in its ability to enforce the law. It will reduce the number of persons who are currently engaged in certain purchases and sales of firearms without a license so that their activities do not perpetuate firearms trafficking.

---

[132] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis, Volume Two, Part III: Crime Guns Recovered and Traced Within the United States and Its Territories* 1 (Mar. 27, 2024), *https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.*

[133] *Id.* at 2.

[134] *Id.* at 14.

[135] *Id.*

[136] 18 U.S.C. 923(g)(3), (6), (7).

[137] 18 U.S.C. 923(g)(3)(a); ATF, *National Tracing Center: Demand Letter Program, https:// www.atf.gov/firearms/national-tracing-center* (last

reviewed Feb. 26, 2024) ("Demand Letter 2 is issued to FFLs who had 25 or more firearms traced to them the previous calendar year with a 'time-to-crime' of three years or less."); Report of Multiple Sale or Other Disposition of Certain Rifles, ATF Form 3310.12 (Feb. 2024), *https://www.atf.gov/firearms/docs/form/report-multiple-sale-or-other-disposition-certain-rifles-atf-form-331012/download;* Demand Letter 2 Program: Report of Firearms Transactions, ATF Form 5300.5 (Dec. 2021), *https://www.atf.gov/firearms/docs/form/report-firearms-transactions-atf-form-53005/download.*

[138] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis, Volume Two, Part II: National Tracing Center Overview* 8–10 (Jan. 11, 2023), *https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-ii-ntc-overview/download.*

[139] Press Release, DOJ, *Justice Department Announces Publication of Second Volume of National Firearms Commerce and Trafficking Assessment: Report Presents Unprecedented Data on Crime Gun Intelligence and Analysis* (Feb. 1, 2023), *https://www.atf.gov/news/pr/justice-department-announces-publication-second-volume-national-firearms-commerce-and* ("The comprehensive—and unprecedented—compilation of data in this report is intended to provide strategic insight to law enforcement, policymakers, and researchers as they work to reduce and prevent gun violence.").

[140] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis, Volume Two, Part V: Firearm Thefts* 2 (Jan. 11, 2023), *https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-v-firearm-thefts/download.*

[141] *Id.* at 5–12.

[142] Press Release, DOJ, *Justice Department Announces Publication of Second Volume of National Firearms Commerce and Trafficking Assessment: Report Presents Unprecedented Data on Crime Gun Intelligence and Analysis* (Feb. 1, 2023), *https://www.atf.gov/news/pr/justice-department-announces-publication-second-volume-national-firearms-commerce-and* ("The Department of Justice is committed to using cutting-edge crime gun intelligence to reduce violent crime, and this first of its kind data set on emerging threats, specifically the epidemic of stolen firearms and the proliferation of machinegun conversion devices, will have real-world impact in safeguarding our communities.").

[143] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis, Volume Two, Part V: Firearm Thefts* 2 (Jan. 11, 2023), *https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-v-firearm-thefts/download* ("[F]irearm thefts from private citizens greatly outnumber firearms stolen from FFLs. As reflected in Figure BRL–01, firearms stolen from private citizens accounted for most stolen crime guns known to LEAs. From 2017 to 2021, there were 1,074,022 firearms reported stolen. About 3% (34,339) were stolen in FFL thefts, 1% (13,145) were stolen in interstate shipments, and almost 96% (1,026,538) were stolen in thefts from private citizens.").

Moreover, as noted previously, prohibited persons continue to seek to purchase firearms through licensed dealers—there were over 130,000 attempts in 2022 alone. By helping sellers better understand when they must be licensed pursuant to the BSCA, and thus increasing the number of licensees, this rule will result in more prohibited persons being denied firearms at the point of sale before they can be used in a violent crime. And, to the extent criminals purchase firearms through licensed dealers, the firearms they use will be able to be traced through the dealers' transaction records when they are later found at a crime scene or otherwise linked to a violent crime. Unlicensed sellers are not required to run background checks or maintain transaction records through which crime guns can be traced. As to the proliferation of more hand-made and 3D-printed firearms, other rules address the licensing requirements for persons engaged in the business of manufacturing firearms.[144] Nonetheless, when dealers who become licensed under this rule accept hand-made, 3D-printed, and privately made firearms into inventory, they are already required to serialize and record such firearms for crime gun tracing purposes and run background checks on subsequent purchasers.[145]

### 3. Punishes Law-Abiding Citizens

#### Comments Received

Thousands of commenters stated that the proposed rule is an attack on the entire population of law-abiding firearm owners through unlawful infringement of their rights. To that end, many commenters claimed they will lose the ability to protect themselves and their families because they believe the proposed rule was designed to make it difficult for law-abiding Americans to acquire firearms.

Many commenters opined that they would be prevented—potentially criminally—from passing firearms to family, friends, or others when trading up, retiring from their gun collecting hobby, or otherwise wishing to purge firearms from their collections. Many commenters believed that a certain number of firearms sold, such as more than three per year, would make them a felon. One commenter was concerned with how the rule affects him as a WWII re-enactor when members seek to sell firearms to new members and stated that it would be difficult for this group to continue their hobby under the proposed rule without going through an FFL.

In that vein, many commenters stated that the proposed rule is threatening, puts law-abiding citizens in a burdensome defensive position of proving to an "over-zealous" Government that they are not required to be licensed as a firearms dealer, and could entrap them. Some opined that the goal of the proposed rule is to use complex and confusing language to criminalize the activities of countless average individuals who wish to sell or otherwise liquidate their firearms as they naturally gain in value over time, especially during periods of inflation. One commenter stated that "[t]his proposal is a transparent attempt to strong-arm internet service providers, gun shows, technology platforms, and other facilitators to abandon any involvement in private gun sales with vague threats of 'administrative action' for non-compliance." Another commenter suggested that the proposed rule was intended to "make every American gun owner live in fear of buying or selling a gun at any point in their lives."

A few commenters raised concerns that, if they inadvertently deal in firearms without a license, and are therefore determined to be in violation of the rule by ATF, they would not be able to then become a legal dealer. "One footnote in this proposed rule suggests the ATF might prevent a person from obtaining a license to even engage in future firearm transactions because they were presumed to have 'willfully engaged in the business of dealing in firearms without a license,' " a commenter said. "Therefore, the agency might warn that individual of their purportedly unlawful behavior," the commenter continued, and "[s]uch an individual, wishing to complete a future firearm transaction without ATF harassment, might submit an application to obtain a license to deal in firearms. But ATF's footnote suggests the law-abiding individual might be denied the license simply because their previous conduct was presumptively unlawful," they concluded.

#### Department Response

The Department disagrees with the assertions that this rule is intended to or will make felons of law-abiding citizens when they wish to pass firearms to family or friends, or to sell all or a part of a personal collection of firearms. This rule effectuates the BSCA and helps protect innocent and law-abiding citizens from violent crime. This rule does not place additional restrictions on law-abiding citizens who occasionally acquire or sell personal firearms to enhance a personal collection or for a hobby. Instead, the rule provides clarity to persons on when they are engaged in the business as a dealer in firearms with the predominant intent to profit. It articulates what it means to be engaged in the business, as well as other relevant statutory terms, to identify those persons whose conduct requires that they obtain a license—as distinguished from persons who make occasional purchases and sales in private transactions not motivated predominantly by profit.

This rule does not prevent law-abiding persons from purchasing or possessing firearms, from selling inherited firearms, or from using their personal firearms for lawful purposes such as self-defense, historical re-enactments, or hunting. The rule includes a non-exhaustive list of conduct that does not support a presumption that a person is engaging in the business and that may also be used to rebut the presumptions. Additionally, this rule does not impose any new restrictions in the application process to become an FFL. Further, nothing in this rule imposes licensing requirements on internet service providers, gun show promotors, or technology platforms that are operating in conformity with applicable legal requirements. And finally, this rule does not inhibit law-abiding citizens from acquiring firearms. In fact, this rule will likely increase the number of licensed dealers available to sell firearms to consumers. Nonetheless, a small percentage of unlicensed persons who are engaged in the business under the BSCA amendments, and therefore must become licensed to continue dealing in firearms, might choose to leave the firearm sales market rather than become licensed, for a variety of reasons. *See* Sections IV.D.5 and VI.A of this preamble for further discussion of this potential outcome.

In this rule, despite several commenters advocating for a strict numerical threshold, the Department did not establish a numerical threshold for what would constitute being "engaged in the business." Any number would be both overinclusive and underinclusive. It would be overinclusive in that a collector who does not sell firearms to predominantly earn a profit might sell a significant number of firearms to liquidate a personal collection (and thus cross the numerical threshold), even though the GCA provides that sales to liquidate a personal collection are not made to

---

[144] For more information on who must be licensed as a manufacturer, *see Definition of "Frame or Receiver" and Identification of Firearms,* 87 FR 24652 (Apr. 26, 2022).

[145] *See* 27 CFR 478.92(a)(2); 478.125(i).

predominantly earn a profit. *See* 18 U.S.C. 921(a)(22). And it would be underinclusive in that someone might devote time, attention, and labor to dealing in firearms with the intent to profit (and would thus qualify as being engaged in the business under the statute), but might not meet some hypothetical number of sales and thus elect not to get, or purposefully evade getting, a license. As stated above, the courts have indicated that a license may be required even when there is a single firearms transaction or offer to engage in a transaction where persons also hold themselves out as sources of additional weapons. *See* Section III.D of this preamble. At the same time, however, Congress specifically exempted from the definition of "engaged in the business" as a dealer in firearms "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms," 18 U.S.C. 921(a)(21)(C), so a person who makes multiple sales will not always be engaged in the business.

The Department disagrees with the commenters who said that persons who inadvertently deal without a license in violation of the rule would be "caught in a trap" of not being able to become a licensed dealer. Even if a person is presumed to be engaged in the business of dealing in firearms under one of the EIB presumptions in the rule, ATF would need to have evidence that the person "willfully" engaged in that business without a license to deny the application for license. *See* 18 U.S.C. 923(d)(1)(C). Consistent with the way the courts have long interpreted this term in this administrative firearms licensing context, the term "willfully" means that the license applicant "knew of his legal obligation [to become licensed] and purposefully disregarded or was plainly indifferent to" that requirement. *Article II Gun Shop, Inc.* v. *Gonzales,* 441 F.3d 492, 497 (7th Cir. 2006) (quoting *Stein's, Inc.* v. *Blumenthal,* 649 F.2d 463, 467 (7th Cir. 1980)).[146] So, only an applicant who purposefully disregarded or was plainly indifferent to the licensing requirement

would be denied a license on those grounds.

The Department disagrees that WWII re-enactors will be unable to sell firearms to fellow hobbyists under this rule without going through a licensed dealer. While Federal law already generally prevents persons from selling firearms to a person in another State without going through a licensed dealer,[147] neither existing law nor this rule prevents persons residing in the same State from occasionally purchasing and reselling firearms to enhance their personal collections or for a hobby without going through a licensee. Nonetheless, to further address these concerns, the Department has amended the definition of "personal collection" in this rule to include, as an example, personal firearms that a person accumulates for "historical re-enactment."

### 4. Adverse Impact on Underserved and Minority Communities

#### Comments Received

Certain commenters opined that the proposed rule could somehow have an adverse effect on persons with limited economic means who would be forced to "choose between living expenses and protecting themselves and love[d] ones." Comments included scenarios such as economically disadvantaged persons being unable to sell a personally owned firearm to make ends meet because of, for example, prohibitive costs and hurdles to becoming licensed; families needing to liquidate assets, including personally owned firearms, to care for loved ones, pay for food, rent, or other obligations; disadvantaged persons having to choose between selling a firearm at a loss or being prosecuted as an "illegal gun dealer"; and low-income individuals being financially unable to acquire a firearm to provide protection for themselves or families as a result of the rule. One commenter stated that the requirement for individuals to rebut presumptions in administrative or civil proceedings poses a considerable financial burden, particularly for those with lower incomes, and specifically persons of color.

Several commenters expressed concern that the proposed rule would unfairly target minority communities. Some commenters opined that the proposed rule is classist and racist: "only rich [White] people" can afford to legally obtain guns because licensed firearms dealers are disproportionately distributed in white neighborhoods;

minority populations experience disproportionately higher rates of arrest versus non-minority populations; and minority communities will have the greatest struggle to obtain a firearm for protection where self-defense needs may be most acute. Another commenter opined that Black and brown communities, LGBTQI+ people, and transgender people will be disproportionately affected by the final rule. Others suggested that the FFL licensing costs should be reduced by this rule, suggesting a $10 limited FFL license for a personal collector.

#### Department Response

The Department disagrees that this rule will prevent persons with limited income from lawfully acquiring or liquidating firearms. Specifically, under this rule, a person will not be presumed to be engaged in the business of dealing in firearms when reliable evidence shows that the person is only reselling or otherwise transferring firearms occasionally as bona fide gifts, to obtain more valuable, desirable, or useful firearms for the person's personal collection; occasionally to a licensee or to a family member for lawful purposes; to liquidate all or part of a personal collection; to liquidate firearms they have inherited; or to liquidate firearms pursuant to a court order. *See* 27 CFR 478.13(e). With respect to the cost of a dealer license and the comment suggesting that ATF reduce the FFL licensing cost, this rule must effectuate the laws of Congress and that amount is set by 18 U.S.C. 923(a)(3)(B) ($200 for three years, and $90 renewal for three years). With respect to commenters' asserted limited access to licensed dealers in minority communities, neither the GCA nor this rule distinguishes between communities. All persons who engage in the business of dealing in firearms must be licensed at fixed business premises within a State, *see* 18 U.S.C. 923(d)(1)(E), and this rule implements the licensing requirements wherever that dealing may occur.

The Department further disagrees that this rule will disproportionately affect lower-income individuals or certain minority groups. This final rule implements the GCA, as amended by the BSCA, which regulates commerce in firearms. The GCA requires that all persons who meet the definition of engaged in the business of dealing in firearms must become licensed without regard to their socioeconomic status, where they live, or to which identity groups they belong. The GCA does not distinguish between minority groups and other groups, and its licensing provisions are not targeted at reducing

---

[146] *See also CEW Properties, Inc.* v. *ATF,* 979 F.3d 1271, 1273 (10th Cir. 2020); *Shawano Gun & Loan, LLC* v. *Hughes,* 650 F.3d 1070, 1077–78 (7th Cir. 2011) (quoting *Gonzales,* 441 F.3d at 497); *Armalite, Inc.* v. *Lambert,* 544 F.3d 644, 647–49 (6th Cir. 2008); *On Target Sporting Goods, Inc.* v. *Attorney General of U.S.,* 472 F.3d 572, 575 (8th Cir. 2007); *RSM, Inc.* v. *Herbert,* 466 F.3d 316, 321–22 (4th Cir. 2006); *Willingham Sports, Inc.* v. *ATF,* 415 F.3d 1274, 1277 (11th Cir. 2005); *Perri* v. *ATF,* 637 F.2d 1332, 1336 (9th Cir. 1981).

[147] *See* 18 U.S.C. 922(a)(5).

the number of locations where lower income residents can lawfully purchase firearms. And, according to several commenters, including a civil rights organization, minority communities are disproportionately hurt by gun violence, including hate crimes (often by prohibited persons who would not pass a background check), and this rule will help minority communities by reducing gun violence.

Under the GCA and this rule, a person who "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of the person's personal collection of firearms" is not "engaged in the business" of dealing firearms. § 478.13(a). In addition, nothing in the GCA or this rule precludes a person from lawfully purchasing firearms for self-protection or other lawful personal use, or making isolated sales of such firearms without devoting time, attention, and labor to dealing in firearms as a regular course of trade or business. A single or isolated sale of a firearm that generates pecuniary gain to help make ends meet, care for loved ones, or pay for food, rent or other obligations would not alone be sufficient to qualify as being engaged in the business; instead, there would need to be additional conduct indicative of firearms dealing within the meaning of the GCA. Similarly, persons who liquidate (without restocking) all or part of their personal collection are not considered to be engaged in the business and may use the proceeds for lawful purposes, including those mentioned above. However, a person could still be engaged in the business even when they are using proceeds to make ends meet, care for loved ones, or pay for food, rent, or other obligations if they were to engage in additional conduct that is indicative of firearms dealing within the meaning of the GCA.

### 5. More Important Priorities and Efficiencies

#### Comments Received

Many of the commenters opined that there are more important ways that ATF should address firearm violence and crime instead of promulgating the rule. Thousands of commenters suggested considering alternative solutions that address the root causes of gun violence, such as community-based violence prevention programs, mental health reform, or improved access to mental health services, including allocating money for such services. Others suggested implementing weapon safety courses in schools. Specifically, a

commenter said, "[a]ccording to the government's own statistics [citing to the CDC website], the majority of gun deaths are due to suicides. And the next highest category of deaths by firearms is inner city peer on peer murders of young men[.]" If the Government wants to try to fix these sources of firearm-related deaths, the commenter added, it should look at the evidence and address the root causes.

Many commenters suggested increasing support for law enforcement agencies, such as funding and equipment, while many more suggested enforcing current laws, such as targeting stolen firearms or felons possessing firearms, instead of creating new laws and regulations. Others suggested targeting straw purchases, criminals who sell firearms to minors, unlawful internet sales such as Glock switches, and individuals who lie on the ATF Form 4473.

Some suggested focusing enforcement efforts based on geography, such as focusing on the southern border to address firearm, drug, and human trafficking whereas others suggested focusing on gangs or criminals known to operate in certain cities or other areas and creating gang task forces. Along those lines, some suggested enforcing existing Federal law against prohibited persons possessing firearms in communities where local officials downplay Federal prohibitions for political reasons. In addition to enforcing current laws, some suggested other measures, such as harsher prison sentences for violent criminals, eliminating "no bail" policies, constructing more prisons, and ending a "revolving door" justice system that they said fails to hold violent felons accountable.

Other commenters expressed concern about the firearm background check system. Some commenters suggested improving firearm background check response times for currently licensed FFLs before implementing a rule that would increase the number of licensees. Some suggested focusing on comprehensive background checks and closing legal loopholes that allow firearms to fall into the wrong hands.

#### Department Response

The Department acknowledges comments about treating mental health and drug addiction, securing schools and workplaces, improving records available to the NICS, properly funding law enforcement, and various other national policy issues, such as the root causes of gun violence, border control, gangs, drug and human trafficking, penal facilities and laws, and how State

and local officials implement laws. The Department agrees that these are important issues; however, they are not addressed in the GCA or the BSCA's provisions relating to persons engaged in the business of dealing in firearms, and therefore are outside the scope of this rule.

To the extent that commenters raised issues within ATF's jurisdiction—such as by suggesting that ATF focus on firearms trafficking, felons possessing firearms, stolen firearms, targeting straw purchases, criminals who sell firearms to minors, unlawful internet sales of weapons such as Glock switches, and individuals who lie on ATF Form 4473—the Department agrees that these are, and should be, among the Department's most important concerns. At their core, they are all related to keeping firearms out of the hands of prohibited persons and others who may commit crimes with firearms. In addition to ATF's other enforcement efforts, the Department considers this rulemaking necessary to implement the GCA and address those concerns.[148] Clarifying who qualifies as a dealer in firearms and must be licensed will not only increase the number of FFLs, but also provide ATF with a better ability to: (1) curb prohibited sales to minors, felons, and others; (2) better identify and target those engaging in straw purchases and firearms trafficking (which can indirectly aid in capturing people who engage in drug and human trafficking); and (3) identify unlawful internet sales and false statements on ATF Forms 4473, among other benefits. These issues are precisely what this rule targets.

### 6. Concerns With Effect on ATF

#### Comments Received

A number of commenters expressed views that the proposed rule would cause such an increase in the number of dealer applicants and licensees that ATF would not have the resources to handle the corresponding increased workload. One commenter stated, "Legal sales of firearms by individuals take place every day over trading websites and gun shows, creating thousands of transactions; estimates in the proposed rule indicate as many as 300,000 individuals would need to obtain an FFL which would overburden the ATF and result in long delays and high expense for the government, likely

---

[148] Although these other matters may fall within the scope of ATF's authority, "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities." *Massachusetts* v. *E.P.A.,* 549 U.S. 497, 527 (2007).

much greater than the estimates." Another stated, "[t]he true cost is likely to be far greater when factoring in the ATF's expanded responsibilities, increased workload, and the potential need for additional personnel and resources to manage the influx of license applications and compliance checks. This could result in unforeseen financial and logistical challenges for both the ATF and the individuals seeking licenses." Another commenter stated that the NPRM would increase the number of inspections ATF would have to conduct, including just for one or two firearms sold.

In addition to costs to ATF and potential licensees, another commenter suggested that the proposed rule raises concerns relating to the NICS. By exponentially increasing the number of transactions requiring background checks, the proposal risks overburdening the NICS, leading to delays or even erroneous outcomes, they said, adding, "This rule would exacerbate existing problems, thereby undermining its effectiveness as a tool for ensuring public safety."

Other commenters suggested that all this extra cost and work would provide little benefit because nearly all of these current exchange activities are innocent and legal, having no criminal intent, the "mountains of applications [would be] for what will be temporary FFL licenses," and the increase would, ironically, "hinder" ATF's ability to solve crime. As one commenter stated, "After all, licensed dealers can directly order firearms from distributors or manufacturers, and the more licensed dealers, the harder it is to ensure all those dealers are complying with all applicable laws and regulations (fixed number of agents available for compliance inspections, more license holders, lower rate of inspections per license holder)." Although acknowledging that the licensing fee is set by statute, several of these commenters nonetheless suggested an increase in the fees to help ATF. The application fee for dealers in firearms is currently set by the GCA at $200 for the first three-year period, stated one of these commenters. They continued by comparing this to the amount people spend in State fees for hunting licenses, as well as the scope of ATF's work: "In the area of firearms alone ATF not only assists thousands of law enforcement agencies nationally and internationally in firearm tracing but also further contributes to public safety through permitting and monitoring with follow up compliance checks of 11 different types of [FFLs]. Your agency needs additional staff and funding support. I

recommend increasing the FFL application fee to $600 to help facilitate carrying out your public safety mission. If an out of state person went on an elk hunting trip to Oregon, Wyoming, Montana, or Colorado they would be paying over $700 just for the license/ tags!" (emphasis removed)

Department Response

In response to comments saying that ATF does not have resources necessary to process additional licenses and increasing workload, the Department acknowledges that the BSCA amended the GCA to broaden the scope of persons who are required to be licensed as dealers under the GCA. The Department anticipates that, soon after this final rule is published, there will be an initial influx of applicants, which will then level off as licenses are processed and issued. The Department will reallocate resources as necessary to handle the estimated initial increase in the number of license applicants and anticipates being able to do so without taking away from other enforcement priorities.

The Department acknowledges commenters' desire to increase dealer license fees; however, those fees are set by statute, not by regulation. *See* 18 U.S.C. 923(a)(3). As such, those comments are beyond the scope of this rule.

7. Concerns With the Comment Process

Comments Received

One commenter stated that ATF required all commenters to include their name and address to comment and added that this requirement violates the First Amendment, adding that courts have consistently held that restrictions on anonymous speech are subject to "exacting scrutiny." They also stated that asking for commenter identity "severely limit[s] both the degree and amount of public participation." The commenter further stated that this "is predictably likely to chill the gun owning public from weighing in and exercising their right to participate." Finally, the commenter pointed out that many government agencies accept anonymous comments in identical circumstances and that the Administrative Procedure Act ("APA") does not require agencies to authenticate comments. As a result, the commenter requested that ATF re-open the comment period. At least one commenter who submitted a comment later in the comment period expressed skepticism about the large number of comments already posted in favor of the rule and thought they could have been produced by automated bots. Further, at

least two commenters were under the impression that ATF refused to accept boxes of petitions submitted by a firearms advocacy organization.

Department Response

The Department disagrees that ATF's request for self-identification in its instructions "severely limit[ed] the degree and amount of public participation," or discouraged the public from commenting, as evidenced by the thousands of electronic comments that ATF received that were either submitted anonymously or under an obvious pseudonym. Moreover, among the tens of thousands of submitted comments opposing the rule were many comments in which commenters expressly declared that they would not comply with any regulation or simply made disparaging or profane statements about the proposed rule, DOJ, or ATF, which undermines the comment's suggestion that commenters who have a negative view of ATF were deterred from submitting comments. ATF accepted, posted, and considered the anonymous and pseudonymous comments and those with negative views.

The commenter's statement that restrictions on anonymous speech are subject to "exacting scrutiny" under the First Amendment is irrelevant here because ATF did not restrict anonymous speech. Rather, ATF required commenters to include their first and last name and contact information when submitting comments, and noted that "ATF may not consider, or respond to, comments that do not meet these requirements." 88 FR 62019. Thus, individuals could submit anonymous comments at will, but ATF indicated that it might not respond. ATF is not constitutionally required to respond to all comments, as "[n]othing in the First Amendment or in [the Supreme Court's] case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Minn. State Bd. for Cmty. Colleges* v. *Knight,* 465 U.S. 271, 285 (1984). Nonetheless, ATF did consider the submitted comments, anonymous or not, and is responding in this preamble to the issues raised, even though not to every individual comment.

The NPRM instructions under "Public Participation," requiring that commenters include their first and last name and contact information (88 FR 62019), were for mail-in comments. ATF generally requires that persons provide such information on mailed comments in case of illegible handwriting in the

comment or in case the agency would like to follow up on a comment to gain further information or perspective from the commenter. In addition, ATF also generally requests such information on any comment submitted by electronic means or mail for the latter reason. Commenters are encouraged to include such information when submitting an electronic comment; however, the NPRM made clear that if commenters were submitting via the Federal eRulemaking portal, they should follow instructions on the portal. 88 FR 61993, 62019. On the Federal eRulemaking portal, the Department permits individuals to submit comments anonymously or even use aliases to mask their identity.

The significant majority of comments were submitted through the eRulemaking portal and were not required to include identifying information. As discussed above, thousands of commenters submitted electronic form letters opposing the rule, and those commenters, though they could have submitted anonymously, typically provided a name as part of those mass-mail campaigns. Accordingly, the Department disagrees that commenters opposing the rule were discouraged from participating and also disagrees with the suggestion that ATF should re-open the comment period.

Additionally, the developers of the Federal eRulemaking portal have in place measures to prevent comments from automated bots [149] and did not inform ATF that there were any system irregularities during the comment period.

And finally, the commenters who believed that ATF denied acceptance of boxes of petitions were mistaken. ATF received, accepted, scanned, posted, and considered the petitions from the firearms advocacy organization on behalf of their constituency, which were timely mailed before the close of the comment period in accordance with the NPRM instructions. Those petitions, which expressed objections to the proposed rule, totaled over 17,000 comments and were processed and considered.

---

[149] According to *regulations.gov*, the system employs reCAPTCHA "to support the integrity of the rulemaking process and manage the role of software-generated comments." *See Frequently Asked Questions, Regulations.gov, https:// www.regulations.gov/faq* (last visited Mar. 7, 2024).

## 8. Constitutional Concerns

### a. Violates the Ex Post Facto Clause

#### Comments Received

A few commenters stated that the NPRM directly violates clause 3 of Article I, Section 9, of the United States Constitution, which prohibits ex post facto laws. These commenters' opposition comes from their belief that, once the final rule goes into effect, sales of firearms that are currently lawful will no longer be legal, and that the new prohibition would constitute an ex post facto law. The commenters who provided reasons for their assertion that this rule constitutes an ex post facto law primarily focused on their belief that the rule would be an "infringement on firearms ownership and property rights" and would create a backdoor firearms registry, that the rule is "criminalizing and restricting transactions and expanding the scope of scrutiny" of the "engaged in the business" as a dealer definition to "those who the original law had not intended," and that the rule is an attempt to tax and punish Americans that have not committed a crime. One commenter stated that the EIB presumption that applies when a person repetitively sells firearms of the same or similar kind or type "reads like a trap ready to spring on an unsuspecting collector who[se conduct] would previously be perfectly legal" if, for example, they had exchanged a bolt-action Mosin-Nagant rifle in 7.62x54r for a Star Model B pistol in 0x18. According to the commenter, "the concern here is taking an activity which was entirely acceptable prior to this rule, then moving the goalposts to make it illegal. It is concerning that this would appear to be an ex-post facto change." Another commenter asked whether it was legal "to pass a law in 2022, then redefine what that law says?"

#### Department Response

The Department disagrees that the proposed rule violates the Ex Post Facto Clause. As an initial matter, the rule does not itself impose any new liability. Rather, the rule implements the BSCA, which amended the GCA, a statute passed by Congress. A law "violates the Ex Post Facto Clause if it applies to events occurring before its enactment and alters the definition of criminal conduct or increases the punishment for a crime." *United States* v. *Pfeifer,* 371 F.3d 430, 436 (8th Cir. 2004) (citing *Lynce* v. *Mathis,* 519 U.S. 433, 441 (1997)). But a law does not violate the Ex Post Facto Clause just because it applies to conduct that "began prior to, but continued after" its effective date.

*United States* v. *Brady,* 26 F.3d 282, 291 (2d Cir. 1994) (internal quotation marks omitted). For example, in the context of firearm possession, courts have consistently recognized that regulating the continued or future possession of a firearm that was acquired before the regulation took effect does not implicate the Ex Post Facto Clause because such a regulation does not criminalize past conduct. *See, e.g., United States* v. *Pfeifer,* 371 F.3d 430, 436–37 (8th Cir. 2004); *United States* v. *Mitchell,* 209 F.3d 319, 322–23 (4th Cir. 2000); *United States* v. *Brady,* 26 F.3d 282, 290–91 (2d Cir. 1994); *United States* v. *Gillies,* 851 F.2d 492, 495–96 (1st Cir. 1988); *United States* v. *D'Angelo,* 819 F.2d 1062, 1065–66 (11th Cir. 1987); *cf. Samuels* v. *McCurdy,* 267 U.S. 188, 193 (1925) (rejecting Ex Post Facto Clause challenge to statute that prohibited the post-enactment possession of intoxicating liquor, even when the liquor was lawfully acquired before the statute's enactment).

Here, the rule does not impose any civil or criminal penalties and nothing in this rule requires that the statute be applied in a manner that violates the Ex Post Facto Clause. Nor does this rule regulate "firearm ownership" in a vacuum—it addresses dealing in firearms. This rule describes the proper application of the terms Congress used in various provisions of the GCA, as modified by the BSCA, to define what constitutes being engaged in the business as a dealer—and, thus, when persons must obtain a dealer's license before selling firearms. As stated above, this rule does not impose liability independent of the pre-existing requirements of those statutes.

The Department disagrees that this rule "redefine[s] what that law says." It simply explains and further clarifies the terms of the BSCA. The Department further disagrees that substantive rules that interpret an earlier statute—such as the 2022 changes the BSCA made to the GCA—through a congressional grant of legislative rulemaking authority are ex post facto laws merely because they interpret or clarify those laws. The proposed rule is exclusively prospective and does not penalize prior conduct; it is not an ex post facto law. *See Lynce,* 519 U.S. at 441. For these reasons, the Department disagrees with commenters' assertions that the rule violates the Ex Post Facto Clause.

### b. Violates the First Amendment

#### Comments Received

A few commenters raised concerns that the proposed definitions violate the First Amendment. These commenters

stated that, "One is not required by the Constitution to be vetted and permitted in order to claim protection under the First Amendment Right to Free Speech," which the commenters stated includes the right to "procure and sell firearms as a citizen." In addition, at least one commenter stated that the "promotion" presumption under the definition of "predominantly earn a profit" violates the First Amendment by infringing on a private citizen's ability to promote their brand by conflating intent to sell with promotion of a brand. Another commenter stated that, when an agency can charge a crime against a person solely because they utter an offer to sell a firearm, ATF is enforcing thought crimes. The commenter added that this goes beyond existing law structures and does not meet the standard of calling "Fire!" in a theater.

Some commenters expressed First Amendment concerns specifically regarding the definition of terrorism included in the regulation. While some commenters voiced approval of including the definition of terrorism because they believe it allows the Government address potential threats effectively, other commenters objected, with some stating it is unnecessary and possibly infringes on freedom of speech and expression because the Government might inadvertently stifle protected political activism or dissent. They urged that the definition needs to be more precise to avoid unintended consequences and to ensure that legitimate firearms activities are not penalized.

Department Response

The Department disagrees with the commenters' First Amendment objections. As an initial matter, this rule does not regulate speech at all, nor is the right to "procure and sell firearms as a citizen" protected speech under the First Amendment. Although the Supreme Court has held that the First Amendment protects "expressive conduct," it is not implicated by the enforcement of a regulation of general application not targeted at expressive activity. *Arcara* v. *Cloud Books, Inc.,* 478 U.S. 697, 702, 706–07 (1986). (First Amendment scrutiny "has no relevance to a statute directed at . . . non-expressive activity," but applies "where it was conduct with a significant expressive element that drew the legal remedy in the first place."); *see also Wright* v. *City of St. Petersburg,* 833 F.3d 1291, 1298 (11th Cir. 2016) ("First Amendment scrutiny 'ha[d] no relevance to [a trespass ordinance] directed at imposing sanctions on nonexpressive activity' "); *cf. Talk of the*

*Town* v. *Dep't of Fin. & Bus. Servs. ex rel. Las Vegas,* 343 F.3d 1063, 1069 (9th Cir. 2003) (section of Las Vegas Code barring consumption of alcohol in places that lack valid liquor licenses "in no way can be said to regulate conduct containing an element of protected expression"). Conduct may be expressive where "[a]n intent to convey a particularized message [is] present, and . . . the likelihood [is] great that the message would be understood by those who viewed it." *Texas* v. *Johnson,* 491 U.S. 397, 404 (1989) (quoting *Spence* v. *Washington,* 418 U.S. 405, 410–11 (1974)). This final rule does not regulate expressive conduct of any kind, and the commenters have not offered any valid reason to believe that selling firearms constitutes expressive conduct. As such, the First Amendment is not implicated by this rule.

Even if certain aspects of procuring and selling a firearm could be considered expressive conduct, "a sufficiently important governmental interest in regulating the nonspeech element" of conduct that also includes an expressive element "can justify incidental limitations on First Amendment freedoms." *United States* v. *O'Brien,* 391 U.S. 367, 376 (1968). Under an *O'Brien* analysis—

a government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377.

Addressing these elements, first, "the Government may constitutionally regulate the sale and possession of firearms." *Wilson* v. *Lynch,* 835 F.3d 1083, 1096 (9th Cir. 2016). Second, courts have repeatedly held that public safety and preventing crime are not only substantial, but compelling, governmental interests. *See, e.g., United States* v. *Salerno,* 481 U.S. 739, 750 (1987); *Mai* v. *United States,* 952 F.3d 1106, 1116 (9th Cir. 2020); *Worman* v. *Healey,* 922 F.3d 26, 39 (1st Cir. 2019); *Kolbe* v. *Hogan,* 849 F.3d 114, 139 (4th Cir. 2017); *N.Y. State Rifle & Pistol Ass'n* v. *Cuomo,* 804 F.3d 242, 261 (2d Cir. 2015); *Horsley* v. *Trame,* 808 F.3d 1126, 1132 (7th Cir. 2015). Third, "the Government's efforts to reduce gun violence" are not directed at any hypothetical expressive conduct and cannot be construed to be related to the suppression of free expression in any way. *Wilson,* 835 F.3d at 1096–97. Fourth, the regulation's definitions and

rebuttable presumptions do not ban ownership, purchase, or sale of firearms, nor do they restrict purchases and sales for enhancement of personal firearms collections. The regulation merely clarifies that recurring sales or purchases for resale, with the predominant intent to earn a profit, constitute being engaged in the business as a dealer. It does not ban these sales; it just requires that dealers comply with existing statutory licensing requirements. Therefore, any burden is "incidental" and "minimal." *Id.* Because the regulation "satisfies each of the *O'Brien* conditions," it would "survive[ ] intermediate scrutiny." *Id.* at 1097 (finding ATF's Open Letter to Federal Firearms Licensees, informing them that they would have cause to deny a firearm sale as violating 18 U.S.C. 922(b)(3) if a purported purchaser presented their medical marijuana registry card, did not violate the First Amendment even if having the card was considered expression). Thus, even if the *O'Brien* standard applies, the regulation does not violate the First Amendment.

Moreover, this rule does not establish that an individual will be charged with a crime "solely" because they "utter" an offer to sell a firearm. As noted above, the presumptions set forth in this rule do not apply to criminal proceedings. Further, the application of a rebuttable presumption based on a seller's speech does not restrict speech in any way—it means only that, in a proceeding to determine whether a seller of firearms is "engaged in the business" of dealing in firearms, the Department may be able to make an initial evidentiary showing based on the seller's speech, and the evidentiary burden then shifts to the seller. The Supreme Court has held that the First Amendment "does not prohibit the evidentiary use of speech to establish" a claim "or to prove motive or intent." *Wisconsin* v. *Mitchell,* 508 U.S. 476, 489 (1993). Consistent with this principle, courts have rejected First Amendment challenges to rebuttable presumptions that are triggered by speech evidence. *See Cook* v. *Gates,* 528 F.3d 42, 63–64 (1st Cir. 2008); *cf. Village of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495–96 (1982) (rejecting claim that a village had unlawfully restricted speech through a drug paraphernalia licensing ordinance just because guidelines for enforcing the ordinance "treat[ed] the presence of drug-related literature as indicium that paraphernalia are 'marketed for use with illegal cannabis or drugs' "). Ultimately, the subject of this final rule is a seller's conduct and not his speech, and the

rule does not impose any burdens on speech.

To the extent commenters are alleging this rule impermissibly inhibits commercial speech, it does no such thing. Repetitively or continuously advertising the sale of firearms can result in a person being presumed to be engaging in the business, but a presumption may be rebutted. At any rate, even if unrebutted, the implication of the presumption is simply that the person must have a license to deal in firearms—that person is not precluded from advertising the sale of firearms. Assuming the presumption does burden commercial speech, courts have routinely recognized that "[t]he Constitution accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of New York,* 447 U.S. 557, 562–63 (1980) (internal quotation marks omitted). If the content of the commercial speech is not illegal or misleading, the Government must first "assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, the regulation must be 'narrowly drawn.'" *Fla. Bar* v. *Vent For It, Inc.,* 515 U.S. 618, 624 (1995). As stated above, "the Government may constitutionally regulate the sale and possession of firearms," *Wilson,* 835 F.3d at 1096, and public safety is a compelling governmental interest. Requiring those who are engaged in the business of dealing in firearms to be licensed—and thus to keep records and conduct background checks on potential purchasers to deny transfers to those who are prohibited from possessing firearms—materially advances public safety. Moreover, this requirement is narrowly drawn because it pertains to only those "who devote[ ] time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." *It does not apply to every sale.*

The Department also disagrees that the rule's definition of "terrorism" is unnecessary or infringes upon protected speech. The definition mirrors the statutory definition of "terrorism" that Congress enacted and codified in 18 U.S.C. 921(a)(22) and (a)(23), with only a minor addition at the beginning to state the definitions to which it applies. It is also necessary to explain the congressionally enacted proviso that proof of profit shall not be required when a person engages in the regular

and repetitive purchase and disposition of firearms in support of terrorism. The definition does not constitute a governmental restriction on speech or expressive conduct, and so it does not violate the First Amendment.

Again, it bears emphasizing that this statutory definition of "terrorism" existed in the definition of "principal objective of livelihood and profit" before the BSCA was passed, and still remains there verbatim. The BSCA added that same definition to the new "predominantly earn a profit" definition. This rule merely moves that definition within the regulations to be a standalone definition so that it applies to both the term "predominantly earn a profit" and "principal objective of livelihood and profit" (in the sections governing importers, manufacturers, and gunsmiths)—consistent with the statute—without repeating it in two places, and makes a slight edit at the beginning to state that it applies to both definitions. This rule does not further interpret or define that term, and comments in that regard are beyond the scope of the rule.

### c. Violates the Second Amendment

### Comments Received

Of those who objected to the NPRM, a majority argued that any changes to the definitions, or creating new requirements and rebuttable presumptions, are inconsistent with the Second Amendment and are therefore unconstitutional. Commenters stated that the right to have—and thus purchase and sell—firearms dates back to the Founding and that requiring licenses for any aspect of firearm sales is an unconstitutional infringement of Second Amendment rights. Many commenters stated that the rule is "reclassifying all sales (even private) to require a 'licensed dealer' (FFL) . . . thusly preventing law abiding United States citizens from obtaining firearms. If a citizen cannot obtain a firearm, a citizen cannot keep or bear a firearm violating the Second Amendment," and similar statements. Some of these commenters stated that the rule violates the Second Amendment by creating universal background checks, making it difficult and costly for citizens to sell personal firearms, and that it deprives people of the inherent right to dispose of, trade, or do what they wish with their own property.

Some stated that they understand the importance of balancing public safety and regulation of illegal firearms activity with firearm ownership, but expressed concerns that the correct balance point has not been determined

yet or that the proposed regulation might "inadvertently classify individuals who engage in the lawful and occasional transfer of personal firearms to friends or family members as arms dealers," raising concerns about overreach and undue burden.

Several commenters tied these concerns to *District of Columbia* v. *Heller,* 554 U.S. 570 (2008), stating that expanding the definition of who is engaged in the business of dealing in firearms may criminalize law-abiding citizens engaging in their Second Amendment rights, which the commenters stated were "unequivocally affirm[ed]" by *Heller.* One commenter stated that the *Heller* decision "emphasized that any restrictions placed on the Second Amendment must be closely tailored to avoid unnecessary infringement on individual rights. The proposed rule, by including casual sellers under the umbrella of those 'engaged in the business,' stretches this definition beyond its historical and legal boundaries. This is not a close tailoring of restrictions but an undue burden on average citizens who may occasionally sell firearms without falling under any standard commercial definition of a firearms dealer."

Many other commenters stated that the regulation violates *New York State Rifle & Pistol Ass'n,* v. *Bruen,* 597 U.S. 1 (2022), because, the commenters argued, there is no analogous historical law from either the Founding era—when the Second Amendment was ratified—or the Reconstruction period—when the Fourteenth Amendment's Due Process Clause incorporated the Second Amendment's protections and rendered them applicable to the States—that defined a "dealer" in firearms or required background checks, dealer licensing, recordkeeping, or gun registration. Others stated that the regulation violates *Bruen* because, they stated, *Bruen* precludes the Government from using means-end scrutiny to justify its firearms laws. Accordingly, the commenters argued, the proposed rule's use of public safety as a basis for purportedly banning firearms from average citizens renders it unconstitutional under *Bruen.* These commenters further argued the proposed rule is unconstitutional under *Bruen* because it serves no public interest.

A few other commenters directly stated that the BSCA, GCA, and NFA all violate the Second Amendment. Some added that the ATF regulation is misinterpreting the BSCA, which did not intend to change the definition of "engaged in the business" or any other definition, and the proposed rule is thus

an effort to work around the Second Amendment.

Department Response

The Department disagrees with commenters that the GCA, the BSCA amendments, or this rule implementing these statutes violate the Second Amendment. Those statutes and this final rule are consistent with the Supreme Court's Second Amendment decisions. In *Heller,* the Court emphasized that "the right secured by the Second Amendment is not unlimited" and "nothing in our opinion should be taken to cast doubt" on certain laws, including those "imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27. The Court repeated the same statement in *McDonald* v. *City of Chicago,* 561 U.S. 742, 786 (2010), and Justice Kavanaugh, joined by the Chief Justice, reiterated the point in his concurring opinion in *Bruen,* 597 U.S. at 81 (Kavanaugh, J.).

Those precedents confirm that this rule raises no constitutional concern under the Second Amendment. The rule addresses the commercial sale of firearms. This rule does not prevent individuals who are permitted to possess firearms under Federal law from possessing or acquiring firearms; individuals remain free to purchase firearms from an FFL or in a private sale from a non-licensee who is not engaged in the business of dealing in firearms. Nor does this rule require a dealer's license for all sales. By its terms, this rule applies only to those who "devote[ ] time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. 921(a)(21)(C). And because this rule does not mandate a license for all sales, it does not mandate a background check for all sales. Likewise, this rule does not prevent those who own firearms from lawfully selling, acquiring, or keeping this property. This rule does not prevent law-abiding citizens from making occasional sales or purchases of firearms for the enhancement of a personal collection or for a hobby—it concerns only those "engaged in the business" of firearms dealing. Firearm owners would only need a license in the event that they are devoting time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms.

At least one circuit court has rejected a facial Second Amendment challenge to the licensing requirement in 18

U.S.C. 923(a) on the ground that it "imposes a mere condition or qualification. Though framed as a prohibition against unlicensed firearm dealing, the law is in fact a requirement that those who engage in the [business of selling] firearms obtain a license." *United States* v. *Hosford,* 843 F.3d 161, 166 (4th Cir. 2016). The licensing requirement, which is implemented by this rule, is "a crucial part of the federal firearm regulatory scheme." *Id.* at 168; *see also Focia,* 869 F.3d at 1286 (prohibiting transfers between unlicensed individuals in different states "does not operate to completely prohibit [the defendant] or anyone else, for that matter, from selling or buying firearms"; instead, it "merely" imposes "conditions and qualifications on the commercial sale of arms" (internal quotation marks omitted)); *United States* v. *Nowka,* No. 11–CR–00474, 2012 WL 2862061, at *6 (N.D. Ala. May 10, 2012) ("[Plaintiff's] right to buy or sell a firearm is not abridged. It is regulated."). This rule implements a definitional change that Congress made in the BSCA, which will expand the number of firearms sellers affected by the licensing requirement in 18 U.S.C. 923(a).

Additionally, the final rule is consistent with the Supreme Court's more recent decision in *Bruen.* That case clarified the standard for resolving Second Amendment claims "[i]n keeping with *Heller,*" 597 U.S. at 17, and the Court did not draw into question *Heller's* explanation that regulations of commercial sales of firearms are presumptively lawful. *See id.* at 81 (Kavanaugh, J., concurring); *see also id.* at 79 (noting that the Second Amendment does not prohibit the imposition of objective "licensing requirements" commonly associated with firearms ownership); *id.* at 72 (Alito, J., concurring) (noting that nothing in that opinion decided anything about "the requirements that must be met to buy a gun"). Under *Bruen,* to establish a Second Amendment violation, a challenger must first show that the final rule implicates "the Second Amendment's plain text." *Id.* at 17 (majority opinion). Only if that threshold requirement is met is the Government then required to "demonstrate that the [final rule] is consistent with this Nation's historical tradition of firearm regulation." *Id.* Here, the final rule does not implicate the Second Amendment's "plain text," which addresses the right to "keep and bear Arms" and is silent as to the commercial sale of firearms. U.S. Const. amend. II. Both before and after *Bruen,*

courts have agreed that the Second Amendment does not "protect a proprietor's right to sell firearms." *Teixeira* v. *County of Alameda,* 873 F.3d 670, 690 (9th Cir. 2017); *see also United States* v. *Kazmende,* No. 22–CR–236, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023) (rejecting a Second Amendment challenge to 18 U.S.C. 922(a)(1)'s prohibition on willfully engaging in the business of dealing in firearms without a license on the ground that the "Second Amendment . . . simply does not cover the *commercial* dealing in firearms."), *report and recommendation adopted,* 2023 WL 3867792 (N.D. Ga. June 7, 2023); *United States* v. *Flores,* 652 F. Supp. 3d 796, 799–802 (S.D. Tex. 2023) (holding that "commercial firearm dealing is not covered by the Second Amendment's plain text"); *United States* v. *King,* 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022) (holding that "the Second Amendment does not protect the *commercial* dealing of firearms"); *United States* v. *Tilotta,* 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (concluding that the plain text of the Second Amendment does not cover the commercial sale and transfer of firearms).

Even if, contrary to law, the scope of the Second Amendment's protection extended to commercial dealing in firearms, there is a robust historical tradition supporting the Government's authority to require licenses and inspection of firearms sellers. Where a regulation implicates the Second Amendment, the Government may justify it "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," including, for example, by pointing to "a well-established and representative historical *analogue.*" *Id.* at 24, 30. To be analogous, historical and modern firearms regulations need only be "relevantly similar"; a "historical *twin*" is not required. *Id.* at 29–30. In fact, from colonial times, State and local governments have routinely exercised their authority to regulate the sale of firearms, through licensing, inspection, and similar requirements.

For instance, the third U.S. Congress made it unlawful for a limited period "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenades, gunpowder, sulpher, or saltpetre," Act of May 22, 1794, 1 Stat. 369, ch. 33, sec. 1 ("An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same"), demonstrating a clear understanding that the Constitution permitted regulation of firearms sellers.

**Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations    **29003**

Further, as the en banc Ninth Circuit recounted in detail, as early as the 1600s, "colonial governments substantially controlled the firearms trade," including through "restrictions on the commercial sale of firearms." *Teixeira,* 873 F.3d at 685 (further explaining, as examples, that "Connecticut banned the sale of firearms by its residents outside the colony," and Virginia law made it unlawful for any individual to travel more than three miles from a plantation with "arms or ammunition above and beyond what he would need for personal use").

Measures regulating firearms sellers, similar to the inspection and licensing regime of today, have been commonplace throughout history. To take one example, in 1805, Massachusetts required that all musket and pistol barrels manufactured in the State and offered for sale be "proved" (inspected and marked by designated individuals) upon payment of a fee, to ensure their safe condition, and Maine enacted similar requirements in 1821.[150] Further, multiple States, such as Massachusetts (1651, 1809), Connecticut (1775), New Jersey (1776), and New Hampshire (1820), required licenses or inspection to export or sell gunpowder (akin to modern ammunition).[151] *See*

also *United States* v. *El Libertad,*—F. Supp. 3d—,No. 22–CR–644, 2023 WL 4378863, at *7 (S.D.N.Y. July 7, 2023) (finding that historical laws showed "expansive authority exercised by colonial and early state legislatures as well as early congresses over the transfer of firearms between individuals and across borders," including through "licensing requirements [and] registration requirements"). Similar licensing and taxation requirements for the sale of gunpowder and certain arms were enacted through the antebellum and Reconstruction eras.[152]

That modern laws regarding the commercial sale of firearms may not be identical to laws from the Founding era is not dispositive. There are many reasons other than constitutional limitations that historical regulations are not a "dead ringer" for modern regulations. *Bruen,* 597 U.S. at 30. For example, during the Founding era, guns in America were "produced laboriously, one at a time," Pamela Haag, *The Gunning of America* 9 (2016), and communities were "close-knit," where "[e]veryone knew everyone else," *Range* v. *Att'y Gen.,* 69 F.4th 96, 117 (3d Cir. 2023) (en banc) (Krause, J., dissenting) (quoting Stephanos Bibas, *The Machinery of Criminal Justice* 2 (2012)). That is substantially different from today, where guns may be mass-produced quickly and are widely available for purchase at ubiquitous retailers through modern technology and more plentiful and far-reaching channels of national and international commerce, where sellers are unlikely to know their customers. But from the Founding and before, the principle remains the same. The Government has been allowed to—and has enacted measures to—regulate the commercial sale of firearms to prevent their sale to persons the Government deemed dangerous. Thus, assuming for the sake of argument that the regulation

implicates Second Amendment rights, it would pass muster under *Bruen.*

In response to commenters stating that the Department should not use the *Heller* two-step process, the Department acknowledges that *Bruen* abrogated the "two-step" framework of *Heller,* as "one step too many," and rejected the application of means-end scrutiny at the second step. *Bruen,* 597 U.S. at 19. Although the Department believes this rule does promote public safety, the Department is not relying on this benefit in conducting the historical analysis required by *Bruen* (assuming again for the sake of argument that it applies).

Therefore, to the extent that commenters argued the rule or the underlying statute violates the Second Amendment, the Department disagrees for all of the reasons stated above.

### d. Violates the Fourth or Fifth Amendment Right to Privacy

#### Comments Received

Several commenters claimed the proposed rule violates their right to privacy under the Fourth Amendment and the Fifth Amendment's Due Process Clause. These commenters believe that the proposed rule creates a de facto firearms registry by requiring that people who engage in recurring purchases and sales with the predominant intent to earn a profit must obtain a dealer's license. Other commenters stated that enforcement of the proposed rule would lead to a violation of their constitutional right to privacy by requiring them to be registered dealers subject to privacy-invading and warrantless inspections without breaking a law—even for a single firearms transaction. They raised particular concerns in this regard for those who operate from home. And other commenters asserted a Fourth Amendment violation in regard to their property if the Government knows what firearms or how many weapons each individual owns. One commenter focused on the rule's inclusion of electronic marketplaces as a violation of privacy, stating that including online brokers, auctions, text messaging services, and similar electronic means of transacting purchases and sales would cause people to "forfeit their privacy to the ATF in these matters."

#### Department Response

The Department disagrees that the rule violates the Fourth Amendment or any constitutional right to privacy. Under both the statute and the proposed and final rules, there are no recordkeeping or background check requirements for personal firearms that

---

[150] *See* 3 Laws of the Commonwealth of Massachusetts, from November 28, 1780, to February 28, 1807, at 259–61 (1807); 1 Laws of the State of Maine 546 (1830).

[151] *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126, Powder (1890) (1651 statute requiring license to export gunpowder); 2 General Laws of Massachusetts from the Adoption of the Constitution to February, 1822, at 198–200, ch. 52, An Act Providing for the Appointment of Inspectors and Regulating the Manufactory of Gun-Powder, secs. 1, 8 (1823) (1809 statute providing for the appointment of an "inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder," and imposing penalties for any sale or export of gunpowder "before the same has been inspected and marked"); 15 The Public Records of the Colony of Connecticut, from May, 1775, to June, 1776, Inclusive 191, An Act for Encouraging the Manufactures of Salt Petre and Gun Powder (1890) (1775 Connecticut law establishing, among other things, that no gunpowder manufactured in the colony "shall be exported out" of the colony "without [an applicable] licence"); Acts of the General Assembly of the State of New-Jersey, at a Session Begun at Princeton on the 27th Day of August 1776, and Continued by Adjournments 6, ch. 6, An Act for the Inspection of Gun-Powder, sec. 1 (1877) (No person shall offer any gunpowder for sale "without being previously inspected and marked as is herein after directed."); Laws of the State of New Hampshire; With the Constitutions of the United States and of the State Prefixed 276–78, An Act to Provide for the Appointment of Inspectors and Regulating the Manufactory of Gunpowder, secs. 1, 8 (1830) (authorizing "inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state" and imposing penalties for any sale or disposition of gunpowder "before the same be inspected and marked").

[152] The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois 123–24, ch. 16, Regulating the Keeping and Conveying Gun Powder and Gun Cotton, secs. 1, 6 (1851) (1851 city law barring the sale of gunpowder "in any quantity" without government permission, and barring "retailer[s] of intoxicating liquors" and "intemperate person[s]" from such permits); The Charter and Ordinances of the City of Saint Paul, to August 1st, 1863, Inclusive 166, Gunpowder, ch. 21, sec. 1 (1863) (similar 1858 city law requiring permission to sell gunpowder,); Acts of the General Assembly of Alabama: Passed at the Session of 1874–75, at 41, An Act to Establish Revenue Laws for the State of Alabama, Act No. 1, sec. 102(27) (1875) (imposed $25 license fee on dealers of pistols and certain knives); Acts of the General Assembly of Alabama, Passed at the Session of 1878–9, at 436–37, Act of Feb. 13, 1879, Act No. 314, sec. 14 (authorized town to "license dealers in pistols, bowie-knives and dirk-knives").

ATF 015315

APPX.036

are occasionally bought and sold as part of enhancing a personal collection, such as for sporting purposes. As to the recordkeeping and background check requirements for the licensees engaged in the business of dealing in firearms, those records are not maintained in the custody of the government but are retained by the licensee until they discontinue their business. *See* 18 U.S.C. 923(g)(4); 27 CFR 478.129. Moreover, even when these records are in ATF's possession after the licensee discontinues their business, due to statutory and permanent appropriations restrictions, they are not searchable by a transferee's name or any personal identification code. *See* 18 U.S.C. 926(a); [153] Consolidated and Further Continuing Appropriations Act, 2012, Public Law 112–55, 125 Stat. 552, 609–10 (2011) ("That, hereafter, no funds made available by this or any other Act may be used to electronically retrieve information gathered pursuant to 18 U.S.C. 923(g)(4) by name or any personal identification code . . ."). This rule does not create or modify requirements with respect to retaining and searching records.

The Department also does not agree that this rule will violate a constitutional right to privacy with regard to commenters' property. This rule does not require individuals to provide any information with regard to their possession of firearms. It applies only to those engaged in the business of dealing in firearms. "Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property. 'An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home.'" *Minnesota* v. *Carter,* 525 U.S. 83, 90 (1998) (quoting *New York* v. *Burger,* 482 U.S. 691, 700 (1987)). Moreover, every applicant for a license is made aware of ATF's right of entry into their premises and examination of their records, *see* 27 CFR 478.23; thus there can be no reasonable expectation of privacy in the information contained in those records. *Cf. United States* v. *Marchant,* 55 F.3d

509, 516 (10th Cir. 1995) (finding no reasonable expectation of privacy in the information contained in ATF Form 4473 and further noting that "Form 4473 did not advise Defendant that the information elicited was private, or that it would remain confidential"). Additionally, while the proposed rule in no way establishes a registry of firearms, and Congress has specifically prohibited such a registry, it is worth noting that the nearly century-old requirement for the actual registration of privately held firearms has never once been found to violate a Fourth Amendment right to privacy.

Some courts have recognized a privacy interest in avoiding disclosure of certain personal matters under the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Doe No. 1* v. *Putnam County,* 344 F. Supp. 3d 518, 540 (S.D.N.Y. 2018). Even under these court decisions, however, "not all disclosures of private information will trigger constitutional protection." *Id.* (internal quotation marks omitted). In at least one circuit, the right to privacy in one's personal information under the Due Process Clauses is "limited [to a] set of factual circumstances involving one's personal financial or medical information." *Id.* "[T]he question is not whether individuals regard [particular] information about themselves as private, for they surely do, but whether the Constitution protects such information." *DM* v. *Louisa County Dep't of Human Services,* 194 F. Supp. 3d 504, 508–09 (W.D. Va. 2016) (internal quotation marks omitted) (finding no right to privacy with respect to the nature and location of an individual's counseling sessions). Basic information regarding firearms ownership or possession is of neither the medical nor financial variety, and no court has found this information to be constitutionally protected. *See Doe 1,* 344 F. Supp. 3d at 541 ("Disclosure of one's name, address, and status as a firearms license [holder] is not one of the 'very limited circumstances' in which" a right to privacy exists).

e. Violates the Fifth Amendment—Unconstitutionally Vague

Comments Received

Some commenters objected to the rule on the ground that it is so vague that it violates the Due Process Clause of the Fifth Amendment. Most commenters merely stated that the rule violates the Fifth Amendment because it is unconstitutionally vague, without providing further details. Of those few commenters that elaborated their vagueness concern, the primary concern

was that the rule does not define a threshold number of firearms that must be sold to qualify a person as a dealer in firearms, and that they felt this is unconstitutionally vague. A couple of other commenters stated that the rule was unconstitutionally vague and arbitrary in setting some of the rebuttable presumptions, and focused particularly on the presumption that a resale within 30 days after purchase could qualify a person as a dealer in firearms. These commenters believed that the time period included in this provision was arbitrary and so vague that routine actions that commonly arise in personal firearms contexts could trigger the presumption without people realizing it, thus entrapping people or exposing law-abiding citizens to a criminal prosecution. One commenter stated that "[p]hrases like 'time, attention, and labor' or 'predominantly earn a profit' are nebulous and subject to interpretation," and stated that this vagueness conflicts with the principles established in *Grayned* v. *City of Rockford,* 408 U.S. 104 (1972).

One commenter argued that the proposed rule is unconstitutional, relying on *Johnson* v. *United States,* 576 U.S. 591 (2015), for the proposition that a criminal statute is unconstitutionally vague in violation of due process for either of two reasons: first, if "it fails to give ordinary people fair notice" of what is proscribed; and, second, if it is "so standardless that it invites arbitrary enforcement." *Johnson,* 576 U.S. at 595. The commenter added that "[o]ther case law expounding the 'void for vagueness' doctrine" includes *Grayned.* According to the commenter, "[u]nder *Grayned,* due process required that a law provide fair warning and provide 'persons of reasonable intelligence a reasonable opportunity to know what is prohibited so he may act accordingly.'" Another commenter cited to *Cargill* v. *Garland,* 57 F.4th 447, 469 (5th Cir.) (en banc), *cert. granted* 144 S. Ct. 374 (2023) (mem.), and stated, "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" Relying on *Cargill,* the commenter said, "[a] statute is ambiguous if, after a court has 'availed [itself] of all traditional tools of statutory construction,' the court is left to 'guess at its definitive meaning' among several options. *Id.* (cleaned up)." This commenter continued, "In those circumstances involving ambiguous criminal statutes, the court is 'bound to apply the rule of lenity.' *Id.* at 471. So even if a court were to find that the statutory definition of 'engaged in the business' is ambiguous enough to allow

[153] "No such rule or regulation prescribed after the date of the enactment of the Firearm Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established. Nothing in this section expands or restricts the [Attorney General's] authority to inquire into the disposition of any firearm in the course of a criminal investigation."

for presumptions of guilt based on a single transaction, that is far from the most obvious reading of the statute, which interpretation would thus be resolved in favor of lenity." Some congressional commenters stated, "The proposed rule raises serious vagueness concerns in light of the severe penalties. Will someone face a civil investigation for handing out business cards to sell his personal collection? What about if someone decides to sell a firearm in its original packaging?"

Department Response

The Department disagrees with commenters that this regulation, terms within it, or the rebuttable presumptions established by it are unconstitutionally vague. To begin, many of the comments are critical of the specific language Congress included in the statute (which is being added to the regulation). The Department cannot change the terms in the statute or their effect on sellers' legal rights and obligations. However, these comments illustrate the benefits of a rule that provides additional clarification to the public. The rule explains the Department's understanding of the statutory terms at issue and describes how those terms apply to particular circumstances, thus providing greater clarity to the public.

In any event, however, the terms employed in the statute and rule are not unconstitutionally vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned,* 408 U.S. at 108. A law is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages discriminatory enforcement." *FCC* v. *Fox Television Stations, Inc.,* 567 U.S. 239, 253 (2012) (internal quotation marks omitted). However, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110. The definitions in this rule use the terms with their ordinary meanings and in context, *see United States* v. *TRW Rifle,* 447 F.3d 686, 689, 690 (9th Cir. 2006), and are sufficiently clear to "'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited,'" *Village of Hoffman Estates,* 455 U.S. at 498 (quoting *Grayned,* 408 U.S. at 108). Absolute certainty is not required. *See Hosford,* 843 F.3d at 171 (explaining that laws "necessarily have some ambiguity, as no standard can be distilled to a purely objective, completely predictable

standard"); *Draper* v. *Healey,* 827 F.3d 1, 4 (1st Cir. 2016) ([I]f due process demanded [a] how-to guide, swaths of the United States Code, to say nothing of state statute books, would be vulnerable."); *United States* v. *Lachman,* 387 F.3d 42, 56 (1st Cir. 2004) ("The mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague."); *Kolbe* v. *O'Malley,* 42 F. Supp. 3d 768, 800 (D. Md. 2014) (A "statute is not impermissibly vague simply because it does not spell out every possible factual scenario with celestial precision." (internal quotation marks omitted). The many objective examples and detailed explanations in the rule, all supported by a thorough administrative record, provide clarification and assist people in complying with the statute. This rule is therefore not unconstitutionally vague.

The Department further disagrees that this rule violates the rule of lenity. The rule of lenity does not apply whenever a law or rule may contain some ambiguity. "The simple existence of some statutory ambiguity . . . is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." *Muscarello* v. *United States,* 524 U.S. 125, 138 (1998). To invoke the rule of lenity, a court "must conclude that there is a 'grievous ambiguity or uncertainty' in the statute." *Id.* at 138–39 (quoting *Staples* v. *United States,* 511 U.S. 600, 619 n.17 (1994)). A grievous ambiguity or uncertainty is present "'only if, after seizing everything from which aid can be derived, [a] [c]ourt 'can make no more than a guess as to what Congress intended.'" *Ocasio* v. *United States,* 578 U.S. 282, 297 n.8 (2016) (quoting *Muscarello,* 524 U.S. at 138–39). This rule does not require "a guess" as to what conduct satisfies being "engaged in the business"; it adopts the plain, statutory or dictionary meaning of terms and provides rebuttable presumptions and examples for additional clarity.

The rule's rebuttable presumptions are also not unconstitutionally vague; indeed, such presumptions are common in the law. Courts frequently rely on them because they provide an approach that is particularized to certain circumstances. The presumptions in this rule are specific and tailored to particular situations. The fact that they may be overcome by rebuttal evidence does not render them vague. Although the presumptions do not address all circumstances in which a person might be engaged in the business, they do take into account common fact patterns that have been found to be appropriate indicators.

While a bright line numerical approach might provide greater clarity, the Department has rejected such an approach for the reasons identified in Section IV.B.3 of this preamble, as well as in the NPRM. The Department has also chosen to use presumptions in this rule rather than another approach,[154] because these presumptions are consistent with the analytical framework long applied by the courts in determining whether a person has violated 18 U.S.C. 922(a)(1)(A) and 923(a) by engaging in the business of dealing in firearms without a license even under the pre-BSCA definition.

**f. Violates the Fifth Amendment— Unconstitutional Taking**

Comments Received

A few commenters opposed the rule as an unconstitutional taking under the Fifth Amendment. The primary concerns raised by these commenters were that, by requiring people who currently sell firearms without a license to acquire a license, the rule creates a backdoor registry, enabling the Government to identify what weapons, and how many, each person has, so that the Government can then enter private property without a warrant and seize them. One commenter spelled out the concern more fully, stating, "Moreover, the rights to self-defense and to keep and bear arms are, in no small measure, property rights. The Fifth Amendment's Takings Clause provides additional protection to these rights. This clause ensures that private property cannot be taken for public use without just compensation. Arms, as personal property acquired lawfully, fall under this protection. Therefore, any regulation that effectively deprives an individual of their arms, or the utility thereof, intersects with property rights and demands rigorous scrutiny under the Takings Clause."

Department Response

The Department disagrees that the proposed regulation constitutes a taking, and further disagrees that it results in a compensable taking. As an initial matter, no property is being taken. This rule does not require individuals who currently own firearms that they might sell or who might buy firearms in the future to surrender or destroy any personal property in order to engage in those activities. Further, even if they predominantly intend to earn a profit through repetitive purchases or resales, and thus must obtain a dealer license, they still do not have to surrender or

---

[154] For the reasons why the Department did not adopt a factor-based approach, see Section IV.C.3.

destroy any personal property to comply with this rule.

Furthermore, even where the application of Federal firearms laws results in the forfeiture of firearms, that is not a compensable taking. The Federal Circuit has recognized that, under Supreme Court precedent, there are certain exercises "of the police power that ha[ve] repeatedly been treated as legitimate even in the absence of compensation to the owners of the . . . property." *Acadia Tech. Inc.* v. *United States,* 458 F.3d 1327, 1332–33 (Fed. Cir. 2006). As the Supreme Court articulated the doctrine, "[a] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Mugler* v. *Kansas,* 123 U.S. 623, 668–69 (1887); *see Acadia Tech., Inc.,* 458 F.3d at 1333. The Federal Circuit and the Court of Federal Claims have also made clear that these principles apply with full force in analyzing the impact of firearms regulations. *See Mitchell Arms, Inc.* v. *United States,* 7 F.3d 212 (Fed. Cir. 1993); *Akins* v. *United States,* 82 Fed. Cl. 619 (2008).

Even if a takings analysis would be appropriate, a takings claim would likely be analyzed under *Penn Central Transportation Co.* v. *City of New York,* 438 U.S. 104, 124 (1978), and the result would be the same. Under *Penn Central,* a court considers: (1) the character of the Government's actions, (2) the property holder's investment-backed expectations, and (3) the economic impact on the property holder. *Id.*

No taking exists under the *Penn Central* test. A restriction "directed at the protection of public health and safety . . . is the type of regulation in which the private interest has traditionally been most confined and governments are given the greatest leeway to act without the need to compensate those affected by their actions." *Rose Acre Farms, Inc.* v. *United States,* 559 F.3d 1260, 1281 (Fed. Cir. 2009). A plaintiff's "reasonable investment-backed expectations are greatly reduced in a highly regulated field," *Branch* v. *United States,* 69 F.3d 1571, 1581 (Fed. Cir. 1995), such as the firearms industry. And as the Supreme Court has made clear, an owner of personal property "ought to be aware of the possibility that new regulation might even render his property economically worthless." *See Lucas* v. *South Carolina Coastal Council,* 505 U.S. 1003, 1027–28 (1992). At the same time, with respect to economic impact,

the Court has observed that even when a regulation "prevent[s] the most profitable use of [a person's] property," a "reduction in the value of property is not necessarily equated with a taking." *Andrus* v. *Allard,* 444 U.S. 51, 67 (1979); *see also Jacob Ruppert, Inc.* v. *Caffey,* 251 U.S. 264, 303 (1920) (upholding a Federal law banning nonintoxicating alcoholic beverages on the ground that "there was no appropriation of private property, but merely a lessening of value due to a permissible restriction imposed upon its use"). Therefore, even under a takings analysis, this rule does not constitute a taking under the Fifth Amendment.

The Department disagrees that the proposed rule will enable ATF to create a national firearms registry that can be used to seize firearms. Since Fiscal Year 1979, Congress has prohibited ATF from using any Federal funds to create a national gun registry. Treasury, Postal Service, and General Government Appropriations Act, 1979, Public Law 95–429, 92 Stat. 1001, 1002 (1978). ATF complies with that statutory prohibition, and this proposed rule does not change either the prohibition or ATF's compliance. Nor does the rule permit ATF to create a backdoor national firearms registry, and it is not doing so. Any records that licensed dealers are legally required to keep remain with the dealer as long as the business continues, and information from those records is requested only if a particular firearm becomes part of a criminal investigation by a law enforcement entity. *See* 18 U.S.C. 923(g). ATF does not keep or receive records until the licensee ceases operations. And, although ATF may receive some records from discontinued businesses, they are not searchable by name or other personally identifiable information. This rule does not change that.

g. Violates the Fifth Amendment—Equal Protection Clause

Comments Received

A few commenters claimed that the proposed rule violates what they characterize as the Fifth Amendment's Equal Protection Clause by enabling uneven application of the law; uneven enforcement; seizing personal property; and creating a chilling effect on owners, buyers, and sellers of firearms.

Department Response

The Department disagrees that the proposed rule violates the equal protection component of the Fifth Amendment's Due Process Clause. Under certain circumstances, the equal

protection component prohibits the Federal Government from treating similarly situated persons differently. *See Bolling* v. *Sharpe,* 347 U.S. 497, 498 (1954). However, like the Fourteenth Amendment Equal Protection Clause, the equal protection component of the Fifth Amendment "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer* v. *Evans,* 517 U.S. 620, 631 (1996). If a "classification 'impermissibly interferes with the exercise of a fundamental right or operates to the peculiar advantage of a suspect class,' [a court will] subject the classification to strict scrutiny. Otherwise, [courts] will uphold the classification if it is 'rationally related to a legitimate state interest.'" *Mance* v. *Sessions,* 896 F.3d 699, 711 (5th Cir. 2018) (footnote omitted) (quoting *Nat'l Rifle Ass'n* v. *ATF,* 700 F.3d 185, 211– 12 (5th Cir. 2012)). There is no fundamental right to be engaged in the business of dealing in firearms or in selling firearms without a license. *See Kazmende,* 2023 WL 3872209, at *5. Nor are firearms dealers a "suspect class," meaning a class that is "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U.S. 307, 313 (1976) (internal quotation marks omitted).

Rational basis review thus applies here. Rational basis review requires a "rational relationship" between the classification and "some legitimate governmental purpose." *See Heller* v. *Doe,* 509 U.S. 312, 320 (1993). Under rational basis review, a classification "is accorded a strong presumption of validity," *id.* at 319, and will be upheld if "there is some rational basis for the statutory distinctions made . . . or [those distinctions] have some relevance to the purpose for which the classification is made." *Lewis* v. *United States,* 445 U.S. 55, 65 (1980) (internal quotation marks omitted) (rejecting an equal protection challenge to a "firearm regulatory scheme" that prohibits a felon from possessing a firearm).

There is clearly a rational basis for requiring those engaged in the business of dealing in firearms to be licensed according to the classifications and other requirements set forth in this rule. The "principal purpose" of the GCA is "to curb crime by keeping firearms out of the hands of those not legally entitled to possess them." *Huddleston* v. *United States,* 415 U.S. 814, 824 (1974)

ATF 015318

APPX.039

(internal quotation marks omitted). As a result, "[c]ommerce in firearms is channeled through federally licensed importers, manufacturers, and dealers in an attempt to halt mail-order and interstate consumer traffic in these weapons." *Id.; see also United States* v. *Biswell,* 406 U.S. 311, 315 (1972) ("[C]lose scrutiny" of "interstate traffic in firearms" is "undeniably of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders"); *id.* at 315–16 ("Federal regulation" of the traffic in firearms "assures that weapons are distributed through regular channels and in a traceable manner"); *United States* v. *Hosford,* 82 F. Supp. 3d 660, 667 (D. Md. 2015) (prohibiting engaging in the business of firearms without a license "ensures that significant commercial traffic in firearms will be conducted only by parties licensed by the federal government" (internal quotation marks omitted)); *id.* ("Nor is the licensing requirement onerous."). As discussed throughout this preamble, the regulatory changes in this final rule are essential to implementing Congress's changes to the GCA and furthering the Government's interest in having people who are engaged in the business of selling firearms be licensed as FFLs.

h. Violates the Fifth Amendment—Due Process Clause

Comments Received

A few commenters claimed that the proposed rule violates the Fifth Amendment's Due Process Clause and the concept of "innocent until proven guilty" by creating rebuttable presumptions. The Due Process Clause states, "No person shall be . . . deprived of life, liberty, or property, without due process of law .............." U.S. Const. amend. V. Some of these commenters asserted that the presumptions reduce the scrutiny that would be required under the Due Process Clause before charging a person with a crime or removing their property, or cause a person to inadvertently commit a crime without knowing it would be seen that way under a presumption.

Others interpreted the presumptions as causing people to be presumed guilty, and then having to prove their innocence, thereby undermining the concept of "innocent until proven guilty." Two U.S. senators stated, "If the proposed rule goes into effect, innocent people will have to prove to the ATF that they are not firearms dealers when they, for example, try to resell firearms that are in the original packaging or

represent that they can sell additional firearms to their friends. These types of activities do not make someone a licensed firearms dealer. Nothing in current law, including as amended by the BSCA, empowers the ATF to shift the burden to an innocent person to prove that keeping a firearm in its original packaging or discussing the sale of firearms to friends or family makes him a licensed firearms dealer."

Other commenters asserted that the statutory provision saying that it is not necessary for the Government to prove intent to profit if the person was dealing in firearms for criminal purposes or terrorism runs contrary to the axiom that one is innocent until proven guilty and raises due process concerns under the Fifth Amendment. Others were concerned that the process of defending oneself during administrative processes to rebut a presumption would require people to set themselves up for self-incrimination during a subsequent criminal process. One commenter explained that using rebuttable presumptions shifts the burden of proof from the Government to the subject of the investigation, and runs counter to the Fifth Amendment, which they explained precludes using "forced testimony" against a person in a criminal trial unless waived. The commenter argued that if an accusation that a person is engaged in the business of dealing in firearms without a license is based upon a rebuttable presumption, then the person is unfairly and unconstitutionally placed in legal jeopardy. The person will lose the civil or administrative action against them, the commenter said, if they do not present facts to rebut the presumption, but then the information shared with the Government will be available for use against them in a criminal case. (The commenter cited *Allen* v. *Illinois,* 478 U.S. 364 (1986), *Minnesota* v. *Murphy,* 465 U.S. 420, 435 & n.7 (1984), and other cases.) In other words, the commenter added, the person is penalized for not responding to the inquiry or allegation based upon a presumption. (The commenter cited *Marchetti* v. *United States,* 390 U.S. 39 (1968).)

Department Response

The Department disagrees that the rebuttable presumptions in this rule violate the Due Process Clause of the Fifth Amendment. First, the rebuttable presumptions apply only to shift the burden of production, not the burden of persuasion. Although the presumptions expressly do not apply in criminal proceedings, even in that context, presumptions that shift only the burden

of production do not violate due process. *See Ruan* v. *United States,* 597 U.S. 450, 463–64 (2022). Second, "[t]he law is well established" that presumptions shifting the burden of production "may be established by administrative agencies, as long as there is a rational nexus between the proven facts and the presumed facts." *Cablevision Sys. Corp.* v. *F.C.C.,* 649 F.3d 695, 716 (D.C. Cir. 2011); *see also Cole* v. *U.S. Dep't of Agric.,* 33 F.3d 1263, 1267 (11th Cir. 1994); *Atchison, Topeka & Santa Fe R.R.* v. *Interstate Com. Comm'n,* 580 F.2d 623, 629 (D.C. Cir. 1978). The BSCA broadened the scope of persons who are required to be licensed under the GCA, and the implementing presumptions in this rule are necessary to provide persons with a greater understanding as to who is likely to be "engaged in the business" as a "dealer" under that new standard. The presumptions are narrowly tailored and based on specific firearms purchase and sale activities to effectuate that purpose. As a result, there is a rational connection between the facts to be proven—for example, frequent and multiple purchases and resales, accepting credit cards as a method of payment, advertising, etc.—and the presumed facts—being engaged in the business or having the requisite intent to profit. *See USX Corp.* v. *Barnhart,* 395 F.3d 161, 172 (3d Cir. 2004) (finding agency's "rebuttable presumption [was] entirely reasonable" and noting that the "presumption is rebuttable and therefore avoids problematic mechanical operation").

Contrary to commenters' assertions, the rebuttable presumptions in this rule, even when applied in a civil or administrative proceeding, do not alleviate the burden of persuasion on the Government to prove that a person is willfully engaged in the business without a license under the applicable evidentiary standard. They neither limit nor prescribe the manner in which a party can rebut such a presumption. Agencies may adopt evidentiary presumptions provided that the presumptions shift the burden of production, not the burden of persuasion (also sometimes referred to as the burden of proof). *Cablevision,* 649 F.3d at 716.[155] That is the case here. Because the rebuttable presumptions are merely evidentiary tools to assist the trier of fact in determining whether the Government has met its burden of production in a given proceeding and

---

[155] *See also Chem. Mfrs. Ass'n.* v. *Dep't of Transp.,* 105 F.3d 702, 706 (D.C. Cir. 2007); *U.S. Steel Corp.* v. *Astrue,* 495 F.3d 1272, 1284 (11th Cir. 2007) (internal quotation marks omitted)).

do not shift the burden of persuasion, this rule does not violate due process.[156] In the NPRM, the Department stated that a person "shall not be presumed to be engaged in the business of dealing in firearms" when the person engaged in certain types of conduct (*e.g.,* clearly a person is not presumed to be engaged in the business when that person's conduct is limited to activity the statute specifically excludes). However, to alleviate commenter concerns, the regulatory text of this final rule now makes clear that evidence of such conduct may also be presented as rebuttal evidence (*e.g.,* gifts, certain occasional sales, etc.), and further makes clear that additional types of reliable rebuttal evidence could be offered beyond those examples.

The Department acknowledges the commenters' concerns about the possibility of self-incrimination if they provide rebuttal evidence in an administrative or civil proceeding that could be used against them in a criminal proceeding. The Fifth Amendment privilege against compulsory self-incrimination, however, can be asserted "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory," and it "protects against disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar* v. *United States,* 406 U.S. 441, 444–45 (1972). The Fifth Amendment's protection against self-incrimination not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution, but it also affords protection against having compelled responses provided in civil or administrative proceedings used against him in a later criminal prosecution. *Lefkowitz* v. *Turley,* 414 U.S. 70, 77 (1973). Moreover, it is not uncommon for individuals to have to balance the implications of providing testimony in a civil or administrative case against the potential that such testimony may be used in a future criminal proceeding. For instance, this circumstance can occur whenever a statute has criminal, civil, and administrative implications.

[156] *See Ruan* v. *United States,* 597 U.S. 450, 463–64 (2022) (Statute providing "a presumptive device, akin to others we have recognized in a criminal context, which merely shift[s] the burden of production to the defendant, following the satisfaction of which the ultimate burden of persuasion returns to the prosecution" did not violate due process); *Alabama By-Products Corp.* v. *Killingsworth,* 733 F.2d 1511, 1517 (11th Cir. 1984) (regulatory presumption under 20 CFR 727.203(a)(1) that miner is disabled with an X-ray showing of pneumoconiosis did not violate due process).

*See, e.g.,* 15 U.S.C. 1825(a), (b) (civil and criminal penalties for violations relating to sales or exhibitions of horses that are sore); 18 U.S.C. 670(c), (d) (civil and criminal penalties for theft of medical products); 22 U.S.C. 2778(c), (e) (civil and criminal penalties for unlawful exportation of defense articles); 30 U.S.C. 820(a), (b), (d) (civil and criminal penalties for violations of mine health and safety standards); and 33 U.S.C. 533(a), (b) (civil and criminal penalties for failing to comply with lawful orders of the Coast Guard).

The statutory definition of "terrorism" existed in the GCA's definition of "principal objective of livelihood and profit" before the BSCA was passed, *see* 18 U.S.C. 921(a)(22) (2020), and remains there verbatim. The BSCA added that same definition to the new definition of "to predominantly earn a profit" in the GCA, as well. This rule merely: (1) moves that definition within the regulations to be a standalone definition so that it applies to both the term "predominantly earn a profit" and "principal objective of livelihood and profit" without repeating it in two places; and (2) makes a minor revision to identify the provisions to which the definition applies. This rule does not further interpret or define that term, and comments in that regard are beyond the scope of the rule.

### i. Violates the Tenth Amendment

#### Comments Received

Some commenters opposed the proposed rule on the grounds that it violates the Tenth Amendment, which provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Some of these commenters referred to the rule as a violation of the separation of powers or federalism. The majority of these commenters stated that the rule "will override the authority of the states with overburdensome federal regulations and strip state's rights." One commenter suggested that this rule will "intrud[e] [upon] states' responsibilities." Several commenters stated that the power to regulate commerce in firearms is not a power delegated to the Federal Government. Others stated that, although the Federal Government has the power to regulate interstate commerce in firearms, it has not been delegated authority to regulate commerce between people within a given state, or in intrastate commerce. One commenter stated that, "as long as the transaction doesn't cross state lines, it cannot be regulated by the Federal

government." A couple of commenters cited *McDonald* v. *City of Chicago,* 561 U.S. 742 (2010), for the proposition that each state has its own body of laws that reflect its unique needs, culture, and opinions of its residents, and has the autonomy to tailor public safety measures to these unique situations. These commenters stated that the proposed rule disregards this principle.

#### Department Response

The Department disagrees that the rule violates the Tenth Amendment. Commenters seemingly argued that the powers exercised by the Department in issuing the rule were "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X. However, if Congress has acted within its power under the Commerce Clause, "the Tenth Amendment expressly disclaims any reservation of that power to the States." *See New York* v. *United States,* 505 U.S. 144, 156 (1992). Simply put, a valid exercise of Congress' power is not a violation of the Tenth Amendment. Multiple courts have repeatedly and consistently upheld the GCA as a valid exercise of Congress' Commerce Clause power, *see, e.g., United States* v. *Hosford,* 843 F.3d 161, 163 (4th Cir. 2016); *United States* v. *Rose,* 522 F.3d 710, 716–19 (6th Cir. 2008); *Navegar, Inc.* v. *United States,* 192 F.3d 1050, 1054–1065 (D.C. Cir. 1999), and rejected challenges to the statute on Tenth Amendment grounds, *see, e.g., Bezet* v. *United States,* 714 F. App'x 336, 342–43 (5th Cir. 2017) ("[E]ach provision [of the GCA] that Bezet has standing to challenge was validly enacted under the commerce power or the taxing power. Therefore, the district court was correct to reject Bezet's claims under the Tenth Amendment.").

As for commenters who argued Congress does not have authority to regulate any intrastate firearms transactions, regardless of its connection to interstate commerce, Congress may "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales* v. *Raich,* 545 U.S. 1, 17 (2005). *Raich* held that one situation in which "Congress can regulate purely intrastate activity" even if that activity is not itself commercial, is "if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.* at 18. When there is a "comprehensive framework for regulating the production, distribution, and possession" of a commodity, the fact that the regulatory scheme

"ensnares some purely intrastate activity is of no moment." *Id.* at 22, 24. This analysis has been specifically applied to firearms. *See Montana Shooting Sports Ass'n* v. *Holder,* No. CV–09–147, 2010 WL 3926029, at *17 (D. Mont. Aug. 31, 2010) ("As *Raich* instructs, the fact that Federal firearms laws 'ensnare some purely intrastate activity,' such as . . . manufacturing and sales activity . . . , 'is of no moment.' Under *Raich,* the National Firearms Act and Gun Control Act constitute a valid exercise of federal commerce power, even as applied to the purely intrastate manufacture and sale of firearms............ ") (quoting *Raich,* 545 U.S. at 22), *aff'd,* 727 F.3d 975 (9th Cir. 2013); *see also United States* v. *Stewart,* 451 F.3d 1071, 1078 (9th Cir. 2006); *Hollis* v. *Lynch,* 121 F. Supp. 3d 617, 640 (N.D. Tex. 2015) (citing *Raich,* 545 U.S. at 22), *aff'd,* 827 F.3d 436 (5th Cir. 2016); *Rose,* 522 F.3d at 717–18.

j. Violates Other Constitutional Provisions

Comments Received

A small number of commenters stated that the NPRM violates the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments; the Ninth Amendment (which states, "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people," U.S. Const. amend. IX); and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. These commenters did not explain how they thought the proposed rule violated these constitutional provisions. One commenter stated that the proposed rule constitutes restricted zoning that is and is therefore unconstitutional. Numerous other commenters stated that the NPRM is unconstitutional and deprives people of their rights, but did not provide detailed arguments, although some of these commenters based their statement on a belief that the rule requires anyone who sells a firearm to be licensed as a dealer or that it creates a universal background check. Several commenters stated that the Constitution does not grant the Federal Government, including Congress, the authority to regulate firearms or the trade in firearms, and any law or regulation that does so is unconstitutional. Some of these commenters specifically stated that the BSCA, and even the NFA and GCA, are unconstitutional laws.

Department Response

The Department disagrees that the proposed rule violates the Eighth Amendment's protection against excessive fines and cruel and unusual punishments. Criminal and civil penalties, including forfeiture, can be considered fines under the Eighth Amendment if they are punishments for an offense and, thus, must not be excessive. *Austin* v. *United States,* 509 U.S. 602, 619 (1993); *Disc. Inn, Inc.* v. *City of Chicago,* 72 F. Supp. 3d 930, 934 (N.D. Ill. 2014), *aff'd,* 803 F.3d 317 (7th Cir. 2015). Under the Eighth Amendment, a "fine" is "excessive" if it is "grossly disproportional to the gravity of [the] offense." *United States* v. *Bajakajian,* 524 U.S. 321, 334 (1998). Here, the penalties for dealing firearms without a license are up to five years' imprisonment, a $250,000 fine, or both. *See* 18 U.S.C. 922(a)(1)(A), 923(a), 924(a)(1)(D), 3571(b)(3). The GCA does not require a minimum penalty, and the penalty in any particular case will vary according to circumstances, so the Department disagrees that the penalties associated with unlawfully dealing in firearms (which could be very low or none) are facially "excessive." The Department may also seek forfeiture of the property involved in criminal activity. Courts have repeatedly found on a case-by-case basis that these are not excessive penalties, *see, e.g., United States* v. *Approximately 627 Firearms, More or Less,* 589 F. Supp. 2d 1129, 1135–37 (S.D. Iowa 2008), and the proposed rule does not increase the penalties for noncompliance with the GCA, which are set by statute.[157]

The Department also disagrees that the rule violates the commenters' rights under the Ninth Amendment. The BSCA amendments to the statutory definition of "engaged in the business" and this rule implementing those amendments constitute only a modest congressional expansion of the previous FFL licensing requirements, and do not infringe upon any constitutional rights. The commenters discussed an implied right to self-defense and a right to "transfer nonliving personal property without government hindrance or supervision." This rule does not prevent any individuals from exercising self-defense, and no court has ever recognized a categorical right to transfer personal property free of government regulation. The Ninth Amendment "does not confer substantive rights in addition to those conferred by other

portions of our governing law." *Gibson* v. *Matthews,* 926 F.2d 532, 537 (6th Cir. 1991).

It is unclear how the commenters believe that the rule would violate the Equal Protection or Due Process Clauses of the Fourteenth Amendment. First, the Fourteenth Amendment applies to the States and State actors, not Federal agencies. *See Shell* v. *United States Dep't of Housing & Urban Dev.,* 355 Fed. App'x 300, 307 (11th Cir. 2009). Second, the rule, like the statute, applies to all persons and does not burden one suspect class or group of people more than others. Instead, the rule helps to identify persons who are engaged in the business of dealing in firearms or have the predominant intent to earn a profit through certain firearms purchase and resale activities. Nor is the Government engaging in intentional disparate treatment of a suspect class or group of people regarding a fundamental right. This final rule has also complied with the requirements of the APA, including public notice and comment, of which the commenters availed themselves during the proposed rule stage. *See* 5 U.S.C. 553. With respect to a rulemaking of general and prospective applicability, the Due Process Clause does not require additional procedural safeguards. *See Bi-Metallic Inv. Co.* v. *State Bd. of Equalization,* 239 U.S. 441, 445 (1915); *see also General Category Scallop Fishermen* v. *Sec'y of U.S. Dep't of Commerce,* 720 F. Supp. 2d 564, 576 (D.N.J. 2010) (explaining that publication in the **Federal Register** satisfies notice requirements under the Due Process Clause).

The Department disagrees that this rule amounts to restricted zoning and is therefore unconstitutional. The commenter seems to suggest that because the BSCA and this rule will result in more firearms sellers being deemed to be "engaged in the business" within the meaning of 18 U.S.C. 921, those sellers will no longer be permitted to make firearms sales from their homes and will instead have to comply with State and local commercial zoning laws. However, State and local governments determine zoning classes and requirements pursuant to their police powers. *Carter* v. *City of Salina,* 773 F.2d 251, 254 (10th Cir. 1985) ("It is the general rule that zoning ordinances are in derogation of common-law property rights and find their authority through the state police power."). Nothing in this rule purports to alter State and local zoning laws or dictate how those laws should treat firearms sellers who are "engaged in the business" of dealing in firearms under Federal law. Nor does the commenter point to any particular

---

[157] To the extent commenters argue that the fees required to be a Federal firearms licensee violate the Eighth Amendment, they are (1) not a fine, and (2) not excessive.

zoning restrictions that might apply to an individual firearms seller who would be "engaged in the business" of dealing in firearms under this rule. At bottom, this rule does not create additional zoning restrictions. Such restrictions, if they exist at all, are created and managed on the State, local, and Tribal levels.

9. Statutory Authority Concerns

a. Lack of Delegated Authority To Promulgate the Rule

Comments Received

A majority of the commenters opposed to the rule argued that ATF is exceeding its authority by promulgating the rule, and that it is the job of Congress to change the laws and the job of Federal agencies to enforce them. A majority of these commenters stated that they considered the proposed regulation to be a method of changing the law without passing new legislation and stated that Congress has given ATF no additional authority to "re-define" "details" in the law. One commenter stated that "No federal agency has the right to interpret laws, amendments, or constitutions. That's what [C]ongress is for." A few others made similar statements. Other commenters stated that the NPRM is an executive order or a law itself, and ATF has no authority to change law via an executive order or by issuing new laws.

One commenter, instead of saying that ATF has no authority to promulgate regulations, stated that ATF has no authority to "devise its own definitions." They further argued that the only exception to this is the term "collector," because the statute specifically delegates authority to the Attorney General to further define that term. The commenter concluded that when Congress includes explicit authorization to define one term, it negates any implied regulatory power to expand definitions for other terms, quoting the *expressio unius est exclusio alterius* principle described in *Bittmer* v. *United States,* 598 U.S. 85, 94 (2023). A second commenter, in a similar but narrower vein, pointed to the "specific definitions provided by Congress for both 'engaged in the business' and 'predominantly earn a profit.' " These definitions, the commenter argued, "should entirely foreclose any attempt by ATF to redefine those terms." The commenter quoted *Royce* v. *Hahn,* 151 F.3d 116, 123 (3d Cir. 1998), for the proposition that "[s]uch an explicit reference to a statutory definition demonstrates a Congressional intent to forestall interpretation of the term by an

administrative agency and acts as a limitation on the agency's authority."

Some commenters stated that the proposed definition of "engaged in the business" is contrary to or an overreach of the BSCA or the FOPA. One commenter asked "[w]here in the text of the FOPA does the ATF believe Congress expressly grants it the authority to redefine 'engaged in the business' as Congress has clearly defined it through several amendments made to the FOPA by Congressional legislative action?" Another commenter, citing 18 U.S.C. 926(a) and section 106 of FOPA, 100 Stat. at 459, stated that the FOPA reduced ATF's regulatory authority under the GCA by changing the original phrase " 'such rules and regulations as he deems reasonably necessary' " to " 'only such rules and regulations as are necessary.' " The commenter asserted that this change means that ATF has the authority to enact only regulations that are "necessary [for enforcement of the Act] as a matter of fact, not merely reasonably necessary as a matter of judgment." Another commenter, characterizing the BSCA, stated that "[t]he essence of the change was simply that illegal firearm sales need not amount to a person's 'livelihood' for that activity to be criminally actionable. It was never intended to give the administration a blank check to comprehensively rewrite settled law or understandings about private firearms sales for lawful purposes or for the enhancement or liquidation of personal firearm collections." One commenter cited the legislative record for the GCA, contending that Congress declined to adopt a provision that would have made it a crime to violate any regulation promulgated pursuant to the GCA due to asserted concerns that the provision would delegate to ATF the authority to determine what constitutes a crime. The commenter concluded that the proposed rule "would do exactly what Congress rejected when it enacted the GCA in 1968. It would redefine and expand GCA definitions, with the consequence that unlawful acts would be expanded by regulation. ATF has no such authority."

A few commenters argued that the regulation exceeds ATF's authority because it criminalizes behavior or deprives people of something. As a result, these commenters assert that the alleged penal provisions must be clearly stated in the statute itself. One commenter stated that the regulation, "with a stroke of a pen creates violations that may lead to fines, confiscation of assets and possibly jail time." Another added that, because the

proposed rule involves criminal penalties, it must "not criminalize any action that is either not clearly prohibited by the law or that is specifically prohibited by the law." "Removing rights," added another commenter, "should be a matter take[n] up before the full body of Congress and U.S. Citizens, not an un-elected group of individuals." An additional commenter couched the issue in terms of deference, citing cases like *United States* v. *Apel,* 571 U.S. 359, 369 (2014), for the proposition that because the GCA is a criminal statute, ATF's reading is not entitled to any deference.

Department Response

As an initial matter, the Department disagrees that this rule "comprehensively rewrite[s]" or otherwise alters "settled law" in a manner inconsistent with Congress's enactments. Most recently, Congress passed the BSCA in 2022, and this rule implements the GCA, as amended by the BSCA. The Department and ATF have the legal authority to promulgate regulations and rules that are necessary to implement, administer, and enforce the GCA, as amended by the FOPA and the BSCA, including its definition of "engaged in the business" as a dealer. *See* 18 U.S.C. 926(a); 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)–(2); Treas. Order No. 221(1), (2)(d), 37 FR 11696–97 (June 10, 1972). This rule—which updates ATF's regulations in accordance with the BSCA's new statutory definition of when a person is considered to be "engaged in the business" and makes other related changes—is a valid exercise of that statutory authority. *See Nat'l Rifle Ass'n* v. *Brady,* 914 F.2d 475, 479 (4th Cir. 1990) ("Because § 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.' ")

The rule is also consistent with ATF's historical experience implementing the GCA. In the original GCA implementing regulations in 1968, ATF's predecessor agency provided regulatory definitions of terms that Congress did not define in the statute. 33 FR 18555 (Dec. 14, 1968). Since that time, ATF has promulgated additional regulatory definitions to the GCA, including FOPA and the Brady Act. *See, e.g.,* Commerce in Firearms and Ammunition, 53 FR 10480 (Mar. 31, 1988) (providing definitions for, among other terms, "dealer" and "engaged in the business"); Definitions for the Categories of Persons Prohibited from Receiving Firearms, 62 FR 34634 (June

ATF 015322

APPX.043

27, 1997). Now that Congress has passed further legislation to amend the statutory definition of certain terms, it is logical and appropriate for ATF—consistent with its statutory authority and experience in administering the relevant statutory provisions—to review existing rules and promulgate new ones if necessary to properly implement that statutory change.

This rule is necessary to assist people, such as unlicensed persons seeking to comply with the law and fact finders in certain proceedings, to determine when firearms sellers are required to be licensed as wholesale or retail dealers under the expanded statutory definition of "engaged in the business," and for ATF to effectively regulate the firearms industry. Indeed, numerous commenters stated that because the BSCA redefined "engaged in the business" to focus on a person's intent "to predominantly earn a profit," regulatory updates were necessary to clarify when a license was needed and how ATF would consider and enforce certain aspects of firearms and sales that are relevant to the intent-to-profit analysis in the current marketplace.[158]

The Department also disagrees with commenters that the rule or its presumptions are inconsistent with the text or legislative history of FOPA,[159] or with the structure of the GCA. The GCA includes delegations of rulemaking authority that are both general and specific,[160] and its express grants of

statutory authority to define particular terms do not negate the broader authority that Congress has granted to the Department to issue regulations that define additional statutory terms as necessary to carry out the GCA. Indeed, as congressional commenters have noted, the GCA as amended by FOPA and the BSCA authorizes the Department to utilize its expertise gained from decades of enforcement experience to further define terms or to issue other rules that are necessary to implement the GCA. In light of that delegation, the fact that Congress generally defined the term "engaged in the business" does not mean that the Department lacks the authority to further define that term.[161] In enacting the BSCA, Congress found it necessary to broaden the term "engaged in the business," but did not provide guidance on how to apply that new definition to specific firearms transaction activities. This rule provides that necessary clarification in accordance with the Department's delegated authority.

The Department disagrees that the rule criminalizes behavior or imposes criminal penalties. Congress long ago both enacted the statutory requirement that persons who engage in the business of dealing in firearms must obtain a license and imposed criminal penalties for noncompliance with that statutory requirement. This rule, on the other hand, merely implements Congress's latest amendment to the definition of "engaged in the business." Nothing in the rule criminalizes behavior or prohibits persons from engaging in the business of dealing in firearms; it merely implements the statutory requirement, as amended by the BSCA, that requires persons to become licensed if they wish to engage in that business.

**b. Lack of Authority To Promulgate Presumptions**

*Comments Received*

In addition to the concerns raised under Section IV.B.8.g of this preamble about the efficacy of the rule given that

the presumptions will not be required in any criminal proceeding, several commenters argued that creating such presumptions is unlawful and problematic. Some commenters argued that nowhere in the rule did the Department cite any authority authorizing it to adopt or create presumptions applicable to statutory terms. Another commenter stated that "ATF's recently proposed rule now aims to create several presumptions when a person is 'engaged in the business,' despite the [BSCA] definition that contains no such presumptions. It is clearly not the intent of Congress to include those presumptions in this proposed rule." A third commenter objected on the grounds that "many of [the presumptions] concern common and entirely innocent conduct related to firearms transactions."

Additionally, at least one commenter stated that the legislative history of the GCA clearly demonstrates that ATF cannot make the violation of a regulation a crime. As originally proposed, the commenter stated, the bill that became the GCA provided, "[w]hoever violates any provision of this chapter *or any rule or regulation promulgated thereunder* . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both." Prior to passage, however, Congress deleted the provision making it an offense to violate "any rule or regulation promulgated thereunder." 114 Cong. Rec. 14,792, 14,793 (1968). The commenter concluded that, with the redefined and expanded GCA definitions in the proposed rule, unlawful acts would be expanded by regulation, which is contrary to the fact that all GCA offenses are defined in terms of violations of "this chapter" of the statute.

Moreover, commenters asserted, as a practical matter, that even with the disclaimer that the presumptions are only required in administrative and civil proceedings, it does not change the fact that 18 U.S.C. 924(a)(1)(D), which makes it a criminal act to engage in the business of dealing in firearms without a license, exists and carries prison time and high fines. One commenter questioned how ATF could say it would not use the presumptions in a criminal case if the agency intends for courts to be in a position to rely on the presumptions to create permissive inferences in jury instructions. Another commenter stated that the Department did not adequately explain how any presumption would be "useful" or in any way appropriate to a criminal proceeding, whether considered by the judge or jury, and that there is no

[158] *See, e.g.,* ATF–2023–0002–319816 (Dec. 7, 2023); ATF–2023–0002–362368 (Dec. 6, 2023); ATF–2023–0002–317174 (Dec. 5, 2023); ATF–2023–0002–281792 (Nov. 29, 2023); ATF–2023–0002–333284 (Nov. 26, 2023); ATF–2023–0002–262638 (Nov. 2, 2023); ATF–2023–0002–246750 (Oct. 25, 2023); ATF–2023–0002–171793 (Oct. 18, 2023); ATF–2023–0002–218598 (Oct. 17, 2023); ATF–2023–0002–84981 (Oct. 5, 2023); ATF–2023–0002–65889 (Sep. 19, 2023); ATF–2023–0002–43184 (Sep. 14, 2023); ATF–2023–0002–0538 (Sep. 10, 2023).

[159] The Fourth Circuit has explained that the FOPA amendments did not change ATF's authority to promulgate regulations necessary to implement the GCA. *See Nat'l Rifle Ass'n,* 914 F.2d at 478–79 (rejecting argument that FOPA requires courts to "strike down [ATF] regulations if we do not find them strictly necessary and the least restrictive means of accomplishing the purposes of the [GCA]").

[160] *Compare, e.g.,* 18 U.S.C. 926(a) ("The Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter................"); H.R. Rep. No. 90–1577, at 18 (1968) ("Section 926. Rules and regulations. This section grants rulemaking authority to the Secretary . . . ."); S. Rep. No. 90–1501, at 39 (1968) (similar), *with, e.g.,* 18 U.S.C. 921(a)(13) ("The term 'collector' means any person who acquires, holds, or disposes of firearms as curios or relics, as the Attorney General shall by regulation define ................."); *id.* 923(g)(1)(A) ("Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney

General may by regulations prescribe."); *id.* 923(g)(2) ("Each licensed collector shall maintain in a bound volume the nature of which the Attorney General may by regulations prescribe, records of the receipt, sale, or other disposition of firearms."); *id.* 923(i) ("Licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer.").

[161] *See, e.g., Guedes* v. *ATF,* 45 F.4th 306, 314–19 (D.C. Cir. 2022) (upholding ATF regulation interpreting the statutory term "machine gun"); *cf. Nat'l Rifle Ass'n,* 914 F.2d at 480–81 (ATF had the legal authority to define the statutory terms "business premises" and "gun show or event").

explanation as to how these presumptions become permissive inferences.

At least one commenter pointed out that jury instructions are written based on statutory language and applicable judicial decisions that interpret the law. As the GCA is a criminal statute, the commenter stated, ATF cannot expand it, and because the GCA definitions are the same in criminal and civil contexts, ATF cannot have rebuttable presumptions regarding the definitions that are different in a civil or administrative context. According to another commenter, this would violate the "chameleon cannon" in which courts have said statutory terms "are not chameleons, acquiring different meanings when presented in different contexts." *Maryland* v. *EPA,* 958 F.3d 1185, 1202 (D.C. Cir. 2020); *see also Clark* v. *Martinez,* 543 U.S. 371, 382 (2005) (similar). Other commenters similarly cited *Leocal* v. *Ashcroft,* 543 U.S. 1 (2004), for the proposition that ATF is legally prohibited from employing a rebuttable presumption of liability in noncriminal proceedings that does not apply in the criminal context. Commenters pointed out that in *Leocal,* the Supreme Court stated that a statute with "both criminal and noncriminal applications" must be interpreted "consistently, whether [courts] encounter its application in a criminal or noncriminal context." *Id.* at 11–12 n.8. Commenters also argued that an agency involved in the prosecution of a case does not get to tell the judge how to draft the jury instructions.

Additionally, commenters argued that the Department's use of presumptions in the civil and administrative context, but not the criminal context, runs afoul of the rule of lenity and is contrary to existing case law, specifically the Supreme Court's holding in *United States* v. *Thompson/Center Arms Co.,* 504 U.S. 505 (1992). In *Thompson/ Center Arms,* commenters stated that the Court rejected ATF's interpretation of the application of a certain definition in the NFA. The Court concluded that "although it is a tax statute that we construe now in a civil setting, the NFA has criminal applications that carry no additional requirement of willfulness . . . . It is proper, therefore, to apply the rule of lenity and resolve the ambiguity in Thompson/Center's favor." *Id.* at 517–18. Commenters therefore argued that the Department's claim that the rebuttable presumptions are applicable to civil and administrative proceedings, but not criminal ones, is also impermissible.

Commenters also disagreed with the Department's characterization of case law in which the Department described that courts have relied on ATF's regulatory definition to decide whether the defendant was an "unlawful user of or addicted to any controlled substance" under the GCA. Specifically, commenters stated that in the cases cited in footnote 60 of the NPRM, 88 FR 62000, the courts relied on ATF's regulation because there was no applicable statutory definition, unlike the terms that are the subject of this rulemaking. Another commenter argued that none of the cases cited by the Department support the use of presumptions in an "engaged in the business" analysis in which a single data point would suffice to satisfy what is inherently a multifactor test. The commenter argued that an appropriate and relevant jury instruction would be for the jury to consider all the facts. In this sense, the commenter added, at most the NPRM could have: "(i) provided a list (as numerous courts have provided in their opinions) of various types of factors that can legitimately play into an 'engaged in the business' determination; (ii) noted that such conduct involves a tremendous amount of gray area that cannot be resolved by unyielding regulation; and (iii) concluded that each case is to be decided on its own unique facts and circumstances." Lastly, at least one opposing commenter noted that the Department was also incorrect in referring to forfeitures as a civil or administrative proceeding for which the presumptions could be raised because, the commenter said, forfeitures require a showing of intent by "clear and convincing evidence" under 18 U.S.C. 924(d)(1), not a presumed violation. Focusing on forfeiture, another commenter stated that "[f]orfeitures may occur in civil, administrative, or criminal proceedings. ATF's proposed 'rebuttable presumptions,' in addition to being unauthorized by law, are particularly negated by the . . . requirement of clear and convincing evidence in § 922(a)(1) cases involving forfeiture."

In contrast to the commenters opposed to the presumptions as a matter of law, one commenter in support of the rule suggested including the "predominantly earn a profit" presumptions under the EIB presumptions, rather than having them as separate sets of presumptions. The reason for this suggestion is that each of the proposed presumptions under "predominantly earn a profit" also demonstrates other elements of the statutory definition. For example, a person who purchases or secures

physical space to display firearms not only demonstrates profit motive but also establishes that the seller "devotes time, attention, and labor to dealing with firearms," therefore satisfying all elements of BSCA's revised statutory definition of "engaged in the business" as a dealer in firearms. Another commenter in support stated that in the final rule, "ATF should consider clarifying that the conduct described in the list of rebuttable presumptions, while not creating presumptions in criminal prosecutions, may nonetheless be relevant and important when ATF prioritizes what conduct it focuses on when conducting criminal investigations."

*Department Response*

The Department disagrees that it lacks the legal authority to promulgate rebuttable presumptions in ATF regulations. As discussed above, the Attorney General and ATF have the authority and responsibility to promulgate regulations necessary to enforce the provisions of the GCA, and a regulation that clarifies when a license is required is such a regulation. *See* 18 U.S.C. 926(a); *see also* H.R. Rep. No. 90–1577, at 18 (1968); S. Rep. No. 90–1501, at 39 (1968). Because the BSCA broadened the scope of persons who are required to be licensed under the GCA, this rule, including its presumptions, are necessary to implement the BSCA and provide persons with a greater understanding of who is likely to be "engaged in the business" as a "dealer" under that new standard. *See Nat'l Rifle Ass'n,* 914 F.2d at 479 ("Because § 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.' ").

Further, "[t]he law is well established that presumptions may be established by administrative agencies, as long as there is a rational nexus between the proven facts and the presumed facts." *Cole,* 33 F.3d at 1267.[162] The

---

[162] *See, e.g.,* 88 FR 31314, 31450 (May 16, 2023) (Department of Homeland Security ("DHS") rule establishing rebuttable presumption that certain noncitizens are ineligible for asylum); 87 FR 65904, 66069 (Nov. 1, 2022) (Department of Education rule establishing rebuttable presumption that when a higher education institution closes and causes detriment to student loan borrowers, student loan borrowers who suffered that detriment are entitled to relief from loan repayment); 81 FR 34243, 34258 (May 31, 2016) (Small Business Administration ("SBA") rule establishing rebuttable presumption of affiliation based on an identity of interest); 8 CFR 208.13(b) (DHS regulations creating rebuttable presumption that past persecution of refugee establishes well-founded fear of future persecution); 12 CFR 225.32 (Federal Reserve Board regulations

ATF 015324

presumptions that the Department has chosen to promulgate are derived from ATF's extensive regulatory, enforcement, and investigative experience, and they are based on common firearms purchase and sales activities by dealers engaged in the business. As the Department has explained, each of the presumptions describes conduct that, in its experience, indicates that an individual is likely to be engaged in the business of firearms dealing (or, as applicable, acting with a predominant intent to profit). For example, persons who engage in frequent and multiple purchases and resales, accept credit cards as a method of payment, advertise, etc. are likely to be engaged in the business or have the requisite intent to profit. *See also, e.g.,* 88 FR 61999–62003 (NPRM setting forth the rationale underlying each presumption). Accordingly, there is a rational connection between the facts to be proven and the presumed facts. *See Cablevision Systems Corp.* v. *FCC,* 649 F.3d 695, 716 (D.C. Cir. 2011) (noting that a court must "defer to the agency's judgment" and uphold an evidentiary presumption so long as "there is a sound and rational connection between the proved and inferred facts, and when proof of one fact renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of [the inferred] fact . . . until the adversary disproves it" (citation omitted)). The Department's determination that presumptions are necessary to carry out the GCA here is also informed by its experience in other regulatory contexts where the agency has incorporated presumptions and found them to promote a common understanding of, and consistent compliance with, the laws it implements.[163]

The Department acknowledges, as commenters noted, that failure to comply with the licensing requirement can have criminal implications. It is unlawful under 18 U.S.C. 922(a)(1)(A), 923(a), and 924(a)(1)(D) for any person to willfully engage in the business of dealing in firearms without a license. However, the Department disagrees with commenters' assertions about how the rule would apply in a criminal context. First, the presumptions in the regulatory text do not apply to criminal proceedings. Instead, persons seeking to comply with the licensing requirement should take them into account in determining whether they must obtain a license, and they apply in civil and administrative proceedings. This includes license denial or revocation proceedings for willful violations "of this chapter or regulations issued thereunder," *see* 18 U.S.C. 923(d)(1)(C), 923(e), and civil/administrative asset forfeiture proceedings based on "willful violation of any other provision of this chapter or any rule or regulation promulgated thereunder," *see id.* 924(d)(1).

The Department also disagrees with the commenters' assertion that the rebuttable presumptions are contrary to the clear and convincing evidence standard for forfeiture in "intended to be used" violations of 18 U.S.C. 922(a)(1). Section 924(d)(1) provides for seizure and forfeiture of firearms and ammunition involved in the commission of several specified crimes. The statute also authorizes the forfeiture of any firearm and ammunition intended to be used in the commission of offenses set forth in 18 U.S.C. 924(d)(3)—which includes the prohibition against unlicensed dealing in 18 U.S.C. 922(a)(1). When a civil forfeiture action is based on the offenses in 18 U.S.C. 924(d)(3)(C), the Government is required to establish by a preponderance of the evidence (as required by 18 U.S.C. 983(c)(1)) the underlying violation that supports forfeiture (including inchoate offenses) and also, by clear and convincing evidence (as required by 18 U.S.C. 924(d)(1) and (d)(3)(C)) that the firearms and ammunition for which forfeiture is sought were intended to be used in that crime. When a criminal forfeiture action is based on the offenses in 18 U.S.C. 924(d)(3)(C), the Government, having already proven the underlying violation beyond a reasonable doubt, is required to establish by clear and convincing evidence (as required by 18 U.S.C. 924(d)(1) and (d)(3)(C)) that the firearms

for which forfeiture is sought were intended to be used in that crime. Thus, the presumptions (or permissive inferences) would apply only to the Government's evidence to prove an individual is "engaged in the business" for purposes of the underlying section 922(a)(1) violation, not to the Government's burden of proving that a particular firearm was intended to be used in the section 922(a)(1) violation.

Moreover, the presumptions do not change the burden of proof applicable to forfeitures; they simply shift the burden of producing evidence in the underlying determination of whether a section 922(a)(1) violation occurred. If the Government seeks to seize a firearm on the basis that it was intended to be used in an unlicensed dealing offense by a person presumed to be "engaged in the business" under this rule, the Government would still have the burden of proving that intent by clear and convincing evidence (and the underlying offense by a preponderance of the evidence). And in civil forfeiture cases where the firearms to be forfeited were actually offered for sale by a person presumed to be engaged in the business under this rule, rather than simply intended to be used in such violation, the "preponderance of the evidence" burden of proof applicable to all civil forfeitures under 18 U.S.C. 983(c)(1) would apply to that forfeiture proceeding. *See* 18 U.S.C. 924(d)(1) (providing for the forfeiture of "[a]ny firearm or ammunition involved in or used in any . . . willful violation of any other provision of this chapter [including section 922(a)(1)(A)]").[164]

The rule recognizes the unique constitutional context in which criminal proceedings take place, where defendants are entitled to heightened procedural protections and the Government bears the burden of persuasion beyond a reasonable doubt, and makes clear that its presumptions do not apply in criminal cases. But that does not mean, as some commenters have suggested, that the Department has given the statute a different meaning in the civil and criminal contexts. In any proceeding that requires proof that an

---

[163] *See, e.g.,* 27 CFR 478.12(b) ("The modular subpart(s) identified in accordance with § 478.92 with an importer's or manufacturer's serial number shall be presumed, absent an official determination by the Director or other reliable evidence to the contrary, to be part of the frame or receiver of a weapon or device."); *id.* § 478.12(f)(1) ("Any such part [previously classified by the Director] that is identified with an importer's or manufacturer's serial number shall be presumed, absent an official determination by the Director or other reliable evidence to the contrary, to be the frame or receiver of the weapon."); *id.* § 478.92(a)(1)(vi) ("[F]irearms awaiting materials, parts, or equipment repair to be completed are presumed, absent reliable evidence

creating rebuttable presumptions that determine when a company controls another company); 13 CFR 124.103(b) (SBA regulations creating rebuttable presumption that individuals who are members of certain groups are socially disadvantaged); 38 CFR 3.307 (Department of Veterans Affairs regulations creating rebuttable presumptions relating to exposure by veterans to certain chemicals or diseases).

to the contrary, to be in the manufacturing process").

[164] *See, e.g., United States* v. *133 Firearms With 36 Rounds of Ammunition,* No. 08–cv–1084, 2012 WL 511287, at *3 (S.D. Ohio 2012) ("Where it is alleged that the firearm was 'involved or used in' any of the offenses listed in 18 U.S.C. 924(d)(3), the government's burden of proof is by a preponderance of the evidence."); *United States* v. *Four Hundred Seventy Seven Firearms,* 698 F. Supp. 2d 890, 893 (E.D. Mich. 2010) ("[T]he statute's requirement of a heightened burden of clear and convincing evidence to prove intent does not apply to a forfeiture action premised on a firearm being actually *involved in or used in* a willful violation of 922(a)(1)(A).").

individual was "engaged in the business"—whether criminal, civil, or administrative—the Government has the burden to prove conduct that meets the definition in 18 U.S.C. 921(a)(21)(C), *i.e.,* that the person devoted time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms. This rule further defines that term and sets forth certain activities that are indicative of being engaged in the business to provide clarification and guidance to persons who are potentially subject to the licensing requirement. These activities are indicative of being engaged in the business regardless of the type of proceeding in which the activities may ultimately be offered as proof. But the rule's delineation of evidentiary presumptions for use only in civil and administrative proceedings does not require courts to "giv[e] the same [statutory] provision a different meaning." *Clark* v. *Martinez,* 543 U.S. 371, 380 (2005). As the proposed rule explained, in criminal cases, courts may decide to use the presumptions as permissive inferences, such as when drafting jury instructions, and nothing prevents the Department from requesting that criminal courts consider, or prevents such courts on their own from considering, the conduct underlying the rule's presumptions to determine whether an individual was "engaged in the business" (such as when instructing juries regarding permissive inferences).[165]

For example, the Department has concluded that a person who repetitively resells firearms within 30 days from purchase is likely to be "engaged in the business" requiring a license. A person potentially subject to the licensing requirement should take

that interpretation into account in assessing their need for a license and, in a civil or administrative proceeding, the Government and court will apply that interpretation through rebuttable presumptions. Those presumptions do not apply in criminal proceedings, but that does not change the Department's interpretation that a person who repetitively resells firearms within 30 days from purchase is likely to be "engaged in the business" requiring a license, nor does it prevent a court presiding over a criminal proceeding from adopting the Department's interpretation and applying it in a manner consistent with the Constitution and criminal law. In a criminal proceeding, a court may, at its discretion, elect to instruct the jury that it may draw an inference that a person is "engaged in the business," or has the "predominant intent to earn a profit," based on evidence that the person repetitively resold firearms within 30 days from purchase, or engaged in any of the other activities set forth in the rule's presumptions. If the court decided to instruct the jury regarding such a permissive inference, that instruction would be consistent with the Department's interpretation of the statute contained in this rule.

The Department disagrees with commenters who imply that it is improper or unusual for a party, including the Government, to submit or advocate for proposed jury instructions in a case. Under the Federal Rules of Criminal Procedure, any party may request in writing that the court instruct the jury on the law as specified in the request, and any party may object to any portion of the instructions. *See* Fed. R. Crim. P. 30(a), (d). Independent bodies, including those that are private, quasi-judicial, and academic, also prepare form or pattern instructions. While criminal courts are under no obligation to adopt the Department's interpretation of "engaged in the business," and a court's ultimate treatment of the Department's evidence might differ across criminal and civil proceedings, the Department's interpretation of the statutory term is the same across "both criminal and noncriminal applications." *Leocal,* 543 U.S. at 11 n.8.

For similar reasons, the commenters' reference to the Supreme Court's decision in *Thompson/Center Arms* is inapposite. There, the Supreme Court applied the rule of lenity to resolve an ambiguous statutory term, even though it was construing that term in a "civil setting," due to the statute's potential criminal applications. *See Thompson/Center Arms Co.,* 504 U.S. at 517–18. As discussed above, the Department's rule

offers one definition of the statutory term "engaged in the business," and its use of presumptions does not require that courts apply the term differently in criminal and noncriminal settings. Further, *Thompson/Center Arms* does not speak to the burden of proof or attendant evidentiary presumptions, and its invocation of the rule of lenity to resolve an ambiguous statutory term imposes no barrier to the Department establishing prospectively by regulation presumptions for persons potentially subject to the licensing requirement to consider and for use in civil and administrative proceedings.

As noted above, it is well established that administrative agencies can create rebuttable presumptions. This is the case even when the statute at issue has both civil and criminal components.[166] In *Chemical Manufacturers Association* v. *Department of Transportation,* for example, the D.C. Circuit did not invoke the rule of lenity or suggest that the Department of Transportation's presumptions would result in inconsistent interpretations, but rather upheld the presumption at issue because the agency "adequately articulated a reasonable evidentiary basis for [it]." 105 F.3d 702, 707 (D.C. Cir. 1997). As addressed in Section IV.B.8.g of this preamble, the presumptions in this rule are rationally based on ATF's regulatory, investigative, and law enforcement experience, supported by subject matter expertise and decades of applicable case law applying various presumptions in civil and administrative proceedings.[167]

---

[165] *See, e.g., United States* v. *Zareck,* Criminal No. 09–168, 2021 WL 4391393, at *68–69 (W.D. Pa. Sept. 24, 2021) (rejecting challenge to jury instructions that included an inference of current drug use based on the regulatory definition of "unlawful user of a controlled substance" in 27 CFR 478.11); *United States* v. *South,* No. 19cr43, 2020 WL 3489341 (N.D.W.V. June 26, 2020) (similar); Eighth Circuit Committee on Model Jury Instructions, Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit, 266–68 (incorporating inference of current drug use in 27 CFR 478.11); *United States* v. *Perez,* 5 F.4th 390, 400 (3d Cir. 2021) (finding that application note to Federal sentencing guidelines allowed courts to draw a rebuttable presumption that a firearm is used in connection with a drug-trafficking offense where it is found in close proximity to drugs or drug paraphernalia); *United States* v. *Freeman,* 402 F. Supp. 1080, 1082 (E.D. Wis. 1975) (interpreting Selective Service regulations to create a rebuttable presumption that shifted to the defendant the burden of putting forward evidence showing he did not receive the order requiring him to report for service).

[166] *See* footnotes 162 and 163, *supra; see also, e.g.,* 17 CFR 255.1, 255.3(b)(4) (Securities and Exchange Commission ("SEC") regulations implementing the Bank Holding Company Act of 1956, which provides for both criminal and civil penalties, *see* 12 U.S.C. 1847, and creating a presumption that the purchase or sale of a financial instrument by a banking entity is not for the trading account of the entity if it is held for 60 days or longer); *id.* § 255.20(g) (SEC regulation from same part establishing rebuttable presumption that a banking entity with limited assets and liabilities is in compliance with regulatory obligations).

[167] *See, e.g., Big Branch Res.* v. *Ogle,* 737 F.3d 1063, 1069 (6th Cir. 2013) (in disability benefits proceeding, claimant's proof of disability shifted the burden to employer's insurer to demonstrate otherwise); *Medina* v. *Cram,* 252 F.3d 1124, 1129 (10th Cir. 2001) (rebuttable presumption of qualified immunity in civil proceeding "necessarily shifts the burden from the party favored by the presumption to the party rebutting it."); *Scales* v. *I.N.S.,* 232 F.3d 1159, 1163 (9th Cir. 2000) (in deportation proceedings, evidence of foreign birth shifts burden to the petitioner to prove citizenship); *Garvey* v. *National Transp. Safety Bd.,* 190 F.3d 571, 580 (D.C. Cir. 1999) ("[O]nce the FAA shows that a pilot failed to follow a clear ATC instruction, the burden of production shifts to the pilot to offer an exculpatory explanation.); *Spilman* v. *Mosby-Yearbook, Inc.,* 115 F. Supp. 2d 148, 154 (D. Mass. 2000) (in copyright dispute proceeding, registration of the copyright created a rebuttable presumption

The Department disagrees with the commenters' recommendation to include the set of PEP presumptions under the EIB presumptions. While the Department agrees that the conduct underlying the PEP presumptions may often be found and proven in cases that depend on establishing that an individual "engaged in the business," the EIB presumptions stand on their own because, once proven, they demonstrate a likelihood of devoting time, attention, and labor to dealing in firearms as a regular course of business in addition to the person's intent to predominantly earn a profit through the repetitive purchase and resale of firearms. In contrast, the PEP presumptions, once proven, demonstrate only a likelihood of a predominant intent to earn a profit through the repetitive purchase and resale of firearms, not that the person is presumed to be engaged in the business as a result of their actual repetitive purchasing or reselling of firearms. That the Government is able to produce evidence of intent sufficient to satisfy a PEP presumption does not necessarily mean that the evidence put forward is always sufficient to prove the other EIB statutory elements in a civil or administrative proceeding.

For example, if a person repetitively rents tables at gun shows over the course of several months to display firearms for resale, that conduct would demonstrate a predominant intent to profit from repetitive resales and, therefore, the second PEP presumption (repetitively renting physical space to display firearms for resale). Indeed, a person would not likely continue to rent or continuously purchase space at a cost if the person did not intend to profit from selling at gun shows, even if no firearms were actually sold. The seller is presumed to have a predominant intent to earn a profit through repetitive firearms purchases and resales even though there may not have been any actual purchases or resales that would rise to an EIB presumption. Repetitively renting tables at gun shows over the course of several months is certainly

indicative of being engaged in the business; however, by itself, it does not yet demonstrate the other elements of being engaged in the business—devoting time, attention, and labor to dealing in firearms as a regular course of trade or business. Those elements would still have to be proven even if there was evidence sufficient to demonstrate the seller's predominant intent to support a PEP presumption. In contrast, if the seller repetitively rents tables at gun shows over the course of several months to display firearms for sale, and repetitively resells firearms within 30 days after purchasing them, the person's conduct meets both the PEP and EIB presumptions. In addition to the second PEP presumption, the first EIB presumption (offering to sell firearms and demonstrating a willingness and ability to purchase and resell additional firearms) would be met because this conduct demonstrates not only a predominant intent to profit, but also the devotion of time, attention, and labor to dealing in firearms as a regular course of trade or business by actually transacting firearms.

c. Arbitrary or Capricious

Comments Received

Some commenters objected to the NPRM on grounds that it is arbitrary and capricious because, they said, it is nothing more than a politically motivated rulemaking designed to stop all private sales, create universal background checks, or establish a national firearms registry in furtherance of political agendas, rather than developing clear standards that apply over time. Others more specifically argued that the entire rule is arbitrary and capricious under 5 U.S.C. 706(2)(A) of the APA. Some of these commenters argued that the agency relied on factors that Congress did not intend for it to consider when enacting the BSCA. A few contended that the changes being made to the definition of "engaged in the business" were unnecessary because the definition as it was pre-BSCA has been in effect and working fine for a long time. Others said that changing the definition oversteps the authority allowed by the BSCA, which did not grant "additional authority" to "re-define" dealer, or asserted that the Department's definition does not simply clarify the law, which cannot be expanded without a solid basis.

Other commenters stated that the rule is arbitrary because it causes the proposed definition of a dealer "engaged in the business" to be less clear and makes it almost impossible to determine when one is in compliance.

One of these commenters elaborated that "[t]he proposed rule outlines a set of extremely complex, subjective, and arbitrary guidelines on how [ATF] will determine if an individual is engaged in the business of 2nd Amendment protected sales." Another commenter asserted that the rule was unfair because it changed the definition overnight without notice that most people would be aware of. A third stated the rule "fails to provide any bright-line rules for individuals to ascertain whether they are actually 'engaged in the business' and instead claims that ATF will conduct a 'fact-specific inquiry' under which 'even a single firearm transaction' may suffice ...............This is not a rule, nor is it knowable to the average, reasonable person. And yet, this Proposed Rule suggests alterations to Federal regulation that will bear the full force of criminal law. More, the Proposed Rule leaves complete and total discretion in the hands of ATF."

Several commenters focused on the lack of a threshold number of firearms as an indicator of the arbitrary nature of the rule. One of these commenters explained that "[t]he rule does not provide any rationale for why selling more than one firearm per calendar year should be considered engaging in the business of dealing in firearms. There is no evidence that this is a meaningful threshold, and there is no reason to believe that it will be effective in preventing straw purchases." Related to frequency, another commenter stated that "the proposed rule negatively affects the public by providing the ATF exceptionally capricious leeway in its definition of 'repetitive'; since no clear definition is given, it is reasonable to assume that the ATF considers offering any of the listed firearms for sale more than once in the citizen's lifetime as repetitive."

Other commenters stated that the rebuttable presumptions as a whole are "a compilation of totally arbitrary criteria that just makes it hard for normal citizens to sell weapons to each other under non-business transactions." Others focused on specific presumptions as arbitrary or capricious. For example, a couple of commenters asserted that the firearm's condition is an unsupported and arbitrary basis for a rebuttable presumption that one is engaged in the business. One of these commenters elaborated that new buyers may need the manufacturer instructions on care and handling of the firearms, among other information contained on original packaging, as well as special tools, locks, and cases that come with the original packaging. As a result, selling a firearm with original packaging

---

of validity and shifted the burden to the respondent to prove invalidity of the copyright); *Idaho Mining Ass'n* v. *Browner,* 90 F. Supp. 2d 1078, 1087–98 (D. Idaho 2000) (upholding environmental regulations adopting a rebuttable presumption in favor of fishable/swimmable use designations); *In re The Medicine Shoppe,* 210 B.R. 310, 312 (N.D. Ill. 1997) (in bankruptcy proceeding, a properly filed claim creates a rebuttable presumption of validity and shifts the burden to the objector to produce evidence to overcome the presumption); *Sinatra* v. *Heckler,* 566 F. Supp. 1354, 1358–59 (E.D.N.Y. 1983) (in Social Security benefits proceeding, regulatory presumption served to shift the burden of going forward with evidence of receipt of notice of adverse determination).

ATF 015327

APPX.048

may indicate nothing more than passing it on to a new owner. As another example, a commenter raised concerns about the resale of a firearm within 30 days after purchase, stating that "an arbitrary 30 day rule to define those individuals engaged in firearms sales cannot possibly be based on any data and facts .................If it were based on actual data, the days would be 28, or 34, or 67, for example. My point is that 30 days is an arbitrary amount based on nothing other than making it an easy number to remember for policy and enforcement purposes."

Some other commenters found the concept of "profit" to be unclear. One commenter stated that "[s]elling at a profit does not equate to engaging in the business. That is totally absurd. Prices of firearms appreciate, as do any other valuable object." Another stated that "'the statutory definition further provides that proof of profit is not required ..........', which in other words means 'here at the ATF we will charge you whether or not we have evidence of wrongdoing.'" Another commenter, an organization that runs gun shows, stated that the application of the concept of profit in the rule not only exceeds the statutory scope, but also does not appropriately account for what constitutes a profit.

And finally, some commenters stated that the rule lends itself to arbitrary and capricious interpretation and enforcement, placing citizens at risk. For example, one commenter stated that "[u]ltimately, this rule will only impair the rights of the law[-]abiding citizens and potentially create additional felons through what is merely an arbitrary and capricious rule." Another stated that "[t]he rule would give the Attorney General broad discretion to determine who is a gun dealer and who is not, and it would subject gun owners to arbitrary and capricious enforcement actions."

Department Response

The Department disagrees that the rule is arbitrary or capricious, or otherwise violates the APA. The BSCA amended the GCA, and the Department has invoked its rulemaking authority, *see* 18 U.S.C. 926(a), to promulgate regulations necessary to implement the GCA, as amended. As stated previously, ATF has been delegated the authority to further define statutory terms, such as "engaged in the business," when necessary to administer and enforce the GCA.

While the BSCA broadened the definition of "engaged in the business" as it applies to dealers, it did not set forth or explain what specific firearms purchase and sale activities are

sufficient for a person to be "engaged in the business" of dealing in firearms under the GCA. Many commenters stated that they believe this rulemaking provides much needed clarity about the persons who must obtain a license, thereby increasing the firearms transactions conducted through licensed dealers, helping to ensure that persons who are prohibited from receiving or possessing firearms do not receive them, and creating more licensed dealers who maintain records through which crime guns can be traced.

The Department disagrees that the rule is unclear or overly complex. The rule sets forth definitions of terms that are based on standard dictionary definitions and decades of case law interpreting "engaged in the business." The rebuttable presumptions are based on specific, identifiable conduct and clearly defined in the regulatory text.

The Department explained its reasoning, both in the proposed rule and elsewhere in this final rule, for not adopting a specific numerical threshold of firearms that an individual must sell to be considered "engaged in the business." *See* Department Response in Section IV.B.3 of this preamble. The Department disagrees with commenters who argued that a single sale, standing alone, would presumptively classify the seller as "engaged in the business" under this rule. The regulatory text explains that a single sale must be coupled with additional evidence to support a determination that the seller required a license. It is important to note that, in any event, all presumptions in this rule are rebuttable.

The Department disagrees with the comments that the presumptions are arbitrary. As explained previously, and in response to particular comments about specific presumptions, the presumptions are all based on the Department's investigative and regulatory enforcement experience,[168] as well as numerous post-FOPA court and administrative decisions cited in this rule.[169] Indeed, some of the regulatory text that commenters asserted is new or represents a significant change was adopted from ATF's published guidance issued almost eight years ago in 2016.[170] That guidance explained

that "there is no 'magic number' related to the frequency of transactions that indicates whether a person is 'engaged in the business' of dealing in firearms."[171]

The Department disagrees with the comments arguing that a firearm's condition—or the fact that a firearm is in, or sold with, original packaging that contains manufacturer instructions and other useful items—is an arbitrary basis for a rebuttable presumption. Persons who are engaged in the business of dealing in firearms often desire firearms that are in either a new condition, or a nearly new condition, accompanied by original packaging so they can command the highest price while quickly attracting buyers in the shortest amount of time. Moreover, purchasers of deadly, explosive-based weapons are more likely to trust the safety and reliability of new, factory-tested firearms, rather than used firearms in a lesser condition. Nonetheless, in response to comments regarding the presumptions that a person is engaged in the business if they repetitively resell or offer for resale new or like-new firearms, or firearms that are of the same or similar kind and type, the Department has revised those presumptions to apply only where the resales or offers for resale occurs within one year from the date of purchase (also referred to in this rule as a "turnover" limitation) to reduce the chance that personal collection firearms might fall within either of these presumptions. *See* 27 CFR 478.13(c)(3)(ii). In this regard, the Department agrees with some commenters that collectible firearms could be maintained in a like-new condition months or years after they were originally sold. However, based on the Department's extensive experience investigating and enforcing civil, administrative, and criminal cases against persons who were willfully engaged in the business without a license, it is unlikely that a collector or hobbyist would repetitively resell such firearms within one year after purchase if not to engage in the business of dealing in firearms. Of course, as the rule text states, the determination of whether a person is engaged in the business is a fact-specific inquiry. Thus, a person who intentionally stockpiles and sells new or like-new firearms, or the same make and model or variants thereof, with an intent to evade the one-year turnover limitation may still be considered to be engaged in the business if circumstances warrant that determination.

---

[168] *See Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1322 (11th Cir. 2021) ("Agencies are permitted to rely on their experience in the regulated field, so long as they explain what their experience is and how that experience informs the agency's conclusion.").

[169] *See* footnotes 71–83, *supra*.

[170] *See* ATF Publication 5310.2, *Do I Need a License to Buy and Sell Firearms?* 5 (Jan. 2016), *https://www.atf.gov/file/govinfo.gov/content/pkg/GOVPUB-J38-PURL-gpo125446/pdf/GOVPUB-J38-PURL-gpo125446.pdf.*

[171] *Id.* at 5.

The Department's views have been further confirmed and supported by a survey ATF conducted of special agents who work on "engaged-in-the-business" criminal cases. The survey was conducted to better understand the appropriate turnover limitation, as these special agents have encountered bona fide collectors during the course of their work. In that survey, ATF asked how soon after purchase bona fide collectors typically resell a firearm in new or like-new condition with original packaging or firearms of the same make and model. Of the 116 agents who responded, 65 percent reported that, based on their observations, bona fide collectors typically resell a firearm that they purchased for their collection sometime after one year. Of that 65 percent, 13 percent added that many bona fide collectors do not resell for as long as five years after purchase, if ever. Another 15 percent of agents responded that they had observed some collectors resell a firearm sometime after six months. Only 6 percent of agents reported seeing a collector resell a firearm after 90 days, and only 1 percent of agents reported observing a resale within 60 days. The remaining 15 percent of agents did not provide a response because they had not closely observed the behavior of collectors. None of the agents reported collectors reselling firearms within 30 days after purchase. In addition, these results were about single sales of firearms; they did not report on frequency of repetitive sales, or sales involving multiple firearms. Given that 65 percent of agents reported that collectors do not typically resell even one firearm in new or like-new condition with original packaging or firearms of the same make and model within a year after purchase, the likelihood that collectors or hobbyists would engage in repetitive resales of such firearms within one year is low.

It is Congress, not the Department, that identified the predominant intent to profit as a key element of being engaged in the business of dealing in firearms, so commenters' concerns with the concept of profit's role in making EIB determinations are not addressed in this rulemaking. However, the Department agrees with the commenter who stated that actually "[s]elling at a profit does not equate to engaging in [the] business" because a showing of actual profit, whether or not expenses or inflation are considered, is not required to be engaged in the business. Rather, it is the predominant intent of obtaining pecuniary gain from sale or disposition of firearms that matters. *See* 18 U.S.C. 921(a)(22). Moreover, because the

person's predominant intent to profit is the relevant fact, it does not matter how actual profit is calculated.

Finally, the Department disagrees that the rule lends itself to arbitrary or capricious enforcement of the dealer licensing requirement because the rule sets forth specific, identifiable evidence that is presumed to demonstrate that a person is engaging in the business, or predominantly intends to earn a profit. In any proceedings where such evidence is presented, it may be rebutted by the party alleged to be engaged in the business of firearms dealing to the extent such rebuttal evidence is available. The presumptions are based on purchase and resale activities that, in ATF's experience, are indicators of dealing in firearms, as well as court cases, which greatly reduces the possibility of inconsistent interpretation and enforcement.

### d. Violates the Prohibitions Against Creating a Gun Registry

*Comments Received*

Numerous commenters objected to the regulation as a ploy by the Government to subject law-abiding gun owners who have the right to buy and sell firearms to a rigorous registration requirement. They claimed that the new definition of "dealer" would require any person who sells a firearm to obtain a license, and that being licensed requires a person to register all of their firearms, thereby creating a universal backdoor gun registry. A few commenters also stated that ATF already has and maintains "nearly a billion entries of gun owner's information in a searchable database."

*Department Response*

The Department disagrees that this rule creates a registry of firearms. First, the definition of "engaged in the business" as a dealer in firearms as implemented in this rule does not result in a requirement, directly or indirectly, that all persons who sell a firearm must be licensed. Under this rule, persons who sell firearms but who are not engaged in the business of dealing in firearms do not need to become licensed. This includes persons who make occasional sales to family members or FFLs, to enhance their personal collection, and to liquidate inherited firearms, among others. Section 478.13(e) of the regulatory text in this rule provides more information on conduct that does not support a presumption of being engaged in the business as a dealer in firearms.

Second, and more fundamentally, the rule does not create a firearms registry. Licensees are required by the GCA, *see*

18 U.S.C. 923(g)(1)(A), (g)(2), to complete and maintain records of production, acquisition, and disposition of all firearms at their licensed business premises for such period, and in such form, as the Attorney General may prescribe by regulations. But licensees are not required to register their firearms with ATF or to otherwise submit a listing of the firearms they own or sell. Although ATF has the authority to inspect a licensee's records under certain conditions, *see* 18 U.S.C. 923(g)(1)(B)–(C), the records belong to and are maintained by the licensees, not the government. Only after a licensee discontinues business do the GCA and implementing regulations require licensees to provide their records to ATF, which allows ATF tracing of crime guns to continue.[172] *See* 18 U.S.C. 923(g)(4); 27 CFR 478.127. In fact, 18 U.S.C. 926(a)(3) expressly provides that "[n]othing in this section expands or restricts the [Attorney General's] authority to inquire into the disposition of any firearm in the course of a criminal investigation." [173] This rule does not in any way alter the longstanding legal requirements preventing ATF from creating a national firearms registry.

### e. Violates 18 U.S.C. 242

*Comments Received*

Out of concern regarding their rights under the Second Amendment to the Constitution, several commenters claimed that by working on this rule, ATF officials are violating 18 U.S.C. 242, which makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States. Commenters also claimed that ATF officials and employees are likewise violating their oath of office to support

---

[172] The out-of-business firearms transaction records are indexed by abbreviated FFL number so that they may be accessed when needed to complete a firearm trace request involving a licensee that is no longer in business. Out-of-business firearms transaction records are not searchable by an individual's name or other personal identifiers. In 2006, ATF transitioned from using microfilm images of records to scanning records into a digital storage system with images that are not searchable through character recognition, consistent with ATF's design and use of its prior Microfilm Retrieval System.

[173] Federal law has long prohibited ATF from consolidating or centralizing licensee records. Since 1979, congressional appropriations have prohibited ATF from using any funds or salaries to consolidate or centralize records of acquisition and disposition of firearms maintained by FFLs. *See* Treasury, Postal Service, and General Government Appropriations Act, 1980, Public Law 96–74, 93 Stat. 559, 560 (1979). This annual restriction became permanent in 2011. *See* Public Law 112–55, sec. 511, 125 Stat. at 632.

and defend the Constitution (particularly the Second Amendment) under the same provision.

Department Response

The Department disagrees that any official involved in promulgating or implementing this rule is violating 18 U.S.C. 242 or any other criminal law. The regulations proposed and finalized herein do not raise constitutional concerns for the reasons given above. *See* Section IV.B.8 of this preamble.

*C. Concerns With Specific Proposed Provisions*

The Department received thousands of comments from the public concerned about specific provisions in the proposed rule. A majority of those concerns were in opposition to the rule, but ATF also received comments from individuals who generally supported the proposals. These specific comments originated from a variety of interested parties, including advocacy, sporting, and gun owners' organizations; gun safety organizations; lawmakers; gun enthusiasts; members of the general public; and persons with legal backgrounds. The topics included concerns regarding the proposed definitions, issues regarding the presumptions as a general matter, comments on some of the individual EIB and PEP presumptions, and questions about the transfer of firearms between licensees.

1. Definition of "Dealer"

Comments Received

In commenting on whether the rule's definition of dealer is clear, a number of commenters mentioned that the rule does not include a numerical threshold of firearms or a specified time frame establishing when a person's activities become engaged in the business. As a result, for example, one commenter stated that an average person could not reasonably be expected to understand what activities would require them to get a license, which, the commenter said, essentially means that a single sale of a firearm by a private owner would require a dealer's license unless the seller is either selling to improve their collection or is liquidating their collection.

Other commenters were concerned about the places in which the proposed rule defined firearms purchase and sales activities as dealing. For example, one commenter stated that the reference to an international marketplace in the definition of "dealer" could be read to include activities that occur wholly outside the United States, which goes against the legal presumption that

Congress ordinarily intends its statutes to have domestic, not extraterritorial, application. The commenter did not think the Department intended to exercise extraterritorial jurisdiction and suggested the definition of "dealer" should be revised to make this clear. As another example, one commenter expressed concerns about the rule's clarification that dealing may occur wherever, or through whatever medium, qualifying activities may be conducted, suggesting that instead of clarifying, this is likely to create more confusion because having a license would then prohibit the person from selling in some locations. The commenter said that 27 CFR 478.100 is clear that a dealer can transact sales only at its licensed premises or a "qualifying" gun show or event. To be a qualifying gun show or event, the commenter said, it must be sponsored by an organization devoted to collecting, competitive use, or other sporting use of firearms. As an example, the commenter stated, "it would be difficult to imagine a circumstance where a licensed dealer would be allowed to sell at a flea market, though private sales there might be legal."

Finally, other commenters expressed concern about whether the rule would include certain persons as dealers. For example, one commenter, a large FFL, stated that it is unclear whether its individual employees must be separately licensed as dealers when working in the employ of an FFL. They stated that a plain reading of the proposed regulatory text suggests its employees would be required to be separately licensed. For example, they noted, an associate working in the commenter's customer service department is responsible for the physical repair of firearms returned for service. The associate is a "person," performs the repair work, and obtains monetary compensation for the repairs via paycheck. The commenter asked if, in this scenario, the associate is a "dealer" requiring license as a gunsmith, even if the repairs they perform are made at the direction of the commenter, who itself is a licensee. Similarly, another commenter inquired whether the definition of being engaged in the business as a dealer now includes those who sell only component parts of a weapon, but not the whole weapon itself. Another commenter was also concerned about those who fabricate certain parts, but for a different reason. The commenter, who supported the overall definition of "dealer" because they believe it to be consistent with the BSCA and to enhance public safety, said, "I have concerns about the broad

reach concerning persons engaged in the fabrication fitment of barrels, stocks, [and] trigger mechanisms due to these parts being unregulated and not considered firearms under the current frame or receiver rule, as well as the GCA. *See* [Docket No.] 2021R–05F, AG Order No. 5374–2022. Despite this portion of the definition being in the previous definition, I . . . would recommend that this portion be dropped from the definition."

Department Response

The Department disagrees that the rule does not explain who must be licensed as a "dealer." The definition of "dealer" is, in relevant part, "any person engaged in the business of selling firearms at wholesale or retail" and was already established in the GCA and ATF regulations prior to the BSCA amendments. *See* 18 U.S.C. 921(a)(11)(A). The rule clarifies within this definition that a person can be considered a dealer regardless of the location or medium through which a person engages in the business. In the definition of "engaged in the business" as a wholesale or retail dealer, the rule then sets forth specific and defined conduct that will be presumed to be "engaged in the business" requiring a license as a "dealer," as well as conduct that does not support a presumption and may be used as evidence to rebut any such presumption. *See* § 478.13(c), (e), (f).

The Department disagrees that a single sale of a firearm by a private owner, without more, would necessarily require a dealer's license under this rule. To the contrary, a dealer who is engaged in the business "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. 921(a)(21)(C). To that end, one presumption established by this rule states that a person who sells or offers firearms for sale (even if a firearm is not actually sold) and then also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (*i.e.,* to be a source of additional firearms for resale) is presumptively engaged in the business. Thus, it is clear from the rule's plain language that, to trigger this presumption, additional evidence is required beyond merely a single sale of a firearm.

The Department disagrees that the rule seeks to assert extraterritorial jurisdiction in excess of statutory authority by referencing "international

marketplaces" in the definition of "dealer." The statutory prohibition at 18 U.S.C. 922(a)(1)(A) makes it unlawful for unlicensed persons "to ship, transport, or receive any firearm in interstate or foreign commerce." Including "international" marketplaces in the definition of "dealer" is consistent with Congress's intent to regulate unlicensed sales in "foreign" commerce.[174] Additionally, the GCA, as recently amended by the BSCA, now expressly prohibits a person from smuggling or knowingly taking a firearm out of the United States with intent to engage in conduct that would constitute a felony for which the person may be prosecuted in a court in the United States if the conduct had occurred within the United States. *See* 18 U.S.C. 924(k)(2)(B). Willfully engaging in the business of dealing in firearms without a license is an offense punishable by more than one year in prison, *see id.* 924(a)(1)(D), and constitutes a felony. Therefore, unlicensed persons who purchase firearms in the United States and smuggle or take them out of the United States (or conspire or attempt to do so) for sale in another country would be violating 18 U.S.C. 924(k)(2)(B), among other provisions of U.S. law. This is not conduct "wholly outside the United States," as the commenter suggests. Accordingly, this rule now clarifies in the definition of "dealer" that purchases or sales of firearms as a wholesale or retail dealer may occur "at any other domestic or international public or private marketplace or premises."

The Department disagrees with the commenter who said that the definition of "dealer" will cause more confusion because it includes dealing that "may be conducted" at a gun show or event, due to, as the commenter stated, some gun shows or events not being qualified under 27 CFR 478.100. Persons who want to engage in the business of dealing in firearms at a gun show or event must first apply for and receive a license at a business premises in the same State as the gun show or event, regardless of whether the gun show or event is qualified. During the application process, ATF advises the applicant during an application inspection concerning their responsibilities as a dealer, to include dealing only at qualified gun shows or events within the same State as their licensed business premises. To the extent that the definition's use of the phrase "may be conducted" causes some persons to incorrectly believe they may lawfully deal in firearms at gun

shows or events that are not qualified, the phrase "may be conducted" has been replaced with "are conducted" in the final definition of "dealer."

With regard to the commenter's question whether an employee of a gunsmith who performs repair work, or fitment of barrels, stocks, and trigger mechanisms to firearms, is a "dealer" who must be licensed, the rule does not address who is "engaged in the business" as a dealer-gunsmith under 18 U.S.C. 921(a)(21)(D), and therefore must be licensed under 18 U.S.C. 921(a)(11)(B).[175] This rule addresses only who is engaged in the business as a dealer under 18 U.S.C. 921(a)(11)(A). Also, this rule does not require employees of dealers to be licensed separately. Firearms businesses carry out their operations through their employees.[176] Employees of dealers therefore do not require a separate license, provided the employees are acting within the scope of their duties on behalf of the licensee.[177]

Lastly, in response to the question whether the rule applies to persons who deal in component parts of a complete weapon, this rule applies to persons who engage in the business of dealing in "firearms," as that term is defined by 18 U.S.C. 921(a)(3). This includes weapons that will, are designed to, or may readily be converted to expel a projectile under 18 U.S.C. 921(a)(3)(A), and the frames or receivers of any such weapons under 18 U.S.C. 921(a)(3)(B). Persons who engage in the business of dealing in any such firearms under the GCA must be licensed.

## 2. Definitions of "Purchase" and "Sale"

### Comments Received

In the NPRM, the Department proposed to define the terms

"purchase" and "sale" as they pertain to the term "engaged in the business" of dealing in firearms. While some commenters agreed with including definitions for "purchase" and "sale" so persons cannot evade licensing through the barter or exchange of non-monetary items, other commenters believed the proposed definitions went too far. One commenter opined that the definition is so focused on barter, profit, and trade that it will allow ATF to find any nexus such that the agency would be able to detain, investigate, and refer for prosecution an honest series of sales, trades, or bartering that are not in any way executed as part of a business scheme. Other commenters opined that the definitions offered for these terms "deviate from historical practices that allowed for the transfer and trade of firearms among private citizens with minimal government interference." Another considered the definitions to be generally consistent with the plain meaning of those terms.

Several commenters also offered suggestions to the regulatory text. One commenter stated that the definition of "sale" is too broad and includes "Christmas gifts, because [the proposed definition does] not require[ ] for the firearm's delivery to be 'bargained-for in exchange,' [which is] the core of contract that distinguishes contract from gift." The commenter stated that ATF's definition of "sale" runs counter to the dictionary definition that is quoted in footnote 45 of the NPRM, 88 FR 61999. The commenter quoted this definition of "sale," emphasizing that it references "a *contract* transferring the absolute or general ownership of property from one person or corporate body to another for a price (as a sum of money or any other consideration)." (Emphasis added by commenter) The commenter noted that ATF's regulatory definition does not include the term "contract" and therefore ignores that there must be consideration for a sale to have occurred. In a similar vein, a couple of other commenters emphasized that sales, trades, or exchanges of firearms occur on the basis of agreements or agreed exchanges between the parties and should therefore be permitted.

Another commenter raised a concern that "the [proposed] definition of 'sale' could potentially include non-dispositional transfers ............. Rather than use the term 'providing,' which could include many temporary transfers, the more statutorily consistent term would be 'disposing of.' The GCA uses the terms 'disposition' or 'dispose' in connection with the words 'sale' or 'sell' seven times in section 922. 18 U.S.C. 922(a)(6), 922(b)(2), 922(d), 922(d)(10),

---

[174] *See* footnote 48, *supra.*

[175] For more information on who must be licensed as a gunsmith, see *Definition of "Frame or Receiver" and Identification of Firearms,* 87 FR 24652 (Apr. 26, 2022).

[176] *See* ATF Ruling 2010–1, *Temporary Assignment of a Firearm by an FFL to an Unlicensed Employee,* at 2–3 (May 20, 2010), *https://www.atf.gov/firearms/docs/ruling/2010-1-temporary-assignment-firearm-ffl-unlicensed-employee/download.*

[177] *See United States* v. *Webber,* No. 2:14–cr–00443, 2017 WL 149963, at *8 (D. Utah Jan. 13, 2017) ("[A]n employee of Cabela's is not engaged in the business of dealing in firearms because Cabela's has the profit motive and Cabela's is the party engaged in the repetitive purchase and resale of firearms. However, let us assume that the employee, who did not have his own FFL, began buying hundreds of guns from Cabela's and reselling them out of his home for personal profit. Cabela's maintains the A&D book, but the employee is not paid for his extracurricular activities. Under those facts, the Gun Control Act would prohibit the employee's conduct. The employee would not be permitted to circumvent the Gun Control Act's licensing requirement by engaging in the business of dealing in firearms with Cabela's FFL.").

922(d)(11), 922(j).'' Therefore, the commenter suggested it would be more statutorily consistent to define the term as ''disposing of a firearm in exchange for something of value'' instead of ''providing a firearm in exchange for something of value.''

**Department Response**

The Department disagrees that the definitions of ''purchase'' and ''sale'' are overbroad and should not include bartering or trading firearms. As the rule points out, even before the BSCA, courts upheld criminal convictions where payment was made in exchange for firearms in the form of goods or services, rather than cash. Non-cash methods of payment may include contraband, such as drugs. A non-cash method of payment may also be used to conceal illicit firearms dealing, to include avoiding reporting requirements associated with transfers of cash.[178] Moreover, while the Department agrees with the commenters that one definition of ''purchase'' can include acquiring something of value by contract (*i.e.,* a ''bargained for'' exchange), the common definition of ''purchase'' is more generally defined to mean ''to obtain by paying money or its equivalent.'' [179] Nonetheless, to ensure that acquiring the firearm is understood to be intentional, the Department has added the words ''an agreed'' before ''exchange,'' as used in other comments that view an exchange more broadly than by contract. This includes an agreement to exchange something of value indirectly, such as payment of the seller's debt owed to a third party in exchange for a firearm.

Regarding the definition of ''sale,'' the Department disagrees that the proposed definition of that term is inconsistent with common dictionary definitions.[180] Moreover, giving bona fide gifts [181] continues to be excluded from conduct

presumed to be engaged in the business, and evidence of such gifts can be used to rebut the presumptions that a person is engaged in the business. *See* § 478.13(e)(1), (f). Furthermore, the Department agrees that it is more consistent with the GCA to use the phrase ''disposing of a firearm'' rather than ''providing a firearm,'' in the definition of ''sale,'' and that change has accordingly been made.[182]

**3. Definition of Engaged in the Business Generally**

**Comments Received**

Numerous commenters did not agree with the Department's assertion in the proposed rule that a single firearms transaction or no sale at all may require a license. They believed that this runs counter to statutory language that emphasizes ''regular'' and ''repetitive'' manufacture and sale or purchase and resale of firearms. Commenters stated that ''repetitive'' cannot be proven by ''a single firearm transaction''; that the statute clearly requires a course of conduct of purchasing and reselling firearms repetitively. One commenter stated that the required repetitive purchase and resale of firearms means that ''[the] firearms must be purchased 'and' resold. If firearms are not purchased with the intention of resale at time of purchase, [they] fall [ ] under the exception.'' Otherwise, the commenter argued, simple purchases and sales are something any gun owner might do; that is why Congress carefully chose the word ''resale''—meaning ''the act of selling something again.'' Along this vein, at least one commenter suggested that the Department amend all the presumptions for engaged in the business to use the word ''resale'' or ''reselling'' rather than ''sale'' or ''selling'' to be consistent with the phrase ''repetitive purchase and resale of firearms'' in the GCA definition of dealer.

Another commenter also rejected the Department's position that ''there is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms,'' and that ''even a single firearm transaction, or offer to engage in a

transaction [without any actual transaction], when combined with other evidence, may be sufficient to require a license.'' The organization identified six indicators in the GCA that they argued demonstrate that more is required, including: (1) use of ''firearms'' in the plural; (2) ''regular course,'' contemplating a series of events; (3) ''repetitive,'' meaning more than once; (4) requiring actual ''purchase and *re*sale,'' which (5) provides a contemporaneous conjunctive requirement; and (6) exempting ''sales, exchanges, or purchases,'' in the plural. The commenter concluded that these indicators require ATF to reverse its position.

Another organization emphasized that a person who makes occasional sales, exchanges, or purchases for enhancement of a personal collection or for a hobby, or to sell all or part of their personal firearms collection, is not engaged in the business as a dealer even if the person sells the firearms to ''predominantly earn a profit.'' ''Profit motive,'' they stated, ''is not relevant to activities that fit within the carve-out because it is an exception to the general 'engaged in the business' rule. This construction of the statute is extremely important because it covers common behavior for law-abiding gun owners.''

Some congressional commenters focused specifically on the presumptions in this light and stated that ''the civil and administrative presumptions ignore the occasional seller and hobbyist protections under the law.................Occasional sellers may keep firearms in their original packaging or discuss the purchase and resale of firearms with friends. Occasional sellers—because they are occasional sellers—may represent that they are able to get firearms. And occasional sellers may collect or even sell firearms of the same make and model. The proposed rule paints a broad brush to attempt to regulate conduct that is protected under the law for occasional sellers of firearms.'' An additional commenter stated that the statute's use of the plural form of ''occasional sales, exchanges, or purchases'' clearly indicates that multiple sales, exchanges, or purchases can be made by gun owners without rising to the level of dealing.

Indeed, at least one commenter in support of the presumptions suggested that the rule could be clearer about what constitutes an occasional sale. ''[W]hile it is not necessary for the final rule to establish a numerical ceiling for what constitutes 'occasional' sales or exchanges under 18 U.S.C. 921(a)(21)(C) (given the NPRM's general preference for a fact-specific inquiry),'' they said, it

---

[178] *See* 31 U.S.C. 5313(a); 31 CFR 1010.330 (reports relating to currency in excess of $10,000 received by a trade or business).

[179] *Purchase,* Webster's Online Dictionary, *https://www.merriam-webster.com/dictionary/purchase* (last visited Mar. 4, 2024); *Purchase,* Collins English Dictionary, *https://www.collinsdictionary.com/us/dictionary/english/purchase* (last visited Mar. 4, 2024) (''to obtain for money or by paying a price'').

[180] *See Sale,* Collins English Dictionary, *https://www.collinsdictionary.com/us/dictionary/english/sale* (last visited Mar. 4, 2024) (''exchange of property of any kind, or of services, for an agreed sum of money or other valuable consideration''); *Sale,* Oxford English Dictionary, *https://www.oed.com/search/dictionary/?scope=Entries&q=sale* (last visited Mar. 4, 2024) (''The action or an act of selling or making over to another for a price; the exchange of a commodity for money or other valuable consideration.'').

[181] For the definition of ''bona fide gift,'' *see* footnote 69, *supra.*

[182] *See* 18 U.S.C. 922(a)(6) (prohibiting false statements in connection with the ''sale or other disposition'' of a firearm); *id.* 922(b)(2) (prohibiting the sale or delivery of any firearm in violation of any State law or published ordinance at the place of ''sale, delivery or other disposition''); *id.* 923(g)(1)(A),(g)(2) (requiring licensees to maintain records of ''sale, or other disposition of firearms''); *id.* 923(g)(3)(A) (requiring licensees to prepare reports of multiple ''sales or other dispositions''); *id.* 923(j) (requiring that the gun show or event location of the ''sale or other disposition'' of firearms be entered in licensee records).

ATF 015332

APPX.053

"should at minimum clarify that 'occasional' sales conduct should not be construed to include sales conduct that is consistently ongoing or that is regularly scheduled in a consistent or periodic fashion."

One commenter stated that ATF has created a nebulous moving target without including a numerical threshold to determine when one is a dealer in firearms. Indeed, two commenters otherwise in support of the rule proposed adding a rebuttable presumption that the sale or transfer of five or fewer firearms is presumed to be selling or transferring firearms occasionally, whereas another commenter suggested 8–10 firearm sales as the appropriate number. One of the commenters cited to similar provisions in California (which the commenter stated has five firearms per year as its threshold) and other States to support the proposition that it is possible to set a number, while not necessarily agreeing that five is the reasonable threshold. These commenters stated that by adding this threshold, the public and law enforcement would have a clearer idea of when one is subject to, or exempt from, becoming licensed. Similarly, another commenter suggested a threshold number of five firearms per month would be reasonable because the vast majority of individual hobbyists and collectors would not even approach half of the limit. This commenter specifically stated, "[t]his would leave no room for guessing and would send a strong message from the ATF that persons who may touch the limit would need to go ahead and obtain their FFL." Another commenter suggested that, rather than trying to define what "engaged in the business" means, it would be better to explain how a citizen may sell a firearm so as not to be considered a firearms dealer needing a license. Defining it from that direction, they added, would make any conduct outside that "non-dealer" definition presumptively conduct that requires a license.

An additional commenter suggested that, to alleviate the "occasional seller exemption" issue, ATF should treat the presumptions as permissive inferences in civil/administrative contexts as well as in criminal ones. "This is a much more lenient standard for those who have not even repetitively sold or purchased a firearm," they stated, because permissive inferences are not mandatory, do not shift the burden of proof, and do not require a specific outcome. Similarly, a final commenter suggested that the first EIB presumption should instead be a permissive inference (dealing in firearms when the

person sells or offers for sale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and sell additional firearms). The commenter stated that, as a mandatory presumption, this presumption is too inflexible to be fairly applied, even on a case-by-case basis, but also that it does not allow for the case-by-case analysis the commenter said ATF purports to want. There is a tension between the presumptions that indicate a person is "engaged in the business," the commenter added, and the exclusion from being engaged in the business for those who make only occasional sales. By its plain language, the commenter continued, the presumption includes anyone who intends to purchase or sell any number of firearms, regardless of whether they intend to do so for pecuniary gain or to enhance or liquidate a personal collection. "This linguistic imprecision undercuts ATF's stated exemption of persons who only make occasional purchases, sales, or trades for the enhancement or liquidation of a personal collection," they concluded.

### Department Response

The Department agrees with commenters that the GCA's definition of "engaged in the business" contemplates a person's devotion of time, attention, and labor to a regular trade or business of buying and selling more than one firearm, but disagrees that the statute requires any minimum number of firearms to actually be sold to be "engaged in the business" under the GCA, or that the EIB presumptions are contrary to the statutory language. While some commenters reference particular words or phrases in the statute, the statutory language must be considered as a whole. To be "engaged in the business" as a wholesale or retail dealer under 18 U.S.C. 921(a)(11)(A), a person must "devote[ ] time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. 921(a)(21)(C).

A person may "devote[ ] time, attention, and labor to dealing in firearms as a regular course of trade or business," for example, by spending time, effort, and money each day purchasing, storing, and securing firearms inventory, and advertising or displaying those firearms for sale. The specific resale activities identified in each presumption reflect this devotion of time, attention, and labor to dealing in firearms as well as the element of intent. But it is only the intent element

of the statute—to predominantly earn a profit—that mentions "repetitive purchase and resale of firearms." There is no statutory requirement that firearms actually be sold; indeed, a dealer may routinely (*i.e.,* "regularly") devote time and resources working toward that goal, but never find a buyer or consummate any sales due to insufficient demand or poor sales practices. This is because the phrase "repetitive purchase and resale of firearms" refers to the method, or modus operandi, by which a person intends to engage in the firearms business.[183] Thus, under the statutory text and judicial interpretations of it, no actual sales are required if the intent element is met and the person's conduct demonstrates their devotion of time, attention, and labor to dealing in firearms as a regular course of trade or business.[184]

Intent may be inferred from a person's words or conduct.[185] Unlike a

[183] *See Palmieri,* 21 F.3d at 1268 ("Although the definition [of engaged in the business] explicitly refers to economic interests as the principal purpose, and repetitiveness as the *modus operandi,* it does not establish a specific quantity or frequency requirement." (footnote omitted)); *Focia,* 869 F.3d at 1281–82 ("[N]othing in the [FOPA] amendments or the rest of the statutory language indicates that a person violates § 922(a)(1)(A) only by selling firearms as his primary means of income. And the word 'hobby'—which [defendant] suggests includes the regular sale of guns for profit and financial gain, so long as it is not the seller's primary source of income—simply cannot bear the weight that [defendant] seeks to put on it. The exact percentage of income obtained through the sales is not the test; rather, we have recognized that the statute focuses on the defendant's motivation in engaging in the sales.").

[184] *See, e.g., King,* 735 F.3d at 1107 n.8 (upholding conviction where defendant attempted to sell one firearm and represented that he could purchase more for resale and noting that "Section 922(a)(1)(A) does not require an actual sale of firearms"); *Nadirashvili,* 655 F.3d at 119 (2d Cir. 2011) ("[T]he government need not prove that dealing in firearms was the defendant's primary business. Nor is there a 'magic number' of sales that need be specifically proven. Rather, the statute reaches those who hold themselves out as a source of firearms. Consequently, the government need only prove that the defendant has guns on hand or is ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers." (quoting *Carter,* 801 F.2d at 81–82)).

[185] *See Agnew* v. *United States,* 165 U.S. 36, 50 (1897) (referring to a "presumption that a person intends the natural and probable consequences of acts intentionally done, and that an unlawful act implies an unlawful intent"); *cf. United States* v. *Scrivner,* 680 F.2d 1099, 1100 (5th Cir. 1982) ("[I]ntent may be inferred from words, acts, and other objective facts."); *United States* v. *Arnold,* 543 F.2d 1224, 1225 (8th Cir. 1976) ("The requisite intent may be inferred from the acts of the defendant."); *United States* v. *Spinelli,* 443 F.2d 2, 3 (9th Cir. 1971) ("It is clear that the Government need not adduce direct proof of intent. It may be inferred from the defendant's acts."); *United States* v. *Ledbetter,* 432 F.2d 1223, 1225 (10th Cir. 1970) ("Intent may be inferred from the conduct of the
Continued

numerical threshold number of sales, the rule's EIB presumptions are all activities, based on case law and ATF's experience, that are indicative of the intent to earn a profit through the repetitive purchase and resale of firearms. With respect to the suggestion that there should be a five-firearm sale or transfer threshold for determining whether a person is engaged in the business, the Department's approach will allow it to more effectively enforce the licensing requirement for individuals who are engaged in the business. For example, even before the BSCA broadened the engaged in the business definition, the Department successfully prosecuted, and courts routinely upheld, multiple criminal cases in which the evidence presented would not have met a five-sale threshold, but other evidence made clear the individual was engaged in the business without a license.[186]

The terms "sale" and "resale" were used interchangeably in the NPRM because any sale after the firearm was produced and previously sold is a "resale." When speaking of a firearm resale in the context of dealing, it is generally understood that it includes any sale of a firearm, including a stolen firearm, any time after any prior sale has occurred. Nonetheless, the Department agrees with the commenters that this was not explicitly stated in the NPRM, that using the term "resale" more consistently would be clearer, and that the intent element of the statute contemplates potential repetitive "resales" of firearms to be engaged in the business. For these reasons, the Department has revised the regulatory text to change "sale" to "resale" in various presumptions where that prefix ("re") was not already used, and defined "resale" to mean "selling a firearm, including a stolen firearm, after it was previously sold by the original manufacturer or any other person." This change aligns the regulatory text with the intent element in 18 U.S.C. 921(a)(21)(C), and makes clear that the term "resale" refers to any wholesale or retail sale of a firearm any time after it was previously sold by anyone.

In response to comments, the Department has also incorporated, as examples of rebuttal evidence: bona fide

gifts, occasional sales to enhance a personal collection, occasional sales to a licensee or to a family member for lawful purposes, liquidation of all or part of a personal collection, and liquidation of firearms that are inherited, or liquidation conducted pursuant to a court order. *See* § 478.13(e), (f). The Department has also added language explicitly stating that, similar to the way the presumptions operate, these are not the only types of evidence that could be presented to rebut a claim of being engaged in the business. *See* § 478.13(g). Additionally, while the term "occasional" is not defined in the regulatory text, the Department agrees that the plain and ordinary meaning of that term means "of irregular occurrence; happening now and then; infrequent." [187] The Department also agrees that regular or routine sales, exchanges, or purchases of firearms (even on a part-time basis) for the enhancement of a personal collection or for a hobby would not fall within the definition of "occasional."

The Department disagrees with the suggestion to instead define how a citizen may not be considered to be engaged in the business. Because of the myriad circumstances under which a person may sell a firearm, it would be difficult, if not impossible, for the Department to outline all the circumstances in which firearms might lawfully be sold without a license. However, the Department has set forth in the final rule a non-exhaustive list of conduct that does not support a presumption and can be used as evidence to rebut any of the narrowly tailored presumptions indicating that a person is engaged in the business of dealing in firearms. *See* § 478.13(e), (f).

Finally, the Department disagrees with the recommendation to change the rebuttable presumptions to permissive inferences in civil and administrative proceedings to alleviate concerns by occasional sellers of personal collection firearms. The Department believes that the use of rebuttable presumptions in civil and administrative proceedings will be much more effective at achieving compliance with the GCA, as amended by the BSCA, than voluntary permissive inferences or the existing factor-based approach to determining whether a person is engaged in the business. ATF's 2016 guidance, for example, outlined the general factors and some examples of being engaged in the business, but compliance with that guidance document was voluntary and it was not published in the **Federal Register** for broader distribution and attention by

the public.[188] As such, it resulted in only a brief increase in the number of persons engaged in the business becoming licensed dealers (around 567).[189] The rule's approach is consistent with Congress's purposes in enacting the BSCA, which included, among other things, addressing significant non-compliance in the firearms market with the engaged in the business licensing requirements. *See* Section II.D of this preamble. Using rebuttable presumptions in this context is also consistent with the use of rebuttable presumptions in the GCA and other ATF regulations. Indeed, the GCA and implementing regulations already incorporate rebuttable presumptions in various other firearms-related contexts.[190]

### 4. Definition of Engaged in the Business as Applied to Auctioneers

#### Comments Received

Some commenters asserted that the Department should reconsider or make clearer the definition of "engaged in the business" as a dealer in firearms as applied to auctioneers. At least one commenter disagreed with conditioning an auctioneer's need for a license on whether that auctioneer takes possession of the firearm prior to the auction. The commenter stated that an auctioneer may take a deceased person's firearms into possession prior to the auction for purposes of safety and security and indicated that this kind of action does not make one a dealer. Another commenter stated the Department's attempt to distinguish between estate-type versus consignment-type auctions generates confusion because it seems that, under the rule, whether an auctioneer must be licensed depends on who owns the firearm (*i.e.,* an individual other than the auctioneer, versus an estate). In particular, the commenter stated that ATF's statement that an auctioneer would not need a license if acting as an agent of "the owner or executor of an estate who is liquidating a personal collection," is inconsistent with other statements in the NPRM, which suggest that the exemption would apply only to estate sales (*e.g.,* "[t]he firearms are within the estate's control and the sales made on the estate's behalf"). The commenter stated that it is the method or sale (consignment versus true

---

defendant and from circumstantial evidence which furnishes a basis for a reasonable inference.").

[186] *See, e.g., Orum,* 106 F. App'x 972 (sold three guns on two occasions and testimony that defendant frequented flea markets and gun shows where he displayed and sold firearms); *United States* v. *Shah,* 80 F. App'x 31, 32 (9th Cir. 2003) (evidence of one sale and defendant's "disposition as a person 'ready and able to procure' additional weapons"); *see also Hosford,* 82 F. Supp. 3d 660 (five transactions).

[187] *See* footnotes 70, 123, *supra.*

[188] *See* ATF, *Do I Need a License to Buy and Sell Firearms?* (Jan. 2016), *https://www.govinfo.gov/content/pkg/GOVPUB-J38-PURL-gpo125446/pdf/GOVPUB-J38-PURL-gpo125446.pdf.*

[189] Source: ATF, Federal Firearms Licensing Center.

[190] *See* footnote 65, *supra.*

auction) that determines if the auctioneer exemption applies, not the origin of the firearm (estate versus personal collection). Separately, at least one commenter believed that, because auctioneers are exempt from the requirement to have a license under the rule, a family estate, or the heirs, would have difficulty selling their collection through an auction house in the future.

One organization, though not in support of the rule overall, recognized this portion as the Department's attempt to establish by regulation ATF's longstanding guidance for auctioneers. The commenter suggested that the Department further clarify how "engaged in the business" applies in various auction contexts. For instance, the commenter said it is not clear whether auction companies, which are commonly engaged by nonprofit organizations, would need to be licensed when assisting nonprofit organizations with their auctions. The commenter questioned whether an auction company that does not take possession of the firearms prior to the auction, or consign the firearms for sale, would be exempt from licensing requirements even though the firearms are not part of the nonprofit organization's "personal collection" as defined by the proposed rule. Separately, the same commenter asked whether nonprofit organizations that conduct auctions of donated firearms would need to obtain a license or whether their use of an FFL to facilitate the auction is sufficient. If the nonprofit itself need be an FFL, the commenter asked if it could coordinate with other FFLs out of State to facilitate auctions outside of the State where the nonprofit organization's business premises is located.

At least one commenter that supported the proposed rule overall urged the Department to provide further guidance to auctioneers that, to the extent an auctioneer operates in States that require background checks on private transactions, estate-type auctioneers risk aiding and abetting illegal transactions if they knowingly facilitate sales of guns without background checks. Further, the commenter, while recognizing the Department did not set any numerical thresholds to determine when a person is a dealer in firearms, suggested that it would be appropriate in this context to provide numerical thresholds because estate-type auctions represent a source of guns that can be purchased without background checks. They recommended that the Department clarify that if an estate-type auctioneer facilitates an individual auction involving more than

five guns or facilitates auctions involving more than 25 guns in a one-year period, then they must be a licensed as an FFL or risk aiding and abetting liability under Federal law.

Department Response

This rule merely establishes by regulation ATF's longstanding understanding of the GCA's requirements with respect to auctioneers and does not affect the ability of persons to sell firearms through auction houses. Estate-type auctioneers are not required to be licensed because they are not devoting time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms. They are instead providing services as an agent of the owner on commission. These auctioneers are not in the business of dealing in firearms and do not themselves purchase the firearms. The auctioned firearms are within the estate's control and the sales are made on the estate's behalf. The rule uses the term "estate-type" auction to indicate that the firearms need not be part of a decedent's estate, but may instead have been acquired through certain other non-commercial means, such as a non-profit organization receiving a donation of firearms that the non-profit then auctions through an estate-type auctioneer who does not take ownership of the firearms or accept the firearms for resale on consignment. *See* § 478.13(a).

The Department agrees with the comment that there may be personal firearms that may be auctioned at an estate-type auction that do not fall within the rule's definition of "personal collection," such as firearms that were acquired by an individual for self-defense. For this reason, the regulatory text in 27 CFR 478.13(a) has been revised to delete the reference to a "personal collection" when discussing how the regulation applies to auctioneers. The Department also agrees with commenters' concerns about limiting the auctioneer exception where the estate-type auctioneer takes possession of firearms prior to the auction for reasons other than consignment (*e.g.,* temporary safe storage and return to the estate). The main reason consignment-type auctions require a dealer's license is because the auctioneer has been paid to take firearms into a business inventory for resale at auction in lots, or over a period of time, *i.e.,* consigned for sale. In a "consignment-type" auction, the auctioneer generally inventories, evaluates, and tags the firearms for

identification, and has the legal authority to determine how and when they are to be sold. Consequently, the auctioneer dealer exception has been revised in § 478.13(a) so that it does not apply where the firearms for sale have been taken into possession on consignment prior to the auction.

The Department agrees that auctioneers must comply with Federal, State, and local laws. The Department therefore agrees with the comment that estate-type auctioneers must abide by State and local laws that require background checks when the auctioneer is assisting private parties in liquidating inventories of firearms on their behalf. However, no changes are being made as a result of that comment because the requirements imposed by State and local jurisdictions to run background checks do not determine whether a person is "engaged in the business" as a dealer under Federal law. Further, with regard to those auctioneers who obtain a license, the regulations already provide that a license "confers no right or privilege to conduct business or activity contrary to State or other law." *See* 27 CFR 478.58.

Finally, as stated previously, the Department disagrees that there should be a minimum threshold number of firearms to be considered a dealer, whether through an estate-type auction or otherwise. Bona fide estate-type auctioneers are assisting persons in liquidating firearms inventories, not firearms that were acquired for the purpose of resale, and thus would not incur aiding and abetting liability.

5. General Concerns on Presumptions That a Person is Engaged in the Business

a. Overbreadth and Lack of Foundation

Comments Received

A general sentiment from commenters opposed to the proposed presumptions is that they are overbroad, would capture too many permissible sales by collectors, and are not valid indicators of unlawful activity or activity showing the person is an unlicensed gun dealer. The commenters opined that the presumptions include common, innocent behavior with firearms that firearm owners engage in every day, including the presumption, for example, that arises from evidence of selling firearms within 30 days after a purchase or selling firearms that are new or like-new, have original packaging, or are of the same or similar type of firearms. For example, one commenter stated that the presumptions would apply in a typical situation where a person has improved their financial situation and upgrades

multiple of their firearms from entry-level, inexpensive items that have more features or better reputation for reliability. This commenter argued that such a person's conduct in upgrading their collection would likely touch upon every single presumption. Similarly, another commenter explained how a person's conduct could fall within multiple presumptions without that person necessarily being engaged in the business. For example, the commenter said, a person purchases a 9mm firearm to carry concealed, but then does not like the recoil impulse and subsequently sells it in like-new condition within 30 days and with the original box. Subsequently, the commenter continued, the person purchases a second firearm and also does not like how it operates for concealed carry. If the person sells that second firearm in like-new condition within 30 days with the original box and it is a similar kind to the previously purchased firearm, then, the commenter concluded, that person would have multiple criteria factored against them as engaging in the business even though the person is not in fact engaging in the business of dealing in firearms.

Further, commenters stated the rule contradicts the scheme established by Congress and the new presumptions would apply to collectors in every instance despite the statutory language to specifically exempt the licensing requirement "occasional" gun sales and gun sales from a "personal collection." The presumptions, they stated, fail to recognize this exception. Some congressional commenters opposed to the rule stated: "We merely struck the 'livelihood' language from the statute. This was done to prevent someone who should register as a firearms dealer from evading licensing requirements because he or she had another job that supported his livelihood. In other words, we wanted to clarify that if a person has a job and also operates a firearms business, he or she must still register as a firearms dealer. This was the law in many different jurisdictions across the country and consistent with the ATF's guidance................In making this incremental clarification, we left in place all of the other language in the statute that needs to be considered by the ATF before deeming someone a firearms dealer..............Nothing in the presumptions take into account whether the individual devotes time, attention, and labor to dealing firearms. Similarly, the presumptions do not factor in whether the person repeatedly buys and

sells firearms as a regular course of trade or business" (footnote omitted).

Additionally, some commenters stated the proposed rule did not provide sufficient foundation or actual evidence for how any of the presumptions are linked to or give rise to criminal activity. Even though the Department cited observations and criminal and civil actions, one commenter stated these conclusions are "based on a censored sample" and are unreliable because the rule overstates the probative value of the behavior. The commenter argued that ATF would need to survey the likelihood that the circumstances giving rise to the presumption are present within the full class of persons who purchase firearms.

Department Response

The Department disagrees that the presumptions in the rule are overbroad and would capture innocent persons who only occasionally sell firearms from their personal collection without a license. The rebuttable presumptions are narrowly tailored to specific conduct that the Department has found through its investigative and regulatory enforcement experience, as well as numerous post-FOPA court and administrative decisions, to require a license. And crucially, the presumptions are rebuttable, so in the event a civil or administrative proceeding is brought, and a presumption is raised, it can be rebutted with reliable evidence to the contrary. Rebuttable presumptions are just that; they are not established fact, as some of the commenters suggest. And as stated previously, the presumptions shift only the burden of production; they do not change the burden of persuasion. Moreover, consistent with the statutory exclusions, the final rule expressly provides that a person will not be presumed to be engaged in the business of dealing in firearms when reliable evidence shows that the person is only reselling or otherwise transferring firearms: (a) as bona fide gifts; (b) occasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection; (c) occasionally to a licensee or to a family member for lawful purposes; (d) to liquidate (without restocking) all or part of the person's personal collection; or (e) to liquidate firearms that are inherited, or pursuant to a court order. *See* § 478.13(e). Evidence of these situations may be used to rebut any presumption in the rule, and the Department has clarified that this is not an exhaustive list. *See* § 478.13(f), (g). The Department is therefore providing objectively reasonable standards for

when a person is presumed to be "engaged in the business" to strike an appropriate balance that captures persons who should be licensed because they are engaged in the business of dealing in firearms, without limiting or regulating occasional sales by personal collectors and hobbyists.

The Department disagrees that the proposed rule did not provide sufficient foundation or evidence for how the presumptions are linked to or give rise to criminal activity. First, the presumptions in the rule are based on decades of pre-BSCA criminal case law that continues to be applicable, and the proposed rule cites numerous ATF criminal cases brought against persons who engaged in the business without a license based on evidence cited in each presumption. The presumptions are also based on ATF's significant regulatory enforcement experience,[191] including tens of thousands of compliance inspections of licensed FFLs in the last decade. ATF also reviewed summary information on criminal cases from Fiscal Year 2018 to Fiscal Year 2023 that it investigated, or is currently investigating, involving violations of 18 U.S.C. 922(a)(1)(A) and 923(a), to assess the extent to which the presumptions were consistent with conduct engaged in by persons who are unlawfully dealing in firearms without a license. Hundreds of cases described conduct that would fall under one or more of the EIB or PEP presumptions. Each of the presumptions was supported by the conduct described in these cases, except one. ATF did not find a case that included conduct that would fall under the PEP presumption on business insurance. The Department has therefore removed that presumption in this final rule. *See* § 478.13(d).

The Department disagrees with some commenters that the EIB presumptions do not indicate that a person devotes time, attention, and labor to dealing firearms. Each presumption requires conduct that demonstrates the devotion

---

[191] To further confirm that the proposed PEP presumptions were grounded in the behaviors of licensees who are engaged in the business or applicants seeking to become licensed, ATF surveyed Industry Operations Investigators ("IOIs") on their observations of active licensees and applicants during compliance and qualification inspections, respectively, regarding conduct that is described under the PEP presumptions. All PEP conduct had been observed by IOIs based on their experience inspecting various sizes and types of firearms businesses or applicants seeking to become licensed, except for the eighth PEP presumption (business insurance). For the eighth PEP presumption, IOIs indicated that, based on their experience of interacting with existing FFLs and FFL applicants who operate out of a residence, these types of businesses did not have or plan to have a business insurance policy that covered firearms inventory.

of time, attention, and labor to dealing in firearms through specific purchase and sale activities. For example, a person who purchases and resells firearms, and then offers to purchase more firearms for resale to the same person, has devoted time, attention, and labor to dealing in firearms as a regular course of business. The seller has expended time, effort, and money to locate and purchase firearms and locate interested customers, then offered to buy and sell more firearms to customers. The statutory definition of "engaged in the business" does not require a seller to have repeatedly purchased and resold firearms; rather, it is the person's intent to predominantly earn a profit through repetitive purchases and resales that must be proven. Each EIB presumption involves activities that tend to show this predominant profitmaking intent.

b. Enforcement of Presumptions

Comments Received

Several commenters stated that the proposed rule did not make clear to whom it would apply or how ATF or other law enforcement entities should consider the presumptions or criteria in an enforcement context. Commenters stated the rule needs to make clear what sales relating to personal collections or hobby are allowed without a license, so the public knows ahead of time if what they are doing requires a license. One commenter stated that there are no safe harbors in the rule that could encourage lawful and responsible behavior. The commenter suggested that it would be simpler to include a presumption that "[a]ny seller of a firearm who first transfers that firearm to a licensee should be presumed not to be a dealer in firearms regardless of all other indicia." According to the commenter, transferring a firearm to a licensee first shows that the seller cares about creating a record of the sale more than simply maximizing profit, and so such sellers should not be considered dealers. Further, this suggested presumption would encourage the conduct of private transactions through FFLs and accomplish the statutory objectives and the Department's and ATF's policy goals. However, the commenter added that this suggested presumption should not be used to imply that a sale that does not occur through an FFL is automatically an unlawful transaction. Another commenter similarly suggested that ATF's chief concern with creating these presumptions is to keep people from avoiding background checks. As a result, they said, ATF should exclude from the presumptions all sales in which background checks are

conducted, including sales to a current FFL, private sales facilitated through a current FFL, and sales of NFA firearms.[192]

Another commenter, who supported the rule, suggested that absent guidance from the Department about how the "criteria" would be weighted, an atmosphere of ambiguity and uncertainty exists for persons who sell or transfer firearms at gun shows, online, or through other means without an FFL, as well as for law enforcement and regulatory agencies enforcing the rule. The commenter suggested adding language to state that while no single factor is determinative, the Department will assign different weights to each factor depending on the context and circumstances of each case. For example, the commenter suggested that if a person rented a table at a gun show, the Department would consider the person to be engaged in the business if the person has displayed signs or banners with a business name or logo, offered warranties or guarantees for the firearms sold, or transferred firearms to residents of another State. Likewise, if the transaction occurs online, the commenter suggested the Department make clear in the rule that it will consider if the person created a website with a domain name that indicates a business activity, posted advertisements on online platforms that cater to firearm buyers and sellers, accepted payments through online services that charge fees for transactions, and whether the person has shipped firearms to persons who are residents of another State through online sales or transfers.

Another suggestion was that "ATF should consider clarifying that the initial burden of producing evidence to establish an 'engaged in the business' presumption in a civil or administrative proceeding falls on the government." They further suggested the rule should also state that, after a determination that the initial evidentiary burden for a presumption has been met, the burden of producing reliable rebuttal evidence shifts to the other party, and if the other party fails to produce sufficient reliable rebuttal evidence, the presumption will stand. They also suggested that the final rule should clarify whether the examples of conduct in paragraph (c)(4) (now § 478.13(e) and (f)) of the NPRM's definition of "engaged in the business"—that is not presumed to be "engaged in the business"—are intended to serve as rebuttable presumptions or as rebuttal evidence. "It appears," the commenter said, "from their placement outside of (c)(3) that the

(c)(4) examples are not designed to be rebuttable presumptions, but the final rule would benefit from clarifying how those examples are to be raised and applied in proceedings."

Department Response

The Department disagrees that the rule does not make clear to whom it would apply. The rule implements the provisions of the BSCA that amended the definition of "engaged in the business" in the GCA as it applies to wholesale and retail dealers of firearms. Thus, the rule is applicable to any person who intends to "engage in the business" of dealing in firearms at wholesale or retail, as the rule further defines that term. Such persons must become licensed and abide by the applicable requirements imposed on licensees under the GCA and 27 CFR part 478. And the rule further explains that the rebuttable presumptions are applicable in civil and administrative proceedings (*e.g.,* license issuance and asset forfeiture), not in criminal proceedings, though courts in criminal cases may choose to use them as permissive inferences. *See* § 478.13(c), (h). The Department will exercise its discretion to utilize the presumptions set forth in the rule in civil and administrative cases and may recommend their use as permissive inferences in criminal proceedings, when appropriate.

The Department disagrees that the rule does not make clear what sales relating to personal collections or hobbies are allowed without a license. The proposed rule explicitly recognized the GCA's "safe harbor" provision that a person is not engaged in the business if the person makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby. 88 FR 61994, 62001–02. It also stated that a person would not be presumed to be engaged in the business if the person transfers firearms only as bona fide gifts. *Id.* Transfers of firearms for these reasons do not support a presumption that a person is "engag[ing] in the business," and reliable evidence of these purposes may also be used to rebut any presumption and show that a person is not engaged in the business under the statute. *See* § 478.13(e), (f). The final rule also specifies that a person shall not be presumed to be engaging in the business when reliable evidence shows that the person is transferring firearms only to liquidate all or part of a personal collection of firearms. *See id.* In addition, the term "personal collection" is defined consistently with dictionary definitions to include firearms acquired

"for a hobby," and explains the circumstances under which firearms transferred to a personal collection by a former licensee prior to license termination may be sold or otherwise disposed.

Nonetheless, to further allay the concerns of commenters who sought further clarification of the "safe harbors," the Department is adding to this rule a list of conduct that does not support a presumption, as previously stated. *See* § 478.13(e). Reliable evidence of such conduct may also be used to rebut the presumptions. *See* § 478.13(f). The Department has also stated in the rule that the list of rebuttal evidence is not exhaustive. *See* § 478.13(g). Additionally, while the Department disagrees with the commenter that the regulatory text in the final rule needs to explain how the rebuttable presumptions shift the burden of production, the Department agrees with the commenter as to how they are to be applied. As an initial matter, a person will not be presumed to be engaged in the business of dealing in firearms when reliable evidence shows that the person only sells or transfers firearms for one of the reasons listed in § 478.13(e). Determining whether a presumption applies is a fact-specific assessment, as is determining whether a person is engaging in conduct that does not support a presumption, such as buying or selling firearms to enhance or liquidate a personal collection. For example, unlicensed individuals selling firearms at a gun show or using an online platform cannot merely display a sign or assert in their advertisement that the firearms offered for sale are from a "personal collection" and preclude application of a presumption. Instead, whether a presumption would apply requires an assessment of the totality of the circumstances, including an evaluation of the reliability of any such assertion regarding a "personal collection."

Once a proceeding is initiated, the burden of persuasion never shifts from the Government or plaintiff. If evidence sufficient to support a presumption is produced in a civil or administrative proceeding, the responding person has the opportunity to produce reliable rebuttal evidence to refute that presumption. If the responding person produces such reliable evidence, additional evidence may be offered by the Government or plaintiff to further establish that the person has engaged in the business of dealing in firearms, or had the intent to predominantly earn a profit through the repetitive purchase and resale of firearms, depending on which set of presumptions is applied. If

the responding person fails to produce evidence to rebut a presumption, however, the finder of fact would presume that the person was "engaged in the business" of dealing in firearms, or had a predominant intent to earn a profit from the repetitive sale or disposition of firearms, as the case may be.

The Department agrees that a person should be able to rebut a presumption that they are engaged in the business of dealing in firearms requiring a license if the sales are occasionally only to an FFL or to a family member for lawful purposes. A person who only occasionally sells a firearm to a licensee is not likely to have a predominant intent to earn a profit because a licensee typically will offer less than a non-licensee for the firearm given the licensee's intent to earn a profit through resale.[193] The same reasoning applies to family members because the seller is less likely to have a predominant intent to earn a profit due to their pre-existing close personal relationship (*i.e.*, a less than arms-length transaction). For this reason, the occasional sale of firearms to a licensee or to a family member for lawful purposes has been added to the non-exhaustive list of examples of evidence that may rebut any presumption. § 478.13(e)(3), (f). However, the Department is not excluding from the presumptions a person who engages in private sales that are facilitated by a licensee. Even though such sales are certainly allowed,[194] a private seller likely

intends to predominantly earn a profit from those arms-length sales even if the licensee requires a fee for the service of running a background check.

The Department disagrees with the comment that the rebuttable presumptions in the rule should be considered only as criteria that should be weighted and not as rebuttable presumptions. Of course, in the final determination of whether someone is "engaged in the business," all the evidence, for and against, will be weighed by the fact finder. But that does not preclude the use of reasonable and supported rebuttable presumptions as part of that process. In that vein, to best clarify who is presumptively required to be licensed as a dealer, the rule identifies specific conduct that will be presumed to be "engaging in the business" with the intent to "predominantly earn a profit." The presumptions are not factors; nor are they weighted according to the various circumstances described in each presumption because any one of them is sufficient to raise the presumption, and any may be rebutted by reliable evidence to the contrary.

c. Exemption From Presumptions

Comments Received

At least one commenter in support of the proposed rule raised concerns about the exception from the presumptions where a person "would not be presumed to be engaged in the business requiring a license as a dealer when the person transfers firearms only as bona fide gifts or occasionally sells firearms only to obtain more valuable, desirable, or useful firearms for their personal collection or hobby, unless their conduct also demonstrates a predominant intent to earn a profit." [195] The commenter stated that, although a bona fide gift should suffice to rebut a presumption, the exclusion of these types of situations "risks creating a significant loophole whereby firearms traffickers could shift the burden of proof simply by claiming that any suspicious transaction was a gift." The commenters cited *United States* v. *Gearhart*, No. 23–cr–00013, 2023 WL 5925541, at *2 n.3 (W.D. Va. Sept. 12, 2023) as an example of when a straw purchaser initially told investigators that she bought the gun as a gift.

By contrast, another commenter not in support of the rule stated that "Congress affirmatively exempted from licensure *all* sales to expand or liquidate a private collection and occasional transactions— even with some profit motive—to

---

[193] *See* Enlisted Auctions, *How Do I Sell My Firearms?, https://www.enlistedauctions.com/resources/how-do-i-sell-my-firearms* (last visited Mar. 6, 2024) ("You can take your firearm to a local gun shop. Typically gun shops will buy your firearm from you at a lower price and then try to resell the firearm at a profit. Pros to this method are that you can take the firearm to the store, drop it off, receive your payment and you are done. Downside is that you do not typically receive market value for your firearm. Think of it as trading in a vehicle. When you trade in your car at a dealership, the dealer never pays you what the car is worth on the open market."); Dunlap Gun Buyers, *How to Sell a Gun in Maryland: A Comprehensive Guide* (Sept. 8, 2023), *https://www.cashmyguns.com/blog/how-to-sell-a-gun-in-maryland* ("Gun owners can sell their firearm to a local dealer. This is a good way to help ensure gun owners are complying with gun laws in Maryland for firearm sales. However, sellers may be leaving money on the table by selling for much less than the gun's actual market value.").

[194] *See* ATF, *Facilitating Private Sales: A Federal Firearms Licensee Guide, https://www.atf.gov/firearms/docs/guide/facilitating-private-sales-federal-firearms-licensee-guide/download* (last visited Mar. 6, 2024); ATF Proc. 2020–2, *Recordkeeping and Background Check Procedure for Facilitation of Private Party Firearms Transfers* (Sept. 2, 2020), *https://www.atf.gov/rules-and-regulations/docs/ruling/atf-proc-2020-2-%E2%80%93-recordkeeping-and-background-check-procedure/download*.

[195] 88 FR 62001–02.

enhance a collection or for a hobby. But ATF now seeks to presume the opposite for a wide array of transactions.''

**Department Response**

The Department disagrees that the bona fide gift exception is a ''loophole'' for multiple reasons. First, transferring a firearm as a bona fide gift to another person is not a ''sale'' because there is no ''exchange'' or payment of money, goods, or services for the firearm. Second, a person who is not otherwise engaged in the business as a dealer and truly intends to give a firearm as a gift does not ordinarily devote time, attention, and labor to firearms dealing as a trade or business or show the predominant intent to earn a profit through the repetitive purchase and resale of firearms. The *Gearhart* case cited by one of the commenters is not a case of dealing in firearms without a license; rather, it is a case where a person aided and abetted a straw purchaser to buy a firearm for himself—the actual buyer—not for resale to others. Third, as in all fact-based proceedings, a party must establish through evidence that a claim of fact is reliable in order to use that fact in their favor. That determination is made by the finder of fact, not the proponent of the argument. Fourth, to the extent that gifts are mutually exchanged between both parties, as the commenter recognizes, the transfer of bona fide gifts is evidence that can be used to rebut any presumption. Once the Government proves an exchange, or offer to exchange, firearms for something of value, the responding party may submit evidence to show that the firearms were transferred only as bona fide gifts.

The Department disagrees with the commenter that this rule causes all firearms transactions to be deemed engaged in the business of dealing in firearms, but agrees that the rule should make clear that an occasional sale only to obtain more valuable, desirable, or useful firearms for a personal collection or hobby, or liquidation of all or part of a personal collection, should not be presumed to be engaging in the business. Based on the Department's agreement with this comment, the final rule adds this activity to the list of conduct that does not support a presumption and as evidence that can rebut any presumption a proceeding be initiated. *See* § 478.13(e)(2) and (4), (f). However, as explained previously, the term ''liquidation'' is inconsistent with a person acquiring additional firearms for their inventory (*i.e.,* ''restocking''), and that has been made clear in a

parenthetical in the regulatory text. *See* § 478.13(e)(4).

**d. Use of Presumptions in Particular Proceedings**

**Comments Received**

Several commenters expressed concerns about the application of the presumptions in criminal contexts or in administrative or civil contexts. More than one commenter expressed that there was confusion as to whether ATF will use the presumptions (either the engaged in the business presumptions or the intent to predominantly earn a profit presumptions) in criminal proceedings. One of the commenters raised concerns about when and how ATF will use the presumptions in administrative or civil proceedings. The commenter stated that much of ATF's administrative jurisdiction is over existing FFLs, which are already engaged in the business and thus not affected by the rule. The commenter then asked whether ATF intends to apply the presumptions to ''FFLs who transfer firearms for unlicensed individuals that ATF believes are 'engaged in the business?' '' They expressed concerns that this would mean holding FFLs responsible for whether their customers are unlawfully engaging in the business ''under the nebulous standards of the proposed rule,'' which would make it too risky for any FFL to ever facilitate a third-party transfer. The commenter suggested that the only other possibility was to use the presumptions in forfeiture actions, but these were substantially restricted as part of FOPA and were not amended as part of the BSCA.

**Department Response**

The Department acknowledges commenters' confusion about the application of the presumptions to criminal, civil, and administrative proceedings. This final rule makes clear that the rebuttable presumptions are to be used by persons potentially subject to the licensing requirement to consider whether they must obtain a license, as well as in civil and administrative proceedings, but they do not apply to criminal proceedings. Civil and administrative proceedings include, for example, civil asset forfeiture and administrative licensing proceedings.[196] However, as discussed in Section IV.B.9.b of this preamble, this final rule indicates that a court in a criminal case, in its discretion may, for example, elect to use the presumptions as permissive inferences in jury instructions.[197]

Criminal investigations, prior to formal charging, are covered by separate policies, rules, and legal limitations, and are not within the scope of this rule. The final rule does not suggest the presumptions be used in criminal proceedings to shift the Government's burden of proof to the defendant. In criminal proceedings, the Due Process Clause prohibits the prosecution from using evidentiary presumptions in a jury charge that have the effect of relieving the prosecution of its burden of proving every element of an offense beyond a reasonable doubt.[198] This rule does no such thing.

Regarding civil or administrative proceedings involving existing licensees, the Department disagrees that the standards in the rule are ''nebulous.'' The presumptions identify specific conduct that is presumed to be engaging in the business, and the presumptions are to be applied in all civil and administrative proceedings where there is evidence of such specific conduct. Indeed, licensees have long been prohibited by the GCA from willfully assisting persons they know are engaged in the business of dealing in firearms without a license. *See* 18 U.S.C. 2; 922(a)(1)(A). Moreover, the BSCA's amendment at 18 U.S.C. 922(d)(10) now prohibits licensees or any other person from selling or otherwise disposing of a firearm to a person knowing or having reasonable cause to believe that such person intends to sell or otherwise dispose of the firearm in furtherance of a Federal or State felony, including 18 U.S.C. 922(a)(1). These violations of the GCA may be brought against a licensee, or the licensee's firearms, in a civil forfeiture or administrative licensing proceeding. For example, if a licensed dealer sold firearms to a known member of a violent gang who the dealer knew was repetitively selling the firearms within 30 days from purchase to other gang members, the dealer's license could be revoked under 18 U.S.C. 923(d)(1)(C) for willfully aiding and abetting a violation of section 922(a)(1)(A), and potentially for willfully violating section 922(d)(10). Under these circumstances, the gang member would be presumed to be engaged in the business, and evidence of the gang member's repetitive sales could be put forward in the administrative action to revoke the dealer's license.

However, for the Government to take administrative action on that basis against an existing licensee, or a license applicant, it would still need to prove the person committed the conduct

[196] *See* footnote 85, *supra.*
[197] *See* footnote 66, *supra.*
[198] *See Francis,* 471 U.S. at 313.

**29028** **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

willfully. *See* 18 U.S.C. 922(a)(1)(A), 923(d)(1)(C), 923(e). Even if a presumption applied in a given case against a licensee, the Government would still have to prove that a licensee facilitating a private sale knew of an unlicensed dealer's purchase and resale activities without a license, and either purposefully disregarded the unlicensed dealer's lack of a license or was plainly indifferent to it. Thus, a licensed dealer who inadvertently facilitates occasional private sales for an unlicensed person whom the licensee does not know is engaged in the business, and who is not plainly indifferent to the seller's need for a license, would not be liable for the private seller's misconduct.

### 6. EIB Presumption—Willingness and Ability To Purchase and Sell More Firearms

#### Comments Received

Generally, commenters opposing this EIB presumption stated it was too broad and provided several examples of typical conduct that would be captured under the presumption requiring a person to obtain an FFL. Gun collectors' associations stated that most people who collect firearms or engage in the sale of firearms for a hobby are willing to buy or willing to sell. A commenter provided additional examples in which the commenter stated that ATF could presume a person is unlawfully engaged in the business, such as a person downsizing a personal collection by a single firearm while expressing a desire to continue downsizing, selling one firearm while offering to buy another, or trading one firearm for another in someone else's collection. Likewise, some commenters believed that any gun owner who discusses sales of firearms with friends or relatives or who makes repetitive offers to sell a firearm in order to secure a reasonable price will need to be licensed because of the first presumption.

Specifically, some commenters argued that this presumption would capture and penalize sellers who make statements as a part of normal interactions, such as "I need money to settle my divorce. That's why I'm selling this Colt 1911. If you like this one, I also have another with a consecutive serial number. Yeah, I'm losing money on them, but I need the cash." This type of statement or innocuous statements such as, "[M]y wife makes me sell a gun to buy a new one, so I'm always buying and selling guns" are being wrongfully equated to criminal actors who may say to an undercover officer, "I can get you whatever you want" or that he can "get plenty more of these guns" and "in a

hurry" for the right amount of money. Commenters indicated that a huge difference between these two scenarios is the totality of the circumstances. The rule, they argued, is incorrectly crafted to avoid the need for any totality of the circumstances analysis, so that only one firearm, one presumptive circumstance, or "possibly one overriding circumstance" is necessary, coupled with the subjective assessment of an agent.

Another commenter suggested that ATF could amend the presumption to correct the issue. "Presently," the commenter said, "the language is too broad to function as a rebuttable presumption because its plain language meaning places it in conflict with the presumption that an occasional seller is *not* 'engaged in the business.' If ATF amended this presumption to include a frequency element, it would rectify this issue." (emphasis added by commenter). The commenter suggested one option could be, "[a] person will be presumed to be engaged in the business of dealing in firearms when the person, on a recurring basis, sells or offers for sale firearms, and also represents to potential buyers a willingness and ability to purchase and sell additional firearms, or otherwise demonstrates the person's willingness and ability to act as a dealer in firearms on a recurring basis," and added that this alternative would add the necessary frequency element and also correct a disjunctive "or" included in the original to make the presumption clearer.

#### Department Response

The Department disagrees with the comments that the first EIB presumption is too broad, or that collectors or hobbyists will be unable to maintain or downsize their personal collections without a license under the first EIB presumption in the rule. A person who makes repetitive offers to sell firearms to downsize or liquidate a personal collection does not fall within the presumption, which requires not only that the person sell or offer for sale firearms, but also demonstrate a willingness and ability to purchase and resell additional firearms that were not already part of their personal collection. This conduct is sometimes referred to as "restocking." [199] Nonetheless, to make

this point clear, the following parenthetical has been added in the first EIB presumption: "(*i.e.,* to be a source of additional firearms for resale)." § 478.13(c)(1). This presumption, like the others, may be rebutted with reliable evidence to the contrary in any proceeding.

The Department disagrees that the first presumption is too broad to function as a presumption without a time limitation because it conflicts with the statutory exception for occasional sales to enhance a personal collection. Persons who resell (or offer for resale) firearms and hold themselves out to potential buyers or otherwise demonstrate a willingness and ability to purchase and resell additional firearms for resale are engaged in the business, according to well-established case law. For example, in *Carter,* 801 F.2d at 82, the Second Circuit found there was sufficient evidence that the defendant engaged in the business in violation of 18 U.S.C. 922(a)(1) even though he made only two sales four months apart. The Court explained that, "[a]lthough the terms 'engage in the business of' and 'dealing in' imply that ordinarily there must be proof of more than an isolated transaction in order to establish a violation of this section . . . [the] defendant's conduct was within the intended scope of the statute" because "the statute reaches those who hold themselves out as a source of firearms." [200] There is no need for a time limitation because such persons are holding themselves out as a source of additional firearms for resale, thereby demonstrating a present intent to engage in repetitive purchases and resales for profit. This presumption merely shifts the burden of production to the responding person to show that those resales occurred only occasionally to enhance a personal collection, liquidate inherited firearms, or were otherwise not sold to engage in the business as a dealer.

### 7. EIB Presumption—Spending More Money on Firearms Than Reported Income

#### Comments Received

Numerous commenters stated that this presumption is broad and unclear. A couple of commenters questioned the meaning of "applicable period of time" in this presumption, with one commenter claiming that the presumption would "assume the majority of purchasers of high end collectible firearms [are] 'engaged in the business' off of merely the fact that[they]

---

[199] *See Restock,* Cambridge Online Dictionary, *https://dictionary.cambridge.org/us/dictionary/ english/restock* (last visited Mar. 7, 2024) ("to replace goods that have been sold or used with a new supply of them"); *Restock,* The Britannica Online Dictionary, *https://www.britannica.com/ dictionary/restock* (last visited Mar. 7, 2024) ("to provide a new supply of something to replace what has been used, sold, taken, etc.").

[200] 801 F.2d at 81, 82 (internal quotation marks omitted); *see also* footnote 68, *supra.*

ATF 015340

APPX.061

they purchased a gun more expensive than their income for some period." Other commenters also stated there are many ways people might not have reportable gross income. For example, adult children may not have any gross taxable income, so buying and selling even two firearms in a year could trigger the presumption. Similarly, commenters noted that retired collectors with little or no reportable gross income compared to their assets could be at significant risk of being considered dealers without even offering a gun for sale or for spending as little as $200 to advertise the sale of a firearm on *GunBroker.com* or in a similar publication.

Another commenter provided specific examples of how law-abiding gun owners who should not be considered dealers could easily be dealers under this presumption. For instance, a California peace officer, who suffers career-ending injuries and goes through the appropriate process, would be eligible for ongoing disability payments of 50 percent of base pay, none of which is taxable. Under this pattern of facts, the commenter argued, a law-abiding gun owner with such a disability award and no other income could be presumed to be a dealer if they sold only one firearm of any value. The commenter asserted that many military members are in a similar situation where they may receive disability pay that is not taxable. In all these cases, these people might need post-separation income or to buy and sell firearms without ever desiring to be dealers or making a profit on the sales, but they run the risk of being presumed to be dealers based on this second presumption. An additional commenter similarly stated the "provision that a person who spends more money than their reported gross taxable income on purchasing firearms for resale, has no basis what-so-ever in 'profit.' Profit is based on a sum in excess of all costs. Not gross income. Further, many retired people have a small gross taxable income compared to their assets."

One commenter claimed that assorted welfare benefits are excluded from gross income and that, to the extent that those benefits "benefit disproportionately persons based on race or other classification," the second presumption is constitutionally suspect. The commenter said that ATF needs to justify the use of gross income in this presumption, which could have a disproportionate impact on persons on the basis of race. Similarly, at least one commenter in support of the proposed rule also suggested that this presumption could potentially create an "unreliable" standard, whereby high-income dealers could sell large amounts of firearms without ever being subject to the presumption, while a single sale could be enough to subject a person with low or fixed income to the presumption of unlawful dealing. The commenter advised that for this specific presumption, the Department adopt a numerical threshold of ten gun sales per year, which would make applying this presumption easier for courts and law enforcement while avoiding the inequities of ATF's income-based approach.

Department Response

In proposing this presumption, the Department noted that the likely intention of a person who expends more funds on the purchase of firearms in an "applicable period of time" than the total amount of their reported gross income for that period would be to resell the firearms for a profit. As noted by several commenters, however, there are several situations in which individuals with income that is not reportable as gross taxable income—such as those receiving disability or welfare benefits, retired firearm collectors, retirees drawing on Roth IRAs, and young adult children—could expend that non-reportable income at levels in excess of their gross reported income to purchase firearms, yet not intend to resell those firearms for a profit. Application of a gross income presumption to such individuals, commentors argued, would unfairly require them to disprove that they were engaged in the business when they purchased a firearm or firearms. While such circumstances would seem to be unlikely, the Department acknowledges they could occur. The Department similarly acknowledges that commenters' observations regarding the potential disparate effect of a gross income-based presumption on low-income individuals, while also unlikely, may occur. In light of these considerations, the Department has decided not to include a gross income-based presumption in this final rule and has removed it from the final rule.

Although the Department has determined not to include a gross income-based presumption in this final rule, the Department notes that evidence of expenditures for the purchase of firearms in excess of an individual's reported gross income may nevertheless be relevant to the factual assessment as to whether an individual is engaged in the business. As amended by BSCA, the relevant assessment under the GCA is whether a person's intent in engaging in firearms sales is predominantly one of obtaining pecuniary gain; the financial circumstances of an individual engaged in the repetitive acquisition and sale of firearms is therefore relevant to this assessment.

8. EIB Presumption—Certain Types of Repetitive Transactions

a. Repetitively Transacting Firearms Through Straw Persons/Sham Businesses

Comments Received

With regard to this presumption, at least one commenter questioned why it was needed if straw purchasing is already a felony, while another commenter raised no objection to a presumption that relied on other crimes to establish the presumption. A couple of commenters did not agree with the straw purchaser presumption because it could unfairly capture unlicensed persons, as demonstrated in the following scenarios. For example, they said, collectors purchase firearms on the used firearms market, which is the only place to find vintage firearms, but they could trigger this presumption without being aware they had purchased the firearm through a straw seller. Similarly, an unlicensed person who innocently sells two firearms that he no longer finds suitable for self-defense would be presumed to be engaged in the business if the buyers of the firearms turn out to be straw purchasers.

One commenter suggested that "[t]he final rule should clarify that while firearm sales involving illicit straw middlemen and contraband firearms are indicative of the seller's criminal purposes, these sales are also indicative of an individual's predominant intent to profit when undertaking the sales. The conduct can indicate both at the same time, and, as the NPRM notes, it is the illicit nature of the middleman activity and firearm types that increases the profitability of the sale. While the criminal purposes involved in such sales obviate ATF's need to prove profit under BSCA's definition of 'to predominantly earn a profit,' it does not obviate the fact that such sales are in fact predominantly motivated by profit."

The same commenter, who generally supported the rule, had a suggestion for improving this presumption. They stated that, "[w]hile sensible as currently drafted and deserving of inclusion in the final rule, this presumption would benefit by clarifying whether the word 'repetitively' in the Proposed Rule is intended to apply to the phrase 'sells or offers for sale' in the same way that it clearly applies to 'purchases for the purpose of resale.' "

Department Response

The Department disagrees that the presumption addressing straw purchasers is not needed because straw purchasing is already a felony. While it is true that straw purchasing is a felony,[201] all persons who engage in the business of dealing in firearms are required to be licensed, even if the means by which those firearms are purchased and sold is unlawful. Moreover, the Department agrees with the comment that firearms purchases and sales through straw individuals and sham businesses are indicative of an individual's predominant intent to profit from those repeated illicit sales. In any event, Federal law provides that the Government is not required to prove profit, including an intent to profit, where a person is engaged in regular and repetitive sales for criminal purposes, pursuant to 18 U.S.C. 921(a)(22). Making repetitive resales through straw individuals or sham businesses for the purpose of engaging in the business without a license is a criminal purpose.[202] The statute itself thereby provides notice to such persons that they may be unlawfully engaging in the business of dealing in firearms.

At the same time, collectors who innocently purchase and sell firearms from or through a straw purchaser without knowing the person was acting for someone else, or purposefully disregarding or being plainly indifferent to that fact, would not incur liability for engaging in the business without a license. The Government must prove willful intent in all relevant licensing and forfeiture proceedings. For example, if the Government were to deny an application for a license because of previous unlawful unlicensed dealing, it must show that the applicant "willfully violated" the unlicensed dealing prohibition at 18 U.S.C. 922(a)(1). *See* 18 U.S.C. 923(d)(1)(C).

The Department agrees that the term "repetitively" applies to purchases of firearms in the same way as it applies to sales of firearms. Consequently, the Department has added the word "repetitively" before "resells or offers for resale" with respect to the straw/ sham business and unlawfully

possessed firearms presumptions. *See* § 478.13(c)(2).

b. Repetitively Purchasing Unlawfully Possessed Firearms

Comments Received

As with the presumption related to straw purchasing or sham businesses, at least one commenter said that the presumption is unnecessary because unlawful possession of certain firearms can already be prosecuted as a stand-alone felony. The commenter also questioned the need for this presumption because no legitimate business would deal in illegal firearms, and so buying and selling such firearms would show that a person is not engaged in the business. The commenter further noted that there is no way for a person to know if the firearm they acquire is stolen because "[t]here is no database where a would-be purchaser, or seller for that matter, may check if a gun is stolen." The commenter similarly questioned how an average person would know if a particular firearm was imported illegally, providing the example of a vintage World War I Luger that could have been brought to the United States legally in 1919 as a souvenir, or smuggled into the country illegally in 1970. Another commenter noted that the NPRM did not explain how possession of certain unlawful firearms (stolen guns, those with serial numbers removed, or those imported in violation of law), in addition to its own separate crime, also constitutes unlawful dealing. The commenter added that the GCA draws no connection between being engaged in the business as a dealer in firearms and the unlawful possession of certain types of firearms.

By contrast, at least one commenter in support of the rule suggested that the Department add "weapons, the possession of which is prohibited under [S]tate or local laws" to the list of examples in the presumption of firearms that cannot be lawfully purchased or possessed.

Department Response

The Department disagrees that the presumption addressing buying and selling of prohibited firearms is not needed because possession of such firearms is already a crime. As with dealers who transact through straw individuals, which is also a Federal crime, all persons who engage in the business of dealing in firearms are required to be licensed even if the firearms purchased and sold by the business are also unlawful to possess. Contraband firearms are actively sought

by criminals and earn higher profits for the illicit dealer because of the additional labor and risk to acquire them. Illicit dealers will often buy and sell stolen firearms and firearms with obliterated serial numbers because those firearms are preferred by both sellers and buyers to avoid background checks and crime gun tracing. However, bona fide collectors who occasionally purchase and resell firearms from their personal collections without knowing the characteristics of the firearms that make them unlawful to possess would not incur liability for engaging in the business without a license. There is always a requirement for the Government to prove a willful intent to violate the law in any proceeding arising under 18 U.S.C. 922(a)(1), 923(a), 923(d)(1)(C), or 923(e). In addition, each presumption may be refuted with reliable evidence that shows the person was not engaging in the business, such as evidence that they were occasionally reselling to obtain more valuable firearms for their personal collection. *See* § 478.13(f). Moreover, under the BSCA, 28 U.S.C. 534(a)(5), once licensed, dealers who may have innocently purchased unlawful firearms will now have access to the FBI's National Crime Information Center database to verify whether firearms offered for sale have been stolen.

The Department agrees with the comment that it should revise this presumption on repetitive purchases and resales to clarify that it includes firearms unlawfully possessed under State and local laws. The fact that profit motive is buttressed by the illicit nature of the product applies equally to firearms that are illegal under State law. One of the primary purposes of the GCA was to enable the States effectively to regulate firearms traffic within their borders. *See* Omnibus Crime Control and Safe Streets Act of 1968, Public Law 90–351, sec. 901(a), 82 Stat. 197, 225– 26.[203] And, according to the comment from Attorneys General representing 20 States and the District of Columbia, "many guns are trafficked across [S]tate lines, exploiting the differences in [S]tate regulations." Accordingly, the Department has revised the presumption to make it clear that it includes all firearms that cannot lawfully be purchased, received, or possessed "under Federal, State, local, or Tribal law," and cites the Federal prohibitions only as examples. § 478.13(c)(2)(ii).

---

[201] *See* 18 U.S.C. 932 (prohibiting straw purchasing of firearms); 922(a)(6) (prohibiting false statements about the identity of the actual purchaser when acquiring firearms); 924(a)(1)(A) (prohibiting false statements made in licensee's required records).

[202] *See* 18 U.S.C. 922(d)(10) (making it unlawful for any person to sell or otherwise dispose of a firearm to any person knowing or having reasonable cause to believe that such person, including as a juvenile, intends to sell or otherwise dispose of the firearm or ammunition in furtherance of a felony, including sec. 922(a)(1)).

[203] *See also* S. Rep. No. 90–1097, at 28 (1968); H.R. Rep. No. 90–1577, at 6 (1968); S. Rep. No. 90– 1501, at 1 (1968).

9. EIB Presumption—Repetitively Selling Firearms in a Short Period of Time

a. Repetitively Selling Firearms Within 30 Days After Purchase

Comments Received

Numerous commenters disagreed with the presumption that a person is a dealer if they repetitively sell or offer for sale a firearm within 30 days after originally purchasing the firearm. Commenters noted that this presumption shows ATF's lack of understanding of the firearms community. Commenters stated it is common for people, including collectors and firearm enthusiasts, to find themselves in a situation where they buy a firearm and quickly regret the purchase. They disagreed with the Department basing the presumption on the assertion that stores have a 30-day return period. Some commenters stated that stores frequently have strict no-return policies, and other commenters stated that stores frequently offer a "non-firing inspection period" within which a customer can return the firearm. This means that if the customer fires the gun after purchase and does not like it, the person has no choice but to sell the firearm as used. Another commenter provided common scenarios where they claimed a person would be presumed to be a dealer under this presumption. In one example, a non-licensee who buys two firearms that do not work or fulfill their intended role and subsequently sells them within 30 days would be presumed to be engaged in the business because of the "repetitive" sales of the firearms within 30 days of purchase. The commenter also suggested that a person who inherits a firearm collection from a parent and chooses to sell those firearms by auction or by other private sale within 30 days would be subject to prosecution under this presumption.

At least one commenter in support of the rule recommended that the period for this presumption be extended from 30 days to 90 days to make it more difficult for people to structure transactions in a way that would evade licensing and background check obligations.

Department Response

The Department disagrees with commenters that it is common for persons to repetitively purchase and resell firearms within 30 days without a predominant intent to profit, such as by selling unsuitable or defective firearms. Common sense and typical business practices dictate that it is more consistent with profit-based business

activity than collecting to buy and resell inventory in a short period, and as stated previously, that is true especially when the firearm could be returned yet is resold instead. For one thing, multiple firearms would have to be purchased and resold within that 30-day period of time to trigger the presumption. Thus, even assuming a person could not return a firearm, which is not always the case, it is unlikely that there would be more than one unsuitable or defective firearm that would need to be resold during the 30-day period unless the person is engaged in the business.[204] And, as with the other presumptions, this presumption may be refuted by reliable evidence to the contrary to account for less common circumstances raised by the commenters.

With regard to the suggestion to extend the 30-day period to 90 days, the Department disagrees. The Department believes that the turnover presumption for persons actively engaged in the business of dealing in firearms of varying conditions, kinds, and types is more likely to occur within a relatively short period of time from the date of purchase. While the Department understands that some licensees will not accept returns, 30 days is a reasonable time frame within which ATF can distinguish those who are engaged in the business from those who are not because many licensees, including licensed manufacturers, will accept returns of unsuitable or defective firearms within that period of time. *See* footnote 81, *supra*.

Finally, the Department disagrees that a person who inherits a personal collection and liquidates it within 30

days after inheritance falls within the 30-day turnover presumption. The presumption applies only to persons who repetitively resell firearms within 30 days "after the person purchased the firearms." § 478.13(c)(3)(i). A person who inherits a personal collection does not, in the absence of other factors, "purchase" or exchange something of value in order to receive the firearms. To further clarify, the final rule also lists, as rebuttal evidence, the specific example of a person who liquidates inherited firearms. *See* § 478.13(e)(5)(i), (f).

b. Repetitively Selling New or Like-New Firearms

Comments Received

Of the several presumptions, some commenters believed that this presumption hurts collectors, who are not licensees, the most because they value the original condition of firearms and, as such, frequently keep firearms in like-new condition and with their original packaging. Again, commenters stated that including this presumption demonstrates the Department's and ATF's lack of understanding of how the community values firearms. One commenter pointed out, as an example, that "[t]he National Rifle Association has three collector grades for new or like new modern firearms—'New,' 'Perfect,' and 'Excellent'—which represent the three most coveted and sought-after grades," and included a link to an article on how to evaluate firearms. Another commenter noted that it is fairly standard for a person to buy a firearm, shoot it a few times, and then sell it in the original box in a private sale because selling the firearm in its original box contributes to the value of the firearm. This, the commenter noted, should not be considered to be engaging in the business. Numerous commenters noted that owners keep firearms in the original boxes not out of criminality, but for collectability. At times, the packaging may be more valuable than the firearm. Therefore, a gun might appear to be "like new" possibly months or years after a transaction and one may be presumed to be engaging in the business under this presumption if the person later sells their like-new firearm with the original packaging. Further, "like new in original packing firearms are . . . the most sought after of collectible firearms," said one commenter. At least one commenter stated that this rule will make firearms less safe if individuals discard the original packaging, which often includes warnings and safety information about the firearm, in order

---

[204] Further support for a 30-day resale presumption comes from ATF's experience observing persons who sell firearms at gun shows. Because of the frequency of gun shows, unlicensed dealers have a readily available marketplace in which to buy, display, and sell numerous firearms for a substantial profit within one month. According to one study, there were 20,691 guns shows in the United States that were promoted and advertised between 2011 and 2019, with 2,299 gun shows per year. *See* David Pe´rez Esparza et al., *Examining a Dataset on Gun Shows in the US, 2011–2019,* 4 Journal of Illicit Economies and Development 86, 87 (2022), *https://storage.googleapis.com/jnl-lse-j-jied-files/journals/1/articles/146/submission/proof/146-1-1646-1-10-20220928.pdf;* see also Crossroads of the West, *2024 Gun Show Calendar* 1, *https://www.crossroadsgunshows.com/wp-content/uploads/2024/03/Calendar-2024.pdf* (last updated Mar. 20, 2024) (48 gun shows in Arizona, California, Nevada, and Utah in 2024); Gun Show Trader, *Missouri Gun Shows, https://gunshowtrader.com/gunshows/missouri-gun-shows/* (last visited Mar. 26, 2024) (57 gun shows in Missouri and Arkansas in 2024); Gun Show Trader, *Central Indiana Gun Show Calendar, https://gunshowtrader.com/gunshows/central-indiana/* (last visited Mar. 8, 2024) (54 gun shows in Indiana in 2024).

to avoid being considered a dealer under the presumption when they later want to sell the firearm.

Department Response

The Department does not agree that most persons who repetitively purchase and resell firearms that are in a new condition, or like-new condition in their original packaging, lack a predominant intent to earn a profit. That is too broad an assessment. On the contrary, the Department has found—based on its experience as described above—that this type of behavior is an indicator of being engaged in the business with a predominant intent to earn a profit from dealing in firearms in pristine condition.[205] This is even more likely to be the case when the new or like-new firearms are repetitively purchased and resold within a one-year period of time. However, the Department acknowledges commenters' concerns and agrees that true collectors may hold collectible firearms for a long period of time, and that some collectible firearms may appear to be like-new months or years after purchase. Therefore, to reduce the possibility that these "new" or "like-new" firearms [206] are part of a personal collection, and to account for the higher likelihood that repetitive resales of such firearms in a relatively short time period are made with an intent predominantly to earn a profit, the Department has incorporated a one-year turnover limitation into the presumption. *See* § 478.13(c)(3)(ii)(A). The Department believes that persons acting with a predominant intent to earn a profit are likely to repetitively turn over firearms they purchase for resale within this period. In addition, ATF's experience [207] is that collectors and

hobbyists routinely retain their personal collection firearms for at least one year before resale, so the Department believes this is also a reasonable period that would not pose a burden on collectors and hobbyists.[208] As with the other presumptions, this one may be refuted with reliable evidence to the contrary.

c. Repetitively Selling Same or Similar Kind/Type Firearms

Comments Received

Numerous commenters stated that this presumption targets collectors who often focus on collecting a specific type or kind of firearm (*e.g.,* Colt single action revolvers, over-under shotguns, or World War II-era bolt-action rifles) and would thus be more likely to sell firearms by the same manufacturer or of the same type to enhance their collection. "Virtually every collector or hobbyist focuses their efforts on specific manufactures and types of firearms. They are for the most part devoted to something," said one commenter. The commenters claimed that "a collector liquidating his collection will almost assuredly be presumed to be engaged in the business, especially if he requires more than one incident to sell his collection," but the collector "is doing exactly that which is explicitly allowed by statute."

Some commenters strongly disagreed with ATF's description that "[i]ndividuals who are bona fide collectors are less likely to amass firearms of the same kind and type than amass older, unique, or less common firearms" because this disregards not only the fact that collectors can purchase and sell common firearms that do not hold antique value, but also what is known in the firearms community as "pattern collecting." According to commenters, some people purchase the same type of pistol or rifle over and over again, in every single iteration imaginable, which can vary due to manufacturing date, manufacturing location, minute changes in the firearms, or any number of reasons. In pattern collecting, a person would have multiple firearms for sale that look exactly the same to a lay person. For instance, one commenter asked if a seller would be subject to this presumption if they sold a small collection of highly valuable 19th century Winchester lever action rifles, which would be of the same kind and

type. Similarly, another commenter said that large portions of the modern firearms market can be considered "of similar kind," pointing out that a "Gen 3 Glock in 9mm Luger is of similar kind to a polymer Walther in 9mm or a Palmetto State Armory Dagger in 9mm. The 9mm polymer pistol market has a lot of variety, but [those firearms] can all be considered 'of similar kind.'" The commenter noted further that individuals might have numerous 9mm polymer pistols in their personal collection because it makes it easier to acquire ammunition, and if magazines or accessories are interchangeable, it makes it easier to have a variety of configurations at hand at a lower cost. The commenter also noted that many modern sporting rifles would also be considered of "similar kind" if they can all be chambered in the same caliber. The commenter stated that it is overbroad for the Department to assume that someone selling modern firearms of the same type is more likely to be a dealer in firearms because collecting is not limited to curio and relic firearms.

One commenter expressed concerns about how firearms of the same or similar kind and type could be ascertained and quoted an example from the proposed rule's discussion about the "same kind and type" presumption. As quoted by the commenter, the proposed rule stated that this presumption may be rebutted based on "evidence that a collector occasionally sells one specific kind and type of curio or relic firearm to buy another one of the same kind and type that is in better condition to 'trade-up' or enhance the seller's personal collection." The commenter added, "using 'same kind and type' is not correct. For instance, a [Curio and Relic] (C&R) [license] holder sells a bolt-action Mosin-Nagant rifle in 7.62x54r, then uses the funds to purchase a Star Model B pistol in 9x18. Are these (Mosin-Nagant & Star Model B) the 'same kind and type' or not? Both are clearly collectable C&R firearms, while one is a bolt-action rifle and the other a pistol."

Department Response

As with the previous EIB presumption, the Department disagrees that collectors are likely to repetitively purchase and resell firearms that are of the same or similar kind and type without a predominant intent to earn a profit, at least not within a relatively short period of time. If a person is accumulating and repetitively reselling the same or similar kinds and types of firearms as part of a personal collection as defined in this rule, they can use evidence that they are doing so to

---

[205] *See* footnote 82, *supra.*

[206] For purposes of this rule, the Department interprets the term "new" in accordance with its common definition to mean, "having recently come into existence," and the term "like new" to mean "like something that has recently been made." *See, e.g., New,* Merriam-Webster Online Dictionary, *https://www.merriam-webster.com/dictionary/new* (last visited Mar. 8, 2024); *Like New,* Merriam-Webster Online Dictionary, *https://www.merriam-webster.com/dictionary/like%20new* (last visited Mar. 8, 2024). The Department understands that collectors commonly grade or rate collectible firearms as a means of determining their appreciated value over time, insurance, collectability, etc. However, this presumption is not aimed at collectible firearms and is not making a distinction based on a firearm's grade or rating in relation to commonly accepted firearms condition standards, such as those contained in the NRA Modern Gun Condition Standards or the Standard Catalog of Smith & Wesson. *See* Jim Supica, *Evaluating Firearms Condition,* NRA Museums, *https://www.nramuseum.org/gun-info-research/evaluating-firearms-condition.aspx* (last visited Mar. 26, 2024).

[207] See the discussion under the Department's response in Section IV.B.9.c of this preamble.

[208] In further support of a one-year time limit, 18 U.S.C. 923(c) provides that after one year, firearms transferred by a licensee from the licensee's business inventory to the licensee's personal collection are no longer deemed business inventory.

enhance or liquidate their personal collection to refute the presumption.

Nonetheless, to substantially reduce the possibility that these "like-kind" firearms are part of a personal collection, as stated previously, a one-year turnover limitation has been incorporated into the presumption and, as always, any presumption may be rebutted with reliable evidence to the contrary.[209] *See* § 478.13(c)(3)(ii)(B). It is unlikely that persons who collect the same or similar kinds and types of firearms for study, comparison, exhibition, or for a hobby will repetitively resell firearms within one year after they were purchased.

Finally, in response to commenters' concerns about determining which firearms would be of the same kind and type, the Department has made some changes. First, as to the comment on whether the Mosin and Star firearms described would be the same kind and type, the Department notes that the Mosin-Nagant rifle in 7.62x54r and the Star Model B pistol in 9x18 are not the same or similar kind and type of firearms. They are of a different manufacturer (Mosin-Nagant v. Star), model (M1891 v. BM), type (rifle v. pistol), caliber (7.62x54R v. 9x18), and action (bolt action v. semiautomatic). They share almost no design features and would thus not be subject to the "same kind and type" presumption. Nonetheless, to avoid any confusion about the meaning of "same kind and type" of firearms, and to allow for collectors who obtain multiple firearms of the same type, but from different makers and of different models, the Department has substituted the more precise term "same make and model" in the final rule. *See* § 478.13(c)(3)(ii)(B).

Further, to clarify the meaning of "similar" in this context, the final rule now instead refers to "variants thereof" (*i.e.,* variants of the same make and model). *See id.* The term "variant" is already defined in 27 CFR 478.12(a)(3) to mean "a weapon utilizing a similar frame or receiver design, irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments." Thus, to identify a "variant" of a particular make and model, the design of the frame or receiver of one firearm is compared to the design of the frame or receiver of the other firearm, regardless of newer model designations or configurations other than the frame or receiver.[210] For

example, an AK–74M is a rifle variant of the original AK–47 rifle. "The notable changes in the AK–74M include a 90-degree gas block, a lightened bolt and bolt carrier, a folding polymer stock, a new dust cover designed to resist the recoil of an attached grenade launcher, [and] a reinforced pistol grip." Alexander Reville, *What are all the AK Variants?, guns.com* (Jan. 5, 2024), *https://www.guns.com/news/what-are-ak-variants.* But none of the changes found in the AK–74M involve a design modification to the receiver—the housing for the bolt—so that firearm is a rifle variant of the original make and model (AK–47 rifle). *See* 27 CFR 478.12(a)(4)(vii). Likewise, an AR-type firearm with a short stock (*i.e.,* pistol grip) is a pistol variant of an AR–15 rifle because they share the same or a similar receiver design. *See* 27 CFR 478.12(a)(3), (f)(1)(i). Repetitive resales of firearms that are the same make and model, or variants of the same make and model, within a year of purchase, demonstrate that the firearms were likely purchased and resold as commodities (*i.e.,* business inventory), as opposed to collectibles. Thus, to identify a firearm subject to this presumption, the rule now looks to the make and model of a firearm and its "variants" (as defined in 27 CFR 478.12(a)(3)) which are generally easy to determine by comparing the design of the frame or receiver—the key structural component of each firearm repetitively sold. As with the other presumptions, this one may be rebutted with reliable evidence to the contrary.

### 10. EIB Presumption—Selling Business Inventory After License Termination

#### Comments Received

Commenters raised concern over the impact of this presumption on certain former licensees. Commenters stated that they believe this EIB presumption will hurt recently retired FFLs who might need to sell off firearms due to financial hardship. Some commenters stated that the rule would punish former FFLs, holding them to a different and more onerous standard than persons who were never licensed, and disagreed with ATF's statement in justification of the presumption that a "licensee likely

intended to predominantly earn a profit from the repetitive purchase and resale of those firearms, not to acquire the firearms as a 'personal collection.' " 88 FR 62003. They stated that ATF offered no citation for this proposition and ignored that a firearm might be acquired first for business inventory and later become a part of a personal collection. They argued that the former FFL should be entitled to sell part or all of that collection under the statute without becoming a dealer. Further, they argued that, unlike the other presumptions affecting former FFLs, there is no time limitation, which in essence means this presumption bars a former FFL from ever selling firearms that were in their business inventory for any purpose without triggering the presumption of again being engaged in the business. This puts former licensees in an untenable position never contemplated by Congress. One commenter suggested that, at a minimum, the rule should grandfather in former FFLs who went out of business prior to this rule becoming effective and allow them to treat those former business-inventory firearms as a personal collection even if all the proposed criteria of that presumption (now § 478.13(c)(4)), such as formal transfer from the A&D book, were not followed.

An additional commenter suggested that ATF should consider supplementing this presumption with an additional presumption that any formerly licensed firearms dealer, or person acting on their behalf, that sells or offers to sell multiple guns that were in the former FFL's business inventory at the time the license was terminated will be presumed to be "engaged in the business" unless the firearms are disposed of through a sale to another FFL.

#### Department Response

The Department disagrees that this EIB presumption is contrary to the GCA, or that firearms that were repetitively purchased for resale by licensees can be considered part of a "personal collection" if they were not transferred to a personal collection prior to license termination. The GCA at 18 U.S.C. 923(c) clearly contemplates that any business-inventory firearms transferred while the person is a licensee must be held in a personal collection by the licensee for at least one year before the firearms lose their status as business inventory. However, when a licensee does not transfer business inventory firearms to a personal collection prior to license termination, the firearms remain

---

[209] Per footnote 208, this time period is also supported by 18 U.S.C. 923(c).

[210] In addition to the fact that the term "variant" was incorporated into ATF regulations in 2022, *see*

87 FR 24735, this term is well understood by the firearms industry and owners. *See, e.g.,* Alexander Reville, *What are all the AK Variants?, guns.com* (Jan. 5, 2024), *https://www.guns.com/news/what-are-ak-variants* ("[T]he AK has gone through several revisions over the years, creating more modern variants. In fact, what you find yourself calling an AK–47 might just be something different."); Aaron Basiliere, *The AR–15 Pistol: The Rise of America's Rifle Variant, catoutdoors.com* (Apr. 19, 2022), *https://catoutdoors.com/ar-15-pistol/.*

business inventory.[211] Such firearms were not acquired for a personal collection, and were not transferred to one, and cannot be said to have lost their status as firearms purchased for resale with a predominant intent to profit simply because the licensee is no longer licensed to sell them. Moreover, allowing former licensees to continue to sell business inventory after license termination without background checks and records through which crime guns can be traced clearly undermines the licensing requirements of the GCA. It also places such former licensees at an unfair competitive advantage over current FFLs, who are continuing to sell firearms while following the rules and procedures of the GCA. Indeed, there would be little point revoking a license for willful violations of the GCA by a non-compliant FFL if the former licensee could simply continue to sell firearms without abiding by the requirements under which they purchased the firearms with the predominant intent to profit, and by which the compliant FFLs abide. As to concerns that a former licensee might need to quickly sell its inventory to stave off financial hardship, the former licensee is still free to sell firearms from this inventory on occasion to a licensee. *See* §§ 478.57(b)(1), (c); 478.78(b)(1), (c).

Under the rule, this presumption operates in conjunction with the new liquidation-of-business-inventory provisions in 27 CFR 478.57 (discontinuance of business) and 478.78 (operations by licensee after notice), which allow former licensees to either liquidate remaining business inventory to a licensee within 30 days after their license is terminated (or occasionally to a licensee thereafter), or transfer what is now defined as "former licensee inventory" (firearms that were in the business inventory of a licensee at the time of license termination, as distinguished from a "personal collection" or other personal firearms) to a responsible person of the former licensee within that period. Under these new provisions, when firearms in a former licensee inventory are

transferred to the responsible person, they remain subject to the presumptions in this rule. Such firearms were repetitively purchased for resale and cannot be considered part of a "personal collection" as that term is defined in the rule. Firearms in a former licensee inventory differ from those in a personal collection or other personal firearms in that they were purchased repetitively as part of a business inventory with the predominant intent to earn a profit. Persons who continue to sell those business inventory firearms, including those transferred to a responsible person of the former licensee, other than occasionally to an FFL, will be presumed to be engaged in the business without a license, though the presumption may be refuted with reliable evidence to the contrary.

The Department disagrees with a commenter's suggestion to grandfather in former FFLs who went out of business prior to the effective date of the rule and allow them to treat former business inventory as a personal collection. Prior to the rule, former licensees and their responsible persons were not entitled to sell their business inventories after license termination if their predominant intent was to obtain livelihood and pecuniary gain from those sales. This rule merely establishes by regulation the guidance ATF has provided for at least ten years and of which the FFL community has been aware; that is, ATF has long advised former licensees in written notices of revocation, expiration, and surrender not to engage in the business after license termination by selling the business inventory.[212] Continuing to sell business inventory would undermine the licensing requirements of the GCA.

The Department agrees with a commenter's suggestion to incorporate a presumption that a formerly licensed dealer who sells firearms from the former business inventory is engaging in the business unless the firearms are sold to a licensee. An occasional sale to a licensee generally does not show a predominant intent to profit because a licensed dealer is likely to pay less than fair market value to buy a firearm for resale from an unlicensed person given the licensed dealer's intent to profit. Nor does it present the same public safety concerns associated with unlicensed dealing because the purchasing dealer would record the acquisitions and dispositions and run background checks when they resell the firearms. For these reasons, in addition to allowing liquidation of a business inventory to a

licensee within 30 days, this presumption has been amended by the final rule to allow former licensees (or a responsible person acting on their behalf) to occasionally sell "former licensee inventory" firearms to an active licensee after the initial 30-day liquidation period in accordance with the discontinuation of business provisions at §§ 478.57(b)(2) and 478.78(b)(2) without triggering the EIB presumptions. However, if the former licensee (or responsible person) sells former licensee inventory more frequently than occasionally to a licensee after the initial 30-day liquidation period, they are subject to the presumptions in this rule.

11. EIB Presumption—Selling Business Inventory Transferred to a Personal Collection Prior to License Termination

Comments Received

Commenters disagreed with inclusion of this last presumption in which a former licensee (or responsible person acting on behalf of the former licensee) is presumed to be a dealer if they sell or offer to sell firearms that were transferred to their personal collection prior to license termination, unless those firearms were transferred to the former licensee's personal collection without intent to willfully evade firearms laws and one year has passed from the date of transfer to the personal collection.

At least one commenter stated that prior unlawful transfers do not necessarily taint a future transfer, nor do they demonstrate that a former FFL continues to be engaged in the business. The commenter stated that there would be no possible way for former FFLs, whose licenses were revoked and who may be prohibited or facing practical circumstances that preclude them from being re-licensed in the future, to liquidate their former inventory that was not transferred to a personal collection to ATF's satisfaction. The commenter also noted that section 923(c) applies only to licensees and that none of the provisions apply to an unlicensed person who happened to formerly held an FFL. In other words, the commenter seemed to question how the Department could require former FFLs or even responsible persons, who are non-FFLs, to abide by certain restrictions upon license revocation, such as disposing of the former business inventory in a particular manner; as former licensees, the commenter argued, they automatically do not have "business inventory." This is particularly true, the commenter stated, as a former licensee

[211] *See* ATF, *Important Notice: Selling Firearms AFTER Revocation, Expiration, or Surrender of an FFL* 1 (June 3, 2021) ("If a current FFL is disposing of business inventory, the fact that no [firearms] purchases are made after the date of license revocation, expiration, or surrender does not immunize him/her from potential violations of 18 U.S.C. 922(a)(1)(A). Instead, business inventory acquired through repetitive purchases while licensed are attributed to the former FFL when evaluating whether subsequent [firearms] sales constitute engaging in the business of dealing in firearms without a license."); ATF, *Important Notice: Selling Firearms AFTER Revocation, Expiration, or Surrender of an FFL* 1 (Dec. 1, 2014) (same).

[212] *See* footnote 211, *supra.*

whose license was revoked—and who, by law, may never be able to be a licensee again—may be precluded from ever transferring their firearms under any circumstances (other than by giving them away as free gifts).

Furthermore, a commenter stated, section 923(c) adds that "nothing in this chapter shall be construed to prohibit a licensed manufacturer, importer, or dealer from maintaining and disposing of a personal collection of firearms, subject only to such restrictions as apply in this chapter to dispositions by a person other than a licensed manufacturer, importer, or dealer." The commenter concluded that this means, under the statute, a dealer may acquire a personal collection while they are a dealer or while going out of business and may later dispose of that collection under the same rules as other non-dealers, except as provided in 18 U.S.C. 923(c). The commenter also noted that nothing in either 18 U.S.C. 921(a)(21)(C) or 923 discusses a required intent at the time the firearm is acquired, and ATF provided no clarity to support the "proposition that firearms acquired by an FFL are not (or cannot be) for a 'personal collection.' " While all can agree that the predominant purpose of the FFL is to earn a profit, the commenter stated the proposed rule ignores the fact that many FFL holders are also firearm collectors or enthusiasts, and that often many of the firearms that are put into the business inventory are for the personal collection of the FFL holder or its responsible persons.

One of the commenters stated that this presumption seems to apply to all firearms transferred to any responsible person of an FFL, even if those guns were transferred to that responsible person via an ATF Form 4473 and a background check was conducted. They stated this presumption overlooks the fact that an FFL may have dozens of responsible persons who may change frequently, and that a former responsible person may have no say in the business dealings once they are gone; in fact, the person may not even know that the business has given up or lost its license. Yet, they said, ATF's presumption now seeks to hold that former responsible person to a burdensome presumption based on their former employer's decision to cease its firearms operations.

The commenter stated that this presumption seems contrary to ATF's existing position that a transfer to a personal collection happens as a matter of law once the license is given up because there is no more business inventory as a result of the firearms

business ceasing operations. They cited ATF's National Firearms Act Handbook, ATF E-Publication 5320.8 (Apr. 2009), *https://www.atf.gov/firearms/docs/ guide/atf-national-firearms-act-handbook-atf-p-53208/download* ("NFA Handbook"), as an example of the agency's position; they stated that, in section 14.2.2 of the NFA Handbook, ATF stated, "FFLs licensed as corporations, partnerships, or associations, who have been qualified to deal in NFA firearms and who go out of the NFA business, may lawfully retain their inventory of these firearms . . . as long as the entity does not dissolve but continues to exist under State law." Further, as a practical matter, the commenter stated that it is not clear how a company going out of business would store the firearms "separately from, and not commingled with the business inventory" to meet the definition of "personal collection" when the company no longer has a business inventory due to its going out of business. The rule, they argued, provides no clarity for how former FFLs are to treat their business inventory if the former FFL just allowed firearms to come into their collection after their business ceased but did not meet all of the requirements set out by ATF.

Department Response

The Department disagrees that this EIB presumption is contrary to section 923(c) of the GCA. Contrary to the implicit views of the commenters, an FFL that loses or surrenders its license is not thereby immune from the provisions of the GCA. As provided by section 923(c), for licensees to dispose of firearms from a personal collection, they must be transferred from the business inventory to a personal collection and maintained in that collection for at least one year before they lose their status as business inventory. This rule implements section 923(c) by establishing a presumption that resales or offers for resale of such firearms show that the former licensee is engaging in the business. Thus, licensees who know they will be going out of business by reason of license revocation, denial of renewal, surrender, or expiration cannot simply transfer their business inventory to a "personal collection" the day before license termination, and two days later, sell off the entire inventory as liquidation of a "personal collection" without background checks or transaction records. Such firearms were not personal firearms acquired for "study, comparison, exhibition . . . or for a hobby." However, consistent with section 923(c) and this rule, once the

one-year period has passed, the former licensee will no longer be presumed to be engaged in the business without a new license if they later liquidate all or part of the personal collection, assuming the firearms were received and transferred prior to license termination without any intent to willfully evade the restrictions placed on licensees by the GCA. This includes licensees whose licenses were revoked or denied renewal due to willful violations if they transferred business-inventory firearms to their personal collection or otherwise as personal firearms prior to license termination in accordance with the law.

The Department disagrees with the comment that, under the law, prior unlawful transfers do not "taint a future transfer." The GCA at 18 U.S.C. 923(d)(1)(C) authorizes approval of an application for firearms license if the applicant "has not willfully violated any of the provisions of this chapter or regulations issued thereunder." If ATF previously revoked or denied license renewal for willful violations of the GCA or its implementing regulations, then under the law, that former licensee may be denied a firearms license in the future. *See id.* This provision shows that prior unlawful activity is relevant to future dealing in firearms. Moreover, section 923(c) deems firearms to be part of a business inventory if their transfer to a personal collection "is made for the purpose of willfully evading the restrictions placed upon licensees." This demonstrates that Congress was specifically concerned with licensees evading the requirements of the GCA through improper transfers to a personal collection. Therefore, as to the comment that ATF cannot require former licensees (or a responsible person acting on their behalf) to abide by regulations addressing their former business inventory, the Department believes that it has the authority under the GCA to take enforcement action, such as to deny a license or seize firearms for forfeiture, when a former licensee (or a responsible person acting on their behalf) has willfully violated the rules concerning winding down licensed business operations, 27 CFR 478.57 or 478.78 (as applicable). The former licensee (or a responsible person acting on their behalf) is presumed to be engaged in the business without a license if they thereafter sell off that business inventory (unless they transfer it within 30 days after license termination to a former licensee inventory, and thereafter only occasionally sell a firearm from that inventory to a licensee)—inventory that they did not transfer to a personal collection or

otherwise as a personal firearm prior to license termination and then retain for a year, as required.

Regarding responsible persons while they are acting on behalf of such licensees, the Department does not agree that such persons will be unaware of the termination of the license. As set forth in 18 U.S.C. 923(d)(1)(B) and this rule, responsible persons are only those responsible for the management and policies of the firearms business. They are not sales associates, logistics personnel, engineers, or representatives who might have little control over or understanding of the firearms business operations or license status. Responsible persons acting on behalf of a former licensee must therefore be careful not to sell business inventory of the former licensee without a license. Nonetheless, the final rule makes clear that responsible persons of former licensees who (1) after one year from transfer, sell firearms from their personal collection that were transferred from the former licensee's business inventory before license termination, or (2) occasionally sell firearms to a licensee that were properly transferred to a former licensee inventory after license termination, are not presumed to be engaged in the business due to those sales (assuming they did not acquire or dispose of those firearms to willfully evade the restrictions placed on licensees).

Regarding the comment that this presumption applies to all firearms transferred to any responsible person of a licensee, even if those firearms were transferred to that responsible person on an ATF Form 4473 and a background check was conducted, the Department disagrees that the presumption applies. Responsible persons who properly received a firearm from the then-licensee's business inventory on an ATF Form 4473 for their own personal use, in accordance with 27 CFR 478.124, are not subject to the liquidation presumption because they now own the firearm disposed to them by the business. Subsequent termination of the license has no bearing on the responsible person's prior acquisition of a personal firearm. The liquidation presumption does not apply to former responsible persons who are selling what are now their own personal firearms. Any subsequent sale of those personally owned firearms is evaluated the same way as any other firearm transactions by unlicensed persons.

## 12. Definition of ''Personal Collection (or Personal Collection of Firearms, or Personal Firearms Collection)''

### Comments Received

At least one commenter noted that the proposed definition of personal collection, which excludes any firearm purchased for the purpose of resale with the predominant intent to earn a profit, is problematic because collectors buy guns with the purpose of eventual resale when they locate and can afford guns of higher quality and rarity. This sentiment was echoed by several commenters who asserted that the proposed rule negatively affects collectors and hobbyists by requiring them to become licensed dealers simply because they want to sell or trade some firearms from their personal collection. For instance, one commenter stated that a hobbyist may purchase a firearm in degraded condition, or lacking components. This commenter indicated that they should not be considered engaged in the business of dealing even if they made a reasonable profit simply because they refurbished or upgraded the lawfully acquired firearm and sold it for a personal reason.

Another commenter stated the definition of ''personal collection'' was too vague, leaving room for misinterpretation. The commenter stated that, without more clarity, licensees will have difficulty determining whether their occasional sale for personal collection enhancement falls within that scope, and the definition will create further confusion among licensees and law enforcement officials.

Some commenters stated that the definition of ''personal collection,'' and also the examples of what constitutes a hobby, are too narrow. First, they explained that the hobbies mentioned in the statute and the regulation as examples focus heavily on activities that involve shooting firearms (*e.g.,* hunting, skeet, or target shooting) but do not mention non-shooting hobbies, such as curio collecting. Further, they questioned why ''personal collection'' is limited to non-commercial purposes and pointed out that commercial entities that are not engaged in the business of dealing in firearms frequently use firearms for commercial business purposes. They provided examples, including a hunting outfitter that might have a collection of firearms for use in the commercial hunting enterprise, yet the firearms would still be considered part of a personal collection, or an armored car company having firearms for protection that would be in the company's personal

collection and not in a business inventory. These businesses are engaged in a business and have firearms, but they are not engaged in the business of dealing in firearms even if they, for example, buy firearms to upgrade ones used by the truck drivers or replace old ones taken on hunting trips by clients. Similarly, at least one commenter noted that firearms acquired as part of teaching and safety instruction activities would not be covered under the proposed definition of personal collection and therefore, according to the commenter, an owner whose firearm ownership grew because of these activities and who then sold some firearms would not be exempt from being engaged in the business even though that person might not have acquired the firearms for purposes of resale with the predominant intent to earn a profit.

Another commenter stated that the definition of personal collection is so narrowly defined it would exclude transfers of firearms to law enforcement and make ''the somewhat common 'Gun Buy-Back' scheme unlawful.'' The commenter suggested the following scenario: ''An estate may include any number of firearms. The inheritor receives their property may have been considered a personal collection. Whatever the size or value, the new owner has no association with any 'study, comparison, exhibition, or hobby' and would like to be rid of them. Currently, some new owners transfer their firearms to municipal police at a local 'gun buy-back event.' '' But under the new definition, the commenter added, ''[t]ransferring any number of firearms for even limited pecuniary gain (even directly to law enforcement in exchange for marginally valued gift cards) would be a [F]ederal crime. Byrne grants could no longer fund these activities.''

Other commenters also noted that the proposed definition means that firearms acquired by an individual for any other purpose, such as for self-defense, would not be part of a personal collection. Commenters stated that studies show that about two-thirds of Americans report owning firearms primarily for ''defense'' or ''protection.'' Without including firearms acquired for self-defense as part of a personal collection, commenters believed that ATF is trying to create a third classification of owned firearms, *i.e.,* firearms that are owned by non-licensees but are not acquired for ''study, comparison, exhibition, or for a hobby.'' In essence, commenters argued that the definition is incorrectly limited to firearms that are for noncommercial, recreational enjoyment.

ATF 015348

Some commenters, including some gun collectors' associations, argued that the proposed definition erodes statutory protections for nonbusiness conduct by conflating "sales, exchanges, or purchases of firearms for the enhancement of a personal collection" and "for a hobby." In other words, the proposed definition includes "hobby" within "personal collection" rather than it being its own safe harbor. Commenters stated that the "for a hobby" provision and the "for a personal collection" provision are two separate and distinct items, meaning that a person who purchases or sells firearms occasionally as a collector or for a hobby is not a firearms dealer and not required to be licensed, and that "personal collection" and "hobby" must have distinct meanings.

Commenters provided suggestions on how the term "hobby" could be defined. One commenter suggested the definition be broader to mean "a group [of] firearms that a person accumulates for any reason, other than firearms currently in the business inventory of a current licensee." One commenter, while supporting ATF in considering the "totality of the circumstances when determining if one is 'engaged in the business,'" suggested the rule "could benefit from specific examples that help collectors and hobbyists understand when they may incite the need for licensure and to help confirm the intent of the rule."

In a similar vein, another commenter in support of the rule provided a suggested clarification of when a gun sale would be part of a hobby. They said the rule parenthetically describes "hobby" in the definition of "personal collection" as follows: "(*e.g.,* noncommercial, recreational activities for personal enjoyment, such as hunting, or skeet, target, or competition shooting)." As a result, the commenter suggested the rule "could clarify that, to be covered by the exception, a hobbyist may only engage in gun sales to serve an interest in such 'noncommercial, recreational activities for personal enjoyment, such as hunting, or skeet, target, or competition shooting.' " The same commenter also suggested that the rule "should clarify that the hobby exception to the 'engaged in the business' definition does not cover an individual whose hobby is gun selling to generate profit."

A different commenter in support of the rule proposed other clarifying language to create a rebuttable presumption for when a sale or transfer of a firearm is presumed to be part of a hobby. The proposed addition would specify that a person who meets all of the following criteria will be presumed to be selling or transferring firearms as part of a hobby: when the collection (A) has been appraised by an expert who is qualified to evaluate firearms; (B) has been documented by photographs that show each firearm and its serial number; (C) has been catalogued by serial numbers and other identifying features; (D) has been insured by an insurance company that covers firearms; (E) has been displayed in a secure location that is not accessible to unauthorized persons; and (F) has not been used for hunting, sporting, or self-defense purposes. The commenter proposed that this presumption would help infrequent sellers or those who transfer firearms for personal reasons distinguish between regular commercial sales and "occasional" or "hobby" sales.

The same commenter also suggested adding a similar rebuttable presumption providing that a person is presumed to be selling or transferring firearms for hunting, sporting, or self-defense purposes when the person sells or transfers a firearm that is suitable for hunting certain game animals, participating in certain shooting competitions, or providing protection against certain threats. The commenter also suggested a presumption based on a threshold number of sales per year as an additional way to help distinguish infrequent sellers. This suggested presumption would read, "a person who sells or transfers five or fewer firearms per calendar year shall be presumed to be selling or transferring firearms occasionally. This presumption may be rebutted by evidence that shows that the person is engaged in the business of dealing in firearms. A person who sells or transfers more than five firearms per calendar year shall be presumed to be engaged in the business of dealing in firearms. This presumption may be rebutted by evidence that shows that the person is not engaged in the business of dealing in firearms."

Other commenters stated that the portion of the definition of "personal collection" stating that licensees can only consider firearms as a part of their personal collection if they are stored separately from and not comingled with business inventory and appropriately tagged as "not for sale" would be difficult to operationalize and would make things complicated not only for the business but also for the employees of that business. These commenters stated that the rule does not allow for licensed (or otherwise lawfully permitted) concealed carry activities. For instance, a business could be cited for a violation if an employee carries their personal firearm to work on their person if the employee temporarily puts it in desk drawer or work bench. Additionally, to avoid potential liability, they opined that the employee would have to tag their personal firearm as not for sale. These commenters argued that ATF should either remove the requirement for FFLs to store personal collections separately from business inventory or clearly exclude firearms owned by persons and carried on or about the person for self-defense.

Another commenter stated that the rule inappropriately requires FFLs going out of business to "dispose" of the firearms in their business inventory to themselves in order for such firearms to be considered part of their personal collection. They added that such a transfer to a personal collection happens as a matter of law once the license is given up, because there is no more business inventory, because the firearms business has ceased.

Department Response

The Department agrees that collectors who purchase firearms for a personal collection are permitted under the GCA, as amended, to occasionally sell them to enhance their collection or liquidate them without being required to obtain a license. However, firearms that are purchased by collectors or hobbyists for the purpose of resale with the intent to predominantly earn a profit cannot be said to primarily have been accumulated for study, comparison, exhibition, or for a hobby.[213] They are considered commercial firearms or firearms obtained for financial gain, not part of a personal collection. Many of the criticisms of the definition of "personal collection" have one misconception in common: that any person who amasses multiple firearms without a license and without criminal purpose has, by definition, a "personal collection," or is a "collector" under the statute.[214] But that is not correct. This

---

[213] *See The Federal Firearms Owner Protection Act: Hearing on S. 914 Before the S. Comm. on the Judiciary,* 98th Cong. 50–51 (1983) (response of Robert E. Powis, Deputy Assistant Secretary, Dep't of the Treasury, to questions submitted by Sen. Hatch) ("The proposed definition states that the term ['with the principal objective of livelihood and profit'] means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and necessary gain, as opposed to other intentions such as improving or liquidating a personal firearms collection. It does not require that the sale or disposition of firearms is, or be intended as, a principal source income or a principal business activity. This provision would make it clear that the licensing requirement does not exclude part-time firearms businesses as well as those firearms collectors or hobbyists who also engage in a firearms dealing business.").

[214] Under the GCA, 18 U.S.C. 921(a)(13), the term "collector" means "any person who acquires, holds, *Continued*

assertion is akin to saying that any person who walks around with change in their pockets for daily use has a coin collection or is a coin collector.

The Department has revised the definition of "personal collection" in the final rule to make it clear that firearms a person obtains predominantly for a commercial purpose or for financial gain are not within that definition. This distinguishes such firearms from personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, which are included in the definition of "personal collection," but which the person may also intend to increase in value. Nonetheless, the Department agrees that collecting "curios or relics" (as defined in 27 CFR 478.11), "collecting unique firearms to exhibit at gun club events," "historical re-enactment," and "noncommercial firearms safety instruction" should be added to the specific examples of firearms acquired for a "personal collection," and has added them to this final rule.

The Department disagrees that the definition of "personal collection" is so narrowly defined that it would preclude personal firearms that are inherited from being sold under a common government "gun-buy-back" program. First, the occasional sale of inherited firearms to a government agency is not conduct that would likely fall within any presumption or otherwise rise to the level of being engaged in the business of dealing in firearms. Second, sales of inherited firearms, whether or not they are part of a personal collection, are generally not made by a person who is devoting time, attention, and labor to dealing in firearms with a predominant intent to profit. To make this clear, the Department has added liquidation transfers or sales of inherited firearms as conduct that does not support a presumption of being engaged in the business. The Department also included reliable evidence that a person was liquidating inherited firearms in the types of evidence that can be used to rebut any presumption. *See* §478.13(e)(5)(i), (f). For these reasons, a person would not be presumptively engaged in the business if they only sold

---

or disposes of firearms as curios or relics." A firearm is a "curio" or "relic" when it: (1) is "of special interest to collectors by reason of some quality other than is associated with firearms intended for sporting use or as offensive or defensive weapons"; and (2) either (a) was manufactured at least 50 years prior to the current date, (b) was certified by a museum curator to be a curio or relic of museum interest, or (c) derives a substantial part of its monetary value from the fact that it is novel, rare, bizarre, or because of its association with some historical figure, period, or event. 27 CFR 478.11.

inherited firearms to a government agency as part of a "gun-buy-back" program, regardless of whether the firearms fell within the definition of "personal collection."

The Department disagrees with commenters who said that the definition of "personal collection" is too vague and acknowledges that the definition does not include firearms owned by commercial entities and used for commercial business purposes. The definition is from standard dictionary definitions, and firearms acquired by commercial entities are not "personal" or a "collection," and cannot be said to be part of "personal collection." [215] That, however, does not necessarily mean commercial entities that own firearms are engaged in the business of dealing in firearms under the statute or this rule. When a company, such as an armored car company or hunting outfitter, purchases firearms for a business inventory, their predominant intent is not likely to be earning a profit by repetitively purchasing and reselling firearms. While the operations of each company must be examined on a case-by-case basis to determine, for example, if they are engaged in the business of dealing in firearms on a part-time basis, such companies generally do not need to be licensed.

The Department also disagrees with commenters who indicated that "personal collection" is too narrow because it does not include firearms purchased for self-defense. The dictionary definition of "collection" means "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby." [216] This common definition is consistent with how the GCA views a "collection." The GCA, 18 U.S.C. 921(a)(13), defines the term "collector" as "any person who acquires, holds, or disposes of firearms as curios or relics, as the Attorney General shall by regulation define." The regulations have long further defined the term "curios or relics" as "[f]irearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended . . . as offensive or defensive weapons." For this reason, the definition of "personal collection" in this rule does not include firearms that have no special interest to the collector

---

[215] *See* footnote 88, *supra.*

[216] *Collection,* Merriam-Webster Online Dictionary, *https://www.merriam-webster.com/ dictionary/collection* (last visited Mar. 7, 2024); *see also Collection,* Brittanica Online Dictionary, *https://www.britannica.com/dictionary/collection* (last visited Mar. 7, 2024) ("a group of interesting or beautiful objects brought together in order to show or study them or as a hobby").

or hobbyist other than as weapons for self-defense or defense of others, as has been clarified in the final rule.[217] At the same time, the Department recognizes that 18 U.S.C. 921(a)(21)(C) allows persons to make occasional sales, exchanges, or purchases of firearms "for a hobby." For this reason, the Department has defined the term "personal collection" more broadly than just a collection of curios or relics, and has included firearms for "noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction."

Moreover, by definition, all firearms are "weapons" that will, are designed to, or may readily be converted to expel a projectile, and are therefore instruments of offensive or defensive combat.[218] 18 U.S.C. 921(a)(3)(A). Some firearms that can be used for personal defense may also be collectibles or purchased for a hobby, while others may not. Additionally, including all firearms usable for self-defense in the definition of "personal collection" is inconsistent with the statutory scheme

---

[217] *See, e.g., Tyson,* 653 F.3d at 202–03 ("Tyson called himself a firearms 'collector,' which, if true, would also have shielded him from criminal trafficking liability. See 18 U.S.C. 921(a)(21)(C) (stating that one who 'makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms' is not a 'dealer in firearms'). These were lies designed to game the system. After all, none of the firearms purchased by Tyson were antiques and his behavior was decidedly inconsistent with that of a collector."); *Idarecis,* 164 F.3d 620, 1998 WL 716568, at *3 (unpublished table decision) ("[Defendant] nevertheless argues that the definition of a gun 'collection' in § 921(a)(21)(C) should be read more broadly than the definition of a gun 'collector' in order to encompass the guns [Defendant] owned and sold. We cannot say that the district court's failure to instruct the jury on the collection exemption pursuant to § 921(a)(21)(C) was plain error. There is no case authority to suggest that there is a distinction between the definition of a collector and of a collection in the statute."); *Palmieri,* 21 F.3d at 1269 ("'[A] 'collector' is defined as 'any person who acquires, holds, or disposes of firearms as curios or relics .................' *Id.* sec. 921(a)(13). Section 922(a) requires inquiry into both the defendant's conduct and status. If the conduct constituted engaging in the business of dealing in firearms, then it is illegal unless the defendant is a licensed dealer. On the other hand, sales by a licensed or unlicensed collector from a personal collection in furtherance of a hobby are not illegal. Once the conduct is deemed equivalent to the business of dealing, however, collector status will not shield a defendant from liability under § 922(a).").

[218] *See Lunde Arms Corp.* v. *Stanford,* 107 F. Supp. 450, 452 (S.D. Cal. 1952), *aff'd,* 211 F.2d 464 (9th Cir. 1954) ("To be a firearm an implement must be a weapon .............. A weapon is defined in Webster's New International Dictionary, 2nd edition, as: 'An instrument of offensive or defensive combat[.]'").

of the GCA. The GCA places restrictions on dealing in firearms, but permits individuals to make "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby" or sell all or part of a personal collection. 18 U.S.C. 921(a)(21)(C). Including all firearms usable for self-defense in the definition of "personal collection" would allow the limited definitional exclusions for enhancing and liquidating a personal collection to swallow the rule that dealers in firearms must be licensed, because one could always claim that a firearm was purchased or sold to improve or liquidate the firearms one keeps for self-defense. That assertion is not consistent with the common definitions of "collection" or "hobby." In addition, it would potentially create similar problems with the GCA provision that places limitations on the disposition of firearms transferred by licensees to their "personal collection." 18 U.S.C. 923(c). It could also create a conflict with the provision of the United States Sentencing Guidelines that allows persons convicted of certain firearms violations in some situations to receive a reduction in their sentencing offense level if they possessed firearms "solely for lawful sporting purpose or collection." [219] U.S.S.G. 2K1.1(b)(2).

Whether a firearm is part of a personal collection or for a hobby depends on the kind and type of firearms,[220] and courts

have also looked to the nature and purpose for which they are accumulated.[221] This is not to say individuals or companies cannot buy or sell firearms that are primarily for self-defense or protection of others under this rule. It just means that those other personal firearms are not necessarily part of a "personal collection," and persons who buy or sell such firearms cannot avail themselves of the statutory exception for personal collections in 18 U.S.C. 921(a)(21)(C) unless the firearms are of a type and purpose to qualify as personal collection firearms. To make this point clear, the definition of "personal collection" has been revised to state that "[i]n addition, the term shall not include firearms accumulated primarily for personal protection: *Provided,* that nothing in this definition

shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use." § 478.11.

The Department has made it explicit in this final rule that firearms acquired for a hobby—including noncommercial, recreational activities for personal enjoyment, such as hunting, or skeet, target, or competition shooting, or historical re-enactments—may be part of a "personal collection." Therefore, reliable evidence of occasional sales of such firearms only to obtain more valuable, desirable, or useful firearms for the person's personal collection would not support a presumption and may be used to rebut any EIB presumption.[222] *See* § 478.13(e)(2), (f). However, as stated previously, the Department will not set a minimum threshold number of firearms to determine when a person is engaged in the business or occasionally selling firearms to enhance a personal collection. While not included in the regulatory text, the plain and ordinary meaning of the term "occasional" should be read to mean "infrequent or irregular occurrence,"[223] and to exclude firearm sales, exchanges, or purchases that are routinely or regularly made (even on a part-time basis).

The Department agrees with the comment that the phrase "or for a hobby" in 18 U.S.C. 921(a)(21)(C) has a meaning independent of the term "collection." The rule therefore incorporates that phrase into the definition of "personal collection," and expressly recognizes that firearms that may not be considered "collectibles" are also included in the definition of "personal collection." Under this combined definition, firearms acquired "for a hobby" are, for example, those acquired for "noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction."

The Department agrees with commenters that the requirement, in the definition of "personal collection of a licensee," that licensees must segregate business inventory from personal firearms in the proposed rule was not

---

[219] *See United States* v. *Miller,* 547 F.3d 718, 721 (7th Cir. 2008) ("Miller concedes that he kept the shotgun for security against intruders, rather than as part of a collection. It follows that § 2K2.1(b)(2) does not reduce Miller's offense level."); *United States* v. *Bertling,* 510 F.3d 804, 807, 811 (8th Cir. 2007) (defendant was not entitled to sentencing guidelines calculation reduction for sporting purposes or collection where he possessed a handgun for personal protection); *United States* v. *Halpin,* 139 F.3d 310, 310–11 (2d Cir. 1996) (possession or use of a gun for purposes of personal protection, or protection of others, does not qualify a defendant for a sentence reduction for sporting purposes or collection); *United States* v. *Dudley,* 62 F.3d 1275, 1277 (10th Cir. 1995) (same); *United States* v. *Greso,* 24 F.3d 879, 881–82 (7th Cir. 1994) ("[T]he Sentencing Commission allows a reduction in *penalty* for certain types of possession; these favored uses [of sporting purposes or collection] do not include self-protection. It is easy to understand why self-protection is not included. Attempting to distinguish as a practical matter between defensive and potentially offensive purposes might be next to impossible."); *United States* v. *Cousens,* 942 F.2d 800, 803–04 (1st Cir. 1991) (same).

[220] *Cf. United States* v. *Hanson,* 534 F.3d 1315, 1319 (10th Cir. 2008) ("[T]he type of gun here, which is most commonly used for self-protection, weighs against Mr. Hanson's claim that he purchased it entirely for a sporting purpose."); *United States* v. *Wilder,* 12 F. App'x 297, 299 (6th Cir. 2001) (some of the defendant's firearms were not suited for hunting or target practice, and so the U.S.S.G. 2K2.1(b)(2) sentence reduction did not apply); *United States* v. *Levitzke,* 176 F.3d 1022, 1028 (7th Cir. 1999) (affirming the district court's finding that defendant's guns were not of the type

normally used for target shooting and therefore weighed against granting the reduction); *United States* v. *Hause,* 26 F. App'x 153, 154 (4th Cir. 2001) (same with inexpensive handgun that was not the sort of firearm that would be considered collectible).

[221] *See United States* v. *Fifty-Two Firearms,* 362 F. Supp. 2d 1308, 1314–15 (M.D. Fla. 2005) ("[Defendant] did not merely make occasional sales or exchanges of firearms to enhance his personal collection or for a hobby. Rather, he possessed a significant number of inexpensive shotguns, rifles, and handguns for resale."); *Hannah'* 2005 WL 1532534, at *3 (rejecting a defendant's argument that purchases and sales of firearms were made for the enhancement of his personal collection or for a hobby where "[n]one of the firearms had any historical value"); *cf. United States* v. *Baker,* 501 F.3d 627, 629 (6th Cir 2007) (affirming the district court's decision not to apply sentencing guideline 2K2.1(b)(2) because "the gun was not 'stored in a manner showing that it was valued or treasured,' nor was it 'polished and treated as one would treat something that was part of a collection'"); *United States* v. *Denis,* 297 F.3d 25, 33–34 (1st Cir. 2002) (same where a rifle was stored loaded and near cash to protect marijuana sales, rather than kept for sporting purposes as alleged); *United States* v. *Clingan,* 254 F.3d 624, 626 (6th Cir. 2001) (upholding denial of the collection sentence reduction, and noting that "[n]one of the weapons were antiques or of other special value"); *United States* v. *Miller,* 224 F.3d 247, 251 (3d Cir. 2000) (affirming district court's denial of the 2K2.1(b)(2) sentence reduction to the defendant's sentence for dealing in firearms without a license under 18 U.S.C. 922(a)(1)(A) because the firearms sold were not "solely for sporting purposes or collection" where the defendant was convicted for firearms trafficking); *United States* v. *Zakaria,* 110 F.3d 62, 1997 WL 139856, at *3 (4th Cir. 1997) (unpublished table decision) ("In the present case, there was substantial evidence showing that Zakaria purchased the firearms with the sole intent of selling them to his cousin for illegal export to Pakistan; not for placing them in his private collection."); *United States* v. *Andrews,* 45 F.3d 428, 1994 WL 717589, at *3 (4th Cir. 1994) (unpublished table decision) (denying sentence reduction, saying "[a]lthough Andrews possessed a large number of guns that were unloaded and on display in his den, they generally were common shotguns and rifles typically not 'collected' in the narrow sense of being 'collectors' items'"); *United States* v. *Gonzales,* 12 F.3d 298, 301 (1st Cir. 1993) (same with respect to accumulation by a felon of "a small arsenal of handguns" allegedly for sporting purposes or collection).

[222] *See, e.g., Approximately 627 Firearms,* 589 F. Supp. 2d at 1135 ("[Claimant] offered credible testimony that he was an avid hunter, and that 'maybe 20 to 25' of the firearms at issue were his personal guns. The firearms which [Claimant] held for personal use are not subject to forfeiture simply because the vast majority of seized firearms were 'involved in' [dealing without a license]." (citation omitted)).

[223] *See* footnote 123, *supra.*

meant to apply to personal firearms ordinarily carried by the licensee. It was meant to apply only to personal firearms that are stored or displayed on the licensee's business premises, which should not be commingled with business inventory. For this reason, the applicable language in this final rule's definition of "personal collection of licensee" has been revised to clarify that it applies only to personal firearms "when stored or displayed" on the business premises.

The Department disagrees that transfer of firearms in a business inventory to a personal collection (or otherwise as a personal firearm) by an FFL "happens as a matter of law" when the FFL goes out of business. Under the GCA, 18 U.S.C. 923(c), a business inventory of firearms held by a licensee only becomes part of a "personal collection" (or otherwise a personal firearm) if the firearms were transferred from the licensee's "business inventory into such licensee's personal collection" (or other personal firearms) while the person is licensed, and one year has passed from the time of transfer. Additionally, such disposition or any other acquisition cannot have been made by the licensee for the purpose of willfully evading the restrictions placed on licensees. Under this rule, the licensee must take affirmative steps to accomplish this task.[224] It does not occur automatically by operation of law, and it would frustrate the operation of the GCA for such restrictions to apply to a licensee one day before discontinuance of business but not one day after.

### 13. Definition of "Responsible Person"

#### Comments Received

Some commenters generally agreed with the Department's proposed definition of "responsible person," stating it is important for accountability and oversight. Other commenters stated that the definition of "responsible person" needed more clarity because,

---

[224] 27 CFR 478.11 (definition of "personal collection" requires that for a firearm to be in a "personal collection," the acquisition of the firearm must be recorded in the licensee's acquisition book, recorded as a disposition from the licensee's inventory to a personal collection, maintained and stored separately for one year, and not have been acquired or transferred with the intent to willfully evade the GCA); *cf. Zakaria*, 110 F.3d 62, 1997 WL 139856, at *2 (holding that licensee's sale to his cousin was from his business inventory as a matter of law, saying "[w]e find that the district court reasonably interpreted 18 U.S.C. 923(c) (1994) and 27 CFR 178.125a (1996) to contain a default provision which provides that the sale of firearms held for less than one year which are not properly recorded pursuant to 27 CFR 178.125a(a), regardless of how acquired, are to be considered to be from the licensee's business inventory.").

without it, there may be unintended consequences for individuals engaged in legitimate firearms transactions, further complicating what they referred to as an already complex regulatory landscape. For instance, one commenter, a large FFL with thousands of employees, stated the definition of "responsible person" is overbroad and could capture hundreds of employees in its company. As examples, they listed logistics and shipping associates; marketing and sales associates; value stream managers; group and team leads; associates responsible for establishing and disseminating standard work and job instructions as they pertain to firearms manufacture, destruction, transfer, and testing; customer service associates; engineers; and product and project managers involved in firearms design and manufacture. The commenter added that, were all these employees to be considered responsible persons, it would become extremely burdensome to add them to their license as well as timely update the license as people join or leave the company. The commenter, therefore, suggested that the designation of a responsible person should be based on (1) the person's responsibilities, and (2) the licensee's designation of the person as a responsible person.

Another commenter stated that the proposed regulatory definition of "responsible person" is contrary to the statute at 18 U.S.C. 923(d)(1)(B), which they said describes an applicant for a license to include, "in the case of a corporation . . . any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association." The commenter stated that the proposed regulatory definition adds words that are not in section 923(d)(1)(B), specifically "*business practices* of a corporation, partnership, or association *insofar as they pertain to firearms.*" The commenter argued that "practice" is the "actual performance" of something or even "a repeated customary action," regardless of whether the action is permitted by or contrary to the organization's management or policies. Despite the Department's explanation that store clerks or cashiers cannot make management or policy decisions with respect to firearms and are unlikely to be considered a "responsible person," the commenter asked whether gun store clerks who direct "business practices" each time they perform their job duties could be captured under the regulatory definition. The commenter asserted that the Department was trying to capture

more people as responsible persons than Congress intended by adding those emphasized phrases, which the commenter characterized as amorphous and unexplained.

Another commenter also stated the definition is too broad on grounds that the words "indirectly" and "cause the direction" are unclear terms. The commenter suggested the Department adopt the definition of "responsible person" from the explosives context, where it is defined in 18 U.S.C. 841(s) as "an individual who has the power to direct the management and policies of the applicant pertaining to explosive materials."

#### Department Response

The Department disagrees that the definition of "responsible person" is overbroad; it merely establishes by regulation the longstanding definition used on ATF Form 7/7CR, Application for Federal Firearms License, based on statutory language in 18 U.S.C. 923(d)(1)(B). The Department declines to fully adopt the definition set forth in the Federal explosives laws at 18 U.S.C. 841(s), because, although it is similar, it does not include persons who indirectly possess the power to direct or cause the direction of the management and policies of an entity, as identified in section 923(d)(1)(B). The Department does not intend, by means of this rule, to change how persons apply the current definition of "responsible person" on ATF Form 7/7CR. Nonetheless, the Department agrees with commenters that the term "responsible person" would benefit from some additional clarity, as follows. First, to help ensure that persons do not interpret the term "business practices" to cover sales associates, logistics personnel, human resources personnel, engineers, and other employees who cannot make management or policy decisions on behalf of the licensee with respect to the firearms business, the Department has removed the term "business practices" from the definition of "responsible person" in the final rule and intends to remove the term "business practices" from ATF Form 7/7CR in the future. Second, to ensure that persons understand the term "applicant" in 18 U.S.C. 923(d)(1)(B) to include as "responsible persons" sole proprietors and individuals with authority to make management or policy decisions with respect to firearms for companies (including limited liability companies) the definition in this final rule includes sole proprietorships and companies. This will make it clear that all licensees (including sole proprietors and limited liability companies) must

ATF 015352

inform ATF of responsible persons who have the authority to make management or policy decisions with respect to firearms, and ensure they undergo a background check. At the same time, the Department does not intend to include in the definition of responsible persons those employees who have no authority to make management or policy decisions that impact the firearms portion of a licensed business.

### 14. Definition of "Predominantly Earn a Profit"

#### a. Overbreadth

#### Comments Received

Numerous commenters expressed concern over the scope of the term "predominantly earn a profit." Some commenters raised questions regarding "intent to earn a profit," noting that it is only logical for a person selling a good, like a firearm, to want to earn a profit and that it would be ridiculous to expect any private seller to sell a firearm for less than its expected value. For instance, one commenter stated they had a small gun collection of primarily curio and relic firearms and would set a sales price based on their perception of the firearm's market value. This person stated that while they might make some money, their motivation is not to make a profit (noting that their last sale was to pay a medical bill) but they believe they would be required to get an FFL under the rule.

In a similar vein, some commenters opined that they would have to sell their firearms at a loss to avoid generating a "profit" and that the proposed rule would prevent an owner from receiving fair market value for their firearms. Similarly, other commenters pointed out how a person might avoid the "intent" requirement. One commenter asked if a person who states that their primary goal is not to earn a profit and acts as a nonprofit organization can, as a result, sell as many guns as they like without becoming licensed. Another commenter noted that under IRS rules of "income," an even exchange of goods means there is no income or profit, and that if there is no profit, there is no business activity. This commenter believed that, if the buyer and seller determine the value of the items and make an even exchange, then the buyer should not be captured under the definition of "predominantly earn a profit." Other commenters questioned who would determine who made a "profit" where a trade involved no cash, but a person instead traded a gun and a laser sight for a different gun.

Another commenter critiqued the definition, stating that it has been

expanded to include any pecuniary gain, which they stated is overbroad. The commenter argued that the definition fails to recognize that all sales have some motive of pecuniary gain; otherwise a seller would give away or destroy their firearm. They stated that not only does the GCA expressly allow non-licensees to make occasional sales, but nothing in the GCA prohibits non-licensees from attempting to derive pecuniary gain from their occasional sales. One organization argued that the definition would apply even when a person is selling a firearm on consignment because, if a person consigned their firearm to an FFL, that person would be reselling with the intent to predominantly earn a profit and therefore would need to be licensed, even though the transaction is facilitated by an FFL.

#### Department Response

The Department disagrees that the rule's definition of "predominantly earn a profit" is overbroad. The definition merely implements the statutory definition "to predominantly earn a profit" in 18 U.S.C. 921(a)(22), which defines that term, in relevant part, to mean that "the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." The Department agrees that some persons who sell firearms do not have the predominant intent to profit through repetitive purchase and resale even if they do intend to obtain pecuniary gain from firearms sales (*e.g.,* where the intent to obtain such gain is a secondary motive). However, even if a person has a predominant intent to earn a profit, it does not automatically follow that they are always engaged in the business. A predominant intent to profit through repetitive resale of firearms is only one element of being engaged in the business.

Under the BSCA, a person's intended use for the income they receive from the sale or disposition of firearms is not relevant to the question of whether they intended to predominantly obtain pecuniary gain. If a person must sell their previously acquired firearms to generate income for subsistence, such as to pay medical or tuition bills, they are still subject to the same considerations as persons who intend to sell their firearms to go on a vacation, increase their savings, or buy a sports car. If persons repetitively resell firearms and actually obtain pecuniary gain, whether or not it was for support or subsistence, that gain is evidence demonstrating the

intent element of being engaged in the business. However, the Department emphasizes that a single or isolated sale of firearms that generates pecuniary gain would not alone be sufficient to qualify as being engaged in the business without additional conduct indicative of firearms dealing. For example, a person who bought a firearm 40 years ago and now sells it for a substantial profit to augment income during retirement is not engaged in the business because the person's intent was not to earn that pecuniary gain through repetitive purchases and resales of firearms.

With regard to the comment about nonprofit organizations, they can also have the predominant intent to earn a profit from the sale or disposition of firearms. They just do not distribute their profits to private owners (although their employees can receive compensation).[225] In response to commenters who questioned whether a like-kind exchange would result in a profit, or whether the IRS would consider it "profit," the Department reiterates that the relevant standard is not whether an actual profit is earned under the definition of "engaged in the business." The standard is whether the person who exchanged the firearms for money, goods, or services had the predominant intent to earn a profit— meaning to obtain pecuniary gain— through repetitive firearms purchases and resales.

The Department disagrees with some commenters who said that a person always has a *predominant* intent to earn a profit when selling or disposing of a firearm. For example, a person may wish to get rid of unsuitable or damaged firearms quickly, so the person intends to sell them at a loss for less than fair market value. In that case, there is only an intent to minimize a pecuniary loss, not obtain a pecuniary gain. Likewise, a person who only transfers firearms: as bona fide gifts; occasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection; occasionally to a licensee or to a family member for lawful purposes; to liquidate (without restocking) all or part of a personal collection; or to liquidate firearms that are inherited, or

---

[225] *Myths About Nonprofits,* Nat'l Council of Nonprofits, *https://www.councilofnonprofits.org/about-americas-nonprofits/myths-about-nonprofits* (last visited Mar. 7, 2024) ("The term 'nonprofit' is a bit of a misnomer. Nonprofits can make a profit (and should try to have some level of positive revenue to build a reserve fund to ensure sustainability.) The key difference between nonprofits and for-profits is that a nonprofit organization cannot distribute its profits to any private individual (although nonprofits may pay reasonable compensation to those providing services).").

pursuant to court order, does not usually have a predominant intent to earn a profit from those activities. This is true even if the seller has a secondary motive to obtain pecuniary gain from those sales. To make this clear, the final rule now expressly states that any such evidence may be used to rebut the presumptions. *See* § 478.13(e), (f).

The Department agrees with commenters who suggested that a person who consigns firearms for sale (consignor) may have a predominant intent to earn a profit from the sale of the firearms; however, that does not end the inquiry because that person is often not devoting time, attention, and labor to dealing in firearms as a regular course of trade or business. The person engaged in the business is the seller who accepts the firearms on consignment (consignee), is paid to take the firearms into a business inventory for resale, and determines the manner in which to market and resell them on the consignor's behalf.[226] Like consignment-type auctioneers, firearms consignment businesses must be licensed because they are devoting time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms.

b. Government Proof of Intent To Profit Through Repetitive Purchase and Resale

Comments Received

Other commenters raised concerns that the proposed definition of "predominantly earn a profit" does not require a person to have actually obtained pecuniary gain. Some congressional commenters stated, "under the proposed rule, the ATF would require someone to prove he or she is not a firearms dealer in instances where no firearms are actually exchanged or sold" and opined that that situation was not consistent with the statute.

Some commenters stated that even though the proposed rule incorporates to "predominantly earn a profit" from the BSCA, the proposed definition includes language that directly contradicts the statute and legislative history of the GCA. They stated that Congress made clear that it is not necessary for the Government to prove profit in cases involving the repetitive purchase and disposition of firearms for

criminal purposes or terrorism, meaning that it is necessary for the Government to prove profit in all other cases. Thus, they argued that the added phrase "[f]or purposes of this definition, a person may have the intent to profit even if the person does not actually obtain pecuniary gain from the sale or disposition of firearms" and explanation from ATF that one can be a dealer without ever making a purchase or sale are both contrary to the statute. Commenters stated that ATF may not relieve itself of the congressionally imposed burden to prove profit. Another commenter pointed out that eliminating the need for profit is in tension with the concept of being in a business; if a business does not make a profit, then they cease to exist.

Moreover, at least one commenter disagreed with all the cases that were cited in support of the claim that the Government does not need to prove that the defendant actually profited. The commenter claimed that three of the cases cited—*United States* v. *Wilmoth,* 636 F.2d 123 (5th Cir. Unit A Feb. 1981), *United States* v. *Mastro,* 570 F. Supp. 1388 (E.D. Pa. 1983), and *United States* v. *Shirling,* 572 F.2d 532 (5th Cir. 1978)—were decided before there was any statutory mention of "profit" as it relates to dealing. They noted that two other cases—*Focia,* 869 F.3d 1269 and *United States* v. *Allah,* 130 F.3d 33 (2d Cir. 1997)—were not on point because in both cases the Government had shown that defendants profited.

Department Response

The Department disagrees with commenters who said that the GCA requires that a person actually obtain pecuniary gain. The only "profit" element in the GCA—both before and after the BSCA was enacted—is the intent to profit through the repetitive purchase and resale of firearms. This is because the statutory terms "to predominantly earn a profit" through the repetitive purchase and resale of firearms in 18 U.S.C. 921(a)(22), and "with the principal objective of livelihood and profit" in 18 U.S.C. 921(a)(23), are both defined to mean "the intent underlying the sale or disposition of firearms is predominantly one of obtaining . . . pecuniary profit." One does not need to realize a profit to have the intent to profit.

The Department does not agree with commenters who argued that the proviso concerning the disposition of firearms for criminal purposes demonstrates otherwise. The statement that "proof of profit shall not be required" in that proviso requires neither proof of profit nor proof of

intent to profit for persons who engage in the regular or repetitive purchases and dispositions of firearms for criminal purposes or terrorism. *See United States* v. *Fifty-Two Firearms,* 362 F. Supp. 2d 1308, 1324 (M.D. Fla.), *adopted by* 362 F. Supp. 2d 1323 (M.D. Fla. 2005) ("[P]roof of profit motive is not required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." (citing 18 U.S.C. 922(a)(22) and Eleventh Circuit Pattern Jury Instruction No. 34.1). Reading that proviso to, by negative implication, require proof of profit—and intent to profit—with respect to other forms of engaging in the business would be contrary to the plain text of the definition of "to predominantly earn a profit," which refers to the "intent underlying the sale or disposition of firearms." 18 U.S.C. 921(a)(22); *see also id.* 921(a)(23) (definition of "with the principal objective of livelihood and profit," similar). It would also be contrary to decades of Federal case law on 18 U.S.C. 922(a)(1).[227]

Some commenters asserted that, because some of the criminal cases cited in the proposed rule referenced the fact that the defendant actually profited from firearms sales, the cases support their conclusion that actual profit must be proven in an engaged in the business case. The Department disagrees. Of course, proof of actual profit may be presented in a case, but that does not mean it is required. Proof of actual profit is merely cited by courts in cases, such as *Focia,* 869 F.3d at 1282 (defendant "immediately turned around and sold them at a steep profit"), and *Allah,* 130 F.3d at 44 (defendant "had several people bring him 'dough' from selling guns for him 'in the streets' "), as evidence that supported findings that the defendant had the requisite intent to profit. But evidence of actual profit is not necessary where the totality of the facts otherwise demonstrates the predominant intent to profit. For example, if the defendant admitted to an undercover officer that he wanted "to make a whole lot of money" from reselling the firearms to the officer, that evidence would likely be sufficient to prove a predominant intent to earn a profit from those sales. Moreover, where a person engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism, no proof of profit, including, as explained above, the intent to profit, is required at all in an engaged in the business case. *See* 18 U.S.C. 921(a)(22).

---

[226] *See, e.g., United States* v. *Strunk,* 551 F. App'x 245, 246 (5th Cir. 2014) (Defendant "without being licensed, sold firearms entrusted to him by others for the purpose of sale. Such conduct is unquestionably prohibited by the legislation's text.").

[227] *See* footnote 96, *supra.*

## c. Suggestions on Meaning of Profit

### Comments Received

Numerous commenters stated that the definition of "predominantly earn a profit" with its presumptions will capture practically all firearms owners who wish to sell their personal or inherited firearms because the value of firearms typically increases over time and will thus always result in a profit. Several commenters stated that profit should be defined to avoid misinterpretation while others asked how profit should be calculated or made suggestions. For example, one commenter asked if the labor to customize a firearm or any additional parts that are added should be included in a calculation of profit.

Similarly, numerous commenters pointed out that determining profit does not account for inflation and indicated that it should. Commenters provided examples of how they would not earn a profit, or would make a minimal profit, from the sale of a firearm due to inflation. For example, one commenter posited that if a person purchased a firearm for $600 ten years ago and sold it in the present for $750, this could be viewed as making a profit, but it would actually be a loss in real terms because the purchasing power of $600 was greater ten years ago than the purchasing power of $750 is today due to inflation. At least one commenter asserted that ATF's proposed definition of "profit" is problematic under the U.S. tax code, as inflation is not allowed to be accounted for in the ATF definition, even though it is an adopted measure of the price of all goods.

Gun collectors' associations said the definition does not take into account any other expense or time value of money associated with the sale of the firearm, which is a part of any normal calculation of "profit" and hence is beyond proper basis of an interpretive regulation. Additionally, they stated that the costs gun collectors incur to attend events should be factored into any reasonable definition of "profit."

Similarly, to account for the change in time in the fair market value of goods, another commenter proposed adding language providing that "[i]f a private individual sells a firearm that they have purchased for more than the original purchase price, they are not considered to be selling the firearm for the purpose of primarily making a profit if the fair market price of the firearm has increased since the original date of purchase."

### Department Response

The Department agrees that a person who liquidates inherited firearms from a personal collection at fair market value, absent additional circumstances indicating otherwise, typically does not have a predominant intent to profit from those sales. While the person may have an intent to receive pecuniary gain when they sell these firearms and may or may not have a predominant intent to profit, the person would not be "engaged in the business" because liquidating this one set of inherited firearms does not constitute dealing as a regular course of trade or business. Nevertheless, because the Department believes that persons in such a scenario typically do not have a predominant intent to profit, the Department has incorporated, as conduct that does not support a presumption, and as rebuttal evidence, a person who only "liquidate[s] firearms [t]hat are inherited." § 478.13(e)(5)(i), (f).

In response to commenters who said that any profit should account for inflation, or expenses incurred, again, the statute does not require proof of actual profit. The statute's and rule's focus is on the person's predominant intent to profit, not on whether a person actually profits. Because the focus is on a person's intent, it makes no difference whether the costs or inflation mentioned by the commenters are included in the sales price or in assessing actual profit.

The Department disagrees with the commenter who suggested that a private individual automatically does not have an intent to profit if they sell a firearm that was purchased for more than the original purchase price if the fair market price of the firearm has increased since the original date of purchase. The Department declines to make this a blanket exception or rebuttal evidence to the current presumptions because the fair market value of the firearm may have increased substantially more than the original purchase price. The details of any particular situation may vary, and those facts may impact the determination of intent. Based on these facts, the seller may or may not have had a predominant intent to earn a profit from that sale.

### d. Other Suggestions Related to Definition of "Predominantly Earn a Profit"

### Comments Received

Many commenters proposed various changes to the definition of the term "predominantly earn a profit" that they felt would narrow the scope of when a person has intent to predominantly earn a profit such that they are "engaged in the business" of dealing in firearms. Proposed exceptions included excluding when a person earns less than $5,000 per year or when they sell fewer than ten guns a month. One commenter suggested that certain scenarios be excluded because while there may be monetary gain there is no desire to increase the collection or buy firearms. These scenarios include liquidation at fair market value of inherited firearms or firearms passed down through a family member, liquidation of firearms at fair market value due to financial hardship or disability, and liquidation of firearms at fair market value due to loss of interest or change in a hobby.

Similarly, one commenter pointed out that "predominantly" under 26 U.S.C. 118(c)(3) means "80 percent or more" and argued that ATF's proposed definition should be consistent with this statutory provision in the Internal Revenue Code. Therefore, the commenter suggested that ATF's definition of dealer should be amended to someone who engages in selling or disposing of firearms "where the intent is to obtain a pecuniary gain in 80 or more of the total transactions involving firearms as defined by" 18 U.S.C. 921.

Another commenter suggested that the term be revised to be clear that a collector can liquidate all or part of their collection by having a table at a gun show without requiring them to become a Type 01 FFL. Still another commenter suggested that the text should make clear the sources or methods used to acquire the firearm that is subsequently resold to "predominantly earn a profit."

### Department Response

The Department disagrees that the scope of the PEP presumptions should be limited to when a person earns less than $5,000 per year from selling firearms, or when they sell fewer than ten guns per month. The amount of money a person makes when intending to earn a profit through repetitively purchasing and reselling firearms may be relevant in determining whether a person is engaged in the business. The fact that a person earns a large amount of profit from repetitively reselling firearms may be evidence that a person had a predominant intent to profit from those sales. However, there is no statutory requirement that a person make a certain amount of money (or any money at all) to have a predominant intent to profit. Persons who operate a part-time firearms business that earns less than $5,000 per year, or even a firearms business that loses money due to poor salesmanship or lack of demand, would still be engaged in the business

if they devote time, attention, and labor to dealing with the predominant intent to profit through repetitive purchases and resales of firearms. As stated previously, it is the seller's intent to predominantly earn a profit that determines whether a person needs a license, not the number of sales or amount of profit.

The Department disagrees that the sale of firearms at fair market value due to financial hardship or disability is evidence sufficient to exclude a person from being considered engaged in the business, or to rebut the presumptions. The statute's definition of "engaged in the business" does not create an exception for people who intend to engage in firearms dealing to earn income for support or subsistence; the definition as amended by the BSCA focuses only on a person's devotion of time, attention, and labor to that business and intent to earn a profit, not the uses to which they put any resulting profit or income. As a result, providing evidence that a person is engaging in the business of firearms dealing for livelihood reasons does not rebut any of the elements that constitute being engaged in the business.

As to the suggestion that the term "predominantly" be defined consistently with 26 U.S.C. 118(c)(3) as "80 percent or more," such that 80 percent of the transactions must be for pecuniary gain, the Department declines to do this. First, 26 U.S.C. 118(c)(3) is a definition of "predominantly" that is used to determine whether a regulated public water or sewage disposal services may exclude certain amounts expended on those services from their gross income. This calculation has no connection or similarity to intent, let alone the context of firearms sales. Second, the GCA contains no such limitation. A person may have the predominant intent to profit from the sale or offer to sell a single firearm, even if the person has no such intent with respect to other firearms being sold.[228]

In response to a commenter who suggested that the regulations be changed to make it clear that a collector can liquidate all or part of their collection by having a table at a gun show without a license, the Department

has revised the final rule to state that reliable evidence that the person resells firearms only occasionally to obtain more valuable, desirable, or useful firearms for their personal collection, or to liquidate a personal collection, does not support a presumption and can be used to rebut any presumption. § 478.13(e)(2) and (4), (f).

### 15. Presumptions That a Person Intends to Predominantly Earn a Profit

#### Comments Received

Commenters stated that none of the individual presumptions that a person has the intent to predominantly earn a profit are supported by the Federal statute and raised concerns that they generally penalize entirely innocent and natural conduct of non-licensee sellers. Commenters stated these criteria are overbroad and fail to differentiate between genuine business activity and casual or incidental actions related to firearms. They stated that it is unfair for ATF to presume an intent to profit in scenarios where no such intent exists and that these presumptions make it effectively impossible for an unlicensed person to sell their firearm without running afoul of the rule. Indeed, one commenter stated that all avenues to make a personal sale were cut off and that he "cannot fathom how [he is] supposed to sell ANY firearm without being presumed to be engaged in the business under these rules. This rule says that [he] can sell part of [his] collection, but [he] cannot see a way to do so without being presumed to be engaged in the business under this rule." At least one commenter stated that all the presumptions ignore the statutory requirement that the intent "underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain."

Similarly, one commenter noted that determining when someone acts to "predominantly earn a profit" requires not determining that a profit was made, but rather, the underlying motivating factor for that person's actions. The commenter disagreed that any of the presumptions listed are indicators of such motivation; rather, they said, these presumptions reflect efficient and timely ways to sell a firearm and do not speak at all to the person's motivation when buying the firearm initially. For instance, they said, a person who wants to sell their car will take all actions possible to get the best price for it, such as advertising, providing maintenance records, renting space to list it online or a visible place to park it. A person wanting to sell their firearm would take similar steps, but these actions that

trigger the presumptions do not shed light on the motivation for the purchase or transaction.

A few other commenters were concerned about the fact that they have owned firearms for a long time and are reaching an advanced age at which they will need to sell them. One such commenter stated, "The idea of a profit is to sell something for more than it was purchased for. In my collection I have firearms that were obtained over 40 years ago. Inflation has raised their value so that any sale will make a profit. This means I am a dealer." Another explained that he is not a collector per se, but is a firearms competitor who thus has a number of firearms that "one day I must dispose of due to my advancing age. This would eliminate me from making private sales from my own holdings. The sale of which would generate a 'profit' since all were bought years ago when prices were much lower. The only choice this would leave me would be to sell on concession through a dealer . . . if I could find one willing to take the goods."

Commenters stated that many businesses have a large inventory of firearms for business purposes but are not licensed; these include armored car services, security companies, farmers, ranchers, and commercial hunting operations. If "predominantly earn a profit" is separate from "engaged in the business" as a set of presumptions, the commenters added, then a security company keeping track of its firearm inventory and the cost of obtaining those firearms for tax or other reasons would be captured under any of the presumptions listed under "predominantly earn a profit." Or a hunting outfitter with a large inventory of firearms for client use would easily be captured under a "predominately-earn-a-profit" presumption if they have security services like monitored alarms or cameras. The commenters concluded that the rule might therefore have the unintended consequence of reducing public safety if some people avoid certain security measures, such as monitored alarms, to avoid being presumed to be engaged in the business because they qualified for one of the "predominantly earn a profit" presumptions.

One comment noted that "while this set of presumptions is separate from the presumptions that establish that a person meets the definition of 'engaged in the business,' evidence of the conduct described in this set of presumptions can serve to rebut evidence of conduct that, under paragraph (c)(4) (now § 478.13(e)) of the Proposed Rule's definition of 'engaged

---

[228] The term "predominant" is commonly defined as "more noticeable or important, or larger in number, than others." *Predominant,* Cambridge Online Dictionary, *https://dictionary.cambridge.org/us/dictionary/english/predominant* (last visited Mar. 17, 2024); *see also Predominant,* Oxford English Dictionary, *https://www.oed.com/dictionary/predominant_adj?tab=meaning_and_use#28860543* (last visited Mar. 17, 2024) ("Having ascendancy, supremacy, or prevailing influence over others; superior, predominating.").

ATF 015356

in the business,' is presumed not to be engaged in the business." They suggested that ATF further clarify this.

Department Response

The Department disagrees that the presumptions that separately address the BSCA's new intent element—"to predominantly earn a profit" through the repetitive purchase and resale of firearms—penalize innocent and natural conduct of sellers who are not engaged in the business. Nothing in this rule creates any new penalties. The PEP presumptions serve only to establish the intent element. Even when that element is satisfied, a person would not be engaged in the business unless the other statutory requirements are present, including the requirements that the person "devote[ ] time, attention, and labor to dealing in firearms as a regular course of trade or business" and that the person is engaging, or intends to engage, in "the repetitive purchase and resale of firearms." 18 U.S.C. 921(a)(21)(C).

As the preamble and regulatory text explain, the EIB presumptions are not exhaustive of the conduct that may show that, or be considered in determining whether, a person is engaged in the business of dealing in firearms. *See* § 478.13(g). There are many other fact patterns that could support a finding that a person is engaged in the business requiring a license. The presumptions are tools that assist persons, including firearms sellers, investigators, and fact finders, to understand a set of common situations that have been found over the course of decades to indicate that a person is engaged in the business. Similarly, these PEP presumptions are not the only fact patterns that could support a finding that a person has a predominant intent to earn a profit, but they are tools to assist in assessing the element of intent. At the same time, there are other fact patterns, such as where a person advertises a valuable collectible firearm for sale from a personal collection that could generate a substantial profit, that would not require a license. The fact that the collector, or even a company, intends to earn a profit from the sale or disposition of a firearm is not, by itself, dispositive as to whether that person is engaged in the business of dealing in firearms requiring a license. These presumptions apply only to an individual's or entity's predominant motivation in selling the firearm, and like other presumptions, they may be refuted with reliable evidence to the contrary.

The Department disagrees that these presumptions do not address a person's motivation. First, as stated previously,

actual profit is not a requirement of the statute—it is only the predominant intent to earn a profit through the repetitive purchase and resale of firearms that is required. Indeed, a person may repeatedly advertise and display firearms for sale, and therefore demonstrate a predominant intent to earn a profit from repeatedly reselling the firearms purchased, but never actually find a buyer. Second, as stated previously, intent appropriately may be inferred from a person's words or conduct demonstrating such intent.[229] The motivation to predominantly obtain pecuniary gain from the repetitive sale or disposition of firearms can be demonstrated when a person takes certain preliminary steps to earn a profit, such as those reflected in the PEP presumptions. Generally, persons who do not intend to profit from firearms sales are not going to expend time, attention, labor, and money to repetitively advertise, secure display space, maintain profit documentation, hire security, set up business accounts, or apply for business licenses. And even if they do expend such time, attention, and labor without a predominant intent to earn a profit, the person can bring forward reliable rebuttal evidence to refute the presumed intent.

The Department disagrees with the commenter who stated that a collector who holds firearms in a personal collection for many years would always show a profit due to inflation when they are sold, and would therefore automatically be considered a dealer. As stated previously, a showing of actual profit is not dispositive as to whether a person is engaged in the business. Rather, it is the predominant intent of obtaining pecuniary gain from the repetitive purchase and resale or disposition of firearms that matters. *See* 18 U.S.C. 921(a)(22). However, a person who is occasionally selling firearms from a personal collection to enhance it, or who liquidates it, typically does not have that intent, which is why this final rule states that reliable evidence of those activities and intent does not support a presumption and may be used to rebut any presumption. *See* § 478.13(e), (f).

The Department agrees that security companies, farmers, ranchers, and hunting outfitters that do not purchase firearms primarily for resale would be unlikely to have a predominant intent to earn a profit from liquidating their businesses' firearms, particularly since these firearms have likely lost their value over time due to constant use and handling. Non-firearms-dealing

businesses may simply want to quickly sell them in bulk to a licensee for less than fair market value, in order to purchase new firearms. However, even if such businesses were to resell their firearms with a predominant intent to profit, that would not automatically mean that they were engaged in the business of dealing in firearms. The intent to profit is only one element of being engaged in the business; the other elements of dealing would also have to be established. Therefore, if these businesses engaged in conduct that falls under one of the PEP presumptions and are presumed to have a predominant intent to profit, that does not mean they are also necessarily presumed to be engaged in the business of dealing in firearms.

The PEP presumption on recordkeeping is about keeping records to document, track, or calculate profits and losses from firearms purchases and resales, not about general recordkeeping of a firearms inventory or merely the cost of obtaining the firearms. Nonetheless, to avoid confusion as to when it applies, this PEP presumption has been revised to read, "[m]akes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale." § 478.13(d)(2)(iii). Therefore, as revised, the presumption is clarified to show that it does not include persons who merely keep track of their firearms or what they spend on them.

The Department does agree that the PEP presumption on securing a business security service to protect inventory is somewhat overbroad as drafted in the NPRM, and has therefore limited it in this final rule to maintaining security for both firearms assets and repetitive firearms transactions. *See* § 478.13(d)(2)(v). While some businesses may purchase firearms, and eventually liquidate them, such activity may be for reasons completely unrelated to any profit motive for the firearms transactions. In contrast, if they secure business security services to protect both their firearms assets and transactions, they are presumed to have a predominant intent to profit from those transactions. The focus of the licensing provisions in the GCA is on firearms transactions, not merely storing or maintaining firearms as assets. So, for example, if a business or other person merely purchases firearms for their own use, but not to enter into transactions involving those firearms, they would not fall under this presumption because it is unlikely they would hire business security to protect firearms transactions.

The Department declines to adopt a commenter's suggestion that evidence of

---

[229] *See* footnote 186, *supra.*

conduct identified in the PEP presumptions be used to "rebut" conduct not presumed to be engaged in the business (listed in paragraph (c)(4) of the NPRM's definition of engaged in the business, and now in § 478.13(e)). Section 478.13(e) is not a list of rebuttable presumptions. Rather, it is a nonexhaustive list of conduct that does not support a presumption of engaging in the business. As such, reliable evidence that a person is or was engaging only in such conduct can be used to rebut any presumption. In addition, the rule has been revised to state that the examples of rebuttal evidence set forth in the rule are not an exhaustive list of evidence a person may present to rebut the presumptions. *See* § 478.13(g).

### 16. PEP Presumption—Promotion of a Firearms Business

#### Comments Received

Several commenters disagreed with the inclusion of "[a]dvertises, markets, or otherwise promotes a firearms business (*e.g.,* advertises or posts firearms for sale, including on any website, establishes a website for offering their firearms for sale, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally" as a presumption in determining whether a person has the intent to predominantly earn a profit.

First, commenters noted that Congress explicitly rejected limitations on the private transfers of firearms pursuant to classified ads and gun shows, implying that ATF cannot now include in its rule a presumption that advertising or promoting a firearms business shows predominant intent to profit. Additionally, commenters stated that such advertisements in a classified advertisement hardly qualify someone as having such intent and that this is criminalizing protected behavior. For instance, the commenters said, if a person is liquidating a personally owned NFA weapon because of a move to a State where possession of the item would be unlawful, they believed that the presumption would capture such a person who posts an advertisement on the internet to sell their NFA weapon even if they lose money on the sale. In fact, stated one commenter, the presumption is so broad it could apply to posting even a single firearm for sale on a website, which is a common occurrence where the seller did not purchase the firearm with intent to profit and is most likely losing money on the sale. The commenter stated that

there is "no indicia that a seller who posts on a website is doing so for pecuniary gain" so "the presumption lacks any connection to the statutory definition of 'predominantly earn a profit.' "

Similarly, a couple of gun collectors' associations stated this first presumption essentially limits all sales to word of mouth if a seller does not want to be captured under the presumption. A third association added, "[m]ost who collect firearms or engage in the sale of firearms for a hobby are willing to buy or willing to sell, but this in and of itself [does] not establish by a preponderance that they are doing so to 'predominately earn a profit'. . . . The changes in the law did not provide that a person could not advertise a firearm for sale, put a price tag on it, place it for sale on the internet, or rent a table at a gun show." In another commenter's view, the presumptions also preclude word-of-mouth sales. They stated that the definition of "engaged in the business" does not require that a firearm actually be sold, so long as the person holds themselves out as a dealer. So, they added, "[i]n other words, if I *converse* with another person and *offer* to sell a personal firearm or represent to that person that I have a willingness, and ability, to purchase and/or sell other personal firearms [which occurs regularly if one is a collector], I am a Dealer. I would ask how, exactly, a person who wanted to actively seek out and add firearms to his/her collection would do so if you are not allowed to actually converse about it or negotiate with the owner of that firearm? . . . You can't 'spread the word' among other people as that activity also presumes you are a dealer." One company raised a concern over whether certain brand ambassadors that promote company products, or associates that go to trade shows who promote their company, would now be presumed to be engaged in the business of dealing in firearms.

In contrast, another commenter made a suggestion to strengthen this presumption with regard to online sales advertising because they found, through their own research, that the number of online sales advertisements for firearms through sites such as Armslist was overwhelmingly listed by unlicensed sellers rather than licensed dealers. They suggested that ATF should also consider stating that any person who engages in online conduct that falls within this presumption on more than one discrete occasion will qualify for a rebuttable presumption that the person is "engaged in the business" of firearms dealing. "Put differently," they

explained, "the [I]nternet is the epicenter of the unregulated firearm sales market—and repeatedly advertising for sales online should be presumptively considered to be holding oneself out as a dealer. Plainly describing such an additional rebuttable presumption . . . would make it much clearer that a person's second or subsequent use of online advertising, marketing, or posting of firearms for sale puts the burden on the seller to provide rebuttal evidence demonstrating that their multiple online advertisements are not engaging in the business of firearms dealing."

#### Department Response

The Department disagrees that the presumption that a person demonstrates a predominant intent to profit from selling firearms if the person "advertises, markets, or otherwise promotes a firearms business" is unfounded. Advertising or promoting a firearms business has long been recognized as a primary way of increasing sales and profits [230] and nothing in this rule prohibits or criminalizes isolated private transfers of firearms using classified advertisements and at gun shows. The presumption is narrowly tailored based on the Department's regulatory and enforcement experience, court decisions with similar fact patterns, and the investigations and prosecutions it has brought over the years. Because promoting a firearms business requires investing time and money, persons typically do not engage in such activities without intending to profit from resulting sales and recoup potential advertising costs in the process. As a result, advertising or promoting a firearms business is activity that indicates a person has a predominant intent to profit from firearms sales. This presumption does not prevent or hinder individuals from advertising to promote occasional private transactions, as intent to

---

[230] *See, e.g., The Importance of Marketing for Your Firearms Company,* The Coutts Agency, *https://couttsagency.com/digital-marketing-for-firearms-companies* (last visited Mar. 18, 2024) ("Whether you're an established name in the firearms manufacturing sector or you're a new firearm company looking to find your niche on the national level, marketing is how you'll achieve your goals."); Joshua Claflin, *Maximizing ROI With Effective Firearms Marketing Tactics (The Complete Guide),* Garrison Everest (Nov. 24, 2023), *https://www.garrisoneverest.com/firearms-marketing/maximizing-roi-with-effective-firearms-marketing-tactics-complete-guide* ("Marketing serves as the bridge between firearms businesses and their target audience. It's not just about promoting products; rather, it's about building firearm brand recognition, establishing trust, and nurturing long-term customer relationships.").

predominantly earn a profit is just one element of being engaged in the business.

Nevertheless, the Department acknowledges commenters' worries that an advertisement for an isolated firearms sale might cause them to be presumed to have a predominant intent to profit through the repetitive purchase and resale of firearms. Therefore, to increase the likelihood that promoting or advertising a firearms business as covered by this presumption relates to persons who predominantly intend to earn pecuniary gain from the sale of firearms, the presumption has been revised to add the words "repetitively or continuously" before "advertises, markets, or otherwise promotes a firearms business." § 478.13(d)(2)(i). Thus, persons who do not repetitively or continuously advertise or otherwise promote a firearms business are excluded from the presumption that they predominantly intend to profit from repetitive sales of firearms. Of course, like the other presumptions, this one may be rebutted with reliable evidence to the contrary.

With regard to employees of licensees who promote a firearms business, such individuals do not need to be licensed because businesses "carry out operations through their employees," and no transfer or disposition of firearms occurs when they are temporarily assigned firearms for business purposes. ATF Ruling 2010–1, *Temporary Assignment of a Firearm by an FFL to an Unlicensed Employee,* at 2 (May 20, 2010), *https://www.atf.gov/firearms/docs/ruling/2010-1-temporary-assignment-firearm-ffl-unlicensed-employee/download.* These employees operate under the license of the business, and the business sells firearms under the requirements of the GCA (*e.g.,* background checks). However, a contractor who is not an employee would demonstrate a predominant intent to earn a profit from firearms sales by promoting another person's firearms business, or posting firearms for sale for someone else, particularly a company. This does not mean that such persons are themselves engaged in the business, but they are promoting a firearms business with the predominant intent to earn a profit from the sale and distribution of those firearms, and thereby assisting another person engaging in the business of dealing in firearms without operating under their license.

The Department also disagrees with the alternative suggestion that any person who advertises firearms online on more than one discrete occasion should qualify for a rebuttable

presumption that the person is "engaged in the business" of firearms dealing. The presumption relates to advertising a "business," and the Department recognizes that persons who wish to dispose of all or part of a personal collection, or "trade up" to enhance their personal collection, for example, are likely to occasionally offer for resale firearms from their personal collection online. To be engaged in the business, the Department believes those offers must be accompanied by additional evidence. That could include repetitive offers for resale within 30 days after the firearms were purchased, or within one year after purchase if the firearms are new or like-new in their original packaging or the same make and model, or a variant thereof. That is not to say that other fact patterns will not demonstrate engaging in the business; however, the Department has carefully considered these issues and narrowly tailored the presumptions in this rule based on its regulatory and enforcement experience, court decisions with similar fact patterns, and the investigations and prosecutions it has brought over the years.

### 17. PEP Presumption—Purchases or Rents Physical Space

#### Comments Received

Commenters disagreed with this PEP presumption that purchasing, renting, or otherwise securing or setting aside permanent or temporary physical space to display firearms at gun shows or elsewhere is an indication of intent to profit. Commenters stated this presumption is contrary to the statutory protection for those who wish to sell all or part of a personal collection and contrary to Congress's intent in passing 18 U.S.C. 923(j), which permits licensees to temporarily conduct business at certain gun shows. Citing FOPA's legislative history, S. Rep. No. 98–583 (1984), one commenter stated that Congress's intent in passing section 923(j) was to put licensed dealers at parity with non-licensees, whom Congress assumed could already sell at gun shows. Further, another commenter stated that, "[t]he act of renting space at a gun show is obviously protected under the BSCA if the person is only making 'occasional sales, exchanges, or purchases' or if the person is using the space to sell 'all or part of his personal collection of firearms.' "

At least one commenter indicated that collectors or individuals often rent temporary physical space at gun shows to dispose of any excess guns such as World War II firearms, like Mausers, and to complete firearms transactions

face-to-face. Likewise, at least one commenter stated that often private persons display firearms at a gun show, and they will have FFLs process the transactions. This does not demonstrate that these private persons are dealers with an intent to profit, they said. At least one commenter said that a space to store firearms is not an indicator of intent to profit or being engaged in the business; rather, that person might simply want to store their firearms safely.

One commenter stated that these criteria are so broad "that a seller of popcorn who rents a table at a gun show would presumptively be engaged in the business of selling firearms under the proposed rule." Another commenter went so far as to state that this presumption "would turn literally every gun owner who has ever sold a gun into an unlicensed firearms dealer" because everyone who possesses firearms sets aside physical space to display or store them.

#### Department Response

The Department agrees with commenters that collectors may secure or set aside physical space in which to store firearms from their personal collections that they offer for resale, including at a gun show. For this reason, the presumption in the final rule deletes the words "or store," and replaces the phrase "otherwise secures or sets aside" with "otherwise exchanges (directly or indirectly) something of value to secure," to ensure that merely setting aside space to store or display firearms is not included in the presumption, and that only persons who secure space at a cost in order to profit from firearm sales are included. *See* § 478.13(d)(2)(ii). In this regard, the Department continues to believe that it is appropriate to presume that persons who repetitively or continuously secure permanent or temporary physical space at a cost to display firearms they offer for resale primarily intend to earn a profit from those sales. This is true even if the firearms are sold at a gun show, and nothing in the GCA purports to authorize non-licensees to rent space at a gun show to deal in firearms without a license. The GCA provision addressing guns shows, 18 U.S.C. 923(j), authorizes licensees to conduct operations temporarily at gun shows under certain limited conditions, not non-licensees. Again, this does not mean that a collector who occasionally sells a firearm from a personal collection at a gun show is required to be licensed. The presumption means only that the collector likely has a predominant intent to obtain pecuniary gain from the

sale of that firearm. To be considered a dealer, evidence would be required to show that the collector has devoted time, attention, and labor to dealing in firearms as a regular course of trade or business. And if a proceeding were to be brought against a collector, that person could refute the presumption with reliable evidence to the contrary.

To make this clear, the final rule has been revised to state that certain conduct, including liquidating a personal collection or occasionally reselling firearms to improve a personal collection, is conduct that does not support a presumption that a person is engaged in the business. *See* § 478.13(e)(2) and (4). Additionally, to increase the likelihood that this presumption targets persons who predominantly intend to earn pecuniary gain from the sale of firearms, the Department has revised the presumption to add the words "repetitively or continuously" before "purchases, rents, or otherwise exchanges (directly or indirectly) something of value to secure permanent or temporary physical space to display firearms they offer for resale." *See* § 478.13(d)(2)(ii). The word "continuously" was added to cover instances where a person buys a single location and occupies it for this purpose over an extended period. This presumption includes nontraditional commercial arrangements to secure display space (such as charging a higher membership or admission fee in exchange for "free" display space, or authorizing attendance at a gun show or sales event in exchange for something else). The phrase "directly or indirectly" was added to include indirect exchanges and clarify that nontraditional commercial arrangements are included. The presumption excludes persons who do not repetitively or continuously purchase, rent, or otherwise exchange something of value to secure physical space to display firearms they offer for resale. Of course, like the other presumptions, this one may be rebutted with reliable evidence to the contrary. *See* § 478.13(f).

### 18. PEP Presumption—Records of Profits and Losses

#### Comments Received

Numerous commenters objected to including records to calculate profits or losses from firearms purchases and sales as a presumption that determines one has intent to earn a profit as a dealer in firearms because it is a common behavior for any firearms owner to keep such records. The commenters stated

that the presumption is overbroad based on their belief that a person who keeps any sort of records of firearms, often for insurance purposes just like they would for a car or home, would be considered a dealer. They noted that keeping such records is important not only for insurance purposes but also to help with recovery of a stolen firearm. Some commenters also thought that this presumption could hurt collectors who have a Type 03 license because they are required to keep a collector's bound book where they record their purchases and sales. They noted that, under this presumption, ATF could presume they have the wrong type of license and they would be forced to get a dealer's license. Similarly, some commenters noted that the IRS requires investors or collectors to keep information on purchase history including acquisition date, improvement to the asset and cost of the asset to determine taxable gain upon sale. An additional commenter stated that businesses like a security company would keep track of their firearms inventory and track the cost of obtaining those firearms for tax and other reasons, but the law surely does not presume such a company is a firearms dealer. The commenters appeared to indicate that keeping such documentation for a transaction does not necessarily make the person a dealer. At least one commenter stated this presumption discourages the very behavior (*i.e.,* personal recordkeeping) that ATF should want to encourage while other commenters noted that the Personal Firearms Record, P3312.8, that ATF encourages people to keep for purposes of protecting their property and to aid in recovery of stolen firearms, could now be used against them to make them a dealer. One of these commenters added that even a licensed collector of curios and relics "would risk liability under this presumption, because they are in fact *required* by ATF to maintain such documentation. However, the NPRM will presume that even *these* FFLs simply have the *wrong* FFL (collector, not dealer)."

#### Department Response

The Department disagrees that keeping records to calculate profits and losses does not indicate a predominant intent to earn a profit from the sale or disposition of firearms. The point of making or maintaining such a record is to document profits or other pecuniary gain from firearms transactions. However, to further clarify this point, and to address comments regarding businesses that purchase and use firearms for purposes other than resale, the final rule revises this PEP

presumption to say that the person "[m]akes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale," not merely to document profits and losses from firearms purchased for other commercial (or noncommercial) purposes. § 478.13(d)(2)(iii).

The commenter is incorrect that the collector bound book, maintained by Type 03 licensed collectors of curios or relics pursuant to 27 CFR 478.125(f), is a record that documents profits and losses from firearms purchases and sales. The format for that record in § 478.125(f)(2) does not require any information concerning the purchase or sales prices of the curio or relic firearms, or profits and losses from those sales. Another commenter is incorrect that ATF Form 3312.8, Personal Firearms Record (revised Aug. 2013), *https://www.atf.gov/firearms/docs/guide/personal-firearms-record-atf-p-33128/download,* is a record of profits and losses. It does not document profits and losses from the purchase and resale of firearms, nor does it document the sales price—it documents only the cost of the firearm(s) at the time the person acquired them and the person or entity to whom the firearms are transferred, if any. Contrary to commenters' assertions, individuals can certainly make and maintain records of their personal inventories of firearms for insurance purposes without documenting profits and losses from firearms transactions. The presumption requires the latter, which is rebuttable by reliable evidence to the contrary.

Finally, in response to the comment that tracking profits is necessary for tax purposes, the Internal Revenue Code taxes only income from capital gains on personal property, meaning a positive difference between the purchase price and the sales price.[231] Money or other benefits a person receives from sales of depreciated personal firearms would not be reported as income (or treated as a capital gain for tax purposes). Thus, the primary reason for a person to track, for tax purposes, funds a person receives from selling firearms would likely be to account for pecuniary gain they predominantly intend to make from the sales. To the extent that the pecuniary gain is recorded for tax purposes from appreciating collectible or hobby firearms, or to record capital losses on firearms sales, that evidence can be used to rebut the presumption that the pecuniary gain recorded was the

---

[231] *See* Topic No. 409, *Capital Gains and Losses,* IRS, *https://www.irs.gov/taxtopics/tc409* (last updated Jan. 30, 2024).

person's predominant intent.[232] But it is inconsistent with the case law and ATF's regulatory and enforcement experience (and common sense) to say that maintaining these types of financial records is not indicative of profit-motivated business activity.

19. PEP Presumptions—Secures Merchant Services for Payments and Business Security Services

Comments Received

Commenters disagreed with, and stated they were confused by, the presumptions that a person is intending to predominantly earn a profit as a dealer in firearms if they use a digital wallet or use the services of a credit card merchant to accept payments, or if they hire business security services, such as a monitored security system or guards for security. At least one commenter argued that the presumption for using third-party services to ''make[ ] or offer[ ] to make payments'' seems to target buyers of firearms who make electronic payments rather than purported dealers who accept electronic payments when they sell the firearms. They noted that one case that the Department cited in footnote 97 of the NPRM, *United States* v. *Dettra,* 238 F.3d 424, 2000 WL 1872046, at *2 (6th Cir. 2000) (unpublished table decision), focuses on a defendant selling firearms, *i.e.,* accepting payments, rather than making payments. The commenter opined that the presumption is overbroad because it could make a dealer out of anyone who makes electronic payments for firearms using a business account. This would capture any business that purchases .22LR rifles for instructional purposes. The commenter said that even if the presumption is meant to target people who accept payments, the language is still overbroad. The commenter offered a particular hypothetical in which, they said, it would seem that ATF would presume a dentist has intent to earn profit as a firearms dealer if the dentist sells a patient a firearm after a visit, tacks it onto the dental bill, and accepts credit card payment for that entire bill. Because the presumption could include a case such as the hypothetical dentist, they argued that it is clear the

presumption is overbroad. They claimed every eBay seller must worry about becoming a dealer under this presumption. Another commenter stated that electronic transactions are commonplace even for occasional

firearms transactions. The commenter stated that the Department should not focus on a specific method of payment but rather focus on other factors such as the frequency, volume, and commercial nature of sales as well as the person's intent to earn a profit.

Some commenters were of the opinion that having a security service to protect one's firearms is simply a means of responsible firearm ownership and that they are now being penalized for the use of a digital payment app for a single firearms transaction. At least one commenter disagreed with the characterization in footnote 98 of the NPRM where the Department stated, ''for profit business are more likely to maintain, register, and pay for these types of alarms rather than individuals seeking to protect personal property.'' The commenter stated that it is fairly common for individuals to have a personal security system in their home that can cost as little as $100 per year after initial installation, and that such a system is not necessarily an item reserved for business owners alone. Similarly, other commenters stated that the presumption for using security services needs to be clarified because it seems entirely too broad. They argued that a plain reading of the presumption is that intent to predominantly earn a profit exists when the person selling a firearm has an alarm system at their business to protect any business assets. For example, they questioned whether a gas station with a centralized alarm service where the owner keeps a firearm that is the gas station's property is considered a dealer because the station has an intent to predominantly earn a profit for an entirely unrelated transaction (such as selling gas). The commenters also questioned whether a company that keeps its company firearms in a securely monitored warehouse would be considered a dealer if it one day sells its old firearms to a dealer so it can buy new ones for its employees. The commenters argued this could extend even to a sheriff's department with a security system when it trades in old duty guns. One commenter characterized the projected outcomes in these scenarios as nonsensical and overbroad, and questioned whether the security services presumption was instead meant to cover firearms transactions and business assets that include firearms rather than, as the commenter had read the NPRM, security services purchased to secure any business assets.

Department Response

The Department agrees with commenters that the presumption about

securing merchant services, such as electronic payment systems, is meant to be directed at firearms sellers, not at individual firearms purchasers. For this reason, the phrase ''makes or offers to make payments'' has been deleted from the presumption, which now applies only to merchant services ''through which the person intends to repetitively accept payments for firearms transactions.'' § 478.13(d)(2)(iv).

The Department disagrees that individual firearms sellers that use online services, such as eBay, purchase or secure ''merchant services as a business.'' These sellers are not securing merchant services as a business, and the online companies often distinguish between the services they provide to merchants and the services they provide to individuals seeking to sell personal items.[233]

Additionally, the manner in which merchants accept payments is a strong indicator of a predominant intent to earn a profit. Private citizens generally do not sign up for credit card processing services. Merchants are persons engaged in a profit-making business, and those services are designed to accept payments on behalf of profit-seeking sellers,[234] though individual firearms sellers may also have an intent to earn a profit when selling online. Again, this does not mean that a person is ''engaged in the business'' requiring a license when they occasionally sell a firearm from a personal collection with the intent to profit. That person must also devote time, attention, and labor to dealing in firearms as a regular course of trade or business. For this reason, the Department does not believe the merchant service PEP presumption is overbroad, especially as revised in this final rule in light of comments received. And, as with the others, the presumption may be refuted with reliable evidence to the contrary (*e.g.,* by the hypothetical dentist).

Some commenters also misunderstood the security service presumption, which applies only to ''business security services . . . to protect business assets or transactions,'' not to personal security services. The Department recognizes that some

---

[232] This evidence could include, for example, that the 28 percent collectibles capital gains tax was paid on income earned from those sales, as reported on IRS Form 8949.

[233] *See, e.g., eBay for Business,* eBay, *https:// www.ebay.com/sellercenter/ebay-for-business* (last visited Mar. 26, 2024).

[234] *See, e.g., Venmo for Business,* Venmo, *https:// venmo.com/business/profiles/* (last visited Mar. 26, 2024); *Sell in person with Shopify Point of Sale,* Shopify, *https://www.shopify.com/pos/free-trial/ sell-retail; Your unique business. Our all-in-one solution,* PayPal, *https://www.paypal.com/us/ webapps/mpp/campaigns/business/contact* (last visited Mar. 26, 2024); *I'm a Small Business Using Zelle,* Zelle, *https://www.zellepay.com/faq/small-business-using-zelle* (last visited Mar. 26, 2024).

ATF 015361

individuals have a central-station monitoring system, and the regulatory text is clear that it applies only to a central-station monitoring system registered to a business. In addition, what is being protected are business assets that include firearms or transactions that include firearms. Nonetheless, to reduce the concern that a business not engaged in the business of dealing in firearms would be considered to have the predominant intent to earn a profit by securing business security services, the Department has revised the presumption to replace the word "or" with "and" so the presumption applies only where business security services have been secured to protect both firearms "business assets" and firearms "transactions." *See* § 478.13(d)(2)(v). This clarifies the scope of the presumption in response to commenter concerns.

20. PEP Presumptions—Establishes a Business Entity, Trade Name, or Account, or Secures or Applies for a Business License

Comments Received

For these two presumptions under "predominantly earn a profit," commenters argued that they were too broad and that whether a person establishes a business entity or has a business license has nothing to do with intent to predominantly earn a profit. Some commenters asserted that a lot of people have an all-purpose business license that could be for any number of purposes. Some States require multi-use licenses, the commenters said, such as combined resale and use ones. In those cases, a company that simply uses firearms as part of their business operations, rather than dealing in firearms as their business, would have a business license and be presumed to be dealing in firearms. Having one, these commenters argued, does not necessarily mean that a person has intent to earn a profit as a dealer in firearms. One commenter believed that a business that sells gun accessories would be forced to register as a licensee. Another suggested that the presumption would also treat other businesses that have firearms, like a security company, as dealers merely because they have a business license or are established as a business entity in an arena other than firearms sales.

Another commenter, who identified as a firearm owner, stated that a true FFL is a legal business but that a trade or transaction between two law-abiding citizens does not constitute a reason for one to obtain an FFL. One commenter

noted that the case, *United States* v. *Gray,* 470 F. App'x 468, 469–70 (6th Cir. 2012), cited in the NPRM in support of the business entity presumption, involved facts much more indicative of unlicensed dealing than simple use of a business name. The commenter said the circumstances of that case stand in stark contrast to a situation where an owner of an antique store who decides to sell the family's World War I-era firearm at the store and could now be captured as a dealer under this presumption.

Department Response

The Department disagrees that the business entity and business license presumptions have nothing to do with an intent to predominantly earn a profit from its firearm sales or dispositions. Establishing a business entity or account "through which the person makes or offers to make firearms transactions" is often a preliminary step to engaging in the business of dealing in firearms with the predominant intent to earn a profit. A separate business entity can potentially provide liability protection, which is particularly advantageous when selling dangerous instruments, like firearms. A business entity or account can make it easier to sell firearms for a profit and may provide certain discounts or benefits when doing so. Likewise, a business license to sell firearms or merchandise that includes firearms is direct evidence of an intent to earn a profit from repeated firearms transactions. Indeed, a firearms business cannot operate lawfully without it.[235] While the Department agrees that there may be businesses that primarily sell merchandise other than firearms, such as an antique store, such businesses are profit-seeking, and are likely to sell any firearms at least on a part-time basis with the predominant intent to earn a profit. As stated

previously, even part-time firearms businesses are required to be licensed.[236] Again, intent to predominantly earn a profit is just one element of engaging in the business.

In response to commenters who said that some States may have general business licenses that are required to engage in any business, the presumption would apply only if the license allowed them to sell firearms as part of their business operation. Of course, if they do not resell firearms, then that business would not be presumed to have a predominant intent to profit from firearms purchases and resales. To the extent commenters asserted that there are licensed businesses that may technically be licensed to sell firearms, but primarily buy and use firearms, and do not devote time, attention, and labor to dealing in firearms as a regular course of business, they can offer reliable rebuttal evidence, as with any of the presumptions.

21. PEP Presumption—Purchases a Business Insurance Policy

Comments Received

A few commenters, including an FFL, stated that one cannot presume that a person or company has intent to earn a profit and is engaged in the business of dealing in firearms merely because they have a business insurance policy that covers firearms. They noted that many non-firearms businesses, whether it be a hunting outfitter or an armored security company, have one or more firearms owned by the entity or business. If the business has insurance for its property, which would cover the firearms owned and used by the business, it is not clear why this should result in a presumption that a completely unrelated transaction is an indication of intent to predominantly to earn a profit. The commenters said that these are not the types of entities meant to be FFLs.

Department Response

The Department notes that most firearms businesses purchase business insurance policies that cover their firearms inventory in the event of theft or loss, which, unfortunately, is not uncommon. The Department also agrees with commenters that a business insurance policy may also be purchased by a variety of companies that purchase and use firearms and are not necessarily primarily intending to profit from

---

[235] *See, e.g.,* State of Maryland, *Obtain Licenses or Permits, https://businessexpress.maryland.gov/ start/licenses-and-permits* (last visited Apr. 2, 2024) ("State and local governments require many industries to have permits or licenses to operate. A business license is required for most businesses, including retailers and wholesalers. A trader's license is required for buying and re-selling goods."); State of Colorado, *Do I Need a Business License, https://www.coloradosbdc.org/do-i-need-a- business-license/* (last visited Apr. 2, 2024) ("In Colorado, if you are selling goods, you are required to collect State Sales Tax and will need a Sales Tax License."); State of Michigan, *Who Needs a Sales Tax License, https://www.michigan.gov/ taxes/business-taxes/sales-use-tax/resources/who- needs-a-sales-tax-license* (last visited March 2, 2024) ("[R]etailers must be licensed to collect tax from their customers and remit the sales tax to the State of Michigan"); State of Ohio, *Licenses & Permits, https://ohio.gov/jobs/resources/licenses- and-permits* (last visited Apr. 2, 2024) ("Businesses are required to register with the Ohio Secretary of State to legally conduct business in the state—this is commonly called a business license.").

[236] *See* 27 CFR 478.11 (definition of "dealer" includes those engaged in the business on a part- time basis); *In the Matter of SE.L.L. Antiques,* Application No. 9–87–035–01–PA–00725 (Phoenix Field Division, July 14, 2006) (denied applicant for license that repetitively sold modern firearms from unlicensed storefront).

selling or disposing of their business inventory. For example, a firearms business inventory maintained by a security company whose guards use the firearms daily, or a hunting outfitter that rents firearms on its business premises, likely have firearms that have lost their value over time due to constant use and handling. The company may decide to sell these firearms simply to upgrade from old to new firearms without intending to earn a profit. In addition to these considerations, as discussed in detail earlier in this preamble (*see* Section IV.C.5.a (Department Response) of this preamble, *supra*), ATF examined records of cases and investigations it initiated between 2018 and 2023 for examples of fact patterns that align with the rebuttable presumptions in the proposed rule. The agency did not find examples other than the criminal case cited in the NPRM involving business insurance. 88 FR 62006 n.101. For these reasons, the Department has revised the final rule to remove this presumption. *See* § 478.13(d)(2).

22. Concerns With Disposition of Business Inventory After Termination of License

Comments Received

Commenters stated that while they thought it was notable that the Department addressed the disposition of an FFL's business inventory upon license revocation or termination, they did not think that ATF struck the "right balance" between law enforcement concerns and business owners so that a licensee can avoid financial ruin after having its license terminated. One commenter said the Department created a "Catch-22" situation regarding transfers because, in the commenter's opinion, "1. Former inventory not transferred to a personal collection may never be transferred; 2. Former inventory that was unlawfully transferred may never be transferred; and 3. Former inventory that was transferred cannot be transferred for one year." (Emphasis omitted.) Other commenters stated that the additional requirements that establish how to dispose of remaining inventory are unwarranted burdens that make it more challenging to wind down operations in an efficient manner. They stated that the process should be more streamlined to ensure fairness and flexibility. At least one commenter criticized the 30-day period in which a licensee is expected to liquidate their inventory, stating that it would take a minimum of 90 or 120 days. Similarly, another commenter stated it was completely unreasonable that an FFL who has voluntarily surrendered their license or has had it revoked would have to wait a year before they could start selling their inventory privately.

One commenter said the proposed rule was arbitrary and had conflicting standards within the proposed text regarding disposition of inventory. In this commenter's opinion, "a person or company no longer having an FFL (and persons acting on their behalf) may transfer their remaining firearms inventory to another third-party current FFL for liquidation under section 478.78, but may not do so under section 478.11. The result is an arbitrary and confusing conflict..............'' At least one commenter thought the rule would make it impossible for an FFL who has had their license revoked to keep their inventory while at least one other commenter thought the impact of the rule would mean they could never sell their inventory if a former licensee then needed a license to liquidate the inventory. Another commenter believed this portion of the rule should have more detail and be clearer because without it there is an increased chance of non-compliance and confusion among FFLs. At least one commenter objected to the 30-day time frame the rule would add to §§ 478.57 and 478.78, stating that no such timeline is required by the GCA.

One commenter noted that, if a former FFL transferring their business inventory to another FFL is not considered "engaged in the business," then there would be no reason for ATF to limit the time period for when such transactions can take place. In other words, they indicated that for such a transaction, the former FFL still seems to be "engaged in the business"; otherwise, there would not be a time limit on when they could act. If that is the case, the commenter stated, the rule does not make clear the effect of a former licensee transferring their firearms to another licensee and questioned whether an FFL could face revocation for facilitating others "engaging in the business" without a license.

Finally, another commenter stated that the rule fails to adequately address the potential for exploitation of inventory liquidation by former licensees. "While it is important to outline lawful ways for former licensees to dispose of their inventory upon license revocation or termination, the rule does not establish sufficient safeguards to prevent the diversion of firearms into the illegal market," they wrote. The commenter added that this oversight leaves room for abuse.

Department Response

A license may be terminated for a number of reasons, whether it is a voluntary surrender of license or an involuntary termination due to license revocation or denial upon renewal. The regulations in the past have not clearly addressed lawful methods for disposing of business inventory before or after license termination. In the case of a licensee who does not dispose of its business inventory prior to license termination, both the former licensee and law enforcement are placed in a difficult situation. Because this inventory consists of firearms repetitively purchased for resale with predominant intent to profit, it was clearly purchased as part of a regular course of business or trade. If the former licensee now sells the firearms after termination of the license to dispose of inventory, the former licensee could be engaging in the business of dealing in firearms without a license and violating the law. Particularly in the case of former licensees whose licenses were revoked or denied due to willful violations, such persons would unjustly profit from their illegal actions. Further, allowing such sales would mean that a significant number of firearms would be sold without background checks or the ability to trace them if later used in crimes. This is an outcome the BSCA was intended to reduce by amending the definition of "engaged in the business" to increase licensure of persons engaged in the business with a predominant intent to earn a profit. *See* Section II.D of this preamble.

The Department disagrees that licensees face financial ruin if their license is terminated and they cannot sell their inventory. As an initial matter, licensees who voluntarily terminate their firearms license have the option of waiting to surrender their license until after they have liquidated their inventory. The final rule allows former licensees that did not have the opportunity to properly dispose of their business inventory before license termination to do so after termination by either selling their remaining "former licensee inventory" to an active licensee within 30 days after license termination, or transferring the former licensee inventory to a responsible person who may lawfully possess those firearms. *See* §§ 478.11 (definition of "former licensee inventory"), 478.57(b), 478.78(b). The new term "former licensee inventory" is necessary to clarify that business inventory transferred to a responsible person after license termination is not a "personal collection" within the meaning of 18

U.S.C. 921(a)(21)(C), and accordingly, former licensees or responsible persons who devote time, attention, and labor to selling "former licensee inventory" as a regular course of trade or business to predominantly earn a profit will be presumed to be engaged in the business of dealing in firearms. *See* 18 U.S.C. 922(a)(1)(A), 923(a). If a former licensee needs more time in which to sell their business inventory to an active licensee, the Director may authorize an additional period of time for good cause.

The Department acknowledges that some commenters were confused about the relationship between the presumption based on liquidation of business inventory in the definition of "engaged in the business," now in § 478.13(c)(4) of the final rule, and provisions about the discontinuance of business and operations by licensees after notice in §§ 478.57 and 478.78. Those proposed provisions were meant to be read together. Like the two discontinuance provisions at §§ 478.57 and 478.78, the two liquidation-of-business inventory presumptions distinguish between pre-termination and post-termination disposal of business inventory.

If the former licensee disposes of the business inventory properly before license termination, they will have several options for disposing of the firearms, one of which is to transfer firearms from the business inventory to their personal collection or otherwise as a personal firearm so long as they meet two conditions, *i.e.,* that they retain the firearms for at least one year from the date or transfer and they do not transfer the firearms to willfully evade the restrictions placed on licensees. *See* 18 U.S.C. 923(c). The corresponding presumption related to firearms transferred before license termination aligns with these requirements. *See* § 478.13(c)(5). If the former licensee (or responsible person acting on behalf of the former licensee) sells a firearm: (a) after license termination that was transferred to the former licensee's personal collection or otherwise as a personal firearm, but (b) before one year has passed from the date of that transfer, or (c) the sale is other than as an occasional sale to a licensee, that sale would fall under § 478.13(c)(5) and the person would be presumed to be dealing without a license. However, once the year has passed from the transfer date, they may occasionally sell firearms properly transferred to their personal collection or otherwise as personal firearms to anyone without falling under this presumption, unless the transfer was made to willfully evade the restrictions placed on licensees.

If the former licensee did not dispose of business inventory before license termination, it becomes "former licensee inventory" (see new definition under § 478.11, below), and the former licensee has two options to dispose of it within 30 days after license termination: liquidate to a licensee, or transfer to a responsible person of the former licensee. Under revised §§ 478.57(c) and 478.78(c), the date, name, and address of this responsible person (which can include a sole proprietor or an individual who is acting on behalf of a business entity) must be recorded as the transferee of such firearms in the licensee's disposition record prior to delivery of the records by the end of the 30 days, in accordance with 18 U.S.C. 923(g)(4) and 27 CFR 478.127.[237] If the recipient responsible person thereafter sells the transferred former licensee inventory, other than as an occasional sale to a licensee, they will fall under § 478.13(c)(4) and be presumed to be dealing without a license.

To make this relationship between the post-termination discontinuance provision and the related presumption more clear, the presumption, which is located in the final rule at § 478.13(c)(4), has been revised to state that it does not apply when the business inventory is being liquidated to a licensee either within 30 days of termination of license, or occasionally thereafter, in accordance with § 478.57 or § 478.78, as the case may be. The presumption now further states that it does not matter whether such firearms were transferred to a responsible person after the license was terminated under 27 CFR 478.57(b)(2) or 478.78(b)(2); the presumption would apply if those transferred firearms are subsequently resold outside the 30-day window other than as an occasional sale to a licensee. The Department has changed the term "personal inventory" to "former licensee inventory" to make it easier to distinguish between the former licensee's personal collection firearms and other personal firearms, which a former licensee may treat the

same way as other non-licensees, and the business inventory transferred to themselves that must be treated differently from personal collection firearms and other personal firearms. *See* §§ 478.57(b)(2), 478.78(b)(2).

The Department disagrees that the limited 30-day period for liquidation to an active licensee is inconsistent with the GCA. While the Department recognizes that such sales may be conducted to predominantly earn a profit, the recipient licensee will be recording them in its business inventory and running NICS background checks when those firearms are further distributed into commerce. The final rule also makes clear that any such transfers of remaining inventory within the 30-day period must appropriately be recorded as dispositions in the licensee's records prior to delivering the records after discontinuing business consistent with 27 CFR 478.127. *See* §§ 478.57(c), 478.78(c). This will ensure that any liquidated/transferred firearms may be traced if they are later used in a crime. The rule is therefore necessary to prevent former licensees from selling off numerous business inventory firearms at retail without abiding by these important requirements of the GCA. It also provides a reasonable "winding down" period that is fully consistent with the relinquishment of licensee records requirement under the GCA. *See* 18 U.S.C. 923(g)(4) (records this chapter requires to be kept shall reflect when a firearms or ammunition business is discontinued, and, if succeeded by a new licensee, shall be transferred to that successor; where the discontinuance is absolute, the records shall be transferred within 30 business days to the Attorney General).[238] Licensees who are terminating their license should begin the winding-down process well before the license is terminated. Otherwise, they run the risk of having unsold inventory they cannot easily sell without either engaging in the unlicensed business of dealing in firearms after they terminate their license, or being able to sell only on occasion to a licensee. Selling before license termination also ensures that background checks are run on purchasers, and dispositions are appropriately recorded.

The Department disagrees with the comment that the rule fails to address the potential for exploitation of inventory liquidation by former licensees. The rule addresses the

---

[237] This is consistent with the requirement for licensees to record the personal information of an individual authorized to receive firearms on behalf of a business entity. *See* ATF Form 4473, at 4 (Aug. 2023), *https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download* ("When the transferee/buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete section B of the form with his/her personal information, sign section B, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity; and (B) the name and address of that business entity.").

[238] This provision is also consistent with the 30-day winding down period for licensees who incur firearms disabilities under the GCA during the term of their current license. *See* 27 CFR 478.144(i)(1).

potential for diversion in several ways. Consistent with 18 U.S.C. 923(c), it limits the ability of former licensees to liquidate business inventory firearms by establishing two rebuttable presumptions that a person is engaged in the business when those firearms are sold—§ 478.13(c)(4) and (5). With regard to firearms transferred by a licensee to a personal collection prior to license termination, the presumption still applies even if one year has passed from the transfer if the transfer or any other acquisition was made for the purposes of willfully evading the restrictions placed upon licensees. 18 U.S.C. 923(c). Moreover, as provided by amended §§ 478.57 and 478.78, after license termination, former licensees have limited sales options that would avoid the presumption in § 478.13(c)(4), such as sales to an active licensee where the risk of diversion is limited.

23. Concerns With the Procedure To Transfer of Firearms Between FFLs

Comments Received

Some commenters remarked on the requirement that FFLs follow verification and recordkeeping procedures in 27 CFR 478.94 and subpart H of part 478 instead of using ATF Form 4473 for transfers between licensees. At least one commenter thought this provision should be made clearer to avoid interruptions in the transfer of firearms, while another thought the proposed changes were unnecessarily complex and increased the risk for administrative errors. This commenter stated that "[l]icensees should be allowed to use the existing streamlined form, which is already widely used and understood by both licensees and the ATF." At least one commenter stated that a phrase in the proposed amendment to § 478.124—"for the sole purpose of repair or customizing"—should be deleted because it is not part of 18 U.S.C. 922(a)(2)(A). That statutory provision only provides, in relevant part, that "this paragraph [prohibiting transfer in interstate commerce to a non-licensee] and subsection (b)(3) shall not be held to preclude [an FFL] from returning a firearm or replacement firearm of the same kind and type to a person from whom it was received."

Department Response

The Department disagrees that the changes proposed to be made to 27 CFR 478.124(a) are unnecessarily complex and increase the chance for administrative errors. To the contrary, licensees know that ATF Form 4473 documents the transfer of a firearm from

a licensee to an unlicensed person. It is not intended to be used by a licensee to purchase personal firearms. If a recipient licensee were to complete a Form 4473 for the purchase of a firearm, but not record that receipt in their bound book record asserting it is a "personal firearm," then tracing efforts pursuant to the GCA could be hampered if the firearm was later used in a crime. The well-established procedure for licensees to purchase firearms is through the verification and recordkeeping procedures in 27 CFR 478.94 and subpart H of 27 CFR part 478.

Regarding the comment that the phrase "for the sole purpose of repair or customizing" should be stricken from § 478.124(a), that provision allowing a limited exception to the requirement to complete an ATF Form 4473 has long been found in the regulations and this rule does not change that proviso in any manner. Allowing licensees to sell or otherwise dispose of firearms without completion of this form or recording NICS checks on the form would undermine the purposes of the GCA and BSCA. Crime gun traces would not be able to be completed, and there would be no way to verify that the identity of firearms purchasers had been checked, or that background checks had been properly run. The Department therefore disagrees with the comment seeking to remove this phrase.

*D. Concerns With the Economic Analysis*

1. Need for Rule

Comments Received

One commenter stated that the Department's need for this rulemaking was contrived without the Department providing any facts or persuasive arguments. The commenter specifically challenged the statement in the preamble that "ATF has observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA," and asked for the number of incidents of noncompliance and by what standard that level of noncompliance was determined to be "significant" enough to justify rulemaking. The commenter also stated that a rulemaking should not be justified by a presidential executive order, "which is not now nor has it ever been a reason for rulemaking sufficient for APA purposes." The same commenter also stated that the agency has not identified any market failure demonstrating that, in the absence of the rule, the free market will fail to reach the optimal number of gun sales outside of current FFL dealers.

Department Response

The Department disagrees that the need for this regulation was "contrived without any facts or persuasive arguments." The Department has explained the public safety need for this rule and has extensively laid out and discussed the facts and arguments supporting that need in both the NPRM and in this final rule. For reference, those discussions are included in the Background discussion in Section II.D of this preamble, in the Benefits section of the Executive Order 12866 economic analysis in Section VI.A.7 of this preamble, throughout Section III of this preamble (which includes the Department's discussion of proposed revisions from the NPRM), elsewhere in the Department's responses to comments under Section IV of this preamble, and in other portions of this preamble. This rulemaking implements certain statutory changes enacted by Congress in the BSCA, which Congress passed in the interest of public safety after at least one mass shooting in which the perpetrator purchased a firearm from an unlicensed dealer. In addition, this final rule implements the Department's response to Executive Order 14092, which was also issued to implement and enforce the BSCA's statutory changes and public safety goals.

The public safety justifications referenced above include the accounts and analysis of ATF agents and investigators with years of experience enforcing the relevant provisions of the GCA, who reported significant levels of firearms dealing that was not in compliance with pre-BSCA statutory licensing requirements. More specific data or statistics regarding such noncompliance, as requested by the commenter, are not readily available and not needed in light of the Department's experience and the other public safety justifications underlying this rule.

Finally, the Department is not required to identify any market failure demonstrating that, "in the absence of the rule, the free market will fail to reach the optimal number of gun sales outside of current FFL dealers." For example, OMB Circular A–4 (2003) specifically recognizes that "[c]orrecting market failure" is "not the only reason" for regulation, and allows regulations based on other social purposes.[239] In

---

[239] Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Circular No. A–4, at 5 (2003) ("OMB Circular A–4"), *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf.* Because the
Continued

addition, Executive Order 12866, Regulatory Planning and Review, 58 FR 51735 (Sept. 30, 1993), permits agencies to promulgate rules that are necessary to interpret the law or are necessary due to compelling need, which includes when private markets are not protecting or improving public health and safety. This rule is necessary on both grounds. As explained throughout this preamble, there is a public safety need for this rulemaking. This position on public safety is supported by the facts and arguments laid out by the Department and affirmed by the hundreds of thousands of public comments ATF received in support of this rulemaking that specifically explained that the rule is needed for public safety (in many cases emphasizing that the rule is the minimum action needed to address public safety). *See* Sections IV.A.1–2, 4– 7 of this preamble.

2. Population Accuracy

Comments Received

Various commenters objected to the Department's calculation of the population impacted by this rulemaking. Some of these commenters argued that the Department's high population estimate (328,296, which was derived from the Russell Sage Foundation ("RSF") survey) should be used as the primary cost estimate, including one commenter who opined that the RSF-derived estimate was more accurate because, they stated, the Department's subject matter expert ("SME")-derived estimate uses a single, private party firearm sales website as the primary source of unlicensed firearms seller numbers. This same commenter added that the RSF survey considered multiple mediums of firearm sales.

In addition, various commenters opined that the Department's population estimates were not accurate or requested more "accurate" numbers. A couple of commenters provided critiques of the methodology used to generate population estimates. These commenters opined that the Department

NPRM was published in September 2023, prior to the November publication of the 2023 version of OMB Circular A–4, the Department based its Executive Order 12866 economic analysis in the NPRM on the 2003 guidance. Although the November 2023 version of OMB Circular A–4 supersedes the version from 2003, OMB allowed agencies to continue following the 2003 version in final rules published prior to January 1, 2025, if their NPRM relied on the 2003 version and was published prior to February 29, 2024. *See* Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Circular No. A–4, at 93 (2023), *https:// www.whitehouse.gov/wp-content/uploads/2023/11/ CircularA-4.pdf.* Accordingly, the Department is continuing to follow the 2003 version of OMB Circular A–4 in this final rule.

should use standards accepted by scientific, peer-reviewed journals as the basis for estimating the relevant population. Furthermore, they opined that the Department's population estimates should have used statistical calculations such as "[c]onfidence intervals, [p]-[v]alues, and K-values." Primarily, these commenters objected to the Department's SME estimate that Armslist may constitute 50 percent of the market share for online non-FFL sales, contending that this estimate is not supported by data and that using an SME-derived estimate is biased and unsupported. One commenter stated that *Gunbroker.com* is the largest online marketplace where people perform private firearms transactions and suggested that the impacted population would be higher if the Department included individuals conducting private sales on that website. Another commenter went further, stating that "the number put forth by ATF, an estimation of 24,540 to 328,926 unlicensed persons who could be considered 'engaged in the business' of dealing firearms, is at worst a shot in the dark, and at best, an educated guess." This commenter noted that there are "numerous other venues in which firearms are sold, including *GunBroker.com,* as well as social media platforms such as Facebook, where clever sellers can get around the Facebook Marketplace rules against selling firearms."

Finally, one commenter opined that this rule will affect all persons who own firearms in the United States and even some portions of the population than have never owned a firearm. None of these commenters provided data recommendations or alternate sources of relevant data except as noted above.

Department Response

The Department does not agree that the SME/online sample and the SME-derived primary estimate it put forth in the NPRM are less viable than the RSF survey-derived estimate it also included for comparison. Each estimate is necessarily imperfect due to the paucity of data on how many unlicensed persons currently sell firearms and how many such persons would need to be licensed under this rule. The estimates from each source the Department used have different limitations, which is why the Department included them both as potential alternatives. The SME-derived estimate is based on historical data and experience with unlicensed sales activities, combined with sampling from an online sales site and ATF's law enforcement and regulatory experience. The Department thus considers its SME-

derived estimate to be a more reliable data source for this purpose than the RSF survey. The RSF survey was not limited to capturing sales by unlicensed persons, which is the population potentially impacted by this rule. Rather, the authors sought to establish the total number of citizens who sold their firearms over a given period, not the current number of unlicensed sellers who are engaged in the business of firearms dealing or who are making sales on publicly accessible marketplaces and platforms. As a result, the population set derived from the RSF results is significantly higher and includes people who would not be covered by the rule. The Department thus considers the SME-derived estimate to be more realistic.

It is because the RSF survey used a larger sample that the Department provided the RSF population estimates in the NPRM analysis as an alternative unlicensed seller population set (and continues to do so in this final rule). However, in order to be able to meaningfully compare results from the two starting sets of unlicensed seller population estimates (SME-derived and RSF-derived), the Department applied the same treatment regarding the rule's potential impact to both numbers. This included applying the same SME estimates to both starting populations to determine, for each group, the proportion of unlicensed sellers affected by various provisions of the rule. For example, the Department applied the same SME estimate of the proportion of unlicensed sellers estimated to be engaged in the business without a license under the rulemaking (approximately 25 percent) to each starting population, as well as the same estimate of the proportion of those sellers who are likely to be either unwilling or unable to become licensed as an FFL as a result of the rule (10 percent). Because there is no other source of data on the size of these groups of currently unlicensed dealers likely to be impacted by this rule, the Department used the best estimates from SMEs as the percentages for each, and then applied those estimates to both starting population sets for consistent treatment and comparable outcomes. In the NPRM, the Department explained these estimates, solicited public comment on them, requested alternative data sources and models, and welcomed more accurate data on the number of unlicensed persons selling firearms. However, the Department did not receive any specific information— including any alternative data sources

or models—or more accurate numbers in response.

At this time, the Department does not consider any peer-reviewed statistical sample to be possible, much less perfectly accurate. Typically, peer-reviewed journal articles use research data they gather themselves or a database, such as for the U.S. Census, from which to extrapolate a number, such as a covered population. The Department noted, and continues to note, that it is currently not possible for the Department to base population estimates in this rule on a peer-reviewed statistical sample because there is no database that could be used to extrapolate a population as specific as unlicensed individuals who may be selling firearms, let alone one that includes data on factors from which to determine the population of such individuals who may be engaged in the business as a dealer under the definitions included in this rule. The very limited options for source data make it impossible to arrive at a more precise number than is currently reflected in this rule. The Department reiterates, however, that this rule will not impact all individuals who own a firearm, nor will it require everyone who sells a firearm to become a licensed dealer.

While the journal and news articles cited by the commenters may estimate the population of individuals who own a firearm, these numbers are still estimates and are not any more accurate than the Department's estimates (as requested or suggested by these commenters), nor do they pertain more specifically to the situation covered by this rule. Based on the little information available, the Department used a related literature review, and combined professional expertise and an online site sample to provide two estimates on population. OMB Circular A–4 encourages agencies to use the "best reasonably obtainable scientific, technical, and economic information available," including peer-reviewed literature "where available." [240] The Department did so using the two estimates described above: one (the RSF survey) gleaned from a peer-reviewed journal article about survey results that correlated with the data set relevant to this rule more than any other article the Department was able to find; and another gleaned from SME knowledge and experience, and sampling from a website (Armslist) that identifies which sellers are licensed and is recognized as

[240] OMB Circular A–4, at 17, *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf.*

being a popular online site used by the potentially affected population to sell firearms.

As for the comments suggesting that ATF incorporate another online site, GunBroker, into the analysis, the Department concurs that a subset of non-FFL sellers on GunBroker may also be considered "engaged in the business" despite already transferring firearms advertised online through an FFL intermediary. However, the Department already accounted for the existence of online platforms other than the one it sampled (Armslist) by assigning a 50 percent share of the market to all other platforms, including GunBroker. Nonetheless, in response to the comments, ATF requested further SME estimates of the relative proportions of Armslist and GunBroker sales as part of the total, as well as social media. Website traffic data for GunBroker and Armslist and additional and more specialized SME opinions were incorporated into the model and informed the Department's assumptions. As a result, the Department has revised its estimate of the portion of unlicensed population making sales through Armslist from the initial 50 percent of the online marketplace to 30 percent, adjusting the estimate of total unlicensed sellers that use non-traditional mediums accordingly. These changes are reflected in Section VI.A.2 of this preamble.

### 3. Sample Size and Confidence Interval

#### Comments Received

One commenter stated that the Department did not specify the methodology used to determine and collect the sample size included in the NPRM. In particular, they stated the Department did not specify whether the sampling obtained on Armslist was collected "randomly, stratified random, [or] non-random." Furthermore, this commenter stated that the Department did not include the results of the sampling for public inspection and that the commenter was thus unable to verify the Department's claim that the sample size has a 95 percent confidence interval. Another commenter recognized that the Department used a sample size generator to estimate a sample size but stated that the confidence interval cannot be calculated without knowing the standard deviation of a sample. One commenter questioned how the Department derived its estimate of individuals "engaged in the business" from the sample collected from Armslist when Armslist does not indicate whether sellers meet the statutory definition of being "engaged in the

business." This commenter stated that not providing the methodology through which the Department made this calculation was a violation of the APA and the Small Business Regulatory Enforcement Fairness Act ("SBREFA").

#### Department Response

The Department decided to take a random sample from among the firearms listings on Armslist to use in its survey. A sample-size calculator was then used to determine the statistically valid sample size from those listings, as explained in more detail in both the NPRM and this final rule under the methodology section (Section VI.A.2) of this preamble. A standard deviation was not separately calculated because the Department assumed a normal distribution, which is in accordance with usual practice when there is no reason to anticipate that the data may skew in one direction or another and the sample is used to calculate a population rather than a regression or other statistically driven analysis. Therefore, in accordance with standard practice, to estimate the sample size, the Department assumed the largest standard deviation (0.5 or 50 percent) to obtain the most conservative (largest) sample size. While the sample is one unit of measurement at a single point in time over a several-day period, the Department verified its viability by taking another sample after the comment period closed, to determine that the overall population remained stable over time.

The Department acknowledges that there are inherent limitations to the lower estimate. However, the Department's prior experience helped inform its estimate as well. As explained in the NPRM's Benefits section, the Department previously provided guidance in 2016 to sellers, clarifying the circumstances in which they would need to obtain a license as a dealer under the previous statutory definition, which focused on similar factors to those included in this rule. Thereafter, the Department encountered an increase of only 567 new FFL applications. This and similar historical data support the SME estimates arising from the combined information and Armslist sampling. Furthermore, regardless of the sales or transaction volume of firearms, the number of FFLs has been relatively stable over time.

The Department derived its estimate of unlicensed individuals by extrapolating from Armslist listings. Armslist uses the categories of "private party" "and "premium vendors." When the Department reviewed the entries, it found that the premium vendors were

all listed as FFLs. Therefore, the sample did not include entries categorized as premium vendors. Although the "private party" sales did not indicate whether they were FFLs or unlicensed sellers, other information included in the listings indicated that "private party" sellers were likely to be home-based individuals rather than FFLs with funds to advertise on the website. Nonetheless, the Department could not be certain, so the sample from Armslist (and thus the estimated population of unlicensed sellers) might be larger than the actual number of unlicensed sellers. Because the population estimate was being used to estimate impact and potential cost for purposes of this rulemaking, the Department erred on the side of overinclusiveness (thus generating a potentially larger overall population of unlicensed sellers, higher cost estimates, and potentially more impacted persons) rather than underinclusiveness (by instead trying to remove some of the private party sellers that could potentially be FFLs).

Generally, the Department incorporated a model where the relative size of the total online marketplace was derived from the estimated size and characteristics of Armslist. From there, the Department made estimates regarding the total unlicensed market both online and offline, before filtering for intention and incentives. Again, as there is no definitive source of accurate data from which to generate these numbers and resulting estimates, the Department was forced to use available data, public comments, and internal surveys of SMEs who have specialized, often decade-long experience with the industry to meet its standard of best available information.

### 4. Russell Sage Foundation Model Calculation

#### Comments Received

One commenter argued that the population derived from the Russell Sage Foundation ("RSF") survey data (the NPRM's high estimate) was overcalculated, including transactions that the commenter did not believe required a license, such as "family, friends, gifts, inheritance, trades, and other." This commenter further suggested that the portion of the total unlicensed seller population considered to be engaged in the business in both the RSF and SME-derived models should be less than 10 percent, not the 25 percent estimated by the SMEs. Furthermore, they stated the Department incorrectly used the overall percentage of RSF survey dispositions over the course of five years rather than "annualizing" that

survey result over the course of five years.

One commenter could not recalculate how the Department used the RSF survey to calculate percentages. Another commenter estimated that the affected population of individuals is 478,000 and that the methodology used by the Department over-estimated the population by a minimum of 45 percent. Overall, this commenter estimated that this rule will have a marginal increase of 150,000 new FFLs. The commenter, however, did not point to or provide a data source for their numbers. One commenter challenged the RSF data, claiming the model is based on a "small sample size of just 2,072 gun-owning respondents, providing questionable representativeness." Moreover, by analyzing "outdated 2015 survey data," the commenter suggested that the study fails to account for increases in the rates of American gun ownership in recent years, and that the Department therefore undercounted the number of sellers this rule would affect. The commenter cited a 2020 Gallup study [241] that estimated that what the commenter described as a "whopping 32 percent" of adults own firearms, not 22 percent as estimated in the 2015 RSF survey data.

#### Department Response

The Department partially agrees with the commenter's suggestion that firearms transfers listed in the RSF survey that involve "family, friends, gifts, inheritance, trades, and other" should not be included in the Department's estimate. The RSF survey did not include sufficient information about private transactions between friends and families, as gifts, inheritances, or other similar transfers, from which the Department could assess whether any of those transferors might have been engaged in the business as a dealer. However, the rule specifically excludes these categories of transactions—*e.g.,* transactions between family, as gifts, or due to inheriting firearms—when they are not made repetitively with predominant intent to profit. In the Department's experience, most such transactions have not involved a dealer engaged in the business of dealing in firearms as defined in this rule. Therefore, the Department did not include RSF survey results involving private transactions between friends and families in the NPRM. However, transactions such as trading or bartering, or sales conducted

---

[241] *What Percentage of Americans Own Guns?*, Gallup: The Short Answer (Nov. 13, 2020) (summarizing Gallup's crime poll for September 30 to October 15, 2020), *https://news.gallup.com/poll/ 264932/percentage-americans-own-guns.aspx.*

through FFLs, such as wholesale and retail dealers, are more likely to include transactions involving qualifying "engaged in the business" dealers, so the Department included them to calculate the RSF survey-generated population estimate it used in the NPRM. The Department explained this in the NPRM and does so again in this final rule under Section VI.A of this preamble.

Although a commenter suggested that ATF's SME-derived estimate that 25 percent of the population of unlicensed sellers would be engaged in the business under this rule was too high, they did not provide a basis for their recommended estimate of 10 percent. The commenter suggested that ATF's estimate of the unlicensed seller population was too high, but even if that were true, it would not affect what percentage of such unlicensed sellers would be determined to be engaged in the business under this rule. In addition, the commenter suggested that the estimate of those engaged in the business under this rule should not include unlicensed sellers who solicit background checks from FFLs, but the Department disagrees with this, as discussed in detail in Section IV.D.10 of this preamble. As a result, the Department continues to use the SME-derived estimate of 25 percent for the population of currently unlicensed sellers who would be deemed engaged in the business under this rule.

The Department concurs with the commenter's understanding that, in the RSF survey, the sales rate of personal firearms was 5 percent over the course of five years rather than 5 percent over one year as initially interpreted by the Department. Accordingly, the Department recalculated its estimate, using a personal sales rate of 5 percent over the course of five years, or 1 percent annually.

The RSF survey contained many percentages and descriptions of different types of firearms transactions. As explained in response to comments under Section IV.D.1–2 of this preamble, the RSF survey and resulting journal article were not designed to capture or address information specifically relevant to this rule. As a result, the data the Department could glean from the RSF survey, while useful in some respects, were not directly on point for purposes of making estimates related to the area affected by this rule. In addition, the RSF survey results are compiled in a way that does not provide accurate data on, or align with, issues related to whether a seller or transaction might be among the total potentially affected population base or might be

among the portion that could qualify as engaged in the business under this rule. This is not a flaw in RSF's data but is a result of different focuses between RSF's article and this rule.

Because this rule is focused on dispositions (or "sales") of firearms, the Department used only survey results and percentages outlined in the Dispositions portion of the RSF survey journal article on page 51 and made its best effort to include categories that were potentially likely to contain relevant kinds of transactions, while excluding categories that were less likely to contain such transactions. The Department therefore continues to use those NPRM percentages as derived from the RSF survey to determine the high population estimate in this final rule.

The Department acknowledges that the estimated populations are estimates using the best available information and are not perfect. However, the Department disagrees that there will now be 478,000 individuals who must be licensed. The commenter who made that assertion did not provide a source or data to support this estimate. As explained above, there is no definitive source of accurate data from which to generate these numbers and resulting estimates. As a result, the Department used available data combined with public comments and internal surveys of SMEs with specialized, often decades-long experience with the industry, to meet its standard of best available information. Nonetheless, as discussed elsewhere in this preamble and based on comments pointing out calculation errors from using the RSF survey, the Department has reduced the overall high estimated population of the estimated affected individuals. For more information, please see the discussion under Section VI.A.2 (Population) of this preamble.

Finally, the Department concurs that the percentage of individuals owning a firearm in the United States may have changed since 2015 and, as a result, now uses the 32 percent estimate from the more recent Gallup study the commenter cited. Nonetheless, the Department disagrees that the sample size of gun owners in the RSF survey is, as the commenter suggested, "too small," with "just 2,072 gun-owning respondents." The RSF study surveyed 3,949 persons; of that number, 2,072 respondents stated they owned firearms. The RSF sample size of 3,949 is larger than the sample size in the Gallup study of 1,049 survey respondents cited by the commenter. However, while both samples are statistically viable sample sizes, the Department has elected to use

the commenter's suggestion of the more recent Gallup study.

### 5. Inability To Comply

#### Comments Received

One commenter suggested that the Department did not account for individuals who wish to become an FFL but are not otherwise able to obtain a license due to State or local zoning ordinances, or even restrictions from a Homeowner's Association ("HOA"). This commenter further suggested that the Department should calculate a loss of social welfare due to the indirect reduction of firearm sales resulting from this rule and indirect requirements stemming from local restrictions. One commenter suggested that there may be individuals who, after publication of this final rule, will choose to leave the market of selling firearms altogether so as to avoid coming under scrutiny under this new definition.

#### Department Response

The Department concurs that there may be individuals who are restricted from engaging in commercial activity from their homes or other spaces by State, county, and local laws or ordinances, or by residential HOAs. Individuals who fall under this category may apply for a zoning permit or variance through their local jurisdictions, or may arrange to conduct sales from a rented business premises or other space that permits commercial activity instead. But some may nonetheless choose not to continue making supplemental income through firearm sales activity from residential spaces. However, the Department notes that these persons, if making commercial sales from such locations, were most likely already prohibited from such sales before this rule was issued, unless they had requested a permit, variance, or other appropriate exception. Zoning ordinances and HOA restrictions on commercial activity often include limitations on foot traffic, number of employees, or the amount of interference with neighbors.[242] Most of these zoning restrictions are not predicated on whether a resident is formally established as a business, whether they sell firearms versus some other product (although there may also be additional ordinances specifically

addressing firearms), or whether they are determined by Federal law to be engaged in the business as a firearms dealer. But the Department has no source (and no commenter provided any) from which to gather data on the number of people who might have been permitted to sell firearms under their zoning or HOA requirements before this rule and would now be unable to continue selling firearms for this reason.

However, there may also be other subsets of individuals who are affected by this rule and may choose to leave the firearm sales market for personal reasons. For example, some people may not want to go through the process of getting a license or some may not agree with it on principle and would rather forego firearms sales than comply. The Department acknowledges that there may be individuals who leave the market for a variety of reasons, including zoning ordinances, licensing requirements, or personal philosophy. Although the Department does not have data from which to extrapolate an estimated percentage for each such group, based on past experience with parallel requirements and SME expertise, the Department has combined these groups into a single estimate for individuals who may leave the firearm sales market for personal reasons, which is now accounted for in the economic analyses in Section VI.A of this preamble.

### 6. Costs of the Rule

#### a. Accuracy of Costs

#### Comments Received

Other commenters stated that it was unclear how accurate the costs and time burdens were that ATF calculated for the rule asserted that ATF underestimated costs, or alleged that ATF's estimates were "random" or had no "data to support them." Another commenter asked how many of the 30,806 Armslist listings were, for example, selling inherited firearms, whether any of the listings were misclassified as "private" when they actually involved a licensed dealer, or whether the 30,806 listings were representative of the typical number of listings at any given time. This commenter also asked whether the average of 2.51 listings per seller was skewed by a minority of extreme outliers. One commenter suggested that the population characteristics derived from Armslist could not be used to generalize the potentially affected population that use non-traditional mediums (such as other online platforms) outside Armslist.

---

[242] *See* Van Thompson, *Zoning Laws for Home Businesses,* Hous. Chron.: Small Business, *https://smallbusiness.chron.com/zoning-laws-home-businesses-61585.html* (last visited Mar. 7, 2024); A.J. Sidransky, *Home-Based Businesses: Challenges for Today's Co-ops, Condos and HOAs,* New Eng. Condominium (Oct. 2016), *https://newenglandcondo.com/article/home-based-businesses.*

**29058**    **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

One commenter stated that, based on their calculations, the rule would "cost private citizens about $338 to obtain a new license, and $35 to $194 annually to maintain the license." Additionally, in the commenter's opinion, this new rule would cost the government "$116 million to process new licenses." Another commenter provided their own cost estimate of the rule and estimated that the 10-year annualized cost would be $18,813,987.17 or 14.7 times more expensive than ATF's primary estimate. Another commenter noted that the Department rounded cost estimates, including rounding wages from $16.23 to $16, which they stated could result in a 6 percent difference in total amounts. This commenter argued that costs considered in rulemakings should not be rounded (or should be rounded to the penny) to avoid the rounding errors that, they stated, were present in the Department's analysis.

A few commenters stated that the Department did not include compliance costs such as alarms, cameras, gun safes, secure record storage, and secure doors. One of these commenters further estimated that such security items cost them $1,000, plus monthly monitoring charges of $40. An additional and separate gun safe can range from $1,000 to $3,000, they stated, and a security door would cost between $800 and $1,000. Furthermore, this commenter stated that the Department did not include liability insurance, much less labeling costs. Another commenter suggested that the Department did not include business start-up costs such as attorney drafting of articles of incorporation or other legal advice. One commenter suggested that the rule would increase litigation costs. Another commenter suggested that the Department's estimate of the costs should include the costs of obtaining a State dealer's license and local and State business licenses, because, they said, people who now get licensed at the Federal level to engage in the business of dealing firearms will also have to be licensed as a business and as a dealer at the State level.

Department Response

The Department disagrees that ATF's estimated costs are "random" or are not supported by data. They are, however, estimates. Wherever possible, the Department used publicly available information to calculate costs and time burdens. Where relevant, the Department included footnotes and explanations regarding the calculations. Where applicable, the Department provided (and continues to provide) sources and methodologies

demonstrating its means of determining the overall cost of the rule. Sources of data included, but were not limited to, fees required by ATF to apply for a license, costs for having photographs or fingerprints commercially taken (as posted by private companies), and similar costs of obtaining a license. However, despite best efforts, the Department acknowledges that not all licensing costs, like time burdens, could be substantiated in the same manner by third-party or publicly available data. In these cases, ATF made estimates based on its experience, such as the time needed to obtain fingerprints or passport photographs.

In the NPRM, the Department welcomed comments as to any assumptions made, and in particular solicited input about any countervailing costs or time estimates that commenters felt the Department could not or did not consider. In this final rule, the Department considered the suggestions it received in response and, where appropriate, updated the overall costs of the rule, including by incorporating new data or updating to a more appropriate source. For example, the final rule uses wage inflation per the Bureau of Labor Statistics ("BLS") rather than BLS's Consumer Product Index to update household income, based on a commenter's suggestion and further Department assessment.

The Department acknowledges that estimates that round to the penny might differ from estimates that do not. However, the Department disagrees that rounding to the penny provides the public a more accurate total cost of the rule in this context because, as discussed above, there is an inherent lack of precise numbers that arises from estimating a total population or total cost without a comprehensive database, registry, survey, or other source of accurate data. OMB Circular A–4 allows agencies to make predictions and estimates during the rulemaking process and provides guidance for accuracy in making such estimates. It instructs agencies to make their estimates based on the precision of the underlying analysis. For example, OMB Circular A–4, section G (Precision of Estimates) suggests that an estimate of $220 million implies rounding to the nearest $10 million.[243] In accordance with this guidance and to avoid misrepresenting the Department's estimates as a more precise cost value than they are (as rounding to the penny would indicate),

the Department continues to choose to round estimates to the dollar.

In response to comments on the Armslist sampling, the agency acknowledges that Armslist does not label vendors based on whether they are engaged in the business of firearms dealing or not. Armslist uses the categories of "private party" and "premium vendors." When the Department reviewed the entries, it found that the premium vendors were all listed as FFLs. Therefore, the sample did not include entries categorized as premium vendors. Although the "private party" sales did not indicate whether they were by FFLs or unlicensed sellers, other information included in the listings indicated that "private party" sellers were likely to be unlicensed individuals rather than FFLs with funds to advertise on the website.

Nonetheless, the Department cannot be certain, so the sample size from Armslist (and thus the estimated population of unlicensed sellers) might be larger than the actual number of unlicensed sellers. However, even if we assume all the private party sellers on Armslist are unlicensed (which we cannot conclusively ascertain), not all unlicensed sellers of firearms will qualify as being "engaged in the business" under this rule. Some portion of them will be persons selling without the requisite intent to profit and only occasionally, selling inherited firearms, selling to upgrade a personal collection, selling to exchange for a curio or relic they prefer, selling to acquire a firearm for hobbies like hunting, or other similar situations. Many persons fitting into various of these categories will be unaffected by this rule to the extent that they would potentially not meet the requirements to be engaged in the business as a dealer, depending on the specifics of their operation.

Because of the known existence of such sellers in potentially large numbers, and to account for the uncertainty of the number of individuals sampled who might simply be engaging in activities not affected by this rulemaking, the Department estimated that, of all private sellers of firearms, 25 percent might be deemed to be "engaged in the business" and the other 75 percent will not be affected.

In response to the comment asking whether the average of 2.51 listings per seller was skewed by a minority of extreme outliers, the Department used this number as an average per seller in order to estimate the number of sellers in the sample set of listings from Armslist. The number of firearms per seller was otherwise not relevant to the Department's calculations. The sampled

---

[243] *See* OMB Circular A–4, at 46, *https:// www.whitehouse.gov/wp-content/uploads/legacy_ drupal_files/omb/circulars/A4/a-4.pdf.*

**Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations **29059**

sellers on Armslist in the private sales category varied in the number of firearms they had listed for sale, skewed to mostly selling one firearm or to a few selling multiple firearms. This partially informed the Department's estimate that approximately 75 percent of the population of currently unlicensed sellers would not be deemed engaged in the business under this rule and accordingly would not need to obtain a license.

With respect to the comment about whether Armslist could be used as a proxy for other sellers on other online platforms, the Department is unclear how sellers of firearms on Armslist might have significantly different characteristics than those of firearms sellers on other online platforms. Generally, there are two types of sellers on online platforms, licensed (FFLs) and unlicensed persons. While there may be differences in certain terms and conditions on given websites—for example, GunBroker requires that firearm transactions be mediated through a local FFL while Armslist does not—those aspects of online sales are not relevant to determining the affected population or calculating the costs of this rule. The terms and conditions that online platforms offer are also not impacted by this rule and will continue to be set at the discretion of the entities operating such platforms. Sellers on online platforms such as Armslist may continue to perform in-person transactions simply by making a phone call to perform a NICS background check for a buyer and will not be required to use a local FFL to complete a firearms transaction like sellers on GunBroker. These characteristics that may differentiate between online platforms do not affect the costs or the impacts to sellers due to the requirements of this rule.

The Department disagrees that items such as alarms, cameras, gun safes, or other security measures are costs under this rule. Although it recommends FFLs consider purchasing such items for security purposes and theft avoidance, the Department does not require—in this rule or anywhere else—that they purchase such items. Therefore, the Department is not including these costs in this rule. The Department also did not include litigation costs because possible future lawsuits are speculative.

The Department disagrees that the costs of the rule should include costs for all persons who are dealing in firearms to also obtain State dealer's licenses and State and local business licenses. Persons who are purchasing and reselling firearms in a State have always been required to follow State and local

laws regarding licensing and business operations. The fact that the statute is now further defining the circumstances in which such individuals will be required to be licensed at the Federal level does not change State licensing requirements.[244] This regulation does not change the GCA statutory definition, as amended by the BSCA, and it does not require any State to adopt any presumptions or other clarifying provisions under Federal law into their State requirements. So, in general, State licensing requirements or costs are not affected by this rule. However, ten States and the District of Columbia tie their dealer licensing requirements to the definition of dealer at 18 U.S.C. 921 or the dealer licensing requirements at 18 U.S.C. 923 (though not to any ATF regulations) or require that a person with a Federal firearms license for dealing must also get a State dealer's license. As a result, in those 11 jurisdictions, firearms sellers who must get a Federal firearms license for dealing due to the changes in the BSCA and, therefore, this rule, will likely also need to obtain State dealer licenses for the same reason. The Department has added those costs in the economic analysis under Section VI.A.3 of this preamble.

b. Derivation of Leisure Wage Rate

Comments Received

Some commenters had questions or concerns about the leisure wage rate. One commenter asked why ATF referred to the Department of Transportation ("DOT") guidance as a method of determining a leisure wage rate. A few commenters opined that the calculated leisure wage rate was too low. One of these commenters estimated that a $16 leisure wage would not result in a livable household income. Another commenter suggested that an average occupational wage rate of $34 per hour was more realistic since individuals would be considered engaged in the business of dealing in firearms and not engaged in leisure time.

Another commenter stated that the Department underestimated the leisure wage rate, which should have been adjusted from $16 to $19.48 to account for wage inflation between April 2020 and the present (which this commenter calculated to September 2023). This commenter used the BLS's Consumer Price Index ("CPI") as a means of

calculating wage increases over time to $19.48.

Department Response

The Department assumes that currently unlicensed persons who may be affected by this rule are not already engaged in a full-time occupation of selling firearms for their income because, if they were, they would already either be licensed in compliance with the GCA as it existed before the BSCA or working for such a licensee. The Department therefore also assumes these persons are not paying themselves a specific wage from their monetary gain from selling their firearms as, typically, a sideline. In other words, the changes enacted by this rule are not likely to cause individuals to qualify as being engaged in the business based on having a full-time or part-time job, including a job working for an FFL, where they get paid salaries or hourly wages as part of an occupation. Instead, the firearms sales activities that would require unlicensed individuals to obtain a license as a result of this rule likely constitute a supplemental source of income or a side business. Such activities are not correlated to an actual wage because they are typically done on the side and this rule does not require FFLs to pay themselves an occupational wage. The affected dealers typically have another job that generates an occupational wage, receive retirement pay, or receive similar primary income. As a result, ATF used a leisure wage to calculate the cost of their non-work time spent on dealing, rather than an occupational wage.

As such, the BLS does not track or assign a specific wage in this context, as there is no wage involved. Nonetheless, the Department recognizes that the rule imposes an opportunity cost of time on persons who will now need to apply for and maintain a license in order to continue dealing in firearms. In the NPRM, the Department therefore assigned a monetary value to that unpaid, hourly burden, as a comparison in "cost," even though these persons are not likely paying themselves an hourly wage for such duties. As a result, the Department opted to use a "leisure" wage rather than a retail wage and continues to do so in this final rule. The Department used DOT's guidance on the value of travel time to calculate a leisure wage rate in the NPRM. During the final rulemaking process, however, the Department determined that the methodology used by the Department of Health and Human Services ("HHS") to calculate the cost of time that persons use to perform actions that are not part of an official occupation is a more

---

[244] *See* 27 CFR 478.58 (Federal license confers no right or privilege to conduct business or activity contrary to State or other law, grants no immunity for violations of State or other law, and State or other law grants no immunity under Federal law or regulations.).

accurate measure of the relevant leisure wage rate than the DOT methodology used in the NPRM. As a result, the Department has used HHS's methodology to derive the leisure wage it used for this final rule. Because HHS's methodology relies on BLS data that is updated on a monthly basis, the Department does not need to use an inflation-adjusted wage rate as suggested by the commenter.

Using this methodology, the Department raised the leisure wage rate to $23 an hour, which is higher than the $19 suggested by the commenter. For more discussion on how the new wage of $23 per hour was derived, see Section VI.A.3 of this preamble.

c. Hourly Burden

Comments Received

One commenter suggested that the Department underestimated the hourly burdens to complete a Form 7 application and to undergo a licensing inspection. This commenter estimated that it would take more than one hour to read, understand, and complete a Form 7. In addition, they said, the estimated hourly burdens should include the time needed to closely read and understand hundreds of pages of Federal laws and regulations, which they estimated would take at least 22 hours (100,000 words at 75 words per minute). They also estimated that it would take an additional 5.5 hours to read Form 7 and acknowledge it via signature prior to the license being issued, and 4.5 hours to do a renewal Form. Therefore, this commenter estimated that the per FFL cost should be $1,165, to account for 27.5 hours of work, at an average hourly occupational wage rate of $34 per hour, in addition to the $230 cost of items such as the Form 7 application fee, fingerprints, and photographs.

Department Response

The Department concurs with the commenter that the estimated time for inspections was underestimated and has revised the amount of time needed to perform an inspection. From additional research it conducted based on the comment, ATF found that ATF Industry Operations Investigators ("IOIs") report an average of 15 hours for an initial inspection and 34 hours for a compliance inspection, as opposed to the three hours for each inspection estimated under the NPRM. These averages account for all sizes of licensee operations, some of which may take far less time to inspect and others of which may take far more time, depending on various factors about the licensee's

operations. Accordingly, the Department has revised and updated the hourly burdens for initial and compliance inspections in Section VI.A of this preamble.

However, the Department disagrees with the commenter regarding the hourly burden to complete a Form 7. First, the Form 7 application itself is only four pages long and the questions for the person establishing the license are on only pages 1 and 2. They also primarily pertain to the individual's personal demographics and what type of license the individual is requesting.[245] For ease of access, pages 3 and 4 include the responsible person questionnaire that an applicant can fill out about another person if the applicant is applying for an FFL license to include more than one person. Form 7 also includes instructions and definitions of terms, to make filling out the form easier and faster. They are for reference, as needed, and do not necessitate reading and studying in such a way that would require significant additional time. In addition, the Department's hourly burden calculation does not need to account for a person taking any time to read regulations and laws. Most persons who need to fill out Form 7 are unlikely to need to read regulations or laws in order to do so. Moreover, the Department prepares guidance documents that summarize the relevant regulations, and those guidance documents are freely available online and do not necessitate any reading and studying that would require significant additional time. In addition, if a person did wish to read the regulation, the relevant regulatory text is about five pages long at 12-point font and does not require significant additional time to read. Nonetheless, the Department has added familiarization costs to the costs outlined in Section VI.A.3 of this preamble.

The Department also notes that Form 7 has undergone public review and OMB review through the required Paperwork Reduction Act process, including detailed explanations for the time burden the Form entails. Those vetted and approved numbers form the basis for estimates included in the NPRM and now in the final rule regarding this Form. Therefore, hourly burdens to complete Form 7 and travel times to obtain items such as forms, fingerprints, and photographs have not been modified because Form 7 can be requested by mail or downloaded via the internet. Furthermore, fingerprints

[245] *Application for Federal Firearms License,* ATF Form 7 (5300.12)/7CR (5310.16) (revised Oct. 2020), *https://www.atf.gov/file/61506/download.*

and photographs are commercially available throughout the United States for employment or passport purposes. The Department has determined that travel times and mileage costs have been appropriately calculated.

d. Office Hours/Business Operational Costs

Comments Received

One commenter suggested that the Department failed to include business operational costs stemming from maintaining at least one hour of operation or availability every week, as they believe Form 7 requires. This commenter estimated that, based on a wage rate of $34 an hour, maintaining business operations for one hour a week for 52 weeks would cost an individual 52 hours, or $1,768 in wages. They also suggested that the cost of becoming a licensee and maintaining a license to deal in firearms should include hourly burdens of 40 hours a week for 50 weeks, allowing for two weeks of vacation.

Another commenter suggested that this rule did not include expenses or time burden associated with selling a firearm. This commenter further suggested that these expenses should be subtracted from any "profit" from a sale. A third commenter suggested that ATF should include the time factor to run a business operation, and another commenter suggested including insurance and retirement as costs to comply with the rule.

Department Response

The Department disagrees with the commenter's analysis regarding operational costs. Neither this rule, nor any existing Federal firearms regulation, requires that a licensed dealer maintain full-time business hours, must hire staff or provide benefits. As discussed in more detail under Section IV.D.6.b of this preamble, unlicensed sellers who would be affected by this rule would not have been engaging in the business as their full-time occupation; full-time firearms sellers are clearly already covered by the GCA licensing requirements before the BSCA and this rule and are thus not counted in the affected population. Therefore, the unlicensed sellers who would be affected by this rule would not have been earning a wage from such activities or paying staff. This rule does not change that, nor does it require that such sellers begin engaging in such activities as part of obtaining a license to deal in firearms. As a result, the Department is not requiring or anticipating that these individuals will,

as a result of this rule, begin paying themselves an occupational wage with benefits. In addition, the Department acknowledges that Form 7 requires that an applicant list at least one business hour per week during which they are available and may be contacted for information or scheduling purposes in the event the newly licensed individual needs to be inspected. But there is no requirement that the affected individual engage in or maintain actual business operations or otherwise actively sell firearms during this time (or during any other specified time or frequency); that individual would be able to maintain the operational hours and frequency that they had prior to being licensed. Therefore, no additional operational opportunity costs were assessed in this final rule.

The time burden associated with the sale of a firearm or to run a business operation is not included because these actions are not required by this rule and are otherwise considered to be "sunk" costs. The same is true for other operational costs, including insurance and retirement benefits. Because the rule does not require that a business operator incur any such costs, it is reasonable to presume that, to the extent such costs are incurred, the business operator was already incurring them before the rule, or will only incur them thereafter on a voluntary basis. This rule only requires individuals that are engaged in the business of dealing in firearms to apply for and maintain a license to be a dealer in firearms. The only costs this rule requires to be incurred are costs to become a licensed dealer and costs to maintain that license. While the Department agrees that an individual may have expenses and time burdens with respect to the actual sale of a firearm or to operate a business, these actions are not required by the Department, are voluntary, and are not considered costs of this rule.

### e. Costs to the Government

#### Comments Received

One commenter calculated the annual Government cost as derived from the RSF survey—the "high" population estimate—and estimated that, using the upper population estimate, the Government cost is about 14.7 times higher than the Department's estimated Government cost.

#### Department Response

The Department agrees that using the population estimates derived from the RSF survey would result in a higher government cost estimate. However, for reasons discussed in Section IV.D.2 of

this preamble, the Department included the RSF estimate for comparative purposes so people could see the possible options but believes that the more accurate estimate is the lower SME-based estimate. As mentioned above, the SME-derived estimate is based on real historical data and experience with relevant sales activities, combined with sampling from an online sales site and ATF's law enforcement and regulatory experience. The Department thus considers it to be a more reliable data source for this purpose than the RSF survey and therefore uses the SME-derived estimate as the primary estimate for this rulemaking.

### 7. Impact on Jobs and Economy

#### Comments Received

One commenter suggested that requiring additional firearms sellers to become licensed will increase the prices of firearms sold in the marketplace. This commenter further estimated that the total U.S. firearms market was $32.1 billion as of 2022 and that this rule, based on their own estimates, would cause a 0.099 percent increase in firearm prices across the overall firearms market. The commenter used an internal model to compare the cost of the rule to their estimated increase in prices; from that, they estimated that the increased prices they assessed would result in 0.89 percent fewer firearm sales, which would in turn result in fewer jobs, including jobs represented by newly licensing these sellers as FFLs. Based on their internal modeling, this commenter estimated that this rule will indirectly result in a loss of 350 direct retail jobs. The commenter went on to estimate that, including supplier jobs, the rule will indirectly result in over 550 fewer jobs and a total of $26.5 million in lost wages and benefits. Finally, this commenter estimated that the American economy would be $70 million smaller.

#### Department Response

The Department disagrees with the commenter's assessment of the effect this rule will have on the price of firearms and the effect on the U.S. firearms market and overall economy. The Department has reviewed the literature provided by the commenter and determined that the estimated impacts on the economy, retail jobs, wages, and subsequent taxes detailed by the commenter's internal literature are largely not connected to the market impacted by this rule. The literature cited by this commenter primarily focused on existing licensees, their

retail jobs, and their firearms market. The literature does not cover unregulated persons who sell firearms on the secondary market. While there may be some effects due to an increase in the number of licensed FFLs, the new licensees that would be generated by this rule have already been selling, and would continue to sell, firearms on the secondary market, and thus would not impact the primary market. Based on the totality of public comments and the Department's experience and analysis, the Department has no basis to believe that persons obtaining new licenses under the clarifications in this rule would enter the primary firearms market industries of manufacturing firearms, becoming intermediaries, or engaging in retail sales of new firearms. Instead, the majority of the unlicensed sellers who would need to obtain a license pursuant to this rule already obtain firearms through existing retail FFLs and subsequently resell them on the secondary market. Some also acquire firearms through estate sales or other secondary sources. Since this buying and further reselling secondary market has been and will continue to operate, the Department does not estimate a significant impact on the firearms industry as suggested by this commenter.

### 8. Impact on Existing FFLs

#### Comments Received

Some commenters suggested that the rule would cause windfall gains to current FFLs under the belief that the rule would require all firearm transactions to be done through an existing FFL. Other commenters claimed that the rule would make it harder to lawfully transfer firearms due to the costs of obtaining and maintaining an FFL. Several individuals claimed that the rule would cause more so-called "mom-and-pop" businesses to go out of business.

#### Department Response

The Department acknowledges that this rule will create more FFLs, which will result in an increase in the amount of licensed competition. However, competition from these new licensees does not equate to an increase in sales competition, nor is the competition new, because those same people who will be required to obtain licenses under the rule are currently selling as unlicensed dealers. And they are operating at an unfair advantage. As one set of commenters noted, "[a]s recognized in the Proposed Rule, these requirements would come at modest cost to most people falling under the

clarified definition. Furthermore, requiring regulatory compliance by dealers operating on the margin of the current scheme would have the equitable effect of subjecting them to the same requirements as current FFLs engaged in substantially similar business activities.'' These sellers would have already existed in the marketplace under the baseline prior to this rule, but they have been operating and competing with FFLs in a largely unregulated state—without being subject to the laws and regulations under which FFLs are required to operate. Rather than adding competition to existing FFLs, clarifying when sellers are likely to be engaged in the business under this rule and would need to become licensed would increase equity in the marketplace by extending costs and obligations incumbent upon all existing FFLs to include currently unlicensed sellers that are acting as dealers in firearms.

There may be additional positive market effects on FFLs as a result of their serving as an intermediary for private party firearm transactions at a greater rate, but the Department finds this effect difficult to estimate based on the lack of existing data sources and subject matter expertise. However, the Department disagrees that this rule will cause more ''mom-and-pop'' businesses to go out of business. The majority of existing licensees are considered to be small businesses and will continue to operate as small businesses. Furthermore, as other commenters have pointed out and as discussed in Sections IV.D.10.c and IV.D.12 of this preamble, many States already require background checks for all private party transactions and any costs associated with such background checks are not due to this rule. Finally, a newly licensed seller who might newly need to undertake background checks may do so under FBI processes by making a simple phone call for free. The Department included these qualitative effects of the rule.

### 9. License Revocation Costs

#### Comments Received

One commenter questioned ATF's assumption that, upon revocation of a license, the underlying market value of the revoked FFL's existing inventory of firearms would be unchanged when sold or transferred to another FFL's inventory. This commenter suggested that during a comprehensive sale or transfer of an existing FFL's inventory to another FFL, the selling FFL would need to liquidate their existing inventory at a loss to the purchasing FFL. In other words, the commenter

suggested the selling FFL would experience an adverse price when liquidating their existing inventory.

Another commenter suggested that the adverse price response described above would be large. The same commenter also suggested that those who choose to surrender their FFLs must still liquidate their business-owned firearm assets within 30 days, with the same adverse price response of those who have had their license revoked, rather than engage in an ''orderly, lawful liquidation'' as ATF estimates.

#### Department Response

The Department estimated that the rule would likely have a qualitative impact on FFLs that fail to comply with existing regulations and requirements, mainly due to the rule's clarification of what must occur with their existing inventory when their license is terminated. FFLs that have had their licenses terminated before this rule were already not permitted to engage in unlawful means of disposing of their remaining inventory, but the rule makes the lawful options clearer. However, ATF revokes or denies renewal of FFL licenses very rarely, with a *de minimis* 0.093 percent of all active FFLs being revoked annually as described below in Section VI.A.4 of this preamble. Furthermore, the economic impact of transferring inventory to another FFL is unclear, given the range in volume and value of firearm inventories. Public comment was specifically sought on these topics, but the Department did not receive any data. In addition, the disposal requirements are not expected to have an adverse cost impact on FFLs that choose to cancel or not renew their licenses. Because such FFLs do so voluntarily, they know in advance that they will need to dispose of their inventory and thus do not have the same disruption and urgency that disposition due to a license revocation would potentially carry.

### 10. Benefits of the Rule

#### a. Costs Outweigh the Benefits

#### Comments Received

A couple of commenters opined that the costs of this rule outweigh the benefits. Of those two commenters, one calculated a 188 percent increase in Form 7 applications but stated there would be less than a 0.2 percent increase in background checks resulting from that increase in FFLs. Further, this commenter suggested that the ''actual number of firearm transactions at licensed dealers is likely a good bit higher'' because ''[m]ultiple guns can

transfer based off of one background check.''

One commenter asserted that ATF incorrectly included individuals who sell firearms through existing licensees and, therefore, no benefit should accrue from such individuals because these firearm transactions are already subject to the background check process. The commenter further stated that the Department failed to account for sellers that currently undergo background checks for all private transactions, as required by certain States. This commenter estimated that 50 percent of the population lives in States that already require background checks and thus implied that any benefits derived from the rule are not as abundant as stated by the Department.

#### Department Response

The Department disagrees that the benefits of the rule are outweighed by the costs, as outlined in the economic analysis in Section VI.A.6 of this preamble. The value society places on the qualitative social benefits of the rule cannot be quantitatively represented in a way that would allow them to be compared to the quantitative costs of licensing more people, so the comment's comparison of the two is not accurate or appropriate. People know that society has placed a high positive value on increasing the licensure of sellers who engage in the business of dealing, in aid of public safety, because Congress passed a law to change the definition for that purpose. In addition, hundreds of thousands of commenters on this rule have also expressed that they place a high positive value on increasing licensure for public safety needs. But people cannot place a numerical value on the qualitative benefits flowing from those statutory changes and thus from this rule. However, there are quantitative benefits that relate to the subject indirectly. The Department does not have sufficient data from which to assess these indirect benefits and has thus not included or relied on them as quantitative benefits resulting from this rule. However, the Department is including some quantitative illustrative considerations in response to this comment as they shed some light on the indirect benefits. For example, there are studies that have examined the economic costs of gun violence. Those studies have demonstrated that the annual healthcare and medical costs of firearms violence alone run into the billions.[246] Therefore,

---

[246] *See, e.g.,* Everytown for Gun Safety, *The Economic Cost of Gun Violence* (July 19, 2022), *https://everytownresearch.org/report/the-economic-*

even a marginal decrease in firearms violence as a result of this rule would constitute a large enough quantitative benefit from the rule to offset the estimated costs of the rule.

The Department further disagrees that there is a marginal decrease in returns with respect to the costs attributed to this rule. This rule is primarily intended to implement the BSCA and to accordingly reduce the means by which a prohibited person can obtain firearms, including those subsequently used in a crime. The ratio between the number of Form 7 applications versus the number of background checks versus how many firearms a buyer can purchase under one background check is not relevant in determining benefits. In other words, benefits stem from having more firearms sellers be licensed, for multiple public safety reasons (as discussed in this section and Section IV.D.10 of this preamble). These benefits are not solely the result of increasing background checks, so the perceived increase in the number of background checks does not offset the rule's benefits. In addition, even comparing the number of background checks with and without the rule would not be accurate because there are other factors involved. For example, although some prohibited persons do attempt to purchase firearms from FFLs, many currently buy from unlicensed dealers. Imposing a requirement that those dealers now be licensed would likely deter more prohibited persons from trying to purchase firearms, which would decrease the number of background checks. The number of firearms that are being purchased and resold per transaction is also not relevant. Multiple

_____

*cost-of-gun-violence/* (estimating $1.57 billion in directly measurable medical costs to taxpayers due to firearms violence, including immediate and long-term medical care, mental health care, and ambulance and patient transport (not including costs to families, survivors, and employers); Nathaniel J. Glasser et al., *Economics and Public Health: Two Perspectives on Firearm Injury Prevention*, 704 Annals Am. Acad. Pol. & Soc. Sci. 44 ("The direct and associated medical care costs of firearm injury are high. In 2019, medical costs associated with firearm fatalities totaled an estimated $233million (CDC 2022). For nonfatal firearm injuries in 2019, the estimated 12-month attributable medical care cost was $24,859 per patient (Peterson et al. 2019; Peterson, Xu, and Florence 2021). While further research is needed to estimate long-term-care costs, the annual direct medical cost of firearm injuries has been conservatively estimated to exceed $2.8 billion (CDC 2022)."); Government Accountability Office, *Firearm Injuries: Health Care Service Needs and Costs* (2021), *https://www.gao.gov/assets/gao-21-515.pdf* (finding that initial inpatient costs from firearms violence in 2016 and 2017 were more than $1 billion, plus another 20 percent for physician costs, and additional first-year costs of $8,000 to 11,000 each for 16 percent of such patients, and stating that there are additional costs thereafter).

transactions already occur pursuant to a single background check and neither the BSCA nor this rule are directed at reducing firearm transactions. The commenter's comparison of the number of firearms that are purchased and resold per transaction therefore also does not result in an offset of the rule's benefits.

An increase in background checks is not the only benefit accrued from requiring that persons engaged in the business as dealers obtain a license. Increasing the number of licensed dealers also results in an increase in sellers who maintain firearms transaction records, submit multiple sales reports, report theft and losses of firearms, and respond to crime gun trace requests. These activities are directly correlated with an increase in the number of prohibited persons who are denied firearm purchases, law enforcement's ability to investigate and retrieve lost or stolen firearms before they can be used in crimes or trafficked, and law enforcement's ability to trace firearms that have been used in crimes and use them to find the perpetrators, among other benefits. This is particularly beneficial for States that have higher rates of straw purchasing or are otherwise larger sources of firearms trafficking, but it benefits society as a whole because each of these actions help law enforcement reduce criminal activities and opportunities. Furthermore, the Department believes that this rule will increase background checks, primarily in States that have less stringent background check requirements, which reduces the potential sources of firearms trafficking.

The Department concurs with the statement that the economic analysis model failed to account for sellers that currently undergo background checks for all private transactions, as required by certain States, but disagrees that the fact that some States currently require background checks for private firearm transfers reduces the benefits accrued from this rule. While the Department acknowledges that certain States already require background checks, States that currently do not require background checks pose a greater risk to public safety. These States tend to have higher rates of straw purchasing or otherwise are sources of firearms trafficking. Although State requirements that all sales undergo background checks could be relevant in general terms, they do not reduce the benefits accrued from this rule because relatively few States have universal background check requirements, because State background checks differ with respect to their thoroughness and which databases are

utilized, and because the benefits of increasing licensees are not solely due to an increase in background checks. Please see Section VI.A.7 of this preamble for more information about States and firearms trafficking.

The Department further disagrees that the benefits derived from the rule should be reduced to account for unlicensed persons who sell firearms or obtain background checks through existing FFLs (either voluntarily or due to State requirements).

As a result of the comments on this topic, the Department has added a discussion of State background checks, tracing, and firearms trafficking to the Benefits discussion in Section VI.A.6 of this preamble to supplement the Department's position that the benefits of this rule outweigh the costs.

b. Lack of Benefits From Licenses

*Comments Received*

One commenter argued that benefits attributed to this rule "do not flow from licenses"; rather, the rule's benefits are derived from the act of undergoing background checks and maintaining records. This commenter also stated that the Department failed to use denied background checks and responsiveness to traces as a benefit to the rule, suggesting, according to the commenter, that this rule does not address public safety as stated by the Department.

*Department Response*

The Department disagrees that the act of obtaining and maintaining a license does not directly contribute to the safety and welfare of the public. Congress chose to make the dealer the "principal agent of federal enforcement" in "restricting [criminals'] access to firearms." *Huddleston* v. *United States*, 415 U.S. 814, 824 (1974). As the Supreme Court explained in a later case, *Abramski*, 573 U.S. at 172–73:

The statute establishes a detailed scheme to enable the dealer to verify, at the point of sale, whether a potential buyer may lawfully own a gun. Section 922(c) brings the would-be purchaser onto the dealer's "business premises" by prohibiting, except in limited circumstances, the sale of a firearm "to a person who does not appear in person" at that location. Other provisions then require the dealer to check and make use of certain identifying information received from the buyer. Before completing any sale, the dealer must "verify[] the identity of the transferee by examining a valid identification document" bearing a photograph. § 922(t)(1)(C). In addition, the dealer must procure the buyer's "name, age, and place of residence." § 922(b)(5). And finally, the dealer must (with limited exceptions not at issue here) submit that information to the National Instant Background Check System

ATF 015375

APPX.096

(NICS) to determine whether the potential purchaser is for any reason disqualified from owning a firearm. See §§ 922(t)(1)(A)–(B).

The benefits of this rule therefore stem from bringing potential purchasers onto a licensed business premises to prevent prohibited persons from obtaining firearms, channeling the commerce in firearms through licensed dealers so that State and local law enforcement can regulate firearms commerce in their borders, and allowing the tracing of crime guns. Making it harder for prohibited persons to obtain firearms makes it less likely that such persons will use a firearm in a crime. To the extent that a firearm purchased through an FFL is used in a crime, that firearm can then be traced by law enforcement. Furthermore, should firearms be stolen from an FFL, there are requirements that thefts be reported so that ATF and local law enforcement can analyze theft patterns for future reduction purposes. This approach helps to ensure that regulated firearms continue to be used for legal purposes and not criminal activities.

c. Lack of Empirical Data

Comments Received

Some commenters asserted that the proposed rule would not improve public safety, and cited statistics to support their view. One commenter stated that the proposed rule would not hinder criminals or save lives. In support of that view, the commenter stated that the State of Washington's per capita gun murder rate increased by more than 26 percent following its 2014 passage of universal background checks ("UBCs") versus an unnamed neighboring State that the commenter stated had no such increase and no UBC requirement. Another commentator stated that numerous studies, including in peer-reviewed journals, found that the correlation between gun control measures and reduction in gun violence is negligible. *See* Michael Siegel et al., *The Relationship Between Gun Ownership and Firearm Homicide Rates in the United States, 1981–2010,* 103 Am. J. Pub. Health 2098 (2013) (cited by the commenter as in the *Journal of the American Medical Association* instead). Another commenter stated that the Bureau of Justice Statistics shows that less than 1 percent of individuals obtain firearms at gun shows. Finally, some commenters believed the proposed rule itself is reactive or lacks supporting evidence, analysis, or well-considered evidence to show that it will have a meaningful impact on crime reduction or improve public safety.

Similar to the comments on the population estimates, one commenter stated that the benefits lacked empirical data that would demonstrate the effects on public safety. The commenter referenced a peer-reviewed study that stated that each percentage point increase in gun ownership increased the homicide rate by 0.9 percent. One commenter questioned the lack of quantifiable benefits, including the lack of tracing data. Many commenters who supported the proposed rule referenced research showing that one in five firearms are sold without a background check[247] and further stated that allowing firearms to be purchased without a background check is a significant threat to public safety. One commenter reinforced this sentiment by citing an article from *Bloomberg*.[248] Some commenters stated that firearms that are purchased without a background check cannot be later be traced. Many public commenters agreed with the rule and suggested that requiring background checks for sales of firearms increases public safety.

Department Response

The Department disagrees that there is no quantitative data to support the analysis in the NPRM and the public safety justification for the provisions of this rule; on the contrary, there is much data in support. Such data include the National Firearms Commerce and Trafficking Assessment ("NFCTA") referenced by one commenter and released by ATF as a two-volume report in May 2022 and January 2023.[249] That report revealed, for example, that even though only 3 percent (41,810) of crime guns traced between 2017 and 2021 were acquired from licensees at a gun show, the percentage of those traces increased year-over-year by 19 percent. And as ATF noted in the report, "[i]t is important to recognize that this figure

does not represent the total percentage of recovered crime guns that were sold at a gun show during the study period as private citizens and unlicensed dealers sell firearms at gun show venues. National data, however, are not available on unregulated firearm transfers at gun shows." [250]

Furthermore, the Department disagrees with the commenter's interpretation of the article in the *American Journal of Public Health.* The commenter argued that any correlation between gun control measures and reduction in gun violence is negligible. But the article states, "[g]un ownership was a significant predictor of firearm homicide rates (incidence rate ratio = 1.009; 95% confidence interval = 1.004, 1.014). This model indicated that for each percentage point increase in gun ownership, the firearm homicide rate increased by 0.9%." Siegel, Ross, & King, *supra,* at 2098. The Department interprets this article to suggest that for every percent increase in gun ownership, there is almost a comparable (almost 1:1 ratio) increase in firearm homicide, which is not negligible. In other words, for every percent increase in firearms ownership, there was an almost equal percentage increase in firearm homicide.

However, the Department concurs with many of the statistics provided by the commenters and has incorporated those statistics into the economic analysis in Section VI.A of this preamble. Additionally, the Department used information provided by the commenters to illustrate the effectiveness of tracing data to help determine firearms trafficking or straw purchasing patterns. Finally, the Department compared commenters' statistics on States that require background checks for all private firearms transactions to States that have the highest and lowest time-to-crime statistics and determined that States with the least restrictive background check requirements may be larger sources of firearms trafficking and straw purchases. For more details, *see* Section VI.A.7 of this preamble, which discusses the benefits of the rule.

[247] German Lopez, *Study: 1 in 5 gun purchases reportedly go through without a background check,* Vox (Jan. 4, 2017), *https://www.vox.com/policy-and-politics/2017/1/4/14153594/gun-background-check-study* (discussing a study published in the *Annals of Internal Medicine*).

[248] Brentin Mock, *Mapping How Guns Get Around Despite Background Check Laws,* Bloomberg (Oct. 22, 2015), *https://www.bloomberg.com/news/articles/2015-10-22/40-percent-of-gun-owners-got-them-without-background-checks.*

[249] ATF, *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce* (May 5, 2022), *https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume/download*; ATF, *National Firearms Commerce and Trafficking Assessment: Crime Gun Intelligence and Analysis, Volume Two* (Jan. 11, 2023), *https://www.atf.gov/firearms/national-firearms-commerce-and-trafficking-assessment-nfcta-crime-guns-volume-two.*

[250] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis, Volume Two, Part III: Crime Guns Recovered and Traced Within the United States and Its Territories* 14 (Mar. 27, 2024), *https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.*

## 11. Federalism Impact

### Comments Received

One commenter estimated that this rule will increase the number of FFL dealers nationwide by 903 percent. Many States will have a subsequent "massive burden" due to this increase, the commenter concluded. This commenter also suggested that due to the burden this rule will have on States, the Department should have included a federalism summary impact statement as to how these new licensees will affect State regulatory agencies. This commenter suggested that this rule will have a significant impact on States because many States license FFLs themselves, separately from the Federal licensing scheme. In addition, another commenter stated that the proposed rule presented a potential conflict in which an individual might be engaged in a business operation requiring a license under Federal law but might not be required to obtain a license under State law. The commenter added that this would create potential problems for people who are legally required to hold an FFL, but then are prohibited from operating or possessing such a license under local ordinances. They also stated that ATF is seeking to broadly regulate a field that states have already addressed in different ways.

Another commenter challenged the NPRM's statement that "[t]his rulemaking would not result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments." They claimed that ATF failed to consider the impact of its expansion of mandatory background checks for firearm transactions on State, local, and Tribal government budgets, as those political entities may have to expand their staffing and infrastructure to respond to a greater number of declined background checks.

### Department Response

The Department disagrees that a federalism impact statement is needed for this rulemaking under Executive Order 13132. Nothing in this rule changes how State and local authorities conduct background checks or otherwise regulate persons engaged in a firearms business. This rule, which implements the GCA, and the changes made to it by the BSCA, does not preempt State laws or impose a substantive compliance cost on States. Under 18 U.S.C. 927, no provision of the GCA "shall be construed as indicating an intent on the part of Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the statute so that the two cannot be reconciled or consistently stand together." State and local jurisdictions are therefore free to create their own definitions of terms such as "engaged in the business" to be applied for purposes of State or local law within their respective jurisdictions. They are free to mandate their own requirements concerning the licensing of firearms dealers.

State licensing schemes for retail dealers in firearms (or merchandise that includes firearms) stand on their own and are not dependent on Federal law. If persons have been engaged in a firearms business requiring a State or local business license, then they should have acquired the State or local business license regardless of the new rule. In fact, as set forth below, the new rule looks to whether a person "[s]ecures or applies for a State or local business license to purchase for resale or to sell merchandise that includes firearms" to help determine whether a person is engaged in the business requiring a license under Federal law, 18 U.S.C. 922(a)(1) and 923(a). *See* 27 CFR 478.13(d)(2)(vii) (definition of "predominantly earn a profit") (final rule).

The Department disagrees with the estimate that the rule will significantly or uniquely affect small governments due to increased background checks by local authorities since 22 States already require background checks for private party sales. Of the States that do not currently require background checks for all private sales, only three States (Florida, Tennessee, and Utah) [251] do not rely on Federal law enforcement for their background checks and are "point of contact" States in which designated State agencies conduct NICS checks.

## 12. Regulatory Flexibility Act

### Comments Received

Various commenters stated that this rule, by increasing operational and administrative costs, will have a significant and disproportionate impact on, or otherwise destroy, small businesses (some of which have operated for decades) or even destroy a sector of business. One commenter stated that the proposed rule inappropriately did not contain an analysis under the Regulatory Flexibility Act ("RFA"). The same commenter opined that small businesses may not have the resources or infrastructure to comply with enhanced recordkeeping requirements. Another commenter opined that with more people applying for a license, existing FFLs that operate a brick-and-mortar store will go out of business.

One commenter requested various data regarding the analysis performed under the RFA. This commenter stated that ATF may not have properly considered small entities and further asked a series of questions:

1. ATF did not list a cost per business............... What is the average additional cost a small business would incur as a result of this rule?

2. Why did the ATF not include [the additional cost] in the published rule?

3. What alternatives [for small businesses] did ATF consider?

   a. What would have been [the alternatives'] impact on small entities?

   b. Why were these alternatives deemed insufficient?

   c. Why did the ATF not explain the alternatives in its original RFA analysis?

4. ATF anticipates that nearly 25,000 new individuals or entities must register as a firearm dealer. Of these entities, how many does the ATF anticipate will stop selling firearms?

5. What impact will this rule have on existing FFL dealers, many of whom are small businesses and how did ATF assess the costs of this rule on large entities, compared to the 25,000 new small businesses it created?

6. What impact does the ATF believe adding 25,000 new FFL dealers will have on the price of firearms?

7. Why did ATF not explain this rule's impact on the 25,000 businesses?

### Department Response

The Department disagrees that this rule will destroy a whole sector of business (*i.e.,* the firearms industry). FFL dealers are a subsector of the firearms industry, and the impact on some dealers will not destroy that subsector or the entire firearms industry. The firearms industry is significantly large and robust, and the impact of this rule affects only a small portion of one subsector of it. In any event, as stated above in Section IV.D.8 of this preamble, the Department believes that, rather than adding competition to existing FFLs, requiring sellers engaged in the business under this rule to become licensed adds equity to the marketplace by spreading costs and obligations incumbent upon all existing FFLs to include currently unlicensed sellers that are acting as

---

[251] FBI, *How We Can Help You: NICS Participation Map* (Feb. 1, 2024), *https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/about-nics.*

ATF 015377

dealers in firearms. There may be additional positive market effects on FFLs as a result of them serving as an intermediary for private party firearm transactions at a greater rate, but the Department finds this effect difficult to estimate based on the lack of existing data sources and subject matter expertise. Finally, the Department does not believe the congressionally mandated recordkeeping requirements constitute a significant burden for a small business. Many existing FFLs are small businesses and already comply with the recordkeeping requirements.

Regarding the first and second questions on small business impacts, the Department did not distinguish between the cost of individuals complying with this rule versus small businesses complying with this rule. For the purposes of this rule and Final Regulatory Flexibility Act analysis, the Department assumed individuals becoming licensed will become small businesses and the cost per person (or small business) is outlined in Section VI.A.3 of this preamble, discussing "Costs for Unlicensed Persons Becoming FFLs." The Department did not determine that there were additional costs beyond those individuals (or newly formed businesses) complying with this rule; therefore, no other costs were attributed to small businesses that were not already outlined in Section VI.A.3 of this preamble.

Regarding the third question on consideration of alternatives, the Department considered alternatives in the NPRM (88 FR 62016 and 62017) and discusses them in the final rule in Section VI.A.8 of this preamble. No separate alternative was considered for small business specifically because it was assumed that all individuals complying with this rule will become small businesses. Other alternatives suggested during the comment period and the Department's response to such suggestions are discussed in Section IV.D.13 of this preamble. All alternatives (including the proposed alternative) were considered alternatives for small business compliance. All impacts considered in the alternatives and all impacts under this rule were considered to be alternatives and regulations for small business compliance. Alternatives such as lower fees or guidance were deemed insufficient for various reasons, including that fees are imposed by statutory requirement and guidance alone would result in insufficient compliance. These alternative discussions are outlined below in Section VI.A.8 of this preamble ("Alternatives") and above in the

Department's response to comments received on alternatives in Section IV.D.13 of this preamble. The Department did not discuss alternatives targeted at small businesses separately from alternatives aimed at all affected parties because they were deemed to be one and the same.

Regarding the fourth question, on the estimated number of individuals leaving the market: of the individual or new entities affected by this rule, the Department estimates in this final analysis that 10 percent of affected individuals (or potential entities) may opt to stop selling firearms. Discussions on that are located in Sections IV.D.2 ("Population Accuracy"), IV.D.4 ("Russell Sage Foundation Model Calculation"), and VI.A.2 ("Population") of this preamble.

Regarding the fifth question, as responded to in Section IV.D.8 ("Impact on Existing FFLs") of this preamble, there may be some impact on existing FFLs as there will now be more licensed dealers. However, these newly licensed dealers have been selling firearms prior to this rule, and most of them will continue to sell firearms regardless of this rule, so the impact on existing FFLs will not be significant since the overall number of firearm transactions are unlikely to be significantly affected. For a more detailed discussion, please see Section IV.D.8 of this preamble.

Regarding the sixth question, the Department does not anticipate a significant impact on the prices of firearms. The firearm transactions affected by this rule are primarily firearms sold on the secondary market (*i.e.,* previously purchased firearms for resale). Furthermore, sales of these firearms have been and will continue to occur regardless of the implementation of this rule; therefore, no impact on the prices was considered. The Department further notes that this rule is not affecting the manufacture or importation of firearms, so supply is considered to be stable.

Regarding the seventh question, the Department considered the impact of this rule on all unlicensed sellers (or newly created businesses) and addressed cost under Section VI of this preamble. As mentioned above, no distinction was made between small businesses because it was assumed that all unlicensed sellers (or businesses) affected by this rule are small.

### 13. Alternatives

#### Comments Received

One commenter opined that only retailers of firearms who own brick-and-mortar stores should be required to have

a license. Another commenter suggested using a minimum threshold number and accounting for inflation to define a dealer. One commenter suggested a stricter background check for all firearms transactions. Another suggested that ATF charge a $10 per application fee for a dealer's license, not $200. Two commenters suggested a plethora of alternatives, including education for individuals and local law enforcement. One of those two commenters also suggested revisions to the NFA and GCA for items such as increasing the fees of NFA weapons, and the other commenter suggested that the Department track and report on citizens using firearms to prevent a crime or protect themselves. One commenter suggested that, rather than expanding the Federal licensing requirements, ATF should institute a permitting system where purchasers could use a firearms ID or demarcation on their license to provide proof of ability to purchase firearms.

A commenter recommended leaving the regulations as they are but suggested adding straw purchases because "ATF has estimated that 50 percent of the illegal firearms market is conducted through straw purchases." Another commenter agreed and said that rather than implementing universal background checks, ATF should focus on cracking down on illegal straw purchases.

#### Department Response

The Department disagrees that only retailers who operate out of brick-and-mortar stores should be required to have licenses. Currently, a portion of ATF's existing FFLs include high-volume sellers of firearms who do not operate in brick-and-mortar store locations; they should not be excluded from licensing requirements simply because they sell from other locations or through other mediums. There are unlicensed sellers who operate out of brick-and-mortar locations and others who do not; the law requires any such sellers who qualify as engaged in the business as a dealer to be licensed. The BSCA does not distinguish on the basis of where the sales occur—and the rule provides details to aid people in understanding that approach. The BSCA was enacted with the intent to increase, not reduce, the population of regulated dealers. Therefore, this alternative has not been included in the analysis.

As explained in detail in the NPRM, the Department considered, but did not propose, a specific number of firearms sales as a threshold for being engaged in the business as a dealer. Although some commenters suggested this alternative again, they did not provide any

information or reasons to overcome or refute the explanations and evidence cited in the NPRM discussion on this topic. As those reasons still hold true, the Department continues to decline to adopt this alternative.

The Department understands that some commenters consider the license fee of $200 and other costs related to obtaining a license too costly for some people transacting in firearms as part of a hobby or to enhance a personal collection. However, the Department does not set the application fee or the costs of obtaining photographs or fingerprints. The application fee is set by statute and the Department cannot change it.[252] The other costs (such as for photographs or fingerprints) are set by private companies and similarly cannot be changed by the Department. Nonetheless, the rule does not require occasional sellers of firearms as part of a hobby or to enhance personal collections to obtain a license, so the costs of complying with this rule would not present a burden to them. Instead, the rule impacts persons who have been engaging in certain repetitive firearms dealing that demonstrates they are engaged in the business as a firearms dealer and should be licensed. For these reasons, the Department declines to pursue alternatives to licensing fees.

The Department previously considered and rejected guidance as an alternative means of implementing the statutory changes to the definition of "engaged in the business." The Department does not believe guidance would be an effective method, based partly on prior experience with guidance on this topic. ATF's 2016 guidance, for example, outlined the general factors and examples of being engaged in the business under the statutory definition of that term in effect at the time,[253] but compliance with that guidance document was voluntary and it was not included in the Code of Federal Regulations for broader distribution to the public. Therefore, the guidance resulted in only a brief increase in the number of persons engaged in the business becoming licensed dealers. Although this increase of 567 additional dealers illustrated that people would try to comply with the licensing requirement when they better understood the requirement, this approach was not effective enough, by

itself, to address the problem of unlicensed dealing.

A regulation is much more effective at achieving compliance with the GCA, as amended by the BSCA, than guidance that is both voluntary and distributed by ATF at gun shows or other venues when the agency is present (or found online if people search for it). People recognize that a regulation sets the requirements they must follow and affects all those participating in the topic area; they also know where to look for a regulation. Now that the BSCA has redefined "engaged in the business," there is even more of a need to ensure that unlicensed people who meet the definition of that term understand that they are violating the law if they do not obtain a license. And if the Department does not update its regulations, they would not accurately reflect the statutory text and would thus create confusion.

As a result, the Department did not select the alternative to publish only guidance documents in lieu of this regulation because guidance alone would be insufficient as a means to inform the public in general, rather than solely the currently regulated community. Guidance would not have the same reach and attention as a regulation, and it would not be able to change existing regulatory provisions on the subject of "engaged in the business" or impact intersecting regulatory provisions. The Department considers it necessary to use a regulatory means of putting sellers who continuously or repetitively engage in firearm sales on notice regarding the impacts the statute will have on them, and to clarify the parameters of the new definition. For more detail, please refer to Section VI.A.8 of this preamble.

The Department did not consider the remaining alternatives proposed by commenters, such as creating and including educational training, cracking down on straw purchases, or adopting a buyer permitting system, because they are outside the scope of this rulemaking and the Department's NPRM. ATF will provide training and outreach as it routinely does, but such activities are not included in a regulation.

## V. Final Rule

### Subsections in Section V

A. Definition of "Dealer"
B. Definition of Engaged in the Business— "Purchase," "Sale," and "Something of Value"
C. Definition of "Engaged in the Business as a Dealer in Firearms Other Than a Gunsmith or Pawnbroker"
D. Definition of "Engaged in the Business" as Applied to Auctioneers

E. Presumptions That a Person Is Engaged in the Business
F. Definition of "Personal Collection (or Personal Collection of Firearms, or Personal Firearms Collection)"
G. Definition of "Responsible Person"
H. Definition of "Predominantly Earn a Profit"
I. Disposition of Business Inventory After Termination of License
J. Transfer of Firearms Between FFLs and Form 4473
K. Effect on Prior ATF Rulings
L. Severability

### A. Definition of "Dealer"

The rule finalizes, with minor edits, the amendments proposed in the NPRM to the definition of "dealer" in 27 CFR part 478, which clarify that this term includes such activities wherever, or through whatever medium, they are conducted. In this regard, the Department replaced the words "may be conducted" with "are conducted" to help ensure that the definition is not interpreted as authorizing a firearms business to operate at unqualified gun shows, events, or other locations, where such activities could not serve as a proper business premises at which a license could be issued under the GCA.

### B. Definition of Engaged in the Business—"Purchase," "Sale," and "Something of Value"

To conform with designation of paragraphs elsewhere in this rule, the final rule redesignates paragraphs (a) through (f) of the "engaged in the business" definition in § 478.11 to paragraphs (1) through (6) and continues the numerical designation in new paragraphs thereafter. The rule finalizes the definitions of "Purchase," "Sale," and "Something of value" with minor amendments. First, for consistency across those who deal in firearms, the definitions were moved in the definition of "engaged in the business" to a new paragraph (7), to apply, not only to the definition of "dealer in firearms other than a gunsmith or pawnbroker," but generally to all persons engaged in the business of dealing in firearms. This includes importers and manufacturers who are authorized by 27 CFR 478.41(b) to engage in business on the licensed premises as a dealer in the same type of firearms authorized by the license to be imported or manufactured. Second, in the definitions of "purchase" and "sale," the words "an agreed" were inserted before "exchange for something of value" to clarify that the transaction must be intentional. Such transactions include indirect exchanges of something of value. Third, the Department revised the term "sale" to change "providing

[252] Application fees for firearms regulated under the GCA are set by 18 U.S.C. 923(a). Rates for the NFA special (occupational) tax (SOT) are established by 26 U.S.C. 5801(a).

[253] *See* ATF Publication 5310.2, *Do I Need a License to Buy and Sell Firearms?* (2016), *https://www.govinfo.gov/pkg/GOVPUB-J38-PURL-gpo125446/pdf/GOVPUB-J38-PURL-gpo125446.pdf*.

APPX.100

to'' to "disposing of'' to be more consistent with the statutory language, and for further clarity, to define the term "resale" as "selling a firearm, including a stolen firearm, after it was previously sold by the original manufacturer or any other person." Finally, the phrase "legal or illegal" was added at the end of the definition of "something of value" to make clear that the item or service exchanged for a firearm could be one that is unlawful to possess or transfer (*e.g.,* a controlled substance).

### C. Definition of "Engaged in the Business as a Dealer in Firearms Other Than a Gunsmith or Pawnbroker"

The rule finalizes the definition of "engaged in the business" of wholesale or retail dealing in a new section of the regulation at § 478.13, instead of keeping the definition under the overall definitions section at § 478.11, due to its length. In conjunction with this change, the final rule has also moved the definition of "predominantly earn a profit" to § 478.13 because it is an element of the definition of "engaged in the business as a dealer." As a result of consolidating the two definitions into one integrated section, the rule also eliminated duplication of identical paragraphs on rebuttal evidence, the non-exhaustive nature of the listed rebuttal evidence, and applicability to criminal proceedings, which were previously located in each definition. In conjunction with these changes, the final rule has also included cross-references to these definitions in § 478.11.

### D. Definition of Engaged in the Business as Applied to Auctioneers

The rule finalizes the definition of "engaged in the business" of wholesale or retail dealing with minor edits to make clear that estate-type auctioneers may assist in liquidating all firearms as a service on commission without a license, not merely those in a personal collection (as that term is defined in this rule). Additionally, the final rule addresses the concerns of estate-type auctioneers by limiting the caveat for possession of the firearms prior to the auction of the firearms to those that are "for sale on consignment."

### E. Presumptions That a Person Is Engaged in the Business

The rule finalizes the presumptions that a person is "engaged in the business" of dealing in firearms at wholesale or retail by making the following changes: (1) in the introductory paragraph (a), separating the definition of "engaged in the business" in that paragraph from a new

paragraph (b), "fact-specific inquiry," which sets forth the factual analysis courts have historically applied to determine whether a person falls within the definition in paragraph (a); including in paragraph (b) the example to compare a single firearm transaction, or offer to engage a transaction, in which a person represents to others "a willingness and ability" to purchase more firearms for resale, which may require a license, with "a single isolated firearm transaction without such evidence" that would not require a license; and adding the following at the end of the same paragraph (b): "At all times, the determination of whether a person is engaged in the business of dealing in firearms is based on the totality of the circumstances"; (2) revising the sentence at the beginning of the presumptions to move the phrase "[i]n civil or administrative proceedings" to the beginning of the sentence, and adding "it is shown that" before "the person—"; (3) adding the prefix "re" before "sell" and "sale" in the various presumptions to more closely track the statutory definition of "engaged in the business" in 18 U.S.C. 921(a)(21)(C); (4) adding to the EIB presumption on willingness and ability to purchase and sell more firearms the parenthetical "(*i.e.,* to be a source of additional firearms for resale)" to clarify what it means to represent to potential buyers or otherwise demonstrate a willingness and ability to purchase and resell additional firearms; (5) removing the EIB presumption relating to gross taxable income to address concerns raised by commenters about how it would apply in certain low-income situations; (6) revising the EIB presumption on certain types of repetitive transactions to add the word "repetitively" before "resells or offers for resale" to more closely track the statutory language in 18 U.S.C. 921(a)(21)(C); (7) revising the same EIB presumption to make it applicable to firearms that cannot lawfully be purchased, received, or possessed under Federal, State, local, and Tribal law, not merely under Federal law (as the citations made it appear to commenters), and to explain that firearms not identified as required under 26 U.S.C. 5842 are among the types of firearms that cannot lawfully be possessed; (8) revising the EIB presumption on repetitively selling firearms in a short period of time to include a time limitation of one year with respect to repetitive resales or offers for resale of firearms that are new or like new, and those that are the same make and model; in addition, revising

and limiting the presumption for firearms that were the "same or similar kind" to those firearms that are of the "same make and model, or variants thereof"; (9) revising the EIB presumption on liquidation of business-inventory firearms by a former licensee that were not transferred to a personal collection prior to license termination, to reference the rules pertaining to liquidation of former licensee inventory in §§ 478.57 and 478.78 to ensure that they are read consistently with each other; (10) revising the EIB presumption on liquidation of firearms transferred to a personal collection or otherwise as a personal firearm prior to license termination, to reference the rules pertaining to the sale of such firearms in 18 U.S.C. 923(c) and 27 CFR 478.125a(a) to ensure that they are read consistently with each other; (11) adding explanatory headers for the paragraphs in the regulatory text; (12) clarifying, in a new paragraph, that the list of conduct not supporting a presumption that a person is "engaged in the business" is also evidence that may be used to rebut any presumption should an enforcement proceeding be initiated; and (13) expanding the list of conduct that does not support a presumption to not only include firearms resold or otherwise transferred as bona fide gifts and those sold occasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection, but also those sold "[o]ccasionally to a licensee or to a family member for lawful purposes"; "[t]o liquidate (without restocking) all or part of the person's personal collection"; "[t]o liquidate firearms that are inherited" or "[p]ursuant to a court order; or "[t]o assist in liquidating firearms as an auctioneer when providing auction services on commission at an estate-type auction."

### F. Definition of "Personal Collection (or Personal Collection of Firearms, or Personal Firearms Collection)"

The rule finalizes the definition of "Personal collection (or personal collection of firearms or personal firearms collection)" with some additional clarifying edits. First, headers were added to each main paragraph for clarity. Second, a parenthetical was added to clarify that "collecting curios or relics" and "collecting unique firearms to exhibit at gun club events" are examples of firearms accumulated "for study, comparison, exhibition," and that "historical re-enactment" and "noncommercial firearms safety instruction" are examples of firearms accumulated "for a hobby." Third, to clarify the nature of the firearms not

included in the definition of "personal collection" due to the fact that they were purchased for the purpose of resale with the predominant intent to earn a profit, the following was added to examples in the parenthetical: "primarily for a commercial purpose or financial gain, as distinguished from personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, but which the person may also intend to increase in value)." Fourth, to clarify that firearms accumulated primarily for self-protection are not included in the definition of "personal collection," but can be purchased for personal use, the following was added: "In addition, the term shall not include firearms accumulated primarily for personal protection: *Provided,* that nothing in this definition shall be construed as precluding a person from lawfully acquiring a firearm for self-protection or other lawful personal use." Finally, minor edits were made to the definition of personal collection as it pertains to licensees, to explain that licensees may transfer firearms to a personal collection "or otherwise as a personal firearm," and that the separation requirement for personal firearms applies "[w]hen stored or displayed on the business premises," as distinguished from those personal firearms that are being carried by the licensee for self-protection.

### G. Definition of "Responsible Person"

The rule finalizes, with minor changes, the amendments proposed in the NPRM to the definition of "responsible person" in 27 CFR part 478. The proposed definition was revised to remove the term "business practices," which term was considered confusing and overbroad to some commenters. It was also changed to explain that sole proprietorships and companies are included in the list of businesses that have responsible persons and to indicate that both the individual sole proprietor and their authorized employees are responsible persons. This change ensures that individual sole proprietors (who are always responsible for the management and policies of their firearms businesses), companies, and their authorized employees will be identified as responsible persons when submitting an Application for License, Form 7/7CR, and undergo the required background check.

### H. Definition of "Predominantly Earn a Profit"

The rule moves the definition of "predominantly earn a profit" into a stand-alone section with the definition

of "engaged in the business" at § 478.13. The rule also breaks down the definition of "predominantly earn a profit" into subparagraphs for ease of reference and finalizes that definition with minor edits to the last sentence in the first paragraph. Specifically, the final rule adds the word "intended" before "pecuniary gain," consistent with the statutory language. The rule also finalizes the introductory paragraph to the "Presumptions" subsection with minor edits. Specifically, the sentence at the beginning of the paragraph was revised to move the phrase "[i]n civil or administrative proceedings" to the beginning of the sentence; the phrase "from the sale or disposition" of firearms was changed to "the repetitive purchase and resale" of firearms, to more closely track the statutory language; and "it is shown that" was added before "the person." Additionally, the following clarifying edits were made to the set of presumptions in the definition of "predominantly earn a profit": (1) the term "repetitively" was added into various presumptions to better focus them on persons who are reselling firearms with the requisite intent under the statute; (2) in the PEP presumption on marketing, the words "or continuously" were inserted at the beginning to include advertising that is perpetual, and the phrase "on any website" was revised to "through the internet or other digital means"; (3) the PEP presumption on purchasing or renting space was revised by adding "repetitively or continuously" to the beginning to better demonstrate the requisite intent, and by removing the phrases "or otherwise secures or sets aside" and "or store," and replacing those phrases with "or otherwise exchanges (directly or indirectly) something of value to secure," to focus the presumption on firearms that are displayed for resale by a person who has paid for that service, and to make clear that the item or service exchanged for a firearm could be either a direct or an indirect form of payment (*e.g.,* payment of cash or an indirect membership or admission fee); (4) the PEP presumption on maintaining records was revised to make clear that "repetitive" firearms purchases for resale are being tracked; (5) the PEP presumption on purchasing or otherwise securing merchant services was limited to those through which a person intends to repetitively accept payments for firearms transactions, to focus on the seller as opposed to the purchaser or end user of firearms who makes or offers to make payments for firearms transactions, and to add the

word "repetitive" before "firearms transactions" to further support the intent element of the statute; (6) the PEP presumption on securing business security services was limited to those services intended "to protect firearms assets and firearms transactions," to focus on businesses that conduct transactions involving firearms rather than those that may purchase security services solely to protect or store their business inventory for company use; and (7) the PEP presumption on business insurance policies was removed to address commenter concerns and because information indicated it was not commonly found in ATF cases.

### I. Disposition of Business Inventory After Termination of License

Several changes were made to the liquidation provisions on the disposition of business inventory by a former licensee after termination of license, 27 CFR 478.57 and 478.78. Specifically, with respect to business inventory that remains after license termination, the term "personal inventory" was replaced with the term "former licensee inventory" to better explain the business nature of this inventory. A definition of "[f]ormer licensee inventory" was added to 27 CFR 478.11, which includes a sentence to explain that "[s]uch firearms differ from a personal collection and other personal firearms in that they were purchased repetitively before the license was terminated as part of a licensee's business inventory with the predominant intent to earn a profit." The liquidation provisions at 27 CFR 478.57(c) and 478.78(c) now expressly require that transfers of firearms in a former licensee inventory must be appropriately recorded as dispositions in accordance with 27 CFR 478.122(b) (importers), 478.123(b) (manufacturers), or 478.125(e) (dealers) prior to delivering the records after discontinuing business consistent with 27 CFR 478.127. This will allow former licensee inventory to be traced if later used in crime and is consistent with the existing delivery of records requirement in 18 U.S.C. 923(g)(4) and 27 CFR 478.127. The liquidation provisions also expressly state, in §§ 478.57(b)(2) and 478.78(b)(2), that transferring former licensee inventory to a responsible person of the former licensee within 30 days after license termination does not negate the fact that the firearms were repetitively purchased, and were purchased with the predominant intent to earn a profit. Finally, the liquidation provisions now expressly recognize that a responsible person of a former

licensee may occasionally sell a firearm even after the 30-day liquidation period to a licensee without being presumed to be engaged in a firearms business. *See* §§ 478.57(c), 478.78(c).

*J. Transfer of Firearms Between FFLs and Form 4473*

The rule finalizes the provision on the proper procedure for licensee transfers of firearms to other licensees, 27 CFR 478.124(a), with a minor edit to add the phrase "or otherwise as a personal firearm" after "personal collection." The rule makes it clear that Form 4473 may not be used by sole proprietors when they transfer to themselves other personal firearms that are not in a "personal collection" as defined in this rule. § 478.124(a).

*K. Effect on Prior ATF Rulings*

ATF publishes formal rulings and procedures to promote uniform understanding and application of the laws and regulations it administers, and to provide uniform methods for performing operations in compliance with the requirements of the law and regulations. ATF Rulings represent ATF's guidance as to the application of the law and regulations to the entire state of facts involved, and apply retroactively unless otherwise indicated. The following ruling is hereby superseded: ATF Ruling 96–2, *Engaging in the Business of Dealing in Firearms (Auctioneers)* (Sept. 1996), *https://www.atf.gov/file/55456/download.*

*L. Severability*

Based on the comments received in opposition to this rule, there is a reasonable possibility that this rule will be subject to litigation challenges. The Department has determined that this rule implements and is fully consistent with governing law. However, in the event any provision of this rule, an amendment or revision made by this rule, or the application of such provision or amendment or revision to any person or circumstance, is held to be invalid or unenforceable by its terms, the remainder of this rule, the amendments or revisions made by this rule, and the application of the provisions of such rule to any person or circumstance shall not be affected and shall be construed so as to give them the maximum effect permitted by law. The Supreme Court has explained that where specific provisions of a rule are unlawful, severance is preferred when doing so "will not impair the function of the [rule] as a whole, and there is no indication that the regulation would not have been passed but for its inclusion." *K Mart Corp.* v. *Cartier, Inc.,* 486 U.S.

281, 294 (1988); *see also Sw. Elec. Power Co.* v. *EPA,* 920 F.3d 999, 1033 (5th Cir. 2019) (vacating only challenged portions of a rule). It is the intent of the Department that each and every provision of this regulation be severable from each other provision to the maximum extent allowed by law.

For example, if a court invalidates a particular subpart of § 478.78 of the final rule concerning the liquidation or transfer procedure of former licensees, that invalidation would have no effect on other subparts of § 478.78 or the rest of the final rule and its provisions, which should remain in effect. The Department's intent that sections and provisions of the final rule can function independently similarly applies to the other portions of the rule.

## VI. Statutory and Executive Order Review

Subsections in Section VI

A. Executive Orders 12866, 13563, and 14094
B. Executive Order 13132 (Federalism)
C. Executive Order 12988 (Civil Justice Reform)
D. Regulatory Flexibility Act
E. Small Business Regulatory Enforcement Fairness Act of 1996
F. Congressional Review Act
G. Unfunded Mandates Reform Act of 1995
H. Paperwork Reduction Act of 1995

*A. Executive Orders 12866, 13563, and 14094*

Executive Order 12866 (Regulatory Planning and Review) directs agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 (Improving Regulation and Regulatory Review) emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. Executive Order 14094 (Modernizing Regulatory Review) amends section 3(f) of Executive Order 12866.

OMB has determined that this proposed rule is a "significant regulatory action" under Executive Order 12866, as amended by Executive Order 14094, though it is not a significant action under section 3(f)(1) of Executive Order 12866. Accordingly, the rule has been reviewed by OMB. While portions of this rule merely incorporate the BSCA's statutory definitions into ATF's regulations, this rule will likely result in additional unlicensed persons becoming FFLs to the extent that currently unlicensed

persons intend to regularly purchase and resell firearms to predominantly earn a profit.

1. Need for Federal Regulation

This final rule implements the BSCA by incorporating statutory definitions into ATF's regulations and clarifying the criteria for determining when a person is "engaged in the business" requiring a license to deal in firearms. The rulemaking is necessary to implement a new statutory provision that alters the definition of being engaged in the business as a wholesale or retail firearms dealer; to clarify prior regulatory provisions that relate to that topic; and to establish by regulation practices and policies on that issue. In addition to establishing specific, easy-to-follow standards regarding when buying and selling firearms presumptively crosses the threshold into being "engaged in the business," the rule also recognizes that individuals are allowed by law to occasionally buy and sell firearms for the enhancement of a personal collection or a legitimate hobby without the need to obtain a license. As discussed in detail under this rule's Background discussion (Section II.D of this preamble), in the Benefits section of this economic analysis (Section VI.A.7 of this preamble), throughout Section III discussing each revision as it was originally proposed, in the Department's responses to comments under Section IV of this preamble, and in other portions of this rule, the changes in this rule—like the statutory provisions they implement—were designed to address public safety needs. Specifically, this rulemaking implements the statutory changes enacted by Congress in the BSCA, which Congress passed in the interest of public safety after at least one mass shooting in which the perpetrator purchased a firearm from an unlicensed dealer. Congress was also concerned with prohibited persons receiving firearms without background checks and significant increases in straw purchasing and firearms trafficking, all of which increase public risk of gun violence and occur more frequently when persons dealing in firearms are unlicensed. Unlicensed dealers also hinder law enforcement efforts to track and curb these prohibited and endangering activities. Congress deemed those public safety needs compelling enough, and the private market response insufficient, such that it was necessary to pass a law to address them. This rule is necessary to further address those same public safety needs and implement Congress's statutory

APPX.103

response. Executive Order 12866 [254] permits agencies to promulgate rules that are necessary to interpret the law or are necessary due to compelling need, which includes when private markets are not protecting or improving public health and safety. This rule is necessary on both grounds. The Department considered other alternatives to rulemaking and determined they would be insufficient to meet its articulated public safety needs or to fully interpret and implement the law.

2. Population

This rule implements a statutory requirement that affects persons who repetitively purchase and resell firearms, including by bartering, and are required to be, but are not currently, licensed. As described in the preamble of this final rule, these may be persons who purchase, sell, or transfer firearms from places other than traditional brick-and-mortar stores, such as at a gun show or event, flea market, auction house, or gun range or club; at one's home; by mail order, or over the internet (*e.g.,* an online broker, online auction); through the use of other electronic means (*e.g.,* text messaging service or social media raffle); or at any other domestic or international public or private marketplace or premises. A person may be required to have a license to deal in firearms regardless of where, or the medium through which, they purchase or sell (or barter) firearms, including locations other than a traditional brick-and-mortar store.

Furthermore, because those willfully engaged in the business of dealing in firearms without a license are violating Federal law, these individuals often take steps to avoid detection by law enforcement, making it additionally difficult for the Department to precisely estimate the population. Therefore, for purposes of this analysis, the Department used information gleaned from Armslist, an online broker website that facilitates the sales or bartering of firearms, as a means of estimating a population of unlicensed persons selling firearms using online resources.[255] The Department focused its efforts on estimating an affected population using Armslist since that website is considered to be the largest source for unlicensed persons to sell firearms on the internet.[256]

Out of a total listing of 30,806 entries in the "private party" category (unlicensed users) on Armslist, the Department viewed a random sample [257] of 379 listings, and found that a given seller on Armslist had an average of three listings per seller.[258] Based on approximately 30,806 "private party" (unlicensed) sales listings on Armslist, the Department estimates that there are approximately 12,270 unlicensed persons who sell on that website alone, selling an average of approximately three firearms per user.[259] The Department estimates that Armslist may hold approximately 30 percent of the market share among websites that unlicensed sellers may frequent. This means the 12,270 estimated unlicensed persons on Armslist would be about 30 percent of all such online sellers, and that the estimated number of unlicensed sellers on all such websites would therefore be approximately 40,900 nationwide. The estimate of Armslist's market share is based on ATF Firearms Industry Programs Branch ("FIPB") expert opinion, news reports,[260] and public web traffic lists.[261] This estimate of the online market share proportion held by Armslist has been revised downward from the initial estimate of 50 percent used in the NPRM, based on public comment and additional data sources that supported attributing a larger share of the unlicensed firearm market to GunBroker than had originally been estimated. GunBroker had been originally included with other smaller platforms within the remaining (non-Armslist) 50 percent of the online

market. However, due to the new estimates of GunBroker's proportion of the online market share, the Department has increased its estimated total market share for the non-Armslist platforms (inclusive of GunBroker) to 70 percent of the online marketplace.

To better estimate both online and offline sales, the Department assumes, based on best professional judgment of FIPB SMEs [262] and with limited available information, that the national online marketplace estimate above might represent 40 percent of the total national firearms market, which would also include in-person, local, or other offline transactions like flea markets, State-wide exchanges, or consignments to local FFLs within each of the 50 States. This estimate of the online marketplace has been revised upwards from the 25 percent estimate that was published in the NPRM to 40 percent in the final rule, based on more in-depth SME questioning in the course of reviewing each aspect of the models due to public comments about other parts of the models. Given the lack of data on the question of online avenues for unlicensed firearm sales, and the illicit nature of firearms trafficking, the limited empirical inputs that exist must be contextualized using qualitative and subjective assessments by industry experts. ATF also solicited additional opinions from the public and incorporated those that were found to be credible into the Department's population model.

While the above analysis would bring the total estimated market of unlicensed sellers to approximately 102,250 persons,[263] this figure must be reduced by the estimated subset of this population of persons who occasionally sell their firearms without needing to obtain a license (*e.g.,* as part of their hobby or enhancement of their personal collection). The Department assumes this subset of unlicensed sellers constitutes the majority of the unlicensed seller market, based on estimates from FIPB SMEs. Based on limited available information, the best assessment from FIPB SMEs is that, based on their long-time experience with the firearms industry, at least 25 percent of the estimated total number of

[254] *See also* OMB Circular A–4 at 5, *https:// www.whitehouse.gov/wp-content/uploads/legacy_ drupal_files/omb/circulars/A4/a-4.pdf.*

[255] *See www.armslist.com.*

[256] Colin Lecher & Sean Campbell, *The Craigslist of Guns: Inside Armslist, the online 'gun show that never ends,'* The Verge (Jan. 16, 2020). *https:// www.theverge.com/2020/1/16/21067793/guns-*

*online-armslist-marketplace-craigslist-sales-buy-crime-investigation* ("Over the years, [Armslist] has become a major destination for firearm buyers and sellers."); Tasneem Raja, *Semi-Automatic Weapons Without a Background Check Can Be Just A Click Away,* National Public Radio (June 17, 2016), *https://www.npr.org/sections/alltechconsidered/ 2016/06/17/482483537/semi-automatic-weapons-without-a-background-check-can-be-just-a-click-away* ("Armslist isn't the only site of its kind, though it is considered to be the biggest and most popular.").

[257] In accordance with standard practice, to estimate the sample size, the Department assumed the largest standard deviation (0.5 or 50 percent) to obtain the most conservative (largest) sample size.

[258] Using an online sample size calculator, the Department determined that a statistical sample for a universe of 30,806 listings would require a sample size of 379, using a 95 percent confidence level and a confidence interval of five. A random sample of 379 was gathered between March 1 and 2, 2023. *Sample Size Calculator,* Calculator.net (last accessed April 8, 2024), *https://www.calculator.net/ sample-size-calculator.html.*

[259] 12,270 unlicensed individuals = 30,806 "private party" unlicensed listings on Armslist/2.51 average listings per user.

[260] *See* footnote 256, *supra.*

[261] Such lists are available at *https:// www.similarweb.com/website/armslist.com/ #overview.*

[262] Experts were identified within ATF and interviewed in a group setting to reach a consensus. These conclusions were validated based on best professional estimates by additional ATF personnel, who are familiar with the field and with the industry, until a reasonable estimate was accepted by all of them. *See* OMB Circular A–4 at 41.

[263] The Department's online estimate of 40,900 individuals is equal to at least 40 percent of the national firearms market. Thus, 100 percent of that estimated firearms market would be 40,900/.4 = 102,250.

unlicensed sellers may be considered "engaged in the business" under this rule and would subsequently need to become an FFL in order to continue repetitively selling firearms. The actual number may be higher or lower, and the Department does not have data to support a higher number, but FIPB SMEs do expect their estimate to be conservative and closer to the lower end of a possible range. Using the information gleaned from Armslist and multiplying it according to these estimated percentages, the Department estimates that 25,563 unlicensed persons may be classified as engaged in the business of firearms dealing and thus affected by this rule, an upward revision from the 24,540 estimate included in the NPRM.

Finally, the Department has introduced an additional assumption into its revised model: the proportion of unlicensed persons who would be considered "engaged in the business" under this rule but who are unwilling or unable to become FFLs and will instead choose to cease their dealing in firearms altogether. These persons may choose this option due to the new requirements, other disincentives such as costs or discomfort with inspections, prohibitions or restrictions in their respective State or local laws, ordinances or HOA rules, or other reasons. Based on the public's responses to previously published firearms rules and regulations, Department SMEs estimate that this group constitutes approximately 10 percent of all currently unlicensed sellers who would be required to obtain a license under this rule. Removing this segment from the total population of 25,563 persons affected by this rule results in an estimated 23,006 unlicensed persons engaged in the business of firearms dealing who would, under the rule, apply for licenses in order to continue repetitively selling firearms.

Because there is no definitive data on this topic, the actual number of unlicensed sellers may be higher. Therefore, the Department also calculated a second possible estimate using information published by RSF based on a survey it conducted regarding a similar, but differently sourced, estimated population of private sellers of firearms.[264] This survey showed that 22 percent of the U.S. adult population owned at least one firearm

(56.84 million adults).[265] In the NPRM, the Department used this 22 percent figure, applied to the U.S. Census as a basis for the population, to calculate this second population estimate of individuals owning firearms. However, one public commenter suggested the Department use a more recent survey (Gallup Survey, published in 2020), which showed that the number of U.S. adults owning firearms was 32 percent.[266] The Department concurred and has updated the estimated population of individuals owning a firearm from 22 to 32 percent (82.7 million individuals) in this second model.[267] However, the Department continues to use the RSF survey data for the remaining estimates, such as number of transactions, because the Department still considers that survey to provide the best available data, and no other sources were provided by public commenters.

The RSF survey found that 5 percent of the total population transferred firearms in some manner over the course of five years, or an annualized total of 1 percent of owners (826,699 individuals).[268] Of the owners that transferred a firearm, 71 percent did so by selling (586,956 individuals). Of those that sold a firearm, 51 percent (299,348 individuals) sold through various mediums (*e.g.,* online, pawnshop, gun shop) other than through or to a family member or friend (which likely would not be affected by this rule).[269] Of the owners that

transferred a firearm, an additional 10 percent (82,670) did so by trading or bartering rather than selling. Thus, taking the 299,348 that sold and the 82,670 that traded or bartered according to these survey results, the total number of unlicensed persons that might transfer a firearm through a manner that could be affected by this rule is 382,018. Of the 382,018 unlicensed persons selling, trading, or bartering firearms under this RSF-derived estimate, the Department continues to estimate (as it did in the SME-derived estimate described above) that 25 percent (or 95,505 unlicensed individuals) may be engaged in the business of firearms dealing with an intent to profit and thus potentially affected by this rule. Consistent with the modification introduced in the SME-derived model, the Department also reduced this estimate by 10 percent to account for the proportion of unlicensed persons unwilling or unable to become FFLs as required by this rule. This brings the estimated population of unlicensed persons "engaged in the business" who would obtain licenses in order to continue selling under this rule to 85,954 using this RSF/Gallup-derived model.

In sum, based on the limited available sources of information, the Department estimates that either 23,006 or 85,954 could represent the number of currently unlicensed persons who might be engaged in the business as defined in this rule, and who would obtain a license to continue engaging in the business of dealing in firearms in compliance with the rule. The SME-derived estimate of 23,006 is based on real historical data and experience with relevant sales activities, combined with sampling from an online sales site and ATF's law enforcement and regulatory experience. Because of this, the Department considers the SME-derived estimate to be a more reliable data source than the RSF/Gallup estimate and uses it as the primary estimate. Nevertheless, for purposes of this final analysis, the Department provides the estimated costs under both population estimates.

The first cost that may apply to both estimated populations is the cost of initial familiarization with the final rule. Given the widespread attention, awareness, and publicly available discourse on these and other firearm regulations, and the nature of the firearms community, existing firearms owners would not need to spend a greater amount of time researching regulations and becoming updated on these topics than they already do as a regular course of activity. The

---

[264] Azrael, D., Hepburn, L., Hemenway, D., & Miller, M. (2017). *The stock and flow of U.S. firearms: Results from the 2015 National Firearms Survey.* The Russell Sage Foundation Journal of the Social Sciences 3(5), 38–57 (pp. 39 and 51). *https://www.jstor.org/stable/10.7758/rsf.2017.3.5.02.*

[265] *Id.* at 39.

[266] *What percentage of Americans own guns?,* Gallup: The Short Answer (Nov. 13, 2020), *https://news.gallup.com/poll/264932/percentage-americans-own-guns.aspx.*

[267] 82,699,849.92 (rounded to 82,699,950, or 82.7 million) owners of firearms = 258,344,281 individuals living in the United States multiplied by 32 percent.

[268] 826,699 individuals transferring a firearm = 82,699,850 individuals owning a firearm multiplied by 1 percent.

[269] The RSF survey did not distinguish individuals who sold to family or friends on a recurring basis from those who made an occasional sale; nor did it distinguish between those who did so with intent to earn a profit from those who did not. As noted earlier in the preamble, a person who makes only occasional firearms transfers, such as gifts, to immediate family (without the intent to earn a profit or circumvent requirements placed on licensees), generally does not qualify as a dealer engaged in the business. Although it is possible that some portion of the RSF set of family and friend transferors might qualify as dealers if they engage in actions such as recurring transfers, transfers to others in addition to immediate family, or transfers with intent to profit, the survey did not provide enough information for the Department to make that determination. Therefore, the Department erred on the side of caution by assuming, for the purpose of this analysis, that the persons identified on the RSF survey as engaging in transfers to family and friends would likely not be affected by this rule, since, in general, such transfers are less likely to be recurring or for profit.

Department therefore assumed familiarization costs would be minimal for existing firearm owners and particularly for the affected population of sellers. Nevertheless, because of widespread attention and ATF outreach, among other efforts, the Department has costed a familiarization burden of approximately 12 minutes on all unlicensed sellers to account for the time they might spend gleaning guidance or accessing online blogs to determine whether the rule applies to them. Based on HHS's methodology for leisure time, the Department attributes a rounded value of $23 per hour for the estimated 12 minutes spent gaining familiarization with the rule, which amounts to an individual burden of $5 per unlicensed seller. Under the SME model, this cost would fall on all 102,250 sellers, while under the RSF model it would fall on all 382,018 sellers. Familiarization costs would amount to $470,350 in the first year of implementation under the primary SME model, and $1,757,283 in the first year under the alternative RSF model.

3. Costs for Unlicensed Persons Becoming FFLs

As stated earlier, consistent with the statutory changes in the BSCA, this rule implements a new statutory provision that requires individuals to become licensed dealers if they devote time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms. Costs to become an FFL include an initial application on Form 7, along with fingerprints, photographs, and a qualification inspection. This application requires fingerprints and photographs from the person applying and, in the case of a corporation, partnership, or association, from any other individual who is a responsible person of that business entity.

For purposes of this analysis, the Department assumes that most, if not all, unlicensed persons may be operating as sole proprietors because this new requirement would likely affect persons who have other sources of income and currently view dealing in firearms as a supplemental source of income not subject to a licensing requirement. Besides the initial cost of becoming an FFL, there are recurring costs to maintaining a license. These costs include renewing the license on a Federal Firearms License Renewal Application, ATF Form 8 (5310.11) ("Form 8") every three years, maintaining acquisition and disposition ("A&D") records, maintaining ATF Forms 4473, and undergoing periodic compliance inspections.

This rule, which further implements the statutory changes in the BSCA, would affect certain currently unlicensed persons who purchase and resell firearms with the intent to predominantly earn a profit (as defined), not those who are already licensed. Because affected unlicensed persons will need a license to continue to purchase and resell firearms, the Department estimates that the opportunity costs of acquiring a license would be based on their free time or "leisure time." For this final rule, the Department has updated its estimate of the cost for leisure time below, relying on a new HHS methodology for calculating that cost, rather than the DOT methodology it used in the NPRM.[270] The Department considers the HHS methodology to more accurately measure the value of "leisure time," for the purposes of this rule, than the DOT methodology used in the NPRM. Accordingly, consistent with HHS's methodology, the Department used the BLS median weekly income for full-time employees as the base for calculating the pre-tax hourly wage. The Department then used the proportion between Census publications on median household income and median household income after taxes to estimate the percent of State and Federal taxes (14 percent). This percent was deducted from the hourly pre-tax wage to derive the post-tax hourly wage, which becomes the leisure wage under the HHS methodology. Table 1 outlines the leisure wage.

BILLING CODE 4410–FY–P

---

[270] U.S. Dep't of Health and Human Servs., *Valuing Time in the U.S. Department of Health and Human Services Regulatory Impact Analyses: Conceptual Framework and Best Practices* 40–41 (June 2017), *https://aspe.hhs.gov/sites/default/files/private/pdf/257746/VOT.pdf.*

ATF 015385

APPX.106

**29074**    **Federal Register** / Vol. 89, No. 77 / Friday, April 19, 2024 / Rules and Regulations

### Table 1. Leisure Wage Rate for Individuals

| Inputs for Leisure Wage Rate | Numerical Inputs | Source |
|---|---|---|
| Median Weekly Wage | $1,085 | News Release, BLS, *Usual Weekly Earnings for Wage and Salary Workers – Fourth Quarter 2022* (Jan. 19, 2023), https://www.bls.gov/news.release/archives/wkyeng_01192023.pdf |
| Median Hourly Wage | $27 | Median Weekly Wage / 40 hours per week |
| Real Median Household Income Pre-Tax | $74,580 | U.S. Census Bureau, *Median Household Income After Taxes Fell 8.8% in 2022* (Sept. 12, 2023), https://www.census.gov/library/stories/2023/09/median-household-income.html |
| Real Median Household Income Post-Tax | $64,240 | U.S. Census Bureau, *Median Household Income After Taxes Fell 8.8% in 2022* (Sept. 12, 2023), https://www.census.gov/library/stories/2023/09/median-household-income.html |
| State and Federal Taxation | 14 percent | $64,240 post-tax median income / $74,580 pre-tax median income = 86 percent; 14 percent State and Federal Taxes = 100 percent - 86 percent |
| Leisure Wage | $23.36 | $23.36 Post-tax median wage = $27 Median hourly wage * (100 percent - 14 percent State and Federal Taxes) |
| Rounded Leisure Wage Rate | $23.00 | |

Based in part on HHS's methodology for leisure time, the Department attributes a rounded value of $23 per hour for time spent buying and reselling (including bartering) firearms on a repetitive basis. The same hourly cost applies to persons who will become licensed as a firearms dealer who would not have become licensed without the clarifications provided by this rule. This could include persons who begin selling firearms after the final rule's effective date and understand from the rule that they qualify as firearms dealers (as defined by the statute and regulations), or persons who were previously selling without a license and now realize they must acquire one to continue selling because their firearms transactions qualify them as dealers.

In addition to the cost of time, there are other costs associated with applying to become an FFL. To become an FFL, persons need to apply on a Form 7 and submit payment to ATF for fees associated with the Form 7 application. Furthermore, these unlicensed persons will need to obtain documentation, including fingerprints and photographs, undergo a background investigation, and submit all paperwork via mail. While not a cost attributed towards their first-year application to become an FFL, an FFL will need to reapply to renew their license every three years on a Form 8 renewal application to ensure that that they can continue to sell firearms thereafter. Table 2 outlines the costs to become an FFL and the costs to maintain a license.

ATF 015386
APPX.107

## Table 2. Cost Inputs to Become an FFL and Maintain a License

| Cost Input | Cost | Source |
|---|---|---|
| Form 7 Application Cost | $200 | Application for Federal Firearms License, ATF (Oct. 2020), https://www.atf.gov/firearms/docs/form/form-7-7-cr-application-federal-firearms-license-atf-form-531012531016/download |
| Fingerprint Cards | $0 | Distribution Center Order Form, ATF (Jan. 25, 2024), https://www.atf.gov/distribution-center-order-form |
| Fingerprint Cards (Commercial) | $24 | Various |
| Average Cost for Fingerprint Cards | $12 | See Above |
| Postage | $1 | Mailing and Shipping Prices, USPS, https://www.usps.com/business/prices.htm (last visited Mar. 30, 2024) |
| Photograph | $17 | Passport Photos, CVS, https://www.cvs.com/photo/passport-photos (last visited April 5, 2024) |
| | $17 | Passport Photos, Walgreens, https://photo.walgreens.com/store/passport-photos (last visited April 5, 2024) |
| FFL Renewal Cost (Form 8) | $90 | FFLC |

BILLING CODE 4410–FY–C

For purposes of this rule, the Department assumes that unlicensed persons applying for a license as a result of this rule are likely to file for a Type 01 Dealer license.[271] This license costs $200 and requires the submission of a Form 7 application; every three years thereafter, the licensee must pay $90 to renew the license using Form 8. Applicants also need to obtain and submit fingerprints in paper format. The unlicensed person can obtain fingerprint cards for free from the Department and travel to select law enforcement offices that perform fingerprinting services (usually also for

free). Or the unlicensed person may pay a fee to various market entities that offer fingerprinting services in paper format. The average cost found for market services for fingerprinting on paper cards is $24 (rounded).

Because it is not clear whether an unlicensed person would choose to obtain fingerprint cards from the Department and go to a local law enforcement office that provides fingerprinting services or use commercial services to obtain cards and fingerprinting services, an average cost of $12 was used. In addition to paper fingerprint cards, the unlicensed person must also submit a photograph

appropriate for obtaining a passport. The average cost for a passport photo is $17 (rounded). Once they complete the application and gather the documentation, unlicensed persons must submit the Form 7 package by mail. The Department rounds the first-class stamp rate of $0.63 to $1 for calculating the estimated mailing cost.

In addition to the direct costs associated with compiling documentation for a Form 7 application, the Department estimates the time burdens related to obtaining and maintaining a Federal firearms license. Table 3 outlines the hourly burdens to apply, obtain, and maintain a license.

---

[271] A Type 01 Dealer license is used to purchase and resell firearms at wholesale or retail.

**Table 3.  Hourly Burdens to Apply, Obtain, and Maintain a License**

| Activity Type | Hourly Burden | Source |
|---|---|---|
| Form 7 Application | 1 | Application for Federal Firearms License (atf.gov) |
| Form 8 Application | 0.5 | OMB 1140-0019 Justification |
| Time to Travel to and obtain Fingerprints | 1 | N/A |
| Time to Travel to and obtain Photograph | 0.5 | N/A |
| A&D Records | 0.05 | OMB 1140-0032 Justification |
| Form 4473 | 0.5 | OMB 1140-0020 |
| Qualification Inspection Time | 15 | Department internal case management system |
| Compliance Inspection Time | 34 | Department internal case management system |

As stated above, hourly burdens include one hour to complete a Form 7 license application and the time spent to obtain the required documentation. For purposes of this analysis, the Department assumes that vendors that offer passport photograph services are more readily available than places that provide fingerprinting services; therefore, the Department estimates that it may take 30 minutes (0.5 hours) to travel to a vendor and obtain a passport photograph, and up to one hour to travel to and obtain fingerprinting services. Other time burdens may include 0.05 hours (three minutes) to enter and maintain A&D records for each firearm transaction (0.3 hours for 6 transactions); 0.5 hours for maintaining a Form 4473 for each firearm sale (1.5 hours for 3 firearms); and 15 to 34 hours for an inspection (qualification or compliance, respectively).[272]

The Department then multiplied each of these hourly burdens by the $23 hourly leisure wage rate to account for the value of time spent applying for and obtaining a license using a Form 7 (including any other actions related to obtaining a license), then added the cost per item to determine a cost per action taken. Table 4 outlines the first-year costs to apply for an FFL.

**Table 4.  First-Year Costs to Obtain a Type 01 FFL**

| Cost Item | Hourly Burden | Hourly Wage Rate | Hourly Cost per Activity | Cost Item | Rounded Cost for Each Activity |
|---|---|---|---|---|---|
| Form 7 | 1 | $23 | $23 | $200 | $223 |
| Fingerprints | 1 | $23 | $23 | $12 | $35 |
| Passport Photo | 0.5 | $23 | $12 | $17 | $29 |
| Postage | N/A | $23 | N/A | $1 | $1 |
| Form 4473 | 1.5 | $23 | $35 | | $35 |
| A&D Records | 0.3 | $23 | $7 | | $7 |
| Qualification Inspection | 15 | $23 | $345 | $0 | $345 |
| First Year Cost | | | | | $675 |

---

[272] These inspection times are an average of all currently regulated FFLs, including small and large dealers and manufacturers, and are not necessarily representative of the time involved in inspecting small dealers.

Overall, the Department estimates that it would cost an unlicensed person $675 in terms of time spent and fees paid to apply under a Form 7 to become a Type 01 FFL. The Department considers the $675 to be an unlicensed person's initial cost. In addition to their initial cost, the newly created FFL would need to maintain a Form 4473 and A&D records (two entries per firearm: one entry to purchase and one entry to sell) for every firearms transaction, undergo periodic compliance inspections, and renew their license every three years (ATF Form 8 application). Table 5 outlines the cost per recurring activity to maintain an FFL.

### Table 5. Recurring Costs to Maintain an FFL

| Cost Item | Number of Entries or Applications | Hourly Burden | Hourly Wage Rate | Hourly Cost | Cost Item | Rounded Cost for Each Activity |
|---|---|---|---|---|---|---|
| Form 8 Renewal Cost | 1 | 0.5 | $23 | $12 | $90 | $102 |
| Form 4473 | 3 | 0.5 | $23 | $35 | | $35 |
| A&D Records | 6 | 0.05 | $23 | $7 | | $7 |
| Inspection Time | 1 | 34 | $23 | $782 | | $782 |
| Recurring Costs | | | | | | Varies by Year |

While renewing a license under a Form 8 application occurs every three years, there are additional costs associated with Form 4473 and A&D records that may occur more often. There are also costs from compliance inspections that may occur periodically. The Department notes that an FFL's actual number of firearms sales may range from zero sales to more than three per year. Persons engaged in the business of dealing in firearms can sell anywhere from a few firearms to hundreds per year, depending on the size of their operation and other factors. Information on these factors or on the number of sellers who might be at each level is not available. However, the average number of listings per seller on Armslist was three. So, for purposes of this economic analysis only, the Department uses three firearms (six A&D entries) per year to illustrate the potential costs that a person may incur as a result of this rule. Although a person might not resell a given firearm in the same year they purchase it, for the purposes of these estimates the Department includes both ends of the firearm transaction because the person could buy and sell the same firearm, or buy one and sell a different one in a given year.

As for compliance inspections, based on information gathered from ATF's Office of Field Operations, the frequency of such inspections varies depending on the size of the area of operations and the number of FFLs per area of operations. Overall, the Department estimates that it inspects approximately 8 percent of all existing FFLs in any given year. In the chart above, ATF has indicated the cost of an inspection, which would normally not occur more than once in a given year per FFL. ATF performs compliance inspections annually, so while every single FFL does not necessarily undergo a compliance inspection every year, this analysis includes an annual cost for inspections to account for a subset of the total number of affected FFLs that may be inspected in any given year (8 percent). The Department estimates that it would cost $782 for the time an individual will spend on a compliance inspection in a given subsequent year. Therefore, this individual would incur annually recurring costs that could range from a low of $42 a year to complete Forms 4473 and maintain A&D records, to a high of $926 to include that $42, Form 8 renewal costs ($102), and compliance inspection time ($782).[273]

In addition to the cost burdens of becoming licensed at the Federal level, persons who are currently engaged in the business as a dealer without a license under the Federal definition may reside in a State that either defines a dealer at the State level by linking it to the Federal statutory definition, or that requires any Federal dealer licensee to also become licensed as a dealer with the State. While this rule does not impose costs on States and does not directly impact whether persons must be licensed under State requirements, in the case where States have tied their dealer licensing requirements to Federal statutory licensing requirements, this rule indirectly causes new Federal licensees in those States to also incur State dealer licensing costs because they are incurred due to BSCA's amendments to the GCA. The Department accounts for such costs for that segment of the affected population in this final rule.

The Department found that State-level licensing linked to or contingent on Federal firearms licensing was required by State and local laws in ten states and the District of Columbia (DC).[274] Five of

---

[273] The Department notes that the high $926 estimate may be higher than actual costs because it assumes that an FFL would simultaneously renew their license (which occurs every three years) in the same year that they perform a compliance inspection, which typically occurs only periodically.

[274] Giffords Law Center surveyed all 50 States and the District of Columbia to determine which States have laws regulating firearms dealers. They determined that 26 States and DC have such laws. Of those with laws regulating dealers, Giffords Law Center found that 16 States and DC require persons dealing in firearms to obtain a State dealers license.
Continued

those States and DC required licensing for dealing in any type of firearms, and the other five States required licensing only for dealing in handguns. For the purposes of this analysis, the Department grouped all such States together as imposing additional licensing costs, such that all 11 jurisdictions were included in the cost analysis where data was available. The respective populations of each of these jurisdictions as a percentage of the total U.S. population were aggregated to a total of 29.08 percent. This total was applied to the populations estimated to be EIB under both the primary SME model and the alternative RSF model to estimate how many sellers affected by this rule at the Federal level would incur the additional State licensure costs as well. The respective State populations were also used as weights to their respective licensure costs, which ranged from 50 cents to $300 a year, in order to determine a weighted average cost per seller, which was $73.37 per year, rounded to $73.00 for calculations. The Department estimated a processing time of one hour of leisure time, since the application forms ranged from one to five pages, while maintaining the same dollar postage cost as for FFLs. Both photograph and fingerprint costs were assumed to be accounted for when securing both for FFL applications, as they are frequently secured in pairs. These costs are outlined in Table 6.

## Table 6. State dealer licensing costs flowing from this rule

| State | 12-Year Cost[275] | Annualized 12 year | Percent of US Population | Weighted Average: 12–Year annualized |
|---|---|---|---|---|
| Alabama | $ 6.00 | $0.50 | 1.499 | $0.75 |
| California | $1,380.00 | $115.00 | 11.800 | $1,357.00 |
| Connecticut | $400.00 | $33.33 | 1.076 | $35.87 |
| Delaware | $1,370.00 | $114.17 | 0.295 | $33.68 |
| District of Columbia | $3,600.00 | $300.00 | 0.206 | $61.80 |
| Illinois | $750.00 | $62.50 | 3.824 | $239.00 |
| New Hampshire | $1,200.00 | $100.00 | 0.411 | $41.10 |
| Pennsylvania | $120.00 | $10.00 | 3.881 | $38.81 |
| Washington | $1,500.00 | $125.00 | 2.300 | $287.50 |
| Indiana | $120.00 | $10.00 | 2.025 | $20.25 |
| Wisconsin | $120.00 | $10.00 | 1.759 | $17.59 |
| **Total** | | **$880.50** | **29.08** | **$2,133.35** |
| **Average** | | | | **$73.37** |

The $73.37 average State costs, rounded to $73, were combined with the hour burden and postage cost, resulting in a total per-seller cost of $97. This total per-seller cost was applied to 29.08 percent of the EIB population, resulting in an estimated 6,689 sellers under the SME-derived model and 24,992 sellers under the RSF-derived model. This adds a total of $648,862 and $2,424,237 in annual costs for State dealer licenses, respectively.

### 4. Costs for FFLs After Termination of License

This rule is also designed to enhance compliance by former FFLs who no longer hold their licenses due to license revocation, denial of license renewal, license expiration, or surrender of license but nonetheless engage in the business of dealing in firearms. Under existing standards, such persons sometimes transfer their inventory to their personal collections instead of selling or otherwise disposing of the firearms to a licensed importer, licensed manufacturer, or licensed dealer for sale, auction, or pawn redemption. This rule clarifies what dispositions of former licensee inventory former FFLs may make after their license is terminated. The former licensee may transfer their business inventory within 30 days, or occasionally thereafter, to another licensee if they meet the requirements set out in the new provisions under 27 CFR 478.57 or 478.78. Another possibility is that the licensee may transfer their business inventory within 30 days to themselves in a personal capacity—called a ''former licensee inventory'' in the final rule. After that time, the firearms may be sold

See Giffords Law Center to Prevent Gun Violence, *Gun Dealers, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/gun-dealers/* (last accessed Mar. 30, 2024). The Department researched requirements it could access online for those 16 States and DC and determined that 10 of those 16 States, and DC, either link their definition of a dealer at the State level to the Federal

definition of dealer or require a person selling firearms with a Federal firearms license for dealers to also obtain a State dealers license. The Department used the information on those 10 States and DC to calculate the costs in this section.

[275] Several States had 3- or 6-year renewal windows/validity periods rather than annual licensing costs. Using a 10-year horizon underestimates the cost burden in those cases, particularly for the States that had a 6-year validity window. The Department therefore calculated the total for 12 years for each State before annualizing them to find the weighted average.

ATF 015390

APPX.111

only occasionally to a licensee or the former dealer risks being presumed to be "engaged in the business" of dealing without a license. In that case, former FFLs who sell such firearms would potentially be in violation of the statutory prohibitions (18 U.S.C. 922(a)(1)(A) and 923(a), (c)) on unlicensed dealers.

The various means by which a license can be terminated—revocation of a license, denial of license renewal, license expiration, or surrender of license—present two categories of affected populations. Group 1, comprising individuals who have their license revoked or are denied license renewals, could be described as former FFLs who have failed to comply with existing regulations and requirements to a degree that resulted in the revocation or denial of their licenses. This rule is likely to have a qualitative impact on this group because a revocation or denial may not provide ample opportunity for an orderly and planned liquidation or transfer of inventory before losing the license, which may therefore be disruptive. Based on data from the FFLC, such FFL license revocations and non-renewals are rare, with an annual average of 76 licenses revoked or denied renewal over the past five years (with a range between 14 and 180),[276] or a de minimis percentage of 0.093 percent of all active FFLs.[277] Furthermore, the economic impact of transferring inventory to another FFL instead of the former FFL holder retaining the inventory is unclear, as the

underlying market value of the inventory is unchanged by this rule's requirements. Additional factors surrounding the potential cost of no longer being able to transfer one's business inventory after the first 30 days post-license termination are also unknown and presumed to be similarly *de minimis*. Therefore, the Department believes there are no quantitative impacts associated with this population. Although ATF requested public comments on the potential impacts on former FFLs with revoked licenses, ATF did not receive any data from which to assess such potential costs.

Group 2, comprising individuals who surrender their license or let it expire, captures those who no longer have a license for discretionary or lawful reasons. This group also comprises former FFLs that choose to close or to sell their business to another party. They are similarly excluded from expected impacts attributable to this rule: because the closure is planned, it is likely that the FFL will include reasonable considerations for orderly, lawful liquidation or inventory transfer as part of closing or selling their enterprise. Such considerations are also likely to occur ahead of, rather than subsequent to, the expiration or surrender of their license. As a result, the Department assumes that the options that exist under current standards—transferring business inventory to the licensee's personal collection or selling business inventory to another FFL—would similarly be freely available to Group 2 FFLs under this rule. As a result, we are excluding both groups from the affected population.

### 5. Government Costs

In addition to the private costs to unlicensed persons, ATF will incur additional work due to the increase in Form 7 and Form 8 applications for unlicensed persons who become FFLs, which would be offset by the fees received with FFL applications ($200) and renewals ($90). Based on information gathered from the FFLC, which processes and collects the fees for FFL applications, various contractors and Federal Government employees process Form 7 and 8 applications, verify and correct applications, and

further process them for background checks and approval.

Based on information provided by the FFLC, the average hourly rate for contracting staff, including benefits, is $13.29.[278] To determine the wage rates for Federal employees, the Department used the wage rates set forth in the General Schedule ("GS"). At any level within the GS, step 5 is used as an average wage rate per activity. Government processing activities range from an entry level Federal employee between a GS–5/7, upwards to a GS–13.[279] To account for fringe benefits such as insurance, the Department estimated a Federal load rate using the methodology outlined in the Congressional Budget Office's report comparing Federal compensation to private sector compensation. It states that total compensation to Federal workers, factoring in both wages and benefits, is 17 percent higher than for similar private sector workers' benefits (or a multiplier factor of 1.17).[280] The Department calculated private sector benefits from the BLS (in 2022) and determined that the overall private sector benefits are 41.9 percent in addition to an hourly wage, or a load rate of 1.419. This makes the Federal load rate 1.66 above the hourly wage rate (after applying the 1.17 multiplier).[281]

Table 7 outlines the Government costs to process a Form 7 application to become an FFL.

---

[276] Data on FFL revocations and denials of renewal has been updated from the NPRM to cover 2018 through 2023.

[277] The Department did not reduce the estimated number of persons affected by this EIB rule to account for this reduction of FFLs that may have their license revoked, denied, expired, or surrendered because historically, the number of FFLs has been stable over time. This means that the increase and decrease of FFLs have been relatively equal to each other. Because the Department is not calculating an increase of population over time, the Department did not calculate a decrease of population over time. Additionally, for the existing number of FFLs, the number of revoked/denied renewals annually is 0.093 percent of all active FFLs. Therefore, applying this percentage to the estimated EIB population above (23,006) will affect a very small number (21) of the estimated EIB FFL population. For both of these reasons, the Department believes that any change in cost would be *de minimis* and would overestimate a decrease in population where the population has been held as constant in this analysis.

[278] The Department notes that because the contracting salary is a loaded wage rate, a base wage rate (not including benefits) was not included in Table 7 below.

[279] Off. of Pers. Mgmt, *OPM Salary Table 2023 For the Locality Pay Area of Washington-Baltimore-Arlington, DC–MD–VA–WV–PA* (effective Jan. 2023), *https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2023/DCB_h.pdf.*

[280] Cong. Budget Off., *Comparing the Compensation of Federal and Private-Sector Employees, 2011 to 2015* (Apr. 2017), *https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/52637-federalprivatepay.pdf.*

[281] 1.66 Federal load rate = 1.416 private industry load rate * 1.17 multiplier factor. BLS Series ID CMU2010000000000D,CMU2010000000000P (Private Industry Compensation = $37.15)/BLS Series ID CMU2020000000000D, CMU2020000000000P (Private Industry Wages and Salaries = $26.23) = 1.416. BLS average 2021. U.S. Bureau of Labor Statistics (2021), Database for Employee Compensation, *https://data.bls.gov/cgi-bin/srgate.*

**Table 7. Hourly Burden and Costs to Process a New Application for an FFL**

| Government Costs to Process FFL Applications | Hourly Burden | Staffing Level | Hourly Wage | Loaded Hourly Wage | Rounded Cost |
|---|---|---|---|---|---|
| Average Contracting Time to Prepare and Enter Application | 0.5 | Contracting Staff | N/A | $13.29 | $7 |
| Processing Time for New Applications | 1 | GS 10 | $38.85 | $64.49 | $64 |
| Processing Time for Fingerprint Cards | 2 | GS 12 | $51.15 | $84.91 | $170 |
| Qualification Inspection Time (Includes Travel) | 17 | GS 5/7 to GS 13 | $37.65 | $62.50 | $1,062 |
| Subtotal | | | | | $1,303 |
| Fees Received from New Application | | | | | ($200) |
| Total | | | | | $1,103 |

Based on the hourly burdens and the hourly wage rates for various contract and Federal employees, the Department estimates that it would take on average 20.5 hours to process a Form 7 application, at a cost of $1,303 per application. This would be offset by the new $200 application (Form 7) fee paid to the government, for an overall net cost to the government of $1,103 per application as a result of this rule. Form 8 application renewals are estimated to cost $71 every three years (or $1,303 less the $1,062 inspection time and the $170 fingerprint costs). However, the cost to review a Form 8 application ($71) is offset by the renewal fee of $90 (which is set by statute), making the net cost or overall savings to Government for this rule $19 per FFL renewal (subsequently represented in this analysis as ¥$19).

In addition to processing Form 7 applications, ATF IOIs will need to perform qualification and compliance inspections. The qualification inspection occurs once during the application process and is accounted for in Table 7 above. But, as discussed above, there is a recurring compliance inspection after the person becomes a licensee. For both the qualification and compliance inspections, the Department notes that the respective 17-hour or 36-hour inspection time estimates for the Government are more than the inspection time for the private sector, as discussed above, because the Department is including travel time for an IOI to travel to the person's location. Based on the hourly burdens and wage rates of IOIs, the Department anticipates that it costs ATF $2,250 to perform a compliance inspection.

Table 8 outlines the recurring Government costs to inspect an FFL.

**Table 8. Recurring Government Costs to Inspect an FFL**

| Government Annually Recurring Costs | Hourly Burden | Staffing Level | Hourly Wage | Loaded Hourly Wage | Rounded Cost |
|---|---|---|---|---|---|
| Compliance Inspection Time | 36 | GS 5/7 to GS 13 | $37.65 | $62.50 | $2,250 |

To summarize the overall Government costs, Table 9 outlines the Government costs to process Form 7 applications, process Form 8 renewal applications, and conduct FFL compliance inspections.

**Table 9. Summary of Government Costs per Action**

| Government Costs per Unlicensed Individual | Cost |
|---|---|
| Per Application Cost | $1,103 |
| Per Renewal Cost | -$19 |
| Per Compliance Inspection Cost | $2,250 |

ATF 015392

APPX.113

The Department estimates that the Government costs of this rule include the initial application cost that occurs in the first year (including the qualification inspection), renewal costs that typically occur every three years after the first year, and the cost for the Government to conduct a compliance inspection of an FFL in a given year (the Government currently conducts compliance inspections of approximately 8 percent of FFLs per year).

6. Total Cost

The total costs take into account the familiarization burden, State and Federal private licensing costs, and Government costs to process and support the increase in licensing of this rule, as described above in Section VI.A.3 and VI.A.5 of this preamble. The Department estimates that the initial application cost (Form 7 and initial inspection) occurs in the first year, that renewal costs (Form 8 renewals) occur every three years after the first year, and that completion and maintenance of Forms 4473 and A&D records and compliance inspection costs (for a subset of FFLs affected by this rule) occur annually. Tables 10 to 13 illustrate the quantitative 10-year familiarization, Federal, and State licensing costs of this final rule. As discussed above, qualitative costs have been identified but were unable to be quantified for the *de minimis* proportion of FFLs that will have their licenses revoked for failure to comply with existing regulations. Qualitative costs have also been identified but not quantified for the estimated 10 percent of unlicensed sellers currently engaged in the business (or between 2,550 and 9,550 individuals) that are assumed to be unwilling or unable to become licensed as required by this rule. These individuals are expected to cease selling firearms altogether by choice or as a result of State or local restrictions acting as obstacles to their becoming FFLs.

Tables 10 and 11 provide the 10-year costs using the SME-derived estimate.

BILLING CODE 4410–FY–P

### Table 10. Total 10-Year Licensing Costs of Rule Based on SME-Derived Estimate

| Year | Familiarization | FFL Costs | State FL | Government Cost | Total |
|---|---|---|---|---|---|
| 1 | $470,350 | $15,529,219 | $648,862 | $25,375,894 | $42,024,325 |
| 2 | | $2,405,925 | $648,862 | $4,142,250 | $7,197,037 |
| 3 | | $2,405,925 | $648,862 | $4,142,250 | $7,197,037 |
| 4 | | $4,752,562 | $648,862 | $3,705,131 | $9,106,555 |
| 5 | | $2,405,925 | $648,862 | $4,142,250 | $7,197,037 |
| 6 | | $2,405,925 | $648,862 | $4,142,250 | $7,197,037 |
| 7 | | $4,752,562 | $648,862 | $3,705,131 | $9,106,555 |
| 8 | | $2,405,925 | $648,862 | $4,142,250 | $7,197,037 |
| 9 | | $2,405,925 | $648,862 | $4,142,250 | $7,197,037 |
| 10 | | $4,752,562 | $648,862 | $3,705,131 | $9,106,555 |
| **Total** | **$470,350** | **$44,222,455** | **$6,488,620** | **$61,344,787** | **$112,526,202** |

### Table 11. Total 10-Year Costs of Rule Based on SME-Derived Estimate[282]

| Year | Total Undiscounted | Discount 3% | Discount 7% |
|---|---|---|---|
| 1 | $42,024,325 | $40,800,315 | $39,275,070 |
| 2 | $7,197,037 | $6,783,897 | $6,286,170 |
| 3 | $7,197,037 | $6,586,308 | $5,874,926 |
| 4 | $9,106,555 | $8,091,056 | $6,947,347 |
| 5 | $7,197,037 | $6,208,227 | $5,131,388 |
| 6 | $7,197,037 | $6,027,405 | $4,795,689 |
| 7 | $9,106,555 | $7,404,463 | $5,671,105 |
| 8 | $7,197,037 | $5,681,407 | $4,188,741 |
| 9 | $7,197,037 | $5,515,929 | $3,914,711 |
| 10 | $9,106,555 | $6,776,132 | $4,629,311 |
| **Total** | **$112,526,212** | **$99,875,142** | **$86,714,460** |
| **Annualized** | | **$11,708,413** | **$12,346,188** |

Tables 12 and 13 provide the 10-year licensing costs using the RSF-derived estimate.

### Table 12. Total 10-Year Licensing Costs of Rule Based on RSF-Derived Estimate

| Year | Familiarization | FFL Costs | State Licensing | Government Cost | Undiscounted |
|------|-----------------|-----------|-----------------|-----------------|--------------|
| 1 | $ 1,757,283 | $58,019,288 | $2,424,237 | $94,807,814 | $157,008,621 |
| 2 | | $8,987,121 | $2,424,237 | $4,142,250 | $15,553,608 |
| 3 | | $8,987,121 | $2,424,237 | $4,142,250 | $15,553,608 |
| 4 | | $17,754,480 | $2,424,237 | $2,509,115 | $22,687,832 |
| 5 | | $8,987,121 | $2,424,237 | $4,142,250 | $15,553,608 |
| 6 | | $8,987,121 | $2,424,237 | $4,142,250 | $15,553,608 |
| 7 | | $17,754,480 | $2,424,237 | $2,509,115 | $22,687,832 |
| 8 | | $8,987,121 | $2,424,237 | $4,142,250 | $15,553,608 |
| 9 | | $8,987,121 | $2,424,237 | $4,142,250 | $15,553,608 |
| 10 | | $17,754,480 | $2,424,237 | $2,509,115 | $22,687,832 |
| **Total** | **$1,757,283** | **$165,205,454** | **$24,242,370** | **$127,188,659** | **$318,393,766** |

### Table 13. Total 10-Year Licensing Costs of Rule Based on RSF-Derived Estimate[283]

| Year | Total Undiscounted | Discounted 3% | Discounted 7% |
|------|--------------------|----------------|----------------|
| **1** | $157,008,621 | $152,435,554 | $146,737,029 |
| **2** | $15,553,608 | $14,660,767 | $13,585,124 |
| **3** | $15,553,608 | $14,233,755 | $12,696,377 |
| **4** | $22,687,832 | $20,157,844 | $17,308,438 |
| **5** | $15,553,608 | $13,416,679 | $11,089,508 |
| **6** | $15,553,608 | $13,025,902 | $10,364,026 |
| **7** | $22,687,832 | $18,447,283 | $14,128,841 |
| **8** | $15,553,608 | $12,278,162 | $9,052,341 |
| **9** | $15,553,608 | $11,920,545 | $8,460,132 |
| **10** | $22,687,832 | $16,881,877 | $11,533,343 |
| **Total** | **$318,393,766** | **$287,458,372** | **$254,955,161** |
| **Annualized** | | **$33,698,891** | **$36,299,879** |

BILLING CODE 4410–FY–C

Overall, the total familiarization, Federal, and State licensing costs of this rule are $112.52 million over 10 years, which are annualized to $11.70 million at three percent discounting and $12.34 million at seven percent discounting under the SME-derived estimate. Meanwhile, under the RSF-derived estimate, the total familiarization, Federal, and State licensing costs of the rule are $318.39 million over 10 years, which are annualized to $33.69 million at three percent discounting and $36.29 million at seven percent discounting.

### 7. Benefits

By ensuring that ATF's regulatory definitions conform to the BSCA's statutory changes and can be relied upon by the public, this final rule will provide significant public safety benefits. The rule clarifies that persons who intend to predominantly earn a profit from the repetitive purchase and resale of firearms are engaged in the business of dealing in firearms. It also clarifies that such sellers must be licensed in order to continue selling firearms, even if they are conducting

---

[282] The "Undiscounted" column represents totals from the underlying costs. Consistent with guidance provided by OMB in Circular A–4, the "3 Percent Discount Rate" and "7 Percent Discount Rate" columns result from applying an economic formula to the number in each row of this "Undiscounted" column to show how these future costs over time would be valued today; they do not contain totals from other tables.

[283] The "Undiscounted" column represents totals from the underlying costs. Consistent with guidance provided by OMB in Circular A–4, the "3 Percent

Discount Rate" and "7 Percent Discount Rate" columns result from applying an economic formula to the number in each row of this "Undiscounted" column to show how these future costs over time would be valued today; they do not contain totals from other tables.

such transactions on the internet or through other mediums or forums. As part of the license application, those dealers will undergo a background check, as those who subsequently purchase a firearm from the licensed dealers.

The background check process for license applicants helps ensure that persons purchasing and selling (including bartering) firearms with the intent to earn a profit are not themselves prohibited from receiving or possessing firearms. It also correspondingly reduces the risk that those sellers engage in selling firearms to persons who are prohibited from receiving or possessing such firearms under Federal, State, local, or Tribal law—including violent criminals—because those prospective purchasers will also be subject to a background check. The NFCTA, a study conducted by ATF and a team of academic and other subject matter experts, concluded that "[i]ndividuals who are prohibited due to their criminal records or other conditions are unlikely to purchase directly from a licensed federal firearms dealer. Instead, prohibited persons determined to get crime guns acquire them through underground crime gun markets that involve unregulated transactions with acquaintances and illicit 'street' sources." [284] By clarifying when a person is engaged in the business of dealing in firearms, the rule helps ensure such persons obtain licenses and comply with the safeguards in the GCA. This thereby promotes public safety by reducing the number of firearms transferred to violent criminals and others whom Congress has determined are prohibited from receiving or possessing firearms. In particular, these safeguards reduce the danger to public safety that results when firearms are trafficked to criminals who are likely to use them to commit violent crimes. Finally, beyond reducing unlawful dealing of firearms to violent criminals, the safeguards applicable to licensees also help prevent the acquisition of firearms by those who may use a firearm to harm themselves,[285] or who allow

children to access them because they cannot make proper decisions concerning the acquisition, use, storage, and disposition of firearms and ammunition.[286]

The rule will also benefit public safety by enhancing ATF's ability to trace firearms recovered in criminal investigations. The GCA requires licensees to maintain records when they transfer a firearm to an unlicensed purchaser, commonly referred to as both the "first retail purchaser" and, if they are the only known sale, the "last known purchaser" (the tracing process may also identify additional unlicensed purchasers beyond this first retail purchaser, in which case one of these unlicensed purchasers would become the last known purchaser instead). When a firearm is recovered in a criminal investigation and submitted for tracing, ATF is often able to identify the last known purchaser through records maintained by the licensee, providing crucial leads in the underlying criminal investigation. When a firearm is transferred by an unlicensed person, however, such records rarely exist and, if such records do exist, they are not accessible to ATF through the tracing system. By helping increase compliance with the GCA's licensing and recordkeeping requirements, the rule will enhance ATF's capacity to complete crime-gun traces, thereby expanding the evidentiary leads ATF provides to law enforcement investigating crimes involving firearms, particularly violent offenses such as homicide, aggravated assault, armed robbery, and armed drug trafficking.

Moreover, because unlicensed dealers who are engaged in the business of selling firearms often deal in used firearms, the rule will also enhance the tracing of crime guns that have been recovered after an initial retail sale by an FFL. By facilitating licensure of those who engage in the business of dealing firearms through purchasing and reselling used firearms, the rule will enhance the tracing system's capacity to identify "secondary purchasers" of crime guns. This capacity will be enhanced because new licensees will be required by the GCA to maintain records on sales of used firearms that are accessible to the Department when conducting a trace on a crime gun. When a used "firearm re-enters

regulated commerce, the tracing process may identify additional unlicensed purchasers beyond the first retail purchaser." [287]

Crime-gun tracing is one of the most valuable and effective services ATF provides to law enforcement agencies—nationally and internationally—in investigating crimes involving firearms. As one public commenter noted, law enforcement agencies submitted a total of "1,922,577 crime guns for the Department to trace between 2017 and 2021." Largely as a result of the records the GCA requires licensees to maintain, "ATF was able to determine the purchaser in 77 percent (1,482,861)" of those trace requests.[288] By clarifying when a Federal firearms license is required, the rule will promote compliance by increasing licensure of those engaged in the business of dealing in firearms, and correspondingly increase the availability of GCA-required records from those newly licensed dealers. As a result, the rule will enhance the capacity of the Department to successfully complete crime-gun traces for law enforcement partners globally.

The benefits to public safety of crime-gun tracing are substantial. For example, in fiscal year 2022, the Department performed over 623,000 crime-gun traces.[289] Of these, 27,156 were deemed "urgent," which included firearms used in criminal activities such as mass shootings, homicides, bank robberies, and other immediate threats to officer and public safety.[290] Tracing also allows ATF to determine if there are straw purchasing patterns or individuals operating as straw purchasers. Straw purchasers—individuals without a criminal record who purchase firearms for drug dealers, violent criminals, or persons who are prohibited by law from receiving firearms—are the lynchpin of most firearms trafficking operations.[291] Straw purchasers, often acquiring a relatively small number of firearms in each transaction, make it possible for firearms traffickers to effectively circumvent the background check and

[284] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis, Volume Two, Part III: Crime Guns Recovered and Traced Within the United States and Its Territories* 41 (Mar. 27, 2024), *https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.*

[285] For example, in 2021, there were an average of 127.2 suicides per day among U.S. adults, including 17.5 per day among veterans and 109.6 per day among non-veteran adults. Firearms were involved in 73.4% of deaths among veteran men, and 51.7% of veteran women. *See* U.S. Dep't of Veterans Affairs, *2023 National Veteran Suicide Prevention Annual Report* 15, 27 (Nov. 2023).

[286] In *Huddleston,* the Supreme Court examined the legislative history of the GCA and determined that "[t]he principal purposes of the federal gun control legislation . . . was to curb crime by keeping firearms out of the hands of those not legally entitled to possess them, because of age, criminal background, or incompetency." 415 U.S. at 824.

[287] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis, Volume Two, Part III: Crime Guns Recovered and Traced Within the United States and Its Territories* 23 (Mar. 27, 2024), *https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.*

[288] *Id.* at 2.

[289] ATF, *Fact Sheet – eTrace: Internet-Based Firearms Tracing and Analysis* (Apr. 2023), *https://www.atf.gov/resource-center/fact-sheet/fact-sheet-etrace-internet-based-firearms-tracing-and-analysis.*

[290] *Id.* at 1.

[291] The BSCA amended the GCA to expressly prohibit straw purchasing of firearms. *See* 18 U.S.C. 932.

recordkeeping requirements of Federal law to get guns into the hands of criminals. Straw purchasers may acquire firearms directly for prohibited persons or purchase them for other middlemen on behalf of violent criminals.

After a trace is conducted on a recovered crime gun, ATF is able to determine whether the purchaser was also the possessor of the firearm when it was used in a crime, or whether the purchaser is different from the possessor. Traces where the purchaser and possessor are different provide

leads to help determine whether the possessor or others in a trafficking distribution network utilized one or more straw purchasers to acquire firearms. Table 14 shows the share of traced guns attributed to these potential purchaser and possessor relationships.

### Table 14. Percentage of Traced Crime Guns by Purchaser and Possessor Relationships, 2017 – 2021[292]

| | |
|---|---|
| Purchaser and Possessor are the same | 12.20% |
| Purchaser and Possessor are different | 58.40% |
| Purchaser known, Possessor unknown | 29.40% |

In Table 14 above, in most traces, the purchaser of the traced crime gun was different from the possessor or the purchaser of the traced crime gun is known but the possessor is unknown. These two categories amount to a total of 87.8 percent of successfully traced crime guns.

Finally, the Department notes that, when a firearm is recovered in a criminal investigation and submitted for tracing, transactions in which the purchaser of the firearm was subject to a background check tend to have a longer time-to-crime. As stated in the NFCTA, "a short [time-to-crime] can be an indicator of illegal firearms

trafficking." [293] A time-to-crime recovery of three years or less is generally considered a "short" time-to-crime,[294] indicating that at time the firearm was purchased, the purchase was more likely to be associated with firearm trafficking, straw-purchasing, or other intended criminal use. Again, by clarifying when a Federal firearms license is required, the rule will facilitate increased licensure of those engaged in the business of dealing in firearms. This, in turn, will result in those newly licensed dealers conducting more purchaser background checks, which, the longer time-to-crime data indicates, will deter violent felons,

traffickers, and other prohibited persons from obtaining firearms from those dealers.[295] FFLs who have a large number of traced firearms with short time-to-crime statistics may undergo more inspections, because certain FFL practices might be making them more susceptible to straw purchasing activities.

The longer time-to-crime for recovered crime guns in which the purchaser was subject to a background check is demonstrated by a review of state laws and geographic recovery data by city. Table 15 provides time-to-crime statistics by State.

### Table 15. Shortest Time-to-Crime States versus Longest Time-to-Crime States

| State | Median TTC (Years) | State | Median TTC (Years) |
|---|---|---|---|
| Virginia | 1.6 | Hawaii | 7.5 |
| Michigan | 2 | Connecticut | 5.9 |
| Arizona | 2.1 | New York | 5.7 |
| Missouri | 2.2 | New Jersey | 5.3 |
| Mississippi | 2.2 | Maryland | 5 |

Table 16 provides time-to-crime statistics by city of recovery.

---

[292] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis, Volume Two, Part III: Crime Guns Recovered and Traced Within the United States and Its Territories* 26 (Mar. 27, 2024), *https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.*

[293] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis, Volume Two, Part III: Crime Guns Recovered and Traced Within the United States and Its Territories* 23 (Mar. 27, 2024), *https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.*

[294] *See generally id.* at 35 (A "[s]hort TTC suggests that traced crime guns were rapidly diverted from lawful firearms commerce into criminal hands and represents a key indicator of firearm trafficking. Between 2017 and 2021, half of traced crime guns were purchased and recovered within three years of the last known sale.").

[295] *See id.* at 41.

## Table 16. Shortest Time-to-Crime Cities versus Longest Time-to-Crime Cities

| City | Median TTC (Years) | City | Median TTC (Years) |
|---|---|---|---|
| Richmond, VA | 1.5 | New York, NY | 6.3 |
| Detroit, MI | 1.6 | Baltimore, MD | 5.3 |
| Columbia, SC | 1.7 | San Jose, CA | 4.6 |
| Phoenix, AZ | 1.8 | San Bernardino, CA | 4.2 |
| Memphis, TN | 1.9 | San Diego, CA | 4.2 |
| Saint Louis, MO | 1.9 | Los Angeles, CA | 4.2 |

As explained by one public commenter, of the States and cities that have shorter time-to-crime statistics, only Virginia and Michigan also currently require background checks for all private party transactions.[296] The commenter further stated that all of the States and cities with longer time-to-crime statistics already require background checks for private party transactions. Consistent with the findings of the NFCTA, this data suggests that background checks tend to inhibit or otherwise deter prohibited persons from purchasing firearms and then subsequently using them in crime. In addition to making more records of transactions occurring on the secondary market readily available for tracing purposes, this rule—by increasing the number of properly licensed dealers who conduct background checks before selling a firearm—also helps ensure that prohibited persons are denied access to firearms, as suggested above. Based on FBI information, there were 131,865 prohibited persons in 2022 and 153,565 prohibited persons in 2021 who were denied the ability to purchase a firearm after a NICS background check.[297] The Department notes that these numbers are under-reported since there are a number of States that do not rely on the FBI to perform their background checks. Nonetheless, this data suggests that requiring firearms to be sold on the regulated market has a preventative effect, as the process to obtain a firearm sold on the regulated market can deter or prevent prohibited persons from acquiring and possessing firearms.

The U.S. Sentencing Commission has reported that "88.8 percent of firearm offenders sentenced under § 2K2.1 [298] [of the November 2021 United States Sentencing Commission *Guidelines Manual*] were [already] prohibited from possessing a firearm" under 18 U.S.C. 922(g). These individuals would thus have been flagged in a background check, and therefore would have been prohibited from buying a firearm from a licensed dealer after their first offense. As a result, they would not have been able to commit the subsequent firearms offense(s) with those firearms if the seller had been licensed. In addition, the U.S. Sentencing Commission reported that firearms offenders sentenced under section 2K2.1 "have criminal histories that are more extensive and more serious than other offenders," and that they are "more than twice as likely to have a prior conviction for a violent offense compared to all other offenders." [299]

In another report on "armed career criminals" (those who, at the time of sentencing, have three or more prior convictions for violent offenses, serious drug offenses, or both), the Commission found that a substantial share of such "armed career criminals" (83 percent in fiscal year 2019) had prior convictions for at least one violent offense, as opposed to solely serious drug offense convictions. This included "57.7 percent who had three or more [prior violent] convictions." [300] In other words, many persons who are prohibited by law from possessing firearms, including the more serious "armed career criminals," were able to obtain guns and continued to commit more violent offenses after they would have been flagged by a background check and denied a firearm if purchasing from a licensed dealer.

Such violence has a significant adverse effect on public safety. By increasing the number of licensed dealers who are required to conduct background checks on unlicensed transferees, this rule helps prevent firearms from being sold to felons or other prohibited persons, who may then use those firearms to commit crimes and acts of violence, or themselves become sources of firearms trafficking. Furthermore, these licensed dealers must also maintain firearms transaction records, which will help with criminal investigations and tracing firearms subsequently used in crimes.

In 2016, ATF distributed and discussed the above-mentioned "engaged in the business" guidance at gun shows to ensure that unlicensed dealers operating at gun shows became licensed, and portions of that previous guidance are incorporated in this rule. The 2016 guidance was particularly directed at encouraging unlicensed persons who sell firearms for a supplemental source of income to continue selling firearms, but as licensed dealers. Based on data from the FFLC, ATF found that, within one year after releasing the guidance, there was an increase of approximately 567 Form 7 applications to account for unlicensed persons selling at gun shows. This previous experience demonstrates that, when ATF clarified the licensing requirements, some unlicensed market participants immediately recognized the need to obtain a license to avoid enforcement action. Although the

---

[296] According to the commenter, which provided information current as of 2022, the following States require background checks for all private party firearms transactions: CA, CO, CT, DC, DE, HI, IL, MA, MD, MI, MN, NE, NJ, NM, NV, NY, OR, PA, RI, VA, VT, WA. *See https://www.regulations.gov/comment/ATF-2023-0002-354412.*

[297] FBI, Crim. Just. Info. Servs. Div., *National Instant Criminal Background Check System 2022 Operational Report* 32 (Nov. 2022), *https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view.*

[298] Section 2K2.1 provides sentencing guidelines for "Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition."

[299] U.S. Sent'g Comm'n, *What Do Federal Firearms Offenses Really Look Like?* 2 (July 2022), *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220714_Firearms.pdf.*

[300] U.S. Sent'g Comm'n, *Federal Armed Career Criminals: Prevalence, Patterns, and Pathways* 9 (Mar. 2021), *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210303_ACCA-Report.pdf.*

guidance alone did not achieve the full effects that would result from having these requirements in a regulation, the response illustrated that persons engaged in the business of dealing in firearms will comply with Federal licensing requirements and that there will be an increase in dealers as awareness of those licensing requirements increases. This both enhances public safety by increasing sellers' ability to identify prohibited persons and keep them from purchasing firearms and increases the likelihood that more prohibited persons will be deterred from attempting to purchase firearms.

Finally, providing a clear option for FFLs to transfer their business inventory to another FFL when their license is terminated helps to ensure that these business inventories of firearms are traceable and do not become sources of trafficked firearms.

8. Alternatives

In addition to the requirements outlined in this rule, the Department considered the following alternative approaches:

*Alternative 1. A rulemaking that focuses on a bright-line numerical threshold of what constitutes being engaged in the business as a dealer in firearms.* As discussed above in the past, it has been proposed to the Department that a rulemaking should set a specific threshold or number of sales per year to define "engaged in the business." The Department considered this alternative in the past and again as part of developing this rulemaking. However, the Department chose not to adopt this alternative for a number of reasons stated in detail above.[301] In summary: courts have held even before the passage of the BSCA that the sale or attempted sale of even one firearm is sufficient to show that a person is "engaged in the business" if that person represents to others that they are willing and able to purchase more firearms for resale; a person could structure their transactions to avoid the minimum threshold by spreading out sales over time; and firearms could be sold by unlicensed persons below the threshold number without records, making those firearms unable to be traced when they are subsequently used in a crime. Finally, at this time, the Department does not believe there is a sufficient evidentiary basis to support setting a specific minimum number of firearms

bought or sold that, without consideration of additional factors, would establish that a person is "engaged in the business."

The Department believes replacing this rule with a simple numerical threshold would not appropriately address the statutory language regarding the requisite intent predominantly to earn a profit and would have unintended effects, such as those summarized in the previous paragraph, which would impact personal firearms transactions and decrease public safety and law enforcement's ability to trace firearms used in crimes.

*Alternative 2. Publishing guidance instead of revising the regulations.* Under this alternative, rather than publishing regulations further defining "engaged in the business," the Department would publish only guidance documents to clarify the topics included in this rule. Although the Department has determined that it will also update existing guidance documents to answer any questions that the firearms industry may have, the Department has also determined that issuing only guidance would be insufficient to address the issues discussed above. A regulation is much more effective at achieving compliance with the GCA, as amended by the BSCA, than guidance, which is both voluntary and distributed by ATF at gun shows or other venues when the agency is present, or found online if people search for it. People recognize that a regulation sets the requirements they must follow and affects all those participating in the topic area, and they also know where to look for a regulation. Now that the BSCA has redefined the term "engaged in the business," there is even more of a need to ensure that unlicensed people who meet the definition of that term understand that they are violating the law if they do not obtain a license. And if the Department does not update its regulations, they would not accurately reflect the statutory text and would thus create confusion.

As a result, the Department did not select the alternative to publish only guidance documents in lieu of regulations. Guidance alone would be insufficient as a means to inform the public in general, rather than solely the currently regulated community; it would not have the same reach and attention as a regulation; it would not benefit from the input of public review and comment to aid in accounting for possible unintended impacts or interpretations; and it would not be able to change existing regulatory provisions on the subject of "engaged in the business" or impact intersecting

regulatory provisions. In addition, the Department can incorporate existing guidance in a rule based on its experience or in response to comments. When an agency establishes or revises requirements that were previously established pursuant to a rulemaking process, it must do so through a regulation issued in compliance with the requirements of the Administrative Procedure Act and certain executive orders. Guidance does not meet these requirements. Therefore, although the Department considered this alternative, it determined it was not in the best interest of the public.

*Alternative 3. No action.* Rather than promulgating a regulation, the Department could instead take no action to further clarify the BSCA's amendments to the GCA. However, the Department considered this alternative and decided against it for a number of reasons. First, Congress, through the BSCA, determined that there was a need to revise the definition of "engaged in the business" for the first time in almost 40 years. While that by itself does not preclude the Department from using its discretion not to promulgate a formal rule, it indicates an important change to the landscape of who must have a license to deal in firearms and warrants consideration of what that means to persons who have been operating under the previous definition. It has potential effects on those who have not considered themselves to fall under the definition before but now would need to obtain a license. The change to the definition removed any consideration of an individual's intent to obtain "livelihood" from the "engaged in the business" analysis, and it is reasonable to expect that those who transact in firearms have questions about how to interpret and apply this change. This includes how it affects other aspects of existing laws and regulatory provisions that govern such transactions, as well as how other BSCA amendments, such as the new international trafficking provisions, might apply to the dealer requirements. For these reasons, the Department determined that taking no action was not a viable alternative.

Second, as the various enforcement actions and court decisions cited above demonstrate, ATF observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA. And third, on March 14, 2023, President Biden issued Executive Order 14092, requiring the Attorney General to report on agency efforts to implement the BSCA, develop and implement a plan to clarify the definition of who is engaged in the business of dealing in firearms, "including by considering a

---

[301] The relevant discussion is set forth in Section II.A, "Advance Notice of Proposed Rulemaking (1979)," and in more detail in Section III.D, "Presumptions that a Person is 'Engaged in the Business,'" of this preamble.

rulemaking," and prevent former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms.[302]

The alternative of taking no action would not generate direct monetary costs because it would leave the regulatory situation as it is. Because the costs and benefits of this alternative arise from the statute itself, the Department did not include an assessment of them in this rulemaking.

### B. Executive Order 13132 (Federalism)

This regulation will not have substantial direct effects on the States, the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132 (Federalism), the Attorney General has determined that this regulation does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### C. Executive Order 12988 (Civil Justice Reform)

This regulation meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 (Civil Justice Reform).

### D. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA") establishes as a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation. To achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration. Public Law 96–354, section 2(b), 94 Stat. 1164 (1980).

Under the RFA, the agency is required to consider whether this rule will have a significant economic impact on a substantial number of small entities. Agencies must perform a review to determine whether a rule will have such an impact. If the agency determines that it will, the agency must prepare a regulatory flexibility analysis as described in the RFA.

Pursuant to 5 U.S.C. 604(a), the final regulatory flexibility analysis must contain:

• A statement of the need for, and objectives of, the rule;
• A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;
• The response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;
• A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;
• A description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities that will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and
• A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency that affect the impact on small entities was rejected.

The RFA covers a wide range of small entities. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. 5 U.S.C. 601(3)–(6). The Department determined that the rule affects a variety of currently unlicensed persons engaged in the business of selling firearms, and assumed that all of these sellers would become small businesses upon the licensure required by this rule (see the section below titled "A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available"). Based on the requirements above, the Department prepared the following regulatory flexibility analysis assessing the impact on small entities from the rule.

A statement of the need for, and objectives of, the rule.

*See* Section VI.A.1 of this preamble for discussion on the need for this regulation and the objectives of this rule.

A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments.

*See* Section IV.D.13 of this preamble for public comments regarding the RFA. Responses to those public comments are included with each topic.

The response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments.

There were no comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule. Therefore, no changes were made in the final rule as a result of such comments.

A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.

Persons affected by this rule are not currently considered small businesses or small entities but will become small businesses upon implementation of this rule if they obtain licenses and continue selling firearms as dealers. However, the Department assumes that, should an individual be considered "engaged in the business" due to factors related to their sale of firearms and not simply to enhance their personal collection, there may be an impact on their revenue. Due to limitations on data, the Department is unable to determine the extent to which the licensing costs will impact their firearms sales revenue. As discussed in the primary analysis (Section VI.A.2 of this preamble), the Department estimated 10 percent of those affected by this rule would cease dealing in firearms for various reasons. To the extent such individuals are currently functioning as small businesses, even though not licensed, this could be deemed to represent an adverse regulatory impact on small businesses and their ability to operate as dealers.

A description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

Persons affected by this rule will need to apply for a license using Form 7, undergo an initial inspection, undergo background checks, maintain Form 4473

---

[302] 88 FR 16528.

records of firearms transactions, and periodically undergo a compliance inspection. No professional skills are required to fulfill these tasks.

A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

*See* Sections IV.D.13 and VI.A.8 of this preamble. No separate distinction was made in alternatives for small businesses, specifically, because the Department determined that all unlicensed sellers affected by this rule will become small businesses once they are licensed.

### E. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is likely to have a significant economic impact on a substantial number of small entities under SBREFA, 5 U.S.C. 601 *et seq.* Accordingly, the Department prepared an initial regulatory flexibility analysis for the proposed rule and prepared an FRFA for the final rule. 5 U.S.C. 603–04. Furthermore, a small business compliance guide will be published as required by SBREFA.

### F. Congressional Review Act

Pursuant to the Congressional Review Act, 5 U.S.C. 801 *et seq.,* OMB's Office of Information and Regulatory Affairs has determined this rule does not meet the criteria in 5 U.S.C. 804(2). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. While there may be impacts on employment, investment, productivity, or innovation, these impacts will not have a significant impact on the overall economy.

### G. Unfunded Mandates Reform Act of 1995

This rule would not result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Twenty-two States already

require background checks for private party sales, and of the 28 States that do not, only three states (Florida, Tennessee, and Utah) do not rely on Federal law enforcement for their background checks. While these three States may be affected by this rule to the extent they have to conduct increased background checks, the Department did not determine that this rule will have an impact of $100 million or more in any year to any of these States. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995, Public Law 104–4, 109 Stat. 48.

### H. Paperwork Reduction Act of 1995

Under the Paperwork Reduction Act of 1995 ("PRA"), 44 U.S.C. 3501–21, agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. The collections of information contained in this rule are collections of information which have been reviewed and approved by OMB in accordance with the requirements of the PRA and have been assigned an OMB Control Number. As defined in 5 CFR 1320.3(c), "collection of information" comprises reporting, recordkeeping, monitoring, posting, labeling, and other similar requirements. The collections of information in this rule are mandatory. The title and description of each information collection, a description of those who must collect the information, and an estimate of the total annual burden follow. The estimate covers the time for reviewing instructions, searching existing sources of data, gathering and maintaining the data needed, and completing and reviewing the collection.

*Title:* Application for a Federal Firearms License—ATF Form 7(3312.12)/7CR (5310.16).

*OMB Control Number:* OMB 1140–0018.

*Summary of the Collection of Information:* 18 U.S.C. 922 specifies a number of unlawful activities involving firearms in interstate and foreign commerce. Some of these activities are not unlawful if the persons taking the actions are licensed under the provisions of section 923. Some examples of activities that are not unlawful if a person has a license include: engaging in the business of dealing, shipping, receiving, and transporting firearms in interstate or foreign commerce, including the acquisition of curio or relic firearms acquired by collectors from out-of-State for personal collections. This collection of information is necessary to ensure that anyone who wishes to be licensed

as required by section 923 meets the requirements to obtain the desired license.

*Need for Information:* Less frequent collection of this information would pose a threat to public safety. Without this information collection, ATF would not be able to issue licenses to persons required by law to have a license to engage in the business of dealing in firearms or shipping or transporting firearms in interstate or foreign commerce in support of that business, or acquire curio and relic firearms from out of State.

*Proposed Use of Information:* ATF personnel will analyze the submitted application to determine the applicant's eligibility to receive the requested license.

*Description of the Respondents:* Individuals or entities wishing to engage in the business of dealing, shipping, receiving, and transporting firearms in interstate or foreign commerce, as well as acquiring firearms classified as curios and relics for personal collections.

*Number of Respondents:* 13,000 existing. New respondents due to the rule: 24,540.

*Frequency of Response:* one time.

*Burden of Response:* one hour.

*Estimate of Total Annual Burden:* 24,540 hours (incremental change).

*Title:* Application for a Federal Firearms License—Renewal Application ATF Form 8 (5310.11).

*OMB Control Number:* OMB 1140–0019.

*Summary of the Collection of Information:* 18 U.S.C. chapter 44 provides that no person may engage in the business of importing, manufacturing, or dealing in either firearms, or ammunition, without first obtaining a license to do so. These activities are licensed for a specific period. The benefit of a collector's license is also provided for in the statute. In order to continue to engage in the aforementioned firearms activities without interruption, licensees must renew their FFL by filing Federal Firearms License ("FFL") RENEWAL Application-ATF Form 8 (5310.11) Part II, prior to its expiration.

*Need for Information:* Less frequent use of this information collection would pose a threat to public safety, since the collected information helps ATF to ensure that the applicants remain eligible to renew their licenses.

*Proposed Use of Information:* ATF Form 8 (5310.11) Part II, is used to identify the applicant and determine their eligibility to retain the license.

*Description of the Respondents:* Respondents desiring to update the

responsible person (RP) information on an existing license must submit a letter in this regard, along with the completed FFL renewal application to ATF.

*Number of Respondents:* 34,000 existing. New respondents due to the rule: 24,540.

*Frequency of Response:* every three years and periodically.

*Burden of Response:* 0.5 hours.

*Estimate of Total Annual Burden:* 12,270 hours (incremental change).

*Title:* Firearms Transaction Record— ATF Form 4473 (5300.9) and Firearms Transaction Record Continuation Sheet.

*OMB Control Number:* OMB 1140– 0020.

*Summary of the Collection of Information:* The subject form is required under the authority of 18 U.S.C. 922 and 923 and 27 CFR 478.124. These sections of the GCA prohibit certain persons from shipping, transporting, receiving, or possessing firearms. All persons, including FFLs, are prohibited from transferring firearms to such persons. FFLs are also subject to additional restrictions regarding the disposition of a firearm to an unlicensed person under the GCA. For example, age and State of residence also determine whether a person may lawfully receive a firearm. The information and certification on the Form 4473 are designed so that a person licensed under 18 U.S.C. 923 may determine if the licensee may lawfully sell or deliver a firearm to the person identified in section B of the Form 4473, and to alert the transferee/buyer of certain restrictions on the receipt and possession of firearms. The Form 4473 should only be used for sales or transfers of firearms where the seller is licensed under 18 U.S.C. 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction.

*Need for Information:* The consequences of not conducting this collection of information, or conducting it less frequently, are that the licensee might transfer a firearm to a person who is prohibited from possessing firearms under Federal law. The collection of this information is necessary for compliance with the statutory requirements to verify the eligibility of a person receiving or possessing firearms under the GCA. There is no discretionary authority on the part of ATF to waive these requirements. Respondents are required to supply this information as often as necessary to comply with statutory provisions. The form is critical to the prevention of criminal diversion of firearms and

enhances law enforcement's ability to trace firearms that are recovered in crimes.

*Proposed Use of Information:* A person purchasing a firearm from an FFL must complete section B of the Form 4473. The buyer's answers to the questions determine if the potential transferee is eligible to receive the firearm. If those answers indicate that the buyer is not prohibited from receiving a firearm, the licensee completes section C of the Form 4473 and contacts the NICS or the State point of contact to determine if the firearm can legally be transferred to the purchaser.

*Description of the Respondents:* Unlicensed persons wishing to purchase a firearm.

*Number of Respondents:* 17,189,101 existing. New respondents due to the rule: 24,540.

*Frequency of Response:* periodically.

*Burden of Response:* 0.5 hours.

*Estimate of Total Annual Burden:* 12,270 hours (incremental change).

*Title:* Records of Acquisition and Disposition, Dealers of Type 01/02 Firearms, and Collectors of Type 03 Firearms [Records of Acquisition and Disposition, Collectors of Firearms].

*OMB Control Number:* OMB 1140– 0032.

*Summary of the Collection of Information:* The recordkeeping requirements as authorized by the GCA, 18 U.S.C. 923, are for the purpose of allowing ATF to inquire into the disposition of any firearm received by a licensee in the course of a criminal investigation.

*Need for Information:* Less frequent collection of this information would pose a threat to public safety as the information is routinely used to assist law enforcement by allowing them to trace firearms in criminal investigations.

*Proposed Use of Information:* This collection of information grants ATF officers the authority to examine a collector's records for firearms traces or compliance inspections, per 27 CFR 478.23(c)(1), (2).

*Description of the Respondents:* Federal Firearms Licensees.

*Number of Respondents:* 60,790 existing. New respondents due to the rule: 24,540.

*Frequency of Response:* annually recurring.

*Burden of Response:* three minutes to maintain A&D records and one hour to perform an inspection.

*Estimate of Total Annual Burden:* 24,540 hours in inspection time (incremental change) and 3,681 hours maintaining A&D records (incremental change).

ATF asks for public comment on the proposed collection of information to help determine how useful the information is; whether the public can help perform ATF's functions better; whether the information is readily available elsewhere; how accurate ATF's estimate of the burden of collection is; how valid the methods for determining burden are; how to improve the quality, usefulness, and clarity of the information; and how to minimize the burden of collection.

If you submit comments on the collection of information, submit them following the "Public Participation" section under the **SUPPLEMENTARY INFORMATION** heading. You need not respond to a collection of information unless it displays a currently valid control number from OMB. Before the requirements for this collection of information become effective, ATF will publish a notice in the **Federal Register** of OMB's decision to approve, modify, or disapprove the proposed collection.

**Disclosure**

Copies of the proposed rule, the comments received in response to it, and this final rule are available through the Federal eRulemaking portal, at *www.regulations.gov* (search for RIN 1140–58), and for public inspection by appointment during normal business hours at: ATF Reading Room, Room 1E– 063, 99 New York Ave. NE, Washington, DC 20226; telephone: (202) 648–8740.

**List of Subjects in 27 CFR Part 478**

Administrative practice and procedure, Arms and munitions, Exports, Freight, Imports, Intergovernmental relations, Law enforcement officers, Military personnel, Penalties, Reporting and recordkeeping requirements, Research, Seizures and forfeitures, Transportation.

**Authority and Issuance**

For the reasons discussed in the preamble, the Department amends 27 CFR part 478 as follows:

**PART 478—COMMERCE IN FIREARMS AND AMMUNITION**

■ 1. The authority citation for 27 CFR part 478 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 18 U.S.C. 847, 921–931; 44 U.S.C. 3504(h).

■ 2. Amend § 478.11 by:
■ a. Revising the definition of "Dealer";
■ b. In the definition of "Engaged in the business":
■ i. Redesignating paragraphs (a) through (f) as paragraphs (1) through (6);
■ ii. Revising newly redesignated paragraph (3); and

■ iii. Adding paragraph (7);
■ c. Adding definitions of "Former licensee inventory", "Personal collection (or personal collection of firearms, or personal firearms collection)", and "Predominantly earn a profit" in alphabetical order;
■ d. Revising the definition of "Principal objective of livelihood and profit"; and
■ e. Adding definitions of "Responsible person" and "Terrorism" in alphabetical order.

The revisions and additions read as follows:

### § 478.11  Meaning of terms.

\*    \*    \*    \*    \*

*Dealer.* Any person engaged in the business of selling firearms at wholesale or retail; any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms; or any person who is a pawnbroker. The term shall include any person who engages in such business or occupation on a part-time basis. The term shall include such activities wherever, or through whatever medium, they are conducted, such as at a gun show or event, flea market, auction house, or gun range or club; at one's home; by mail order; over the internet (*e.g.,* online broker or auction); through the use of other electronic means (*e.g.,* text messaging service, social media raffle, or website); or at any other domestic or international public or private marketplace or premises.

\*    \*    \*    \*    \*

*Engaged in the business*—\* \* \*
(3) *Dealer in firearms other than a gunsmith or a pawnbroker.* The term "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker" shall have the same meaning as in § 478.13.

\*    \*    \*    \*    \*

(7) *Related definitions.* For purposes of this definition—
(i) The term "purchase" (and derivative terms thereof) means the act of obtaining a firearm in an agreed exchange for something of value;
(ii) The term "sale" (and derivative terms thereof) means the act of disposing of a firearm in an agreed exchange for something of value, and the term "resale" means selling a firearm, including a stolen firearm, after it was previously sold by the original manufacturer or any other person; and
(iii) The term "something of value" includes money, credit, personal property (*e.g.,* another firearm or ammunition), a service, a controlled substance, or any other medium of exchange or valuable consideration, legal or illegal.

\*    \*    \*    \*    \*

*Former licensee inventory.* Firearms that were in the business inventory of a licensee at the time the license was terminated. Such firearms differ from a personal collection and other personal firearms in that they were purchased repetitively before the license was terminated as part of a licensee's business inventory with the predominant intent to earn a profit.

\*    \*    \*    \*    \*

*Personal collection (or personal collection of firearms, or personal firearms collection)*—(1) *General definition.* Personal firearms that a person accumulates for study, comparison, exhibition (*e.g.,* collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.,* noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit (*e.g.,* primarily for a commercial purpose or financial gain, as distinguished from personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, but which the person may also intend to increase in value). In addition, the term shall not include firearms accumulated primarily for personal protection: *Provided,* that nothing in this definition shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use.
(2) *Personal collection of licensee.* In the case of a firearm imported, manufactured, or otherwise acquired by a licensed manufacturer, licensed importer, or licensed dealer, the term shall include only a firearm described in paragraph (1) of this definition that was—
(i) Acquired or transferred without the intent to willfully evade the restrictions placed upon licensees under 18 U.S.C. chapter 44;
(ii) Recorded by the licensee as an acquisition in the licensee's acquisition and disposition record in accordance with § 478.122(a), § 478.123(a), or § 478.125(e) (unless acquired prior to licensure and not intended for sale);
(iii) Recorded as a disposition from the licensee's business inventory to the licensee's personal collection or otherwise as a personal firearm in accordance with § 478.122(a), § 478.123(a), or § 478.125(e) (unless acquired prior to licensure and not intended for sale);
(iv) Maintained in such personal collection or otherwise as a personal firearm (whether on or off the business premises) for at least one year from the date the firearm was so transferred, in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a; and
(v) Stored separately from, and not commingled with the business inventory. When stored or displayed on the business premises, the personal collection and other personal firearms shall be appropriately identified as "not for sale" (*e.g.,* by attaching a tag).

\*    \*    \*    \*    \*

*Predominantly earn a profit.* The term "predominantly earn a profit" shall have the same meaning as in § 478.13.
*Principal objective of livelihood and profit.* The intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents such as improving or liquidating a personal firearms collection: *Provided,* That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

\*    \*    \*    \*    \*

*Responsible person.* Any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of a sole proprietorship, corporation, company, partnership, or association, insofar as they pertain to firearms.

\*    \*    \*    \*    \*

*Terrorism.* For purposes of the definitions "predominantly earn a profit" and "principal objective of livelihood and profit," the term "terrorism" means activity, directed against United States persons, which—
(1) Is committed by an individual who is not a national or permanent resident alien of the United States;
(2) Involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and
(3) Is intended—
(i) To intimidate or coerce a civilian population;
(ii) To influence the policy of a government by intimidation or coercion; or
(iii) To affect the conduct of a government by assassination or kidnapping.

\*    \*    \*    \*    \*

■ 3. Add § 478.13 to subpart B to read as follows:

**§478.13  Definition of "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker."**

(a) *Definition.* A person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms. The term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of the person's personal collection of firearms. In addition, the term shall not include an auctioneer who provides only auction services on commission to assist in liquidating firearms at an estate-type auction; *provided,* that the auctioneer does not purchase the firearms, or take possession of the firearms for sale on consignment.

(b) *Fact-specific inquiry.* Whether a person is engaged in the business as a dealer under paragraph (a) of this section is a fact-specific inquiry. Selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity. However, there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. For example, even a single firearm transaction or offer to engage in a transaction, when combined with other evidence (*e.g.,* where a person represents to others a willingness and ability to purchase more firearms for resale), may require a license; whereas, a single isolated firearm transaction without such evidence would not require a license. At all times, the determination of whether a person is engaged in the business of dealing in firearms is based on the totality of the circumstances.

(c) *Presumptions that a person is engaged in the business as a dealer.* In civil and administrative proceedings, a person shall be presumed to be engaged in the business of dealing in firearms as defined in paragraph (a) of this section, absent reliable evidence to the contrary, when it is shown that the person—

(1) Resells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (*i.e.,* to be a source of additional firearms for resale);

(2) Repetitively purchases for the purpose of resale, or repetitively resells or offers for resale, firearms—

(i) Through straw or sham businesses, or individual straw purchasers or sellers; or

(ii) That cannot lawfully be purchased, received, or possessed under Federal, State, local, or Tribal law, including:

(A) Stolen firearms (*e.g.,* 18 U.S.C. 922(j));

(B) Firearms with the licensee's serial number removed, obliterated, or altered, or not identified as required by law (*e.g.,* 18 U.S.C. 922(k) or 26 U.S.C. 5861(i));

(C) Firearms imported in violation of law (*e.g.,* 18 U.S.C. 922(l), 22 U.S.C. 2778, or 26 U.S.C. 5844, 5861(k)); or

(D) Machineguns or other weapons defined as firearms under 26 U.S.C. 5845(b) that cannot lawfully be possessed (*e.g.,* 18 U.S.C. 922(o); 26 U.S.C. 5861(d));

(3) Repetitively resells or offers for resale firearms—

(i) Within 30 days after the person purchased the firearms; or

(ii) Within one year after the person purchased the firearms if they are—

(A) New, or like new in their original packaging; or

(B) The same make and model, or variants thereof;

(4) As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale to a person (other than a licensee in accordance with § 478.57 or § 478.78) firearms that were in the business inventory of the former licensee at the time the license was terminated (*i.e.,* license revocation, denial of license renewal, license expiration, or surrender of license), whether or not such firearms were transferred to a responsible person of the former licensee after the license was terminated in accordance with § 478.57(b)(2) or § 478.78(b)(2); or

(5) As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale firearms that were transferred to the licensee's personal collection or otherwise as personal firearms in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a(a) prior to the time the license was terminated, unless:

(i) The firearms were received and transferred without any intent to willfully evade the restrictions placed on licensees by 18 U.S.C. chapter 44; and

(ii) One year has passed from the date of transfer to the licensee's personal collection or otherwise as personal firearms.

(d) *Predominantly earn a profit*—(1) *Definition.* The intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other

intents, such as improving or liquidating a personal firearms collection: *Provided,* that proof of profit, including the intent to profit, shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this section, a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms.

(2) *Presumptions that a person has intent to predominantly earn a profit.* In civil and administrative proceedings, a person shall be presumed to have the intent to predominantly earn a profit through the repetitive purchase and resale of firearms as defined in paragraph (d)(1) of this section, absent reliable evidence to the contrary, when it is shown that the person—

(i) Repetitively or continuously advertises, markets, or otherwise promotes a firearms business (*e.g.,* advertises or posts firearms for resale, including through the internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally;

(ii) Repetitively or continuously purchases, rents, or otherwise exchanges (directly or indirectly) something of value to secure permanent or temporary physical space to display firearms they offer for resale, including part or all of a business premises, a table or space at a gun show, or a display case;

(iii) Makes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale;

(iv) Purchases or otherwise secures merchant services as a business (*e.g.,* credit card transaction services, digital wallet for business) through which the person intends to repetitively accept payments for firearms transactions;

(v) Formally or informally purchases, hires, or otherwise secures business security services (*e.g.,* a central station-monitored security system registered to a business, or guards for security) to protect firearms assets and repetitive firearms transactions;

(vi) Formally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes, or offers to make, repetitive firearms transactions; or

(vii) Secures or applies for a State or local business license to purchase for

resale or to resell merchandise that includes firearms.

(e) *Conduct that does not support a presumption.* A person shall not be presumed to be engaged in the business of dealing in firearms when reliable evidence shows that the person is only reselling or otherwise transferring firearms—

(1) As bona fide gifts;

(2) Occasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection;

(3) Occasionally to a licensee or to a family member for lawful purposes;

(4) To liquidate (without restocking) all or part of the person's personal collection; or

(5) To liquidate firearms—

(i) That are inherited; or

(ii) Pursuant to a court order; or

(6) To assist in liquidating firearms as an auctioneer when providing auction services on commission at an estate-type auction.

(f) *Rebuttal evidence.* Reliable evidence of the conduct set forth in paragraph (e) of this section may be used to rebut any presumption in paragraph (c) or (d)(2) of this section that a person is engaged in the business of dealing in firearms, or intends to predominantly earn a profit through the repetitive purchase and resale of firearms.

(g) *Presumptions, conduct, and rebuttal evidence not exhaustive.* The activities set forth in the rebuttable presumptions in paragraphs (c) and (d)(2) of this section, and the activities and rebuttal evidence set forth in paragraphs (e) and (f) of this section, are not exhaustive of the conduct or evidence that may be considered in determining whether a person is engaged in the business of dealing in firearms, or has the intent to predominantly earn a profit through the repetitive purchase and resale of firearms.

(h) *Criminal proceedings.* The rebuttable presumptions in paragraphs (c) and (d)(2) of this section shall not apply to any criminal case, although they may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences.

■ 4. Amend § 478.57 by designating the undesignated paragraph as paragraph (a) and adding paragraphs (b) through (d) to read as follows:

### § 478.57    Discontinuance of business.

\*    \*    \*    \*    \*

(b) Upon termination of a license (*i.e.,* license revocation, denial of license renewal, license expiration, or surrender of license), the former licensee shall within 30 days, or such additional

period approved by the Director for good cause, either:

(1) Liquidate the former licensee inventory by selling or otherwise disposing of the firearms to a licensed importer, licensed manufacturer, or licensed dealer for sale, auction, or pawn redemption in accordance with this part; or

(2) Transfer the former licensee inventory to a responsible person of the former licensee to whom the receipt, possession, sale, or other disposition is not prohibited by law. Any such transfer, however, does not negate the fact that the firearms were repetitively purchased, and were purchased with the predominant intent to earn a profit by repetitive purchase and resale.

(c) Transfers of former licensee inventory to a licensee or responsible person in accordance with paragraph (b)(1) or (2) of this section shall be appropriately recorded as dispositions, in accordance with § 478.122(b), § 478.123(b), or § 478.125(e), prior to delivering the records after discontinuing business consistent with § 478.127. Except for liquidation of former licensee inventory to a licensee within 30 days (or approved period) in accordance with paragraph (b)(1) of this section, or occasional sale of a firearm from such inventory thereafter to a licensee, a former licensee (or responsible person of such licensee) who resells any such inventory, including former licensee inventory transferred in accordance with paragraph (b)(2) of this section, is subject to the presumptions in § 478.13 (definition of "engaged in the business as a dealer in firearms other than a gunsmith or pawnbroker") that apply to a person who repetitively purchased those firearms for the purpose of resale.

(d) The former licensee shall not continue to engage in the business of importing, manufacturing, or dealing in firearms by importing or manufacturing additional firearms for purposes of sale or distribution, or purchasing additional firearms for resale (*i.e.,* "restocking").

■ 5. Amend § 478.78 by designating the undesignated paragraph as paragraph (a) and adding paragraphs (b) through (d) to read as follows:

### § 478.78    Operations by licensee after notice.

\*    \*    \*    \*    \*

(b) Upon final disposition of license proceedings to disapprove or terminate a license (*i.e.,* by revocation or denial of renewal), the former licensee shall within 30 days, or such additional period approved by the Director for good cause, either:

(1) Liquidate the former licensee inventory by selling or otherwise disposing of the firearms to a licensed importer, licensed manufacturer, or licensed dealer for sale, auction, or pawn redemption in accordance with this part; or

(2) Transfer the former licensee inventory to a responsible person of the former licensee to whom the receipt, possession, sale, or other disposition is not prohibited by law. Any such transfer, however, does not negate the fact that the firearms were repetitively purchased, and were purchased with the predominant intent to earn a profit by repetitive purchase and resale.

(c) Transfers of former licensee inventory to a licensee or responsible person in accordance with paragraph (b)(1) or (2) of this section shall be appropriately recorded as dispositions, in accordance with § 478.122(b), § 478.123(b), or § 478.125(e), prior to delivering the records after discontinuing business consistent with § 478.127. Except for the sale of former licensee inventory to a licensee within 30 days (or approved period) in accordance with paragraph (b)(1) of this section, or occasional sale of a firearm from such inventory thereafter to a licensee, a former licensee (or responsible person of such former licensee) who resells any such inventory, including former licensee inventory transferred in accordance with paragraph (b)(2) of this section, is subject to the presumptions in § 478.13 (definition of "engaged in the business as a dealer in firearms other than a gunsmith or pawnbroker") that apply to a person who repetitively purchased those firearms for the purpose of resale.

(d) The former licensee shall not continue to engage in the business of importing, manufacturing, or dealing in firearms by importing or manufacturing additional firearms for purposes of sale or distribution, or purchasing additional firearms for resale (*i.e.,* "restocking").

■ 6. Amend § 478.124 by revising paragraph (a) to read as follows:

### § 478.124    Firearms transaction record.

(a) A licensed importer, licensed manufacturer, or licensed dealer shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearm transaction record, Form 4473: *Provided,* that a firearms transaction record, Form 4473, shall not be required to record the disposition made of a firearm delivered to a licensee for the sole purpose of repair or customizing when such firearm or a replacement

firearm is returned to the person from whom received; *provided further,* that a firearms transaction record, Form 4473, shall not be used if the sale or other disposition is being made to another licensed importer, licensed manufacturer, or licensed dealer, or a curio or relic to a licensed collector, including a sole proprietor who transfers a firearm to their personal collection or otherwise as a personal firearm in accordance with § 478.125a. When a licensee transfers a firearm to another licensee, the licensee shall comply with the verification and recordkeeping requirements in § 478.94 and this subpart.

\*    \*    \*    \*    \*

**§ 478.125a    [Amended]**

■ 7. Amend § 478.125a in paragraphs (a)(2) and (3) by removing the citation ''§ 478.125(e)'' and adding in its place ''§ 478.122(a), § 478.123(a), or § 478.125(e)''.

Dated: April 8, 2024.

**Merrick B. Garland,**

*Attorney General.*

[FR Doc. 2024–07838 Filed 4–18–24; 8:45 am]

**BILLING CODE 4410–FY–P**

ATF 015405

APPX.126

Engineer, FAA, 1600 Stewart Avenue, Suite 410, Westbury, NY 11590; telephone 206–231–3225; email *dan.rodina@faa.gov.*

**(m) Material Incorporated by Reference**

(1) The Director of the Federal Register approved the incorporation by reference (IBR) of the service information listed in this paragraph under 5 U.S.C. 552(a) and 1 CFR part 51.

(2) You must use this service information as applicable to do the actions required by this AD, unless this AD specifies otherwise.

(i) European Union Aviation Safety Agency (EASA) AD 2023–0092, dated May 5, 2023.

(ii) [Reserved]

(3) For EASA AD 2023–0092, contact EASA, Konrad-Adenauer-Ufer 3, 50668 Cologne, Germany; telephone +49 221 8999 000; email *ADs@easa.europa.eu;* website *easa.europa.eu.* You may find this EASA AD on the EASA website *ad.easa.europa.eu.*

(4) You may view this material at the FAA, Airworthiness Products Section, Operational Safety Branch, 2200 South 216th Street, Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195.

(5) You may view this material that is incorporated by reference at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, email *fr.inspection@nara.gov,* or go to: *www.archives.gov/federal-register/cfr/ibr-locations.html.*

Issued on September 1, 2023.

**Victor Wicklund,**

*Deputy Director, Compliance & Airworthiness Division, Aircraft Certification Service.*

[FR Doc. 2023–19365 Filed 9–7–23; 8:45 am]

BILLING CODE 4910–13–P

---

**DEPARTMENT OF JUSTICE**

**Bureau of Alcohol, Tobacco, Firearms, and Explosives**

**27 CFR Part 478**

**[Docket No. ATF 2022R–17; AG Order No. 5781–2023]**

**RIN 1140–AA58**

**Definition of "Engaged in the Business" as a Dealer in Firearms**

**AGENCY:** Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice.

**ACTION:** Notice of proposed rulemaking; request for comment.

**SUMMARY:** The Department of Justice ("Department") proposes amending Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") regulations to implement the provisions of the Bipartisan Safer Communities Act ("BSCA"), effective June 25, 2022, that broaden the definition of when a person is considered "engaged in the business" as a dealer in firearms other than a gunsmith or pawnbroker. This proposed rule incorporates the BSCA's definition of "predominantly earn a profit," creates a stand-alone definition of "terrorism," and amends the definitions of "principal objective of livelihood and profit" and "engaged in the business" to ensure each conforms with the BSCA's statutory changes and can be relied upon by the public. The proposed rule also clarifies what it means for a person to be "engaged in the business" of dealing in firearms, and to have the intent to "predominantly earn a profit" from the sale or disposition of firearms. In addition, it clarifies the term "dealer," including how that term applies to auctioneers, and defines the term "responsible person." These proposed changes would assist persons in understanding when they are required to have a license to deal in firearms. Consistent with the Gun Control Act ("GCA") and existing regulations, the proposed rule also defines the term "personal collection" to clarify when persons are not "engaged in the business" because they make only occasional sales to enhance a personal collection, or for a hobby, or if the firearms they sell are all or part of a personal collection. This proposed rule further addresses the lawful ways in which former licensees, and responsible persons acting on behalf of such licensees, may liquidate business inventory upon revocation or other termination of their license. Finally, the proposed rule clarifies that a licensee transferring a firearm to another licensee must do so by following the verification and recordkeeping procedures instead of using a Firearms Transaction Record, ATF Form 4473.

**DATES:** Written comments must be post-marked and electronic comments must be submitted on or before December 7, 2023. Commenters should be aware that the electronic Federal Docket Management System will not accept comments after midnight Eastern Time on the last day of the comment period.

**ADDRESSES:** You may submit comments, identified by docket number ATF 2022R–17, by either of the following methods—

• *Federal eRulemaking Portal: www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Helen Koppe, Mail Stop 6N–518, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, 99 New York Ave. NE, Washington, DC 20226; *ATTN: ATF 2022R–17.*

*Instructions:* All submissions received must include the agency name and docket number (ATF 2022R–17) for this notice of proposed rulemaking ("NPRM" or "proposed rule"). All properly completed comments received from either of the methods described above will be posted without change to the Federal eRulemaking portal, *www.regulations.gov.* This includes any personal identifying information ("PII") submitted in the body of the comment or as part of a related attachment. Commenters who submit through the Federal eRulemaking portal and who do not want any of their PII posted on the internet should omit PII from the body of their comment or in any uploaded attachments. Commenters who submit through mail should likewise omit their PII from the body of the comment and provide any PII on the cover sheet only. For detailed instructions on submitting comments and additional information on the rulemaking process, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:** Helen Koppe, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Department of Justice, 99 New York Ave. NE, Washington, DC 20226; telephone: (202) 648–7070 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Department is proposing to amend ATF regulations to implement the provision of the Bipartisan Safer Communities Act, Public Law 117–159, sec. 12002, 136 Stat. 1313, 1324 (2022) ("BSCA"), that amended the definition of "engaged in the business" in the Gun Control Act of 1968 ("GCA") at 18 U.S.C. 921(a)(21)(C), and to facilitate compliance with the statute.

The Attorney General is responsible for enforcing the GCA. This responsibility includes the authority to promulgate regulations necessary to enforce the provisions of the GCA. *See* 18 U.S.C. 926(a). Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA to the Director of ATF ("Director"), subject to the direction of the Attorney General and the Deputy Attorney General. *See* 28 U.S.C. 599A(b)(1)–(2), (c)(1); 28 CFR 0.130(a)(1) and (2); Treasury Department Order No. 221, sec. 2(a), (d), 37 FR 11696, 11696–97 (June 10, 1972). Accordingly, the Department and ATF have promulgated regulations necessary

to implement the GCA. *See* 27 CFR part 478.

The GCA, at 18 U.S.C. 922(a)(1)(A), makes it unlawful for any person, except a licensed dealer, to "engage in the business" of dealing in firearms.[1] The GCA further provides that no person shall engage in the business of dealing in firearms until the person has filed an application with and received a license to do so from the Attorney General (18 U.S.C. 923(a)), who has delegated that function to ATF (28 CFR 0.130(a)(1)). The application contains information necessary to determine eligibility for licensing and must include a photograph, fingerprints of the applicant, and a license application fee. The fee for dealers in firearms other than destructive devices is currently set by the GCA at $200 for the first three-year period and $90 for a renewal period of three years. 18 U.S.C. 923(a)(3)(B); 27 CFR 478.42(c)(2). The Application for Federal Firearms License, ATF Form 7(5310.12)/7CR (5310.16) ("Form 7"), requires the applicant to include a completed Federal Bureau of Investigation ("FBI") Form FD–258 ("Fingerprint Card") and a photograph for all responsible persons, including sole proprietors. *See* ATF Form 7, Instruction 6.

Significantly, under the GCA, once licensed, firearms dealers are required to conduct background checks through the FBI's National Instant Criminal Background Check System ("NICS") on prospective firearm recipients to prevent prohibited persons from receiving firearms, and to maintain firearms transaction records for crime gun tracing purposes. *See* 18 U.S.C. 922(t); 923(g)(1)(A). Persons who willfully engage in the business of dealing in firearms without a license are subject to a term of imprisonment of up to five years, a fine of up to $250,000, or both. *Id.* 922(a)(1)(A); 924(a)(1)(D); 3571(b)(3).

*A. Advance Notice of Proposed Rulemaking (1979)*

The term "dealer" is defined by the GCA, 18 U.S.C. 921(a)(11)(A), and 27 CFR 478.11, to mean "any person engaged in the business of selling firearms at wholesale or retail." However, as originally enacted, the GCA did not define the term "engaged in the

business." [2] Nor did ATF define the term "engaged in the business" in the original GCA implementing regulations.[3] Although courts had "continually found that the current situation" was "adequate for enforcement purposes," ATF published an Advance Notice of Proposed Rulemaking ("ANPRM") in the **Federal Register** in 1979 in an effort to "develop a workable, commonly understood definition of ['engaged in the business']." *See* 44 FR 75186, 75186–87 (Dec. 19, 1979) ("1979 ANPRM"); 45 FR 20930 (Mar. 31, 1980) (extending the comment period for 30 more days). The ANPRM referenced the lack of a common understanding of that term by the courts and requested comments from the public and industry on how the phrase should be defined and the feasibility and desirability of defining it.

ATF received 844 comments in response, of which approximately 551, or 65.3 percent, were in favor of ATF defining that term.[4] This included approximately 324 firearms dealers in favor of defining the term. However, none of the proposed definitions appeared "to be broad enough to cover all possible circumstances and still be narrow enough to be of real benefit in any particular case." [5] One possible definition ATF considered would have established a threshold number of firearms sales per year to serve as a baseline for when a person would qualify as a dealer. The threshold numbers proposed ranged from "more than one" to "more than 100" per year. ATF did not adopt that proposal because it would have potentially interfered with tracing firearms by persons who avoided obtaining a license (and therefore kept no records) by selling firearms under the minimum threshold.[6] Ultimately, ATF decided not to proceed further with rulemaking at that time. Congress also had not yet acted on then-proposed legislation—the McClure-Volkmer bill (discussed below)—which, among other provisions, sought to define "engaged in the business." [7] For additional reasons why ATF has not adopted a minimum

number of sales, see Section II.D of this preamble.

*B. Firearms Owners' Protection Act of 1986*

Approximately six years later, the McClure-Volkmer bill was enacted as part of the Firearms Owners' Protection Act ("FOPA"), Public Law 99–308, 100 Stat. 449 (1986). With its passage, FOPA added a statutory definition of "engaged in the business" to the GCA. As applied to a person selling firearms at wholesale or retail, it defined the term "engaged in the business" in 18 U.S.C. 921(a)(21)(C) as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." [8] The term excluded "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." [9] FOPA further defined the term "with the principal objective of livelihood and profit" to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." [10] Congress amended FOPA a few months later, clarifying that "proof of profit" was not required "as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." [11]

Consistent with their text, the definitions' purposes were to clarify that individuals not otherwise engaged in the business of dealing firearms who make only occasional firearms sales for a hobby are not required to obtain a license, and to benefit law enforcement "by establishing clearer standards for investigative officers and assisting in the prosecution of persons truly intending to flout the law." [12] The legislative history also reveals that Congress did not intend to limit the license requirement to only persons for whom selling or disposing of firearms is a principal source of income or a principal business activity. The Committee Report stated, "[t]hus, this provision would not remove the necessity for licensing from part-time

---

[1] Persons who engage in the business of manufacturing or importing firearms, including those that are 3D printed or assembled from parts, must also be licensed. 18 U.S.C. 922(a)(1)(A), 923(a). Once licensed, importers and manufacturers may also engage in the business of dealing but only at their licensed premises and only in the same type of firearms their license authorizes them to import or manufacture. *See* 27 CFR 478.41(b).

[2] *See generally* Public Law 90–617, 82 Stat. 1213 (1968).

[3] 33 FR 18555 (Dec. 14, 1968).

[4] Memorandum for Assistant Director, Regulatory Enforcement, ATF, from Chief, Regulations and Procedures Division, ATF, *Re: Evaluation of Comments Received Concerning a Definition of the Phrase "Engaged in the Business," Notice No. 331,* at 1–2 (June 9, 1980) ("ATF Internal Memorandum"), attach. *Summary Sheet on "Engaged in the Business," ANPRM No. 331, Published December 19, 1979,* at 1.

[5] *Id.*

[6] *See id.* at 2.

[7] ATF Internal Memorandum at 4.

[8] Public Law 99–308, sec. 101, 100 Stat. at 450.

[9] *Id.*

[10] *Id.*

[11] Public Law 99–360, sec. 1(b), 100 Stat. 766, 766 (1986).

[12] S. Rep. No. 98–583, at 8 (1984).

businesses or individuals whose principal income comes from sources other than firearms, but whose main objective with regard to firearm transfers is profit, rather than hobby."[13]

Two years after enactment, FOPA's definition of "engaged in the business" was incorporated into ATF's implementing regulations at 27 CFR 178.11 (now 478.11) in defining the term "Dealer in firearms other than a gunsmith or a pawnbroker."[14] At the same time, consistent with the statutory text and legislative history, ATF amended the regulatory term "dealer" to clarify that the term includes "any person who engages in such business or occupation on a part-time basis."[15]

With respect to "personal collections," FOPA included a provision, codified at 18 U.S.C. 923(c), that expressly authorized licensees to maintain and dispose of private firearms collections separately from their business operations. However, under FOPA, as amended, the "personal collection" provision was and remains subject to three limitations. 18 U.S.C. 923(c). First, if a licensee records the disposition (*i.e.,* transfer) of any firearm from their business inventory into a personal collection, that firearm legally remains part of the licensee's business inventory until one year has elapsed after the date of transfer. Should the licensee wish to sell or otherwise dispose of any such "personal" firearm during that one-year period, the licensee must re-transfer the applicable firearm back into the business inventory at the licensee's business premises "with appropriate recording."[16] A subsequent transfer from the business inventory would then be subject to the recordkeeping and background-check requirements of the GCA applicable to all other firearms in the business inventory. Second, if a licensee acquires or disposes of any firearm for the purpose of willfully evading the restrictions placed upon licensees under the GCA, that firearm always legally remains part of the business inventory. Thus, "circuitous transfers are not exempt from otherwise applicable licensee requirements."[17] Third, even when a licensee has made a bona fide transfer of a firearm from their personal

collection, section 923(c) requires the licensee to record the description of the firearm in a bound volume along with the name, place of residence, and date of birth of an individual transferee, or if a corporation or other business entity, the transferee's identity and principal and local places of business.[18] ATF incorporated these provisions into its FOPA implementing regulations in 1988.[19]

Courts interpreting the 1986 FOPA definition of "engaged in the business" found a number of factors relevant to assessing whether a person met that standard. For example, in one leading case, the U.S. Court of Appeals for the Third Circuit listed the following nonexclusive factors for consideration to determine whether the defendant's principal objective was livelihood and profit (*i.e.,* economic): (1) quantity and frequency of sales; (2) location of the sales; (3) conditions under which the sales occurred; (4) defendant's behavior before, during, and after the sales; (5) price charged for the weapons and the characteristics of the firearms sold; and (6) intent of the seller at the time of the sales. *United States* v. *Tyson,* 653 F.3d 192, 200–01 (3d Cir. 2011). The court expanded further that, "[a]s is often the case in such analyses, the importance of any one of these considerations is subject to the idiosyncratic nature of the fact pattern presented." *Id.* at 201. In a separate case, the Third Circuit also stated, "[a]lthough the definition explicitly refers to economic interests as the principal purpose, and repetitiveness as the *modus operandi,* it does not establish a specific quantity or frequency requirement. In determining whether one is engaged in the business of dealing in firearms, the finder of fact must examine the intent of the actor and all circumstances surrounding the acts alleged to constitute engaging in business. This inquiry is not limited to the number of weapons sold or the timing of the sales." *United States* v. *Palmieri,* 21 F.3d 1265, 1268 (3d Cir. 1994), *vacated on other grounds,* 513 U.S. 957 (1994).[20]

### C. Executive Action To Reduce Gun Violence (2016)

On January 4, 2016, President Obama announced several executive actions to reduce gun violence and to make communities across the United States safer. Among them was a requirement that ATF clarify, in a manner consistent with court rulings on the issue: (1) that a person can be engaged in the business of dealing in firearms regardless of the location in which firearm transactions are conducted, and (2) that there is no specific threshold number of firearms purchased or sold that triggers the licensure requirement.[21] To provide this clarification, ATF published a guidance document entitled *Do I Need a License to Buy and Sell Firearms?,* ATF Publication 5310.2 (Jan. 2016), *https://www.atf.gov/file/100871/download,* which addressed these topics. The guidance was developed to assist unlicensed persons in understanding when they will likely need to obtain a license as a dealer in firearms. ATF is updating this guidance to conform with the "engaged in the business" definition as amended by the BSCA. Further, once a final rule is adopted based on this NPRM, ATF intends to update the guidance to include additional detail as needed to conform with the rule.

### D. Bipartisan Safer Communities Act (2022)

Over 35 years after FOPA's enactment, on June 25, 2022, President Biden signed into law the Bipartisan Safer Communities Act, Public Law 117–159, 136 Stat. 1313. Section 12002 of the BSCA broadened the definition of "engaged in the business" under 18 U.S.C. 921(a)(21)(C) to all persons who intend to "predominantly earn a profit" from wholesale or retail dealing in firearms by eliminating the requirement that a person's "principal objective" of purchasing and reselling firearms must include both "livelihood and profit." The statute now provides that, as applied to a dealer in firearms, the term

---

[13] *Id.* The Committee Report further explained that a statutory reference to pawnbrokers in the definition of "engaged in the business" was deleted because "all pawnbrokers whose business includes the taking of any firearm as security for the repayment of money would automatically be a 'dealer.'" *Id.* at 9.

[14] 53 FR 10480, 10491 (Mar. 31, 1988).

[15] *Id.* 10490–91.

[16] S. Rep. No. 98–583, at 13.

[17] *Id.*

[18] *See* Public Law 99–360, sec. 1(c), 100 Stat. at 766–67.

[19] *See* 53 FR 10480; 27 CFR 178.125a (now 478.125a).

[20] *See also United States* v. *Brenner,* 481 F. App'x 124, 127 (5th Cir. 2012) ("Needless to say, in determining the character and intent of firearms transactions, the jury must examine all circumstances surrounding the transaction, without the aid of a 'bright-line rule.'"); *United States* v. *Bailey,* 123 F.3d 1381, 1392 (11th Cir. 1997) ("In determining whether one is engaged in the business of dealing in firearms, the finder of fact must examine the intent of the actor and all circumstances surrounding the acts alleged to constitute engaging in business." (quotation marks and citation omitted)); *United States* v.

*Nadirashvili,* 655 F.3d 114, 119 (2d Cir. 2011) ("[T]he government need not prove that dealing in firearms was the defendant's primary business. Nor is there a 'magic number' of sales that need be specifically proven. Rather, the statute reaches those who hold themselves out as a source of firearms. Consequently, the government need only prove that the defendant has guns on hand or is ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers." (quoting *United States* v. *Carter,* 801 F.2d 78, 81–82 (2d Cir. 1986))).

[21] *See* The White House, Office of the Press Secretary, FACT SHEET: New Executive Actions to Reduce Gun Violence and Make Our Communities Safer (Jan. 4, 2016), *https://obamawhitehouse.archives.gov/the-press-office/2016/01/04/fact-sheet-new-executive-actions-reduce-gun-violence-and-make-our.*

"engaged in the business" means "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." However, the BSCA definition does not include "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. 921(a)(21)(C).

As now defined by the BSCA, the term "to predominantly earn a profit" means that the person who engages in selling or disposing of firearms has a predominant intent of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection. The statutory definition further provides that proof of profit is not required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. 18 U.S.C. 921(a)(22). According to the BSCA's sponsors, the BSCA's change to the definition was driven by "confusion about the GCA's definition of 'engaged in the business,' as it pertained to individuals who bought and resold firearms repetitively for profit, but possibly not as the principal source of their livelihood." [22] The sponsors "maintain[ed] that these changes clarify who should be licensed, eliminating a 'gray' area in the law, ensuring that one aspect of firearms commerce is more adequately regulated." [23] Congress did

not make the same amendment to the various definitions of "engaged in the business" in 18 U.S.C. 921(a)(21) with respect to licensed gunsmiths, manufacturers, or importers.[24]

*E. Executive Order 14092 (2023)*

On March 14, 2023, President Biden issued Executive Order 14092, "Reducing Gun Violence and Making Our Communities Safer." That order requires the Attorney General to report actions taken to implement the BSCA and to develop and implement a plan to: (1) clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal firearms licensees ("FFLs"), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law; and (2) prevent former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms.[25]

This NPRM proposes to implement the "engaged in the business" provisions of the BSCA [26] and the Department's plan in response to Executive Order 14092 by making conforming changes to the new or amended definitions, by clarifying the updated BSCA definition of "engaged in the business," and by preventing former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms. The rule proposes to accomplish this clarity and deterrence by setting forth specific activities demonstrating when an unlicensed person's buying and selling of firearms presumptively rises to the level of being

"engaged in the business," thus requiring that person to obtain a dealer's license, conduct background checks, and abide by the other requirements set forth in the GCA. At the same time, it recognizes that individuals who purchase firearms for the enhancement of a personal collection or a legitimate hobby are permitted by the GCA to occasionally buy and sell firearms for those purposes without the need to obtain a license.

**II. Proposed Rule**

As stated previously, the BSCA revised 18 U.S.C. 921(a)(21)(C) to change part of the definition of persons "engaged in the business" of dealing in firearms. This amendment broadened the definition to reflect that it applies to persons who engage in the business of purchasing and selling firearms at wholesale or retail with the predominant purpose of earning a profit, rather than just to persons whose primary purpose is both livelihood and profit. This means "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C. 921(a)(22). "As a result, the BSCA definitional changes could make some, but not all, intrastate, private firearm transfers subject to GCA recordkeeping and background check requirements" that previously were not subject to those requirements, "if those transfers are made by profit-oriented, repetitive firearms buyers and sellers." [27]

To implement the new statutory language, this proposed rule amends paragraph (c) of the regulatory definition of "engaged in the business," in § 478.11, pertaining to a "dealer in firearms other than a gunsmith or pawnbroker," to conform with 18 U.S.C. 921(a)(21)(C) by removing the phrase "with the principal objective of livelihood and profit" and replacing it with the phrase "to predominantly earn a profit." This proposed rule also amends § 478.11 to conform with new 18 U.S.C. 921(a)(22) by adding the statutory definition of "predominantly earn a profit" as a new regulatory definition. Additionally, this rule proposes to move the regulatory definition of "terrorism," which currently exists in the regulations under

---

[22] William J. Krouse, Cong. Research Serv., IF12197, *Firearms Dealers "Engaged in the Business"* at 2 (Aug. 19, 2022).

[23] *Id.*; 168 Cong. Rec. H5906 (daily ed. June 24, 2022) (Statement of Rep. Jackson Lee) ("[O]ur bill would . . . further strengthen the background check process by clarifying who is engaged in the business of selling firearms and, as a result, is required to run background checks."); 168 Cong. Rec. S3055 (daily ed. June 22, 2022) (Statement of Sen. Murphy) ("We clarify in this bill the definition of a federally licensed gun dealer to make sure that everybody who should be licensed as a gun owner is. In one of the mass shootings in Texas, the individual who carried out the crime was mentally ill. He was a prohibited purchaser. He shouldn't have been able to buy a gun. He was actually denied a sale when he went to a bricks-and-mortar gun store, but he found a way around the background check system because he went online and found a seller there who would transfer a gun to him without a background check. It turned out that seller was, in fact, engaged in the business, but didn't believe the definition applied to him because the definition is admittedly confusing. So we simplified that definition and hope that will result—and I believe it will result—in more of these frequent online gun sellers registering, as they should, as federally licensed gun dealers which

then requires them to perform background checks."); *see also* Letter for Director, ATF, *et al.*, from Sens. John Cornyn and Thom Tillis at 2–3 (Nov. 1, 2022) ("Cornyn/Tillis Letter") ("The BSCA provides more clarity to the industry for when someone must obtain a federal firearms dealers license. In Midland and Odessa, Texas, for example, the shooter—who at the time was prohibited form possessing or owning a firearm under federal law—purchased a firearm from an unlicensed firearms dealer.").

[24] The BSCA retained the existing term "with the principal objective of livelihood and profit," which still applies to persons engaged in the business as manufacturers, gunsmiths, and importers. That definition became 18 U.S.C. 921(a)(23), and Congress renumbered other definitions in section 921 accordingly.

[25] *Reducing Gun Violence and Making Our Communities Safer,* E.O. 14092, secs. 2, 3(a)(i)–(ii), 88 FR 16577, 16527–28 (Mar. 14, 2023).

[26] The Department is also issuing a separate rulemaking to amend ATF's regulations to conform with other provisions in the BSCA.

[27] Krouse, Cong. Research Serv., *Firearms Dealers "Engaged in the Business"* at 2.

the definition of "principal objective of livelihood and profit," to a new stand-alone definition. This is because the BSCA definitions of "to predominantly earn a profit" (18 U.S.C. 921(a)(22)) and "with the principal objective of livelihood and profit" (18 U.S.C. 921(a)(23)) both include the same exception to the requirement to prove intent to profit when a licensee engages in the firearms business for the purpose of terrorism.

To further implement these statutory changes, this rule then proposes to clarify when a person is "engaged in the business" as a dealer in firearms at wholesale or retail by: (a) clarifying the definition of "dealer"; (b) defining the terms "purchase" and "sale" as they apply to dealers; (c) clarifying when a person would not be engaged in the business of dealing in firearms as an auctioneer, or when purchasing firearms for, and selling firearms from, a personal collection; (d) setting forth conduct that is, in civil and administrative proceedings, presumed to constitute "engaging in the business" of dealing in firearms and presumed to demonstrate the intent to "predominantly earn a profit" from the sale or disposition of firearms, absent reliable evidence to the contrary; (e) adding a single definition for the terms "personal collection," "personal firearms collection," and "personal collection of firearms"; (f) adding a definition for the term "responsible person"; (g) clarifying that the intent to "predominantly earn a profit" does not require the person to have received pecuniary gain, and that intent does not have to be shown when a person purchases or sells a firearm for criminal or terrorism purposes; (h) addressing how former licensees, and responsible persons acting on behalf of former licensees, may lawfully liquidate business inventory upon revocation or other termination of their license; and (i) clarifying that licensees must follow the verification and recordkeeping procedures in 27 CFR 478.94 and subpart H of title 27, part 478, rather than using a Firearms Transaction Record, ATF Form 4473 ("Form 4473") when firearms are transferred to other licensees, including transfers by a licensed sole proprietor to that person's personal collection.

*A. Definition of "Dealer"*

In enacting the BSCA, Congress expanded the definition of "engaged in the business" "as applied to a dealer in firearms," as noted above. 18 U.S.C. 921(a)(21)(C). Consistent with the text and purpose of the GCA, ATF regulations have long defined the term "dealer" to include persons engaged in

the business of selling firearms at wholesale or retail, or as a gunsmith or pawnbroker, on a part-time basis. 27 CFR 478.11 (definition of "Dealer").[28] Due to the BSCA amendments, the Department has further considered what it means to be a "dealer" engaged in the firearms business in light of new technologies, mediums of exchange, and forums in which firearms are bought and sold with the predominant intent of obtaining pecuniary gain.

Since 1968, advancements in manufacturing (*e.g.,* 3D printing) and distribution technology (*e.g.,* internet sales) and changes in the marketplace for firearms and related products (*e.g.,* large-scale gun shows) have increased the ways in which individuals shop for firearms, and therefore have created a need for further clarity in the regulatory definition of "dealer."[29] The proliferation of new communications technologies and e-commerce has made it simple for persons to advertise and sell firearms to a large potential market at minimal cost and with minimal effort,

using a variety of means, and often as a part-time activity. The proliferation of sales at larger-scale gun shows, flea markets, other similar events, and online has also altered the marketplace since the GCA was enacted in 1968.

Therefore, to provide additional guidance on what it means to be engaged in the business as a "dealer" within the diverse modern marketplace, this rule first proposes to amend the regulatory definition of "dealer" in 27 CFR 478.11 to clarify that firearms dealing may occur wherever, or through whatever medium, qualifying activities may be conducted. This includes at any domestic or international public or private marketplace or premises. The revised definition provides nonexclusive examples of such marketplaces: a gun show[30] or event,[31] flea market,[32] auction house,[33] or gun range or club; at one's home; by mail order;[34] over the internet;[35] through the use of other electronic means (*e.g.,* an

---

[28] 53 FR at 10481 ("The final rule retains the sentence [including part-time dealers] since it comports with legislative intent as expressed in committee reports."); *see also United States* v. *McGowan,* 746 F. App'x 679, 680 (9th Cir. 2018) ("Selling firearms need not have been McGowan's primary source of income."); *United States* v. *Focia,* 869 F.3d 1269, 1281 (11th Cir. 2017) ("[N]othing in the [FOPA] amendments or the rest of the statutory language indicates that a person violates §922(a)(1)(A) only by selling firearms as his primary means of income."); *United States* v. *Valdes,* 681 F. App'x 874, 877 (11th Cir. 2017) ("The government must prove the defendant's activity rose above 'the occasional sale of a hobbyist,' but does not need to show 'the defendant's primary business was dealing in firearms or that [she] necessarily made a profit from dealing.'"); *United States* v. *Ibarra,* 581 F. App'x 687, 690 (9th Cir. 2014) ("The statute requires that the defendant have a 'principal objective of livelihood and profit,' . . . but nowhere requires a principal objective that profit be one's *primary* source of income."); *United States* v. *Shipley,* 546 F. App'x 450, 454 (5th Cir. 2013) (upholding conviction for dealing in firearms as a regular side business to supplement lawful income); *United States* v. *Gray,* 470 F. App'x 468, 472 (6th Cir. 2012) ("[A] defendant need not deal in firearms as his primary business for conviction."); *Nadirashvili,* 655 F.3d at 119 (*quoting Carter,* 801 F.2d at 81–81, as holding that "[t]he government need not prove that dealing in firearms was the defendant's primary business"); *United States* v. *Manthey,* 92 F. App'x 291, 297 (6th Cir. 2004) ("[A] defendant need not deal in firearms as his primary business for conviction."); *United States* v. *Allah,* 130 F.3d 33, 43–44 (2d Cir. 1997) ("[I]t is not a necessary element of the crime [of dealing without a license] that a defendants' only business be that of selling firearms"); *United States* v. *Beecham,* Nos. 92–5147, 92–5399, 1993 WL 188295, at *3 (4th Cir. June 2, 1993) ("The government need not prove that a defendant's primary business was dealing in firearms or that he necessarily made a profit from it." (internal quotation marks omitted)).

[29] *See* Cornyn/Tillis Letter at 3 ("Our legislation aims at preventing someone who is disqualified from owning or possessing a firearm from shopping around for an unlicensed firearm dealer.").

[30] *See* ATF FFL Newsletter, July 2017, at 9 (gun show guidelines); *Important Notice to Dealers and Other Participants at This Gun Show,* ATF Information 5300.23A (Sept. 2010); ATF Ruling 69–59.

[31] *See* ATF Q&A, *How may a licensee participate in the raffling of firearms by an unlicensed organization?, https://www.atf.gov/firearms/qa/how-may-licensee-participate-raffling-firearms-unlicensed-organization* (May 22, 2020); ATF FFL Newsletter, June 2021, at 8–9 (addressing conduct of business at firearm raffles); Letter to Pheasants Forever, from Acting Chief, Firearms Programs Division, ATF at 1–2 (July 9, 1999) (addressing nonprofit fundraising banquets); 1 ATF FFL Newsletter, Feb. 1999, at 4–5 (addressing dinner banquets).

[32] *See* ATF FFL Newsletter, June 2010, at 5–6 (flea market guidelines).

[33] *See Selling firearms—legally: A Q&A with the ATF,* Auctioneer, at 22–27 (June 2010).

[34] *See, e.g., United States* v. *Buss,* 461 F. Supp. 1016 (W.D. Pa. 1978) (holding that mail order sales by unlicensed defendant violated statute proscribing illegally engaging in business of dealing in firearms, even though defendant acted in concert with licensed firearms dealers who recorded the transfers).

[35] *See* ATF FFL Newsletter, June 2021, at 8 (addressing internet sales of firearms); ATF Intelligence Assessment, *Firearms and Internet Transactions* (Feb. 9, 2016); *Felon Seeks Firearm, No Strings Attached: How Dangerous People Evade Background Checks and Buy Illegal Guns Online,* City of New York (Sept. 2013), *https://www.nyc.gov/html/om/pdf/2013/felon_seeks_firearm.pdf; Point, Click, Fire: An Investigation of Illegal Online Gun Sales,* City of New York (Dec. 2011); *Focia,* 869 F.3d at 1274 (affirming defendant's conviction for engaging in the business without a license by dealing firearms through the "Dark Web").

online broker,[36] online auction,[37] text messaging service,[38] social media raffle,[39] or website [40]); or at any other domestic or international public or private marketplace or premises. These examples are provided to clarify for unlicensed persons that firearms dealing requires a license in whatever place or through whatever medium the firearms are purchased and sold, including the internet and locations other than a traditional brick and mortar store.[41] However, regardless of the medium or location at which a dealer buys and sells firearms, to obtain a license under the GCA, the dealer must still have a fixed premises in a State from which to conduct business subject to the license, and comply with all applicable State and local laws regarding the conduct of such business.[42] 18 U.S.C. 923(d)(1)(E)–(F).

Even though an applicant must have a business premises in a particular State to obtain a license, under the GCA, firearms purchases or sales requiring a license in the United States may involve conduct outside of the United States. Specifically, 18 U.S.C. 922(a)(1)(A) has long prohibited any person without a license from shipping, transporting, or receiving any firearm in foreign commerce while in the course of being engaged in the business of dealing in firearms,[43] and 18 U.S.C. 924(n) prohibits travelling from a foreign country to a State in furtherance of conduct that constitutes a violation of section 922(a)(1)(A).

Further, as recently amended by the BSCA, the GCA now expressly prohibits a person from smuggling or knowingly taking a firearm out of the United States with intent to engage in conduct that would constitute a felony for which the person may be prosecuted in a court in the United States if the conduct had occurred within the United States. 18 U.S.C. 924(k)(2). Willfully engaging in the business of dealing in firearms without a license is an offense punishable by more than one year in prison, *see* 18 U.S.C. 924(a)(1)(D), and constitutes a felony. Therefore, unlicensed persons who purchase firearms in the United States and smuggle or take them out of the United States (or conspire or attempt to do so) for resale in another country would still be engaging in unlawful dealing in firearms without a license, among other violations of United States law. Accordingly, this rule proposes to clarify in the definition of ''dealer'' that purchases or sales of firearms as a wholesale or retail dealer may occur either domestically or internationally.

*B. Definition of ''Engaged in the Business''—''Purchase'' and ''Sale''*

To further clarify the regulatory definition of a dealer ''engaged in the business'' with the predominant intent of earning a profit through the repetitive purchase and resale of firearms in 27 CFR 478.11, this rule also proposes to define, based on common dictionary definitions and relevant case law, the terms ''purchase'' and ''sale'' (and derivative terms thereof, such as ''purchases,'' ''purchasing,'' ''purchased,'' and ''sells,'' ''selling,'' or ''sold''). This should help clarify, through examples, how those terms apply to dealing in firearms. Specifically, this rule proposes to define ''purchase'' (and derivative terms thereof) as ''the act of obtaining a firearm in exchange for something of

---

[36] *See, e.g., Fulkerson* v. *Lynch,* 261 F. Supp. 3d 779, 783–86, 788–89 (W.D. Ky. 2017) (denying summary judgment to applicant whose license was denied by ATF for previously willfully engaging in the business of dealing without a license through an online broker and granting summary judgement to the government). Although some dealers may sell firearms through online services sometimes called ''brokers,'' like a magazine or catalog company that only advertises firearms listed by known sellers and processes orders for them for direct shipment from the distributor to their buyers, these ''brokers'' are not themselves considered ''dealers.'' This is because these online ''brokers'' do not purchase the firearms for valuable consideration (*i.e.,* take or transfer title to them). Rather, they typically only collect a commission or fee for providing contracted services to market and process the transaction for the seller. This is distinguished from a broker who, for example, purchases the firearms from a manufacturer, importer, or other distributor, sells the firearms to the buyer, and has them shipped directly to the buyer from the distributor. Such persons must be licensed as dealers since they are purchasing and selling the firearms with the predominant intent to earn a profit. *See, e.g.,* ATF FFL Newsletter, Sept. 2016, at 3; 2 ATF FFL Newsletter, Mar. 2023, at 6–7.

[37] *See, e.g.,* Press Release, Department of Justice Office of Public Affairs (''OPA''), *Minnesota Man Indicted for Dealing Firearms without a License* (Feb. 18, 2016), *https://www.justice.gov/opa/pr/minnesota-man-indicted-dealing-firearms-without-license* (defendant dealt in firearms through websites such as *gunbroker.com,* an online auction website).

[38] *See, e.g.,* Press Release, OPA, *Odenton, Maryland Man Exiled to 8 Years in Prison for Firearms Trafficking Conspiracy,* DOJ/OPA (Apr. 27, 2017), *https://www.justice.gov/usao-md/pr/odenton-maryland-man-exiled-8-years-prison-firearms-trafficking-conspiracy* (defendant texted photos of firearms for sale to his customer and discussed prices).

[39] *See* ATF FFL Newsletter, June 2021, at 9 (''Social media gun raffles are gaining popularity on the internet. In most instances, the sponsor of the event is not a Federal firearms licensee, but will enlist the aid of a licensee to facilitate the transfer of the firearm to the raffle winner. Often, the sponsoring organization arranges to have the firearm shipped from a distributor to a licensed third party and never takes physical possession of the firearm. If the organization's practice of raffling firearms rises to the level of being engaged in the business of dealing in firearms, the organization must obtain a Federal firearms license.'').

[40] *See, e.g.,* Press Release, Department of Justice United States Attorney's Office (''USAO''), *Snapchat Gun Dealer Convicted of Unlawfully Manufacturing and Selling Firearms* (Oct. 4, 2022), *https://www.justice.gov/usao-edca/pr/snapchat-gun-dealer-convicted-unlawfully-manufacturing-and-selling-firearms;* Press Release, USAO, *Sebring Resident Sentenced to Prison for Unlawfully Dealing Firearms on Facebook* (Nov. 7, 2016), *https://www.justice.gov/usao-sdfl/pr/sebring-resident-sentenced-prison-unlawfully-dealing-firearms-facebook.*

[41] *See* Letter for Outside Counsel to National Association of Arms Shows, from Chief, Firearms and Explosives Division, ATF, *Re: Request for Advisory Opinion on Licensing for Certain Gun Show Sellers* at 1 (Feb. 17, 2017) (''Anyone who is engaged in the business of buying and selling firearms, regardless of the location(s) at which those transactions occur is required to have a Federal firearms license. ATF will issue a license to persons who intend to conduct their business primarily at gun shows, over the internet, or by mail order, so long as they otherwise meet the eligibility criteria established by law. This includes the requirement that they maintain a business premises at which ATF can inspect their records and inventory, and that otherwise complies with local zoning restrictions''); ATF FFL Newsletter, June 2010, at 5 (Unless there is a permanent business premises from which to conduct firearms business (*e.g.,* an identified rented space that can securely hold required records), ''[t]he GCA prohibits any person from engaging in the business of selling, dealing, or trading in firearms at flea markets. The only exceptions would be an unlicensed individual making an occasional firearm sale or for a Federal firearms licensee to display firearms and take orders of firearms.''); Letter for Sen. Dan Coats, from Deputy Director, ATF (Aug. 22, 1990) (an FFL cannot be issued at a table or booth at a temporary flea market); ATF Internal Memorandum #23264 (June 15, 1983) (same); *United States* v. *Allman,* 119 Fed. App'x. 751, 754 (6th Cir. 2005) (''Illegal gun transactions at flea markets are not atypical.''); *United States* v. *Orum,* 106 F. App'x 972 (6th Cir. 2004) (defendant illegally displayed and sold firearms at flea markets and gun shows).

[42] *See Abramski* v. *United States,* 573 U.S. 169, 172, 181 (2014) (''The statute establishes a detailed scheme to enable the dealer to verify, at the point of sale, whether a potential buyer may lawfully own a gun. Section 922(c) brings the would-be purchaser onto the dealer's 'business premises' by prohibiting, except in limited circumstances, the sale of a firearm 'to a person who does not appear in person' at that location.''); *National Rifle Ass'n* v. *Brady,* 914 F. 2d 475, 480 (4th Cir. 1990) (holding that FOPA did not eliminate the requirement that a licensee have a business premises from which to conduct business ''so that regulatory authorities will know where the inventory and records of a licensee can be found''); *Meester* v. *Bowers,* No. 12CV86, 2013 WL 3872946 (D. Neb. July 25, 2013) (upholding ATF's denial of license in part because the applicant lacked a means of accessing the premises).

[43] *See, e.g., United States* v. *Baptiste,* 607 F. App'x 950, 953 (11th Cir. 2015) (upholding section 922(a)(1) conviction where firearms purchased in the United States were to be resold in Haiti); *United States* v. *Murphy,* 852 F.2d 1, 8 (1st Cir. 1988) (same with firearms to be resold in Ireland); *United States* v. *Hernandez,* 662 F.2d 289, 291 (5th Cir. 1981) (same with firearms to be resold in Mexico). *But see United States* v. *Mowad,* 641 F.2d 1067 (2d Cir. 1981) (reversing conviction for purchasing firearms for resale in Lebanon on the basis that there was no mention of exporting firearms in the GCA or any suggestion of Congressional concern about firearm violence in other countries).

value," [44] and the term "sale" (and derivative terms thereof, including "resale") as "the act of providing a firearm in exchange for something of value." [45] The term "something of value" includes money, credit, personal property (*e.g.*, another firearm [46] or ammunition [47]), a service,[48] a controlled substance,[49] or any other medium of exchange [50] or valuable consideration." [51]

Defining these terms to include any method of payment for a firearm would clarify that persons cannot avoid licensing by, for instance, bartering or providing or receiving services in exchange for firearms with the predominant intent to earn pecuniary gain even where no money is exchanged. It would also clarify that a

## C. Definition of "Engaged in the Business" as Applied to Auctioneers

Because the definitions of "purchase" and "sale" broadly include services provided in exchange for firearms, both as defined by common dictionaries and as proposed in this rule, the Department further proposes to make clear that certain persons who provide auctioneer services are not required to be licensed as dealers. ATF has long interpreted the statutory definition of "engaged in the business" as excluding auctioneers who provide only auction services on commission by assisting in liquidating a personal collection of firearms at an "estate-type" auction.[52] The new definition in the BSCA does not affect that determination. The Department is proposing to incorporate this longstanding interpretation into the regulations while otherwise clarifying the regulatory definition.

In this context, the auctioneer is generally providing services only as an agent of the owner or executor of an estate who is liquidating a personal collection. The firearms are within the estate's control and the sales made on the estate's behalf. This limited exclusion from the definition of "dealer" is conditioned on the auctioneer not purchasing the firearms, taking possession of the firearms prior to the auction, or consigning the firearms for sale. If the auctioneer were to engage in any of that conduct, the auctioneer would need to have a dealer's license because that person would be engaged in the business of purchasing and reselling firearms to earn a profit. An "estate-type" auction as described above differs from liquidating a personal collection of firearms by means of a "consignment-type" auction, in which the auctioneer is paid to accept firearms into a business inventory and then resells them in lots,

or over a period of time. In this "consignment-type" auction, the auctioneer generally inventories, evaluates, and tags the firearms for identification.[53] Therefore, under "consignment-type" auctions, an auctioneer would generally need to be licensed.

## D. Presumptions That a Person Is "Engaged in the Business"

The Department has observed through its enforcement efforts and subject-matter expertise that persons who are engaged in certain firearms purchase-and-sale activities are highly likely to be "engaged in the business" of dealing in firearms at wholesale or retail. These activities have been observed through a variety of criminal, civil, and administrative enforcement actions and proceedings brought by the Department, to include: (1) ATF inspections of prospective and existing wholesale and retail dealers of firearms who are engaged, or intend to engage in the business; [54] (2) criminal investigations and prosecutions of persons who engaged in the business of dealing in firearms without a license; [55] (3) civil and administrative actions under 18 U.S.C. 924(d) to seize and forfeit firearms intended to be sold by persons engaged in the business without a license; [56] (4) ATF cease and desist letters issued to prevent section 922(a)(1)(A) violations; [57] and (5) ATF administrative proceedings under 18 U.S.C. 923 to deny licenses to persons who willfully engaged in the business of dealing in firearms without a license, or to revoke or deny renewal of existing

---

[44] This definition is consistent with the common meaning of "purchase," which is "to obtain (as merchandise) by paying money or its equivalent." Webster's Third New International Dictionary 1844 (1971); *see also* Black's Law Dictionary 1491 (11th Ed. 2019) (The term "purchase" means "[t]he acquisition of an interest in real or personal property by sale, discount, negotiation, mortgage, pledge, lien, issue, reissue, gift, or any other voluntary transaction.").

[45] This definition is consistent with the common meaning of "sale," which is "a contract transferring the absolute or general ownership of property from one person or corporate body to another for a price (as a sum of money or any other consideration)." Webster's Third New International Dictionary 2003 (1971). The related term "resale" is "the act of selling again." *Id.* at 1929.

[46] *See, e.g., United States* v. *Gross,* 451 F.2d 1355, 1360 (7th Cir. 1971) (defendant "had traded firearms [for other firearms] with the object of profit in mind").

[47] *See, e.g., United States* v. *Huffman,* 518 F.2d 80 (4th Cir. 1975) (defendant traded large quantities of ammunition in exchange for firearms).

[48] *See, e.g., United States* v. *57 Miscellaneous Firearms,* 422 F. Supp. 1066, 1070–71 (W.D. Mo. 1976) (defendant obtained the firearms he sold or offered for sale in exchange for carpentry work he performed).

[49] *See, e.g., Johnson* v. *Johns,* No. 10–CV–904(SJF), 2013 WL 504446 (E.D.N.Y. Feb. 5, 2013) (on at least one occasion, petitioner, who was engaged in the unlicensed dealing in firearms through straw purchasers, compensated a straw purchaser with cocaine base).

[50] *See, e.g., Focia,* 869 F.3d at 1274 (defendant sold pistol online to undercover ATF agent for 15 bitcoins).

[51] The term "medium of exchange" generally means "something commonly accepted in exchange for goods and services and recognized as representing a standard of value," and "valuable consideration" is "an equivalent or compensation having value that is given for something (as money, marriage, services) acquired or promised and that may consist either in some right, interest, profit, or benefit accruing to one party or some responsibility, forbearance, detriment, or loss exercised by or falling upon the other party." Webster's Third New International Dictionary 1403, 2530 (1971). *See, e.g., United States* v. *Berry,* 644 F.2d 1034, 1036 (5th Cir. 1981) (defendant sold firearms in exchange for large industrial batteries to operate his demolition business); *United States* v. *Reminga,* 493 F. Supp. 1351, 1357 (W.D. Mich. 1980) (defendant traded his car for three guns that he later sold or traded).

[52] *See* ATF Q&A, *Does an auctioneer who is involved in firearms sales need a dealer's license?, https://www.atf.gov/firearms/qa/does-auctioneer-who-involved-firearms-sales-need-dealer-license* (July 10, 2020); ATF Federal Firearms Regulations Reference Guide, P 5300.4, Q&A L1, at 207 (2014); ATF FFL Newsletter, May 2001, at 3; ATF Ruling 96–2, *Engaging in the Business of Dealing in Firearms (Auctioneers);* 1 ATF FFL Newsletter, 1990, at 7; Letter for Editor, CarPac Publishing Company, from Acting Assistant Director (Regulatory Enforcement), ATF, CC–28,953 (July 26, 1979).

[53] *Id.*

[54] In Fiscal Year 2022, for example, ATF conducted 11,156 qualification inspections of new applicants for a license, and 6,979 compliance inspections of active licensees. *See* ATF, *Fact Sheet—Facts and Figures for Fiscal Year 2022* (Jan. 2023), *https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-figures-fiscal-year-2022.*

[55] *See* footnotes 62 through 72, *infra.*

[56] *See, e.g., United States* v. *Four Hundred Seventy Seven (477) Firearms,* 698 F. Supp. 2d 890 (E.D. Mich. 2010) (civil forfeiture of firearms intended to be sold from an unlicensed gun store); *United States* v. *One Bushmaster, Model XM15–E2 Rifle,* No. 5:06–CV–156 (WDO), 2006 WL 3497899 (M.D. Ga. Dec. 5, 2006) (civil forfeiture of firearms intended to be sold by an unlicensed person who acquired an unusually large amount of firearms quickly for the purpose of selling or trading them); *United States* v. *Twenty Seven (27) Assorted Firearms,* No. SA–05–CA–407–XR, 2005 WL 2645010 (W.D. Tex. Oct. 13, 2005) (civil forfeiture of firearms intended to be sold at gun shows without a license).

[57] Over the years, ATF has issued numerous letters warning unlicensed persons not to continue to engage in the business of dealing in firearms without a license, also called a "cease and desist" letter. *See, e.g., United States* v. *Kubowski,* 85 F. App'x 686, 687 (10th Cir. 2003) (defendant served cease and desist letter after selling five handguns and one rifle to undercover ATF agents).

licenses held by licensees who aided and abetted that misconduct.[58] In addition, numerous courts have identified certain activities or factors they deemed relevant to determining whether a person is "engaged in the business" even prior to Congress's decision to expand the definition in the BSCA.[59] This rule, therefore, proposes to establish rebuttable presumptions in certain contexts to help unlicensed persons, industry operations personnel, and others determine when a person is presumed to be "engaged in the business" requiring a dealer's license.

These rebuttable presumptions would apply in civil and administrative proceedings. While the criteria set forth in the proposed rule may be useful to a court in a criminal case—for example, to inform appropriate jury instructions regarding permissible inferences [60]—the regulatory text makes clear that the

presumptions shall not apply to criminal cases.[61]

The Department has considered, but not proposed in the NPRM, an alternative that would have set a minimum numerical threshold of firearms sold by a person within a certain period of time. That approach has not been proposed for several reasons. First, while selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity, neither the courts nor the Department has recognized a set minimum number of firearms purchased or resold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. Instead, the established approach for determining whether an individual is "engaged in the business" is to look at the totality of circumstances. Thus, even a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license. For example, even under the previous statutory definition, courts have upheld convictions for dealing without a license when few firearms, if any, were actually sold, provided other factors were also present, such as the person representing to others a willingness and ability to repetitively purchase firearms for resale. *See, e.g., United States* v. *King,* 735 F.3d 1098, 1107 n.8 (9th Cir. 2013) (upholding conviction where defendant attempted to sell one firearm and represented that he could purchase more for resale and noting that "Section 922(a)(1)(A) does not require an actual sale of firearms").[62] Second, in addition

to the tracing concerns expressed by ATF in response to comments on the 1979 ANPRM, a person could structure their transactions to avoid a minimum threshold by spreading out their sales over time. Finally, the Department does not believe there is a sufficient evidentiary basis, without consideration of additional factors, to support a specific minimum number of firearms bought or sold for a person to be considered "engaged in the business."

Rather than establishing a minimum threshold number of firearms purchased or sold, this rule proposes to clarify that, absent reliable evidence to the contrary, a person will be presumed to be engaged in the business of dealing in firearms when the person:

(1) sells or offers for sale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and sell additional firearms;[63]

(2) spends more money or its equivalent on purchases of firearms for the purpose of resale than the person's reported taxable gross inome during the applicable period of time;[64]

(3) repetitively purchases for the purpose of resale, or sells or offers for sale firearms—

[58] *See, e.g., In the Matter of Scott,* Application Nos. 9–93–019–01–PA–05780 and 05781 (Seattle Field Division, Apr. 3, 2018) (denied applicant for license to person who purchased and sold numerous handguns within one month; *In the Matter of S.E.L.L. Antiques,* Application No. 9–87–035–01–PA–00725 (Phoenix Field Division, Feb. 21, 2006) (denied applicant who repetitively sold modern firearms from unlicensed storefront).

[59] *See* footnote 20, *supra,* and accompanying text.

[60] While rebuttable presumptions may not be presented to a jury in a criminal case, jury instructions may include, for example, reasonable permissive inferences. *See Francis* v. *Franklin,* 471 U.S. 307, 314 (1985) ("A permissive inference suggests to the jury a possible conclusion to be drawn if the [government] proves predicate facts, but does not require the jury to draw that conclusion."); *County Court of Ulster County* v. *Allen,* 442 U.S. 140 (1979) (upholding jury instruction that gave rise to a permissive inference available only in certain circumstances, rather than a mandatory conclusion); *Baghdad* v. *Att'y Gen. of the U. S.,* 50 F.4th 386, 390 (3d Cir. 2022) ("Unlike mandatory presumptions, permissive inferences . . . do not shift the burden of proof or require any outcome. They are just an 'evidentiary device . . . [that] allows—but *does not require*—the trier of fact to infer' that an element of a crime is met once basic facts have been proven beyond a reasonable doubt."); *Patton* v. *Mullin,* 425 F.3d 788 (10th Cir. 2005) (upholding jury instruction that created a permissive inference rather than a rebuttable presumption); *United States* v. *Warren,* 25 F.3d 890, 897 (9th Cir. 1994) (same); *United States* v. *Washington,* 819 F.2d 221 (9th Cir. 1987) (same); *Lannon* v. *Hogan,* 719 F.2d 518 (1st Cir. 1983) (same); *United States* v. *Gaines,* 690 F.2d 849 (11th Cir. 1982) (same); *cf., e.g., United States* v. *Antonoff,* 424 F. App'x 846, 848 (11th Cir. 2011) (district court relied on permissive inference of current drug use in ATF's definition of "unlawful user" in 27 CFR 478.11 to conclude that the defendant's drug use was "contemporaneous and ongoing" sufficient to apply the 2K2.1 sentencing guideline); *United States* v. *McCowan,* 469 F.3d 386, 392 (5th Cir. 2006) (upholding application of a sentencing enhancement based on the permissive inference of current drug use in 27 CFR 478.11); *United States* v. *Stanford,* No. 11–10211–01–EFM, 2012 WL 1313503 (D. Kan. Apr. 16, 2012) (upholding arrest under 18 U.S.C. 922(g)(3) relying, in part, on ATF's regulatory definition of "unlawful user").

[61] *See generally* 2 Handbook of Fed. Evid. § 303:4 (9th ed. 2020) (explaining Federal Rule of Evidence Standard 303(c), which "provides that whenever the existence of a presumed fact against the accused is submitted to the jury, the court should instruct the jury that it may regard the basic facts as sufficient evidence of the presumed fact but is not required to do so. In addition, if the presumed fact establishes guilt, is an element of the offense, or negatives a defense, the court should instruct the jury that its existence on all the evidence must be proved beyond a reasonable doubt. . . . The applicability and constitutionality of Standard 303(b) must be evaluated in light of the Supreme Court decisions in *County Court of Ulster* v. *Allen, Sandstrom* v. *Montana,* and *Francis* v. *Franklin.* As a result of these decisions it is clear, if it wasn't before, that it is never permissible to shift to the defendant the burden of persuasion to disprove an element of a crime charged by means of a presumption, and of course, that a conclusive or irrebuttable presumption operating against the criminal defendant is also unconstitutional.").

[62] *See* Do I Need a License to Buy and Sell Firearms?, ATF Publication 5310.2 (Jan. 2016). *See also Nadirashvili,* 655 F.3d at 120–21 (despite defendants' knowledge of only a single firearms

transaction, there was sufficient evidence to prove they had "engaged in the business" because they knew co-defendant held himself out generally as a source of firearms, and was ready to procure them for customers); *United States* v. *Shan,* 361 F. App'x 182 (2d Cir. 2010) (defendant sold two firearms within roughly a month and acknowledged he had a source of supply for other weapons); *United States* v. *Shan,* 80 F. App'x 31 (9th Cir. 2003) (sale of weapons in one transaction where the defendant was willing and able to find more weapons for resale); *Murphy,* 852 F.2d at 8 ("[T]his single transaction was sufficiently large in quantity, price and length of negotiation to constitute dealing in firearms."); *United States* v. *Swinton,* 521 F.2d 1255, 1259 (10th Cir. 1975) ("Swinton's sale [of one firearm] to Agent Knopp, standing alone, without more, would not have been sufficient to establish a violation of section 922(a)(1). That sale, however, when considered in conjunction with other facts and circumstances related herein, established that Swinton was engaged in the business of dealing in firearms. The unrebutted evidence of the Government established not only that Swinton considered himself to be and held himself out as a dealer, but that, most importantly, he was actively engaged in the business of dealing in guns." (internal citation omitted)).

[63] *See King,* 735 F.3d at 1107 (defendant attempted to sell one of the 19 firearms he had ordered, and represented to the buyer that he was buying, selling, and trading in firearms and could procure any item in a gun publication at a cheaper price).

[64] *See, e.g., Focia,* 869 F.3d at 1282 ("And finally, despite efforts to obtain Focia's tax returns and Social Security information, agents found no evidence that Focia enjoyed any source of income other than his firearms sales. This evidence overwhelmingly demonstrates that Focia's sales of firearms were no more a hobby than working at Burger King for a living could be described that way.").

(A) through straw or sham businesses,[65] or individual straw purchasers or sellers; [66] or

(B) that cannot lawfully be purchased or possessed, including:

(i) stolen firearms (18 U.S.C. 922(j)); [67]

(ii) firearms with the licensee's serial number removed, obliterated, or altered (18 U.S.C. 922(k); 26 U.S.C. 5861(i)); [68]

(iii) firearms imported in violation of law (18 U.S.C. 922(l), 22 U.S.C. 2778, or 26 U.S.C. 5844, 5861(k)); or

(iv) machineguns or other weapons defined as firearms under 26 U.S.C. 5845(a) that were not properly registered in the National Firearms Registration and Transfer Record (18 U.S.C. 922(o); 26 U.S.C. 5861(d)); [69]

(4) repetitively sells or offers for sale firearms—

(A) within 30 days after they were purchased; [70]

(B) that are new, or like new in their original packaging; [71] or

(C) that are of the same or similar kind (i.e., make/manufacturer, model, caliber/gauge, and action) and type (i.e., the classification of a firearm as a rifle, shotgun, revolver, pistol, frame, receiver, machinegun, silencer, destructive device, or other firearm); [72]

(5) who, as a former licensee (or responsible person acting on behalf of the former licensee) sells or offers for sale firearms that were in the business inventory of such licensee at the time the license was terminated (i.e., license revocation, denial of license renewal, license expiration, or surrender of license), and were not transferred to a personal collection in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a; or

(6) who, as a former licensee (or responsible person acting on behalf of a former licensee) sells or offers for sale firearms that were transferred to a personal collection of such former licensee or responsible person prior to the time the license was terminated, unless: (A) the firearms were received and transferred without any intent to willfully evade the restrictions placed on licensees by chapter 44, title 18, of the United States Code; and (B) one year has passed from the date of transfer to the personal collection.

Any one or a combination of the circumstances above gives rise to a presumption in civil and administrative proceedings that the person is engaged in the business of dealing in firearms and must be licensed under the GCA. The activities set forth in these rebuttable presumptions are not exhaustive of the conduct that may show that, or are considered in determining whether, a person is engaged in the business of dealing in firearms. Further, as noted above, while the criteria may be useful to courts in criminal cases when instructing juries regarding permissible inferences, the presumptions outlined above shall not apply to criminal cases.

At the same time, the Department recognizes that certain transactions are not likely to be sufficient to support a presumption that a person is engaging in the business of dealing in firearms. For this reason, the proposed rule also includes examples of when a person is not presumed to be engaged in the business of dealing in firearms. Specifically, under this proposed rule, a person would not be presumed to be engaged in the business requiring a license as a dealer when the person transfers firearms only as bona fide

---

[65] See, e.g., MEW Sporting Goods, LLC. v. Johansen, 992 F. Supp. 2d 665, 674–75 (N.D.W.V. 2014), aff'd, 594 F. App'x 143 (4th Cir. 2015) (corporate entity disregarded where it was formed to circumvent firearms licensing requirement); King, 735 F.3d at 1106 (defendant felon could not "immunize himself from prosecution" for dealing without a license by "hiding behind a corporate charter."); United States v. Fleischli, 305 F.3d 643, 652 (7th Cir. 2002) ("In short, a convicted felon who could not have legitimately obtained a manufacturer's or dealer's license may not obtain access to machine guns by setting up a sham corporation."); National Lending Group, L.L.C. v. Mukasey, No. CV 07–0024, 2008 WL 5329888 (D. Ariz. Dec. 19, 2008), aff'd, 365 F. App'x 747 (9th Cir. 2010) (straw ownership of corporate pawn shops); Casanova Guns, Inc. v. Connally, 454 F.2d 1320, 1322 (7th Cir. 1972) ("[I]t is well settled that the fiction of a corporate entity must be disregarded whenever it has been adopted or used to circumvent the provisions of a statute."); XVP Sports, LLC v. Bangs, No. 2:11CV379, 2012 WL 4329258, at *5 (E.D. Va. Sept. 17, 2012) ("unity of interest" existed between firearm companies controlled by the same person); Virlow LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives, No. 1:06–CV–375, 2008 WL 835828 (W.D. Mich. Mar. 28, 2008) (corporate form disregarded where a substantial purpose for the formation of the company was to circumvent the statute restricting issuance of firearms licenses to convicted felons); Press Release, OPA, Utah Business Owner Convicted of Dealing in Firearms without a License and Filing False Tax Returns (Sept. 23, 2016), https://www.justice.gov/opa/pr/utah-business-owner-convicted-dealing-firearms-without-license-and-filing-false-tax-returns (defendant illegally sold firearms under the auspices of a company owned by another Utah resident).

[66] See, e.g., Bryan v. United States, 524 U.S. 184, 189 (1998) (defendant used straw purchasers to buy pistols in Ohio for resale in New York); United States v. Ochoa, 726 F. App'x 651, 652 (9th Cir. 2018) ("[W]hile the evidence demonstrated that Ochoa did not purchase and sell the firearms himself, it was sufficient to demonstrate that he had the princip[al] objective of making a profit through the repetitive purchase and sale of firearms, even if those purchases and sales were carried out by others."); United States v. Hosford, 843 F.3d 161, 163 (4th Cir. 2016) (defendant purchased firearms through a straw purchaser who bought them at gun shows); United States v. Paye, 129 F. App'x 567, 570 (11th Cir. 2005) (defendant paid straw purchaser to buy firearms for him to sell); United States v. Bryan, 122 F.3d 90, 92 (2d Cir. 1997) (defendant enlisted the aid of two straw purchasers to buy guns for resale in another state).

[67] See, e.g., United States v. Simmons, 485 F.3d 951 (7th Cir. 2007); United States v. Perkins, 633 F.2d 856 (8th Cir. 1981).

[68] See, e.g., United States v. Ilarraza, 963 F.3d 1 (1st Cir. 2020); United States v. Fields, 608 F. App'x 806 (11th Cir. 2015); United States v. Barrero, 578 F. App'x 884 (11th Cir. 2014); United States v. Teleguz, 492 F.3d 80 (1st Cir. 2007); United States v. Kitchen, 87 F. App'x 244 (3d Cir. 2004); United States v. Bostic, 371 F.3d 865 (6th Cir. 2004); United States v. Ortiz, 318 F.3d 1030 (11th Cir. 2003); United States v. Jackson, No. 97–6756, 1997 WL 618902 (4th Cir. Oct. 8, 1997); United States v. Rosa, 123 F.3d 94 (2d Cir. 1997); United States v.

Twitty, 72 F.3d 228 (1st Cir. 1995); United States v. Collins, 957 F.2d 72 (2d Cir. 1992).

[69] See, e.g., United States v. Fridley, 43 F. App'x 830 (6th Cir. 2002) (defendant purchased and sold unregistered machineguns); United States v. Idarecis, No. 97–1629, 1998 WL 716568 (2d Cir. Oct. 9, 1998) (defendant converted rifles to automatic weapons and obliterated the serial numbers on the firearms he sold).

[70] See, e.g., Press Release, OPA, Minnesota Man Indicted for Dealing Firearms without a License (Feb. 18, 2016), https://www.justice.gov/opa/pr/minnesota-man-indicted-dealing-firearms-without-license#:~:text=U.S.%20Attorney%20Andrew%20M.,least%20nine%20firearms%20transaction%20records (defendant sold firearms he purchased through online websites, and the average time he actually possessed a gun before offering it for sale was only nine days); Press Release, USAO, Ex-Pasadena Police Lieutenant Sentenced to One Year in Federal Prison for Unlicensed Selling of Firearms and Lying on ATF Form (Feb. 25, 2019), https://www.justice.gov/usao-cdca/pr/ex-pasadena-police-lieutenant-sentenced-one-year-federal-prison-unlicensed-selling (defendant resold 79 firearms within six days after he purchased them); United States v. D'Agostino, No. 10–20449, 2011 WL 219008 (E.D. Mich. Jan. 20, 2011) (some of the weapons defendant sold at gun shows were purchased "a short time earlier").

[71] See, e.g., United States v. Carter, 203 F.3d 187, 189 n.1 (2d Cir. 2000) (defendant admitted to willfully shipping and transporting interstate eleven handguns in the course of engaging in the business of dealing in firearms without a license that were contained in their original boxes); United States v. Van Buren, 593 F.2d 125, 126 (9th Cir. 1979) (defendant's "gun displays were atypical of those of a collector because he exhibited many new weapons, some in the manufacturers' boxes"); United States v. Powell, 513 F.2d 1249 (8th Cir. 1975) (defendant acquired and sold six "new" or "like new" shotguns over several months); United States v. Posey, 501 F.2d 998, 1002 (6th Cir. 1974) (defendant offered firearms for sale, some of them in their original boxes); United States v. Day, 476 F.2d 562, 564, 567 (6th Cir. 1973) (60 of the 96 guns to be sold by defendant were new handguns still in the manufacturer's original packages).

[72] See, e.g., Press Release, USAO, FFL Sentenced for Selling Guns to Unlicensed Dealers (May 27, 2022), https://www.justice.gov/usao-ndtx/pr/ffl-sentenced-selling-guns-unlicensed-dealers (defendant regularly sold large quantities of identical firearms to unlicensed associates who sold them without a license); Shipley, 546 F. App'x at

453 (defendant sold mass-produced firearms of similar make and model that were not likely to be part of a personal collection).

**62002** **Federal Register**/Vol. 88, No. 173/Friday, September 8, 2023/Proposed Rules

gifts,[73] or occasionally[74] sells firearms only to obtain more valuable, desirable, or useful firearms for their personal collection or hobby, unless their conduct also demonstrates a predominant intent to earn a profit.

The rebuttable presumptions set forth above are supported by the Department's investigative and regulatory enforcement experience,[75] as well as conduct that the courts have found to require a license even before the BSCA expanded the definition of "engaged in the business." Moreover, these presumptions are consistent with the case-by-case analytical framework long applied by the courts in determining whether a person has violated 18 U.S.C. 922(a)(1)(A) and 923(a) by engaging in the business of dealing in firearms without a license even under the pre-BSCA definition. The fundamental purpose of the GCA would be severely undermined if persons were allowed to repetitively purchase and resell firearms to predominantly earn a profit without conducting background checks, keeping records, and otherwise complying with the license requirements of the GCA simply because the effort needed to conduct commerce in general has dramatically diminished. The Department is therefore providing objectively reasonable standards for when a person is presumed to be "engaged in the business" to strike an appropriate balance that captures persons who should be licensed, without limiting or regulating activity truly for the purposes of a hobby or enhancing a personal collection.

The first presumption stated above—that a person will be presumed to be engaged in the business when the person sells or offers for sale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and sell additional firearms—reflects that the

definition of "engaged in the business" in 18 U.S.C. 921(a)(21)(C) does not require that a firearm actually be sold by a person so long as the person is holding themself out as a dealer. This is because, under the definition of "engaged in the business" in 18 U.S.C. 921(a)(21)(C), the "repetitive purchase and resale of firearms" is the means through which the person intends to engage in the business even if those firearms are not actually repetitively purchased and resold.

The second presumption above—that a person is engaged in the business when spending more money or its equivalent on purchases of firearms for the purpose of resale than the person's reported taxable gross income during the applicable period of time—reflects that persons who spend more money or its equivalent on purchases of firearms for resale than their reported gross income are likely to be earning livelihood from those sales, which is even stronger evidence of an intent to profit than merely supplementing one's income.[76] Alternatively, the funds the person used to purchase the firearms may have been derived from criminal activities, for example, if they were provided by a co-conspirator to repetitively purchase and resell the firearms without a license or for other criminal purposes, or the funds were laundered from past illicit firearms transactions. Such illicit and repetitive firearm purchase and sale activities do not require proof of profit to prove the requisite intent under 18 U.S.C. 921(a)(22), which states that proof of profit is not required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

The first presumption underlying the third category listed above—that a person is engaged in the business when repetitively purchasing, reselling, or offering to sell firearms through straw or sham businesses or individual straw purchasers or sellers—reflects that persons who willfully engage in the business of dealing without a license often do so to conceal their transactions by setting up straw or sham businesses or hiring "middlemen" to conduct transactions on their behalf.[77] The

second presumption under that category—that a person is engaged in the business when repetitively purchasing, reselling, or offering to sell firearms that cannot lawfully be possessed—reflects that such firearms are actively sought by criminals and earn higher profits for the illicit dealer. Such dealers will often buy and sell stolen firearms and firearms with obliterated serial numbers because such firearms are preferred by both sellers and buyers to avoid background checks and crime gun tracing.[78] They sometimes sell unregistered National Firearms Act ("NFA") weapons[79] and unlawfully imported firearms because those firearms are more difficult to obtain, cannot be traced through the National Firearms Registration and Transfer Record, and may sell for a substantial profit. Although these presumptions do not directly address an individual's intent to profit, they are supported by 18 U.S.C. 921(a)(22), which does not require the government to prove an intent to profit where a person repetitively purchases and disposes of firearms for criminal purposes. This includes willfully engaging in the business of dealing in contraband firearms. These presumptions are also implicitly supported by 18 U.S.C. 923(c), which deems any firearm acquired or disposed of with the purpose of willfully evading the restrictions placed on licensed dealers under the GCA to be business inventory, not part of a personal collection. Indeed, concealing the identity of the seller or buyer of a firearm, or the identification of the firearm, undermines the requirements imposed on legitimate dealers to conduct background checks on actual purchasers (18 U.S.C. 922(t)) and maintain transaction records (18 U.S.C.

---

[73] The Department interprets the term "bona fide gift" to mean a firearm given in good faith to another person without expecting any item, service, or anything of value in return. *See* Form 4473, at 4, Instructions to Question 21.a. (Actual Transferee/Buyer) ("A gift is not bona fide if another person offered or gave the person . . . money, service(s), or item(s) of value to acquire the firearm for him/her, or if the other person is prohibited by law from receiving or possessing the firearm."); ATF FFL Newsletter, June 2021, at 2 (same).

[74] While the GCA does not define the term "occasional," that term is commonly understood to mean "of irregular occurrence; happening now and then, infrequent." Letter for Borderview LLC, from Chief, Firearms Industry Programs Branch, ATF (Oct. 14, 2015) (citing Collins American English Dictionary (2015)) (addressing persons engaged in the business of importing firearms).

[75] See the discussion at the beginning of Section II.D of this preamble. "Presumptions that a Person is 'Engaged in the Business.'"

[76] Webster's Online Dictionary defines the term "livelihood" as "means of support or subsistence." *Livelihood, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/livelihood* (last visited Aug. 25, 2023).

[77] *See* footnotes 65 and 6666, *supra*; *Abramski*, 573 U.S. at 180 ("[C]onsider what happens in a typical straw purchase. A felon or other person who cannot buy or own a gun still wants to obtain one. (Or, alternatively, a person who could legally buy a firearm wants to conceal his purchase, maybe so

he can use the gun for criminal purposes without fear that police officers will later trace it to him.)").

[78] *See* footnote 68, *supra; Twitty*, 72 F.3d at 234 n.2 (defendant resold firearms with obliterated serial numbers, which was "probably designed in part to increase the selling price of the weapons"); *United States* v. *Hannah*, No. CRIM.A.05–86, 2005 WL 1532534, at *3 (E.D. Pa. 2005) (defendant told buyers to obliterate the serial numbers on the firearms so he would not "get in trouble").

[79] The National Firearms Act of 1934, 26 U.S.C. 7801 *et seq.*, restricts certain firearms that Congress determined were particularly dangerous "gangster-type" weapons, to include short-barreled rifles and shotguns, machineguns, silencers, and destructive devices. NFA provisions still refer to the "Secretary of the Treasury." *See generally* 26 U.S.C. ch. 53. However, the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). Thus, for ease of reference, this final rule refers to the Attorney General throughout.

923(g)(1)–(2)) through which firearms involved in crime can be traced.

The first presumption under the fourth category listed above—repetitive sales or offers for sale of firearms within 30 days from purchase—reflect that firearms for a personal collection are not likely to be repetitively sold within such a short period of time from purchase.[80] Likewise, under the second and third presumptions under this category, persons who repetitively sell firearms in new condition or in like-new condition in their original packaging, or firearms of the same kind and type, are not likely to be selling such firearms from a personal collection. Individuals who are bona fide collectors are less likely to amass firearms of the same kind and type than amass older, unique, or less common firearms that hold special interest. In contrast, persons engaged in the business can earn the greatest profit

by selling firearms in the best (*i.e.*, in a new) condition, or by selling the particular makes and models of firearms (*i.e.*, of the same kind and type) that their customers want the most and would generate the greatest profit.

The presumption under the fifth category listed above—that a former licensee, or responsible person acting on behalf of such former licensee, is engaged in the business when they sell or offer for sale firearms that were in the business inventory upon license termination—recognizes the fact that the licensee likely intended to predominantly earn a profit from the repetitive purchase and resale of those firearms, not to acquire the firearms as a "personal collection." Consistent with the GCA's plain language under section 921(a)(21)(C), this presumption recognizes that former licensees who thereafter intend to predominantly earn a profit from selling firearms they had previously purchased for resale can still be considered to be "engaging in the business" after termination of their license. The GCA does not provide exceptions to the definition of "engaged in the business" based on one's prior license status, even if the firearms were purchased while the person had that license.[81]

The final presumption above—that the personal inventory of a former licensee (or responsible person acting on behalf of the former licensee) remains business inventory until one year has passed from license termination or transfer to their personal collection—is consistent with 18 U.S.C. 923(c) of the GCA, which deems firearms transferred from a licensee's business inventory to their personal collection as business inventory until one year after the transfer.[82]

The Department notes that these presumptions may be rebutted in an administrative or civil proceeding with reliable evidence demonstrating that a person is not "engaged in the business" of dealing in firearms.[83] If, for example, where there is reliable evidence that a few collectible firearms were purchased from a licensed dealer where "all sales are final" and resold back to the licensee within 30 days because the purchaser was not satisfied, the presumption that the unlicensed reseller is engaged in the business may be rebutted. Similarly, the presumption may be rebutted based on evidence that a collector occasionally sells one specific kind and type of curio or relic firearm to buy another one of the same kind and type that is in better condition to "trade-up" or enhance the seller's personal collection. Another example in which evidence may rebut the presumption would be the occasional sale, loan, or trade of an almost-new firearm in its original packaging to an immediate family member, such as for their use in hunting, without the intent to earn a profit or to circumvent the requirements placed on licensees.[84]

### E. Definition of "Personal Collection," "Personal Collection of Firearms," and "Personal Firearms Collection"

The statutory definition of "engaged in the business" excludes "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or

---

[80] Further support for this 30-day presumption comes from the fact that, while many retailers do not allow firearm returns, some retailers and manufacturers do allow a 30-day period within which a customer who is dissatisfied with a firearm purchased for a personal collection or hobby can return or exchange the firearm. Dissatisfied personal collectors and hobbyists—persons not intending to engage in the business—are more likely to return new firearms rather than incurring the time, effort, and expense to resell them within that period of time. *See, e.g., Cabela's Return Policy: Here's How it Actually Works, Retail be-shopping.com, https://www.rather-be-shopping.com/blog/cabelas-return-policy/* (Jan. 31, 2023) ("[I]f they sell you a fully functioning gun, and you take it to the range, and it will not eject a shell or casing or will not perform basic functions, THEY TYPICALLY WILL exchange it. . . . Make sure you fully test the firearm within 30 days of purchase as it will be MUCH more difficult to exchange the gun after 30 days."); *LEARN ABOUT THE 30 DAY MONEY BACK GUARANTEE! HOW TO RETURN YOUR FIREARM!, Waltherarms.com, https://waltherarms.com/guarantee/#:~:text=Walther%20understands%20this%20and%20that, it%20is%20right%20for%20you/* (last visited Aug. 10, 2023); *Retail Policies, centertargetsports.com, https://centertargetsports.com/retail-range/* (last visited Aug. 10, 2023) ("When you purchase any gun from Center Target Sports, we guarantee your satisfaction. Use your gun for up to 30 days and if for any reason you're not happy with your purchase, return it to us within 30 days and receive a store credit for the FULL purchase price."); *Warranty & Return Policy,* Century Arms (Mar. 6, 2019), *https://www.centuryarms.com/media/wysiwyg/Warranty_and_Return_v02162021.pdf* ("Customer has 30 days to return surplus firearms, ammunition, parts, and accessories for repair/replacement if the firearm does not meet the advertised condition."); *I Love You PEW 30 Day Firearm Guarantee,* Alphadog Firearms, *https://alphadogfirearms.com/i-love-you-pew/* (last visited Aug. 10, 2023) ("Original purchaser has 30 calendar days to return any new firearm purchased for store credit."); *Return Exceptions Policy,* Big 5 Sporting Goods, *https://www.big5sportinggoods.com/static/big5/pdfs/Customer-Service-RETURN-EXCEPTIONS-POLICY-d.pdf* (last visited Aug. 10, 2023) ("Firearm purchases must be returned to the same store at which they were purchased. No refunds or exchanges unless returned in the original condition within thirty (30) days from the date of release.").

[81] The Department is aware of non-binding dicta in *United States* v. *Shumann,* 861 F.2d 1234, 1238 (11th Cir. 1988), in which the court expressed its view that had the FOPA definition of "engaged in the business" been applicable (which the court ruled it was not) it would have absolved the petitioner of liability in a forfeiture action if, as he claimed, he was merely closing out his gun business and liquidating his inventory, saying "[w]hile the government presented evidence of firearms sales by Schumann to undercover BATF agents . . . there was no proof of firearms purchases, much less a proven pattern of 'repetitive purchase and resale.'" However, none of the amendments to the GCA made by FOPA defined the terms "collection" or "personal collection." The fact remains that the firearms to be liquidated were repetitively purchased for resale by the same person while licensed. And whether a person is "engaged in the business" under post-BSCA section 921(a)(21)(C) is not dependent on the license status of the person so engaged.

[82] Even if one year has passed from the date of transfer, business inventory transferred to a personal collection of a former licensee (or responsible person acting on behalf of that licensee) prior to termination of the license cannot be treated

as part of a personal collection if the licensee received or transferred those firearms with the intent to willfully evade the restrictions placed upon licensees by the GCA (*e.g.,* willful violations as cited in a notice of license revocation or denial of renewal). This is because, under section 923(c), any firearm acquired or disposed of with intent to willfully evade the restrictions placed upon licensees by the GCA is automatically business inventory. Therefore, because the firearms are statutorily deemed to be business inventory under either of these circumstances, a former licensee (or responsible person acting on behalf of such licensee) who sells such firearms is presumed to be engaged in the business, requiring a license.

[83] An example of an administrative proceeding where rebuttable evidence might be introduced would be where ATF denied a firearms license application, pursuant to 18 U.S.C. 923(d)(1)(C) and (f)(2), on the basis that the applicant was presumed under this rulemaking to have willfully engaged in the business of dealing in firearms without a license. An example of a civil case would be an asset forfeiture proceeding, pursuant to 18 U.S.C. 924(d)(1), on the basis that the seized firearms were intended to be involved in willful conduct presumed to be engaging the business without a license under this rulemaking.

[84] *See, e.g., Clark* v. *Scouffas,* No. 99–C–4863, 2000 WL 91411 (N.D. Ill. 2000) (license applicant was not a "dealer" who was "engaged in the business" as defined under section 921(a)(21)(C) where he only sold a total of three .38 Special pistols—two to himself, and one to his wife, without any intent to profit).

for a hobby, or who sells all or part of his personal collection of firearms.'' 18 U.S.C. 921(a)(21)(C). To clarify this definitional exclusion, this proposed rule would: (1) add a single definition for the terms ''personal collection,'' ''personal collection of firearms,'' and ''personal firearms collection''; (2) explain how those terms apply to licensees; and (3) make clear that licensees must follow the verification and recordkeeping procedures in 27 CFR 478.94 and subpart H, rather than using ATF Form 4473, when they acquire firearms from other licensees, including a sole proprietor who transfers a firearm to their personal collection in accordance with 27 CFR 478.125a.

Specifically, this rule proposes to define ''personal collection,'' ''personal collection of firearms,'' and ''personal firearms collection'' as ''personal firearms that a person accumulates for study, comparison, exhibition, or for a hobby (e.g., noncommercial, recreational activities for personal enjoyment such as hunting, or skeet, target, or competition shooting).'' This reflects a common definition of the terms ''collection'' and ''hobby.'' [85] The phrase ''or for a hobby'' was adopted from 18 U.S.C. 921(a)(21)(C), which excludes from the definition of ''engaged in the business'' firearms acquired ''for'' a hobby. Also expressly excluded from the definition of ''personal collection'' is ''any firearm purchased for resale or made with the predominant intent to earn a profit'' because of their inherently commercial nature. 18 U.S.C. 921(a)(21)(C).

Under the GCA, 18 U.S.C. 923(c), and implementing regulations, 27 CFR 478.125(e) and 478.125a, a licensee who acquires firearms for a personal collection is subject to certain additional requirements before the firearms can become part of such a ''personal collection.'' [86] Accordingly,

the proposed rule further explains how that term would apply to firearms acquired by a licensee (i.e., a person engaged in the business as a licensed manufacturer, licensed importer, or licensed dealer under the GCA), by defining ''personal collection,'' ''personal collection of firearms,'' or ''personal firearms collection'' when applied to licensees, to include only firearms that were: (1) acquired or transferred without the intent to willfully evade the restrictions placed upon licensees by chapter 44, title 18, United States Code; [87] (2) recorded by the licensee as an acquisition in the licensee's acquisition and disposition record in accordance with 27 CFR 478.122(a), 478.123(a), or 478.125(e) (unless acquired prior to licensure and not intended for sale); [88] (3) recorded as a disposition from the licensee's business inventory to the person's personal collection in accordance with 27 CFR 478.122(a), 478.123(a), or 478.125(e); (4) stored separately from, and not commingled with the business inventory, and appropriately identified as ''not for sale'' (e.g., by attaching a tag), if on the business premises; [89] and (5) maintained in such personal collection (whether on or off the business premises) for at least one year

from the date the firearm was so transferred, in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a. [90] These proposed parameters to define the term ''personal collection'' as applied to licensees reflect the statutory and regulatory requirements for personal collections in 18 U.S.C. 923(c) and 27 CFR 478.122(a), 478.123(a), 478.125(e), and 478.125a. [91] To implement these changes, the rule also would make conforming changes by adding references in 27 CFR 478.125a to the provisions that relate to the acquisition and disposition recordkeeping requirements for importers and manufacturers.

### F. Definition of ''Responsible Person''

To accompany these changes, this rule also proposes to add a regulatory definition of the term ''responsible person'' in 27 CFR 478.11, to mean ''[a]ny individual possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, and business practices of a corporation, partnership, or association, insofar as they pertain to firearms.'' This definition comes from 18 U.S.C. 923(d)(1)(B), and has long been reflected on the application for license (Form 7) and other ATF publications since enactment of a similar definition in the Safe Explosives Act in 2002. [92] As

---

[85] See Webster's Third New International Dictionary 444, 1075, 1686 (1971) (defining the term ''personal'' to include ''of or relating to a particular person,'' ''collection'' to include ''an assembly of objects or specimens for the purposes of education, research, or interest'' and ''hobby'' as ''a specialized pursuit . . . that is outside one's regular occupation and that one finds particularly interesting and enjoys doing''); Webster's Online Dictionary (2023) (defining the term ''personal'' to include ''of, relating to, or affecting a particular person,'' ''collection'' to include ''an accumulation of objects gathered for study, comparison, or exhibition or as a hobby'', and ''hobby'' as a ''pursuit outside one's regular occupation engaged in especially for relaxation''); see also United States v. Idarecis, 164 F.3d 620 (2d Cir. 1998) (Table) (''There is no case authority to suggest that there is a distinction between the definition of a collector and of a [personal] collection in the statute.'').

[86] The GCA, 18 U.S.C. 923(c), and implementing regulations, also require that all firearms disposed

of from a licensee's personal collection, including firearms acquired before the licensee became licensed, that are held for at least one year and that are sold or otherwise disposed of, must be recorded as a disposition in a personal bound book. See 18 U.S.C. 923(c); 27 CFR 478.125a(b)(4).

[87] See ATF Q&A, May a licensee create a personal collection to avoid the recordkeeping and NICS background check requirements of the GCA?, https://www.atf.gov/firearms/qa/may-licensee-create-personal-collection-avoid-recordkeeping-and-nics-background-check (July 15, 2020).

[88] See ATF Q&A, Does a licensee have to record firearms acquired prior to obtaining the license in their acquisition and disposition record?, https://www.atf.gov/firearms/qa/does-licensee-have-record-firearms-acquired-prior-obtaining-license-their-acquisition (July 15, 2020); ATF Federal Firearms Regulations Reference Guide, ATF P 5300.4, Q&A (F2) at 201 (2014) (''All firearms acquired after obtaining a firearms license must be recorded as an acquisition in the acquisition and disposition record as business inventory.''); ATF FFL Newsletter, Feb. 2011, at 7 (''There may be occasions where a firearms dealer utilizes his license to acquire firearms for his personal collection. Such firearms must be entered in his permanent acquisition records and subsequently be recorded as a disposition to himself in his private capacity.''); ATF FFL Newsletter, Mar. 2006, at 7 (''[E]ven if a dealer acquires a firearm from a licensee by completing an ATF Form 4473, the firearm must be entered in the transferee dealer's records as an acquisition.'').

[89] See ATF Q&A, May a licensee store personal firearms at the business premises?, https://www.atf.gov/firearms/qa/may-licensee-store-personal-firearms-business-premises (July 15, 2020); ATF FFL Newsletter, Feb. 2011, at 7; ATF FFL Newsletter, Mar. 2006, at 6; ATF Industry Circular 72–30, Identification of Personal Firearms on Licensed Premises Not Offered for Sale (Oct. 10, 1972).

[90] See ATF Q&A, May a licensee maintain a personal collection of firearms? How can they do so?, https://www.atf.gov/firearms/qa/may-licensee-maintain-personal-collection-firearms-how-can-they-do-so (July 15, 2020).

[91] The existing regulations, 27 CFR 478.125(e) and 478.125a, which require licensees to record the purchase of all firearms in their business bound books, record the transfer of firearms to their personal collection, and demonstrate that personal firearms obtained before licensing have been held at least one year prior to their disposition as personal firearms were upheld by the Fourth Circuit in National Rifle Ass'n v. Brady, 914 F.2d 475, 482–83 (4th Cir. 1990) (''The regulations ensure that firearms kept in the personal collection are bona fide personal firearms, and they minimize the opportunity for licensees to evade the statute's recordkeeping requirements for business firearms by simply designating those firearms 'personal firearms' immediately prior to their disposition. . . . In addition, the record-keeping requirements contained in the regulations provide a means for the [Attorney General] to verify that personal firearms were actually held for a year by a licensee prior to sale. Thus, we think the regulations at issue here are both 'rational and consistent with the statute.'"); See also United States v. Twelve Firearms, 16 F. Supp. 2d 738, 742 n.4 (S.D. Tex. 1998) (''[T]he United States appears to be correct that Claimant was required to keep records of the firearms no matter whether they were part of his business inventory, under § 923(g)(1)(A), or whether they were his own personal property, under § 923(c).'').

[92] See 18 U.S.C. 841(s); Application for Federal Firearms License, ATF Form 7, Instructions at 6 (5300.12); Gilbert v. ATF, 306 F. Supp. 3d 776, 781 (D. Md. 2018); Gossard v. Fronczak, 206 F. Supp. 3d 1053, 1065 (D. Md. 2016), aff'd, 701 F. App'x

examples, this definition would not include store clerks or cashiers who cannot make management or policy decisions with respect to firearms (*e.g.,* what company or store-wide policies and controls to adopt, which firearms are bought and sold by the business, and who is hired to buy and sell the firearms), even if their clerical duties include buying or selling firearms for the business.

### G. Definition of "*Predominantly Earn a Profit*"

The BSCA broadened the definition of "engaged in the business" as a dealer by substituting "to predominantly earn a profit" for "with the principal objective of livelihood or profit." 18 U.S.C. 921(a)(21)(C). It also defined the term "to predominantly earn a profit." 18 U.S.C. 921(a)(22). This rule is proposing to incorporate those statutory changes, as discussed above.

This rule proposes to further implement these amendments by: (1) clarifying that the "proof of profit" proviso also excludes "the intent to profit," thus making clear that it is not necessary for the Federal Government to prove that a person intended to make a profit if the person was dealing in firearms for criminal purposes or terrorism; (2) clarifying that a person may have the predominant intent to profit even if the person does not actually obtain pecuniary gain from selling or disposing of firearms; and (3) establishing a presumption in civil and administrative proceedings that certain conduct demonstrates the requisite intent to "predominantly earn a profit," absent reliable evidence to the contrary.

These proposed regulatory amendments are consistent with the plain language of the GCA. Neither the pre-BSCA definition of "with the principal objective of livelihood and profit" nor the post-BSCA definition of "to predominantly earn a profit" require the government to prove that the defendant actually profited from firearms transactions. *See* 18 U.S.C. 921(a)(22), (a)(23) (referring to "the intent underlying the sale or disposition of firearms"); *Focia,* 869 F.3d at 1282 ("The exact percentage of income obtained through the sales is not the test; rather, . . . the statute focuses on the defendant's *motivation* in engaging in the sales.").[93]

ATF's experience also establishes that certain conduct related to the sale or disposition of firearms presumptively demonstrates that primary motivation. In addition to conducting criminal investigations of unlicensed firearms businesses under 18 U.S.C. 922(a)(1)(A), ATF has for many decades observed through qualification and compliance inspections how dealers who sell or dispose of firearms demonstrate a predominant intent to obtain pecuniary gain, as opposed to other intents, such as improving or liquidating a personal collection.

Based on this decades-long body of experience, the proposed rule provides that, absent reliable evidence to the contrary, a person is presumed to have the intent to "predominantly earn a profit" when the person: (1) advertises, markets, or otherwise promotes a firearms business (*e.g.,* advertises or posts firearms for sale, including on any website, establishes a website for selling or offering for sale their firearms, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally;[94] (2) purchases, rents, or otherwise secures or sets aside permanent or temporary physical space to display or store firearms they offer for sale, including part or all of a business premises, table or space at a gun show, or display case;[95] (3) makes or maintains records,

in any form, to document, track, or calculate profits and losses from firearms purchases and sales;[96] (4) purchases or otherwise secures merchant services as a business (*e.g.,* credit card transaction services, digital wallet for business) through which the person makes or offers to make payments for firearms transactions;[97] (5) formally or informally purchases, hires, or otherwise secures business security services (*e.g.,* a central station-monitored security system registered to a business,[98] or guards for security[99]) to

266 (4th Cir. 2017); ATF FFL Newsletter, Sept. 2011, at 6; ATF Letter to Dunham's Sports (May 30, 2003).

[93] *See also Valdes,* 681 F. App'x at 877 (the government does not need to show that the defendant "necessarily made a profit from dealing") (*citing United States* v. *Wilmoth,* 636 F.2d 123, 125 (5th Cir. 1981)); *King,* 735 F.3d at 1107 n.8 (Section

922(a)(1)(A) does not require an actual sale of firearms); *Allah,* 130 F.3d at 43–44 (upholding jury instruction that selling firearms need not "be a significant source of income"); *United States* v. *Mastro,* 570 F.Supp. 1388 (E.D. Pa. 1983) (the government need not show that defendant made or expected to make a profit) (citing cases); *United States* v. *Shirling,* 572 F.2d 532, 534 (5th Cir. 1978) ("The statute is not aimed narrowly at those who profit from the sale of firearms, but rather broadly at those who hold themselves out as a source of firearms.").

[94] *See, e.g., United States* v. *Caldwell,* 790 F. App'x 797, 799 (7th Cir. 2019) (defendant placed 192 advertisements on a website devoted to gun sales); *Valdes,* 681 F. App'x at 878 (defendant handed out business card); *United States* v. *Pegg,* 542 F. App'x 328 (5th Cir. 2013) (defendant sometimes advertised firearms for sale in the local newspaper); *United States* v. *Crudgington,* 469 F. App'x 823, 824 (11th Cir. 2012) (defendant advertised firearms for sale in local papers, and tagged them with prices); *United States* v. *Dettra,* 238 F.3d 424, at *2 (6th Cir. 2000) (Table) ("Dettra's use of printed business cards and his acceptance of credit payment provide further reason to infer that he was conducting his firearms activity as a profitable trade or business, and not merely as a hobby."); *United States* v. *Norman,* No. 4–10CR00059–JLH, 2011 WL 2678821, at *3 (E.D. Ark. 2011) (defendant placed advertisements in local newspaper and on a website).

[95] *See, e.g., United States* v. *Wilkening,* 485 F.2d 234, 235 (8th Cir. 1973) (defendant set up a glass display case and displayed for sale numerous ordinary long guns and handguns that were not curios or relics); *United States* v. *Jackson,* 352 F. Supp. 672, 676 (S.D. Ohio 1972), *aff'd,* 480 F.2d 927

(6th Cir. 1973) (defendant set up glass display case, displaying numerous long guns and handguns for sale which were not curios or relics); Press Release USAO, *Asheville Man Sentenced For Dealing Firearms Without A License,* (Jan. 20, 2017), *https://www.justice.gov/usao-wdnc/pr/asheville-man-sentenced-dealing-firearms-without-license-0* (defendant sold firearms without a license from his military surplus store).

[96] *See, e.g., United States* v. *White,* 175 F. App'x 941, 942 (9th Cir. 2006) ("Appellant also created a list of all the firearms he remembers selling and the person to whom he sold the firearm."); *Dettra,* 238 F.3d 424, at *2 ("Dettra carefully recorded the cost of each firearm he acquired, enabling him to later determine the amount needed to sell the item in a profitable manner."); *United States* v. *Angelini,* 607 F.2d 1305, 1307 (9th Cir. 1979) (defendant kept sales slips or invoices).

[97] *See, e.g., King,* 735 F.3d at 1106–07 (defendant incorporated and funded firearms business "on behalf" of friend whose American citizenship enabled business to obtain Federal firearms license. He then misappropriated company's business account, using falsified documentation to set up credit accounts); *Dettra,* 238 F.3d 424, at *2 (defendant accepted credit card payments).

[98] Numerous jurisdictions require all persons with alarms or security systems designed to seek a police response to be registered with or obtain a permit from local police and pay the requisite fee. *See, e.g.,* Albemarle County (Virginia) Code § 12–102(A); Arlington County (Virginia) Code § 33–10; Cincinnati (Ohio) City Ord. Ch. 807–1–A4 (2); City of Coronado (California) Code § 40.42.050(A); Irvine (California) Code § 4–19–105; Kansas City (Missouri) Code § 50–333(a); Larimer County (Colorado) Ord. § 3(A); Lincoln (Nebraska) Mun. Code § 5.56.030(a); Los Angeles (California) Mun. Code § 103.206(b); Loudoun County (Virginia) Code § 655.03(a); Mobile (Alabama) Code § 39–62[g](1); Montgomery County (Maryland) Code § 3A–3; Prince William County (Virginia) Code § 2.5.25(a); Rio Rancho (New Mexico) Mun. Code § 97.04(A); Scottsdale (Arizona) Code § 3–10(a); Tempe (Arizona) Code § 22–76; Washington County (Oregon) Code § 8.12.040; West Palm Beach (Florida) Code § 46–32(a); Wilmington (Delaware) Code § 10–38(c); Woburn (Massachusetts) Code Title 11 § 8–18. Due to the value of the inventory and assets they protect, for profit businesses are more likely to maintain, register, and pay for these types of alarms rather than individuals seeking to protect personal property. *See generally What is a Central Station Alarm Monitoring System?,* agmonitoring.com (July 10, 2019), *https://www.agmonitoring.com/blog/industry-news/what-is-a-central-station-monitoring-system;* Central Station Service Certification, UL.com, *https://www.ul.com/resources/central-station-service-certification#:~:text=Station%20Service%20Certification-,Overview,and%20initiates%20the%20appropriate%20response.*

[99] *See, e.g., United States* v. *De La Paz-Rentas,* 613 F.3d 18, 22–23 (1st Cir. 2010) (defendant hired
Continued

protect business assets or transactions that include firearms; (6) formally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes or offers to make firearms transactions;[100] (7) secures or applies for a State or local business license to purchase for resale or to sell merchandise that includes firearms; or (8) purchases a business insurance policy, including any riders that cover firearms inventory.[101] Any of these nonexclusive, firearms-business-related activities justifies a rebuttable presumption that the person has the requisite intent to predominantly earn a profit from reselling or disposing of firearms.

This set of rebuttable presumptions that establishes an intent "to predominantly earn a profit"—one of the elements of the definition of "engaged in the business"—is separate from the set of presumptions that establishes a person meets the definition of "engaged in the business." This second set of presumptions that addresses only intent "to predominantly earn a profit" may be used to independently establish the requisite intent to profit in a particular proceeding. As with the "engaged in the business" presumptions, the activities set forth in these intent presumptions are not exhaustive of the conduct that may show that, or be considered in determining whether, a person actually has the requisite intent "to predominantly earn a profit." There are many other fact patterns that do not fall within the specific conduct that presumptively requires a license under this proposed rule (e.g., firearms that were repetitively resold after 30 days from purchase, or that were not in a like-new condition), but that reveal one or more preparatory steps that presumptively demonstrate a predominant intent to earn a profit from firearms transactions. Again, none of these presumptions apply to criminal cases, but could be useful to courts in criminal cases, for example, to inform appropriate jury instructions regarding permissible inferences. These presumptions are supported by the

Department's investigative and regulatory efforts and experience as well as conduct that the courts have relied upon in determining whether a person was required to be licensed as a dealer in firearms even before the BSCA expanded the definition.

*H. Disposition of Business Inventory After Termination of License*

One public safety issue that ATF has encountered over the years relates to former licensees who have improperly liquidated their business inventory of firearms without performing required background checks or maintaining required records after the license was revoked, denied renewal, or otherwise terminated (e.g., license expiration or surrender of license).[102] Sometimes former licensees even continue to acquire more firearms for resale ("restocking") after license termination, a practice that is clearly inconsistent with the concept of "liquidation." These activities, in turn, have resulted in numerous firearms being sold by former licensees (including those whose licenses have been revoked or denied due to willful GCA violations) to potentially prohibited persons without any ability to trace those firearms if later used in crime.[103]

---

[102] The problem of licensees liquidating a former licensee's business firearms as firearms from their "personal collections" without background checks or recordkeeping has been referred to by some advocacy groups and members of Congress as the "fire-sale loophole." *See* Dan McCue, *Booker Bill Takes Aim at Gun Fire Sale Loophole,* The Well News (Sept. 9, 2022), *https://www.thewellnews.com/guns/booker-bill-takes-aim-at-gun-fire-sale-loophole/*; Shira Toeplitz, *Ackerman proposes gun-control bill to close 'firesale loophole'*, Politico (Jan. 12, 2011), *https://www.politico.com/blogs/on-congress/2011/01/ackerman-proposes-gun-control-bill-to-close-firesale-loophole-033289*; Annie Linskey, *Closed store is a source of guns,* The Baltimore Sun (Apr. 15, 2008), *https://www.baltimoresun.com/news/bs-xpm-2008-04-15-0804150118-story.html* (after revocation of license, a dealer transferred around 700 guns to his "personal collection" and continued to sell them without recordkeeping).

[103] *See, e.g., Dettra,* 238 F.3d 424, at *2 (defendant continued to deal in firearms after license revocation); Press Release OPA, *Gunsmoke Gun Shop Owner and Former Discovery Channel Star Indicted and Arrested for Conspiracy, Dealing in Firearms without a License and Tax Related Charges* (Feb. 11, 2016), *https://www.justice.gov/opa/pr/gunsmoke-gun-shop-owner-and-former-discovery-channel-star-indicted-and-arrested-conspiracy* (defendant continued to deal in firearms at a different address after he surrendered his FFL due to his violations of the Federal firearms laws and regulations); *Kish,* 424 F. App'x at 405 (defendant continued to sell firearms after revocation of license); *Gilbert* v. *Bangs,* 813 F. Supp. 2d 669, 672 (D. Md. 2011), *aff'd* 481 F. App'x 52 (4th Cir. 2012) (license denied to applicant who willfully engaged in the business after license revocation); ATF Letter to AUSA (Mar. 13, 1998) (advising that seized firearms offered for sale were not deemed to be part of a "personal collection" after surrender of license).

For this reason, the proposed rule also would revise the regulation's sections on discontinuing business, 27 CFR 478.57 and 478.78, to clarify statutory requirements regarding firearms that remain in the possession of a former licensee (or a responsible person of the former licensee) at the time the license is terminated. Again, firearms that were in the business inventory of a former licensee at the time the license was terminated (i.e., license revocation, denial of license renewal, license expiration, or surrender of license) and that remain in the possession of the licensee (or a responsible person acting on behalf of the former licensee), are not part of a "personal collection." While 18 U.S.C. 921(a)(21)(C) allows an unlicensed person to "sell all or part of his personal collection" without being considered "engaged in the business," in this context, these firearms were purchased by the former licensee as business inventory and were not accumulated by that person for study, comparison, exhibition, or for a hobby.

Also, firearms that were transferred by a former licensee to a personal collection prior to the time the license was terminated cannot be considered part of a personal collection unless one year has passed from the date the firearm was transferred into the personal collection before the license was terminated. This gives effect to 18 U.S.C. 923(c), which requires that all firearms acquired by a licensee be maintained as part of a personal collection for a period of at least one year before they lose their status as business firearms.

Under amended 27 CFR 478.57 (discontinuance of business) and 27 CFR 478.78 (operations by licensee after notice), as proposed, once a license has been terminated (i.e., license revocation, denial of license renewal, license expiration, or surrender of license), the former licensee will have 30 days, or such additional period designated by the Director for good cause, to either: (1) liquidate any remaining business inventory by selling or otherwise disposing of the firearms to a licensed importer, licensed manufacturer, or licensed dealer for sale, auction, or pawn redemption in accordance with this part; or (2) transfer the remaining business inventory to a personal collection of the former licensee (or a responsible person of the former licensee), provided the recipient is not prohibited by law from receiving or possessing firearms. Except for the sale of remaining inventory to a licensee within the 30-day period (or designated additional period), a former licensee (or responsible person of such licensee)

---

as bodyguard for protection in an unlawful firearms transaction).

[100] *See, e.g., United States* v. *Gray,* 470 F. App'x at 469 (defendant sold firearms through his sporting goods store, advertised his business using signs and flyers, and displayed guns for sale, some with tags).

[101] *See, e.g., United States* v. *Kish,* 424 F. App'x 398, 404 (6th Cir. 2011) (defendant could only have 200 firearms on display because of insurance policy limitations).

who resells any such inventory, including business inventory transferred to a personal collection, would be subject to the same presumptions in 27 CFR 478.11 (definition of "engaged in the business" as a dealer other than a gunsmith or pawnbroker) that apply to a person who repetitively purchased those firearms for the purpose of resale.

The 30-day period from license termination for a former licensee to transfer the firearms to either another licensee or to a personal collection is derived from the disposition of records requirement in the GCA, 18 U.S.C. 923(g)(4), which is a reasonable period for that person to wind down operations after discontinuance of business without acquiring new firearms.[104] That period of liquidation may be extended by the Director for good cause, such as to allow pawn redemptions if required by State, local, or Tribal law. However, former licensees (or responsible persons of such licensees) who choose not to sell the remaining business inventory to a licensee within the 30-day period (or designated additional period), and who continue to sell those firearms, are not permitted under the GCA to engage in the business of dealing in firearms without a license. Former licensees (or responsible person) who sell business inventory after that period (or within that period to unlicensed persons), or within one year from transfer to a personal collection, have no special legal exemptions that give them greater privileges to conduct business than a licensee.

Moreover, a former licensee is not permitted to continue to engage in the business of importing, manufacturing, or dealing in firearms by importing or manufacturing additional firearms for purposes of sale or distribution, or purchasing additional firearms for resale (*i.e.*, "restocking") without a license. Therefore, a former licensee (or responsible person) is subject to the same presumptions in 27 CFR 478.11 (definition of "engaged in the business" as a dealer other than a gunsmith or pawnbroker) that apply to persons who sell firearms that were repetitively purchased with the predominant intent to earn a profit and any sales by such a person will be closely scrutinized by ATF on a case-by-case basis.

*I. Transfer of Firearms Between FFLs and Form 4473*

Finally, to ensure the traceability of all firearms acquired by licensees from other licensees, the proposed rule would make clear that licensees cannot satisfy their obligations under 18 U.S.C. 923(g)(1)(A) by completing a Form 4473 when selling or otherwise disposing of firearms to another licensed importer, licensed manufacturer, or licensed dealer, or a curio or relic to a licensed collector, including a sole proprietor licensee who transfers the firearm to their personal collection in accordance with 27 CFR 478.125a.[105] Form 4473 was not intended for use by licensees when transferring firearms to other licensees or by a sole proprietor transferring to their personal collection.

Pursuant to 18 U.S.C. 926(a)(1) and 27 CFR 478.94, when a licensee transfers a firearm to another licensee, the transferor must first verify the recipient's identity and license status by examining a certified copy of the recipient's license and recording the transfer as a disposition to that licensee in the bound book record. In turn, the recipient licensee must record the receipt as an acquisition in their bound book record. *See* 27 CFR 478, subpart H. If a recipient licensee were to complete a Form 4473 for the purchase of a firearm, but not record that receipt in their bound book record asserting it is a "personal firearm," then tracing efforts pursuant to the GCA could be hampered if the firearm was later used in a crime.

However, this clarification that FFLs may not satisfy their obligations by completing a Form 4473 to transfer firearms between themselves would not include dispositions by a licensed legal entity such as a corporation, LLC, or partnership, to the personal collection of a responsible person of such an entity. This is because when an individual responsible person does not acquire a firearm as an employee on behalf of the business entity, it results in a change in dominion or control, or "transfer," subject to all GCA requirements.[106] Such an entity, including a corporation or partnership, must therefore use a Form 4473, NICS check, and disposition record entry when transferring a firearm to one of its individual officers (or partners, in the case of a partnership) for their personal use.[107]

**III. Statutory and Executive Order Review**

*A. Executive Orders 12866, 13563, and 14094*

Executive Order 12866 ("Regulatory Planning and Review") directs agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 ("Improving Regulation and Regulatory Review") emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. Executive Order 14094 ("Modernizing Regulatory Review") amends section 3(f) of Executive Order 12866.

The Office of Management and Budget ("OMB") has determined that this proposed rule is a "significant regulatory action" under Executive Order 12866, as amended by Executive Order 14094, though it is not a section 3(f)(1) significant action. Accordingly, the proposed rule has been reviewed by OMB. While portions of this proposed rule merely incorporate the BSCA's statutory definitions into ATF's regulations, this rulemaking, if finalized, may result in additional unlicensed persons becoming FFLs if the unlicensed persons intend to regularly purchase and resell firearms to predominantly earn a profit.

*1. Need for Federal Regulation*

This proposed rule would implement the BSCA by incorporating statutory definitions into ATF's regulations and clarifying the criteria for determining when a person is "engaged in the business" requiring a license to deal in firearms. The rulemaking is necessary to implement a new statutory provision on being engaged in the business as a wholesale or retail dealer; to clarify prior regulatory provisions that relate to that topic; and to codify practices and policies on that issue. In addition to establishing specific, easy-to-follow standards regarding when buying and selling firearms presumptively crosses the threshold into being "engaged in the

---

[104] *See also* 27 CFR 478.57 (requiring the owner of a discontinued or succeeded business to notify ATF of such discontinuance or succession within 30 days), and 478.127 (requiring discontinued businesses to turn in records within 30 days).

[105] *See* ATF FFL Newsletter, Mar. 2006, at 7 ("A dealer who purchases a firearm from another licensee should advise the transferor licensee of his or her licensed status so the transferor licensee's records may accurately reflect that this is a transaction between licensees. An ATF Form 4473 should not be completed for such a transaction, because this form is used only for a disposition to a nonlicensee.").

[106] *See* ATF Ruling 2010–1 (permanently assigning a firearm to a specific employee for personal use is considered a "transfer" that would trigger the recordkeeping and NICS background check requirements).

[107] *See* ATF Q&A, *Does an officer or employee of an entity that holds a federal firearms license, such as a corporation, have to undergo a NICS check when acquiring a firearm for their own personal collection?, https://www.atf.gov/firearms/qa/does-officer-or-employee-entity-holds-federal-firearms-license-such-cororation-have* (May 22, 2020); 2 ATF FFL Newsletter, Sept. 2013, at 4.

business,'' the rule also would recognize that individuals are allowed by law to occasionally buy and sell firearms for the enhancement of a personal collection or a legitimate hobby without the need to obtain a license.

### 2. Population

This proposed rule implements a statutory requirement that affects persons who repetitively purchase and resell (including bartering) firearms and are required to be, but are not currently, licensed. As described in the preamble of this NPRM, these may be persons who purchase, sell, or transfer firearms from places other than traditional brick-and-mortar stores, such as at a gun show or event, flea market, auction house, or gun range or club; at one's home; by mail order, or over the internet; through the use of other electronic means (*e.g.,* an online broker, online auction, text messaging service, social media raffle, or website); or at any other domestic or international public or private marketplace or premises. A person may be required to have a license to deal in firearms regardless of where, or the medium through which, they purchase or sell (or barter) firearms, including locations other than a traditional brick and mortar store.

The GCA prohibits ATF from prescribing regulations that establish any ''system of registration'' of firearms, firearms owners, or firearms transactions or dispositions.[108] Furthermore, because those willfully engaged in the business of dealing in firearms without a license are violating Federal law, these individuals often take steps to avoid detection by law enforcement, making it additionally difficult for ATF to precisely estimate the population. Therefore, for purposes of this analysis, ATF used information gleaned from ArmsList, an online broker website that facilitates the sales or bartering of firearms, as a means of estimating a population of unlicensed persons selling firearms using online resources.[109] ATF focused its efforts on estimating an affected population using ArmsList since that website is considered to be the largest source for unlicensed persons to sell firearms on the internet.[110] Out of a total listing of

30,806 entries in the ''private party'' category (unlicensed users) on ArmsList, ATF viewed a sample of 379 listings, and found that a given seller on ArmsList had an average of three listings per seller.[111] Based on approximately 30,806 ''private party'' (unlicensed) sales listings on ArmsList, ATF estimates that there are approximately 12,270 unlicensed persons who sell on that website alone, selling an average of three firearms per user.[112] ATF estimates that ArmsList may hold approximately 50 percent of the market share among websites that unlicensed sellers may frequent. This means the 12,270 estimated unlicensed persons on ArmsList would be about half, and the estimated number of unlicensed sellers on all such websites would be approximately 24,540 nationwide. The estimate of ArmsList's market share is based on ATF Firearms Industry Programs Branch (''FIPB'') subject matter expert (''SME'') opinion, news reports,[113] and public web traffic lists.[114]

To better estimate both online and offline sales, ATF assumed, based on best professional judgment of FIPB SMEs and with limited available information, that the national online marketplace estimate above may represent 25 percent of the total national firearms market, which would also include in-person, local, or other offline transactions like flea markets, State-wide exchanges, or websites within each of the 50 States.

While this would bring the total estimated market to approximately 98,160 unlicensed sellers,[115] this figure would need to be reduced by the estimated subset of this population of persons who occasionally sell their firearms without needing to obtain a license (*e.g.,* as part of their hobby or enhancement of their personal collection). Also, based on limited

alltechconsidered/2016/06/17/482483537/semi-automatic-weapons-without-a-background-check-can-be-just-a-click-away (''Armslist isn't the only site of its kind, though it is considered to be the biggest and most popular.'').

[111] A sample of 379 listings from an estimated population of 30,806 listings (viewed between Mar. 1 and 2, 2023), using a 95 percent confidence level and a confidence interval of 5. *See* Sample Size Calculator- Confidence Level, Confidence Interval, Sample Size, Population Size, Relevant Population, *https://www.surveysystem.com/sscalc.htm.*

[112] 12,270 unlicensed individuals = 30,806 ''private party'' unlicensed listings on ArmsList/ 2.51 average listings per user.

[113] *See* footnote 110, *supra.*

[114] Similar web profile and market share lists are available at *https://www.similarweb.com/website/armslist.com/#overview.*

[115] The online estimate of 24,540 = at least 25 percent of national firearms market. So, 100 percent of the firearms market would be 4 * 24,540 = 98,160.

available information, ATF's best, very conservative assessment from FIPB SMEs is that at least 25 percent of the estimated total number of unlicensed sellers may be considered engaged in the business and would subsequently need to become an FFL in order to continue making their repetitive sales of firearms. The actual number may be higher, but ATF does not have data to support a higher number. Using the information gleaned from ArmsList, this means that 24,540 is the estimated number of unlicensed persons that may be considered engaged in the business and affected by this proposed rule.

Because there is no definitive information, the actual number of total unlicensed sellers may be higher. Therefore, ATF also calculated a second possible estimate using information from a published survey by the Russell Sage Foundation regarding a similar, but differently sourced estimated population of private sellers of firearms.[116] Based on the 2020 U.S. Census, there are 258.3 million adults (over 18).[117] ATF used the U.S. Census as a basis for the population and also percentages from ''The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey,'' published by the Russell Sage Foundation.[118] This survey showed that 22 percent of the U.S. adult population owns at least one firearm (56.84 million adults), and of this, five percent transferred firearms (2.84 million). Of the five percent that transferred, 71 percent sold a firearm (2.02 million). Of those that sold a firearm, 51 percent (1.03 million) sold through various mediums (*e.g.,* online, pawnshop, gun shop) other than through or to a family member or friend (which likely would not be affected by this rulemaking).[119] Of the five percent

[116] Azrael, D., Hepburn, L., Hemenway, D., & Miller, M. (2017). The stock and flow of U.S. firearms: Results from the 2015 National Firearms Survey. *The Russell Sage Foundation Journal of the Social Sciences, 3*(5), pp 38–57 (pp. 39 and 51). *https://www.jstor.org/stable/10.7758/rsf.2017.3.5.02?seq=1.*

[117] U.S. Census, Stella U. Ogunwole, *et al.,* U.S. Adult Population Grew Faster Than Nation's Total Population From 2010 to 2020, U.S. Census (Aug. 12, 2021), *https://www.census.gov/library/stories/2021/08/united-states-adult-population-grew-faster-than-nations-total-population-from-2010-to-2020.html.*

[118] Azrael, D., Hepburn, L., Hemenway, D., & Miller, M. (2017). The stock and flow of U.S. firearms: Results from the 2015 National Firearms Survey. *The Russell Sage Foundation Journal of the Social Sciences, 3*(5), pp 38–57 (pp. 39 and 51). *https://www.jstor.org/stable/10.7758/rsf.2017.3.5.02?seq=1.*

[119] The Russell Sage Foundation Survey did not divide those who sold to family or friends on a recurring basis from those who made an occasional sale, or between those who did so with intent to earn a profit and those who did not. As noted

[108] 18 U.S.C. 926(a).

[109] *See www.Armslist.com.*

[110] Colin Lecher & Sean Campbell, *The Craigslist of Guns: Inside Armslist, the online 'gun show that never ends',* The Verge (Jan. 16, 2020), *https://www.theverge.com/2020/1/16/21067793/guns-online-armslist-marketplace-craigslist-sales-buy-crime-investigation* (''Over the years, [Armslist] has become a major destination for firearm buyers and sellers.''); Tasneem Raja, Semi-Automatics Without A Background Check Can Be A Click Away, NPR (June 17, 2016), *https://www.npr.org/sections/*

that transferred a firearm, ten percent traded or bartered (284,178). Thus, taking the 51 percent that sold (1.03 million) and the ten percent (284,178) that transferred by trading or bartering, the total number of unlicensed persons that may transfer a firearm, based on this survey, in any given timeframe is 1.31 million. Of the 1.31 million unlicensed persons selling, trading, or bartering firearms, ATF continues to assume, based on the best, very conservative assessment from SME experts, that 25 percent (or 328,296 unlicensed individuals) may be engaged in the business with an intent to profit. In sum, based on these limited sources of information, ATF estimates either 24,540 or 328,296 could represent an estimate of unlicensed persons that may be engaged in the business and affected by this proposed rule.

ATF requests public comments on what sources ATF should look to for accurate estimates of the percentage of the population that would need to obtain a license because they are "engaged in the business" of dealing in firearms, compared to those who make occasional sales of firearms (e.g., enhancement of a personal collection or for a hobby) and would not need to obtain a license.

### 3. Costs for Unlicensed Persons Becoming FFLs

As stated earlier, consistent with the statutory changes in the BSCA, this proposed rule implements a new statutory provision that requires individuals to become licensed dealers if they intend predominantly to earn a profit through the repetitive purchase and resale of firearms (which includes benefits from bartering). Costs to

earlier in the preamble, a person who makes only occasional firearms transfers, such as gifts, to immediate family (without the intent to earn a profit or circumvent requirements placed on licensees), generally does not qualify as a dealer engaged in the business. Although it is possible that some portion of the Russell Sage set of family and friend transferors might qualify as dealers if they engage in actions such as recurring transfers, transfers to others in addition to immediate family, or transfers with intent to profit, ATF was not in a position to make that determination from the Survey. Therefore, ATF erred on the side of assuming, for the purpose of this analysis, that the Russell Sage Foundation data on transfers to family and friends would likely not be affected by this rulemaking, since, in general, such transfers are less likely to be recurring or for profit.

become an FFL include an initial application on a Form 7, along with fingerprints and photographs, and a qualification inspection. This application would require fingerprints and photographs, not only from the person applying, but also, in the case of a corporation, partnership, or association, from any other individual who is a responsible person of that business entity.

For purposes of this analysis, ATF assumes that most, if not all unlicensed persons may be operating alone as sole proprietors because this new requirement would likely affect persons who have other sources of income and do not currently view licensing as a requirement. Besides the initial cost of becoming an FFL, there are recurring costs to maintain a license. These costs include renewing the license on a Federal Firearms License Renewal Application, ATF Form 8 (5310.11) ("Form 8") every three years, maintaining acquisition and disposition ("A&D") records, maintaining ATF Forms 4473, and undergoing periodic compliance inspections.

The proposed rule, which further implements the statutory changes in the BSCA, would affect unlicensed persons who purchase and resell firearms with the intent to predominantly earn a profit (as defined), not those who are already licensed. Because affected unlicensed persons would now need a license to continue to purchase and resell firearms, ATF estimates that the opportunity costs of acquiring a license would be based on their free time or "leisure time." Based on the Department of Transportation's ("DOT's") guidance on the costs for leisure time, ATF attempted to update the leisure wage below based on the methodology outlined in the guidance.[120] The DOT uses median household income as the base for income from the U.S. Census. ATF used the latest median income of a household from the U.S. Census,

[120] Department of Transportation, The Value of Travel Time Savings: Departmental Guidance for Conducting Economic Evaluations Revision 2 (2016 Update), *https://www.transportation.gov/sites/dot.gov/files/docs/2016%20Revised%20Value%20of%20Travel%20Time%20Guidance.pdf.*

published September 2021.[121] Table 1 outlines the leisure wage.

#### TABLE 1—LEISURE WAGE RATE FOR INDIVIDUALS

| Inputs for leisure wage rate | Numerical inputs |
|---|---|
| Median Household Income ...... | $67,521. |
| DOT Travel Time ..................... | 2080. |
| DOT's Value of Travel Time Savings. | 50 percent. |
| Leisure Wage Rate ................ | $16.23. |
| Rounded Leisure Wage Rate ... | $16. |

Based on DOT's methodology for leisure time, ATF attributes a rounded value of $16 per hour for time spent buying and reselling (including bartering) firearms on a repetitive basis. The same hourly cost applies to persons who would now become licensed as a firearms dealer who would not have become licensed without the clarifications provided by this proposed rule. This could include persons who begin selling firearms after the final rule's effective date and understand from the rule that they qualify as firearms dealers (as defined by the statute and regulations), or persons who were previously selling without a license and now realize that they must acquire one to continue selling because their firearms transactions qualify them as dealers.

In addition to the cost of time, there are other costs associated with applying to become an FFL. To become an FFL, persons need to apply on a Form 7 and submit payment to ATF for fees associated with the Form 7 application. Furthermore, these unlicensed persons would need to obtain documentation, including fingerprints and photographs, undergo a background investigation, and submit all paperwork via mail. While not a cost attributed towards their first-year application to become an FFL, an FFL will need to reapply to renew their license every three years on a Form 8 renewal application to ensure that that they can continue to sell firearms thereafter. Table 2 outlines the costs to become an FFL and costs to maintain a license.

[121] U.S. Census, Income and Poverty in the United States: 2020, *https://www.census.gov/library/publications/2021/demo/p60-273.html.*

**62010**    **Federal Register** / Vol. 88, No. 173 / Friday, September 8, 2023 / Proposed Rules

TABLE 2—COST INPUTS TO BECOME AN FFL AND MAINTAIN A LICENSE

| Item | Cost item | Source |
|---|---|---|
| Form 7 Application Accompanying Licensing Fees ................. | $200.00 | Application for Federal Firearms License, ATF, *https://www.atf.gov/firearms/docs/form/form-7-7-cr-application-federal-firearms-license-atf-form-531012531016/download*. |
| Fingerprint Cards ........................................................................ | 0.00 | Distribution Center Order Form, ATF, *https://www.atf.gov/distribution-center-order-form* (Apr. 20, 2023). |
| Fingerprint Cards (Commercial) .................................................. | 23.70 | Various Sources. |
| Average Cost for Fingerprint Cards ........................................... | 12 | See above. |
| Postage ........................................................................................ | 0.63 | Mailing and Shipping Prices, USPS, *https://www.usps.com/business/prices.htm* (last visited Aug. 17, 2023). |
| Photograph ................................................................................... | 16.99 | Passport Photos, CVS, *https://www.cvs.com/photo/passport-photos* (last visited Aug. 17, 2023). |
| FFL Renewal Application Licensing Fees (Form 8) every three years. | 90.00 | Federal Firearms Licensing Center ("FFLC"). |

For purposes of this proposed rule, ATF assumes that unlicensed persons applying for a license as a result of this rulemaking are likely to file for a Type 01 Dealer license.[122] This license costs $200 and uses a Form 7 application (and every three years thereafter, costs $90 to renew the license using Form 8). Applicants also need to obtain and submit fingerprints in paper format. The unlicensed person can obtain fingerprint cards for free from ATF and travel to select law enforcement offices that perform fingerprinting services (usually also for free). Or the unlicensed

person may pay a fee to various market entities that offer fingerprinting services in paper format. The average cost found for market services for fingerprinting on paper cards is $24 (rounded).

Because it is not clear whether an unlicensed person would choose to obtain fingerprint cards from ATF and go to a local law enforcement office that provides fingerprinting services or use commercial services both to obtain cards and fingerprinting services, an average cost of $12 was used. In addition to paper fingerprint cards, the unlicensed person must also submit a photograph appropriate for obtaining

passports. The cost for a passport photo is $17 (rounded). Once they complete the application and gather the documentation, unlicensed persons must submit the Form 7 package by mail. ATF rounds the first-class stamp rate of $0.63 to $1 for calculating the estimated mailing cost.

In addition to costs associated with compiling documentation for a Form 7 application, ATF estimates time burdens related to obtaining and maintaining a Federal firearms license. Table 3 outlines the hourly burdens to apply, obtain, and maintain a license.

TABLE 3—HOURLY BURDENS TO APPLY, OBTAIN, AND MAINTAIN A LICENSE

| Activity type | Hourly burden | Source |
|---|---|---|
| Form 7 Application ...................................................................... | 1 | Application for Federal Firearms License, ATF, *https://www.atf.gov/firearms/docs/form/form-7-7-cr-application-federal-firearms-license-atf-form-531012531016/download*. |
| Time to Travel to and Obtain Photograph ................................. | 0.5 | N/A. |
| Time to Travel to and Obtain Fingerprints ................................ | 1 | N/A. |
| A&D Records ............................................................................... | 0.05 | OMB 1140–0032. |
| Form 4473 ................................................................................... | 0.5 | OMB 1140–0020. |
| Inspection Times (Qualification or Compliance) ........................ | 3 | Field Operations and OMB 1140–0032. |

As stated above, hourly burdens include one hour to complete a Form 7 license application and the time spent to obtain the required documentation. For purposes of this analysis, ATF assumes that places that offer passport photograph services are more readily available than places that provide fingerprinting services; therefore, ATF estimates that it may take 30 minutes (0.5 hours) to travel to and obtain a

passport photograph and estimates up to one hour to travel to and obtain fingerprinting services. Other time burdens may range from 0.05 hours (three minutes) to enter and maintain A&D records for each firearm transaction and 0.5 hours for maintaining a Form 4473, to three hours for an inspection (qualification or compliance).

ATF then multiplied the hourly burdens by the $16 leisure wage rate to account for the value of time spent applying for and obtaining a license using a Form 7 (including any other actions related to obtaining a license), then added the cost per item to determine a cost per action taken. Table 4 outlines the first-year costs to apply for an FFL.

---

[122] The cost for a Type 01 Dealer is used because this license is used to purchase and resell firearms at wholesale or retail.

APPX.144

**Federal Register** / Vol. 88, No. 173 / Friday, September 8, 2023 / Proposed Rules     **62011**

### TABLE 4—FIRST-YEAR COSTS TO OBTAIN A TYPE 01 FFL

| Cost item | Hourly burden | Hourly wage rate | Hourly cost | Cost item | Rounded cost for each activity |
|---|---|---|---|---|---|
| Form 7 | 1 | $16 | $16 | $200 | $216 |
| Fingerprints | 1 | 16 | 16 | 12 | 28 |
| Passport Photograph | 0.5 | 16 | 8 | 17 | 25 |
| Postage | N/A | 16 | N/A | 0.63 | 1 |
| Qualification Inspection | 3 | 16 | 48 | N/A | 48 |
| Initial Cost | | | | | 318 |

Overall, ATF estimates that it would cost an unlicensed person $318 in terms of time spent and fees paid to apply under a Form 7 to become a Type 01 FFL. ATF considers the $318 as an unlicensed person's initial cost. In addition to their initial cost, the newly created FFL would need to maintain a Form 4473 (for each firearm sale), A&D records (two entries per firearm: one entry to purchase and one entry to sell) for every firearms transaction, undergo periodic compliance inspections, and renew their license every three years (ATF Form 8 application). Table 5 outlines the cost per recurring activity to maintain an FFL.

### TABLE 5—RECURRING COSTS TO MAINTAIN AN FFL

| Item | Number of entries or applications | Hourly burden | Hourly wage rate | Hourly cost per activity | Cost item | Rounded cost for each activity |
|---|---|---|---|---|---|---|
| Form 8 Renewal Application | 1 (every three years) | 0.5 | $16.00 | $8.00 | $90 | $98 |
| Form 4473 | 3 (firearm sales every year) | 0.5 | 16.00 | 24.00 | N/A | 24 |
| A&D Records | 6 (two entries per firearm every year) | 0.05 | 16.00 | 4.80 | N/A | 5 |
| Compliance Inspections | 1 (periodically) | 3 | 16.00 | 48.00 | N/A | 48 |

While renewing a license under a Form 8 application occurs every three years, there are additional costs associated with Form 4473 and A&D records that may occur more often. There are also costs from compliance inspections that may occur periodically. ATF notes that the actual number of firearms sales may range from zero sales to more than three per year, but for purposes of this economic analysis only, ATF uses three firearms (six A&D entries) per year to illustrate the potential costs that a person may incur based on information gleaned from ArmsList. Although a person might not resell a given firearm in the same year they purchase it, for the purposes of these estimates, this analysis includes both ends of the firearm transaction because they could buy and sell the same firearm or buy one and sell a different one in a given year.

As for compliance inspections, based on information gathered from ATF's Office of Field Operations, the frequency of such inspections varies depending on the size of the area of operations and the number of FFLs per area of operations. Overall, ATF estimates that it inspects approximately eight percent of all existing FFLs in any given year. ATF has indicated the cost of an inspection, which would normally not occur more than once in a given year per FFL. ATF performs compliance inspections annually, so while the FFL would not necessarily incur a compliance inspection every year, this analysis includes an annual cost for inspections to account for a subset of the total number of affected FFLs that would be inspected in any given year.

In summary, ATF estimates that it would cost an individual $318 in the first year to become licensed. Furthermore, this individual would incur annually recurring costs that could range from $29 a year to complete Forms 4473 and maintain A&D records to $175 to include Form 8 renewal costs and compliance inspections.[123] In addition, ATF estimates that annual costs would range from $805,884 to $7.8 million, with the $7.8 million being the highest annual cost, occurring in the first year, using the SME estimates. Using the alternative inputs from the Russell Sage Foundation Survey results in annual costs ranging from $10.8 million to $104.4 million. Tables 6 and 7 illustrate the 10-year period of analysis.

### TABLE 6—10-YEAR PRIVATE COSTS TO THE PROPOSED RULE USING SME ESTIMATE

| Year | Undiscounted | Discounted at 3 percent | Discounted at 7 percent |
|---|---|---|---|
| 1 | $7,803,720 | $7,576,427 | $7,293,196 |
| 2 | 805,884 | 759,623 | 703,890 |
| 3 | 805,884 | 737,498 | 657,841 |
| 4 | 3,210,804 | 2,852,758 | 2,449,507 |
| 5 | 805,884 | 695,163 | 574,584 |
| 6 | 805,884 | 674,915 | 536,995 |

---

[123] ATF notes that the high $175 may be higher than actual costs since this high cost assumes that an FFL would simultaneously renew their license (which occurs every three years) in the same year that they perform a compliance inspection, which occurs periodically.

TABLE 6—10-YEAR PRIVATE COSTS TO THE PROPOSED RULE USING SME ESTIMATE—Continued

| Year | Undiscounted | Discounted at 3 percent | Discounted at 7 percent |
|---|---|---|---|
| 7 | 3,210,804 | 2,610,677 | 1,999,527 |
| 8 | 805,884 | 636,172 | 469,032 |
| 9 | 805,884 | 617,643 | 438,348 |
| 10 | 3,210,804 | 2,389,140 | 1,632,210 |
| Total | 22,271,436 | 19,550,016 | 16,755,130 |
| Annualized | | 2,291,858 | 2,385,554 |

Overall, the annualized private cost of this proposed rule using SME estimates is $2.3 million at three percent and $2.4 million at seven percent.

TABLE 7—10-YEAR PRIVATE COSTS TO THE PROPOSED RULE USING THE RUSSELL SAGE FOUNDATION SURVEY

| Year | Undiscounted | Discounted at 3 percent | Discounted at 7 percent |
|---|---|---|---|
| 1 | $104,398,128 | $101,357,406 | $97,568,344 |
| 2 | 10,781,256 | 10,162,368 | 9,416,767 |
| 3 | 10,781,256 | 9,866,377 | 8,800,716 |
| 4 | 42,954,264 | 38,164,307 | 32,769,602 |
| 5 | 10,781,256 | 9,300,006 | 7,686,887 |
| 6 | 10,781,256 | 9,029,132 | 7,184,006 |
| 7 | 42,954,264 | 34,925,747 | 26,749,757 |
| 8 | 10,781,256 | 8,510,823 | 6,274,789 |
| 9 | 10,781,256 | 8,262,935 | 5,864,289 |
| 10 | 42,954,264 | 31,962,006 | 21,835,770 |
| Total | 297,948,456 | 261,541,108 | 224,150,926 |
| Annualized | | 30,660,597 | 31,914,049 |

Overall, the annualized private cost of this proposed rule, based on alternate inputs from the Russell Sage Foundation Survey, is $30.7 million at three percent and $31.9 million at seven percent.

4. Costs for FFLs After Termination of License

The proposed rule is also designed to enhance compliance by former FFLs who no longer hold their licenses due to license revocation, denial of license renewal, license expiration, or surrender of license but nonetheless engage in the business of dealing in firearms. Such persons sometimes, under existing standards, transfer their inventory to their personal collections instead of selling or otherwise disposing of the firearms to a licensed importer, licensed manufacturer, or licensed dealer for sale, auction, or pawn redemption. The proposed rule would clarify that such former licensees must sell to other licenses or transfer their personal collection within 30 days, but they may not treat a business firearm that they have transferred to their personal collection as a personal firearm until the firearm has been in their personal collection for a period of one year. Former FFLs who sell any such firearm within one year of the transfer date as

a personal firearm may be in violation of existing statutory and regulatory restrictions (18 U.S.C. 922(a)(1)(A) and 923(a),(c)) on unlicensed dealers, and may be deemed to be "engaged in the business."

ATF license revocation, denial of license renewal, license expiration, or surrender of license realistically present two categories of affected populations. Group 1, comprising license revocations and denial of license renewals, could be described as former FFLs who have failed to comply with existing regulations and requirements to a degree which resulted in the revocation or denial of their licenses. The proposed rule is likely to have a qualitative impact on this group because a revocation or denial may not provide ample opportunity for an orderly and planned liquidation or transfer of inventory before losing the license, which may therefore be disruptive. Based on data from the FFLC, the number of such FFL license revocations are rare, with an average of 37 licenses revoked by ATF over the past 5 years (with a range between 8 and 79), or a de minimis percentage of 0.05 percent of all active FFLs. Furthermore, the economic impact of transferring inventory to another FFL instead of the former FFL holder retaining the

inventory is unclear, as the underlying market value of the inventory is unchanged by this proposed rule's requirements. Additional factors surrounding the potential cost of no longer being able to transfer one's inventory to oneself are also unknown and presumed to similarly be de minimis. Therefore, ATF believes there are no quantitative impacts associated with this population. However, ATF welcomes public comments on these assumptions in general and on the potential impacts on former FFLs with revoked licenses.

Group 2, comprising license expiration or surrender of license, captures those who no longer have a license for discretionary or lawful reasons. This group comprises former FFLs that choose to close or to sell the business to another party. They are similarly excluded from expected impacts attributable to the proposed rule because of the likelihood that, because the closure is planned, the FFL will include reasonable considerations for orderly, lawful liquidation or inventory transfer as part of closing or selling their enterprise. Such considerations are also likely to occur ahead of, rather than subsequent to, the expiration or surrender of their license. As a result, ATF assumes that the

options of transfer to the licensee's personal collection or sale to another FFL that exist under current standards would similarly be freely available to Group 2 FFLs over their expected course of action under the proposed rule. As a result, we are excluding both groups from the affected population.

5. Government Costs

In addition to the private costs to unlicensed persons, ATF would incur additional work due to the increase in Form 7 and Form 8 applications for unlicensed persons who become an FFL which would be offset by the fees incurred with FFL applications ($200) and renewals ($90). Based on information gathered from FFLC, which processes and collects the fees for FFL

applications, various contractors and Federal Government employees process Form 7 and 8 applications, verify and correct applications, and further process them for background checks and approval.

Based on information provided by FFLC, the average hourly rate for contracting staff, to include benefits, is $13.29.[124] To determine the wage rates for Federal employees, ATF used the wage rates according to the General Schedule ("GS") level, step 5 as an average wage rate per activity. Government processing activities range from an entry level Federal employee between a GS–5/7, upwards to a GS–13.[125] To account for fringe benefits such as insurance, ATF estimated a

Federal load rate. ATF estimated the Federal load rate using the methodology outlined in the Congressional Budget Office's report comparing Federal benefits to private sector benefits. It states that Federal benefits are 17 percent more than private sector benefits (or a multiplier factor of 1.17).[126] ATF calculated private sector benefits from the Bureau of Labor Statistics (in 2022) and determined that the overall private sector benefits are 41.9 percent in addition to an hourly wage, or a load rate of 1.419. This makes the Federal load rate 1.66 above the hourly wage rate (after applying the 1.17 multiplier).[127] Table 8 outlines the government costs to process a Form 7 application to become an FFL.

TABLE 8—HOURLY BURDEN AND COST TO PROCESS A NEW APPLICATION FOR AN FFL

| Government cost to process new FFL applications | Hourly burden | Staffing level | Hourly wage | Loaded hourly wage | Rounded cost |
|---|---|---|---|---|---|
| Average Contracting Time to Prepare and Enter Application ............ | 0.5 | Contracting Staff .... | $13.29 | $13.29 | $7 |
| Processing Time for New Applications ................................................. | 1 | GS 10 .................... | 38.85 | 64.49 | 64 |
| Processing Time for Fingerprint Cards ................................................ | 2 | GS 12 .................... | 51.15 | 84.91 | 170 |
| Qualification Inspection Time (Includes Travel) ................................. | 5 | GS 5/7 to GS 13 .... | 37.65 | 62.50 | 312 |
| Subtotal ....................................................................................... | ................ | ................ | ................ | ................ | 553 |
| Fees Incurred from New Application ............................................. | ................ | ................ | ................ | ................ | −200 |
| Total ........................................................................................ | ................ | ................ | ................ | ................ | 353 |

Based on the hourly burdens and the hourly wage rates for various contract and Federal employees, ATF estimates that it would take on average 8.5 hours to process a Form 7 application, at a cost of $553 per application, offset by the new application fee (Form 7) of $200, for an overall net cost to the government for this rulemaking of $353. Form 8 application renewals are estimated to cost $71 every three years (or $553 less the $312 inspection time and the $170 fingerprint costs).

However, the cost to review a Form 8 application ($71) is offset by the renewal fee of $90, making the net cost or overall savings to government for this rulemaking −$19 per FFL renewal.

In addition to processing Form 7 applications, ATF Industry Operations Investigators ("IOIs") would need to perform qualification and compliance inspections. The qualification inspection occurs once during the application process and is accounted for in table 7 above. But, as discussed

above, there is a recurring compliance inspection after the person becomes a licensee. For either the qualification or compliance inspection, ATF notes that the estimated five-hour inspection time for the government is more than the inspection time for the private sector, as discussed above, because ATF is including travel time for an IOI to travel to the person's location. Table 9 outlines the recurring government cost to inspect an FFL.

TABLE 9—RECURRING GOVERNMENT COSTS TO INSPECT AN FFL

| Activity | Hourly burden | Staffing level | Hourly wage | Loaded hourly wage | Rounded cost |
|---|---|---|---|---|---|
| Compliance Inspection (Includes Travel) ............................................. | 5 | GS 5/7 to GS 13 .... | $37.65 | $62.50 | $312 |

Based on the hourly burdens and wage rates of IOIs, ATF anticipates that it costs ATF $312 to perform a compliance inspection. To summarize the overall government costs, table 10 outlines the government costs to process

---

[124] ATF notes that because the contracting salary is a loaded wage rate, a base wage rate (not including benefits) was not included in table 8 below.

[125] Office of Personnel Management, Salary Table 2023–DCB, *https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2023/DCB_h.pdf.*

[126] Congressional Budget Office, Comparing the Compensation of Federal and Private-Sector Employees, 2011 to 2015, *https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/52637-federalprivatepay.pdf.*

[127] 1.66 Federal load rate = 1.419 private industry load rate * 1.17 multiplier factor. BLS Series ID CMU2010000000000D,CMU2010000000000P

(Private Industry Compensation = $39.34)/BLS Series ID CMU2020000000000D,CMU2020000000000P (Private Industry Wages and Salaries = $27.73) = 1.419. BLS average 2022. U.S. Bureau of Labor Statistics, Database for Employee Compensation, *https://data.bls.gov/cgi-bin/srgate.*

Form 7 applications, process Form 8 renewal applications, and conduct FFL compliance inspections.

### TABLE 10—SUMMARY OF GOVERNMENT COST PER LISTED ACTION

| Government cost per unlicensed person | Cost |
|---|---|
| Per Application Cost (including qualification inspection) | $353 |
| Per Renewal Cost | −19 |
| Per Compliance Inspection Cost | 312 |

ATF estimates that the government costs of this proposed rule include the initial application cost that occurs in the first year (including the qualification inspection), renewal costs that occur every three years after the first year, and the cost for the government to conduct a compliance inspection of an FFL in a given year (the government currently conducts compliance inspections of approximately eight percent of FFLs per year). Table 11 illustrates the 10-year government costs this proposed rule.

### TABLE 11—TOTAL GOVERNMENT COSTS OF PROPOSED RULE

| Year | Undiscounted | 3 Percent discount rate | 7 Percent discount rate |
|---|---|---|---|
| Year | Undiscounted | 3% | 7% |
| 1 | $8,662,620 | $8,662,620 | $8,662,620 |
| 2 | 612,456 | 612,456 | 612,456 |
| 3 | 612,456 | 612,456 | 612,456 |
| 4 | 146,196 | 146,196 | 146,196 |
| 5 | 612,456 | 612,456 | 612,456 |
| 6 | 612,456 | 612,456 | 612,456 |
| 7 | 146,196 | 146,196 | 146,196 |
| 8 | 612,456 | 612,456 | 612,456 |
| 9 | 612,456 | 612,456 | 612,456 |
| 10 | 146,196 | 146,196 | 146,196 |
| Total | 12,775,944 | 12,775,944 | 12,775,944 |
| Annualized | | 1,497,730 | 1,819,007 |

Overall, the annualized government cost of this proposed rule is $1.5 million at three percent and $1.8 million at seven percent.

#### 6. Total Cost

The total costs, therefore, take into account the private and government costs of the proposed rule, as described in sections 3 and 5 above. ATF estimates that the initial application cost (Form 7 and initial inspection) occurs in the first year, renewal costs (Form 8 renewals) occur every three years after the first year, and completion and maintenance of Forms 4473 and A&D records, and compliance inspection costs (for a subset of FFLs affected by this rulemaking), occur annually. Tables 12 and 13 illustrate the 10-year private and government costs of this proposed rule.

### TABLE 12—TOTAL PRIVATE AND GOVERNMENT COSTS OF PROPOSED RULE BASED ON SME ESTIMATES [128]

| Year | Undiscounted | 3 Percent discount rate | 7 Percent discount rate |
|---|---|---|---|
| 1 | $16,466,340 | $15,986,738 | $15,389,103 |
| 2 | 1,418,340 | 1,336,921 | 1,238,833 |
| 3 | 1,418,340 | 1,297,982 | 1,157,788 |
| 4 | 3,357,000 | 2,982,651 | 2,561,039 |
| 5 | 1,418,340 | 1,223,473 | 1,011,257 |
| 6 | 1,418,340 | 1,187,837 | 945,100 |
| 7 | 3,357,000 | 2,729,548 | 2,090,571 |
| 8 | 1,418,340 | 1,119,651 | 825,487 |
| 9 | 1,418,340 | 1,087,040 | 771,483 |
| 10 | 3,357,000 | 2,497,923 | 1,706,529 |
| Total | 35,047,380 | 31,449,764 | 27,697,189 |
| Annualized | | 3,686,872 | 3,943,457 |

---

[128] The ''Undiscounted'' column represents totals from the underlying private and government cost tables. Consistent with guidance provided by OMB in Circular A–4, the ''3 Percent Discount Rate'' and ''7 Percent Discount Rate'' columns result from applying an economic formula to the number in each row of this ''Undiscounted'' column to show how these future costs over time would be valued today; they do not contain totals from other tables.

Overall, the total annualized cost of this proposed rule is $3.7 million at three percent and $3.9 million at seven percent using information based off of SME estimates.

TABLE 13—TOTAL PRIVATE AND GOVERNMENT COSTS OF PROPOSED RULE BASED ON RUSSELL SAGE FOUNDATION SURVEY AND SME ESTIMATES [129]

| Year | Undiscounted | Discounted at 3 percent | Discounted at 7 percent |
|---|---|---|---|
| 1 | $113,060,748 | $109,767,717 | $105,664,250 |
| 2 | 11,393,712 | 10,739,666 | 9,951,709 |
| 3 | 11,393,712 | 10,426,861 | 9,300,663 |
| 4 | 43,100,460 | 38,294,200 | 32,881,135 |
| 5 | 11,393,712 | 9,828,316 | 8,123,559 |
| 6 | 11,393,712 | 9,542,054 | 7,592,111 |
| 7 | 43,100,460 | 35,044,618 | 26,840,800 |
| 8 | 11,393,712 | 8,994,301 | 6,631,244 |
| 9 | 11,393,712 | 8,732,332 | 6,197,424 |
| 10 | 43,100,460 | 32,070,790 | 21,910,088 |
| Total | 310,724,400 | 273,440,855 | 235,092,985 |
| Annualized | | 32,055,610 | 33,471,952 |

Overall, using the information from the Russell Sage Foundation Survey and FIPB SME estimates, table 13 represents the upper bound estimate in which the total annualized cost of this proposed rule is $32 million at three percent and $33.4 million at seven percent.

### 7. Benefits

These proposed revisions will have significant public safety benefits by ensuring that ATF's regulatory definitions conform to the BSCA's statutory changes and can be relied upon by the public, and by clarifying that persons who intend to predominantly earn a profit from the repetitive purchase and resale of firearms are engaged in the business of dealing in firearms and must be licensed, even if they make few or no sales, or if they are conducting such transactions on the internet or through other mediums or forums. As part of the license application, those dealers will undergo a background check. This increases the ability to ensure that persons purchasing and selling (including bartering) firearms with the intent to earn a profit are lawfully able to do so and reduces the risk that they could pose a danger to others by trafficking in illicit firearm sales or otherwise engaging in criminal activities. Additionally, these licensed dealers must take steps to help determine that they are not selling

firearms to persons prohibited from receiving or possessing such firearms under Federal, State, local, or Tribal law.

The U.S. Sentencing Commission reports that "88.8 percent of firearm offenders sentenced under § 2K2.1 [130] [of the United States Sentencing Commission *Guidelines Manual* (Nov. 2021)] were [already] prohibited from possessing a firearm" under 18 U.S.C. 922(g). These individuals would thus have been flagged in a background check, would have therefore been prohibited from buying a firearm from a licensed dealer after their first offense, and would not have been able to commit the subsequent firearms offense(s) if their seller had been licensed. In addition, the Commission reports that such offenders "have criminal histories that are more extensive and more serious than other offenders" [131] and that they are "more than twice as likely to have a prior conviction for a violent offense compared to all other offenders." [132]

In another report, on "armed career criminals" (those who have three or more convictions for violent offenses, serious drug offenses, or both), the Commission reports that a substantial share of "armed career criminals" (83 percent in fiscal year 2019) had prior convictions for at least one violent

offense (as opposed to solely serious drug offense convictions). This includes "57.7 percent who had three or more [prior violent] convictions." [133] In other words, persons who prohibited by law from possessing firearms, as well as the more serious "armed career criminals" who are also prohibited, were able to obtain guns and continued to commit more violent offenses after they would have been flagged by a background check and denied a firearm if purchasing from a licensed dealer.

Such violence has a significant adverse effect on public safety. Because licensed dealers are required to conduct background checks on unlicensed transferees, another benefit of this rulemaking is to aid in preventing firearms being sold to felons or other prohibited persons, who may commit crimes and acts of violence or themselves become sources of firearms trafficking. Furthermore, these licensed dealers must also maintain firearms transaction records, which will help with criminal investigations and tracing firearms subsequently used in crimes.

In 2016, ATF distributed and discussed the above-mentioned "engaged in the business" guidance at gun shows to ensure that unlicensed dealers operating at gun shows became licensed, and portions of that previous guidance are incorporated in this proposed rule. This guidance was particularly directed at unlicensed persons who sell firearms as a secondary source of income to allow

---

[129] The "Undiscounted" column represents totals from the underlying private and government cost tables. Consistent with guidance provided by OMB in Circular A–4, the "3 Percent Discount Rate" and "7 Percent Discount Rate" columns result from applying an economic formula to the number in each row of this "Undiscounted" column to show how these future costs over time would be valued today; they do not contain totals from other tables.

[130] Section 2K2.1 provides sentencing guidelines for "Unlawful Receipt, Possessions, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition."

[131] *What do Federal Firearms Offenses Really Look Like?*, United States Sentencing Commission Report at 2 (July 14, 2022), *https://www.ussc.gov/research/research-reports/what-do-federal-firearms-offenses-really-look.*

[132] *Id.*

[133] *Federal Armed Career Criminals: Prevalence, Patterns, and Pathways,* United States Sentencing Commission, at 9 (March 2021), *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210303_ACCA-Report.pdf.*

them to continue to sell firearms, but as licensed dealers. Based on the FFLC, ATF found that there was an increase of approximately 567 ATF Form 7 applications to account for these unlicensed persons selling at gun shows. This prior outcome demonstrates the market response to clarifying licensing requirements and that such a response both increases the likelihood that persons engaged in the business comply with Federal licensing requirements and enhance public safety by denying persons prohibited from purchasing firearms through completion of ATF Forms 4473 and running background checks on prospective purchasers.

Finally, providing a clear option for FFLs to transfer their business inventory to another FFL when their license is terminated helps to ensure that these business inventories of firearms are traceable and do not become sources of trafficked firearms.

### 8. Alternatives

In addition to the requirements outlined in this proposed rule, ATF considered the following alternative approaches:

*Alternative 1. A rulemaking that focuses on a bright-line numerical threshold of what constitutes being engaged in the business as a dealer in firearms.* As discussed above, in the past, it has been proposed to ATF that a rulemaking should set a specific threshold or number of sales per year to define "engaged in the business." ATF considered this alternative in the past and again as part of developing this proposed rulemaking.[134] However, ATF chose not to adopt this alternative for a number of reasons stated in detail above. In summary: courts have held even before the passage of the BCSA that the sale of or attempt to sell even one firearm is sufficient to show that a person is "engaged in the business" if that person represents to others that they are willing and able to purchase more firearms for resale; a person could structure their transactions to avoid the minimum threshold by spreading out sales over time; and firearms could be sold by unlicensed persons below the threshold number without records, making those firearms unable to be traced when they are subsequently used in a crime. Finally, the Department does not believe there is a sufficient evidentiary basis, without consideration of additional factors, to support a specific minimum number of firearms bought or sold for a person to be considered "engaged in the business."

The costs of implementing a specific threshold would be lower than in the primary analysis proposed in this rule. However, the Department believes it would not appropriately address the language regarding the requisite intent predominantly to earn a profit (which can include bartering) and would have unintended effects such as those summarized in the previous paragraph that would impact personal firearms transactions and decrease public safety and law enforcement's ability to trace firearms used in crimes.

*Alternative 2. Publishing guidance instead of revising the regulations.* Under this alternative, rather than publishing regulations further defining "engaged in the business," ATF would publish only guidance documents to clarify the topics included in this proposed rule. Although ATF has determined that in addition to revising its regulations, it will also update existing guidance documents to answer any questions that the firearms industry may have, the Department has determined that issuing only guidance would be insufficient to address the issues discussed above. ATF did not select the alternative to publish only guidance documents in lieu of regulations because guidance would be insufficient as a means to inform the public in general, rather than solely the currently regulated community; guidance would not have the same legal effect and applicability as a regulation; it would not benefit from the input of public review and comment to aid in accounting for possible unintended impacts or interpretations; and it would not be able to change existing regulatory provisions on the subject of "engaged in the business" or impact intersecting regulatory provisions. In addition, ATF can incorporate guidance in a proposed rule based on its experience or in response to comments. When an agency establishes or revises legally binding requirements, it must do so through a regulation issued under the Administrative Procedure Act and Executive order provisions flowing from it. Guidance does not meet these requirements. Therefore, although the Department considered this alternative, it determined it was not in the best interest of the public.

*Alternative 3. No action.* Rather than promulgating a regulation, ATF could instead take no action to further clarify the BCSA's amendments to the GCA. However, the Department considered this alternative and decided against it for a number of reasons. First, as the various enforcement actions and court decisions cited above demonstrate, ATF has observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA. Second, on March 14, 2023, President Biden issued Executive Order 14092, requiring the Attorney General to report on agency efforts to implement the BSCA, develop and implement a plan to clarify the definition of who is engaged in the business of dealing in firearms, "including by considering a rulemaking," and prevent former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms.[135] Third, Congress, through the BSCA, determined that there was a need to revise the definition of "engaged in the business" for the first time in almost 40 years. While that by itself does not preclude ATF from using its discretion not to promulgate a formal rule, it indicates an important change to the landscape of who must have a license to deal in firearms and warrants consideration of what that means to persons who have been operating under the previous definition. It has potential effects on those who have not considered themselves to fall under the definition before and now would have to have a license. The change to the definition removed any intent to obtain "livelihood," and it is reasonable to expect that those who transact in firearms would have questions about how to interpret and apply this change. This would include how it affects other aspects of existing laws and regulatory provisions that govern such transactions, as well as how other BSCA amendments, such as the new international trafficking provisions, might apply to the dealer requirements. For these reasons, the Department determined this was not a viable alternative.

Although the Department considered this alternative, it does not generate direct monetary costs because it leaves the regulatory situation as it is. Because the costs and benefits of this alternative arise from the statute itself, ATF did not include an assessment of them in this proposed rulemaking.

### B. Executive Order 13132

This regulation will not have substantial direct effects on the States, the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive

---

[134] See discussion *supra* under Section I.A. "Advance Notice of Proposed Rulemaking (1979)" and in more detail in Section II.D. "Presumptions that a Person is "Engaged in the Business.""

[135] 88 FR at 16528.

Order 13132 ("Federalism"), the Attorney General has determined that this regulation does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*C. Executive Order 12988*

This regulation meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 ("Civil Justice Reform").

*D. Regulatory Flexibility Act ("RFA")*

ATF performed an initial regulatory flexibility analysis of the impacts on small businesses and other entities on this proposed rule. Based on the information from this analysis, ATF has determined that this proposed rule would impact unlicensed persons who would now have to become licensed dealers to lawfully operate as a small business. Because some of these unlicensed persons may transact in low-volume firearms sales to predominantly earn a profit, the costs to become an FFL could have an impact on their overall profit from firearms transactions.

Initial Regulatory Flexibility Analysis

The RFA establishes "as a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation. To achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration." Public Law 96–354, section 2(b), 94 Stat. 1164, 1165 (1980) (codified at 5 U.S.C. 601, *et seq.*).

Under the RFA, the agency is required to consider whether this rule would have a significant economic impact on a substantial number of small entities. Agencies must perform a review to determine whether a rule would have such an impact. If the agency determines that it would, the agency must prepare a regulatory flexibility analysis as described in the RFA.

The RFA covers a wide range of small entities. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. 5 U.S.C. 601(3)–(6). ATF determined that the rulemaking affects a variety of large and small businesses (see the "Description

of the Potential Number of Small Entities" section below). Based on the requirements above, ATF prepared the following initial regulatory flexibility analysis assessing the impact on small entities from the rulemaking.

1. A description of the reasons why action by the agency is being considered.

Congress passed the BSCA, which amended the definition of engaged in the business from a person seeking to transact in firearms for livelihood and profit to a person intending predominantly to earn a profit. Moreover, on March 14, 2023, the President ordered the Attorney General to report on efforts to implement the BSCA and to develop and implement a plan to clarify the definition of "engaged in the business" of dealing in firearms and prevent FFLs from continuing to deal after license revocation or surrender.

2. A succinct statement of the objectives of, and legal basis for, the proposed rule.

The Attorney General is responsible for enforcing, among other statutes, the GCA, as amended. The BSCA redefined who is a regulated dealer under the GCA. This proposed rule updates the regulations to ensure the language conforms with the amended statutory provisions, and clarifies for the public how to understand and implement the statutory change and also implements Executive Order 14092.

3. A description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply.

This proposed rule implements a statutory requirement that affects unlicensed persons who purchase and sell firearms, with the intent to profit (including barter), on a recurring basis. As persons who engage in higher-frequency firearms transactions meeting these requirements are typically already licensed as dealers, the persons impacted by this proposed rule will primarily be those who transact in low volume repetitive firearms sales. These persons likely either already are, or would become, small entities.

4. A description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

ATF estimates that this proposed rule would affect at least 24,540 unlicensed persons who, as a result of changes enacted in the BSCA, are now required to obtain a Federal firearms license.

Such persons would need to file a Form 7 application, pay a licensing fee, undergo a qualification inspection, maintain Form 4473 and A&D records for every firearm transaction, and undergo periodic compliance inspections. If they continue in business after three years, they would need to file a Form 8 renewal application and pay a renewal licensing fee. No professional skills are necessary to prepare or perform application or recordkeeping activities.

5. An identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.

This proposed rule does not duplicate or conflict with other Federal rules.

6. Descriptions of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities.

ATF did not find any suitable alternatives that would meet the objectives of this proposed rule that would minimize the economic impact that this rulemaking would have on small entities.

*E. Small Business Regulatory Enforcement Fairness Act of 1996*

This rulemaking is likely to have a significant economic impact on a substantial number of small entities under the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. 601 *et seq.* Accordingly, the Department prepared an initial regulatory flexibility analysis.

*F. Unfunded Mandates Reform Act of 1995*

This rulemaking would not result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995, Public Law 104–4, 109 Stat. 48. *See* 2 U.S.C. 1532(a).

*G. Paperwork Reduction Act of 1995*

Under the Paperwork Reduction Act of 1995 ("PRA"), 44 U.S.C. 3501–21, and its implementing regulations, 5 CFR part 1320, agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. The collections of information contained in this proposed rule are collections of information which have been reviewed and approved by OMB in accordance with

the requirements of the PRA and have been assigned an OMB Control Number.

As defined in 5 CFR 1320.3(c), "collection of information" comprises reporting, recordkeeping, monitoring, posting, labeling, and other similar actions. The collections of information in this rulemaking are mandatory. The title and description of the information collection, a description of those who must collect the information, and an estimate of the total annual burden follow. The estimate covers the time for reviewing instructions, searching existing sources of data, gathering, and maintaining the data needed, and completing and reviewing the collection.

*Title:* Application for a Federal Firearms License—ATF Form 7(5310.12)/7CR (5310.16)3.

*OMB Control Number:* OMB 1140–0018.

*Summary of the Collection of Information:* 18 U.S.C. 922 specifies a number of unlawful activities involving firearms in interstate and foreign commerce. Some of these activities cease to be unlawful when persons are licensed under the provisions of 18 U.S.C. 923. Some examples of activities that are no longer unlawful once a person becomes licensed include: engaging in the business of selling, shipping, receiving, and transporting firearms in interstate or foreign commerce, including the acquisition of curio or relic firearms acquired by collectors from out-of-state for personal collections. This collection of information is necessary to ensure that anyone who wishes to be licensed as required by 18 U.S.C. 923 meets the requirements to obtain the desired license.

*Need for Information:* Less frequent collection of this information would pose a threat to public safety. Without this information collection, ATF would not be able to issue licenses to persons required by law to have a license to engage in the business of dealing in firearms or shipping or transporting firearms in interstate or foreign commerce in support of that business, or acquire curio and relic firearms from out of state.

*Proposed Use of Information:* ATF personnel will analyze the submitted application to determine the applicant's eligibility to receive the requested license.

*Description of the Respondents:* Individuals or entities wishing to engage in the business of selling, shipping, receiving, and transporting firearms in interstate or foreign commerce, as well as acquiring firearms classified as curios and relics for personal collections.

*Number of Respondents:* 13,000 existing. New respondents due to the rule 24,540.

*Frequency of Response:* one time.
*Burden of Response:* one hour.
*Estimate of Total Annual Burden:* 24,540 hours (incremental change).

*Title:* Application for a Federal Firearms License—Renewal Application ATF Form 8 (5310.11).

*OMB Control Number:* OMB 1140–0019.

*Summary of the Collection of Information:* 18 U.S.C. Chapter 44 provides that no person may engage in the business of importing, manufacturing, or dealing in either firearms, or ammunition, without first obtaining a license to do so. These activities are licensed for a specific period. The benefit of a collector's license is also provided for in the statute. In order to continue to engage in the aforementioned firearms activities without interruption, licensees must renew their FFL by filing Federal Firearms License ("FFL") RENEWAL Application-ATF F 8 (5310.11) Part II, prior to its expiration.

*Need for Information:* Less frequent use of this information collection would pose a threat to public safety, since the collected information helps ATF to ensure that the applicants remain eligible to renew their licenses.

*Proposed Use of Information:* ATF F 8 (5310.11) Part II, is used to identify the applicant and determine their eligibility to retain the license.

*Description of the Respondents:* Respondents desiring to update the responsible person (RP) information on an existing license must submit a letter in this regard, along with the completed FFL renewal application to ATF.

*Number of Respondents:* 34,000 existing. New respondents due to the rule 24,540.

*Frequency of Response:* every three years and periodically.

*Burden of Response:* 0.5 hours.
*Estimate of Total Annual Burden:* 12,270 hours (incremental change).

*Title:* Firearms Transaction Record—ATF Form 4473 (5300.9) and Firearms Transaction Record Continuation Sheet.

*OMB Control Number:* OMB 1140–0020.

*Summary of the Collection of Information:* The subject form is required under the authority of 18 U.S.C. 922 and 923 and 27 CFR 478.124. These sections of the GCA prohibit certain persons from shipping, transporting, receiving, or possessing firearms. All persons, including FFLs, are prohibited from transferring firearms to such persons. FFLs are also subject to additional restrictions regarding the

disposition of a firearm to an unlicensed person under the GCA. For example, age and State of residence also determine whether a person may lawfully receive a firearm. The information and certification on the Form 4473 are designed so that a person licensed under 18 U.S.C. 923 may determine if the licensee may lawfully sell or deliver a firearm to the person identified in Section B, and to alert the transferee/buyer of certain restrictions on the receipt and possession of firearms. The Form 4473 should only be used for sales or transfers of firearms where the seller is licensed under 18 U.S.C. 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction.

*Need for Information:* The consequences of not conducting this collection of information, or conducting it less frequently, are that the licensee might transfer a firearm to a person who is prohibited from possessing firearms under Federal law. The collection of this information is necessary for compliance with the statutory requirements to verify the eligibility of a person receiving or possessing firearms under the GCA. There is no discretionary authority on the part of ATF to waive these requirements. Respondents are required to supply this information as often as necessary to comply with statutory provisions. The form is critical to the prevention of criminal diversion of firearms and enhances law enforcement's ability to trace firearms that are recovered in crimes.

*Proposed Use of Information:* A person purchasing a firearm from an FFL must complete Section B of the Form 4473. The buyer's answers to the questions determine if the potential transferee is eligible to receive the firearm. If those answers indicate that the buyer is not prohibited from receiving a firearm, the licensee completes Section C of the Form 4473 and contacts the FBI's NICS system or the State point of contact to determine if the firearm can legally be transferred to the purchaser.

*Description of the Respondents:* Unlicensed persons wishing to purchase a firearm.

*Number of Respondents:* 17,189,101 existing. New respondents due to the rule 24,540.

Frequency *of Response:* periodically.
*Burden of Response:* 0.5 hours.
*Estimate of Total Annual Burden:* 12,270 hours (incremental change).

*Title:* Records of Acquisition and Disposition, Dealers of Type 01/02 Firearms, and Collectors of Type 03

Firearms [Records of Acquisition and Disposition, Collectors of Firearms].

*OMB Control Number:* OMB 1140–0032.

*Summary of the Collection of Information:* The recordkeeping requirements as authorized by the GCA, 18 U.S.C. 923, are for the purpose of allowing ATF to inquire into the disposition of any firearm received by a licensee in the course of a criminal investigation.

*Need for Information:* Less frequent collection of this information would pose a threat to public safety as the information is routinely used to assist law enforcement by allowing them to trace firearms in criminal investigations.

*Proposed Use of Information:* This collection of information grants ATF Officers the authority to examine a collector's records for firearms traces or compliance inspections, per 27 CFR 478.23(c)(1), (2).

*Description of the Respondents:* Federal Firearms Licensees.

*Number of Respondents:* 60,790 existing. New respondents due to the rule 24,540.

*Frequency of Response:* annually recurring.

*Burden of Response:* three minutes to maintain A&D records and one hour to perform an inspection.

*Estimate of Total Annual Burden:* 24,540 hours in inspection time (incremental change) and 3,681 hours maintaining in A&D records (incremental change).

ATF asks for public comment on the proposed collection of information to help determine how useful the information is; whether the public can help perform ATF's functions better; whether the information is readily available elsewhere; how accurate ATF's estimate of the burden of collection is; how valid the methods for determining burden are; how to improve the quality, usefulness, and clarity of the information; and how to minimize the burden of collection.

If you submit comments on the collection of information, submit them following the "Public Participation" section under the **SUPPLEMENTARY INFORMATION** heading. You need not respond to a collection of information unless it displays a currently valid control number from OMB. Before the requirements for this collection of information become effective, ATF will publish a notice in the **Federal Register** of OMB's decision to approve, modify, or disapprove the proposed collection.

## IV. Public Participation

### A. Comments Sought

ATF requests comments on the proposed rule from all interested persons. ATF specifically requests comments on:

(1) The clarity of this proposed rule, and how easy it is to understand;

(2) The various definitions and rebuttable presumptions relevant to determining when a person is "engaged in the business" of dealing in firearms at wholesale or retail, as described in Section II.D of this preamble, and when a person acts with the intent to "predominantly earn a profit" from the sale or disposition of firearms, as described in Section II.G of this preamble.

(3) Whether the rule should use inferences, factors, or some other method of determining when a person is "engaged in the business" of dealing in firearms or acting with the intent to "predominantly earn a profit", instead of, or in addition to, using presumptions of any kind, including (a) whether the criteria should function as rebuttable presumptions or permissive inferences in the administrative and civil contexts, and (b) whether and how the criteria should function differently in different types of proceedings;

(4) Whether there is additional specific conduct that would provide indicia of whether or when a person is or is not "engaged in the business" of dealing in firearms, or acts with the intent to "predominantly earn a profit" from the sale or disposition of firearms;

(5) When and how any presumptions, inferences, or factors can or should be rebutted;

(6) Whether the rule should define "occasional" as that term is used in the definition of "engaged in the business" under 18 U.S.C. 921(a)(21)(C), and if so, how the term should be defined; and

(7) The costs or benefits of the proposed rule, and appropriate methodology and data for calculating those costs and benefits, including what sources ATF should look to, beyond ATF's own expertise, for accurate estimates of the percentage of this population that would need to obtain a license because they are "engaged in the business" of dealing in firearms compared to those who make occasional sales of firearms (*e.g.,* enhancement of a personal collection or for a hobby) and would not need to obtain a license.

All comments must reference this document's docket number, ATF 2022R–17, and be legible. Commenters must also include the commenter's complete first and last name and contact information. If submitting a comment through the Federal eRulemaking portal, as described in Section IV.C of this preamble, commenters should carefully review and follow the website's instructions on submitting comments. If submitting as an individual, any information provided for city, state, zip code, and phone will not be publicly viewable when ATF publishes the comment on *regulations.gov*. If submitting a comment by mail, commenters should review Section IV.B of this preamble regarding proper submission of PII. ATF may not consider, or respond to, comments that do not meet these requirements or comments containing profanity or threatening or abusive language. ATF will retain anonymous comments and those containing excessive profanity as part of this rulemaking's administrative record but will not publish such documents on *www.regulations.gov*. ATF will treat all comments as originals and will not acknowledge receipt of comments. In addition, if your comment cannot be read due to technical difficulties and ATF cannot contact you for clarification, ATF may not be able to consider your comment.

ATF will carefully consider all comments, as appropriate, received on or before the closing date, and will give comments after that date the same consideration if practical to do so, but assurance of consideration cannot be given except as to comments received on or before the closing date.

### B. Confidentiality

ATF will make all comments meeting the requirements of this section, whether submitted electronically or on paper, available for public viewing at *www.ATF.gov*, on the internet through the Federal eRulemaking Portal, and through the Freedom of Information Act (5 U.S.C. 552). Commenters who submit by mail and who do not want their name or other PII posted on the internet should submit their comments by mail along with a separate cover sheet containing their PII. Both the cover sheet and comment must reference this docket number (ATF 2022R–17). For comments submitted by mail, information contained on the cover sheet will not appear when posted on the internet, but any PII that appears within the body of a comment will not be redacted by ATF and it will appear on the internet. Commenters who submit through the Federal eRulemaking portal and who do not want any of their PII posted on the internet should omit such PII from the body of their comment or in any uploaded attachments.

APPX.153

A commenter may submit to ATF information identified as proprietary or confidential business information. The commenter must place any portion of a comment that is proprietary or confidential business information under law on pages that are separated from the balance of the comment, with each page prominently marked "PROPRIETARY OR CONFIDENTIAL BUSINESS INFORMATION" at the top of each page.

ATF will not make proprietary or confidential business information submitted in compliance with these instructions available when disclosing the comments that it received, but will disclose that the commenter provided proprietary or confidential business information that ATF is holding in a separate file to which the public does not have access. If ATF receives a request to examine or copy this information, it will treat it as any other request under the Freedom of Information Act (5 U.S.C. 552). In addition, ATF will disclose such proprietary or confidential business information to the extent required by other legal process.

*C. Submitting Comments*

Submit comments using either of the two methods described below (but do not submit the same comment multiple times or by more than one method). Hand-delivered comments will not be accepted.

• *Federal eRulemaking Portal:* ATF recommends that you submit your comments to ATF via the Federal eRulemaking portal at *www.regulations.gov* and follow the instructions. Comments will be posted within a few days of being submitted. However, if large volumes of comments are being processed simultaneously, your comment may not be viewable for up to several weeks. Please keep the comment tracking number that is provided after you have successfully uploaded your comment.

• *Mail:* Send written comments to the address listed in the **ADDRESSES** section of this document. Written comments must appear in minimum 12-point font size (.17 inches), include the commenter's first and last name and full mailing address, be signed, and may be of any length. See also Section IV.B of this preamble.

*D. Request for Hearing*

In accordance with 18 U.S.C. 926(b), any interested person who desires an opportunity to comment orally at a public hearing should submit a request, in writing, to the Director of ATF within the notice period. The Director,

however, reserves the right to determine, in light of all circumstances, whether a public hearing is necessary.

**Disclosure**

Copies of this proposed rule and the comments received in response to it will be available through the Federal eRulemaking portal, at *www.regulations.gov* (search for RIN 1140–58), and for public inspection by appointment during normal business hours at: ATF Reading Room, Room 1E–063, 99 New York Ave. NE, Washington, DC 20226; telephone: (202) 648–8740.

**Severability**

Consistent with the Administrative Procedure Act, the issues raised in this proposed rule may be finalized, or not, independently of each other, after consideration of comments received. The Department intends separate aspects of any final rule that results from this proposed rule to be severable from each other, as demonstrated by the rule's structure. In the event any provision of this rule as finalized is held to be invalid or unenforceable by its terms, the remainder shall not be affected and shall be construed so as to give remaining provisions the maximum effect permitted by law.

**List of Subjects in 27 CFR Part 478**

Administrative practice and procedure, Arms and munitions, Exports, Freight, Imports, Intergovernmental relations, Law enforcement officers, Military personnel, Penalties, Reporting and recordkeeping requirements, Research, Seizures and forfeitures, Transportation.

**Authority and Issuance**

For the reasons discussed in the preamble, the Department proposes to amend 27 CFR part 478 as follows:

**PART 478—COMMERCE IN FIREARMS AND AMMUNITION**

■ 1. The authority citation for 27 CFR part 478 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 18 U.S.C. 847, 921–931; 44 U.S.C. 3504(h).

■ 2. Amend § 478.11 by:
■ a. Revising the definition of "Dealer";
■ b. Revising paragraph (c) of the definition of "Engaged in the business";
■ c. Adding the definitions of "Personal collection, personal collection of firearms, or personal firearms collection" and "Predominantly earn a profit" in alphabetical order;
■ d. Revising the definition of "Principal objective of livelihood and profit"; and

■ f. Adding the definitions of "Responsible person" and "Terrorism" in alphabetical order.

The revisions and additions read as follows:

**§ 478.11  Meaning of terms.**

\*    \*    \*    \*    \*

*Dealer.* Any person engaged in the business of selling firearms at wholesale or retail; any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms; or any person who is a pawnbroker. The term shall include any person who engages in such business or occupation on a part-time basis. The term shall include such activities wherever, or through whatever medium, they may be conducted, such as at a gun show or event, flea market, auction house, or gun range or club; at one's home; by mail order; over the internet; through the use of other electronic means (*e.g.,* an online broker, online auction, text messaging service, social media raffle, or website); or at any other domestic or international public or private marketplace or premises.

\*    \*    \*    \*    \*

*Engaged in the business*—

\*    \*    \*    \*    \*

(c) *Dealer in firearms other than a gunsmith or a pawnbroker.* (1) A person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of the person's personal collection of firearms. The term shall not include an auctioneer who provides only auction services on commission by assisting in liquidating a personal collection of firearms at an estate-type auction, provided the auctioneer does not purchase the firearms, take possession of the firearms prior to the auction, or consign the firearms for sale.

(2) For purposes of this definition—
(i) The term "purchase" (and derivative terms thereof) means the act of obtaining a firearm in exchange for something of value;
(ii) The term "sale" (and derivative terms thereof, including "resale") means the act of providing a firearm in exchange for something of value; and
(iii) The term "something of value" includes money, credit, personal property (*e.g.,* another firearm or ammunition), a service, a controlled

substance, or any other medium of exchange or valuable consideration.

(3) Whether a person is engaged in the business of dealing in firearms requiring a license is a fact-specific inquiry. Selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity. However, there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is ''engaged in the business'' of dealing in firearms. For example, even a single firearm transaction or offer to engage in a transaction, when combined with other evidence (*e.g.,* where a person represents to others a willingness to acquire more firearms for resale or offers more firearms for sale), may require a license. A person shall be presumed to be engaged in the business of dealing in firearms in civil and administrative proceedings, absent reliable evidence to the contrary, when the person—

(i) Sells or offers for sale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and sell additional firearms;

(ii) Spends more money or its equivalent on purchases of firearms for the purpose of resale than the person's reported gross taxable income during the applicable period of time;

(iii) Repetitively purchases for the purpose of resale, or sells or offers for sale, firearms—

(A) Through straw or sham businesses, or individual straw purchasers or sellers; or

(B) That cannot lawfully be purchased or possessed, including:

(*1*) Stolen firearms (18 U.S.C. 922(j));

(*2*) Firearms with the licensee's serial number removed, obliterated, or altered (18 U.S.C. 922(k), 26 U.S.C. 5861(i));

(*3*) Firearms imported in violation of law (18 U.S.C. 922(l), 22 U.S.C. 2778, or 26 U.S.C. 5844, 5861(k)); or

(*4*) Machineguns or other weapons defined as firearms under 26 U.S.C. 5845(b) that were not properly registered in the National Firearms Registration and Transfer Record (18 U.S.C. 922(o); 26 U.S.C. 5861(d));

(iv) Repetitively sells or offers for sale firearms—

(A) Within 30 days after the person purchased the firearms;

(B) That are new, or like new in their original packaging; or

(C) Of the same or similar kind (*i.e.,* make/manufacturer, model, caliber/gauge, and action) and type (*i.e.,* rifle, shotgun, revolver, pistol, frame,

receiver, machinegun, silencer, destructive device, or 'other' firearm);

(v) Who, as a former licensee (or responsible person acting on behalf of the former licensee) sells or offers for sale firearms that were in the business inventory of such licensee at the time the license was terminated (*i.e.,* license revocation, denial of license renewal, license expiration, or surrender of license), and were not transferred to a personal inventory in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a; or

(vi) Who, as a former licensee (or responsible person acting on behalf of the former licensee) sells or offers for sale firearms that were transferred to the personal inventory of such former licensee or responsible person prior to the time the license was terminated, unless:

(A) The firearms were received and transferred without any intent to willfully evade the restrictions placed on licensees by chapter 44, title 18, United States Code; and

(B) One year has passed from the date of transfer to the personal collection.

(4) Where a person's conduct does not otherwise demonstrate a predominant intent to earn a profit, the person shall not be presumed to be engaged in the business of dealing in firearms when the person transfers firearms only as bona fide gifts, or occasionally sells firearms only to obtain more valuable, desirable, or useful firearms for the person's personal collection or hobby.

(5) The activities set forth in the rebuttable presumptions in paragraphs (c)(3)(i) through (vi) of this definition are not exhaustive of the conduct that may show that, or be considered in determining whether, a person is engaged in the business of dealing in firearms.

(6) The rebuttable presumptions in paragraphs (c)(3)(i) through (vi) of this definition shall not apply to any criminal case, although they may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences.

\*     \*     \*     \*     \*

*Personal collection, personal collection of firearms, or personal firearms collection.* (1) Personal firearms that a person accumulates for study, comparison, exhibition, or for a hobby (*e.g.,* noncommercial, recreational activities for personal enjoyment, such as hunting, or skeet, target, or competition shooting). The term shall not include any firearm purchased for the purpose of resale or made with the predominant intent to earn a profit.

(2) In the case of a firearm imported, manufactured, or otherwise acquired by

a licensed manufacturer, licensed importer, or licensed dealer, the term shall include only a firearm described in paragraph (1) of this definition that was—

(i) Acquired or transferred without the intent to willfully evade the restrictions placed upon licensees under chapter 44, title 18, United States Code;

(ii) Recorded by the licensee as an acquisition in the licensee's acquisition and disposition record in accordance with § 478.122(a), 478.123(a), or 478.125(e) (unless acquired prior to licensure and not intended for sale);

(iii) Recorded as a disposition from the licensee's business inventory to the individual's personal collection in accordance with § 478.122(a), 478.123(a), or 478.125(e);

(iv) Stored separately from, and not commingled with the business inventory, and appropriately identified as ''not for sale'' (*e.g.,* by attaching a tag), if on the business premises; and

(v) Maintained in such personal collection (whether on or off the business premises) for at least one year from the date the firearm was so transferred, in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a.

\*     \*     \*     \*     \*

*Predominantly earn a profit.* (1) The intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided,* that proof of profit, including the intent to profit, shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this definition, a person may have the intent to profit even if the person does not actually obtain pecuniary gain from the sale or disposition of firearms.

(2) The intent to predominantly earn a profit is a fact-specific inquiry. A person shall be presumed to have the intent to predominantly earn a profit from the sale or disposition of firearms in civil and administrative proceedings, absent reliable evidence to the contrary, when the person—

(i) Advertises, markets, or otherwise promotes a firearms business (*e.g.,* advertises or posts firearms for sale, including on any website, establishes a website for offering their firearms for sale, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally;

(ii) Purchases, rents, or otherwise secures or sets aside permanent or

temporary physical space to display or store firearms they offer for sale, including part or all of a business premises, table or space at a gun show, or display case;

(iii) Makes or maintains records, in any form, to document, track, or calculate profits and losses from firearms purchases and sales;

(iv) Purchases or otherwise secures merchant services as a business (*e.g.,* credit card transaction services, digital wallet for business) through which the person makes or offers to make payments for firearms transactions;

(v) Formally or informally purchases, hires, or otherwise secures business security services (*e.g.,* a central station-monitored security system registered to a business, or guards for security) to protect business assets or transactions that include firearms;

(vi) Formally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes or offers to make firearms transactions;

(vii) Secures or applies for a State or local business license to purchase for resale or to sell merchandise that includes firearms; or

(viii) Purchases a business insurance policy, including any riders that cover firearms inventory.

(3) The activities set forth in the rebuttable presumptions in paragraphs (2)(i) through (viii) of this definition are not exhaustive of the conduct that may show that, or be considered in determining whether, a person has the intent to predominantly earn a profit from the sale or disposition of firearms.

(4) The rebuttable presumptions in paragraphs (2)(i) through (viii) of this definition shall not apply to any criminal case, although they may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences.

\*     \*     \*     \*     \*

*Responsible person.* Any individual possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, and business practices of a corporation, partnership, or association, insofar as they pertain to firearms.

\*     \*     \*     \*     \*

*Terrorism.* For purposes of the definitions "predominantly earn a profit," and "principal objective of livelihood and profit," the term "terrorism" means activity, directed against United States persons, which—

(1) Is committed by an individual who is not a national or permanent resident alien of the United States;

(2) Involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

(3) Is intended—

(i) To intimidate or coerce a civilian population;

(ii) To influence the policy of a government by intimidation or coercion; or

(iii) To affect the conduct of a government by assassination or kidnapping.

■ 3. In § 478.57, designate the introductory text as paragraph (a) and add paragraph (b) to read as follows:

### § 478.57  Discontinuance of business.

\*     \*     \*     \*     \*

(b) Upon termination of a license (*i.e.,* license revocation, denial of license renewal, license expiration, or surrender of license), the former licensee shall within 30 days, or such additional period designated by the Director for good cause:

(1) Liquidate the remaining business inventory by selling or otherwise disposing of the firearms to a licensed importer, licensed manufacturer, or licensed dealer for sale, auction, or pawn redemption in accordance with this part; or

(2) Transfer the remaining business inventory to a personal inventory of the former licensee, or a responsible person of the former licensee, provided the recipient is not prohibited by law from receiving or possessing firearms. Except for the sale of remaining inventory to a licensee within the 30-day period (or designated additional period), a former licensee or responsible person of such licensee who resells any such inventory, including business inventory transferred to a personal inventory, is subject to the presumptions in § 478.11 (definition of "engaged in the business" as a dealer in firearms other than a gunsmith or pawnbroker) that apply to a person who repetitively purchased those firearms for the purpose of resale. In addition, the former licensee shall not continue to engage in the business of importing, manufacturing, or dealing in firearms by importing or manufacturing additional firearms for purposes of sale or distribution, or purchasing additional firearms for resale (*i.e.,* "restocking").

■ 4. In § 478.78, designate the introductory text as paragraph (a) and add paragraph (b) to read as follows:

### § 478.78  Operations by licensee after notice.

\*     \*     \*     \*     \*

(b) Upon final disposition of license proceedings to disapprove or terminate a license (*i.e.,* by revocation or denial of renewal), the former licensee shall within 30 days, or such additional period designated by the Director for good cause, either:

(1) Liquidate the remaining business inventory by selling or otherwise disposing of the firearms to a licensed importer, licensed manufacturer, or licensed dealer for sale, auction, or pawn redemption in accordance with this part; or

(2) Transfer the remaining business inventory to a personal inventory of the former licensee, or a responsible person of the former licensee provided the recipient is not prohibited by law from receiving or possessing firearms. Except for the sale of remaining inventory to a licensee within the 30-day period (or designated additional period), a former licensee or responsible person of such former licensee, who resells any such inventory, including business inventory transferred to a personal inventory, is subject to the presumptions in § 478.11 (definition of "engaged in the business" as a dealer in firearms other than a gunsmith or pawnbroker) that apply to a person who repetitively purchased those firearms for the purpose of resale. In addition, the former licensee shall not continue to engage in the business of importing, manufacturing, or dealing in firearms by importing or manufacturing additional firearms for purposes of sale or distribution, or purchasing additional firearms for resale (*i.e.,* "restocking").

■ 5. In § 478.124, revise paragraph (a) to read as follows:

### § 478.124  Firearms transaction record.

(a) A licensed importer, licensed manufacturer, or licensed dealer shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearm transaction record, Form 4473: *Provided,* that a firearms transaction record, Form 4473, shall not be required to record the disposition made of a firearm delivered to a licensee for the sole purpose of repair or customizing when such firearm or a replacement firearm is returned to the person from whom received; *provided further,* that a firearms transaction record, Form 4473, shall not be used if the sale or other disposition is being made to another licensed importer, licensed manufacturer, or licensed dealer, or a curio or relic to a licensed collector, including a sole proprietor who transfers a firearm to their personal collection in accordance with § 478.125a. When a licensee transfers a

firearm to another licensee, the licensee shall comply with the verification and recordkeeping requirements in § 478.94 and subpart H of part 478.

\* \* \* \* \*

■ 6. In § 478.125a, in paragraphs (a)(2) and (3), remove the citation "§ 478.125(e)" and add in its place "§§ 478.122(a), 478.123(a), or 478.125(e)".

Dated: August 30, 2023.

**Merrick B. Garland,**

*Attorney General.*

[FR Doc. 2023–19177 Filed 9–7–23; 8:45 am]

**BILLING CODE 4410–FY–P**

---

## POSTAL REGULATORY COMMISSION

### 39 CFR Part 3050

**[Docket No. RM2023–7; Order No. 6659]**

### Periodic Reporting

**AGENCY:** Postal Regulatory Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Commission is conducting further proceedings and will be accepting further comments with respect to a rulemaking proceeding to consider changes to analytical principles relating to periodic reports (Proposal Two). This document invites further public comment and takes other administrative steps.

**DATES:** *Comments are due:* October 16, 2023.

**ADDRESSES:** Submit comments electronically via the Commission's Filing Online system at *http:// www.prc.gov.* Those who cannot submit comments electronically should contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section by telephone for advice on filing alternatives.

**FOR FURTHER INFORMATION CONTACT:** David A. Trissell, General Counsel, at 202–789–6820.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Introduction
II. Proposal Two, Order No. 6659, and Direction for Further Proceedings
III. Notice and Comment
IV. Ordering Paragraphs

### I. Introduction

On May 26, 2023, the Postal Service filed a petition pursuant to 39 CFR 3050.11 requesting that the Commission initiate a rulemaking proceeding to consider changes to analytical principles relating to periodic reports.[1] The Petition identified the proposed analytical changes as Proposal Two. In Order No. 6659 the Commission conditionally approved Proposal Two but directed the Postal Service to propose further changes to analytical principles relating to periodic reports to address what the Commission found to be outstanding issues with respect to cost identification and attribution for interagency agreements (IAAs).[2]

### II. Proposal Two, Order No. 6659, and Direction for Further Proceedings

*Background.* The Postal Service Reform Act of 2022[3] modified and expanded the Postal Service's ability to enter into IAAs to provide property and services to, or on behalf of, other government agencies. Specifically, 39 U.S.C. 3703 for the first time authorizes the Postal Service to enter into agreements with agencies of any state government, local government, or tribal government to provide property or nonpostal services to the public on behalf of such agencies for non-commercial purposes. At the same time, with respect to the Postal Service's pre-existing authority under 39 U.S.C. 411 to provide property and services to other Federal agencies, the PSRA specifies that "[t]he Postal Service may establish a program to provide property and nonpostal services to other Government [*i.e.,* federal] agencies within the meaning of section 411[4], but only if such program provides a net contribution to the Postal Service, defined as reimbursement that covers at least 100 percent of the costs attributable . . .." 39 U.S.C. 3704.

Under the PSRA, the Postal Service must submit a report to the Commission after the close of each fiscal year that "analyzes costs, revenues, rates, and quality of service for each agreement or substantially similar set of agreements for the provision of property or nonpostal services under section 3703 or the program as a whole under section 3704, . . . using such methodologies as the Commission may prescribe, and in sufficient detail to demonstrate compliance with the requirements of [Chapter 37 of Title 39 of the United States Code]." 39 U.S.C. 3705(a). Upon receiving the Postal Service's report and providing an opportunity for public comment, the Commission must make a written determination of compliance. 39 U.S.C. 3705(e).

In the Commission's FY 2022 Annual Compliance Determination,[5] the Commission directed the Postal Service to develop a proposed methodology (or methodologies) for calculating and attributing costs and revenue to IAAs authorized under 39 U.S.C. 3703 and 3704, and to initiate a rulemaking proceeding to establish such methodology (or methodologies) in accordance with 39 CFR 3050.11 by no later than May 31, 2023. *Id.* at 102. As directed, the Postal Service initiated the instant proceeding to propose a categorical approach to identifying costs and revenue for similar types, or groupings, of IAAs. Petition, Proposal Two at 2–3.

*Order No. 6659 and direction for further proceedings.* In Order No. 6659 the Commission conditionally approved Proposal Two, but directed the Postal Service to propose further changes to analytical principles relating to periodic reports to address specific issues that the Commission found remained unaddressed. First, the Commission directed the Postal Service to develop a proposed change in accepted analytical principles to develop a separate line item (or line items) in the Cost and Revenue Analysis (CRA) and related workbooks to enable the attribution of costs and related revenue to IAAs. Order No. 6659 at 16. Second, for agreements with government agencies that involve the provision of both postal services and property or nonpostal services, the Commission directed the Postal Service to develop a proposed change in analytical principles to separately account for the costs and revenue for those respective portions. *Id.* The Commission directed the Postal Service to file proposals related to these issues by September 29, 2023. *Id.* The Commission will then accept comments on the Postal Service's proposals until October 16, 2023. *Id.* at 18.

---

[1] Petition of the United States Postal Service for the Initiation of a Proceeding to Consider Proposed Changes in Analytical Principles (Proposal Two), May 26, 2023 (Petition).

[2] Docket No. RM2023–7, Order on Analytical Principles Used in Periodic Reporting (Proposal Two), Directing the Postal Service's Participation in Further Proceedings, and Providing Notice of Filing Attachment Under Seal, August 31, 2023 (Order No. 6659).

[3] Postal Service Reform Act of 2022 (PSRA), Public Law. 117–108, 136 Stat. 1127 (2022).

[4] Prior to the enactment of the PSRA, the Postal Service's authority for these agreements was governed by 39 U.S.C. 411, which authorizes the Postal Service to "furnish property and services" to "Executive agencies within the meaning of [5 U.S.C. 105] and the Government Publishing Office. . . ." 39 U.S.C. 411. Section 105 of Title 5 of the United States Code specifies that an "'Executive agency' means an Executive department, a Government corporation, and an independent establishment" of the U.S. Government, as those terms are defined in 5 U.S.C. chapter 1. 5 U.S.C. 105.

[5] Docket No. ACR2022, Annual Compliance Determination Report, FY 2022, March 29, 2023.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, | § § § § § § § § § | |
| *Plaintiffs,* | § | |
| v. | § § | CIVIL ACTION NO. _____ |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF, | § § § § § § § § § § | |
| *Defendants.* | § § | |

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

1. Since 1938, when Congress first began regulating firearms "dealers," federal statutes have always recognized the legality of private, unregulated sales by non-dealers. And in 1986, Congress narrowed the definition of "dealer" specifically to make it harder for ATF to pursue private sellers of firearms. But now, with the stroke of the regulatory pen, ATF is flouting this decades-long Congressional direction, seeking to declare countless thousands of Americans unlawfully "engaged in the business," and thereby attempting to implement the very regime that Congress has expressly sought to avoid.

2.   Plaintiffs bring this action seeking a stay of agency action, temporary restraining order, and/or a preliminary injunction to preserve the status quo, followed by a declaratory judgment and permanent injunctive relief restraining Defendants from enforcing a Final Rule issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives of the U.S. Department of Justice on April 19, 2024, entitled "Definition of 'Engaged in the Business' as a Dealer in Firearms" ("Final Rule"), 89 Fed. Reg. 28968.

3.   While purporting to amend federal regulations to comport with recently amended federal firearms statutes, the Final Rule goes far beyond the subtle change Congress made to the law, subjecting hundreds of thousands of law-abiding gun owners to ***presumptions of criminal guilt*** for all manner of activities relating to the innocuous, statutorily authorized, and constitutionally protected private sale of firearms.

4.   This Court's action is necessary on an urgent basis because, contrary to past practice, Defendants have accelerated the effective date of their latest edict to a mere ***30 days*** from publication in the Federal Register, in an attempt to circumvent timely judicial review.[1] *Cf.* 83 Fed. Reg 66514 (90 days for bump stock rule); 87 Fed. Reg 24652 (120 days for "frame or receiver" rule); 88 Fed. Reg 6478 (120 days for pistol stabilizing brace rule). And so that (once again) hundreds of thousands of Americans are not turned into felons overnight, this Court should administratively stay, temporarily restrain, or preliminarily enjoin the Final Rule pending full review on the merits.

---

[1] What is more, "ATF intends to further update [its] guidance once it issues this final rule." 89 Fed. Reg. at 28971. Plaintiffs are left guessing as to whether this purportedly "final" rule is indeed a final rule at all, or whether ATF will continue to move the goalposts.

APPX.159

5.  The Final Rule was published in the Federal Register on April 19, 2024, and has an effective date of May 20, 2024.

## I.  Jurisdiction and Venue

6.  This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331. This Court has authority to grant the remedy Plaintiffs seek pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

7.  Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e).

## II.  Parties

8.  Plaintiff the State of Texas is a sovereign state of the United States.

9.  Plaintiff the State of Louisiana is a sovereign state of the United States.

10.  Plaintiff the State of Mississippi is a sovereign state of the United States.

11.  Plaintiff the State of Utah is a sovereign state of the United States.

12.  Jeffrey W. Tormey is a firearm owner and a member of Gun Owners of America, Tennessee Firearms Association, and Virginia Citizens Defense League, residing in Amarillo, Texas, within this district. Mr. Tormey is eligible to possess firearms under state and federal law and is an avid gun owner and Second Amendment supporter. Mr. Tormey possesses a large collection of firearms, and over the years has occasionally purchased, traded, and sold various firearms through private sales, in order to enhance his personal collection, as finances allow. Mr. Tormey has never held a federal firearms license and has never been "engaged in the business" of dealing in firearms. Mr. Tormey wishes to continue to engage in this same lawful course of activity, as he has done during his several decades of firearms ownership. Nevertheless, as described further in his declaration, Mr. Tormey reasonably fears that the vague threats and ambiguous definitions in the

3

Final Rule will be yielded as a weapon against him, in order to threaten and to coerce him into complying with ATF's bureaucratic edict, and forcing him to obtain a license that federal law does not require he obtain. Mr. Tormey fears that, should he continue to engage in this lawful behavior that the statute allows, but which the Final Rule now declares unlawful, he will be subject to administrative action, civil forfeiture, an ATF cease-and-desist letter, or even arrest and criminal indictment. *See* Declaration of Jeffrey W. Tormey.

13. Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business in Springfield, VA. GOA is organized and operated as a nonprofit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code. GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners. GOA has more than 2 million members and supporters across the country, including tens of thousands within Texas, many of whom reside in this district. As discussed in more detail below, many of these persons, like the individual Plaintiff, are being irreparably harmed by the Final Rule. *See* Declaration of Erich Pratt.

14. Plaintiff Gun Owners Foundation ("GOF") is a Virginia non-stock corporation with its principal place of business in Springfield, VA. GOF was formed in 1983 and is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code. GOF is supported by gun owners across the country, who fund the organization's activities so that it can, *inter alia*, file litigation such as this to preserve, protect, and defend their right to keep and bear arms. *See* Declaration of Erich Pratt.

15. Plaintiff Tennessee Firearms Association ("TFA") has its principal place of business in Nashville, Tennessee. It is organized and operated as a non-profit membership organization under Tennessee law and is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code. TFA was formed in 1995 to preserve and defend Second Amendment rights of gun owners. TFA has several thousand members and supporters in Tennessee, along with a number who reside in other states. *See* Declaration of C. Richard Archie.

16. Plaintiff Virginia Citizens Defense League ("VCDL") is a non-stock corporation with its principal place of business in Newington, Virginia. VCDL is organized and operated as a nonprofit civil league and is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code. VCDL has tens of thousands of members and supporters, including within the jurisdiction of this Court, and operates as a nonpartisan, grassroots organization dedicated to advancing the enumerated right to keep and bear arms as guaranteed by the Second Amendment to the U.S. Constitution and Article I, § 13 of the Virginia Constitution. *See* Declaration of Philip Van Cleave.

17. Defendant United States Department of Justice ("DOJ") is an executive agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530. DOJ is the agency responsible for enforcing federal firearms laws.

18. Defendant Merrick Garland is the United States Attorney General. Attorney General Garland oversees the DOJ. He is sued in his official capacity.

19. Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is a component of the DOJ, and is headquartered at 99 New York Avenue, Washington, D.C. 20226. ATF is

APPX.162

delegated authority to enforce federal gun control laws. *See* 28 U.S.C. § 599A; 28 C.F.R. § 0.130; 18 U.S.C. § 926(a).

20.  Defendant Steven M. Dettelbach is the Director of ATF and is responsible for overseeing the agency's promulgation of the Final Rule challenged herein. He is sued in his official capacity.

## III. Statutory History

### A.  The Federal Firearms Act of 1938 ("FFA")

21.  The notion that one must obtain a license in order to deal in firearms, on pain of criminal penalty, is a thoroughly modern invention. Even so, federal law has defined "dealer" in one form or another for more than 80 years, and only now do Defendants claim that private sales pose a regulatory issue that must be solved through bureaucratic edict.

22.  The FFA first defined a "dealer" of firearms to mean "any person engaged in the business of selling firearms or ammunition…."[2] Congress later repealed the FFA, finding that it "had not provided adequate license fees or proper standards for the granting or denial of licenses and that this had led to licenses being issued to unqualified persons." *United States v. Gross*, 313 F. Supp. 1330, 1332 (S.D. Ind. 1970).

### B.  The Gun Control Act of 1968 ("GCA")

23.  Later recodifying the FFA's definition of "dealer" into the new GCA, Congress defined the term "in somewhat the same manner as that definition appears in [the FFA]." *See* Act of Apr.

---

[2]https://1.next.westlaw.com/Link/Document/Blob/Iab48cdc1d03c11d8a81b00065ba32aee.pdf?targetType=us-statlrg&originationContext=document&transitionType=DocumentImage&uniqueId=831bb52a-bcba-45a4-a205-66750d622617&ppcid=856b29ff18984d079a00b1592d4963ea&contextData=(sc.DocLink)

APPX.163

29, 1968, Pub. L. No. 90-351, 1968 U.S.C.C.A.N. 2112, 2201 (to be codified at 18 U.S.C § 921(a) (11)).[3]

24.  As amended, the GCA defined "dealer" to mean "(A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this chapter." 18 U.S.C. § 921(a)(11).

25.  Like the FFA, the GCA did not define what it meant to be "engaged in the business." That determination was left to judicial interpretation, which resulted in varying holdings.

26.  In 1979, ATF issued a notice of proposed rulemaking which proposed to define "engaged in the business," on the theory that the phrase was "not defined in the law or the regulations." *See* Definition of the Phrase "Engaged in the Business," 44 Fed. Reg. 75186 (Dec. 19, 1979) (to be codified at 27 C.F.R. pt. 178). But in its 1979 proposed rule, ATF failed to identify a single court that had trouble defining or applying the phrase, despite courts' varying approaches.

27.  To the contrary, ATF's proposal acknowledged that "courts have continually found that the current situation is adequate for enforcement purposes…." *Id.* at 75187.

28.  On March 31, 1980, ATF extended the comment period for 30 days, *see* Definition of the Phrase "Engaged in the Business," 45 Fed. Reg. 20930 (March 31, 1980) (to be codified at 27 C.F.R. pt. 178), but no action was taken thereafter.

---

[3]https://www.westlaw.com/Document/IC70AEF6063EA11D9B7CECED691859821/View/Full Text.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0

APPX.164

29.   That is to say, ATF ultimately decided not to define the phrase "engaged in the business,"

apparently determining the statutory text to be adequate.

## C.   The McClure-Volkmer Firearms Owners' Protection Act ("FOPA")

30.   In 1986, FOPA, Pub. L. No. 99-308, 100 Stat. 449, added a definition of "engaged in the

business" to the statute: "a person who devotes time, attention, and labor to dealing in firearms as

a regular course of trade or business with the principal objective of livelihood and profit through

the repetitive purchase and resale of firearms, but such term shall not include a person who makes

occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection

or for a hobby, or who sells all or part of his personal collection of firearms." Firearms Owners'

Protection Act, Pub. L. 99-308, 100 Stat. 450. (1986).

31.   FOPA further defined the term "with the principal objective of livelihood and profit" to

mean "that the intent underlying the sale or disposition of firearms is predominantly one of

obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or

liquidating a personal firearms collection." *Id.*

32.   Shortly thereafter, FOPA was amended to clarify that "proof of profit" was not required

"as to a person who engages in the regular and repetitive purchase and disposition of firearms for

criminal purposes or terrorism." Firearms Owners' Protection Act, Pub. L. No. 99-360, § 1(b),

100 Stat. 766, 766 (1986).

33.   Prior to FOPA's enactment, there was no statutory definition of "engaged in the

business." As such, two tests emerged. The majority of circuits followed the test in *United States

v. Gross*, which held that "'dealer' means anyone who is engaged in *any* business of selling firearms,

8

and that 'business' is that which occupies time, attention and labor for the purpose of livelihood and profit." *United States v. Gross,* 451 F.2d 1355, 1357 (7th Cir. 1971) (citation omitted). [4]

34.    The other test emerged in *United States v. Jackson*, which held that persons are considered to be "engaged in the business of dealing firearms if they have guns on hand or are ready and able to procure them, in either case for the purpose of selling some or all of them to such persons as they might from time to time conclude to accept as customers." *United States v. Jackson*, 352 F. Supp. 672, 674 (S.D. Ohio 1972), aff'd without opinion, 480 F.2d 927 (6th Cir. 1973). *See also United States v. Swinton*, 521 F.2d 1255, 1258 (10th Cir. 1975) (declining to following the holdings in *Gross* and *Day*, the court held that the government is not required to "establish that a person engaged in the business of dealing in firearms make a profit, even though the 'dealing' activity requires time, attention and effort.")

35.    By defining the never-before defined "engaged in the business" in FOPA, Congress narrowed the broad and varying tests that emerged from the courts.

---

[4] *See United States v. Van Buren*, 593 F.2d 125, 126 (9th Cir. 1979)(Defendant was willing to trade or sell firearms in profitable transactions and his activity was more than occasional sales); *United States v. King*, 532 F.2d 505, 510 (5th Cir. 1976)("'Business' is commonly understood to mean an activity engaging of some of one's time, attention and effort performed in expectation of profit or other benefit" and "'Dealing in firearms' is commonly understood as selling and/or trading in firearms, as well as acquiring firearms for sale by purchase and/or trades"); *United States v. Huffman*, 518 F.2d 80, 81 (4th Cir. 1975)("…while the government need not prove an actual profit from sales of firearms, it must show a willingness to deal, a profit motive, and a greater degree of activity than occasional sales by a hobbyist" (citing *Gross*)); *United States v. Williams*, 502 F.2d 581, 583 (8th Cir. 1974)("There appears to be little doubt that 'dealer' means anyone who is engaged in any business of selling firearms, and that 'business' is that which occupies time, attention and labor for the purpose of livelihood or profit." (citation omitted); *United States v. Day*, 476 F.2d 562, 567 (6th Cir. 1973) (The district court borrowed the definition of 'engaged in the business' from *Gross* and the Sixth Circuit held "that this definition is an adequate reflection of the plain meaning of the phrase and approve it.").

36.   On October 29, 1986, ATF adopted Temporary Rule, 51 Fed. Reg. 39612, to implement FOPA, and invited comments. Under the Temporary Rule, the phrase "engaged in the business" was defined to mirror FOPA's statutory language. On March 31, 1988, ATF adopted the regulatory definitions with no changes, again apparently deciding that the statutory text was adequate. *See* Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480 (March 31, 1988) (to be codified at 27 C.F.R pts. 72, 178 and 179).

37.   Importantly, as to the definition of "engaged in the business," one commenter had requested "the definition list examples illustrating when a license is required," but *ATF declined to add examples* "since the definition adequately addresses this concern by expressly delineating the activity requiring licensing from that of a firearms collector not subject to licensing." *Id.* at 10481. But as discussed further below, what ATF previously believed to be "adequate" apparently is no longer so.

### D.   The Bipartisan Safer Communities Act ("BSCA")

38.   For several decades—from FOPA's addition of definitions in 1986 until enactment of BSCA in 2022—18 U.S.C. § 921(a)(21)(C) has stated, in part, that "engaged in the business" meant "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business **with the principal objective of livelihood and profit** though the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby or who sells all or part of his personal collection of firearms."

39.   Further, 18 U.S.C. § 921(a)(22) previously defined the term "with the principal objective of livelihood and profit" to mean the "intent underlying the sale or disposition of firearms is

APPX.167

predominantly one of **obtaining livelihood and pecuniary gain**, as opposed to other intents, such as improving or liquidating a personal firearms collection…."

40.   But in 2022, the BSCA amended this definition of "engaged in the business" as it pertained to dealers, replacing Section 921(a)(21)(C)'s phrase "with the principal objective of livelihood and profit" with the phrase "to **predominantly earn a profit**…."

41.   Due to that tweak in terminology, 18 U.S.C. § 921(a)(22) was also amended to define "to predominantly earn a profit," replacing the language "obtaining livelihood and pecuniary gain" with the singular intent of "obtaining pecuniary gain…."

42.   Thus, the BSCA slightly expanded the definition of "dealer" by removing the word "livelihood." Before BSCA, a person selling a firearm was not a "dealer" unless the sale was part of the person's "livelihood." In other words, if a person did not sell firearms, that person's income would significantly decrease. According to ATF, "[t]he BSCA amendments to the statutory definition of 'engaged in the business' and this rule implementing those amendments constitute only **a modest congressional expansion** of the previous FFL licensing requirements." Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28968, 29009 (April 19, 2024) (to be codified 27 C.F.R. pt. 478) (emphasis added).

43.   Under the BSCA, a person selling a firearm is a "dealer" if the sale was predominantly intended to make a profit, provided satisfaction of the remaining statutory elements, **unless** that sale is an "occasional sale[], exchange[], or purchase[] of firearms for the enhancement of a personal collection or for a hobby or … all or part of [a] personal collection of firearms." In other words, even if a person sells a firearm for a profit, he is not a "dealer" if the sale was an occasional sale.

44.   The Final Rule is not consistent with the statutory framework as amended by the BSCA.

45.   On March 14, 2023, following enactment of the BSCA, President Biden issued an Executive Order directing the Attorney General, *inter alia*, to "(i) clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal firearms licensees (FFLs), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law; [and] (ii) prevent former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms." 89 Fed. Reg. at 28972.

46.   Purportedly acting pursuant to this directive, the DOJ announced the notice of proposed rulemaking on August 31, 2023, claiming that its proposed revisions "conform[] ATF's regulations to the new BSCA definition and further clarify[] the conduct that presumptively requires a license under that revised definition." [5]

47.   But while some of the proposed revisions in the notice of proposed rulemaking ("NPRM") amended various regulations to mirror the newly enacted federal statutory language, others fabricated entirely new provisions that contravene and effectively nullify the very statutes they claim to implement. Plaintiffs identified these atextual provisions and numerous other defects in their respective public comments to the NPRM. *See* Public Comment of Gun Owners of America, Inc. et al. (Dec. 2023) ("GOA Comment");[6] Public Comment of State Attorneys General (Dec. 7, 2023) ("States' Comment").[7]

---

[5] atf.gov/news/pr/justice-department-proposes-new-regulation-update-definition-engaged-business-firearms

[6] https://www.gunowners.org/wp-content/uploads/GOA-Comments-to-ATF-on-Definition-of-Engaged-in-the-Business-as-Gun-Dealer.pdf

[7] https://dojmt.gov/wp-content/uploads/Comment-Letter-to-ATF-88-Fed-Reg-61993-Filed.pdf.

## IV. The Final Rule

48.   The Final Rule purports to do two things: (1) implement the BSCA and (2) "provide additional guidance on what it means to be engaged in the business as a 'dealer....'" 89 Fed. Reg at 28973.

49.   However, the Final Rule, for the most part, has nothing to do with the BSCA. Rather, for the most part the Final Rule represents an ATF wish list of how it would like the statute to operate.

50.   The Final Rule revises the existing definitions of *dealer*, *engaged in the business*, and *principal objective of livelihood and profit*. And it adds definitions of *personal collection (or personal collection of firearms, or personal firearms collection)*, *former licensee inventory*, *predominantly earn a profit*, *responsible person*, and *terrorism*.

51.   The definition prior to the effective date of the Final Rule of *dealer* is "[a]ny person engaged in the business of selling firearms at wholesale or retail; any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms; or any person who is a pawnbroker. The term shall include any person who engages in such business or occupation on a part-time basis." 27 C.F.R. § 478.11.

52.   The Final Rule's new definition is: "Any person engaged in the business of selling firearms at wholesale or retail; any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms; or any person who is a pawnbroker. The term shall include any person who engages in such business or occupation on a part-time basis. **The term shall include such activities wherever, or through whatever medium, they are conducted, such as at a gun show or event, flea market, auction house, or gun range or club; at one's home; by mail order; over the Internet (e.g., online broker or**

13

**auction); through the use of other electronic means (e.g., text messaging service, social media raffle, or website); or at any other domestic or international public or private marketplace or premises."** (Emphasis added to new part of the definition.)

53.   In relevant part, the definition prior to the effective date of the Final Rule of *engaged in the business* is:

c. DEALER IN FIREARMS OTHER THAN A GUNSMITH OR A PAWN BROKER. A person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such a term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms;

27 C.F.R. § 478.11.

54.   The Final Rule's new definition revises paragraph (c), and adds new paragraph (g):

c. Revised paragraph: *Dealer in Firearms other than a gunsmith or a pawnbroker.* The term "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker" shall have the same meaning as in § 478.13.

g. *Related definitions.* For purposes of this definition—

(1) The term "*purchase*" (and derivative terms thereof) means the act of obtaining a firearm in an agreed exchange for something of value;

(2) the term "*sale*" (and derivative terms thereof) means the act of disposing of a firearm in an agreed exchange for something of value, and the term "resale" means selling a firearm,

14

APPX.171

including a stolen firearm, after it was previously sold by the original manufacturer or any other person; and

(3) the term "*something of value*" includes money, credit, personal property, (*e.g.,* another firearms or ammunition), a service, a controlled substance, or any other medium of exchange or valuable consideration, legal or illegal.[8]

55.   The Final Rule adds the following definition of *personal collection (or personal collection of firearms, or personal firearms collection).*

(1) *General Definition.* Personal firearms that a person accumulates for study, comparison, exhibition (e.g., collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (e.g., noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit (e.g., primarily for a commercial purpose or financial gain, as distinguished from personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, but which the person may also intend to increase in value). In addition, the term shall not include firearms accumulated primarily for personal protection: Provided, that nothing in this section shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use.

---

[8] The Final Rule's preamble further defines some of these terms.  89 Fed. Reg at 28975 n.56.

(2) *Personal collection of licensee.* In the case of a firearm imported, manufactured, or otherwise acquired by a licensed manufacturer, licensed importer, or licensed dealer, the term shall include only a firearm described in paragraph (1) of this definition that was—

(i) Acquired or transferred without the intent to willfully evade the restrictions placed upon licensees under chapter 44, title 18, United States Code;

(ii) Recorded by the licensee as an acquisition in the licensee's acquisition and disposition record in accordance with §§ 478.122(a), 478.123(a), or 478.125(e) (unless acquired prior to licensure and not intended for sale);

(iii) Recorded as a disposition from the licensee's business inventory to the licensee's personal collection or otherwise as a personal firearm in accordance with §§ 478.122(a), 478.123(a), or 478.125(e) (unless acquired prior to licensure and not intended for sale);

(iv) Maintained in such personal collection or otherwise as a personal firearm (whether on or off the business premises) for at least one year from the date the firearm was so transferred, in accordance with 18 U.S.C. 923(c) and 27 C.F.R. 478.125a; and

(v) Stored separately from, and not commingled with the business inventory. When stored or displayed on the business premises, the personal collection and other personal firearms shall be appropriately identified as "not for sale" (e.g., by attaching a tag).

56. The Final Rule adds the following definition of *Former licensee inventory*: Firearms that were in the business inventory of a licensee at the time the license was terminated. Such firearms differ from a personal collection and other personal firearms in that they were purchased repetitively before the license was terminated as part of a licensee's business inventory with the predominant intent to earn a profit.

57.   The definition prior to the effective date of the Final Rule of *principal objective of livelihood and profit* is: The intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents such as improving or liquidating a personal firearms collection: Provided, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. 27 C.F.R. § 478.11.

58.   The Final Rule's new definition removes the definition of *principal objective of livelihood and profit* and instead adds a definition of *predominantly earn a profit*, but moves it out of § 478.11 (Meaning of Terms) and moves it to the new § 478.13 (Definition of "engaged in the business as a dealer in firearms other than a gunsmith or pawnbroker.").

59.   The Final Rule's addition of § 478.13 (Definition of "engaged in the business as a dealer in firearms other than a gunsmith or pawnbroker") (i) adds a definition of *engaged in the business as a dealer in firearms other than a gunsmith or pawnbroker*, (ii) declares that whether a person is engaged in the business as a dealer in firearms is a "fact-specific inquiry," and (iii) adds *presumptions that a person is engaged in the business as a dealer* that are nowhere to be found in the statute. The new § 478.13 also (iv) adds a definition of *predominantly earn a profit*, (v) adds *presumptions that a person has intent to predominantly earn a profit* that are nowhere to be found in the statute, (vi) adds *conduct that does not support a presumption* that is nowhere to be found in the statute, (vii) adds *rebuttal evidence* that is nowhere to be found in the statute, but then concludes, in a catch-all section, that (viii) *presumptions, conduct, and rebuttal evidence are not exhaustive*.

60.   ATF lists five circumstances in which a person shall be presumed to be engaged in the business of dealing in firearms, 89 Fed. Reg. at 29091, when the person:

17

APPX.174

(1) Resells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (i.e., to be a source of additional firearms for resale);

(2) Repetitively purchases for the purpose of resale, or repetitively resells or offers for resale, firearms—

(i) Through straw or sham businesses, or individual straw purchasers or sellers; or

(ii) That cannot lawfully be purchased, received, or possessed under Federal, State, local, or Tribal law, including:

(A) Stolen firearms (e.g., 18 U.S.C. 922(j));

(B) Firearms with the licensee's serial number removed, obliterated, or altered, or not identified as required by law (e.g., 18 U.S.C. 922(k) or 26 U.S.C. 5861(i));

(C) Firearms imported in violation of law (e.g., 18 U.S.C. 922(l), 22 U.S.C. 2778, or 26 U.S.C. 5844, 5861(k)); or

(D) Machineguns or other weapons defined as firearms under 26 U.S.C. 5845(b) that cannot lawfully be possessed (e.g., 18 U.S.C. 922(o); 26 U.S.C. 5861(d));

(3) Repetitively resells or offers for resale firearms—

(i) Within 30 days after the person purchased the firearms; or

(ii) Within one year after the person purchased the firearms if they are—

(A) New, or like new in their original packaging; or

(B) The same make and model, or variants thereof;

(4) As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale to a person (other than a licensee in accordance with §§ 478.57 or 478.78)

18

APPX.175

firearms that were in the business inventory of the former licensee at the time the license was terminated (i.e., license revocation, denial of license renewal, license expiration, or surrender of license), whether or not such firearms were transferred to a responsible person of the former licensee after the license was terminated in accordance with §§ 478.57(b)(2) or 478.78(b)(2); or

(5) As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale firearms that were transferred to the licensee's personal collection or otherwise as personal firearms in accordance with 18 U.S.C. 923(c) and 27 C.F.R. 478.125a(a) prior to the time the license was terminated, unless:

(i)The firearms were received and transferred without any intent to willfully evade the restrictions placed on licensees by chapter 44, title 18, United States Code; and

(ii) One year has passed from the date of transfer to the licensee's personal collection or otherwise as personal firearms.

61.  Shockingly, where ATF declares that whether a person is engaged in the business as a dealer in firearms is a fact-specific inquiry, it also states that "there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms. For example, **even a single** firearm transaction **or offer** to engage in a transaction, when combined with other evidence (e.g., where a person represents to others a willingness and ability to purchase more firearms for resale), may require a license; whereas, a single isolated firearm transaction without such evidence would not require a license. At all times, the determination of whether a person is engaged in the business of dealing in firearms is based on the totality of the circumstances." 89 Fed. Reg. at 29091.

19

62. Elsewhere in the Final Rule, ATF claims that, under the statute which requires "the repetitive **purchase and resale** of firearms," "**no actual sales** are required…." 89 Fed. Reg. at 29021 (emphases added).

63. Further complicating the matter, ATF lists seven circumstances in which a person shall be *presumed to have intent* to predominantly earn a profit, 89 Fed. Reg. at 29091-92, when the person:

(i) Repetitively or continuously advertises, markets, or otherwise promotes a firearms business (e.g., advertises or posts firearms for resale, including through the Internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally;

(ii) Repetitively or continuously purchases, rents, or otherwise exchanges (directly or indirectly) something of value to secure permanent or temporary physical space to display firearms they offer for resale, including part or all of a business premises, a table or space at a gun show, or a display case;

(iii) Makes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale;

(iv) Purchases or otherwise secures merchant services as a business (e.g., credit card transaction services, digital wallet for business) through which the person intends to repetitively accept payments for firearms transactions;

(v) Formally or informally purchases, hires, or otherwise secures business security services (e.g., a central station-monitored security system registered to a business, or guards for security) to protect firearms assets and repetitive firearms transactions;

(vi) Formally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes, or offers to make, repetitive firearms transactions; or

(vii) Secures or applies for a State or local business license to purchase for resale or to resell merchandise that includes firearms.

64. ATF is careful to note that the five presumptions that a person is engaged in the business as a dealer, and the seven presumptions that a person has intent to predominantly earn a profit, apply "shall not apply to any criminal case," but in the same sentence ATF goes on to say that the presumptions "may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences." § 478.13(h).

65. In other words, the Final Rule offers a 'wink wink, nudge nudge' that courts nonetheless should use these presumptions to aid DOJ in its criminal prosecutions of the many thousands of gun owners now exposed to criminal liability by the Final Rule. *See, e.g.*, 89 Fed. Reg. at 28976 & n.66, 29014.

66. After creating this set of five presumptions that a person is unlawfully engaged in the business, and a separate set of seven presumptions that a person has an unlawful profit motivation, the Final Rule then establishes six categories of conduct that purportedly "may be used to rebut" any of the aforementioned presumptions. 89 Fed. Reg. at 29092.

67. Thus, "[a] person shall not be presumed to be engaged in the business of dealing in firearms when reliable evidence shows that the person is only reselling or otherwise transferring firearms…" (1) as bone fide gifts; (2) occasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection; (3) occasionally to a licensee or to a family member

APPX.178

for a lawful purpose; (4) to liquidate (without restocking) all or part of the person's personal collection; (5) to liquidate firearms (i) that are inherited; or (ii) pursuant to a court order; or (6) to assist in liquidating firearms as an auctioneer when providing auction services on commission at an estate-type auction. 89 Fed. Reg.at 29092.

68.   In stark contrast to the Final Rule's "conduct that does not support a presumption" (89 Fed. Reg.at 29092), the statute provides that a "dealer in firearms … *shall not include* a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C) (emphasis added).

69.   Watering down that clear statutory safe harbor, the Final Rule establishes a regime where that conduct only can be "used to rebut" its presumptions by provision of "reliable evidence," rather than accept that the statute clearly and unequivocally provides when a person is *not* a dealer in firearms.

70.   Equally alarming is the Final Rule's creation of "a Catch-22 situation where ATF will *require* a person to obtain a license in order to sell firearms, only then to *deny* that person the very license that ATF demanded be obtained." GOA Comment at 58. Indeed, while alleging scores of gun owners are currently engaging in the business without a license (a willful violation of the GCA), ATF simultaneously "claims that it will 'den[y] a firearms license application … on the basis that the applicant was presumed under this rule to have willfully engaged in the business of dealing in firearms without a license.'" *Id.*

71. Finally, the Final Rule adds new regulations for an FFL holder to discontinue business (§ 478.57), and requirements for a former licensee whose license proceedings ended in disapproval or termination of his or her license (§ 478.78), neither of which are statutorily authorized.

## V. Legal Analysis

### A. The Final Rule violates the APA because it is contrary to statute and exceeds the authority granted by Congress.

72. The Final Rule revises and adds definitions that are already defined by statute. Indeed, Defendants claim that "the fact that Congress generally defined the term 'engaged in the business' does not mean that the Department lacks the authority to further define that term." 89 Fed. Reg. at 29011.

73. But ATF only has statutory authority to "prescribe … such rules and regulations as are *necessary* to carry out the provisions of this chapter." 18 U.S.C. § 926(a) (emphasis added).

74. "As a general rule of statutory construction, where the terms of the statute are unambiguous, judicial inquiry is complete." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 642 (1990).

75. Terms already defined by statute cannot be further defined (i.e., changed) by regulation. Rather, "the need to rewrite clear provisions of the statute should have alerted [ATF] that it had taken a wrong interpretive turn." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

76. Because many terms the Final Rule defines—"dealer," "engaged in the business," and "to predominantly earn a profit"—are *already defined by statute*, ATF must accept the congressionally provided definition of these terms.

77. In the face of congressionally enacted definitions, "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Regul. Grp.*, 573 U.S. at 325.

23

APPX.180

78.  Indeed, as the Supreme Court observed, "[a]gencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always 'give effect to the unambiguously expressed intent of Congress.'" *Util. Air Regul. Grp.*, 573 U.S. at 325-26. For this reason, the Tenth Circuit explained that, "[w]hen the Supreme Court has discussed the exercise of agency discretion 'in the interstices created by statutory silence,' it has done so *only when 'considering undefined terms in a statute....'*" *Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, 1201 (10th Cir. 2019) (emphasis added).

79.  The statute here is far from silent.

80.  ATF disagrees that it must follow the statutory language. "While some commenters reference particular words or phrases *in the statute,* the statutory language must be considered as a whole." 89 Fed. Reg. at 29021 (emphasis added).

81.  The statute specifically defines terms such as "engaged in the business," and it further defines what it means to "predominantly earn a profit." ATF has no authority to "define" (i.e., rewrite) those statutorily prescribed definitions. *See also* GOA Comment at 10 n.12 ("The likelihood of abuse here is hardly speculative. … [With] ATF's definition of a definition of a definition[,] … ATF has taken something unambiguous and made it ambiguous.").

82.  Nor is ATF permitted to provide plain meaning, dictionary definitions for clear and unambiguous statutory terms.

83.  For example, the Final Rule purports to define the term "purchase" (and derivative terms thereof) as "the act of obtaining a firearm in agreed exchange for something of value." 89 Fed. Reg. at 29090.

APPX.181

84.   The Final Rule purports to define the term "sale" (and derivatives terms thereof) as "the act of disposing of a firearm in an agreed exchange for something of value, and the term 'resale' means selling a firearm, including a stolen firearm, after it was previously sold by the original manufacturer or any other person." *Id.*

85.   The Final Rule purports to define the term "something of value" as "money, credit, personal property (*e.g.,* another firearm or ammunition), a service, a controlled substance, or any other medium of exchange or valuable consideration, legal or illegal." *Id.*

86.   ATF has not identified any ambiguity in the terms it purports to define, nor has it explained why a person of common understanding cannot comprehend these simple statutory words.

87.   Even if there was some grievous ambiguity in Congress's statutory definitions, many of the definitions in the Final Rule simply add language, rather than resolve some ambiguity or explain some nuance in greater detail. In fact, many commenters "stated that the rule is arbitrary because it causes the proposed definition of a dealer 'engaged in the business' to be less clear and makes it almost impossible to determine when one is in compliance." 89 Fed. Reg. at 29015. Defendants' only response, that they 'used dictionary definitions and decades of case law' (89 Fed. Reg. at 29016), does not cure these defects.

88.   Even to the extent that some further clarification of the statute was necessary—which it is not—the rule of lenity requires that ambiguous criminal laws be construed in favor of the criminal defendant. *See Cargill v. Garland*, 57 F.4th 447, 469 (5th Cir. 2023); *id.* at 473 (Ho, J., concurring) ("it is not enough to conclude that a criminal statute *should* cover a particular act. The statute must *clearly* and *unambiguously* cover the act."). In other words, the statute must be interpreted so that licensure is *not* required in ambiguous cases. The Final Rule, however, takes the opposite approach.

25

*See* 89 Fed. Reg. at 29091 (establishing presumptions of required licensure in myriad contexts), 89 Fed. Reg. at 29092 (reducing explicit statutory safe harbors to "rebuttal evidence" for use against its presumptions).

89.   Moreover, *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505 (1992), requires the government to apply *one interpretation* of a statute, uniformly, across civil and criminal contexts: "The rule of lenity … is a rule of statutory construction whose purpose is to help give authoritative meaning to statutory language. It is not a rule of administration calling for courts to refrain in criminal cases from applying statutory language that would have been held to apply if challenged in civil litigation." *Id.* at 518 n.10.  *See also Leocal v. Ashcroft*, 543 U.S. 1 (2004).

90.   Accordingly, despite purporting to disclaim use of its presumptions outside "civil and administrative proceedings" (89 Fed. Reg. at 29014), the Final Rule establishes an untenable condition where courts must apply ATF's presumptions of guilt in criminal prosecutions to avoid running afoul of *Thompson/Center*.

91.   The Final Rule is an assertion of authority in excess of what was statutorily granted to ATF by Congress and therefore is invalid.

**B.   The Final Rule violates the APA because it is arbitrary, capricious, an abuse of discretion, and not in accordance with law.**

92.   Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

93.   An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation, or disregards either alternatives to its action or the affected

APPX.183

communities' reliance on the prior rule. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

94. The Final Rule purports to interpret the GCA but instead departs from the statute's text.

95. The GCA's express purpose is not "to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or other lawful activity." Pub. L. No. 90-618, 82 Stat. 1213.

96. Further, the GCA is "not intended to discourage or eliminate the private ownership or use of firearms for law-abiding purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably needed to implement and effectuate the provisions of this title." Pub. L. No. 90-618, 82 Stat. 1214.

97. The 'other-than-reasonably-necessary' requirement ensures the GCA does not burden lawful gun owners' rights.

98. FOPA and BSCA clarified parts of the GCA, but *did not amend* the GCA's other-than-reasonably-necessary requirement.

99. The Final Rule violates the GCA's letter and spirit.

100. The Final Rule renders anyone that ATF identifies to be selling a firearm for a profit as a person engaged in the business of dealing in firearms.

101. A firearms dealer without the required FFL faces civil, administrative, and criminal consequences.

102. The Final Rule's five "engaged in the business" presumptions and seven "to predominantly earn a profit" presumptions are entirely arbitrary and conflict with statute.

APPX.184

103. The Final Rule's rebuttable evidence is entirely arbitrary and conflicts with statute.

104. First, the idea that there are various actions a person can take which "presumptively" prove that he is unlawfully "engaged in the business" is found nowhere in any of the statutes Congress enacted.

105. In fact, if Congress wanted to enact such presumptions, it is perfectly capable of doing so. *See, e.g.*, 18 U.S.C. § 1469(a) (creating a criminal presumption that obscene material was transported in interstate commerce); 18 U.S.C. § 3142(e)(2) (creating a criminal presumption of pretrial detention if the defendant has been convicted of certain enumerated offenses); 35 U.S.C. § 282(a) ("A patent shall be presumed valid."); 38 U.S.C. § 1118 (creating a civil presumption of service connection for certain illnesses associated with service in the Gulf War for purposes of VA compensation).

106. Thus, with no statutory authority creating or authorizing ATF to create legal presumptions of statutory guilt, the Final Rule fails to even clear the starting gate because ATF simply has no authority to water down the text to make it easier for bureaucrats to harass gun owners.

107. The Final Rule is littered with implications that create civil, administrative, and criminal liability for millions of otherwise law-abiding citizens who merely sell or offer to sell a firearm. Indeed, as Plaintiff GOA originally commented, Defendants' new rule "effectively creates 'attempt' liability out of whole cloth." GOA Comment at 51; *cf.* 89 Fed. Reg. at 29092 (mere "offers" and "represent[ations]" suffice to be presumed in violation of the GCA). *But see United States v. Hopkins*, 703 F.2d 1102, 1104 (9th Cir. 1983) (emphasis added) ("There is no general federal 'attempt' statute. A defendant therefore can only be found guilty of an attempt to commit a federal offense if the statute defining the offense also *expressly proscribes* an attempt.").

APPX.185

108. The Final Rule also represents a complete reversal of course from its apparent recognition that it lacked authority to create a list of examples illustrating when an FFL is required.

109. The Final Rule goes well beyond any reasonable interpretation of the statute and is therefore arbitrary and capricious and should be set aside because it violates the APA.

### C. The Final Rule violates the APA because it is contrary to constitutional right, power, privilege or immunity.

110. The APA requires agency action be set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

111. The Final Rule is contrary to the Fifth Amendment, as discussed *infra*.

112. The Final Rule is contrary to the Second Amendment, as discussed *infra*.

113. The Final Rule contrary to the Fourth Amendment, as discussed *infra*.

114. The Final Rule is contrary to Article I, Sections 1 and 7 of the U.S. Constitution, as discussed *infra*.

115. Thus, the Final Rule is contrary to constitutional rights and powers and should be set aside because it violates the APA.

### D. The Final Rule violates the Fifth Amendment's due process protections and is void for vagueness.

116. Federal criminal laws must "give ordinary people fair warning about what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).

117. Accordingly, a law is void for vagueness where it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).

118. The Final Rule acknowledges that "whether a person is engaged in the business as a dealer under paragraph (a) of this section is a fact-specific inquiry." 89 Fed. Reg. at 29091.

119. It then goes on to explain situations that "may" be indicative of business activity, but states that "there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement."[9] And "similarly, there is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms." *Id.*

120. Most shocking is the example in the Final Rule that states "even a single firearm transaction or *offer* to engage in a transaction" (*i.e.*, without any actual transaction) may require a license. *Id.* (emphasis added).

121. Purporting to address public comments that the Final Rule "is vague or lacks clarity," Defendants simply demur that "[t]his rule cannot possibly describe every potential scenario." 89 Fed. Reg. at 28991. But that is not the concern; rather, Plaintiffs object that the Final Rule's presumptions indiscriminately sweep up a whole host of innocent conduct.

122. Defendants appear to acknowledge that no one can ascertain whether the Final Rule applies to them. For example, ATF begins with the presumption that selling a firearm in like-new condition in the original packaging is dealing in firearms. 89 Fed. Reg at 29032. ATF then appears to limit this to firearms in like-new condition in the original packaging to "within one year after the person purchased the firearms…." 89 Fed. Reg.at 29091. But what ATF gives, it then takes back,

___

[9] On the contrary, as Plaintiff GOA commented, there *is* a minimum number under the statute. *See* GOA Comment at 14 ("If the statute was not clear enough already, in order to be 'engaged in the business' as a dealer in firearms, one must also engage in the '*repetitive* purchase and resale of firearms.' 18 U.S.C. § 921(a)(21)(C) (emphasis added). Of course, repetition means more than once, that is, 'the act or an instance of repeating' something 'such as a push-up' that is 'usually counted.'").

as the Final Rule's preamble states that, "a person who intentionally stockpiles and sells new or like-new firearms, or the same make and model or variants thereof, with an intent to evade the one-year turnover limitation may still be considered to be engaged in the business if the circumstances warrant that determination." 89 Fed. Reg. at 29016. This is just one example of the layer upon layer of hopeless nonsense contained in the voluminous Final Rule, which no ordinary person could hope to understand.

123. The Final Rule also claims that the "presumptions, conduct, and rebuttable evidence [are] not exhaustive." 89 Fed. Reg. at 29092.

124. Perhaps even more confusing is the Final Rule's declaration that "the rebuttable presumptions…shall not apply to any criminal case, although they may be useful to courts in a criminal case." *Id.*

125. This is ATF's obvious attempt to maximize criminal penalties for "engaging in the business" of dealing in firearms, based on a thin set of facts that shifts the burden to the defendant to rebut.

126. Because an ordinary person cannot hope to read the Final Rule and distinguish between the permissible and the impermissible, the Final Rule is contrary to the Fifth Amendment and is void for vagueness.

## E. The Final Rule violates the Second Amendment.

127. The Final Rule seeks to require an FFL of ordinary gun owners who sell one or more of their personal firearms for a profit, including "money, credit, personal property (*e.g.,* another firearm or ammunition), a service, a controlled substance, or any other medium of exchange or valuable consideration, legal or illegal." 89 Fed. Reg. at 29090.

128. The Final Rule also threatens "presumptions" of guilt for those who engage in perfectly innocent conduct. For example, a person who repetitively sells or offers for sale firearms within one year after purchase if the firearm is new or like-new in its original packaging. 89 Fed. Reg. at 29091. Or a person who repetitively sells or offer for sale firearms within one year after purchase if the firearms are of the same make and model. *Id.*

129. Despite the Final Rule regulating conduct that implicates the Second Amendment of the U.S. Constitution, the only time the Final Rule references the Second Amendment is in response to comments suggesting that it is a violation of the Second Amendment.[10] But in responding to those comments, ATF was not faithful to the Second Amendment's text or the Supreme Court's instruction.

130. The Supreme Court recently clarified the framework for determining the constitutionality of a law or regulation under the Second Amendment in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022).

131. There, the Court explained that, if the Second Amendment "covers an individual's conduct," *any* burden on that conduct is presumptively unconstitutional. *Id.*

132. Defendants can overcome that presumption only by showing the "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

133. The Final Rule fails to comply with this stringent requirement.

134. In addressing the public's Second Amendment concerns, the Final Rule offered a bewildering constitutional analysis that insisted an unprecedented executive edict compelling gun-

---

[10] The NPRM never mentioned the Second Amendment. *See* GOA Comment at 62.

owner licensure both evades the Second Amendment's plain text and finds support in Founding-era and subsequent tradition. *See* 89 Fed. Reg.at 29002-03. This analysis is wrong on all fronts.

135. First, the Final Rule began by misquoting *District of Columbia v. Heller*, editing out the "longstanding" qualifier from its dicta on "conditions and qualifications on the commercial sale of arms." 89 Fed. Reg. at 29002; *cf. District of Columbia v. Heller*, 554 U.S. 570, 627 (2008). Claiming such dicta controls, the Final Rule maintained that it "raises no constitutional concern under the Second Amendment" at all. 89 Fed. Reg. at 29002. In support, the Final Rule listed out a number of activities that individuals could still do as evidence of the Final Rule's purportedly limited sweep. 89 Fed. Reg. at 29002-03. *But see Heller*, 554 U.S. at 629 (explaining that it is "no answer" to claim that alternate methods of enjoying rights remain available).

136. Next, the Final Rule cited abrogated interest-balancing decisions in further support of its position—namely, "one circuit court" rejecting a facial challenge to GCA licensing in 2016, which claimed licensing is "a crucial part of the federal firearm regulatory scheme," and a 2012 district court decision remarking that, under the GCA, one's "right to buy or sell a firearm is not abridged. It is regulated." 89 Fed. Reg. at 29002 (collecting three cases). These interest-balancing decisions only shed light on courts' previous judgment calls (made prior to *Bruen*), not the original public understanding of the Second Amendment.

137. Following this bizarre detour, the Final Rule finally addressed *Bruen*. At the outset, the Final Rule claimed *Bruen* did nothing to upend *Heller*'s purportedly controlling commercial-sales dicta, *citing concurrences only*. 89 Fed. Reg. at 29002. Next, the Final Rule maintained that it survives review at the plain text, because "the right to 'keep and bear Arms' … is silent as to the commercial sale of firearms" and "courts have agreed" the Second Amendment "does not cover

the commercial dealing in firearms." 89 Fed. Reg. at 29002. But this textual argument is flat wrong, as denying a right to purchase, sell, or otherwise acquire arms necessarily would eviscerate the right to "keep and bear" them. U.S. Const. amend. II.[11]

138. But "[e]ven if, contrary to law, the scope of the Second Amendment's protection extended to commercial dealing in firearms," the Final Rule claimed next that "there is a robust historical tradition supporting the Government's authority to require licenses and inspection of firearms sellers." 89 Fed. Reg. at 29002. In support, the Final Rule posited that it need only show

---

[11] Numerous courts across the country have found that the Second Amendment protects the manufacture, purchase, and/or sale of firearms, ammunition, and related items. *See, e.g., United States v. Hicks*, 649 F. Supp. 3d 357, 359-60 (W.D. Tex. 2023) ("[W]hat the Government is suggesting is absurd in practice. If receiving a firearm were illegal, but possessing or carrying one remained a constitutional right, one would first need to break the law to exercise that right. And if buying (receiving) a gun is not covered by the Second Amendment's plain text, neither would selling one. So according to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms. What a marvelous, Second Amendment loophole!"); *Lynchburg Range & Training, LLC v. Northam*, 105 Va. Cir. 159, 162 (Lynchburg 2020) (alteration in original) (observing that "the right to keep and bear arms 'includ[es] the otherwise lawful … sale[] or transfer of firearms'"); *Kole v. Village of Norridge*, 2017 U.S. Dist. LEXIS 178248, at *29 (N.D. Ill. Oct. 27, 2017) (quoting Thomas Jefferson) ("Our citizens have always been free to make, vend, and export arms."); *Luis v United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) (constitutional rights "implicitly protect those closely related acts necessary to their exercise."); *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."); *Duncan v. Bonta*, 2023 WL 6180472, at *8 (S.D. Cal. Sept. 22, 2023) ("[n]either magazines, nor rounds of ammunition, nor triggers, nor barrels are specifically mentioned in the Second Amendment … But without a right to keep and bear triggers, or barrels, or ammunition and the magazines that hold ammunition, the Second Amendment right would be meaningless.") *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire...."); *United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5 (W.D. Tex. Jan. 9, 2023) ("The clear answer is that 'keep and bear arms' includes receipt."); *Bezet v. United States*, 276 F. Supp. 3d 576, 605 (E.D. La. 2017) (emphasis added) ("the rights of law-abiding, responsible citizens … to acquire" firearms), aff'd, 714 F. App'x 336 (5th Cir. 2017); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them … and to purchase and provide ammunition suitable for such arms....").

"relevantly" similar history, omitting any mention of *Bruen*'s discussion of *distinct* similarity or why the Final Rule's perceived societal ills would qualify for a loosening in analogical stringency. 89 Fed. Reg. at 29002.

139. First, the Final Rule identified a 1794 law that "made it unlawful *for a limited period*" to export weapons from the United States, a far cry from controlling *Americans'* access to arms. 89 Fed. Reg.at 29002 (emphasis added).

140. Second, the Final Rule cited the Ninth Circuit's decision in *Teixeira v. County of Alameda* for the proposition that colonial governments placed "restrictions on the commercial sale of firearms." 89 Fed. Reg at 29003. But the page the Final Rule cited only discussed prohibitions on the provision of arms to Indians (i.e., often-hostile non-citizens). *See Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017).

141. Third, the Final Rule cited 1805 Massachusetts and 1821 Maine barrel "proving" laws – hardly akin to licensure in order to sell. 89 Fed. Reg.at 29003.

142. Fourth, the Final Rule cited multiple state laws that regulated the storage of gunpowder for fire safety, which existed to prevent era-specific cataclysmic explosions, not firearms dealing. 89 Fed. Reg.at 29003 & nn.151, 152.

143. Finally, the Final Rule cited just *two* laws from 1875 and 1879 that required licensing of arms dealers, which are too few, too transient, and too distant from the Founding to be relevant. 89 Fed. Reg. at 29003 n.152.

144. Defendants' paltry historical record fails under *Bruen*'s (1) controlling "distinctly similar" standard, (2) "how" and "why" metrics, if this Court were to unnecessarily analogize, (3) requirement of "representative" history (i.e., widespread regulation), and (4) elevation of

Founding-era historical evidence and attendant rejection of subsequent, contrary history. *See generally Bruen*, 597 U.S. 1.

145. Nothing in this nation's historical tradition of firearm regulation required that every firearm seller register for a license with the federal government. That is true even if the sale was for a profit. *See* GOA Comment at 63-66.

146. Indeed, there is no Founding-era history, dating to 1791, of any governmental regulation remotely comparable to the Final Rule.

147. Moreover, the Final Rule greatly alters the legal landscape with respect to firearm licensure. Previously, only those who actually engaged in regular commerce in firearms as a business had to be licensed.

148. Now, every gun owner who innocently sells—or even just *offers* to sell—a few guns from his personal collection, but happens to fall within one or more of ATF's "presumptions," is threatened to obtain a Federal Firearms License or else risk the consequences.

149. All told, the Final Rule will result in tens of thousands (if not hundreds of thousands)[12] of new gun dealers being licensed and subject to all of the GCA's statutory and regulatory controls.

150. Defendants bear the burden of showing that the Final Rule is consistent with history and tradition. *Bruen*, 597 U.S. at 17.

151. If Defendants do not meet their burden, the Second Amendment is violated. *Id.*

---

[12] Indeed, in response to comments taking issue with the NPRM's population methodology, ATF adjusted its estimated affected population to "either 23,006 or 85,954" people. 89 Fed. Reg. at 29072. *But see* GOA Comment at 74 (estimating an affected population of more than 478,000 people).

36

APPX.193

152. Because Defendants will be unable to meet that burden, the Final Rule violates the Second Amendment, and should be declared unconstitutional and should be enjoined.

## F.  The Final Rule violates the Fourth Amendment's right against unreasonable searches and seizures.

153. The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

154. Yet once an individual receives an FFL, ATF reserves the right "to enter during business hours" without a warrant, "the premises, including places of storage, of any … licensed dealer for the purpose of inspecting or examining records, documents, ammunition and firearms." 27 C.F.R. § 478.23(b).

155. For most forced to obtain an FFL by the Final Rule, this "premises" is the private home.

156. For most forced to obtain an FFL by the Final Rule, "business inventory" is their personal collection of firearms.

157. ATF can conduct this inspection without a warrant and entirely without notice.

158. For individuals who were required by the Final Rule to apply for and receive an FFL so they could sell personal collections (or even one firearm) without being unjustly prosecuted for being "engaged in the business," this warrantless search is a violation of the Fourth Amendment.

159. Under the Final Rule, the ATF is entitled, at least once per year, to conduct warrantless searches of the homes of, at minimum, tens (if not hundreds) of thousands of firearm owners to inspect their personally owned firearms. *See* 89 Fed. Reg. at 29072 (expecting between "23,006 or

37

85,954" people to "obtain a license to continue engaging in the business of dealing in firearms in compliance with the rule").

160. Further, because an FFL is required to maintain business hours (so the ATF can "enter during business hours" for inspection, *see* 27 C.F.R. § 478.23(a)), this means the FFL must keep his home open for business *every week* in order to comply with the ATF's regulations. This would be a near-impossible task for someone who is employed outside of their home, and who does not actually intend on carrying on a firearms business, but whom the Final Rule requires to be licensed.

161. Finally, the new FFL will be required to maintain a multitude of records and acquisition and disposition books, forever, or until the FFL goes out of business, at which time the person would have to send all records to the ATF. 27 C.F.R. § 478.127.

162. This compelled access to Americans' "houses, papers, and effects" is a violation of the Fourth Amendment.

163. The only "exception" to the Fourth Amendment that could be argued to apply to gun dealers is the "highly regulated industry" exception. Yet the Final Rule expands that narrow exception beyond its breaking point, claiming that tens or even hundreds of thousands of unwitting Americans suddenly have now innocently become part of this highly regulated industry (in spite of their wishes), and claiming the right to engage in a general warrant-type search of their private homes, records, and collections of Second Amendment-protected arms.

164. Thus, the Final Rule violates the Fourth Amendment, and should be declared unconstitutional and should be enjoined.

### G. The Final Rule violates the Constitutional separation of powers doctrine in Article I, Sections 1 and 7.

165. Article I, § 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

166. Article I, § 7, Clause 2 of the U.S. Constitution mandates that "[e]very Bill … shall have passed the House of Representatives and the Senate" and "shall … be presented to the President of the United States … before it becomes a Law…."

167. The Supreme Court has repeatedly instructed that "the separation of powers … requir[es] that Congress, rather than the executive … branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018); *see also Whitman v. United States*, 574 U.S. 1003, 1004 (2014) (Scalia, J., respecting the denial of cert.) ("legislatures, not executive officers, define crimes"); *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019) ("Only the people's elected representatives in Congress have the power to write new federal criminal laws.").

168. In stark contrast, the Defendants claim that rulemaking is necessary "in light of new technologies, mediums of exchange, and forums in which firearms are bought and sold…." 89 Fed. Reg. at 28973. But such developments are quintessentially within congressional (not bureaucratic) purview to address.

## VI. Claims for Relief

### COUNT 1
### Violation of APA, 5 U.S.C. § 706(2)(C): In Excess of Statutory Jurisdiction of Authority

169. All foregoing allegations are repeated and realleged as if fully set forth herein.

170. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

171. The Final Rule constitutes a final agency action that is *ultra vires* and should be set aside by the Court.

172. Defendants may only exercise the authority conferred upon them by statute, and may not legislate through regulation in order to implement the perceived intent of Congress or purported congressional purpose behind federal gun control statutes.

173. The Final Rule expands the applicability of federal crimes to make millions of otherwise law-abiding citizens subject to civil liability or felony charges should they fail to obtain an FFL, even though they are not actually engaged in the business in dealing firearms.

174. Congress did not authorize ATF to materially revise definitions or to add definitions to make it so that an FFL is needed even if a person has only communicated that they may be willing to sell a firearm from their personal collection.

175. The Final Rule is in excess of the authority Congress granted to ATF and is therefore in violation of the APA, 5 U.S.C. § 706(2)(C).

## COUNT 2
## Violation of APA, 5 U.S.C. § 706(2)(A): Arbitrary, Capricious, Abuse of Discretion, Not in Accordance with Law

176. All foregoing allegations are repeated and realleged as if fully set forth herein.

177. The Final Rule challenged herein constitutes "agency action" pursuant to 5 U.S.C. § 551(13) for purposes of review under the APA, 5 U.S.C. § 702.

178. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

179. A court may hold that an agency action is arbitrary and capricious when the agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.

180. An agency's departure from prior practice can serve as an additional basis for finding an agency's action to be arbitrary and capricious. In this case, the Final Rule is a dramatic policy shift on the part of ATF which, in the past, has sought to dramatically reduce the number of FFLs,[13] but now seems to exponentially expand the number of FFLs. ATF has failed to provide the required explanation for this 180 degree policy shift.

181. Additionally, the Final Rule adopts vague and arbitrary presumptions and rebuttals that invite further arbitrary and capricious actions on the part of ATF.

182. Finally, the Final Rule conflicts with the plain text of the statute it purports to interpret and implement, making it not in accordance with law.

## COUNT 3
### Violation of APA, 5 U.S.C. § 706(2)(B): Contrary to Constitutional Right, Power, Privilege or Immunity

183. All foregoing allegations are repeated and realleged as if fully set forth herein.

184. The APA requires agency action be set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

---

[13] *See* GOA Comment at 82 ("ATF's agenda to put tens of thousands of dealers out of business was a direct result of then-President Clinton's directive to the Secretary of the Treasury….").

185. The Final Rule is contrary to the Second Amendment, in that it regulates conduct covered by the Second Amendment's plain text and is unsupported by widespread Founding-era historical tradition.

186. The Final Rule is contrary to the Fifth Amendment, in that it is void for vagueness.

187. The Final Rule is contrary to the Fourth Amendment, in that the Final Rule grants ATF the right to "enter during business hours" without a warrant, "the premises, including places of storage, of any … licensed dealer for the purpose of inspecting or examining the records, documents, ammunition and firearms." 27 C.F.R. § 478.23(b). For individuals who are required, under the Final Rule, to apply for and receive an FFL so they could sell personal firearms without be prosecuted for being "engaged in the business" of dealing in firearms, this warrantless search is contrary to the Fourth Amendment.

188. The Final Rule is contrary to the constitutional separation of powers, which lays out the only legitimate process for the enactment of legislation. *See, e.g.*, *Terkel v. CDC*, 521 F. Supp. 3d 662, 669 (2021).

**COUNT 4**
**Fifth Amendment: Void for Vagueness**

189. All foregoing allegations are repeated and realleged as if fully set forth herein.

190. A law is void for vagueness where it "'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by statute.'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)).

APPX.199

191. The provisions of the Final Rule fail to give a person of ordinary intelligence fair notice as to when a person would be considered to be "engaged in the business" of dealing firearms because its non-exhaustive list of presumptions sweep up a host of innocent behavior, and because its rebuttals to those presumptions are counterintuitive and water down the statute. For example, the Final Rule provides that "even a single firearm transaction or offer to engage in a transaction" may require an FFL, contrary to the statute's plain text. 89 Fed. Reg at 29091. No person of ordinary intelligence would believe they would be considered to be engaged in the business of selling firearms if they sold one firearm or even just offered to sell one firearm.

192. The Final Rule is therefore void for vagueness.

### COUNT 5
### Second Amendment: Right to Keep and Bear Arms

193. All foregoing allegations are repeated and realleged as if fully set forth herein.

194. The Second Amendment provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

195. The text of the Second Amendment provides no qualifications or limitations constraining who may exercise the right or for what purpose the right may be exercised. Accordingly, the Second Amendment presumptively protects all Americans and all lawful purposes.

196. ATF failed "to justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). Nor can ATF justify its regulation because there is no early American tradition of requiring licensure of gun sellers.

197. The Final Rule thus violates the Second Amendment and must be enjoined.

## COUNT 6
### Fourth Amendment: Right Against Unreasonable Searches and Seizures

198. All foregoing allegations are repeated and realleged as if fully set forth herein.

199. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

200. The Final Rule is contrary to the Fourth Amendment, in that the Final Rule grants ATF the right to "enter during business hours" without a warrant, "the premises, including places of storage, of any … licensed dealer for the purpose of inspecting or examining the records, documents, ammunition and firearms." 27 C.F.R. § 478.23(b). For individuals who are required, under the Final Rule, to apply for and receive an FFL so they could sell personal firearms without be prosecuted for being "engaged in the business" of dealing in firearms, this warrantless search is contrary to the Fourth Amendment.

201. The Final Rule thus violates the Fourth Amendment and must be enjoined.

## COUNT 7
### Constitution, Article I, Sections 1 and 7: Separation of Powers

202. All foregoing allegations are repeated and realleged as if fully set forth herein.

203. Article I, § 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

204. Article I, § 7, Clause 2 of the Constitution mandates that "[e]very Bill … shall have passed the House of Representatives and the Senate" and "shall … be presented to the President of the United States … before it becomes Law…."

205. The Final Rule violates these provisions, usurping legislative powers. The Final Rule represents an attempt by an administrative agency to implement policy change and enact omnibus federal gun control legislation through bureaucratic fiat, rather than through legislation.

## VII.   Demand For Relief

Plaintiffs respectfully request that the Court:

a. Declare that the Final Rule violates the Administrative Procedure Act as it is in excess of statutory jurisdiction or authority and an *ultra vires* agency action;

b. Declare that the Final Rule violates the Administrative Procedure Act because it is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

c. Declare that the Final Rule violates the Administrative Procedure Act because it is contrary to constitutional right, power, privilege or immunity;

d. Set aside the Final Rule pursuant to 5 U.S.C. § 706 of the Administrative Procedure Act;

e. Declare that the Final Rule violates the Fifth Amendment;

f. Declare that the Final Rule violates the Second Amendment;

g. Declare that the Final Rule violates the Fourth Amendment;

h. Declare that the Final Rule violates Article I, Sections 1 and 7;

i. Preliminarily and permanently enjoin Defendants and anyone acting in concert with them from enforcing the Final Rule or from taking any action inconsistent with the injunction of the Final Rule;

APPX.202

j. Grant Plaintiffs an award of attorneys' fees and other litigation costs reasonably incurred in this action;

k. Grant Plaintiffs such other relief as the Court deems just and proper and as justice so requires.

APPX.203

Date: May 1, 2024

Respectfully submitted.

**KEN PAXTON**
Attorney General

*/s/Garrett Greene*
**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**KATHLEEN T. HUNKER**
Special Counsel
Texas Bar No. 24118415

**RYAN D. WALTERS**
Chief, Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
garrett.greene@oag.texas.gov
kathleen.hunker@oag.texas.gov

**COUNSEL FOR PLAINTIFF STATE OF TEXAS**

**LYNN FITCH**
Attorney General of Mississippi

**ELIZABETH B. MURRILL**
Attorney General

*/s/Justin L. Matheny*
**JUSTIN L. MATHENY** (MS Bar 100754)
Deputy Solicitor General
**OFFICE OF THE ATTORNEY GENERAL**
P.O Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
Fax: (601) 359-2003
justin.matheny@ago.ms.gov

*/s/J. Benjamin Aguiñaga*
**J. BENJAMIN AGUIÑAGA\***
Solicitor General

**LOUISIANA DEPARTMENT OF JUSTICE**
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel: (225) 506-3746
aguinagab@ag.louisiana.gov

**COUNSEL FOR PLAINTIFF STATE OF MISSISSIPPI**

**COUNSEL FOR PLAINTIFF THE STATE OF LOUISIANA**
**\*Admission To NDTX Pending**

47

APPX.204

| | |
|---|---|
| **SEAN D. REYES**<br>Utah Attorney General<br><br>*/S/ Andrew Dymek*<br>**ANDREW DYMEK***<br>Assistant Solicitor General<br><br>**UTAH OFFICE OF THE ATTORNEY GENERAL**<br>350 North State Street, #230<br>P.O. Box 142320<br>Salt Lake City, Ut 84114-2320<br>Tel.: 801-366-0533<br>adymek@agutah.gov<br><br>**COUNSEL FOR PLAINTIFF STATE OF UTAH**<br>*Admission To NDTX Pending | */s/ Stephen D. Stamboulieh*<br>**STEPHEN D. STAMBOULIEH**<br><br>**STAMBOULIEH LAW, PLLC**<br>NDTX#: 102784MS<br>MS Bar No. 102784<br>P.O. Box 428<br>Olive Branch, MS 38654<br>(601) 852-3440<br>stephen@sdslaw.us<br><br>**COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE** |
| */s/ John I. Harris III\**<br>**JOHN I. HARRIS III (TN # 12099)**<br><br>**SCHULMAN, LEROY & BENNETT PC**<br>3310 West End Avenue, Suite 460<br>Nashville, Tennessee 37203<br>(615) 244 6670 Ext. 111<br>Fax (615) 254-5407<br>jharris@slblawfirm.com<br><br>**COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE**<br>*Admission to NDTX pending | */s/ Brandon W. Barnett*<br>**BRANDON W. BARNETT**<br>Texas Bar No. 24053088<br><br>**BARNETT HOWARD & WILLIAMS PLLC**<br>930 W. 1st St., Suite 202<br>Fort Worth, Texas 76102<br>817-993-9249 (T)<br>817-697-4388 (F)<br>barnett@bhwlawfirm.com<br><br>**LOCAL COUNSEL, COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE** |

48

APPX.205

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, *and* VIRGINIA CITIZENS DEFENSE LEAGUE,<br>　　*Plaintiffs*,<br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF,<br>　　*Defendants*. | Civil Action No. _____ |

---

DECLARATION OF JEFFREY W. TORMEY

---

1. My name is Jeffrey M. Tormey. I am a U.S. citizen and resident of Amarillo Texas, located within Potter County. I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief. Unless otherwise stated, I make this declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained herein.

2. I am a law-abiding person, eligible to possess firearms under state and federal law. I am employed as an attorney. I am an avid gun owner and supporter of the right to keep and bear

1

APPX.206

arms.  I am a member of Gun Owners of America, a member of Tennessee Firearms Association, and a member of Virginia Citizens Defense League.

3.  I have been a gun owner for more than four decades, and I have been around firearms my entire life, as both of my parents were employed in the firearms industry.  Thus, from a young age and to this day, much of my daily activities revolve around firearms and the right to keep and bear arms.

4.  I presently have a large personal collection of firearms that I have accumulated over many years.  I am a collector and a hobbyist, but I also believe that the widespread public ownership of firearms is, as the Second Amendment says, "necessary" for a "free state."

5.  Thus, in addition to maintaining my personal collection of firearms, and engaging in regular shooting activities (including recreation, competitive shooting, hunting, and training), I also attempt to promote responsible gun ownership in whatever capacity I can, including teaching, instructing, training, and advocating.

6.  For example, I am the President of a local rifle and pistol club in Amarillo, and those activities generally have me shooting firearms on a weekly (or more often) basis.

7.  I am a paid, Lifetime Member, of the Pioneer Gun Collectors Association, an Amarillo, Texas based organization which hosts gun shows locally, and uses the proceeds of those events to fund firearms projects such as college scholarships, 4-H programs, establishment of shooting ranges, training, instruction, etc.

8.  I have attended these local gun shows for many years.  I have bought, sold, and traded firearms at various times and for various reasons.  I have even previously purchased a table at certain gun shows, in order to facilitate enhancing my collection.

9.  I would estimate that, on average, I have sold at least a couple, or even several, firearms

2

APPX.207

per year, through various mediums, for a number of years. This is due to a number of factors, including getting rid of guns I no longer want, freeing up funds for guns that I do want, or trading up to nicer models as funds permit, all in order to enhance the collection of firearms that I own.

10. But although I have occasionally bought and sold firearms through private sales, I have never been "engaged in the business" of dealing in firearms. Thus, I do not hold, nor have I ever held, a federal firearms license in order to engage in my purely private and non-commercial activities.

11. Thus, I believe my activities have always been lawful under federal law, and I wish to continue to alter, improve, or even be able to liquidate my personal collection, if the need were to arise, without becoming a licensed dealer. Indeed, I am not even sure if I could become licensed, due to zoning restrictions, etc.

12. However, ATF's recent "Engage in the Business" rulemaking makes portions of my perfectly lawful activity seem suspect under the new regulations being enacted.

13. For example, various of the Final Rule's definitions are written so broadly that they cover conduct that Congress left lawful under the statute, or are written so narrowly that they eviscerate explicit statutory protections for personal collections such as mine. Indeed, the Rule arbitrarily defines "collection" so narrowly that I am not even certain if my firearms collection still qualifies.

14. Moreover, various of the Rule's presumptions would seem to so broad that they apply to certain of my activities, thus making me "presumptively" engaged in felonious activity unless I can prove (to ATF's satisfaction) that my activities are in fact innocent, as they are.

15. Finally, parts of the Rule are so convoluted, vague, and ambiguous that I (even as a lawyer) cannot determine what is prohibited versus what is allowed. I thus fear that the vague threats and ambiguous definitions in the Final Rule will be wielded as a weapon against me and

3

persons like me, in order to threaten, coerce, and intimidate me into complying with ATF's bureaucratic edict, and forcing me to obtain a license that federal law does not require.

16. I have represented clients in gun cases and Second Amendment litigation, and I thus know firsthand the way ATF has manipulated federal law to target innocent gun owners.

17. If I am to continue to engage in the perfectly lawful behavior that the statute allows, but which the Rule declares could be unlawful, I fear that I will be subject to an overreaching administrative action, civil forfeiture, an ATF cease-and-desist letter, or even arrest and criminal indictment.

I, Jeffrey W. Tormey, declare under penalty of perjury that the foregoing is true and correct.

_____        _____
4/30/24                                        JEFFREY W. TORMEY
DATE

4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, *and* VIRGINIA CITIZENS DEFENSE LEAGUE,<br><br>　　　*Plaintiffs*,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF,<br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. _____ |

---

## DECLARATION OF ERICH M. PRATT

---

　　1.　My name is Erich M. Pratt.  I am a U.S. citizen and resident of Virginia.  I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief.  Unless otherwise stated, I make this declaration based on personal knowledge.  If called as a witness, I can testify to the truth of the statements contained herein.

　　2.　I am the Senior Vice President of Gun Owners of America, Inc. ("GOA"), and the Senior Vice President of Gun Owners Foundation ("GOF").

1

3.  In that capacity, I oversee staff that is in daily contact with members and supporters regarding their concerns, questions, requests, and suggestions on how GOA and GOF can best represent their interests.

4.  Gun Owners of America, Inc. is a California non-stock corporation with its principal place of business in Springfield, Virginia.  GOA is organized and operated as a non-profit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code.  GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners.  GOA has more than 2 million members and supporters across the country, including residents of this district, many of whom will be irreparably harmed by the Department of Justice's ("DOJ") Final Rulemaking entitled "Definition of 'Engaged in the Business' as a Dealer in Firearms" ("Final Rule").

5.  Gun Owners Foundation is a Virginia non-stock corporation, with its principal place of business in Springfield, Virginia.  GOF is organized and operated as a non-profit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code.  GOF is supported by gun owners across the country, including Texas residents, many of whom are and will be irreparably harmed by ATF's actions.  Donations by supporters of GOF fund the organization's activities, including litigation such as this to defend their right to keep and bear arms.

6.  Since ATF's Notice of Proposed Rulemaking ("NPRM") was announced in 2023, an overwhelming concern of our members and supporters has been that this Rule will be used to mandate (or threaten) that ordinary gun owners engaged in lawful activity nevertheless must become licensed as Federal Firearms Licensees ("FFL"), attendant with all the warrantless inspections and paperwork requirements that come along with obtaining and maintaining an FFL,

2

simply to sell their privately owned firearms in an entirely personal and non-business capacity.

7.   Traditionally, law-abiding Americans have been able to buy and sell firearms from their personal collections largely without government oversight, and certainly without the fear of being labeled a "dealer" that is "engaged in the business" of dealing in firearms.

8.   Our members and supporters desire and overwhelmingly support GOA and GOF's involvement in litigation to protect their right to acquire firearms easily and unimpeded by government, a right that is being unconstitutionally infringed by ATF's Final Rule.

9.   GOA and GOF routinely hear from our members and supporters on various topics, including such topics as the Final Rule, which allows us to direct our resources (including to litigation) where they are needed most.  By way of example only, members in New York reached out to us after the Supreme Court issued its opinion in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), which triggered a response from the Governor and legislature of New York, culminating in the inaptly named "Concealed Carry Improvement Act," which made the carry of firearms illegal almost everywhere across New York.  GOA and GOF immediately filed suit, leading to the reinstatement of the Second Amendment across wide swaths of previously off-limits places to carry.  *See Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022) (granting and denying preliminary injunctive relief); *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) (affirming in part and reversing in part the preliminary injunction).

10. As noted, GOA and GOF together have more than two million members and supporters nationwide, including within this district.  Among these persons, GOA and GOF represent countless FFLs (both as entities and as individuals), along with numerous GOA Industry Partners within the firearms industry and community.

11. For example, GOA maintains the Caliber Club, a "partnership program" comprised of

APPX.212

more than five thousand gun stores and shooting ranges across the country.  Information about this program is listed on our website: https://www.gunowners.org/caliberclub/.  Likewise, a listing of Caliber Club members is publicly available on our website as well: https://www.gunowners.org/caliber-club-gun-stores-ranges/.  Each of these FFLs and their responsible parties is a GOA member.

12. GOA's Caliber Club members join GOA to collectively support Second Amendment rights, including their rights and interests as firearms dealers, and in turn, GOA advocates for and at times litigates to protect the rights of its Caliber Club members.

13. Since both the NPRM was announced and the Final Rule published, GOA and GOF have heard from members and supporters who will be directly impacted because they have in the past bought and resold firearms, and wish to do so in the future without being labeled as a "dealer" in firearms.  Such persons are unsure if the ATF will consider them to be "engaged in the business" of dealing in firearms without a license and thus, whether they will have civil actions brought against them, or be criminally charged (and perhaps raided and killed[1]).

14. And once licensed as dealers, our members and supporters will be subject to ATF's rampage of license revocation under the bureau's new "zero tolerance" policy, as our existing Caliber Club members currently are.

15.  This "zero tolerance" policy was announced on June 23, 2021 by President Biden as part of a purported "Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety."[2]  Part of that "strategy" was "establishing zero tolerance for rogue gun dealers that

---

[1] *See* https://www.usatoday.com/story/news/politics/elections/2024/04/22/arkansas-lawmakers-demand-answers-atf-raid-death-bryan-malinowski/73413499007/.
[2] *See* https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/23/fact-sheet-biden-harris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crime-and-ensure-public-safety/

willfully violate the law," described as "a new policy to underscore zero tolerance for willful violations of the law by federally licensed firearms dealers that put public safety at risk." This "zero tolerance" policy has had a profound and negative effect on the firearms community, leading to massive increases in the number of FFLs who are seeing their licenses revoked for a variety of inconsequential misunderstandings and technical paperwork violations. Currently, GOA and GOF are involved as plaintiffs in one case in North Dakota challenging ATF's "zero tolerance" policy, where ATF conveniently decided not to revoke a dealer's license once suit was filed. *See Morehouse Enterprises, LLC d/b/a Bridge City Ordnance, et al., v. Bureau of Alcohol, Tobacco, Firearms and Explosives, et al.*, Civil Action No. 3:23-cv-00129-PDW-ARS (D.N.D.). GOA and GOF are supporting a similar challenge in the Northern District of Florida, where ATF once again conveniently decided not to revoke once suit was filed. *See Kiloton Tactical, LLC, et al. v. Bureau of Alcohol, Tobacco, Firearms and Explosives, et al.*, Civil Action No. 3:23-cv-23985-MCR-ZCB (N.D. Fla.).

16. Under ATF's "zero tolerance" policy, revocations have exploded 3,040%, with ATF even *reopening* old and previously resolved cases to impose harsher punishments under its new policy.[3] These skyrocketing revocation actions will inevitably lead to FFLs whose license was revoked for these new policy reasons, which will negatively impact their ability to sell personally owned firearms in the future under the Final Rule.

17. For example, we recently spoke with one GOA member who was formerly an FFL for a period of several decades, but whose license was recently revoked by ATF under the "zero tolerance" policy.

18. Thus, this member would be considered a "former licensee" with "former licensee

---

[3] https://www.atf.gov/rules-and-regulations/enhanced-regulatory-enforcement-policy.

APPX.214

inventory" under the Final Rule challenged here.  Although no federal law places any restrictions on a personal collection by someone who, like this GOA member, is *not* a licensee, the Final Rule creates an entirely new classification of "former licensee," and an entirely new category of "former licensee inventory."  FR 29090, 29091.

19. After GOA reviewed the ATF revocation paperwork provided by this FFL, it became clear that ATF had revoked this member's license based on a single, inconsequential recordkeeping error that involved *no* prohibited person obtaining a firearm, *no* intentional wrongful act on the part of the FFL, and *no* inability of ATF to trace any firearm.  In other words, this case involved a technical paperwork violation, and raised no public safety concerns. Nevertheless, ATF revoked this license.

20. Being as this GOA member had held an FFL for several decades, the business had accumulated a large number of firearms over the years, but suddenly was left without a license to sell them.

21. Consistent with ATF instructions and federal law, this member informed GOA that they properly transferred their "business inventory" firearms to their "personal collection" prior to termination of their license by ATF.

22. This GOA member reports that they transferred well over 1,000 firearms in this manner, with a value of around a million dollars.  This member reports that this lifetime of accumulated inventory largely constitutes their retirement.

23. However, due to being forced out of business by ATF's "zero tolerance" policy, and now promulgation of the Final Rule, this GOA member now fears that they will be unable lawfully to dispose of these firearms from their personal collection without being presumed by ATF to be engaged in the business, and potentially criminally charged, and subject to forfeiture of a

6

collection accumulated over a lifetime.

24. And although this GOA member properly transferred their business inventory to their personal collection per federal law and ATF instructions, the Final Rule still casts aspersions and makes vague threats as to this member's ability to transfer their firearms.  *See* FR 29034 (threatening that a "former licensee" may not sell "former licensee inventory" even to another FFL, after license termination).

25. For example, the Final Rule makes it impossible to transfer such firearms until "[o]ne year has passed from the date of transfer to the licensee's personal collection." FR 29091.  But while the statute imposes that requirement on licensees, *unlicensed* persons (like this GOA member) are not similarly restricted.

26. The Final Rule justifies this new rule by claiming that "licensees who know they will be going out of business … cannot simply transfer their business inventory to a 'personal collection' the day before license termination, and two days later, sell off the entire inventory as liquidation of a 'personal collection'...." FR 29035.

27. On the contrary, this is *precisely* what the statute allows, even if ATF does not like how the law operates.  In fact, this GOA member reports that their local ATF personnel *expressly instructed* that they could do *exactly* what the Final Rule now says they cannot.

28. Separately, the Final Rule claims that, if ATF asserts this member's transfer to their personal collection was done "to willfully evade" federal law, or if the transfer was otherwise improper or ineffective and ATF believes the firearms remain "business inventory … at the time the license was terminated," ATF may pursue such former licensee and consider them unlawfully "engaged in the business." FR 29091.  And if ATF were to make such accusation, then under the Final Rule, this GOA member understands that they *could never transfer* their firearms.  FR

7

29052.  This inability *ever* to transfer a lifetime collection of firearms would be catastrophic for this GOA member.

29. Moreover, even if this new ATF classification of "former licensees" and new category of "former licensee inventory" do not impede this GOA member's transfers from their personal collection, the Final Rule separately threatens prosecution for "repetitive" sales of former business inventory, *even though this member would not be acquiring any new firearms*.  FR 29091.

30. Shockingly, even though the statute clearly requires both "purchase[s] and resale[s]," the Final Rule states that a person might be engaged in the business *merely for selling* firearms from their personal collection.  This is based on ATF's claim that prohibited "purchase[s]" can occur during the period of licensure, even though during that period such purchases for resale *were lawful*.  FR 29090.

31. The chances are not remote or speculative that ATF might pursue this GOA member for merely doing what the law allows (and what ATF personnel told them to do).  Indeed, GOA already has expended significant resources to defend one former FFL from this very charge.

32. Specifically, GOA funded the 2014 legal defense of former FFL and GOA member Robert G. Arwady against criminal charges brought by ATF in Houston, Texas.

33. When Mr. Arwady voluntarily surrendered his FFL (after *previously* being prosecuted by ATF, but acquitted by a jury on all charges), he transferred his "business inventory" firearms to his personal collection.  Again, this was consistent with federal law and with ATF instructions to Mr. Arwady.

34. Mr. Arwady then sold those personally owned firearms to other private parties, in order to liquidate his collection and recoup his investment.  Notably, each time Mr. Arwady did so, he

went out of his way to pay for a transfer *from his local FFL to the buyer's FFL*.  This ensured paperwork for each firearm, and a background check for each buyer.  In other words, Mr. Arwady did *more* than the law required him to do for these private sales.

35. Nevertheless, a vindictive ATF swooped in and indicted Mr. Arwady a second time.  ATF arrested Mr. Arwady, put him in federal lockup, and seized his lifetime of collected firearms.  ATF charged Mr. Arwady with being "engaged in the business" without a license merely for selling off his personal collection.

36. However, after the government brought the case to trial, a jury unanimously voted – ***again*** – to acquit Mr. Arwady of all charges.

37. To this day, Mr. Arwady remains the only person of whom GOA is aware to have *twice* been prosecuted by ATF – and then acquitted on all counts.

38. After Mr. Arwady's second acquittal, ATF begrudgingly returned the hundreds of firearms it had seized from him.  But although Mr. Arwady's collection previously had been pristine – with many firearms new in their boxes – ATF returned a damaged, and often destroyed, collection, having mishandled, mistreated, and deliberately acted destructively towards Mr. Arwady's collection.  Firearms were missing.  Firearms were disassembled.  Firearms had been modified.  And almost all had been damaged, greatly reducing the value of the collection.

39. Not only were many years of Mr. Arwady's life ruined by ATF's baseless prosecution, but also his valuable firearm collection was all but destroyed.

40. In addition to these harms caused by ATF to Mr. Arwady, GOA was forced to expend tens of thousands of dollars to engage in the criminal defense against the baseless charges by ATF.

41. In other words, the harms threatened by the Final Rule, and reasonably feared by many

APPX.218

GOA members, are far from speculative. Rather, *they are a guaranteed certainty* if the Final Rule is allowed to take effect. And the harms created by the Final Rule, which will have a ubiquitous and negative effect on the firearms community, are still yet to be fully realized, as the Final Rule has yet to be fully implemented.

42. Protection of the rights and interests advanced in this litigation is germane to GOA and GOF's respective missions, which includes the effort to preserve and protect the Second Amendment and the rights of Americans to keep and bear arms, including against overreach by unelected and unaccountable anti-gun bureaucrats. GOA and GOF routinely litigate cases throughout the country on behalf of their members and supporters, and GOA and GOF are capable of fully and faithfully representing the interests of their members and supporters without participation by each of the individuals and entities.

I, Erich M. Pratt, declare under penalty of perjury that the foregoing is true and correct.

*April 30, 2024*
**DATE**

*Erich Pratt*
**ERICH M. PRATT**

APPX.219

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, | § § § § § § § § § § | |
| *Plaintiffs*, | § | |
| v. | § § | CIVIL ACTION NO.2:24-CV-00089-Z |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF, | § § § § § § § § § | |
| *Defendants*. | § § | |

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION

Although purporting to update federal regulations to align with recently amended federal firearms statutes, the regulations promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") of the U.S. Department of Justice on April 19, 2024, entitled "Definition of 'Engaged in the Business' as a Dealer in Firearms" ("Rule"), 89 Fed. Reg. 28968, go far beyond the subtle change Congress made to the law. Instead, they subject hundreds of thousands of law-abiding gun owners to *presumptions of criminal guilt* for all manner of innocuous activities related to the statutorily authorized and constitutionally protected private sale of firearms. Moreover, in an

1

obvious attempt to preclude timely judicial review, Defendants have accelerated the effective date of their latest edict to a mere *30 days* from publication in the Federal Register, contrary to past practice.[1] *Cf.* 83 Fed. Reg. 66514 (90 days for bump stock rule); 87 Fed. Reg. 24652 (120 days for "frame or receiver" rule); 88 Fed. Reg. 6478 (120 days for pistol stabilizing brace rule). Because of the urgency created by Defendants own actions, and because the new regulations threaten to turn otherwise law-abiding Americans into felons overnight, Plaintiffs seek a temporary restraining order and/or preliminary injunction to preserve the status quo and prevent Defendants from enforcing the Rule against lawful gun owners and collectors. If a temporary restraining order and/or preliminary injunction is not granted, the Rule will become effective on May 20, 2024.

---

[1] ATF intends to "further update [its] guidance once it issues this Rule." 89 Fed. Reg.at 28971. However, as explained below, the Rule exceeds ATF's statutory authority and is contrary to law, and the First, Second, Fourth, and Fifth Amendments. Any "further" guidance based off these regulations would likewise be unlawful and irreparably harm Plaintiffs.

2

# TABLE OF CONTENTS

Table of Contents ...............................................................................................................3

Table of Authorities ........................................................................................................ 4

Introduction ....................................................................................................................10

Background and Facts .................................................................................................... 11

   A.   Statutory History .................................................................................................11

   B.   Enactment of the BSCA.....................................................................................14

   C.   The Rule ............................................................................................................15

Standard ..........................................................................................................................17

   A.   Plaintiffs Are Likely to Succeed on the Merits. ................................................17

      I.    The Rule Violates the Administrative Procedure Act ("APA") by Enacting Arbitrary and Capricious Edicts, Abusing ATF Discretion, Contravening the Statute, Violating Constitutional Rights, and Exceeding ATF Authority. .......................................17

      II.   The Rule's Three Sets of Presumptions Are Unlawful, Arbitrary, and Overbroad. .... 26

           A.   The EIB Presumptions Are Flawed. ........................................................ 29

           B.   The PEP Presumptions Are Flawed. ....................................................... 30

           C.   The Rule's Opposite Presumptions Eviscerate the Statute's Safe Harbor. ...........32

      III.   The Rule's "Former Licensee Inventory" Is Atextual Revisionism that Contravenes the Statute.......................................................................................................................33

      IV.   The Rule Violates the Second Amendment. .................................................35

      V.   The Rule Violates the Fourth Amendment. ....................................................38

      VI.   The Rule Violates the Separation of Powers. ...............................................40

   B.   Plaintiffs Will Suffer Irreparable Harm if the Rule Takes Effect. ....................42

   C.   The Balance of Equities and Public Interest Overwhelmingly Favor Plaintiffs. ................43

Conclusion ..................................................................................................................... 44

APPX.222

# TABLE OF AUTHORITIES

Cases

18 U.S.C. § 921(a)(21)(C) ................................................................................ passim

*ACLU v. FCC*,
   823 F.2d 1554 (D.C. Cir. 1987) ...................................................... 18, 19

*Adams Fruit Co. v. Barrett*,
   494 U.S. 638 (1990) ..................................................................................18

*Altman v. County of Santa Clara*,
   464 F. Supp. 3d 1106 (N.D. Cal. 2020).....................................................37

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023) (Barrett, J., concurring) ..........................................19

*Career Colleges & Sch. of Tex. v. U.S Dep't of Educ.*,
   98 F.4th 220 (5th Cir. 2024) ...................................................................27

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
   2024 U.S. App. LEXIS 8152 (5th Cir. Apr. 4, 2024)................................25

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023)................................................................... 42

*Chem. Mfrs. Ass'n v. DOT*,
   105 F.3d 702 (D.C. Cir. 1997) ...............................................................25

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ..............................................................................17

*City of Los Angeles v. Patel*,
   576 U.S. 409 (2015) ..............................................................................39

*Def. Distributed v. U.S. Dep't of State*,
   865 F.3d 211 (5th Cir. 2017) (Elrod, J. dissenting)..................................43

*Dig. Realty Trust, Inc. v. Somers*,
   583 U.S. 149 (2018) ..............................................................................18

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ..............................................................................36

4

APPX.223

*Dobrova v. Holder,*
    607 F.3d 297 (2d Cir. 2010) ................................................................. 20

*El Paso Elec. Co. v. FERC,*
    76 F.4th 352 (5th Cir. 2023) ................................................................. 27

*Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) ............................... 37

*Garland v. Gonzalez,*
    142 S. Ct. 2057 (2022) ...........................................................................

*Gordon v. NovaStar Mortg., Inc.,*
    524 F.3d 1175 (11th Cir.) *revised on other grounds,* 529 F.3d 1026 (11th Cir. 2008) ................... 41

*Humana, Inc. v. Jacobson,*
    804 F.2d 1390 (5th Cir. 1986) ............................................................. 42

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) ................................................................. 17

*Kaneshiro v. United States,*
    445 F.2d 1266 (9th Cir. 1971) ............................................................. 11

*Katz v. United States,*
    389 U.S. 347 (1967) ............................................................................. 39

*Kole v. Village of Norridge,*
    No. 11 C 3871, 2017 WL 5128989 (N.D. Ill. Nov. 6, 2017) ...................... 36

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ............................................................................. 17

*Louisiana v. Biden,*
    55 F.4th 1017 (5th Cir. 2022) ............................................................. 43

*Lynchburg Range & Training, LLC v. Northam,*
    105 Va. Cir. 159, 3 (2020) ................................................................... 36

*Maralex Res., Inc. v. Barnhardt,*
    913 F.3d 1189 (10th Cir. 2019) ........................................................... 18

*Martinez v. Larose,*
    968 F.3d 555 (6th Cir. 2020) ............................................................... 21

*Martinez v. Tyson Foods, Inc.,*
    533 F. Supp. 3d 386 (N.D. Tex. 2021) ................................................. 41

APPX.224

*Missouri v. Biden,*
   83 F.4th 350 (5th Cir. 2023) ....................................................................................

*Mock v. Garland,*
   75 F.4th 563 (5th Cir. 2023) .......................................................................... 42

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) ................................................................................. passim

*Netflix, Inc. v. Babin,*
   88 F.4th 1080 (5th Cir. 2023) ....................................................................... 44

*Nken v. Holder,*
   556 U.S. 418 (2009) ...................................................................................43

*NRA of Am., Inc. v. BATFE,*
   No. 3:23-CV-1471-L, 2024 U.S. Dist. LEXIS 57557 (N.D. Tex. Mar. 29, 2024) .....................43

*Peabody Twentymile Mining, LLC v. Sec'y of Labor,*
   931 F.3d 992 (10th Cir. 2019) ...................................................................... 30

*Pol'y & Rsch., LLC v. HHS,*
   313 F. Supp. 3d 62 (D.D.C. 2018) ...................................................................18

*Reese v. BATFE,*
   647 F. Supp. 3d 508 (W.D. La. 2022) .................................................................37

*Teixeira v. County of Alameda*
   873 F.3d 670 (9th Cir. 2017) ........................................................................37

*Teixeira v. County of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ........................................................................37

*United States v. Biswell,*
   406 U.S. 311 (1972) ...................................................................................39

*United States v. Brenner,*
   481 F. App'x 124 (5th Cir. 2012) ................................................................... 28

*United States v. Davis,*
   139 S. Ct. 2319 (2019) ............................................................................. 40

*United States v. Gross,*
   313 F. Supp. 1330 (S.D. Ind. 1970) ..............................................................11, 12

APPX.225

*United States v. Koutsostamatis,*
    956 F.3d 301 (5th Cir. 2020) ............................................................. 29

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010), *abrogated on other grounds as recognized by Range v. Att'y Gen. U.S.,*
    69 F.4th 96 (3d Cir. 2023) ................................................................. 37

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ........................................................................ 17

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) .................................................................. 17, 41

*Valley v. Rapides Parish Sch. Bd.,*
    118 F.3d 1047 (5th Cir. 1997) ........................................................ 43

*VanDerStok v. Garland,*
    86 F.4th 179 (5th Cir. 2023) ..................................................... 26, 42

*VanDerStok v. Garland,* No. 23-10718, 2023 U.S. App. LEXIS 26499, at *6 (5th Cir. Oct. 2,
    2023) ........................................................................................... 43

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) .................................................................. 27

*Wilgar Land Co. v. Dir., OWCP,*
    85 F.4th 828 (6th Cir. 2023) .......................................................... 30

*Wis. Central Ltd. v. United States,*
    138 S. Ct. 2067 (2018) .................................................................. 41

## Statutes

18 U.S.C. § 1469(a) ................................................................................ 27

18 U.S.C. § 3142(e)(2) ........................................................................... 27

18 U.S.C. § 921(a)(22) ........................................................................ 15,

18 U.S.C. § 926(a) ........................................................................... 18, 27

35 U.S.C. § 282(a) .................................................................................. 27

38 U.S.C. § 1118 .................................................................................... 27

APPX.226

Act of Apr. 29, 1968, Pub. L. No. 90-351, 1968 U.S.C.C.A.N. 2112, 2201 (to be codified at 18 U.S.C § 921(a) (11) ...................................................................................12

Firearms Owners' Protection Act, Pub. L. 99-308, 100 Stat. 450. (1986) ...................................13

Rules & Regulations

Bipartisan Safer Communities Act Conforming Regulations,
    89 Fed. Reg. 28622 (April 19,2024)........................................................................ 20

Bump-Stock-Type Devices, 83 Fed. Reg. 66514 (Dec. 26. 2018)
    (to be codified at 27 C.F.R pts. 447, 478, & 479) ................................................... 42

Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480 (March 31, 1988)
    (to be codified at 27 C.F.R pts. 72, 178 and 179)....................................................14

Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480 (March 31, 1988)
    (to be codified at 27 C.F.R pts 72,178 & 179)........................................................ 28

Commerce in Firearms and Ammunition; Temporary Rule,
    51 Fed. Reg. 39612 (Oct. 29, 1986) .......................................................................14

Dealer in Firearms, 89 Fed. Reg. 28968, 28972 (April 19, 2024)
    (to be codified 27 C.F.R. pt. 478).................................................................... passim

Definition of "Engaged in the Business" as a Dealer in Firearms,
    88 Fed. Reg. 61993 61999 nn.44, 45(Sept. 8, 2023)
    (to be codified at 27 C.F.R. pt 478)................................................. 19, 23, 24, 28

Definition of the Phrase "Engaged in the Business,"
    45 Fed. Reg. 20930 (March 31, 1980) (to be codified at 27 C.F.R. pt. 178) .............................13

Definition of the Phrase "Engaged in the Business,"44 Fed. Reg. 75186 (Dec. 19, 1979)
    (to be codified at 27 C.F.R. pt. 178) .......................................................................12

Factoring Criteria for Firearms with Attached "Stabilizing Braces,"
    88 Fed. Reg. 6478 (Jan. 31, 2023) (to be codified at 27 C.F.R. pts. 478 & 479)....................... 42

Other Authorities

98th Congress, 2d Sess., Report 98-583 at 9, Aug. 8, 1984...........................................................14

Antonin Scalia & Bryan A. Garner,
    Reading Law: The Interpretation of Legal Texts 56 (2012) ....................................................41

8

Benjamin Hardy et al., *Illegal Guns Sales Led to Fatal ATF Raid on Airport Director Malinowski's Home, Affidavit Says*, Ark. Times (Mar. 21, 2024) ................................................................. 42

David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 Harv. L. Rev. F. 230, 235 (2014) ..........................................................................................................................38

9

## INTRODUCTION

ATF's Rule redefines the landscape of American gun ownership. Under the guise of clarifying existing statutes, the ATF is poised to radically expand the definition of who is considered to be "engaged in the business" of dealing firearms. The Rule stretches the modest language adjustments made by Congress in the 2022 Bipartisan Safer Communities Act ("BSCA") into a broad, catch-all dragnet that threatens to ensnare countless ordinary citizens. This sweeping reinterpretation of well-settled statutory definitions will turn everyday gun owners into de facto arms dealers overnight.

Indeed, the Rule establishes a broad and ambiguous framework that potentially categorizes ordinary individuals as firearm dealers if they engage in even minimal activities such as selling a single firearm, offering to sell a firearm, advertising sales informally, or documenting transactions for personal record-keeping. This expansive interpretation by ATF not only stretches the statutory language beyond its reasonable bounds, but it also imposes severe civil, administrative, and criminal penalties on individuals without providing clear, objective criteria for compliance.

For instance, the Rule posits that selling firearms with the "intent to predominantly earn a profit" now falls under the purview of activities requiring a Federal Firearms License ("FFL"), regardless of whether such sales are infrequent or merely incidental to personal gun ownership. This is a significant and unfounded expansion from the congressionally mandated definitions, which still demand a "course" of "repetitive" buying and selling to qualify as being "engaged in the business." The Rule also introduces presumptions that could criminalize lawful transactions and chill constitutionally protected conduct through the vague threat of "administrative action." ATF cannot provide a rational basis for such a sweeping change—much less a cogent theory for

10

how its omnibus rulemaking comports with the statutory text.

The Rule does not represent reasoned (much less lawful) decision making. To the contrary, it is no more than an agency power-grab, attempting to severely restrict private firearms transactions—effectively creating a de facto national gun registry by mandating that individuals wishing to sell almost any firearm, for any reason, must obtain an FFL.

## BACKGROUND AND FACTS

### A. Statutory History

Historically, the Federal Firearms Act of 1938 defined "dealer" to mean "any person engaged in the business of selling firearms or ammunition. . . ." In one of the only cases to interpret that phrase under the Federal Firearms Act, the Ninth Circuit discussed "shipment of guns to Tokyo," noting that the "guns were sold in two separate installments to two different people" and that the defendants "procure[d] … possible buyers for the guns," which supported a "finding that appellants were 'engaged in the business of selling firearms'. . . ." *Kaneshiro v. United States*, 445 F.2d 1266, 1270 (9th Cir. 1971).

Congress later repealed the Federal Firearms Act, finding that "it had not provided adequate license fees or proper standards for the granting or denial of licenses and that this had led to licenses being issued to unqualified persons." *United States v. Gross*, 313 F. Supp. 1330, 1332 (S.D. Ind. 1970). But in recodifying the Act's definition of "dealer" into the new Gun Control Act of 1968 ("GCA"), Congress defined the term "in somewhat the same manner as that definition appears

11

in [the Federal Firearms Act]. *See* Act of Apr. 29, 1968, Pub. L. No. 90-351, 1968 U.S.C.C.A.N. 2112, 2201 (to be codified at 18 U.S.C § 921(a) (11)).[2]

Thus, the GCA defined "dealer" to mean "any person engaged in the business of selling firearms or ammunition at wholesale or retail" but, like the FFA, did not further define what it meant to be "engaged in the business." That determination was left, for a time, to judicial interpretation, which resulted in varying holdings. For example, the district court in *Gross* held the definition required "no minimum number of sales, dollar volume of sales, or number of employees" to be considered "engaged in the business," but that "there should be no doubt in the minds of men of common intelligence that 'dealer' means one that is engaged in *any* business of selling, repairing or pawning firearms and that 'business' is that which occupies the time, attention and labor of men for the purpose of livelihood or profit." *Gross*, 313 F. Supp. at 1333.

In 1979, ATF issued a notice of proposed rulemaking which proposed to define "engaged in the business," on the theory that the phrase was "not defined in the law or the regulations." *See* Definition of the Phrase "Engaged in the Business," 44 Fed. Reg. 75186 (Dec. 19, 1979) (to be codified at 27 C.F.R. pt. 178). But in its proposal to define that phrase, ATF failed to identify a single court that had trouble defining or applying the phrase. To the contrary, ATF's proposal acknowledged that "courts have continually found that the current situation is adequate for enforcement purposes. . . . " *Id.* at 75187. On March 31, 1980, ATF extended the comment period for 30 days, *see* Definition of the Phrase "Engaged in the Business," 45 Fed. Reg. 20930 (March

---

[2]
https://www.westlaw.com/Document/IC70AEF6063EA11D9B7CECED691859821/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0

31, 1980) (to be codified at 27 C.F.R. pt. 178),[3] but no action was taken from that point. In other words, ATF ultimately decided not to define the phrase "engaged in the business."

In 1986, the McClure-Volkmer Firearms Owners' Protection Act ("FOPA"), added a definition of "engaged in the business" to the statute – "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." Firearms Owners' Protection Act, Pub. L. 99-308, 100 Stat. 450. (1986). FOPA further defined "with the principal objective of livelihood and profit" to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." FOPA was amended soon after, clarifying that "proof of profit" was not required "as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.*

As the Senate Committee on the Judiciary reported regarding the "engaged in the business" definition contained in the bill that would eventually become FOPA, "[l]ower courts have applied two different, but similar tests for 'engaging in the business.' Neither is especially clear, and both can be applied to a hobbyist to whom profit is a secondary objective." *See* 98th

---

[3] https://archives.federalregister.gov/issue_slice/1980/3/31/20912-20982.pdf.

APPX.232

Congress, 2d Sess., Report 98-583 at 9, Aug. 8, 1984.[4] After laying out those two judicially created tests, the report explained that Congress' intent was to "**substantially narrow** these broad parameters by requiring that the person undertake such activities as part of a 'regular course of trade or business with the principal objective of livelihood and profit.'" *Id.* (emphasis added).

On October 29, 1986, ATF adopted a Temporary Rule to implement FOPA, and invited comments.[5] Commerce in Firearms and Ammunition; Temporary Rule, 51 Fed. Reg. 39612 (Oct. 29, 1986) Under the Temporary Rule, the phrase "engaged in the business" was defined to mirror FOPA's statutory language. On March 31, 1988, ATF adopted the regulatory definitions with no changes. *See* Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480 (March 31, 1988) (to be codified at 27 C.F.R pts. 72, 178 and 179).[6] Importantly here, as to the definition of "engaged in the business," a commenter had requested "the definition list examples illustrating when a license is required," but **ATF declined to add examples** "since the definition adequately addresses this concern by expressly delineating the activity requiring licensing from that of a firearms collector not subject to licensing." *Id.* at 10481.

**B.  Enactment of the BSCA**

Thus, for several decades from FOPA's addition of definitions in 1986 until enactment of the BSCA last year, 18 U.S.C. § 921(a)(21)(C) has stated, in part, that "engaged in the business"

---

[4]https://books.google.com/books?id=WjaxxKw8ixcC&pg=RA2-PA77&lpg=RA2-PA77&dq=%22The+purpose+of+S.+914,+as+reported%22&source=bl&ots=C1ruIFGR-k&sig=ACfU3U0_AZISnBWMe6mumA0Grt7SxuRA3w&hl=en&sa=X&ved=2ahUKEwj9ttiAgvCFAxXa8MkDHbyzBSoQ6AF6BAgKEAM#v=onepage&q=%22The%20purpose%20of%20S.%20914%2C%20as%20reported%22&f=false.

[5] https://archives.federalregister.gov/issue_slice/1986/10/29/39607-39634.pdf.

[6] https://archives.federalregister.gov/issue_slice/1988/3/31/10460-10512.pdf.

meant "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business **with the principal objective of livelihood and profit** through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." Further, 18 U.S.C. § 921(a)(22) defined "with the principal objective of livelihood and profit" to mean an "intent underlying the sale or disposition of firearms is predominantly one of **obtaining livelihood and pecuniary gain**, as opposed to other intents, such as improving or liquidating a personal firearms collection. . . . " The BSCA amended this definition of "engaged in the business," replacing Section 921(a)(21)(C)'s phrase "with the principal objective of livelihood and profit" with the phrase "to **predominantly earn a profit**. . . . " Due to that change in terminology, 18 U.S.C. § 921(a)(22) was also modified, replacing the language "obtaining livelihood and pecuniary gain" with the singular intent of "**obtaining pecuniary gain**. . . . "

### C. The Rule

On March 14, 2023, following enactment of the BSCA, President Biden issued an Executive Order directing the Attorney General, among other things, to "(i) clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal firearms licensees ("FFLs"), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law; [and] (ii) prevent former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms." Definition of

15

"Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28968, 28972 (April 19, 2024) (to be codified 27 C.F.R. pt. 478).

Purportedly acting pursuant to this directive, the DOJ announced the notice of proposed rulemaking ("NPRM") on August 31, 2023, claiming that its proposed revisions "conform[] ATF's regulations to the new BSCA definition and further clarify[] the conduct that presumptively requires a license under that revised definition."[7]

But while some of the proposed revisions in the NPRM amended various regulations to mirror the newly enacted federal statutory language, others fabricated entirely new provisions that contravene and effectively nullify the very statutes they claim to implement. Plaintiffs identified these atextual provisions as well as several other defects in their public comments to the NPRM. *See* Public Comment of Gun Owners of America, Inc. et al. (Dec. 2023) ("Ex. A"); Public Comment of State Attorneys General (Dec. 7, 2023) ("Ex. B.").[8]

The Rule purports to do two things: (1) implement the BSCA and (2) "provide additional guidance on what it means to be engaged in the business as a 'dealer….'" 89 Fed. Reg. at 28973. But the Rule, for the most part, has nothing to do with the BSCA. Rather, for the most part the Rule represents an ATF wish list of how it would like the statute to operate. For example, the Rule revises the existing definitions of *dealer*, *engaged in the business*, and *principal objective of livelihood and profit*. And it adds definitions of *personal collection (or personal collection of firearms, or personal*

---

[7] https://atf.gov/news/pr/justice-department-proposes-new-regulation-update-definition-engaged-business-firearms.

[8] https://dojmt.gov/wp-content/uploads/Comment-Letter-to-ATF-88-Fed-Reg-61993-Filed.pdf.

*firearms collection*), *former licensee inventory*, *predominantly earn a profit*, *responsible person*, and *terrorism*.

## STANDARD

For a preliminary injunction, Plaintiffs must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The standard is the same for a temporary restraining order. *Janvey*, 647 F.3d. at 595.

### D. Plaintiffs Are Likely to Succeed on the Merits.

### I. The **Rule Violates the Administrative Procedure Act ("APA") by Enacting Arbitrary and Capricious Edicts, Abusing ATF Discretion, Contravening the Statute, Violating Constitutional Rights, and Exceeding ATF Authority.**

Because administrative agencies are creatures of statute, they possess only the authority that Congress has provided. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). And it is a core principle of American law that an agency may not rewrite statutory terms to suit its own sense of how the law should operate. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). When agencies exceed their statutory authority, those actions are unlawful and *ultra vires*. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). ATF flouts its limited function at every step.

First, the Rule defines several terms, including "dealer," "engaged in the business," and

APPX.236

"to predominately earn a profit." But Congress *already* defined these terms in the statute, and ATF has no authority to alter that text and thereby expand, contract, or alter the statutory meaning. Ex. A at 8-11. To the contrary, ATF only has statutory authority to "prescribe … such rules and regulations as are *necessary* to carry out the provisions of this chapter." 18 U.S.C. § 926(a) (emphasis added). ATF disagrees. It claims that "the fact that Congress generally defined the term . . . does not mean that the Department lacks the authority to further define that term." 89 Fed. Reg. at 29011. But "[t]he statute's unambiguous … definition … precludes the [agency] from more expansively interpreting that term." *Dig. Realty Trust, Inc. v. Somers*, 583 U.S. 149, 169 (2018); *see also ACLU v. FCC*, 823 F.2d 1554, 1568 (D.C. Cir. 1987) ("the statute speaks with crystalline clarity. It provides a precise definition … for the exact term the Commission now seeks to redefine. … From the face of the statute then, we are left with no ambiguity and thus no need … for clarification."); *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) ("an agency acts arbitrarily and capriciously if it acts in a manner that is contrary to … a congressional statute."); *Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, 1201 (10th Cir. 2019) ("agency discretion 'in the interstices created by statutory silence'" applies "only when 'considering undefined terms in a statute . . . . '"); *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 642 (1990) ("where the terms of a statute are unambiguous, judicial inquiry is complete."); 89 Fed. Reg. at 29010 (admitting that, in the past, ATF has only "provided regulatory definitions of terms that Congress did not define in the statute").

Second, the Final Rule seeks to create and then resolve ambiguity in the statute where none

18

exists, excising ordinary words[9] like "purchase" and "sale" and defining them "consistent with the[ir] *common meaning*. . . . " 89 Fed. Reg. 28974 . . . " Definition of "Engaged in the Business" as a Dealer in Firearms, 88 Fed. Reg. 61993, 61999 nn. 49, 50..44, 45 (Sept. 8, 2023) (to be codified at 27 C.F.R. pt 478). But ATF does not explain what ambiguity exists in these terms, or why ordinary people cannot understand them. *ACLU*, 823 F.2d at 1568 ("we are left with no ambiguity and thus no need … for clarification."). Elsewhere the Final Rule *refuses to define* commonplace terms, stating that "readers should use the *ordinary meaning*. . . . " 89 Fed. Reg. at 28992. ATF provides no reason for these inconsistent approaches. And as Plaintiffs noted in comments (Ex. A. at 10 n.12), ATF's attempt to define simple words often backfires spectacularly – for example, starting with the easily understood word "sale," defining it to include "something of value," defining that to include "valuable consideration," and then defining that to include "forbearance" (89 Fed. Reg at 28975 n.56) – a word that likely is not easily comprehended by many. But that is what the Final Rule does – take something simple and complicate it to the point of incomprehensibility. As with past ATF rulemakings, this is a feature, not a bug.

Third, the Rule conflicts with the Rule of lenity. Neither the NPRM nor the Rule ever claims any part of the statute is in any way ambiguous, seeks deference, or invokes *Chevron*. Yet ATF still feels the need to use nearly a ream of paper in order to "clarif[y]" (89 Fed. Reg. 28968) just what the statute means. *See also* 89 Fed. Reg at 28973 ("in light of the BSCA's changes . . . *and*

---

[9] Courts have rejected this acontextual, surgical approach many times before. *See, e.g.*, *Missouri v. Biden*, 83 F.4th 350, 382-83 (5th Cir. 2023) ("reading … in 'context, not in isolation'"); *Garland v. Gonzalez*, 142 S. Ct. 2057, 2074 (2022) (rejecting "rigidly segmenting each word in the clause, defining each in isolation, and adding those definitions together," as "this Court has cautioned against such a piecemeal approach to statutory interpretation"); *Biden v. Nebraska*, 143 S. Ct. 2355, 2382 (2023) (Barrett, J., concurring) ("a vacuum is no home for a textualist. Instead, we stressed that the "meaning" of a word or phrase "may only become evident when placed in *context*.").

19

*to provide additional guidance*"). In fact, the Rule expressly anticipates that it is not ATF's last word on the subject, and that ATF will continue to "*further update* [its] guidance once it issues this Rule. 89 Fed. Reg. at 28971.[10] But criminal statutes (or those that carry criminal penalties[11]) may not be vague or unclear. They should not require hundreds of pages of "additional guidance" to understand. Or any pages, for that matter. Ordinary people should be able to read and comprehend what is proscribed. That ATF believes the Rule to be necessary means that ATF believes the statute fails to provide fair notice without the Rule. *See Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010) ("if the statutory text is unambiguous, no further inquiry is necessary"). And if the statute is suddenly now (after decades) so grievously ambiguous that ATF must step in, the Rule of lenity dictates any ambiguities be resolved in favor of the gun owner (*i.e.*, <u>against</u> licensure – the opposite of what the Rule does). *See* 89 Fed. Reg. at 29005 (arguing lenity does not apply by focusing on the Rule, not the statute).

Fourth, the Rule conflicts with the statute on its face. ATF claims that only a *single sale* of a single firearm must be considered "engaged in the business." *But see* 89 Fed. Reg. at 29028–29. *But see* 89 Fed. Reg. at 29021 ("buying and selling *more than one* firearm"). In fact, the Rule later says that "*no actual sales are required* if the intent element is met. . . . " *Id.* This reasoning is impossible to square with the statute, which requires not only intent, but also action – the "repetitive purchase and resale of firearms." *Cf.* Fed. Reg. at 29045 (seeking to expand the

---

[10] On the same date ATF published the Rule, it also published a Rule done without notice-and-comment, purportedly making "noncontroversial … conforming regulations" related to being engaged in the business. Bipartisan Safer Communities Act Conforming Regulations, 89 Fed. Reg. 28622 (April 19,2024). This seems to be the "other firearm provisions" referenced in 89 Fed. Reg. at 28984 n.114, but it is unclear if this is the "further update" referenced in 89 Fed. Reg. at 28971.

[11] *See* 89 Fed. Reg. 29013 ("The Department acknowledges … that failure to comply with the licensing requirement can have criminal implications . . . . ").

20

statutory text so that it is enough if a person "is engaging, *or intends to engage*, in 'the repetitive purchase and resale of firearms'"). Although acknowledging Plaintiffs' point that the statute requires *multiple* purchases *and* resales (89 Fed. Reg. at 29020–21), noting the "six [statutory] indicators" that ATF has got it wrong (Ex. A at 12-18), the Rule doubles down and claims there is no "minimum number of firearms to actually be sold." 89 Fed. Reg. at 29021. And in response to Plaintiffs' focus on the "particular words or phrases in the statute," ATF demurs that "the statutory language must be considered as a whole." *Id.* But it is ATF which ignores the whole text, ignoring the element of *sales* and focusing exclusively on the profit "*intent* underlying the sale."[12] 89 Fed. Reg. at 29042. *See Martinez v. Larose*, 968 F.3d 555, 561 n.5 (6th Cir. 2020) (when "the plain text of the statute provides the answer, we need not examine the structure"). A person can have all the intent in the world, but if he never actually *does* anything (repetitive purchase and resale), the statute does not render him "engaged in the business."[13] As Plaintiffs explained in their comments, there is no federal "attempt" crime for being an unlicensed dealer. Ex. A at 51-53; *cf.* 89 Fed. Reg. at 29045 ("a person may repeatedly advertise and display firearms for sale … but never actually find a buyer").

Fifth and similarly, the Rule conflicts with the statute by claiming that the government *need not demonstrate actual profit*, but only the *intent* to profit. 89 Fed. Reg. at 29045. On the contrary, the statute says that "proof of profit" is "not … required" only in cases of "criminal purposes or

---

[12] Elsewhere, the Rule admits these are separate elements, conceding that "intent to profit … is only one element of being engaged in the business." 89 Fed. Reg. at 29041; *see also* 89 Fed. Reg. at 29045 (same).
[13] The statute says that a person must act "to predominantly earn a profit through the repetitive purchase and resale of firearms. . . ." 18 U.S.C. § 921(a)(21)(C). Congress' use of the word "through" is instructive, because it explains *how* a person acts to earn a profit – "repetitive purchase and resale." By focusing exclusively on intent to profit (absent any actual transactions), ATF entirely eliminates a requirement to prove the crime.

21

terrorism." 18 U.S.C. § 921(a)(22). The obvious corollary is that proof of profit *is* required in other cases. Ex. A at 19-24 (explaining that none of ATF's cited cases support its claim that only proof of intent is required). The Rule acknowledges the point (89 Fed. Reg. at 29042) but disagrees, rejecting the "negative implication" principle, and focusing on the statutory use of "to predominantly earn a profit" meaning "intent underlying the sale." 89 Fed. Reg. at 29042-. But the fact that "intent" appears *in the definition* (explaining what *type* of profit is unlawful) does not mean that intent is all that is required with respect to profit. Rather, that definition in Section 921(a)(22) is meant to distinguish between profit that is permissible and profit that shows a person "engaged in the business." Either way, *profit is required – because actual sales are required*. This Court should reject ATF's creative attempt to avoid proving *multiple* elements of the crime.

Sixth, on top of watering down numerous requirements to prove the crime of being unlawfully "engaged in the business," the Rule also seeks to undermine the safe harbor provisions contained in Section 921(a)(21)(C), which states that a person is *definitively not* engaged in the business if he "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or … sells all or part of his personal collection of firearms." As GOA's Comments explained (Ex. A at 24–28), this language contains three separate safe harbors: firearm transacting done (i) "for the enhancement of a personal collection" or (ii) "for a hobby," or (iii) "sell[ing] all or part of [a] personal collection. . . ." The Rule, however, combines harbors (i) and (ii) into a single definition, defining "personal collection" to *include* firearms acquired "for a hobby." 89 Fed. Reg. at 29090. The Rule acknowledges "conflating" the separate provisions (89 Fed. Reg. at 29037), and agrees that a "'hobby … has a meaning independent of the term 'collection,'" but argues that "this combined definition" somehow sufficiently accounts

22

for both concepts (89 Fed. Reg. at 29039).

But more problematic still is the Rule's constrictive definition of just what constitutes a "personal collection," seeking to collapse and confine that expansive term to just "study, comparison, exhibition" and "noncommercial, recreational activities for personal enjoyment." 89 Fed. Reg. at 29038. And although GOA noted that this restrictive reading would exclude a collection purchased for "long-term investment purposes" or Second Amendment "'arms' for self-defense" (Ex. A at 26), the Rule doubles down, claiming there to be one "misconception in common: that any person who amasses multiple firearms without a license and without criminal purpose has, by definition, a 'personal collection,' or is a 'collector' under the statute." 89 Fed. Reg. at 29037. According to ATF, this is "akin to saying that any person … with change in their pockets … has a coin collection. . . ." 89 Fed. Reg. at 29038. To that end, the Rule now says that "personal collection … *shall not include* firearms accumulated primarily for personal protection."[14] 89 Fed. Reg. at 29090. But as ATF recognizes, "personal protection" is the reason that most people acquire firearms in the first place (89 Fed. Reg. at 29036), meaning the Rule construes the statutory safe harbors *so that they do not apply to most gun owners.* And in concocting its narrow definition of "personal collection," ATF employed the narrowest definition of "collection" it could find. *See* 88 Fed. Reg at 62004 n. 88.85. This conflicts with the Rule's general focus on using "the common meaning" of words. 89 Fed. Reg. at 28974 nn.49-50. Indeed, Congress intended "personal collection" to be broad and generally applicable. Other definitions of "collection"

---

[14] The Rule drops a note that "nothing … preclud[es] a person from lawfully *acquiring* firearms for self-protection or other lawful personal use" (89 Fed. Reg. at 29090), in stark contrast to the safe harbor which deals with "*sales*, *exchanges*, [and] purchases."

APPX.242

include "a group of objects or an amount of material accumulated in one location,"[15] a far broader understanding that encompasses firearms purchased for self-defense by ordinary people. The Rule fails to explain why the narrow definition should be adopted, rather than the broader. Under the Rule, a person who keeps a collection of firearms for self-defense, or as a safeguard against tyranny, has no statutory safe harbor to sell those firearms. This is clearly not what Congress intended.

Seventh, the Rule is hopelessly vague, in violation of both the Due Process Clause and the APA. ATF disagrees, claiming that the Rule is not vague because its definitions "are based on standard dictionary definitions and decades of case law. . . . " 89 Fed. Reg. at 29016. Yet many of ATF's series of "presumptions" related to unlawful dealing act indiscriminately, sweeping in a host of lawful conduct,[16] failing to differentiate between lawful and unlawful,[17] and threatening *everyone* (including countless law-abiding gun owners) with a *presumption* that they are committing felonious acts unless they "rebut the presumptions" with "reliable evidence to the contrary."[18]

---

[15] *Collection*, <u>Dictionary.com</u>, https://www.dictionary.com/browse/collection (last visited Apr. 30, 2024).

[16] For example, under the NPRM, selling a firearm that was new in its original box carried the automatic presumption that a person was unlawfully dealing firearms. 88 Fed. Reg. at 62001. Once commenters pointed out that behavior is quite ordinary, noting "ATF's lack of understanding of the firearms community" (89 Fed. Reg. at 29031), the Rule now creates a safe harbor within a presumption, saying that new-in-box firearms sold *after one year* do not qualify for the presumption. 89 Fed. Reg. at 29091. However, ATF immediately walks back that safe harbor, stating that it does not apply if a person "intentionally stockpiles" firearms "with an intent to evade the one-year turnover. . . ." 89 Fed. Reg. at 29016. In other words, ATF *presumes a person is dealing, except to the extent that he is not, except to the extent that he is* – a presumption, within a safe harbor, within a presumption, within a statute. And gun owners must read the preamble of the Rule (not just the Rule itself) in order to figure out if they engaged in felonious behavior. *Id.*

[17] After claiming that everyone who keeps track of money when they purchase and sell firearms has a presumptively unlawful profit motivation (88 Fed. Reg. at 62022), the Rule now provides that this only applies to "firearms repetitively purchased for resale." 89 Fed. Reg. at 29048, 29091. This makes little sense, as it ties profit motivation (one element of the crime) to repetitive purchase and resale (a different element of the crime). The Rule is clear as mud.

[18] *See, e.g.,* 89 Fed. Reg. at 29048 (because the Rule creates a regime where federal law now both *requires* records and *prohibits* records of firearm purchases and sales, gun owners must now show that the records

24

The Rule acknowledges[19] this point, noting "[a] general sentiment from commenters opposed to the proposed presumptions is that they are overbroad, [and] would capture too many permissible sales by collectors. . . . "[20] 89 Fed. Reg. at 29023. But the Rule does little to alleviate those legitimate concerns, instead repeatedly demurring that, even if the Rule captures otherwise lawful conduct, "the presumptions are rebuttable" and "refuted by reliable evidence" provided by the accused. 89 Fed. Reg. at 29016, 29024, 29031-29033, 29045, 29047-29050. No doubt, this right to engage in self-defense is a cold comfort to law-abiding gun owners who find themselves on the wrong end of an ATF cease-and-desist letter, administrative action, forfeiture notice, or even a criminal charge that should have never been brought in the first place.[21] Persons whose conduct is *law-abiding* should not be forced – in any sort of proceeding – to present "reliable evidence" to

---

they keep are "recorded for tax purposes" in order to *disprove* the presumption that they have an unlawful profit motivation).

[19] Initially, ATF claims that the Rule is not vague because it "does not purport to include every possible scenario." 89 Fed. Reg. at 28991; *see also* 89 Fed. Reg. at 28992 ("address every conceivable scenario"). But Plaintiffs never claimed the Rule addresses *too little*, but instead that it sweeps in *too much* – assuming for the sake of bureaucratic expediency that all manner of innocent conduct is unlawful *until proven otherwise*.

[20] Often, rather than acknowledge the lack of clarity in the NPRM, ATF first blames the public for failing to understand– but then quietly amends the Rule. For example, ATF accuses commenters of having a "misconception in common" about what constitutes a "personal collection," but nevertheless "has revised" the language in the Rule. 89 Fed. Reg. at 29038. *See also* 89 Fed. Reg. at 29016 ("The Department disagrees…. Nonetheless … the Department has revised those presumptions"); 89 Fed. Reg. at 29046-47 (same); 89 Fed. Reg. at 29038-39 ("The Department disagrees…. At the same time, the Department recognizes. . . . To make this point clear, the definition … has been revised"); 89 Fed. Reg. at 29048 ("The Department disagrees…. However, to further clarify this point. . . ."); 89 Fed. Reg. at 29049-50 (same).

[21] Rather than inspiring confidence, the Rule delivers a hollow promise – that the Rule's presumptions *shall not* apply in criminal cases, *except to the extent they may. See, e.g.,* 89 Fed. Reg. at 28969 (suggesting presumptions "may be useful to judges … to instruct juries regarding permissible inferences"). But "[p]resumptions, especially in administrative proceedings that may generate institution-destroying liability, cannot be a matter of Department *ipse dixit*." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 2024 U.S. App. LEXIS 8152, at *61 (5th Cir. Apr. 4, 2024); *see also Chem. Mfrs. Ass'n v. DOT*, 105 F.3d 702, 705 (D.C. Cir. 1997) ("unlike a legislative body, which is free to adopt presumptions for policy reasons, … an agency may only establish a presumption if there is a sound and rational connection between the proved and inferred facts.").

defend themselves, merely because ATF cannot formulate a rule which can distinguish between lawful and unlawful conduct, and for the sake of expediency assumes everything is unlawful.[22]

Writing in concurrence in *VanDerStok v. Garland*, Judge Oldham rejected a similar tactic attempted in ATF's last attempt to make felons out of millions of Americans (those who own firearms with pistol stabilizing braces). Although seeming to acknowledge the vagueness of that rulemaking:

> ATF also argues that it could provide sufficient guidance in individual cases: Where 'persons remain uncertain' as to the exact scope of the Rule, 'they may submit a voluntary request to ATF for a classification.' … *But this does nothing to cure the Final Rule's vagueness.* As important as the Fifth Amendment's guarantee of fair notice to individuals is the Amendment's prohibition against 'arbitrary enforcement' by government officials. … It is thus of no use for ATF to say that it will tell ordinary people what they can do. *The law exists to tell both the people and government officials what they can do.* [*Id.* at 209 (Oldham, J., concurring).]

*VanDerStok v. Garland*, 86 F.4th 179, 209 (5th Cir. 2023)

## II.    The **Rule's Three Sets of Presumptions Are Unlawful, Arbitrary, and Overbroad.**

Aside from these many textual and APA conflicts in the Rule's numerous definitions, the Rule also creates three sets of so-called "rebuttable presumptions" that stand in obvious direct conflict with the statute. First, the Rule claims there to be five indicators that a person is

---

[22] Such elevation of expediency over justice also characterizes ATF's "zero tolerance" FFL revocation policy, which automatically *presumes* certain regulatory violations to be willful, bypassing statutory revocation procedures to close more gun dealers (and seize more records) than ever before. As GOA commented, the Rule must be understood in its greater context. *See* Ex. A at 83 ("all evidence points to the creation of an illegal (not to mention unconstitutional) federal registry of almost all gun owners nationwide"). Likewise, the Rule creates a Catch-22, where "ATF will *require* a person obtain a license in order to sell firearms, only then to *deny* that person the very license that ATF demanded be obtained." *Id.* at 58; *cf.* 89 Fed. Reg. at 29013 (acknowledging "license denial or revocation proceedings for willful violations," yet the Rule's entire premise is that thousands of gun owners are illegally engaging in the business (*i.e.*, willfully violating the law)) ATF's only response is that "ATF would need to have evidence," 89 Fed. Reg. at 28996, apparently claiming that it is unlikely that ATF would ever know that a person had been violating the new requirements contained in the Rule.

presumptively "engaged in the business as a dealer." 89 Fed. Reg. at 29091 ("EIB presumptions"). Second, the Rule claims that there are seven indicators that a person "has the intent to predominantly earn a profit." 89 Fed. Reg. at 29091–92 ("PEP presumptions"). Third, the Rule claims that there are six categories of "conduct that does not support a presumption" that a person is engaged in illegal activity. 89 Fed. Reg. at 29092. Lastly, the Rule says a person may use "reliable evidence … to rebut any presumption" from the first two categories.[23] *Id.*

ATF's presumptions are tied to civil and criminal implications that threaten to upend the entire system of private gun sales. ATF's assurance that these presumptions rest on its "experience" is of no matter, because "[p]resumptions, especially in administrative proceedings that may generate institution-destroying liability, cannot be a matter of [agency] *ipse dixit.*" *Career Colleges & Sch. of Tex. v. U.S Dep't of Educ.*, 98 F.4th 220, 251 (5th Cir. 2024). The problems with these various sets of presumptions are many. For starters, there is nothing in the statutes Congress enacted[24] that creates or permits the creation of such presumptions of unlawful activity.[25] As noted

---

[23] The Rule claims that all of these presumptions are permissible because of ATF's "enforcement efforts, regulatory functions, knowledge of existing case law, and subject-matter expertise. . . ." 89 Fed. Reg. at 28975; *see also* 89 Fed. Reg. at 28981 (citing "ATF's experience"). In other words, 'we know best' is ATF's rationale for subjecting countless gun owners to high-stakes enforcement actions. On the contrary, "the argument for agency expertise and judgment does not get [the ATF] very far," as "falling back on unexplained claims of agency expertise does not carry the [ATF's] burden" under the APA. *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023).

[24] Congress knows how to create such presumptions when it wants. *See, e.g.*, 18 U.S.C. § 1469(a); 18 U.S.C. § 3142(e)(2); 35 U.S.C. § 282(a); 38 U.S.C. § 1118.

[25] In response to the many comments that ATF lacked authority to promulgate presumptions in the first place (89 Fed. Reg. at 29011-12), the Rule notes that ATF may "promulgate regulations necessary to enforce the provisions of the GCA, and a regulation that clarifies when a license is required is such a regulation." 89 Fed. Reg. at 29012; *see* 18 U.S.C. § 926(a). But that means the presumptions are *necessary* to comprehend the statute, yet Congress never enacted them. *See* Ex. A at 8-11. Had Congress intended to authorize an action so significant, it would have done so expressly. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (providing under the major questions doctrine that agency actions with "'economic and political significance' … provide a 'reason to hesitate before concluding that Congress' meant to confer such authority").

27

above, these presumptions sweep into their ambit a whole host of *lawful* activity, tainting all sorts of innocuous conduct with presumed criminality – something the Rule repeatedly acknowledges. In order to combat such a wrongful allegation of unlawful dealing, the Rule saddles gun owners with the unprecedented obligation to affirmatively *demonstrate* that they are *not* violating the statute. The presumptions thus fundamentally alter the statute, which previously required ATF to prove unlawful dealing before bringing action, to now permitting ATF to make presumptions in order to begin proceedings and later force the gun owner to defend (or else).

Nor is there any ambiguity in the statutory text requiring the presumptions, something ATF previously has acknowledged. Expressly declining to "list examples" of prohibited conduct in 1998, ATF claimed that "the [statutory] definition adequately addresses this concern by expressly delineating the activity requiring licensing from that of a firearms collector not subject to licensing." Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480, 10481 (March 31, 1988) (to be codified at 27 C.F.R. pts 72,178 & 179). The Rule gives no reason that the same statute is now inadequate. The Fifth Circuit, too, has rejected the approach taken in the Rule, explaining that a charge of unlawful dealing requires "examin[ation of] *all circumstances* … without the aid of a 'bright-line rule.'" *United States v. Brenner*, 481 F. App'x 124, 127 (5th Cir. 2012) (emphasis added); *see also* 89 Fed. Reg. at 29016 ("the determination of whether a person is engaged in the business is a fact-specific inquiry."). But the Rule creates such bright-line rules anyway, under which a person is *presumed* to be dealing based on a single data point,[26] and *without examination* of other facts (which presumably must then be offered as "reliable evidence" in rebuttal).

---

[26] The NRPM, in fact, accidentally said the quiet part out loud, treating the purported "presumptions" as conclusive, and opining that anyone falling into any of the presumptions is "thus require[d]" to obtain a license. 88 Fed. Reg. at 61996.

A. **The EIB Presumptions Are Flawed.**

In addition to this cornucopia of general, overarching problems with the Rule's presumptions, the specifics of the presumptions themselves are arbitrary – either indistinguishable from lawful conduct, or in direct conflict with the statutory text. *See generally* Ex. A at 37-42. Numerous examples bear out these realities. The first EIB presumption states that a person is presumptively EIB if he "offers for sale" or "demonstrates a willingness and ability to purchase and resell" firearms. 89 Fed. Reg. at 29091. But as noted above, the statute requires *actual* purchases *and* resales, not merely offers or willingness. The second EIB presumption also conflicts with the statute, making presumptively unlawful anyone who "purchases … *or* … resells" various types of firearms. But again, the statute says "purchase *and* resale."[27] The third EIB presumption, reselling firearms "within 30 days after … purchase[]," fails to acknowledge that, because of the uniquely personal nature of carrying a firearm for self-defense, gun owners *routinely* purchase and then resell firearms that do not fit their body type, do not feel good in the hand, do not function reliably, *etc.* Ex. A at 39-40. ATF acknowledges these "common scenarios," but opines without explanation that this could only reasonably happen once. 89 Fed. Reg. at 29031. This third EIB presumption also makes presumptively unlawful selling firearms "new or like new in their original packaging" or of "the same make and model," unless the firearms have been held by the owner for more than a year.[28] But this rule, in which the right to dispose of one's property does not fully vest for one year, is not even fixed in stone. Rather, the Rule's preamble (not the Rule itself) states

---

[27] "In statutory interpretation, we have three obligations: '(1) Read the statute; (2) read the statute; (3) read the statute!' Henry J. Friendly, Benchmarks 202 (1967) (attributing the treble commandment to Justice Frankfurter)." *United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020).

[28] ATF added this part in response to GOA's criticism that this presumption, along with the fourth presumption on selling "the same make and model," contained no "temporal limitation." Exhibit A at 41.

that the one-year safe harbor does not apply if a person "intentionally stockpiles" firearms and then waits one year to resell them. 89 Fed. Reg. at 29016. In other words, the presumption applies, unless it does not, except to the extent that it does. No ordinary person could even uncover these nuanced details hidden in the Rule's preamble,[29] much less decipher whether their conduct is lawful.

## B. The PEP Presumptions Are Flawed.

Like the EIB presumptions, the Rule's PEP presumptions are flawed. Each assumes that certain forms of behavior or activity constitute an unlawful *intent* to earn a profit (unless proven otherwise). But as noted above, ATF fails to recognize that the statute requires *actual* profit from *actual* purchases and resales, *and* that the intent underlying that profit come from an impermissible motivation. *See supra* at 22–23. But even so, the first and second PEP presumptions[30] take these defects one step further, implicating those who "[r]epetitively or continuously … post firearms [online] for resale" or secure for value "space to display firearms … for resale. . . . " 89 Fed. Reg. at 29091. But because the Rule defines "resale" not as a business term of art[31] but as any sale of "a

---

[29] *See Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992, 998 (10th Cir. 2019) ("the limitations that appear in the preamble do not appear in the language of the regulation, and we refuse to engraft those limitations onto the language."). *See also Wilgar Land Co. v. Dir., OWCP*, 85 F.4th 828, 837 (6th Cir. 2023) ("While a preamble's interpretation of regulations may help clarify any ambiguity in them, an agency cannot use preambles to add substantive duties that the regulations themselves do not contain.").

[30] The NPRM would have dinged a gun owner for posting even a single firearm for sale to an online forum. *See* Ex. A at 42-43. The Rule thus now adds the words "repetitively or continuously." 89 Fed. Reg. at 29047, 29091; *see also* 89 Fed. Reg. at 29047 (admitting that people "who wish to dispose of all or part of a personal collection, or 'trade up' … are likely to occasionally offer for resale firearms from their personal collection online").

[31] Indeed, "embedded within the word 'resale' is a contemporaneity requirement, instructing that firearm purchases and resales must be linked together within a short enough timeframe of each other to constitute business activity. … Take, for example, a rare coin dealer that charges a 'margin' on each product sold, with the price determined not by the dealer's basis in that product, but in the *replacement cost* of obtaining another one in the marketplace." Exhibit A at 16-18. This reading of the term is the only one that makes sense in

30

firearm … after it was previously sold" (89 Fed. Reg. at 29090), these PEP presumptions eviscerate the statute's explicit protection of people "who sell[] all or part of [their] personal collection of firearms," who often do so incrementally (*i.e.*, listing firearms "repetitively") and with help from gun-show venues. 18 U.S.C. § 921(a)(21)(C); *see* Ex. A at 43. The same issues plague the third presumption, which punishes diligent recordkeeping once the Rule's loose "resale" definition takes effect. 89 Fed. Reg. at 29091; *cf.* Ex. A at 43-44.

Next, the fourth PEP presumption implicates businesses that "secure[] merchant services … through which the person intends to repetitively accept payments for firearms transactions." 89 Fed. Reg. at 29091. As GOA commented, this presumption could apply to anyone, with any sort of business, who allows a person to pay for a firearm through the business. Ex. A at 45. And just "repetitively accept[ing] payments" for firearm sales does not make someone a dealer – for example, someone who sells off an inherited collection. By demurring that "[p]rivate citizens generally do not sign up for credit card processing services" (89 Fed. Reg. at 29049) the Rule misses this nuance entirely – that the presumption reaches businesses *unrelated to firearms* that may accept payments for firearms.[32, 33]

---

context. The Rule's definition, by contrast, merely defines the word "resale" in a vacuum. Indeed, the Rule's all-encompassing "resale" definition places its PEP presumptions in direct conflict with its opposite presumptions, one of which purports to "not … presume[]" EIB when one liquidates their personal collection. Fed. Reg. at 29092. The Rule never attempts to reconcile this conflict.

[32] But by acknowledging that this presumption does not necessarily make a person a dealer (89 Fed. Reg. at 29049), it is unclear why such conduct must be a presumption in the first place. Further unclear is how a presumption can admittedly sweep up lawful activity while simultaneously not being "overbroad." *See id.*

[33] The Rule also ignores current technology, like Cash App, Venmo, PayPal, and Apple Pay which, contrary to what ATF believes, allows "private citizens" to accept credit cards through commonly used smartphone apps.

31

The fifth PEP presumption affects businesses that "secure[] business security services ... to protect firearms assets and repetitive firearms transactions." 89 Fed. Reg. at 29091. But such overbroad wording means security companies whose premises have security systems, and who routinely buy and sell firearms for use in the regular course of their business – like Brink's and GardaWorld – would be forced to defend against charges of unlawful dealing. It appears Plaintiffs' comments fell on deaf ears. Ex. A at 45-46. The Rule's sixth PEP presumption fails for similar reasons, reaching security companies that purchase and sell firearms for employee use.

C. **The** Rule's Opposite Presumptions Eviscerate the Statute's Safe Harbor.

After sweeping all manner of lawful conduct into its atextual EIB and PEP presumptions, the Rule adds insult to injury by reducing explicit statutory safe harbors into mere instances where "[a] person shall not be presumed to be engaged in the business," but only if "reliable evidence" so indicates. *Compare* FR 29092 (providing seven total 'opposite' presumptions), *with* Ex. A at 40–47. In stark contrast, the statute provides that a "dealer" definitively (not presumptively) "*shall not include* a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby. . . . " 18 U.S.C. § 921(a)(21)(C) (emphasis added). The Rule neuters this exemption, claiming "[a] person shall not be presumed to be engaged in the business ... when reliable evidence shows that the person is only reselling or otherwise transferring firearms ... [o]ccasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection. . . . " 89 Fed. Reg. at 29092. In other words, the Rule reads the statute two degrees removed from its text. As Plaintiff GOA commented, "there is a massive difference between being **_declared not_** in violation of federal law (*i.e.*, the statute), versus being **_presumed not_** in violation of federal law, versus **_not being presumed_** in violation of federal law

32

(what the [Rule] says)." Ex. A at 47-48. Indeed, "[t]he meaning has changed, the protection has changed, and the burden of proof has changed." *Id.* at 48.[34] ATF has no authority to revise the statute to its watered-down liking.

### III.    The **Rule's "Former Licensee Inventory" Is Atextual Revisionism that Contravenes the Statute.**

As for licensure as a dealer in firearms, there are two types of individuals under the Gun Control Act – those who *are* licensed dealers, and those who *are not* (everyone else). 18 U.S.C. § 923(c); Ex. A at 32. Not so, according to the Rule. Rather, the Rule purports to create a 'third rail' of "former licensee," purports to establish and define "a new term" ATF calls "former licensee inventory" (89 Fed. Reg. at 28969, 29090), and purports to create special rules that apply to firearms owned by formerly licensed (*i.e.*, *unlicensed*) persons, but which do not apply to the public at large. The Rule also creates various "presumptions" of dealing that apply only to *former* licensees. 89 Fed. Reg. at 29091. The Rule claims this all is necessary to deal with "the problem of licensees who improperly liquidate their business inventory … after their license is terminated. . . ." 89 Fed. Reg. at 28969. The only problem is that the statutory text supports none of this. *See* Ex. A at 31-34.

Focusing on *whether, how, and when* firearms were transferred to a personal collection before becoming unlicensed, the Rule creates – out of whole cloth – several idiosyncratic categories of firearms owned by "former licensees." First, the Rule says that, if firearms were lawfully

---

[34] The Rule insists that "[a]gencies may adopt evidentiary presumptions provided that the presumptions shift the burden of production, not the burden of persuasion [*i.e.*, proof]. . . ." 89 Fed. Reg. at 29007. But the Rule simultaneously demands "reliable evidence" for an opposite presumption to apply. *Id.* No doubt, this "reliable evidence" will not come from the government. Rather, in the real world, an accused will have to *prove their own compliance* with the statute to avoid liability.

33

transferred to a personal collection *prior* to license termination, they may not be sold until "[o]ne year has passed." 89 Fed. Reg. at 29091 (EIB presumption #5(ii)). But the statute contains no such requirement. Rather, Section 923(c) by its plain text applies only to "any firearm … disposed of *by a licensee* within one year after its transfer from his business inventory." (Emphasis added.) ATF has no authority to expand this requirement to "*former* licensees." Second, under the Rule, if a licensee transferred firearms to a personal collection *prior* to license termination, but did so "to willfully evade" federal law, then such firearms *may never be transferred* by the "former licensee." 89 Fed. Reg. at 29091 (EIB presumption #5(i)). But while that past conduct may have been unlawful, the mere possession of firearms that *previously* were unlawfully transferred does not taint the firearms themselves or support a presumption that unlawful dealing continues. Third, the Rule creates an impossible category of firearms that "were in the business inventory at the time the license was terminated" and were never transferred to a personal collection. 89 Fed. Reg. at 29091. According to the Rule, these firearms remain forever in purgatory, and any attempt to transfer them leads to the presumption of unlawful dealing. *Id.* ATF's theory here is that the EIB "purchase[s]" occurred while licensed, while the EIB "resale[s]" occurred after licensure. 89 Fed. Reg. at 29051, 29090. On the contrary, as GOA explained, purchases *while licensed to engage in the business* cannot serve as a predicate offense for a charge of *unlicensed* dealing. Ex. A at 31-34. Rather, if a "former licensee" merely sells inventory acquired while licensed to do just that, the statute permits that activity. 18 U.S.C. § 921(a)(21)(C). GOA also pointed out the untenable situation created by these presumptions, such that certain firearms *can never change ownership*. Ex. A at 32-33.

34

The Rule acknowledges and notes that "the former licensee … [is] placed in a difficult situation," but ultimately discounts the problem so that "such persons [cannot] unjustly profit from their illegal actions." 89 Fed. Reg. at 29051; *see also* 89 Fed. Reg. at 29035 (lamenting that *former* licensees cannot be "immune" from the provisions governing licensees). The Rule attempts to bridge the gap by digging the hole deeper, fabricating a new "reasonable 'winding down' period" of "30 days of termination of license" during which a "former licensee" can still liquidate inventory in certain ways.[35] FR 29052. But after that period has expired, ATF is finally forced to admit that a "former licensee[] …. cannot easily sell" firearms he possesses "without … engaging in the unlicensed business of dealing. . . ." *Id.* This cannot be the law.[36]

## IV.     The **Rule Violates the Second Amendment.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." This "unqualified command" contains no limitation as to who may exercise the right, what arms may be owned or carried, where the right may be exercised, or for what purpose. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). The right therefore belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," presumptively protects

---

[35] Within 30 days of license termination or as otherwise approved, a former licensee either must transfer their firearms inventory (1) to another licensee, or (2) to a responsible person of the former licensee, but "such transfer … does not negate the fact that the firearms were repetitively purchased, and were purchased with the predominant intent to earn a profit by repetitive purchase and resale." 89 Fed. Reg. at 29092. The Rule never addresses the statutory basis for the 30-day liquidation requirement. *See* 89 Fed. Reg. at 29051-53; *cf.* Ex. A at 33.

[36] FFL revocations have exploded 3,040% since the ATF announced its "zero tolerance" policy, where it identified five "qualifying violations which . . . "will result in ATF issuing a notice of revocation . . . " for the FFL's license to be a dealer. *See Enhanced Regulatory Enforcement Policy*, <u>ATF</u>, https://www.atf.gov/rules-and-regulations/enhanced-regulatory-enforcement-phttps://www.atf.gov/rules-and-regulations/enhanced-regulatory-enforcement-policy olicy

APPX.254

all locations, and presumptively covers all "lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 581-582 (2008); *Bruen*, 597 U.S. at 31; *Heller*, 554 U.S. at 624. And "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, … the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17.

Here, Plaintiffs enjoy a presumption of constitutional protection under the Second Amendment's plain text. By exposing Plaintiffs to civil and criminal liability for engaging in the purchase and sale of firearms – natural prerequisites to keeping and bearing them – the Rule regulates conduct that the Second Amendment clearly protects.[37] *See, e.g.*, *Lynchburg Range & Training, LLC v. Northam*, 105 Va. Cir. 159, 3 (2020)(observing "the right to keep and bear arms 'inclu[des] the otherwise lawful possession, carrying, transportation, sale, or transfer of firearms'"); *Kole v. Village of Norridge*, No. 11 C 3871, 2017 WL 5128989, at *10 (N.D. Ill. Nov. 6, 2017) (citing "Thomas Jefferson … 'Our citizens have always been free to make, vend, and export arms.'"). Defendants therefore bear the burden of proving a widespread, Founding-era tradition of regulation distinctly similar[38] to the Rule. *See Bruen*, 597 U.S. at 26. Indeed, "the core Second

---

[37] Moreover, any *Heller* dicta on which Defendants may rely is inapposite. GOA already addressed the inapplicability of *Heller*'s dicta on "conditions and qualifications on the commercial sale of arms," explaining that *Heller* had invited future challenges to its assumed traditions and that *Bruen* had made no exceptions to use of its rigorous standard. Ex. A at 65, 66. Plus, private sales are not commercial at all, rendering *Heller*'s dicta doubly inapplicable. *Id.* at 66.

[38] The Rule claimed that it need only show "relevantly" similar history, omitting any mention of *Bruen*'s discussion of *distinct* similarity or why the Rule's perceived societal ills would qualify for a loosening in analogical stringency. 89 Fed. Reg. at 29002.

APPX.255

Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms*.*" *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (internal quotation marks omitted). To this end, courts have held the ability to sell a firearm is protected under the Second Amendment. *See, e.g.*, *Reese v. BATFE*, 647 F. Supp. 3d 508, 521 (W.D. La. 2022); *Altman v. County of Santa Clara*, 464 F. Supp. 3d 1106, 1125 (N.D. Cal. 2020); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), *abrogated on other grounds as recognized by Range v. Att'y Gen. U.S.*, 69 F.4th 96 (3d Cir. 2023).

Based on the historical analysis provided in the Rule, Defendants have already failed. First, the Rule identified a 1794 law that "made it unlawful *for a limited period*" to *export* weapons from the United States. 89 Fed. Reg. at 29002 (emphasis added). But exportation of arms to *foreigners* bears no resemblance to restrictions on citizen-to-citizen transfers and fails *Bruen*'s "how" and "why" metrics. *See Bruen*, 597 U.S. at 29. Moreover, "short lived" and "transitory" "restrictions deserve little weight." *Id.* at 69. Second, the Rule cited the Ninth Circuit's decision in *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017), for the proposition that colonial governments placed "restrictions on the commercial sale of firearms." 89 Fed. Reg. at 29003. But the page the Rule cited only discussed prohibitions on the provision of arms *to Indians* (not then considered part of the community), another inapposite historical concern. *See Teixeira*, 873 F.3d at 685. Third, the Rule cited 1805 Massachusetts and 1821 Maine barrel "proving" laws, which fail *Bruen*'s "how" and "why" as product *quality control* measures, not attempts to impose *dealer* licenses on individuals. 89 Fed. Reg. at 29003. Fourth, the Rule cited multiple state laws that regulated the storage of gunpowder for fire safety, another "how" and "why" mismatch. 89 Fed. Reg. at 29003

37

nn.151-152. Finally, the Rule cited just *two* laws from 1875 and 1879 that required licensing of arms dealers. *Id.*. Of course, "19th-century evidence [i]s 'treated as mere confirmation of what the Court thought had already been established'" and "cannot overcome or alter th[e] text" when inconsistent with earlier history. *Bruen*, 597 U.S. at 37, 36. All told, the Rule's analogues are too few, too late, and too dissimilar to support Defendants' historically unprecedented action today.

Requiring such licensure of hundreds of thousands of ordinary Americans merely to sell personal firearms cannot comport with early American historical tradition. In fact, in 1777, when it appeared the British were poised to win the American Revolution, British Colonel Undersecretary William Knox drafted a plan called *What Is Fit to Be Done with America?* to prevent any future rebellions. David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 Harv. L. Rev. F. 230, 235 (2014). In relevant part, the plan stated, "the Arms of all the People should be taken away … nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence." *Id.* In other words, the licensing of gun sellers is a uniquely 20th-century invention without a historical analogue. ATF fails to shoulder its burden showing otherwise. Thus, the Rule violates the Second Amendment.

## V.     The **Rule Violates the Fourth Amendment.**

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." By requiring untold thousands of gun owners to seek licensure in order to avoid criminal liability when

selling portions of their personal collections, the Rule unconstitutionally subjects all these new, home-based licensees to the GCA's warrantless inspection regime. *See* Ex. A at 66-69. That is because, when deployed *en masse*, the GCA's purported constitutional basis for conducting warrantless administrative searches must fail. Indeed, as the Supreme Court observed, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357 (1967). Consequently, the so-called "highly regulated industry" exception to the warrant requirement must be, and "has always been[,] a *narrow* exception" that cannot "swallow the Rule." *City of Los Angeles v. Patel*, 576 U.S. 409, 424-425 (2015) (emphasis added).

But the Rule does just that. Moreover, the "highly regulated industry" exception's constitutional validity remains suspect after *Bruen*, as the Supreme Court conceded in *United States v. Biswell*, that "[f]ederal regulation of the interstate traffic in firearms is *not as deeply rooted* in history as is governmental control" of other traditionally regulated industries. *United States v. Biswell*, 406 U.S. 311, 315 (1972) (emphasis added). Thus, after *Bruen*, the modern Court would probably not decide *Biswell* similarly today. Ex. A at 68. Because of that lack of historical example, the Rule cannot purport to apply the "highly regulated industry" exception to hundreds of thousands of ordinary Americans who have no desire or intent to enter the industry at all.

ATF failed to respond to GOA on this issue. *See* 89 Fed. Reg. at 29003-04. Conceding "more persons who are already engaged in the business of dealing in firearms [must] becom[e] licensed" (89 Fed. Reg. 28968), the Rule implicitly admitted there *could* be Fourth Amendment issues for home-based licensees. *See* 89 Fed. Reg. at 29004 ("'An expectation of privacy in commercial premises … is different from, and indeed less than, a similar expectation in an

39

individual's home.'"). Even so, the Rule doubled down, engaging in *Katz* circularity by claiming "every applicant for a license is made aware of ATF's right of entry into their premises and examination of their records … thus there can be no reasonable expectation of privacy. . . ."[39] *Id.* In other words, according to the Rule, if the government announces 'no privacy' in any given area of life, the public can no longer expect privacy, and the Fourth Amendment has nothing to say. The highly regulated industry exception to the Fourth Amendment is of questionable continuing validity when it comes to the Second Amendment. Even so, the Rule cannot use that "narrow exception" to extend federal licensing to hundreds of thousands of ordinary Americans who happen to sell a few personal firearms.

## VI.    The **Rule Violates the Separation of Powers.**

Article I, Sections 1 and 7 of the Constitution explain the way the legislative power is exercised and bills become law. And as the Supreme Court recently reminded in *United States v. Davis*, "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019) Violating that principle, the Rule charts a different course, allegedly promulgated "in light of the BSCA's changes to the GCA *and to provide additional guidance*. . . ." 89 Fed. Reg. at 28973 (emphasis added). ATF claims that "advancements in manufacturing … and distribution technology … and changes in the marketplace for firearms … have *created a need for further clarity* in the regulatory definition of 'dealer.'" *Id.* (emphasis added).

In other words, ATF believes the law needs updating *beyond* what the BSCA accomplished.

---

[39] This is also somewhat of a strawman, reframing the privacy issue to the contents of records rather than the fact that a home is being searched.

40

But even if so, that is the job of the people's representatives in Congress – not unelected bureaucrats. *See* 89 Fed. Reg. at 29010. Indeed, "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law." *Wis. Central Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018); *see also Martinez v. Tyson Foods, Inc.*, 533 F. Supp. 3d 386, 393 (N.D. Tex. 2021) (citation omitted) ("We do not inquire what the legislature meant; we ask only what the statute means."); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325-28 (2014) ("[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms . . . . to suit its own sense of how the statute should operate[,] . . . [which] should have alerted [it] that it had taken a wrong interpretive turn."). Agencies cannot edit statutes at will, either to fit their own policy agendas, or to give meaning to some alleged "purpose" or "intent" that bureaucrats believe they have divined from a prior Congressional enactment. *See Gordon v. NovaStar Mortg., Inc.*, 524 F.3d 1175, 1188 (11th Cir.) ("[w]e interpret and apply statutes, not congressional purposes"), *revised on other grounds*, 529 F.3d 1026 (11th Cir. 2008); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56 (2012) ("purpose must be derived from the text, not from . . . an assumption about the legal drafter's desires"). Moreover, the fact that Congress so recently enacted the BSCA – choosing *not* to provide the "additional guidance" or "further clarity" the Rule claims to provide – confirms that ATF has wandered off the congressionally chartered path.[40]

---

[40] Two of the BSCA's most ardent supporters – Senators Cornyn and Tillis – provide further confirmation that the Rule contravenes congressional intent. Indeed, both Senators "plan to oppose the new rule using the Congressional Review Act" and have announced that "the vast majority of this rule has nothing to do with the BSCA. . . . " Zachary Folk, *Biden Closes 'Gun Show Loophole' – Here's What to Know and When*

41

The Rule does not exist in a vacuum. Rather, it is the latest of a series of ATF attempts to amend congressionally enacted statutes (without involvement of Congress) at the behest of presidential administrations. *See* Bump-Stock-Type Devices, 83 Fed. Reg. 66514 (Dec. 26. 2018) (to be codified at 27 C.F.R pts. 447, 478, & 479); 87 FR 24652 (unfinished frames and receivers); Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478 (Jan. 31, 2023) (to be codified at 27 C.F.R. pts. 478 & 479) And each time Congress cracks the door, ATF kicks it in.[41] Yet each time the ATF has pulled such shenanigans, the Fifth Circuit has struck down the Rule. *See Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (bump stocks); *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023) (unfinished frames and receivers); *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023) (pistol stabilizing braces). Likewise, this Court should strike down ATF's most recent attempt to amend federal gun laws without involving Congress.

### E. Plaintiffs Will Suffer Irreparable Harm if the Rule Takes Effect.

By virtue of the Rule's numerous statutory and constitutional defects, Plaintiffs suffer a variety of irreparable harms that necessitate injunctive relief. Here, Plaintiffs need not even "demonstrate that harm is inevitable and irreparable," but only that there is "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Plaintiffs more than meet this standard. First, under the Rule, Plaintiffs are threatened with administrative

---

*Rule Comes into Effect*, Forbes, https://www.forbes.com/sites/zacharyfolk/2024/04/11/biden-closes-gun-show-loophole-heres-what-to-know-and-when-rule-comes-into-effect/?sh=89dcf6a19ed8 (Apr. 11, 2024).

[41] *See, e.g.*, Benjamin Hardy et al., *Illegal Guns Sales Led to Fatal ATF Raid on Airport Director Malinowski's Home, Affidavit Says*, Ark. Times (Mar. 21, 2024), https://arktimes.com/arkansas-blog/2024/03/21/judge-unseals-documents-in-malinowski-case (reporting on ATF's fatal dawn raid of the home of an Arkansas airport executive accused of "engaging in the business"). It would appear that, by promulgating the Rule, ATF desires to increase the frequency of these sorts of interactions.

and even criminal enforcement actions for engaging in noncommercial conduct that is entirely lawful under the statute. Plaintiffs likewise cannot dispose of firearms from their personal collections for fear of being presumed engaged in the business. *See* Tormey Dec. ¶ 18. Nor can so-called "former licensees," whose "inventory" now constitutes frozen assets incapable of seeing a realization of value. *See* Pratt Dec. ¶ 22–24. These compliance costs, in addition to the costs accrued by those now seeking licensure to avoid liability, "are unrecoverable because of the government-defendant's sovereign immunity from monetary damages. . . ." *NRA of Am., Inc. v. BATFE*, No. 3:23-CV-1471-L, 2024 U.S. Dist. LEXIS 57557, at *25 (N.D. Tex. Mar. 29, 2024). Such "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Id.*; *see also Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) ("complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs."). Second, because the Rule also violates the Second, Fourth, and Fifth Amendments, "irreparable harm occurs whenever a constitutional right is deprived, even for a short period of time." *Def. Distributed v. U.S. Dep't of State*, 865 F.3d 211, 214 (5th Cir. 2017) (Elrod, J. dissenting)

### F. The Balance of Equities and Public Interest Overwhelmingly Favor Plaintiffs.

When the government is a party, the balance-of-equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A court therefore must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). As the Fifth Circuit held in *VanDerStok v. Garland*, No. 23-10718, 2023 U.S. App. LEXIS 26499, at *6 (5th Cir. Oct. 2, 2023), "both the balance of equities and the public

43

interest weigh in favor of allowing orderly judicial review of the Rule before anyone shuts down their businesses or sends them to jail." Given that the Rule seeks to upend this Nation's tradition of private sales, and to make what was once lawful behavior uncertain and illegal, the balance of equities tips sharply in Plaintiffs' favor, requiring an injunction to maintain the status quo. Finally, the vindication of constitutional rights is always in the public interest. *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1100 (5th Cir. 2023) ("Our precedent similarly establishes that injunctions protecting First Amendment rights 'are always in the public interest.'"); *see also Bruen*, 597 U.S. at 70 (Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

## CONCLUSION

For the foregoing reasons, this Court should temporarily enjoin Defendants from enforcing the Rule.

Date: May 2, 2024

Respectfully submitted.

**KEN PAXTON**
Attorney General

/s/Garrrett Greene
**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217

**BRENT WEBSTER**
First Assistant Attorney General

**KATHLEEN T. HUNKER**
Special Counsel
Texas Bar No. 24118415

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**RYAN D. WALTERS**
Chief, Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
garrett.greene@oag.texas.gov
kathleen.hunker@oag.texas.gov

**COUNSEL FOR PLAINTIFF STATE OF TEXAS**

**LYNN FITCH**
Attorney General of Mississippi

**ELIZABETH B. MURRILL**
Attorney General

/s/Justin L. Matheny
**JUSTIN L. MATHENY** (MS Bar 100754)
Deputy Solictor General
**OFFICE OF THE ATTORNEY GENERAL**
P.O Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
Fax: (601) 359-2003
justin.matheny@ago.ms.gov

/s/J. Benjamin Aguiñaga
**J. BENJAMIN AGUIÑAGA**\*
Solicitor General

**LOUISIANA DEPARTMENT OF JUSTICE**
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel: (225) 506-3746
aguinagab@ag.louisiana.gov

**COUNSEL FOR PLAINTIFF STATE OF MISSISSIPPI**

**COUNSEL FOR PLAINTIFF THE STATE OF LOUISIANA**
\*Admission To NDTX Pending

45

| | |
|---|---|
| SEAN D. REYES<br>Utah Attorney General<br><br>*/S/ Andrew Dymek*<br>ANDREW DYMEK*<br>Assistant Solicitor General<br><br>UTAH OFFICE OF THE ATTORNEY GENERAL<br>350 North State Street, #230<br>P.O. Box 142320<br>Salt Lake City, Ut 84114-2320<br>Tel.: 801-366-0533<br>adymek@agutah.gov<br><br>COUNSEL FOR PLAINTIFF STATE OF UTAH<br>*Admission To NDTX Pending | */s/ Stephen D. Stamboulieh*<br>STEPHEN D. STAMBOULIEH<br><br>STAMBOULIEH LAW, PLLC<br>NDTX#: 102784MS<br>MS Bar No. 102784<br>P.O. Box 428<br>Olive Branch, MS 38654<br>(601) 852-3440<br>stephen@sdslaw.us<br><br>COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE |
| */s/ John I. Harris III**<br>JOHN I. HARRIS III (TN # 12099)<br><br>SCHULMAN, LEROY & BENNETT PC<br>3310 West End Avenue, Suite 460<br>Nashville, Tennessee 37203<br>(615) 244 6670 Ext. 111<br>Fax (615) 254-5407<br>jharris@slblawfirm.com<br><br>COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE<br>*Admission to NDTX pending | */s/ Brandon W. Barnett*<br>BRANDON W. BARNETT<br>Texas Bar No. 24053088<br><br>BARNETT HOWARD & WILLIAMS PLLC<br>930 W. 1st St., Suite 202<br>Fort Worth, Texas 76102<br>817-993-9249 (T)<br>817-697-4388 (F)<br>barnett@bhwlawfirm.com<br><br>LOCAL COUNSEL, COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE |

APPX.265

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 2, 2024 and that all parties will be served with the Original Complaint via certified mail and process server.

*/s/Garrrett Greene*
GARRETT GREENE

47



# NO UNIVERSAL REGISTRATION CHECKS

Docket No. ATF 2022R–17
Definition of "Engaged in the Business" as a Dealer in Firearms

Gun Owners of America
and
Gun Owners Foundation

8001 Forbes Place, Suite 202
Springfield, VA 22151






APPX.267

**December 2023**

Gun Owners of America
Gun Owners Foundation
Tennessee Firearms Association
Virginia Citizens Defense League



# Table of Contents

**INTRODUCTION** .................................................................... 1

**BACKGROUND** ................................................................... 2
 STATUTORY HISTORY.............................................................. 2
 ENACTMENT OF BIPARTISAN SAFER COMMUNITIES ACT.. 6
 ATF'S NOTICE OF PROPOSED RULEMAKING ........................... 6

**ATF'S REVISIONS CONFLICT WITH STATUTORY TEXT........... 8**
 RULE DEFINES WHAT IS ALREADY DEFINED.......................... 8
 ATF IGNORES STATUTORY REQUIREMENTS ......................... 11
 ATF EDITS OUT "PROOF OF PROFIT".................................... 19
 POOR DEFINITION OF "PERSONAL COLLECTION" .............. 24
 ATF REWRITES DEFINITION OF "RESPONSIBLE PERSON" ... 28
 ATF RULES FOR FORMER LICENSEES CONFLICT ................... 31

**"PRESUMPTIONS" PENALIZE INNOCUOUS CONDUCT ......... 34**
 ATF'S "PRESUMPTIONS" CONFLICT WITH STATUTE ........... 34
 ATF'S PRESUMPTIONS ARE ARBITRARY.................................. 37
 "PREDOMINANTLY EARN A PROFIT" PRESUMPTIONS ......... 42
 ILLOGICAL OPPOSING PRESUMPTIONS .................................. 47

**ATF EXCEEDS STATUTORY AUTHORITY, INVENTS CRIMES .. 51**
 NO FEDERAL "ATTEMPT" CRIME .............................................. 51
 NO "CONSPIRACY" CHARGES .................................................... 54
 ATF IS TRYING TO MISLEAD CRIMINAL JURIES .................... 56
 ATF'S CATCH-22: REQUIRING & DENYING LICENSURE ...... 58

**ATF'S STATUTORY REVISIONS VIOLATE CONSTITUTION...... 60**
 RULE VIOLATES THE FIRST AMENDMENT ............................. 60
 RULE VIOLATES THE SECOND AMENDMENT ......................... 62
 RULE VIOLATES THE FOURTH AMENDMENT......................... 66
 OTHER CONSTITUTIONAL CONCERNS .................................. 69
 ATF UNDERESTIMATES REGULATORY BURDEN, COST ...... 70

**NOTICE AND COMMENT PERIOD** ........................................ 80

**FLIP-FLOPPING UNDERMINES NEW RULE** ........................... 81

**CONCLUSION** ..................................................................... 83

## I.    Introduction

On September 8, 2023, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") published a "Notice of Proposed Rulemaking" in the Federal Register, entitled "Definition of Engaged in the Business as a Dealer in Firearms," 2022R-17, 88 FR 61993 ("NPRM").  ATF has sought public comment on its proposal by December 7, 2023.  These comments are submitted on behalf of Gun Owners of America, Inc., Gun Owners Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, Inc., and Virginia Citizens Defense League (together, "Commenters").

**Gun Owners of America, Inc.** ("GOA") is organized and operated as a nonprofit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code ("IRC").  GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners and has become one of the nation's leading Second Amendment advocacy organizations, with more than two million members and supporters nationwide.  **Gun Owners Foundation** ("GOF") is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the IRC.  GOF is supported by gun owners across the country.  **Tennessee Firearms Association** ("TFA") is organized and operated as a nonprofit membership organization that is exempt from federal income taxation under Section 501(c)(4) of the IRC.  TFA was formed in 1995 and incorporated in 1996 to restore, preserve and defend the rights of all citizens as protected by Second Amendment and the Tennessee Constitution.  TFA is the leading Second Amendment advocacy organization based in Tennessee.  **Tennessee Firearms Foundation, Inc.** ("TFF") is organized in Tennessee and operated as a nonprofit organization that is exempt from federal income taxation under Section 501(c)(3) of the IRC.  TFF was incorporated in 2023 to preserve,

APPX.269

protect and defend the Constitutionally protected rights of gun owners, including promoting and developing a greater understanding and awareness regarding the importance and benefits of firearms ownership. **Virginia Citizens Defense League** ("VCDL") is a nonprofit, nonpartisan organization, exempt from federal income taxation under Section 501(c)(4) of the IRC. VCDL is focused on a single issue – protecting and restoring the right to keep and bear arms.

Commenters submit these comments in response to ATF's request for public comment. As detailed below, the NPRM is arbitrary and capricious, contrary to law, and contrary to constitutional right. While purporting "to implement" the Bipartisan Safer Communities Act ("BSCA"), which became effective June 25, 2022, the NPRM in reality seeks to effect yet another unilateral policy change to implement the radical political agenda of a rabidly anti-gun administration, without any input from Congress. The NPRM should be repudiated and withdrawn, and Commenters stand ready to challenge any illegal and unconstitutional final rule that is finalized based on this flawed proposal.

## II.  Background

### A. Statutory History

Historically, the Federal Firearms Act of 1938 defined "dealer" to mean "any person engaged in the business of selling firearms or ammunition...."[1] In one of the only cases to interpret that phrase under the Federal Firearms Act, the Ninth Circuit discussed "shipment of guns to Tokyo," noting that the "guns were sold in two separate installments to two different people" and that the defendants "procure[d] … possible buyers for the guns," which supported a "finding that appellants were 'engaged in the business of selling firearms'...." *Kaneshiro v. United States*, 445 F.2d 1266, 1270 (9th Cir. 1971).

---

[1] https://tinyurl.com/2xeccfu4.

**2**

Congress later repealed the Federal Firearms Act, finding that "it had not provided adequate license fees or proper standards for the granting or denial of licenses and that this had led to licenses being issued to unqualified persons." *United States v. Gross*, 313 F. Supp. 1330, 1332 (S.D. Ind. 1970). However, in recodifying the Act's definition of "dealer" into the new Gun Control Act of 1968 ("GCA"), Congress defined the term "in somewhat the same manner as that definition appears in [the Federal Firearms Act]. *See* U.S. Code, Cong. & Admin. News, 90th Cong., 2d Sess., 1968, Vol. 2, p. 2201.[2]

Thus, the GCA defined "dealer" to mean "any person engaged in the business of selling firearms or ammunition at wholesale or retail"[3] but, like the FFA, did not further define what it meant to be "engaged in the business." That determination was left, for a time, to judicial interpretation, which resulted in varying holdings. For example, the district court in *Gross* held the definition required "no minimum number of sales, dollar volume of sales, or number of employees" to be considered "engaged in the business," but that "there should be no doubt in the minds of men of common intelligence that 'dealer' means one that is engaged in *any* business of selling, repairing or pawning firearms and that 'business' is that which occupies the time, attention and labor of men for the purpose of livelihood or profit." *Gross*, 313 F. Supp. at 1333.[4]

---

[2] https://tinyurl.com/4hp9yaxw.
[3] https://tinyurl.com/ykhzskhf.
[4] *See also United States v. Swinton*, 521 F.2d 1255 (10th Cir. 1975) (finding the sale of only one firearm and not making a profit to be sufficient); *United States v. Huffman*, 518 F.2d 80, 81 (4th Cir. 1975) (holding that the government "must show a willingness to deal, a profit motive, and a greater degree of activity than occasional sales by a hobbyist" but that the defendant need not actually have made a profit); *United States v. King*, 532 F.2d 505, 510 (5th Cir. 1976) ("'Dealing in firearms' is commonly understood as selling and/or trading in firearms, as well as acquiring firearms for sale by purchase and/or trade" while "'[b]usiness' is commonly understood to mean an activity engaging some of one's time, attention and effort and performed in expectation of profit or other benefit."); *United States v. Shirling*, 572 F.2d 532, 534 (5th Cir. 1978) ("We think the better reasoned view is that expectations of profit are not determinative of whether one is engaged

**3**

In 1979, ATF issued a notice of proposed rulemaking which proposed to define "engaged in the business," on the theory that the phrase was "not defined in the law or the regulations." *See* 44 FR 75186, Advance Notice of Proposed Rulemaking (Dec. 19, 1979). But in its proposal to define that phrase, ATF failed to identify a single court that had trouble defining or applying the phrase. To the contrary, ATF's proposal acknowledged that "courts have continually found that the current situation is adequate for enforcement purposes...." *Id.* at 75187. On March 31, 1980, ATF extended the comment period for 30 days, *see* 45 FR 20930,[5] but no action was taken thereafter. In other words, ATF ultimately decided not to define the phrase "engaged in the business."

In 1986, the McClure-Volkmer Firearm Owners' Protection Act ("FOPA"), Pub. L. No. 99-308, 100 Stat. 449, added a definition of "engaged in the business" to the statute – "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." FOPA further defined the term "with the principal objective of livelihood and profit" to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." FOPA was amended shortly thereafter, clarifying that "proof of profit" was not required "as to a person who engages

---

in the business of selling firearms."); *United States v. Day*, 476 F.2d 562, 567 (6th Cir. 1973) (affirming a conviction over "four separate sales over two months").

[5] https://tinyurl.com/6ywekaav.

in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism."[6]

As the Senate Committee on the Judiciary reported regarding the "engaged in the business" definition contained in the bill that would eventually become FOPA, "[l]ower courts have applied two different, but similar tests for 'engaging in the business.' Neither is especially clear, and both can be applied to a hobbyist to whom profit is a secondary objective." *See* 98th Congress, 2d Sess., Report 98-583 at 9, Aug. 8, 1984.[7] After laying out those two judicially-created tests, the report explained that Congress' intent was to "**substantially narrow** these broad parameters by requiring that the person undertake such activities as part of a 'regular course of trade or business with the principal objective of livelihood and profit.'" *Id.* (emphasis added).

On October 29, 1986, ATF adopted a Temporary Rule, 51 FR 39612, to implement FOPA, and invited comments.[8] Under the Temporary Rule, the phrase "engaged in the business" was defined to mirror FOPA's statutory language. On March 31, 1988, ATF adopted the regulatory definitions with no changes. *See* 53 FR 10480.[9] Importantly here, as to the definition of "engaged in the business," a commenter had requested "the definition list examples illustrating when a license is required," but **ATF declined to add examples** "since the definition adequately addresses this concern by expressly delineating the activity requiring licensing from that of a firearms collector not subject to licensing." *Id.* at 10481. But apparently that was then, and this is now.

---

[6] Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 (1986).
[7] https://tinyurl.com/4864jjjy.
[8] https://tinyurl.com/mrxftava.
[9] https://tinyurl.com/u9nyfveb.

**B. Enactment of the Bipartisan Safer Communities Act**

Thus, for more than half a century, from FOPA's addition of definitions in 1986 until enactment of the BSCA last year, 18 U.S.C. § 921(a)(21)(C) has stated, in part, that "engaged in the business" meant "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business **with the principal objective of livelihood and profit** through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."  Further, 18 U.S.C. § 921(a)(22) defined the term "with the principal objective of livelihood and profit" to mean an "intent underlying the sale or disposition of firearms is predominantly one of **obtaining livelihood and pecuniary gain**, as opposed to other intents, such as improving or liquidating a personal firearms collection...."

The BSCA amended this definition of "engaged in the business," replacing Section 921(a)(21)(C)'s phrase "with the principal objective of livelihood and profit" with the phrase "to **predominantly earn a profit**...."[10]  Due to that change in terminology, 18 U.S.C. § 921(a)(22) was also modified, replacing the language "obtaining livelihood and pecuniary gain" with the singular intent of "**obtaining pecuniary gain**...."

**C. ATF's Notice of Proposed Rulemaking**

Following enactment of the BSCA, President Biden issued an Executive Order directing the Attorney General, *inter alia*, to "clarify the definition of who is engaged in the business of

---

[10] There is one case that uses this language from the amended BSCA: "The Court finds that the definitions enacted by Congress provide ample detail for Defendants to have notice, and for the jury to separate lawful conduct from unlawful conduct."  *United States v. Deare*, 2023 U.S. Dist. LEXIS 128640, at *6 (W.D. La. July 25, 2023).

dealing in firearms, and thus required to become Federal firearms licensees (FFLs), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law." 88 FR at 16527-28. Purportedly acting pursuant to this directive, the Department of Justice announced the NPRM on August 31, 2023, claiming that its proposed revisions "conform[] ATF's regulations to the new BSCA definition and further clarify[] the conduct that presumptively requires a license under that revised definition."[11] But while some of the NPRM's proposed revisions simply amend various regulations to mirror the newly enacted federal statutory language, others fabricate entirely new provisions of administrative "law" that contravene and effectively nullify the very statutes they claim to implement. Specifically, in order to match the BSCA's new statutory definitions, the NPRM proposes to amend the regulatory definition of "engaged in the business," and provide an updated regulatory definition of "to predominantly earn a profit." Further, the NPRM proposes to move the existing regulatory definition of "terrorism" to a new location to better reflect its use in BSCA definitions.

Beyond that, the NPRM's proposals unmoor from the statute. The NPRM proposes to amend the definitions of "dealer," "purchase," and "sale" to include new and different language from the underlying statutory text, all to purportedly "clarify" a purported mass confusion among members of the firearm industry that does not exist. The NPRM then fabricates a total of 14 categories of "presumptions," any one of which will *presume* statutory violations under certain facts, and all of which operate to shift the burden of proof from ATF to the accused. Many of these "presumptions" plainly conflict with the statute, as they recast innocuous conduct as business

---

[11] *Justice Department Proposes New Regulation to Update Definition of "Engaged in the Business" as a Firearms Dealer*, ATF (Aug. 31, 2023), https://tinyurl.com/yhef8n5e.

activity warranting licensure – *i.e.*, the very ill Congress sought to address by providing statutory definitions.

Beyond these unprecedented "presumptions," the NPRM adds new definitions for "personal firearms collection" and "responsible person," each with their own defects, before concluding with statutorily untethered directives as to how former FFLs and their responsible persons may liquidate their business inventories and how current FFLs may maintain records of transfers between licensees. For the reasons that follow, Commenters explain that the NPRM should be withdrawn and scrapped, because the majority of its proposed promulgations either remove statutory protections or create additional liabilities on gun owners that are not found in the law. To the extent that ATF wishes to promulgate regulations that simply mirror the unambiguous statutory text, that is all it has the authority to do.

## III. The NPRM's Revisions Blatantly Conflict with the Statutory Text

### D. The NPRM Impermissibly "Defines" That Which Is Already Defined and "Clarifies" That Which Is Unambiguous

The NPRM advances a litany of regulatory revisions purportedly "clarifying," "defining," "setting forth," and "adding" to terms that are already defined and fully explained by statute. NPRM at 61997. But at the outset, ATF only has statutory authority to "prescribe … such rules and regulations as are *necessary* to carry out the provisions of this chapter." 18 U.S.C. § 926(a) (emphasis added). Terms already defined by statute cannot be further defined (*i.e.*, changed) by regulation. Rather, "the need to rewrite clear provisions of the statute should have alerted [ATF] that it had taken a wrong interpretive turn." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Because many of the terms that the NPRM proposes to define – "dealer," "engaged in the

8

APPX.276

business," "to predominantly earn a profit," and "responsible person" – *already are defined* by statute, ATF must accept the congressionally provided definition of these existing terms.

In the face of congressionally enacted definitions, "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms. Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always 'give effect to the unambiguously expressed intent of Congress.'" *Util. Air Regul. Grp.*, 573 U.S. at 325-26. As the Tenth Circuit explains, "[w]hen the Supreme Court has discussed the exercise of agency discretion 'in the interstices created by statutory silence,' it has done so **only when 'considering undefined terms in a statute**....'" *Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, 1201 (10th Cir. 2019) (emphasis added). Here, the statute is far from silent. It specifically defines terms such as "engaged in the business," and it further defines what it means to "predominately earn a profit." ATF thus has no authority to "define" more narrowly or more expansively (*i.e.*, rewrite) those statutory definitions to add its own regulatory gloss (or smear).

Next, ATF is not permitted to provide plain meaning, dictionary definitions for clear and unambiguous statutory terminology, even if such terms are not further defined. For example, the NPRM purports to define, "based on common dictionary definitions," a "sale" as "the act of providing [something] in exchange for something of value." *Id.* at 61998, 62020. Likewise, the NPRM defines "purchase" as "the act of obtaining [something] in exchange for something of value." *Id.* at 62020. Finally, apparently divining further ambiguity in its own definition, the NPRM purports to define "something of value." *Id.* at 62020-21. The NPRM claims "[t]his should help clarify" the various terminology. *Id.* at 61998.

But as the NPRM makes clear, these definitions are nothing more than "consistent with the common meaning" of these words and phrases. *Id.* at 61999 nn.44, 45. ATF has identified no

9

ambiguity in the words "purchase" or "sale," or the phrase "something of value." ATF has not explained why a person of common understanding cannot comprehend these simple statutory words. Yet agencies do not have free reign to layer definition upon definition, needlessly adding complexity to the Code of Federal Regulations without having identified any statutory ambiguity that needs to be resolved in the first place. *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 642 (1990) ("As a general rule of statutory construction, where the terms of a statute are unambiguous, judicial inquiry is complete."); *ACLU v. FCC*, 823 F.2d 1554, 1568 (D.C. Cir. 1987) ("the statute speaks with crystalline clarity. It provides a precise definition … for the exact term the Commission now seeks to redefine. … From the face of the statute then, we are left with no ambiguity and thus no need … for clarification."); 18 U.S.C. § 926(a) (only regulations "necessary to carry out the provisions of this chapter"). This is especially true when, as here, there is no indication that Congress intended the agency to have any role to play.[12]

Finally, even if there were some grievous ambiguities in the statutory definitions that Congress provided, many of the NPRM's definitions simply add language to the statute rather than resolve some ambiguity or explain some nuance in greater detail. *See, e.g.*, NPRM at 62004

---

[12] The likelihood of abuse here is hardly speculative. For example, the NPRM **defines** the statutory words "purchase" and "sale" to include transmission of "something of value," and **further defines** "something of value" to include "any other medium of exchange or valuable consideration." *Id.* at 62020-21. The NPRM then **further defines** "medium of exchange" to include "something commonly accepted in exchange for goods and services and recognized as representing a standard of value," and **further defines** "valuable consideration" as "an equivalent or compensation having value that is given for something (as money, marriage, services) acquired or promised and that may consist either in some right, interest, profit, or benefit accruing to one party or some responsibility, forbearance, detriment, or loss exercised by or falling upon the other party." *Id.* at 61999 n.51. At bottom, ATF claims that an ordinary person cannot possibly understand the simple statutory word "sale," but expects that same person to understand the word "forbearance" (contained in ATF's definition of a definition of a definition) without further definition. ATF has taken something unambiguous and made it ambiguous. Regulation for the sake of regulation, it would seem.

(adding the phrase "and business practice" to the statutory definition of "responsible person"); *id.*
at 62016 (emphasis added) (admitting the NPRM is legislating because it "establishes … *legally*
*binding requirements*").  Moreover, even to the extent some further elucidation of the statute were
necessary, the rule of lenity requires that ambiguous criminal laws be construed in favor of the
criminal defendant.[13]  In other words, when in doubt, ATF must construe the statute to conclude
that a person is *not* unlawfully dealing – a mandate the NPRM fails to respect, as it is expansively
designed to sweep up hundreds of thousands of persons into the federal definition of "dealer" by
accusing them of being unlawfully "engaged in the business."

## E.  The NPRM Ignores the Statutory Requirements for Being "Engaged in the Business"

The NPRM recounts that, in 1979, ATF decided against "establish[ing]n a threshold
number of firearm sales every year to serve as a baseline for when a person would qualify as a
dealer."  *Id.* at 61994.  According to ATF, this was on the theory that a person could simply stay
below the threshold[14] and "avoid[] obtaining a license...."  *Id.*; *see also id.* at 62000 ("structure[15]

---

[13] *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 469 (5th Cir. 2023); at 473 (Ho, J., concurring) ("it
is not enough to conclude that a criminal statute *should* cover a particular act.  The statute must
*clearly* and *unambiguously* cover the act.") (emphasis original); *Hardin v. BATFE*, 65 F.4th 895,
901 (6th Cir. 2023); *see also United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 4 (1st Cir.
1997) (noting that "courts should interpret the same language in the same section of the same
statute uniformly, regardless of whether the impetus for interpretation is criminal or civil");

[14] This is a bit like saying that it would be ill advised to post a speed limit *because drivers might
actually follow the law*.

[15] ATF's use of the word "structure" is problematic, because the idea of "structuring" transactions
has no antecedent in administering the GCA or the NFA.  Rather, "structuring" is a term used in
the financial and banking industry with regard to attempting to hide large cash deposits.  Those
areas uniformly contain an underlying statute that proscribes evading mandatory cash reporting at
financial institutions, specifically using the wording "structuring."  *See* 31 U.S.C § 5324(a)(3).  No
similar crime exists here, and ATF cannot read one into the statute any more than it was permissible

their transactions to avoid a minimum threshold by spreading out their sales over time"). Thus, the NPRM repeatedly takes the position that "there is no specific threshold number of firearms purchased or sold that triggers the licensure requirement." *Id.* at 61995. Rather, ATF claims that "even a single firearm transaction, or offer to engage in a transaction [*i.e.*, no transaction], when combined with other evidence, may be sufficient to require a license." *Id.* at 62000. According to ATF, this conclusion – that a person may be engaged in the business without ever acquiring or selling a single firearm – somehow flows from the statute. Hardly.

Because the NPRM purports to "clarify" a statute, "[w]e start, of course, with the statutory text," *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006), and "if the statutory text is unambiguous, no further inquiry is necessary." *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010). The statutory definition of "engaged in the business … as applied to a dealer in firearms," is:

> a person who devotes time, attention, and labor to dealing in **firearms** as a **regular course** of trade or business to predominantly earn a profit through the **repetitive purchase** **and** **resale** of firearms, but such term shall not include a person who makes occasional **sales, exchanges, or purchases** of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms. [18 U.S.C. § 921(a)(21)(C) (emphases added).]

Contrary to ATF's claim that a person can be engaged in the business without ever consummating any actual business, the statutory text contains at least six clear indicators that more is required, any one of which is sufficient to repudiate ATF's claims made in the NPRM – 1) use of "firearms," in the plural; 2) "regular course," contemplating a series of events; 3) "repetitive," meaning more than once; 4) requiring actual "purchase and *re*sale," which 5) provides a contemporaneous

---

to attempt to do so in the "frame or receiver" rule. *See* 87 FR at 24692 ("In sum, persons cannot undermine these requirements and prohibitions by working with others or structuring transactions to avoid the appearance that they are not commercially manufacturing and distributing firearms.").

APPX.280

conjunctive requirement; and 6) exempting "sales, exchanges, or purchases," in the plural. Individually and together, these terms unequivocally reject the NPRM's suggestions that "there is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms," and that "even a single firearm transaction, or offer to engage in a transaction [without any actual transaction], when combined with other evidence, may be sufficient to require a license."  NPRM at 62000.

### 1.  The Statutory Scheme Discusses "Firearms" in the Plural

First, the statute contemplates business conduct involving more than one firearm transaction (and certainly more than zero) – the "term 'dealer' means … any person engaged in the business of selling *firearms* at wholesale or retail."  18 U.S.C. § 921(a)(11) (emphasis added). Further, a dealer is "a person who devotes time, attention, and labor to dealing in *firearms*."  18 U.S.C. § 921(a)(21)(C) (emphasis added).  The word "firearms" appears repeatedly throughout the statute, obviously denoting dealing in more than one "firearm."

### 2.  A "Regular Course" Is a Series of Events Demonstrating an Activity Is Occurring

Contrary to the NPRM's claim that even a single firearm transaction (or offer for sale without any transaction) can suffice to demonstrate business intent and require licensure, the statute requires a putative dealer's conduct to be part of a "regular course of trade or business."  18 U.S.C. § 921(a)(21)(C).  Naturally, this phrase refers to a series of events demonstrating an overarching business purpose and mindset.  Courts construing the word "regular" in other contexts have observed:

> "Regular" has been defined as "steady or *uniform in course, practice, or occurrence*: not subject to unexplained or irrational variation: steadily pursued; orderly, methodical"; even as "returning, *recurring, or received at stated, fixed or uniform intervals* …; functioning at proper intervals."  *Webster's Third New*

13

> *International Dictionary of the English Language Unabridged* 1913 (1971) (emphasis added). Clearly, the word, "regular" in the phrase "regular course of the taxpayer's trade or business" refers to an *ongoing* business concern. [*Ex parte Uniroyal Tire Co.*, 779 So. 2d 227, 236 (Ala. 2000) (emphases in original).]

Similar to the word "regular," the word "course" means "the path over which something moves or extends" or "moving in a path from point to point,"[16] again clearly denoting something more than a static event at one moment in time.

In contrast, isolated events – like a mere offer to sell or even a single completed transaction – do not evince regularity or a course of business. For example, in the "regular course" of making breakfast, one might expect to crack an egg. However, a cracked egg on its own is insufficient to infer a broader course of conduct; eggs can crack when inadvertently dropped, after all. But when one cracks eggs in some melted butter, places slices of bread in the toaster, and pours a glass of orange juice, a pattern begins to emerge that evinces a "regular course" of conduct – making breakfast. A single firearm transaction – like a single cracked egg – is logically insufficient to show a "regular course of trade or business."[17]

### 3. "Repetitive" Obviously Means More than Once

If the statute was not clear enough already, in order to be "engaged in the business" as a dealer in firearms, one must also engage in the "*repetitive* purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C) (emphasis added). Of course, repetition means more than once, that is, "the act or an instance of repeating" something "such as a push-up" that is "usually counted."[18] Doing a single pushup is not repetitive; nor does it evince that a person is seriously intending to

---

[16] *Course*, Merriam-Webster, https://tinyurl.com/53hnbvmj (last visited Oct. 27, 2023).
[17] *See United States v. Gross*, 451 F.2d 1355 (7th Cir. 1971) ("The reasonable reader would conclude that … a single isolated sale did not constitute engaging in the 'business of selling firearms.'").
[18] *Repetition*, Merriam-Webster, https://tinyurl.com/mun5hawv (last visited Oct. 27, 2023).

engage in exercise.  Talking about doing pushups provides even less evidence still.  Yet the NPRM maintains that "there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement.  Similarly, there is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms."  NPRM at 62021.  These irreconcilable statements resolve in favor of the statute – purchases and resales must be *repetitive*.

For example, an ordinary gun owner who peruses online ads and happens upon a great deal on a firearm (or perhaps even a group of firearms), even if he purchases and then resells that firearm *with the intent to profit*, still does not constitute a firearms dealer, because his activity is a one-off – far from "repetitive," and certainly not a "regular course" of activity.  Indeed, Congress expressly intended its "legislation to limit Federal regulation to those involved in *more* than isolated activities."  S. Rep. No. 98-583, at 6 (1984) (emphasis added).

### 4.  Actual Dealers Must "Purchase and Resell" Firearms

Although by now perhaps beating a dead horse, the statute also mandates that a crucial component of being "engaged in the business" is the repetitive "purchase and resale of firearms."  18 U.S.C. § 921(a)(21)(C).  Thus, firearms must be purchased "***and***" resold – a conjunctive requirement – a far cry from the NPRM's claim that "there is no minimum threshold number of firearms purchased *or* sold that triggers the licensure requirement."  NPRM at 62021 (emphasis added).

For starters, sales alone are not enough, nor are mere purchases of firearms.[19]  Both elements must be present.  Moreover, as discussed in the next section, there must be more than one

---

[19] ATF erroneously claims that a former licensee can be charged with unlawful dealing based on **purchases made during** the period of licensure and **sales made after** the license expired, was revoked, or was relinquished.  NPRM at 62022 ("a former licensee … who resells any such inventory … is subject to the presumptions … that apply to a person who repetitively purchased

"purchase" and more than one "resale" – more than two each, in fact.  To be sure, ATF points to at least one jurisdiction that has prosecuted someone for unlicensed dealing without any evidence of any sales having taken place.  *See* NPRM at 61998 n.38 (noting only that "defendant texted photos of firearms for sale to his customer and discussed prices"); *see also id.* at 62000 (citing to *United States v. King*, 735 F.3d 1098, 1107 n.8 (9th Cir. 2013).  But such precedent is clearly wrong – failing to require a "resale" in addition to a "purchase" (never mind requiring each to be "repetitive") reads the word "resale" right out of the statute.

### 5. A "Resale" Is Something More than a "Sale," and Is Done Contemporaneously

The statute is not done with providing indications that the NPRM's approach is misguided. Notably, the statute does not require merely "purchases" and "sales" – something any gun owner might do.  Rather, the text mandates "resale" – meaning "the act of selling something again" such as "buying used cars for resale to overseas markets."[20]  Thus, embedded within the word "resale"

---

those firearms for the purpose of resale"); *see also id.* at 62006 ("While 18 U.S.C. 921(a)(21)(C) allows an unlicensed person to 'sell all or part of his personal collection' without being considered 'engaged in the business,' in this context, these firearms were purchased by the former licensee as business inventory and were not accumulated by that person for study, comparison, exhibition, or for a hobby.").  This is nonsense.  *During* the period of time a person was licensed, he was *legally authorized* to be "engaged in the business," including purchasing firearms for the purpose of resale. Simply selling those firearms (half the statutory requirement) *after* licensure is insufficient, because a criminal charge cannot be based in part on activity that the statute expressly permits.  In fact, the NPRM admits that at least one court has held as much.  *Id.* at 62003 n.81 (citing *United States v. Shuman*, 861 F.2d 1234, 1238 (11th Cir. 1988) (finding "no proof of firearms purchases" and explaining that no liability attaches for simply liquidating former business inventory); *cf. id.* at 62006 (contrasting a person who would "continue to acquire more firearms for resale … after license termination").  ATF maligns the possibility that former licensees may liquidate their inventory, calling this permissible activity a "problem" pejoratively classifying it as a "'fire-sale loophole.'"  *Id.* at n.102.  But ATF proves too much.  Another way of saying "loophole" is "lawful activity."  If ATF wants to close a perceived loophole, it should ask Congress to do so.

[20] *Resale*, <u>Cambridge Dictionary</u>, <u>https://tinyurl.com/mrxspent</u> (last visited Oct. 27, 2023).

**16**

is a contemporaneity requirement, instructing that firearm purchases and resales must be linked together within a short enough timeframe of each other to constitute business activity.

The NPRM purports to define "sale" to "include[e] … derivative terms" like "resale," defining both to be "the act of providing a firearm in exchange for something of value." *Id.* at 62020. But as noted, selling something is *not* the definition of "resale." If the words "sale" and "resale" were synonymous, they would not be different words. Rather, the prefix "re" is added to words and "used with the meaning 'again' or 'again and again' to indicate repetition."[21] *See* Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal Texts 69, 101 (2012). The NPRM's definition of a "resale" as nothing more than a "sale" thus defies the meaning of words.[22]

Congress's choice of wording was deliberate. For example, no one would say that a collector who buys rare cars, maintains and enjoys them in his garage, and subsequently offers them at auction decades later has been "buying used cars for resale to overseas markets." Likewise, no firearm dealer (at least none that wants to stay in business) purchases large quantities of firearms only to hold them in inventory for a long period of time, as does a firearm collector or even investor. Whereas a private collector might purchase large numbers of firearms (even of the same make and model) with the intent that they increase in long-term value, a dealer's profit incentives are much more short-term, out of necessity. Take, for example, a rare coin dealer that charges a "margin" on each product sold, with the price determined not by the dealer's basis in that product, but in the

---

[21] *Re*, Dictionary.com, https://tinyurl.com/2vkwxmvf (last visited Nov. 10, 2023).
[22] *See* Lewis Carroll, Through the Looking Glass (1871) ("When *I* use a word," Humpty Dumpty said in rather a scornful tone, "it means just what I choose it to mean—neither more nor less." "The question is," said Alice, "whether you CAN make words mean so many different things." "The question is," said Humpty Dumpty, "which is to be master—that's all.'").

**17**

*replacement cost* of obtaining another one in the marketplace.[23]   No one would allege that an investor, who purchases coins and holds them for a period of time until they (hopefully) appreciate in value, is "engaged in the business" of dealing in coins.  Likewise, while a firearm collector or investor might purchase firearms and hope to *sell* them for a profit one day in the future (turn $10 into $100), a dealer who is "engaged in the business" purchases firearms to *resell* them as soon as possible (turn $10 into $20), and then turn around and buy more.  In other words, the statute clearly does not cover nearly as much innocent behavior as the NPRM purports to outlaw.

### 6.  The Statute Exempts Non-Business "Sales, Exchanges, or Purchases" in the Plural

Finally, the statute contains explicit exceptions – a statutory safe harbor – to being "engaged in the business" based on the "occasional *sales, exchanges, or purchases* of firearm*s* for the enhancement of a personal collection or for a hobby."[24]  18 U.S.C. § 921(a)(21)(C) (emphasis added).  Notably, each of these terms is plural, accommodating multiple sales, multiple exchanges, or multiple purchases without rising to the level of "dealing."  Indeed, no one could amass a "collection" – another plural word meaning "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby"[25] – without accumulating multiple firearms, and probably getting rid of some as well.  Indeed, Congress was well aware that "[m]any firearm hobbyists sell or trade firearms from their collections," S. Rep. No. 98-583, at 8, and Congress never intended for such conduct to require licensure.

---

[23] Ellis Davidson, *Replacement Cost vs. Market Value*, Chron, https://tinyurl.com/5fj3tkaa (last visited Oct. 27, 2023).

[24] To be sure, the statutory safe harbor is *not the only* way to engage in firearms transactions without being "engaged in the business."  If that were so, then the statute would say that anyone who is not within the safe harbor provisions is required to obtain a license.

[25] *Collection*, Merriam-Webster, https://tinyurl.com/2552xmrc (last visited Oct. 27, 2023).

In sum, the plain text of the statute contains no fewer than six different indications that ATF's notion in the NPRM – that a person can be dealer without ever purchasing or reselling a single firearm – is bunkum.

## F. The NPRM Impermissibly Edits "Proof of Profit" Out of the Statute, Claiming that Someone Can Be a Dealer Without Ever Making a "Purchase" or "Resale"

As explained above, the NPRM unlawfully removes the requirement that a person *actually make* purchases and sales in order to be engaged in the business. And the NPRM improperly interprets the clear statutory text so that *even one* such transaction might require licensure. As discussed here, the NPRM also ignores the clear statutory requirement of profit.

The NPRM notes that the BCSA amended the text of 18 U.S.C. § 921(a)(21), replacing the language "principal objective of livelihood and profit" with the phrase "to predominantly earn a profit." NPRM at 61993.[26] Under the NPRM's repetition of that statutory language, one acts "to predominantly earn a profit" when:

> [T]he intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. [18 U.S.C. § 921(a)(22).]

---

[26] The BCSA also made a corresponding change to the definition of "to predominantly earn a profit" in Section 921(a)(22), replacing the phrase "predominantly one of obtaining livelihood and pecuniary gain" with "predominantly one of obtaining pecuniary gain." Thus, the NPRM proposes to add a definition of "to predominantly earn a profit" to 27 C.F.R. § 478.11 that mirrors that statutory definition in Section 921(a)(22). NPRM at 61996.

Under the plain text of the statute, then, "proof of profit" is "not … required" **only** in cases where the prohibited activity is "for criminal purposes or terrorism."[27] 18 U.S.C. § 921(a)(22). A natural corollary to that language is that "proof of profit" is "required" in all other cases.[28] *See Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration in original) ("[Where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *see also* Scalia & Garner, *supra*, at 107, 167 ("The expression of one thing implies the exclusion of others" and "[t]he text must be construed as a whole."). After all, if Congress had intended to do away with requiring proof of profit *in all cases*, Congress certainly could have done so.[29]

Yet without skipping a beat, the NPRM purports to "clarify that a person may have the predominant intent to profit *even if the person does not actually obtain pecuniary gain from selling or disposing of firearms*." *Id.* at 62005 (emphasis added); *see also id.* at 62021 ("a person may have the intent to profit even if the person does not actually obtain pecuniary gain...."); *id.* at 62002 (statute "does not require that a firearm actually to [sic] be sold"). ATF offers the further gibberish justification that "the 'repetitive purchase and resale of firearms' is the means through which the

---

[27] Whereas the statute states that "proof of profit shall not be required" when it comes to "criminal purposes or terrorism," the NPRM changes this language to "proof of profit, **including the intent to profit**, shall not be required...." *Id.* at 62021 (emphasis added). ATF has no authority to supplement the statutory text to suit its policy goals.

[28] As defined by 18 U.S.C. § 921(a)(11)(A) (dealing as selling versus dealing as gunsmithing).

[29] Prior to FOPA, there was a circuit split as to whether Section 922(a)(1) required profit at all. *See United States v. Swinton*, 521 F.2d 1255, 1258 (10th Cir. 1975) (detailing the circuit split and siding with the no-profit camp, holding "Section 922(a)(1) does not require that the Government establish that a person engaged in the business of dealing in firearms make a profit."). Thus, the FOPA definition "was added to the firearms statute by Congress in 1986, to resolve [the] circuit split...." *United States v. Graham*, 305 F.3d 1094, 1101 (10th Cir. 2002).

APPX.288

person intends to engage in the business even if those firearms are not actually repetitively purchased and resold." *Id.* at 62002. Aside from being impenetrable gobbledygook, this claim directly conflicts with the statute, which exempts the requirement of proof of profit *only* for those engaged in "criminal purposes or terrorism." 18 U.S.C. § 921(a)(22). Thus, rather than conforming its regulations to the statutory text, the NPRM rewrites the statute to water down FOPA's stringent standard.

In support of ATF's claim that no proof of profit is *ever* necessary, the NPRM cites a number of federal cases that ATF claims have reached similar conclusions. NPRM at 62005 (citing *United States v. Focia*, 869 F.3d 1269, 1282 (11th Cir. 2017)); *id.* n.93 (citing *United States v. Valdes*, 681 F. App'x 874, 877 (11th Cir. 2017); *United States v. Wilmoth*, 636 F.2d 123, 125 (5th Cir. Unit A Feb. 1981); *United States v. King*, 735 F.3d 1098, 1107 n.8 (9th Cir. 2013); *United States v. Allah*, 130 F.3d 33, 43-44 (2d Cir. 1997); *United States v. Mastro*, 570 F. Supp. 1388, 1391 (E.D. Pa. 1983) (collecting cases); *United States v. Shirling*, 572 F.2d 532, 534 (5th Cir. 1978)). ATF claims that "[n]either the pre-BSCA definition … nor the post-BSCA definition … require the government to prove that the defendant actually profited...." *Id.*

But these seven cases hardly evince the consensus the NPRM claims. For starters, three of these cases predate *both* the "pre-BSCA" and "post-BSCA definition," having been decided before there was *any* statutory mention of "profit" as it relates to firearm dealing. *See Wilmoth*, 636 F.2d 123 (1981); *Mastro*, 570 F. Supp. 1388 (1983); *Shirling*, 572 F.2d 532 (1978). Indeed, the Firearms Owners' Protection Act **of 1986** ("FOPA"), Pub. L. No. 99-308, 100 Stat. 449, 450, defined for the first time the phrase "engaged in the business," which had previously been "subject to judicial interpretation." *United States v. Schumann*, 861 F.2d 1234, 1237 n.2 (11th Cir. 1988).

21

Accordingly, pre-1986 cases interpreting a previously undefined statutory phrase cannot shed light on the meaning of a modern definition that did not then exist.

Next, two of ATF's cases do not say anything close to what the NPRM claims. *Focia*, for example, never held that proof of profit is not required, because such proof was never at issue in that case. 869 F.3d at 1280 ("the exact percentage of income … is not the test"). Nor did *Allah*, which in fact said that selling firearms need not "be a *significant* source of income." 130 F.3d at 44 (emphasis added). On the contrary, both of these cases indicate that the government had shown the defendants profited.

The NPRM's remaining cases, *Valdes* and *King*, offer a slender reed to support the NPRM's blatant statutory revisionism. ATF cites *Valdes* for the proposition that "the government does not need to show that the defendant 'necessarily made a profit from dealing.'" NPRM at 62005 n.93. But *Valdes* was quoting *Wilmoth*, one of the pre-FOPA cases already discussed, which was decided in 1981 which, again, was prior to the statute even mentioning "profit." *See Valdes*, 681 F. App'x at 877 (citing *Wilmoth*, 636 F.2d at 125). Moreover, such a cursory quotation had no bearing on the outcome of the case, as it was clear that *the defendant in Valdes had been profiting* left and right. *See id.* at 878 (noting that the defendant had "called her activity a 'hustle,'" "sold a high volume of firearms—600 in 7 years," and "handed out business cards").

As for *King*, it is true that the Ninth Circuit observed that "there was no evidence that King successfully sold any firearms," 735 F.3d at 1102, but it did so with the caveat that "[t]wo of the twenty-four firearms ordered on behalf of [the business King effectively ran], … *were never located or accounted for*." *Id.* at n.4 (emphasis added); *id.* (noting that "King also sold ammunition and magazines for $1,700 in cash to a man he arranged to meet in a grocery store parking lot."). King's unlicensed business conduct was particularly brazen, with an extensive history of

22

purporting to act on an FFL's behalf, forging documents, purchasing inventory, and otherwise managing the FFL's affairs. *See id.* at 1101-03. Significantly, because King had "failed to preserve his sufficiency-of-evidence challenge," the Ninth Circuit only "appl[ied] plain-error review," concluding only that "[t]here [wa]s ample evidence in the record from which a reasonable jury *could have drawn* th[e] conclusion" that he had dealt in firearms without a license. *Id.* at 1106 (emphasis added).

Consequently, the *King* court's observation, relegated to a footnote which ATF now elevates to the level of divinely inspired text, "that Section 922(a)(1)(A) *does not require an actual sale of firearms*," was not central to the court's plain-error review. Moreover, the authority the *King* court cited for that proposition, *United States v. Nadirashvili*, 655 F.3d 114, 120 (2d Cir. 2011), itself cited *United States v. Carter*, 801 F.2d 78, 82 (2d Cir. 1986),[30] which itself quoted *United States v. Berry*, 644 F.2d 1034, 1037 (5th Cir. 1981). Although perhaps well-hidden by the NPRM's string citation, all roads seemingly lead to pre-FOPA, pre-"profit" cases.

On the contrary, the statutory text and context clearly require proof of profit in all cases that are not "criminal purposes or terrorism." This understanding – that **actual "sales" must occur _and_** that the government is **required to show proof of "profit"** from those sales) is confirmed by FOPA's legislative history. In Senate Report 98-583, the Senate Judiciary Committee summarized the various pre-FOPA tests applied by the courts, including one holding that "anyone who 'has guns on hand' or can obtain them and is willing to sell has so engaged." *Id.* at 8. However, the Senate Committee noted that "S. 914 would substantially narrow these broad parameters by requiring that the person undertake such activities as part of a 'regular course of trade or business

---

[30] *Carter* did not even disclaim a requirement of proof of profit; indeed, the defendant had made multiple sales. 801 F.2d at 80-82.

APPX.291

with the principal objective of livelihood and profit.'" *Id.*; *see also* House Report 99-495[31] ("This definition, which does not follow the case law, is likely to have a serious weakening effect on the GCA.").  FOPA thus was a deliberate departure from the case law on which the NPRM relies, and the Ninth Circuit's continued reliance in *King* on the pre-FOPA standard is clearly erroneous.

To the extent that ATF wishes to nationalize a pre-FOPA approach advanced by, at most, only one or two outlier courts, the NPRM is the inappropriate vehicle to advance such policy goals, as it is the duty of Congress to set nationwide legislative policy, the duty of the judiciary to interpret such legislation, and the duty of the Supreme Court to address issues of interpretive uniformity among the circuits.  *See* U.S. Const. art. I, § 1; *Patchak v. Zinke*, 138 S. Ct. 897, 904 (2018); *Bousley v. United States*, 523 U.S. 614, 618 (1998).  At bottom, "the role of the agencies remains basically to execute legislative policy; they are no more authorized than are the courts to rewrite acts of Congress."  *Talley v. Matthews*, 550 F.2d 911, 919 (4th Cir. 1977).

## G. The NPRM's Definition of "Personal Collection" Impermissibly Erodes Statutory Protections for Non-Business Conduct

Following the NPRM's atextual, revisionist theme, the NPRM purports to "clarify" a statute that already is clear on its face.  The statutory definition of "dealer" expressly excludes from attendant licensing requirements "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."  18 U.S.C. § 921(a)(21)(C).  Thus, a plain reading of the statute makes clear that three safe harbors exist:

1. "occasional sales, exchanges, or purchases of firearms *for the enhancement of a personal collection*";

2. "occasional sales, exchanges, or purchases of firearms … *for a hobby*."; or

---

[31] https://tinyurl.com/2s47zmbj.

3. "a person … *who sells all or part of his personal collection of firearms*."[32]

By use of two "or's" and two "for's," Congress clearly intended a broad range of conduct to fall outside the statutory definition of "dealer."

In contrast, the NPRM proposes to define "personal collection" and related phrasings like "personal collection of firearms" and "personal firearms collection" as "[p]ersonal firearms that a person accumulates for study, comparison, exhibition, or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, or skeet, target, or competition shooting)." NPRM at 62021. This proposed definition's syntax and limiting language contradict the statutory language it purports to "clarify."

First, the NPRM impermissibly excises the word "hobby" from the statute, and tucks it away within the definition of "personal collection," meaning a "hobby" is no longer its own *separate* safe harbor. *But see* NPRM at 62004 (treating "collection" and "hobby" as distinct "exclu[sions]," showing that ATF apparently is confused about its own NPRM). But an agency cannot override a deliberate separation of phrases in a statute by combining them into a novel jumble, because Congress clearly intended these phrases to mean different things. Indeed, "every word and every provision is to be given effect.... None should be ignored. *None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence*." Scalia & Garner, *supra*, at 174 (emphasis added) (discussing the surplusage canon of statutory interpretation).

Second, the NPRM impermissibly limits the contexts in which a "personal collection" of firearms may exist. The NPRM defines a "personal collection" as the accumulation of firearms

---

[32] This could be one, ten, or a thousand.

only "for study, comparison, exhibition, or for a hobby" (all recreational type purposes), to the exclusion of other contexts that undoubtedly also apply to the "personal collection" of firearms discussed in the statute. NPRM at 62021. For example, an accumulation of firearms for long-term investment purposes constitutes a "personal collection," and not business activity where a license is required, in much the same way that the accumulation of securities in one's 401(k) does not make one a professional stock trader. Moreover, millions of Americans "accumulat[e]" personal firearms for a variety of purposes unrelated to "study, comparison, exhibition, or for a hobby." For example, many gun owners possess "arms" for self-defense, the purpose of contributing "to the security of a free State"[33] or, if at some point it becomes necessary, for refreshing "the tree of liberty."[34] ATF cannot claim that a personal collection of firearms for these purposes is not in fact a "personal collection," just because the NPRM seeks to recast the statutory phrase in entirely recreational terms.

Moreover, the NPRM limits the contexts of personal collecting to "noncommercial, recreational activities for personal enjoyment." NPRM at 62021. But, for example, receiving instruction on the use of firearms for self-defense and "the imposition of proper discipline and training" hardly can be characterized as "recreational"[35] activities, yet they are perfectly valid (if not paramount) reasons to acquire firearms. *District of Columbia v. Heller*, 554 U.S. 570, 597 (2008) (discussing the meaning of a well-regulated militia); *see also id.* at 599 ("The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting.").

---

[33] U.S. Const. amend. II.
[34] Letter from Thomas Jefferson to William Smith (Nov. 13, 1787), https://tinyurl.com/26u4hfz8.
[35] *See Recreation*, Merriam-Webster, https://tinyurl.com/yz22454a (last visited Nov. 1, 2023) (defining the term as "a means of refreshment or diversion" and finding it synonymous to "fun and games").

To the extent that the NPRM purports to exclude from a "personal collection" those firearms owned for self-defense, such a reading would in fact render the statute unconstitutional. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2143 (2022) (noting that arms "in 'common use' for self-defense today" are among those arms which the Second Amendment protects).

Third, regardless of whether the NPRM's "*e.g.*," parenthetical applies to just a "hobby" or the entire phrase "study, comparison, exhibition, or for a hobby," the NPRM necessarily limits personal collections to those that are "noncommercial, recreational activities for personal enjoyment, such as hunting, or skeet, target, or competition shooting." NPRM at 62021. Moreover, the NPRM does not use the word "includes" in the definition of "personal collection," indicating that "study, comparison, exhibition, or for a hobby" might be the only purposes included. *See* Scalia & Garner, *supra*, at 93 (providing under the omitted-case canon that "[n]othing is to be added to what the text states or reasonably implies.... That is, a matter not covered is to be treated as not covered."); *see also id.* at 199 ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned (*ejusdem generis*).")." Accordingly, the NPRM's proposed definition apparently fails to consider the exercise of Second Amendment rights (not "a hobby" and certainly not merely "for personal enjoyment") as legitimate non-dealer activity.

Fourth and finally, the NPRM provides that the "term [personal collection] shall not include any firearm purchased for the purpose of resale or made [sic] with the predominant intent to earn a profit." NPRM at 62021. But the statute does not say that, nor does it support such a reductionist reading of mere "purpose" or "predominant intent" when the statute requires a multitude of other elements to constitute business activity. *See* 18 U.S.C. § 921(a)(21)(C) (requiring not merely "any firearm purchased for the purpose of resale," but instead "a regular course of trade or business"

27

and "the repetitive purchase and resale of firearms" to be "engaged in the business").  Finally, by imposing a disjunctive condition ("purchased for the purpose of resale *or* made with the predominant intent to earn a profit"), the NPRM negates the required statutory conjunction and instead allows *either* condition to require licensure.

All told, the statute supports none of the NPRM's proposed revisions to the plain, unambiguous meaning of "personal collection."

## H. The NPRM Improperly Rewrites the Statutory Definition of "Responsible Person"

The statute defines a "responsible person," without actually naming the term, as "in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association."  18 U.S.C. § 923(d)(1)(B).  Congress created this definition in the narrow context of requiring FFL applicants to not be "prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (n)." *Id.*  Although Congress certainly had ample opportunity to revise this statute during the BSCA's drafting, it did not do so.

Enter ATF.  The NPRM "proposes to add a regulatory definition of the term 'responsible person'" which ATF claims "comes from" elsewhere in the statute.  NPRM at 62004.  However, the NPRM's proposed definition *counterfeits new language not found in the statute* and adds it directly to the regulatory definition.  *Compare* 18 U.S.C. § 923(d)(1)(B) ("in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association"), *with* NPRM at 62022 (emphasis added to denote additions) ("Any individual

possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, **and business practices** of a corporation, partnership, or association, **insofar as they pertain to firearms**.").

Clearly, this regulatory definition is intended to, and has the effect of, watering the statutory language down in order to cover more people and conduct than Congress authorized – otherwise, the NPRM would simply copy and paste the existing statutory definition. To illustrate, while the "management" and "policies" of an organization contemplate individuals with some form of managerial control, almost anyone can "indirectly … cause the direction of … business practices," NPRM at 62022, because "business practices" are entirely amorphous. A "practice" simply is the "actual performance" of something, or even "a repeated or customary action,"[36] regardless of whether such an action is permitted by or contrary to the "management" or "policies" of the organization. For example, a lawyer retained to provide regulatory advice to an FFL can "indirectly … cause the direction of … business practices" of a gun store, but clearly does not become a "responsible person." So can gun store clerks, who direct "business practices" each time they perform their job duties, whether in accordance with store policy or not.

To be sure, the NPRM anticipates this objection and makes the hollow assurance that "this definition would not include store clerks or cashiers who cannot make *management or policy* decisions with respect to firearms … even if their clerical duties include buying or selling firearms for the business." *Id.* at 62005 (emphasis added). But this example simply parrots the existing statutory definition and *does not address* the effects of the newly added "business practices" language. And, regardless of whatever this assurance may be worth (not much), the text of the amended regulation ultimately will control. *See Tex. Child.'s Hosp. v. Azar*, 315 F. Supp. 3d 322,

---

[36] *Practice*, Merriam-Webster, https://tinyurl.com/bd8wrsvf (last visited Oct. 31, 2023).

334 (D.D.C. 2018) (citation omitted) ("the preamble to a statute or rule may be used to help inform the proper interpretation of an ambiguous text. The preamble cannot, however, be used to contradict the text of the statute or rule at issue."); *Hearn v. W. Conf. of Teamsters Pension Tr. Fund*, 68 F.3d 301, 304 (9th Cir. 1995) (observing that "legislative history – no matter how clear – can't override statutory text"); *see also* Scalia & Garner, *supra*, at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").

To make matters worse, the NPRM does not offer any explanation for the apparent necessity of amending the existing statute to include this language – something ATF has no authority to do in the first place. Instead, the NPRM obliquely states that the purpose of this redefinition is "[t]o accompany" all the other changes made in the NPRM. NPRM at 62004. It appears, then, that ATF's only justification is that ATF *already has usurped* the legislative power from Congress. *See id.* ("This definition … has long been reflected on the application for license (Form 7) and other ATF publications since enactment of a similar definition in the Safe Explosives Act in 2002."). But the "similar definition" in the Safe Explosives Act mirrors 18 U.S.C. § 923(d)(1)(B), providing no more support for ATF's statutory revisionism than does the GCA licensing definition. *See* 18 U.S.C. § 841(s). In other words, Congress has not once – but twice – declined include the so-called "business practices" that the NPRM now seeks to add to its regulation.

Finally, the NPRM's definitional rewrite risks codifying one of ATF compliance inspectors' favorite methods of FFL revocation, wherein they claim someone from outside the company – like a spouse – is in fact a "responsible person" whose unlicensed status warrants revocation of a license, in the face of an otherwise spotless compliance record. *See, e.g.*, *MEW Sporting Goods, LLC v. Johansen*, 992 F. Supp. 2d 665 (N.D. W. Va. 2014) (holding that the FFL applicant's wife

was a responsible person because she handled the day-to-day operations of the gun-sales business while the applicant worked a different full-time job); *see also Gossard v. Fronczak*, 206 F. Supp. 3d 1053 (D. Md. 2016) (holding that the FFL applicant's willful failure to list a landlord as a responsible person permitted ATF to deny the FFL application).

## I. The NPRM's Rules for Former Licensees Conflict with the Statute

As discussed in more detail below, the NPRM creates the sort of Catch-22 situation where ATF proposes first to demand a gun owner to obtain a firearms license in order to sell a few personal firearms, but then deny that person the very same license, on the theory that the person previously had been unlawfully engaged in the business. *See* Section IV(D), *infra*; NPRM at 62008, 62009, 62003 n.83, 61999-62000. This sadly ironic situation is further magnified in the case of a former licensee whose license is either relinquished or revoked.

As the NPRM explains, one of the "presumptions that a person is 'engaged in the business'" occurs when "a former licensee … sells or offers for sale firearms that were in the business inventory … at the time the license was terminated (*i.e.*, license revocation) … and *were not transferred* to a personal collection...." NPRM at 61999, 62001 (emphasis added). Alternatively, the NPRM creates another two dealing presumptions if "a former licensee … sells or offers for sale firearms that *were transferred* to a personal collection" with "intent to willfully evade the restrictions placed on licensees" and/or "*one year has [not] passed* from the date of transfer to the personal collection." *Id.* at 62001 (emphasis added). In the case of "willfully evading," the NPRM claims that "that firearm **_always_** legally remains part of the business inventory."[37] *Id.* at 61995 (emphasis added). In other words:

---

[37] ATF provides no citation for this claim. Nor is it logical, because once a former licensee is no longer licensed, there is no "business inventory" because there is no "business."

1. Former inventory not transferred to a personal collection **may never be transferred**;

2. Former inventory that was unlawfully transferred **may never be transferred**; and

3. Former inventory that was transferred **cannot be transferred for one year**.

These absurd rules put persons whose licenses are revoked or relinquished in untenable positions that Congress clearly never intended.

As a preliminary matter, ATF's presumptions *for non-licensees* conflict with the statutory text, which on its face applies only to "*licensees*." Indeed, 18 U.S.C. § 923(c) is clear that a license "shall entitle **the licensee**" to engage in various activities, clarifying that a "**license[e]** [may] ... maintain[] and dispos[e] of a personal collection," and that "**a licensee** ... [may] dispose[]" of such firearms " within one year after its transfer from his business inventory into such **licensee's** personal collection." *See also* NPRM at 61995 (using the term "licensee" eleven times to describe Section 923(c)'s requirements). Notably, none of these provisions applies to an *unlicensed person* who happened to *formerly* have held a federal firearms license.[38] Nor do ATF's attempts to apply these requirements to non-licensees make any sense.

First, no longer being licensed, a former licensee no longer can "transfer" a firearm from business inventory to a personal collection, even if that should have occurred at the time of revocation or relinquishment. And as for a revoked licensee, such person may not ever become licensed again, even if for the sole purpose to transfer the alleged "business inventory" firearms to a personal collection. *See* Senate Report 98-583 at 13 (envisioning that only a "*licensee* would be

---

[38] The NPRM's proposal to apply these requirements to "responsible persons" is doubly problematic. *See* NPRM at 61993, 62001, 62003. Notably, the statute includes what ATF calls "responsible persons" **only** in its discussion of who must be eligible to possess firearms when defining "the applicant" to include "a corporation, partnership, or association." 18 U.S.C. § 923(d)(1)(B). The statute certainly imposes no restrictions on what the responsible person of a former licensee may do with firearms.

required to re-transfer any such firearms into his inventory, then transfer them at his premises with appropriate recording.").

Second, while transfers to a personal collection to evade the GCA might support a criminal charge (for the *prior* activity), they do not demonstrate that a former licensee *continues* to be engaged in the business. Nor does a purportedly unlawful prior transfer somehow permanently taint a firearm and restrict a lawful future transfer.

Third, there plainly is no statutory requirement that a *former* licensee wait one year before disposing of firearms in a personal collection. Rather, Section 923(c) requires that such a transfer be made only after a *licensee* transfers the firearm *back* to its "business inventory," and out again in its "bound volume." A former licensee does not have "business inventory," nor is such person required by any law to keep a "bound volume." Thus, the statute clearly does not regulate activities by unlicensed persons, even if they previously were licensed.

For the first and second groups of former licensees whose licensees were revoked — and who by law may never again qualify for a license (18 U.S.C. § 923(d)(1)(C)) – there would be literally no way for such persons to liquidate their former inventory that was not transferred to a personal collection to ATF's satisfaction. Unable to obtain a license to do so, ATF's absurd rule would create an untouchable class of firearms that *literally may not be transferred under any circumstance* (other than, perhaps, giving them away for free, as gifts).[39]

The ridiculous situation imposed by the NPRM on former licensees, then, is contrary to ATF's promise to "address[] the lawful ways in which former licensees … **_may liquidate_** business

---

[39] In such a situation, a former licensee could not even safely sell its firearms at a loss. *See United States v. Shipley*, 546 F. App'x 450, 454 (5th Cir. 2013) ("while a conviction requires that the defendant had the 'principal objective' of making a profit, but it does not require that he succeeded in that endeavor."); *United States v. Beecham*, 1993 U.S. App. LEXIS 13050, at *3 (4th Cir. June 2, 1993) (government "need not prove … that he necessarily made a profit from it").

inventory." *Id.* at 61993. In reality, the NPRM actually declares that, in certain situations, former licenses **_may not liquidate_** their inventory at all.[40] This absurd rule that certain firearms may never be transferred may also constitute an unconstitutional taking without compensation.

## IV. The NPRM's Civil "Presumptions" Are Arbitrary and Capricious, Contrary to Law, Unrepresentative of Business Activity or Profit Motive, and Would Penalize Innocuous Conduct

The NPRM proposes a staggering number of so-called "presumptions" which, once levied against an accused, will saddle gun owners with unprecedented obligations to affirmatively *prove* that they are *not* violating statutory prohibitions which carry both civil and criminal penalties. ATF's "presumptions" bifurcate into six "engaged in the business" presumptions and eight "to predominantly earn a profit" sub-presumptions. NPRM at 62021-22. Although acknowledging the "totality of circumstances" and "fact-specific inquiry" necessitated by statute, *id.* at 62000, 62021, the NPRM nonetheless taints all sorts of innocuous types of conduct with assumed illegality, without any regard for consideration of the whole picture of any given case. ATF's "presumptions" undermine the statute, are entirely arbitrary, and should not be promulgated.

### J. ATF's "Presumptions" Conflict with the Statute and Judicial Precedents

As a preliminary matter, the notion that there are various actions a person can take which "presumptively" prove she is unlawfully "engaged in the business" is a concept found nowhere in the statutes Congress enacted. Yet Congress is no stranger to such civil presumptions, and thus perfectly competent to enact such provisions when it so desires. *See, e.g.*, 18 U.S.C. § 1469(a)

---

[40] ATF apparently believes these provisions are necessary to "prevent former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms." NPRM at 61996. But ATF forgets that being "engaged in the business" requires both "purchase **_and_** resale of firearms." Simply disposing of inventory held during licensure, by definition, cannot possibly constitute "purchase" of firearms, when no new firearms are acquired.

(creating a criminal presumption that obscene material was transported in interstate commerce);

18 U.S.C. § 3142(e)(2) (creating a criminal presumption of pretrial detention if the defendant has

been convicted of certain enumerated offenses); 35 U.S.C. § 282(a) ("A patent shall be presumed

valid."); 38 U.S.C. § 1118 (creating a civil presumption of service connection for certain illnesses

associated with service in the Gulf War for purposes of VA compensation).  Thus, with no statutory

authority creating (or authorizing ATF to create) legal presumptions of statutory guilt, the NPRM

fails even to clear the starting gate, because ATF simply has no authority to water down the text in

order to make it easier for its bureaucrats to harass gun owners.

Interestingly enough, ATF previously appears to have recognized that it lacks the authority

to do what the NPRM proposes to do.  On March 31, 1988, ATF adopted the current regulatory

definitions.  *See* 53 FR 10480.  In so doing, ATF engaged with a commenter who had requested

that "the definition list examples illustrating when a license is required," but declining to create

such a list "since the definition adequately addresses this concern by expressly delineating the

activity requiring licensing from that of a firearms collector not subject to licensing."  *Id.* at 10481.

In other words, the NPRM does the very thing that ATF in 1988 claimed the statute did not allow.

What is more, the NPRM repeatedly acknowledges that the "engaged in the business"

inquiry is a "fact-specific inquiry," and that "the established approach … is to look at the totality

of circumstances."  NPRM at 62000, 62021.  Indeed, numerous courts have said as much.  *See*

NPRM at 61995 n.20 (citing *United States v. Brenner*, 481 F. App'x 124, 127 (5th Cir. 2012) ("jury

must examine all circumstances … without the aid of a 'bright-line rule'")); *United States v. Bailey*,

123 F.3d 1381, 1392 (11th Cir. 1997) ("finder of fact must examine the intent of the actor and all

circumstances surrounding the acts alleged....")); *see also* NPRM at 61995 (citing *United States v.*

35

*Tyson*, 653 F.3d 192, 200-01 (3d Cir. 2011) ("the importance of any one of these considerations is subject to the idiosyncratic nature of the fact pattern")).

The NPRM violates these principles, creating a prohibited "bright-line rule" whereby certain conduct or activity – by itself – is presumed to constitute a federal offense. By permitting a finding that a person is "engaged in the business" based solely on any one of many factors, the NPRM impermissibly fails to require consideration of "the intent of the actor" and "the totality of circumstances," instead presuming intent based on a single factor. *See id.* at 62001 ("[a]ny one or a combination of the circumstances above gives rise to a presumption"). This is precisely what the case law *says not to do*. There is no authority in either the statute or judicial precedent for the idea that ATF may show a person is "engaged in the business" by glomming on to a single data point and claiming that it, by itself, is sufficient.[41]

Simply put, each of the cases ATF references listed a variety of factors that – taken together in various combinations – were considered sufficient to demonstrate unlawful dealing. The NPRM now claims that *any one* of the items from *any one* of those lists – by itself – is sufficient. Worse still, the NPRM uses imprecise language. For example, although claiming (albeit, wrongly) that certain "specific activities demonstrat[e]" that a person is "***presumptively*** … 'engaged in the business,'" the NPRM then includes something of a Freudian slip, treating that alleged *presumption* as in fact being *conclusive* – claiming that anyone who meets a presumption is "***thus require[d]*** to obtain a dealer's license...." *Id.* at 61996 (emphasis added). Of course, a person cannot be required to obtain a dealer's license even if presumed to be – but in fact not actually

---

[41] By way of analogy, what the NPRM does is take a court case that says "We have a door, we have a windshield, we have an engine, we have a steering wheel, and we have four tires. We reasonably can conclude that this is a car," and translate that into a test that says "whenever there is a door, we *presume* it is a car."

being – engaged in the business.  *Cf. id.* at 61999 (conceding that such a person is only "highly likely to be 'engaged in the business'").  But even aside from these overarching defects with the NPRM's "presumptions," the presumptions themselves should be withdrawn because they are arbitrary standards which will chill and prevent entirely innocent and perfectly lawful activity that Congress designed the statute to permit.

### K.  The "Engaged in the Business" Presumptions Are Overwhelmingly Arbitrary

First, the NPRM provides that "[a] person shall be presumed to be engaged in the business of dealing in firearms … when the person … [s]ells or offers for sale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and sell additional firearms."  NPRM at 62021.  Under the plain text of this presumption, the mere offer to sell one firearm to a friend and the *suggestion* that another future sale *could* occur would suffice to presumptively require federal licensure.  Indeed, a casual firearm owner's innocent remark that "Yeah, I might consider selling that rifle if I can find something to replace it," heard by the wrong ears, could "otherwise demonstrate[] a *willingness and ability* to purchase and sell additional firearms."  *Id.* (emphasis added).  To the contrary, the statute does not criminalize this sort of innocent conduct by gun owners.

Second, the NPRM presumes unlicensed dealing whenever a person "[s]pends more money or its equivalent on purchases of firearms for the purpose of resale than the person's reported gross taxable income during the applicable period of time."  *Id.*  But such a standard fails to consider the numerous circumstances in which one may have a low – or no – gross taxable income, therefore exposing any purchase "for the purpose of resale" – which is not forbidden by statute – to the presumption of unlicensed dealing.  For example, purchasing a firearm on the first day of the year

and subsequently losing one's job could create a condition where "more money" was spent on firearms than gross taxable income, at least until a new job was found.

Next, the phrase "the applicable period of time" is entirely ambiguous in scope – for example, most people do not earn any gross taxable income five minutes before and five minutes after purchasing a new gun. But hyperbole aside, some workers are paid weekly, some bi-weekly, and some monthly, while some receive quarterly sales commissions. What is to stop ATF from ignoring a large commission check earned December 31 of the prior year, and claiming that a March 15 firearm purchaser has had *no income at all for the entire quarter*? The potential for abuse of this absurd "applicable period of time" language is not hard to see.

A firearm purchase made while living off one's savings or retirement accounts would also qualify under ATF's ridiculous standard, because a person making withdrawals from a savings account or Roth IRA has no taxable income at all. So too would a purchase made using Social Security or VA disability benefits, or even a settlement from an injury (none of which are taxable). At bottom, millions of Americans have no taxable income,[42] or even gross income, and a "presumption" that they engage in the business if they buy and sell a few guns is entirely untethered to reality.

Moreover, this presumption's qualification that such purchases be "for the purpose of resale" must comport with the statute, which requires "the *repetitive* purchase and resale of firearms," in the plural, and exempts certain personal "sales, exchanges, or purchases of firearms,"

---

[42] Howard Gleckman, *TPC: The Number of Those Who Don't Pay Federal Income Tax Drops to Pre-Pandemic Levels*, Tax Pol'y Ctr. (Oct. 27, 2022), https://tinyurl.com/yryyvu99 ("About 30 million households, or about 16.5 percent, will pay neither federal income tax nor payroll taxes this year.").

APPX.306

also in the plural.  18 U.S.C. § 921(a)(21)(C) (emphasis added).  In other words, resales must be numerous, in contrast to the presumption which contemplates the mere "purpose of resale."

Third, the NPRM presumes unlicensed dealing upon the mere "[r]epetitive[] … offer[] for sale" of firearms, *inter alia*, "imported in violation of law."  NPRM at 62021.  Although not listed as an example in the NPRM, there is no reason this presumption would not apply, on its face, to alleged violations of 18 U.S.C. § 922(r), which implicates countless imported braced pistols that ATF magically now claims are "semiautomatic rifles" and which ATF alleges should not have been imported.  *See* 88 FR 6478.  In other words, the mere offer to sell more than one braced pistol – which number in the tens of millions nationwide[43] – could suffice to presumptively establish unlicensed dealing under the NPRM.  But again, even a repetitive "purchase[] for the purpose of resale" or "s[ale] or offer[] for sale" is insufficient as a matter of law when the statute requires both "the repetitive purchase *and* resale of firearms."  18 U.S.C. § 921(a)(21)(C).  It is also worth mentioning that the presumption that any sale of a firearm with the "serial number removed, obliterated, or altered" constitutes dealing, (NPRM at 62021), fails to consider that 18 U.S.C. § 922(k) recently was struck down by at least one federal district court.  *See United States v. Price*, 635 F. Supp. 3d 455 (S.D. W. Va. 2022).  At bottom, the NPRM offers no explanation how possession of certain purportedly unlawful firearms (stolen guns, serial numbers removed, import violations), in addition to constituting its own separate crime, *also* constitutes unlawful dealing.  The statute certainly draws no connection between them.

Fourth, the NPRM presumes unlicensed dealing each time someone "[r]epetitively sells or offers for sale" firearms:

---

[43] William J. Krouse, *Handguns, Stabilizing Braces, and Related Components*, Cong. Rsch. Serv., https://tinyurl.com/ycxdhxvr (Apr. 19, 2021).

**39**

1) "[w]ithin 30 days after the person purchased the firearms,"

2) "[t]hat are new, or like new in their original packaging, or are

3) "[o]f the same or similar kind … and type."  NPRM at 62021.

But any number of innocuous circumstances reveal just how misguided and overbroad this presumption is.  As for the "30 days" presumption, ATF appears to base its arbitrary timeframe entirely on *a minority of* retailers' return windows.  *Id.* at 62003 n.80.  But as the NPRM itself admits, *most retailers allow no returns at all.  Id.* (acknowledging that, "while many retailers do not allow firearm returns,[44] some" do).  As a result, the NPRM will in fact *presume* unlawful activity when people sell a couple firearms within a month of purchasing them.  Of course, there are any number of reasons a person might want to get rid of a recently acquired firearm – regret of having overspent one's means, a firearm that did not fulfill needs or expectations, the need for the firearm (perhaps a hunting trip) has passed, *etc.*[45]  None of these people is unlawfully dealing.  Doing further damage this presumption's focus on the timing of sales, the Third Circuit has

---

[44]  *See, e.g.*, *Sportsman's Warehouse – Return Policy*, Sportsman's Warehouse, https://tinyurl.com/3h6pc3kz (last visited Oct. 31, 2023) (emphasis added) (announcing that "[t]he following items *cannot be returned*: … *Firearms*, Ammunition, … and related products"); *Shipping & Returns*, Buds Gun Shop, https://tinyurl.com/2c34usdv (last visited Oct. 31, 2023) ("Once a new firearm is transferred to you, it is considered used, even if un-fired. Consequently, we cannot accept returns on firearms once they have been transferred into your possession.").

[45] For example, without specific firearm models available to examine in person, one may discover poor ergonomics only after they have purchased and received a firearm from an online retailer with a "no returns" policy.  In such a case, one will have no recourse but to sell the firearm to another soon after initial receipt.  Likewise, innocuous circumstances such as simply falling on hard times, voluntary liquidation due to mental-health concerns, or even involuntary liquidation due to becoming a prohibited person under state or federal law, could see individuals conducting multiple sales practically contemporaneously with previous purchases.  The perverseness of a regulation mandating such people to retain their firearms until they become licensed (an impossibility for the felon) cannot be understated.

40

explained that the dealing "inquiry is not limited to … the timing of the sales." *United States v. Palmieri*, 21 F.3d 1265, 1268 (3d Cir. 1994).

As for the NPRM's like-new or original-packaging presumption, this bizarre edict will punish collectors and casual firearm owners alike for their diligence in maintaining original boxes, warnings, manuals, and even factory-included safety accessories.  Indeed, many people who are in no way "dealers" under the statute sell firearms secondhand, advertising them as "new in box," or "never fired," and therefore in "collector's condition."  Other gun owners are more interested in collecting firearms than shooting them.  Moreover, this presumption contains no temporal limitation, so the requirement of "repetitive" sale or offer of sale of "new in box" firearms ostensibly could be satisfied *years* apart (*i.e.*, a listing for "original 1986 Glock 17, Gen 1, new in box!").  The NPRM thus shows ATF's extreme disconnect from the reality of the behavior of ordinary, law-abiding gun owners who are in no way "engaged in the business."

ATF's "same or similar kind … and type" presumption suffers from similar real-world defects.  Contrary to ATF's claim, collectors *routinely* purchase multiple examples of the same kind (make, model, etc.) and type (rifle, pistol, etc.) of firearm, such as C&R collectors of military surplus arms.  The eventual sales of these firearms – often after years or even decades of appreciation – cannot reasonably be presumed to be "dealing."  For example, if one purchased 20 surplus rifles a decade ago as an investment, shot them little but admired them much, while hoping they would increase in value, even the repetitive sale of the same "type" of firearm now would not constitute "dealing," as it simply would be the earning of a return on one's hobby investment.  Moreover, with no limiting principle as to what is "similar" enough to constitute a "similar kind" or "similar … type" of firearm, this presumption opens the door to arbitrary and discriminatory enforcement where a Glock and a Steyr could be considered "similar" enough "makes" just for

41

being Austrian and polymer, if one squints hard enough. And, because this presumption reads the conjunctive initial "purchase" requirement right out of the statute, even a son offering his father's inherited collection for sale would be swept up in the NPRM's presumption of unlicensed dealing. *See* NPRM at 62021 (contemplating only the repetitive sale or offer of sale of firearms without any acquisition). Like the others, this "presumption" offers no guiding principle to delineate between unlawful and perfectly innocent conduct.[46]

## L. The NPRM's "Predominantly Earn a Profit" Presumptions Are Overwhelmingly Arbitrary

Next, although acknowledging that the intent to profit "is a fact-specific inquiry," the NPRM proposes eight presumptions that purportedly establish "the intent to predominantly earn a profit from the sale or disposition of firearms" – **without the consideration of any other facts**. NPRM at 62021. However, just like the NPRM's "engaged in the business" presumptions, these sub-presumptions are also defective for implicating far too much innocuous conduct.

First, the NPRM presumes all advertising, marketing, or promotion of a "firearms business" displays an intent to predominantly earn a profit. NPRM at 62021. But that is not the presumption the NPRM *actually* creates. Rather, the NPRM claims that merely "advertis[ing] or **post[ing] firearms for sale**, including **on any website**" shows that a person intends to profit. *Id.* (emphasis added). Under this presumption, then, anyone who wishes to sell even *one* firearm from their personal collection, and who posts a sale listing on an online forum, whether public or private, will be presumed to have a business-related profit motive. This is absurd. As ATF readily acknowledges, **most private sales** of firearms these days **involve online mediums** (*i.e.*, online

---

[46] The NPRM's misguided rules that apply to "former licensees" and their "responsible persons" are addressed *supra*, and are not discussed further here.

APPX.310

postings). *Id.* at 62008. Many of them involve transfers through licensed dealers (such as sales across state lines that occur between private parties on GunBroker or ArmsList). Either way, the fact that a person posts grandad's shotgun for sale in a hometown forum does not an unlawful firearms dealer make.

Second, the NPRM presumes anyone who "[p]urchases, rents, or otherwise secures or sets aside permanent or temporary physical space to display or store firearms they offer for sale" must have the intent to predominantly earn a profit. NPRM at 62021-22. However, this presumption is in outright conflict with the statutory protection for those who wish to "sell[] all or part of [their] personal collection of firearms" at a public location, like a gun show. 18 U.S.C. § 921(a)(21)(C). Indeed, some of the best places to liquidate such a personal collection would be public gatherings *designed* to facilitate firearm transactions. ATF cannot presume statutory violations from conduct that the statute explicitly protects. Not to mention, literally every person who possesses firearms "sets aside … physical space to … display or store [their] firearms," such as a "display case" (*id.* at 62021-22), home gun safe, or even tucked in a nightstand drawer. A dentist who keeps a couple firearms in his office for self-defense has set aside "part … of a business premises." *Id.* at 62022. The NPRM's foolish and uncabined presumption would turn literally every gun owner who has ever sold a gun into an unlicensed firearms dealer.

Third, the NPRM presumes anyone who "[m]akes or maintains records, in any form, to document, track, or calculate profits and losses from firearms purchases and sales" must have the intent to predominantly earn a profit. NPRM at 62022. If the others did not already, this presumption borders on the inane, if not the insane. Indeed, many firearm owners maintain documentary evidence of their firearm collections, records of modifications, receipts of purchases, and bills of sale, purely for organizational or accounting purposes which have nothing to do with

43

dealing or profiting from business activity. Should ATF come across a collector's spreadsheet,[47] for example, such documentation automatically would support a presumption of a GCA violation that the unwitting collector would be forced to rebut, at their own cost, should ATF initiate an administrative enforcement action (or seek to invoke its presumptions in a criminal case). Worse yet, ATF speaks out of both sides of its mouth, because ATF in fact *recommends* that people maintain documentation of their firearm purchases and sales, even providing an official booklet to do so.[48] It is beyond hypocritical for an agency that desires records of every firearm transfer[49] to claim that such records in the hands of law-abiding gun owners somehow constitute evidence of criminal activity.

Fourth, the NPRM presumes anyone who "[p]urchases or otherwise secures merchant services as a business (*e.g.*, credit card transaction services, digital wallet for business) through which the person *makes or offers to make payments for firearms* transactions" has the intent to predominantly earn a profit. NPRM at 62022 (emphasis added). As worded, then, this presumption appears to target *buyers* of firearms who *make* electronic payments, rather than purported *dealers* who *accept* electronic payments when they sell guns. *See id.* (emphasis added) ("the person *makes or offers to make* payments"). Yet when discussing this language "make payments," the NPRM confusingly references a case involving a defendant selling firearms (*i.e.*, *accepting* payments). *See id.* at 62005 n.97 (citing *United States v. Dettra*, 2000 U.S. App. LEXIS

---

[47] Even a licensed collector of curios and relics (FFL 03) would risk liability under this presumption, because they are in fact *required* by ATF to maintain such documentation. However, the NPRM will presume that even *these* FFLs simply have the *wrong* FFL (collector, not dealer).

[48] *See Personal Firearms Record*, ATF, https://tinyurl.com/7b48hfhc (last visited Oct. 31, 2023).

[49] *See* Houston Keene, *Texas Congressman Introduces Anti-Gun Registry Bill as ATF Cracks Down on Gun Stores*, Fox News (Mar. 1, 2023, 1:09 PM), https://tinyurl.com/4u6992vb (reporting on GOA's discovery that "ATF has processed and digitized over 50,000,000 'out of business' records of gun dealers in FY 2021" and that "ATF has reached a point where it has converted nearly one billion records … into a single, centralized, and searchable national gun registry").

33715, at *2 (6th Cir. Dec. 15, 2000)). In other words, it is entirely unclear who ATF is trying to target with this presumption. But either way, the presumption swings too far.

For starters, if the presumption is interpreted as written (making a dealer out of anyone who *makes electronic payments* for firearms using a business account), that would cover any business that employs armed guards or otherwise purchases firearms for non-dealing business purposes (*e.g.*, the Boy Scouts purchasing .22lr rifles for instructional purposes). Alternatively, to the extent that this presumption is designed to target firearm sellers who *accept electronic payments* through a business account, the dentist discussed *supra* might choose to sell one of his firearms to a patient after striking up a conversation about their common hobby. Should the dentist add that cost to the total bill, and accept payment by credit card, ATF would presume him intending to profit from the sale, even though the dentist has not remotely "engaged in the business" either under the totality of the circumstances or the statute's plain text. Indeed, any ordinary gun owner with a small business[50] PayPal account – which permits payment via credit card[51] – who accepts payment for an unrelated firearm sale could irrationally be argued to constitute a "merchant service[] as a business" "secure[d]" to accept "payments for firearms transactions." NPRM at 62022. When every small eBay seller must worry about becoming a presumptive "dealer" should they sell a personal firearm, perhaps the NPRM has strayed a bit too far.

Fifth, the NPRM presumes anyone who "[f]ormally or informally purchases, hires, or otherwise secures business security services … to protect business assets or transactions that include firearms" must have the intent to predominantly earn a profit. ATF is once again off the

---

[50] "Small business" may be a low bar these days, when PayPal must report total annual "goods and services" payments in excess of $600 to the IRS. *See Will PayPal Report My Sales to the IRS?*, PayPal, https://tinyurl.com/2s43jjdp (last visited Nov. 2, 2023).
[51] *See* Meena Thiruvengadam, *Boost Your Rewards by Using PayPal with Your Credit Cards*, Points Guy (Mar. 24, 2020), https://tinyurl.com/muan9fsr.

APPX.313

rails.  Corporations and other business entities may own firearms without having remotely anything to do with the business of firearm dealing.  For example, an armored truck or security guard company no doubt has a warehouse/central location where employees' work firearms are stored.  If the company then has some monitored security cameras installed to secure those firearms – and one day sells its old firearms to a dealer so it can then buy new ones – that company would become an unlawful dealer under this "presumption."  Is every Sheriff's department with a security system now a presumptive unlicensed firearms dealer when it trades in old duty guns?

Sixth, the NPRM presumes anyone who "[f]ormally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes or offers to make firearms transactions" is presumptively intending to earn a profit.  NPRM at 62022.  But again, the case ATF references involved an entirely more damning fact pattern than the "presumption" the NPRM creates.  ATF's cited case involved a defendant who "possessed a federal firearms license … allowed the FFL to lapse," continued to "advertis[e] that 101 Outdoors sold … guns and ammunition," and had "twelve guns on display, some of which had price tags on them," had "a sign advertising guns and ammo," later had "fifteen to twenty long guns … displayed" outside and "several more long guns and a few handguns" displayed for sale inside and, on another date, had even more and new guns on display and said "he would be having an auction [and] selling rifles, shotguns, and some handguns."  *United States v. Gray*, 470 F. App'x at 468, 469-70 (6th Cir. 2012) (recounting how no fewer than eight different ATF informants and undercover agents had purchased firearms from Gray over a period of many months, and discussed Gray obtaining more firearms to sell them).  In stark contrast to the *Gray* case, the NPRM's presumption would apply to the owner of an antique store who decides to sell her grandfather's WWI-era firearm, and figures

46

that the best place to offer it for sale is at her store. Such person clearly is not "engaged in the business," but the NPRM would lead to that presumption.

Finally, the NPRM's eighth presumption of profit intent is for anyone who "purchases a business insurance policy, including any riders that cover firearms inventory." NPRM at 62022. Once again, this overbroad presumption would cover the armed guard company, or the Boy Scouts, should they purchase insurance to protect their corporate firearm collection against loss, and then later dispose of, sell, trade, or upgrade one or more firearms.

In short, the NPRM's "presumptions" certainly could, in some instances, demonstrate that a person is selling firearms with the intent to make a profit. Problematically, though, each of ATF's presumptions swing far too broadly, sweeping up all manner of innocent conduct and presuming that countless gun owners are seeking to profit and thus engaged in the business based on perfectly innocent activity. That is why courts have uniformly engaged in "fact-specific inquiries" of "the totality of circumstances," without being bound by the sort of "bright-line rule[s]" that the NPRM proposes to create. For this reason (and the numerous others provided above), the NPRM's unlawful "presumptions" should be withdrawn.

## M. The NPRM's Illogical Opposing Presumptions Contravene the Statute

Instead of "assist[ing] persons in understanding" federal law or "clarify[ing] when persons are not 'engaged in the business,'" NPRM at 61993, the NPRM does nothing to benefit gun owners. Rather, the NPRM rewrites the statute, replacing its unambiguous protections with contradictory language preferred by ATF. After labeling various innocuous conduct as "presumptively" violative of federal law, the NPRM reframes the statute's explicit safe-harbor provisions as merely establishing the *absence* of the presumptions ATF just invented. *See id.* at 62021. But there is a massive difference between being **declared not** in violation of federal law

47

APPX.315

(*i.e.*, the statute), versus being ***presumed not*** in violation of federal law, versus ***not being presumed*** in violation of federal law (what the NPRM says). Indeed, the NPRM waters down the statutory protections to the greatest extent possible, replacing the bright line safe harbors Congress enacted with a promise that a person merely will not be presumed to be breaking the law if he engages in certain activities. The NPRM's regulatory rewrite conflicts with the plain text of the statute.

The statute provides that a "dealer in firearms … ***shall not include*** a person who makes occasional sales, exchanges, or purchases of firearms [i] for the enhancement of a personal collection or [ii] for a hobby, or [iii] who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C) (emphasis added). This statutory safe harbor affirmatively declares that certain persons are *not* "dealers" – not by omission, not by presumption, but by express exemption.

In stark contrast, the NPRM provides:

> Where a person's conduct does not otherwise demonstrate a predominant intent to earn a profit, the person ***shall not be presumed*** to be engaged in the business of dealing in firearms when the person transfers firearms only as bona fide gifts, or occasionally sells firearms only to obtain more valuable, desirable, or useful firearms for the person's personal collection or hobby. [NPRM at 62021 (emphasis added).]

This provision is defective for several reasons besides ATF's general lack of authority to legislate. First, it neuters the statute's "shall not include" – an unequivocal statement – to a mere "shall not be presumed." The meaning has changed, the protection has changed, and the burden of proof has changed.

Second, there is a significant difference between being "presumed not" something and being "not presumed" something. The former is closer to the statutory formula; "presumed not" at least affords an individual a protection that the government must overcome. The latter is the NPRM's formula; "not presumed" merely exempts an individual from a burden that normally must be overcome. Of course, even a "presumed not" formula would not be sufficient, as the statute is

definitive and forecloses being "engaged in the business" under its exceptions.  In other words, the NPRM is not just one – but two – degrees removed from the statutory text.  *See* NPRM at 62001 (certain facts "*not likely to be sufficient to support* a presumption" of dealing).  This is no drafting error; the NPRM admits that the conduct of those who fall under the statutory exemption is "not *likely* to be sufficient to support a presumption that a person is engaging in the business of dealing in firearms," NPRM at 62001 (emphasis added), implying one could still be "engaged in the business" even if one's conduct falls squarely under the NPRM's purported safe-harbor provisions. *See id.* at 62002 (referencing "the rebuttable presumptions set forth above," presumably including the opposing presumptions).  On the contrary, the statute does not express or imply any such thing.

Third, the NPRM's "shall not be presumed" examples misstate and therefore alter fundamentally the statutory safe-harbor provisions.  In part, the NPRM states that a "person shall not be presumed to be engaged in the business of dealing in firearms when the person transfers firearms only as bona fide gifts."  NPRM at 62021.  In other words, the NPRM asserts that there is no presumption of legality *in one's favor* even if they give a bona fide gift – just that there is no presumption of illegality.  But this claim totally mischaracterizes the law and in fact contradicts ATF's own statements on its Form 4473 – that giving a bona fide gift is *conclusively lawful*.[52] Moreover, while the statute provides that 'if you do this, then you are not breaking the law,' the NPRM revises this statement to 'if you do this, then we will not assume you are breaking the law.' Apparently, according to the NPRM, there is a way to "demonstrate a predominant intent to earn a profit" by giving a "bona fide gift"—because presumptions may be rebutted.  NPRM at 62021. In no universe (except ATF's) can this be true.

---

[52] *Firearms Transaction Record*, ATF 4 (Aug. 2023), https://tinyurl.com/47xsnvwy ("A person is also the actual transferee/buyer if he/she is legitimately purchasing the firearm as a bona fide gift for a third party.").

Similarly, the NPRM disclaims any presumption of legality in one's favor when a person "occasionally sells firearms only to obtain more valuable, desirable, or useful firearms for the person's personal collection or hobby." *Id.* On the contrary, like giving a bona fide gift, this conduct is also *conclusively lawful* – Congress said so. 18 U.S.C. § 921(a)(21)(C) (emphasis added) (providing that "such term *shall not include* a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby").

To make matters worse, the NPRM neuters the statute even further by editing "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection," 18 U.S.C. § 921(a)(21)(C), to mean the "occasional[] s[ale]" of "firearms **only to** obtain more valuable, desirable, or useful firearms for the person's personal collection." NPRM at 62021 (emphasis added). As the statute acknowledges, there are more ways to enhance one's collection than "occasionally sell[ing]" firearms, such as by "exchang[ing]" them. Indeed, one could enhance their collection by bartering or trading firearms, or by selling firearms to fund modifications to existing firearms – neither of which falls under the NPRM's absolute language that the occasional sale of firearms must be "**only to** obtain more valuable, desirable, or useful firearms for the person's personal collection or hobby." *Id.*

Finally, the NPRM ignores entirely the statutory safe harbor for "a person … who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C); *cf.* NPRM at 62021 (omitting any mention of this permissible activity). Of course, the statute takes precedence. At bottom, the NPRM's non-presumptions – like its novel presumptions – are illogical, contradictory, and violate the plain text of the statute they purport to implement.

## V.    The NPRM Exceeds Statutory and Constitutional Authority to Invent New Crimes that Congress Never Enacted

As the Supreme Court has recognized time and again, "Congress has only limited authority over crime." *Taylor v. United States*, 579 U.S. 301, 311 (2016).  Without a plenary police power, Congress must invoke an enumerated power, like commerce or taxation, to proscribe conduct.  If Congress is so limited, then agencies are limited even more.  In fact, bureaucrats are entirely prohibited from creating new federal crimes.  *See Whitman v. United States*, 574 U.S. 1003, 1004 (2014) (Scalia, J., respecting denial of certiorari).[53]  Rather, as "creatures of statutory authority," agencies have "no power to act … unless and until Congress confers power upon [them]." *Friends of the Crystal River v. EPA*, 35 F.3d 1073, 1080 (6th Cir. 1994).  ATF certainly has no authority to proscribe more conduct in the NPRM than Congress did in the statute.

### N. There Is No Federal "Attempt" Crime for "Engaging in the Business"

Contrary to this basic constitutional axiom, the NPRM effectively creates "attempt" liability out of whole cloth.  NPRM at 62000 (emphasis added) ("Thus, even a[n] … <u>offer to engage</u> in a transaction, when combined with other evidence, may be sufficient to require a license."); *cf.* 18 U.S.C. § 922(a)(1)(A) (emphasis added) (criminalizing "<u>engag[ing]</u> in the business of … dealing in firearms" without a license).  But "[t]here is no general federal 'attempt' statute.  A defendant therefore can only be found guilty of an attempt to commit a federal offense if the statute defining the offense also *expressly proscribes* an attempt." *United States v. Hopkins*, 703 F.2d 1102, 1104 (9th Cir. 1983) (emphasis added).

---

[53] "[T]he norm [is] that legislatures, not executive officers, define crimes.  When King James I tried to create new crimes by royal command, the judges responded that "the King cannot create any offence by his prohibition or proclamation, which was not an offence before." *Id.*

APPX.319

Importantly, 18 U.S.C. § 922(a)(6) provides only one "attempt" crime with respect to firearm transactions,[54] making it a crime for "any person in connection with [an] … attempted acquisition of any firearm or ammunition from a [licensee] [to] knowingly to make" a materially false statement to deceive a licensee. In contrast, 18 U.S.C. § 923(a) states that "[n]o person <u>shall engage</u> in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has … received a license…." Emphasis added. And 18 U.S.C. § 921(a)(21)(C), in turn, discusses how a person engages in that business – through "the repetitive purchase and resale of firearms" – not merely "an offer to engage." Thus, the statutes make no mention of an "attempt" to be "engaged in the business," and provide no indication that mere discussion of firearm transactions (without any actual purchases or sales) constitutes dealing, and therefore authorize no "attempt" liability. *See Hopkins*, 703 F.2d at 1104. Certainly, Congress knew perfectly well how to create attempt crimes for firearm transactions (*see* 18 U.S.C. § 922(a)(6)), and Congress certainly could have done so for unlawful dealing, but Congress did not.

Nevertheless, the NPRM relies on *United States v. King*, 735 F.3d 1098 (9th Cir. 2013), for the proposition that engaging in the business of "dealing in firearms" does not even require one actual sale to be made. NPRM at 62005 n.93. In *King*, the Ninth Circuit stated that the defendant "attempted to sell one firearm to a tenant in MHPS's office building and offered to provide another

---

[54] To be sure, there are other "attempt" crimes in Title 18, but none relate to the subject matter of the NPRM. For instance, 18 U.S.C. § 924(h) criminalizes the "[w]hoever knowingly receives or transfers a firearm or ammunition, or attempts or conspires to do so, knowing or having reasonable cause to believe that [it] will be used to commit" certain crimes. Likewise, 18 U.S.C. § 924(k) criminalizes attempt or conspiracy to "smuggle or knowingly bring[] into the United States a firearm or ammunition … with intent to engage in or promote [certain] conduct…." Finally, 18 U.S.C. §§ 924(g)(4) and (n) criminalize additional attempts involving crossing state and international lines to commit crimes. *See also* 18 U.S.C. § 922(q)(3)(A) (attempt to discharge a firearm in a school zone).

to his building manager." 735 F.3d at 1107. In a footnote, the court cited to a Second Circuit case which restated a previous holding that "the government's burden under Section 922(a)(1)(A) is to prove that the defendant has guns on hand or is ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers." *Id.* at n.8 (alteration in original) (quoting *United States v. Nadirashvili*, 655 F.3d 114, 120 (2d Cir. 2011)).

However, in *Nadirashvili*, those defendants were convicted of, among other things, "engaging in a domestic firearms trafficking conspiracy, in violation of 18 U.S.C. § 922(a)(1)(A) and (o), of firearms trafficking (or aiding and abetting thereof), in violation of 18 U.S.C. § 922(a)(1)(A)...." 655 F.3d at 118-19. *Nadirashvili* is silent as to whether any defendant sold any firearm, noting only that they had "succeeded in procuring eight guns" (actual purchases) so they could fulfill orders. *Id.* at 120. And in *King*, while the defendant did not sell even one firearm, the Ninth Circuit held that the defendant's conviction "rested on King's activities that rose to the level of 'engaging in the business of firearms dealing'—i.e., ordering, receiving, transporting, and attempting to sell firearms," 735 F.3d at 1106, again referencing in part an "attempt" at selling firearms, but not an actual sale.

In contrast, the statute clearly requires the "repetitive purchase and resale of firearms" rather than the mere claim of being a general source for guns, without any actual sales. 18 U.S.C. § 921(a)(21)(C). The cases on which ATF relies all trace their authorities back to pre-FOPA, pre-"profit" cases interpreting the meaning of "engaged in the business" prior to more recent congressional amendments. *See, e.g.*, *Nadirashvili*, 655 F.3d at 120 (citing *United States v. Berry*, 644 F.2d 1034, 1037 (5th Cir. 1981)). At bottom, neither the statute, nor the few cases the NPRM references, authorize the imposition of "attempt" liability for engaging in the business where Congress has indicated that none should exist.

53

## O. Similarly, "Conspiracy" Charges Are Unavailable for Most Conduct the NPRM Seeks to Prohibit

In addition to foreclosing "attempt" liability for "engaging in the business," the statute also forecloses other inchoate liability for most of the conduct that is targeted by the NPRM.

For example, the NPRM cites a past conspiracy prosecution, claiming that the continued acquisition of firearms by former licensees has "resulted in numerous firearms being sold … to potentially prohibited persons without any ability to trace those firearms if later used in crime." NPRM at 62006; *id.* at n.103. As a preliminary matter, this passage's apparent Freudian slip – that ordinary Americans purchasing firearms are "*potentially prohibited persons*" as opposed to *presumptively law-abiding persons* – betrays an overarching contempt for gun owners that permeates the entire NPRM.

But more importantly, the cited conspiracy case represents an outlier circumstance where a defendant and multiple unnamed coconspirators were alleged to have continued selling firearms following FFL surrender. *See* Indictment, *United States v. Wyatt*, No. 1:16-cr-00057-MSK (D. Colo. Feb. 8, 2016), ECF No. 1 (charging two counts conspiracy under 18 U.S.C. § 371 for dealing in firearms without a license). Such uncommon cases aside, conspiracy liability would not attach in practically any of the circumstances contemplated by the NPRM, for two reasons.

First, Congress has displayed an intent to proscribe only certain specific inchoate conduct relating to firearms, via narrowly drafted conspiracy statutes. *See* 18 U.S.C. § 924(h) (imposing attempt and conspiracy liability for the knowing receipt or transfer of a firearm for the commission of certain crimes); § 924(k) (imposing attempt and conspiracy liability for the knowing smuggling into and out of the United States a firearm for the commission of certain crimes); § 924(o) (imposing conspiracy liability for conduct proscribed by § 924(c)). Because Congress has enacted

*specific* conspiracy statutes in federal firearms laws, Congress implicitly has excluded application of *general* conspiracy statutes in these circumstances. *See* Scalia & Garner, *supra*, at 183 ("If there is a conflict between a general provision and a specific provision, the specific provision prevails...."); *id.* at 107 ("The expression of one thing implies the exclusion of others...."); *id.* at 327 ("Repeals by implication are disfavored.... But a provision that flatly contradicts an earlier-enacted provision repeals it."); *see also* Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683, 701 (enacting 18 U.S.C. § 371, the general conspiracy statute, decades before more specific conspiracy statutes amending the Gun Control Act of 1968 would be enacted). In other words, there is no unbounded ability to bring conspiracy charges based on GCA crimes.

Second, a purported "dealer's" firearm sale to an unwitting buyer would fail to satisfy the basic elements of a conspiracy. As the Eleventh Circuit has observed, "[t]he elements of a conspiracy under 18 U.S.C. § 371 are (1) an agreement *among two or more persons to achieve an unlawful objective*; (2) *knowing and voluntary participation in the agreement*; and (3) an overt act by a conspirator in furtherance of the agreement." *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003) (emphases added). In contrast, the NPRM's "engaged in the business" and "predominantly earn a profit" presumptions target purported dealers that sell firearms, but not the innocent buyers who merely purchase firearms in what they believe to be private sales. Indeed, a potential buyer is unlikely to know anything about a seller's *other* offers to sell, repetitive purchases, purchase and resale frequency, maintenance of records, use of security services, or any other fact patterns outlined in the NPRM's presumptions. Accordingly, even assuming these presumptions are valid (they are not), these buyers could not "know[] and voluntary[ily] participat[e]" in an agreement, let alone agree "to achieve an unlawful objective" when they are

entirely unaware of a firearm seller's alleged need for licensure.  Without these elements present, there can be no conspiracy arising from an innocuous firearm sale.

At bottom, without attempt or conspiracy charges available, the NPRM has no possible avenue to rewrite the statutory text "purchase and resale" to claim that neither is required.

## P. Despite ATF's Assurances to the Contrary, the NPRM's Presumptions Will Mislead Criminal Juries

The NPRM's proposal of civil presumptions (and criminal permissive inferences) marks a worrying trend in ATF's recent enforcement philosophy.  Rather than "help[ing] unlicensed persons" interpret federal law, NPRM at 62000, these presumptions operate to stack the deck against gun owners[55] in much the same way that ATF's new "zero-tolerance" FFL revocation policy stacks the deck against licensed dealers.  *See, e.g.*, Complaint ¶ 263, *Morehouse Enters., LLC v. BATFE*, No. 3:23-cv-00129-PDW-ARS (D.N.D. July 11, 2023), ECF No. 1 (emphasis added) ("ATF's AAP takes the position that, regardless of whether there are actually any facts to establish 'willfulness,' *ATF will presume* that certain violations establish willfulness and 'shall result in a revocation recommendation….'").  Thus, putting the two policies together, ATF now claims that **just about everyone "presumptively" needs a license, and just about every license "presumptively" should be revoked**.

The NPRM's civil presumptions are an obvious pretext to maximize criminal convictions for "engaging in the business" based on a thin set of facts.  By definition, these presumptions mean

---

[55] Indeed, ATF's claimed efforts to "help the public" always seem to *hurt* the public (what are the odds?) by expanding the reach of criminal laws to implicate more and more conduct that ATF previously promised was entirely lawful.  *See, e.g.*, 88 FR 6478 (expanding liability for felonies via mass reclassification of braced pistols as short-barreled rifles); 87 FR 24652 (expanding liability for felonies via redefinition of when an unfinished frame or receiver becomes a firearm); 83 FR 66514 (expanding liability for felonies via reclassification of firearm parts as machine guns).

the government wins "absent reliable evidence to the contrary." NPRM at 62000. And while disclaiming their direct application in criminal cases, the NPRM then immediately provides the thinly veiled suggestion that these presumptions may serve as backdoor "reasonable permissive inferences" in criminal cases. *Id.* at 62000; *see also id.* at 62001 ("shall not apply to criminal cases" but "may be useful to courts in criminal cases"). Such "inferences" would "'allow[] … the trier of fact to infer' that an element of a crime is met once basic facts have been proven beyond a reasonable doubt." *Id.* at 62000 n.60; *see also id.* at 62005 (noting that ATF's presumptions that purportedly do not apply in criminal cases nevertheless come from "ATF's experience … conducting criminal investigations").

*Au contraire.* As the NPRM acknowledges, whether unlicensed conduct rises to the level of engaging in the business is a "fact-specific inquiry" requiring examination of "all circumstances surrounding the acts" in question. *Id.* at 62021, 61995. This totality-of-the-circumstances approach is wholly incompatible with the NPRM's fanciful evidentiary shortcuts. Indeed, of the 11 cases the NPRM cites in its footnote discussion of criminal inferences, *id.* at 62000 n.60, *not a single one* supports the use of presumptions in an "engaged in the business" analysis, where a single data point essentially would suffice to satisfy an inherently multifactor test.[56] On the contrary, an appropriate jury instruction in an "engaged in the business" prosecution simply would

---

[56] *See Francis v. Franklin*, 471 U.S. 307 (1985) (malice murder); *Cnty. Ct. of Ulster Cnty. v. Allen*, 442 U.S. 140 (1979) (firearm possession); *Baghdad v. Att'y Gen. of the U.S.*, 50 F.4th 386 (3d Cir. 2022) (shoplifting); *Patton v. Mullin*, 425 F.3d 788 (10th Cir. 2005) (murder); *United States v. Warren*, 25 F.3d 890 (9th Cir. 1994) (murder); *United States v. Washington*, 819 F.2d 221 (9th Cir. 1987) (murder and assault with a deadly weapon); *Lannon v. Hogan*, 719 F.2d 518 (1st Cir. 1983) (murder); *United States v. Gaines*, 690 F.2d 849 (11th Cir. 1982) (false income tax return); *United States v. Antonoff*, 424 F. App'x 846 (11th Cir. 2011) (false statements by a prohibited person in connection with acquisition of a firearm); *United States v. McCowan*, 469 F.3d 386 (5th Cir. 2006) (possession of a firearm with an obliterated serial number); *United States v. Stanford*, 2012 U.S. Dist. LEXIS 52607 (D. Kan. Apr. 16, 2012) (possession of a firearm by a prohibited person).

57

be that the jury should consider *all the facts*.  Rather than suggesting the use of presumptions as permissive inferences in a criminal case, the NPRM at most could have (i) provided a list (as numerous courts have provided in their opinions) of the various types of factors that legitimately can play into an "engaged in the business" determination, (ii) noted that such conduct involves a tremendous amount of gray area that cannot be resolved by unyielding regulation, and (iii) concluded that each case is to be decided on its own unique facts and circumstances.

### Q. The NPRM Creates a Catch-22, Both Requiring and Denying Licensure

The NPRM seeks to require between 24,540 and 328,296 persons to obtain a federal firearms license, on the grounds that they *currently* constitute "unlicensed persons that [sic] may be considered engaged in the business...."  NPRM at 62008, 62009.  Yet at the same time, ATF claims that it will "den[y] a firearms license application … on the basis that the applicant was presumed under this rule to have willfully engaged in the business of dealing in firearms without a license."  *Id.* at 62003 n.83; *see also id.* at 61999 ("deny licenses to persons who willfully engaged in the business of dealing in firearms without a license").

Apparently, the irony of this sort of "heads I win, tails you lose" situation is lost on ATF. Indeed, the NPRM both acknowledges and deliberately creates a Catch-22 situation where ATF will *require* a person obtain a license in order to sell firearms, only then to *deny* that person the very license that ATF demanded be obtained.  *See id.* at 62000 n.58.  The NPRM thus permits ATF to conclude that hundreds of thousands of Americans may not sell a firearm without obtaining a license that ATF will not issue, based on the misguided theory that the very same course of conduct (which occurred prior to and thus without notice of ATF's new standard) *both requires a person*

58

APPX.326

*to, and precludes a person from*, obtaining a license.  But as the maxim goes, the law will not require an impossibility.[57]

The NPRM also would have the effect of leaving a person denied a license (on the grounds that he had unlawfully engaged in the business) in the position of having to pay hefty legal fees to (a) participate in an ATF administrative hearing and, assuming ATF affirmed its denial, (b) seek relief in federal court pursuant to Section 923(f).  These hefty costs would be incurred before ever having obtained a license and thus before ever being able to go into business and make a "livelihood and profit."  This is something few if any applicants reasonably could afford – especially those at the margin, who sell only a few personal firearms, but who would now be declared dealers under the NPRM.

Moreover, such a determination by ATF, denying a license on the grounds that a person had previously been engaged in the business unlawfully, would not come after a legal determination by a jury (such as a criminal conviction), a judge (such as a de novo review of license revocation under Section 923(f)), or even a formal adjudication (such as an ATF revocation hearing).  Rather an ATF determination under the NPRM that a person is not qualified for a license to sell guns, because he previously sold some guns, would be an entirely arbitrary and informal decision made by ATF bureaucrats exercising unbridled discretion.  ATF cannot possibly justify the NPRM's unfairly imposing a new licensure requirement on hundreds of thousands of persons, and then claim that none of them is eligible for a license.

---

[57]  Whereas other alleged violations (such as a dealer "willfully" failing to keep records) arguably might preclude future licensure, no license is required to keep shoddy records.  In contrast, here the license is required to engage in the business of dealing in firearms. *See Haynes v. United States*, 390 U.S. 85 (1968) (dismissing a criminal charge for failure to register an NFA item possessed by a convicted felon who could not possess an NFA item).

**59**

APPX.327

## VI. The NPRM's Proposed Statutory Revisions Violate the Constitution

### R. The NPRM Violates the First Amendment

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech." Contrary to this clear proscription, the NPRM contends that even so much as engaging in speech can be prosecuted as "engaging in the business" of dealing in firearms. *See* NPRM at 62000 n.62. In that footnote, the NPRM cites to *United States* v. *Nadirashvili,* 655 F.3d 114, 120-21 (2d Cir. 2011), for the proposition that co-defendants "knew [the defendant] held himself out generally as a source of firearms, and was ready to procure them for customers." But a rule that states individuals can be prosecuted – not for selling firearms without a license but for engaging in speech about selling firearms – violates the First Amendment.

On the contrary, "[a]n offer to sell firearms or ammunition is speech that 'does no more than propose a commercial transaction.' Such an offer is, therefore, commercial speech within the meaning of the First Amendment." *Nordyke v. Santa Clara Cnty.*, 110 F.3d 707, 710 (9th Cir. 1997) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 762 (1976)). Of course, "commercial speech, like other varieties, is protected." *Va. State Bd. of Pharmacy*, 425 U.S. at 770. Imagine a person attempting to decide whether to obtain an ATF license and become "engaged in the business" of importing firearms from abroad. Were he to approach a friend who owned several retail gun stores, explain his overseas contacts, and discuss (and perhaps even agree) to import certain firearms at certain prices to be sold at retail – all in order to verify that licensure is worthwhile – ATF could accuse him, under the NPRM, of having unlawfully "engaged in the business," even though *no actual transaction* had occurred prior to the planned obtaining of a license. *See id.* at 1193 ("hold[ing] [himself] out as a source of firearms" and "is ready and able to procure them for the purpose of selling them from [time] to

60

time to such persons as might be accepted as customers"). *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980) ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity.").

Worse yet, the NPRM adds a number of "presumptions" that assume mere speech, by itself, can presumptively render someone "engaged in the business" of dealing in firearms, which no doubt will be used against the speaker in some type of legal proceeding:

- Engaged in business presumption 1 – "offers for sale" and "represent[ations] to potential buyers"
- Engaged in business presumptions 4, 5, 6 – "offers for sale"
- Predominantly earn a profit presumption 1 – "advertises, markets, or otherwise promotes"
- Predominantly earn a profit presumption 3 – "makes or maintains records, in any form"
- Predominantly earn a profit presumption 6 – "offers to make firearms transactions" [NPRM at 62021, 62022.]

At least one court already has held that a governmental action that "prohibit[s] offers to sell guns" under certain circumstances (in that case, at fairgrounds) is "an unconstitutional infringement of commercial free speech rights." *Nordyke v. King*, 319 F.3d 1185, 1191 (9th Cir. 2003) (discussing *Nordyke v. Santa Clara Cnty.*, 110 F.3d 707 (9th Cir. 1997)). The NPRM operates the same way – it prohibits and penalizes protected commercial speech – including mere offers – unless individuals first obtain government licenses. *See Lovell v. City of Griffin*, 303 U.S. 444 (1938). Such an abridgment of speech violates the First Amendment.

61

APPX.329

**S.  The NPRM Violates the Second Amendment**

**1.  The NPRM Fails Even to Mention the Second Amendment, Let Alone Analyze the Constitutionality of Its Statutory Revisions Under the Supreme Court's Required Analytical Framework**

Despite addressing a variety of issues related to firearms, the NPRM entirely fails to mention the Second Amendment even once.  Thus, the NPRM does not address the requirement in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022), to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  This absolutist language contains no qualification or limitation constraining who may exercise the right, which arms may be owned and carried, where the right may be exercised, or for what purposes.  Accordingly, the right presumptively belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," presumptively protects all locations, and presumptively covers all "lawful purposes."  *District of Columbia v. Heller*, 554 U.S. 570, 581, 582 (2008); *Bruen*, 142 S. Ct. at 2134; *Heller*, 554 U.S. at 624.

As the U.S. Supreme Court explained in *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important governmental interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  142 S. Ct. at 2126.  Because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *id.* at 2136, the relevant historical time period for analysis is that of the Founding

era. *See id.* ("[W]e must … guard against giving postenactment history more weight than it can rightly bear."); *id.* at 2137 ("[T]o the extent later history contradicts what the text says, the text controls."); *id.* ("[P]ostratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text."); *id.* ("[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'"); *id.* (treating 19th-century evidence "as mere confirmation of what the Court thought had already been established"); *id.* ("[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."); *id.* at 2154 n.28 ("We will not address any of the 20th-century historical evidence brought to bear.... As with … late-19th-century evidence, the 20th-century evidence … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."); *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258-59 (2020) (rejecting examples of 19th century-era laws even from "more than 30 States" as failing to "establish an early American tradition").

### 2. There Is No Enduring Early American Tradition of Requiring Licensure of Gun Sellers

As of 1791, there was no broad and enduring historical tradition of government regulation, or even licensing of firearms manufacturers, wholesalers, or dealers. Indeed, as of 1791, there was no historical tradition of government regulation of the commercial sales of firearms at all. Certainly, there is no historical tradition of government bureaucrats requiring licenses or limiting the ability of persons to offer "arms" for sale. Likewise, as of 1868 (even though that is not a relevant time period here), there was no historical tradition of government regulation or even

APPX.331

licensing of firearms manufacturers, wholesalers, or dealers.  Such regulation is a uniquely 20th-century invention that our Founders never would have accepted.

Absent clear evidence that firearms licensing schemes for individuals seeking to sell personally owned firearms are part of a broad and enduring historical tradition of firearms regulation as of 1791, ATF is not authorized to require the licensure of anyone to engage in activities that are protected by the Second Amendment.  At a minimum, the historical tradition certainly does not support the government requiring an individual selling a firearm, even for a profit, to become licensed as an FFL.  For that simple reason – that there is no broad and enduring historical tradition supporting the challenged agency action – the proposed rule is constitutionally invalid.

Rather, during the Founding Era, manufacturers and dealers in firearms (usually called "gunsmiths") were ubiquitous and entirely unregulated.  In fact, gunsmiths were practically as widespread in the decades following the Founding as FFLs are today, evincing a widespread early (and now modern) American tradition of domestic production and sale with "vast numbers of gunsmiths in this country's first three centuries."  Frank M. Sellers, <u>American Gunsmiths</u> 4 (2d ed. 2008).  In the year 1850, the first official industrial census of its kind recorded over 3,800 active gunsmiths across the country, relative to a free population of just shy of 20 million,[58] yielding a rate of approximately one per 5,260 persons.  *Id.* at 6.  In comparison, ATF reported 66,853 dealer

---

[58] *See* https://tinyurl.com/44vz97kf (reporting 19,553,068 "Whites" and 434,495 freed slaves who ostensibly could access firearms in 1850).

and manufacturer FFLs as of 2020,[59] relative to a population of about 334 million,[60] yielding a remarkably similar proportion of 5,007 persons per each modern equivalent of "gunsmith."[61]

The NPRM would upset that historical balance. ATF assumes that "based on the best, very conservative assessment," there may be "328,296 unlicensed individuals" that "may be engaged in the business with an intent to profit." NPRM at 62009. In short, ATF seeks to increase – involuntarily – the FFL rolls by a factor of almost *five*, putting the ratio of FFLs to Americans at 1 dealer per 870 persons. Even under ATF's numbers, such unprecedented regulatory action would implicate a massive number of firearm transactions and impose lifetime record retention requirements for FFLs (courtesy of ATF's last omnibus rulemaking, 87 FR 24652).

This extra-statutory and unconstitutional requirement dovetails with the ATF Director's recently professed desire for "universal background checks," as all firearms sold through FFLs require a background check be performed.[62] But this nation's early history supports no such thing.

ATF may counter with *Heller*'s dicta that "nothing in our opinion should be taken to cast doubt on … laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. But *Heller* never claimed (nor could it, without rendering a disfavored

---

[59] *See* https://tinyurl.com/22fv63u3 at 21 (reporting 52,799 dealers and 14,054 manufacturers in 2020).

[60] *See* https://tinyurl.com/2rvpcycx (reporting a total resident population of 334,735,155 in 2020).

[61] It is likely that, during the Founding Era, the per capita rate of "gunsmiths" was even greater than in 1850 as, prior to the Industrial Revolution, the production of firearms was a laborious and time-consuming process. *See, e.g.*, https://tinyurl.com/ycyaxx5w (describing the painstaking process of forging rifle barrels by hand and the individual fitment of other components). One source contains a list of many thousands of such gunsmiths during that era, in a time that the population numbered fewer than 4 million. *See generally* Sellers, back cover, *supra* (containing "[o]ver 20,000 listings of individual manufacturers, trademarks, gunsmiths, and other trade names" from early American history and onwards); *see also* https://tinyurl.com/4zwxnxy4 (reporting a population of 3.9 million in 1790).

[62] *See* https://tinyurl.com/bdcddcna ("I think it would be helpful if we had universal background checks in this country. I think that's something that makes some sense.").

APPX.333

advisory opinion) that such regulations were conclusively lawful. Rather, *Heller* invited future challenges even to its dicta, to test their assumed (but not truly known) historical traditions. *Id.* at 635 ("there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."). Similarly, *Bruen* prohibited governmental avoidance of its affirmative obligation to prove the constitutionality of its firearm regulations by stating and restating that "[o]nly if" history supports such regulations "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" 142 S. Ct. at 2126.

Regardless of *Heller*'s dicta, private sales between nonlicensees are not commercial in nature. In fact, these firearms already have been sold on the commercial market at least once. When an individual sells a personally owned firearm that he purchased, it does not fall within the "commercial sale of arms," and mere invocation of that talismanic chant does nothing to shield ATF's regulation (or even the statute) from proper Second Amendment analysis. The NPRM improperly fails to conduct that required analysis.

## T. The NPRM Violates the Fourth Amendment

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Once an individual receives an FFL, however, the ATF reserves the right to "enter during business hours" without a warrant, "the premises, including places of storage, of any … licensed dealer for the purpose of inspecting or examining the records, documents, ammunition and firearms." 27 C.F.R. § 478.23(b). The ATF can conduct this inspection without a warrant and entirely without notice

66

"not more than once during any 12-month period," or "any time with respect to records relating to a firearm involved in a criminal investigation that is traced to the licensee." *Id.*

For individuals who were required, under the NPRM, to apply for and received an FFL so they could sell personal collections without being unjustly prosecuted for being "engaged in the business," this warrantless search poses constitutional issues. First, the "licensed premises" for these individuals and their FFL most likely will be their home. Moreover, the firearms ATF will claim to be part of their "business inventory" most likely will be their personal collection of firearms. This means that the ATF is entitled, at least once per year, to make a warrantless search of the homes of hundreds of thousands of gun owners, to inspect their personally owned firearms. Second, because an FFL requires that a licensee maintain business hours (for the ATF to be able to "enter during business hours" for inspection, *see* 27 C.F.R. § 478.23(a)), this means that this new FFL must keep his home open for business every week in order to comply with the ATF's regulations. Third, the new FFL would be required to keep a multitude of records, including Forms 4473 and acquisition and disposition books, forever, or until the FFL goes out of business, at which time, this person would have to send all of those records to ATF. This sort of compelled backdoor access to countless Americans' "houses, papers, and effects" – in response to their exercise of Second Amendment rights – violates the Fourth Amendment.

Indeed, the NPRM's radical expansion of the population of firearm dealers would undermine the very purported constitutional exception that ATF enjoys in conducting warrantless administrative searches under the Gun Control Act. That is because the constitutional norm for governmental searches is the warrant requirement, and "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357 (1967).

As the Supreme Court has asserted, a narrow exception to the Fourth Amendment's otherwise sweeping warrant requirement is the administrative search of a so-called "highly regulated industry." *City of Los Angeles v. Patel*, 576 U.S. 409, 424 (2015). But not just any commercial industry will suffice – only those "industries that 'have *such a history of government oversight* that no reasonable expectation of privacy … could exist for a proprietor over the stock of such an enterprise'" can be considered "highly regulated" under the Fourth Amendment. *Id.* (emphasis added) (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978)). But that narrow exception is supposed to be just that – ***narrow*** – unlike the sweeping new scheme of "administrative" searches created by the NPRM.

To be sure, the Supreme Court has identified "firearms dealing" as one such highly regulated industry, albeit in a decades-old decision that did not place the same emphasis on Founding-era traditions that the Court does now. *See United States v. Biswell*, 406 U.S. 311, 315 (1972) (conceding that "[f]ederal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control of the liquor industry...."). But there is no "history of government oversight" that could remove a "reasonable expectation of privacy" in one's *private* firearm sales (let alone a pre-1938 history of government oversight of firearm sales to begin with). *Patel*, 576 U.S. at 424. As the NPRM now seeks to insert ATF jurisdiction into hundreds of thousands of ordinary American homes, it is highly unlikely that any court could justify ATF's administrative compliance inspections of the same under this "narrow" exception.

In short, requiring untold thousands (if not millions) of gun owners to become licensed dealers, each purportedly subject to narrowly excepted administrative searches, not only would contravene early historical tradition, but also it would flip the general warrant requirement on its head. *Id.* (quoting *Barlow's, Inc.*, 436 U.S. at 313) ("Moreover, "[t]he clear import of our cases is

68

that the closely regulated industry … is the exception."). Indeed, the NPRM's unilateral expansion of firearm dealers to astronomical proportions "would permit what has always been a narrow exception to swallow the rule." *Id.* at 424-25. The Fourth Amendment permits no such thing.

## U. The NPRM Poses Other Constitutional Concerns

The NPRM's novel requirements also implicate the Fifth Amendment's Takings Clause. "Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'" *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). There is no question that individuals have property rights in the firearms they own. But under the NPRM, gun owners lose one of the most important "sticks" from their "bundle of rights" in their personal property, as their right to dispose of their personal property is severely diminished. Instead, they will either not be able to sell freely their personally owned firearms, or they will need to become licensed by the ATF as an FFL.[63] In this dilemma, should the individual choose not to become licensed and thus not permitted to sell his firearm, he will be stuck with a firearm he does not want. Alternatively, if that individual chooses to become licensed, then he will be forced to do all the things ATF requires to become licensed, including paying a fee, keeping records forever, and of course, allowing government agents to inspect his firearm collection at least once per year under the guise of a "compliance inspection," a cost greatly exceeding the one or two firearms he wishes to sell  Because the NPRM interferes with gun owners' rights to dispose of their personal property as they so desire, such a rule would constitute a taking in violation of the Fifth Amendment to the U.S. Constitution.

---

[63] Of course, the Supreme Court has already found it "intolerable that one constitutional right should have to be surrendered in order to assert another," *Simmons v. United States*, 390 U.S. 377, 393-394 (1968), and gun owners cannot be forced to choose which of their rights to exercise.

69

Worse still, by requiring hundreds of thousands of persons to become licensed in order to sell their own firearms, but then claiming ATF can deny them a license on the same basis, the NPRM leave these persons entirely unable to dispossess themselves of their firearms (short of giving them away, perhaps).  *See* Section IV.D, *supra*.  The same is true for "former licensees" who ATF puts in the position of being entirely unable to dispose of former "business inventory." *See* Section II.F, *supra*.  For either of these classes of persons, the NPRM entirely seizes the market value of their property, claiming it cannot be sold in the marketplace.

Finally, the NPRM will result in legal impossibilities.  Indeed, some localities' zoning requirements entirely preclude home-based FFLs entirely.  *See Fattahi v. BATF*, 186 F. Supp. 2d 656, 658 n.2 (E.D. Va. 2002) ("Item 24 of the application reads: 'The business to be conducted under the Federal firearms license is not prohibited by State or local law at the premises shown in Item 5.  This includes compliance with zoning ordinances.'  Item 5 of the application is entitled 'business address.'"); *see also Morgan v. United States DOJ*, 473 F. Supp. 2d 756, 775 (E.D. Mich. 2007) (upholding denial of renewal of home-based FFL due to zoning requirements).  The NPRM entirely upends and changes the rules of firearm ownership, requiring licenses from countless persons who have no intent to "engage in the business," yet making it impossible for them to actually become licensed, and thus raising serious Fifth Amendment takings concerns.

## V.  The NPRM Grossly Underestimates Its Regulatory Burden and Will Saddle Gun Owners with Exorbitant Compliance Costs

In addition to being legally erroneous, the NPRM is also *factually* off base.  The NPRM's estimated compliance costs are predicated on entirely arbitrary assumptions and cherrypicked standards, omitting mention of the significant regulatory burdens that await newly minted FFLs.  Moreover, these deleterious effects will be widespread.  The NPRM acknowledges that "this

70

APPX.338

rulemaking, if finalized, may result in additional unlicensed persons becoming FFLs....”  NPRM at 62007.  That is certainly putting it mildly.  Indeed, the NPRM presumes that practically anyone who has ever sold or will sell a firearm may need to be licensed, as discussed *supra*, and therefore implicates hundreds of thousands – if not millions – of gun owners.  Several key defects bear emphasis.

First, the NPRM provides an unreliable estimate of the total affected population.  Beginning by bemoaning FOPA’s prohibition on ATF creating a national gun registry, the NPRM claims that “there is no definitive information” and thus it is “difficult for ATF to precisely estimate the population.”  NPRM at 62008.  Thus, the NPRM uses two different methodologies to suggest an immense range of between “24,540 or 328,296” unlicensed persons currently “engaging in the business.”  *Id.* at 62009.  ATF’s first method samples a meager 1.2%[64] of a *snapshot* of online private-sale listings on *one* website, ArmsList, to extrapolate a nationwide number of private sellers needing licensure.  Based on 1.2% of private ArmsList listings at only one point in time, ATF calculated an average of 2.51 listings per seller.  *Id.* at 62008; *id.* at n.112.  Dividing this average to obtain over 12,000 unlicensed sellers on ArmsList at that time, ATF then doubled this figure to obtain over 24,000 unlicensed sellers online, nationwide.  ATF’s source?  “Just trust us.”  *See id.* at 62008 (estimating ArmsList’s apparent 50% online market share based, in part, on ATF’s own “subject matter expert … opinion,” whatever that means).  ATF then applies two further layers of shoddy “just trust us” estimation, first to assume that the online private-sale market accounts for 25% of all private sales, and then to assume that 25% of all private sales are “engaged in the business” sales.  *Id.* (applying unverifiable “professional judgment” and a “best, very conservative

---

[64] ATF sampled 379 out of 30,806 “private party” sales at the time.  NPRM at 62008.  ATF generated this “379” sample size using an online calculator with a 95% confidence level and a confidence interval of 5.  *Id.* at n.111.

assessment" with no citations whatsoever). Besides layer upon layer of guesswork, there is no telling (1) how many of the 30,806 ArmsList listings were, for example, selling inherited firearms (*i.e.*, definitively not engaging in the business at all), (2) whether any of the 30,806 listings were misclassified as "private" while actually being by licensed dealers, (3) whether the 30,806 listings at one point in time would be representative of the typical number of listings at any given time (*i.e.*, gun sales usually spike around the holidays, and during times of political uncertainty), (4) whether the average of 2.51 listings per seller was skewed by a minority of extreme outliers (sellers who may actually be engaged in the business, offering dozens or hundreds of firearms)[65] with the median listings per seller being much lower, or (5) whether the sample size of 379 is a representative sample.

Moreover, ATF's lower-bound estimate is predicated on an anemic sample size of 379. Based on an online calculator designed for survey evaluation (*i.e.*, binary yes/no answers),[66] the NPRM applies an arbitrary and utterly meaningless confidence interval of "5" to justify a conveniently small sample size. But a confidence interval cannot be calculated without knowing the standard deviation of a sample,[67] which the NPRM omits entirely. All told, ATF's lower bound cannot possibly provide a reliable estimate.

---

[65] Or those sellers not engaging in business pursuant to a statutory safe harbor, like those liquidating a personal collection all at once. *See* 18 U.S.C. § 921(a)(21)(C).

[66] *See Sample Size Calculator*, Creative Rsch. Sys., https://tinyurl.com/2p9jrpyp (last visited Nov. 6, 2023) ("You can use it to determine how many people you need to interview in order to get results that reflect the target population as precisely as needed.").
> For example, if you use a confidence interval of 4 and 47% percent of your sample picks an answer you can be "sure" that if you had asked the question of the entire relevant population between 43% (47-4) and 51% (47+4) would have picked that answer.

*Id.*

[67] *See* Rebecca Bevans, *Understanding Confidence Intervals: Easy Examples & Formulas*, Scribbr, https://tinyurl.com/bhbusnfm (June 22, 2023).

**72**

ATF's upper bound fares no better. Calculating "a second possible estimate using information from a published survey," the NPRM derives a figure of 1,310,000 possible unlicensed persons "selling, trading, or bartering firearms," of which 25% are engaging in the business "based on the best, very conservative assessment from SME experts" using their "professional judgment" and "limited available information." NPRM at 62008, 62009; *see also id.* at 62008 n.116 (citing the survey). But upon closer examination, this survey also bases its conclusions on a small sample size of just 2,072 gun-owning respondents, providing questionable representativeness.[68] Moreover, by analyzing outdated 2015 survey data, this study fails to account for the massive increases in the rates of American gun ownership in recent years. *See* NPRM at 62008 (assuming a 22 percent gun ownership rate among adults as of 2015). Indeed, "[m]ore than 5 million adults became first-time gun owners between January 2020 and April 2021 compared to 2.4 million in 2019," necessarily expanding the private-sale market by an untold margin.[69] Consequently, the NPRM's estimates are utterly unreliable, and a final rule implementing such statutory revisions would harm a significant number of gun owners who are not taken into account by the NPRM.

Indeed, as of 2020, Gallup reported that not 22 percent of adults own a firearm, but rather a whopping 32 percent.[70] Even based solely on that more recent datum, ATF's estimate must change dramatically – from 1.31 million potential unlicensed sellers to 1.91 million (258.3 million adults, 32 percent of whom own a firearm (82.7 million), 5 percent of whom transferred (4.13

---

[68] Deborah Azrael et al., *The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey*, 3 Russell Sage Found. J. Soc. Scis., no. 5, Oct. 2017, at 38, 41, https://tinyurl.com/ydavrjhw.

[69] Edward Helmore, *Gun Purchases Accelerated in the US from 2020 to 2021, Study Reveals*, Guardian (Dec. 20, 2021, 5:00 PM), https://tinyurl.com/2p876hss.

[70] L. Saad, *What Percentage of Americans Own Guns?*, Gallup (Nov. 13, 2020), https://tinyurl.com/yw8769sn; *see also For Most U.S. Gun Owners, Protection Is the Main Reason They Own a Gun*, Pew Rsch. Ctr. (Aug. 16, 2023), https://tinyurl.com/mr3zw2yu (reporting the same 32 percent figure as of August of 2023).

73

million), and where (1) 71 percent of whom sold a gun (2.93 million), 51 percent of whom sold through "various mediums" (1.5 million), and where (2) 10 percent of whom traded or bartered (413k), together adding up to 1.91 million). Based on ATF's estimate that 25 percent of these persons must now be licensed (NPRM at 62009), <u>the NPRM could affect more than 478,000 people – far greater than ATF's estimate of 328,296</u>. In other words, ATF's estimate (using its own methodology) is off – at minimum – by 45 percent. But what's another 150,000 FFLs amongst friends?

Second, the NPRM underestimates the costs associated with preparing an FFL application to comply with the proposed rule. The NPRM assumes, without citation to any authority, that "the opportunity costs of acquiring a license would be based on … free time or 'leisure time,'" using an entirely speculative "leisure wage" of $16 per hour. NPRM at 62009. Of course, the purported purpose of this proposed rule is to "clarify" when someone is "engaged in the business" of dealing in firearms, not "engaged in leisure time." With that in mind, it would be more appropriate to use (at minimum) Americans' "average hourly earnings" of $34.[71] Again, ATF's estimates are off by more than 100 percent.

Third, the NPRM claims the hourly burdens of completing a Form 7 and conducting a licensing inspection are one hour and three hours, respectively (along with another 1.5 hours to obtain fingerprints and photographs). *Id.* at 62010. On the contrary, these figures are ridiculously low estimates, especially considering the sheer amount of close reading one must do to both understand fully and complete accurately an application (the Form 7 is 12 pages, just by itself). Indeed, ATF expects new licensees to read and understand hundreds of pages of federal laws and

---

[71] *Economic News Release: Table B-3*, U.S. Bureau Lab. Stat., https://tinyurl.com/ycyz5dup (Nov. 3, 2023).

regulations, which ATF attempts to coerce new licensees into acknowledging via signature prior to issuance of an FFL, attesting that they have read and understand every nuance of federal gun laws and regulations.[72]  Licensees thus have no choice but to read these voluminous documents, as the failure to abide by regulations may establish "willfulness" at a future license revocation proceeding (or, worse yet, criminal charges).[73]  For example, ATF's "Federal Firearms Regulations Reference Guide"[74] is a whopping 237 pages, consisting of more than 200,000 words.  Even skipping some significant portion of that (such as the sections dealing with firearm imports), even a first read would require a new licensee to expend dozens of hours just to get a feel for ATF's mountain of regulations.[75]  Even reading half of the FFL Guide would take an estimated 22 hours (100,000 words, at 75 words per minute).   Adding even this conservative figure to ATF's ridiculously low estimate, a new licensee would spend upwards of **27.5 hours** to obtain a license and merely obtain a feel for the laws by which he or she must abide.  Again, ATF is off by at least 400 percent.

Based on more accurate figures, then, the "cost for an unlicensed person … to become a Tyle 01 FFL" should be estimated (*at least*) at **$1,165** – not $318, the number given in the NPRM. *Id.* at 62011.  This reflects 27.5 hours of work, at an average hourly earnings rate of $34 per hour ($935), added together with ATF's estimate of $230 of item costs (application fee, fingerprints, photographs).

---

[72] *Federal Firearms Licensee Quick Reference and Best Practices Guide*, <u>ATF</u>, <u>https://tinyurl.com/4b69nd7d</u> (Dec. 2021) (linking a 237-page document distributed to new FFLs).
[73] *See Firearms Compliance Inspections*, <u>ATF</u>, <u>https://tinyurl.com/556hzuz4</u> (Oct. 2, 2023).
[74] *Federal Firearms Regulations Reference Guide*, <u>ATF</u> (2014), <u>https://tinyurl.com/mhsfssdv</u>.
[75] *See Reading Speed Statistics*, <u>WordsRated</u> (Nov. 8, 2021), <u>https://tinyurl.com/ycbe7mx8</u> ("The average reading rate for advanced scientific or technical is 6 pages per hour, which equates to 75 words per minute.").

APPX.343

Fourth, the NPRM utterly fails to account for the significant regulatory burdens FFLs will incur *subsequent to licensure*. Indeed, as the NPRM acknowledges, all FFLs must "maintain a business premises at which ATF can inspect their records and inventory, and that otherwise complies with local zoning restrictions." NPRM at 61998 n.41. Although not provided by regulation, the Form 7 requires applicants provide – and subsequently maintain – "at least one hour" of "Operation and/or Availability of Business" every week.[76] As a result, the NPRM's compliance estimate is off by an astounding 52 hours annually, at minimum (one hour per week), even for new licensees who ATF estimates will perform only "3 … firearm sales every year" (NPRM at 62011 tbl.5). ATF takes these "open" hours seriously; they establish *when* compliance inspections may occur. Should a licensee fail to accommodate an unannounced compliance inspector during the availability window listed on the licensee's Form 7, such failure will be "considered a willful violation of the GCA and ATF will pursue revocation of the license."[77] In other words, for at least 52 hours a year, newly minted licensees must make themselves available at their licensed premises (to the exclusion of other activities) for possible inspection. That's another average of **$1,768** annually that the NPRM entirely fails to take into account ($34/hr x 52 hours). Of course, ATF's estimate for "recurring costs to maintain an FFL" including renewals, 4473s, A&D records, and compliance inspections uses the deflated "leisure" rate of $16 per hour. NPRM at 62011 tbl.5. Using a more realistic $34, that's another $70 per year (at minimum).[78]

---

[76] *Application for Federal Firearms License*, ATF, https://tinyurl.com/2yetkzjp (Oct. 2020).
[77] *Supra* note 73.
[78] This number was arrived at by taking ATF's number, $10,781,256 (62011 tbl.5) and dividing by the 328,296 FFLs who must bear it, for an annual maintenance cost of $32.84 per FFL (ATF estimate). Using a $34 average hourly wage instead of a $16 leisure wage results in an $69.79 annual maintenance cost.

All told, ATF estimates an upward bound of "$104.4 million" for the first-year costs of obtaining licensure (328,296 persons at $318 per license). NPRM at 62011. But when using more accurate figures (478,000 persons at $1,165 per license), the resulting number is staggering – more than half a billion dollars (**$556.7 million**) – *at least*.

And whereas ATF estimates *ongoing* costs at about $10.8 million per year for the first two years and $43 million every third year (when licenses must be renewed) (NPRM at 62012 tbl.7), neither takes into account the time spent holding regular business hours but otherwise twiddling thumbs. More accurately, then, the NPRM costs not $10.8 million per year in ongoing costs but *at least* $33.3 million per year (478,000 licensees, not 328,296, at $34 per hour, not $16) for paperwork and inspections (Table 5), plus another $845 million (478,000 x $1,768) for holding regular business hours, for a total of **$878 million per year** in years 1 and 2 of ongoing costs. These numbers are astronomically larger than what ATF estimates in the NPRM.

Fifth, the NPRM threatens an astronomical increase in staffing resources and processing time. As of 2022, there were "136,563 active federal firearms licensees (FFLs) and 43,494 firearms licenses issued (to include renewals)," with 52,910 active Type 01 dealers in total.[79] At its most conservative, the NPRM estimates a 46% increase in dealers nationwide,[80] and at its most liberal (yet still "the best, very conservative assessment," NPRM at 62009), the NPRM estimates a dizzying *620% increase* in total dealers.[81] But using the more accurate 478,000 number estimated, *supra*, **the NPRM would cause a 903% increase in the number of FFL dealers**.

---

[79] *Fact Sheet - Facts and Figures for Fiscal Year 2022*, ATF (Jan. 2023), https://tinyurl.com/4bajrn2y.
[80] Adding 24,540 new dealers to the existing 52,910.
[81] Adding 328,296 new dealers to the existing 52,910.

**77**

To process all this new paperwork, "ATF estimates that it would take on average 8.5 hours to process a Form 7 application" at a net loss of $353 per application, *id.* at 62013, so it could cost the government **$168 million** ($353 x 478,000) to process applications from all unlicensed "dealers" the NPRM contemplates. Moreover, at 8.5 hours of processing time per application (NPRM at 62013), it would take **four million man-hours to process these newly-mandated applications** – meaning more than two thousand additional full-time ATF employees doing nothing but application processing all year.[82] Even assuming a less-than-100% compliance rate, the NPRM proposes an exorbitant expenditure of taxpayer dollars that is untenable under ATF's current budget. Talk about mission creep.

The NPRM also references IOI time to perform qualification and compliance inspections, at $312 per inspection, and inspection 8 percent of licensees per year. *Id.* at 62014. Using the number of 478,000 new licensees, that is **another $12 million per year**. Peanuts, in comparison to ATF's other misses.

Sixth and finally, the NPRM ignores the numerous other costs associated with the NPRM's compelled licensing scheme,[83] as ATF's entire analysis assumes that the only true cost for applicants is the application itself. This proposition is nothing short of laughable. Indeed, claiming that "it would cost an unlicensed person $318 in terms of time spent and fees paid to apply under a Form 7 to become a Type 01 FFL," *id.* at 62011, would be like claiming that the cost to become

---

[82] Assuming 40 hours per week for 50 weeks with 2 weeks' vacation.

[83] This includes immense regulatory costs that no doubt will be incurred at the state level. While ATF claims "[t]his regulation will not have substantial direct effects on the States," NPRM at 62016, many states license FFLs themselves (*see, e.g.*, 18 Pa.C.S. § 6113(a)), separately from the federal licensing scheme. With a potential 903% increase in the number of FFL dealers nationwide, *supra*, many states will shoulder a massive burden, in turn. Contrary to the Attorney General's claim otherwise, "federalism implications" abound and the NPRM should have included a federalism summary impact statement analyzing how hundreds of thousands of new licensees will affect state regulatory agencies. *Id.* at 62017.

a lawyer in the U.S. District Court for the District of Columbia is just $213[84] – if one omits the costs of a bachelor's degree, a law degree, bar exam preparation, state bar licensing, and then office-related costs, malpractice insurance, and a Lexis subscription. On the contrary, other necessary startup costs and considerations for FFLs include, at minimum, zoning compliance (and attendant issues obtaining zoning approval for residential FFLs), attorney drafting of articles of incorporation or other legal advice, business licensing, business registration, tax implications, CPA and other tax professional fees, general liability insurance, security systems with monitoring, child safety locks, and even additional security if the licensee's residence is listed publicly as a licensed premises. Commenters do not begin to estimate these costs here, but it is safe to say that obtaining and maintaining an FFL is no easy feat. By failing to consider the true cost of "engaging in the business," the NPRM grossly underestimates its true effects on gun owners nationwide.

**Total Costs (Undiscounted)**

| Year | Gov't and Private | Private Costs Only |
|------|-------------------|--------------------|
| 1 | $1,602,700,000.00 | $1,434,700,000.00[85] |
| 2 | $890,000,000.00 | $878,000,000.00[86] |
| 3 | $890,000,000.00 | $878,000,000.00[87] |
| 4 | $1,058,000,000.00 | $902,300,000.00[88] |
| 5 | $890,000,000.00 | $878,000,000.00 |
| 6 | $890,000,000.00 | $878,000,000.00 |
| 7 | $1,058,000,000.00 | $902,300,000.00 |
| 8 | $890,000,000.00 | $878,000,000.00 |
| 9 | $890,000,000.00 | $878,000,000.00 |
| 10 | $1,058,000,000.00 | $902,300,000.00 |
| | **$10,116,700,000.00** | **$9,409,600,000.00** |

---

[84] *Application for Admission*, U.S. Dist. & Bankr. Cts. for D.C. (May 2023), https://tinyurl.com/3ecj7xph.
[85] Including $556.7 million for initial licensure, $878 million for maintenance, and $168 million to process licenses.
[86] Including $878 million for maintenance and $12 million for inspections.
[87] Including $878 million for maintenance and $12 million for inspections.
[88] Including $878 million for maintenance, $12 million for inspections, and $168 million to process licenses.

The above estimate, based on more realistic inputs than those found in the NPRM, demonstrates the sheer absurdity of what ATF is proposing, and shows that the NPRM, if finalized, would cause literally billions of dollars of damage to the economy.  Eclipsing ATF's highest estimate by a factor of 32 (compare NPRM at 62015 tbl.13 with estimate above), the NPRM's unlawful and unconstitutional provisions simply cannot be promulgated.

Based on this stunningly massive regulatory cost, ATF comes to the unsurprising conclusion that "the costs to become and FFL could have an impact on … overall profit from firearms transactions."  NPRM at 62017.  Indeed, ATF estimates that "the persons impacted by this rule will primarily be those who transact in low volume repetitive firearm sales," and that these new dealers will sell an average of *only three firearms per year*.  *Id.* at 62017, 62011 tbl.5 (claiming that this number is used "for purposes of this economic analysis only").  Of course – "for purposes of this economic analysis only" – that means that the total regulatory cost per firearm sold (14.3 million firearms, assuming 478,000 dealers each sell 3 firearms per year over 10 years) is $705.  And including only private (not public) costs that are borne by licensees only, under the NPRM, **the average licensee will need to make a profit of at least $656 per firearm sold, just to break even**.  That is, quite simply, impossible.

## VII.   Any Final Rule that Departs from the NPRM's Proposals Must Undergo a Separate Notice and Comment Period

To the extent that the ATF chooses to limit itself to acting with the scope of its statutory authority, it might be permissible to promulgate a regulation that simply mirrors the language enacted by Congress (as ATF has done repeatedly in the past).  However, given that the NPRM purports to include regulations that either have no basis in the statute, or flatly attempt to expand the statute beyond its breaking point, ATF needs to withdraw the proposed rule in its entirety and

try again. Moreover, any Final Rule that recognizes the legion of flaws in the NPRM, and promulgates any language *other than strict fidelity to the statutory text*, would violate the APA's logical outgrowth rule, because "fair notice" of the proposals adopted in any eventual Final rule is required. *See Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2012) (citing *Long Island Care*, 551 U.S. at 174). *See Mock v. Garland*, 75 F.4th 563, 583 (5th Cir. 2023) ("If interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period, then the rule is deemed to constitute a logical outgrowth of the proposed rule."). Since these Commenters can conceive of no legitimate regulation other than one which mirrors the statutes Congress actually enacted, any subsequent alternative proposal by ATF must go through the APA's notice and comment process.

## VIII. ATF's Characteristic Flip-Flopping on Significant Policies Further Undermines the NPRM

Interestingly enough, the NPRM represents a dramatic policy shift on the part of ATF which, in the past has sought to *dramatically reduce* the rolls of FFLs, but which now seeks to *exponentially expand* them. It is unreasonable to expect the regulated public to keep up with ATF's latest about face, continuing its trend of "frequent reversals on major policy issues...." *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 461 (6th Cir. 2021) (vacated by grant of *en banc* review).

In the 1990s, the Clinton Administration engaged on a mission to eliminate so-called "kitchen table FFLs" that possessed a license but either did not "engage in the business" of selling firearms, or sold so few firearms for family and friends that the ATF did not want to deal with them. As The Free Beacon reported:

> In 1994, ATF officials complained that many FFLs were not actually "engaged in the business" and oversight of the small sellers was cumbersome, if not impossible.

"Probably 70 percent of the people holding licenses shouldn't hold them," one ATF spokesperson told the *Times.* "Most applicants declare that they intend to buy and sell guns as a primary livelihood, but in reality, the firearms bureau says, most people want to buy guns at wholesale prices for personal use," the paper added.[89]

Thus, ATF's agenda to put tens of thousands of dealers out of business was a direct result of then-President Clinton's directive to the Secretary of the Treasury which claimed, among other things that, while "there [were] in excess of 287,000 Federal firearms licensees," "only about 30 percent of these are bona fide storefront gun dealers," while "40 percent of the licensees conduct no business at all," and that the "remaining 30 percent of licensees engage in a limited level of business...."[90]

President Clinton's war on the gun industry was successful, "result[ing] in the number of licensed dealers dropping from about 252,000 in 1993 to about 55,000 in 2014" – a reduction of nearly 80 percent.[91]  Now, years after ATF sought to destroy the home-based FFL, it is now demanding that virtually every seller of firearms become a licensed dealer.[92]  Of course, as the Supreme Court has noted, "when the government … speaks out of both sides of its mouth, no one should be surprised if its latest utterance isn't the most convincing one."  *Bittner v. United States*, 143 S. Ct. 713, 722 (2023).

---

[89] Stephen Gutowski, *Obama Gun Action Reverses Course on Clinton Admin Policy*, Wash. Free Beacon (Jan. 6, 2016), https://tinyurl.com/4t9n5hxx.

[90] *Memorandum on Gun Dealer Licensing*, Am. Presidency Project (Aug. 11, 1993), https://tinyurl.com/35xb6hnn.

[91] *See* Gutowski, *supra* note 89.

[92] *See FACT SHEET: New Executive Actions to Reduce Gun Violence and Make Our Communities Safer*, White House (Jan. 4, 2016), https://tinyurl.com/4hhw8h85 ("Today, the Administration took action to ensure that anyone who is 'engaged in the business' of selling firearms is licensed and conducts background checks on their customers....  There is no specific threshold number of firearms purchased or sold that triggers the licensure requirement. But it is important to note that even a few transactions, when combined with other evidence, can be sufficient to establish that a person is 'engaged in the business.'").

## IX.    Conclusion

This NPRM must be withdrawn.  But unauthorized and unconstitutional as this proposed rule may be, it cannot be viewed in a vacuum.  Rather, the NPRM is yet another step towards this and every anti-Second Amendment administration's ultimate goal – a *de facto* national gun registry that subverts, circumvents, and effectively repeals the Firearms Owners' Protection Act.[93]  From forcing almost everyone who sells a gun to become a federally licensed dealer,[94] to "mov[ing] as close to universal background checks as possible" by routing every firearm transaction through such dealers,[95] to requiring licensed dealers to preserve transaction records indefinitely and ultimately serve them up to ATF,[96] to subsequently forcing as many dealers out of business as possible[97] to expedite the receipt of such records and bottleneck firearms commerce,[98] all evidence points to the creation of an illegal (not to mention unconstitutional) federal registry of almost all gun owners nationwide.[99]  This NPRM will (and no doubt was designed to) only accelerate the

---

[93] *See* 18 U.S.C. § 926(a) (emphasis added) (prohibiting the creation of "**any** system of registration of firearms, firearms owners, or firearms transactions or dispositions").

[94] As the legend of a map would say, "you are here" with this NPRM.

[95] *FACT SHEET: Biden-Harris Administration Takes Another Life-Saving Step to Keep Guns Out of Dangerous Hands*, White House (Aug. 31, 2023), https://tinyurl.com/bdzz7ufh; *see also* 87 FR 24652 (reclassifying unfinished frames and receivers as "firearms" subject to serialization and dealer transfers).

[96] *See* 87 FR at 24746 ("Licensees shall retain each Form 4473 until business or licensed activity is discontinued...."); 27 C.F.R. § 478.127 ("Where discontinuance of the business is absolute, the records shall be delivered within 30 days … to the ATF Out-of-Business Records Center....").

[97] *See Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety*, White House (June 23, 2021), https://tinyurl.com/mvv975c8 (establishing "zero tolerance" for various inadvertent dealer errors); Complaint, *Morehouse Enters., LLC v. BATFE*, No. 3:23-cv-00129-PDW-ARS (D.N.D. July 11, 2023), ECF No. 1 (detailing ATF's weaponization of this "zero tolerance" revocation policy in retaliation against one dealer that dared to sue ATF).

[98] *See* 27 C.F.R. § 478.127.

[99] Keene, *supra* note 49 (reporting on GOA's discovery that "ATF had processed and digitized over 50,000,000 'out of business' records of gun dealers in FY 2021" and that "ATF has reached a point where it has converted nearly one billion records … into a single, centralized, and searchable national gun registry").

mass registration already well underway – so that, when the next anti-gun President feels the time is right, all that will need be done is to "from the files, obtain form 4473"[100] and begin the confiscation *en masse*.



For the reasons stated, the Notice of Proposed Rulemaking should be withdrawn.

Sincerely yours,

Robert J. Olson
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

---

[100] <u>Red Dawn</u> (Valkyrie Films 1984).

84

  

December 7, 2023

TO:        Bureau of Alcohol, Tobacco, Firearms and Explosives

FROM:    State of Kansas; Office of the Attorney General of Kansas

RE:        Notice of Proposed Rulemaking: "Definition of 'Engaged in the Business' as a Dealer in Firearms"

           Docket No.: ATF 2023-19177

The Attorneys General for the States of Kansas, Iowa, Montana, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Hampshire, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, and Wyoming, and the Arizona State Legislature submit the following public comment to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the Bureau) in response to the request for comments on its proposed rule titled, *Definition of "Engaged in the Business as a Dealer in Firearms,"* 88 Fed Reg. 61993 (Sept. 8, 2023).

## 1. Introduction

The Bureau's proposed rule takes the unprecedented step of making any individual who sells a firearm "predominantly for profit" liable to civil, administrative, or even criminal penalties—unless the seller acquires a federal license.[1]  The Bureau's definition of sale for profit is itself arbitrary and capricious.  Beyond capricious, the proposed rule is capacious. The Bureau's presumptions in support of predominant profit-seeking include when a person:

> (1) advertises, markets, or otherwise promotes a firearms business (e.g., advertises or posts firearms for sale, including on any website, establishes a website for selling or offering for sale their firearms, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally; (2) purchases, rents, or otherwise secures or sets aside permanent or temporary physical space to display or store firearms they offer for sale, including part or all of a business premises, table or space at a gun show, or display case; (3) makes or

---

[1] 88 Fed. Reg. at 62000.

1

maintains records, in any form, to document, track, or calculate profits and losses from firearms purchases and sales . . .

[or] (7) secures or applies for a State or local business license to purchase for resale or to sell merchandise that includes firearms.[2]

The proposed rule also presumes a person is a "dealer" in firearms if he "sell[s] or offer[s] for sale firearms, and also represent[s] to potential buyers or otherwise demonstrate[s] a willingness and ability to purchase and sell additional firearms."[3]  This presumption applies even if the seller only sells one firearm.[4]

The Bureau lists very few exceptions to this rule, and even those exceptions paint a disturbing picture.  For instance, the proposed rule states that an "example in which evidence may rebut the presumption would be the occasional sale, loan, or trade of an almost-new firearm in its original packaging to an immediate family member, such as for their use in hunting, without the intent to earn a profit or to circumvent the requirements placed on licensees."[5]

That example is not an aberration but central to the entire proposed rule.  The proposed rule expands the definition of earning a profit to be determined by something other than money to include (1) personal property that includes another firearm or ammunition, (2) a service, (3) another medium of exchange, or (4) valuable consideration.[6]  In addition, there is no requirement that a firearm actually be sold (only an offer to engage in a transaction)[7] nor is there any requirement that a person selling a firearm make a pecuniary gain.[8]

## 2.  The proposed rule violates the Second Amendment

This overreach is both shocking and unconstitutional.  Although longstanding regulations of large commercial enterprises that sell firearms might be consistent with the Second Amendment,[9] that is not what this proposed rule does.  This proposed rule seeks to

---

[2] *Id.* at 62006–07 (footnotes omitted).

[3] *Id.* at 62000.

[4] *Id.*

[5] *Id.* at 62003.

[6] *Id.* at 61999.

[7] *Id.* at 62000.

[8] *Id.* at 61997.

[9] The U.S. Supreme Court, in *District of Columbia v. Heller*, stated that "laws imposing conditions and qualifications on the commercial sale of arms" were "presumptively lawful." 554 U.S. 570, 626–27 (2008).  But the Court did not undertake a thorough historical analysis, and the regulations and presumptions proposed by the ATF here go far beyond any longstanding tradition of firearm regulation.  *C.f. Renna v. Bonta*, No. 20-CV-2190-DMS-DEB, 2023 WL 2846937, at *9 (S.D. Cal. Apr. 3, 2023) (unpublished) ("A one sentence conclusion by Defendants that the provisions of the [Unsafe Handgun Act] are presumptively lawful

require a license of every individual who sells a firearm for *anything* the Bureau sees as a profit to include currency, exchange of another firearm, or a service.

Despite the proposed rule regulating conduct that implicates the Second Amendment of the United States Constitution, the proposed rule does not at any point reference the term "Second Amendment." This omission demonstrates that there was no attempt by the Bureau to comply with the Constitution.

As the Bureau should be well aware, the Supreme Court recently clarified the framework for determining the constitutionality of a law or regulation under the Second Amendment.[10] The Court explained that if the Second Amendment "covers an individual's conduct," *any* burden on that conduct is presumptively unconstitutional.[11] The government can overcome that presumption only by showing "the regulation is consistent with this Nation's historical tradition of firearm regulation."[12] The proposed rule doesn't even attempt to do this.

As a starting point, the sale of firearms among individuals for profit is protected by the Second Amendment. The plain text of the Second Amendment protects the rights of the people to "keep and bear" arms. "[T]he core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms."[13] To this end, as many courts have held, the ability to buy a firearm is encompassed in the right to keep a firearm.[14] Likewise, the ability to sell a firearm to another is also protected.[15]

The type of government overreach this proposed rule attempts was among the concerns the Founders had at the time the Second Amendment was ratified. In 1774, King George III embargoed all imports of firearms and ammunition into the Thirteen Colonies,

---

'conditions and qualifications on the commercial sale of arms' is insufficient . . . ."). In addition, this proposed rule and the change in the statute it interprets are not longstanding and therefore enjoy no presumption of constitutionality.

[10] *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111, 2129–30 (2022).

[11] *Id.*

[12] *Id.* at 2126.

[13] *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (internal quotation marks omitted).

[14] *See, e.g.*, *Rocky Mountain Gun Owners v. Polis*, No. 23-CV-01077-PAB, 2023 WL 5017253, at *12 (D. Colo. Aug. 7, 2023) (unpublished) (collecting cases); *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 106 (3d Cir. 2023); *Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:22-CV-410, 2023 WL 3355339, at *3 (E.D. Va. May 10, 2023) (unpublished); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

[15] *See, e.g.*, *Reese v. Bureau of Alcohol Tobacco Firearms & Explosives*, 647 F. Supp. 3d 508, 521 (W.D. La. 2022); *Altman v. Cnty. of Santa Clara*, 464 F. Supp. 3d 1106, 1125 (N.D. Cal. 2020); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), *abrogated on other grounds as recognized by Range*, 69 F.4th 96.

which the Americans treated as a plain intent to enslave America. In reaction, the Americans redoubled their efforts to engage in firearms commerce.[16]

In 1777, when it appeared the British were poised to win the American Revolution, British Colonel Undersecretary William Knox drafted a plan called *What is Fit to be Done with America?* to prevent any future rebellions.[17] In relevant part, the plan stated, "the Arms of all the People should be taken away . . . nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence."[18]

The proposed rule does not give sufficient treatment to this nation's important historical context. And it does not even mention *Heller* or *Bruen*. Given that those two landmark cases provide the standard with which all federal and state firearms regulations must comply, it is peculiar that they receive no mention in this proposed rule. This omission combined with the stunning overreach of this proposed rule shows that the Bureau has no respect for the Second Amendment rights of the citizens that it tries to regulate.

If the proposed rule attempted to apply *Heller* or *Bruen*, it would fail. Nothing in this country's historical tradition of firearm regulation required that every firearm seller register for a license with the federal government. That holds true even if the sale is for a profit. Indeed, given how broad the conduct covered in the proposed rule is, one would be hard pressed to even find an analogous modern firearm regulation, raising serious *Bruen* concerns.

This proposed rule does not come close to passing constitutional muster. The Bureau should understand this and change course immediately.

### 3.   The proposed rule is arbitrary and capricious

Beyond the proposed rule's unconstitutionality, it is also unlawful under the Administrative Procedure Act ("APA"). Under the APA, a court must also "hold unlawful and set aside agency action" that is "arbitrary, capricious [or] an abuse of discretion."[19] An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation or disregards either alternatives to its action or the affected communities' reliance on the prior rule.[20]

Context helps show the extent of the proposed rule's arbitrary and capricious nature. The proposed rule purports to build on the Gun Control Act of 1968 ("GCA") but departs from

---

[16] David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 HARV. L. REV. F. 230, 234–35 (2014).

[17] *Id.* at 235.

[18] *Id.*

[19] 5 U.S.C. § 706(2)(A).

[20] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

that statute's text.[21]  In relevant part, the GCA explains that its purpose is not "to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or other lawful activity."[22]  Nor is the GCA "intended to discourage or eliminate the private ownership or use of firearms for law-abiding purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably needed to implement and effectuate the provisions of this title."[23]  This no-broader-than-reasonably-necessary requirement helps ensure the GCA's focus on mitigating firearms-related crime does not unduly burden lawful gun owners' Second Amendment rights.  The Firearms Owners' Protection Act of 1986[24] and Bipartisan Safer Communities Act[25] clarified parts of the GCA, but they did not amend the GCA's requirement of a tailored regulatory approach.

Unfortunately, this proposed rule violates the GCA's letter and spirit.  As a starting point, the rule renders anyone that the Bureau identifies to be selling a firearm for profit a firearms dealer.  As a firearms dealer without a federal license, that seller will face civil, administrative, and criminal consequences—with very few exceptions.  And even those exceptions lead to absurd implications.

For example, one of the above-listed exceptions attempts to carve out sales of firearms to family members.  Fair enough.  In America, it should be legal for a family member to sell a firearm to another family member without risk of prosecution.  But the exception is flawed.  Reading the exception, one can conclude that if a family member sells another family member a firearm for as little as one dollar more than the original purchase price, that seller could be open to civil, administrative, or criminal liability.  That absurdity risks hurting innocent people and chilling law-abiding behavior.  That is not only an unreasonable interpretation of the statute, it conflicts with the GCA, which sought to avoid creating unnecessary burdens on lawful firearms acquisitions.  This proposed rule instead maximizes such a burden.

Unfortunately, the absurd results of the above hypothetical are not an aberration. Every part of this proposed rule is littered with implications that create civil, administrative, and criminal liability for millions of otherwise responsible and law-abiding citizens who merely sell or attempt to sell a firearm.  In short, the proposed rule goes well beyond any reasonable interpretation of the statute and is arbitrary and capricious.

### 4.  The proposed rule is bad public policy

The Bureau has decided to criminalize responsible and law-abiding citizens rather than doing its job—that being arresting, investigating, and aiding in prosecuting violent

---

[21] Pub. L. No. 90-618, 82 Stat. 1213.

[22] *Id.*

[23] *Id.*

[24] Pub. L. No. 99–308 (S. 49), May 19, 1986, 100 Stat 449.

[25] Pub. L. No. 117-159, June 25, 2022, 136 Stat 1313.

criminals who use firearms to terrorize our communities. The undersigned Attorneys General and State Legislature agree that violent crime is at unacceptably high levels. Rather than focus on that primary and important objective, this proposed rule seeks to criminalize what should be lawful behavior.

While the duty to hold violent criminals accountable largely falls to local prosecutors and judges, the Bureau already has tools at its disposal to help combat this. As an example, 18 U.S.C. § 924(e) provides a 15-year mandatory minimum sentence for any individual who possesses a firearm after accumulating three violent felonies or serious drug offenses or both. In addition, 18 U.S.C. § 924(c) provides a five-year mandatory minimum sentence for any individual who carries a firearm during and in relation to a crime of violence or drug trafficking offense. These are just some laws available for the Bureau to enforce.

If the Bureau was serious about combatting violent crime, it would focus on enforcing the laws that are already on the books to hold violent criminals accountable for their actions. That would be the type of work that could save lives. Unfortunately, the Bureau has instead targeted innocent people who sell firearms. That is not only unlawful but wrong and the Bureau must change course.

## 5. Conclusion

For these reasons, the Bureau should withdraw the proposed rule.

Kris W. Kobach
Kansas Attorney General

Brenna Bird
Iowa Attorney General

Austin Knudsen
Montana Attorney General

6

APPX.358

Steve Marshall
Alabama Attorney General

Treg Taylor
Alaska Attorney General

Tim Griffin
Arkansas Attorney General

Christopher Carr
Georgia Attorney General

Raúl Labrador
Idaho Attorney General

Todd Rokita
Indiana Attorney General

Daniel Cameron
Kentucky Attorney General

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Andrew Bailey
Missouri Attorney General

APPX.359

Mike Hilgers
Nebraska Attorney General

John Formella
New Hampshire Attorney General

Drew. H. Wrigley
North Dakota Attorney General

Dave Yost
Ohio Attorney General

Gentner Drummond
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General

Marty Jackley
South Dakota Attorney General

Jonathan Skrmetti
Tennessee Attorney General

Ken Paxton
Texas Attorney General

Sean D. Reyes
Utah Attorney General

APPX.360

Jason Miyares
Virginia Attorney General

Patrick Morrisey
West Virginia Attorney General

Bridget Hill
Wyoming Attorney General

Ben Toma
Speaker of the Arizona House of
Representatives

Warren Petersen
President of the Arizona State Senate

9

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS, et al,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO.2:24-CV-00089-Z** |
| | § | |
| **BUREAU OF ALCOHOL, TOBACCO,** | § | |
| **FIREARMS AND EXPLOSIVES, et al,** | § | |
| **Defendants.** | § | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY RELIEF**

i

APPX.362

# TABLE OF CONTENTS

Plaintiffs' Reply In Support Of Motion For Preliminary Relief ..................................................1

Table of Contents ........................................................................................................... 2

Table Of Authorities ...................................................................................................... 4

   I.    Plaintiffs Have Standing and Will Suffer Irreparable Harm.......................................1

      A.    Texas Has Standing and Faces Irreparable Harm. .............................................1

      A.    B. Tormey Has Standing and Faces Irreparable Harm. ..................................... 2

      B.    C. The Organizational Plaintiffs Have Standing.................................................5

   II.    Venue Is Proper. ..........................................................................................7

   III.    Plaintiffs Are Likely to Succeed on the Merits.............................................7

      A.    The Rule Conflicts with the Statute. ..............................................................7

      B.    The Rule's Presumptions Are Invalid on Their Face. ..................................12

          1.    The Statute Restricts ATF's Authority to Establish Presumptions of Criminality.....12

          2.    The EIB Presumptions Are Unlawful. ....................................................15

          3.    The PEP Presumptions Are Unlawful. ....................................................16

          4.    The Rule's "Not Presumed" Language Waters Down the Statute. ........................17

      C.    The Rule's Provisions for "Former Licensees" Violate the Statute............................18

   IV.    The Rule Violates the Second Amendment. ...................................................19

   V.    The Rule Violates the Fourth Amendment....................................................21

APPX.363

VI.    Relief Should Not be Limited to the Parties.................................................... 22

VII.   The Balance of Equities Favors a Stay........................................................... 24

Conclusion ...................................................................................................................... 24

Certificate of Service ....................................................................................................27

APPX.364

**TABLE OF AUTHORITIES**

## Cases

*Abramski v. United States*,
    573 U.S. 169, 191 (2014) .............................................................................14

*Am. Civ. Rts. Union v. Martinez-Rivera*,
    166 F. Supp. 3d 779, 804 (W.D. Tex. 2015) ................................................ 6

*BRAIDWOOD MANAGEMENT, INCORPORATED v. EEOC*,
    70 F.4th 914, 926, 928 (5th Cir. 2023)...........................................................3

*Bryan v. United States*,
    524 U.S. 184, 191 (1998) ............................................................................. 4

*Career Colls. & Sch. of Tex. v. United States Dep't of Educ.*,
    98 F.4th 220, 250 (5th Cir. 2024)..........................................................15,23

*Cargill v. BATFE*,
    2023 U.S. Dist. LEXIS 166989, at *14 (W.D. Tex. Sept. 20, 2023) ........5

*Collins v. Yellen*,
    141 S. Ct. 1761, 1779 (2021) .....................................................................1

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451, 137 S. Ct. 973, 983, 197 L.Ed.2d 398 (2017)....................1

*Disability Rts. Wis., Inc. v. Walworth County Bd. of Supervisors*,
    522 F.3d 796, 802 (7th Cir. 2008) .............................................................. 6

*District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008) .........................21

*Enter. Int'l Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
    762 F.2d 464, 472 (5th Cir. 1985) ............................................................. 2

*Fairmont Cash Mgmt., L.L.C. v. James*,
    858 F.3d 356, 362 (5th Cir. 2017) ............................................................. 4

*Grayned v. City of Rockford*,
    408 U.S. 104, 108 (1972)................................................................... passim

*Holland Livestock Ranch v. United States*,
    714 F.2d 90, 92 (9th Cir. 1983) ................................................................ 13

*HollyFrontier Cheyenne Refinery, LLC v. Renewabler Fuels Ass'n*,
    141 S. Ct. 2172, 2180 (2021)............................................................. 14, 15

*Idaho Mining Ass'n v. Browner*,
    90 F. Supp. 2d 1078, 1098-99 (D. Idaho 2000) ...................................... 13

APPX.365

*In re NTE Conn., LLC,*
    26 F.4th 980, 990– 91 (D.C. Cir. 2022)................................................ 2

*James v. Hegar,*
    86 F.4th 1076, 1081 (5th Cir. 2023) ................................................... 2

*Lane v. United States,*
    612 F. Supp. 3d 659, 666 (N.D.T.X. 2020)........................................18

*Marszalek v. Kelly,*
    2021 U.S. Dist. LEXIS 107613, at *10-11 (N.D. Ill. June 9, 2021)........................ 6

*Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023),...................................... 20

*N. A. A. C. P. v. ALABAMA,*
    357 U.S. 449, 462 (1958) ........................................................ 6

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022) ........................................... 20

*Nat'l Council of La Raza v. Cegavske,*
    800 F.3d 1032, 1041 (9th Cir. 2015) .................................................. 6

*Natl. Rifle Assn. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives,*
    No. 3:23-CV-1471-L, 2024 WL 1349307, at *9 (N.D. Tex. Mar. 29, 2024)........................... 2

*Peyote Way Church of God, Inc. v. Smith,*
    742 F.2d 193, 198 (5th Cir. 1984)................................................3

*Republic Aviation Corp. v. NLRB,*
    324 U.S. 793, 798 (1945)........................................................12

*Sackett v. EPA,*
    566 U.S. 120, 127 (2012) ........................................................3

*Texas v. United States*,
    809 F.3d 134, 155 (5th Cir. 2015) ..............................................1, 2

*Soc'y of Separationists, Inc. v. Herman,*
    959 F.2d 1283, 1285 (5th Cir. 1992) .................................................. 2

*Speech First, Inc. v. Shrum,*
    92 F.4th 947, 949-50 (10th Cir. 2024) ................................................... 6

*Texas v. U.S.,*
    50 F.4th 498, 518 (5th Cir. 2022) ................................................1

*TransUnion, LLC v. Ramirez,*
    141 S. Ct. 2190 ................................................................1

*Tyler v. Hennepin County,*
    598 U. S. 631, 636 (2023) ......................................................1

APPX.366

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590, 600 (2016)...............................................................................3

*U.S. Steel Corp v. Astrue*,
   495 F.3d 1272, 1284 (11th Cir. 2007) ......................................................13

*United States v. Apel*,
   571 U.S. 359, 369 (2014)..............................................................................14

*United States v. Shan*,
   361 F. App'x 182 (2d Cir. 2010) ................................................................10

*United States v. Shirling*,
   572 F.2d 532 (5th Cir. 1978) ......................................................................10

*United States v. Valdes*,
   681 F. App'x 874 (11th Cir. 2017)..............................................................10

*United States v. Wilmoth*,
   636 F.2d 123 (5th Cir. 1981)........................................................................10

*Wis. Gas Co. v. FERC*,
   758 F.2d 669, 674 (D.C. Cir. 1985) .............................................................2

**Constitutional Provisions & Statutes**

5 U.S.C. § 705 ...................................................................................................24

18 U.S.C. § 921(a)(13). .....................................................................................24

18 U.S.C. § 926(a)........................................................................................8, 12

27 C.F.R. § 478..................................................................................................24

18 U.S.C. § 921(a)(21)(C).................................................................................24

18 U.S.C. § 926(a) .............................................................................................24

**Rules & Regulations**

89 Fed. Reg 29051.............................................................................................19

Fed. Reg 29054....................................................................................................1

APPX.367

### I.    Plaintiffs Have Standing and Will Suffer Irreparable Harm.

#### A.  Texas Has Standing and Faces Irreparable Harm.

Monetary harm is an injury that confers standing. *See Tyler v. Hennepin County*, 598 U. S. 631, 636 (2023); *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190 at 2204 (2021). Texas stands to suffer direct harm from the Rule in the form of a pocketbook injury. A pocketbook injury "is a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). For standing purposes, the exact cost is irrelevant. *Texas v. U.S*., 50 F.4th 498, 518 (5th Cir. 2022); *see Texas v. United States* (DAPA), 809 F.3d 134, 155 (5th Cir. 2015) (holding that Texas established injury in fact without precisely quantifying the costs of issuing driver's licenses to DAPA beneficiaries). "[A] loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 137 S. Ct. 973, 983, 197 L.Ed.2d 398 (2017).

The Rule is expected to reduce the amount of people who sell firearms, period. The Rule estimates that its implementation will reduce gun sales. *See* 89 Fed. Reg. 29,054 (contemplating 10% of currently unlicensed dealers leaving the market altogether). Texas has a sales tax that applies to the sale of firearms at gun shows.  Between the effective date of the Rule and just July 2024, Texas has 58 gun shows calendared.[1] Texas collects 6.25 percent state tax on taxable items sold— including guns sold at gun shows.[2] Unlicensed dealers exiting the market will inevitably result in less gun sales, and thus less sales tax collected by the state. *See generally* Exhibit A, Declaration of Murl E. Miller. This is not speculative. The ATF has told us as much.  Fed. Reg. 29,054 (10% of unlicensed sellers likely to be either "unwilling or *unable* to become licensed as an FFL as a result

---

[1] https://gunshowtrader.com/gunshows/texas-gun-shows/.
[2] https://comptroller.texas.gov/taxes/publications/96-211.php#:~:text=You%20must%20collect%20sales%20or,tax%20on%20your%20taxable%20sales.

APPX.368

of the [R]ule") (emphasis added).

In determining whether costs are irreparable, the key inquiry is "not so much the magnitude but the irreparability." *Texas v. EPA*, 829 F.3d at 433–34 (quoting *Enter. Int'l Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)). Even purely economic costs may count as irreparable harm "where they cannot be recovered 'in the ordinary course of litigation.' " *Id*. at 434 & n.41 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *see also, e.g., In re NTE Conn., LLC*, 26 F.4th 980, 990– 91 (D.C. Cir. 2022) ("We have recognized that financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." (cleaned up)).

Without a stay of the Rule, Texas will suffer irreparable harm from the illegal Rule. The remedy of damages against the United States is unavailable to Texas, so the Rule's effect on the State sales tax revenue—both on items like tickets to gun shows and the firearms sold at those shows—"are unrecoverable because of the government-defendant's sovereign immunity from monetary damages. . . ." *Natl. Rifle Assn. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 3:23-CV-1471-L, 2024 WL 1349307, at *9 (N.D. Tex. Mar. 29, 2024).

A.      B.      **Tormey Has Standing and Faces Irreparable Harm.**

For starters, Defendants misrepresent the standard for pre-enforcement challenges, claiming Plaintiffs "must demonstrate … a real and immediate threat of *repeated injury* in the future," as if to say Plaintiffs cannot bring a pre-enforcement challenge at all.  Opp. 13 (quoting *James v. Hegar*, 86 F.4th 1076, 1081 (5th Cir. 2023) (emphasis added)).  But *James* concerned claims for prospective relief based *solely* on past injuries, 86 F.4th at 1082, quoting "repeated injury" language from *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992), which clearly limited Defendants' cherrypicked standard to "obtain[ing] equitable relief for past wrongs."

APPX.369

In contrast, it is black-letter law that a person "need not[] … disobey the law and await his prosecution before challenging its unconstitutionality." *Peyote Way Church of God, Inc. v. Smith*, 742 F.2d 193, 198 (5th Cir. 1984).[3] Rather, one need only "show a 'genuine threat' of enforcement," and "even a 'public[] announce[ment]' to enforce a statute and *one prior proceeding* are sufficient for standing." *BRAIDWOOD MANAGEMENT, INCORPORATED v. EEOC*, 70 F.4th 914, 926, 928 (5th Cir. 2023) (citation omitted, alterations in original, emphasis added). Of course, Defendants have announced their intent to enforce their new Rule and the GCA generally. And although entirely unnecessary, Plaintiffs *have* identified one prior enforcement proceeding targeting conduct falling squarely within the Rule's ambit. *See* Declaration of Erich M. Pratt ¶¶32-40, ECF #1-2 (detailing the prosecution, GOA defense, and repeat acquittal of GOA member Robert Arwady). Plaintiff Tormey, also a GOA member, has every reason to believe ATF would enforce its Rule against him.

Defendants finally admit that "[p]otential future enforcement [can] amount[] to an Article III injury," but they dispute Tormey's standing "on multiple fronts." Opp. 13. Defendants are incorrect on each. First, Defendants claim Tormey has no "'serious intention to engage in conduct' that is actually 'proscribed' by the Rule[]'" because they assert that Tormey's conduct *definitively* "does not rise to the level of being 'engaged in the business.'" Opp. 14. But Defendants' nonbinding (and convenient) opinion in this litigation presents no bar to federal prosecution generally. Moreover, Tormey has "bought, sold, and traded firearms" for "many

---

[3] *See also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) ("parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties'"); *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (plaintiff need not "wait for the Agency to drop the hammer").

APPX.370

years" as part of his "large personal collection," and he has "even previously purchased a table at certain gun shows, in order to facilitate enhancing [his] collection." Declaration of Jeffrey W. Tormey ¶¶8, 4, 8. This is precisely the sort of conduct that falls under several of the Rule's presumptions, including EIB (1), (3), and PEP (ii).[4] *See* 89 FR 29091. Finally, Defendants claim that "such occasional 'purely private and non-commercial' sales … *do not* qualify as being 'engaged in the business,'" but they cannot square their new position with the Rule's text, which provides that "even a single firearm transaction or offer to engage in a transaction" may suffice. Opp. 14; 89 FR 29091.

Next, Defendants deny any "credible threat" of enforcement but discuss only the prospect of *criminal liability*, Opp. 16, 16-17, a puzzling departure from the Rule's assurances that it does "not apply in any criminal proceedings." 89 FR 28969. Moreover, "willful" violations also expose people to *civil liability* at a much lower standard than that used in criminal cases. *See, e.g., Bryan v. United States*, 524 U.S. 184, 191 (1998) (noting "in the criminal context, a 'willful' act is one undertaken with a 'bad purpose'"). Defendants then cite Tormey's "professed uncertainty" under the Rule as an apparent defense against willfulness. Opp. 17. But this has never been the case, as "knowledge of the particular regulation violated is not required...." *Fairmont Cash Mgmt., L.L.C. v. James*, 858 F.3d 356, 362 (5th Cir. 2017). Dispensing with similar arguments against pre-enforcement standing in a challenge to ATF's "zero tolerance" FFL revocation policy, another Texas district court recently observed that "[i]f a plaintiff can establish that it is an 'object' of the

---

[4] Even if Tormey (or anyone else) ultimately prevails defending against an enforcement action, that does not mean he would not be harmed. Rather, "the general rule of thumb is that the 'nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm.'" *Mock v. Garland*, 2023 U.S. Dist. LEXIS 178809, at *21 (N.D. Tex. Oct. 2, 2023).

APPX.371

agency regulation at issue, 'there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it.'" *Cargill v. BATFE*, 2023 U.S. Dist. LEXIS 166989, at *14 (W.D. Tex. Sept. 20, 2023) (alteration in original). As a gun owner and frequent buyer and seller, Tormey clearly is an object of the Rule "sufficient to establish standing in this case." *Id.* at *15.

### B. C.   The Organizational Plaintiffs Have Standing.

Similarly, the organizational Plaintiffs have standing to assert the interests of their members and supporters. Claiming "the organizational plaintiffs collectively identify only two [such persons] with any degree of specificity," Opp. 18, Defendants ignore those TFA and VCDL members and supporters who have contacted their respective organizations and who "have in the past bought and resold firearms, and wish to do so in the future without being improperly labeled as a 'dealer'...." Declaration of C. Richard Archie ¶10, ECF #1-3; *see also* Declaration of Philip Van Cleave ¶10, ECF #1-4. As a result of the Rule, these persons now face unprecedented application of *state law* covering gun dealers, in addition to *zoning restrictions* that will necessitate "obtain[ing] a separate premises" for licensure. Declaration of C. Richard Archie ¶6, ECF #1-3; Declaration of Philip Van Cleave ¶12, ECF #1-4. That VCDL, and TFA did not name names, or detail specific conversations they have had with specific persons, does not mean that they have not communicated with and sufficiently described how they have members who will be harmed by the Rule.

As for GOA, Defendants acknowledge the former FFL whose retirement savings are now frozen in unsellable inventory, but they demand the person be *named*. Opp. 19; *see* Declaration of Erich M. Pratt ¶¶17-31, ECF #1-2. But the law on representational standing imposes no such naming requirement, which would only expose GOA members to government scrutiny by the very same Defendants who demand to know "the frequency of their members' purported firearms sales;

APPX.372

the number of firearms sold during those transactions; the types of firearms being sold," and more – perhaps for harassment, intimidation, or even prosecution. Opp. 20. But "[c]ompelled disclosure of membership in an organization engaged in advocacy of particular beliefs is" an "effective … restraint on freedom of association," *N. A. A. C. P. v. ALABAMA*, 357 U.S. 449, 462 (1958), and "[a] plaintiff is not required to name names in a complaint in order to properly allege injury in fact to its members." *Am. Civ. Rts. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 804 (W.D. Tex. 2015); *accord Disability Rts. Wis., Inc. v. Walworth County Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949-50 (10th Cir. 2024); *Marszalek v. Kelly*, 2021 U.S. Dist. LEXIS 107613, at *10-11 (N.D. Ill. June 9, 2021). Rather, it is enough merely to identify harmed members and supporters, as Plaintiffs clearly have done.

Defendants then claim GOA's former FFL member faces *no harm* anyway, because (i) "the member *might* dispose of their firearms at some point in the future" (*but see* Declaration of Erich M. Pratt ¶22, ECF #1-2 ("this lifetime of accumulated inventory largely constitutes their retirement")), (ii) "ATF *might* deem such a disposition as being 'engaged in the business' under the Rule" (*but see id.* ¶35 (ATF did so for Arwady)),(iii)  and "the member *might potentially* face civil or even criminal sanctions as a result" (*but see id.* – Arwady already did). Opp. 19. In other words, "[t]he chances are not remote or speculative that ATF might pursue this GOA member for merely doing what the law allows...." Declaration of Erich M. Pratt ¶31, ECF #1-2.[5]

---

[5] Defendants also claim that "the Rule expressly provides that once one year has passed after the transfer of firearms from business inventory to a personal collection" GOA's "former licensee will generally 'no longer be presumed to be engaged in the business....'" Opp. 19. But the Rule simultaneously claims that, if one purchases firearms *during* licensure and then sells them *after* licensure, *that* is 'engaging in the business.' Compl. ¶56. That is precisely the fact pattern described regarding this GOA member.

APPX.373

Finally, although lumping standing and irreparable harm into the same title, Defendants do not dispute irreparable harm separately, but rather attach their objections to their standing argument. *See* Opp. 13-20. So, if Plaintiffs *do* have standing (they do), Defendants appear to concede that harm necessarily flows from the Rule.

## II.   Venue Is Proper.

Curiously arguing that this case does not belong in this Court, Defendants make a claim of improper venue that is premised entirely on their claims that no plaintiff has standing. Opp. 21-22. Indeed, Defendants apparently recognize that Plaintiff Tormey resides within this district, that GOA and GOF have members within this district, and that it is entirely appropriate for the State of Texas to litigate *in Texas*. Not to mention, VCDL and TFA have at least one member (Tormey) in this district, and potentially others. Thus, in order to claim improper venue, Defendants first must eliminate every plaintiff from this case. And if there is a case with no plaintiffs, determining the appropriate venue hardly seems worthwhile. Indeed, other than objecting to venue, Defendants do not bother to identify *to where* this case should be transferred. Again, that is because so long as any of the above plaintiffs remain in this suit, venue is proper in this district.

## III.   Plaintiffs Are Likely to Succeed on the Merits.

### A. The Rule Conflicts with the Statute.

Defendants offer a series of seven reasons why the Rule does not violate the statute. None is persuasive.

First, Plaintiffs explained that ATF has no authority to define statutory terms that Congress expressly defined. Defendants respond that they alone get to "determine what regulations are in fact 'necessary'" and "here, ATF concluded that this Rule was necessary." Opp. 23. On

APPX.374

the contrary, 18 U.S.C. Section 926(a) severely limits ATF's authority to regulate at all – a deliberate choice by Congress. Defendants next claim that they enacted the Rule "to provide 'clarity'" and that, since Plaintiffs have demanded clarity, they must accept the Rule. *Id.* Operating on the principle that 'more is better,' Defendants posit that hundreds of pages of rulemaking *must be* clearer than no rulemaking at all. Defendants claim that, "without the benefit of the Rule, Plaintiffs would have *less* guidance and clarity regarding how the GCA operates, not more." *Id.* This is the sort of logic that appeals only to bureaucrats.

Defendants also claim to have enacted the Rule to "improve public safety." *Id.* But they cite no authority for the notion that agencies are free to edit statutes at will in order to effectuate such lofty goals. Lastly, Defendants concede Plaintiffs' cases, which say that *agencies cannot define words that Congress already defined. Id.* Defendants' only response is that their "rule is consistent with the GCA's text." *Id.* On the contrary, the Rule is *different from* the statute – of that there can be no doubt, as the Rule adds countless words to definitions that Congress already provided. What is different, by definition, cannot be the same.

Second, Defendants claim that they were permitted to incomprehensibly define common words that ordinary people can easily understand. Opp. 23-24. Defendants ignore Plaintiffs' cases on this point, and instead demur that the Rule was meant "to 'clarify'" certain terms. Opp. 24. But again, ambiguity is required for ATF to act – and Defendants never claim the statute is in any way unclear or ambiguous. Nor can Defendants make such a claim, as the Supreme Court is abundantly clear that "laws must provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

APPX.375

Indeed, Defendants' third point undermines their second.  They claim that the rule of lenity does not apply *because the statute is not ambiguous*.  Opp. 24.  But if there is no ambiguity, then there was nothing for the Rule to "clarify."  Defendants cannot have it both ways.

Fourth, Defendants object to Plaintiffs' claim that the statute requires *actual* profit be derived from *actual* purchases and *actual* resales.  Opp. 24-26.  Rejecting Plaintiffs' "negative implication" principle (that, because no profit is required in terrorism cases, then profit must be required in other cases), Defendants opine that mere "intent" to profit is enough.  Opp. 25.  But in reaching that conclusion, Defendants focus entirely on the definition in Section 921(a)(22) (defining impermissible types of profit) and ignore the definition of "engaged in the business" found in Section 921(a)(21) – which *ties profit to a course of conduct comprised of a series of activities*.  *Id*.  It would make no sense for Congress to relieve ATF of the burden to prove profit in *certain* cases, if Defendants are correct that they need *never* prove profit in any case.

Fifth, after claiming no profit is required (only intent), Defendants claim that "multiple successful purchases and [re]sales of firearms" are not required.  Opp. 26.  Rather, Defendants again claim that the statutory phrase – "to predominantly earn a profit through the repetitive purchase and resale of firearms" – "as a whole means that" intent is enough to fulfill all its parts,

APPX.376

"regardless of whether a person's" intent "successfully results in actual sales and actual profit."[6] *Id*. Defendants thus transform the statute Congress enacted – which requires a series of actions and results – into a pure intent crime, where a person *does not actually have to do anything* (including ever even putting hands on a firearm).

Curiously, Defendants admit that the first part of the statutory definition – "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business" – in fact "refers to action, not intent." *Id*. But Defendants do not explain (i) how a person can be considered "engaged in the business" without ever transacting business, (ii) how a person can be "dealing in firearms" without ever purchasing or reselling a firearm, or (iii) how a person can be engaged in a "regular course of trade or business" based only on hopes and dreams. In sum, the statute that Congress enacted has been entirely changed by the Rule.

Sixth, responding to Plaintiffs' criticism that the Rule's definition of "personal collection" as far too narrow, Defendants respond that "the phrase 'personal collection or for a hobby' cannot be read to mean any firearms that a person possesses for any lawful purpose." Opp. 28. Purporting

---

[6] Defendants rely on only one outlier case where no firearms were actually sold, *U.S. v. KING*, 735 F.3d 1098 (9th Cir. 2013). In *King*, the defendant, an immigrant, helped an immigrant friend obtain an FFL, and then "misappropriated the company's business account, using falsified documentation to set up credit accounts and order firearms from manufacturers and wholesalers behind his purported partner's back." *Id*. at 1102, 1106-07. But even if *King* supports dealing without sales, King had acquired numerous firearms (*id*. at 1103) – clearly then attempting to sell them. The Rule goes further, however, saying that neither sales *nor even purchases* is required. ATF's remaining cases all involved *actual* sales. *See, e.g.*, *United States v. Valdes*, 681 F. App'x 874 (11th Cir. 2017) (600 sales); *United States v. Wilmoth*, 636 F.2d 123 (5th Cir. 1981) (4 sales); *United States v. Shan*, 361 F. App'x 182 (2d Cir. 2010) (2 sales); *United States v. Murphy*, 852 F.2d 1 (1st Cir. 1988) (sale of 102 rifles); *United States v. Mastro*, 570 F. Supp. 1388 (E.D. Pa. 1983) ("approximately three dozen" sales); *United States v. Shirling*, 572 F.2d 532 (5th Cir. 1978) (2 sales).

APPX.377

to derive this limitation from "dictionary definitions" of "collection," Defendants narrow "collection" to nothing more than "an assembly of objects or specimens for the purposes of education, research, or interest." Opp. 27. <u>But just because Defendants have found *a* dictionary definition does not mean it is the *best* definition for the job</u>. On the contrary, the more natural reading of "personal collection" uses the definition Plaintiffs proposed – basically, any group of objects accumulated in one place. This, unsurprisingly, would apply to the ordinary gun owner[7] with a "collection" of firearms accumulated for any purpose at all. But Defendants reject the notion that Congress intended the statute to broadly apply and to ordinary people, instead creating a new regime where the GCA's safe harbor provision applies only to museum curators.

Defendants claim to find further support for their narrow reading of "personal collection" in the GCA's definition of a collector of "curio and relic" firearms, defined as "any person who acquires, holds, or disposes of firearms as curios or relics...." *Id.* But this is not the narrow language Defendants claim. Rather, it applies to anyone who acquires a certain type of firearm. Likewise, a "personal collection" applies to anyone who "collects" firearms "personally" (*i.e.*, not for business purposes).[8]

---

[7] Disputing that the statutory safe harbor was meant to apply to ordinary people doing ordinary things, Defendants opine that "firearms accumulated primarily for personal protection [do not] fit with … the ordinary meaning of 'collection'...." Opp. 28-29. Defendants promise that people may "acquire and use firearms for self-defense," but may not sell them under the statutory safe harbor. To be sure, Defendants reassure "that does not mean that a person is necessarily engaged in the business of dealing when he sells a firearm that he acquired for personal protection." Opp. 29. Of course, the statutory safe harbor is unambiguous that people selling firearms they acquired for self-defense definitively are not engaged in the business.

[8] Plaintiffs also criticized the rule for lumping two separate statutory safe harbor provisions ("personal collection or for a hobby") into a single definition of "personal collection," thereby watering down the statute. MPI 22-23. Defendants do not respond to that argument.

APPX.378

Seventh, Defendants argue that the Rule is not vague because it sets forth "specific cir-cumstances" and "specific types of conduct" that give rise to a presumption that a person either is or is not unlawfully engaged in the business.  Opp. 30.  According to Defendants, these examples are "quite clear," and "Plaintiffs simply list provisions of the Rule with which they disagree." *Id.* But the entire point of a "presumption" is that it may be true – or it may not be true.  And <u>when such a presumption broadly sweeps in large swaths of perfectly innocent conduct, it is impossible to know which side of the line one is on</u> – not to mention when *multiple* presumptions are involved. Defendants finally admit as much, arguing that "even if … there could be some borderline cases in which it might be difficult to determine how the rule applies," that "is true of almost any statute or rule...."  Opp. 31.  But Plaintiffs do not pick nits about cases at the margin, focusing on the one percent of hard cases and ignoring the rest.  Rather, the opposite is true – the Rule "presumes" illegality in the vast majority of cases where the conduct is perfectly lawful.  *See* ECF #7-2 at 24-26.

## B. The Rule's Presumptions Are Invalid on Their Face.

### 1. The Statute Restricts ATF's Authority to Establish Presumptions of Criminality.

Claiming that the Rule's presumptions "help effectuate the GCA" by accomplishing gobs of good things (Opp. 32), Defendants point to a series of cases they claim support the broad authority of agencies to create presumptions.  None is helpful.  Whereas the GCA permits ATF to enact *only* regulations "*necessary* to carry out the provisions," 18 U.S.C. Section 926(a), the Supreme Court noted in *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945), that Congress had "left to the Board the work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms."  Congress

12

APPX.379

provided no similar broad grant of authority to ATF to define and apply "engaged in the business" here.

No matter, say Defendants, because they have the "*inherent* power" to create presumptions "regardless of whether the statute explicitly addresses presumptions." Opp. 33 (citing no authority for this).[9]  *But see Holland Livestock Ranch v. United States*, 714 F.2d 90, 92 (9th Cir. 1983) (a "presumption cannot stand where it is not needed" and cautioning that "[p]resumptions should not replace proof needlessly").  On the contrary, by claiming "general authority to promulgate regulations to effectuate its administration of the statutes it is charged with administering," the Rule blatantly rewrites the express Congressional limitation on its authority found in Section 926(a).

There is also one inconvenient truth behind Defendants' insistence of their authority to formulate presumptions – such administrative creations seem uniformly to rest on the application of *Chevron* deference (or deference by another name).  *See, e.g.*, *Idaho Mining Ass'n v. Browner*, 90 F. Supp. 2d 1078, 1098-99 (D. Idaho 2000) ("the rebuttable presumption is merely an interpretation of existing regulations and that the Court's analysis should therefore by guided by *Chevron*.").  But again, ATF has not made any explicit claim to deference here, or otherwise

---

[9] Similarly, in *U.S. Steel Corp v. Astrue*, 495 F.3d 1272, 1284 (11th Cir. 2007), the court allowed the Social Security Administration to use a "rebuttable presumption" in response to "to the difficulty of locating records" which "can date back fifty to sixty years...."  *See also USX Corp. v. Barnhart*, 395 F.3d 161, 172 (3d Cir. 2004) (same); *COLE v. U.S. DEPT. OF AGRICULTURE*, 33 F.3d 1263, 1269 (11th Cir. 1994) ("The reason for the presumption is also apparent … it would be difficult for the government to trace and identify the producer who initially sold the over-quota tobacco.").  No similar impossibility exists here, as neither ATF nor the courts have had any difficulty applying the statute for many decades without any presumptions at all.  *See* Compl. ¶37 ("*ATF declined to add examples*" in 1988, stating "the definition adequately addresses this concern....").  ATF's sudden reversal – at the President's behest – is by definition 'capricious.'

claimed the statute to be ambiguous and in need of presumptions in order to apply it. Indeed, to the extent that Defendants were to make such a claim to deference, it would not hold water, because the "engaged in the business" statute is one that carries criminal penalties. *See Abramski v. United States*, 573 U.S. 169, 191 (2014) ("criminal laws are for courts, not for the Government, to construe. We think ATF's old position no more relevant than its current one – which is to say, not relevant at all."); *United States v. Apel*, 571 U.S. 359, 369 (2014) ("we have never held that the Government's reading of a criminal statute is entitled to any deference."); *HollyFrontier Cheyenne Refinery, LLC v. Renewabler Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021) ("the government does not … ask [for deference] here…. We therefore decline to consider whether any deference might be due….").

Although acknowledging that being "engaged in the business" requires a "fact-specific inquiry considering the totality of the circumstances" – *i.e.*, not something easily determined by reliance on a single presumption based on a single fact – Defendants claim that the Rule somehow requires consideration of "the totality of the circumstances, including the presumptions and any rebuttal evidence." Opp. 34. On the contrary, the Rule's presumptions – by design and intent – permit a person to be assumed to be deemed unlawfully dealing based on meeting *any one* of ATF's arbitrary criteria (and nothing more). Such presumptions are the antithesis of a "totality of the circumstances" review – by definition, they represent a shortcut around such review.

Claiming that Plaintiffs may not even dispute ATF's authority to create presumptions, Defendants assert that the only challenge Plaintiffs may levy is "'the heavy burden of demonstrating that there is no rational connection between the fact proved and the ultimate fact to be presumed.'" Opp. 33 (citation omitted). And, opining that "none of the presumptions suffers from a failure of explanation," Defendants assert that each of them is "either supported by case

APPX.381

law … or other evidence demonstrating that a rational nexus exists." *Id.*  But as Plaintiffs explained, merely because another court once found a certain fact to be relevant (during a *totality of the circumstances* review in a particular case) does not give ATF carte blanche to hone in on that factor as *alone* creating a presumption of illegality, with nothing more.

As the Fifth Circuit has held, even if permissible, "presumptions in the law result when 'proof of one fact renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of the inferred fact....' "  *Career Colls. & Sch. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 250 (5th Cir. 2024).  Although Defendants claim the Rule's presumptions are "common sense, confirmed by decades of ATF's enforcement experience" (Opp. 34), this is nothing more than the "ipse dixit" that the Fifth Circuit prohibits.  98 F.4th at 251.

### 2.  The EIB Presumptions Are Unlawful.

Defendants' naked appeal to "common sense" does not a reasoned decisionmaking process make.  For starters, many of the presumptions directly conflict with the statute they purport to implement.  *See* Compl. ¶¶102-09; MPI 26-33.  Additionally, many of the Rule's presumptions do not meet the Fifth Circuit's standard above – *i.e.*, they sweep in far more lawful conduct than unlawful, meaning it cannot possibly be the case that the existence of facts to prove one of ATF's presumptions "renders the existence of [unlawful dealing] *so probable* that it is sensible and timesaving to assume [its] truth...."  *Career Colls. & Sch. of Tex.*, 98 F.4th at 250.

Defendants respond first that the Rule's presumptions do not violate the statute.  Opp. 35-36.  Again, disputing that "the statute requires actual sales," Defendants opine that, either way, the "presumption does not render the specified conduct a violation … but rather presumes" a violation "pending reliable evidence to the contrary."  Opp. 36.  But the opportunity to defend oneself is no answer.  Plaintiffs do not seek the right to defend themselves from an improper charge – they want

never to be improperly charged in the first place.

Second, Defendants seek to rehabilitate the presumption of dealing if a person "resell[s] firearms within 30 days of purchase...." Op. 36. Defendants' only justification for this presumption is that "many firearms sellers allow returns within 30 days...." Op. 37. Yet even the NPRM acknowledged that "many" retailers allow no returns on firearms, while only "some" do. 88 Fed. Reg. 62003 n.80. Indeed, Plaintiff GOA's comments further explained how most gun sellers do not allow returns, giving examples. ECF #16-1 at 40. Don't worry, say Defendants, because again, anyone charged with this presumption "may present … rebuttal evidence...." Opp. 37. As noted above, this is no answer.

Defendants also defend the Rule's new-in-box presumption, claiming it does not create a "presumption, within a safe harbor, within a presumption, within a statute." Opp. 37; ECF #7-2 at 24. Rather, Defendants say, if a person "intentionally" evades the statute, but waits a year in doing so, the presumption does not apply at all and "the factfinder would [need to] consider all the relevant facts. Opp. 37. In other words, under the Rule, the clear law-breaker *falls outside the presumption*, while the innocent gun owner who loses his job and sells a few new guns to pay the mortgage *is presumed a felon* and must defend himself. It would seem that the Rule's absurdity continues to grow.

### 3. The PEP Presumptions Are Unlawful.

Again disputing that the statute requires no actual profit (only intent), Defendants claim that their PEP presumptions are both lawful and "sensible." Opp. 37-40. First, Defendants deny that the Rule takes the explicit statutory safe harbor, and waters it down into the mere opportunity to defend oneself. Defendants claim that "Plaintiffs misapprehend the structure of the statute" – but then make Plaintiffs' point for them – pointing out that, although the statute says that unlawful

APPX.383

dealing definitively "*shall* not include" certain conduct, the Rule instead allows that "evidence of such conduct *can* rebut the presumptions." Opp. 38 (emphasis added). But again, the statutory safe harbor does not require a person to provide "evidence" to prove his innocence. Rather, it declares unequivocally that he is not breaking the law.

Next, Defendants callously concede that the Rule's purportedly "common-sense" PEP presumptions "may capture some individuals" who are engaged in perfectly lawful activity, but demur "that is why the presumptions are rebuttable." Opp. 38. But again, it is no answer to say that any errors at the outset may be corrected on the back end (that is, if a person is able to assemble and present evidence to prove his innocence).

Finally, Defendants object for two additional reasons, largely on the theory that the PEP presumptions are "common-sense," that they will not sweep up as much lawful activity as Plaintiffs claim, and that either way, innocent people will be offered the opportunity to prove their innocence. Opp. 39-40. Each of these arguments has been addressed above.

### 4. The Rule's "Not Presumed" Language Waters Down the Statute.

Disputing that the Rule waters down the statutory safe harbor language, Defendants claim that "the Rule tracks the statute exactly...." Opp. 40-41. But Defendants then concede that the Rule also "added conduct that satisfies this statutory exclusion as conduct that cannot be presumed to be engaged in the business." Opp. 41. In other words, by "add[ing]" language, the Rule *does more than* "track the statute exactly."

Indeed, whereas the statute offers clear protection – *i.e.*, 'if you do this, you conclusively are *not* a dealer' – the Rule waters this down to "conduct that cannot be presumed" – *i.e.*, 'if you do this, *we won't assume* you're dealing – but you may still be.' Defendants offer no cognizable theory as to why the Rule's "not presumed" language is helpful, when the statute already provides

APPX.384

far more robust protection through its safe harbor language.

### C. The Rule's Provisions for "Former Licensees" Violate the Statute.

Defendants' insistence that the statute permits regulation of so-called "former licensees" is incoherent. Unable to cite any statute for the creation of such a class of individuals, Defendants simply assert that "former licensees are an inherent feature of the GCA's licensing scheme." Opp. 41. But in the same breath, Defendants then concede that "a former licensee is [governed] *in the same ways and to the same extent as anyone else who is not currently licensed*." *Id.* (emphasis added). In other words, any distinction between 'former licensees' and 'ordinary people' is something that the Rule contrives out of whole cloth.[10] Accordingly, Defendants' suggestion that "the Rule actually … provide[s] [former licensees] with a way to dispose of their inventory lawfully" is nothing short of bureaucratic paternalism. *Id.* "Former licensees" can do all that non-licensees do – without the need for a Rule no one asked for, which provides additional limitations, not greater freedoms.

Defendants then advance three reasons why their statutory revisionism should survive. None is availing. First, Defendants claim their one-year rule is permissible because it is "reasonable" to assume a former licensee attempting to sell their remaining inventory must be "engaged in the business." Opp. 42. *But see* Declaration of Erich M. Pratt ¶22, ECF #1-2 ("This member reports that this lifetime of accumulated inventory largely constitutes their retirement."). On the contrary, it is no more "reasonable" to presume a former licensee is breaking the law than

---

[10] In a now-common refrain, Defendants accuse Plaintiffs of "misunderstand[ing]" the Rule, only to admit that what Plaintiffs say is technically true. Opp. 35, 38, 42. Of course, as another judge in this district has noted, "[t]echnically correct is the best kind of correct…." *Lane v. United States*, 612 F. Supp. 3d 659, 666 (N.D.T.X. 2020).

18

APPX.385

any other unlicensed person.  Left without any statute authorizing their latest edict, Defendants simply demur that "[t]he rational nexus supporting this presumption is based on ATF's *common-sense* interpretation of the GCA."  Opp. 42.  But as Plaintiffs already explained, statutory revisionism is anything but "common-sense."

Second, Defendants defend their effective sales ban on 'willful evaders' by citing nothing more than their own opinions that the Rule is "manifestly sensible," "patently clear," and yet another "common-sense interpretation."  Opp. 43.  But absent statutory text authorizing Defendants' action, a thesaurus cannot save the Rule.

Third, Defendants claim Plaintiffs' observation that firearms never transferred to business inventory "remain forever in purgatory" is "inaccurate," but their only defense is the atextual 30-day transfer window created by the Rule.  Opp. 43.  Plus, it would seem that, outside this window, Plaintiffs' concerns are vindicated, and *certain firearms may never be transferred*.  Finally, Defendants dispute that "[p]urchasing inventory while licensed does not in any sense 'serve as a predicate offense for a charge of *unlicensed* dealing,'" but that is exactly what the Rule states.  *See* 89 Fed. Reg. 29051 ("Because this inventory consists of firearms repetitively purchased for resale with predominant intent to profit, it was clearly purchased as part of a regular course of business or trade."), 29090 ("they were purchased repetitively before the license was terminated as part of a licensee's business inventory with the predominant intent to earn a profit.").

## IV.    The Rule Violates the Second Amendment.

Requiring licensure for incidental, private transactions in firearms would violate the Second Amendment. Courts routinely hold that the exercise of the right to keep and bear arms necessarily requires the incidental acquisition and disposition of firearms.  The Rule expands "engaging in the business" so broadly that it essentially requires a license for ordinary persons doing ordinary things

APPX.386

merely to exercise their Second Amendment rights, thereby infringing a right that "shall not be infringed."  While the Second Amendment explicitly protects the right to "keep and bear arms," the only way to exercise the right "is to get one, either through sale, rental, or gift," *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023), or through private manufacture.  Therefore, if a person's ability to acquire and dispose of firearms is restricted, that person's right to keep and bear arms is hindered – *i.e.*, infringed.  *See id*. at 1044 n.8.

As the Supreme Court has recently explained, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, … the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022).  No such historical showing can be made here.

ATF's opposition seeks historical analogues in all the wrong places.  *See* ECF No. 31 at 46–47; n.31.  Contrary to Defendants' claim of historical similarity, in 1794, Congress temporarily restricted the export of arms and matériel in order to *enhance the arming of America*, at a time when war with Great Britain loomed.  Likewise, the colonies restricted arms trade with Indians to reduce the threat from hostile tribes.  As for Massachusetts' barrel proving law, this was a product quality-control measure.  And the various laws concerning gunpowder were enacted to prevent widespread fire damage to cities caused by volatile, rudimentary compounds no longer in widespread use.  None of these laws parallels the "how" and the "why" of the Rule's radical expansion of the GCA's licensing requirement. *Bruen*, 597 U.S. at 29.

To be sure, the Supreme Court said in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding ... laws imposing conditions and qualifications on the commercial

APPX.387

sale of arms," which are "presumptively lawful regulatory measures." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008). But this language in *Heller* was dicta, and it does not even apply in the non-commercial context. Rather, if anything, by singling out conditions on the commercial sale of arms, this language in *Heller* indicates that conditions on non-commercial sales of firearms are constitutionally suspect. Nor are dealer licensing laws a "longstanding" type of statute, but instead largely arose in the 20th century and cannot form a early national tradition under *Bruen's* stringent standard.

## V. The Rule Violates the Fourth Amendment.

Defendants attack Plaintiffs' standing to challenge the Rule on Fourth Amendment grounds, noting that "nothing in Tormey's declaration indicates that he intends to seek a federal firearms license." ECF No. 31 at 62. On the other hand, if Mr. Tormey would like to engage in the same activities as he has for years, licensure is his only option. Yet the Rule presents him with the Hobson's choice of foregoing exercising his Second Amendment rights, or obtaining an FFL and being subject to warrantless invasions of his home (a Fourth Amendment violation). Yet it is axiomatic that one constitutional right cannot be conditioned on another. Moreover, if Mr. Tormey continues his current activity, and does not obtain a license, he could be criminally charged—which would also involve government intrusion into his home. Beyond Tormey's obvious standing, it is likely that several GOA and VCDL members and supporters will be forced to become licensed to continue carrying on with their lives. Indeed, the organizational Plaintiffs' declarations directly anticipate, assume, and allege that numerous of their members will become licensed. *See generally* Dec. of Erich Pratt ¶ 14; Dec. of Philip Van Cleave ¶¶ 5,6; see also ¶ 11 ("once licensed as dealers"); ¶ 13 (same).

Rather than engage with Plaintiffs' argument about the "heavily regulated industry"

APPX.388

exception to the Fourth Amendment's warrant requirement, Defendants simply allege that the exemption exists. Opp. 48-49. But Plaintiffs never disputed that. Rather, their argument is that, if the Rule is permitted to force hundreds of thousands (or potentially more) Americans to become federally licensed dealers merely to engage in protected Second Amendment activity, this "narrow" Fourth Amendment "exception" would swallow the rule. To the extent the Rule seeks to make dealers out of countless ordinary Americans, it cannot be sustained by any Fourth Amendment exception, and thus violates the warrant requirement.

## VI.    Relief Should Not be Limited to the Parties.

This Court should stay enforcement of the Final Rule nationwide pending a decision on the merits. The APA allows a reviewing court to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). "'When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh,* 878 F.2d 484, 495 n. 21 (D.C.Cir.1989)); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 (2020) (explaining that, when "a provision is declared invalid," it "cannot be lawfully enforced against others").

Motions to stay agency actions are reviewed under the same standards used to review requests for preliminary injunctive relief. *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing 5 U.S.C. § 705); s*ee also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors).

Under Section 705, a court "may issue all necessary and appropriate process to postpone

APPX.389

the effective date of an agency action or to preserve status or rights pending conclusion of the review proceeding." 5 U.S.C. § 705. "Nothing in the text of Section 705" suggests that preliminary relief "needs to be limited to" the parties before the court. *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).

To be sure, relief under Section 705 is different than the relief sought in a "nationwide injunction." While "[a] stay [of an agency action] pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one … [due to both having] the practical effect of preventing some action before the legality of that action has been conclusively determined," *Nken v. Holder*, 556 U.S. 418, 428 (2009), "a stay achieves this result by temporarily suspending the source of authority to act—the order or judgment in question—not by directing an actor's conduct." *Id.* at 428–29.

"In the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay [under section 705] is the temporary form of vacatur." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023). "Under 5 U.S.C. § 705, [courts] may, under 'certain conditions[,] … and to the extent necessary to prevent irreparable injury, … issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (quoting 5 U.S.C. § 705).

That is the relief Plaintiffs seek here. The Rule cannot be salvaged and should be stayed in its entirety—which this Court has the express authority to do. *See* 5 U.S.C. § 705; *see also* Jonathan Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1014 (2018) ("[T]he APA does give the judiciary a unique power that it lacks when reviewing the constitutionality of statutes: Reviewing

APPX.390

courts may formally vacate an agency's rule or order, rather than merely enjoining officials from enforcing it.").

## VII.    The Balance of Equities Favors a Stay.

This novel rule presents a stark departure from the longstanding status quo that more fully protected Second Amendment rights. Until now, Defendants adopted the Congressional definitions of terms such as "engaged in the business" rather than attempting to expand those definitions beyond what Congress already included. *See* 27 C.F.R. § 478. That makes sense. Federal law limits Defendants' authority to draft rules and regulations to only those that "are necessary to carry out provisions of this chapter." 18 U.S.C. § 926(a). And Congress was explicit in what they allowed Defendants to define. *See* 18 U.S.C. § 921(a)(13). That is why the definitions Defendants previously adopted for 18 U.S.C. § 921(a)(21)(C) precisely mirrored what Congress wrote. *See* 27 C.F.R. § 478.

There is no harm to ATF in being prevented from enforcing an illegal rule, and there is no public interest in violating Second Amendment rights.

### CONCLUSION

For these reasons, Plaintiffs ask this Court to stay ATF's Rule under 5 U.S.C. § 705.

APPX.391

Date: May 15, 2024                          Respectfully submitted.

**KEN PAXTON**                              /s/Garrrett Greene
Attorney General                            **GARRETT GREENE**
                                            Special Counsel
                                            Texas Bar No. 24096217
**BRENT WEBSTER**
First Assistant Attorney General
                                            **KATHLEEN T. HUNKER**
**RALPH MOLINA**                            Special Counsel
Deputy Attorney General for Legal Strategy  Texas Bar No. 24118415

**RYAN D. WALTERS**                         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Chief, Special Litigation Division          Special Litigation Division
                                            P.O. Box 12548, Capitol Station
                                            Austin, Texas 78711-2548
                                            Tel.: (512) 463-2100
                                            garrett.greene@oag.texas.gov
                                            kathleen.hunker@oag.texas.gov

                                            **COUNSEL FOR PLAINTIFF STATE OF TEXAS**

**LYNN FITCH**                              **ELIZABETH B. MURRILL**
Attorney General of Mississippi             Attorney General

/s/Justin L. Matheny                        /s/J. Benjamin Aguiñaga
**JUSTIN L. MATHENY** (MS Bar 100754)       **J. BENJAMIN AGUIÑAGA***
Deputy Solicitor General                    Solicitor General
**OFFICE OF THE ATTORNEY GENERAL**
P.O Box 220                                 **LOUISIANA DEPARTMENT OF JUSTICE**
Jackson, MS 39205-0220                      1885 N. Third Street
Tel: (601) 359-3680                         Baton Rouge, Louisiana 70802
Fax: (601) 359-2003                         Tel: (225) 506-3746
justin.matheny@ago.ms.gov                   aguinagab@ag.louisiana.gov

**COUNSEL FOR PLAINTIFF STATE OF MIS-**     **COUNSEL FOR PLAINTIFF THE STATE OF LOUISI-**
**SISSIPPI**                                **ANA**
                                            *Admission To NDTX Pending

APPX.392

SEAN D. REYES
Utah Attorney General

/S/ Andrew Dymek
ANDREW DYMEK*
Assistant Solicitor General

UTAH OFFICE OF THE ATTORNEY GENERAL
350 North State Street, #230
P.O. Box 142320
Salt Lake City, Ut 84114-2320
Tel.: 801-366-0533
adymek@agutah.gov

COUNSEL FOR PLAINTIFF STATE OF UTAH
*Admission To NDTX Pending

/s/ John I. Harris III*
JOHN I. HARRIS III (TN # 12099)

SCHULMAN, LEROY & BENNETT PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

COUNSEL for JEFFERY W. TORMEY, GUN OWNERS of AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE
*Admission to NDTX pending

/s/ Stephen D. Stamboulieh
STEPHEN D. STAMBOULIEH

STAMBOULIEH LAW, PLLC
NDTX#: 102784MS
MS Bar No. 102784
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE

/s/ Brandon W. Barnett
BRANDON W. BARNETT
Texas Bar No. 24053088

BARNETT HOWARD & WILLIAMS PLLC
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
817-993-9249 (T)
817-697-4388 (F)
barnett@bhwlawfirm.com

LOCAL COUNSEL, COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE

APPX.393

**CERTIFICATE OF SERVICE**

  I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 15, 2024 and that all parties will be served with the Original Complaint via certified mail and process server.

            */s/Garrrett Greene*
            **GARRETT GREENE**

APPX.394

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS *et al.*,

        Plaintiffs,

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES *et al.*,

        Defendants.

2:24-CV-89-Z

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion for a Temporary Restraining Order ("Motion") (ECF No. 16), filed on May 9, 2024. Defendants responded (ECF No. 22) on May 14, 2024. Having reviewed the materials, the Court **GRANTS IN PART** the Motion. Accordingly, Defendants are hereby **TEMPORARILY RESTRAINED** from enforcing the regulations — "Definition of 'Engaged in the Business' as a Dealer in Firearms" (hereinafter "Final Rule") — published at 89 Fed. Reg. 28968 (April 19, 2024) (to be codified at 27 C.F.R. pt. 478) against Plaintiffs Texas, Jeffery Tormey ("Tormey"), the Gun Owners of America, Inc. ("GOA"), the Gun Owners Foundation ("GOF"), the Tennessee Firearms Association ("TFA"), and the Virginia Citizens Defense League ("VCDL"), **through June 2, 2024**.

### BACKGROUND

The United States Attorney General has authority to enforce the Gun Control Act of 1968 ("GCA") and promulgate regulations necessary to enforce its provisions. 18 U.S.C. § 926(a). Congress and the Attorney General, in turn, delegated GCA administrative and enforcement responsibilities to the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). 28 U.S.C. §§ 599A(b)(1), (c)(1); 28 C.F.R. §§ 0.130(a)(1)–(2).

The GCA imposes strict requirements on firearms dealers and severe consequences for violating them. It makes it unlawful for any person — save a licensed dealer — to "engage in the business" of dealing in firearms until he has filed an application with ATF and received a license. 18 U.S.C. § 923(a). It requires dealers to conduct background checks on prospective firearms recipients and to maintain records for tracing purposes. *Id.* §§ 922(t), 922(b)(5), 923(g)(1)(A). And it provides that persons who willfully engage in the business of dealing firearms without a license face imprisonment for up to five years, a fine of up to $250,000, or both. *Id.* §§ 922(a)(1)(A), 924(a)(1)(D), 3571(b)(3). Any firearms involved in such violations may be subject to administrative or civil forfeiture. *Id.* § 924(d)(1).

The Firearms Owners' Protection Act of 1986 ("FOPA") modified the GCA, adding a statutory definition of "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." Public Law 99-308, § 101, 100 Stat. 449, 450 (1986). Then in 2022, President Biden signed into law the Bipartisan Safer Communities Act ("BSCA"). The BSCA broadened the definition of "engaged in the business" by eliminating the requirement that a person's "principal objective" of purchasing and reselling firearms must include both "livelihood and profit," replacing it with a requirement to "predominantly earn a profit." 18 U.S.C. § 921(a)(21)(C). However, the BSCA did not alter FOPA's exclusions for "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.*

On April 19, 2024, ATF promulgated a Final Rule to "provide clarity to persons who remain unsure of whether they are *engaged in the business* as a dealer in firearms with

2

APPX.396

the *predominant intent* of obtaining pecuniary gain." 89 Fed. Reg. at 28968 (emphasis added). To that end, it clarifies "that firearms dealing may occur wherever, or through whatever medium, qualifying . . . activities are conducted." *Id.* This includes "a gun show or event, flea market, auction house, or gun range or club; at one's home; by mail order; over the internet; through . . . other electronic means (*e.g.*, an online broker, online auction, text messaging service, social media raffle, or website) . . . ." *Id.* at 28973–74. And it clarifies that "a single firearm transaction or *offer* to engage in a transaction" may require a license. *Id.* at 29091 (emphasis added).

Four States, a handful of organizations, and an individual citizen argue that the Final Rule violates the Administrative Procedure Act ("APA") and the U.S. Constitution. In their view, the Final Rule is (1) arbitrary and capricious; (2) in excess of ATF's lawful authority; (3) an abuse of ATF's discretion; (4) in contravention of the BSCA; and (5) violative of the Second and Fourth Amendments. *See generally* ECF No. 16. And Plaintiffs aver that they will suffer irreparable harm when the Final Rule takes effect — as scheduled — on May 20, 2024. *Id.* at 2. Defendants respond that (1) Plaintiffs do not have standing, and (2) even if they did, their claims fail on the merits. ECF No. 31 at 25, 36.

## LEGAL STANDARD

To obtain a preliminary injunction or temporary restraining order, Plaintiffs must show (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest. *Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023); *Air Prod. & Chemicals, Inc. v. Gen. Servs. Admin.*, No. 2:23-CV-147-Z, 2023 WL 7272115, at *2 (N.D. Tex. Nov. 2, 2023); *see also Janvey*

*v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (explaining that courts apply identical standards for preliminary injunctions and temporary restraining orders).

The first two factors are most critical, and the latter two merge when the government is an opposing party. *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020); *Nken v. Holder*, 556 U.S. 418, 435 (2009). That said, no factor has a "fixed quantitative value." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023). On the contrary, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* In sum, "[t]he decision to grant or deny [relief] lies within the sound discretion of the trial court . . . ." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

ANALYSIS

## I.      Plaintiffs Louisiana, Mississippi, and Utah fail to demonstrate standing.

The Court must address the threshold question of standing before addressing the merits. *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 7 F. Supp. 3d 1, 7 (D.D.C. 2013) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)). Here, Plaintiffs' Complaint — insofar as it implicates Louisiana, Mississippi, and Utah — only claims that each "is a sovereign State of the United States." ECF No. 1 at 3. But the Complaint falls short by not explaining, or even alleging, any injury to each State's sovereign or semi-sovereign interests. *See Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 881 (5th Cir. 2023) (explaining that "the declaration does not 'connect the dots' . . . to the State's ostensible sovereign injury"). Neither Plaintiffs' Motion (ECF No. 16) nor their reply brief (ECF No. 37) proffers *any* arguments to support those States' standing. Likewise, Plaintiffs' "States' Comment" exhibit — despite arguing at length that the Final Rule is unlawful — says nothing about standing.[1] ECF No. 16-2.

---

[1] Moreover, at the TRO hearing, Plaintiffs' counsel did not present any arguments about standing for Louisiana, Mississippi, or Utah. *See* Tr. at 16: 7–8 ("I'm here today . . . just talking about Texas's standing.").

This Court understands the difficulties inherent in multi-State litigation — and particularly where, as here, there is an expedited briefing schedule. However, these States' showings fall short, even at this early stage of litigation. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (explaining that "the proof required to establish standing increases as the suit proceeds[.]"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). As such, Louisiana, Mississippi, and Utah will not be afforded relief at this stage of litigation.

## II.    All other Plaintiffs show standing.

However, Plaintiffs Texas, Tormey, and affiliated organizations have sufficiently demonstrated standing for the purposes of the requested temporary restraining order. The Court takes each in turn.

First, Texas adequately pleads a cognizable "pocketbook injury" — "a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 461 (2017). Specifically, Texas illustrates how the Final Rule will prohibit otherwise eligible persons from obtaining a Federal Firearms License ("FFL"), thereby reducing total gun sales at gun shows. ECF No. 37 at 7–8. And because Texas "has a sales tax that applies to the sale of firearms at gun shows," it will sustain financial loss.[2]

Moreover, "[i]n determining whether costs are irreparable, the key inquiry is 'not so much the magnitude but the irreparability.'" *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (quoting *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016)). And even purely economic costs — like those alleged here — "may count as irreparable harm where they cannot be recovered in the ordinary course of litigation." *Rest. L. Ctr.*, 66 F.4th at 597.

---

[2] Between the Final Rule's effective date and July of 2024, Texas has 58 gun shows calendared. ECF No. 37 at 7. Texas collects 6.25 percent State tax on taxable items sold — including guns sold at gun shows. *Id.*

Second, Tormey pleads that he has "bought, sold, and traded firearms" for "many years" as part of his "large personal collection," and "even previously purchased a table at certain gun shows, in order to facilitate enhancing [his] collection." ECF No. 16-3 at 3. In response, Defendants point to *Susan B. Anthony List v. Driehaus* for the proposition that the "threat of future enforcement" against a plaintiff bringing a pre-enforcement challenge must be "substantial." 573 U.S. 149, 159 (2014). But that case "treated the threat of future enforcement as case-and fact-specific, understanding that evaluating threats . . . cannot be neatly reduced to a rigid formula." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 928 (5th Cir. 2023). Accordingly, "even a 'public[] announce[ment]' to enforce a statute and one prior proceeding are sufficient for standing." *Id.* (quoting *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019)).

Here, Defendants have announced their intent to enforce the Final Rule and the GCA. ECF No. 37 at 9. And Plaintiffs have identified a prior enforcement proceeding "targeting conduct falling squarely within the [Final] Rule's ambit." *Id.*; *e.g.*, ECF No. 16-4 at 8–9 (Declaration of Erich M. Pratt). Tormey is thus well situated to allege that the Final Rule may be enforced against him. And Defendants do not deny — nor could they deny — that such an enforcement would result in irreparable injury if it occurred.

Lastly, the organizations GOA, GOF, TFA, and VCDL show standing. Under the doctrine of associational standing, an association may bring suit on behalf of its members when (1) those members would otherwise have standing to sue; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. Appx. 189, 195 (5th Cir. 2012).

6

Here, three organizations (GOA, TFA, and VCDL) count Tormey — who has standing — as a member. ECF No.16-3 at 2. Moreover, TFA and VCDL have provided declarations evidencing that they have specific members "who will be impacted [by the Final Rule] because they have . . . bought and resold firearms, and wish to do so in the future without being improperly labeled as a 'dealer' in firearms." ECF No. 16-5 at 3 (Declaration of C. Richard Archie); ECF No. 16-6 at 3–4 (Declaration of Philip Van Cleave). The same holds true for GOF. *See* ECF No. 16-4 at 4 (Declaration of Erich M. Pratt). And the GOA describes a former FFL whose retirement savings are now frozen in unsellable inventory. ECF Nos. 37 at 11; 16-4 at 8.

Defendants respond that the organizations must identify their members by *name* to have associational standing. *See* ECF No. 31 at 33 ("[The organizational Plaintiffs] cannot establish standing based on an unnamed member."). And they cite *Summers v. Earth Island Institute*, 555 U.S. 488 (2009) for support. But *Summers* did not consider impermissible reliance on anonymous or pseudonymous declarations to establish standing.[3] *Id.* at 495. Rather, it considered the plaintiffs' failure "to allege that *any* particular . . . sale or other project claimed to be unlawfully subject to the regulations [would] impede a specific and concrete plan" of the plaintiffs. *Id.* (emphasis in original). Nor has the Supreme Court adopted a "naming requirement" — such as the one proposed by Defendants — in the wake of *Summers*. *See, e.g.*, *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 200–01 (2023) (holding that an organization had standing "when it filed suit" where it "identified" individual harmed members but did not provide their names).

Nor does the Fifth Circuit offer any support for Defendants' "identify-by-name" requirement. *See Hancock Cnty. Bd. of Sup'rs*, 487 F. Appx. at 195 (upholding the use of

---

[3] The Tenth Circuit recognized that "[a]nonymity was not even an issue before the Supreme Court in *Summers*." *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024). "Although one might read language in that opinion to require that only persons identified by their legal names can have standing, that was clearly not the intent of the Court." *Id.* "The opinion provided no hint, much less an emphatic statement, that it was abrogating decades of precedent." *Id.*

7

anonymous declarations); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (accepting anonymous declarations); *Blanchard v. Bergeron*, 489 U.S. 87 (1989). Nor do our sister districts in this Circuit. *See Chamber of Com. of U.S.A. v. Consumer Fin. Prot. Bureau*, No. 6:22-CV-00381, 2023 WL 5835951, at *6 (E.D. Tex. Sept. 8, 2023) ("[D]efendants argue that no plaintiff has shown that an 'identified member' suffers harm because some plaintiffs have used pseudonyms . . . . That argument fails."); *id.* (finding that anonymous declarations "credibly show that plaintiffs have identified members . . . currently suffering cognizable harm"). Nor — for that matter — do courts *outside* this Circuit. *See Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024) ("Longstanding and well-established doctrine in the federal courts establishes that anonymous persons may have standing to bring claims.").

For the foregoing reasons, Plaintiffs Texas, Tormey, and the organizations have satisfied their burden at this stage. No arguments advanced by Defendants convince the Court otherwise.

**III. Plaintiffs are substantially likely to prevail on the merits.**

**A. The Final Rule likely violates the APA.**

Judicial review under the APA is limited to the administrative record. 5 U.S.C. § 706. "[A]gencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions." *Clean Water Action v. U.S. Env't Prot. Agency*, 936 F.3d 308, 313 n.10 (5th Cir. 2019); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). As such, courts are compelled to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority . . . ." 5 U.S.C. § 706(2)(A), (C).

8

As this is a question of statutory interpretation, the Court begins with the text. *United States v. Lauderdale Cnty., Miss.*, 914 F.3d 960, 961 (5th Cir. 2019). And here, the Final Rule clashes with the text of the BSCA in at least three ways. First, it asserts that there is no "minimum number of firearms to actually be sold to be 'engaged in the business'" for the purposes of the licensing requirement. 89 Fed. Reg. at 29021. "[A] single firearm transaction" — or even a mere *offer* to engage in a transaction — may suffice. *Id.* at 28976.

> [W]hile selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity, neither the courts nor the Department have recognized a set minimum number of firearms purchased or resold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. *Even a single firearm transaction*, or offer to engage in a transaction, when combined with other evidence, *may be sufficient to require a license*.

89 Fed. Reg. at 28976 (emphasis added).

But the BSCA says otherwise:

> The term "engaged in the business" means . . .
>
> ***
>
> as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through *the repetitive purchase and resale of firearms*, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C) (emphasis added).

Defendants' proffered interpretation is severely undercut by Section 921(a)(21)(C)'s use of (1) "firearms," in the plural; (2) the phrase "regular course," clearly contemplating a series of events; (3) "repetitive," meaning more than once; and (4) the Section's exemption of "sales, exchanges, or purchases" in the plural. 18 U.S.C. § 921(a)(21)(C). So too does Section

9

921(a)(21)(C) require the "purchase *and* resale" of firearms — a conjunctive requirement that flatly contradicts Defendants' assertion that "there is no minimum threshold number of firearms purchased *or* sold that triggers the licensing requirement." 89 Fed. Reg. at 29091 (emphasis added).

Second, the Final Rule suggests that "actual profit is not a requirement of the statute — it is only the predominant *intent* to earn a profit through the repetitive purchase and resale of firearms that is required." *Id.* at 29045. In other words, "a person may repeatedly advertise and display firearms for sale, and therefore demonstrate a predominant intent to earn a profit from repeatedly reselling the firearms purchased, but never actually find a buyer." *Id.* But Section (a)(22) of the BSCA provides:

> The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for *criminal purposes or terrorism*.

18 U.S.C § 921(a)(22) (emphasis added).

The negative corollary is obvious: while proof of profit is *not* required "for criminal purposes or terrorism," it *is* required for all other cases. *See Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 694 (5th Cir. 2020) ("[T]he canon of *Expressio Unius Est Exclusio Alterius* . . . provides that 'expressing one item of [an] associated group or series excludes another left unmentioned.'"). Moreover, the mere fact that the word "intent" appears in the Section does necessitate — or even suggest — that intent is *all* that is required. On the contrary, the Section's usage of "intent" serves merely to distinguish the *type* of intent contemplated: namely, "one of obtaining pecuniary gain." 18 U.S.C § 921(a)(22). Action is needed, too.

10

Third, the Final Rule arbitrarily eviscerates Section 921(a)(21)(C)'s safe harbor provision.[4]

That provision reads:

> The term "engaged in the business" . . . shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C). Nothing in the foregoing text suggests that the term "personal collection" does not include firearms accumulated primarily for personal protection — yet that is exactly what the Final Rule asserts. *See* 89 Fed. Reg. at 29090 ("[T]he term [personal collection] shall not include firearms accumulated . . . for personal protection[.]"). Nor can Defendants' position be supported by its *own* interpretative policy of implementing terms' "common meaning." *See id.* at 28974 ("This definition is consistent with the common meaning of 'purchase,' . . . . This definition is consistent with the common meaning of 'sale[.]'"). Here, Plaintiffs' reading of the Section 921(a)(21)(C) terminology "personal collection" is more consonant with "common meaning." *See Collection*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) ("[A] number of objects or persons or a quantity of a substance that has been collected or has collected often according to some unifying principle . . . ."); *see also Collection*, WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY (1940) ("That which is collected; as: a gathering or assemblage of objects or of persons; an accumulation of specimens of a certain class . . . .").

Yet Defendants maintain their interpretation despite knowing that "two-thirds of Americans report owning firearms primarily for 'defense' or 'protection'" — thereby necessitating the absurdity that the statute's safe harbor provision provides *no safe harbor at all* for the majority

---

[4] Defendants themselves recognize the accuracy of the phrase "safe harbor provision" and utilize it several times throughout the Final Rule. *See, e.g.*, 89 Fed. Reg. at 29025 ("The proposed rule explicitly recognized the GCA's 'safe harbor' provision that a person is not engaged in the business if the person makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby.").

11

of gun owners. *Id.* at. 29036. Such an interpretation is untenable given the provision's logical statutory role. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) ("[T]he whole-text canon . . . calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical *and logical relation of its many parts*," as "[t]he entirety of the document thus provides the context for each of its parts.") (emphasis added); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (holding that courts must look to "the language and design of the statute as a whole"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a[] harmonious whole.").

Lastly, the Final Rule creates sets of presumptions indicating (1) "when a person has the intent to 'predominantly earn a profit'" and (2) "that someone is 'engaged in the business.'" 89 Fed. Reg. at 28968–69. But these presumptions are highly problematic for at least two reasons. First, they flip the statute on its head by requiring that firearm owners prove innocence rather than the government prove guilt. *See id.* at 29024 ("[T]he presumptions are rebuttable, so in the event a civil or administrative proceeding is brought, and a presumption is raised, *it can be rebutted with reliable evidence to the contrary*.") (emphasis added). Second, several presumptions conflict with the statutory text. For example, two provide that a person is presumptively "engaged in the business" if he "demonstrates a willingness and ability to purchase and resell" firearms or "purchases . . . *or* . . . resells" firearms. *Id.* at 29091 (emphasis added).  But as discussed *supra*, a mere willingness is not enough — there must also be prohibited acts. *See* 18 U.S.C. § 921(a)(21)(C) ("through the *repetitive purchase and resale of firearms*") (emphasis added). Nor is purchasing *or* reselling sufficient — the statute provides a conjunctive. *See id.* ("purchas[ing] *and* res[elling]") (emphasis added).

12

Plaintiffs understandably fear that these presumptions will trigger civil or criminal penalties for conduct deemed lawful just yesterday. Nevertheless, ATF avers that its "knowledge of existing case law" and "subject-matter expertise" will prevent misuse or abuse of the presumptions. 89 Fed. Reg. at 28975. In other words, "just trust us." But "[p]resumptions, especially in administrative proceedings that may generate institution-destroying liability, cannot be a matter of Department *ipse dixit*." *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 251 (5th Cir. 2024).

For the foregoing reasons, Plaintiffs are substantially likely to succeed on the merits of their APA claims. As such, further analysis of their other claims — including their constitutional ones — is unnecessary at this time.

### IV. Plaintiffs face irreparable injury and are favored by the equities and public interest.

"In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 348 (5th Cir. 2022); *VanDerStok v. Garland*, 625 F. Supp. 3d 570, 582 (N.D. Tex. 2022). Irreparable harm must also be concrete, non-speculative, and more than *de minimis*. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 586 (5th Cir. 2013). Lastly, "[t]he government's and the public's interests merge when the government is a party." *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023).

That Plaintiffs would suffer irreparable injury absent an injunction is hard to dispute. Plaintiff Texas faces the irreparable injury of revenue loss. *Wages & White Lion Invs.*, 16 F.4th 1130, 1142 (5th Cir. 2021). Other Plaintiffs face both civil and criminal enforcement actions for engaging in conduct that the BSCA permits but the Final Rule impermissibly forbids. They cannot dispose of firearms from their personal collections for fear of being presumed "engaged in the business." ECF No. 16 at 43. And compliance costs — as well as those accrued by persons seeking

13

APPX.407

licensure to avoid liability — "are unrecoverable because of the government–defendant's sovereign immunity from monetary damages[.]" *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:23-CV-1471-L, 2024 WL 1349307, at *9 (N.D. Tex. Mar. 29, 2024); *see also Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs[.])"

Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021). And as this Court's analysis makes clear, Defendants' Final Rule is almost certainly violative of — at the least — the APA. As such, "both the balance of equities and the public interest weigh in favor of allowing orderly judicial review of the Rule before anyone shuts down their businesses or sends them to jail." *VanDerStok v. Garland*, 2023 U.S. App. LEXIS 26499, at *6 (5th Cir. Oct. 2, 2023).

## CONCLUSION

Defendants are **TEMPORARILY RESTRAINED** from enforcing the regulations — "Definition of 'Engaged in the Business' as a Dealer in Firearms" — published at 89 Fed. Reg. 28968 (April 19, 2024) (to be codified at 27 C.F.R. pt. 478) against Plaintiffs Texas, Jeffery Tormey, the Gun Owners of America, Inc., the Gun Owners Foundation, the Tennessee Firearms Association, and the Virginia Citizens Defense League, **through June 2, 2024**. Plaintiffs Louisiana, Mississippi, and Utah are excluded from the relief granted herein.

**SO ORDERED**.

May 19, 2024

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS *et al.*,

     Plaintiffs,

v.

                       2:24-CV-89-Z

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES *et al.*,

     Defendants.

### ORDER

Pursuant to this Court's prior Memorandum Opinion and Order (ECF No. 43), *all* Plaintiffs are **ORDERED** to **INDIVIDUALLY** submit supplemental briefing explaining and evidencing their basis for standing **on or before June 2, 2024**. Said supplemental briefing may not exceed ten (10) pages and must otherwise comply with Local Rule 7.2(c).

**SO ORDERED**.

May 19, 2024

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

APPX.409

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, | § § § § § § § § § § | Civil Action No. 2:24-cv-00089-Z |
| *Plaintiffs*, | § § | |
| v. | § § | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF, | § § § § § § § § § | |
| *Defendants*. | § § | |

---

SUPPLEMENTAL BRIEF OF JEFFREY W. TORMEY

---

**COMES NOW,** JEFFREY W. TORMEY ("Tormey"), by and through counsel of record, and files this, his Supplemental Brief in response to this Court's May 19, 2024 Order. *See* ECF #45. For the reasons below and those already briefed, Mr. Tormey has standing to pursue this litigation.

As stated in Jeffrey W. Tormey's declaration, he is a "member of Gun Owners of America, a member of Tennessee Firearms Association, and a member of Virginia Citizens Defense League." *See* Declaration of Jeffrey W. Tormey, ECF #1-1 at ¶ 2. Tormey stated that he has a "large personal collection of firearms" that he "accumulated over many years." *Id*. at ¶ 4. Tormey

described his previous sales of firearms, "through various mediums, for a number of years." *Id*. at ¶9. And Tormey expressed his fear of how the Final Rule now purports to presume that much of his perfectly lawful conduct is in fact felonious, foisting on him the burden to prove his innocence for conduct that the statute already expressly declares to be lawful. *Id*. at ¶14

During oral argument, counsel for the government contended that Tormey's intended conduct "is not the type of conduct that would implicate the rule which targets unlicensed individuals engaged in the selling of firearms for – principally for profit." *See* Transcript of TRO Hearing, 5/16/2024, 36:18-21; *see also* ECF #31 at 14 ("the conduct described in Tormey's declaration does not rise to the level of being "engaged in the business" and would not subject him to any enforcement action."). Specifically, the government contends that Tormey's "personal collection," i.e., as defined under the Final Rule to exclude "self-defense" firearms, does not trigger the Final Rule's prohibition on unlicensed selling of firearms. *Id*. at 39:3-9.

However, as counsel for Tormey explained, the ATF removed "self-defense firearms" from the definition of "personal collection." *Id*. at 22:24-25 to 23:1. Further, Tormey's "personal collection firearms" includes "a lot of self-defense firearms, which would then strip it outside of the personal collection" definition in the Final Rule, thereby eliminating the statutory safe harbor for Tormey. *Id*. at 71:10-12.

In Tormey's supplemental declaration, he states that excluding "firearms owned for self-defense from the statutory safe harbor for a 'personal collection'" is "an entirely unnatural reading of the statute." *See* Supplemental Declaration of Jeffrey W. Tormey, Exhibit A. Tormey considers "all the guns [he owns,] including [his] 'self-defense' firearms, part of [his] 'personal collection' of firearms." *Id*. at ¶4.

1

Tormey further explains that, as "firearms technology rapidly changes, new models of self-defense firearms are always coming to market." *Id*. at ¶6. As such, Tormey "not infrequently find[s himself] changing the type and model" of firearms he carries for personal protection. *Id*. Thus, he recently sold a "Smith and Wesson J Frame .38 revolver" that he owned "for at least five years." *Id*. at ¶7. Tormey explains that he is "in the process of upgrading some of [his] Generation 3 Glocks to the Generation 5 Glocks that are 'MOS' models, incorporating updated technology and design." *Id*. Additionally, Tormey explains that sometimes, after he has carried a firearm a bit for personal protection, he has decided to sell it. *Id*. at ¶9. Tormey believes that the "ATF's Final Rule is meant to make [him] question whether [his] private purchasing and selling" of his personal self-defense firearms "is in fact criminal activity, even though the statute specifically allows [his] activities in no uncertain terms." *Id*. at ¶11.

Thus, Tormey desires and intends to continue to "sell firearms in an effort to upgrade and enhance" his collection of "self-defense firearms." *Id*. at ¶8. Although this course of conduct in no way constitutes unlawful dealing under the statute Congress enacted, the Final Rule places Tormey in jeopardy of being "presumed" to be engaged in felonious behavior. *See* FR 29091.

Thus, as this Court previously held, "Tormey is thus well situated to allege that the Final Rule may be enforced against him." ECF #44 at 6. This conclusion is further confirmed by Tormey's supplemental declaration.

                                        Respectfully submitted,

Dated: May 31, 2024

                                        Brandon W. Barnett
                                        Texas Bar No. 24053088
                                        Barnett Howard & Williams PLLC
                                        930 W. 1st St., Suite 202
                                        Fort Worth, Texas 76102
                                        817-993-9249 (T)

                                        2

817-697-4388 (F)
E-mail: barnett@bhwlawfirm.com

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
NDTX#: 102784MS
MS Bar No. 102784
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
E-mail: stephen@sdslaw.us

John I. Harris III (TN # 12099)
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

*Counsel for Plaintiffs*

3

## CERTIFICATE OF SERVICE

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing

document or pleading to be filed with this Court's CM/ECF system, which caused a Notice of

Electronic Filing and copy of this document or pleading to be delivered to all counsel of record.

/s/ Stephen D. Stamboulieh
Stephen D. Stamboulieh

4

APPX.414

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS, STATE OF          §
LOUISIANA, STATE OF MISSISSIPPI,  §
STATE OF UTAH, JEFFREY W.         §
TORMEY, GUN OWNERS OF             §
AMERICA, INC., GUN OWNERS         §          CIVIL ACTION NO. 2:24-CV-00089-Z
FOUNDATION, TENNESSEE             §
FIREARMS ASSOCIATION, and         §
VIRGINIA CITIZENS DEFENSE         §
LEAGUE,                           §
      *Plaintiffs*,               §
                                  §
v.                                §
                                  §
BUREAU OF ALCOHOL, TOBACCO,       §
FIREARMS AND EXPLOSIVES,          §
UNITED STATES DEPARTMENT OF       §
JUSTICE, MERRICK GARLAND, in his  §
official capacity as Attorney General of the §
United States, *and* STEVEN M.    §
DETTELBACH, in his official capacity as §
Director of ATF,                  §
      *Defendants*.               §
                                  §

---

SUPPLEMENTAL DECLARATION OF JEFFREY W. TORMEY

---

1.   My name is Jeffrey W. Tormey.  I am a U.S. citizen and resident of Amarillo, Texas,

located within Potter County.  I make this supplemental declaration in support of Plaintiffs'

Complaint for Declaratory and Injunctive Relief.  Unless otherwise stated, I make this declaration

based on personal knowledge.  If called as a witness, I can testify to the truth of the statements

contained herein.

2.   I attended the hearing on Plaintiffs' Motion for Temporary Restraining Order on May 16,

2024 in Amarillo, Texas and heard the arguments from counsel, along with the Court's questions.

1

3.  As I stated in my previous declaration (ECF #1-1), due to the size of my collection and the number of firearm-related activities in which I engage, maintenance and enhancement of my "personal collection" of firearms includes buying and selling firearms through private sales, from time to time.

4.  However, as discussed at the hearing, the ATF Rule challenged in this case purports to exclude firearms owned for self-defense from the statutory safe harbor for a "personal collection." This is an entirely unnatural reading of the statute. As a gun owner, I consider all the guns I own, including my "self-defense" firearms, part of my "personal collection" of firearms.

5.  For the ATF to exclude guns owned for self-defense from the "personal collection" statutory safe harbor is nonsensical to me both as a gun owner and as a lawyer. This ATF Rule is also deeply concerning to me with respect to my lawful activities. Whereas the statute provides that I am definitively not a dealer if I "make[] occasional sales, exchanges, or purchases of firearms for the enhancement of [my] personal collection," by defining "collection" not to include many (if not most) of the firearms that I own, the Rule seems to indicate the contrary – that I may be engaged in unlawful activity merely for selling guns owned for self-defense purposes.

6.  Further, given that firearms technology rapidly changes, new models of self-defense firearms are always coming to market, for example, such as handguns of more compact designs, increased magazine capacity, the availability and interchangeability of various sights or optics, and mechanical innovations to enhance reliability, ergonomics, and recoil management. What was state-of-the-art at one point can quickly become outdated. Thus, I not infrequently find myself changing the type and model of firearm I carry for personal protection, or those I otherwise keep for self-defense purposes.

2

APPX.416

7.   For instance, I recently sold a Smith and Wesson J Frame .38 revolver that I owned for at least five years.  This was a firearm that I had routinely carried as a self-defense firearm, and one that I considered part of my "personal collection," notwithstanding how the Final Rule defines the phrase.  These days, many would consider a revolver outdated for personal self-defense and concealed carry.  I am also in the process of upgrading some of my Generation 3 Glocks to the Generation 5 Glocks that are "MOS" models, incorporating updated technology and design.[1]

8.   In other words, I have sold firearms and in the future plan to sell firearms in an effort to upgrade and enhance my collection of self-defense firearms.  And yet the Rule would seem to indicate that this perfectly lawful activity is now a felony.

9.   Additionally, I sometimes have purchased a firearm I intended to carry, but after carrying it for a bit, decided it was not for me, and therefore I sold it.  Under the ATF's theory, this sale of a "self-defense" firearm would be excluded from my "personal collection" and the statutory safe harbor, exposing me to potential criminal liability at the hands of an overzealous bureaucrat.

10. Indeed, under the Rule, ATF cannot even say for certain that *one* such sale of a self-defense firearm does not constitute being "engaged in the business."

11. It seems as though ATF's Final Rule is meant to make me question whether my private purchasing and selling of my personal firearms is in fact criminal activity, even though the statute specifically allows my activities in no uncertain terms.

I, Jeffrey W. Tormey, declare under penalty of perjury that the foregoing is true and correct.

_5/28/24_
**DATE**

_[signature]_
**JEFFREY W. TORMEY**

---

[1] MOS is Glock's "Modular Optic System" that allows you to mount a variety of optical sights on a handgun.  *See* https://us.glock.com/en/learn/glock-pistols/mos.  This is an example of the technological changes in firearms I discuss above.

3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, | § § § § § § § § § | CIVIL ACTION NO. 2:24-CV-00089-Z |
| *Plaintiffs*, | § § | |
| v. | § § | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF, | § § § § § § § § § | |
| *Defendants*. | § § | |

## SUPPLEMENTAL BRIEF OF TENNESSEE FIREARMS ASSOCIATION

Tennessee Firearms Association ("TFA") submits this Supplemental Brief in response to this Court's May 19, 2024 Order. *See* ECF #45. For the reasons below and those already briefed, TFA has standing to pursue this litigation. For brevity, TFA adopts by reference the arguments made in the supplemental brief filed by Gun Owners of America, Inc. ("GOA") including the summary of case law to the issues of organizational representation and standing.

TFA is a non-profit Tennessee membership organization formed in 1995. It is recognized by the IRS as a Section 501(c)(4) entity. TFA has thousands of members who reside in Tennessee and in other states. *See* ECF #1-3, ¶ 4.

1

TFA demonstrated its standing in both the Complaint and the declarations of Jeffrey W. Tormey and C. Richard Archie (*see* ECF #1-1 and #1-3). Mr. Archie files his supplemental declaration in support of TFA's standing herein. *See* Supplemental Declaration of C. Richard Archie, Exhibit A. In his supplemental declaration, Mr. Archie, who is a board member of TFA and also a member, describes in greater detail how the ATF's new "Engaged in the Business" Rule directly and negatively impacts him (*id*. ¶ 3), another TFA board member (*id*. ¶ 4), and six specific TFA members with whom he has communicated. *Id*. ¶¶ 6-10. Mr. Archie describes how the Rule impacts different TFA members, contrasting for example those who have never had a federal firearms license, those who have had a license but let it expire, and those who have a license which the ATF revoked. *Id*. Mr. Archie further describes the irreparable harm the Final Rule will cause to him, another board member, these six members who are addressed in the supplemental declaration, and TFA members in general. *Id*.

As stated in Mr. Archie's supplemental declaration, TFA has spoken with three specific members, each of whom "is a lawful gun owner who maintains their individual, private collections that contain multiple firearms. Each of them owns their respective private collections as hobbyists, hunters, recreational shooters, and/or for personal defense." *Id*. ¶ 6. Each of these three members have advised TFA that they intend "to change or improve their personal collection through the future acquisition and disposition of firearms." *Id*.

Mr. Archie has communicated with another TFA member who has previously held a federal firearms license but who decided to let that license terminate when he decided to stop being a firearms dealer many years ago. *Id*. ¶ 7. As stated in Mr. Archie's supplemental declaration, this TFA member has communicated to TFA that he "remains a lawful gun owner who maintains his personal private firearms collection that contains multiple firearms including self-defense

APPX.419

firearms. He owns firearms as a hobbyist, recreational shooter and/or for personal defense. He intends to change or improve his personal collection through the future acquisition and disposition of firearms." *Id*. This TFA member has expressed to TFA no desire to get an FFL in the future. *Id.*

Mr. Archie has communicated with two additional TFA members who previously held an FFL that the ATF revoked based on its conclusion that those individuals were "willful violators" of the Gun Control Act. *Id.* ¶ 8. As stated in Mr. Archie's supplemental declaration, "these two individuals are still lawful firearms owners and continue to maintain their personal collections. They intend to change or improve their personal collections." *Id*. Further, neither of these TFA members intends to "go back into the business of being a firearms dealer," and indeed they cannot, because as prior "willful violators," they are ineligible to ever be issued an FFL in the future. *Id*.

As detailed in Mr. Archie's supplemental declaration, neither himself, the other board member nor any of the six specific individuals who are discussed in the declaration are now nor do they intend to be in the future FFLs. *Id.* ¶ 9. Further, none of these individual TFA members want to be FFLs and subjected to the additional federal, state, or local laws that are imposed on FFLs but which are not applicable to non-dealer civilians. *Id.* ¶¶ 10-12. All of the individual TFA members discussed by Mr. Archie in his declaration are concerned about the great uncertainty of whether this Rule would require them to obtain FFLs (if they could) and what future thoughts (the Rule's references to "intent") or actions might require that they obtain FFLs or be at risk for ATF enforcement actions or criminal prosecutions. *Id.* ¶¶ 13-15.

Mr. Archie states in his supplemental declaration that, with respect to any TFA member, including the two members referenced above, who has had his or her federal firearms license previously revoked by the ATF and/or who was a responsible party with respect to a revoked

APPX.420

federal firearms license, these members are now classified by the ATF as "prior willful violators" of the Gun Control Act.  *Id.* ¶ 16.  Nevertheless, such members and others who may also be classified by ATF as prior willful violators are, as private citizens, fully able to purchase, own, trade, sell and maintain private collections so long as they are engaging in non-commercial casual transactions.  *Id.*  However, those TFA members, including the two referenced above, who have been classified as "prior willful violators" according to the ATF, are now subject to lifetime prohibitions on ever obtaining another federal firearms license.  *Id.*  Under the ATF's new "Engaged in the Business" rule, these TFA members would be unable to obtain a firearms license which would place them at a higher risk of being subjected to ATF civil compliance or criminal prosecutions.  *Id.*  Mr. Archie states that these TFA members have expressed extreme concerns about their rights to possess, maintain, improve, or even liquidate some or all of their personal firearms collections if the ATF's new "Engaged in the Business" rule takes effect.  *Id.*

In its communications with TFA members, as stated by Mr. Archie, the TFA's membership is overwhelming concerned with the Rule, its presumptions, uncertainty, and the risk that they might be subject to federal enforcement actions or prosecutions if they do not obtain FFLs (assuming that they could) and/or the cost, expense and burden of additional federal, state and local laws, regulations and ordinances if they do.  *Id.* ¶ 17.

In its communications with TFA members, including the additional board member and the six individuals referenced in the supplemental declaration, many individual TFA members, in addition to co-Plaintiff Tormey, would clearly appear to have standing to in this action to challenge this Rule based on the Court's order.  *Id.* ¶ 18. The issues in this action that TFA seeks to address in order to protect the rights of its members are germane to TFA's mission and purpose as a non-profit membership entity and these interests fall directly in line with the TFA's mission statement

4

as set forth in its state charter which provides, in part, that "the organization is dedicated to restoring government to citizen control and giving full effect to the original intent of the Bill of Rights to the United States Constitution as well as to the provisions of the Tennessee Constitution with an emphasis on the 2nd and 10th Amendments to the United States Constitution and Article I, Section 26 of the Tennessee Constitution." *Id.* ¶ 19.  The issues in this action are such that "(i) … any facts relevant to the disposition of the case are common among [TFA's members], (ii) … the relevant factors are the acts of the Defendants and the statutory and Constitutional restrictions on the Defendants' authority, as well as (iii) the nature of the relief that is being sought." *Id*. ¶ 20. As such, TFA does not believe that it would be necessary to require each or even a substantial number of its members to individually seek to be joined as parties in this action.  *Id.*

Because TFA has identified with specificity several members who are harmed by the Final Rule, TFA has the requisite representational standing to pursue litigation on its members' and supporters' behalf.

Respectfully submitted,

Dated:  May 31, 2024

> Brandon W. Barnett
> Texas Bar No. 24053088
> Barnett Howard & Williams PLLC
> 930 W. 1st St., Suite 202
> Fort Worth, Texas 76102
> 817-993-9249 (T)
> 817-697-4388 (F)
> E-mail: barnett@bhwlawfirm.com
>
> */s/ Stephen D. Stamboulieh*
> Stephen D. Stamboulieh
> NDTX#: 102784MS
> MS Bar No. 102784
> Stamboulieh Law, PLLC
> P.O. Box 428
> Olive Branch, MS  38654

5

(601) 852-3440
E-mail: stephen@sdslaw.us

John I. Harris III (TN # 12099)
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing

document or pleading to be filed with this Court's CM/ECF system, which caused a Notice of

Electronic Filing and copy of this document or pleading to be delivered to all counsel of record.


*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

APPX.423

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| *Plaintiffs*, | §<br>§ | CIVIL ACTION NO. 2:24-CV-00089-Z |
| v. | §<br>§ | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| *Defendants*. | §<br>§ | |

SUPPLEMENTAL DECLARATION OF C. RICHARD ARCHIE

1.      My name is C. Richard Archie.  I am a U.S. citizen and resident of Tennessee. I make this supplemental declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief and pursuant to this Court's Order. (Doc. 45).  I make these statements in my capacity as a director of the Tennessee Firearms Association ("TFA"), of which I am also a member.  Unless otherwise stated, I make this declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained herein.

2.      This declaration is offered as a supplement to my prior Declaration.  (Doc. 1-3).

1

APPX.424

3.      Personally, I own several firearms, and from time to time in the past I have purchased and sold firearms, including firearms purchased for self-defense, although all of my activities have been with a view towards altering and improving my collection, and not for any commercial or business purpose.  I desire to continue to engage in the same or similar activities in the future.  I do not have a federal firearms license and do not want to obtain one since I am not engaged in any manner in the business of being a firearms dealer and do not intend to do so.  As an individual firearms owner and collector, I share the concerns about the ATF's "Engaged in Business" Rule that other TFA members have expressed to me and which are summarized herein.

4.      I have also spoken with another TFA member and director on this matter.  That director has a personal firearms collection that includes rifles, shotguns, and handguns.  That director maintains this personal collection as a collector, a hobbyist, a hunter, a recreational shooter, a hunter, and for self-defense.  That director desires to continue to improve the personal collection.  That director is not in the business of being a firearms dealer and does not collect or improve the personal collection for any commercial or business purposes.  That director has never had a federal firearms license, has never been a responsible party on a federal firearms license, and has never expressed any desire to do so in my discussions. That director does not want a federal firearms license because such is unnecessary historically for private firearms owners and because federal firearms dealers, by licensure, become subject to many ATF rules, regulations and requirements that do not apply to individual firearms owners or collectors. As an individual firearms owner, this director has shared concerns about the ATF's new "Engaged in the Business" rule which concerns are similar to those expressed by other TFA members and summarized herein.

2

5.      In my role with TFA, I have direct and regular contact with members and supporters of TFA regarding their concerns, questions, requests, and suggestions.

6.      For example, three TFA members (Segar, Babcock and Matthews) have stated that they are not federal firearms license holders and have never been.  None of these three members are in the business of being a firearms dealer and none of them have any desire or intent to become a firearms dealer.  Each of them is a lawful gun owner who maintains their individual, private collections that contain multiple firearms. Each of them owns their respective private collections as hobbyists, hunters, recreational shooters, and/or for personal defense. Each of these individuals advised that they intend to change or improve their personal collection through the future acquisition and disposition of firearms.

7.      One TFA member (Low) is a former federal firearms licensee who chose to let his federal firearms license expire many years ago when he decided to get out of the business of being a firearms dealer in another state. At present, this member remains a lawful gun owner who maintains his personal private firearms collection that contains multiple firearms including self-defense firearms. He owns firearms as a hobbyist, recreational shooters and/or for personal defense. He intends to change or improve his personal collection through the future acquisition and disposition of firearms.  He does not intend to go back into the business of being a firearms dealer and he has no intent to get another federal firearms license in the future.

8.      Two other TFA members who have been in touch with TFA are both former federal firearms licensees.  Each of these members had their licenses revoked by the ATF.  Each of them is classified by the ATF as "willful violators" of the Gun Control Act as part of the license revocation process. Each of them understands that they are ineligible to ever be issued a federal firearms license in the future.  However, these two individuals are still lawful firearms

3

APPX.426

owners and continue to maintain their personal collections. They intend to change or improve their personal collections. They do not intend to (nor can they) go back into the business of being a firearms dealer.

9.    Neither I nor any of these six specific individuals believe that we are, nor do we intend to be, in the business of dealing in firearms commercially, as a business, for a profit, to earn a livelihood, or in any manner other that as private collectors, owners and enthusiasts.

10.    Neither I nor any of these six members have expressed a desire to become federal firearms dealers. Neither I nor any of these six members have an intent to be a firearms dealer, we do not desire to be subject to the ATF's rules and regulations, many of which are unduly burdensome relative to the costs, recording keeping, and reporting requirements that are imposed by federal, state, and local laws on licensed firearms dealers. Further, neither I nor these six members want to be subject to the ATF's inspection and audit authority that applies to licensed dealers.

11.    I am and each of these six members is aware that Tennessee is a "point of contact state" and that becoming a federal firearms dealer would also require that they register with the state of Tennessee as a firearms dealer and that they would be required to participate in Tennessee's background check systems.

12.    I am and each of these six members is aware that local zoning laws in Tennessee can impact whether someone can obtain a federal firearms license, particularly "home based" licensees since one of ATF's requirements for a license is that the licensed address, which would normally be a home for most individuals, must be zoned.

13.    Every TFA member that I have talked to, including the six referenced above, have expressed concerns that, if the ATF's "Engaged in the Business" rule takes effect, there would be

4

a great deal of uncertainty as to whether they would be required to obtain a license. Our members, including these six, and I are concerned that the failure to obtain a federal firearms license under this new Rule could result in ATF accusing any unlicensed individual of being unlicensed firearms dealer and thus being subjecting to civil enforcement and/or federal or state criminal prosecutions.

14.     I am aware and these six members have expressed the concern that the ATF's "Engaged in the Business" rule contains many examples, exceptions and presumptions which make it difficult to understand exactly what the new rule requires, prohibits, or criminalizes.

15.     I am concerned and these six members have expressed concerns that the ATF's "Engaged in the Business" rule is so vaguely written that it could be arbitrarily or capriciously used as a weapon to intimidate me, these six members, and any other TFA member into ceasing or curtailing their intent to alter, amend, improve or even seel part of their personal collections.

16.     With respect to any TFA member, including the two members referenced above, who has had his or her federal firearms license previously revoked by the ATF and/or who was a responsible party with respect to a revoked federal firearms license, these members are now classified by the ATF as "prior willful violators" of the Gun Control Act. These members and others who may also be classified by ATF as prior willful violators are, as private citizens, fully able to purchase, own, trade, sell and maintain private collections so long as they are engaging only is non-commercial casual transactions. However, for our members, including the two referenced above, who have been classified as "prior willful violators" according to the ATF, are now subject to lifetime prohibitions on ever obtaining another federal firearms license. Under the ATF's new "Engaged in the Business" rule, these members would be unable to obtain a firearms license which would place them at a higher risk of being subjected to ATF civil compliance or

5

criminal prosecutions. These members expressed extreme concerns about their rights to possess, maintain, improve, or even liquidate some or all of their personal firearms collections if the ATF's new "Engaged in the Business" rule takes effect.

17.     In my discussions and the discussions of TFA's board with our members, it is clear that our members are overwhelmingly opposed to the ATF's "Engaged in Business" rule and are concerned that it would require many if not most of them to expend considerable time and effort to become federal firearms dealers even though they, as individuals, seek only to maintain and improve their personal collections. They are concerned about being subject to federal laws, rules and regulations that apply only to federal firearms dealers and not to individual gun owners or collectors.

18.     Based on our discussions with these six individuals and other members of the TFA, it is clear that each of these persons would otherwise have standing to seek relief in this action, just as co-Plaintiff and TFA member Jeffrey Tormey has done. Substantially all TFA members are in the same or similar circumstances to Plaintiff Tormey, concluding that the ATF's "Engaged in Business" rule could be enforced against them for otherwise lawful activities, and thus putting them at substantial risk of federal civil enforcement or criminal prosecutions, at risk of being forced to engage attorneys to assist and represent them, and at risk of being forced to incur costs and expenses which they may not be able to recover from the ATF even if they prevail in defending themselves against the ATF's Rule.

19.     The interests of TFA members that TFA seeks to protect in this action are germane to the interests and purposes for which TFA exists. TFA has been in existence since 1995. It is recognized by the IRS as a § 501(c)(4) nonprofit advocacy entity. Part of the TFA's purpose, as stated in its charter, is that "the organization is dedicated to restoring government to

6

citizen control and giving full effect to the original intent of the Bill of Rights to the United States Constitution as well as to the provisions of the Tennessee Constitution with an emphasis on the 2nd and 10th Amendments to the United States Constitution and Article I, Section 26 of the Tennessee Constitution. Through a combination of advocacy, legislative involvement and grassroots engagement, the organization seeks to reassert the traditional American values of unalienable personal rights, limited governments, and state sovereignty." Engaging in the matter now before this Court is directly related to the purpose of the TFA, which includes efforts to protect and defend the rights of its members and, to a greater extent, all Tennesseans, as those rights are expressly protected by the Second Amendment.

20.     Given that the declaratory nature of the relief requested in this action, and (i) that any facts relevant to the disposition of the case are common among the non-government Plaintiffs, (ii) that the relevant factors are the acts of the Defendants and the statutory and Constitutional restrictions on the Defendants' authority, as well as (iii) the nature of the relief that is being sought, TFA does not believe that it would be necessary to require each or even a substantial number of its thousands of members to individually seek to be joined as parties in this action.

21.     Protection of the rights and interests advanced in this litigation is germane to TFA's purpose and mission which, as noted, includes the expressed objective to preserve and protect the Second Amendment and the rights of Tennesseans to keep and bear arms against any unconstitutional or illegal overreach by government entities. TFA has been in existence for almost three decades and has years of experience in public advocacy. It has years of experience supporting litigation as an amicus party throughout the country, including numerous filings with the United States Supreme Court on behalf of its members and supporters. TFA's board and its

7

advisory board includes licensed attorneys with experience in constitutional and Second
Amendment litigation. TFA is capable of fully and faithfully representing the interests of its
members and supporters without participation by each of the individuals and entities.

     I, C. Richard Archie, declare under penalty of perjury that the foregoing is true and
correct.

DATE 5/30/2024     C. RICHARD ARCHIE

8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, | § § § § § § § § § § | CIVIL ACTION NO. 2:24-CV-00089-Z |
| *Plaintiffs*, | § § | |
| v. | § § | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF, | § § § § § § § § § | |
| *Defendants*. | § § | |

---

SUPPLEMENTAL BRIEF OF GUN OWNERS OF AMERICA, INC.

---

**COMES NOW,** GUN OWNERS OF AMERICA, INC. ("GOA"), by and through counsel

of record and files this, its Supplemental Brief in response to this Court's May 19, 2024 Order.

*See* ECF #45.  For the reasons below and those already briefed, GOA has standing to pursue this

litigation.[1]

---

[1] In the Fifth Circuit, "[i]t is well settled that once [courts] determine that at least one plaintiff has standing, [the court] need not consider whether the remaining plaintiffs have standing to maintain the suit."  *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) (citing *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 192 (5th Cir. 2012)).  "At least one plaintiff must have standing to seek each form of relief requested in the complaint."  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433 (2017).  While this Court

As stated in Erich Pratt's supplemental declaration, GOA is a "California non-stock corporation with its principal place of business in Springfield, Virginia… GOA has more than 2 million members and supporters across the country, including residents of this district, many of whom will be irreparably harmed by…" the ATF's Final Rule.  *See* ECF #1-2, ¶ 4.

The settled doctrine of representational standing does not require the identification of all individual members in order to obtain relief on their behalf.  *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2158 (2023) ("Where, as here, an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates.").  *See also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("Compelled disclosure of membership in an organization engaged in advocacy of particular beliefs is" an "effective … restraint on freedom of association.").

To the extent "an association does have to identify a member with individual standing," Plaintiffs already have with specificity.  *Free Speech Coal., Inc. v. Colmenero*, 2023 U.S. Dist. LEXIS 154065, at *14 (W.D. Tex. Aug. 31, 2023); *see* Declaration of Jeffrey W. Tormey, ECF #1-1 at ¶2 (identifying himself as a named "member of Gun Owners of America, Inc…"); *Marszalek v. Kelly*, 2021 U.S. Dist. LEXIS 107613, at *10-11 (N.D. Ill. June 9, 2021) ("Only one qualifying member is needed to satisfy this requirement, and he need not be named.").

And while GOA adequately demonstrated its standing in both the Complaint and the declarations of Jeffrey W. Tormey and Erich Pratt (*see* ECF #1-1 and #1-2), Mr. Pratt files his supplemental declaration in support of GOA's standing herein.  *See* Supplemental Declaration of Erich Pratt, Exhibit A.  Mr. Pratt's supplemental declaration describes a number of conversations

---

already held that Tormey and the organizational plaintiffs have standing, GOA and the remainder of the organizational plaintiffs file their briefs and supplemental declarations as ordered by this Court.

1

with GOA members who are directly impacted by the Final Rule, and describes the irreparable harm the Final Rule will cause them.

As stated in Mr. Pratt's supplemental declaration, GOA spoke to "one member who maintains a personal collection of at least a hundred firearms" who "regularly purchases firearms for person, noncommercial use, primarily for self-defense and related training…" *Id*. at ¶ 4. This member explained that they "[o]ccasionally … sells firearms from their collection in order to make room for new firearms or to replace firearms that … are discovered to have shortcomings…" *Id*. at ¶ 7. This individual explained that they "sell[] some firearms to pay child support, pay rent, and other family and business expenses." *Id*. Sometimes, this individual's "sales generate a profit…" but "[m]ore often, however, these sales generate no profit…" *Id*. at ¶ 8. In order to sell their firearms, this individual discusses his firearms on social media accounts "viewed by the public," leading to their sale. This individual estimates that they "sold approximately ten firearms [in this manner], but plans on selling more" from time to time in the future. *Id*. at ¶9.

Another GOA member "inherited a large collection of firearms…" and they wish to "liquidate portions of that inheritance" to "pay rent or help a family member attend school." *Id*. at ¶¶13-14. This individual planned on selling firearms at a gun show and, in order to do that, would have to "'exchange[] … something of value' with the venue" which would presumably trigger one of the Rule's presumptions of unlawful dealing. FR at 29091. *Id*. at ¶¶15-16. This individual also "fears enforcement because the Rule adopts a broad definition of 'resale,' which include 'selling a firearm … after it was previously sold by the original manufacturer or any other person.'" *Id*. at ¶20. This individual explains that "gun shows are frequented by local law enforcement and ATF agents, often undercover, who observe the public … to enforce state and federal laws." *Id*. at ¶22.

Another GOA member explains that they have a "sizeable collection of firearms," including "firearms that constitute 'self-defense' types of firearms." *Id*. at ¶25. This individual desires to sell their firearms, including "self-defense" type firearms, "by handing out flyers during a local gun show." *Id*. at ¶27. However, the Rule says that such activities may rise to a presumption of unlawful dealing, and this individual explains that the gun club is "frequented by local law enforcement" and fears that "there is a credible risk of enforcement" if they "were… to hand out flyers … to sell personally owned firearms…" *Id*. at ¶28.

Another GOA member keeps a "digital spreadsheet of information on their extensive collection." *Id*. at ¶32. Their spreadsheet includes a listing of "their firearms in chronological order based on date of purchase, including the make, model, serial number, caliber, approximate round count (*i.e.*, how many rounds of ammunition have been fired through the firearm), price paid, place of purchase, and if applicable, the date sold and sale price, with a link to any bill of sale or other documentation evincing a transfer in ownership." *Id*. at ¶33. Although such recordkeeping is typical for many gun owners, the Final Rule presumes an individual has an "intent to predominantly earn a profit" when one "[m]akes and maintains records to document, track, or calculate profits and losses…." FR at 29091. As such, this individual "fears that they are presumed to have an 'intent to predominantly earn a profit,' subject to rebuttal upon enforcement, even though they merely intend to enhance their personal collection." *Id*. at ¶ 40.

Finally, another GOA member already has been directly "targeted by the ATF for sales of firearms from their 'personal collection.'" *Id*. at ¶41. GOA's member reported that, "shortly after the Bipartisan Safer Communities Act was passed, the ATF visited them and gave them a 'warning letter' about them selling personal firearms." *Id*. Although this person reports they have never been engaged in the business of dealing in firearms, in "early May 2024… the ATF

3

attempted to visit them" at home and then went to their work to speak to them. *Id*. at ¶42. The ATF apparently made the employer of this member "uncomfortable," which led to the member's employment being terminated. *Id*. This member estimates that they may have sold "ten firearms in the course of a year," but that the sales were "never to make a profit, but only to free up funds to buy other firearms." *Id*. Of course, being as how the Final Rule muddies the waters on what previously constituted perfectly lawful activity, it is easy to see how ATF's agents have improperly targeted this person utilizing the Final Rule's expansive understanding of unlawful dealing. As GOA explained its prior declaration, ATF has previously targeted innocent GOA members with prosecution for unlawful dealing, and it appears that this trend is continuing.

As Plaintiffs alleged, ATF previously enforced "Engaged in the Business" against GOA member Robert G. Arwady. *See* Declaration of Erich Pratt, #1-2 at ¶32. The Court recognized that. *See* Order, ECF #44 at 6. The Court also noted that ATF threatened to enforce the Final Rule. *Id*. And the ATF is currently enforcing it against the GOF supporter as described in Mr. Pratt's supplemental declaration. *See* Exhibit A, at ¶¶41-43. This gives GOA a real and concrete interest in defending its members from the Final Rule's overreach.

As this Court acknowledged, the Supreme Court held "that an organization had standing 'when it filed suit' where it 'identified' individual harmed members but did not provide their names." ECF #44, at 7 (citing *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 200–01 (2023)). Because GOA has identified with specificity several members who are harmed by the Final Rule, GOA has the requisite representational standing to pursue litigation on its members' and supporters' behalf.

Respectfully submitted,

Dated: May 31, 2024

4

Brandon W. Barnett
Texas Bar No. 24053088
Barnett Howard & Williams PLLC
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
817-993-9249 (T)
817-697-4388 (F)
E-mail: barnett@bhwlawfirm.com

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
NDTX#: 102784MS
MS Bar No. 102784
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
E-mail: stephen@sdslaw.us

John I. Harris III (TN # 12099)
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing

document or pleading to be filed with this Court's CM/ECF system, which caused a Notice of

Electronic Filing and copy of this document or pleading to be delivered to all counsel of record.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

5

APPX.437

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS, STATE OF     §
LOUISIANA, STATE OF MISSISSIPPI,     §
STATE OF UTAH, JEFFREY W.     §
TORMEY, GUN OWNERS OF     §
AMERICA, INC., GUN OWNERS     §     CIVIL ACTION NO. 2:24-CV-00089-Z
FOUNDATION, TENNESSEE     §
FIREARMS ASSOCIATION, and     §
VIRGINIA CITIZENS DEFENSE     §
LEAGUE,     §
       *Plaintiffs*,     §
    §
v.     §
    §
BUREAU OF ALCOHOL, TOBACCO,     §
FIREARMS AND EXPLOSIVES,     §
UNITED STATES DEPARTMENT OF     §
JUSTICE, MERRICK GARLAND, in his     §
official capacity as Attorney General of the     §
United States, *and* STEVEN M.     §
DETTELBACH, in his official capacity as     §
Director of ATF,     §
       *Defendants*.     §
    §

---

SUPPLEMENTAL DECLARATION OF ERICH M. PRATT

---

1. My name is Erich M. Pratt. I am a U.S. citizen and resident of Virginia. I make this supplemental declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief and pursuant to this Court's May 19, 2024 Order for supplemental briefing, ECF #45. I make these statements in my capacity as the Senior Vice President of Gun Owners of America, Inc. ("GOA") and as the Senior Vice President of Gun Owners Foundation ("GOF"). Unless otherwise stated, I make this declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained herein.

1

2.   This Declaration is offered as a supplement to my prior Declaration, ECF #1-2.

3.   As I previously reported, GOA and GOF have been in contact with members and supporters nationwide who do not hold Federal Firearms Licenses ("FFLs") to deal in firearms. These members and supporters fear Defendants' Engaged in the Business Rule ("Rule") will lead to them being arbitrarily classified as presumptively "engaged in the business" of dealing in firearms and therefore subject to civil and criminal enforcement.

4.   For example, GOA spoke to one member who maintains a personal collection of at least a hundred firearms.  This individual regularly purchases firearms for personal, noncommercial use, primarily for self-defense and related training (*i.e.*, practicing timed drills, drawing from concealment, and weapon manipulation like reloading or clearing malfunctions).  This individual believes the private ownership of several firearms for self-defense purposes is "necessary to the security of a free State" and also serves as a political statement against governmental overreach and abuse.

5.   This individual does not collect firearms "for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)."  FR at 29090.

6.   Rather, this individual "accumulate[s] [firearms] primarily for personal protection," FR at 29090, a purpose that the Rule expressly exempts from the definition of "personal collection."

7.   Occasionally, this individual sells firearms from their collection in order to make room for new firearms or to replace firearms that, after self-defense training and everyday carry, are discovered to have shortcoming such as poor ergonomics or issues with mechanical reliability.

APPX.439

Additionally, this individual at times has sold firearms to pay child support, pay rent, and other family and business expenses.

8.  At times, these occasional sales generate a profit, compared to the price this person paid when acquiring a given firearm. More often, however, these sales generate no profit (or even a loss).

9.  In order to facilitate these occasional sales, this individual will discuss various firearms they want to sell on a social media account viewed by the public. Then, this individual would be contacted through various social media accounts in order to effectuate the sale. This person estimates that they have sold approximately ten firearms, but plans on selling more.

10. This individual fears that the advertising of these occasional "for sale" ads means that, under the Rule, the individual "[r]epetitively or continuously advertises, markets, or otherwise promotes a firearms business (*e.g.*, **advertises or posts firearms for resale**, including through the internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), **regardless of whether the person incurs expenses** or only promotes the business informally." FR at 29091 (emphases added). As the Rule makes clear, such activities can take place "may occur wherever, or through whatever medium," including "over the internet." FR 28968, 29071.

11. In other words, the Rule presumes this individual, based upon perfectly lawful activities, nevertheless has an "intent to predominantly earn a profit," FR at 29091, and will require this individual to rebut this presumption upon enforcement.

12. This individual has stated that, absent a Temporary Restraining Order or future injunctive relief against the Rule, they would cease their occasional sales of firearms from their private collection altogether for fear of enforcement and the attendant burdens of proving their

APPX.440

compliance with the statute's safe harbor.

13. GOA spoke to another member who inherited a large collection of firearms from a late relative.

14. This individual wishes to liquidate portions of that inheritance so that they can afford to pay rent or help a family member attend school. They believe the best way to do so would be to offer these firearms for sale at a local gun show, where there are plenty of potential buyers.

15. This individual planned on selling some of these inherited firearms at a local gun show.

16. However, the local gun show is not a charitable enterprise. In order to secure a table to display these firearms for sale, this individual must "exchange[] … something of value" with the venue. FR at 29091.

17. Moreover, this individual will have to spread their gun-show sales across several dates, given the number of firearms in this inheritance, the finite duration of the gun show, and the time constraints of their own schedule and availability.

18. But once this individual begins advertising these inherited firearms at the gun show, they fear the Rule will presume they have an "intent to predominantly earn a profit," FR at 29091, and will require this individual to rebut this presumption upon enforcement.

19. Indeed, the Rule establishes a presumption when an individual "[**r**]**epetitively** or continuously **purchases, rents, or otherwise exchanges (directly or indirectly) something of value to secure permanent or temporary physical space to display firearms** they offer for **resale**, including part or all of a business premises, **a table or space at a gun show**, or a display case." FR at 29091 (emphases added).

20. This individual fears enforcement because the Rule adopts a broad definition of "resale," which includes "**selling a firearm**, including a stolen firearm, **after it was previously sold by**

4

**the original manufacturer or any other person**."  FR at 29090 (emphases added).

21. Even though this individual *inherited* the firearms they wish to sell, this does not change the fact that the firearms were, at one point in time, "previously sold by the original manufacturer," if their late relative had purchased them new, or "previously sold by … any other person," if their late relative had purchased them used.

22. Moreover, this individual understands that gun shows are frequented by local law enforcement and ATF agents, often undercover, who observe the public in an effort to enforce state and federal laws.  Consequently, this individual fears that, if they were to secure a table to sell their inherited firearms on more than one occasion, there is a credible risk of enforcement, should the Rule take effect.

23. This individual does not wish to expose themselves to such liability, where they will be forced to prove compliance with the statute.  Therefore, they have indicated that they will not attempt to sell their inherited firearms at a gun show if the Rule takes effect.

24. Practically speaking, this means this individual will be unable to easily convert their inheritance into the money that they need to afford life expenses, even though federal law permits just that.

25. GOA spoke to another member who has a sizeable collection of firearms, both as a collection and firearms that constitute "self-defense" types of firearms.

26. This individual wishes to sell some of these firearms, including guns purchased and carried for "self-defense."  Specifically, this individual states that they have sold a Ruger LC9, and is planning to sell a Glock 43.  Both of these firearms were tried out as "self-defense," but this person ultimately did not like to carry these specific firearms.

27. This individual desires to sell certain of their firearms, including these firearms carried

5

and owned for self-defense, by handing out flyers during a local gun show. In the past, this member has rented a table to sell firearms (and has in the past handed out flyers). This member merely wishes to sell various firearms that did not ultimately fulfill their intended purpose, something that clearly does not constitute being engaged in the business.

28. The Final Rule, however, provides that some of this perfectly lawful conduct may trigger presumptions that this person is an unlawful dealer. And, whereas this individual understands that their local gun show is frequented by local law enforcement, they fear that, if they were in the future to hand out flyers at a rented table at a gun show, in order to sell personally owned firearms, there is a credible risk of enforcement, should the Rule take effect.

29. This individual does not wish to expose themselves to such liability, where they will be forced to prove compliance with the statute. However, they have indicated that they will still attempt to sell their personal firearms at a gun show by renting a table even if the Rule takes effect, because they believe their planned conduct to be lawful under federal law, even if the Final Rule creates a different regime.

30. GOA spoke to another member who maintains a large private collection of firearms.

31. This individual stated that they are an organized person, who finds it important to retain the original documentation of all the firearms they purchase.

32. Likewise, this individual also maintains a digital spreadsheet of information on their extensive collection.

33. For example, in this spreadsheet, this individual has a tab that lists data on their firearms in chronological order based on date of purchase, including the make, model, serial number, caliber, approximate round count (*i.e.*, how many rounds of ammunition have been fired through the firearm), price paid, place of purchase, and if applicable, the date sold and sale price, with a

link to any bill of sale or other documentation evincing a transfer in ownership.

34. Based on the sheer number of firearms in this individual's private collection, they believe this spreadsheet to be the best way to keep track of this important data.

35. For example, if this individual were ever to have a portion of their collection stolen, they would be able to reference the spreadsheet and assist law enforcement with the serial numbers of any stolen firearms and accessories on those firearms.

36. Occasionally, this individual will sell a firearm from their collection, whether to recoup funds in order to purchase a new firearm, or to assuage the concerns of their spouse that they spend too much on firearms.

37. In these cases, this individual tracks bought/sold price data purely out of interest. But sometimes, knowing the price paid for a firearm years ago can be useful in determining a fair price at which to sell the firearm.

38. But despite this individual's inherently noncommercial, private activity, they fear that they fall under at least one of the Rule's presumptions. Accordingly, they have indicated that if the Rule takes effect, they no longer will sell firearms from their private collection, even occasionally, because the spreadsheet that they maintain to stay organized could expose them to liability in the eyes of ATF.

39. Indeed, the Rule presumes an individual has an "intent to predominantly earn a profit" when one "[m]akes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale." FR at 29091.

40. Due to the Rule's expansive definition of "resale," as discussed above, this individual fears that they are presumed to have an "intent to predominantly earn a profit," subject to rebuttal upon enforcement, even though they merely intend to enhance their personal collection.

41. Additionally, GOA spoke with another member who has recently been targeted by the ATF for sales of firearms from their "personal collection." Specifically, this member reported that, shortly after the Bipartisan Safe Communities Act was passed, the ATF visited them and gave them a "warning letter" about selling personal firearms.

42. Then, in early May 2024, this member explained that the ATF attempted to visit them at home, and then showed up at their place of employment in order to speak with them. This person explained that, on the advice of counsel, they declined to meet with the ATF, but that agents made a scene which caused their employer to be uncomfortable, and their employment was terminated shortly thereafter. This member explained that, historically, they would buy firearms for self-defense, and then sometimes would sell them after they decided they either did not want to carry them for self-defense, or otherwise did not like the firearms purchased. This person explained that they may have sold ten firearms in the course of a year, but that such sales were never to make a profit, but only to free up funds to buy other firearms.

43. It thus seems apparent that the ATF is enforcing the Engaged in the Business Rule against this member.

44. Finally, we have spoken with a GOF supporter, who has donated funds specifically with the intent to enable GOF to pursue litigation such as this.

45. This supporter is a "YouTuber" with a YouTube channel focused on reviews of various firearms and firearm accessories.

46. In order to create this content, this GOF supporter will at times purchase a firearm with their own funds, in order to acquire items to then review. However, upon completion of the content and after the review is posted, this member does not have the financial resources to be able to keep each and every firearm that is reviewed.

8

47. Thus, this person will at times sell various firearms after reviewing them, occasionally for a profit, but often for a loss. There is no business purpose or profit motivation involved with these sales.

48. Nevertheless, based on the vague presumptions in the Rule, this supporter fears that the ATF will enforce the Rule and presumptions against them for buying and selling firearms, especially since some of these sales occur a short time after the firearm was acquired.

49. Under the Rule, this supporter fears civil action or criminal prosecution by ATF. If the Rule takes effect, this member will be unable to engage in the sorts of activities in which they have engaged in the past, thus putting their YouTube channel out of commission.

50. GOF funds its litigation efforts, in part, by way of individual contributions, along with contributions received from individuals through the Combined Federal Campaign. GOF's supporters provide the funds directly used to support GOF's litigation efforts, which efforts would be impossible without contributions from our supporters. Our supporters contribute to GOF specifically so that we can bring litigation like this. Many have donated to GOF specifically in order to fund this litigation.

51. And, as part of keeping its supporters up to date on this and other litigation, and various other Second Amendment topics, GOF provides its supporters with a newsletter which provides updates directly to them, keeping them advised of what GOF is doing. *See* Exhibit 1.

52. GOF's supporters desire that GOF be involved in this case as it directly impacts wide swaths of protected Second Amendment conduct.

I, Erich M. Pratt, declare under penalty of perjury that the foregoing is true and correct.

5-31-24
**DATE**

*Erich Pratt*
**ERICH M. PRATT**

9

APPX.446

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, | § § § § § § § § § § | CIVIL ACTION NO. 2:24-CV-00089-Z |
| _Plaintiffs_, | § § | |
| v. | § § | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, _and_ STEVEN M. DETTELBACH, in his official capacity as Director of ATF, | § § § § § § § § § | |
| _Defendants_. | § § | |

---

SUPPLEMENTAL BRIEF OF GUN OWNERS FOUNDATION

---

**COMES NOW,** GUN OWNERS FOUNDATION ("GOF"), by and through counsel of record and files this Supplemental Brief in response to this Court's May 19, 2024 Order. *See* ECF #45. For the reasons below, GOF has standing to pursue this litigation.

As stated in Erich Pratt's declaration, GOF is a "Virginia non-stock corporation, with its principal place of business in Springfield, Virginia…. GOF is supported by gun owners across the country, including Texas residents, many of whom are and will be irreparably harmed by ATF's actions. Donations by supporters of GOF fund the organization's activities, including litigation such as this to defend their right to keep and bear arms." *See* ECF #1-2, ¶ 5. GOF's supporters

contribute funds that are then directed towards various program service activities, including conducting litigation and filing *amicus curiae* briefs, and initiating this litigation specifically. GOF was incorporated in 1983, and, for at least 16 years (and currently), GOF has been approved by the U.S. Office Personnel Management as a participant in the federal government's annual official Combined Federal Campaign ("CFC") which allows federal employees to designate GOF as the recipient of their donations.[1]

GOF's supporters donate through various methods, either directly to GOF[2] or through the CFC, to allow GOF to fight for their Second Amendment rights. For instance, at least one of GOF's supporters specifically donated funds to assist in funding this case. *See* Supplemental Declaration of Erich Pratt (ECF #55-1). GOF's supporters are directly harmed by the Final Rule for the same and similar reasons as demonstrated in the declaration of Jeffrey Tormey, including his supplemental declaration (ECF #1-1 and ECF #53-1), and the declarations and supplemental declarations of the other organizational plaintiffs Gun Owners of America, Inc., Tennessee Firearms Association, and Virginia Citizens Defense League.

While GOF is not a traditional membership association, it has representational standing to litigate cases such as this because it is the functional equivalent of a membership organization. *See Gettman v. Drug Enf't Admin*., 290 F.3d 430, 435 (D.C. Cir. 2002) (representational standing *can be achieved* even by "'an organization that has no members in the traditional sense'" if "'the organization is the <u>functional equivalent</u> of a traditional membership organization,'" such as

---

[1] *See* https://givecfc.org/gun-owners-foundation; *see also* https://foundation.gunowners.org/cfc-united-way/.
[2] For example, contributions to GOF may be made on-line at GOF's website. *See* https://foundation.gunowners.org/civicrm/contribute/ transact?reset=1&id=3.

1

"selecting its leadership, guiding its activities,[3] or financing those activities.").[4] The Fifth Circuit calls this the "indicia of membership" test. *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012). Thus, while GOF does not have "members" *per se* (only supporters), it nonetheless is the "functional equivalent" of a "membership organization" for purposes of representational standing. As alleged in Plaintiffs' Complaint, GOF is "a nonprofit legal defense and educational foundation" that is "supported by gun owners across the country…" ECF #1 at ¶14. GOF members have a significant organizational attachment to GOF demonstrated by their voluntary decision to fund GOF, their receipt of information about GOF activities through a quarterly GOF newsletter[5] and regular emails about its activities, and communicating their views to GOF about issues on which GOF should focus. The reason that GOF exists is to advocate and defend the Second Amendment rights of gun owners, and many such persons fund GOF's activities.

Being that GOF is a nonprofit organization, rather than a for-profit "one-person business" (as in *Fund Democracy*) or a for-profit subscription magazine (as in *Gettman*), it by definition receives funding *only* (as in 100 percent) from its supporters, with the expressly stated "mission"

---

[3] *See also Fund Democracy, LLC v. SEC*, 278 F.3d 21, 26 (D.C. Cir. 2002) (rejecting representational standing because "Fund Democracy's course is steered entirely by Bullard, and Fund Democracy does not claim to receive funding from its purported members," and thus "it may have reasons for instituting suit other than to assert the rights of these alleged supporters") (emphasis added).

[4] In *Apalachicola Riverkeeper v. Taylor Energy Co., L.L.C.*, 113 F. Supp. 3d 870, 876 (E.D. La. July 7, 2015), the court stated that "[n]either compliance with corporate formalities nor the existence of a formal membership structure is required. Instead, the Court inquires whether an individual possesses certain 'indicia of membership,' such as … financing the organization's activities [or] associating with the organization voluntarily. This is a holistic test. The purpose is to determine whether an organization provides the means by which members 'express their collective views and protect their collective interests.'" *See also Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 344-345 (1977) ("while the apple growers and dealers are not 'members' of the Commission in the traditional trade association sense … they alone finance its activities, including the costs of this lawsuit…. In a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests."). This expression of "collective views" and protection of "collective interests" is quintessentially the function of nonprofit organizations, whether to protect seniors, veterans, or another class (such as gun owners), or to advocate for environmental, social justice, or other causes (such as the right to keep and bear arms).

[5] *See* ECF# 55-2 (GOF Newsletter).

APPX.449

to use those funds to "defend[] America's unique constitutional right to keep and bear arms, through education and legal assistance in important firearms cases."[6] *See also* ECF 1-2 at ¶ 42 ("GOA and GOF routinely litigate cases throughout the country on behalf of their members and supporters..."). *See Funeral Consumers Alliance* at 344 n.9 (members "finance the organization's activities, including the case's litigation costs"). Since GOF's supporters finance entirely the nonprofit's activities (including its litigation), and the organization (as a function of its nonprofit status) may *only* engage in activities that benefit the public (and not with the purpose of private benefit or inurement), GOF has representational standing.

As stated in the Supplemental Declaration of Erich Pratt (ECF #55-1), GOF heard from one of its supporters who is a YouTube video content creator with a "YouTube channel focused on reviews of various firearms and firearm accessories." *Id*. at ¶ 45. This supporter "will at times purchase a firearm with their own funds, in order to acquire items to then review." *Id*. at ¶ 46. After this individual reviews and posts a video review, they "will at times sell various firearms after reviewing them, occasionally for a profit, but often for a loss." *Id*. at ¶ 47. This supporter "fears civil action or criminal prosecution by ATF" and stated that "if the Rule is permitted to take effect," they would be "unable to engage in the sorts of activities in which they have engaged in the past, thus putting their YouTube channel out of commission." *Id*. at ¶ 49. Indeed, the nature of purchasing new firearms for review, and then selling them to fund future purchases, seems to run afoul of the Rule's presumption of unlawful dealing when selling firearms shortly after purchase. *See* FR 29091 (modifying §478.13(c)(3)(i) and (ii)).

As this Court explained, the Supreme Court held "that an organization had standing 'when it filed suit' where it 'identified' individual harmed members but did not provide their names."

---

[6] *See* GOF 2021 IRS Form 990 at 1,
https://projects.propublica.org/nonprofits/organizations/521297380/202213189349318031/full

ECF #44, at 7 (citing *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 200–01 (2023)).

Because GOF has identified and specifically described at least one supporter who is harmed by

the Final Rule, and who has specifically donated money to support this litigation, Gun Owners

Foundation has the requisite standing to pursue litigation on its supporters' behalf.

Respectfully submitted,

Dated:  May 31, 2024

Brandon W. Barnett
Texas Bar No. 24053088
Barnett Howard & Williams PLLC
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
817-993-9249 (T)
817-697-4388 (F)
E-mail: barnett@bhwlawfirm.com

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
NDTX#: 102784MS
MS Bar No. 102784
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
E-mail: stephen@sdslaw.us

John I. Harris III (TN # 12099)
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

*Counsel for Plaintiffs*

4

## <u>CERTIFICATE OF SERVICE</u>

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing document or pleading to be filed with this Court's CM/ECF system, which caused a Notice of Electronic Filing and copy of this document or pleading to be delivered to all counsel of record.


<u>/s/ Stephen D. Stamboulieh</u>
Stephen D. Stamboulieh

APPX.452

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, | § § § § § § § § § | CIVIL ACTION NO. 2:24-CV-00089-Z |
| *Plaintiffs*, | § § | |
| v. | § § | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF, | § § § § § § § § § | |
| *Defendants*. | § § | |

## SUPPLEMENTAL BRIEF OF VIRGINIA CITIZENS DEFENSE LEAGUE

Plaintiff Virginia Citizens Defense League ("VCDL") submits this Supplemental Brief in response to this Court's May 19, 2024 Order. *See* ECF #45. For the reasons below and those already briefed, VCDL has standing to pursue this litigation. For the sake of brevity, VCDL adopts by reference the arguments made in the supplemental brief filed by Gun Owners of America, Inc. ("GOA"), including the summary of case law to the issues of organizational representation and standing.

VCDL is a nonprofit Virginia civic league and membership organization. It is recognized by the IRS as a Section 501(c)(4) entity. VCDL has tens of thousands of members and supporters

1

APPX.453

who reside in Virginia and in other jurisdictions, including within the Northern District of Texas. *See* ECF #1-4, ¶ 4.

VCDL demonstrated its standing in both the Complaint and the declarations of Jeffrey W. Tormey and Philip Van Cleave (*see* ECF #1-1 and #1-4). Mr. Van Cleave files his supplemental declaration in further support of VCDL's standing herein. *See* Supplemental Declaration of Philip Van Cleave, Exhibit A. In his supplemental declaration, Mr. Van Cleave, who is the President of VCDL, describes in greater detail how the ATF's new "Engaged in the Business" Rule directly and negatively affects VCDL's members and supporters. *Id.* ¶¶ 4-16. As stated in Mr. Van Cleave's supplemental declaration, VCDL has spoken with two specific members and supporters, each of whom does not currently hold a Federal Firearms License ("FFL") to deal in firearms. *Id.* ¶ 3. Each fears that the Rule will reclassify statutorily protected conduct as presumptively illegal, subjecting them to a burden of proving their own compliance with the statute. *See id.* For example, Mr. Van Cleave describes how the Rule affects one VCDL member, whose occasional sales fall under at least three of the Rule's presumptions, and another VCDL member who questions whether obtaining an FFL solely to avoid liability under the Rule is even possible under Virginia law. *Id.* ¶¶ 13-15, 16.

Mr. Van Cleave describes this first member as a firearm collector who maintains a private collection of primarily self-defense-related firearms. *Id.* ¶ 4. This VCDL member "does not 'study, compar[e], [or] exhibit[]' these firearms, nor do they collect them for 'recreational activities for personal enjoyment.'" *Id.* Rather, this member "sees it as their duty to maintain proficiency with firearms so that they may be able to defend their loved ones and community effectively, should the need for lawful self-defense ever arise at home or in public." *Id.* ¶ 5. In so doing, this member occasionally sells firearms when they do not meet expectations as to their self-

2

defense utility. *See id.* ¶¶ 6-7. These sales enhance this member's self-defense collection by freeing up funds or physical space for future additions. *Id.* ¶ 7.

In order to facilitate these occasional sales, this member previously "has posted flyers at their local range or ads on online forums." *Id.* ¶ 8. While conducting these sales, this member has on occasion "mentioned their firearm purchasing habits to buyers. Specifically, they have indicated that, if they did not find their next planned purchase to meet their needs, whether ergonomic or otherwise, they may be open to selling that future firearm, too." *Id.* ¶ 9. Finally, Mr. Van Cleave notes that this member maintains a spreadsheet to "organize information about their firearm collection in one place." *Id.* ¶ 10. Although this member does not use their spreadsheet primarily to track the prices of firearms occasionally sold, it does contain this information. *Id.* This member has expressed a desire to continue these activities, on occasion and in furtherance of their private collection, but they will not do so, so long as the Rule remains in effect, for fear of exposure to liability. *See id.* ¶¶ 8-11.

This member has articulated four distinct threats of enforcement under the Rule. *First*, because this member maintains their collection for self-defense purposes, this collection falls outside the restrictive definition adopted by the Rule, thereby "read[ing] this individual's collecting activity right out of the statute's safe harbor." *Id.* ¶ 12. *Second*, this member's practice of occasionally listing firearms for sale via paper flyer or online forum falls under one of the Rule's presumptions of an "intent to predominantly earn a profit." *Id.* ¶ 13. Indeed, "this presumption applies whenever one '[r]epetitively or continuously advertises, markets, or otherwise promotes a firearms business (*e.g.*, **advertises or posts firearms for resale**, including through the internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), **regardless of whether the person incurs**

3

**expenses or only promotes the business informally**.'" *Id.* The Rule reaches even this innocuous, occasional activity because it adopts an expansive definition of "resale," which includes the sale of any "firearm, including a stolen firearm, after it was previously sold **by the original manufacturer or any other person**." *Id.* ¶ 14. Because every production firearm has, at some point, been sold by the original manufacturer or any other person, the Rule classifies practically any subsequent sale of a firearm as a "resale." *Id. Third*, this member's prior (and desired future) indications to buyers of a "future interest in selling a firearm they may not like" falls under one of the Rule's "engaged in the business" presumptions. *Id.* Indeed, the Rule would presume this member to be "engaged in the business" – and therefore engaging in criminal activity without an FFL – "for '[r]esell[ing] or offer[ing] for resale firearms, and also represent[ing] to potential buyers or otherwise demonstrat[ing] a willingness and ability to purchase and resell additional firearms.'" *Id. Fourth* and finally, based on this member's use of a spreadsheet to organize collection information but also to track occasional sale proceeds, the Rule presumes "an 'intent to predominantly earn a profit.'" *Id.* ¶ 15. None of this member's occasional, private sales constitute commercial activity requiring licensure under the statute. But under the Rule, this member is *presumed* to be in violation of the law.

Mr. Van Cleave also describes a second VCDL member who has expressed the concern – and confusion – that individuals seeking to comply with the Rule by obtaining an FFL to continue making occasional sales may not be able to do so under Virginia law. *Id.* ¶ 16. Indeed, while federal law now omits the "principal objective of livelihood and profit" language from the definition of engaging in the business, Virginia law retains it. *Id.* Accordingly, a person who obtains an FFL solely to avoid enforcement liability under the Rule may not be eligible for state registration as a Virginia dealer if Virginia maintains its "livelihood" standard. *Id.* Accordingly,

APPX.456

the Rule would impose on Virginians the choice of ceasing statutorily protected activities or continuing prior conduct at the risk of civil and criminal enforcement.

As Mr. Van Cleave's declarations make clear, VCDL's membership is overwhelmingly concerned with the Rule, its presumptions, attendant uncertainty, and the risk of federal enforcement actions or prosecutions, as well as the compliance-related costs, expenses, and burdens of additional federal, state and local laws, regulations, and ordinances. ECF #1-4 ¶ 10. Based on these members' expressed concerns, many individual VCDL members and supporters clearly would appear to have standing to challenge the Rule. But these individual members and supporters need not do so, as VCDL serves as a vehicle for advancing their shared interests. *Id.* ¶ 16. Indeed, "[p]rotection of the rights and interests in this litigation is germane to VCDL's mission," which is to "advanc[e] the enumerated right to keep and bear arms as guaranteed by the Second Amendment to the U.S. Constitution and Article I, § 13 of the Virginia Constitution." *Id.*; *id.* ¶ 4. Accordingly, "VCDL is capable of fully and faithfully representing the interests of its members and supporters without participation by each of the individuals and entities." *Id.* ¶ 16.

Because VCDL has identified with specificity several members who are harmed by the Final Rule, VCDL has the requisite representational standing to pursue litigation on its members' and supporters' behalf.

Respectfully submitted,

Dated: May 31, 2024

> Brandon W. Barnett
> Texas Bar No. 24053088
> Barnett Howard & Williams PLLC
> 930 W. 1st St., Suite 202
> Fort Worth, Texas 76102
> 817-993-9249 (T)
> 817-697-4388 (F)
> E-mail: barnett@bhwlawfirm.com

5

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
NDTX#: 102784MS
MS Bar No. 102784
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
E-mail: stephen@sdslaw.us

John I. Harris III (TN # 12099)
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing

document or pleading to be filed with this Court's CM/ECF system, which caused a Notice of

Electronic Filing and copy of this document or pleading to be delivered to all counsel of record.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS, STATE OF            §
LOUISIANA, STATE OF MISSISSIPPI,    §
STATE OF UTAH, JEFFREY W.           §
TORMEY, GUN OWNERS OF               §
AMERICA, INC., GUN OWNERS           §          CIVIL ACTION NO. 2:24-CV-00089-Z
FOUNDATION, TENNESSEE               §
FIREARMS ASSOCIATION, and           §
VIRGINIA CITIZENS DEFENSE           §
LEAGUE,                             §
          *Plaintiffs*,             §
                                    §
v.                                  §
                                    §
BUREAU OF ALCOHOL, TOBACCO,         §
FIREARMS AND EXPLOSIVES,            §
UNITED STATES DEPARTMENT OF         §
JUSTICE, MERRICK GARLAND, in his    §
official capacity as Attorney General of the §
United States, *and* STEVEN M.      §
DETTELBACH, in his official capacity as §
Director of ATF,                    §
          *Defendants*.             §

---

SUPPLEMENTAL DECLARATION OF PHILIP VAN CLEAVE

---

1.   My name is Philip Van Cleave.  I am a U.S. citizen and resident of Virginia.  I make this supplemental declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief and pursuant to this Court's May 19, 2024 Order for supplemental briefing, ECF #45.  I make these statements in my capacity as the President of Virginia Citizens Defense League ("VCDL").  Unless otherwise stated, I make this declaration based on personal knowledge.  If called as a witness, I can testify to the truth of the statements contained herein.

2.   This Declaration is offered as a supplement to my prior Declaration, ECF #1-4.

1

3.   VCDL has been in contact with members and supporters who do not hold Federal Firearms Licenses ("FFLs") to deal in firearms.  These members and supporters fear Defendants' Rule will classify them as being presumptively "engaged in the business" of dealing in firearms and therefore subject to civil and criminal enforcement.

4.   For example, VCDL recently spoke to one member and supporter who maintains a private collection of firearms.  This individual regularly purchases firearms for personal, noncommercial use, primarily for self-defense.  This individual does not "study, compar[e], [or] exhibit[]" these firearms, nor do they collect them for "recreational activities for personal enjoyment."  FR at 29090.

5.   Rather, this individual sees it as their duty to maintain proficiency with firearms so that they may be able to defend their loved ones and community effectively, should the need for lawful self-defense ever arise at home or in public.

6.   In order to maintain such proficiency, this individual frequently purchases new firearm models to try new features or experiment with ergonomics.

7.   Sometimes, the features or ergonomics of these firearms do not live up to expectations, and this individual occasionally sells these firearms to recoup money or make room for a different firearm.

8.   To facilitate these occasional sales, this individual has posted flyers at their local range or ads on online forums in the past.  This individual wishes to employ the same methods for future sales.

9.   During these occasional sales, this individual recalls having mentioned their firearm purchasing habits to buyers.  Specifically, they have indicated that, if they did not find their next planned purchase to meet their needs, whether ergonomic or otherwise, they may be open to

2

selling that future firearm, too.  This individual wishes to be able to make similar representations in the future, as the case may be.

10. Finally, this individual maintains a spreadsheet to organize information about their firearm collection in one place.  While not the primary purpose of maintaining this spreadsheet, it contains data on firearm prices bought and sold.

11. Although this individual understands their collecting and occasional sale activity to constitute innocuous, noncommercial activity in furtherance of a private collection, they fear enforcement under numerous Rule provisions and have indicated that they will cease all private sales unless and until the Rule is enjoined.

12. First, the Rule expressly exempts from its definition of "personal collection" firearms "accumulated primarily for personal protection."  FR at 29090.  Thus, the Rule reads this individual's collecting activity right out of the statute's safe harbor.

13. Second, the Rule presumes an "intent to predominantly earn a profit" if this individual were to post occasional "for sale" ads, as they have in the past.  Indeed, this presumption applies whenever one "[r]epetitively or continuously advertises, markets, or otherwise promotes a firearms business (*e.g.*, **advertises or posts firearms for resale**, including through the internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), **regardless of whether the person incurs expenses** or only promotes the business informally."  FR at 29091 (emphases added).

14. Third, if, during a sale, this individual merely were to indicate future interest in selling a firearm they may not like, the Rule would presume them to be "engaged in the business" for "[r]esell[ing] or offer[ing] for resale firearms, and also represent[ing] to potential buyers or otherwise demonstrat[ing] a willingness and ability to purchase and resell additional firearms."

APPX.461

FR at 29091. Moreover, the Rule defines "resale" expansively to mean any "firearm, including a stolen firearm, after it was previously sold **by the original manufacturer or any other person**." FR at 29090 (emphasis added). Thus, merely selling a firearm which had, at some point, been sold by the original manufacturer (*i.e.*, every production firearm ever) would implicate every Rule provision contemplating 'resale.'

15. And fourth, the Rule presumes the individual to have an "intent to predominantly earn a profit" merely by maintaining a spreadsheet described above. *See* FR at 29091 ("Makes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale....").

16. VCDL spoke to another member and supporter who has expressed confusion regarding their obligations under the Rule and Virginia law. While the Rule purports to require licensure in numerous factual scenarios or else one is presumed to be "engaged in the business," Virginia does not require licensure unless one "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business **with the principal objective of livelihood and profit** through repetitive purchase or resale of firearms...." Va. Code § 54.1-4200 (emphasis added). Therefore, it is difficult to know whether Virginia law even would allow the state registration[1] of dealers seeking licensure pursuant to the Rule, which imposes a lower federal threshold.

I, Philip Van Cleave, declare under penalty of perjury that the foregoing is true and correct.

**DATE**

_(signature)_

**PHILIP VAN CLEAVE**

5/31/24

---
[1] https://vsp.virginia.gov/wp-content/uploads/2024/03/SP-69-Rev02-26-24A.pdf.

4

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

STATE OF TEXAS, STATE OF
LOUISIANA, STATE OF MISSISSIPPI,
STATE OF UTAH, JEFFREY W.
TORMEY, GUN OWNERS OF
AMERICA, INC., GUN OWNERS
FOUNDATION, TENNESSEE
FIREARMS ASSOCIATION, and
VIRGINIA CITIZENS DEFENSE
LEAGUE,

*Plaintiffs*,

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,
UNITED STATES DEPARTMENT OF
JUSTICE, MERRICK GARLAND, in his
official capacity as Attorney General of
the United States, and STEVEN M.
DETTELBACH, in his official capacity as
Director of ATF,

*Defendants*.

CIVIL ACTION NO. 2:24-CV-00089-Z

---

## PLAINTIFF LOUISIANA'S SUPPLEMENTAL BRIEFING IN SUPPORT OF STANDING

Pursuant to this Court's order, Louisiana submits the following briefing "explaining and evidencing" its "basis for standing." ECF No. 45.

## I.  Louisiana Has Standing.

To establish standing, Louisiana must show an (A) imminent injury (B) caused by the Defendants and (C) redressable by judicial relief. *See, e.g.*, *TransUnion LLC v.*

1

*Ramirez*, 594 U.S. 413, 423 (2021) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Louisiana readily satisfies each of these elements.

### A. Louisiana will suffer a classic "pocketbook injury" caused by the Final Rule and redressable by a favorable decision.

*First, an injury in fact.* Monetary harms are some of "[t]he most obvious" and "traditional tangible harms" that count as concrete injuries. *TransUnion LLC*, 594 U.S. at 425. Louisiana, much like Texas, stands to suffer a direct "pocketbook injury" from the Final Rule. *See* ECF 44 at 5 (citing *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) (describing a pocketbook injury as "a prototypical form of injury in fact")).

For standing purposes, record evidence of the exact amount of monetary harm is unnecessary. *See Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022). In this context, "a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017). Moreover, a future injury "may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Here, the Final Rule will prohibit otherwise eligible persons in Louisiana from obtaining a Federal Firearms License ("FFL"), thereby reducing the total gun sales— both at gun shows and online—and subsequently causing Louisiana to suffer a financial harm via lost sales tax revenue. *See* 89 Fed. Reg. 29,054 (contemplating 10% of currently unlicensed dealers leaving the market altogether).

2

APPX.464

Louisiana collects 4.45% sales tax on taxable items sold, including guns.[1] *See* La. R.S. 47:302, 321, 321.1, 331; La. R.S. 51:1286; Exhibit A, Declaration of Lucius L. Morris II, ¶ 12. The sales tax applies to items sold at fairs, festivals, and other special events—including gun shows. *See* La. R.S. 47:301(4)*;* Ex. A ¶ 12.[2] The sales tax also applies to the sale of tickets or admission fees to gun shows. *See* La. R.S. 47:301(14)(c); Ex. A ¶ 12. Currently, Louisiana has at least 45 gun shows calendared between now (June 2024) and the end of the year. *See* Ex. A ¶ 11.[3] Louisiana also collects a sales tax on internet sales of guns within the state. *See id.* ¶ 13. The upshot: Fewer gun sales in the state will result in less revenue from Louisiana's sales and use tax. *See* Ex. A ¶ 14.

*Second, causation.* The Final Rule is expected to reduce the number of people who sell firearms. The Final Rule confirms this expectation, as it acknowledges that its implementation will reduce gun sales. *See* 89 Fed. Reg. 29,054. To accomplish this goal, the Final Rule will force unlicensed sellers from the marketplace—both in person and online. *See* Ex. A ¶¶ 10, 12–13. Without the Final Rule, certain unlicensed

---

[1] Louisiana does have one weekend a year, normally Labor Day weekend, where the State's sales and use tax does not apply to firearms. *See* La. R.S. 47:305.62 (creating the Annual Louisiana Second Amendment Weekend Holiday Act).

[2] S*ee generally Fairs, Festivals, and Other Special Events*, LOUISIANA DEP'T OF REVENUE, available at https://revenue.louisiana.gov/FAQ/Categories/16 (last visited May 30, 2024).

[3] *See also Louisiana Gun Shows*, GUN SHOW TRADER, available at https://gunshowtrader.com/gunshows/louisiana-gun-shows/ (last visited May 30, 2024).

dealers would still be able to sell their goods at gun shows or via the internet. *See* Ex. A ¶¶ 12–13.

A decline in the number of unlicensed dealers at Louisiana's gun shows will inevitably result in less gun sales, and thus less tax revenue collected by Louisiana. *See* Ex. A ¶ 14. Put differently, Louisiana's economic injury is fairly traceable to the Final Rule. *See, e.g.*, *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 41 (1976); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Tex. v. Becerra*, 575 F. Supp. 3d 701, 714 (N.D. Tex. 2021) ("This causal link 'requires no more than *de facto causality*[.]'" (citation omitted)). Louisiana therefore has "a direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). Especially since any amount of monetary harm is sufficient to establish an injury. *See TransUnion LLC*, 594 U.S. at 425; *Collins*, 141 S. Ct. at 1779; *see also* ECF 44 at 5. The Final Rule, therefore, will directly cause Louisiana to suffer a classic pocketbook injury.

*Third, redressability.* Louisiana must demonstrate a "substantial likelihood that the requested relief will remedy the alleged injury." *Becerra*, 575 F. Supp. 3d at 714 (quoting *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 120 (2000) (internal marks omitted)). Here, Louisiana and the other Plaintiff States request injunctive relief to stop the implementation of the Final Rule. Enforcement of the Final Rule will lead to Louisiana's pocketbook injury—the loss of revenue from sales tax collected on guns sold within Louisiana.

APPX.466

Injunctive relief is necessary because economic injuries, such as those alleged by Louisiana, "cannot be recovered in the ordinary course of litigation." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023); *see also In re NTE Conn., LLC*, 26 F.4th 980, 990–91 (D.C. Cir. 2022) ("We have recognized that financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." (cleaned up)). Such is the case here. The Rule's effects on Louisiana's sales tax revenue are irreparable, as the economic loss is "unrecoverable because of the government-defendant's sovereign immunity from monetary damages[.]" *Natl. Rifle Assn. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 3:23-CV-1471-L, 2024 WL 1349307, at *9 (N.D. Tex. Mar. 29, 2024); *see also* Ex. A ¶ 15. Redressability is therefore satisfied because a grant of injunctive relief would stop the implementation of the Final Rule, thus preventing Louisiana's irreparable injury. *See Simon* v, 426 U.S. at 38 (1976) (Louisiana's pocketbook injury "is likely to be redressed by a favorable decision").

Because Louisiana has a concrete injury, caused by the Final Rule, and redressable by a favorable judicial decision, this Court should hold that Louisiana has demonstrated standing for the purposes of the requested temporary restraining order. *TransUnion LLC*, 594 U.S. at 423; *Lujan*, 504 U.S. at 560–61; ECF 45.

## B.   Texas Has Established Standing, So Louisiana Also Has Standing.

Although Louisiana independently meets the three requirements for standing, *supra* I.A, it is "well settled that once [courts] determine that at least one plaintiff

5

has standing, [courts] need not consider whether the remaining plaintiffs have standing to maintain the suit." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014); *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

This Court has already determined that Texas—a fellow Plaintiff State— "sufficiently demonstrated standing for the purposes of the requested temporary restraining order." ECF 44 at 5 (finding Texas adequately pleaded a cognizable "pocketbook injury" for loss of sales tax revenue from firearm sales at gun shows). Because Texas has shown standing, Louisiana and all plaintiffs in this matter should also have standing. *See McAllen Grace Brethren Church*, 764 F.3d at 471.

## CONCLUSION

For the aforementioned reasons, this Court should find that Louisiana has established standing and should be afforded the same relief previously granted to Texas. ECF No. 44 at 14.

6

Date: May 31, 2024

Respectfully submitted,

LIZ MURRILL
  ATTORNEY GENERAL OF LOUISIANA

*/s/ Kelsey L. Smith*

**GARRETT GREENE**
Special Counsel
Office of the Attorney General
  of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2100
garrett.greene@oag.texas.gov

KELSEY L. SMITH
  *Deputy Solicitor General*
Texas Bar No. 24117070

LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
(225) 428-7432
smithkel@ag.louisiana.gov
*Counsel for State of Louisiana*

COUNSEL FOR PLAINTIFF STATE OF
LOUISIANA

## CERTIFICATE OF SERVICE

    I certify that a true and accurate copy of this document was filed electronically

(via CM/ECF) on May 31, 2024.

*/s/ Kelsey L. Smith*
KELSEY L. SMITH

7

APPX.469

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS, STATE OF
LOUISIANA, STATE OF MISSISSIPPI,
STATE OF UTAH, JEFFREY W.
TORMEY, GUN OWNERS OF
AMERICA, INC., GUN OWNERS
FOUNDATION, TENNESSEE
FIREARMS ASSOCIATION, and
VIRGINIA CITIZENS DEFENSE
LEAGUE,

                 *Plaintiffs,*    CIVIL ACTION NO. 2:24-CV-00089-Z

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,
UNITED STATES DEPARTMENT OF
JUSTICE, MERRICK GARLAND, in his
official capacity as Attorney General of
the United States, and STEVEN M.
DETTELBACH, in his official capacity as
Director of ATF,

                 *Defendants.*

## DECLARATION OF LUCIUS L. MORRIS II

1.     I am Lucius L. Morris II. I am over the age of 18 and a U.S. citizen. I
make this Declaration supporting Plaintiffs' Motion for Stay and Preliminary
Injunction and Louisiana's Supplemental Briefing Regarding in Support of Standing.
I have personal knowledge of the facts contained in this Declaration unless otherwise
stated. I could competently testify as to the contents of this Declaration if called upon
to do so.

1

APPX.470

2.     I am duly appointed the Assistant Secretary for the Office of Legal Affairs with the Louisiana Department of Revenue ("LDR"), pursuant to La. R.S. 36:458(F), where I have worked for over 9 years. In this capacity, I am responsible for providing legal consultation and representation in tax litigation matters before the state and federal courts and the Board of Tax Appeals, bankruptcy cases in the federal bankruptcy courts, and any matters related thereto. I provide executive management of the LDR Litigation Division, External Reporting Division, and Tax Policy and Planning Division, which includes attorneys, analysts, and economists.

3.     The LDR is primarily tasked with collecting and enforcing the collection of all taxes, penalties, interest, and other charges that may be due under the provisions of Subtitle II of Title 47 of the Louisiana Revised Statutes of 1950, as amended, and to administer the legislative mandates contained therein. La. R.S. 47:1502.

4.     I am aware of the Final Rule at issue in this case and have reviewed it. I am also aware of the requirements for a federal firearms licensee and have reviewed them.

5.     The Final Rule states that its implementation will reduce gun sales and increase the number of federal firearms licensees. 89 Fed. Reg. at 28,968, 29,054.

6.     The Final Rule's definition for what it means to be engaged in the business as a "dealer" in firearms creates uncertainty regarding lawful conduct provided by statute and what conduct is prohibited under the Final Rule for a broad swath of business activities occurring within specific business channels. The business

2

APPX.471

activities included in the Final Rule relate to the sale, purchase, and trading of firearms conducted anywhere—such as a gun show or event, flea market, auction house, gun range or club, a person's home—or through any medium, such as by mail order, via the Internet as an online broker or auction, through other electronic means, or any other domestic or international public or private premises. 89 Fed. Reg. at 29,090.

7.      The Final Rule states that a determination of whether a person is engaged in the business as a dealer in firearms is a "fact-specific inquiry." 89 Fed. Reg. at 29,091. The Final Rule adds presumptions that a person is engaged in the business as a dealer and to a person's intent to "predominantly earn a profit." 89 Fed. Reg. at 29,091. The Final Rule states that "even a single firearm transaction or offer to engage in a transaction" "may require a federal firearms license." 89 Fed. Reg. at 29,091. Therefore, under the Final Rule, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. 89 Fed. Reg. at 29,091. Additionally, no actual sales are required to establish that a person is engaged in the repetitive purchase and resale of firearms. 89 Fed. Reg. at 29,021. Determining whether a person is engaged in the business of dealing in firearms is based on the "totality of the circumstances." 89 Fed. Reg. at 29,091.

8.      To a significant number of persons who are not a Federal Firearms Licensee (FFL) and currently lawfully buy, sell, or trade firearms in transactions through one or more of the business activities identified in paragraph 6, the threat of potentially being subject to civil, administrative and possibly criminal penalties

3

APPX.472

under the ATF's interpretations and enforcement actions under the Final Rule, and the burdensome obligations FFL assumed to avoid the potential enforcement risk, will make them less likely to buy, sell, or trade firearms should the Final Rule become effective.

9.　Based on the information available to the ATF, the Final Rule is expected to decrease the sale of firearms by unlicensed vendors and persons by 10%. 89 Fed. Reg. 29,054.

10.　Louisiana's sales and use tax revenue may decrease by a higher percentage given the perceived risks of engaging in such firearm transactions under the Final Rule without being an FFL, given the breadth of the definition of a "dealer" and the business activities covered by the Rule. This is based on the expectation that there will be a 10% or greater decrease in the number of lawful vendors and persons who will purchase, sell, and trade firearms at gun shows, events, and over the Internet due to the risk of an adverse ATF action under the Final Rule. The reduction in lawful non-FFL sales of firearms at a gun show, event, or online will make it less likely for gun enthusiasts, collectors, sportsmen, hunters, and other firearm customers to attend a gun show, event, or log online to purchase, sell, or trade their firearms legally. Over time, the ATF's enforcement actions of the Final Rule may cause a further reduction in public interest and consumer activity at gun shows, events, and sales, purchases, or trades over the Internet. The impact of such reductions in public interest and consumer activity could further reduce the number of persons who purchase, sell, or trade firearms through any other above-described

4

business activities in paragraph 6. The reduction in public interest and consumer activity may also cause fewer overall taxable transactions for other goods or services being sold at the gun show, event, or online due to the reduced consumer traffic should the Final Rule go into effect.

11.     Over 45 Louisiana gun shows and events are scheduled for the remainder of 2024.[1] Gun show and event promoters provide the opportunity for persons to purchase, sell, or trade firearms, including commemorative firearms, historic firearms, sporting firearms, hunting firearms, and self-protection firearms, to customers, including firearm collectors, enthusiasts, sportsmen, hunters, and other customers. These customers are able to meet their different individual needs by purchasing, selling, or trading firearms with individuals or persons who are not FFLs engaged in the business of dealing in firearms as provided by statute.

12.     Gun show promoters (organizers) are considered "dealers" as provided by La. R.S. 47:301(4), and as such, must collect and remit the State's sales and use tax on their sales and trades, as well as sales and trades made by individuals, sellers, or salespersons at these events who do not have a sales tax exemption certificate for sales for resale pursuant to La. R.S. 47:13(B). Gun show promoters and vendors collect and remit 4.45% state sales tax to the State of Louisiana for all sales at retail acquired from the sale or trade of a firearm. La. R.S. 47:302, 321, 321.1, 331; La. R.S.

---

[1]     *See Louisiana Gun Shows*, GUN SHOW TRADER, available at https://gunshowtrader.com/gunshows/louisiana-gun-shows/ (last visited May 29, 2024); *Current Louisiana Gun Show Date*, GUN SHOW TIMES, available at https://www.gunshowtimes.com/states/louisiana/dates (last visited May 29, 2024).

APPX.474

51:1286.[2] Gun shows also collect and remit 4.45% state sales tax to the State of Louisiana on the taxable service of parking and other taxable sales of tangible personal property sold at the gun show venue. La. R.S. 47:301(14)(c).

13.     The collection of the 4.45% sales tax on Internet sales, purchases, and trades of firearms is performed by the Louisiana Sales and Use Tax Commission for Remote Sellers as the designated single collector on behalf of LDR and local sales tax collectors. Many websites allow lawful sales of firearms by persons who are not required to be an FFL. The Final Rule will likely reduce the number of persons who sell on those website, thus causing a decrease in Louisiana's sales tax revenue from such sales. The Final Rule also does not include the additional loss over overall sales tax revenue that may be caused by the loss of sales of related taxable tangible personal property or services that could have been generated from a higher consumer activity or traffic on the website.

14.     Thus, the Final Rule's induced and intended 10% reduction in firearm sales, combined with the probable and related reduction of other taxable vendor and consumer activities (i.e. fewer ticket sales, attendance, and traffic at gun shows), will cause the State of Louisiana to experience a loss of State sales and use tax revenue.

---

[2] *See also Fairs, Festivals, and Other Special Events FAQs*, LOUISIANA DEP'T OF REVENUE, available at https://revenue.louisiana.gov/FAQ/Categories/16 (last visited May 29, 2024) (discussing FAQs regarding state sales tax for events like gun shows).

APPX.475

15.     The remedy of damages against the United States is unavailable to the

State of Louisiana, so the Final Rules' effect on the lost State sales and use tax is

unrecoverable.

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE
UNITED STATES OF AMERICA AND THE STATE OF LOUISIANA THAT
THE FOREGOING IS TRUE AND CORRECT. 28 U.S.C. § 1746.**

Sworn and subscribed this 31 st day of May, 2024, in Baton Rouge, Louisiana.

LUCIUS L. MORRIS II

7

APPX.476

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.* | § | |
| *Plaintiffs,* | § | |
| v. | § | |
| | § | |
| BUREAU OF ALCOHOL, TOBACCO, | § | CIVIL ACTION NO.2:24-CV-00089-Z |
| FIREARMS AND EXPLOSIVES, *et al.* | § | |
| *Defendants.* | § | |

**PLAINTIFF TEXAS' SUPPLEMENTAL BRIEFING IN SUPPORT OF STANDING**

Pursuant to this Court's order, ECF No. 45, Texas submits the following briefing "explaining and evidencing" its "basis for standing." *Id.*

**A.  Texas Has Standing.**

Article III standing requires an injury in fact that is traceable to the defendant's conduct and redressable with a court order. *See, e.g., TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Texas satisfies each element.

**I.      Texas will suffer direct economic harm if the Final Rule goes into effect because the State will lose tax revenue.**

Monetary harm "obvious[ly]" qualifies as injury that confers standing. *TransUnion LLC*, 594 U.S. at 425. Texas stands to suffer direct harm to its State fisc from the Final Rule in the form of a pocketbook injury—"a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). For standing purposes, the exact cost is irrelevant. *See Texas v. United States* (DAPA), 809 F.3d 134, 155 (5th Cir. 2015). Indeed, the Court has made clear that even "a single dollar" of harm is enough. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021). A future injury "may suffice if the

1

threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

The Final Rule is expected to reduce the number of people who buy and sell firearms, period. The Final Rule estimates that its implementation will reduce gun sales. *See* 89 Fed. Reg. 29,054 (contemplating 10% of currently unlicensed dealers leaving the market altogether). Between the weekend of this filing and the end of July 2024 alone, Texas has 58 gun shows calendared.[1] Texas collects 6.25 percent state tax on taxable items sold—including guns sold at gun shows.[2] Unlicensed dealers exiting the market will inevitably result in less gun sales, and thus less tax revenue collected by the state. *See generally* ECF No. 37–1. This is not speculative. The effects of the Final Rule are being realized by gun show promoters witnessing a significant drop in gun show attendance, vendor participation, and the overall willingness of private individuals to buy, sell, and trade firearms. *See* Declaration of Darwin Doebeker ¶¶17–21 ("Ex. A"). Gun clubs expect a similar decline in sales from both licensed and unlicensed sellers of firearms. *See* Declaration of Robyn M. Sandoval ¶¶11–14, 17 ("Ex. B"). Naturally, this decline in consumer traffic and activity will lead to a reduction in taxable transactions between vendors and consumers, reducing sales and use tax revenue for the State of Texas. Ex. A ¶22; Ex. B¶¶ 15, 18; Declaration of Murl E. Miller (May 31, 2024) ("Ex. C") ¶¶14–15. This decline in consumer traffic and activity also leads to a loss of additional state and local tax revenues, including motor fuels taxes, entertainment taxes, alcoholic beverage taxes, and hotel taxes, because of the decreased consumption of these taxable goods and services by promoters, vendors, and attendees. Ex. C¶ 14–15. But this is no surprise. Rather, the

---

[1] https://gunshowtrader.com/gunshows/texas-gun-shows/.
[2] https://comptroller.texas.gov/taxes/publications/96-211.php#:~:text=You%20must%20collect%20sales%20or,tax%20on%20your%20taxable%20sales.

APPX.478

ATF admitted this was the expected effect of the Final Rule. 89 Fed. Reg. at 29,054 (10% of unlicensed sellers likely to be either "unwilling or *unable* to become licensed as an FFL as a result of the [R]ule") (emphasis added).

Now, Defendants argue that the "10%" figure cited in the rule is actually "2.5%."

> [W]hat the ATF actually explained was, in using subject matter experts, there's a universe of unlicensed sellers currently selling firearms. And ATF estimated only 25 percent of that universe would actually be impacted by the rule, i.e., unlicensed sellers who might be engaged in the business under the rule. And of that 25 percent subset, 10 percent of that group of people would then, according to ATF's estimates, ***leave the market for firearms***. So it's 10 percent of a 20 percent figure, so 2.5 percent, a much smaller figure than what Texas cites.

TRO Hearing Tr. (5/16/2024) 32:24–33:8 (emphasis added).

But this argument centers on the *extent* of the harm, not the harm itself. Whether the number of unlicensed sellers leaving the marketplace is 90%,[3] 10%, or 2.5%, there is no minimum amount of tax revenue that must be lost by Texas before it is considered an economic injury sufficient to confer standing. *See Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 600 (5th Cir. 2023) ("Stringently insisting on a precise dollar figure reflects an exactitude our law does not require."); *see also Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("a few pennies" is enough). In fact, by arguing the *extent* of the harm, Defendants concede that there will be at least *some* harm to Texas. In other words, it is "certainly impending," *Susan B. Anthony List*, 573 U.S. at 158, that people *will* "leave the market for firearms." TRO Hearing Tr. (5/16/2024) 33:6; *see also* Ex. A¶¶10–15, 17–21; Ex. B¶¶8–13, 17, 19–20; Ex. C¶ 15.

---

[3] *See* Ex. A ¶16 ("My experience leads me to believe that this 10% estimate is conservative, and sales could decrease by an even greater percentage.").

Aside from ATF's admissions, this certainty is also borne out in the declaration of Darwin Boedeker—a gun show promoter and avid gun show attendee who does not currently possess an FFL. Ex. A ¶23. He states that be believes the Final Rule's estimate of 10% to be conservative, and that gun sales could decrease by an even greater percentage. *Id*. ¶16; *see also* Ex. B ¶16. Mr. Boedeker, like many others, has bought and sold guns at gun shows but now states that he will no longer buy or sell guns at gun shows because of the Final Rule—either because of the financial burden of obtaining an FFL, the threat of criminal prosecution, or both. Ex. A ¶24–26. That even *one* person refuses to buy or sell *one* gun at *one* gun show because of the Final Rule—depriving Texas of the 6.25% sales tax that would normally be collected on that transaction—is enough to give Texas standing. *See Uzuegbunam*, 592 U.S. at 291.

## II. The injury to Texas is "fairly" traceable to the Final Rule and a favorable judgment from this Court will "likely" redress the harm.

A plaintiff's injury must be "fairly" traceable to the defendant, and it must be "likely" redressable by the relief that the plaintiff seeks. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). When it comes to the "inherently imprecise" task of discerning traceability, "common sense" and "basic economics" are "useful tool[s]." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (Kavanaugh, J.). But for the Final Rule taking effect, Texas would not suffer a loss to its State fisc because unlicensed sellers and other potential purchasers of firearms would not be forced from the marketplace. *See* Ex. A ¶¶18–19, 21–22, 26; Ex. B ¶¶ 8–13, 17, 19–20. *See generally* Ex. C.

*United States v. Texas*, 599 U.S. 670 (2023), does not affect the analysis of Texas' standing here. There, Texas and Louisiana challenged an immigration policy that prioritized which aliens were to be arrested and removed from the country. *Texas*, 599 U.S. at 673. Texas and Louisiana claimed

4

that the Department of Homeland Security's Guidelines violated "federal statutes that purportedly require[d] [DHS] to arrest *more* criminal noncitizens pending their removal." *Id.* at 673–74. The states asserted that "they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Texas*, 599 U.S. at 674. The Court ultimately held that Texas and Louisiana lacked standing to sue. *Texas*, 599 U.S. at 681. In a footnote, the Court noted that "when a State asserts" that a federal law has produced only "indirect effects on state revenues" the "State's claim for standing can become more attenuated." *Texas*, 599 U.S. at 680 n.3.

Despite the footnote, *Texas* turned mostly on the conclusion that "federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions." *Id.* at 680. In fact, the Court stressed that the decision was "narrow and simply maintains the longstanding jurisprudential status quo." *Texas*, 599 U.S. at 686. Standing was improper in the case because of "both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 684; *see also id.* at 677 ("The States have not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions. On the contrary, this Court has previously ruled that a plaintiff lacks standing to bring such a suit."). Yet far from the "highly unusual" lawsuit at issue in that case—here, Texas alleges a "prototypical" pocketbook injury that "obvious[ly]" qualifies as an injury that confers standing. *Collins*, 141 S. Ct. at 1779; *TransUnion LLC*, 594 U.S. at 425.

What's more, nothing in *Texas* holds that indirect effects on a State's fisc can never establish standing. The most it offered was that "the State's claim for standing *can* become more

5

attenuated." *Texas*, 599 U.S. at 680 n.3 (emphasis added). It primarily cited two cases to make this point. In the first, a State challenged the United States' participation in a war. *Com. of Massachusetts v. Laird*, 400 U.S. 886, 890 (1970) (Douglas, J., dissenting).[4] In the second, a State's financial injury was based on "pur[e] speculat[ion]" that a challenged law would "induc[e] potential taxpayers to withdraw property from the state, thereby diminishing the subjects upon which the state power of taxation may operate." *State of Fla. v. Mellon*, 273 U.S. 12, 17–18 (1927).

That is not the case here. Rather than asserting some speculative downstream harm from the loss of general tax revenue, Texas alleges a "direct injury in the form of a loss of *specific tax revenues*." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992);[5] Ex. C ¶¶ 14–15 (sales and use tax), (motor fuels tax), (entertainment tax), (alcoholic beverages tax), (hotel tax).

In fact, the Supreme Court recently blessed some States' claims for standing under a far more tenuous threat of pocketbook harm. In *Department of Commerce v. New York*, a question arose about whether States had standing to sue the federal government over a question about citizenship status on the census because (1) "*some*" noncitizens might choose not to respond to the census questionnaire in light of the question and (2) "*if* noncitizen households are undercounted by as

---

[4] It is difficult to draw many conclusions from *Laird*, as it involved a summary denial of a State's motion for leave to file a complaint. Additionally, Justice Douglas's dissent does not seem to address state standing in terms of direct economic injury. Rather, it considered standing from the perspective of the State acting as parens patriae, 400 U.S. at 887–91—a theory of standing Texas does not assert here.

[5] In *Wyoming*, the Court distinguished cases where States challenge actions that allegedly injure their "economy," which, in turn, "cause[] a decline in *general* tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (emphasis added). That describes *Florida v. Mellon*. Florida speculated that a federal inheritance tax would prompt taxpayers to take independent action—"withdraw[ing] property from the state"—which might result in less overall property to tax. *Mellon*, 273 U.S. at 17–18. Such an "indirect" effect on Florida's general tax revenues did not establish standing. *Id.* at 18. Here, however, Texas asserts the loss of a specific tax revenues that will be caused by implementation of the Final Rule.

6

*little as 2%* . . . [the States] will lose out on federal funds that are distributed on the basis of state population." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2563, 2565 (2019) (emphasis added). The Supreme Court held that plaintiffs had standing to challenge the reinstatement of a citizenship question on the decennial census because there was a "sufficient likelihood" that reinstating the question "would result in noncitizen households responding to the census at lower rates than other groups, which in turn would cause them to be undercounted and lead to many of [plaintiffs'] asserted injuries." 139 S. Ct. at 2565. The Court rejected the federal government's argument that this theory of harm was too attenuated for standing because it ultimately depended on the voluntary actions of third parties-the noncitizen households. *Id.* at 2566. Rather, the Court held that plaintiffs had shown that these third parties "will likely react in predictable ways to the citizenship question" based on their "historically" lower response rates. *Id.* This was not "mere speculation." *Id.* It was a reasonable assessment based on "predictable effect of Government action." *Id.*

So too here, Texas stands to suffer direct pocketbook injury because of the entirely "predictable [and admitted] effect," *id.* at 2566, the Final Rule will have on unlicensed sellers at gun shows and individuals who are in the market of buying firearms. *See* 89 Fed. Reg. 29,054; Ex. A ¶¶ 10–15, 17–21,24–26; Ex. B ¶¶8–13, 17, 19–20; Ex. C ¶¶10–15;*see also Texas v. Becerra*, 577 F. Supp. 3d 527, 560 (N.D. Tex. 2021) ("That the plaintiffs have brought forth specific evidence and examples of how they *will* be harmed . . . distinguishes this case from others where a third party's actions *might* have hurt the plaintiff.") (emphasis added).

Finally, because Texas challenges government action, "[c]ausation and redressability typically overlap as two sides of a causation coin." *El Paso Cnty. v. Trump*, 408 F. Supp. 3d 840, 852 (W.D. Tex. 2019) (citation omitted). So in the same way Texas' pocketbook injury is "fairly traceable" to

APPX.483

the implementation of the Final Rule, Texas has shown that its injury is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. 330. "After all, if a government action causes an injury, enjoining the action usually will redress that injury." *El Paso Cnty. v. Trump*, 408 F. Supp. 3d 840, 852 (W.D. Tex. 2019) (citation omitted). That is true here. The harm to Texas' State fisc through the loss of tax revenue stems directly from the ATF's pending enforcement of the federal firearms statutes as "clarified" by the illegal Final Rule. Ex. A ¶18–19, 21–22. In other words, all the economic harm to Texas will be prevented—and thus remedied, by a postponement—and ultimately a vacatur, of the Final Rule. 5 U.S.C. § 705; § 706.

## B. Since Texas has Standing, all Plaintiffs Have Standing. And Relief Afforded Under 5 U.S.C. § 705 Should not be Limited to the Parties.

Because Texas has shown standing, all plaintiffs have standing. *See McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once [courts] determine that at least one plaintiff has standing, [courts] need not consider whether the remaining plaintiffs have standing to maintain the suit."). And relief afforded to the plaintiffs should not be limited to the parties before this Court. *See* ECF No. 37 at 22–24. The specific relief afforded under § 705 means that relief granted to one plaintiff necessarily applies to everyone because it stops the challenged rule from taking effect. *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("Nothing in the text of [§]705. . . suggests that either preliminary or ultimate relief under the APA" must be "party-restricted"). Even states where the Final Rule is in effect should be included in this relief, since "[c]ourts — including the Supreme Court—routinely stay already-effective agency action under Section 705." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D.

8

Tex. 2022), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023) (collecting cases).

## CONCLUSION

For these reasons, this Court should continue to find, ECF No. 44 at 5, that Texas has established standing—especially at this stage of the litigation. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) ("At the preliminary injunction stage, the movant must clearly show *only* that each element of standing is *likely* to obtain in the case at hand.") (emphasis added); *cf. Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors). Beyond that, this Court should grant preliminary relief to all parties—even if they are not before this Court—by postponing the effective date of the Final Rule under §705.

Date: May 31, 2024                          Respectfully submitted.

**KEN PAXTON**                              */s/Garrrett Greene*
Attorney General                           **GARRETT GREENE**
                                            Special Counsel
                                            Texas Bar No. 24096217
**BRENT WEBSTER**
First Assistant Attorney General

                                            **KATHLEEN T. HUNKER**
**RALPH MOLINA**                            Special Counsel
Deputy Attorney General for Legal Strategy  Texas Bar No. 24118415

**RYAN D. WALTERS**                         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Chief, Special Litigation Division          Special Litigation Division
                                            P.O. Box 12548, Capitol Station
                                            Austin, Texas 78711-2548
                                            Tel.: (512) 463-2100
                                            garrett.greene@oag.texas.gov
                                            kathleen.hunker@oag.texas.gov

                                            **COUNSEL FOR PLAINTIFF STATE OF TEXAS**

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of this document was filed electronically (via CM/ECF)

on May 31, 2024.

                          */s/Garrrett Greene*
                          **GARRETT GREENE**

10

APPX.486

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, et al. | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 2:24-CV-00089-Z** |
| | § | |
| BUREAU OF ALCOHOL, TOBACCO, | § | |
| FIREARMS AND EXPLOSIVES, et al., | § | |
| *Defendants.* | § | |

**DECLARATION OF DARWIN BOEDEKER**

I, Darwin Boedeker, declare as follows:

1. I am Darwin Boedeker, I am over the age of 18, and I have personal knowledge of the facts contained in this Declaration. I could competently testify as to the contents of this declaration if called upon to do so.

2. I am a law-abiding person, eligible to possess firearms under state and federal law.

3. I am the owner of Texas Gun Shows ("TGS"). I have owned and operated TGS for twenty-three years.

4. I have built TGS from eight tables at our debut to 800 tables at our Rosenburg, Texas location.

5. As a gun show promoter, I organize about 34 shows a year in 13 locations. I am the only remaining gun show in San Antonio.

6. Presently, I have a gun show scheduled the weekend of May 31–June 2, 2024.

7. I am aware of and have reviewed the Final Rule which redefines what qualifies as "Engaged in the Business" as a Dealer in Firearms ("Final Rule") that is at issue in this case.

8. In my experience of organizing about 34 gun shows a year, I am aware of the impact the Final Rule will have on gun shows overall.

9.  Typically, some vendors at gun shows have federal firearms licenses to be in the business of selling firearms and require all buyers to complete a federal background check before completing a transaction. Other vendors are private sellers, not in active business, but who may be selling firearms from a personal collection or trading firearms as a hobby.  Such private sales have always been legal and allowed until the Final Rule. With a change in administrative rules and definitions, the new regulation could make it a federal crime for private sellers to sell even one firearm.

10. Recently, I have experienced a 30% loss in reservations and attendance at my gun shows. People are confused about what they can and cannot do anymore because of the Final Rule.

11. Previously, approximately 500–750 personally owned guns were brought to each show by individuals looking to sell them.

12. Recently, at a show in Denton, Texas, only fewer than 100 people brought personally owned guns to sell. I estimate a loss of about $40,000 from that show alone.

13. Attendance at my gun shows has significantly decreased. The last show in Denton, Texas, had about 1,115 attendees, down from approximately 3,000.

14. This reduction in attendance, sales of tables, and people coming to sell personal firearms has resulted in a loss of about $150,000 over the last six weeks.

15. The door fee for the gun show is typically $15 or $20, and the reduced attendance significantly impacts revenue.

16. Based on the information available, it is my understanding that the Final Rule is expected to decrease the sale of unlicensed firearms dealers by 10%. 89 Fed. Reg. 29054. My experience leads me to believe that this 10% estimate is conservative, and sales could decrease by an even greater percentage.

17. For example, I have experienced the following direct impacts on TGS from the Final Rule:

    a.   Attendance is down 30%;

    b.   Vendor participation has decreased by 25%;

    c.   The number of firearms coming in the front door to sell has decreased by 75%;

    d.   There is an overall decrease in the buy, sell, and trade mood—which is a direct motivator for purchasing and leads to a better bottom line for participating vendors.

18.  The uncertainties and looming criminal liabilities created by the Final Rule are hurting my ability to bring in enough vendors to cover the costs associated with putting on my gun shows.

19.  Private sellers of firearms at gun shows are unwilling to risk prison time to pursue their hobby or sell firearms from personal collections.

20.  The decrease in vendor participation could, and will likely lead to, a cancellation of future gun shows.

21.  The reduction in the number of lawful vendors and persons who normally purchase, sell, and trade firearms at gun shows is directly attributable to the threat of enforcement actions of ATF through the Final Rule.

22.  Thus, naturally, the Final Rule's induced and intended 10% reduction in firearms sales and the continued loss of related taxable vendor and consumer transactional activities due to the loss of consumer traffic and activity will cause the State of Texas to experience a loss of State sales and use tax revenue.

23.  I attend approximately 34 gun shows in Texas a year. At those guns shows, I have bought and sold firearms for my personal collection. I am not a federal firearms licensee.

24.  I am aware of the requirements of a federal firearms licensee, and they are burdensome for someone who sells firearms as a hobby or to enhance a personal collection.

25.  I am also aware that violating the Final Rule could subject me to civil, administrative, and

criminal penalties.

26. Given the vague and uncertain nature of the Final Rule, the burdens of obtaining an FFL, and the threat of civil, administrative, and criminal penalties, I have passed on—and will continue to pass on—opportunities to buy and sell guns at the gun shows I attend out of fear of prosecution.

27. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of Texas that the foregoing is true and correct.

Executed in San Antonio, Texas on this the 30th day of May 2024.

_____
Darwin Boedeker

APPX.490

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

### AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, *Plaintiffs,* | § § § § § § § § § § § | |
| | § | CIVIL ACTION NO. 2:24-CV-89-Z |
| v. | § § | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, and STEVEN M. DETTELBACH, in his official capacity as Director of ATF, *Defendants.* | § § § § § § § § § § | |

## DECLARATION OF MURL E. MILLER

I, Murl E. Miller, declare as follows:

1. I am Murl E. Miller. I am over the age of 18 and a U.S. citizen. I make this Declaration supporting Plaintiffs' Original Petition and Motion for Stay and Permanent Injunction. I have personal knowledge of the facts contained in this Declaration unless otherwise stated. I could competently testify as to the contents of this Declaration if called upon to do so.

2. I am Chief Counsel at the office of the Texas Comptroller of Public Accounts (CPA), where I have worked for over 14 years. My role with the CPA includes tax policy, tax litigation, and general litigation. I work with numerous divisions within the CPA, with personnel that include attorneys, analysts, accountants, auditors, and economists.

Declaration of Murl E. Miller - Texas

APPX.491

3. The CPA is primarily tasked with collecting all state tax revenue and estimating the tax revenue available to the Texas Legislature for appropriation.

4. I am aware of the Final Rule at issue in this case and have reviewed it. I am also aware of the requirements for a federal firearms licensee and have reviewed them.

5. The Final Rule states that its implementation will reduce gun sales and increase the number of federal firearms licensees. 89 Fed. Reg. at 29,898, 29,054.

6. The Final Rule's definition to determine what it means to be engaged in the business as a "dealer" in firearms creates uncertainty regarding lawful conduct provided by statute and what conduct is prohibited under the Final Rule for a broad swath of business activities occurring within specific business channels. The business activities included in the Final Rule relate to the sale, purchase, and trading of firearms conducted wherever or through whatever medium, such as a gun show or event, flea market, auction house, or gun range or club, at one's home; by mail order; over the Internet as an online broker or auction; through the use of other electronic means; or any other domestic or international public or private premises. 89 Fed. Reg. at 29,090.

7. The Final Rule states that a determination of whether a person is engaged in the business as a dealer in firearms is a "fact-specific inquiry." 89 Fed. Reg. at 29,091. The Final Rule adds presumptions that a person is engaged in the business as a dealer and to a person's intent to "predominantly earn a profit." 89 Fed. Reg. at 29,091. The Final Rule states that "even a single firearm transaction or offer to engage in a transaction" may require a federal firearms license." 89 Fed. Reg. at 29,091. Therefore, under the Final Rule, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. 89 Fed. Reg. at 29,091. Additionally, no actual sales are required to establish that a person is engaged in the repetitive purchase and resale of firearms. 89 Fed. Reg. at 29,021. Determining whether a person is engaged in the business of dealing in firearms is based on the "totality of the circumstances." 89 Fed. Reg. at 29,091.

8. To a significant number of persons who are not a Federal Firearms Licensee (FFL) and currently lawfully buy, sell, or trade firearms in transactions through one or more of the business activities identified in paragraph 3, the threat of potentially being subject to civil, administrative and possibly criminal penalties under the ATF's interpretations and enforcement actions under the Final Rule, and the burdensome obligations FFL assumed to avoid the potential enforcement risk, will be less likely to buy, sell, or trade firearms should the Final Rule become effective.

9. Based on the information available to the ATF, the Final Rule is expected to decrease the sale of firearms by unlicensed vendors and persons by 10%. 89 Fed. Reg. 29,054.

Declaration of Murl E. Miller - Texas

10. At my request, the analyst who reviewed the Final Rule reported that the ATF's estimate of decreased firearms sales by unlicensed vendors and persons by 10% is conservative. Sales and thus State sales and use tax may decrease by a higher percentage given the perceived risks of engaging in such firearm transactions under the Final Rule without being an FFL, given the breadth of the definition of a "dealer" and the business activities covered by the Rule. This is based on the expectation that there will be a 10% or greater decrease in the number of lawful vendors and persons who will purchase, sell, and trade firearms at gun shows, events, and over the Internet due to the risk of an adverse ATF action under the Final Rule. The reduction in lawful non-FFL sales of firearms at a gun show, event, or online will make it less likely for gun enthusiasts, collectors, sportsmen, hunters, and other firearm customers to attend a gun show, event, or log online to purchase, sell, or trade their firearms legally. Over time, the ATF's enforcement actions of the Final Rule may cause a further reduction in public interest and consumer activity at gun shows, events, and sales, purchases, or trades over the Internet. The impact of such reductions in public interest and consumer activity could further reduce the number of persons who purchase, sell, or trade firearms through any other above-described business activities in paragraph 3. The reduction in public interest and consumer activity may also cause fewer overall taxable transactions for other goods or services being sold at the gun show, event, or online due to the reduced consumer traffic should the Final Rule go into effect.

11. Over 260 Texas gun shows and events are scheduled for 2024[1]. Two of the seven largest gun shows in the United States scheduled to be held in 2024 will occur in Texas[2]. Gun show and event promoters provide the opportunity for persons to purchase, sell, or trade firearms that include commemorative firearms, historic firearms, sporting firearms, hunting firearms, and self-protection firearms to customers that include firearm collectors, enthusiasts, sportsmen, hunters, and other customers to meet their different individual needs from individuals or persons who are not FFLs engaged in the business of dealing in firearms as provided by statute.

12. Gun show promoters (organizers) are considered sellers, and they must collect, report, and remit the sales and use tax on their sales and trades, as well as sales and trades made by individuals, dealers, or salespersons at these events who do not have an active Texas Sales and Use Tax Permit and whose sales do not qualify for a tax exemption. Tex. Tax Code §§ 151.0242, 151.409, 151.410. Gun show promoters and vendors collect, report, and pay 6.25% state sales and use tax to the State of Texas and up to 2% local sales and use tax for all taxable proceeds acquired from the sale or trade of a firearm. Tex. Tax Code § 151.051. Gun shows also collect, report, and pay 6.25% state sales and use tax to the State of Texas

---

[1] https://www.gunshowtimes.com/states/texas/current-tx-dates ; https://carry-texas.com/texas-gun-shows ; https://carry-texas.com/texas-gun-shows

[2] The Original Fort Worth Gun Show in Fort Worth, Texas is ranked the 4th largest gun show to be held in the United States during 2024. The NRA Annual Meeting and Exhibits in Dallas, Texas is ranked as the 7th largest gun show to be held in the United States during 2024.

and up to 2% local sales and use tax on attendance fees, parking, and other taxable sales of tangible personal property sold at the gun show venue. Id.

13. Texas also collects 6.25% state sales and use tax and up to 2% of local sales and use tax on Internet sales, purchases, and trades of firearms within the state. Tex. Tax Code § 151.051. Many websites allow lawful sales of firearms by persons who, by statute, are not required to be an FFL. The Final Rule will likely reduce the number of persons who sell on those websites, and the ATF estimates that 10% of unlicensed dealers will leave the market altogether because of the rule supports the loss of such State sales and use tax revenues. 89 Fed. Reg. at 29,898. The Final Rule does not include the additional loss of overall sales tax revenue that may be caused by the loss of sales of related taxable goods or services that could have been generated from the higher consumer activity or customer traffic on the website.

14. The State of Texas considers gun shows to be a form of trade show event. Gun shows generally attract attendees from outside the Texas community hosting the event, and the shows are often attended by individuals from out of state. Some of these attendees will participate in multiple days of a gun show. The larger the gun show, there will generally be a corresponding increase in vendors from outside the Texas community paying the gun show promoter for authorization to set up a booth or operate from a table to sell their goods and services at the show. These vendors will also purchase taxable parking from the vendor. Some gun show promoters do not live in the Texas community hosting the event, and some gun show promoters live out of state and travel to Texas to host the gun show in Texas communities. These attendees, vendors, and promoters may pay 20 cents per gallon motor fuels tax to the State of Texas. These attendees, vendors, and promotors may pay 6.25% food and beverage tax to the State of Texas and up to 2% local tax. These attendees, vendors, and promotors may pay 6.25% entertainment tax to the State of Texas and up to 2% local tax. These attendees, vendors, and promoters may pay a state sales and use tax of 6.25% and up to 2% to local tax on all alcohol purchased for consumption off-premises. If the attendees, vendors, and promotors buying alcohol to be consumed on-premise, there is a 14.95% state tax. All alcoholic drinks purchased on an airline in Texas are taxed an additional 5 cents per drink. These attendees, vendors, and promotors may pay a 6 % state hotel tax, which applies to any room or space in a hotel, including meeting and banquet rooms. Local hotel taxes, however, are due only on those rooms ordinarily used for sleeping and can vary, depending upon the jurisdiction, from 7% to up to 11%.

15. Thus, the Final Rule's induced and intended 10% reduction in firearm sales and the likely loss of related taxable onsite promotor, vendor, and consumer transactional activities due to the loss of consumer traffic and activity will cause the State of Texas and local governments to experience a loss of State and local sales and use tax revenue at the venue. Further, the Final Rule's induced and intended 10% reduction in firearm sales will correspond with State and local governments experiencing a loss of additional sales and

Declaration of Murl E. Miller - Texas

use taxes, motor fuels taxes, entertainment, alcoholic beverage taxes, and hotel taxes from the reduced consumption of such taxable goods and service by the promotors, vendors, and attendees.

16. The remedy of damages against the United States is unavailable to the State of Texas, so the Final Rules' effect on the lost State sales and use tax is unrecoverable.

I declare under penalty of perjury under the laws of the United States of America and the State of Texas that the preceding is true and correct.

Executed in Austin, Texas on this 31<u>st</u> day of May 2024.

BY: _____

Murl E. Miller

APPX.495

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

STATE OF TEXAS, et al.                                    PLAINTIFFS

VS.                              CIVIL ACTION NO. 2:24-cv-00089-Z

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, et al.              DEFENDANTS

### THE STATE OF MISSISSIPPI'S
### SUPPLEMENTAL BRIEFING IN SUPPORT OF STANDING

Plaintiff the State of Mississippi submits this brief that explains and evidences its basis for standing in response to this Court's May 19 order [Dkt. 45].

### Mississippi Has Standing To Challenge ATF's Rule

Under Article III, § 2 of the U.S. Constitution, a plaintiff must establish its standing to sue in federal court by demonstrating: an "injury in fact"; "a causal connection between the injury and the conduct complained of"; and that it is "likely" that "the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). Mississippi meets that test in this Administrative Procedure Act challenge to ATF's "Definition of 'Engaged in the Business' as a Dealer in Firearms," 89 Fed. Reg. 28968 (Apr. 19, 2024) ("Final Rule").

***Injury in fact.*** Mississippi will likely lose state sales-tax revenue collected from retail sales of firearms if the Final Rule takes effect. Those impending losses of sales-tax revenue is a threatened "pocketbook injury" that "is a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021); *see also, e.g., Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023); TRO Order [Dkt. 44 at 5] (quoting 141 S. Ct. at 1779). Sales-tax losses are the loss of a specific tax revenue, which is a

1

APPX.497

cognizable standing injury. *See Wyoming v. Oklahoma*, 502 U.S. 437, 447-48 (1992); *see also El Paso Cnty. v. Trump*, 982 F.3d 332, 340 (5th Cir. 2020) (explaining the difference between losses of general revenues and losses of "specific tax revenue[s]" which support standing). And such revenue losses attributable to the Final Rule show a "concrete" and "particularized" injury to the State's fisc that is "actual or imminent," as Mississippi will begin incurring losses when the Final Rule takes effect in the State as scheduled in June 2024. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quotation marks omitted).

 The Final Rule aims to reduce the number of eligible persons who sell firearms without a federal firearms license, and estimates that ten percent of currently unlicensed sellers are likely to quit selling firearms after the rule takes effect because the sellers will be unwilling or unable to obtain such license. *See* Final Rule, 89 Fed. Reg. at 29054. That reduction in sellers will likely diminish future retail sales of firearms in Mississippi at gun shows and other similar events where such sales often occur. And the State would lose tax revenue if a reduction in retail sales of firearms at such events occurs. Mississippi levies a sales tax of 7% on gross proceeds of sales of "tangible personal property." Duke Declaration at 1, Ex. "A"; *see* Miss. Code Ann. § 27-65-17. Firearms are "tangible personal property" under state law. Duke Declaration at 1, Ex. "A." Retail sales of firearms in Mississippi are taxable sales and generate state sales-tax revenue. *Ibid.*; *see* Miss. Code Ann. § 27-67-3. For example, the State collects revenue for such taxable firearms sales "made by Mississippi retailers, out-of-state retailers or persons selling firearms at gun shows or other

2

promoted events where vendors collect sales tax and remit the tax to the event promoter who then remits the collected tax" to the State revenue department. Duke Declaration at 1, Ex. "A." Between June 1 and the end of this year, at least 19 gun shows are scheduled to take place in Mississippi. *Id.* at 2. The State revenue department anticipates that "any action" that causes "an overall decrease in firearms sales to Mississippi customers" through sales at those gun shows or other retail sales "would result in reduced" sales-tax revenue to the State. *Ibid.* In addition, for similar reasons, the reduction in firearms sellers contemplated by the Final Rule may lead to reduced state use-tax collections on internet firearms transactions by certain sellers who will potentially be impacted by the rule. *See id.* at 1-2. These prospective revenue losses anticipated by the State revenue department are attributable to the Final Rule and establish that Mississippi will suffer an impending pocketbook injury that establishes its standing. *See, e.g., Collins*, 141 S. Ct. at 1779; *Clapper*, 133 S. Ct. 1138 at 1147.

For standing purposes, it is irrelevant that the State cannot yet quantify the precise amount or extent of expected lost tax revenue that the Final Rule will inflict on Mississippi. The loss of even a "small amount of money" can show a standing "injury." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (quotation marks omitted); *see Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (even a "single dollar of harm" can support standing). And lost Mississippi tax revenue caused by the Final Rule—in any amount—would irreparably harm the State, as such revenue loss would be unrecoverable as damages in this litigation or through other means due to

3

defendants' sovereign immunity. *See* TRO Order [Dkt. 44 at 5] (explaining that "[i]n determining whether costs are irreparable, the key inquiry is 'not so much the magnitude but the irreparability'" and that "[e]ven purely economic costs" "'may count as irreparable harm where they cannot be recovered in the ordinary course of litigation'") (quoting *Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4 593, 597 (5th Cir. 2023)).

***Causal Connection.*** The loss of tax revenue that Mississippi would suffer here is "fairly traceable" to the defendants' implementation of the Final Rule and not "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up). As noted, ATF estimates that "as a result of" the Final Rule some currently unlicensed firearms sellers likely will be "unwilling or unable to become licensed" as a dealer. Final Rule, 89 Fed. Reg. at 29054. Those "unwilling or unable" sellers who leave the market will no longer sell firearms in Mississippi. And that loss of sellers will diminish the State's sales-tax collections associated with upcoming gun shows and other retail sales. *See* Duke Declaration at 1-2, Ex. "A." That is but-for causation: Mississippi will lose tax revenues *because of* the defendants' enforcement of the Final Rule. And that is more than enough to show that the State's injury that is "fairly traceable" to the defendants' conduct. *See*, *e.g.*, *Department of Com. v. New York*, 139 S. Ct. 2551, 2565-66 (2019) (finding standing where there was a "sufficient likelihood" that third parties "will likely react in predictable ways" to government action and cause plaintiffs to lose funds).

4

***Redressability.*** Finally, Mississippi's impending lost tax revenue attributable to defendants' implementation of the Final Rule is "likely" to be "redressed by a favorable decision" in this action. *Lujan*, 504 U.S. at 561 (quotation marks omitted). This Court is authorized to enjoin the enforcement of the Final Rule or postpone its enforcement pending judicial review, and ultimately vacate the Final Rule. *See* 5 U.S.C. §§ 705, 706. That relief would prevent and redress Mississippi's impending injury.

## Conclusion

This Court should rule that Mississippi has established standing at this stage and grant preliminary injunctive relief barring defendants from enforcing the Final Rule.

Dated: June 2, 2024

Respectfully submitted,

LYNN FITCH
Attorney General

*S/ Justin L. Matheny*

GARRETT GREENE                     JUSTIN L. MATHENY
Special Counsel                    Deputy Solicitor General
Office of the Attorney General     ND Tex. Bar No. 100754MS
  of Texas                     Mississippi Attorney General's Office
Special Litigation Division        P.O. Box 220
P.O. Box 12548, Capitol Station    Jackson, MS 39205
Austin, TX 78711-2548              (601) 359-3680
(512) 463-2100                     justin.matheny@ago.ms.gov
garrett.greene@oag.texas.gov

*Counsel for Plaintiff State of Mississippi*

APPX.501

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been filed electronically via the Court's ECF system and thereby served on all counsel of record.

Dated: June 2, 2024

*S/Justin L. Matheny*
Justin L. Matheny

APPX.502

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS, ET AL.                                    PLAINTIFFS

VS.                                          CIVIL ACTION NO. 2:24-cv-00089-Z

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, ET AL.                           DEFENDANTS

### Declaration of Gregory I. Duke

I, Gregory I. Duke, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am Gregory I. Duke. I am over the age of 18 and a U.S. citizen. I have personal knowledge of the facts contained in this Declaration unless otherwise stated. I can competently testify as to the contents of this Declaration if called upon to do so.

2. I serve as the Office Director of Business Taxes for the Mississippi Department of Revenue. In my capacity, I am responsible for the administration of Mississippi's sales, use and petroleum tax system as well as field audit for sales tax, use tax, petroleum taxes, income tax and other applicable Mississippi tax levies. I am familiar with Mississippi's sales and use tax codes and how they apply to gun shows and online sales of firearms in the State of Mississippi.

3. Mississippi levies sales tax at the rate of 7% upon the gross proceeds of sales of tangible personal property under Miss. Code Ann. Section 27-65-17. Miss. Code Ann. Section 27-67-5 levies use tax for the privilege of using, storing or consuming tangible personal property in Mississippi possession of which is acquired in any manner. The use tax is at the same rate as the sales tax.

4. Retail sales of firearms in Mississippi are either subject to the imposition of sales or use tax because firearms fall within the meaning of "tangible personal property" as defined under Miss. Code Ann. Section 27-67-3. Taxable sales of firearms include sales made by Mississippi retailers, out-of-state retailers or persons selling firearms at gun shows or other promoted events where vendors collect sales tax and remit the tax to the event promoter who then remits the collected tax to the Mississippi Department of Revenue.

5. Internet sellers and marketplace facilitators who have either a physical presence in Mississippi or who have sales into Mississippi exceeding $250,000.00 in any consecutive twelve-month period are required to register to collect Mississippi use tax on behalf of their Mississippi customers.

Page 1 of 2

APPX.503

6. The Final Rule in this case includes information concerning unlicensed firearm sellers and an estimate of (10 percent) of those unlicensed sellers who are likely to be either unwilling or unable to become licensed as an FFL as a result of the rule. *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968, 29,054 (Apr. 19, 2024).

7. There are nineteen guns shows scheduled to be held in Mississippi from June 1, 2024, through the end of this year, according to gunshowtrader.com. Any action causing an overall decrease in firearm sales to Mississippi customers through regular retail sales, sales made at gun shows, or sales made over the internet would result in reduced sales and or use tax revenue collected by the State of Mississippi.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 29 , 2024.

Gregory J. Duke

Page **2** of **2**

APPX.504

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, *Plaintiffs*, <br><br> v. <br><br> BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, and STEVEN M. DETTELBACH, in his official capacity as Director of ATF, *Defendants*. | No. 2:24-CV-89-Z |

**State of Utah's Supplement Brief on Standing**

The State of Utah submits this supplemental brief explaining and evidencing its basis for standing in response to this Court's order dated May 19, 2024. ECF No. 43.

## Introduction

To establish standing, a plaintiff has a minimal burden, especially in the early stages of litigation. And with multiple plaintiffs, a case may proceed if one plaintiff has standing. Utah has standing for at least two reasons.

First, Utah has standing for the same reason this Court has already determined Texas has standing. The Final Rule will cause Utah to suffer a pocketbook injury by reducing its tax revenue from firearm sales.

Second, because Utah conducts its own background checks, the Final Rule injures Utah by requiring it to perform additional backgrounds checks that federal law doesn't require. That injury also gives Utah standing.

## Argument

The Court ordered this supplemental briefing because it determined it "must address the threshold question of standing before addressing the merits." ECF No. 44 (citation omitted). This case may proceed to merits. As shown below, this Court need only determine that one plaintiff has standing to proceed to the merits. And Utah has standing.

1

I.      **The Court may proceed to the merits if one plaintiff demonstrates standing.**

In a case with multiple plaintiffs, the Court need only determine that one plaintiff has standing. *See McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit."); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) (holding that because one of five State plaintiffs had shown it had standing to challenge a federal program, a lawsuit could proceed); *United States v. Texas*, 97 F.4th 268, 275 & n.28 (5th Cir. 2024) (declining to consider if remaining plaintiffs had standing because one plaintiff had demonstrated standing to obtain preliminary injunction); *Gen. Land Off. v. Biden*, 71 F.4th 264, 271 (5th Cir. 2023) ("Each State asserts it has standing. But only one needs standing for the action to proceed.").

This principle applies to preliminary injunctive relief. In *General Land Office*, after determining one State (Texas) had standing, the Fifth Circuit remanded for the district court to consider both States' motion for a preliminary injunction. 71 F.4th at 275; *see also Texas*, 97 F.4th at 275 & n.28 (determining that standing of one plaintiff sufficed in context of an appeal of an order granting preliminary injunction).

2

In this case, the Court determined that "Plaintiffs Texas, Tormey, and affiliated organizations have sufficiently demonstrated standing for the purposes of the requested temporary restraining order." ECF. No. 44, at 5. That determination allows all plaintiffs to be parties to the TRO.

Further, if this Court confirms that "Plaintiffs Texas, Tormey, and affiliated organizations," or any one of them, has standing based on the supplemental briefing, the Court should allow this case to proceed as to all plaintiffs, especially in the early stages of this litigation.

## II.    Utah has standing.

In any event, Utah has standing in its own right. To demonstrate standing, Utah must show the Final Rule creates a substantial risk of some slight harm to Utah that may be redressed by the relief requested. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice [for standing purposes] if the threatened injury is certainly impending, or there is a *substantial risk* that the harm will occur." (emphasis added) (internal quotation marks omitted)); *see also OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (explaining that because "the injury in fact requirement under Article III is qualitative, not quantitative, in nature," an injury alleged as an Article III injury-in-fact "need not be substantial" and "*need not measure more than an identifiable trifle*" (emphasis added) (internal quotation marks omitted)).

3

APPX.508

Utah clears those hurdles. Utah has standing because the Final Rule will harm Utah by (A) reducing Utah's sales tax revenue and (B) requiring Utah to unnecessarily conduct additional background checks in violation of federal law.

### A. Utah has standing because the Final Rule will cause Utah to suffer a pocketbook injury.

Utah has standing for the same reason this Court has determined Texas has standing. ECF No. 44, at 5. The Final Rule will cause Utah to suffer a pocketbook injury in the form of decreased sales tax revenues.

Texas has already persuaded the Court that that "Final Rule will prohibit otherwise eligible persons from obtaining a Federal Firearms License ("FFL"), thereby reducing total gun sales at gun shows." ECF No. 44, at 5. Like Texas, Utah collects a sales tax on taxable items sold, including firearms sold at gun sales.[1] *See* Utah State Tax Commission, https://tax.utah.gov/sales/specialevents (stating that "[a]ll vendors participating in special events," including gun shows, "are required to obtain a Temporary Sales Tax License" and "to report and pay taxes collected at [the] special event."). And Utah has six gun shows upcoming this year.

---

[1] The sales tax for "retail sales of tangible personal property made within the state" is a minimum of 4.85%. Utah Code §§ 59-13-103(2)(a)(i)(A), -103(11)(a).

4

https://gunshowtrader.com/gunshows/utah-gun-shows/. Thus, like Texas, Utah will sustain a financial loss because of the Final Rule. ECF No. 44, at 5.

### B. Utah has standing because the Final Rule will cause Utah to unnecessarily perform additional background checks.

The Final Rule also harms Utah because it is a "point of contact" state for purposes of firearm background checks. *See* Final Rule, 89 Fed. Reg. at 28,065 (noting Utah is a "point of contact state"); Federal Bureau of Investigation, *NICS Participation Map*, https://www.fbi.gov/file-repository/nics-participation-map-020124, at 1-2; *Mance v. Sessions*, 896 F.3d 699, 717 & n.46 (5th Cir. 2018) (citing, inter alia, Utah Code § 76-10-526(3)(a) (Owen, J., concurring). As a point of contract state, Utah, by and through a state agency, conducts the background checks required by federal law. *See Mance*, 896 F.3d at 706-07.[2]

Federal law requires background checks for sales by federal firearms licensees (FFLs) to unlicensed buyers, 18 U.S.C. § 922(t), but not sales by unlicensed sellers (private sales). *See* Final Rule, 89 Fed. Reg. at 28,987 (stating that "Congress has not passed a law to require universal background checks" that would "require persons to run background checks whenever a private, unlicensed person transfers a firearm to another").

---

[2] That state agency is the Bureau of Criminal Investigations (BCI). Utah Code §§ 76-10-501(2), 76-10-526(5)-(7).

The Final Rule will cause Utah to conduct more background checks. As the Department of Justice acknowledges, the Final Rule will cause some private sellers to become FFLs, and that in turn will increase the number of required background checks:

a. "This rulemaking will result in more persons who are already engaged in the business of dealing in firearms becoming licensed . . . ." 89 Fed. Reg. at 28,968.

b. "*As more persons become licensed under this rule, those licensees will conduct more background checks* to prevent prohibited persons from purchasing or receiving firearms . . . ." *Id.* (emphasis added).

c. "The Department . . . agrees that the rule will result in more persons who are engaged in the business of dealing in firearms, regardless of location, becoming licensed as required [by federal law]. Once licensed, those persons will be required to abide by the . . . background check requirements [federal law]." *Id.* at 28,988.

d. "The Department . . . agrees that, as a result of this rule, . . . more individuals who engage in the business of dealing in firearms at gun shows and online will become licensed under [federal law] and therefore run background checks." *Id.* at 28,989.

e. "*[T]he amended regulations will increase the number of background checks performed* because more dealers will become licensed and run background checks on their customers." *Id.* at 28,993 (emphasis added).

The additional background checks required by the Final Rule will tangibly increase Utah's workload as a point of contact State. As the Department acknowledges, those additional checks aren't already required by Utah law. 89 Fed. Reg. at 29,065 ("Of the States that do not currently require

6

background checks for all private sales, only three States (Florida, Tennessee, and Utah) do not rely on Federal law enforcement for their background checks and are 'point of contact' States."); *see also id.* at 28,088 (stating that of the States that don't "already require background checks for private party sales," only Utah, Florida, and Tennessee conduct their own background checks).

Even the Department concedes "these three States *may* be affected by this rule to the extent they have to conduct increased background checks. *Id.* at 28,088 (emphasis added). Though the Department equivocates with its use of "may," its previous admissions prove Utah *will* be affected by the Final Rule. The Department unequivocally admitted that the ATF's regulations, as amended by the Final Rule, "*will increase* the number of background checks performed." 89 Fed. Reg. at 28,993 (emphasis added). Because Utah conducts the requisite background checks in Utah, the Final Rule increases Utah's workload. At the very least, the Final Rule creates a "substantial risk" Utah's workload will increase, which is all the is required to establish an injury for standing purposes. *See Driehaus*, 573 U.S. 149 at 158.

Beyond the increased workload and associated opportunity cost, Utah has an interest in ensuring that the background checks it performs are required by federal law, and not by a Final Rule that violates federal law. In that regard, this Court has already determined the Final Rule likely violates

7

the APA and "clashes with the text of [Bipartisan Safer Communities Act (BCSA)] in at least three ways." ECF No. 44. at 8-9.

As this Court determined, the Final Rule clashes with the BSCA by providing that "there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement." *Id.* (quoting 89 Fed. Reg. at 29091). The improper triggering of the licensing requirement in turn improperly triggers the background check requirement. So the Final Rule creates a substantial risk that Utah will conduct background checks that violate the BSCA.

This Court also determined the "Final Rule arbitrarily eviscerates Section 921(a)(21)(C)'s safe harbor provision" by excluding from its protections "firearms accumulated primarily for personal protection." ECF No. 44. at 11-12. Because of that evisceration, the Final Rule improperly requires licenses and background checks for sales protected by the statutory safe harbor provision. The unnecessary and unlawful background checks that Utah must perform because of the evisceration constitutes a burden on Utah sufficient to demonstrate standing. *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 446 (5th Cir. 2019) (ruling that Texas had standing to challenge EEOC's guidance that imposed a burden on Texas).

To be clear, for purposes of this motion, Utah doesn't claim these additional background checks cause a pocketbook injury. For now, Utah

APPX.513

assumes the background checks are cost neutral because BCI collects a fee for conducting background checks. Utah Code § 76-10-526(12). Yet, Utah will suffer other substantial injuries from these additional checks. Though background checks presumably are cost neutral, Utah has made the policy choice of not requiring universal background checks or any checks beyond those required by Congress. But, in violation of Utah policy, the Final Rule will compel Utah perform to additional checks not required or authorized by Congress or Utah law. Forcing Utah to violate its policy is an injury. The time spent performing unauthorized background checks could be used to perform other work that promotes Utah policy.

## Conclusion

For these reasons, Utah has standing.

/s/ Andrew Dymek
Andrew Dymek* (Utah Bar No. 9277)
Assistant Solicitor General
Office of the Utah Attorney General
Heber Wells Bldg.
160 East 300 South, Fifth Floor
P.O. Box 140858
Salt Lake City, Utah 84114-0180
801-366-0533
adymek@agutah.gov

Counsel for Plaintiff State of Utah
*Admission to ND Tex pending

Filed on ECF by Stanford Purser on behalf
of Mr. Dymek, and under his signature, by
his permission.

9

## Certificate of Service

The foregoing documents was served on all counsel of record via the Court's ECF filing system.

<u>Andrew Dymek</u>

10

APPX.515

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

STATE OF TEXAS, *et al.*,

      Plaintiffs,

   v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

      Defendants.

Case No. 2:24-cv-00089-Z

## **DEFENDANTS' RESPONSE TO PLAINTIFFS' SUPPLEMENTAL BRIEFING ON STANDING**

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

LEGAL STANDARD ....................................................................................................................1

I.     The State Plaintiffs Fail To Establish That They Have Standing .....................................2

       A.     The State Plaintiffs' Asserted Revenue-Related Injury Does Not Confer
              Standing ................................................................................................................2

       B.     The Rule's Incidental Effect On Utah's Background Check Procedures Also
              Does Not Confer Standing .....................................................................................11

II.    Tormey's Supplemental Filings Show That He Lacks Standing .....................................13

III.   The Organizational Plaintiffs' Supplemental Filings Fail To Establish That They
       Have Associational Standing ............................................................................................17

CONCLUSION ............................................................................................................................22

i

APPX.517

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ...................................................................................7, 8

*Barber v. Bryant*,
  860 F.3d 345 (5th Cir. 2017) ..............................................................................2, 9, 19

*Braidwood Mgmt., Inc. v. EEOC*,
  70 F.4th 914 (5th Cir. 2023) ...................................................................................17

*Cacchillo v. Insmed, Inc.*,
  638 F.3d 401 (2d Cir. 2011)....................................................................................20

*Campaign Legal Ctr. v. Scott*,
  49 F.4th 931 (5th Cir. 2022) ....................................................................................2

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)...........................................................................2, 12, 13, 16

*Do No Harm v. Pfizer Inc.*,
  96 F.4th 106 (2nd Cir. 2024)...................................................................................19

*Draper v. Healey*,
  827 F.3d 1 (1st Cir. 2016)........................................................................................19

*El Paso Cnty. v. Trump*,
  982 F.3d 332 (5th Cir. 2020) ..........................................................................*passim*

*Florida v. Mellon*,
  273 U.S. 12 (1927)...........................................................................................4, 6, 8

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ...............................................................................21

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
  695 F.3d 330 (5th Cir. 2012) ..................................................................................18

*Gray v. White*,
  18 F.4th 463 (5th Cir. 2021) ...................................................................................20

*Iowa ex rel. Miller v. Block*,
  771 F.2d 347 (8th Cir. 1985) ....................................................................................5

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)..................................................................................................1

APPX.518

*Murphy v. Amarillo Nat'l Bank,*
    No. 2:20-cv-48-Z, 2021 WL 40779 (N.D. Tex. Jan. 5, 2021) ..................................................7

*OCA-Great Houston v. Texas,*
    867 F.3d 604 (5th Cir. 2017) ..............................................................................................18

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.,*
    418 F.3d 535 (5th Cir. 2005) ..............................................................................................19

*Pennsylvania v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) .............................................................................................5

*Printz v. United States,*
    521 U.S. 898 (1997) ...........................................................................................................12

*Raines v. Byrd,*
    521 U.S. 811 (1997) .............................................................................................................2

*Religious Sister of Mercy v. Becerra,*
    55 F.4th 583 (8th Cir. 2022) ...............................................................................................19

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ...........................................................................................1, 2

*Speech First, Inc. v. Shrum,*
    92 F.4th 947 (10th Cir. 2024) .............................................................................................19

*Summers v. Earth Island Institute,*
    555 U.S. 488 (2009) ......................................................................................................19, 20

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .....................................................................................................*passim*

*Texas v. ATF,*
    -- F. Supp. 3d --, 2023 WL 7116844 (S.D. Tex. Oct. 27, 2023),
    *appeal filed*, No. 23-40685 (5th Cir. Dec. 1, 2023) ...........................................................18

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ...........................................................................................................11

*Tucker v. SAS Inst., Inc.,*
    462 F. Supp. 2d 715 (N.D. Tex. 2006) .................................................................................9

*United States v. All Funds in the Acct. Prop. of Futures, Inc.,*
    820 F. Supp. 2d 1305 (S.D. Fla. 2011) ...............................................................................20

*United States v. King,*
    735 F.3d 1098 (9th Cir. 2013) .............................................................................................15

iii

APPX.519

*United States v. Nadirashvili,*
   655 F.3d 114 (2d Cir. 2011)................................................................................16

*United States v. Texas,*
   599 U.S. 670 (2023)...............................................................................1, 2, 4

*Vote.Org v. Callanen,*
   39 F.4th 297 (5th Cir. 2022) ..............................................................................18

*Warth v. Seldin,*
   422 U.S. 490 (1975)..........................................................................................18

*Waskul v. Washtenaw Cty. Cmty. Mental Health,*
   900 F.3d 250 (6th Cir. 2018) ........................................................................19, 20

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..........................................................................................2, 3

*Wyoming v. Oklahoma,*
   502 U.S. 437 (1992) ..........................................................................................6

*Wyoming v. U.S. Dep't of Interior,*
   674 F.3d 1220 (10th Cir. 2012)....................................................................5, 8, 9

*Zimmerman v. City of Austin,*
   881 F.3d 378 (5th Cir. 2018) .......................................................................12, 13

**Statutes**

18 U.S.C. § 921(a)(21)(C) ......................................................................................1

18 U.S.C. § 922(t)(1)(A).........................................................................................11

**Rules**

Fed. R. Civ. P. 56(c)(4) .........................................................................................20

**Regulations**

27 C.F.R. § 478.11 ...............................................................................................14

27 C.F.R. § 478.13(a)............................................................................................14

27 C.F.R. § 478.13(b).............................................................................................15

28 C.F.R. § 25.6(a)................................................................................................11

Final Rule, *Definition of "Engaged in the Business" as a Dealer in Firearms,*
   89 Fed. Reg. 28,968 (Apr. 19, 2024) .....................................................*passim*

APPX.520

**Other Authorities**

ATF, *Do I Need A License To Buy And Sell Firearms?*,
   https://www.atf.gov/firearms/docs/undefined/atfpublication53102pdf/download (updated
   May 2024)..........................................................................................................................15, 16

Utah Dep't of Pub. Safety, *Instant Web Gun Checks System (Dealers)*,
   https://bci.utah.gov/firearm-transfers/instant-web-gun-check-system-dealers/...............................13

v

APPX.521

# INTRODUCTION

Plaintiffs seek a preliminary injunction against a Final Rule[1] promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that implements a change made by the Bipartisan Safer Communities Act (BSCA) to the Gun Control Act's (GCA) definition of being "engaged in the business" of dealing in firearms, *see* 18 U.S.C. § 921(a)(21)(C). But Plaintiffs' case suffers from a fundamental jurisdictional flaw: Even with the benefit of supplemental briefing, they fail to clearly show that they have Article III standing to obtain such extraordinary relief. The revenue-related injury the State Plaintiffs assert is not legally cognizable, and they fail in any event to demonstrate that such an incidental economic harm will even materialize in the first place. The firearms-related conduct that Plaintiff Tormey intends to engage in still does not constitute being "engaged in the business" of dealing firearms under the Rule's interpretation of the GCA, nor has he shown that there is a substantial risk that the Rule will be enforced against him specifically. He therefore lacks standing to bring a pre-enforcement challenge against the Rule. And the organizational plaintiffs cannot establish associational standing based on hearsay self-descriptions of their unnamed members.

Standing is not "merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to be adjudicated." *United States v. Texas*, 599 U.S. 670, 675 (2023) (citation omitted). It is "an indispensable part" of Plaintiffs' case. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs have failed to make the requisite showing of standing here. The Court should accordingly deny their Motion for Preliminary Injunction.

## LEGAL STANDARD

"A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020). To have Article III standing, "a

---

[1] Final Rule, *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Rule").

APPX.522

plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Id.* at 330. An injury confers standing only if it is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("Allegations of *possible* future injury are not sufficient." (cleaned up)). The alleged injury must also be "legally and judicially cognizable," meaning that the "dispute" in question must be one "traditionally thought to be capable of resolution through the judicial process." *United States v. Texas*, 599 U.S. at 676 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).

"Plaintiffs always have the burden to establish standing," and they must do so "with the manner and degree of evidence required at the successive stages of litigation." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (citation omitted). "Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,'" a plaintiff seeking one thus must "make a 'clear showing' that they have standing." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). And absent that clear showing, a federal court "ha[s] no jurisdiction to reach the merits" of the plaintiff's claims. *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 935 (5th Cir. 2022); *cf. El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020) ("The Article III standing requirement serves to prevent the judicial process from being used to usurp the powers of the political branches and confines the federal courts to a properly judicial role." (citations omitted)).

## I. The State Plaintiffs Fail To Establish That They Have Standing

### A. The State Plaintiffs' Asserted Revenue-Related Injury Does Not Confer Standing

Four states, led by Texas, challenge the Rule on multiple grounds, and they all base their standing to do so principally on the assertion that each "stands to suffer direct harm" to their respective "State fisc[s]" as a result of the Rule's anticipated impact on firearms sales. Pl. Texas's

Suppl. Br. in Supp. of Standing 1, ECF No. 61 ("Tex. Suppl. Br."); *see* Pl. Louisiana's Suppl. Br. in Supp. of Standing 2, ECF No. 59 ("La. Suppl. Br.") ("Louisiana, much like Texas, stands to suffer a direct 'pocketbook injury' from the Final Rule."); Pl. Mississippi's Suppl. Br. in Supp. of Standing 1, ECF No. 62 ("Miss. Suppl. Br.") (same); Pl. Utah's Suppl. Br. on Standing 1, ECF No. 64 ("Utah Suppl. Br.") (same).

The State Plaintiffs' asserted "pocketbook injury" hinges on the following chain of contingencies: (1) the Rule will reduce the number of people who sell firearms; (2) that expected decrease in the number of sellers will, in turn, "inevitably result in less gun sales" in each state; and (3) because each State Plaintiff collects sales tax on "taxable items sold— including guns," a reduction in gun sales will result in "less tax revenue collected." Tex. Suppl. Br. at 2. The State Plaintiffs' arguments, moreover, focus almost exclusively on how the Rule will affect sales taxes derived from firearms sales at gun shows held in each state. *See, e.g., id.* at 7 (contending that "Texas stands to suffer direct pocketbook injury because of the . . . effect . . . the Final Rule will have on unlicensed sellers at gun shows"); La. Suppl. Br. at 4 ("A decline in the number of unlicensed dealers at Louisiana's gun shows will inevitably result in less gun sales . . . .").[2] But such incidental downstream effects of a federal policy on state tax revenues do not ordinarily qualify as judicially cognizable injuries for purposes of standing. And the State Plaintiffs' asserted revenue-related injury fails on its own terms in any event because Plaintiffs do not clearly show that they will suffer a decline in revenues derived from firearms sales in the aggregate.

---

[2] Texas also appears to base its revenue-related injury on a purported decrease in other "taxable transactions" that occur at or in relation to gun shows. *See* Tex. Suppl. Br. at 2 (asserting that a "decline in consumer traffic and activity" at gun shows will lead to a "reduction in taxable transactions between vendors and consumers" and a "loss of additional state and local tax revenues, including motor fuels taxes, entertainment taxes, alcoholic beverage taxes, and hotel taxes"). Louisiana and Mississippi (but not Texas or Utah) further assert in their respective briefs that the Rule will cause a reduction in tax revenues derived from online firearms sales. *See* La. Suppl. Br. at 3; Miss. Suppl. Br. at 3.

3

To start, the Supreme Court long ago explained that a State may sue the federal government only if it has suffered a "*direct* injury" as a result of a federal action or policy. *Florida v. Mellon*, 273 U.S. 12, 18 (1927). In *Florida v. Mellon*, Florida challenged the constitutionality of a federal inheritance tax, and it argued that the tax would cause the State financial harm by "inducing potential taxpayers to withdraw property" and diminishing its tax base. *Id.* at 17-18. But the Court rejected that theory of standing, explaining that Florida needed to show a "direct injury," and that any harm caused by the tax was "purely speculative, and, at most, only remote and indirect." *Id.* at 18. The Court reiterated this same principle just last year when it observed that because "federal policies frequently generate indirect effects on state revenues or state spending," when a State "asserts . . . that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Texas*, 599 U.S. at 680 n.3 (2023); *see id.* ("[F]ederal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer.").

The Fifth Circuit, too, has applied this bedrock principle to reject state standing premised on a "loss of general tax revenues as an indirect result of federal policy." *El Paso Cnty.*, 982 F.3d at 339. In *El Paso County*, the plaintiff county challenged the Department of Defense's reallocation of $20 million in federal funds to build a wall at the United States-Mexico border, a sum that had originally been earmarked for a construction project at a local military base. *Id.* at 337-38. And the county based its standing on the "economic injury" and attendant "loss of general tax revenues" caused by the cancellation of the military base project. *Id.* at 338-39. More specifically, the county claimed that the project's cancellation would reduce its tax revenues because "a $20 million construction project within the county would necessarily generate taxes through workers staying at hotels, buying supplies, and spending money at local establishments." *Id.* at 338. But the Fifth Circuit concluded that such "incidental and attenuated harm" to "general tax revenue" was "insufficient to grant a state or county standing." *Id.* at 341. As the court noted, "federal policies will inevitably have an economic impact

4

on local governments." *Id.* at 340. Consequently, the court explained, "[i]f every local government could sue to challenge any federal expenditure at a military base, the courts 'would cease to function as courts of law and would be cast in the role of general complaint bureaus.'" *Id.* at 341 (citation omitted). The court thus concluded that Article III and Supreme Court precedent require state and local government plaintiffs to demonstrate "more than an incidental economic impact" of a federal policy on "general tax revenues" to establish a cognizable injury in fact. *Id.* at 340-41; *see id.* at 340 ("A direct link, such as the loss of a specific tax revenue, is necessary to demonstrate standing.").[3]

The revenue-related harms the State Plaintiffs assert in this case cannot be meaningfully distinguished from the incidental revenue-related harms that were deemed inadequate to confer state standing in *El Paso County*. The State Plaintiffs claim, at bottom, that the Rule will reduce certain types of economic activity in their respective states—specifically, various transactions and expenditures related to gun shows (compared to the various transactions and expenditures related to a local construction project at issue in *El Paso County*)—which will in turn cause a reduction in general tax revenues—specifically, sales taxes assessed on a variety of goods, including firearms sold at gun shows (compared to the local taxes assessed on hotel stays, supply purchases, and expenditures at local establishments in *El Paso County*). Indeed, Texas bases its asserted "pocketbook" injury in part on the "reduction in taxable transactions between vendors and consumers" at gun shows and the "decreased consumption" by gun show "promoters, vendors, and attendees" of fuel, entertainment, alcohol, and

---

[3] Other circuits have similarly rejected claims of state standing based on a federal policy's downstream impact on general tax revenues. *See Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (describing a claim that a federal regulation would have "solely a 'generalized impact' on the economy of a state or a state's general tax revenues" as a "generalized grievance" that is insufficient to establish an injury in fact); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (rejecting state standing premised on an assertion that administration of a federal program would injure a state due to "increased responsibility for the welfare and support of its affected citizens while its available tax revenues are declining."); *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) ("[T]he unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing.").

hotel stays that the Rule will purportedly cause. That is the very sort of "incidental economic impact" and reduction in "general tax revenues" that the *El Paso County* court deemed "inadequate" for state standing. 982 F.3d at 340.

Relying on *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), Texas and the other State Plaintiffs suggest that their revenue-related injury is sufficient to confer standing because they assert a "direct injury in the form of a loss of *specific tax revenues*." Tex. Suppl. Br. at 6 (quoting *Wyoming*, 502 U.S at 448); *see* La. Suppl. Br. at 4 (quoting the same). In *Wyoming*, Oklahoma adopted discriminatory regulations with the avowed purpose of reducing purchases of coal from Wyoming and, by extension, Wyoming's collection of a severance tax on that coal. *Wyoming*, 502 U.S. at 443. Here, by contrast, the State Plaintiffs do not and could not claim that the Rule targets or discriminates against them directly; they assert, at most, that the Rule will have indirect downstream effects on their general sales tax revenues. And the Fifth Circuit has already rejected comparisons to *Wyoming* on the basis of such an "incidental economic impact." *El Paso Cnty.*, 982 F.3d at 340; *see id.* at 339-40 (discussing *Wyoming*). Indeed, Texas's own description of *Mellon* illustrates that its theory of standing is no different from Florida's or El Paso County's. *Compare* Tex. Suppl. Br. at 6 n.5 ("Florida speculated that a federal inheritance tax would prompt taxpayers to take independent action—'withdraw[ing] property from the state'—which might result in less overall property to tax." (quoting *Mellon*, 273 U.S. at 17-18)), *with* "[The State Plaintiffs] speculate[] that [the Rule] w[ill] prompt [firearms sellers] to take independent action—withdrawing [from the firearms market]—which might result in [fewer] overall [goods] to tax."

To the extent the State Plaintiffs argue that their revenue-related injury is sufficiently "specific" because they assert that the Rule will cause at least one firearm sale at a gun show to not go forward, thereby depriving a state of the "sales tax that would normally be collected on that transaction," *id.* at 4, such a limitless theory of state standing cannot be squared with the practical realities of federal-state

6

relations and the separation-of-powers principles that Article III undergirds. *See El Paso Cnty.*, 982 F.3d at 341 ("The Article III standing requirement 'serves to prevent the judicial process from being used to usurp the powers of the political branches' . . . ." (citation omitted)); *cf. Murphy v. Amarillo Nat'l Bank*, No. 2:20-cv-48-Z, 2021 WL 40779, at *3 (N.D. Tex. Jan. 5, 2021) ("[F]ederal courts must decide cases and controversies rather than act as roving philosopher kings passing judgment on the validity of the nation's laws."). Indeed, because virtually any federal action could conceivably have some incidental effect on state finances, the State Plaintiffs' theory of standing would allow them to challenge nearly every federal policy to which their elected leaders object. Article III's standing requirements are not so boundless. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J.) ("Are we really going to say that any federal regulation of individuals . . . that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court?").

The State Plaintiffs' revenue-related theory of injury cannot confer standing here in any event because that theory fails on its own terms. The State Plaintiffs' asserted injury is that "[u]nlicensed dealers exiting the market" in response to the Rule "will inevitably result in less gun sales, and thus less tax revenue collected by the state[s]." Tex. Suppl. Br. at 2; *see* La. Suppl. Br. at 3 ("Fewer gun sales in the state will result in less revenue from Louisiana's sales and use tax."); Miss. Suppl. Br. at 1 ("Mississippi will likely lose state sales-tax revenue collected from retail sales of firearms if the Final Rule takes effect."). But this bare assertion rests on a flawed premise. As the State Plaintiffs note, the Rule itself predicts that a small proportion of currently "unlicensed persons who would be considered 'engaged in the business' under th[e] [R]ule" will be "unwilling or unable" to obtain a federal firearms license and "will instead choose to cease their dealing in firearms altogether." Rule, 89 Fed. Reg. at 29,072; *see* Tex. Suppl. Br. at 2 (asserting, inaccurately, that the Rule "contemplat[es] 10 [percent] of

APPX.528

currently unlicensed dealers leaving the market altogether").[4]  But even if the Rule marginally reduces the number of *individuals* who sell firearms, that by no means compels the conclusion that the number of *firearms* sold will decrease in equal measure, or even at all.  To the contrary, it is entirely possible, if not expected, that those wanting to purchase firearms will just go elsewhere, including to federal firearms licensees (FFLs), to do so.  By way of illustration, if a mom-and-pop grocer closes down, that does not mean that fewer groceries will be sold (and fewer sales taxes collected) in the surrounding community; residents will just buy their groceries at other stores, whether that be another small grocer or a supermarket.  This same principle naturally applies to other retail goods that consumers want to buy, including firearms.  It is entirely possible, then, that even with the Rule in effect, roughly the same number of firearms will be sold in Texas, Louisiana, Mississippi, and Utah, just from a marginally smaller pool of sellers, such that the decrease in sales tax revenues that the State Plaintiffs assert here never materializes.  The Rule, in fact, contemplates this very outcome.  *See* Rule, 89 Fed. Reg. at 29,066 ("[T]he overall number of firearm transactions are unlikely to be affected [by the Rule].").

---

[4] Plaintiffs repeatedly assert that the Rule "estimates that ten percent of currently unlicensed sellers are likely to quit selling firearms after the [R]ule takes effect."  Miss. Suppl. Br. at 2; *see* Tex. Suppl. Br. at 2.  But they misconstrue the figure they cite.  The Rule summarizes the methods used by the Department of Justice to calculate "the population impacted by" the Rule.  Rule, 89 Fed. Reg. at 29,054.  According to the Department's "subject matter expert-derived estimate," approximately 25 percent of currently unlicensed sellers are estimated "to be engaged in the business" under Rule, and it was further estimated that roughly 10 percent of *those sellers* are "likely to be either unwilling or unable to become licensed."  *Id.*; *see id.* at 29,066 ("[O]f the individual[s] or new entities affected by this [R]ule, the Department estimates . . . that 10 percent of *affected individuals* (or potential entities) may opt to stop selling firearms." (emphasis added)).  So, the Rule actually estimates that the number of currently unlicensed firearms sellers will drop by roughly 2.5 percent (i.e., 10 percent of 25 percent), a substantially smaller decrease than what Plaintiffs assert.  Texas suggests that this 2.5 percent figure is somehow irrelevant because it only concerns the "*extent*" of its asserted harm.  Tex. Suppl. Br. at 3.  But even setting aside the importance of accuracy for its own sake, that the number of firearms sellers will decrease by much less than what Texas claims, combined with the fact that those sellers sell comparatively few firearms in general, *see* Fed. Reg. at 29,071, makes it substantially harder for Texas and the other State Plaintiffs to clearly demonstrate that the number of firearms sold in the aggregate will actually decrease and, by extension, the loss of tax revenues they assert will actually occur.  *See Wyoming*, 674 F.3d at 1233 (finding no state standing where the plaintiffs "ha[d] not shown" that the federal rules they were challenging "have or will result in lost revenue").

The State Plaintiffs' supplemental declarations do not make their asserted revenue-related injury any less speculative.[5]  Texas, Louisiana, and Mississippi each submitted a declaration from a state tax official.  *See* ECF Nos. 59-1, 61-3, 62-1.  And each of those officials generally declares that the Rule will reduce firearms sales at gun shows held in their respective state and, by extension, reduce sales tax revenues derived from such sales and other gun show-related transactions.  *See, e.g.*, Decl. of Lucius L. Morris II 6, ECF No. 59-1.  But other than describing the particular tax rates their respective states assess on firearms sales, the state tax officials provide no additional "underlying evidence to support [their] claim that a reduction in revenue even exists," or will in fact occur.  *Wyoming*, 674 F.3d at 1232 (finding no state standing).  They instead repeat the conclusory assertions about the Rule's purported impact on state tax revenues that the State Plaintiffs make in their supplemental briefs, just in the form of a declaration—e.g., "the Final Rule is expected to decrease the sale of firearms by unlicensed vendors and persons by 10%," which will "make it less likely" for "firearm customers to attend a gun show . . . to purchase, sell, or trade their firearms legally," which will in turn "cause [the State Plaintiffs] to experience a loss of State and local sales and use tax revenue," Decl. of Murl E. Miller ¶¶ 9-10, ECF No. 61-3.  *See Wyoming*, 674 F.3d at 1232 (concluding that "conclusory statement[s]" in an affidavit "d[id] not demonstrate . . . standing").

Texas is the only State Plaintiff that even attempts to offer more than such mere speculation from a state tax official.[6]  But Texas's additional declarations still fail to clearly show that it will suffer the decrease in sales tax revenue it asserts.  For instance, the declaration from a gun show promoter

---

[5] Despite the Court's Order instructing each plaintiff to "submit supplemental briefing explaining *and evidencing* their basis for standing," Order, ECF No. 45 (emphasis added), Utah did not submit any declarations or other evidence to support the standing-related arguments it advances in its supplemental brief.  *See Tucker v. SAS Inst., Inc.*, 462 F. Supp. 2d 715, 723 (N.D. Tex. 2006) ("[B]riefs themselves . . . are not evidence.").  Utah has thus failed to meet its burden of clearly showing that it has standing to seek a preliminary injunction here.  *See Barber*, 860 F.3d at 352.

[6] Because Louisiana's and Mississippi's conclusory declarations from state tax officials do not "evidenc[e]" the revenue-related injury they assert, Order, ECF No. 45, they too have failed to clearly demonstrate that they have standing to seek preliminary injunctive relief.  *See Barber*, 860 F.3d at 352.

APPX.530

suggests that firearms sales *at certain gun shows* decreased compared to previous shows, which the promoter attributes to vendors' confusion regarding the Rule's scope. *See* Decl. of Darwin Boedeker at 2-3, ECF No. 61-1. Yet the promoter does not, and could not, speak to whether the number of firearms *sold in Texas overall*—including by FFLs and unlicensed sellers unimpacted by the Rule— decreased as well, such that Texas can claim to have suffered a corresponding loss of sales tax revenue. Relatedly, the gun show promoter claims that because of the Rule, he "ha[s] passed on—and will continue to pass on—opportunities to buy and sell guns *at the gun shows* [he] attend[s]," *id.* ¶ 26 (emphasis added), but he says nothing about whether he will buy and sell firearms elsewhere (and thus pay sales taxes on any such purchases), or whether the gun show attendees to whom he would have otherwise sold firearms will do the same (and thus pay sales taxes too).

The declaration from the President and CEO of a women's gun club similarly makes the conclusory assertion that the Rule will "reduce[] the number of firearm purchases that women will make," resulting in lost sales tax revenue for Texas. Decl. of Robyn M. Sandoval ¶ 14, ECF No. 61-2. But such a conclusion relies on a number of assumptions—that club members actually collect sales tax on their occasional private sales of firearms; that those members do not, for whatever reason, simply return their "ill-fitting purchase[s]" to the seller for a refund or more suitable replacement, *id.* ¶ 11; and that the CEO's expectations about how other independent actors will respond to the Rule actually come to fruition—that are no less speculative than Texas's other conclusory assertions regarding its revenue-related injury. That injury, in sum, is simply too "conjectural" and hypothetical" to satisfy Article III. *Susan B. Anthony List*, 573 U.S. at 158.

A final point: even if Texas's additional declarations establish that *it* has standing, that does not mean that any of the other State Plaintiffs have standing as well, such that they can be included in any preliminary injunctive relief. *See* La. Suppl. Br. at 6 ("Because Texas has shown standing, Louisiana and all plaintiffs in this matter should also have standing."); Utah Suppl. Br. at 2-3 (arguing the same).

In *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), the Supreme Court held that federal courts lack authority to award relief to parties without standing. *TransUnion* involved a class action in which the Court held that some class members had standing while others did not. *See* 594 U.S. at 439. The Court then concluded that lower courts had erred in awarding relief to all class members, including those who lacked standing. *Id.* at 442. And the Court made clear it was articulating a general rule that applied to all federal civil cases, explaining that "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Id.* at 431 (citation omitted). It is true that if at least one plaintiff has standing, then a federal action can proceed and need not be dismissed outright for lack of jurisdiction. But as *TransUnion* underscored, a federal court cannot award distinct relief to a party—such as injunctive relief preventing the federal government from enforcing a regulation within a particular state—unless that party meets its burden of establishing standing. At the temporary restraining order (TRO) stage, the Court properly excluded from relief the parties that it concluded had not demonstrated their standing to sue, and it should continue to do so here.

**B.** **The Rule's Incidental Effect On Utah's Background Check Procedures Also Does Not Confer Standing**

Utah, in addition to asserting that the Rule will "cause [it] to suffer a pocketbook injury by reducing its tax revenues from firearm sales," now advances the wholly new argument that the Rule will further "injure[]" the State "by requiring it to perform additional background checks that federal law doesn't require."[7] Utah Suppl. Br. at 1. As explained above, Utah did not submit any evidence supporting either asserted injury. Yet even assuming that such a deficiency is not sufficient on its own

---

[7] Federal law requires FFLs to run a background check through the FBI's National Instant Background Check System (NICS) before transferring a firearm to a prospective purchaser. *See* 18 U.S.C. § 922(t)(1)(A). While FFLs ordinarily contact the federal government directly to perform background checks, federal regulations permit states to voluntarily serve as the point of contact for those background checks. *See* 28 C.F.R. § 25.6(a) (noting that FFLs may initiate background checks in some instances by contacting a state Point of Contact); *id.* § 25.2 (defining "POC (Point of Contact)"). Utah is one such point of contact state.

APPX.532

to preclude Utah from establishing standing here, Utah's alternative background check theory of standing fails for several independent reasons.

First, the expected increase in the number of private sellers obtaining a federal firearms license is a direct consequence of the BSCA's broadening of the definition of being "engaged in the business," *see* Opp'n to Pls.' Mot. for TRO and/or Prelim. Inj. 5-6, ECF No. 31 ("Defs.' Opp'n"), meaning that any corresponding increase in mandatory background checks for firearms purchases is largely traceable to that statute—which Plaintiffs do not challenge—rather than the Rule. Relatedly, Utah fails to explain how it will differentiate between background checks that are lawfully required by the BSCA or are voluntarily conducted by sellers (whether licensed or otherwise) who simply want to ensure that they are not transferring a firearm to a prohibited person, and those that are purportedly compelled "unnecessary[ily] and unlawful[ly]" by the Rule. Utah Suppl. Br. at 8.

Second, any "increased workload" that Utah takes on as a result of the Rule would be a consequence of its own voluntary decision to take responsibility for conducting firearms-related background checks itself. *See Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("[S]tanding cannot be conferred by a self-inflicted injury."). While States are permitted to conduct federal background checks through NICS themselves, they are not required to do so; indeed, during a period when federal law mandated that state and local officials conduct background checks, the Supreme Court held that such requirements were impermissible. *See Printz v. United States*, 521 U.S. 898, 933 (1997)). Thus, if changes to federal firearms laws naturally require a greater number of background checks, and if a State elects to conduct those background checks itself (rather than having FFLs contact the NICS directly), any burden incurred by the State as a result of that voluntary arrangement is the sort of "self-inflicted injury" that fails to confer standing. *Zimmerman*, 881 F.3d at 389; *cf. Clapper*, 568 U.S. at 418 (concluding that "respondents' self-inflicted injuries" were "not fairly traceable to the government activity being challenged and thus "d[id] not give rise to standing").

APPX.533

Third, Utah makes no effort to "evidenc[e]," Order, ECF No 45, the "increased workload" it claims it will suffer, Utah Suppl. Br. at 7, or to explain whether that increased workload actually amounts to a cognizable injury. FFLs in Utah, for instance, are able to submit "instant" background checks "via the internet any hour of any day,"[8] and Utah offers no evidence indicating whether an uptick in the number of background checks will tangibly burden this largely automated system. Utah also collects a fee on the background checks it conducts, yet "assumes" in its supplemental brief that such checks "are cost neutral." Utah Suppl. Br. at 9. But if an increase in background checks actually results in Utah earning money through fees—and there is no evidence to the contrary—it is difficult to see how such a fiscal *benefit* can amount to an *injury* in fact. Utah's unsupported assertions of "*possible future injury*" are not sufficient to establish standing. *Clapper*, 568 U.S. at 409 (citation omitted).

## II. Tormey's Supplemental Filings Show That He Lacks Standing

Tormey contends that he has standing to challenge the Rule based on the risk that the federal government will rely on the Rule to bring an enforcement action against him and subject him to legal sanctions. *See* Suppl. Br. of Jeffrey W. Tormey 3, ECF No. 53 ("Tormey Suppl. Br."). To have standing to challenge the potential future enforcement of a statute or regulation, however, a plaintiff must show "an intention to engage in a course of conduct" that is "arguably proscribed" by that statute or regulation, and that "the threat of future enforcement . . . is substantial." *Susan B. Anthony List*, 573 U.S. at 161-64. And Tormey fails to satisfy multiple elements of this standard.

First, Tormey once again fails to "establish a serious intention to engage in conduct proscribed by law." *Zimmerman*, 881 F.3d at 389.[9] To have standing to bring his pre-enforcement challenge here, Tormey must intend to engage in conduct that would constitute being "engaged in the business" of

---

[8] Utah Dep't of Pub. Safety, *Instant Web Gun Checks System (Dealers)*, https://bci.utah.gov/firearm-transfers/instant-web-gun-check-system-dealers/ (last visited June 5, 2024).

[9] In the Court's discussion of Tormey's standing in its TRO opinion, the Court did not analyze whether Tormey had shown an intention to engage in conduct that is "proscribed" by the Rule. *See* Mem. Op. & Order 6, ECF No. 44.

dealing firearms under the Rule's interpretation of the GCA, which would then subject him to potential legal sanctions if he did not obtain a federal firearms license. Yet Tormey's declarations make plain that his intended firearms-related conduct *does not*, in fact, rise to the level of being "engaged in the business." In his initial declaration, Tormey stated that he is "a collector and a hobbyist" who engages in multiple shooting-related hobbies, "including recreation, competitive shooting, hunting, and training," and who has sold "at least a couple, or even several, firearms per year . . . in order to enhance the collection of firearms that [he] own[s]." Decl. of Jeffrey W. Tormey ¶¶ 4, 5, 9, ECF No. 16-3 ("Tormey Decl."). Yet as Defendants explained in their opposition brief, *see* Defs.' Opp'n at 14-15, such activity falls comfortably within the provision that excludes from the Rule's definition of "engaged in the business" "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby." Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)); *see also id.* at 29,090 (27 C.F.R. § 478.11) (defining "[p]ersonal collection" to include "[p]ersonal firearms that a person accumulates for study, comparison, exhibition . . . or for a hobby (*e.g.,* noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)").

Tormey now asserts in his supplemental declaration that he recently sold a firearm that he used for personal protection, and that he is also considering selling additional "self-defense" firearms to upgrade to newer models. Suppl. Decl. of Jeffrey W. Tormey ¶¶ 7-8, ECF No. 53-1 ("Suppl. Tormey Decl."). But this conduct likewise does not constitute being "engaged in the business" of dealing firearms under the Rule's interpretation of the GCA. That is because the Rule defines engaging in the business to mean "[a] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)). And Tormey's statements

14

that he occasionally sells a small number of personal-protection firearms to upgrade to newer models do not meet this multi-element standard.[10]

In contending otherwise, Tormey states that "ATF cannot even say for certain that *one* such sale of a self-defense firearm does not constitute being 'engaged in the business.'"  Suppl. Tormey Decl. ¶ 10.  Tormey misunderstands the Rule, however.  In providing that a "fact-specific inquiry" governs whether someone is engaged in the business of dealing, the Rule states:

> For example, even a single firearm transaction or offer to engage in a transaction, when combined with other evidence (*e.g.,* where a person represents to others a willingness and ability to purchase more firearms for resale), may require a license; whereas, a single isolated firearm transaction without such evidence would not require a license.

Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(b)).

ATF explained that this part of the Rule was supported by ample case law upholding convictions for unlicensed dealing where few, if any, completed firearms sales occurred, but there was nonetheless evidence of significant dealing activity.  *See id.* at 28,976 & n.67.  For example, in *United States v. King*, 735 F.3d 1098 (9th Cir. 2013), the defendant "secured" an "office" to run a firearms business "and incorporated an entity called McMinnville Hunting and Police Supply."  735 F.3d at 1101.  He also began submitting forged credit applications to "multiple firearms suppliers" to obtain at least "nineteen . . . firearms . . . as well as magazines and thousands of rounds of ammunition."  *Id.* at 1102.  Despite there being "no evidence that [the defendant] successfully sold any firearms," *id.*, the Ninth Circuit upheld his conviction for unlicensed dealing, reasoning that 18 U.S.C. § 922(a)(1)(A) "does not require an actual sale of firearms," *id.* at 1107 n.8.  In another case cited by ATF, the

---

[10] ATF has published guidance to help members of the public understand whether they are engaged in the business of dealing firearms under federal law.  *See* ATF, *Do I Need A License To Buy And Sell Firearms?*, https://www.atf.gov/firearms/docs/undefined/atfpublication53102pdf/download (updated May 2024).  That guidance provides the example of someone who owns "three handguns for self-protection at home and decides that she no longer wants two of them," so she "eventually resells the two handguns to a private collector," and it explains that such a person "would not have needed a license because these facts do not also include conduct indicating that she was devoting time, attention, and labor to dealing as a regular course of trade or business."  *Id.* at 22.

APPX.536

government produced significant evidence of a "weapons trafficking ring," in which the participants "discussed how to obtain and ship 'grenades,' 'warheads,' 'missiles,' and 'launchers'"; created price lists for such weapons; and "had a number of phone conversations in which they spoke about setting up a deal involving" firearms, including machine guns. *United States v. Nadirashvili*, 655 F.3d 114, 117-18 (2d Cir. 2011). And the Second Circuit upheld the convictions of two defendants for aiding and abetting unlicensed firearms dealing, explaining that rather than having to prove that the defendants "were aware that [a co-participant] was actually engaged in multiple [firearms] transactions," the government needed to prove that the defendants were aware that the co-participant "held himself out as a source of firearms and was ready to procure them for his customers." *Id.* at 120-21 (cleaned up).

ATF sensibly relied on this case law to conclude that under longstanding judicial interpretations of the GCA, a person can be engaged in the business of dealing without necessarily having completed multiple firearms sales. Yet that conclusion by no means supports Tormey's bare assertion that ATF would deem the mere sale of a single firearm for the purpose of upgrading to a newer model as amounting to being engaged in the business of dealing firearms too.[11]

Tormey's declarations and supplemental brief also fail to show that the "threat of future enforcement" of the Rule against him "is substantial." *Susan B. Anthony List*, 573 U.S. at 164. Tormey argues that a substantial risk of enforcement exists because he "fear[s]" that ATF might "presume" under the Rule that his "perfectly lawful" firearms-related conduct is "felonious." Tormey Suppl. Br. at 1-2. But as discussed, the conduct Tormey has described does not fall within any presumption articulated in the Rule, and Tormey "cannot manufacture standing" through such a subjective fear of "hypothetical future harm" that is far from "certainly impending." *Clapper*, 568 U.S. at 416.

---

[11] ATF's guidance explains that "nothing" in the Rule "precludes a person from lawfully acquiring firearms for self-protection or other lawful personal use, *or making isolated sales of such firearms* without devoting time, attention, and labor to dealing in firearms as a regular course of trade or business." ATF, *Do I Need A License To Buy And Sell Firearms?* at 32 (emphasis added).

16

At the TRO stage, the Court found a substantial threat of enforcement against Tormey existed after citing "a prior enforcement proceeding" discussed in another Plaintiff's declaration. Mem. Op. & Order at 6 (citing Decl. of Erich M. Pratt at 8-9, ECF No. 16-4 ("Pratt Decl.")). According to the declaration, that prior enforcement proceeding (a prosecution of Robert G. Arwady) was initiated in 2014, a decade before ATF promulgated the Rule and eight years before Congress amended the GCA via the BSCA. *See* Pratt Decl. ¶ 32. That proceeding also involved very different circumstances than those set forth in Tormey's declarations; specifically, Arwady was charged with dealing firearms without a license after he voluntarily surrendered his federal firearms license and later sold off his former "business inventory." *Id.* ¶¶ 33-34. A single example of a prosecution brought several years before the Rule was promulgated and under significantly different circumstances cannot show that there is a substantial risk that the federal government will invoke the Rule to bring an enforcement action against Tormey specifically, especially where his firearms-related conduct does not even constitute being "engaged in the business" of dealing firearms under the Rule's plain terms. *Cf. Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023) (finding standing in the pre-enforcement challenge context where there was a prior enforcement action *and* the plaintiffs were unquestionably "breaking" the agency guidance they were challenging).

## III. The Organizational Plaintiffs' Supplemental Filings Fail To Establish That They Have Associational Standing

For the reasons explained in Defendants' opposition brief, the four organizational plaintiffs in this case—Gun Owners of America, Inc. (GOA), Gun Owners Foundation (GOF), Tennessee Firearms Association (TFA), and Virginia Citizens Defense League (VCDL)—all lack associational standing to bring suit on behalf of their purported members. *See* Defs.' Opp'n at 18-20. And their supplemental filings do not cure that fundamental jurisdictional flaw.

As a threshold matter, GOF lacks associational standing because, as explained in Defendants' opposition brief, it is not the sort of membership organization that can invoke such standing in the

first place. *See* Defs.' Opp'n at 18 n.11; *see also Vote.Org v. Callanen*, 39 F.4th 297, 303 n.2 (5th Cir. 2022) ("Because it is a non-membership organization, Vote.org cannot contend that it has associational standing."). GOF concedes in its supplemental brief that it is "not a traditional membership association," but it contends that it nonetheless has "indicia of membership" sufficient to confer associational standing, principally because its "supporters" fund the organization and "communicat[e] their views . . . about issues on which GOF should focus." Suppl. Br. of Gun Owners Foundation 1-2, ECF No. 56. To satisfy the "indicia of membership" standard, however, an organization's members must "elect leadership, serve as the organization's leadership, *and* finance the organization's activities." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) (emphasis added). And GOF, at most, satisfies only the third requirement. GOF therefore fails to establish that it is an "appropriate representative" of its supporters such that it can claim standing on their behalf. *Warth v. Seldin*, 422 U.S. 490, 511 (1975).[12]

As for the other three organizational plaintiffs, they suggest in their supplemental briefs that they have already "adequately demonstrated [their] standing" based on Tormey being a member of each organization. Suppl. Br. of Gun Owners of America, Inc. 1, ECF No. 55 ("GOA Suppl. Br."); *see* Suppl. Br. of Tennessee Firearms Association 2, ECF No. 54; Suppl. Br. of Virginia Citizens Defense League 2, ECF No. 57. But as explained above and in Defendants' opposition brief, Tormey lacks standing to challenge the Rule in his own right and thus cannot serve as the basis for associational standing. *See OCA-Great Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (noting that associational standing requires an organization's members to have standing themselves).

---

[12] Another federal court in Texas recently found in another matter that GOF "ha[d] not satisfied the indicia of membership test as is required to have standing for a preliminary injunction." *Texas v. ATF*, -- F. Supp. 3d --, 2023 WL 7116844, at *8 (S.D. Tex. Oct. 27, 2023), *appeal filed*, No. 23-40685 (5th Cir. Dec. 1, 2023).

APPX.539

GOA, TFA, and VCDL are not saved by their supplemental filings. Each organization attempts to bolster its claim that it has associational standing with a supplemental declaration describing "conversations" between the organization and unnamed members who purport to be "directly impacted" by the Rule. GOA Suppl. Br. at 1-2; *see* ECF Nos. 54-1, 55-1, 57-1. Defendants respectfully disagree with the Court's conclusion at the TRO stage that the organizations can establish associational standing based on unnamed members, *see* Mem. Op. & Order at 7. *See Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 113 (2nd Cir. 2024) (concluding that *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), "and the precedent upon which it relies, support the view that an association cannot just *describe* the characteristics of specific members with cognizable injuries; it must identity at least one by name"); *see also Religious Sister of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022) (holding that an organizational plaintiff "lack[ed] associational standing to sue on behalf of unnamed members"); *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (explaining in the preliminary injunction context that an organizational plaintiff "must show that one of its *named members*" has standing (emphasis added)); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) ("[T]he Supreme Court has said that an affidavit provided by an association to establish standing is insufficient unless it names an injured individual."). *But see Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024).

Yet even assuming associational standing does not necessarily require identifying members by name, the organizational plaintiffs still must clearly show with sufficient evidence that they have such standing. *See Barber*, 860 F.3d at 352; *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 546 (5th Cir. 2005) ("The plaintiff has the burden of introducing sufficient evidence to justify the grant of a preliminary injunction."). They fail to do so here. Rather than providing declarations from members themselves, the organizations each filed a supplemental declaration from one of its leaders, in which that leader merely summarizes statements made by other non-declarants—namely, unidentified members who purportedly "fear" that the Rule will affect them in some way. Suppl. Decl. of Erich

19

M. Pratt ¶ 3, ECF No. 55-1 ("Suppl. Pratt Decl."); *see, e.g., id.* ¶ 4 ("GOA spoke to one member . . . ."); Suppl. Decl. of Philip Van Cleave ¶ 4, ECF No. 57-1 ("Suppl. Van Cleave Decl.") ("VCDL recently spoke to one member and supporter . . . ."); Suppl. Decl. of C. Richard Archie ¶ 13, ECF No. 54-1 ("Suppl. Archie Decl.") (stating that "[e]very TFA member" the leader "ha[s] talked to . . . have expressed concerns" about the Rule).[13]   And the organizational plaintiffs contend that such summaries of their unnamed members' statements establish that those members will, in fact, be "harmed by" the Rule.  Suppl. GOA Br. at 4.  But "[t]his, of course, is the purest form of inadmissible hearsay." *United States v. All Funds in the Acct. Prop. of Futures, Inc.*, 820 F. Supp. 2d 1305, 1332 (S.D. Fla. 2011); *see Gray v. White*, 18 F.4th 463, 470 (5th Cir. 2021) (defining hearsay).  The Supreme Court has stressed, moreover, that such "self-descriptions" of an organization's membership cannot be accepted in lieu of "individual affidavits" when determining whether an organization has associational standing. *Summers*, 555 U.S. at 498-99

The organizational plaintiffs' hearsay declarations certainly would not establish associational standing at the summary judgment stage.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose [summary judgment] must . . . set out facts that would be admissible in evidence . . . .").   The declarations would likewise fail to establish standing at the preliminary injunction stage in other circuits.  *See Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) ("When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.'" (citation omitted)); *Waskul*, 900 F.3d at 255 n.3 ("'[W]here a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.'" (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)).   And they fail to

---

[13] TFA appears to provide the last names of a few of its members, *see* Suppl. Archie Decl. ¶¶ 6-7, but goes no further in identifying them.

20

properly establish associational standing here too, especially in light of the extraordinary relief Plaintiffs seek.

In any event, GOA's, TFA's, and VCDL's supplemental declarations fail to establish standing for much the same reasons that Tormey's declarations do: The organizational plaintiffs do not clearly show that any of their members have standing to bring a pre-enforcement challenge against the Rule in their own right. Although the unnamed members described in the supplemental declarations face different factual circumstances, none of the declarations describes conduct that is reasonably likely to trigger enforcement under the Rule. *See Susan B. Anthony List*, 573 U.S. at 162 (requiring that a plaintiff bringing a pre-enforcement challenge intend to engage in conduct that is "proscribed" by the statute or regulation "they wish to challenge"). GOA, for instance, describes one unnamed member who "[o]ccasionally . . . sells firearms from their collection in order to make room for new firearms or to replace firearms," Suppl. Pratt Decl. ¶ 7, which, as with Tormey, does not rise to being "engaged in the business" of dealing firearms. Another unnamed GOA member purportedly "wishes to liquidate portions of" a "large collection of firearms" he inherited from a "late relative." *Id.* ¶ 13-14. But the Rule expressly provides that "liquidat[ing] firearms . . . [t]hat are inherited" is conduct that is *not presumed* to amount to being engaged in the business. Rule, 89 Fed. Reg. at 29,092. And TFA's supplemental declaration simply states that its member-declarant and other members "intend to change or improve their personal collection" of firearms "through the future acquisition and disposition of firearms" without providing any other details suggesting that such conduct even remotely falls under the Rule's "engaged in the business" definition. Suppl. Archie Decl. ¶¶ 6-7; *see id.* ¶ 3 (stating that the declarant-member buys and sells guns to improve his collection "and not for any commercial or business purpose"). Furthermore, none of the organizations' unnamed members asserts that they are facing any imminent threat of an enforcement action pursuant to the Rule. *See*

APPX.542

*Susan B. Anthony List*, 573 U.S. at 164.[14] Because the organizational plaintiffs fail to identify members

with standing to sue in their own right, they lack associational standing here.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Preliminary Injunction because, among other

reasons, Plaintiffs lack standing.

DATED: June 7, 2024                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       BRIGHAM J. BOWEN
                                       Assistant Director, Federal Programs Branch

                                       */s/ Zachary W. Sherwood*
                                       ZACHARY W. SHERWOOD
                                       (IN Bar No. 37147-49)
                                       JEREMY S.B. NEWMAN
                                       KERI L. BERMAN
                                       Trial Attorneys
                                       Civil Division, Federal Programs Branch
                                       U.S. Department of Justice
                                       1100 L Street, NW
                                       Washington, DC 20005
                                       Phone: (202) 616-8467
                                       Fax: (202) 616-8470
                                       Email: zachary.w.sherwood@usdoj.gov

                                       *Attorneys for Defendant*

---

[14] GOA asserts in its supplemental declaration that "[i]t . . . seems apparent that the ATF is enforcing [the Rule] against" one of its unnamed members. Suppl. Pratt Decl. ¶ 43. But that member apparently received a warning letter from ATF "shortly after" the BSCA "was passed," which occurred back in 2022, and was purportedly "visit[ed]" by ATF in "early May 2024," which was before the Rule's May 20, 2024 effective date. *Id.* ¶¶ 41-42. This alleged enforcement action thus cannot be attributed to the Rule.

22

APPX.543

## <u>CERTIFICATE OF SERVICE</u>

On June 7, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Zachary W. Sherwood*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS, *et al.*,

       Plaintiffs,

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES, *et al.*,

       Defendants.

2:24-CV-089-Z

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion for a Preliminary Injunction ("Motion") (ECF No. 16), filed May 9, 2024. Defendants filed their response ("Response") (ECF No. 31) on May 14, 2024. Having reviewed the briefing and relevant law, the Court **GRANTS** the Motion. Defendants are hereby **ENJOINED** from enforcing the regulations — "Definition of 'Engaged in the Business' as a Dealer in Firearms" (hereinafter "Final Rule") — published at 89 Fed. Reg. 28968 (April 19, 2024) (to be codified at 27 C.F.R. pt. 478) against Plaintiffs Texas, Louisiana, Mississippi, Utah, Jeffrey Tormey ("Tormey"), the Gun Owners of America, Inc. ("GOA"), the Gun Owners Foundation ("GOF"), the Tennessee Firearms Association ("TFA"), and the Virginia Citizens Defense League ("VCDL") pending the resolution of this lawsuit.

### BACKGROUND

The United States Attorney General has authority to enforce the Gun Control Act of 1968 ("GCA") and promulgate regulations necessary to enforce its provisions. 18 U.S.C. § 926(a). Congress and the Attorney General, in turn, delegated GCA administrative and enforcement responsibilities to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 U.S.C. §§ 599A(b)(1), (c)(1); 28 C.F.R. §§ 0.130(a)(1)–(2).

The GCA imposes strict requirements on firearms dealers and severe consequences for violating them. It makes it unlawful for any person — save a licensed dealer — to "engage in the business" of dealing in firearms until he has filed an application with ATF and received a license. 18 U.S.C. § 923(a). It requires dealers to conduct background checks on prospective firearms recipients and to maintain records for tracing purposes. *Id.* §§ 922(t), 922(b)(5), 923(g)(1)(A). And it provides that persons who willfully engage in the business of dealing firearms without a license face imprisonment for up to five years, a fine of up to $250,000, or both. *Id.* §§ 922(a)(1)(A), 924(a)(1)(D), 3571(b)(3). Any firearms involved in such violations may be subject to administrative or civil forfeiture. *Id.* § 924(d)(1).

The Firearms Owners' Protection Act of 1986 ("FOPA") modified the GCA, adding a statutory definition of "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." Pub. L. 99-308, § 101, 100 Stat. 449, 450 (1986). Then in 2022, President Biden signed into law the Bipartisan Safer Communities Act ("BSCA"). The BSCA broadened the definition of "engaged in the business" by eliminating the requirement that a person's "principal objective" of purchasing and reselling firearms must include both "livelihood and profit," replacing it with a requirement to "predominantly earn a profit." 18 U.S.C. § 921(a)(21)(C). However, the BSCA did not alter FOPA's exclusions for "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.*

On April 19, 2024, ATF promulgated a Final Rule to "provide clarity to persons who remain unsure of whether they are *engaged in the business* as a dealer in firearms with

2

APPX.546

the *predominant intent* of obtaining pecuniary gain." 89 Fed. Reg. at 28968 (emphasis added).
To that end, it clarifies "that firearms dealing may occur wherever, or through whatever medium,
qualifying . . . activities are conducted." *Id.* This includes "a gun show or event, flea market,
auction house, or gun range or club; at one's home; by mail order; over the internet; [and] through
. . . other electronic means (*e.g.*, an online broker, online auction, text messaging service, social
media raffle, or website) . . . ." *Id.* at 28973–74. And it clarifies that "a single firearm transaction
or *offer* to engage in a transaction" may require a license. *Id.* at 29091 (emphasis added).

Four States, a handful of organizations, and an individual citizen argue that the Final Rule
violates the Administrative Procedure Act ("APA") and the Constitution. In their view, the Final
Rule is (1) arbitrary and capricious; (2) in excess of ATF's lawful authority; (3) an abuse of ATF's
discretion; (4) in contravention of the BSCA; and (5) violative of the Second and Fourth
Amendments. *See generally* ECF No. 16. And Plaintiffs aver that they will suffer irreparable harm
if the Final Rule takes effect. *Id.* at 2. Defendants respond that (1) Plaintiffs do not have standing,
and (2) even if they did, their claims fail on the merits. ECF No. 31 at 25, 36.

On May 9, 2024, Plaintiffs moved for a temporary restraining order ("TRO"). ECF No. 16.
After reviewing briefing and conducting a hearing, this Court granted a TRO — but not as to all
Plaintiffs. ECF No. 44. Observing that Louisiana, Mississippi, and Utah's demonstration of
standing fell short, this Court excluded them from the TRO's reach and ordered supplemental
briefing. ECF No. 60. Defendants responded to that supplemental briefing on June 7, 2024.
ECF No. 66.

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must show (1) a substantial likelihood of
prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted;

(3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest. *Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023); *Air Prod. & Chemicals, Inc. v. Gen. Servs. Admin.*, No. 2:23-CV-147-Z, 2023 WL 7272115, at *2 (N.D. Tex. Nov. 2, 2023).

The first two factors are most critical, and the latter two merge when the government is an opposing party. *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020); *Nken v. Holder*, 556 U.S. 418, 435 (2009). That said, no factor has a "fixed quantitative value." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023). On the contrary, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* In sum, "[t]he decision to grant or deny [relief] lies within the sound discretion of the trial court . . . ." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

ANALYSIS

I.      **All Plaintiffs have standing.**

"Article III standing is a threshold issue." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013). As such, the Court addresses it before moving on to the merits. *See Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 525 (5th Cir. 2008) ("[B]efore considering any other matters raised by the parties, [the Court is] obliged to resolve the standing question as a threshold matter of jurisdiction.") (internal marks omitted).

To have standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). And such an injury must be "concrete, particularized, and actual or imminent . . . ." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008); *Texas v. Biden*, 589 F. Supp. 3d 595, 611 (N.D. Tex. 2022).

4

### A. Plaintiff States

Texas, Louisiana, Mississippi, and Utah all plead a "pocketbook injury" — "a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 461 (2017). Each State illustrates that the Final Rule will prohibit otherwise eligible persons from obtaining a Federal Firearms License ("FFL"), thereby reducing total attendance and sales at gun shows. This is not speculative. *See* ECF Nos. 61-1 at 2 (Declaration of Darwin Boedeker) (describing a "30% loss in reservations and attendance at [Boedeker's] shows" and "a loss of about $150,000 over the last six weeks" due to a reduction in "attendance, sales of tables, and people coming to sell" firearms); 37 at 7–8; 59 at 2–3; 62 at 3; 64 at 5–6. Indeed, the Final Rule itself recognizes — and anticipates — this effect. *See* 89 Fed. Reg. at 29054 (providing an estimate "of the proportion of those sellers who are likely to be either unwilling *or unable* to become licensed as an FFL as a result of the [Final Rule]") (emphasis added). And because each State collects a sales tax applicable to gun show admission fees, floor space fees, rental fees, parking fees, and — of course — the sale of firearms, each State will sustain financial losses.[1] ECF Nos. 37 at 7; 59 at 3; 62 at 2; 64 at 5.

Although the foregoing is itself a sufficient injury, the States specify that even taxable gun sales by persons *without* an FFL will be reduced as well. *See* ECF No. 59-1 at 6 ("Many websites allow lawful sales of firearms by persons who are not required to be an FFL."). Those sales are taxed. *See* ECF No. 62-1 at 1–2 ("Internet sellers . . . are required to register to collect Mississippi use tax on behalf of their Mississippi customers."). Louisiana, for example, collects a 4.45 percent sales tax on internet sales, purchases, and trades of firearms. ECF No. 59-1 at 6. As such, the Final Rule injures the States by — at the very least — (1) reducing taxable

---

[1] *See* Taxes — Fairs, Festivals, Markets, and Shows, https://comptroller.texas.gov/taxes/publications/96-211.php#:~:t ext=You%20must%20collect%20sales%20or,tax%20on%20your%20taxable%20sales.

5

APPX.549

sales by persons *with* FFLs, and (2) reducing taxable sales by persons *without* FFLs. Both results shrink the firearms market, lower attendance at gun shows, and deny the States taxable revenue.

Lastly, traceability and redressability "typically overlap" when a plaintiff challenges government action. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (Kavanaugh, J.). Here, the States establish that the Final Rule will result in losses to State fiscs. *See, e.g.*, ECF Nos. 59-1 at 6 (Declaration of Lucius L. Morris II of the Louisiana Department of Revenue); 62-1 at 1 (Declaration of Gregory I. Duke of the Mississippi Department of Revenue); 61-3 at 2 (Declaration of Murl E. Miller of the Office of the Texas Comptroller). That is a "real, immediate, and direct" injury. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). Moreover, enjoining the Final Rule — a but-for cause of the States' lost revenue — will redress that injury. *See Carpenters Indus. Council v. Zinke*, 854 F.3d at 6 n.1 ("After all, if a government action causes an injury, enjoining the action usually will redress that injury.").

Defendants respond with several arguments. First, they argue that Plaintiff States' pled injuries are foreclosed by *United States v. Texas*, 599 U.S. 670 (2023). But that case merely held that a "State's claim for standing *can* become more attenuated" when it asserts "that a federal law has produced only . . . indirect effects" on "state revenues or state spending." *Texas*, 599 U.S. at 680, n.3 (2023) (emphasis added). "Can" does not mean "does." Rather, *Texas* counsels that — in evaluating standing — a fact-specific, case-by-case inquiry is appropriate. The Supreme Court acknowledged as much about its decision. *See id.* at 683 ("The Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo.").

Defendants next cite *El Paso Cnty, Texas v. Trump* for the proposition that "incidental and attenuated harm" to "general tax revenue" is "insufficient to grant a state or county standing." 982 F.3d 332, 341 (5th Cir. 2020); ECF No. 66 at 10. There, the Fifth Circuit explained that "[a]

6

direct link, such as the loss of a *specific* tax revenue, is necessary . . . ." *El Paso Cnty.*, 982 F.3d at 340 (emphasis added). But that is what Plaintiff States provide. In line with cases like *Wyoming v. Oklahoma*, they allege "a direct injury in the form of a loss of *specific* tax revenues." 502 U.S. 437, 438 (1992) (emphasis added). Those tax revenues include, first and foremost, the sales and use taxes levied against firearms transactions (both at gun shows and via e-commerce) — but also motor fuels taxes, entertainment taxes, alcoholic beverages taxes, hotel taxes, and more. ECF Nos. 61-3 at 4–5 (Declaration of Murl E. Miller of the Office of the Texas Comptroller); 59-1 at 6 (Declaration of Lucius L. Morris II of the Louisiana Department of Revenue); 62-1 at 1 (Declaration of Gregory I. Duke of the Mississippi Department of Revenue); 64 at 5 (State of Utah's Brief on Standing).

Lastly, Defendants object that Plaintiff Texas's evidence merely suggests "that firearms sales *at certain gun shows* decreased compared to previous shows, which the promoter attributes to vendors' confusion regarding the [Final] Rule's scope." ECF No. 66 at 16 (emphasis in original). As such, the evidence "does not . . . speak to whether the number of firearms *sold in Texas overall* — including by FFLs and unlicensed sellers unimpacted by the Rule — decreased as well." *Id.* (emphasis in original). But how Texas — or any State, entity, or organization — could possibly demonstrate that is unclear. Indeed, the nature of many unlicensed sales is that they go *unreported*. In any event, a demonstration of omniscience is not required for Article III standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about."). Rather, courts "have found standing based on a 'substantial risk' that the harm will occur . . . ." *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2747 (2010)). Plaintiff States meet their burden.

7

### B.  Plaintiff Tormey

Challenging the potential future enforcement of a regulation requires a plaintiff to show (1) "an intention to engage in a course of conduct" that is "arguably proscribed" by the regulation and (2) that "the threat of future enforcement . . . is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014). Tormey is a gun owner who possesses a "large personal collection of firearms" that he "accumulated over many years." ECF No. 53 at 1. He pleads that he has "bought, sold, and traded firearms" and "previously purchased a table at certain gun shows, in order to facilitate enhancing [his] collection." ECF No. 16-3 at 3. He frequently changes the "model of firearm [he] carr[ies] for personal protection" due to the rapid changes in firearms technology. ECF No. 53-1 at 2. And he fears the Final Rule presumes "that much of his perfectly lawful conduct is in fact felonious, foisting on him the burden to prove his innocence for conduct that the statute already expressly declares to be lawful." ECF No. 53 at 2.

In response, Defendants contend that Tormey's intended conduct "does not . . . rise to the level of being 'engaged in the business.'" ECF No. 66 at 20; *see also* Tr. at 36: 18–21 ("[Tormey's conduct] is not the type of conduct that would implicate the [Final Rule] which targets unlicensed individuals engaged in the selling of firearms . . . principally for profit."). In support of that contention, they cite the Final Rule's definition of "engaged in the business": "[a] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." ECF No. 66 at 20 (citing 89 Fed. Reg. at 29091). From that, they conclude that "occasionally sell[ing] a small number of personal-protection firearms to upgrade to newer models do[es] not meet [the] multi-element standard." ECF No. 66 at 21–22.

8

But for the reasons explained *infra*, the Court disagrees. *See* Part II(A). Moreover, Defendants fail to clarify which element Tormey has not met. Instead, they assure Tormey that "a fact-specific inquiry" governs whether someone is "engaged in the business of dealing." *Id.* at 22. Given Defendants' subsequent reiteration that "a person can be engaged in the business of dealing without necessarily having completed multiple firearms sales," the promise of a "fact-specific inquiry" is cold comfort. *Id.* at 21–22.

Defendants next argue that Tormey fails to illustrate that the "threat of future enforcement" against him is "substantial." *Id.* at 22 (citing *Susan B. Anthony List*, 573 U.S. at 164). But that case "treated the threat of future enforcement as case- and fact-specific, understanding that evaluating threats . . . cannot be neatly reduced to a rigid formula." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 928 (5th Cir. 2023). The Fifth Circuit in *Braidwood* counsels that "even a 'public[] announce[ment]' to enforce a statute and one prior proceeding are sufficient for standing." *Id.* (quoting *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019)). Here, Defendants announced their intent to enforce the Final Rule. ECF No. 37 at 9. And Plaintiffs have identified a prior enforcement proceeding "targeting conduct falling squarely within the [Final] Rule's ambit." *Id.*; *e.g.*, ECF No. 16-4 at 8–9 (Declaration of Erich M. Pratt).

Defendants respond that (1) the identified prior enforcement proceeding "involved very different circumstances than those set forth in Tormey's declarations," and (2) the Fifth Circuit in *Braidwood* only found standing "where there was a prior enforcement action *and* the plaintiffs were unquestionably 'breaking' the agency guidance they were challenging." ECF No. 66 at 23 (emphasis in original). Neither argument succeeds. First, the prior enforcement proceeding involved a man — Mr. Arwady — who voluntarily surrendered his FFL after having been prosecuted by ATF but acquitted on all charges. ECF No. 16-4 at 8. He then "sold those personally

9

owned firearms to other private parties" to liquidate his collection and recoup his investment. *Id.* In doing so, Mr. Arwady did more than the law required: he paid for a transfer from his local FFL to the buyer's FFL and ensured proper paperwork and background checks for each firearm and buyer, respectively. *Id.* at 9. Nevertheless, ATF charged him with being "engaged in the business" without a license, arrested him, "put him in federal lockup, and seized his lifetime of collected firearms." *Id.* After the government brought the case to trial, the jury unanimously voted — again — to acquit him of all charges. *Id.* As such, Mr. Arwady's case and that of Tormey are relevantly similar in at least three ways: (1) neither held, nor hold, an FFL; (2) both intended, or intend, to sell firearms from a "personal collection"; and (3) Mr. Arwady was charged under — and Tormey challenges — similar "engaged in the business" language. ECF No. 44 at 6.

Second, Defendants misconstrue *Braidwood*. They characterize the Fifth Circuit as having found — via independent factual analysis — that "the plaintiffs were unquestionably 'breaking' the agency guidance they were challenging." ECF No. 66 at 23. Not quite. The court in *Braidwood* merely recognized that the plaintiffs "*admit* they are breaking [the] guidance" and "posit statutory . . . issues with the laws under which they are *at risk* of being prosecuted." *Braidwood*, 70 F.4th at 926 (emphasis added). But even if the *Braidwood* court had made such a finding, the opinion nowhere suggests that the "threat of enforcement" analysis *requires* this Court to find an actual violation. It suffices that the threat against Tormey is "substantial." *Susan B. Anthony List*, 573 U.S. at 164. And Defendants do not deny — nor could they — that such an enforcement would result in irreparable injury if it occurred.

### C. Plaintiff Organizations

Under the doctrine of associational standing, an association may bring suit on behalf of its members when (1) those members would otherwise have standing to sue; (2) the interests it seeks

to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. Appx. 189, 195 (5th Cir. 2012) (citing *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010)).

Here, three organizations (GOA, TFA, and VCDL) count Tormey — who has standing — as a member. ECF No.16-3 at 2. Moreover, TFA and VCDL have provided declarations evidencing that they have specific members "who will be impacted [by the Final Rule] because they have . . . bought and resold firearms, and wish to do so in the future without being improperly labeled as a 'dealer' in firearms." ECF No. 16-5 at 3 (Declaration of C. Richard Archie); ECF No. 16-6 at 3–4 (Declaration of Philip Van Cleave). The same holds true for GOF. *See* ECF No. 16-4 at 4 (Declaration of Erich M. Pratt). And the GOA describes a former FFL whose retirement savings are now frozen in unsellable inventory. ECF Nos. 37 at 11; 16-4 at 8.

Defendants respond that GOF "is not the sort of membership organization that can invoke such standing in the first place." ECF No. 66 at 24–25. And indeed, "a non-membership organization . . . cannot contend that it has associational standing." *Vote.org v. Callanen*, 39 F.4th 297, 303 n.2 (5th Cir. 2022). However, an association without traditional members may establish standing "by proving that it has 'indicia of membership' . . . ." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977)); *see also Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 435 (D.C. Cir. 2002) ("In determining whether an organization that has no members in the traditional sense may nonetheless assert associational standing, the question is whether the organization is the functional equivalent of a traditional membership organization.").

11

As described in Plaintiffs' Complaint, GOF is "a nonprofit legal defense and educational foundation" that is "supported by gun owners across the country." ECF No. 1 at 4. It litigates cases "throughout the country on behalf of [its] members and supporters." ECF No. 56 at 4. GOF members receive information about its activities through a quarterly newsletter and regular emails about its activities. *Id.* at 3. They regularly communicate their views to GOF about issues on which GOF should focus. *Id.* And they voluntarily fund GOF. *Id.* Indeed, because GOF is a nonprofit organization, it receives *all* its funding from supporters. *Id.* The foregoing, together, suffice for GOF's associational standing. *See Funeral Consumers All.*, 695 F.3d at 344 n.9 ("The organization must represent the individuals it claims as members and provide 'the means by which [those individuals] express their collective views and protect their collective interests.'") (quoting *Hunt*, 432 U.S. at 345); *see also id.* (recognizing that "financ[ing] the organization's activities, including the case's litigation costs" constitutes an "indicia of membership").

Defendants next argue that the organizations must identify their members by *name* to have associational standing. *See* ECF No. 31 at 33 ("[The organizational Plaintiffs] cannot establish standing based on an unnamed member."). But Defendants' purported support, *Summers v. Earth Island Institute*, did not consider impermissible reliance on anonymous or pseudonymous declarations to establish standing.[2] 555 U.S. 488, 495 (2009). Rather, it considered the plaintiffs' failure "to allege that *any* particular . . . sale or other project claimed to be unlawfully subject to the regulations [would] impede a specific and concrete plan" of the plaintiffs. *Id.* (emphasis in original). Nor has the Supreme Court adopted a "naming requirement" — such as the one proposed by Defendants — in the wake of *Summers. See, e.g., Students for Fair Admissions, Inc. v. Harvard*,

---

[2] The Tenth Circuit recognized that "[a]nonymity was not even an issue before the Supreme Court in *Summers.*" *Speech First, Inc. v. Shrum,* 92 F.4th 947, 949 (10th Cir. 2024). "Although one might read language in that opinion to require that only persons identified by their legal names can have standing, that was clearly not the intent of the Court." *Id.* "The opinion provided no hint, much less an emphatic statement, that it was abrogating decades of precedent." *Id.*

APPX.556

600 U.S. 181, 200–01 (2023) (holding that an organization had standing "when it filed suit" where it "identified" individual harmed members but did not provide their names).

Moreover, Defendants may be correct that some other Circuits require a named member. *See* ECF No. 66 at 25 (arguing that cases from the First, Second, and Sixth Circuits establish that unnamed members are insufficient for associational standing). But this Circuit does not. *See, e.g.*, *Hancock Cnty. Bd. of Sup'rs,* 487 F. Appx. at 195 (upholding the use of anonymous declarations); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (accepting anonymous declarations); *Chamber of Com. of U.S.A. v. Consumer Fin. Prot. Bureau*, No. 6:22-CV-00381, 2023 WL 5835951, at *6 (E.D. Tex. Sept. 8, 2023) ("[D]efendants argue that no plaintiff has shown that an 'identified member' suffers harm because some plaintiffs have used pseudonyms . . . . That argument fails."); *id.* (finding that anonymous declarations "credibly show that plaintiffs have identified members . . . currently suffering cognizable harm").

Lastly, Defendants argue that, "[r]ather than providing declarations from members themselves, the organizations each filed a supplemental declaration from one of its leaders" that merely "summarizes statements made by other non-declarants . . . who purportedly 'fear' that the [Final] Rule will affect them in some way." ECF No. 66 at 25. This objection fails for two reasons. First, it is factually inaccurate. In TFA's case, for example, it filed a declaration from C. Richard Archie, who is both a director *and a member* of the TFA. *See* ECF No. 54-1 at 1 ("I make these statements in my capacity as a director of the [TFA], *of which I am also a member*.") (emphasis added). As with many organizations of this sort, there is no expectation that a leader will not also be a member — if anything, the opposite assumption holds. Second, the declarations provide concreteness and detail, not mere fears that the Final Rule will affect the declarants in *some* way. *See, e.g.*, *id.* at 4–5 (explaining that the Final Rule's examples, exceptions, and presumptions make

13

it unclear how personal collections of firearms will be treated, thereby discouraging the altering, amending, improving, or selling of parts of the collection); 55-1 at 2 (describing a gun owner's concern that selling firearms from his personal collection will require him "to rebut th[e] presumption" of having an "intent to predominantly earn a profit," pursuant to 89 Fed. Reg. at 29091); 57-1 at 2.

The foregoing analyses establish that all Plaintiffs — the States, Tormey, and the firearm organizations — have standing. Having addressed that "threshold inquiry," this Court now moves to the merits analysis. *See Cibolo Waste, Inc.*, 718 F.3d at 473.

## II.     Plaintiffs are substantially likely to prevail on their APA claim.

Judicial review under the APA is limited to the administrative record. 5 U.S.C. § 706. "[A]gencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions." *Clean Water Action v. U.S. Env't Prot. Agency*, 936 F.3d 308, 313 n.10 (5th Cir. 2019); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). As such, courts are compelled to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority . . . ." 5 U.S.C. § 706(2)(A), (C).

The "arbitrary and capricious" standard asks a court to consider whether the agency "has relied on factors which Congress has not intended . . . , entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence[,]" or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

14

As this is a question of statutory interpretation, the Court begins with the text. *United States v. Lauderdale Cnty., Miss.*, 914 F.3d 960, 961 (5th Cir. 2019); *Air Prod. & Chemicals, Inc. v. Gen. Servs. Admin.*, No. 2:23-CV-147-Z, 2023 WL 7272115, at *7 (N.D. Tex. Nov. 2, 2023). Here, the Final Rule clashes with the text of the BSCA in at least three ways. First, it asserts that there is no "minimum number of firearms to actually be sold to be 'engaged in the business'" for the purposes of the licensing requirement. 89 Fed. Reg. at 29021. "[A] single firearm transaction" — or even a mere *offer* to engage in a transaction — may suffice. *Id.* at 28976.

> [W]hile selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity, neither the courts nor the Department have recognized a set minimum number of firearms purchased or resold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. *Even a single firearm transaction*, or offer to engage in a transaction, when combined with other evidence, *may be sufficient to require a license*.

89 Fed. Reg. at 28976 (emphasis added).

But the BSCA says otherwise:

> The term "engaged in the business" means . . .
>
> ***
>
> as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through *the repetitive purchase and resale of firearms*, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C) (emphasis added).

Defendants' proffered interpretation is severely undercut by Section 921(a)(21)(C)'s use of (1) "firearms," in the plural; (2) the phrase "regular course," clearly contemplating a series of events; (3) "repetitive," meaning more than once; and (4) the Section's exemption of "sales,

exchanges, or purchases" in the plural. 18 U.S.C. § 921(a)(21)(C). So too does Section 921(a)(21)(C) require the "purchase *and* resale" of firearms — a conjunctive requirement that flatly contradicts Defendants' assertion that "there is no minimum threshold number of firearms purchased *or* sold that triggers the licensing requirement." 89 Fed. Reg. at 29091 (emphasis added).

Second, the Final Rule suggests that "actual profit is not a requirement of the statute — it is only the predominant *intent* to earn a profit through the repetitive purchase and resale of firearms that is required." *Id.* at 29045. In other words, "a person may repeatedly advertise and display firearms for sale, and therefore demonstrate a predominant intent to earn a profit from repeatedly reselling the firearms purchased, but never actually find a buyer." *Id.* But Section (a)(22) of the BSCA provides:

> The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for *criminal purposes or terrorism*.

18 U.S.C § 921(a)(22) (emphasis added).

The negative corollary is obvious: while proof of profit is *not* required "for criminal purposes or terrorism," it *is* required for all other cases. *See Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 694 (5th Cir. 2020) ("[T]he canon of *Expressio Unius Est Exclusio Alterius* . . . provides that expressing one item of [an] associated group or series excludes another left unmentioned.") (internal marks omitted). Moreover, the mere fact that the word "intent" appears in the Section does not necessitate — or even suggest — that intent is *all* that is required. Rather, the Section's usage of "intent" serves to distinguish the *type* of intent contemplated: "one of obtaining pecuniary gain." 18 U.S.C § 921(a)(22). Action is needed, too.

16

Third, the Final Rule arbitrarily eviscerates Section 921(a)(21)(C)'s safe harbor provision.[3] That provision reads:

> The term "engaged in the business" . . . shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C). Nothing in the foregoing text suggests that the term "personal collection" does not include firearms accumulated primarily for personal protection — yet that is exactly what the Final Rule asserts. *See* 89 Fed. Reg. at 29090 ("[T]he term [personal collection] shall not include firearms accumulated . . . for personal protection[.]"). Nor can Defendants' position be supported by its *own* interpretative policy of implementing terms' "common meaning." *See id.* at 28974 ("This definition is consistent with the common meaning of 'purchase,' . . . . This definition is consistent with the common meaning of 'sale[.]'"). Here, Plaintiffs' reading of the Section 921(a)(21)(C) terminology "personal collection" is more consonant with "common meaning." *See Collection*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) ("[A] number of objects or persons or a quantity of a substance that has been collected or has collected often according to some unifying principle . . . ."); *see also Collection*, WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY (1940) ("That which is collected; as: a gathering or assemblage of objects or of persons; an accumulation of specimens of a certain class . . . .").

Yet Defendants maintain their interpretation despite acknowledging that "two-thirds of Americans report owning firearms primarily for 'defense' or 'protection'" — thereby necessitating the absurdity that the statute's safe harbor provision provides *no safe harbor at all* for the majority

---

[3] Defendants themselves recognize the accuracy of the phrase "safe harbor provision" and utilize it several times throughout the Final Rule. *See, e.g.*, 89 Fed. Reg. at 29025 ("The proposed rule explicitly recognized the GCA's 'safe harbor' provision that a person is not engaged in the business if the person makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby.").

17

of gun owners. 89 Fed. Reg. at 29036. Such an interpretation is untenable given the provision's logical statutory role. *See* A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012) ("[T]he whole-text canon . . . calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical *and logical relation of its many parts*," as "[t]he entirety of the document thus provides the context for each of its parts.") (emphasis added); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (holding that courts must look to "the language and design of the statute as a whole"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a[] harmonious whole.").

Lastly, the Final Rule creates sets of presumptions indicating (1) "when a person has the intent to 'predominantly earn a profit'" and (2) "that someone is 'engaged in the business.'" 89 Fed. Reg. at 28968–69. But these presumptions are highly problematic for at least two reasons. First, they flip the statute on its head by requiring that firearm owners prove innocence rather than the government prove guilt. *See id.* at 29024 ("[T]he presumptions are rebuttable, so in the event a civil or administrative proceeding is brought, and a presumption is raised, *it can be rebutted with reliable evidence to the contrary*.") (emphasis added). Second, several presumptions conflict with the statutory text. Two of them, for example, provide that a person is presumptively "engaged in the business" if he "demonstrates a willingness and ability to purchase and resell" firearms or "purchases . . . *or* . . . resells" firearms. *Id.* at 29091 (emphasis added). But as discussed *supra*, a mere willingness is not enough — there must also be prohibited acts. *See* 18 U.S.C. § 921(a)(21)(C) ("through the *repetitive purchase and resale of firearms*") (emphasis added). Nor is purchasing *or* reselling sufficient — the statute provides a conjunctive. *See id.* ("purchas[ing] *and* res[elling]") (emphasis added).

18

Plaintiffs understandably fear that these presumptions will trigger civil or criminal penalties for conduct deemed lawful just yesterday. Nevertheless, ATF avers that its "knowledge of existing case law" and "subject-matter expertise" will prevent misuse or abuse of the presumptions. 89 Fed. Reg. at 28975. In other words, "just trust us." But "[p]resumptions, especially in administrative proceedings that may generate institution-destroying liability, cannot be a matter of Department *ipse dixit*." *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 251 (5th Cir. 2024). As such, Defendants' assurances fall short.

For the foregoing reasons, Plaintiffs are substantially likely to succeed on the merits of their APA claim. Accordingly, further analysis of their other claims — including their constitutional ones — is unnecessary at this time. *See VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 659 F. Supp. 3d 736, 741 (N.D. Tex. 2023) ("To obtain a preliminary injunction, . . . movants must show that they are likely to succeed on the merits of *at least one* of their claims.") (emphasis added); *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). "The Court defers ruling on the remaining Counts, which should not be construed as an indication of the Court's view of their merits." *Texas v. United States*, 515 F. Supp. 3d 627, 632 (S.D. Tex. 2021).

### III. Plaintiffs face irreparable injury and are favored by the equities and public interest.

"In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 348 (5th Cir. 2022); *VanDerStok v. Garland*, 625 F. Supp. 3d 570, 582 (N.D. Tex. 2022). Irreparable harm must also be concrete, non-speculative, and more than *de minimis*. *Daniels Health Scis., L.L.C.*, 710 F.3d at 586. Lastly, "[t]he government's and the public's interests merge when the government is a party." *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023).

19

That Plaintiffs would suffer irreparable injury absent an injunction is hard to dispute. Plaintiff States face the irreparable injury of revenue loss. *Wages & White Lion Invs.*, 16 F.4th 1130, 1142 (5th Cir. 2021). The particular amount of that revenue loss is of limited relevance. *See Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) ("In determining whether costs are irreparable, the key inquiry is 'not so much the magnitude but the irreparability.'") (quoting *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016)). Indeed, "[e]ven purely economic costs may count as irreparable harm 'where they cannot be recovered in the ordinary course of litigation.'" *Id.* (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Other Plaintiffs face both civil and criminal enforcement actions for engaging in conduct that the BSCA permits but the Final Rule impermissibly forbids. They cannot engage in lawful, noncommercial conduct without fear of prosecution. They cannot collect firearms for personal defense while enjoying statutory protection. Nor can they dispose of firearms from their personal collections for fear of being presumed "engaged in the business." ECF No. 16 at 43. And Plaintiffs' monetary costs — as well as those accrued by persons seeking licensure to avoid liability — "are unrecoverable because of the government–defendant's sovereign immunity from monetary damages[.]" *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:23-CV-1471-L, 2024 WL 1349307, at *9 (N.D. Tex. Mar. 29, 2024); *see also Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs[.]")

Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021). And as this Court's analysis makes clear, Defendants' Final Rule is almost certainly violative of — at the least — the APA. As such, "both

the balance of equities and the public interest weigh in favor of allowing orderly judicial review of the Rule before anyone shuts down their businesses or sends them to jail." *VanDerStok v. Garland*, 2023 U.S. App. LEXIS 26499, at *6 (5th Cir. Oct. 2, 2023).

### CONCLUSION

Plaintiffs' Motion for a preliminary injunction is **GRANTED**. Defendants are hereby **ENJOINED** from enforcing the regulations — "Definition of 'Engaged in the Business' as a Dealer in Firearms" — published at 89 Fed. Reg. 28968 (April 19, 2024) (to be codified at 27 C.F.R. pt. 478) against all Plaintiffs pending the resolution of this lawsuit.

**SO ORDERED**.

June 11, 2024

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

21

APPX.565

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS, *et al.*,

    Plaintiffs,

  v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

    Defendants.

Case No. 2:24-cv-00089-Z

## <u>NOTICE OF APPEAL</u>

Please take notice that Defendants hereby appeal to the United States Court of Appeals for

the Fifth Circuit from the Court's June 11, 2024 Memorandum Opinion and Order, ECF No. 70.

1

DATED: July 2, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Zachary W. Sherwood*
ZACHARY W. SHERWOOD
(IN Bar No. 37147-49)
JEREMY S.B. NEWMAN
KERI L. BERMAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 616-8467
Fax: (202) 616-8470
Email: zachary.w.sherwood@usdoj.gov

*Attorneys for Defendants*

APPX.567

**CERTIFICATE OF SERVICE**

On July 2, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Zachary W. Sherwood*
ZACHARY W. SHERWOOD
Trial Attorney
U.S. Department of Justice

APPX.568

No. 24-10612

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————

STATE OF TEXAS; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE
OF UTAH; JEFFREY W. TORMEY; GUN OWNERS OF AMERICA,
INCORPORATED; GUN OWNERS FOUNDATION; TENNESSEE FIREARMS
ASSOCIATION; VIRGINIA CITIZENS DEFENSE LEAGUE,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED
STATES DEPARTMENT OF JUSTICE; MERRICK GARLAND, in his official
capacity as Attorney General of the United States; STEVEN DETTELBACH, in his
official capacity as Director of Bureau of Alcohol, Tobacco, Firearms and Explosives,

Defendants-Appellants.

———————

On Appeal from the United States District Court
for the Northern District of Texas

———————

BRIEF FOR APPELLANTS

———————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

LEIGHA SIMONTON
*United States Attorney*

MICHAEL S. RAAB
BRAD HINSHELWOOD
KEVIN KENNEDY
*Attorneys, Appellate Staff
Civil Division, Room 7256
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-7823*

APPX.569

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are

all governmental parties.  5th Cir. R. 28.2.1.

## STATEMENT REGARDING ORAL ARGUMENT

The district court issued a preliminary injunction against a Bureau of Alcohol, Tobacco, Firearms and Explosives rule addressing when individuals are required to obtain a license to deal in firearms. The district court's standing analysis departs from two other district courts that denied preliminary injunctions against the same rule and adopts views of the federal licensing requirements that have been consistently rejected by this Court and others. The government believes that oral argument would assist the Court in resolving the case.

APPX.571

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ v

STATEMENT OF JURISDICTION ................................................................... 1

STATEMENT OF THE ISSUES ........................................................................ 1

STATEMENT OF THE CASE ........................................................................... 2

      A.    Statutory and Regulatory Background ................................................ 2

      B.    Prior Proceedings ............................................................................... 7

SUMMARY OF ARGUMENT .......................................................................... 9

STANDARD OF REVIEW .............................................................................. 12

ARGUMENT ................................................................................................... 12

I.     Plaintiffs Lack Article III Standing ....................................................... 12

      A.    Tormey Has Not Alleged an Intent to Engage in Conduct
           Addressed by the Rule ...................................................................... 13

      B.    The Organizational Plaintiffs Lack Associational Standing .............. 19

      C.    The States Cannot Establish Standing Based on Speculative and
           Attenuated Claims of Lost Tax Revenue .......................................... 25

II.    Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits ...... 33

      A.    Federal Law Does Not Set A Numerical Threshold for Firearms
           Sales or Transactions That Require a License .................................... 34

      B.    Persons Dealing in Firearms Require a License Even If They Fail
           to Turn a Profit ................................................................................ 38

      C.    The Rule's Understanding of "Personal Collection" Tracks the
           Statute ............................................................................................. 41

iii

APPX.572

D.    The Rule's Presumptions Do Not Shift the Burden of Proof in
      Any Proceeding .................................................................................45

III.    The Other Factors Weigh Against an Injunction .................................. 47

IV.    Relief Should Be Limited to the Offending Parts of the Rule and to the
       Injured Parties .................................................................................... 48

CONCLUSION ....................................................................................... 51

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                                    **Page(s)**

*Alaska Airlines, Inc. v. Brock,*
    480 U.S. 678 (1987) ......................................................................................... 49

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) .......................................................................... 29

*Braidwood Mgmt., Inc. v. EEOC,*
    70 F.4th 914 (5th Cir. 2023) ...........................................................................18

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024) .......................................................................... 47

*Chemical Mfrs. Ass'n v. Department of Transp.,*
    105 F.3d 702 (D.C. Cir. 1997) ...................................................................... 46

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ....................................................................... 13, 16, 25

*Cole v. USDA,*
    33 F.3d 1263 (11th Cir. 1994) ...................................................................... 46

*Do No Harm v. Pfizer Inc.,*
    96 F.4th 106 (2d Cir. 2024) .......................................................................... 22

*Draper v. Healey,*
    827 F.3d 1 (1st Cir. 2016) ............................................................................. 22

*El Paso County v. Trump,*
    982 F.3d 332 (5th Cir. 2020) .......................................... 9, 27, 28, 28-29, 29, 31, 32, 33

*Florida v. Mellon,*
    273 U.S. 12 (1927) ................................................................................. 26, 27

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) ........................................................... 9, 25, 26, 28

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
    129 F.3d 826 (5th Cir. 1997) ........................................................................ 24

*Funeral Consumers All., Inc. v. Service Corp. Int'l,*
    695 F.3d 330 (5th Cir. 2012) .................................................................. 23, 24

*Gill v. Whitford*,
    585 U.S. 48 (2018)................................................................................ 48

*Haaland v. Brackeen*,
    599 U.S. 244 (2023)............................................................................. 25

*Hancock County Board of Supervisors v. Ruhr*,
    487 F. App'x 189 (5th Cir. 2012).........................................................22

*Huddleston v. United States*,
    415 U.S. 814 (1974)......................................................................... 2, 44

*Iowa ex rel. Miller v. Block*,
    771 F.2d 347 (8th Cir. 1985) ............................................................... 29

*Jiao v. Xu*,
    28 F.4th 591 (5th Cir. 2022) ............................................................... 12

*John Doe #1 v. Veneman*,
    380 F.3d 807 (5th Cir. 2004) .............................................................. 49

*Kansas v. Garland*,
    No. 2:24CV00088 JM, 2024 WL 2384611 (E.D. Ark. May 23, 2024) ...................... 26

*Kansas v. Garland*,
    No. 24-cv-01086-TC-TJJ, 2024 WL 3360533 (D. Kan. July 10, 2024) .................... 26

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................. 13

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994).............................................................................. 49

*MD/DC/DE Broads. Ass'n v. FCC*,
    236 F.3d 13 (D.C. Cir. 2001) ............................................................... 49

*Moore v. Brown*,
    868 F.3d 398 (5th Cir. 2017) ............................................................... 12

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024) ................................................................ 9, 20, 25

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................. 48

vi

APPX.575

*NLRB v. Curtin Matheson Sci., Inc.*,
    494 U.S. 775 (1990)....................................................................................46

*OCA-Greater Hous. v. Texas*,
    867 F.3d 604 (5th Cir. 2017) ............................................... 19, 23

*Pennsylvania ex rel. Shapp v. Kleppe*,
    533 F.2d 668 (D.C. Cir. 1976) .................................................. 29

*Religious Sisters of Mercy v. Becerra*,
    55 F.4th 583 (8th Cir. 2022) .................................................... 22

*Southwestern Elec. Power Co. v. U.S. EPA*,
    920 F.3d 999 (5th Cir. 2019) ................................................... 49

*Speech First, Inc. v. Fenves*,
    979 F.3d 319, 330 (5th Cir. 2020) ...........................................22

*Speech First, Inc. v. Shrum*,
    92 F.4th 947 (10th Cir. 2024) .................................................. 22

*State v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ..................................................... 8

*Steffel v. Thompson*,
    415 U.S. 452 (1974)................................................................. 18

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)................................................................. 23

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)................................................................. 20

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)............................................. 13, 15, 16, 18, 21

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)........................................................... 12, 50

*United States v. Biswell*,
    406 U.S. 311 (1972)........................................................... 11, 48

*United States v. Carter*,
    801 F.2d 78 (2d Cir. 1986) ..................................................... 36

APPX.576

*United States v. Idarecis,*
    164 F.3d 620 (2d Cir. 1998) ............................................................43

*United States v. King,*
    735 F.3d 1098 (9th Cir. 2013) ................................................. 10, 36

*United States v. Nadirashvili,*
    655 F.3d 114 (2d Cir. 2011) .............................................................. 36

*United States v. Shipley,*
    546 F. App'x 450 (5th Cir. 2013) ........................................... 10, 39

*United States v. Swinton,*
    521 F.2d 1255 (10th Cir. 1975) ........................................................ 36

*United States v. Texas,*
    599 U.S. 670 (2023) ........................................................................... 27

*United States v. Tyson,*
    653 F.3d 192 (3d Cir. 2011) ......................................... 11, 39, 42

*United States v. Valdes,*
    681 F. App'x 874 (11th Cir. 2017) .................................................. 39

*United States v. Wilmoth,*
    636 F.2d 123 (5th Cir. Unit A Feb. 1981) ............................. 36, 39

*Viasat, Inc. v. FCC,*
    47 F.4th 769 (D.C. Cir. 2022) .......................................................... 24

*Washington v. U.S. Food & Drug Admin.,*
    108 F.4th 1163 (9th Cir. 2024) ........................................................ 29

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................ 12

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) .................................................................... 31, 32

*Wyoming v. U.S. Dep't of Interior,*
    674 F.3d 1220 (10th Cir. 2012) ....................................................... 29

*Ysleta Del Sur Pueblo v. Texas,*
    596 U.S. 685 (2022) ........................................................................... 44

APPX.577

*Zimmerman v. City of Austin*,
  881 F.3d 378 (5th Cir. 2018) .................................................................. 15, 21

**Statutes:**

Act of July 8, 1986,
  Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 ..................................................40

Bipartisan Safer Communities Act,
  Pub. L. No. 117-159, 136 Stat. 1313 (2022)......................................................2

Firearms Owners' Protection Act,
  Pub. L. No. 99-308, § 101, 100 Stat. 449, 450 (1986)......................................3

Gun Control Act of 1968:
  18 U.S.C. § 921 *et seq.* ....................................................................................... 2
  18 U.S.C. § 921(a)(13) ........................................................................ 10, 42, 43
  18 U.S.C. § 921(a)(21)(C) ............................ 3, 6, 10, 14, 15, 34, 35, 38, 41
  18 U.S.C. § 921(a)(22)...................................... 3, 6, 10, 35, 38, 39, 40
  18 U.S.C. § 922(a)(1)(A) .................................................................................. 1, 2
  18 U.S.C. § 922(b)(5) ........................................................................................ 2
  18 U.S.C. § 922(t)(1) ........................................................................................ 2
  18 U.S.C. § 923(g)(1)(A) .................................................................................. 2

28 U.S.C. § 1292(a)(1) ........................................................................................ 1

28 U.S.C. § 1331 .................................................................................................. 1

**Regulations:**

27 C.F.R. § 478.11 ................................................................ 6, 11, 14, 41, 42, 49-50

27 C.F.R. § 478.13(a) ................................................................................ 14, 15

27 C.F.R. § 478.13(b) ................................................................................ 17, 37

27 C.F.R. § 478.13(c) ................................................................................ 5, 45

27 C.F.R. § 478.13(c)(1) ........................................................................................ 47

27 C.F.R. § 478.13(c)(2) ........................................................................................ 47

27 C.F.R. § 478.13(c)(2)(ii)(A) ............................................................................ 4

APPX.578

27 C.F.R. § 478.13(d) ............................................................................. 40

27 C.F.R. § 478.13(d)(2) ...................................................................... 4, 45

27 C.F.R. § 478.13(d)(2)(i) ..................................................................... 46

27 C.F.R. § 478.13(d)(2)(ii) ..................................................................... 4

27 C.F.R. § 478.13(e) ................................................................................ 4

27 C.F.R. § 478.13(g) ............................................................................... 5

27 C.F.R. § 478.13(h) ............................................................................. 45

27 C.F.R. § 478.57 .................................................................................. 45

27 C.F.R. §§ 478.121-478.134 ................................................................. 2

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ....................................................................... 1

**Other Authorities:**

ATF, *Do I Need A License to Buy and Sell Firearms?*,
  https://perma.cc/RX5R-7K47 (last updated May 2024) ........................... 15

*Collection*, Merriam-Webster Online Dictionary,
  https://perma.cc/KXX7-ASLQ .............................................................. 41

*Definition of "Engaged in the Business" as a Dealer in Firearms*,
  89 Fed. Reg. 28,968 (Apr. 19, 2024) ........................... 1, 3, 4, 5, 6, 7, 10, 11, 14, 15, 17,
                                                                              21, 30, 34, 36-37, 37, 38, 40, 41,
                                                                              42, 43, 44, 45, 46, 47, 48, 49, 50

APPX.579

## STATEMENT OF JURISDICTION

The district court entered a preliminary injunction on June 11, 2024.

ROA.1010.  Defendants appealed on July 2.  ROA.1016; *see* Fed. R. App. P. 4(a)(1)(B)

(60-day time limit).  The district court had jurisdiction under 28 U.S.C. § 1331, and

this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

For decades, persons "engage[d] in the business" of dealing in firearms have

been required to obtain a license from the Bureau of Alcohol, Tobacco, Firearms and

Explosives (ATF).  18 U.S.C. § 922(a)(1)(A).  In 2022, Congress expanded the

definition of "engaged in the business" to cover additional persons.  ATF

subsequently promulgated the rule at issue here, which both implements the statutory

change and addresses longstanding noncompliance issues by clarifying when a person

is "engaged in the business" of dealing in firearms and setting forth examples of

conduct that presumptively does, or does not, rise to the level of engaging in the

business of dealing.  *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed.

Reg. 28,968 (Apr. 19, 2024) (Rule).  The district court issued a preliminary injunction

against the Rule, holding that plaintiffs have standing and that the Rule likely is

unlawful because it is inconsistent with the statute.

The questions presented are:

1.  Whether plaintiffs have standing to challenge the Rule.

2. Whether the Rule is arbitrary and capricious under the Administrative

Procedure Act (APA).

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

1. To restrict the access of criminals and other dangerous individuals to

firearms, federal law has long imposed requirements on dealers of firearms, most

notably through the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.* (GCA). *See*

*Huddleston v. United States*, 415 U.S. 814, 825 (1974). Federal firearms licensees (FFLs)

must comply with various obligations when transferring firearms to non-licensees,

including submitting information about the transferee to the Federal Bureau of

Investigation's National Instant Criminal Background Check System (NICS), which

then conducts a background check on the transferee and prevents transactions where

the transferee is prohibited from receiving or possessing the firearm. 18 U.S.C.

§ 922(t)(1). FFLs also maintain records of firearms transfers, enabling tracing of

firearms recovered from crime scenes. *Id.* §§ 922(b)(5), 923(g)(1)(A); 27 C.F.R.

§§ 478.121-478.134.

Since the GCA's enactment, Congress has required anyone "engage[d] in the

business" of dealing firearms to become an FFL. 18 U.S.C. § 922(a)(1)(A). As most

recently amended by the Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136

Stat. 1313 (2022) (BSCA), "engaged in the business" means "a person who devotes

time, attention, and labor to dealing in firearms as a regular course of trade or

2

APPX.581

business to predominantly earn a profit through the repetitive purchase and resale of firearms," while excluding anyone "who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). The GCA as amended defines "to predominantly earn a profit" to "mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* § 921(a)(22). There is no requirement to prove that intent for persons who "engage[] in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.*

Congress added the definition of "to predominantly earn a profit" to the statute to broaden the category of individuals covered by the licensing requirement. Previously, the GCA required persons to be licensed if they had "the principal objective of livelihood and profit." *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 101, 100 Stat. 449, 450 (1986). There is thus no longer a requirement that "livelihood" be part of the intent in selling firearms; a predominant intent to "obtain[] pecuniary gain" is sufficient. 18 U.S.C. § 921(a)(22).

2. Even before the BSCA amendments, ATF observed significant noncompliance with the licensing requirements of the GCA. 89 Fed. Reg. at 29,086. After the BSCA amendments, ATF conducted the rulemaking at issue here to "implement" the BSCA's "statutory change" to the definition of engaged in the

3

APPX.582

business and to "provide clarity to persons who remain unsure of whether" they are engaged in the business of dealing in firearms. *Id.* at 28,968.

The Rule does not require anyone to become an FFL of its own force. Instead, relying on "conduct that the courts have found to require a license even before the BSCA expanded the definition of 'engaged in the business'" and ATF's enforcement experience, 89 Fed. Reg. at 28,977, the Rule identifies circumstances in which individuals are presumptively "engaged in the business" or likely have the requisite intent "to predominantly earn a profit," *id.* at 29,091; *see id.* at 28,977 nn.72-73, 28,978 nn.74-77, 79-80, 28,979 nn.81-83, 28,981-82, 28,981 nn.97-99, 28,982 nn.100-104 (collecting case law and examples of federal prosecutions), as well as circumstances in which individuals presumptively do not meet the statutory definition, *id.* at 29,092.

For example, a person is presumptively engaged in the business if he repetitively purchases stolen firearms for the purpose of resale, or resells or offers for resale stolen firearms. 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(2)(ii)(A)). Similarly, a person presumptively has the requisite intent to earn a profit if the person repetitively or continuously purchases or rents physical space to display firearms offered for resale. *Id.* (27 C.F.R. § 478.13(d)(2)(ii)). By contrast, a person "shall not be presumed" to be engaged in the business if they only resell or transfer firearms "[o]ccasionally to a licensee or to a family member for lawful purposes." *Id.* at 29,092 (27 C.F.R. § 478.13(e)). The Rule explains that the ultimate assessment will depend upon the totality of the circumstances: "neither the courts nor the Department have

4

APPX.583

recognized a set minimum number of firearms purchased or resold that triggers the licensing requirement." *Id.* at 28,976.

The Rule provides that the identified circumstances give rise to rebuttable presumptions in civil or administrative (but not criminal) proceedings. 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c), (d)(2)). Within civil and administrative proceedings, the rebuttable presumptions "apply only to shift the burden of production, not the burden of persuasion." *Id.* at 29,007. Thus, "the rebuttable presumptions are merely evidentiary tools to assist the trier of fact in determining whether the Government has met its burden of production in a given proceeding." *Id.* Therefore, "[i]f evidence sufficient to support a presumption is produced in a civil or administrative proceeding, the responding person has the opportunity to produce reliable rebuttal evidence to refute that presumption." *Id.* at 29,026. And the Rule is clear that the activities set forth in the presumptions, and the examples of rebuttal evidence set out in the Rule, "are not exhaustive of the conduct or evidence that may be considered." *Id.* at 29,092 (27 C.F.R. § 478.13(g)).

To illustrate the point in concrete terms, if the government produces reliable evidence in an administrative proceeding that a person repetitively purchases stolen firearms for the purpose of resale, that evidence would give rise to a presumption in that proceeding that the person is required to be licensed. The person would then bear the burden to produce reliable evidence showing that their conduct nevertheless does not require a license.

APPX.584

Two specific aspects of the Rule are particularly relevant here. First, the GCA's definition of "to predominantly earn a profit" turns on "the intent underlying the sale," namely that the seller "predominantly" intend to "obtain[ ] pecuniary gain." 18 U.S.C. § 921(a)(22). Consistent with that definition, Rule explains that "actual profit is not a requirement of the statute—it is only the predominant intent to earn a profit through the repetitive purchase and resale of firearms that is required." 89 Fed. Reg. at 29,045. Thus, under the statute, it follows that "a person may repeatedly advertise and display firearms for sale, and therefore demonstrate a predominant intent to earn a profit from repeatedly reselling the firearms purchased, but never actually find a buyer." *Id.*

Second, the statutory definition of "engaged in the business" excludes "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby" or sales of "all or part of [a] personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). Drawing on dictionary definitions and case law, the Rule defines the term "personal collection" to include "[p]ersonal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)." 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11). The Rule further explains that firearms purchased "for the purpose of resale with the predominant

intent to earn a profit" or "accumulated primarily for personal protection" are not part of a "personal collection," though the Rule provides that nothing in it "shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use." *Id.*

### B.     Prior Proceedings

A group of nine plaintiffs—four States (Texas, Louisiana, Mississippi, and Utah), four firearms organizations (Gun Owners of America, Inc. (GOA), Gun Owners Foundation (GOF), Tennessee Firearms Association (TFA), and Virginia Citizens Defense League (VCDL)), and one individual (Jeffrey W. Tormey)—filed suit in the Northern District of Texas and sought a temporary restraining order or preliminary injunction.  ROA.19-21.  The complaint brought three claims that the Rule allegedly violates the APA and claims for violations of the Fifth Amendment's vagueness doctrine, the Second Amendment, the Fourth Amendment, and the separation of powers.  ROA.56-62.

The district court granted a temporary restraining order as to Texas and the individual and organizational plaintiffs, but excluding the other State plaintiffs on the ground that they had not adequately demonstrated standing.  ROA.754, 764.  After supplemental briefing on standing and an extension of the temporary restraining order, the district court granted a preliminary injunction against the entirety of the Rule as to all plaintiffs.  ROA.1010.  The district court first held that all the plaintiffs have standing: the States due to expected decreases in tax revenue stemming from

anticipated reductions in gun sales and related activity; the sole individual, Tormey, based on the risk that the federal government will rely on the Rule to bring an enforcement action against him and subject him to legal sanctions; and the organizations based on injuries to their members (Tormey and other unidentified members described in the declarations). ROA.994-1003.

The court then held that plaintiffs were likely to succeed on their APA claims. Specifically, the district court held that the Rule departed from the statute in three ways: by (1) stating that actual profit is not required to be "engaged in the business"; (2) stating that there is no minimum number of firearms sales necessary to be engaged in the business; and (3) stating that firearms primarily used for self-defense are excluded from the "personal collection" safe harbor. ROA1003-07. The district court also held that the presumptions were "problematic" because they "flip the statute on its head by requiring that firearm owners prove innocence rather than the government prove guilt" and some "conflict with the statutory text," repeating its analysis of the statutory conflicts. ROA.1007. On the other injunction factors, the court held that plaintiffs faced irreparable harm from forgoing lawful conduct for fear of civil and criminal enforcement action, and that the States faced an irreparable injury from lost revenue. ROA.1008-09. And the court believed that the balance of the equities necessarily favored plaintiffs because "[t]here is generally no public interest in the perpetuation of unlawful agency action." ROA.1009 (quoting *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)).

8

APPX.587

## SUMMARY OF ARGUMENT

Plaintiffs have failed to make a "clear showing" that they are "likely to establish each element of standing." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024). The sole individual plaintiff—Tormey—does not allege that he intends to engage in any conduct described in a presumption under the Rule, and on his allegations no license would be required. The organizational plaintiffs have chiefly put forward hearsay statements about what various unidentified members have purportedly told the organizations' leadership. That is no basis on which to enter extraordinary relief. And in any event, the hearsay plaintiffs provide likewise does not describe an intention to engage in any conduct arguably affected by the Rule, and thus cannot suffice for standing.

The plaintiff States cannot plausibly claim to be regulated by the Rule at all. They instead claim that the Rule might lead to a decrease in tax revenue from firearms sales or taxes levied on gun shows. This theory is "too speculative" and "too attenuated" to confer standing, *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024), and indeed this Court has already rejected an essentially identical claim that the "loss of general tax revenues as an indirect result of federal policy" is a cognizable injury. *El Paso County v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020).

The district court also erred in its assessment of the merits. The Rule tracks the statute and applicable case law in stating that there is no "minimum number of firearms to actually be sold to be 'engaged in the business'" and that "[e]ven a single

9

firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license." 89 Fed. Reg. at 28,976, 29,021; *e.g.*, *United States v. King*, 735 F.3d 1098, 1107 n.8 (9th Cir. 2013). The plain text of the statute instead examines whether a person has devoted "time, attention, and labor" to dealing in firearms with the predominant intent to "earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C); *id.* § 921(a)(22).

The Rule also correctly recognizes that "actual profit is not a requirement of the statute." 89 Fed. Reg. at 29,045. The statute defines the phrase "to predominantly earn a profit" to refer to "the intent underlying" a person's actions, regardless of whether the person has completed a sale or succeeded in turning a profit. 18 U.S.C. § 921(a)(22). Here, too, courts (including this one) have consistently rejected the district court's reading of the statute. *E.g.*, *United States v. Shipley*, 546 F. App'x 450, 454 (5th Cir. 2013) (per curiam).

The Rule also correctly recognizes that the term "personal collection" in the statute's exception to the licensing requirement for an individual making "occasional sales . . . for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms," 18 U.S.C. § 921(a)(21)(C), is limited to firearms "accumulated for study, comparison, exhibition . . . , or for a hobby," 89 Fed. Reg. at 29,090. That follows from the ordinary meaning of "collection" and is confirmed by other portions of the statute, which define a "collector" as someone who "acquires, holds, or disposes of" certain firearms, 18 U.S.C. § 921(a)(13), that are

"of special interest to collectors" for some reason other than their capacity "as offensive or defensive weapons," 27 C.F.R. § 478.11. The "personal collection" exception to the licensing requirement thus does not permit individuals to claim that every firearm they own—including those acquired "primarily for personal protection," 89 Fed. Reg. at 29,090—is part of a "personal collection" and thus ignore the licensing requirement that would otherwise attach, as case law likewise confirms. *See, e.g.*, *United States v. Tyson*, 653 F.3d 192, 202 (3d Cir. 2011).

The district court misconstrued the Rule in suggesting that it shifts the burden to "firearm owners" to "prove innocence." ROA.1007. The Rule is clear that its presumptions "shall not apply to any criminal case," 89 Fed. Reg. at 29,092, and that even in civil and administrative proceedings the presumptions affect only "the burden of production, not the burden of persuasion," *id.* at 29,007.

The equities likewise do not favor a preliminary injunction. Plaintiffs' claims of irreparable harm overlap substantially with their claims to standing, and fail for largely the same reasons. On the other hand, regulating "dealers in firearms" is "undeniably of central importance to federal efforts to prevent violent crime," *United States v. Biswell*, 406 U.S. 311, 315 (1972), and the district court's injunction undermines those efforts. And at a minimum, the district court's injunction should be narrowed to apply only to those parts of the Rule actually at issue and only to those plaintiffs who have actually established standing.

## STANDARD OF REVIEW

This Court "review[s] the grant of a preliminary injunction for abuse of discretion." *Jiao v. Xu*, 28 F.4th 591, 598 (5th Cir. 2022). "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Moore v. Brown*, 868 F.3d 398, 403 (5th Cir. 2017) (per curiam).

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The movant must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. Plaintiffs have failed to carry their burden with respect to any of these factors.

## I.    Plaintiffs Lack Article III Standing

"The law of Art. III standing is built on a single basic idea—the idea of separation of powers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021). "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes" and "do not exercise general legal oversight of the Legislative and Executive Branches." *Id.* at 423-24. Instead, to establish standing, a plaintiff must prove (1) that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) that the injury is "fairly traceable to the challenged action of the defendant, and not the

12

result of the independent action of some third party not before the court," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable [judicial] decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). The district court erred in concluding that these requirements were satisfied here.

### A.    Tormey Has Not Alleged an Intent to Engage in Conduct Addressed by the Rule

1. Only one named plaintiff—Tormey—suggests that the Rule may someday apply to him. Tormey "fears" that, on account of the Rule, he will be "subject to" ATF enforcement actions. ROA.21. To establish standing to challenge the potential future enforcement of a statute or regulation, a plaintiff must show "an intention to engage in a course of conduct" that is "arguably proscribed" by that statute or regulation, and that "the threat of future enforcement . . . is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-164 (2014). Mere "subjective fear," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013), or "wholly speculative" possibilities of future application, *Susan B. Anthony List*, 573 U.S. at 160, do not suffice.

Tormey has not stated an intent to engage in conduct that would require obtaining a license to sell firearms. Tormey's first declaration says he is "a collector and a hobbyist" who engages in multiple shooting-related hobbies, "including recreation, competitive shooting, hunting, and training," and who has sold "at least a couple, or even several, firearms per year . . . in order to enhance the collection of

firearms that [he] own[s].  ROA.457-58.  Tormey's stated purpose, in conducting

occasional sales, is to "enhance the collection of firearms that [he] own[s]."

ROA.457-58.

That conduct does not require Tormey to obtain a license.  As the statute

makes clear, "a person who makes occasional sales, exchanges, or purchases of

firearms for the enhancement of a personal collection or for a hobby" is not required

to obtain a license.  18 U.S.C. § 921(a)(21)(C).  The Rule repeats the statutory language

verbatim on this point, *see* 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)), and further

explains that the personal collection exception applies where firearms are

"accumulate[d] for study, comparison, exhibition . . . , or for a hobby (*e.g.*,

noncommercial, recreational activities for personal enjoyment, such as hunting, skeet,

target, or competition shooting, historical re-enactment, or noncommercial firearms

safety instruction)," *id.* at 29,090 (27 C.F.R. § 478.11).  Tormey thus has no obligation

to obtain a license—and faces no prospect of enforcement—based on the conduct he

describes as a "collector and a hobbyist."  ROA.457-58.

In a subsequent declaration, Tormey asserted that he owns certain "self-

defense firearms" that ATF would not regard as part of a "personal collection," and

that he "ha[s] sold firearms and in the future plan[s] to sell" such firearms to "upgrade

and enhance" those weapons, including describing a recent sale of a "revolver that

[he] owned for at least five years" and generally referring to instances where he

decided a particular firearm purchased for personal carry "was not for [him]" and thus

14

"sold it." ROA.789. That conduct likewise does not require Tormey to obtain a license. Tormey nowhere alleges that he "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business," as required under the statute and repeated in the Rule. 18 U.S.C. § 921(a)(21)(C); 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)). Nor does Tormey contend that he makes such sales with the predominant intent to "earn a profit"—again, a necessary threshold requirement for needing a license under the statute that is parroted by the Rule. 18 U.S.C. § 921(a)(21)(C); 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)).[1]

Tormey has thus not alleged a "serious intention to engage in conduct proscribed by law" as necessary to establish standing to sue. *Zimmerman v. City of Austin,* 881 F.3d 378, 389 (5th Cir. 2018). Neither the statute nor the Rule requires Tormey to obtain a license to engage in the activity he describes, and it is telling that Tormey has not identified any presumption under the Rule that he believes his conduct could plausibly fall within. Any fear of future application is thus entirely "speculative." *Susan B. Anthony List*, 573 U.S. at 160, 163.

---

[1] Moreover, ATF has published guidance to help members of the public understand whether they are engaged in the business of dealing firearms under federal law. *See* ATF, *Do I Need A License to Buy and Sell Firearms?*, https://perma.cc/RX5R-7K47 (last updated May 2024). ATF's guidance explains that "nothing" in the Rule "precludes a person from lawfully acquiring firearms for self-protection or other lawful personal use, *or making isolated sales of such firearms* without devoting time, attention, and labor to dealing in firearms as a regular course of trade or business." *Id.* at 32 (emphasis added).

For much the same reason, Tormey's declarations also fail to show that the "threat of future enforcement" of the Rule against him "is substantial." *Susan B. Anthony List*, 573 U.S. at 164. Tormey has at most provided subjective concerns about what the Rule "seems to indicate," ROA.788, 789, or invoked "fear" about the "vague threats" of the Rule, ROA.458. As discussed, however, the Rule poses no "threat" to the activities Tormey describes, and in any event Tormey "cannot manufacture standing" through such a "subjective fear" of "hypothetical future harm" that is far from "certainly impending." *Clapper*, 568 U.S. at 416, 418.

2. The district court did not dispute that Tormey's sales related to a hobby or personal collection, as described in his first declaration, would not implicate the Rule at all. Nor did the district court identify any indication in Tormey's declarations that he had the requisite intent to earn a profit from any sale, much less that Tormey was engaged in "dealing in firearms as a regular course of trade or business." ROA.997. The court instead focused on its conclusion that a minimum number of firearms sales was required to require licensing under the statute, and that the Rule therefore departed from the statute by indicating that "a person can be engaged in the business of dealing without necessarily having completed multiple firearms sales," ROA.998; *see* ROA.1004-05. While the district court's statutory analysis was mistaken, *see infra* pp. 34-38, the dispute it identified has no bearing on Tormey's standing. First, insofar as the district court appeared to believe that the Rule departs from the statute by making every sale trigger the licensing requirement, that was mistaken from the face of the

16

Rule: the Rule is clear that "a single isolated firearm transaction" does not "require a license" of its own force; a single transaction would indicate the need for a license only "when combined with other evidence" demonstrating that the seller's conduct rose to the level of being engaged in the business. 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(b)). Neither Tormey nor the district court identified anything in Tormey's declarations providing any "other evidence" showing that a single sale could even potentially be treated as triggering the licensing requirement. Indeed, as noted above, Tormey has alleged that he engaged in *multiple* sales, and nevertheless neither the statute nor the Rule requires that Tormey obtain a license.

In addition, even aside from that error, Tormey still has not alleged any intent to profit, as would be required to obtain a license. The district court did not identify any way in which the conduct Tormey describes would implicate anything the Rule says about when a person likely has the requisite intent to profit. Thus, even crediting the district court's plain misreading of the Rule, Tormey has not alleged an intent to engage in any conduct plausibly affected by the Rule.

Moreover, the district court was mistaken in concluding that Tormey faced a substantial risk that the Rule would be enforced against him, as separately required for standing. The Court held that a substantial threat of enforcement against Tormey existed given "a prior enforcement proceeding" discussed in another plaintiff's declaration. ROA.998-99. Courts have regarded prior enforcement as significant where past enforcement of a statute or regulation has occurred "against the same

APPX.596

conduct." *Susan B. Anthony List*, 573 U.S. at 164; *see Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding standing where the plaintiff challenged the "specific provisions of state law which have provided the basis for threats of" enforcement made by police). The only enforcement proceeding the district court identified was drawn from a second-hand description in a different plaintiff's declaration, and involved a criminal prosecution for unlawful dealing in firearms that predated the Rule by nearly a decade. ROA.998-99; *see* ROA.467-68. The declaration describes that criminal prosecution as involving an individual who relinquished an FFL, took the business's firearms into his personal inventory, and then sold those firearms without a license. ROA.467-68. Even crediting that untested description, a criminal prosecution alleging substantive liability under a statute has no probative value in showing whether a rule governing evidentiary burdens promulgated a decade later might be applied to Tormey in a civil or administrative proceeding, and likewise involves nothing resembling "the same conduct" Tormey alleges. *Susan B. Anthony List*, 573 U.S. at 164. And that is all the more true where, as discussed, Tormey's conduct does not constitute being "engaged in the business" of dealing firearms under the Rule's plain terms. *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023) (finding standing in the pre-enforcement challenge context where there was a prior enforcement action and the plaintiffs "admit[ted]" to "breaking" the guidance being challenged, an admission the government did "not seriously contest").

18

**B.    The Organizational Plaintiffs Lack Associational Standing**

The organizational plaintiffs—GOA, GOF, TFA, and VCDL—contend that they possess standing to bring suit on behalf of their purported members.  An organization or association's claim to "'[a]ssociational standing' is derivative of the standing of the association's [or organization's] members." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).  Thus, where an organization's identified members lack standing—or the organization lacks members—the organization too lacks standing.

1.  GOA, TFA, and VCDL fail to identify a member with standing.  Those organizations principally attempt to ground their associational standing through the membership of Tormey.  But, for the reasons just discussed, Tormey lacks standing to challenge the Rule; he therefore cannot serve as the basis for associational standing for those organizations.

The organizations' efforts to derive their associational standing from other members is no more successful.  Even after receiving a temporary restraining order and being granted several weeks to obtain further declarations demonstrating standing, the organizations provided only declarations from leaders of the organizations that contain hearsay descriptions of conversations with certain unnamed members claiming to be impacted by the Rule.  *See* ROA.811 (GOA); ROA.797

19

(TFA); ROA.836 (VCDL).[2]  To establish standing, however, the organizations must "make specific allegations establishing that at least one *identified* member had suffered or would suffer harm" through "individual affidavits" establishing injury to those members; an organization's "self-description[] of [its] membership" cannot suffice. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009) (emphasis added).  Second-hand descriptions of the claims of unidentified members who have not themselves provided sworn declarations cannot suffice to make the requisite "clear showing" that plaintiffs are "likely to establish" this element of standing.  *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024).  And that requirement is especially important here, where plaintiffs purport to represent unnamed members and seek to preclude application of the Rule to individual proceedings to which those individuals might be subject.  The organizations do not allege that *every* member has standing, and in any event under plaintiffs' approach neither defendants nor the district court are aware (or could be aware) to whom any injunction would purportedly apply.

Moreover, even accepting these hearsay statements, none of them express an intent to engage in conduct that would require obtaining a license under the statute or the Rule.  GOA, for instance, describes one unnamed member who "[o]ccasionally . . . sells firearms from their collection in order to make room for new firearms or to replace firearms," ROA.811-12, which, as with Tormey, does not rise to being

---

[2] TFA appears to provide the last names of a few of its members, *see* ROA.798, but goes no further in identifying them.

"engaged in the business" of dealing firearms.  Another unnamed GOA member
purportedly "wishes to liquidate portions of" a "large collection of firearms" he
inherited from a "late relative."  ROA.813.  But the Rule expressly provides that
"liquidat[ing] firearms . . . [t]hat are inherited" is conduct that is *not presumed* to amount
to being engaged in the business.  89 Fed. Reg. at 29,092.  TFA's declarant, Richard
Archie, states that he has sold firearms "from time to time in the past . . . with a view
towards altering and improving my collection, and not for any commercial or business
purpose."  ROA.797.  But as with Tormey, nothing about this description suggests
that this conduct requires a license; to the extent Archie's sales involve a bona fide
collection, they do not require a license, and Archie alleges no facts suggesting that he
has a predominant intent to profit for any other sales or otherwise devotes time and
energy to dealing in firearms as a course of trade or business.  And Archie's
declaration otherwise simply describes conversations with other TFA members who
"intend to change or improve their personal collection" of firearms "through the
future acquisition and disposition of firearms" without providing any other details
suggesting that such conduct even remotely falls under the Rule's "engaged in the
business" definition.  ROA.797-98.  Such vague assertions do not describe any
"serious intention to engage in conduct proscribed by law."  *Zimmerman*, 881 F.3d at
389.  Furthermore, none of the organizations' unnamed members asserts that they are
facing any imminent threat of an enforcement action pursuant to the Rule.  *Susan B.
Anthony List*, 573 U.S. at 161-64.

2.  The district court held that it was unnecessary for the organizations to actually identify a member because some courts have permitted organizations to proceed based on claims by anonymous or pseudonymous members.  ROA.1001-02.  At the outset, this Court has not addressed whether such reliance is permissible,[3] and multiple courts of appeals have rejected the district court's view, emphasizing that an organization must provide the court with the name of a member with standing.  *See Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 115-19 (2d Cir. 2024); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016).  But even the one court of appeals that has considered the question and permitted an organization to establish standing based on anonymous or pseudonymous members did so after reviewing declarations actually submitted by the pseudonymous members.  *Speech First, Inc. v. Shrum*, 92 F.4th 947, 948-49 (10th Cir. 2024) ("Three members each submitted a pseudonymous declaration . . .").  Nothing remotely comparable occurred here: the only evidence of these unnamed members' purported injuries comes from hearsay statements in the declarations of others.

---

[3] The district court noted two cases from this Court that involved unnamed members of groups.  ROA.1002.  Neither case addressed the question here.  This Court's unpublished decision in *Hancock County Board of Supervisors v. Ruhr* addressed reliance on unnamed members at the *pleading* stage, not to support a preliminary injunction.  487 F. App'x 189, 198-99 (5th Cir. 2012).  And *Speech First, Inc. v. Fenves* is clear that the "only" dispute was about "whether it is likely that any of Speech First's members would have standing to sue in his own right" based on their conduct, 979 F.3d 319, 330 (5th Cir. 2020), and in any event relied on undisputed allegations by three particular members contained in the complaint to substantiate standing, *id.* at 326, 331.

APPX.601

3.   GOF adds one additional problem to those just explained: GOF lacks associational standing because it is not the sort of membership organization that can properly invoke such standing.  And even if it could, the non-member "supporter" it identifies lacks standing to sue in his own right.

GOF concedes that it is "not a traditional membership association."  ROA.824. As this Court has explained, where an organization "seeking standing does not have traditional members," it must "establish[] its standing by proving that it has 'indicia of membership.'"  *Funeral Consumers All., Inc. v. Service Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012).  To do so, the organization must demonstrate that the non-members (1) "elect leadership," (2) "serve as the organization's leadership," and (3) "finance the organization's activities."  *Id.*  Only then are they "*effectively* members" capable of supporting a claim to associational standing.  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 200 (2023).  GOF does not contend that its supporters elect its leadership or serve in those leadership positions, or indeed exert any formal control over the GOF's activities.  As a result, GOF's supporters are neither traditional members nor effectively members.

But even assuming that GOF's supporters satisfied the indicia-of-membership test, GOF's claim to associational standing remains "derivative" of those supporters, *OCA Greater Hous.*, 867 F.3d at 610, and that derivative claim fails because GOF has not identified a member with standing to sue.  GOF's declarations describe, but do not name or include a declaration from, a non-declarant "supporter" who reviews

23

firearms and posts the reviews on his YouTube channel, and then "sell[s] various firearms after reviewing them."  ROA.817-18.  But the declaration does not identify any way in which that conduct would fall within one of the presumptions established by the Rule.

The district court held that GOF's supporters possessed sufficient indicia of membership simply because GOF receives funding from its supporters and those supporters "regularly communicate their views to GOF about issues on which GOF should focus."  ROA.1001.  Neither of GOF's declarations states that "supporters" communicate their preferences to GOF in any systematic or "regular[]" way, much less describes how that occurs.  ROA.70-79, 810-18.  And GOF has provided no evidence that the "supporters" who it claims to press claims on behalf of control the organization's activities in any meaningful way; GOF simply provides a "newsletter" with updates on its activities, ROA.818, and does not apparently grant "supporters" any voting rights or other forms of control.  GOF cannot establish standing where its supporters exercise no meaningful control over the organization, such as by "elect[ing] the governing body of the organization," *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997); *Funeral Consumers All.*, 695 F.3d at 344 n.9 (similar), or otherwise "guid[ing] its activities," *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022).

24

### C.    The States Cannot Establish Standing Based on Speculative and Attenuated Claims of Lost Tax Revenue

The States do not allege that they will ever or could ever be subject to a civil or administrative proceeding where the Rule might apply, or that they have standing on the basis of injuries suffered by their citizens.  *See Haaland v. Brackeen*, 599 U.S. 244, 294 (2023) (A "State does not have standing as *parens patriae* to bring an action against the Federal Government."  Instead, they assert various speculative economic theories of injury as a result of the Rule's anticipated impact on firearms sales.

At the outset, those theories of economic injury depend entirely on the actions of third parties.  Reliance on third-party actions makes standing "substantially more difficult to establish."  *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 382 (2024); *accord Murthy*, 144 S. Ct. at 1986.  Plaintiffs cannot "rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper*, 568 U.S. at 414 n.5.  Moreover, their showing of causation "must not be too speculative or too attenuated," an inquiry examining both whether the reactions of third parties are "sufficiently predictable" and whether "the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing."  *Alliance for Hippocratic Med.*, 602 U.S. at 383. And changes in behavior attributable to the BSCA's broadening of the statutory definition are not traceable to the Rule; the injury must flow from some way in which the Rule purportedly differs from the requirements of the statute.

1.  Each State alleges injury in the form of reduced tax revenue from the Rule's anticipated follow-on effects on economic activity.  The theory appears to have two strands.  Each State suggests that the Rule will make individuals less likely to sell guns, leading to fewer overall firearms sales, and thus reducing the sales tax collected on private sales of firearms.  ROA.859-60 (Texas); ROA.845-46 (Louisiana); ROA884-85 (Mississippi); ROA.927-28 (Utah).  Texas also suggests that the Rule will make individuals less likely to attend gun shows, thus leading to a decrease in "consumer traffic and activity" that occurs at or in relation to those gun shows, and causing an ensuing reduction in "motor fuels taxes, entertainment taxes, alcoholic beverage taxes, and hotel taxes."  ROA.860.  Each of those alleged injuries is both "too attenuated" and "too speculative" to confer standing, *Alliance for Hippocratic Med.*, 602 U.S. at 383—the conclusion reached by two other district courts presented with essentially identical allegations of standing in another challenge to the Rule at issue here.  *Kansas v. Garland*, No. 24-cv-01086-TC-TJJ, 2024 WL 3360533, at *5 (D. Kan. July 10, 2024); *Kansas v. Garland*, No. 2:24CV00088 JM, 2024 WL 2384611, at *2 (E.D. Ark. May 23, 2024).

The Supreme Court long ago explained that a State may sue the federal government only if it has suffered a "direct," rather than indirect or attenuated, injury from federal action.  *Florida v. Mellon*, 273 U.S. 12, 18 (1927).  In *Mellon*, Florida challenged the constitutionality of a federal inheritance tax, and it argued that the tax would cause the State financial harm by "inducing potential taxpayers to withdraw

26

property" and diminishing its tax base. *Id.* at 17-18. But the Court rejected that theory of standing, explaining that any harm caused by the tax was "purely speculative, and, at most, only remote and indirect." *Id.* at 18. The Court reiterated this same principle just last year when it observed that because "federal policies frequently generate indirect effects on state revenues or state spending," when a State "asserts . . . that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

This Court, too, has rejected standing premised on a "loss of general tax revenues as an indirect result of federal policy." *El Paso County v. Trump.*, 982 F.3d 332, 339 (5th Cir. 2020). In *El Paso County*, the plaintiff county challenged the Department of Defense's reallocation of $20 million in federal funds to build a wall at the United States-Mexico border, a sum that had originally been earmarked for a construction project at a local military base. *Id.* at 337-38. And the county based its standing on the "economic injury" and attendant "loss of general tax revenues" caused by the cancellation of the military base project. *Id.* at 338-39. More specifically, the county claimed that the project's cancellation would reduce its tax revenues because "a $20 million construction project within the county would necessarily generate taxes through workers staying at hotels, buying supplies, and spending money at local establishments." *Id.* at 338. But this Court concluded that

27

APPX.606

such "incidental and attenuated harm" to "general tax revenue" was "insufficient to grant a state or county standing." *Id.* at 341.

The revenue-related harms the States assert in this case cannot be meaningfully distinguished from the incidental revenue-related harms that were deemed inadequate to confer state standing in *El Paso County*. The States claim, at bottom, that the Rule will reduce certain types of economic activity in their respective States—specifically, sales of guns and other transactions and expenditures related to gun shows (compared to the various transactions and expenditures related to a local construction project at issue in *El Paso County*)—which will in turn cause a reduction in general tax revenues—specifically, sales taxes assessed on a variety of goods, including firearms sold at gun shows (compared to the local taxes assessed on hotel stays, supply purchases, and expenditures at local establishments in *El Paso County*). That is the very sort of "incidental economic impact" and reduction in "general tax revenues" that the *El Paso County* court deemed "inadequate" for state standing. 982 F.3d at 340.

The States' contrary view has no limit: because virtually everything the federal government does (or does not do) may have some downstream effect on state tax revenue, States would have standing to sue over virtually every federal policy. Nor would such theories be cabined to States: hotels or restaurants near a gun show would have the same downstream claim to standing. *See Alliance for Hippocratic Med.*, 602 U.S. at 391-92 (rejecting similar theories). Recognizing as much, this Court has noted that "federal policies will inevitably have an economic impact on local governments." *El*

*Paso County*, 982 F.3d at 340. Consequently, this Court explained, "[i]f every local government could sue to challenge any federal expenditure at a military base, the courts 'would cease to function as courts of law and would be cast in the role of general complaint bureaus.'" *Id.* at 341. The court thus concluded that Article III and Supreme Court precedent require government plaintiffs to demonstrate "more than an incidental economic impact" of a federal policy on "general tax revenues" to establish a cognizable injury in fact. *Id.* at 340-41.

Other courts of appeals have likewise rejected claims of state standing premised on the indirect effects of federal policy on state tax revenue or state expenditures. *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1175-76 (9th Cir. 2024); *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022); *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 352-54 (8th Cir. 1985); *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 672-73 (D.C. Cir. 1976). Those circuits, too, have recognized that claims based on the downstream effects of federal policy on state revenue would "make a mockery of the constitutional requirement of case or controversy," *Arizona*, 40 F.4th at 386 (alteration omitted), given "the unavoidable economic repercussions of virtually all federal policies," *Kleppe*, 533 F.2d at 672.

In addition to being attenuated, the States' theories of injury are also highly speculative. Texas asserts that "[u]nlicensed dealers exiting the market" in response to the Rule "will inevitably result in less gun sales, and thus less tax revenue collected by

the state[s]." ROA.860. The other States make similar claims. ROA.860 ("Fewer gun sales in the state will result in less revenue from Louisiana's sales and use tax."); ROA.884 ("Mississippi will likely lose state sales-tax revenue collected from retail sales of firearms if the Final Rule takes effect."); ROA.927-28 (The Rule will "reduc[e] total gun sales at gun shows" and thus Utah "will sustain a financial loss"). But the crucial link in that theory—that some marginal number of fewer sellers means fewer sales—is not supported by record evidence or common sense. The Rule predicts that a small proportion of currently "unlicensed persons who would be considered 'engaged in the business' under th[e] [R]ule" will be "unwilling or unable" to obtain a federal firearms license and "will instead choose to cease their dealing in firearms altogether." 89 Fed. Reg. at 29,072. But even if the Rule slightly reduces the number of firearms sellers, that does not mean that the number of taxable firearms sales will decline: prospective buyers are just as likely to simply go to another source—including an FFL—to obtain a firearm, which would result in the same number of taxable sales. *See id.* at 29,066 ("[T]he overall number of firearm transactions [is] unlikely to be significantly affected [by the Rule].").

Only Texas endeavors to put forth further evidence that the Rule will affect revenue related to gun shows, but that limited effort similarly highlights the speculative nature of the claims at issue and their reliance on independent decisions by third parties. Texas points to a declaration from a gun show owner who asserts that he has experienced a "reduction in attendance, sales of tables, and people coming to

sell personal firearms" at his gun shows.  ROA.870.  Even assuming that could be

attributed to concern about regulation rather than economic or other factors, it is also

unclear whether any such change would be attributable to the Rule rather than to the

BSCA's expansion of the *statutory* definition to include individuals who do not intend

to earn a livelihood from dealing in firearms.  Furthermore, any reduction is a result

of independent decisions by third parties not before the Court—the Rule does not

mandate such a reduction in attendance or sales.  And even if some gun-show-related

tax revenues might decline, there is good reason to think that people who decide not

to attend a gun show will instead spend their discretionary income on other taxable

goods and services.  Any overall loss of tax revenues thus remains speculative, further

underscoring why courts have generally rejected standing based on the incidental

revenue effects of a federal policy.  *El Paso County*, 982 F.3d at 339.

2.  The district court held that the States had established standing based on the

prospect of reduced "sales and use taxes levied against firearms transactions" as well

as "motor fuels taxes, entertainment taxes, alcoholic beverages taxes, hotel taxes, and

more."  ROA.996.  That is indistinguishable from the injury based on lost "taxes

through workers staying at hotels, buying supplies, and spending money at local

establishments" that this Court rejected as too "incidental and attenuated" in *El Paso

County*.  982 F.3d at 338, 341.

*El Paso County* also disposes of the district court's reliance (ROA.996) on

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992).  There, Oklahoma coal power plants

APPX.610

purchased virtually all their coal from Wyoming mines, and the Supreme Court held that Wyoming had standing to challenge the validity of an Oklahoma law requiring Oklahoma power plants to "burn a mixture of coal containing at least 10% Oklahoma-mined coal." *Id.* at 440, 443-44.  There was thus no question how third parties—namely, Oklahoma power plants—would respond to the Oklahoma law, as the law obligated them to reduce their purchases of out-of-state coal, and indeed the undisputed record showed that Oklahoma adopted the regulation in question with the avowed purpose of reducing purchases of coal from Wyoming and, by extension, Wyoming's collection of a severance tax on that coal.  *Id.* at 443.  And the special master presiding over the dispute specifically found that "the loss of any market" for Wyoming coal in Oklahoma "cannot be made up by sales elsewhere, where Wyoming's supply has already risen to meet demand."  *Id.* at 446.

As this Court explained in *El Paso County*, *Wyoming* involved unusual circumstances where a State alleged "[a] direct link" to "the loss of a specific tax revenue," 982 F.3d at 340: Wyoming lost tax revenue based on a targeted law that solely addressed an activity not subject to substitution and for which the reaction of third parties was not speculative.  As *Wyoming* itself recognized, that is different from cases "den[ying] standing to States where the claim was that actions taken by United States Government agencies had injured a State's economy and thereby caused a decline in general tax revenues" because those cases did not "involve[] a direct injury in the form of a loss of specific tax revenues."  502 U.S. at 448.

32

APPX.611

The district court apparently read *Wyoming*'s reference to "specific tax revenues" to require only that a plaintiff State identify a particular type of tax—such as a sales tax or income tax—that could be affected by the federal action. ROA.996 (emphasis omitted). That was the rationale endorsed by the dissent in *El Paso County*, which would have held that the county had standing based on its loss of "specifically the sales and income tax revenue related to" the cancelled federal project. 982 F.3d at 359 (Dennis, J., dissenting). And more generally, embracing the district court's theory would mean that *any* federal policy that affected *any* taxable activity would give rise to state standing so long as the State specified a particular type of tax it believed was affected, leading to precisely the limitless theory of standing this Court and others have consistently rejected and that *Wyoming* itself disclaimed.

## II.    Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits

The Rule at issue here serves the important purpose of providing clarity about when persons are required to obtain a federal firearms license. It does so by describing conduct that courts and ATF have historically and regularly found to constitute being "engaged in the business" of dealing in firearms, even before the 2022 amendments to the BSCA broadened the relevant definition. And its primary effect is to provide for evidentiary presumptions in civil and administrative—not criminal—proceedings, such that conduct understood to constitute engaging in the

33

business of dealing in firearms in past cases will be understood as likely to constitute engaging in the business in future proceedings.

The district court held that plaintiffs had established a likelihood of success on the merits of their APA claim, holding that three aspects of the Rule are inconsistent with the underlying statute. The district court was mistaken in all respects.

### A. Federal Law Does Not Set A Numerical Threshold for Firearms Sales or Transactions That Require a License

The district court believed that the Rule departed from the statute in stating that there is no "minimum number of firearms to actually be sold to be 'engaged in the business'" and that "[e]ven a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license." ROA.1004 (emphasis omitted) (quoting 89 Fed. Reg. at 28,976, 29,021). That holding departed from the plain text of the statute and decades of uniform case law.

Federal law does not set a numerical threshold for the number of firearms a person must sell, or the number of transactions they must engage in, before they are required to obtain a federal firearms license. Instead, a person is engaged in the business of dealing in firearms if they "devote[] time, attention, and labor" to dealing in firearms "to predominantly earn a profit through the repetitive purchase and resale of firearms," 18 U.S.C. § 921(a)(21)(C), and "'to predominantly earn a profit means that the *intent underlying* the sale or disposition of firearms is predominantly one of

34

APPX.613

obtaining pecuniary gain," *id.* § 921(a)(22) (emphasis added). The relevant question is thus whether a person has devoted effort as a regular course of trade or business to firearms transactions with the predominant purpose of profiting from repeated sales.

Because the licensing requirement focuses on a person's intent, it does not set a numerical threshold on the number of firearms a person must sell, or transactions they must complete, before they are required to obtain a license. That means that some individuals are not required to obtain a license even though they have engaged in multiple firearms transactions: as illustrated by plaintiff Tormey, multiple sales that lack the relevant predominant intent to earn a profit do not require a license. *See supra* pp. 13-18.

It also means that a person may have put forth effort to sell firearms with the requisite intent to profit—and thus require a license—even if they have not yet sold a firearm or have only sold one firearm. To take an easy example, a person who incorporates a gun store, purchases inventory for resale, rents a storefront to display the inventory, advertises the availability of guns at the store, and contracts with a payments processor to enable credit card payments is required to obtain a license before making a sale. In those circumstances, the individual undoubtedly has "devote[d] time, attention, and labor" to firearms dealing "as a regular course of trade or business" with the intent to "earn a profit through the repetitive purchase and resale of firearms," 18 U.S.C. § 921(a)(21)(C), regardless of whether they have actually made a sale.

35

APPX.614

Courts have recognized this principle for decades in a variety of factual contexts, explaining that while a single sale or offer to sell standing alone does not mean that a person is "engaged in the business," there is no "'magic number' of sales" that trigger the licensing requirement. *United States v. Carter*, 801 F.2d 78, 82 (2d Cir. 1986). Thus, while a single firearm sale "standing alone, without more," is generally not "sufficient to establish" that an individual is unlawfully dealing in firearms, "other facts and circumstances" in conjunction with that sale or offer may show that a person is "actively engaged in the business of dealing in guns." *United States v. Swinton*, 521 F.2d 1255, 1259 (10th Cir. 1975); *see United States v. Wilmoth*, 636 F.2d 123, 125 (5th Cir. Unit A Feb. 1981) ("It is enough to prove that the accused has guns on hand or is ready and able to procure them for the purpose of selling them from time to time to such persons as might be accepted as customers."). For example, an individual who ordered 19 firearms, unsuccessfully attempted to sell one of them, and repeatedly told others he could procure guns for sale was engaged in the business, as the licensing requirement "does not require an actual sale of firearms." *United States v. King*, 735 F.3d 1098, 1106-07, 1107 n.8 (9th Cir. 2013); *accord United States v. Nadirashvili*, 655 F.3d 114, 120-21 (2d Cir. 2011).

The Rule straightforwardly implements this understanding of the statutory framework. The Rule explains that a "single isolated firearm transaction" may require a license only when "combined with other evidence (*e.g.*, where a person represents to others a willingness and ability to purchase more firearms for resale)." 89 Fed. Reg. at

36

29,091 (27 C.F.R. § 478.13(b)).  And the Rule's preamble—relying on many of the cases cited above—explains that "a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license," while "an isolated firearm transaction would not require a license when other factors were not present." *Id.* at 28,976.

The district court did not engage with any of the case law cited in the Rule or addressed above.  It did not cite any case adopting its interpretation of the statute in the decades since its enactment.  Nor did the district court identify any actual threshold number of firearms or transactions it believed was necessary to trigger the licensing requirement.  It simply noted that Section 921(a)(21)(C) uses various plural terms ("firearms") and terms contemplating an ongoing course of conduct ("repetitive"; "regular course"; "purchase and resale"), and from that concluded that the Rule was wrong to state that "'there is no minimum threshold number of firearms purchased *or* sold that triggers the licensing requirement.'"  ROA.1004-05 (quoting 89 Fed. Reg. at 29,091).  That ignores the intent component of the statute and the structure of the definition.  A person (like the defendant in *King*) may have devoted energy to dealing in "firearms," and may have the requisite intent to profit from "the repetitive purchase and resale of firearms," even if they have not yet completed a sale. Indeed, on the district court's view, it is hard to see what purpose the intent requirement serves.  The Rule, like the case law, instead properly understands the "repetitive purchase and resale of firearms" to describe how a person *intends* "to

37

APPX.616

predominantly earn a profit."  18 U.S.C. § 921(a)(21)(C); *see also id.* § 921(a)(22) (defining "to predominantly earn a profit" in terms of "intent"); 89 Fed. Reg. at 28,977.  Any businessperson can attest that putting effort into a business hoping to turn a profit through "the repetitive purchase and resale" of products is quite different from actually successfully engaging in such sales.

### B. Persons Dealing in Firearms Require a License Even If They Fail to Turn a Profit

The district court also held that the Rule departed from the statute in recognizing that "actual profit is not a requirement of the statute—it is only the predominant intent to earn a profit through the repetitive purchase and resale of firearms that is required," and thus "a person may repeatedly advertise and display firearms for sale, and therefore demonstrate a predominant intent to earn a profit from repeatedly reselling the firearms purchased, but never actually find a buyer." ROA.1005 (emphasis omitted) (quoting 89 Fed. Reg. at 29,045).

That holding is mistaken for many of the same reasons as the district court's view of the threshold number of sales.  The statute defines the phrase "to predominantly earn a profit" to refer to intent, not actual profit: "[t]he term 'to predominantly earn a profit' means that *the intent* underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to *other intents*, such as improving or liquidating a personal firearms collection."  18 U.S.C. § 921(a)(22) (emphases added).  And, consistent with that definition, the statute

38

APPX.617

eliminates the intent requirement for particular bad actors, noting that the "proof of profit" normally required—*i.e.*, proof of intent to profit—"shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.* And that understanding is reinforced by the statutory definition as a whole. As noted, the requirement to obtain a license may attach even before a sale has been consummated (and thus before any profit has been realized); the defendant in *King*, for example, could not avoid a conviction because he had not yet managed to earn a profit from a sale.

Even where sales have occurred, however, this Court has previously rejected the contention that "firearms transactions [that] actually caused [a defendant] to suffer a net loss" precluded a conviction for unlawful dealing in firearms, explaining that the statute requires that an individual intend to "mak[e] a profit, but it does not require that he succeeded in that endeavor." *United States v. Shipley*, 546 F. App'x 450, 454 (5th Cir. 2013) (per curiam); *see Wilmoth*, 636 F.2d at 125 (noting that the government "need not prove . . . that [a defendant] necessarily made a profit from dealing"). Other circuits have recognized the same principle. *E.g.*, *United States v. Valdes*, 681 F. App'x 874, 877 (11th Cir. 2017) (per curiam) (citing *Wilmoth*, 636 F.2d at 125); *United States v. Tyson*, 653 F.3d 192, 200 (3d Cir. 2011) (observing that the statute refers to "profit" as the defendant's "motivation"). Indeed, were it otherwise, someone who is simply a bad businessman—like the defendant in *Shipley*—could sell unlimited firearms without any requirement to obtain a license.

39

Here, too, the district court did not engage with any of the cases rejecting its conclusion that actual profit is required under the statute. It instead focused solely on the text of the exception, which provides that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism," inferring from this language that actual profit must be required for other sales not "for criminal purposes or terrorism." ROA.1005 (emphases omitted) (quoting 18 U.S.C. § 921(a)(22)). This language has been part of federal law since 1986, *see* Act of July 8, 1986, Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766, and until the decision here no court has suggested that it means that an actual profit is required for other sales. That is because the sentence immediately preceding this exception makes clear that "intent" to profit determines whether a person engages in conduct "to predominantly earn a profit." 18 U.S.C. § 921(a)(22). The exception thus provides that someone who deals in firearms to arm a gang or terrorist organization is required to obtain a license—and can be prosecuted for unlicensed dealing—even if their predominant intent is to support terrorism or criminal activity rather than to profit. It does not add requirements to the definition of "to predominantly earn a profit," which exclusively addresses "the intent underlying the sale or disposition of firearms." *Id.* The Rule thus does not depart from the statute in any respect in recognizing that "actual profit is not a requirement of the statute." 89 Fed. Reg. at 29,045; *id.* at 29,091 (27 C.F.R. § 478.13(d)) ("[A]

40

APPX.619

person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms.").

### C.    The Rule's Understanding of "Personal Collection" Tracks the Statute

The GCA excludes from the licensing requirement "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."  18 U.S.C. § 921(a)(21)(C).  The district court held that the Rule departed from the statute in recognizing that not every firearm is part of a "personal collection" under the statute and explaining that the term does not include firearms "accumulated primarily for personal protection."  89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11).  That conclusion was likewise mistaken.

The term "personal collection" under the GCA does not necessarily refer to all firearms an individual owns, just as not everyone who owns cars has a "personal collection" of automobiles.  Instead, the ordinary meaning of the term "collection" is "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby."  89 Fed. Reg. at 29,038 (quoting *Collection*, Merriam-Webster Online Dictionary, https://perma.cc/KXX7-ASLQ); *see id.* at 29,038 n.216.  The Rule directly adopts this definition of "[p]ersonal collection": "Personal firearms that a person accumulates for study, comparison, exhibition . . . or for a hobby."  *Id.* at 29,090 (27 C.F.R. § 478.11).

41

APPX.620

The ordinary meaning of the term is reinforced by comparison to other portions of the GCA.  Under the statute, a "collector" is a "person who acquires, holds, or disposes of firearms as curios or relics."  18 U.S.C. § 921(a)(13).  Congress granted the Attorney General authority to define "curios or relics," *id.*, and the relevant regulations have long defined the term as including "[f]irearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended . . . as offensive or defensive weapons," such as firearms manufactured more than 50 years ago or that "derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event," 27 C.F.R. § 478.11.  As the Rule explains, a "'personal collection' . . . does not include firearms that have no special interest to the collector or hobbyist other than as weapons for self-defense or defense of others."  89 Fed. Reg. at 29,038.

Here, too, courts have consistently rejected arguments that all firearms a person owns are part of a "personal collection."  In *United States v. Tyson*, for example, the Third Circuit addressed a defendant who told others he was selling "'antique' guns" and described himself as a "firearms 'collector.'"  653 F.3d at 202.  The Third Circuit rejected those arguments, emphasizing that "none of the firearms purchased by [the defendant] were antiques."  *Id.*  Similarly, in *United States v. Idarecis*, the Second Circuit rejected arguments "that the definition of a gun 'collection' in § 921(a)(21)(c) should be read more broadly than the definition of a gun 'collector,'" emphasizing the

42

absence of "case authority to suggest that there is a distinction between the definition of a collector and of a collection in the statute." 164 F.3d 620, at *3-4 (2d Cir. 1998) (table).[4]

The district court looked to alternative definitions of "collection" that it read to be broader than the one adopted by the Rule, such as referring to simply "a gathering or assemblage of objects." ROA.1006. But the district court did not even acknowledge, much less address, the GCA's definition of "collector" in 18 U.S.C. § 921(a)(13) or the case law interpreting it, which plainly does not include unremarkable firearms acquired for self-defense. Thus, even assuming "collection" in isolation could sometimes carry a broader meaning than the one ascribed by the Rule, the GCA makes clear that the Rule's definition is correct.

The district court also invoked a policy concern—a purported "absurdity" that the personal-collection exclusion does not exempt persons who accumulate firearms primarily for personal protection, since that would mean many individuals would have "*no safe harbor at all*" from the licensing requirement. ROA.1006-07. It is unsurprising that Congress did not write the statute to exclude "the majority of gun owners" (ROA.1006-07) from the requirement to obtain a license if they engage in the business of dealing firearms; the requirement to obtain a license is a central feature of

---

[4] As the Rule notes, courts routinely draw the same distinction between firearms acquired as part of a "collection" and firearms acquired primarily for self-defense under the Sentencing Guidelines. 89 Fed. Reg. at 29,039 & n.219-221 (collecting cases).

Congress's regulation in this area. *See Huddleston v. United States*, 415 U.S. 814, 825 (1974) (explaining that the "the focus of the federal scheme is the federally licensed firearms dealer" to ensure that "weapons could not be obtained by individuals whose possession of them would be contrary to the public interest"); 89 Fed. Reg. at 29,038-39. The district court's apparent disagreement with that choice is not a reason to ignore the statute Congress wrote. *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 706 (2022) ("It is not [the court's] place to question whether Congress adopted the wisest or most workable policy, only to discern and apply the policy it did adopt.").

In any event, the district court's policy concern is based on mistaken premises. The "personal collection" exception provides that some conduct that would otherwise require a license—such as selling all or part of a personal collection of firearms, which could be a significant number—may nevertheless occur without a license. While firearms acquired primarily for personal protection do not fall within the personal collection *exclusion* from the definition of engaged in the business, that does not mean that sales of such firearms automatically require a license. Private sales of such firearms are permissible without a license so long as the seller's conduct does not rise to the level of being "engaged in the business." *See* 89 Fed. Reg. at 29,039 (noting that the definition does not mean that "individuals or companies cannot buy or sell firearms that are primarily for self-defense or protection of others," just that such "firearms are not necessarily part of a 'personal collection'").

44

APPX.623

### D.     The Rule's Presumptions Do Not Shift the Burden of Proof in Any Proceeding

As discussed above, the Rule looks to "conduct that the courts have found to require a license even before the BSCA expanded the definition of 'engaged in the business'" and ATF's enforcement experience, 89 Fed. Reg. at 28,977, to identify circumstances in which individuals are presumptively "engaged in the business" or presumptively have the requisite intent "to predominantly earn a profit," *id.* at 29,091; *see id.* 28,977 nn.72-73, 28,978 nn.74-77, 79-80, 28,979 nn.81-83, 28,981-82, 28,981 nn.97-99, 28,982 nn.100-104 (collecting case law and examples of federal prosecutions), as well as circumstances in which individuals likely do not meet the statutory definition, *id.* at 29,092.  The Rule provides that the identified circumstances give rise to rebuttable presumptions in civil or administrative (but not criminal) proceedings.  *Id.* at 29,091 (27 C.F.R. § 478.13(c), (d)(2)).

The district court believed that these presumptions were problematic because they "requir[e] that firearm owners prove innocence rather than the government prove guilt."  ROA.1007.  That ignores what the Rule actually says and does.  To begin, "innocence" and "guilt" have nothing to do with it; the Rule is clear that the presumptions "shall not apply to any criminal case," 89 Fed. Reg. at 29,092 (27 C.F.R. § 478.13(h)), a point the Rule's preamble reiterates no less than 10 times, *see id.* at 28,969, 28,976, 28,977, 28,982, 29,000, 29,007, 29,013, 29,014, 29,025, 29,027.

Even in the civil and administrative proceedings in which they apply, the presumptions do not shift "the burden of persuasion (also sometimes referred to as the burden of proof)." 89 Fed. Reg. at 29,007. They instead "apply only to shift the burden of production." *Id.* Thus, a presumption is only relevant if the government first introduces reliable evidence to show that the conditions of the presumption are met—for example, that an individual has "[r]epetitively or continuously advertise[d], market[ed], or otherwise promote[d] a firearms business," and thus should be presumed to have the intent to earn a profit through the repeated purchase and resale of firearms. *Id.* at 29,091 (27 C.F.R. § 478.13(d)(2)(i)); *see id.* at 29,026. The government's obligation to prove the relevant conduct thus does not change; the presumptions simply establish certain types of showings that will satisfy the government's burden and thus shift the burden of production to the respondent. *Id.* at 29,007-08. Such presumptions are not uncommon in such civil or administrative proceedings, recognizing circumstances where "proof of one fact renders the existence of another fact 'so probable that it is sensible and timesaving to assume the truth of [the inferred] fact.'" *Chemical Mfrs. Ass'n v. Department of Transp.*, 105 F.3d 702, 705 (D.C. Cir. 1997) (quoting *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 788-89 (1990)); *Cole v. USDA*, 33 F.3d 1263, 1267 (11th Cir. 1994) ("The law is well established that presumptions may be established by administrative agencies, as long as there is a rational nexus between the proven facts and the presumed facts.").

46

Indeed, the district court—like plaintiffs—largely has not questioned the substance of the presumptions or their relevance to the statutory standard, and as noted, many of the presumptions are based on cases interpreting the statute, not "Department *ipse dixit*." ROA.1008 (quoting *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 251 (5th Cir. 2024)). The district court called into question just two presumptions, but doubted both based on the court's erroneous view—discussed above, *see supra* pp. 34-38—that the licensing requirement requires completed sales. ROA.1007 (questioning presumptions that refer to "a willingness and ability to purchase and resell" firearms and "[r]epetitively purchas[ing] for the purpose of resale, or repetitively resell[ing] or offer[ing] for resale" certain firearms, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(1), (2))). Those asserted conflicts add nothing to the district court's analysis.

## III.    The Other Factors Weigh Against an Injunction

The other injunctive factors likewise do not support the extraordinary relief of a preliminary injunction.

Plaintiffs' claims of irreparable harm largely overlap with their claims to standing, and the district court's assessment of those harms similarly tracks its erroneous assessment of standing and the merits, referring generally to "monetary costs" and potential "civil and criminal enforcement actions for engaging in conduct that the BSCA permits but the Final Rule impermissibly forbids." ROA.1009. As discussed, however, there is no prospect of *criminal* enforcement of the Rule at all, the

APPX.626

Rule in all respects tracks the statutory framework and longstanding case law interpreting the licensing requirement, and the Rule does not create new licensing requirements or require anyone to obtain a license of its own force.

As to the final two factors, the balance of the equities and public interest merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As noted, plaintiffs face no cognizable injury at all from the Rule, and many would face injury only in the event they were involved in some unspecified future administrative or civil proceeding. The government, on the other hand, has a strong interest in continuing to enforce the Rule. Regulating "dealers in firearms" is "undeniably of central importance to federal efforts to prevent violent crime." *United States v. Biswell*, 406 U.S. 311, 315 (1972). ATF nonetheless documented significant noncompliance with the licensing requirements of the GCA, even before the BSCA amendments. 89 Fed. Reg. at 29,086. The Rule here helps to promote compliance with those licensing requirements. Affirming the district court's grant of a preliminary injunction would thus undercut these efforts to reduce noncompliance.

## IV.    Relief Should Be Limited to the Offending Parts of the Rule and to the Injured Parties

If the Court were to conclude that a preliminary injunction is warranted, that relief should be no broader than necessary to remedy any demonstrated harms of the plaintiffs in this case. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should

APPX.627

be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). "The district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).

This Court should limit relief to the provisions or aspects held likely unlawful. The Rule contains a "[s]everability" section expressing ATF's intent that the Rule's provisions be severable to the maximum extent possible, such that if any aspect of the Rule is held unlawful, the remainder "shall not be affected and shall be construed so as to give them the maximum effect permitted by law." 89 Fed. Reg. at 29,070. Typically, "[w]hether the offending portion of a regulation is severable depends upon [1] the intent of the agency *and* [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *accord Southwestern Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019). The Rule's severability section makes clear ATF's intentions with respect to severability. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).

Despite the severability clause—and without conducting a severability analysis—the district court enjoined the entirety of the Rule, despite only addressing three definitions and two presumptions. The Rule, however, contains numerous other definitions and regulatory changes that continue to function without those pieces considered by the district court. *See, e.g.*, 89 Fed. Reg. at 29,090 (27 C.F.R.

49

APPX.628

§ 478.11) (defining, among other terms, "dealer," "purchase," "former licensee inventory"); *id.* at 29,092 (27 C.F.R. § 478.57) (adding provision pertaining to "Discontinuance of business").

Moreover, if any relief is warranted, it should be limited only to those plaintiffs who have actually established standing. *See, e.g.*, *TransUnion*, 594 U.S. at 431. That is particularly important as to the organizational plaintiffs, who purport to litigate on behalf of numerous unidentified members who do not control the litigation and may not even know about the litigation. Indeed, the identities of those members are not known to the district court or to defendants, who are currently enjoined from applying the Rule to "all Plaintiffs." ROA.1010. Even if those organizations can claim Article III standing to sue on behalf of these unidentified members, equitable principles would compel forgoing relief to any member who has not been identified in district court and agreed to be bound by the judgment. Such an approach would respect longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
  *United States Attorney*

MICHAEL S. RAAB

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
KEVIN J. KENNEDY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

September 2024

APPX.630

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,973 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

**ADDENDUM**

APPX.632

## TABLE OF CONTENTS

18 U.S.C. § 921 (excerpts) ...................................................................A1

18 U.S.C. § 922 (excerpts) ...................................................................A4

27 C.F.R. § 478.11 (excerpts) .............................................................A5

27 C.F.R. § 478.13 ...............................................................................A7

APPX.633

**18 U.S.C. § 921 (excerpts)**

**§ 921. Definitions**

**(a)** As used in this chapter—

…

> **(11)** The term "dealer" means (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.

…

> **(13)** The term "collector" means any person who acquires, holds, or disposes of firearms as curios or relics, as the Attorney General shall by regulation define, and the term "licensed collector" means any such person licensed under the provisions of this chapter.

…

> **(21)** The term "engaged in the business" means—
>
> **(A)** as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured;
>
> **(B)** as applied to a manufacturer of ammunition, a person who devotes time, attention, and labor to manufacturing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition manufactured;
>
> **(C)** as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms;
>
> **(D)** as applied to a dealer in firearms, as defined in section 921(a)(11)(B), a person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who makes occasional

A1

APPX.634

repairs of firearms, or who occasionally fits special barrels, stocks, or trigger mechanisms to firearms;

**(E)** as applied to an importer of firearms, a person who devotes time, attention, and labor to importing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms imported; and

**(F)** as applied to an importer of ammunition, a person who devotes time, attention, and labor to importing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition imported.

**(22)** The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: Provided, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which—

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

**(C)** is intended—

    **(i)** to intimidate or coerce a civilian population;

    **(ii)** to influence the policy of a government by intimidation or coercion; or

    **(iii)** to affect the conduct of a government by assassination or kidnapping.

**(23)** The term "with the principal objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: Provided, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which—

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

A2

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

**(C)** is intended—

  **(i)** to intimidate or coerce a civilian population;

  **(ii)** to influence the policy of a government by intimidation or coercion; or

  **(iii)** to affect the conduct of a government by assassination or kidnapping.

A3

**18 U.S.C. § 922 (excerpts)**

**§ 922. Unlawful acts**

**(a)** It shall be unlawful—

    **(1)** for any person—

        **(A)** except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce; or

        **(B)** except a licensed importer or licensed manufacturer, to engage in the business of importing or manufacturing ammunition, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce;

    …

A4

**27 C.F.R. § 478.11 (excerpts)**

**§ 478.11. Meaning of terms.**

…

*Collector.* Any person who acquires, holds, or disposes of firearms as curios or relics.

…

*Curios or relics.* Firearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended for sporting use or as offensive or defensive weapons. To be recognized as curios or relics, firearms must fall within one of the following categories:

   **(a)** Firearms which were manufactured at least 50 years prior to the current date, but not including replicas thereof;

   **(b)** Firearms which are certified by the curator of a municipal, State, or Federal museum which exhibits firearms to be curios or relics of museum interest; and

   **(c)** Any other firearms which derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event. Proof of qualification of a particular firearm under this category may be established by evidence of present value and evidence that like firearms are not available except as collector's items, or that the value of like firearms available in ordinary commercial channels is substantially less.

…

*Personal collection (or personal collection of firearms, or personal firearms collection)*—(1) *General definition.* Personal firearms that a person accumulates for study, comparison, exhibition (e.g., collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (e.g., noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit (e.g., primarily for a commercial purpose or financial gain, as distinguished from personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, but which the person may also intend to increase in value). In addition, the term shall not include firearms accumulated primarily for personal protection: Provided, that nothing in this definition shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use.

…

A5

APPX.638

*Principal objective of livelihood and profit.* The intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents such as improving or liquidating a personal firearms collection: Provided, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

A6

27 C.F.R.§ 478.13

## § 478.13. Definition of "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker."

**(a)** *Definition.* A person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms. The term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of the person's personal collection of firearms. In addition, the term shall not include an auctioneer who provides only auction services on commission to assist in liquidating firearms at an estate-type auction; provided, that the auctioneer does not purchase the firearms, or take possession of the firearms for sale on consignment.

**(b)** *Fact-specific inquiry.* Whether a person is engaged in the business as a dealer under paragraph (a) of this section is a fact-specific inquiry. Selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity. However, there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. For example, even a single firearm transaction or offer to engage in a transaction, when combined with other evidence (e.g., where a person represents to others a willingness and ability to purchase more firearms for resale), may require a license; whereas, a single isolated firearm transaction without such evidence would not require a license. At all times, the determination of whether a person is engaged in the business of dealing in firearms is based on the totality of the circumstances.

**(c)** *Presumptions that a person is engaged in the business as a dealer.* In civil and administrative proceedings, a person shall be presumed to be engaged in the business of dealing in firearms as defined in paragraph (a) of this section, absent reliable evidence to the contrary, when it is shown that the person—

**(1)** Resells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (i.e., to be a source of additional firearms for resale);

**(2)** Repetitively purchases for the purpose of resale, or repetitively resells or offers for resale, firearms—

**(i)** Through straw or sham businesses, or individual straw purchasers or sellers; or

A7

APPX.640

**(ii)** That cannot lawfully be purchased, received, or possessed under Federal, State, local, or Tribal law, including:

**(A)** Stolen firearms (e.g., 18 U.S.C. 922(j));

**(B)** Firearms with the licensee's serial number removed, obliterated, or altered, or not identified as required by law (e.g., 18 U.S.C. 922(k) or 26 U.S.C. 5861(i));

**(C)** Firearms imported in violation of law (e.g., 18 U.S.C. 922(l), 22 U.S.C. 2778, or 26 U.S.C. 5844, 5861(k)); or

**(D)** Machineguns or other weapons defined as firearms under 26 U.S.C. 5845(b) that cannot lawfully be possessed (e.g., 18 U.S.C. 922(o); 26 U.S.C. 5861(d));

**(3)** Repetitively resells or offers for resale firearms—

**(i)** Within 30 days after the person purchased the firearms; or

**(ii)** Within one year after the person purchased the firearms if they are—

**(A)** New, or like new in their original packaging; or

**(B)** The same make and model, or variants thereof;

**(4)** As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale to a person (other than a licensee in accordance with § 478.57 or § 478.78) firearms that were in the business inventory of the former licensee at the time the license was terminated (i.e., license revocation, denial of license renewal, license expiration, or surrender of license), whether or not such firearms were transferred to a responsible person of the former licensee after the license was terminated in accordance with § 478.57(b)(2) or § 478.78(b)(2); or

**(5)** As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale firearms that were transferred to the licensee's personal collection or otherwise as personal firearms in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a(a) prior to the time the license was terminated, unless:

**(i)** The firearms were received and transferred without any intent to willfully evade the restrictions placed on licensees by 18 U.S.C. chapter 44; and

**(ii)** One year has passed from the date of transfer to the licensee's personal collection or otherwise as personal firearms.

**(d)** ***Predominantly earn a profit***—(1) *Definition.* The intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: Provided, that proof of profit, including the intent to profit, shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this section, a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms.

   **(2)** ***Presumptions that a person has intent to predominantly earn a profit.*** In civil and administrative proceedings, a person shall be presumed to have the intent to predominantly earn a profit through the repetitive purchase and resale of firearms as defined in paragraph (d)(1) of this section, absent reliable evidence to the contrary, when it is shown that the person—

   **(i)** Repetitively or continuously advertises, markets, or otherwise promotes a firearms business (e.g., advertises or posts firearms for resale, including through the internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally;

   **(ii)** Repetitively or continuously purchases, rents, or otherwise exchanges (directly or indirectly) something of value to secure permanent or temporary physical space to display firearms they offer for resale, including part or all of a business premises, a table or space at a gun show, or a display case;

   **(iii)** Makes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale;

   **(iv)** Purchases or otherwise secures merchant services as a business (e.g., credit card transaction services, digital wallet for business) through which the person intends to repetitively accept payments for firearms transactions;

   **(v)** Formally or informally purchases, hires, or otherwise secures business security services (e.g., a central station-monitored security system registered to a business, or guards for security) to protect firearms assets and repetitive firearms transactions;

   **(vi)** Formally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes, or offers to make, repetitive firearms transactions; or

A9

APPX.642

**(vii)** Secures or applies for a State or local business license to purchase for resale or to resell merchandise that includes firearms.

**(e)** ***Conduct that does not support a presumption.*** A person shall not be presumed to be engaged in the business of dealing in firearms when reliable evidence shows that the person is only reselling or otherwise transferring firearms—

**(1)** As bona fide gifts;

**(2)** Occasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection;

**(3)** Occasionally to a licensee or to a family member for lawful purposes;

**(4)** To liquidate (without restocking) all or part of the person's personal collection; or

**(5)** To liquidate firearms—

**(i)** That are inherited; or

**(ii)** Pursuant to a court order; or

**(6)** To assist in liquidating firearms as an auctioneer when providing auction services on commission at an estate-type auction.

**(f)** ***Rebuttal evidence.*** Reliable evidence of the conduct set forth in paragraph (e) of this section may be used to rebut any presumption in paragraph (c) or (d)(2) of this section that a person is engaged in the business of dealing in firearms, or intends to predominantly earn a profit through the repetitive purchase and resale of firearms.

**(g)** ***Presumptions, conduct, and rebuttal evidence not exhaustive.*** The activities set forth in the rebuttable presumptions in paragraphs (c) and (d)(2) of this section, and the activities and rebuttal evidence set forth in paragraphs (e) and (f) of this section, are not exhaustive of the conduct or evidence that may be considered in determining whether a person is engaged in the business of dealing in firearms, or has the intent to predominantly earn a profit through the repetitive purchase and resale of firearms.

**(h)** ***Criminal proceedings.*** The rebuttable presumptions in paragraphs (c) and (d)(2) of this section shall not apply to any criminal case, although they may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences.

A10

**U.S. Department of Justice**

Civil Division

*Federal Programs Branch*                                      *Washington, D.C. 20530*

September 17, 2024

VIA FEDERAL EXPRESS
Clerk of Court
U.S. District Court for the Northern District of Texas
205 SE 5th Avenue, Room 133
Amarillo, TX 79101-1559

SEP 18 2024 AM11:48
FILED - USDC - NDTX - AM

     Re:   *State of Texas et al. v. Bureau of Alcohol, Tobacco, Firearms and Explosives et al.*, No. 2:24-cv-00089-Z

Dear Clerk of Court:

Please find enclosed a thumb drive containing the certified administrative record in the above-captioned case, which must be traditionally filed because it is more than 15,000 pages in length. Please file the attached document as part of the record in the above-captioned case. Also enclosed is an index to the administrative record, as well as an agency declaration certifying the record.

Although it is not required by the Local Rules, I have filed a notice today via ECF in the above-captioned case explaining that the administrative record in this case is being filed conventionally.

Copies of all these documents are also being sent to counsel for the parties and to Judge Kacsmaryk's chambers (via Federal Express).

Thank you for your attention to this matter. If you have any questions, please don't hesitate to call me at (202) 532-3114.

Sincerely yours,

*/s/ Jeremy S.B. Newman*
Jeremy S.B. Newman
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005

APPX.644

Align top of FedEx Express® shipping label here.

Press here to seal. Press here to seal. Press here to seal.

ORIGIN ID:RDVA   (202) 305-8546
RACHEL CHRISINGER
US DEPARTMENT OF JUSTICE CIVIL
1100 L STREET
ROOM 12515
WASHINGTON, DC 20530
UNITED STATES US

SHIP DATE: 17SEP24
ACTWGT: 1.00 LB
CAD: 250789303/INET4535

BILL SENDER

TO  **CLERK OF THE COURT**
**U.S. DIST. CT. FOR N.D. TEX.**
**205 SE 5TH AVE**
**ROOM 133**
**AMARILLO TX 79101**
(806) 468-3800
INV:                              REF:
PO:                               DEPT:





FedEx
Express

E

TRK#  **7786 4557 1380**
0201

**WED - 18 SEP 10:30A**
**PRIORITY OVERNIGHT**

**XA AMAA**          **79101**
                TX-US  **LBB**



RT **434**   1   **A**
         10:30
FZ



RECEIVED
SEP 18 2024
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

© 2011 FedEx 158396 REV 1/11

APPX.645



# Recommendations to Close the
# Gun Seller Loophole

**Everytown for Gun Safety Action Fund; March 9, 2023**

Background checks are a foundational and overwhelmingly popular part of any effort to prevent gun violence. An important provision of the landmark Bipartisan Safer Communities Act (BSCA) addressed the gun seller loophole, a loophole that has led to thousands of unlicensed individuals selling firearms—often online or at gun shows—without registering for a Federal Firearms License (FFL). BSCA expanded what it means to be "engaged in the business" of dealing in firearms so that more unlicensed gun sellers are required to obtain a FFL and run background checks on their gun sales. A Congressional Research Service analysis of the BSCA clarification confirms that the meaning and intent of the new language is to reach a class of unlicensed sellers who have heretofore escaped regulation.[1] But to ensure compliance and the full intent of the law, the Biden-Harris Administration must implement it through executive action. Everytown proposes the Administration take steps to ***clarify***, ***alert***, and ***enforce***:

***Clarify:***

    Issue guidance and promulgate substantive rulemaking that makes clear that an individual making commercial gun sales—including sales at gun shows or pursuant to advertisements—is presumptively engaged in the business, defines "hobby" and "personal collection," and clarifies the limited exceptions related to (a) occasional sales made for hobby and enhancement of a personal collection, and (b) the liquidation of a personal collection ;

***Alert****:*

    Send open letters to FFLs and commercial marketplace operators on how to spot a person who may be unlawfully engaged in the business and how to alert the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) of such activity; and

---

[1] Congressional Research Service, "Firearm Dealers 'Engaged in the Business'," August 19, 2022, https://sgp.fas.org/crs/misc/IF12197.pdf.

ATF 012079

APPX.646



**3. Executive action implementing BSCA can close the gun seller loophole by providing clear guidance on the law, alert commercial marketplaces and sellers, and enforce the law by cracking down on unlawful gun sellers and the marketplaces they use.**

ATF should ***clarify*** the contours of the new law, ***alert*** the relevant marketplaces to provide opportunity for law abiding gun sellers to follow the guidance, and then strictly ***enforce*** the law against illegal gun sellers.

***Clarify:*** BSCA amended the definition of "engaged in the business" as applied to firearms dealers by requiring that persons who devote time, attention and labor to dealing in firearms as a regular course of trade or business "to predominantly earn a profit" obtain an FFL.[25] The revision simplifies the prior definition, which required that such activities be "with the principal objective of *livelihood and* profit" (emphasis added), but retains the exceptions for individuals who make "occasional" sales, exchanges or purchases of firearms for the enhancement of a "personal collection" or for a "hobby," or who sell all or part of their collection of firearms.

Enforcement guidance and substantive rulemaking should provide a clear definition that buying and reselling guns to make a profit requires a federal license and that commercial sales—such as advertising firearms for sale at gun shows or pursuant to an advertisement—creates a presumption that a person is engaged in the business. Commercial sales and commercial activity are clearly in the ambit of what Congress intended to cover, and ATF should make clear that this is the type of conduct that it considers to be unlawful. ATF should clarify that engaging in multiple transactions within a one-year period on an internet marketplace or at a gun show creates a presumption that the seller is engaged in the business.

It is also important for ATF to clarify the exceptions in the law that have caused confusion. The exceptions have never been clearly defined in regulation or caselaw, and should be read in connection with the updated definition in the law. The law does not cover: (1) occasional sales for the enhancement of a personal collection, (2) occasional sales for a hobby, and (3) selling all or part of a personal collection. ATF should provide definitions and examples for these exceptions so the public understands when it is clearly in the safe harbor of the law.

---

[25] 18 U.S.C. § 922(a)(21)(C).

 An official website of the United States government

Here's how you know



Menu

Search                                                                                    🔍

| News | + |
| --- | --- |

PRESS RELEASE

# Bonsall Man Pleads Guilty In Illegal Firearms Trafficking Operation

Thursday, May 14, 2015

Share

> **For Immediate Release**
>
> U.S. Attorney's Office, Southern District of California

## Becomes Second Of Five Defendants To Admit Manufacturing And Selling Untraceable Home-made Weapons

SAN DIEGO – Clay Bautista-Marquez of Bonsall pleaded guilty in federal court this morning to a firearms trafficking violation, admitting that he and a co-conspirator sold six untraceable AR-15-style semi-automatic rifles for almost $6,000, and that the guns had been built from unfinished lower receivers.

According to his plea agreement, Bautista-Marquez pleaded guilty before U.S. Magistrate Judge

ATF 012100

APPX.648





An official website of the United States government

Here's how you know

Search 🔍

> The Acquia Search flood control mechanism has blocked a Solr query due to API usage limits. You should retry in a few seconds. Contact the site administrator if this message persists.

**News** ＋

**PRESS RELEASE**

# Everett Man Pleads Guilty to Federal Firearm Charges

Monday, June 19, 2017

Share

> **For Immediate Release**
>
> U.S. Attorney's Office, District of Massachusetts

BOSTON – An Everett man pleaded guilty today in federal court in Boston in connection with selling a firearm with an obliterated serial number.

Brian Segura, 26, pleaded guilty to one count of conspiracy to engage in the business of dealing in fi without a license and one count of possession of a firearm with an obliterated serial number. U.S. Dis Court Senior Judge Mark L. Wolf scheduled sentencing for May 2018.

TOP

ATF 012163

APPX.649



THE UNITED STATES ATTORNEY'S OFFICE

# DISTRICT *of* PUERTO RICO

U.S. Attorneys » District of Puerto Rico » News

**Department of Justice**

U.S. Attorney's Office

District of Puerto Rico

FOR IMMEDIATE RELEASE                                            Tuesday, August 2, 2022

## Three Men, Who Acquired and Transferred Almost 1,000 Guns, Charged With Firearms Trafficking

SAN JUAN, Puerto Rico – A federal grand jury returned three indictments charging Radamés Revilla-Machín, Roberto Miranda-Schmidt, and Luis Matos-Rosa with the unlicensed business of dealing in firearms, announced W. Stephen Muldrow, United States Attorney for the District of Puerto Rico.  The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is in charge of the investigation, with the collaboration of the Puerto Rico Police Bureau (PRPB).

According to the indictments, since 2012 Revilla-Machín and Miranda-Schmidt have transferred over 820 firearms in Puerto Rico. Since 2019, Matos-Rosa has transferred over 100 guns. Several of these transfers occurred within 72 hours of the defendants' acquisitions of the guns. The three defendants advertised guns for sale on websites, such as comprayventadearmas.com and pewpewpr.com.  None of these individuals had a license to sell firearms.  In 2019, ATF sent Revilla-Machín a letter advising him to stop engaging in the unlicensed business of dealing in guns.

"Working with our local partners to tackle violent crime is a top priority of the Justice Department," said U.S. Attorney Muldrow. "Today's arrests are yet another example of our commitment to combating violent crime and illegal firearms trafficking. We will continue to investigate and disrupt the networks that put guns into our communities -- oftentimes with tragic consequences."

"Today's arrests mark significant strides in ATF and PRPB efforts to combat firearms trafficking Puerto Rico," said Christopher A. Robinson, Special Agent in Charge of ATF Miami Field Division. "This collaborative effort enhances our violent crime prevention strategy by apprehending those who place firearms in the hands of criminals."

Assistant U.S. Attorneys Linet Suárez and Jonathan Gottfried of the Violent Crimes and National Security Section are in charge of the prosecution of the case.  If convicted, each defendant faces a sentence of up to five years in prison.

*An indictment is merely an allegation and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.*

###

ATF 012407

APPX.650

## *Engaged in the Business NForce Case Research Project*
## *(June-July 2023)*

### *Overview*

To support the Notice of Proposed Rulemaking entitled *Definition of "Engaged in the Business" as a Dealer in Firearms* ("NPRM"), a working group composed of 17 GS-14 and GS-15 members from various ATF directorates researched and vetted approximately 1,211 criminal investigations (908 open cases/303 closed cases) from the NForce database, which were tagged as 18 U.S.C. § 922(a)(1)(A) cases. The working group[1] reviewed these cases to document those that would support the presumptions that were proposed for the terms "engaged in the business as a dealer in firearms" ("EIB") and to "predominantly earn a profit" ("PEP") in the NPRM.

The working group was instructed to focus on the definition of engaging in the business as applied to wholesale or retail dealing in firearms, to include selling machine gun conversion devices. Cases in which an unlicensed individual was manufacturing and then selling those firearms were not considered for purposes of this project. However, if the unlicensed person was obtaining firearms from someone else conducting the manufacture, then purporting to sell or selling those items, these cases were included.

The working group researched and vetted cases for a 4-week period beginning at the end of June 2023 and ending on July 26, 2023. Each case that supported one or more of the EIB or PEP presumptions was documented in a spreadsheet along with specific facts/behaviors supporting the presumption(s). Throughout August, two members of the Office of Regulatory Affairs performed quality control of the spreadsheets as well as spot checking of individual cases.

### *Results*

Of the total 1,211 cases researched, 348 cases (29%) contained sufficient information to support one or more EIB or PEP presumptions. Some of the cases supported both an EIB and PEP presumption and thus when accounting for overlap, there were approximately 500 instances (41%) of a case supporting one or more EIB presumption(s) and approximately 185 instances (15%) of a case supporting one or more PEP presumption(s), for a total of 685 instances. *See Figure 1.* PEP #8 (business insurance) was the only presumption in which no instances were discovered during the research process.

---

[1] Members of the working group consisted of special agents, current or former industry operations investigators, regulations writers, and program managers from multiple directorates. An initial training session in navigating NForce was provided to the members of the group as well as a training session to explain the types of information or behaviors to look for within each individual case and how to document those on the spreadsheet. Members were also provided with written instructions on navigating NForce as well as a Q&A document for anticipated or probable questions that we may receive from the members. In researching NForce cases, members of the working group gleaned information from evidence logs, texts and other narratives photocopied or recorded, verbal admissions recorded in the case log, indictments, plea agreements, photos, and case management logs. Working group members used their own best judgment and efforts to determine from the best available information within the case management system, which, if any facts and behaviors supported or appeared to support any of the presumptions. Indictments or convictions of 18 U.S.C. 922(a)(1)(A) alone without description of specific behaviors were not considered for purposes of meeting presumptions.

| Engaged in the Business - NForce Case Analysis (Presumptions with overlap) | | |
|---|---|---|
| **EIB (Engaged in the Business)** | **Number of instances** | **Percentage** |
| EIB1 | 196 | 16% |
| EIB2 | 16 | 1% |
| EIB3(i) | 44 | 4% |
| EIB3(ii) | 68 | 6% |
| EIB4(i) | 67 | 6% |
| EIB4(ii) | 36 | 3% |
| EIB4(iii) | 66 | 5% |
| EIB5 | 5 | $\leq$1% |
| EIB6 | 2 | $\leq$1% |
| **Total EIB Cases** | **500** | |
| | | |
| **(PEP) To Predominantly Earn a Profit** | **Number of instances** | **Percentage** |
| PEP1 | 86 | 7% |
| PEP2 | 35 | 3% |
| PEP3 | 54 | 4% |
| PEP4 | 2 | $\leq$1% |
| PEP5 | 2 | $\leq$1% |
| PEP6 | 7 | $\leq$1% |
| PEP7 | 1 | $\leq$1% |
| PEP8 | 0 | 0% |
| **Total PEP Cases** | **185** | |

ATF 012852
APPX.652



U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives
1521 1st Avenue, Suite 600
Seattle, WA 98134

www.atf.gov

May 24, 2018

EXPLANATION LETTER: NOTICE OF DENIAL OF APPLICATION FOR LICENSE

Certified Mail – Return Receipt Requested

████████████████
Scott's Tactical Advantage
869 SE Main St
Roseburg, OR 97470

Re:  Federal Firearms Application

Dear Mr. ████

As you are aware, on April 4, 2018, the Bureau of Alcohol, Tobacco, Firearms and Explosives
(ATF) issued a Notice of Denial of Application for License to ███████████████  On April 24,
2018, ATF timely received a formal written request for a hearing on the Notice of Denial of
Application for License from ███████████████

A hearing on this matter has been scheduled for Wednesday, June 27, 2018, at 9:00 A.M. at the
Wayne L. Morse United States Courthouse, 405 E. 8th Avenue, 2nd Floor Main Conference
Room, Eugene, OR, 97401. This letter serves to inform you of the hearing procedures.

Under no circumstances may you, your representative or witnesses bring firearms or any other
weapons to the hearing.  The hearing will not begin, or will cease, if it is determined that this
policy has been violated.

The hearing itself is informal in nature and does not require adherence to civil court rules and
formal courtroom procedures.  An ATF-hired stenographer will be present to transcribe the
hearing, however, there is no sworn testimony.  The resulting transcript, along with the exhibits
presented at the hearing, constitute the official record of the hearing.  You may order a copy of
the transcript at your own expense.  You may also make an audio recording of the proceedings or
have them recorded by an additional stenographer at your own expense, provided this recording
is not disruptive to the proceedings.

*ATF does not make a video recording of the hearing proceedings. You may not do so either.*

The Director of Industry Operations (DIO) will preside over the hearing and ensure that it occurs in an orderly and professional manner. The primary purpose of the hearing is to give the DIO the opportunity to hear your explanation/argument in response to the proposed licensing action.

During the hearing, ATF, through an attorney, will enter in the official record all evidence establishing the violations cited in the enclosed Notice. The ATF attorney will generally ask the ATF investigator(s) who conducted the inspection, or other ATF employees who have relevant information concerning your case, to describe their findings. At the conclusion of the Government's presentation, you will have the opportunity to respond. You are encouraged to state your case as clearly and factually as possible. Be willing and prepared to address each violation described in the Notice. You may also present relevant evidence. Relevant evidence is evidence that tends to prove or disprove an issue at the hearing, such as whether the alleged violation occurred as stated in the Notice. You may ask witnesses to speak on your behalf about the violations addressed in the Notice.

You will have the opportunity to ask questions about any of the evidence (including witness testimony) that ATF puts on the record. Similarly, ATF will have the opportunity to ask questions about evidence or of witnesses you present. The most important consideration is that the DIO has a full understanding of the relevant facts and circumstances regarding the violations alleged in the Notice.

When the DIO is satisfied that all evidence and arguments have been fully presented, he or she will conclude the hearing. After full consideration of the official record, he or she will notify you of the final decision. If after review of the entire record, the DIO concludes that you failed to satisfy licensing requirements the DIO may issue a Final Notice of Denial of Application, which will be sent to you via certified mail. Similarly, the DIO will notify you in writing if he or she decides not to take further administrative action on the Notice. If you are not satisfied with the final decision, you may appeal the decision to Federal district court within 60 days. The hearing record may become part of that review.

We look forward to meeting with you at the scheduled hearing.

Sincerely yours,

Linda Young
Acting Director, Industry Operations

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | U.S. DEPARTMENT OF JUSTICE |
| IN THE MATTER OF THE NOTICE | * | BUREAU OF ALCOHOL, TOBACCO, |
| TO DENY APPLICATION FOR | * | FIREARMS AND EXPLOSIVES |
| LICENSE | * | |
| | * | SEATTLE FIELD DIVISION |
| ISSUED TO: | | |

▮▮▮▮▮▮▮▮▮▮▮▮▮  *

Scott's Tactical Advantage  *
869 SE Main Street  *
Roseburg, Oregon 97470  *
FFL Nos. 9-93-019-01-PA-05780 and  *
9-93-019-07-PA-05781

## NOTICE OF HEARING

On April 4, 2018, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) issued a Notice to Deny Application for License, ATF Form 5300.43, to ▮▮▮▮▮▮▮▮▮ d/b/a Scott's Tactical Advantage, 869 SE Main Street, Roseburg, Oregon 97470.

On April 24, 2018, ATF received a formal written request for a hearing on the Notice to Deny Application for License from ▮▮▮▮▮▮▮

Therefore, notice is given that a hearing on the matter will be conducted before the undersigned in accordance with the provisions of Title 18, United States Code, Section 923(f) and Title 27, Code of Federal Regulations, Part 478, Subpart E.

| | |
|---|---|
| DATE: | June 27, 2018 |
| TIME: | 9:00 a.m. |
| LOCATION: | Wayne L. Morse U.S. Courthouse |
| | 405 E 8th Avenue |
| | Eugene, Oregon 97401 |
| | 2nd Floor, Main Conference Room |

As provided in 27 C.F.R. § 478.76, the applicant may be represented at the hearing. Further, the applicant may have witnesses appear on its behalf and submit relevant evidence.

All persons attending the hearing must bring a form of state or federally-issued identification (e.g., driver's license or passport) for entry. Additionally, all persons attending the hearing are prohibited from bringing firearms, explosives, or other dangerous weapons into the federal building where the hearing is to occur or onto federal property. *See* 18 U.S.C. § 930; 41 C.F.R. § 102-74, Subpart C.

(continued, next page)

ATF 012857

APPX.655

Please complete the enclosed Hearing Confirmation Form and return it to the following address:

Bureau of Alcohol, Tobacco, Firearms and Explosives
Seattle Field Division
1521 1st Avenue, Suite 600
Seattle, Washington 98134

Attention: Acting DIO Linda Young

The Hearing Confirmation Form may also be emailed to █████████████████

If there is an emergency delay on the day of the hearing, please contact the Seattle Field
Division, at █████████████

Issued this 24th day of May, 2018

Linda Young
Acting Director, Industry Operations
Seattle Field Division
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Encl.: Hearing Confirmation Form

ATF 012858
APPX.656



TO:    Bureau of Alcohol, Tobacco, Firearms and Explosives
       Seattle Field Division
       1521 1st Avenue, Suite 600
       Seattle, Washington 98134

       Attention: Acting DIO Linda Young



## HEARING CONFIRMATION FORM

I hereby confirm that the hearing on the Notice to Deny Application for License will be held at
9:00 a.m., on June 27, 2018, at the Wayne L. Morse U.S. Courthouse, 405 E 8th Avenue, Eugene,
Oregon 97401, 2nd Floor, Main Conference Room.

I anticipate that the following persons will attend the hearing as my representative or witness(es):

_____

_____

_____

_____

_____

I understand that if I fail to appear for the hearing as scheduled, the hearing will occur in my
absence.

_____          Date: _____

Signature

ATF 012859

APPX.657

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Notice to Deny Application for License

| ☑ | In the matter of application for license as a/an | Dealer in Firearms (Type 01) and a Manufacturer of Firearms (Type 07) | , filed by: |
| | or | | |
| ☐ | In the matter of application for renewal of license number | | as a/an |
| | | | , filed by: |

Name and Address of Applicant *(Show number, street, city, State and ZIP Code)*

▆▆▆▆▆

Scott's Tactical Advantage
869 SE Main Street
Roseburg, OR 97470

9-93-019-01-PA-05780
9-93-019-07-PA-05781

## Notice Is Hereby Given That:

The application described above may be denied because the applicant does not qualify for licensing under the provisions of 18 U.S.C. § 923(d), as set forth in the pages attached and made a part of this form. Pursuant to 18 U.S.C. § 923(f)(2), you may file a request for a hearing to review the denial of your application. This request must be received, in duplicate, by the Director of Industry Operations (DIO), Bureau of Alcohol, Tobacco, Firearms and Explosives, located at 1521 1st Avenue South, Suite 600, Seattle, WA 98134 , within 15 days of your receipt of this notice.

Where a timely request for hearing is made, and the application described above is for renewal of a currently valid license, you may continue to operate under your present license pending the outcome of the hearing. The hearing will be held as provided in 27 CFR Part 478.

If a timely request for a hearing is not received, the application shall be disapproved, and a copy so marked will be returned to the applicant.

☑ Please see included brochure

| Date | Name and Title of Bureau of Alcohol, Tobacco, Firearms and Explosives Official | Signature |
| --- | --- | --- |
| 04/03/2018 | Linda D. Young, Acting Director of Industry Operations | *Linda D. Young* |

I certify that on the date shown below I served this notice on the person identified below by:

| ☑ | Certified mail to the address shown below. | ☐ | Delivering a copy of the notice to the address shown |
| | Tracking Number: 7001 1140 0002 3399 3195 | | below. |
| | | Or | |

| Date Notice Served | Title of Person Serving Notice | Signature of Person Serving Notice |
| --- | --- | --- |
| 04/04/2018 | Investigative Analyst | |

| Print Name and Title of Person Served | Signature of Person Served *(if applicable)* |
| --- | --- |
| ▆▆▆▆ Applicant | |

Address Where Notice Served

869 SE Main Street
Roseburg, OR 97470

ATF 012860

APPX.658

Page 2 – ATF Form 5300.43 (4498), Notice to Deny Application for License

███████████████                                                208020  PWM
Scott's Tactical Advantage                                      SEA-18-237138
869 SE Main Street
Roseburg, Oregon 97470
9-93-019-01-PA-05780
9-93-019-07-PA-05781

Pursuant to the provisions of 18 U.S.C. § 923(d) and 27 C.F.R. § 478.71, notice is hereby given
of the denial of the application for Federal firearms licenses submitted by ███████████
d/b/a "Scott's Tactical Advantage", 869 SE Main Street, Roseburg, Oregon 97470 ("applicant"),
in that the Acting Director, Industry Operations, United States Department of Justice, Bureau of
Alcohol, Tobacco, Firearms and Explosives ("ATF"), Seattle Field Division, has reason to
believe that the applicant does not meet the criteria for licensing set forth in the Gun Control Act
of 1968 (GCA), as amended, 18 U.S.C. Chapter 44, and the regulations issued thereunder, 27
C.F.R. Part 478.

The GCA mandates that ATF shall issue a firearms license to a qualified applicant. 18 U.S.C. §
923(c); 27 C.F.R. § 478.47(a).

On October 18, 2017, the applicant filed an Application for Federal Firearms License, ATF E-
Form 7 (5310.12), dated October 12, 2017, as a Dealer in Firearms Other than Destructive
Devices, and as a Manufacturer of Firearms Other than Destructive Devices.

A qualification inspection of the applicant revealed the following:

1. The applicant willfully violated the provisions of the GCA and the regulations issued
   thereunder, to wit:

   a. In connection with the acquisition of firearms, the applicant knowingly and
      willfully made false statements to licensed firearms dealers intended or likely to
      deceive such dealers with respect to facts material to the lawfulness of those sales
      in violation of 18 U.S.C. § 922(a)(6). Specifically, on approximately 35
      occasions, occurring between June 2015 and February 2017, the applicant
      purchased firearms from Federal firearms licensees located in Oregon and falsely
      listed a residence address of ████████████████████████ on
      the Firearms Transaction Records, ATF Forms 4473. At the time, the applicant
      actually resided at ████████████████████ By concealing his
      California residency, the applicant misled the Oregon licensees as to lawfulness of
      the transactions. *See* Appendix, ¶ 1.

   b. The applicant willfully engaged in the business of dealing in firearms without a
      Federal firearms license in violation of 18 U.S.C. § 922(a)(1)(A). Between
      September 2014 and December 2016, the applicant sold approximately 149
      firearms to non-licensees in California. These included approximately 80
      firearms that the applicant had purchased from Oregon licensees between March
      2014 and December 2016. Most of these firearms were sold by the applicant in

Page 3 – ATF Form 5300.43 (4498), Notice to Deny Application for License

California within a month (and in many instances, only a few days) after the applicant purchased them in Oregon. The applicant was aware of the requirement to obtain a Federal firearms license before dealing in firearms. *See* Appendix, ¶ 2.

c. The applicant travelled from California to Oregon to acquire firearms from Federal firearms licensees located in Oregon for the purpose of engaging in the business of dealing in firearms without a license, specifically to sell firearms to non-licensees in California in violation of 18 U.S.C. § 924(n). *See* Appendix, ¶ 2.

As such, the applicant is not eligible for licensing pursuant to 18 U.S.C. § 923(d)(1)(C) and 27 C.F.R. § 478.47(b)(3).

2. The applicant willfully failed to disclose material information required, and has made a false statement as to a material fact, in connection with his application. The applicant falsely identified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as a residence he maintained during the last five years. In turn, the applicant failed to identify ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as his actual residence during that period.

As such, the applicant is not eligible for licensing pursuant to 18 U.S.C. § 923(d)(1)(D) and 27 C.F.R. § 478.47(b)(4).



An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT *of* JUSTICE
STICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                            Friday, September 23, 2016

# Utah Business Owner Convicted of Dealing in Firearms without a License and Filing False Tax Returns

### *Convicted of Illegally Selling Firearms and Underreporting More than $10 Million in Gross Receipts*

A Salt Lake County, Utah man was convicted today by a federal jury of one count of dealing in firearms without a license and five counts of filing false tax returns, announced Principal Deputy Assistant Attorney General Caroline D. Ciraolo, head of the Justice Department's Tax Division, and U.S. Attorney John W. Huber for the District of Utah.

"Individuals such as Mr. Webber, who view themselves above the law and engage in criminal conduct to line their own pockets with funds that belong to the U.S. Treasury, will be held to account for their crimes and face severe consequences, including prosecution and incarceration," said Principal Deputy Assistant Attorney General Ciraolo. "The Tax Division thanks its colleagues in the District of Utah and other federal agencies for their continued efforts to ensure that everyone pays their fair share."

Pursuant to an agreement reached with the United States in 2007, Adam Michael Webber, was barred from applying for a federal firearms license or engaging in the business of dealing firearms. According to the evidence presented at trial, between 2007 and 2008, Webber was the sole owner of HK Parts, an Internet gun parts business that operated originally as a sole proprietorship and later as an S corporation. In 2008, Webber added firearms to his product line and primarily sold them on the Internet at hkparts.net   .  He also sold firearms and firearm parts out of the basement of his residence.  Webber never held a federal firearms license and, from 2009 through May 2012, illegally sold firearms under the auspices of a company owned by another Utah resident.  Webber also sold firearms to undercover Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) agents on two separate occasions, including selling one firearm for cash in a parking lot.  In May 2012, approximately $180,000 in cash, a 70 pound silver bar, silver coins and firearms were found at Webber's residence during the execution of a search warrant.

From 2007 through 2010, Webber earned more than $10 million in gross receipts from his illegal firearms business.  For those years, he reported only a total of $183,397 in gross receipts, underreporting his earnings on his 2007, 2008 and 2009 individual income tax returns and underreporting gross receipts on his 2009 and 2010 corporate tax returns.  In 2010, Webber paid $670,000 in cash for a new home in Salt Lake County.

Sentencing is set for Dec. 1.  Webber faces a statutory maximum sentence of up to five years in prison for dealing in firearms without a license and up to three years in prison for each count of filing a false tax return, as well as a period of supervised release and monetary penalties.

"This defendant repeatedly purchased firearms for resale without a federal firearms license and substantially under reported the gross receipts of the sales on his taxes," said U.S. Attorney Huber.  "Around 2,000 firearms were involved in this conduct. Evidence at trial showed that Mr. Webber claimed a mere fraction of his gross receipts on his tax forms over a four-year period."

ATF 012879

APPX.661



**MEMORANDUM**

Date January 24, 2024

To  Everytown for Gun Safety

From  Preet Bharara, Jay Holtmeier, Kelly P. Dunbar, Alex W. Miller, Kimberly D. Waters

Re  Use of Rebuttable Presumptions in ATF Civil and Administrative Proceedings

The Bipartisan Safer Communities Act (BSCA) modified the statutory definition of who is "engaged in the business" of dealing in firearms to include any person who deals in firearms "to predominantly earn a profit." To implement that and other changes made in the BSCA, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) issued a notice of proposed rulemaking on September 8, 2023 ("the Proposed Rule"). Among the Proposed Rule's most significant provisions is the identification of conduct that will give rise to rebuttable presumptions that a person's buying or selling of firearms (a) constitutes being "engaged in the business" or (b) is "to predominantly earn a profit." ATF proposes applying these rebuttable presumptions in civil and administrative proceedings, and expressly disclaims their use in criminal cases. Various commenters have objected to the presumptions included in the Proposed Rule, including by arguing that the agency lacks authority to promulgate presumptions regarding a law with criminal applications. This memorandum evaluates whether ATF has legal authority to enact rebuttable presumptions as described in the Proposed Rule and proceeds in two parts.

*First*, we provide an overview of how agencies have created rebuttable presumptions and the standards by which courts evaluate them. Agencies have long created rebuttable presumptions for use in civil and administrative proceedings through policy statements and notice-and-comment rulemaking to provide clarity to regulated parties, promote consistency in enforcement, and improve voluntary compliance. Such presumptions must be rational and consistent with the text and purpose of the statute being interpreted, in addition to complying with substantive and procedural provisions of the Administrative Procedure Act (APA). These are context-dependent inquiries.

*Second*, we analyze ATF's authority to create rebuttable presumptions. As a general matter, ATF has authority to promulgate rules defining terms in the laws it administers and has previously promulgated regulations defining "engaged in the business." The proposed presumptions provide notice to affected parties of the BSCA's revisions to that definition, and—although a detailed analysis of the merits of each particular presumption is fact-dependent and beyond the scope of this memorandum—appear broadly in accord with the statutory definitions and caselaw interpreting them. ATF has also, on at least one occasion, announced a rebuttable

Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, New York 10007

Beijing   Berlin   Boston   Brussels   Denver   Frankfurt   London   Los Angeles   New York   Palo Alto   San Francisco   Washington

WilmerHale |WH|

Everytown for Gun Safety
January 24, 2024
Page 2

presumption through a guidance letter.  Various commenters have argued that the criminal
applications of the Gun Control Act's "engaged in the business" and "to predominantly earn a
profit" standards should preclude the use of rebuttable presumptions in the civil context.  But we
conclude that ATF, like other agencies, has the authority to promulgate rational rebuttable
presumptions for civil and administrative proceedings so long as they are consistent with the
statutory terms being interpreted, even when those underlying statutory terms may elsewhere
carry criminal penalties.  And, on balance, ATF can likely promulgate the specific rebuttable
presumptions contained in the Proposed Rule, which appear both rational and consistent with the
BSCA's definitions of "engaged in the business" and "to predominately earn a profit."

I.    **Federal Agencies' Power to Create Rebuttable Presumptions in Civil and
      Administrative Proceedings**

A.   Presumptions Generally

Rebuttable presumptions may be used in civil cases and administrative proceedings.  *See,
e.g.*, Fed. R. Evid. 301.  Presumptions "may, of course, be established both by legislative bodies
and by administrative agencies."  *United Scenic Artists, Local 829, Bhd. of Painters & Allied
Trades v. NLRB*, 762 F.2d 1027, 1034 (D.C. Cir. 1985); *accord Chem. Mfrs. Ass'n v. Dep't of
Transp.*, 105 F.3d 702, 705 (D.C. Cir. 1997) ("It is well-settled that an administrative agency
may establish evidentiary presumptions.").  But "unlike a legislative body," administrative
agencies are not "free to adopt presumptions for policy reasons."  *Chem. Mfrs. Ass'n*, 105 F.3d at
705.  Instead, "an agency may only establish a presumption if there is a sound and rational
connection between the proved and inferred facts."  *Id.*; *see also United Scenic Artists*, 762 F.2d
at 1034 (stating that administrative agencies may not "ignore statutory language by creating a
presumption on grounds of policy to avoid the necessity for finding that which the legislature
requires to be found").  Courts "review agency presumptions for consistency with their
governing statutes, and for rationality."  *Chem. Mfrs. Ass'n*, 105 F.3d at 705 (citing *NLRB v.
Baptist Hosp., Inc.*, 442 U.S. 773, 787 (1979)).

As to rationality, the validity of an agency presumption "depends as a general rule upon a
rational nexus between the proven facts and the presumed fact." *United Scenic Artists*, 762 F.2d
at 1034; *accord Chem. Mfrs. Ass'n*, 105 F.3d at 705.  "Where such a nexus is lacking, the
presumption is invalid." *United Scenic Artists*, 762 F.2d at 1034.  Under the rational connection
requirement, "[a] presumption is normally appropriate when proof of one fact renders the
existence of another fact so probable that it is sensible and timesaving to assume the truth of [the
inferred] fact ... until the adversary disproves it."  *Chem. Mfrs. Ass'n*, 105 F.3d at 705 (citations
and internal quotation marks omitted).

WILMERHALE [WH]

Everytown for Gun Safety
January 24, 2024
Page 3

Evidentiary presumptions defined in final agency actions—like rules issued after notice-and-comment—must also comply with the APA. *See, e.g.*, *E. Bay Sanctuary Covenant v. Biden*, No. 18-CV-06810-JST, 2023 WL 4729278, at *1 (N.D. Cal. July 25, 2023) (reviewing an evidentiary presumption contained in final rule under the APA). Pursuant to the APA, a court must "hold unlawful and set aside agency action [it finds] . . . to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," "contrary to constitutional right, power, privilege, or immunity," or "without observance of procedure required by law." 5 U.S.C. § 706(2). Substantive challenges under the APA (i.e., a claim that a presumption is arbitrary and capricious) merge with the more specific analysis applicable to presumptions discussed above.

      B.  <u>Mechanisms by Which Federal Agencies Can Create Rebuttable Presumptions</u>

Agencies have the discretion to promulgate evidentiary presumptions for use in civil and administrative proceedings through a variety of means. *See, e.g.*, *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F. 2d 1105, 1110 (D.C. Cir. 1987) ("This court and others have consistently stated that an agency may announce presumptions through policy statements rather than notice-and-comment rulemaking."); *see also Am. Forest & Paper Ass'n v. FERC*, 550 F.3d 1179, 1183 (D.C. Cir. 2008) (upholding agency's decision "to adopt certain rebuttable presumptions via rulemaking, rather than by case-by-case adjudication"). Historically, some federal agencies have enacted rebuttable presumptions through policy statements, but some have also done so through the notice-and-comment rulemaking process. Below we discuss illustrative examples of both.

      *1.  Policy Statements*

Agencies often successfully use policy statements to announce evidentiary presumptions. *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369 (11th Cir. 1983), involved the Interstate Commerce Commission's (ICC) creation of presumptions regarding what constituted "private carriage." The plaintiff argued that the ICC's proposed presumptions encompassed conduct beyond the ICC's statutory authority to regulate. *Id.* at 1378. Despite having issued a proposed statement, solicited comments, and held a public hearing, the ICC ultimately promulgated a general policy statement rather than a binding rule. *Id.* at 1372-1375. Procedural and substantive challenges were lodged under the APA, and the Eleventh Circuit upheld the ICC's decision to enact the presumptions through a policy statement. *Id.* at 1387. Notably, the court emphasized that if the "agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm" and thus may be in the form of a policy statement. *Id.* at 1377. The ICC's action met this standard because it explicitly stated that each case would be examined under the totality of the circumstances. *Id.* In addition, the court noted that the presumptions remained rebuttable and held generally that "the use of presumptions does not reasonably transform a statement of policy into a binding norm."

WilmerHale [WH]

Everytown for Gun Safety
January 24, 2024
Page 4

*Id.* On the merits, the court concluded that the ICC had the statutory authority to define private carriage and that there was a rational basis for the presumptions. *Id.* at 1379, 1381.

In *Regular Common Carrier Conference of American Trucking Ass'ns v. United States*, 628 F.2d 248 (D.C. Cir. 1980), the D.C. Circuit also held that the ICC could announce rebuttable presumptions in the form of a policy statement. The case involved the Interstate Commerce Act's definition of "motor contract carrier." *Id.* at 249. The ICC published a general statement of policy explaining that it would apply certain standards when determining if someone met the statutory definition, including various presumptions. *Id.* at 250. Petitioners claimed that the ICC failed to follow notice-and-comment rulemaking requirements and that the statement improperly expanded the underlying statutory definition. *Id.* at 250-251. The court denied the petition, holding that the policy was a general statement of policy consistent with the APA because it retained a case-by-case assessment. *Id.* at 251. In addition, presumptions "are by their nature tentative and rebuttable." *Id.* The court did not reach the substantive challenges because the policy expressed "the agency's tentative intentions for the future," making the policy "unripe for judicial review." *Id.* at 252.

*City of Jersey City v. Pierce*, 669 F. Supp. 103 (D.N.J. 1987), involved substantive and procedural APA challenges to rebuttable presumptions contained in a policy statement issued by the Secretary of Housing and Urban Development. Citing *Ryder Truck* and *Regular Common Carrier*, the court held that the use of rebuttable presumptions "does not reasonably transform a statement of policy into a binding norm" subject to notice-and-comment requirements because the agency retained discretion. *Id.* at 106, 109. The court also rejected the substantive challenges, holding that the presumptions "represent[ed] a reasonable effort on the part of HUD to effectuate" the underlying statute. *Id.* at 109. "[A]gencies are clearly vested with authority to create certain evidentiary presumptions," and in creating presumptions, "the agency's interpretation of its statutory authority need not be the only reasonable interpretation of such authority. All that is needed . . . is that it has warrant in the record and a reasonable basis in law." *Id.* at 109-110 (citations and internal quotation marks omitted). In applying these principles, the court emphasized that the presumptions were supported by HUD's experience administering the statute, addressed problems that HUD had observed, and clarified how HUD intended to administer the statute moving forward. *Id.* at 110-111.

Further examples of the successful creation of rebuttable presumptions through policy statements abound. *See, e.g.*, *Nat'l Ass'n of Broad. v. FCC*, 569 F.3d 416, 425, 427 (D.C. Cir. 2009); *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 45 (D.C. Cir. 1974); *Fischer v. FCC*, 417 F.2d 551, 553 (D.C. Cir. 1969); *All. for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 172-173 (D.D.C. 2000).

WilmerHale [WH]

Everytown for Gun Safety
January 24, 2024
Page 5

### 2. *Notice-and-Comment Rulemaking*

Cases involving procedural challenges to presumptions promulgated through notice-and-comment rulemaking are rare, and the permissibility of using notice-and-comment procedures to take such action appears settled. The typical challenge is instead premised on an agency's *failure* to employ notice-and-comment rulemaking. That is the situation in the cases discussed above, and others like *Idaho Mining Ass'n v. Browner*, 90 F. Supp. 2d 1078, 1099 (D. Idaho 2000) (upholding a rebuttable presumption as a lawful interpretive rule but also noting the agency met APA requirements for notice-and-comment rulemaking). Most cases involving presumptions promulgated after notice-and-comment rulemaking do not even discuss the form of the agency action other than by way of background. *See, e.g.*, *Nat'l Mining Ass'n v. Babbit*, 172 F.3d 906 (D.C. Cir. 1999) (vacating on substantive grounds rebuttable presumption issued through notice-and-comment without discussion of procedural mechanism); *see also Chem. Mfrs. Ass'n*, 105 F.3d 702 (upholding rebuttable presumption enacted through notice-and-comment without discussion of procedural mechanism); *Hazardous Waste Treatment Council v. U.S. E.P.A.*, 861 F.2d 277, 280 (D.C. Cir. 1988) (same). And those cases to confront the issue directly, like *American Forest & Paper Ass'n v. FERC*, 550 F.3d 1179, 1182-1183 (D.C. Cir. 2008), have held that an agency may "ch[oose] to adopt certain rebuttable presumptions via rulemaking, rather than by case-by-case adjudication." These decisions make good sense: if rebuttable presumptions can be established through agency actions like policy statements that contain fewer procedural protections for regulated parties, the additional protections provided by notice-and-comment procedures strengthen the agency's claim to authority.[1]

Recent cases reinforce that notice-and-comment procedures are an appropriate means for enacting rebuttable presumptions. *East Bay Sanctuary Covenant v. Biden*, No. 18-cv-06810, 2023 WL 4729278, at *1 (N.D. Cal. July 25, 2023), for example, involved a rule containing rebuttable presumptions promulgated after notice-and-comment by the Departments of Justice and Homeland Security. Although the court ultimately enjoined the presumptions, it did so in part because the duration of the notice-and-comment period was inadequate. That again suggests that a rebuttable presumption is vulnerable to challenge based on the provision of insufficient

---

[1]    At least some courts have suggested that notice-and-comment rulemaking may be required for certain presumptions, though as discussed above the caselaw reflects wide discretion to use policy statements. *See, e.g.*, *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1051 (D.C. Cir. 1987) (observing that agency action that created "a presumption of invalidity when reviewing [regulated parties'] operations ... would surely require notice and comment"); *see also Mendoza v. Perez*, 754 F.3d 1002, 1024 (D.C. Cir. 2014) (same); *Warren v. United States*, 932 F.2d 582, 587 (6th Cir. 1991) ("[T]he FNS handbook, which was issued without the benefit of the notice and opportunity for comment procedures provided in the Administrative Procedure Act, may not be used to create a presumption that is contrary to all of the evidence.").

ATF 015271

WilmerHale [WH]

Everytown for Gun Safety
January 24, 2024
Page 6

procedural protections, rather than the choice to engage in notice-and-comment rulemaking in the first instance.  Similarly, the Department of Education recently issued a rule creating a rebuttable presumption that when an institution commits certain acts or omits certain information that negatively affect student loan recipients, borrowers who attended the school will be entitled to repayment defenses.  *See Institutional Eligibility Under the Higher Education Act of 1965, as Amended; Student Assistance General Provisions; Federal Perkins Loan Program; Federal Family Education Loan Program; and William D. Ford Federal Direct Loan Program*, 87 Fed. Reg. 65,904 (Nov. 1, 2022).  Although the rule and its presumptions have been challenged on numerous substantive grounds, the plaintiffs did not contest the agency's decision to use notice and comment rulemaking.  *See Career Colls. & Schs. of Texas v. U.S. Dep't of Educ.*, No. 23-cv-433, 2023 WL 4291992 (W.D. Tex. June 30, 2023) (denying preliminary injunction based on failure to show irreparable harm).

* * *

Extensive authority supports that agencies may issue rebuttable presumptions and have discretion over the form of such action.  Although few cases expressly consider whether notice-and-comment rulemaking is a proper means for enacting presumptions, that is because the vast majority of procedural challenges assert that notice-and-comment should have been used.  And those cases to have considered the question hold that presumptions may be issued after notice-and-comment.  In short, then, ATF's decision to create rebuttable presumptions through a rulemaking should be unobjectionable from a procedural perspective.

## II.    ATF's Legal Authority to Create Rebuttable Presumptions

### A.    ATF's Authority Generally

The next logical question is whether ATF has the statutory power to promulgate rebuttable presumptions as a general matter.  We believe that it does.  ATF has statutory authority to issue regulations that are "necessary" to carrying out its duties in administering and enforcing federal firearms laws, including the Gun Control Act (GCA) as amended by the BSCA.  *See* 18 U.S.C. 926(a); 28 U.S.C. § 599A.  As the Fifth Circuit recently explained, "[u]nder the GCA, Congress granted to the Attorney General the power to prescribe rules and regulations necessary to carry out the GCA's provisions.  The Attorney General thereafter delegated this authority to ATF, to investigate, administer, and enforce the laws related to ... firearms."  *VanDerStok v. Garland*, 86 F.4th 179, 183 (5th Cir. 2023) (internal quotation marks and citations omitted).  Although § 926 only "authorizes [ATF] to promulgate those regulations which are 'necessary,'" courts have held that the statute "confers some measure of discretion to determine what regulations are in fact 'necessary.'"  *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990).  Pursuant to that discretion, ATF has for decades "promulgated rules and regulations defining terms necessary to enforce the [GCA]" to provide clarity to regulated

APPX.667

WILMERHALE [WH]

Everytown for Gun Safety
January 24, 2024
Page 7

parties, improve consistency of enforcement across the numerous federal and state agencies involved in the administration of federal firearms laws, and promote the voluntary compliance mechanisms that are essential to the overall regulatory framework. *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1015 (8th Cir. 2023).[2] Indeed, such efforts have included defining "engaged in the business" prior to the BSCA, albeit in terms mirroring the then-applicable statutory definition. *See* 27 C.F.R. § 478.11.

Because ATF's general power to issue regulations defining terms in the statutes it enforces is well-established and courts routinely hold that agencies may adopt presumptions through regulatory action, ATF (like any other agency) has a strong basis for claiming that it may choose to promulgate rebuttable evidentiary presumptions. As explained above, such presumptions are commonly used in civil and administrative procedures, and commenters have not identified particular statutory provisions expressly precluding their use by ATF. ATF, moreover, has not created presumptions "on grounds of policy to avoid the necessity for finding that which the legislature requires to be found." *United Scenic Artists*, 762 F.2d at 1034. The Proposed Rule identifies conduct that may *lead* to a finding of being "engaged in the business," but the presumptions remain "not exhaustive," which ATF correctly states is "consistent with the case-by-case analytical framework long applied by the courts." Proposed Rule, 88 Fed. Reg. 61,993, 62,001-62,002 (Sept. 8, 2023).

B.   Considerations Specific to the Proposed Presumptions

The questions presented by the Proposed Rule are instead more context-dependent, and turn to a significant degree on the individual presumptions. Specifically, any evaluation of the Proposed Rule will ultimately require determining (a) whether the use of *these* rebuttable presumptions is consistent with the statute being interpreted—here, the GCA as amended by the BSCA; and (b) whether *these* presumptions are rational, and otherwise comply with the substantive provisions of the APA. In particular, whether "there is a sound and rational connection between the proved and inferred facts" can only be determined by reference to the

---

[2]      Among other things, ATF exercises civil and regulatory authority through "inspections of prospective and existing wholesale and retail dealers of firearms who are engaged, or intend to engage in the business"; "civil and administrative actions under 18 U.S.C. 924(d) to seize and forfeit firearms intended to be sold by persons engaged in the business without a license"; "cease and desist letters issued to prevent section 922(a)(1)(A) violations"; and "ATF administrative proceedings under 18 U.S.C. 923 to deny licenses to persons who willfully engaged in the business of dealing in firearms without a license, or to revoke or deny renewal of existing licenses held by licensees who aided and abetted that misconduct." Proposed Rule, 88 Fed. Reg. 61,993, 61,999-62,000 (Sept. 8, 2023); *see also id.* at 62,003 n.83 (giving as examples of administrative and civil proceedings ATF's denial of a license based on prior willful engagement in the business, and a civil asset forfeiture proceeding).

WilmerHale [WH]

Everytown for Gun Safety
January 24, 2024
Page 8

specific facts involved in a given presumption. *Chem. Mfrs. Ass'n*, 105 F.3d at 705. Although a detailed analysis of the merits of each individual presumption is beyond this scope of this memorandum, they appear to meet the rational connection test. Consider, for example, the presumption that a person is engaged in the business if he "spends more money or its equivalent on purchases of firearms for the purpose of resale than the person's reported taxable gross in[c]ome during the applicable period of time." 88 Fed. Reg. at 62,000. Courts have held that such evidence suggests that firearms dealing is a primary source of income, and exceeds the statutory requirements for being "engaged in the business." *Id.* at n.64 (citing *United States v. Focia*, 869 F.3d 1269, 1282 (11th Cir. 2017)). Similarly, the presumption "that a former licensee, or responsible person acting on behalf of such former licensee, is engaged in the business when they sell or offer for sale firearms that were in the business inventory upon license termination" appears rational. 88 Fed. Reg. at 62,003. As ATF explains, this presumption recognizes that at the time of acquisition, "the licensee likely intended to predominantly earn a profit from the repetitive purchase and resale of those firearms, not to acquire the firearms as a 'personal collection,'" and reflects that the GCA does not contain an exception "based on one's prior license status." *Id.* That a commenter can conceive of a hypothetical scenario where the presumption does not hold true does not make the presumption irrational; rather, the regulatory scheme proposed by ATF affords the opportunity to rebut the presumption in unusual cases where the presumption is not supported by the individual facts.

Several considerations cut across the proposed presumptions and bear mention.

*First*, ATF's use of rebuttable presumptions is grounded in both history and current practice. For decades, courts have found the authority of agencies to create presumptions to be a matter "of course," *United Scenic Artists*, 762 F.2d at 1034, and "well settled," *Chem. Mfrs. Ass'n*, 105 F.3d at 705. Federal agencies continue to issue rules or notices of proposed rulemakings that contain rebuttable presumptions. For example, on December 13, 2019, FINRA filed a proposed rule change amending its Membership Application Program. *See* Order Approving FINRA Proposed Rule Change Amending Membership Application Program Rules, 85 Fed. Reg. 18,299 (Apr. 1, 2020). Among other things, the proposed rule created a rebuttable presumption that an "application for new membership would be denied if the applicant or its associated persons are subject to a pending arbitration claim." *Id.* at 18,300. That presumption could be overcome by demonstrating the ability to satisfy "an unpaid arbitration award, other adjudicated customer award, unpaid arbitration settlement, or pending arbitration claim," and FINRA would engage in a "reasonableness assessment" when evaluating rebuttal evidence. *Id.* at 18,300-18,301. The SEC approved the proposed rule change. *Id.* at 18,300. Similarly, the Federal Reserve Board includes rebuttable presumptions in its regulations, including 12 C.F.R. § 225.32, which lists rebuttable presumptions regarding when a company is presumed to control another company, in addition to permitting the consideration of "other facts and circumstances." The Federal Reserve Board also uses rebuttable presumptions with respect to acquisitions that

WILMERHALE [WH]

Everytown for Gun Safety
January 24, 2024
Page 9

require providing the Board with prior notice under 12 C.F.R. § 238.31.  Finally, the FCC recently proposed a rule establishing a rebuttable presumption.  *See* Proposed Rule, 88 Fed. Reg. 42,034 (June 29, 2023) (proposed FCC rule codifying a rebuttable presumption that certain conduct revokes consent to be contacted).

*Second*, agencies have long used rebuttable presumptions to provide clarity to potentially regulated parties regarding their compliance obligations, including whether an entity falls within an agency's authority to regulate.  In *Ryder*, for example, the ICC used a rebuttable presumption to help identify what constituted "private carriage" and thus fell outside of the agency's statutory authority.  716 F.2d at 1378.  Similarly, the SEC has issued regulations concerning trading prohibitions that use a rebuttable presumption to exempt certain accounts, *see* 17 C.F.R. § 255.3(b)(4), in addition to using other rebuttable presumptions to exempt entities from ongoing obligations, 17 C.F.R. § 255.20(g).  Here, ATF has taken an analogous approach by identifying conduct that presumably falls within the BSCA's modified definitions of "engaged in the business" and "to predominately earn a profit," which "would assist persons in understanding when they are required to have a license to deal in firearms."  88 Fed. Reg. at 61,993.

*Third*, ATF has previously employed a rebuttable presumption in connection with the GCA in at least one instance, regarding when firearms on the premises of a licensed dealer will be subject to statutory and regulatory recordkeeping requirements.  *See* ATF Industry Circular No. 72-30, *Identification of Personal Firearms on Licensed Premises Not Offered for Sale* (Oct. 10, 1972), https://www.atf.gov/file/141891/download.  The GCA requires licensed firearms dealers to maintain records of their receipt and disposition of all firearms, but exempts personal collections.  ATF's circular provided that "[a] presumption exists that all firearms on a business premises are for sale and accordingly must be entered in the records required to be maintained under the law and regulations."  *Id.*  The circular also provided instructions on how to overcome that presumption, stating that firearms in a personal collection "should be segregated from firearms held for sale and appropriately identified (for example, by attaching a tag) as being 'not for sale.'"  *Id.*  Although not issued in the context of a rule, this presumption suggests that ATF has itself previously recognized the authority to issue rebuttable presumptions, and, in this case, the presumption appears to have gone unchallenged.

*Fourth*, ATF's proposed presumptions appear to maintain the fact-dependent nature of the engaged-in-the-business inquiry and provide regulated parties with the opportunity to rebut the presumptions through the specifics of their particular circumstances.  As the Proposed Rule explains, "the established approach for determining whether an individual is 'engaged in the business' is to look at the totality of circumstances," 88 Fed. Reg. at 62,000, and nothing in the presumptions limits ATF's or courts' ability to consider all of the circumstances.  Indeed, presumptions are likely not required to be issued through notice-and-comment *because* they continue to permit significant agency discretion on a case-by-case basis, and that discretion is expressly reserved here.  The presumptions, moreover, are nonexclusive; the Proposed Rule

**WilmerHale** |W‖H|

Everytown for Gun Safety
January 24, 2024
Page 10

provides that "[t]he activities set forth in these rebuttable presumptions are not exhaustive of the conduct that may show that, or be considered in determining whether, a person is engaged in the business of dealing in firearms." *Id.* at 62,001. Although some commenters have interpreted that statement to mean ATF may employ additional, unstated presumptions, the reference to conduct that may "be considered in determining *whether*[] a person is engaged in the business"—as contrasted to conduct "that may *show* that" a person engages in the business— indicates that the presumptions limit neither the exculpatory nor inculpatory evidence that may be considered. Such an approach is entirely consistent with the rationale underlying the use of rebuttable presumptions, which seek to capture circumstances that make an ultimate fact more likely, while recognizing that there may also be other situations in which that fact does (or does not) occur. *See, e.g.*, *Atchison, T. & S. F. Ry. Co. v. ICC*, 580 F.2d 623, 630 (D.C. Cir. 1978) (rejecting challenge to regulation including presumptions that stated that "the presumptions are not the exclusive means of proving market dominance"). Indeed, at least one court has *rejected* a regulation that sought to make presumptions the exclusive means of proof, instead interpreting the underlying statute to require that the presumptions not be exhaustive. *See Combee v. Brown*, 34 F.3d 1039, 1044 (Fed. Cir. 1994) ("To the extent 38 C.F.R. § 3.311b forecloses the veteran's right to present proof of actual causation," as compared to their entitlement to a presumption of causation, "it lacks support in the [1984 Radiation Compensation] Act.").

*Fifth*, the presumptions appear to be well grounded in caselaw and the agency's experience administering the GCA. *See City of Jersey*, 669 F. Supp. at 110-111 (noting importance of presumptions being grounded in agency experience). The Proposed Rule provides examples of courts concluding that the facts giving rise to the presumptions meet the statutory definitions, which supports both their consistency with the underlying statutes and rationality. Said otherwise, to the extent a presumption conforms to a judicial interpretation of statutory language, the agency has acted within its statutory authority.

*Sixth*, the Proposed Rule delineates situations in which a regulated party will not be presumed to be engaged in the business, which reflect the statute's safe harbors for various conduct and reinforce that each application of the statutory standards turns on individual circumstances. *See, e.g.*, 88 Fed. Reg. at 62,021. Although some commenters have argued that the phrase "shall not be presumed to" should instead be "shall be presumed not to," the decision not to create an alternative set of presumptions that weigh against a finding of being engaged in the business or to predominantly earn a profit does not clearly contravene the statute. The statute requires that the safe harbors be available, and the Proposed Rule retains them. Further, the Proposed Rule lists examples of how the presumptions may be rebutted, providing additional clarity to regulated parties and reinforcing that the statutory inquiry remains context dependent. *Id.* at 62,003.

*Seventh*, the Proposed Rule properly constrains application of the presumptions to civil and administrative proceedings, where such presumptions have been widely accepted by courts.

**WILMERHALE** [H]

Everytown for Gun Safety
January 24, 2024
Page 11

*See supra*, at I.  As ATF recognizes, "it is never permissible to shift to the defendant the burden of persuasion to disprove an element of a crime charged by means of a presumption."  88 Fed. Reg. at 62,000 & n.61.  The Proposed Rule thus clearly disclaims any criminal applications.  *Id.* at 62,000 ("[T]he regulatory text makes clear that the presumptions shall not apply to criminal cases.").  ATF does observe that "the criteria set forth in the proposed rule may be *useful* to a court in a criminal case," by, for example, "*inform[ing]* appropriate jury instructions regarding permissible inferences."  *Id.* (emphasis added).  But the Proposed Rule itself has no such effect. What role—if any—the Proposed Rule should play in informing jury instructions in a criminal prosecution remains a decision for a court to make based on the facts and circumstances of an individual case.

Some commenters have, however, questioned whether the distinction in application ATF draws can properly be made, given that the statutory terms being interpreted are also enforced in criminal proceedings.  For example, the National Shooting Sports Foundation (NSSF) states that because "the GCA is a criminal statute with the same meaning in a civil context, ATF may not create presumptions thereon for civil or administrative purposes."  NSSF Comment Letter on Proposed Rule at 2 (Dec. 6, 2023), https://www.nssf.org/wp-content/uploads/2023/12/NSSF CommentsonATFEIBPR2022R-17andJDAAnalysis.pdf; *see also id.* at 18 (citing *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 & n.10 (1992), for the proposition that distinguishing civil and criminal applications of the GCA is a "false dichotomy"); *accord* National Rifle Association Institute for Legislative Action (NRA-ILA) Comment Letter on Proposed Rule at 3 (Dec. 7, 2023), https://www.regulations.gov/comment/ATF-2023-0002-334959 (arguing that disclaiming criminal applications violates the "chameleon cannon [sic]" because it leads to the same statutory term having multiple meanings).  Gun Owners of America (GOA) lodged a similar objection, and invoked the rule of lenity.  *See* GOA, *No Universal Registration Checks* at 11 (Dec. 5, 2023), https://www.gunowners.org/wp-content/uploads/GOA-Comments-to-ATF-on-Definition-of-Engaged-in-the-Business-as-Gun-Dealer.pdf.[3]

---

[3]    The NRA-ILA also suggests that the Proposed Rule "violates basic due process principles, which require that more guidance be given to criminal statutes than civil statutes," citing *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).  That case reviewed (and rejected) a facial vagueness challenge to a municipal ordinance with criminal and civil applications.  *Id.*  In the portion of the opinion the NRA-ILA relies on, the Court observed that it had "expressed greater tolerance of enactments with civil rather than criminal penalties." *Id.* at 498-499.  No commenters have suggested that the GCA or BSCA are unconstitutionally vague, and *Hoffman Estates* specifically noted that in the civil context, regulated parties may "clarify the meaning of the regulation ... by resort to an administrative process."  *Id.* at 498. Moreover, the Proposed Rule itself raises none of the criminal due process concerns discussed in *Hoffman Estates*, given that ATF does not (because it cannot) seek to apply the rule criminally.

WILMERHALE |WH|

Everytown for Gun Safety
January 24, 2024
Page 12

These objections do not undermine ATF's authority to create presumptions for civil and administrative proceedings. As an initial matter, numerous federal statutes interpreted by agencies carry both civil and criminal penalties, including the Sherman Act, Fair Labor Standards Act, and Securities Exchange Act. The possibility of dual application alone thus cannot preclude an agency from offering interpretations of how to apply a law non-criminally, and nothing in a regulation can displace the government's burden to prove each element of a criminal offense beyond a reasonable doubt. The "chameleon canon," moreover, is simply the proposition that the same statutory term cannot be read to have distinct meanings in different contexts, *see Maryland v. EPA*, 958 F.3d 1185, 1202 (D.C. Cir. 2020), and disclaiming application of the rebuttable presumptions to criminal cases does not create such divergence. The meaning of the BSCA in criminal and civil proceedings remains the same in all circumstances; what differs under the Proposed Rule is that an evidentiary presumption may be employed in the course of proving that the single statutory standard has been met in civil and administrative cases.

To be sure, the Supreme Court has observed that the rule of lenity *can* apply to the interpretation of statutes that carry both criminal and civil penalties. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *Thompson/Ctr. Arms Co.*, 504 U.S. at 518 & n.10. But even if the rule of lenity were to apply to the BSCA's definitions in civil and administrative contexts, that would only beg the question whether ATF's interpretations—as announced, in part, through the rebuttable presumptions—violate that rule. Application of the rule of lenity, in other words, does not necessarily preclude the use of rebuttable presumptions because the rule still requires that the statute actually be interpreted. The more expansive version of the rule of lenity proposed by commenters would also significantly undermine agency authority to issue regulations interpreting language across all laws carrying both criminal and civil applications. The Supreme Court has never accepted such a far-reaching rule and has in fact *rejected* application of the rule of lenity to agency interpretations of ambiguous statutes in civil proceedings despite those statutes being applicable criminally. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995) (citing *Thompson/Center Arms Co.* and stating that "[w]e have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement"). Agency actions such as the Proposed Rule are also poor fits for the rule of lenity, which is designed to ensure defendants receive "fair warning" of liability. *Id.* The Proposed Rule in fact provides additional notice beyond the statutory terms. *See id.* (rejecting application of rule of lenity to regulation that gave "fair warning of its consequences").

*Finally*, the presence of statutory presumptions elsewhere in the GCA does not preclude ATF from creating additional presumptions. "When interpreting statutes that govern agency action, [courts] have consistently recognized that a congressional mandate in one section and silence in another often 'suggests not a prohibition but simply a decision not to mandate any

WILMERHALE |WH|

Everytown for Gun Safety
January 24, 2024
Page 13

solution in the second context, i.e., to leave the question to agency discretion.'" *Catawba Cnty.
v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (quoting *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69
(D.C. Cir. 1990)).  "Silence, in other words, may signal permission rather than proscription." *Id.*
The same principles apply here, and simply employing rebuttable presumptions beyond those
contained in the law itself does not contravene the statute.

### III.    Conclusion

Agencies frequently create rebuttable presumptions through procedures providing fewer
protections to regulated parties than notice-and-comment rulemaking.  ATF's decision to engage
in notice-and-comment rulemaking thus strengthens, rather than undermines, its authority to
promulgate the rebuttable presumptions contained in the Proposed Rule.  Although there is little
caselaw addressing ATF's particular authority to create rebuttable presumptions, and whether
any individual presumption is lawful requires a fact-dependent inquiry, ATF's rulemaking
authority and the wide discretion granted to agencies to employ rebuttable presumptions in civil
and administrative proceedings offer strong support for its authority to issue the Proposed Rule.
The proposed presumptions also appear consistent with the governing statutory terms because
they do not limit the agency's, courts', or regulated parties' ability to present and consider all
relevant evidence, including reliable evidence demonstrating that a person is not "engaged in the
business" of dealing in firearms.  Commenters have raised various objections to the
presumptions, most notably that they interpret terms with criminal applications.  But these
objections distort the caselaw and ignore the long history of agency interpretations of dual-
application statutes.  Because ATF has properly disclaimed any criminal use of the Proposed
Rule, the fact that the GCA has criminal penalties does not affect ATF's authority to create
rebuttable presumptions for administrative and civil proceedings.



| | MEMORANDUM |
|---|---|
| | +1 212 295 6500 |
| | +1 212 230 8888 |

Date  March 6, 2023

To  Everytown for Gun Safety

From  Preet Bharara, Jay Holtmeier, Kelly P. Dunbar, Alex W. Miller, Hillary Chutter-Ames
WilmerHale

Re  Bipartisan Safer Communities Act's Definition of "Engaged in the Business" of Dealing in
Firearms

On June 25, 2022, President Joe Biden signed the Bipartisan Safer Communities Act (BSCA) into law.  The BSCA is the most significant federal gun safety legislation in nearly 30 years and reflects Congress's deep concern that existing legislation inadequately protected Americans from gun violence.  To that end, the BSCA enhances background checks; provides support for state red flag laws, mental health services, and community-based programs to reduce gun violence; expands prohibitions on the possession of firearms by domestic abusers; and changes the definition of who is "engaged in the business" of dealing in firearms and must therefore obtain a license and run background checks prior to gun sales.

This memorandum evaluates the BSCA's new statutory language regarding who is "engaged in the business" of dealing in firearms, both on its own terms and as compared to authority interpreting the pre-BSCA definition.  The memorandum then addresses what actions the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and Department of Justice (DOJ) might take in light of the BSCA's passage.  A preview of the specific questions that we analyze along with a high-level summary of our answers is as follows:

1)  Whether the BSCA can be read to expand the statutory definition of "engaged in the business."

   Yes.  There are strong textual arguments for why the BSCA's revised definition should expand the definition of who is "engaged in the business" of dealing in firearms, though existing caselaw and regulatory guidance were already quite broad and flexible.

2)  Whether the BSCA's new statutory language warrants further regulatory guidance and, if so, whether the Executive Branch can:

   a.  Clarify the statutory exceptions to the "engaged in the business" definition, including by providing guidance:

ATF 015406

APPX.675

WilmerHale |WH|

March 6, 2023
Page 2

      i.  as to the number of guns transferred or transactions engaged in that may no
         longer constitute "occasional sales";

         Yes.  Guidance regarding the degree of activity that will generally
         constitute more than "occasional sales" seemingly comports with the
         broad and flexible approach Congress used in crafting the statutory
         language.

     ii.  as to the role the duration of possession of a firearm plays in claiming that a
         gun is part of a "personal collection";

         Yes.  Congress already determined that length of possession is critical to
         assessing whether a firearm sold by a licensed gun dealer was part of his
         or her personal collection, and a similar approach could seemingly be
         taken with the more general "personal collection" exception.

    iii.  explaining that "restocking" a collection precludes reliance on the liquidation
         exception;

         Yes.  Such guidance appears consistent with the statutory text and would
         give full effect to the law's distinct exceptions.

     iv.  further defining what constitutes a "hobby," including that a hobby may only
         have a de minimis profit motive and cannot consist of selling guns alone.

         Yes.  Such guidance is likely consistent with the statutory language and
         would appear to align with the intent of the BSCA's sponsors.

b.  Clarify that the "engaged in the business" definition encompasses individuals
    engaged in repeated commercial activity for profit regardless of location, but that
    sales at certain locations may be probative of profit motive.

         Yes.  Such guidance appears consistent with statutory text and caselaw.

c.  Clarify that to be "engaged in the business" does not require gun sales to be an
    individual's primary source of income.

         Yes.  Such guidance appears consistent with statutory text and caselaw.

WilmerHale

March 6, 2023
Page 3

## I.    Executive Summary

Federal law permits only "a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms." 18 U.S.C. § 922(a)(1)(A). Said otherwise, all persons "engaged in the business" of importing, manufacturing, or dealing in firearms must obtain a federal firearms license. Licensure imposes various obligations on dealers, including that they must conduct background checks prior to transferring a gun. The safeguards that accompany federal licensure play an important role in preventing gun violence: the overwhelming majority of firearms acquired for criminal purposes are obtained from unlicensed gun sellers, and background checks prevent the transfer of hundreds of thousands of guns to persons barred from possessing them each year.

Before the BSCA, a person "engaged in the business" of dealing in firearms by "devot[ing] time, attention, and labor to dealing in firearms as a regular course of trade or business with *the principal objective of livelihood and profit* through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C) (2020) (emphasis added). This definition was added in the Firearm Owners' Protection Act (FOPA), a 1980s effort to expand the rights of gun owners that excluded from being "engaged in the business" any "person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.*

The BSCA, in contrast, was passed in the wake of a spate of tragic gun violence and represented the most significant and comprehensive attempt by Congress to enhance gun safety in decades. Retreating from FOPA's attempted expansion of gun rights, the BSCA changed the definition of "engaged in the business" for dealers who "sell[] firearms at wholesale or retail." 18 U.S.C. § 921(a)(11)(A). For such dealers, being "engaged in the business" now requires "devot[ing] time, attention, and labor to dealing in firearms as a regular course of trade or business *to predominantly earn a profit* through the repetitive purchase and resale of firearms." *Id.* § 921(a)(21)(C) (emphasis added). "To predominantly earn a profit" means "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* § 921(a)(22). The BSCA thus removes the concept of earning one's "livelihood" from the statutory scheme. The definition continues to expressly exclude "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.* § 921(a)(21)(C).

There are strong arguments for why the BSCA's revised definition should be read to expand the definition of who is "engaged in the business" of dealing in firearms. Most fundamentally, the prior iteration of the statute required a dealer's "principal objective" when dealing in firearms be both "livelihood *and* profit," while the BSCA requires only "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain."

WilmerHale [WH]

March 6, 2023
Page 4

This change should matter—"Congress presumably does not enact useless laws," *United States v. Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring), and that presumption takes on greater meaning here, where Congress removed specific language it had previously added through FOPA's announced effort to expand protections for gun owners.  Reading the BSCA to expand the definition of who is "engaged in the business" would also comport with Congress's stated intention of strengthening gun safety laws through the passage of the BSCA.  And although the BSCA did not amend the language of the statutory exceptions themselves, those provisions too must be construed in light of the altered regulatory scheme.  *See, e.g.*, *Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 739 (1989) ("In construing provisions … in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision."); *id.* ("Given that Congress has enacted a general rule … we should not eviscerate that legislative judgment through an expansive reading of a somewhat ambiguous exception.").  Taken together, Congress plainly did not intend to narrow the sweep of who is "engaged in the business"; the available interpretive evidence instead supports the conclusion that Congress sought to address chronic undercompliance with existing licensure requirements.

To be sure, some of the reasons for that lack of compliance seem likely to persist.  In particular, courts and ATF had both emphasized that the prior statutory language did not lend itself to the imposition of bright line rules, but instead required examination of the totality of the circumstances surrounding an individual's transactions in firearms.  For this reason, our understanding is that federal prosecutors had been reluctant to bring charges under the prior version of the statute absent extremely obvious indicia of a profit-driven venture.  The relevant statutory provisions continue to require an inquiry into an individual's motivations and overall course of conduct, suggesting that regulators and judges may still resist imposing fixed rules, and prosecutors may continue to feel constrained in what cases they can charge.

The changed statutory landscape nevertheless gives ATF and DOJ the tools and mandate to address other aspects of the compliance problem.  First, those agencies may view the removal of the "livelihood" requirement as clarifying the appropriateness of prosecutions of individuals who deal in firearms as a secondary means of obtaining income.  Second—and more importantly given the primacy of voluntary compliance in the regulatory scheme—the BSCA's widely publicized passage, Congress's clear intent to enhance gun safety, and the BSCA's simplified language all create conditions favorable to further executive action to clarify who falls within the revised definition and its exceptions.  Such action might address issues that have previously created confusion among courts, prosecutors, regulators, and gun sellers, including by providing guidance: (a) as to numerical thresholds for gun transfers or transactions that would no longer constitute occasional sales; (b) further defining what constitutes a "personal collection" and the role that the time a firearm is possessed plays in that determination; (c) explaining that "restocking" a collection precludes reliance on the liquidation exception; (d) further defining

WILMERHALE [WH]

March 6, 2023
Page 5

what constitutes a "hobby"; (e) clarifying the relevance of the location of sales; and/or (f) clarifying that sales are not required to be a dealer's primary source of income.

## II.    The BSCA's Definition of "Engaged in the Business"

Federal law has wrestled with what it means to be "engaged in the business" of dealing in firearms since the passage of the Gun Control Act of 1968 (GCA).  Over that time, Congress, ATF, and ultimately the courts have supplied competing definitions in attempts to clarify, expand, or narrow what kinds of activities make an individual subject to federal licensure requirements.  Although the BSCA represents Congress's latest word on the subject, the sweep of the statute can only be understood in the context of this half-century dialogue.

A.    The Current Statutory Scheme - 18 U.S.C. §§ 921, 922

Though the persons subject to the federal firearms licensure scheme have evolved since 1968, the basic statutory structure has not changed.  Persons "engaged in the business" of dealing in firearms must obtain a federal firearms license, because federal law allows only "a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce." 18 U.S.C. § 922(a)(1)(A).  That license has imposed varied requirements over time.  Today, licensed dealers must conduct background checks of potential purchasers prior to sale, as well as comply with various recordkeeping requirements.

Whether a person is "engaged in the business" of importing, manufacturing, or dealing in firearms takes on different meanings depending on the nature of the regulated party.  As applied to a manufacturer of firearms, it means "a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business *with the principal objective of livelihood and profit* through the sale or distribution of the firearms manufactured." 18 U.S.C. § 921(a)(21)(A) (emphasis added).  The same definition applies to importers of firearms.  *Id.* § 921(a)(21)(E).  Prior to the BSCA, a similar definition had long applied to dealers—"a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms"—with the caveat that the term as applied to wholesale or retail dealers did "not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.* §§ 921(a)(21)(C), (D).

The BSCA subjects certain firearms dealers to a different definition of "engaged in the business."  As applied to "any person engaged in the business of selling firearms at wholesale or retail," *id.* § 921(a)(11)(A), "engaged in the business" means "a person who devotes time,

WilmerHale [H]

March 6, 2023
Page 6

attention, and labor to dealing in firearms as a regular course of trade or business *to predominantly earn a profit* through the repetitive purchase and resale of firearms," *id.* § 921(a)(21)(C) (emphasis added). The statute again explicitly excludes "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.*[1]

The statute further defines the key terms in these newly divergent provisions. With regard to manufacturers, importers, and those engaged in the business of repairing or customizing firearms, "[t]he term 'with the principal objective of livelihood and profit' means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* § 921(a)(23). With regard to dealers engaged in the business of selling firearms at wholesale or retail, "[t]he term 'to predominantly earn a profit' means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* § 921(a)(22). In both cases, the statute specifically provides that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.* §§ 921(a)(22), (23).

The scope of these definitions matters because all persons "engaged in the business" of importing, manufacturing, and/or dealing in firearms must be licensed, and all licensed dealers must conduct background checks prior to sale. These checks are not mere formalities—from 1994 to 2018, approximately 3.8 million applications for firearm transfers were denied after a background check, including 230,000 in 2018 alone.[2] Unsurprisingly, then, around 80% of all

---

[1]    Pawnbrokers and those engaged in the business of repairing or customizing firearms are also "dealers" under the statute. The latter remain subject to the prior definition of engaged in the business ("a person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who makes occasional repairs of firearms, or who occasionally fits special barrels, stocks, or trigger mechanisms to firearms," 18 U.S.C. § 921(a)(21)(D)). Pawnbrokers are defined separately, as "any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the payment or repayment of money." *Id.* § 921(a)(12).

[2]    U.S. Dep't of Justice Bureau of Justice Statistics, *Background Checks for Firearm Transfers, 2018*, at 4 (Oct. 2021), https://bjs.ojp.gov/content/pub/pdf/bcft18.pdf.

WILMERHALE [WH]

March 6, 2023
Page 7

firearms acquired for criminal purposes are obtained through transfers from unlicensed sellers, which avoids the federal background check requirement.[3]

B.   The Evolution of "Engaged in the Business"

As described above, the BSCA was not the first time Congress used the term "engaged in the business" to delineate which dealers must obtain a federal firearms license.  First in 1968, then again in 1986, Congress passed gun safety measures using that phrase.  In the years since, an extensive (and at times conflicting) body of caselaw developed interpreting "engaged in the business."  These decisions and the prior statutory regimes provide insight into both the meaning of the BSCA's new language and its likely effect.

1.   1968-1986: "Engaged in the business" under the GCA

The GCA made it a crime for "any person, except a … licensed dealer, to engage in the business of … dealing in firearms."  18 U.S.C. § 922(a)(1)(A).  It then defined "dealer" (in relevant part) as "any person engaged in the business of selling firearms … at wholesale or retail."  Id. § 921(a)(11).  The statute did not, however, "prescribe any standards for determining when a person is 'engaged in the business.'"  United States v. Gross, 451 F.2d 1355, 1357 (7th Cir. 1971).  As a result, courts struggled with defining the degree to which a dealer must be motivated by profit and developed several different tests for determining when an individual is "engaged in the business" of dealing in firearms.

The majority of courts defined "engaged in the business" by reference to "that which occupies time, attention and labor for purpose of livelihood or profit."  This fact-intensive standard was set forth in United States v. Gross, 451 F.2d 1355 (7th Cir. 1971).  As the court explained, "[t]here appears to be little doubt that 'dealer' means anyone who is engaged in any business of selling firearms, and that 'business' is that which occupies time, attention and labor for the purpose of livelihood or profit."  Id. at 1357.  The court then concluded that a "defendant's sale of eleven separate weapons within a reasonably short space of time clearly made him a dealer under the statutory definition."  Id. at 1357-58.  Other courts soon applied the Gross definition.  See, e.g., United States v. Day, 476 F.2d 562, 567 (6th Cir. 1973); United States v. Williams, 502 F.2d 581, 583 (8th Cir. 1974); United States v. King, 532 F.2d 505, 510 (5th Cir. 1976).  By 1983, the D.C. Circuit observed that Gross's "definition has been generally

---

[3]      Katherine A. Vittes et al., Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership, Injury Prevention 19, no. 1, at 26-31 (2013).

WILMERHALE  |WH|

March 6, 2023
Page 8

adopted." *Nat'l Coal. to Ban Handguns v. Bureau of Alcohol, Tobacco & Firearms*, 715 F.2d 632, 635 (D.C. Cir. 1983).[4]

This standard was subject to further refinement as courts struggled to define what constituted "for the purpose of livelihood or profit," and how frequently a person must transact in firearms to fall under the statutory definition. For example, the Fourth Circuit applied *Gross* with its own gloss in *United States v. Huffman*, observing that "while the Government need not prove an actual profit from sales of firearms, it must show a willingness to deal, a profit motive, and a greater degree of activity than occasional sales by a hobbyist." 518 F.2d 80, 81 (4th Cir. 1975). *United States v. Tarr* provides another example of the definition's complexity. The First Circuit held that "ordinarily one sale will not be sufficient to meet the statutory requirement" because "[t]he words 'to engage in the business of' strongly imply more than one isolated sale or transaction" and "[t]he use of the word 'dealing' connotes a regular course of conduct carried on over a period of time or, at least, on more than one or two unrelated occasions." 589 F.2d 55, 58-59 (1st Cir. 1978). But the court nevertheless recognized that there could exist "a single transaction sufficiently large enough in number of guns and the price paid to constitute engaging in the business of dealing in firearms." *Id.* And—presaging later debates about the meaning of "livelihood"—the Eighth Circuit in *United States v. Wilkening* rejected the argument that "dealing in firearms must be a defendant's primary business or that he must make a certain amount of profit from it." 485 F.2d 234, 235 (8th Cir. 1973).

Not every court followed *Gross*, however, and some dispensed with the requirement that sales be motivated by profit in adopting an even broader definition. These courts instead generally hewed closer to the standard set forth in *United States v. Jackson*, 352 F. Supp. 672, 674 (S.D. Ohio 1972): "[A]nyone is engaged in the business of dealing in firearms if they have guns on hand or are ready and able to procure them, in either case for the purpose of selling some or all of them to such persons as they might from time to time conclude to accept as customers." *United States v. Shirling*, for example, adopted the *Jackson* test and concluded that "the better reasoned view is that expectations of profit are not determinative of whether one is engaged in the business of selling firearms." 572 F.2d 532, 534 (5th Cir. 1978). As the court explained, "evidence that the defendant made or hoped to make a profit may be relevant to the question of whether he engaged in a business," but "[o]ther factors … such as the continuing or repeated nature of the sales, or representations made to prospective buyers, may suffice to prove engagement in business, even in the absence of a profit motive." *Id.* (internal citations omitted).

---

[4]    The critical language in *Gross*—"'business' is that which occupies time, attention and labor for the purpose of livelihood or profit"—was borrowed from *Stone v. D.C.*, 198 F.2d 601, 603 (D.C. Cir. 1952), but can be traced back to *Flint v. Stone Tracy Co.*, 220 U.S. 107, 171 (1911). *Flint* adopted this definition of business from Bouvier's Law Dictionary. *Id.*

WilmerHale WH

March 6, 2023
Page 9

And "reading a profit-making requirement into the statute would vitiate its broad corrective and remedial purposes" given that "[t]he statute is not aimed narrowly at those who profit from the sale of firearms, but rather broadly at those who hold themselves out as a source of firearms." *Id.* Courts subsequently recognized that *Jackson* and *Gross* had adopted alternative approaches, *see, e.g.*, *United States v. Hamilton*, 689 F.2d 1262, 1272 (6th Cir. 1982), and a minority followed *Jackson*, *see, e.g.*, *United States v. Carter*, 801 F.2d 78, 82 (2d Cir. 1986) ("[T]he government need only prove that the defendant 'has guns on hand or is ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers.'").

A third set of courts found a middle ground by minimizing *Gross*'s focus on profit without adopting *Jackson*'s "guns on hand" approach. Take *United States v. Swinton*, which recognized the "contrary decisions" permeating the caselaw before going on to hold "that Section 922(a)(1) does not require that the Government establish that a person engaged in the business of dealing in firearms make a profit, even though the 'dealing' activity requires time, attention and effort." 521 F.2d 1255, 1258 (10th Cir. 1975). The court reasoned that:

> In view of the broad corrective and remedial provisions of the Act, we deem it inappropriate to vitiate the efficacy of its provisions by restricting "dealers" exclusively to those who deal in guns on a profit-making basis. We accordingly are not persuaded by the contention that the Government must establish a profit as part of its case-in-chief.

*Id.* at 1258-59. Cases like *Swinton* demonstrate the lack of clarity in the caselaw—the Tenth Circuit said it was not following *Gross* but embraced a decision that had itself done so. *Compare Swinton*, 521 F.3d at 1258 ("[W]e decline to follow the holding[] of … *Gross*"), *and id.* ("We adopt the holding of *Wilkening*"), *with Wilkening*, 485 F.2d at 235 (applying *Gross*). *Swinton* also suggests confusion over whether courts had required proof of actual profit, as compared to proof of being motivated by profit.

    *2. 1986-2022: "Engaged in the business" after the Firearm Owners' Protection Act*

      a.  Congress Amends the Definition of Engaged in the Business

In 1986, Congress sought to address the competing approaches of the courts of appeals and perceived infringements on the rights of gun owners through the Firearm Owners' Protection Act (FOPA), Pub. L. No. 99-308, 100 Stat. 449.[5] FOPA amended the GCA to define a dealer

---

[5]    As to the second justification for the law, FOPA stated that "Congress finds that … the rights of citizens … to keep and bear arms under the second amendment to the United States

WilmerHale [WH]

March 6, 2023
Page 10

"engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C) (2020). This definition of "engaged in the business" tracked the standard widely applied by the courts with a notable exception—consistent with FOPA's purpose of reinforcing protections for gun owners, it replaced the caselaw's reference to "livelihood *or* profit" with "livelihood *and* profit." This could be understood as a significant change, as it replaced alternatives with the conjunctive, arguably reflecting a congressional intent that livelihood and profit be independent, separate requirements. "[W]ith the principal objective of livelihood and profit" was then defined as "the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* § 921(a)(23). FOPA also newly excluded from being engaged in the business "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.* § 921(a)(21)(C) (2020). This is the so-called "hobby" exception.

The Senate Report discussing this new definition provided only limited additional context. It stated that prior to FOPA, lower courts applied "two different, but similar tests for 'engaging in the business,'" neither of which was especially clear. S. Rep. 98-583, 98th Cong., 2d Sess. 27 (1984) at 8. The Report noted that Congress intended to exclude from the "engaged in the business" definition a "hobbyist to whom profit is a secondary objective" and "hobbyists who make occasional sales, exchanges or purchases of firearms for the enhancement of their personal collection, or who sell all or part of a personal collection." *Id.* Importantly, and somewhat in tension with the ordinary meaning of "livelihood," the Report explained that "with the principal objective of livelihood and profit" was not meant to require that firearms dealing be a principal source of income or a principal business activity. *Id.* "Nor does it apply to isolated sales, unless, of course, such sales are part of a regular course of business with the principal objective of livelihood and profit," thus still requiring "part-time businesses or individuals whose

---

Constitution … require additional legislation to correct existing firearms statutes and enforcement policies," and that "additional legislation is required to reaffirm the intent of the Congress, as expressed in section 101 of the Gun Control Act of 1968, that it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap-shooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." Pub. L. No. 99-308 § 1, 100 Stat. 449 (1986) (internal quotation marks omitted).

WilmerHale

March 6, 2023
Page 11

principal income comes from sources other than firearms, but whose main objective with regard to firearm transfers is profit, rather than hobby," to obtain a license. *Id.*[6]

> b.   Courts Continued to Apply a Variety of Fact-Dependent Tests

Despite the modifications to the statutory language and Congress's apparent intent to narrow the definition of "engaged in the business," courts continued to apply variations of the existing tests to determine who is "engaged in the business" of dealing in firearms. These tests remained both broad and highly fact dependent, and effectively wrote the livelihood requirement out of the statute (despite Congress's addition of the conjunctive "and," which suggested that livelihood and profit were independent and separate inquiries).

In *United States v. Nadirashvili*, for example, the court applied the less profit-focused definition that turns on whether a defendant holds himself out as a source of guns:

> The government need not prove that dealing in firearms was the defendant's primary business. Nor is there a "magic number" of sales that need be specifically proven. Rather, the statute reaches those who hold themselves out as a source of firearms. Consequently, the government need only prove that the defendant has guns on hand or is ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers.

655 F.3d 114, 119 (2d Cir. 2011) (alteration original) (quoting *Carter*, 801 F.2d at 81-82).

Other courts took a similar approach and relied on pre-FOPA standards in tension with the statute's reference to "livelihood and profit." For example, in *United States v. Ochoa*, the court concluded that the statute "reaches those who hold themselves out as sources of firearms." 726 F. App'x 651, 652 (9th Cir. 2018) (citing *United States v. King*, 735 F.3d 1098, 1107 (9th Cir. 2013), to uphold the sufficiency of evidence for conviction of a defendant who "held himself out as a firearms dealer"). The court further reasoned that "[i]t is enough to prove that the accused has guns on hand or is ready and able to procure them for the purpose of selling them from time to time to such persons as might be accepted as customers." *Id.* (quoting *United States v. Breier*, 813 F.2d 212, 213-14 (9th Cir. 1987) (internal quotation marks omitted)).

---

[6]   The relevant report accompanied S. 914, the substantially similar predecessor to S. 49 (the Senate bill which was the basis for FOPA). There was no Senate Report on the bill that became FOPA, but courts have found the earlier legislative history probative. *See Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 477 n.1 (4th Cir. 1990).

WilmerHale [WH]

March 6, 2023
Page 12

Jury instructions also suggest resistance to—or at least confusion regarding—FOPA's use of "livelihood and profit." The Second Circuit, for example, rejected a challenge to jury instructions stating that "[a] person is engaged in the business if the person devotes time, attention, or labor to dealing in firearms as a regular course of trade or business for the purpose of a livelihood *or* profit." *United States v. Allah*, 130 F.3d 33, 43 (2d Cir. 1997) (emphasis added). Indeed, even a leading treatise on federal jury instructions struggled with the text. *See* 2A Fed. Jury Prac. & Instr. § 39:05 (6th ed.) ("The phrase 'engaged in the business of' means occupied in terms of time, attention, and labor for the purpose of livelihood *or* profit as opposed to a past time, a hobby, or as a collector." (emphasis added)); *see also United States v. Valdes*, No. 12-80234-CR, 2013 WL 5561131, at *2 (S.D. Fla. Oct. 4, 2013) (rejecting 2010 Eleventh Circuit Pattern Jury Instruction because it incorrectly equated "principal objective of livelihood and profit" with "principally to earn a living").

Even decisions that did grapple with the meaning of "livelihood" failed to give it effect. Rather than strictly applying the term, courts instead concluded that buying or selling firearms need not be a defendant's primary business. *See, e.g.*, *United States v. Manthey*, 92 F. App'x 291, 297 (6th Cir. 2004) ("While Manthey correctly asserts that the principal objective of the firearms transactions must be livelihood and profit, a defendant need not deal in firearms as his primary business for conviction."). This functionally reduced the requirement of showing acts motivated by "livelihood and profit" to proof of a more generalized economic motivation, which was determined by reference to the totality of the circumstances.

Consider *United States v. Tyson*, in which the court concluded that "a defendant engages in the business of dealing in firearms when his principal motivation is economic (i.e., 'obtaining livelihood' and 'profit') and he pursues this objective through the repetitive purchase and resale of firearms." 653 F.3d 192, 200-01 (3d Cir. 2011); *see also id.* ("economic interests" are the "principal purpose," and "repetitiveness" is "the modus operandi"). The court further reasoned that "[a]lthough the quantity and frequency of sales are obviously a central concern, so also are (1) the location of the sales, (2) the conditions under which the sales occurred, (3) the defendant's behavior before, during, and after the sales, (4) the price charged for the weapons and the characteristics of the firearms sold, and (5) the intent of the seller at the time of the sales." *Id.* at 201. Taken together, "the finder of fact must examine the intent of the actor and all circumstances surrounding the acts alleged to constitute engaging in business." *Id.* (quoting *United States v. Palmieri*, 21 F.3d 1265, 1268 (3d Cir. 1994)). And, "[a]s is often the case in such analyses, the importance of any one of these considerations is subject to the idiosyncratic nature of the fact pattern presented." *Id.*

A more recent Eleventh Circuit decision, *United States v. Focia*, 869 F.3d 1269 (11th Cir. 2017), provides particular insight into the difficulty of assessing when sales are motivated by "livelihood and profit," as opposed to being a mere hobby. The defendant had argued that a hobby "includes the regular sale of guns for profit and financial gain, so long as it is not the

WilmerHale |H|

March 6, 2023
Page 13

seller's primary source of income." *Id.* at 1281. The court rejected that position, holding that the word "hobby" "simply cannot bear the weight that [the defendant] seeks to put on it." *Id.* Instead, the court reasoned that "[t]he plain import of [the engaged in the business definition] reflects congressional intent to criminalize the selling of guns as a business—whether as the seller's sole means of income *or as the seller's side business*—by a person who is not a licensed firearms dealer." *Id.* (emphasis added). The court contrasted a "side business" to the actions of "an unlicensed dealer who merely seeks to improve or otherwise modify a personal collection or to infrequently sell an odd gun here or there." *Id.* It also rejected any test based on "[t]he exact percentage of income obtained through the sale," because "we have recognized that the statute focuses on the defendant's motivation in engaging in the sales." *Id.* at 1282 (citing *United States v. Bailey*, 123 F.3d 1381, 1392 (11th Cir. 1997), which held that "[i]n determining whether one is engaged in the business of dealing in firearms, the finder of fact must examine the intent of the actor and all circumstances surrounding the acts alleged to constitute engaging in business." (cleaned up)). As a result, "a defendant who maintains a full-time job but also sells firearms in his spare time is not automatically excluded from the statute's reach." *Id.*; *see also Valdes*, 2013 WL 5561131, at *3-4 (livelihood does not require that a "defendant's purpose must be to support themselves, not merely supplement their income" and "Section 922 does not require the government to prove that the illegal dealing in firearms without a license is an accused defendant's only source of income or livelihood").

   c.   Regulatory Interpretations Provide Little Additional Clarity

      For many years, guidance on the meaning of "engaged in the business" could be found only by reference to judicial decisions. The ATF regulations issued following FOPA restated the statutory definitions without providing further clarity. *See* 27 C.F.R. § 478.11. ATF and other law enforcement stakeholders raised the ambiguity of the "engaged in the business" definition and the enforcement challenges it created.[7] Federal prosecutors "expressed particular concern with the complexity of the statutory definition of 'engaged in the business' of dealing in firearms and noted that this made unlicensed firearms traffickers unusually difficult to prosecute."[8] U.S. Attorneys thus proposed "strengthening the definition of 'engaged in the business' by defining the terms with more precision, narrowing the exception for 'hobbyists,' and lowering the intent requirement," and "limiting the number of private sales permitted by an individual to a specified

---

[7]      *See, e.g.*, U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Dep't of the Treasury, Gun Shows: Brady Checks and Crime Gun Traces, at 13-14 (Jan. 1999), http://www.atf.gov/files/publications/download/treas/treas-gun-shows-brady-checks-and-crime-gun-traces.pdf.

[8]      *Id.* at 2.

WILMERHALE [WH]

March 6, 2023
Page 14

number per year."[9]  But these concerns—and their effect on prosecutors' decisions whether to even bring charges in the first instance—went unheeded.

In the wake of further gun violence in the 2010s, including deadly mass shootings at Sandy Hook Elementary School in Newton, Connecticut, and in San Bernardino, California, there was finally renewed executive interest in the "engaged in the business" definition. Although ATF still did not engage in formal rulemaking, in 2016 it issued nonbinding guidance on the "engaged in the business" definition as part of the Obama administration's package of executive actions on gun control and improving public safety.[10]

The guidance provided the following "key points":

- "As a general rule, you will need a license if you repetitively buy and sell firearms with the principal motive of making a profit.  In contrast, if you only make occasional sales of firearms from your personal collection, you do not need to be licensed."

- "A person can be engaged in the business of dealing in firearms regardless of the location in which firearm transactions are conducted.  For example, a person can be engaged in the business of dealing in firearms even if the person only conducts firearm transactions at gun shows or through the internet."

- "Determining whether you are 'engaged in the business' of dealing in firearms requires looking at the specific facts and circumstances of your activities."

- "Courts have identified several factors relevant to determining on which side of that line your activities may fall, including: whether you represent yourself as a dealer in firearms; whether you are repetitively buying and selling firearms; the circumstances under which you are selling firearms; and whether you are looking to make a profit.  Note that while quantity and frequency of sales are relevant indicators, courts have upheld convictions for

---

[9]    *Id.* at 17.

[10]    *Do I Need A License to Buy and Sell Firearms?*, U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (Jan. 2016) (hereinafter "2016 ATF Guidance"), https://www.atf.gov/firearms/docs/guide/atf-p-53102-do-i-need-license-buy-or-sell-firearms/download; *Fact Sheet: New Executive Actions to Reduce Gun Violence and Make Our Communities Safer*, The White House Office of the Press Secretary (Jan. 4, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/01/04/fact-sheet-new-executive-actions-reduce-gun-violence-and-make-our.

WilmerHale [WH]

March 6, 2023
Page 15

> dealing without a license when as few as two firearms were sold, or when only one or
> two transactions took place, when other factors were also present."

Though a step toward consistency, ATF's guidance primarily reinforced the existing ambiguities by communicating that there were no bright lines and many potentially relevant factors. That left the determination of whether someone was "engaged in the business" a highly fact-dependent inquiry and failed to address the concerns raised by the prosecutors and agents tasked with constructing cases to enforce the statute, as well as potentially diminishing reliable voluntary compliance with the statute's requirements.

      d.   Contemporaneous Statutes Using Similar Language Differ in Important Respects

     As courts, Congress, and regulators revised and reinterpreted the meaning of "engaged in the business" under the GCA and then FOPA, that term also began to appear in other statutory provisions. Such uses can be probative of the meaning of a statutory term, but in this circumstance do little to shed light on what it means to be "engaged in the business" with regard to gun dealing.

     First, the phrase "engaged in the business" was used in 18 U.S.C. § 842 (Import, Manufacture, Distribution and Storage of Explosive Materials), another statute administered by ATF. Section 842 was enacted in 1970 and, like § 921, defines the terms "dealer," "manufacturer," and "importer" using the "engaged in the business" language, but unlike § 921, does not define "engaged in the business" in the statute. In pre-FOPA ATF opinions, ATF provided that "[a]lthough the term 'engaged in the business' is not susceptible to a rigid definition, it is generally interpreted to imply an element of continuity or habitual practice as against a single act or occasional participation." Companies Which Manufacture Explosive Materials for Their Own Operations, 1975-10 A.T.F.B. 3 (Oct. 1975); ATF Bureau Ruling, General, 1975 WL 440964, at *1 (Sept. 12, 1975) (same). In cases following FOPA, the Tenth and Eighth Circuits have applied versions of the *Jackson* test to § 842 while expressly distinguishing the statutes' language. *See United States v. Graham*, 305 F.3d 1094, 1101-03 (10th Cir. 2002) (rejecting FOPA's "engaged in the business" definition and concluding that "one is guilty of 'engaging in the business' of dealing in explosives under the statute if one has explosives 'on hand or is ready and able to procure them for the purpose of selling them from time to time to such persons as might be accepted as customers'"); *see also United States v. Belmont*, 831 F.3d 1098, 1102 (8th Cir. 2016) (applying same definition under § 842). Given that the *Jackson* test remains the minority approach under § 921 and § 842 does not contain the definition provisions that have complicated determining who is a firearms dealer, § 842 (and the cases and regulations interpreting it) seem of limited utility.

WilmerHale |WH|

March 6, 2023
Page 16

The statute governing the selling or transferring of obscene matter, 18 U.S.C. § 1466, also used the term "engaged in the business," but its definition and structure again differ in key ways from § 921. Section 1466(b) provides that:

> The term "engaged in the business" means that the person who produces sells or transfers or offers to sell or transfer obscene matter devotes time, attention, or labor to such activities, as a regular course of trade or business, with the objective of earning a profit, although it is not necessary that the person make a profit or that the production, selling or transferring or offering to sell or transfer such material be the person's sole or principal business or source of income.

18 U.S.C. § 1466(b). This language tracks FOPA's definition of "engaged in the business" in § 921 but omits the phrase "principal objective of livelihood and profit." Section 1466(b) also goes on to create a rebuttable presumption that a person offering obscene matter is "engaged in the business" if "[t]he offering for sale of or to transfer, at one time, two or more copies of any obscene publication, or two or more of any obscene article, or a combined total of five or more such publications and articles." *Id.* Congress looked at the FOPA definition of "engaged in the business" in drafting of the Child Protection and Obscenity Enforcement Act of 1988 (which added 18 U.S.C. § 1466). As the Sixth Circuit explained, "[f]or the purposes of § 1466, Congress recognized that many retailers who show a 'regular course of trade or business' in obscene matter may have other substantial sources of income and eliminated § 921's language requiring a 'principal objective of livelihood and profit.'" *United States v. Skinner*, 25 F.3d 1314, 1318 (6th Cir. 1994). That Congress so intentionally used different statutory language limits the ability of § 1466 to inform § 921's reach.

A number of other chapters in Title 18 use "engaged in the business" but do not define it or provide any useful gloss on the phrase in regulations or case law. *See, e.g.*, 18 U.S.C. § 1084 (Transmission of wagering information; penalties); 18 U.S.C. § 1033 (Crimes by or affecting persons engaged in the business of insurance whose activities affect interstate commerce); 18 U.S.C. § 2710 (Wrongful disclosure of video tape rental or sale records); 18 U.S.C. § 511 (Altering or removing motor vehicle identification numbers); 18 U.S.C. § 1301 (Importing or transporting lottery tickets); 18 U.S.C. § 1510 (Obstruction of criminal investigations).

   *3.  2022 to Present: The BSCA and Our Current Moment*

Against this backdrop, yet more tragic gun violence finally spurred congressional action and resulted in the passage of the 2022 Bipartisan Safer Communities Act. As Senate Majority leader Charles Schumer (D-NY) explained on the Senate floor:

> A little over a month ago, our Nation witnessed two of the most traumatic mass shootings seen in years: a racially motivated attack in Buffalo and the worst

WILMERHALE **W|H**

March 6, 2023
Page 17

> school shooting in years in Uvalde, TX.  After these shootings, the Senate had a
> choice: We could succumb to gridlock and hold a vote on a bill with many things
> we would want but that had no hope of getting passed or we could try to find a
> bipartisan path forward, as difficult as it seemed to get anything done.  Over the
> past 4 weeks, we chose to try to get something done.

168 Cong. Rec. S3046 (daily ed. June 21, 2022) (statement of Sen. Charles Schumer); *see also*
168 Cong. Rec. S3101-S3102 (daily ed. June 23, 2022) (statement of Sen. Charles Schumer).
Senators Kirsten Sinema (then D-AZ), Chris Murphy (D-CT), and John Cornyn (R-TX)—three
of the four main co-sponsors of the BSCA—echoed Sen. Schumer.  168 Cong. Rec. S3053-
S3054 (daily ed. June 21, 2022) (statement of Sen. Kirsten Sinema); 168 Cong. Rec. S3023-
S3024, S3054-S3055 (daily ed. June 21, 2022) (statement of Sen. Chris Murphy); 168 Cong.
Rec. S115-S117 (daily ed. June 23, 2022) (statement of Sen. John Cornyn).

The BSCA was drafted by a working group of 12 senators.  It was introduced on June 21,
2022, and passed without amendment or much substantive discussion by the Senate and House
on June 23 and June 24, respectively.  President Biden signed it into law on June 25, 2022.  The
BSCA included an array of measures to address gun violence and improve community and
school safety, including:

- Increasing support to mental health and safety initiatives in schools;

- Boosting community mental health resources;

- Protecting survivors of domestic violence, including by adding convicted abusers
  in dating relationships to the National Instant Criminal Background Check System;

- Improving background checks, including enhanced background checks for 18-to-
  21-year olds;

- Funding violence interruption programs and community-based interventions;

- Creating incentives for states to enact or improve existing red flag laws, which
  allow authorities with court orders to temporarily take weapons away from people
  who are threatening to kill themselves or commit mass violence; and

- Adding new penalties for gun trafficking and straw purchasing, which is the
  buying of a gun by a person with a clean record to transfer to someone who is
  prohibited from purchasing a firearm.



March 6, 2023
Page 18

As relevant here and described further above, the BSCA also amended the definition of what it means to be "engaged in the business" of dealing in firearms, and thus who is required to obtain a federal firearms license and conduct background checks.  It did so by replacing the phrase "with the principal objective of livelihood and profit" in FOPA's "engaged in the business" definition with "to predominantly earn a profit."  18 U.S.C. § 921(a)(21)(C).  The BSCA defined the term "to predominantly earn a profit" as "mean[ing] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection."  *Id.* § 921(a)(22).  The previous definition's use of "with the principal objective of livelihood and profit," in contrast, "means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining *livelihood and* pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection."  *Id.* § 921(a)(23) (emphasis added).

Though a clear retreat from FOPA's attempted expansion of gun rights, legislative history otherwise sheds only modest light on the meaning of the new language, with legislators variously suggesting the language expanded or clarified the definition.  No Senate or House report accompanied the bill.  Senator Murphy provided the most extensive commentary.  He characterized the BSCA as "clarifying" or "simplifying" the "engaged in the business" definition.  168 Cong. Rec. S3023-S3024 (daily ed. June 21, 2022).  He explained the need for clarification by citing the individual who had sold a gun to the person who shot and killed seven people in Midland and Odessa Texas in 2019, who was not licensed because he "didn't believe the definition applied to him because the definition is admittedly confusing."  *Id.*  Senator Murphy expressed the hope and belief that simplifying the definition would result "in more of these frequent online gun sellers registering, as they should, as federally licensed gun dealers which then requires them to perform background checks."  *Id.*

Other comments variously referred to the idea that the new definition would require "more" individuals to be licensed, or else would "clarify" or "strengthen" the prior definition:

- "Our legislation also makes clear who the Federal firearm licensing requirements apply to, leading to more firearm sales that require a background check."  168 Cong. Rec. S3105 (daily ed. June 23, 2022) (statement of Sen. Martin Heinrich (D-NM));

- The bill "makes more sellers responsible for conducting background checks."  168 Cong. Rec. H5904 (daily ed. June 24, 2022) (statement of Rep. Jerrold Nadler (D-NY));

- The bill "further strengthen[s] the background check process by clarifying who is engaged in the business of selling firearms and, as a result, is required to run

WILMERHALE WH

March 6, 2023
Page 19

background checks."  168 Cong. Rec. H5906 (daily ed. June 24, 2022) (statement of Rep. Sheila Jackson Lee (D-TX));

- "[The BSCA] will strengthen requirements for gun sellers to obtain a Federal firearms license."  168 Cong. Rec. S3118 (daily ed. June 23, 2022) (statement of Sen. Greg Reed (R-AL)).

Against these bipartisan statements indicating intent to strengthen licensing requirements, no Member suggested that the amended language was intended to make the definition of "engaged in the business" cover *less* conduct.

### 4. Defining "Engaged in the Business" After the BSCA

The critical question in assessing the impact of the BSCA is how to interpret the BSCA's removal of the reference to "livelihood."  Starting with the text—as courts and regulators must—that shift should be given effect because "Congress presumably does not enact useless laws." *United States v. Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring).  That presumption takes on greater meaning here, where Congress removed language it had previously added through FOPA's announced effort to expand protections for gun owners.  Similarly, the abandonment of the "livelihood" requirement in one provision but not others strongly suggests that the revised definition should encompass persons not previously subject to licensing requirements.  If it does not have that effect, the word "livelihood" would appear to be superfluous in the other statutory provisions that retained it.  Such a reading of a statute is disfavored.[11]  Additionally, Congress amended the "engaged in the business" provision in a statute that is more broadly intended to enhance safety, and the other provisions of which are directed at that broader goal.  Reading the text in that context—which stands in contrast to the motivations that led livelihood to be added in the first instance—counsels that removing the reference to "livelihood" was intended to expand the number of persons subject to licensure.

The greatest effect of this changed definition may be seen outside of courthouses.  Before bringing charges for unlicensed dealing in firearms, ATF agents and federal prosecutors are forced to assess the application of a fact-dependent test.  Their ability to investigate potential

---

[11]    *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (collecting cases applying the canon against surplusage); *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'"); *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (stating that the canon is a "cardinal principle of statutory construction"); *Babbitt v. Sweet Home Chapter Communities for Great Ore.*, 515 U.S. 687, 698 (1995) (observing that courts are "reluctan[t] to treat statutory terms as surplusage").

**WilmerHale** [WH]

March 6, 2023
Page 20

violations is also hampered by the sheer number of private gun sellers and limited enforcement resources.  Any statutory change that reduces the complexity of assessing violations and removes potential defense arguments may give agents and prosecutors greater confidence in bringing cases.  Indeed, it is the difficulty of making charging decisions and *perceived* risk of successful defenses, not actual adverse caselaw, that appears to have created many of the perceived "loopholes" in the existing licensure regime.[12]  Removing the need to prove anything related to a defendant's "livelihood" could thus result in more cases being brought, especially in "edge" situations involving a limited number of transactions.

And even those investigating cases in which a defendant would likely claim reliance on the "hobby" or "personal collection" exemptions—which were not directly affected by the changes to the statutory text—might reasonably argue that the removal of "livelihood" counsels in favor of a narrower reading of the exceptions.  That is because what constitutes a hobby or transaction involving a personal collection must now be contrasted to any sale motivated predominantly by profit, as compared to sales for livelihood *and* profit.  Said otherwise, the refinement of the conduct covered by the overall provision may be read to inform (and narrow) the conduct covered by the exceptions.  *See, e.g.*, *Clark*, 489 U.S. at 739 ("In construing provisions … in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision."); *id.* ("Given that Congress has enacted a general rule … we should not eviscerate that legislative judgment through an expansive reading of a somewhat ambiguous exception."); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." (cleaned up)).

The BSCA may also provide an opportunity to improve voluntary compliance with the federal firearms licensure regime.  Because of limits on ATF resources, the agency has long sought to encourage guns sellers who meet the statutory definition of "engaged in the business" to register as federal firearms dealers.  Such voluntary compliance furthers the underlying goals of the licensure regime by increasing the number of sellers who perform background checks.

---

[12]    *See, e.g.*, Stewart M. Young, *Going Nowhere "Fast" (or "Furious"): The Nonexistent U.S. Firearms Trafficking Statute and the Rise of Mexican Drug Cartel Violence*, 46 U. Mich. J. of L. Reform 1, 22 (2012) (relaying the first-person perspective of a federal prosecutor on challenges of charging); Chip Brownlee, *What Will the First Federal Gun Reform Law in Three Decades Actually Do?*, THE TRACE (July 1, 2022), https://www.thetrace.org/2022/07/bipartisan-safer-communities-act-gun-law/ (quoting former ATF special agent noting that "[l]ivelihood and profit was always a difficult hurdle [for ATF agents and prosecutors]").

WilmerHale |H|

March 6, 2023
Page 21

But the unclear statutory definition has hampered those efforts, creating doubts as to the kind of sales activities that require a license.  At least some involved in the BSCA have voiced optimism that the simplified language the statute adopted will put more irregular "sellers on notice that if you are selling guns predominantly for profit, you need to be running background checks."[13] Given the significant public attention surrounding the BSCA, its passage may provide an opportunity to renew guidance for who must obtain a license at a time when persons potentially covered will be particularly attentive, even if the statutory text itself makes only modest changes to current law.

Challenges to giving substantial effect to the revised definition, however, remain.  In the criminal enforcement context, existing judicial interpretations of the prior "engaged in the business" provision complicate the strong textual arguments for an expanded definition.  As explained above, courts have routinely rejected the argument that a defendant's trade in guns must be a primary source of income (perhaps the most natural reading of the term "livelihood"), instead largely adopting the same profit-focused test the BSCA embraces.  And ATF's 2016 guidance and various model or court-approved jury instructions already mirror the revised statute's focus on pecuniary motive by dispatching with the requirement that a defendant's intent be obtaining livelihood *and* pecuniary gain.  *See, e.g.*, 2016 ATF Guidance at 4 ("As a general rule, you will need a license if you repetitively buy and sell firearms with the principal motive of making a profit.").  Congress, moreover, declined to adopt the broadest of the judicially created standards, which have minimized the importance of profit motive by focusing on whether a person held himself out as a source of firearms.  Choosing a profit-motivation requirement despite this authority might be interpreted as a rejection of these alternative tests.  To be sure, however, the new statutory language does not *narrow* the existing definition, and clearly rejects the frequently raised argument that profits from dealing in firearms must be a primary source of income.  But this ratification of existing standards seems unlikely to change how courts are actually deciding cases that require interpretation of what it means to be "engaged in the business."[14]  Lack of enforcement resources is also still a significant—perhaps the most significant—problem for reducing the number of unlicensed gun dealers, regardless of the scope

---

[13]    *See* Phil McCausland, *Little-known provisions of bipartisan gun law give feds 'teeth' to target illegal guns*, NBC NEWS (June 30, 2022, 6:54 PM), https://www.nbcnews.com/politics/congress/little-known-provision-bipartisan-gun-law-give-feds-teeth-target-illeg-rcna36162.

[14]    *See, e.g.*, *id.* (quoting Lindsay Nichols, the federal policy director at Giffords Law Center to Prevent Gun Violence, observing that after BSCA changes, "there would be really limited change in terms of who has to get a license," and that "[t]his really just codifies something that courts have already interpreted the law did, so it doesn't really expand the scope").

WilmerHale [WH]

March 6, 2023
Page 22

of the "engaged in the business" definition.[15]  And the revised language does not resolve other ambiguities in the statute that have led to significant litigation—the caselaw and prior guidance uniformly state that whether a defendant is "engaged in the business" is a highly fact-dependent inquiry, and the revised language suggests that will continue to be true by retaining the focus on whether a defendant has a *predominantly* pecuniary motive.

Despite those challenges, because the lack of uniform standards hinders enforcement, reduces the deterrent value of the law, and complicates efforts by regulated parties to voluntarily comply, agency or executive action to provide clearer standards would appear to be beneficial. Indeed, even if the BSCA's revised definition of "engaged in the business" only codifies existing caselaw, the need to offer an interpretation of the changed language—to say nothing of the broad public attention on who is engaged in the business of dealing in firearms after the passage of the BSCA—provides a justification for taking such action now.

**III.    Options for Executive Action**

In this Part, we assess potential executive actions that ATF or DOJ might take in the wake of the BSCA to provide greater clarity regarding the scope of federal licensure requirements.

A.   Form of Executive Action

The Executive Branch can offer clarity regarding what it means for a dealer to be "engaged in the business" of dealing in firearms through a variety of internal or external mechanisms.  Internally, ATF can revise its criteria for making cases against unlicensed dealers (providing clarity to investigators), and DOJ can revise its manual to AUSAs (providing clarity to prosecutors) or issue enforcement directives to pursue cases that it believes should fall within the revised definition.  Externally, ATF can engage in formal notice-and-comment rulemaking to issue regulations with the force and effect of law.  Otherwise, it can pursue a range of non-binding guidance, in the form of interpretative guidance, open letters to the firearms industry, or other handbooks, publications, or FAQs.  The DOJ could make similar public pronouncements regarding enforcement priorities.  Given the importance of voluntary compliance, even these

---

[15]    *See, e.g.*, *supra* n.7 at 17 (noting that U.S. Attorneys "were virtually unanimous in their call for additional resources," including the number of ATF agents available to investigate cases in many judicial districts).  For discussion of enforcement challenges, see generally *Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE): Gun Show Enforcement: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Sec'y*, 109th Cong. 123 (2006).

WilmerHale |WH|

March 6, 2023
Page 23

nonbinding regulatory actions may have significant effects on the number of persons who seek licenses.

Each form of agency action has benefits and drawbacks.  Binding regulations carry the force of law and may have the broadest effect but are slower to enact and face significant hurdles to implementation.  For example, ATF has frequently been granted *Chevron* deference when promulgating binding regulations.  *See, e.g.*, *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 17-28 (D.C. Cir. 2019) (applying *Chevron* to ATF rule classifying bump-stock devices as "machineguns").  That would buttress the agency's ability to provide guidance regarding ambiguous statutory terms.  But recently that practice has been challenged, especially when ATF seeks to set standards with criminal liability.  *See Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 910 (6th Cir. 2021) (Murphy, J., dissenting) (declining to apply *Chevron* to GCA where regulations expanded crime's scope); *Guedes*, 920 F.3d at 35 (Henderson, J., concurring in part and dissenting in part) (same).  A recent outlier decision by the en banc Fifth Circuit went so far as to suggest that ATF interpretations of statutes with criminal penalties are *never* entitled to *Chevron* deference.  *See Cargill v. Garland*, No. 20-51016, 2023 WL 119435, at *14-15 (5th Cir. Jan. 6, 2023).  That decision also highlighted several other potential pitfalls to binding agency action, including that the regulated party challenged ATF's statutory authority to issue a legislative rule at all, and that the court applied a canon of statutory construction (the rule of lenity) in a manner that suggested ambiguous criminal statutes cannot be construed in a way that expands liability.  *Id.* at *7 n.6, *18.  Informal guidance, in contrast, lacks the force of law but is faster and may offer the advantage of allowing ATF to clarify its position and incentivize voluntarily compliance without immediately finding itself in court.  However, even informal guidance in the area of gun regulation has been subject to challenge.  *See, e.g.*, *United States v. Kuzma*, 967 F.3d 959, 974-75 (9th Cir. 2020) (arguing successive ATF guidance letters rendered underlying statute unconstitutionally vague); *Klayman v. President of United States*, 689 F. App'x 921, 924 (11th Cir. 2017) (challenge to ATF guidance on definition of firearms dealer).

B.  <u>Substance of Executive Action</u>

If ATF or DOJ decides to issue further guidance on the meaning of "engaged in the business" to address the ambiguities identified above and clarify the present meaning of the term, they could consider providing additional information regarding what degree and form of activity generally constitutes "occasional sales"; further defining what constitutes a "personal collection" and how the time a firearm is possessed factors into that determination; explaining that "restocking" a collection precludes reliance on the liquidation exception; further defining what constitutes a "hobby"; clarifying the relevance of the location of sales; and/or expressly stating that sales are not required to be a primary source of income.  This section discusses each possibility in turn, along with its advantages and disadvantages.  Given the benefits of prompt agency action, the below discussion proceeds on the assumption that ATF or DOJ would promulgate informal guidance.

WilmerHale

March 6, 2023
Page 24

1. *Whether a Certain Number of Guns Transferred or Transactions Engaged in No Longer Constitutes "Occasional Sales"*

Given the recurring difficulty of assessing what volume of activity requires federal licensure, guidance could be issued to indicate that "occasional sales" generally means transferring five or fewer firearms, or engaging in five or fewer firearms transactions, per year. This guidance could also explain that any "occasional sales" must relate to the enhancement of a "personal collection" or to a "hobby," with only a de minimis profit motivation. Such guidance largely mirrors the statutory text, which (1) requires that a person "engaged in the business" be engaged in "a *regular* course of trade or business" and "the *repetitive* purchase and resale of firearms"; and (2) limits the exception for occasional sales to those made "for the enhancement of a personal collection or for a hobby." The additional clarity provided is (1) the numerical guidance regarding the number of guns or transactions that would generally fall outside of the bounds of "occasional" activity; and (2) the requirement that "occasional sales" be made with only a de minimis profit motive, in contrast to being "predominantly" motivated by profit.[16]

Although courts have eschewed numerical standards in favor of a fact-intensive, totality of the circumstances inquiry, informal guidance regarding the degree of activity that will *generally* constitute more than "occasional sales" seemingly comports with the flexible approach Congress used in crafting the statutory language. Using five guns or transactions as a rule of thumb also takes a conservative position relative to the caselaw, because courts have found persons to be "engaged in the business" on the basis of far fewer transactions or guns sold. *See, e.g.*, *United States v. Murphy*, 852 F.2d 1, 8 (1st Cir. 1988) ("this single transaction was sufficiently large in quantity, price and length of negotiation to constitute dealing in firearms"). There is a risk that such a benchmark would be overinclusive, *see, e.g.*, ATF Rul. 96-2 (determining that auctioneers who regularly assist in the sale of firearms by estates do not engage in the business of dealing in firearms), but the use of less than absolute terms would retain the flexibility courts and ATF have previously embraced. Providing that "occasional sales" may have no more than a de minimis profit motivation would also avoid running afoul of the statutory requirement that to be "engaged in the business" sales must be "to *predominantly* earn a profit," rather than lack any profit motivation at all.

---

[16]    Internal guidance for prosecutors and agents that encourages greater scrutiny of persons engaging in more than a certain number of transactions each year might mitigate underenforcement. In particular, providing assurances to investigators and line prosecutors that DOJ or ATF will support efforts to regulate dealing at these thresholds may encourage greater use of even the existing sweep of the law.

WILMERHALE [WH]

March 6, 2023
Page 25

Weighing against such guidance is 18 U.S.C. § 1466's express inclusion of a rebuttable numerical presumption, which could be read to show that where Congress intends to impose a specific numerical threshold to define what it means to be "engaged in the business," it can and does use language setting such a threshold. This argument may be strengthened by the fact that the definition in § 1466 was modeled on the FOPA definition and could indicate that Congress was aware of the potential to do the same in the BSCA and chose not to. On the other hand, Congress removed language that had previously differentiated § 1466 from § 921 in the BSCA, Congress delegated rulemaking authority to the ATF under the GCA, and there is no canon of statutory interpretation or other firm legal rule that precludes a regulation from imposing a numerical threshold just because the underlying statute does not explicitly do so.[17]

### 2. Whether Time of Possession Is Relevant to the "Personal Collection" Exception

ATF or DOJ might next consider clarifying that the length of time a gun has been possessed is a key determinant of whether that firearm is part of a "personal collection." *See Allah*, 130 F.3d at 44 (rejecting application of the exception in a case in which guns were quickly transferred after receipt, though not giving express weight to this fact); *see also Tyson*, 653 F.3d at 201 (noting that "the defendant's behavior before, during, and after the sales" is relevant to whether he is engaged in the business). Another approach could include guidance that possession for less than one year generally indicates that the gun is not in fact part of a personal collection. Although caselaw interpreting what constitutes a "personal collection" is sparse and (as noted above) courts have been resistant to the imposition of bright line rules in this context, such guidance would align with Congress's determination that length of possession is critical to assessing whether a firearm sold by a gun dealer was part of his or her personal collection. *See*

---

[17]    For example, regulations issued under other provisions of 18 U.S.C. § 922 provide more concrete numerical guidance despite broad statutory language, including for what constitutes an "unlawful user of" or person "addicted to any controlled substance." *Compare* 18 U.S.C. § 922(g)(3), *with* 27 C.F.R. § 478.11 ("An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time, e.g., a conviction for use or possession of a controlled substance within the past year [or] multiple arrests for such offenses within the past 5 years if the most recent arrest occurred within the past year.").

WilmerHale [WH]

March 6, 2023
Page 26

18 U.S.C. § 923(c).[18]  Concerns about particular situations where a quicker sale should not indicate a defendant is "engaged in the business" (such as sales following an inheritance) could be addressed through additional guidance.

As with the comparison to § 1466, however, the use of a specific holding period in § 923(c) also cuts against adoption of a numerical standard.  That is, Congress's decision to impose a one-year holding period through express language in § 923(c) but not in § 922 weighs against reading such a period into this statutory provision, especially given that the present version of § 922 was amended against the backdrop of § 923(c)'s more specific definition.  However, a line of D.C. Circuit cases have concluded that this kind of statutory silence does not preclude agency action, but rather indicates that Congress intended to leave the choice up to the agency.  *See, e.g.*, *Catawba Cnty. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) ("[W]e have consistently recognized that a congressional mandate in one section and silence in another often 'suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, i.e., to leave the question to agency discretion.'" (quoting *Cheney R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990)).  As in those cases, here, "[s]ilence … may signal permission rather than proscription."  *Id.*

### 3.  Whether a "Personal Collection" Can Be Restocked

The broader personal collection exception that allows a person to sell all or part of a collection could be clarified to apply only to liquidation activities—and not to a person who sells all or part of the collection and then restocks and repeats the commercial activity.  This would

---

[18]     Section 923(c) reads, in relevant part:

Nothing in this chapter shall be construed to prohibit a licensed manufacturer, importer, or dealer from maintaining and disposing of a personal collection of firearms, subject only to such restrictions as apply in this chapter to dispositions by a person other than a licensed manufacturer, importer, or dealer.  If any firearm is so disposed of by a licensee *within one year after its transfer from his business inventory into such licensee's personal collection* or if such disposition or any other acquisition is made for the purpose of willfully evading the restrictions placed upon licensees by this chapter, then such firearm shall be deemed part of such licensee's business inventory, except that any licensed manufacturer, importer, or dealer *who has maintained a firearm as part of a personal collection for one year* and who sells or otherwise disposes of such firearm shall record the description of the firearm in a bound volume, containing the name and place of residence and date of birth of the transferee if the transferee is an individual, or the identity and principal and local places of business of the transferee if the transferee is a corporation or other business entity….

WILMERHALE WH

March 6, 2023
Page 27

also make clear the distinction between this exception and the "occasional sales" exception that does allow for replenishment of a collection.

This proposed rule finds support in the statutory text and appears to be one of the stronger options for regulatory action. Although the statute permits the sale of "all or part of [a person's] personal collection of firearms" without reference to restocking, Congress's decision to create separate categories for "occasional sales" that "enhance[]" a personal collection and the sale of "all or part" of a personal collection indicates that these are meant to be distinct categories. This rule accomplishes that.

The 2016 ATF Guidance contains an example that arguably suggests this distinction, though it is not as clear as the proposed rule:

> Lynn regularly travels to gun shows around her state, rents space, and sells firearms under a banner stating 'liquidating personal collection.' Most of the firearms Lynn offers for sale she purchased from a licensed dealer in the prior weeks. Lynn is retired and hopes to supplement her income with the money she makes on the sales, although she has yet to turn a profit. Lynn must get a license because she is repetitively buying and selling firearms with a primary objective of profit.

2016 ATF Guidance at 7. This example could be clarified in future guidance to expressly state that one reason "Lynn" must obtain a license is because she has "restocked her collection in the course of the liquidation, which means she cannot rely on the liquidation exception." Other examples given in the 2016 guidance where the sale-of-personal-collection exception is said to apply also do not include "restocking," again suggesting existing alignment with this interpretation. One of those examples expressly states no purchases were made during the liquidation.[19]

---

[19]    The two examples are:

Bob inherits a collection of firearms from his grandfather. He would rather have cash than the firearms, so he posts them all online for sale. He makes no purchases, but over the course of the next year he sells all of the firearms he inherited in a series of different transactions. Bob does not need a license because he is liquidating a personal collection.

Scott has been collecting high-end firearms for years. In the six months before his son is about to enter college, Scott sells most of his collection in a series of transactions at gun shows, on the

WilmerHale [WH]

March 6, 2023
Page 28

### 4. Whether the "Hobby" Exception Applies to Gun Selling or Other for-Profit Activities

Regulatory action might clarify that the "hobby" exception does not cover an individual whose hobby is "gun selling" or otherwise intended to generate profit. Instead, a covered hobbyist must engage in gun sales to serve an interest in sport, recreation, or pleasure, with only a de minimis profit objective. Such a regulation might also clarify that no businesslike behavior—keeping books or records, holding oneself out as a source of firearms, or advertising—may accompany a "hobbyist's" trade in firearms.

Refining who is a hobbyist would not conflict with any statutory language and would provide meaning to an otherwise ambiguous term. Previously, a "hobby" stood in contrast to conduct motivated by "livelihood and profit." Now, a hobby must be contrasted against conduct motivated by profit more generally. ATF might reasonably conclude that a narrower definition of hobby is required in order to distinguish what falls under that exception from profit-making activities, while before a hobby needed only to be distinguishable from activities undertaken for livelihood and profit. *Cf. A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) ("To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people.").

This narrower definition also aligns with the intention of sponsors of the BSCA. Senator Murphy specifically referenced the individual who had sold a gun to the person who shot and killed seven people in Midland and Odessa Texas in 2019 to justify the revisions to the "engaged in the business" definition. 168 Cong. Rec. S3054-S3055 (daily ed. June 21, 2022). As stated in the factual resume submitted to the court as part of the seller's guilty plea, that seller believed he did not need a license because his gun selling was a "hobby." Factual Resume, *United States v. Braziel*, 20-CR-00128-H, ¶ 8 (N.D. Tex. Oct. 7, 2020) ECF No. 11.

An overbroad interpretation of "hobby" to include "gun selling" does not appear to have ever been blessed by courts or regulators. Indeed, the individual Senator Murphy referenced pleaded guilty to a violation of the prior version of the statute. That makes sense, given that having a profit objective or exhibiting businesslike behavior are already key indicia of engaging in the business of dealing in firearms. Similarly, the 2016 ATF Guidance already gives as an example of a person "engaged in the business" a gun enthusiast who starts selling weapons for profit, drawing some of the distinctions made in this rule:

---

Internet, and to family and friends to provide funds to pay his son's college expenses. Scott does not have to be licensed, because he is liquidating part of a personal collection.

WilmerHale |WH|

March 6, 2023
Page 29

> Jessica enjoys shooting sports and frequently goes to shooting ranges and hunting
> clubs.  To make some extra money, she buys firearms from a dealer who is
> willing to give her a discount, and resells them for a profit to acquaintances from
> the shooting ranges and hunting clubs.  She has done this a few times a month for
> the last several months, and has been spreading the word that she has a source for
> other firearms.  She passes out business cards with her name, phone number and
> email.  Jessica must get a license because she is repetitively buying and selling []
> firearms with the primary objective of profit.

2016 ATF Guidance at 8.  Given ongoing noncompliance despite the prior guidance and caselaw,
further public education on the scope of the hobbyist exception could be helpful.

One starting place for defining "hobby" could be definitions from dictionaries relevant at
the time FOPA added the word to the GCA.  *See, e.g.*, Webster's Ninth New Collegiate
Dictionary, 574 (9th ed. 1985) (defining "hobby" as "a pursuit outside one's regular occupation
engaged in esp[ecially] for relaxation"); Oxford English Dictionary, 317 (1978) (defining
"hobby" as "[a] favorite occupation or topic, pursued merely for the amusement or interest that it
affords…").  Such definitions lend support for defining "hobby" in relation to either livelihood
or profit, as they juxtapose "hobby" with one's regular occupation and with the purpose with
which one acts—for "relaxation" or "merely for the amusement or interest that it affords."[20]

5. *Whether the "Engaged in the Business" Definition Encompasses Repeated
   Commercial Activity for Profit, Including Sales Advertised Online or at Gun Shows*

The definition of "engaged in the business" could be clarified to include all firearms
transactions engaged in "predominantly for profit," regardless of the location of the transaction.
ATF might also include guidance clarifying that sales conducted in some locations are
themselves probative of profit-motive.  For example, ATF might state that engaging in multiple
transactions within a one-year period on an internet marketplace or at more than one gun show
(both circumstances where sales are likely to be to strangers) generally indicates that the seller is
"engaged in the business."

Such an interpretation is consistent with the 2016 ATF Guidance, which explicitly
clarifies that a person can be "engaged in the business" of dealing in firearms regardless of the

---

[20]    Similarly, guidance that defines the word in other contexts may be illustrative.  *See, e.g.*,
28 C.F.R. § 1.183-2(b) (nine-factor test for determining if activity is engaged in for profit for
purposes of deductions under Internal Revenue Code, 26 U.S.C. § 162); *see also WP Realty, LP
v. Comm'r of Internal Revenue*, 118 T.C.M. (CCH) 248 (T.C. 2019) (applying nine-factor test).

WilmerHale |WH|

March 6, 2023
Page 30

location of sale.  That guidance provides that "[a] person can be engaged in the business of dealing in firearms regardless of the location in which firearm transactions are conducted.  A person can be engaged in the business of dealing in firearms even if the person only conducts firearm transactions from a location other than a traditional brick and mortar store."  It further clarifies that "it does not matter if sales are conducted out of your home, at gun shows, flea markets, through the internet, or by other means."  Given that this has already been clarified in informal ATF guidance, any additional value in this clarification would come through formal rulemaking or as part of a broader package of guidance addressing the BSCA.

The statute elsewhere refers to the location of sales, allowing a licensed dealer to conduct business temporarily at a gun show or other event, under rules or regulations as ATF may prescribe.  *See* 18 U.S.C. § 923(j) ("A licensed importer, licensed manufacturer, or licensed dealer may, under rules or regulations prescribed by the Attorney General, conduct business temporarily at a location other than the location specified on the license if such temporary location is the location for a gun show or event sponsored by any national, State, or local organization, or any affiliate of any such organization devoted to the collection, competitive use, or other sporting use of firearms in the community, and such location is in the State which is specified on the license.").  This language does not appear to create a conflict or otherwise preclude a regulation regarding location of sale for purposes of the "engaged in the business" definition.

Were ATF to engage in formal rulemaking to this effect, it is not clear that a specific statutory hook would support such a regulation, *i.e.*, such a regulation would not be tied to defining a particular ambiguous word.  That being said, this rule would likely not conflict with any statutory language and could provide clarity overall to the term "engaged in the business."

### 6.  Whether Gun Sales Must Be a Primary Source of Income

Guidance on the "engaged in the business" definition could be clarified to further emphasize that dealing in firearms need not be a person's primary source of income in order to be "engaged in the business."  The caselaw is clear that, even when the statute contained the reference to "livelihood," buying and selling guns for profit did not need to be a person's primary source of income in order to meet the statutory definition of "engaged in the business."  The BSCA adopts those courts' reading of "engaged in the business" and removes any doubt that dealing in guns to supplement one's income, or even dealing in guns *hoping* to supplement one's income without actually making a profit, meets the statutory definition.

ATF and DOJ could issue regulations and/or make it an enforcement priority to target individuals who sell guns as a secondary source of income.  Such dealers, though likely involving a lower volume of gun sales than persons whose primary source of income relates to

ATF 015435

WilmerHale

March 6, 2023
Page 31

firearms, are the persons most likely to incorrectly believe that they need not apply for a federal license.

As part of this effort, and as discussed in the context of clarifying the definition of "hobby," ATF could provide additional examples of persons who might believe themselves to be "hobbyists," yet still fall under the statutory definition. Such individuals could have other jobs, sell firearms only occasionally and in small amounts, and primarily deal in less formal settings like internet marketplaces or gun shows. Nevertheless, when an individual regularly engages in the buying or selling of firearms primarily to supplement their income, they must register.

The "Jessica" example from the 2016 ATF Guidance (reproduced above) is a useful starting point but suggests too much is required to cross from being a hobbyist into a dealer. A revised example removing the references to the "business-like" activities the regulated party engaged in (obtaining business cards, "spreading the word that she has a source for other firearms"), and/or an alternative example that places the regulated party's activities in the internet setting could provide a better illustration of this concept. Such indicia of commercial activity are themselves highly probative of profit-motive—and any ATF guidance should make as much clear—but they are not necessary, as the current guidance may be read to suggest.

## IV.    Conclusion

Since the term "engaged in the business" was introduced into the federal firearms regulatory scheme, all three branches of the federal government have struggled to define which persons are subject to licensure. The inability to craft readily understandable, clear definitions has undermined voluntary compliance and deterrence. The BSCA represents Congress's latest attempt to mitigate those problems. Although it largely conforms to existing caselaw and regulatory guidance, there are strong textual arguments for why the BSCA's revised definition *should* expand the definition of who is "engaged in the business" of dealing in firearms, and the BSCA's passage provides a moment of significant public attention in which to address the bounds of the statute. The Executive Branch actions assessed here provide examples of steps that might be taken in the wake of the BSCA to address existing ambiguities in federal licensing requirements.

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Washington DC*

www.atf.gov

# IMPORTANT NOTICE

**Selling Firearms AFTER Revocation, Expiration, or Surrender of a Federal Firearms License**

Former Federal Firearms licensees (FFLs) who continue to sell firearms after the revocation, expiration, or surrender of their license are subject to the same rules as persons who have never been licensed, in determining whether they are "engaged in the business" of selling firearms without a license in violation of 18 U.S.C. § 922(a)(l)(A), and 27 CFR 478.11 and 478.41. Accordingly, former licensees who wish to dispose of any remaining business inventory must adhere to the statutory and regulatory restrictions that are applicable to all unlicensed persons selling firearms.

All firearms formerly in the business inventory must be disposed of by the former FFL in a manner that, objectively, does not constitute being engaged in the business of dealing in firearms, using the same facts and circumstances test that would apply to persons who have never been licensed.

The preferred manner of disposition of firearms is for the former licensee to:

- Arrange for another FFL to purchase the business inventory; or
- Consign the inventory of firearms to another FFL to sell on consignment, or at auction.

Should a former FFL decide against those options, he/she should be aware that future firearms sales – whether from his/her personal firearms collection or otherwise – will be evaluated for a potential violation of 18 U.S.C. § 922(a)(l)(A), just as would occur with a person who had never been licensed.

If a former FFL is disposing of business inventory, the fact that no firearms purchases are made after the date of license revocation, expiration, or surrender does not immunize him/her from potential violations of 18 U.S.C. § 922(a)(l)(A). Instead, business inventory acquired through repetitive purchases while licensed are attributed to the former FFL when evaluating whether subsequent firearms sales constitute engaging in the business of dealing in firearms without a license.

ATF remains committed to assisting former licensees in complying with Federal firearms laws. If you have questions, please contact your local ATF office.

Megan A. Bennett
Deputy Assistant Director (Industry Operations)
Field Operations



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Washington, DC_

www.atf.gov

## IMPORTANT NOTICE

### Selling Firearms AFTER Revocation, Expiration, or Surrender of an FFL

Former Federal Firearms licensees (FFL's) who continue to sell firearms after the revocation, expiration, or surrender of their license are subject to the same rules as persons who have never been licensed in determining whether they are "engaged in the business" of selling firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A). Accordingly, former licensees who wish to dispose of any remaining business inventory must adhere to the following guidance:

Business inventory must be disposed of by the former FFL in a manner that, objectively, does not constitute being engaged in the business of dealing in firearms using the same facts and circumstances test that would apply to persons who have never been licensed.

The preferred manner of disposition is for the former licensee to:

- Arrange for another FFL to purchase the business inventory (and other assets) of the business; or
- Consign the inventory to another FFL to sell on consignment, or at auction.

Should a former FFL decide against those options, he/she should be aware that future sales – whether from his/her personal firearms collection or otherwise – will be evaluated for a potential violation of 18 U.S.C. § 922(a)(1)(A), just as would occur with a person who had never been licensed.

If a former FFL is disposing of business inventory, the fact that no purchases are made after the date of license revocation, expiration, or surrender does not immunize him/her from potential violations of 18 U.S.C. § 922(a)(1)(A). Instead, business inventory acquired through repetitive purchases while licensed are attributed to the former FFL when evaluating whether subsequent sales constitute engaging in the business of dealing in firearms without a license.

ATF remains committed to assisting former licensees in complying with Federal firearms laws. If you have questions, please contact your local ATF office.

Andy R. Graham
Deputy Assistant Director (Industry Operations)
Field Operations

ATF 013428

APPX.707



| | |
|---|---|
| **From:** | Shear, Matthew J. (ATF) |
| **To:** | Chu, Vivian S. (ATF) |
| **Cc:** | Mitchem, Marianna S. (ATF); Maaty, Ahmad (ATF); Davalos, Jeana (ATF) |
| **Subject:** | RE: SME Best Guestimate Questions |
| **Date:** | Thursday, January 4, 2024 2:16:53 PM |
| **Attachments:** | image001.png |

Vivian – here is what I've received back from the group:

- **Knapp**: The revised numbers appear accurate to me.
- **Wren**: I agree that the number of unlicensed sellers "getting out of the game" will be low.  I would agree with Vivian's estimate of between 2-5%.  10% would be too high in my opinion.

███████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

- **Griffin**: I agree with the breakdown of online marketplace players.  That feels spot on to me.  I think it's more difficult to assess the number of unlicensed sellers getting out of the game, but I would agree that it will probably be less than 10%.  I think it depends on a lot of variables.

████████████████████████████████████████
████████████████████████

- **Babbie**: I honestly have no opinion on this as I have no clue ████████████████████
██████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████
████████████████████████

- **Smith**: I agree with the breakdown of numbers. ██████████████████████
████████████████████████████████████████████
█████████████████████

- **Gluck**: I agree with these numbers.

# Matthew Shear

Chief, Firearms Industry Programs Branch

Department of Justice
Bureau of Alcohol, Tobacco, Firearms & Explosives
99 New York Ave NE, Washington, DC 20226
Tel ████████████



**From:** Chu, Vivian S. (ATF) ███████████████████
**Sent:** Wednesday, January 3, 2024 7:00 PM

**To:** Shear, Matthew J. (ATF) ████████████████████
**Cc:** Mitchem, Marianna S. (ATF) ████████████████████ ; Maaty, Ahmad (ATF)
████████████ ; Davalos, Jeana (ATF) ████████████████████
**Subject:** SME Best Guestimate Questions

Hi Matt!

In doing the cost-benefit analysis for the final rule on Engaged in the Business, our economists—Jeana and Ahmad—have a couple questions for the FIPB SMEs. Rather than pinging 1 or 2 folks-hoping you can share this email with your group (or part of your group) so that we can draw on collective expertise rather than rely on just 1 SME's point of view.

1. Firstly, the current EIB analysis assumes that the online marketplace for unlicensed firearm sellers was comprised 50% by Armslist, and 50% all other online platforms. As we had seen from comments re: Gunbroker.com and learned more about their platform serving more than just FFLs, we would like to revise that market share breakdown. For purposes of the analysis, we are leaning toward giving Gunbroker.com the lion's share of the market based on data we have seen on their relative unique visitors, which seems to be more like 15% to 85% in favor of Gunbroker, and with an estimated 10% capturing all other/ smaller/ local online marketplaces for unlicensed dealers. So, based on our observations, this would bring breakdown of online marketplace to look like an estimated 13.5% to Armslist, 76.5% to Gunbroker and 10% to all others). **Does this kind of apportionment sound good to you or would you revise the three numbers up or down? If so, what would your estimates be for the 3 values** (Armslist's share of the online market, Gunbroker's share of the online market, and everyone else)?

2. Another question they would like SME input on is regarding what their best estimate would be on the share of the **affected population of unlicensed firearm sellers that would simply cease selling firearms as a result of the rule**. We suspect it would be low, like under 10% and likely between 2 and 5%, (based on the outlying percentage of 1.7% of the affected population of the bump stock reg that voluntarily surrendered their firearms to ATF even though they didn't need to), but we wanted more opinions to support the percentage no matter where it landed.

Do you think your group can respond by like 1pm tomorrow?

Jeana and Ahmad would need to account for any new input SMEs are able to provide in the write up ASAP.

Thank you!!

**Vivian Chu**
**Division Chief**
Office of Regulatory Affairs
Cell ████████████
Desk 202-648-███

NOTICE: This e-mail message and any attached files are intended solely for the use of the addressee(s) named above in connection with official business. This communication may contain Sensitive But Unclassified information that may be statutorily or otherwise prohibited from being released without appropriate approval. Any review, use, or dissemination of this e-mail message and any attached file(s) in any form outside of the Bureau of Alcohol, Tobacco, Firearms & Explosives or the Department of Justice without express authorization is strictly prohibited.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE,<br><br>        *Plaintiffs*,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF,<br><br>        *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 2:24-cv-00089-Z |

## DECLARATION OF JOHN CRUMP

1. My name is John Crump. I am a U.S. citizen and resident of Virginia. I make this declaration in support of Plaintiffs' Motion for Summary Judgment. Unless otherwise stated, I make this declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained herein.

2. I am a law-abiding person, eligible to possess firearms under state and federal law. I am an avid gun owner and supporter of the right to keep and bear arms. I am a member of Gun Owners of America and a supporter of Gun Owners Foundation, a member of Virginia Citizens

1

APPX.710

Defense League, and a member of Tennessee Firearms Association.

3.  I was one of the individuals referenced anonymously in Erich Pratt's declaration (ECF #55-1).

4.  I provided information about my activities to GOA with respect to the litigation challenging ATF's Final Rule for "Engaged in the Business."

5.  I previously explained to GOA that I am an organized person, who finds it important to retain the original documentation of all the firearms I purchase.

6.  Likewise, I also maintain a digital spreadsheet of information on my extensive collection.

7.  For example, in this spreadsheet, I have a tab that lists data on my firearms in chronological order based on date of purchase, including the make, model, serial number, caliber, approximate round count (*i.e.*, how many rounds of ammunition have been fired through the firearm), price paid, place of purchase, and if applicable, the date sold and sale price, with a link to any bill of sale or other documentation evincing a transfer in ownership.

8.  Based on the sheer number of firearms in my private collection, I believe this spreadsheet to be the best way to keep track of this important data.

9.  For example, if I were ever to have a portion of my collection stolen, I would be able to reference the spreadsheet and assist law enforcement with the serial numbers of any stolen firearms and accessories on those firearms.

10. Occasionally, I will sell a firearm from my collection, whether to recoup funds in order to purchase a new firearm, or to assuage the concerns of my wife that I spend too much on firearms.

11. In these cases, I track bought/sold price data purely out of interest.  But sometimes, knowing the price paid for a firearm years ago can be useful in determining a fair price at which

APPX.711

to sell the firearm.

12. But despite my inherently noncommercial, private activity, I fear that I fall under at least one of the Rule's presumptions. Accordingly, if the Rule takes effect, I no longer will sell firearms from my private collection, even occasionally, because the spreadsheet that I maintain to stay organized could expose me to liability in the eyes of ATF.

13. Indeed, the Rule presumes an individual has an "intent to predominantly earn a profit" when one "[m]akes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale." FR at 29091.

14. Due to the Rule's expansive definition of "resale," as discussed above, I fear that I am presumed to have an "intent to predominantly earn a profit," subject to rebuttal upon enforcement, even though I merely intend to enhance my personal collection.

I, John Crump, declare under penalty of perjury that the foregoing is true and correct.

11/18/2024
**DATE**

**JOHN CRUMP**

3

APPX.712

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, | § § § § § § § § § | CIVIL ACTION NO. 2:24-CV-00089-Z |
| *Plaintiffs*, | § § | |
| v. | § § | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF, | § § § § § § § § § | |
| *Defendants*. | § § | |

---

## DECLARATION OF MARK DAVIS

---

1. My name is Mark Davis. I am a U.S. citizen and resident of Virginia. I make this declaration in support of Plaintiffs' Motion for Summary Judgment. Unless otherwise stated, I make this declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained herein.

2. I am a law-abiding person, eligible to possess firearms under state and federal law. I am an avid gun owner and supporter of the right to keep and bear arms. I am a member of Gun Owners of America, a member of Virginia Citizens Defense League, and a member of Tennessee

1

APPX.713

Firearms Association.

3.  I was one of the individuals referenced anonymously in Erich Pratt's declaration (ECF #55-1).

4.  I provided information about my activities to GOA with respect to the litigation challenging ATF's Final Rule for "Engaged in the Business."

5.  I regularly purchase firearms for personal, noncommercial use, primarily for self-defense and related training (*i.e.*, practicing timed drills, drawing from concealment, and weapon manipulation like reloading or clearing malfunctions).  I believe the private ownership of several firearms for self-defense purposes is "necessary to the security of a free State" and also serves as a political statement against governmental overreach and abuse.

6.  I do not collect firearms "for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)." FR at 29090.

7.  Rather, I "accumulate [firearms] primarily for personal protection," FR at 29090, a purpose that the Rule expressly exempts from the definition of "personal collection."

8.  Occasionally, I sell firearms from my collection in order to make room for new firearms or to replace firearms that, after self-defense training and everyday carry, are discovered to have shortcomings such as poor ergonomics or issues with mechanical reliability.  Additionally, I at times have sold firearms to pay child support, rent, and other family and business expenses.

9.  At times, these occasional sales generate a profit, compared to the price I paid when acquiring a given firearm.  More often, however, these sales generate no profit (or even a loss).

2

10.    In order to facilitate these occasional sales, I will discuss various firearms I want to sell on a social media account viewed by the public, or in church, or other small groups.  Then, I would be contacted through various social media accounts or in person in order to effectuate the sale.  I estimate that I have sold approximately ten firearms, but I plan on selling more.

11.    I fear that the advertising of these occasional "for sale" ads means that, under the Rule, as an individual who "[r]epetitively or continuously advertises, markets, or otherwise promotes a firearms business (*e.g.*, **advertises or posts firearms for resale**, including through the internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), **regardless of whether the person incurs expenses** or only promotes the business informally" (FR at 29091 (emphases added)), the ATF may consider me to be "engaged in the business" even though I am not.  As the Rule makes clear, such activities "may occur wherever, or through whatever medium," including "over the internet." FR at 28968, 29071.

12.    In other words, the Rule presumes that I, based upon perfectly lawful activities, nevertheless have an "intent to predominantly earn a profit," FR at 29091, and will require me to rebut this presumption upon enforcement.

13.    Absent further injunctive relief against the Rule, I would cease my occasional sales of firearms from my private collection altogether for fear of enforcement and the attendant burdens of proving my compliance with the statute's safe harbor.

I, Mark Davis, declare under penalty of perjury that the foregoing is true and correct.


_____        _____
**DATE**                                        **MARK DAVIS**

APPX.715

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE, | § § § § § § § § § | |
| *Plaintiffs*, | § § | Civil Action No. 2:24-cv-00089-Z |
| v. | § § | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF, | § § § § § § § § § | |
| *Defendants*. | § § | |

---

## DECLARATION OF RICHARD HUGHES

---

1. My name is Richard Hughes.  I am a U.S. citizen and resident of Florida.  I make this declaration in support of Plaintiffs' Motion for Summary Judgment. Unless otherwise stated, I make this declaration based on personal knowledge.  If called as a witness, I can testify to the truth of the statements contained herein.

2. I am a law-abiding person, eligible to possess firearms under state and federal law.  I am an avid gun owner and supporter of the right to keep and bear arms.  I am a member of Gun Owners of America and a supporter of Gun Owners Foundation, a member of Virginia Citizens Defense League, and a member of Tennessee Firearms Association.

1

APPX.716

3.   I was one of the individuals referenced anonymously in Erich Pratt's declaration (ECF #55-1).   I provided information about my activities to GOA with respect to the litigation challenging ATF's Final Rule for "Engaged in the Business."

4.   I have a sizeable collection of firearms, both as a collection and firearms that constitute "self-defense" types of firearms.

5.   In the past I have sold, and I wish in the future to be able to sell some of these firearms, including guns purchased and carried for "self-defense."   Specifically, I have sold a Ruger LC9, and plan to sell a Glock 43.   Both of these firearms I tried out for "self-defense," but I ultimately did not like to carry these specific firearms.

6.   In the past, I have rented a table to sell firearms (and in the past I have handed out flyers) at a local gun show.   I merely wish to sell various firearms that did not ultimately fulfill their intended purpose, something that clearly does not constitute being engaged in the business.

7.   The Final Rule, however, provides that some of this perfectly lawful conduct may trigger presumptions that I am an unlawful dealer.   And, whereas I understand that my local gun show is frequented by local law enforcement, I fear that, if I were in the future to hand out flyers or display firearms for sale at a rented table at a gun show, in order to sell personally owned firearms, there is a credible risk of enforcement, should the Final Rule ultimately take effect.

8.   I do not wish to expose myself to such liability, where I will be forced to prove compliance with the statute.   However, I will still attempt to sell my personal firearms at a gun show by renting a table even if the Final Rule takes effect, because I believe my planned conduct to be lawful under federal law, even if the Final Rule creates a different regime.

I, Richard Hughes, declare under penalty of perjury that the foregoing is true and correct.

_____                    _____
**DATE**                                                **RICHARD HUGHES**

2

APPX.717

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

STATE OF TEXAS, *et al.*,

     Plaintiffs,

  v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

     Defendants.

Case No. 2:24-cv-00089-Z

## OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

I.      Statutory and Regulatory Background.........................................................................3

      A.     The Gun Control Act of 1968 ..........................................................................3

      B.     The Final Rule ..................................................................................................7

II.     Factual and Procedural Background..........................................................................10

LEGAL STANDARD ........................................................................................................11

ARGUMENT .....................................................................................................................11

I.      Plaintiffs Lack Standing and Fail to Establish Irreparable Harm...............................11

      A.     The State Plaintiffs Fail to Allege or Establish Standing and Irreparable
            Harm.............................................................................................................12

      B.     Plaintiff Tormey Lacks Standing to Bring a Pre-Enforcement Challenge and
            Fails to Demonstrate that He Will Be Harmed Irreparably by the Rule......................13

      C.     The Organizational Plaintiffs Also Lack Standing and Fail to Demonstrate
            Irreparable Harm From the Rule ....................................................................18

II.     Venue Is Improper in this District Because No Plaintiff with Standing Resides Here ...........21

III.    Plaintiffs Are Not Likely to Succeed on the Merits of their Claims ...........................22

      A.     The Rule Is Consistent with the GCA and ATF's Authority .........................22

      B.     The Rule's Presumptions Are a Proper Exercise of ATF's Authority .........................32

            1.     ATF Is Authorized to Create Regulatory Presumptions to Interpret and
                  Enforce the Gun Control Act.........................................................32

            2.     The Rule's Engaged in the Business (EIB) Presumptions Are Permissible ...35

            3.     The Rule's Intent to Predominantly Earn a Profit Presumptions Are
                  Permissible .................................................................................37

            4.     Conduct That the Rule Identifies as Not Supporting a Presumption Does
                  Not Contradict the Statute .........................................................40

      C.     The Rule Appropriately Regulates Former Licensees' Inventory................................41

i

      D.     Plaintiffs Are Not Likely to Succeed on their Second Amendment Claim..................44

      E.     The Rule Is Consistent with the Fourth Amendment .......................................47

      F.     Plaintiffs' Separation-of-Powers Claim Lacks Merit ......................................50

IV.    The Balance of Equities and Public Interest Disfavor Injunctive Relief.................50

V.     Any Relief Should Be Limited....................................................................................51

CONCLUSION...................................................................................................................54

APPX. 720

## TABLE OF AUTHORITIES

**CASES**

*A.J. Taft Coal Co. v. Barnhart,*
    291 F. Supp. 2d 1290 (N.D. Ala. 2003) ...................................................................22

*A.V. v. Plano Indep. Sch. Dist.,*
    585 F. Supp. 3d 881 (E.D. Tex. 2022) ...................................................................28

*Abramski v. United States,*
    573 U.S. 169 (2014) .........................................................................................1, 3

*Alaska Airlines, Inc. v. Brock,*
    480 U.S. 678 (1987) ..............................................................................................54

*Alliance for Hippocratic Medicine* v. *FDA,*
    78 F.4th 210 (5th Cir. 2023), *cert. granted,* 144 S. Ct. 537 (2023) ....................11

*Altman v. Cnty. of Santa Clara,*
    464 F. Supp. 3d 1106 (N.D. Cal. 2020) ...............................................................45

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ...........................................................................52, 53

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..............................................................................................16

*Associated Builders & Contractors of Tex., Inc. v. NLRB,*
    826 F.3d 215 (5th Cir. 2016) ................................................................................11

*Associated Gen. Contractors of Am., Inc. v. Fed. Acquisition Regul. Council,*
    ---F. Supp. 3d---, 2024 WL 1078260 (W.D. La. Mar. 12, 2024) ....................21, 22

*Babbitt v. United Farm Workers Nat'l Union,*
    442 U.S. 289 (1979) ..............................................................................................15

*Barber v. Bryant,*
    860 F.3d 345 (5th Cir. 2017) ....................................................................12, 13, 20

*Barber v. Thomas,*
    560 U.S. 474 (2010) ..............................................................................................24

*Boyce Motor Lines v. United States,*
    342 U.S. 337 (1952) ..............................................................................................31

*Bryan v. United States,*
    524 U.S. 184 (1998) ..............................................................................................17

APPX. 721

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) .......................................................................................52

*Camacho v. Ford Motor Co.,*
   993 F.3d 308 (5th Cir. 2021) ........................................................................28

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
   98 F.4th 220 (5th Cir. 2024) ...................................................... 34, 35, 37, 38

*Carpenter v. United States,*
   585 U.S. 296 (2018) .......................................................................................48

*Chambered Grp. USA LLC v. Babcock,*
   No. CV-23-01850-PHX-SPL, 2023 U.S. Dist. LEXIS 173796 (D. Ariz. Sept. 27, 2023) ................51

*Chem. Mfrs. Ass'n v. Dep't of Transp.,*
   105 F.3d 702 (D.C. Cir. 1997) .....................................................................35

*City of L.A. v. Patel,*
   576 U.S. 409 (2015) .......................................................................................49

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ................................................................................ 13, 19

*Cole v. U.S. Dep't of Agric.,*
   33 F.3d 1263 (11th Cir. 1994) .................................................................. 2, 33

*Cox v. Louisiana,*
   379 U.S. 559 (1965) ................................................................................ 31, 32

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC,*
   710 F.3d 579 (5th Cir. 2013) ........................................................................12

*Davis v. Mich. Dep't of Treasury,*
   489 U.S. 803 (1989) .......................................................................................26

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) .................................................................................. 2, 44

*Do No Harm v. Pfizer Inc.,*
   96 F.4th 106 (2d Cir. 2024) ..........................................................................19

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) .......................................................................................25

*FTC v. Mandel Bros., Inc.,*
   359 U.S. 385 (1959) .......................................................................................25

APPX. 722

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,*
   695 F.3d 330 (5th Cir. 2012) ................................................................................18

*Ga. Republican Party v. SEC,*
   888 F.3d 1198 (11th Cir. 2018) ....................................................................... 21, 22

*Gardner v. Grandolsky,*
   585 F.3d 786 (3d Cir. 2009) .................................................................................23

*Gill v. Whitford,*
   585 U.S. 48 (2018) ...............................................................................................52

*Giragosian v. Bettencourt,*
   614 F.3d 25 (1st Cir. 2010) ...................................................................................49

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ..............................................................................................13

*Holland Am. Ins. Co. v. Succession of Roy,*
   777 F.2d 992 (5th Cir. 1985) ...............................................................................12

*Holland Livestock Ranch v. United States,*
   655 F.2d 1002 (9th Cir. 1981) .............................................................................33

*Huddleston v. United States,*
   415 U.S. 814 (1974) .................................................................................................3

*Inst. of Certified Pracs., Inc. v. Bentsen,*
   874 F. Supp. 1370 (N.D. Ga. 1994) ....................................................................22

*James v. Hegar,*
   86 F.4th 1076 (5th Cir. 2023) ..............................................................................13

*Janvey v. Alguire,*
   647 F.3d 585 (5th Cir. 2011) ......................................................................... 11, 12

*John Doe # 1 v. Veneman,*
   380 F.3d 807 (5th Cir. 2004) ...............................................................................52

*Keane v. Velarde,*
   No. 3:20-cv-00977, 2021 WL 4248896 (D. Conn. Sept. 17, 2021)....................22

*Kole v. Vill. of Norridge,*
   No. 11 C 3871, 2017 WL 5128989 (N.D. Ill. Nov. 6, 2017) .............................45

*La Union Del Pueblo Entero v. FEMA,*
   608 F.3d 217 (5th Cir. 2010) ...............................................................................11

APPX. 723

*Labrador v. Poe ex rel. Poe,*
  144 S. Ct. 921 (2024) ........................................................................................................52

*League of United Latin Am. Citizens v. Abbott,*
  604 F. Supp. 3d 463 (W.D. Tex. 2022) ..........................................................................16

*Licon v. Ledezma,*
  638 F.3d 1303 (10th Cir. 2011) .......................................................................................23

*Louisiana v. Becerra,*
  20 F.4th 260 (5th Cir. 2021) ...........................................................................................52

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .........................................................................................................13

*Lynchburg Range & Training, LLC v. Northam,*
  105 Va. Cir. 159, 2020 WL 8817562 (2020) ...................................................................45

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) .........................................................................................................52

*Magee v. City of S. Padre Island,*
  463 F. App'x 377 (5th Cir. 2012) ............................................................................. 29, 30

*Marshall v. Barlow's, Inc.,*
  436 U.S. 307 (1978) .........................................................................................................49

*Maryland v. King,*
  567 U.S. 1301 (2012) .......................................................................................................51

*McRorey v. Garland,*
  ---F.4th---, 2024 WL 1825398 (5th Cir. Apr. 26, 2024) ................................................44

*MD/DC/DE Broads. Ass'n v. FCC,*
  236 F.3d 13 (D.C. Cir. 2001) ..........................................................................................54

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
  60 F.4th 956 (5th Cir. 2023) ...........................................................................................49

*Mich. Ass'n of Pub. Sch. Acads. v. United States Dep't of Educ.,*
  ---F. Supp. 3d---, 2024 WL 455079 (W.D. Mich. Jan. 10, 2024)..................................22

*Miller v. Albright,*
  523 U.S. 420 (1998) .........................................................................................................21

*Miss. State Democratic Party v. Barbour,*
  529 F.3d 538 (5th Cir. 2008) ...........................................................................................14

vi

APPX. 724

*Munaf v. Geren*,
   553 U.S. 674 (2008) .................................................................................................11

*Munn v. City of Ocean Springs*,
   763 F.3d 437 (5th Cir. 2014) ..................................................................................32

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
   ---F. Supp. 3d---, 2024 WL 561860 (W.D. Tex. Feb. 12, 2024), *appeal filed*,
   No. 24-50180 (5th Cir. Mar. 14, 2024) ...................................................................22

*Nat'l Rifle Ass'n v. Brady*,
   914 F.2d 475 (4th Cir. 1990) ..................................................................................23

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) .........................................................................................44, 46, 47

*New York v. Burger*,
   482 U.S. 691 (1987) .................................................................................................49

*Nken v. Holder*,
   556 U.S. 418 (2009) .....................................................................................11, 12, 50

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
   557 U.S. 193 (2009) .................................................................................................50

*ODonnell v. Harris Cnty.*,
   892 F.3d 147 (5th Cir. 2018), *overruled on other grounds by*,
   *Daves v. Dallas Cnty.*, 64 F.4th 616 (5th Cir. 2023) ..............................................52

*Reading Health Sys. v. Bear Stearns & Co.*,
   900 F.3d 87 (3d Cir. 2018) .....................................................................................21

*Reese v. Bureau of Alcohol Tobacco Firearms & Explosives*,
   647 F. Supp. 3d 508 (W.D. La. 2022) ....................................................................45

*Republic Aviation Corp. v. NLRB*,
   324 U.S. 793 (1945) .................................................................................................32

*Roark & Hardee LP v. City of Austin*,
   522 F.3d 533 (5th Cir. 2008) ..................................................................................31

*Roberts v. Sea-Land Servs., Inc.*,
   566 U.S. 93 (2012) ...................................................................................................26

*Rocky Mountain Wild v. Dallas*,
   98 F.4th 1263 (10th Cir. 2024) ...............................................................................24

*Sampson v. Murray*,
   415 U.S. 61 (1974) ...................................................................................................12

APPX. 725

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) ................................................................... 11, 12, 20

*Spinelli v. City of New York,*
   579 F.3d 160 (2d Cir. 2009) ................................................................................ 49

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ............................................................................... 18, 19, 20

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) .................................................................................... *passim*

*Sw. Elec. Power Co. v. U.S. EPA,*
   920 F.3d 999 (5th Cir. 2019) ............................................................................. 54

*Teixeira v. County of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ................................................................. 44, 45, 47

*Tex. Democratic Party v. Benkiser,*
   459 F.3d 582 (5th Cir. 2006) ............................................................................. 18

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ..................................................................................... 48, 53

*U.S. Steel Corp. v. Astrue,*
   495 F.3d 1272 (11th Cir. 2007) ..................................................................... 2, 32

*United States v. Abbate,*
   970 F.3d 601 (5th Cir. 2020) ............................................................................. 31

*United States v. Biswell,*
   406 U.S. 311 (1972) ..................................................................................... 49, 51

*United States v. Brenner,*
   481 F. App'x 124 (5th Cir. 2012) ...................................................................... 34

*United States v. Caldwell,*
   790 F. App'x 797 (7th Cir. 2019) ...................................................................... 39

*United States v. Carter,*
   801 F.2d 78 (2d Cir. 1986) ................................................................................ 36

*United States v. Clark,*
   582 F.3d 607 (5th Cir. 2009) ....................................................................... 30, 32

*United States v. Dettra,*
   238 F.3d 424, 2000 WL 1872046 (6th Cir. 2000) ............................................. 39

APPX. 726

*United States v. Duncan,*
    Case No. 7:20-cr-00167-M-3, 2023 WL 7346042 (E.D.N.C. Nov. 7, 2023)...................................44

*United States v. Fields,*
    608 F. App'x 806 (11th Cir. 2015)...........................................................................................36

*United States v. Fleischli,*
    305 F.3d 643 (7th Cir. 2002) ...................................................................................................36

*United States v. Flores,*
    652 F. Supp. 3d 796 (S.D. Tex. 2023)....................................................................................44

*United States v. Fridley,*
    43 F. App'x 830 (6th Cir. 2002) ..............................................................................................36

*United States v. Hosford,*
    82 F. Supp. 3d 660 (D. Md. 2015), *aff'd*, 843 F.3d 161 (4th Cir. 2016) ...............................51

*United States v. Idarecis,*
    164 F.3d 620, 1998 WL 716558 (2d Cir. 1998) ....................................................................28

*United States v. Ilarraza,*
    963 F.3d 1 (1st Cir. 2020) .......................................................................................................36

*United States v. Kevin Shan,*
    361 F. App'x 182 (2d Cir. 2010) .............................................................................................36

*United States v. King,*
    646 F. Supp. 3d 603 (E.D. Pa. 2022) ......................................................................................44

*United States v. King,*
    735 F.3d 1098 (9th Cir. 2013) ..........................................................................................26, 36

*United States v. Lipp,*
    533 F. App'x 418 (5th Cir. 2013) ...........................................................................................17

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) ......................................................................................................45

*United States v. McNulty,*
    ---F Supp.3d.---, 2023 WL 4826950 (D. Mass. July 27, 2023) .........................................44, 45

*United States v. Mulholland,*
    702 F. App'x 7 (2d Cir. 2017) .................................................................................................36

*United States v. Nat'l Dairy Prod. Corp.,*
    372 U.S. 29 (1963) ..................................................................................................................32

APPX. 727

*United States v. Ochoa,*
  726 F. App'x 651 (9th Cir. 2018) ............................................................................................36

*United States v. Parish of St. Bernard,*
  756 F.2d 1116 (5th Cir. 1985) .............................................................................................11

*United States v. Paul,*
  274 F.3d 155 (5th Cir. 2001) ..............................................................................................31

*United States v. Tilotta,*
  Case No. 3:19-cr-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) .....................45

*United States v. Tyson,*
  653 F.3d 192 (3d Cir. 2011) ......................................................................................... 16, 17

*United States v. Valdes,*
  681 F. App'x 874 (11th Cir. 2017) .......................................................................................26

*United States v. Vargas,*
  74 F.4th 673 (5th Cir. 2023) ...............................................................................................49

*United States v. Wilkening,*
  485 F.2d 234 (8th Cir. 1973) ..............................................................................................39

*United States v. Williams,*
  553 U.S. 285 (2008) ...........................................................................................................29

*United States v. Wilmoth,*
  636 F.2d 123 (5th Cir. Unit A Feb. 1981) ...........................................................................26

*United States v. Zheng Jian Shan,*
  80 F. App'x 31 (9th Cir. 2003) ............................................................................................36

*USX Corp. v. Barnhart,*
  395 F.3d 161 (3d Cir. 2004) .......................................................................................... 32, 33

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
  455 U.S. 489 (1982) ...........................................................................................................30

*Wash. State Grange v. Wash. State Republican Party,*
  552 U.S. 442 (2008) ...................................................................................................... 29, 30

*White v. Carlucci,*
  862 F.2d 1209 (5th Cir. 1989) ............................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ...............................................................................................................12

APPX. 728

*Zimmerman v. City of Austin*,
881 F.3d 378 (5th Cir. 2018) .......................................................................... 14, 15

**FEDERAL STATUTES**

5 U.S.C. § 705 ....................................................................................... 2, 11, 53

5 U.S.C. § 706 ............................................................................................... 50

18 U.S.C. § 921 *et seq.* ..................................................................................... 3

18 U.S.C. § 921 ...................................................................................... *passim*

18 U.S.C. § 922 ...................................................................................... *passim*

18 U.S.C. § 923 ...................................................................................... *passim*

18 U.S.C. § 924 ........................................................................................ 16, 17

18 U.S.C. § 926 ................................................................................... 7, 22, 50

28 U.S.C. § 599A ..................................................................................... 7, 50

28 U.S.C. § 1391 ............................................................................................ 21

Firearms Owners' Protection Act,
Pub. L. No. 99-308, 100 Stat. 449 (1986) .......................................................... 5

Pub. L. No. 99-360, 100 Stat. 766 (1986) .......................................................... 5

Brady Handgun Violence Prevention Act,
Pub. L. No. 103-159, 107 Stat. 1536 (1993) ...................................................... 4

Bipartisan Safer Communities Act,
Pub. L. No. 117-159, 136 Stat. 1313 (2022) ................................................... 5, 6

**STATE STATUTES**

Va. Code § 44-146.15 ..................................................................................... 45

**REGULATIONS**

27 C.F.R. § 478.11 ......................................................................... 8, 27, 28, 29

27 C.F.R. § 478.13 ................................................................................... *passim*

27 C.F.R. § 478.23 ......................................................................................... 47

27 C.F.R. § 478.57 ............................................................................ 10, 41, 43

APPX. 729

27 C.F.R. § 478.78 ................................................................................................. 10, 41, 43

27 C.F.R. §§ 478.121-478.134 ................................................................................................. 4

28 C.F.R. § 0.130 ................................................................................................. 7

Treasury Department Order No. 221,
    37 Fed. Reg. 11,696 (June 10, 1972) ................................................................................................. 7

Notice of Proposed Rulemaking, Definition of "Engaged in the Business" as a Dealer in Firearms,
    88 Fed. Reg. 61,993 (Sept. 8, 2023) ................................................................................................. 7, 23

Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms,
    89 Fed. Reg. 28,968 (Apr. 19, 2024) ................................................................................................. *passim*

**OTHER AUTHORITIES**

1 Laws of the State of Maine 546 (1830) ................................................................................................. 46

2 General Laws of Massachusetts from the Adoption of the Constitution to February, 1822,
    ch. 52, An Act Providing for the Appointment of Inspectors, and Regulating the
    Manufactory of Gun-Powder (1823) ................................................................................................. 46

3 Laws of the Commonwealth of Massachusetts, from November 28, 1780, to
    February 28, 1807 (1807) ................................................................................................. 46

15 The Public Records of the Colony of Connecticut, from May, 1775, to June, 1776, Inclusive
    191, An Act for Encouraging the Manufactures of Salt Petre and Gun Powder (1890) ................. 46

Act of May 22, 1794, 1 Stat. 369 ................................................................................................. 46

Acts of the General Assembly of the State of New-Jersey, at a Session Begun at Princeton on
    the 27th Day of August 1776, and Continued by Adjournments 6, ch. 6, An Act for the
    Inspection of Gun-Powder, § 1 (1877) ................................................................................................. 46

*Administrative Procedure Act*, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946) ....................................... 53

ATF, Complete Federal Firearms Listings,
    https://www.atf.gov/firearms/listing-federal-firearms-licensees/complete ..................................... 45

ATF Form 4473, Firearms Transaction Record,
    https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-
    atf-form-53009/download ................................................................................................. 3

ATF, National Tracing Center,
    https://www.atf.gov/firearms/national-tracing-center ................................................................. 4

Colonial Laws of Massachusetts Reprinted from the Edition of 1672, Powder (1890) ....................... 46

APPX. 730

Comment of Attorney General of New York, et al., Definition of "Engaged in the Business" as a Dealer in Firearms, Docket No. ATF 2022R-17 (Dec. 7, 2023), https://ag.ny.gov/sites/default/files/letters/multistate-comment-on-nprm-eitb-atf-rule.pdf.......53

FBI, National Instant Background Check System 2022 Operational Report, https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view ....................................4

Laws of the State of New Hampshire; With the Constitutions of the United States and of the State Prefixed, An Act to Provide for the Appointment of Inspectors and Regulating the Manufactory of Gunpowder (1830) ................................................................................................................46

Webster's Third New International Dictionary (1971) ..................................................... 27, 29

William J. Krouse, Cong. Rsch. Serv., IF12197, *Firearms Dealers "Engaged in the Business"* (2022), https://crsreports.congress.gov/product/pdf/IF/IF12197/2............................................6

APPX. 731

# INTRODUCTION

In the Gun Control Act (GCA), Congress required anyone engaged in the business of dealing firearms to obtain a federal firearms license. When transferring firearms, licensees must verify the transferee's identity, run a background check (and deny the transfer if the background check reveals that the transferee is prohibited from receiving or possessing a firearm), and maintain records that can be used to trace the firearm if it is later recovered from a crime scene. These requirements serve the "twin goals" of "keep[ing] guns out of the hands of criminals and others who should not have them, and . . . assist[ing] law enforcement authorities in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 180 (2014). Recognizing the harm to public safety caused by unlicensed dealing in firearms, Congress recently amended the GCA *via* the Bipartisan Safer Communities Act (BSCA) to expand the category of conduct that constitutes engaging in the business of dealing.

In the GCA, Congress vested the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) with authority to promulgate regulations necessary to carry out the GCA's provisions. In the Rule at issue in this case,[1] ATF exercised that authority by defining "engaged in the business" of dealing in firearms and setting forth examples of conduct that presumptively does, or does not, rise to the level of engaging in the business of dealing. In this lawsuit, Plaintiffs (four states, four organizations, and one individual) challenge the Rule and ask for a preliminary injunction that would prevent the federal government from implementing or enforcing the Rule against anyone, nationwide. The Court should deny this extraordinary relief, for several reasons.

Plaintiffs are not likely to succeed on the merits. The Rule falls within ATF's authority to promulgate regulations necessary to carry out the GCA. Its provisions are consistent with the GCA's text and grounded in decades of case law and law enforcement experience. In particular, each of the

---

[1] Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Rule").

APPX. 732

rebuttable presumptions set forth in the Rule is lawful because a "rational nexus" exists between the facts that give rise to the presumptions and the presumed facts. *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1284 (11th Cir. 2007) (quoting *Cole v. U.S. Dep't of Agric.*, 33 F.3d 1263, 1267 (11th Cir. 1994)). And the GCA's routine dealer-licensing requirements are entirely consistent with the Second Amendment, which permits "laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Plaintiffs' Fourth Amendment claim is foreclosed by Supreme Court precedent holding that the Fourth Amendment allows inspections of federal firearms licensees.

But the Court need not reach the merits because Plaintiffs fail to satisfy their burden to establish standing — much less irreparable harm, which they must show to obtain relief. The State Plaintiffs make no effort to establish standing other than to assert that they are States. The individual plaintiff lacks standing because his conduct described in his declaration does not constitute engaging in the business of dealing under the Rule. The organizations lack standing because none of them identifies a member with standing. Furthermore, because the Rule serves vital public safety interests, including preventing dangerous individuals from obtaining firearms from those engaged in the business of dealing firearms without a license, the balance of the equities weighs strongly against injunctive relief.

Even if the Court were to grant some relief (which it should not), it should reject the nationwide relief Plaintiffs seek. Nationwide injunctions are disfavored because they extend beyond an equity court's traditional role of fashioning relief to be no more intrusive than necessary to prevent the parties' demonstrated irreparable harm — which here is nonexistent. And even if 5 U.S.C. § 705 in some circumstances authorized courts to grant equivalent universal preliminary relief, such relief is not appropriate where, as here, a party-specific injunction would fully remedy any injury Plaintiffs might establish and universal relief would effectively pretermit litigation pending in other federal

2

APPX. 733

district courts.

# BACKGROUND

## I.     Statutory and Regulatory Background

### A.     The Gun Control Act of 1968

Congress enacted the Gun Control Act, 18 U.S.C. § 921 *et seq.* (GCA), in 1968 to promote public safety and curb crime and violence caused by the misuse of firearms. "The twin goals of [the GCA's] comprehensive scheme are to keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes." *Abramski*, 573 U.S. at 180. The GCA prohibits various groups of people, including felons, fugitives from justice, and undocumented immigrants, from possessing firearms with a nexus to interstate commerce. *See* 18 U.S.C. § 922(g). In restricting the access of criminals and other dangerous individuals to firearms, "the focus of the federal scheme is the federally licensed firearms dealer." *Huddleston v. United States*, 415 U.S. 814, 825 (1974).

Federal firearms licensees (FFLs) must comply with various obligations when transferring firearms to non-licensees, to prevent prohibited persons from obtaining firearms. "The statute establishes a detailed scheme to enable the dealer to verify, at the point of sale, whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172. In most cases, a transferee must "appear in person at the licensee's business premises" when acquiring a firearm. 18 U.S.C. § 922(c). The licensed dealer must obtain the transferee's "name, age, and place of residence," *id.* § 922(b)(5), and must "verif[y] the identity of the transferee by examining a valid identification document," *id.* § 922(t)(1)(D). Transferees must fill out a form certifying that they are not prohibited by federal law from receiving or possessing firearms.[2] The dealer must submit information about the transferee to

---

[2] *See* ATF Form 4473, Firearms Transaction Record, https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download.

3

the FBI's National Instant Background Check System (NICS), which then conducts a background check on the transferee and will deny the transaction if the background check reveals that the transferee is prohibited from receiving or possessing the firearm.  18 U.S.C. § 922(t)(1).[3]  Since the NICS became operational in 1998, it has conducted more than 443 million background checks, and more than 2.1 million firearms transactions have been denied.  FBI, National Instant Background Check System 2022 Operational Report 14-15, https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view.

FFLs also maintain records of acquisitions and dispositions of firearms, which enable tracing of firearms recovered from crime scenes.  18 U.S.C. §§ 922(b)(5), 923(g)(1)(A); 27 C.F.R. §§ 478.121-478.134.  When a firearm is recovered from a crime scene, law enforcement (often state or local law enforcement) can submit a request to ATF's National Tracing Center to trace the firearm.  *See* ATF, National Tracing Center, https://www.atf.gov/firearms/national-tracing-center.  ATF's tracing process typically involves querying the records maintained by FFLs in order to trace the firearm to its first retail purchaser.  Firearms tracing, which is enabled by the records maintained by FFLs, helps all levels of law enforcement solve crimes involving firearms.  *See* Rule, 89 Fed. Reg. at 28,988.

Each of the above-described obligations relating to the disposition of firearms applies only to transfers by FFLs.  Therefore, the GCA's standard for when a person or business must obtain a federal firearms license to deal firearms has vital public safety implications.  Since the GCA's original enactment, Congress has prohibited individuals from "engag[ing] in the business of . . . dealing in firearms" without a federal firearms license.  18 U.S.C. § 922(a)(1)(A).  If a person is engaged in the business of dealing in firearms, that person must obtain a federal firearms license and comply with the verification, background check, and recordkeeping obligations described above.  But if a person is not

---

[3] The NICS was established pursuant to the Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993).

engaged in the business of dealing in firearms, that person may transfer a firearm without conducting a background check, keeping transaction records, or complying with other obligations on FFLs.[4]

When Congress first enacted the GCA, Congress did not further define what it means to engage in the business of dealing firearms. In 1986, as part of the Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986) (FOPA), Congress added a statutory definition of engaged in the business for the first time. As applied to a dealer in firearms other than as a gunsmith or pawnbroker, FOPA defined "engaged in the business" as follows:

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

*Id.* § 101 (amending 18 U.S.C. § 921). Congress further defined the term "with the principal objective of livelihood and profit" to "mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* Several months later, Congress amended that definition to clarify that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 (1986).

In 2022, Congress amended the GCA by enacting the Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313 (2022). Congress enacted the BSCA in the wake of a series of tragic mass shootings. In one of those mass shootings, which occurred between Midland and Odessa, Texas, an FFL refused to transfer a firearm to the perpetrator based on mental illness, but the perpetrator then unlawfully obtained the firearm used in the shooting from an unlicensed dealer who did not

---

[4] Certain requirements apply even to firearms transfers by unlicensed individuals. For example, no person may transfer a firearm if that person knows or has reasonable cause to believe that the transferee is legally prohibited from possessing or obtaining that firearm. *See* 18 U.S.C. § 922(d).

conduct a background check. That dealer later pleaded guilty to unlawful unlicensed firearms dealing. *See* Rule, 89 Fed. Reg. at 28,971-72 & nn.26-29. As relevant here, the BSCA expanded the GCA's definition of engaged in the business of dealing in firearms. The BSCA replaced the phrase "with the principal objective of livelihood and profit" with the phrase "to predominantly earn a profit," and defined that phrase in a separate subsection, which clarifies that the term "means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain." 136 Stat. at 1324-25, § 12002. The BSCA's sponsors intended to address potential confusion about the GCA's application to individuals who dealt in firearms with the intent to earn a profit, but possibly not as a principal source of livelihood, to "clarify who should be licensed, eliminating a 'gray' area in the law, ensuring that one aspect of firearms commerce is more adequately regulated." Rule, 89 Fed. Reg. at 28,972 (quoting William J. Krouse, Cong. Rsch. Serv., IF12197, *Firearms Dealers "Engaged in the Business"* 2 (2022), https://crsreports.congress.gov/product/pdf/IF/IF12197/2); *see also id.* at 28,972 n.31 (collecting statements of BSCA's sponsors).

As amended by the BSCA, the GCA thus currently defines "engaged in the business" as applied to a dealer in firearms other than a gunsmith or pawnbroker as:

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C). [5]

The GCA further defines the term "to predominantly earn a profit" to

> mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person

---

[5] A separate statutory provision defines "engaged in the business" as applied to a dealer in firearms as a gunsmith. 18 U.S.C. § 921(a)(21)(D). Another provision defines "dealer" to include any pawnbroker who receives any firearm as security for payment or repayment of money. *Id.* § 921(a)(11)(C). Those provisions were not addressed in the Final Rule and are not at issue in this litigation.

6

who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

*Id.* § 921(a)(22).[6]

## B.  The Final Rule

ATF is a bureau within the Department of Justice responsible for implementing and enforcing the federal firearms laws, including the GCA.  Congress has vested in the Attorney General the authority to prescribe regulations "necessary to carry out the provisions of" the GCA, *id.* § 926(a), and Congress and the Attorney General have delegated that authority to ATF.[7]

On September 8, 2023, ATF issued a Notice of Proposed Rulemaking for a proposed rule to address when a person is engaged in the business of dealing firearms.  Notice of Proposed Rulemaking, Definition of "Engaged in the Business" as a Dealer in Firearms, 88 Fed. Reg. 61,993 (Sept. 8, 2023) ("NPRM").  ATF received nearly 388,000 comments, including nearly 258,000 comments in support of and nearly 99,000 comments in opposition to the proposed rule.  Rule, 89 Fed. Reg. at 28,984.

After considering these comments, ATF published the Final Rule on April 19, 2024.  ATF explained that the Rule "implement[s]" the BSCA's "statutory change" to the definition of engaged in the business, *id.* at 28,968, and thereby furthers Congress's design "to improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring firearms and allowing law enforcement officers to trace firearms involved in crime," *id.* at 28,987.[8] The Rule also "provide[s] clarity to persons who remain unsure of whether" they are engaged in the business of dealing in firearms.  *Id.* at 28,968.

---

[6] This provision further contains a definition of "terrorism," which is not at dispute in this litigation. *See* 18 U.S.C. § 921(a)(22).
[7] *See* 28 U.S.C. § 599A(b)(1), (c)(1); 28 CFR § 0.130(a)(1)-(2); Treasury Department Order No. 221, §§ (1), (2)(d), 37 Fed. Reg. 11,696, 11,696-97 (June 10, 1972).
[8] *See also* Rule, 89 Fed. Reg. at 28,993-95 (the Rule will promote compliance with the GCA, which will effectuate the GCA's purposes of enhancing public safety by increasing the number of background checks performed, enabling more traces of firearms, and improving crime gun intelligence).

The Rule defines various subsidiary terms in the GCA's definition of "engaged in the business," consistent with statutory text and ordinary usage. For example, the term "Dealer" includes "[a]ny person engaged in the business of selling firearms at wholesale or retail . . . wherever, or through whatever medium, they are conducted," including at "a gun show," a "flea market," "by mail order," "over the internet," or "through the use of other electronic means." *Id.* at 29,090 (27 C.F.R. § 478.11). ATF explained that this definition reflects the statutory text, because "there is no statutory exemption under the GCA for unlicensed persons to engage in the business of dealing in firearms at a gun show, or at any other venue." *Id.* at 28,989. The list of venues at which firearms dealing could occur is also consistent with decades of case law and ATF practice. *See id.* at 28,973-74 & nn.35-46.

The Rule introduces a standalone section, 27 C.F.R. § 478.13, to define "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker." Rule, 89 Fed. Reg. at 29,090-91. Subsection (a) mostly repeats the statutory definition contained in 18 U.S.C. § 921(a)(21)(C), while also clarifying that being engaged in the business covers consignment-type auctions but not estate-type auctions. *Id.* at 29,091 (27 C.F.R. § 478.13(a)).

Subsection (b) states that whether someone is engaged in the business of dealing "is a fact-specific inquiry," and that while "[s]elling large numbers of firearms . . . may be highly indicative of business activity, . . . there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement." *Id.* (27 C.F.R. § 478.13(b)). This subsection reflects ATF's sensible conclusion that defining "engaged in the business" through a bright-line threshold of number of transactions would be inconsistent with the GCA's text and would necessarily be both underinclusive and overinclusive. *See id.* at 29,086. To clarify the GCA's application, subsection (c) sets forth a number of fact patterns that give rise to rebuttable presumptions "[i]n civil and administrative proceedings" (but not in criminal proceedings) that "a person shall be presumed to be engaged in the business of dealing in firearms." *Id.* at 29,091 (27 C.F.R. § 478.13(c)) (the "EIB presumptions"). For

8

example, a person is presumed to be engaged in the business of dealing firearms when the person repetitively purchases for the purpose of resale stolen firearms, or resells or offers for resale stolen firearms. *Id.* (27 C.F.R. § 478.13(c)(2)(ii)(A)). These presumptions "are supported by the Department's investigative, regulatory, and enforcement experience, as well as conduct that the courts have found to require a license even before the BSCA expanded the definition of 'engaged in the business.'" *Id.* at 28,977; *see also id.* at 28,977-79 nn.72-73, 74-77, 79-83 (citing case law and examples of federal prosecutions supporting these presumptions).

Subsection (d) clarifies the application of the statutory term "predominantly earn a profit." It starts by repeating the statutory definition in 18 U.S.C. § 921(a)(22), which provides that the term "means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain," then clarifies that "a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms." Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(d)(1)). It then sets forth fact patterns giving rise to rebuttable presumptions in civil and administrative proceedings that a person has the intent to predominantly earn a profit. *Id.* (27 C.F.R. § 478.13(d)(2)) (the "PEP presumptions"). For example, a person is presumed to have intent to predominantly earn a profit if the person repetitively or continuously purchases or rents physical space to display firearms offered for resale. *Id.* (27 C.F.R. § 478.13(d)(2)(ii)). Like the EIB presumptions, the PEP presumptions are supported by decades of case law arising before the BSCA's expansion of the statutory language, and enforcement experience. *See id.* at 28,981-82 & nn.97-104.

The Rule then lists categories of conduct that are not to be presumed to be engaging in the business of dealing firearms, and can be used to rebut the EIB presumptions and PEP presumptions, such as reselling or transferring firearms "[o]ccasionally to a licensee or to a family member for lawful purposes." *Id.* at 29,092 (27 C.F.R. § 478.13(e), (f)). Subsection (g) specifies that the activities set

forth in the EIB presumptions, PEP presumptions, and list of rebuttal evidence "are not exhaustive of the conduct or evidence that may be considered in determining whether a person is engaged in the business of dealing in firearms, or has the intent to predominantly earn a profit through the repetitive purchase and resale of firearms." *Id.* (27 C.F.R. § 478.13(g)). Subsection (h) provides that the EIB presumptions and PEP presumptions "shall not apply to any criminal case, although they may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences." *Id.* (27 C.F.R. § 478.13(h)).

Other provisions of the Rule address the procedures that former licensees must follow when they liquidate business inventory upon license revocation or other termination of their license. Within 30 days of license termination, a former FFL must transfer its business inventory either to an FFL or a responsible person of the former FFL (meaning a person who had the authority to direct the former FFL's firearms business). *Id.* (27 C.F.R. §§ 478.57(b), 478.78(b)). After termination, a former FFL must not continue to engage in the business of dealing firearms or restock its inventory by purchasing additional firearms for resale. *Id.* (27 C.F.R. §§ 478.57(d), 478.78(d)).

The Rule is scheduled to take effect on May 20, 2024. *Id.* at 28,968.

## II.     Factual and Procedural Background

Plaintiffs are four states (Texas, Louisiana, Mississippi, and Utah), four organizations that have a general mission of promoting firearms rights (Gun Owners of America, Inc. (GOA), Gun Owners Foundation (GOF), Tennessee Firearms Association (TFA), and Virginia Citizens Defense League (VCDL)), and one individual (Jeffrey W. Tormey). *See* Complaint for Declaratory and Injunctive Relief ¶¶ 8-16, ECF No. 1 ("Compl."). The Complaint brings three claims that the Rule allegedly violates the Administrative Procedure Act (APA) and claims for violations of the Fifth Amendment's vagueness doctrine, the Second Amendment, the Fourth Amendment, and the separation of powers. *Id.* ¶¶ 169-205. Plaintiffs filed a Motion for Temporary Restraining Order and/or Preliminary

Injunction. ECF No. 16 ("Mot."). Plaintiffs ask the Court to "postpone[]" the Rule's "effective date," as to all parties nationwide, pursuant to 5 U.S.C. § 705. Proposed Order, ECF No. 16-7.

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy,'" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted), that "should only issue if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest," *La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217, 219 (5th Cir. 2010). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The same requirements apply to a temporary restraining order. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). The Fifth Circuit has held that the same factors apply when a party seeks to postpone the effective date of agency action under Section 705. *See Alliance for Hippocratic Medicine* v. *FDA*, 78 F.4th 210, 242 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 537 (2023). Because Plaintiffs "bring a facial challenge" to the Rule, Plaintiffs "must establish that no set of circumstances exists under which the [Rule] would be valid." *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 220 (5th Cir. 2016) (citation omitted). "[A] regulation is presumptively valid, and one who attacks it has the burden of showing its invalidity." *United States v. Parish of St. Bernard*, 756 F.2d 1116, 1124 (5th Cir. 1985).

## ARGUMENT

### I. Plaintiffs Lack Standing and Fail to Establish Irreparable Harm

Plaintiffs' demand for a preliminary injunction should be denied at the threshold because they fail to demonstrate that they have standing — much less irreparable harm. To have Article III standing, "a plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Speech First, Inc.*

11

*v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (citation omitted). An injury confers standing only if it is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). "Plaintiffs always have the burden to establish standing." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). And "[b]ecause a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,'" a plaintiff seeking one must likewise "make a 'clear showing' that they have standing." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

Plaintiffs must also show that, in the absence of an injunction, they are "likely to suffer irreparable harm." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (citation omitted). It is not enough simply to "show[] some possibility of irreparable injury." *Nken*, 556 U.S. at 434-35 (citation omitted). "Speculative injury is not sufficient" to "make a clear showing of irreparable harm." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). Moreover, "the irreparable harm element must be satisfied by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. Conversely, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs fail to make the requisite clear and independently supported showing of either standing or irreparable harm.

## A.    The State Plaintiffs Fail to Allege or Establish Standing and Irreparable Harm

Texas, Louisiana, Mississippi, and Utah are named plaintiffs in this case. *See* Compl. ¶¶ 8–11. Yet beyond asserting that each is a "sovereign state of the United States," *id.*, Plaintiffs' Complaint makes no allegations concerning the State plaintiffs' standing to challenge the Rule. States are not

12

entitled to assert their citizens' challenges to the Rule. *Haaland v. Brackeen*, 599 U.S. 255, 294-95 (2023). Neither the Complaint nor the Motion identifies any injury the State plaintiffs might allegedly suffer as a result of the Rule, much less whether any such injuries are sufficiently "concrete and particularized" and "actual or imminent" to confer standing, *Barber*, 860 F.3d at 352 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); or how a favorable decision in this case would likely redress such unidentified injuries. Accordingly, the State plaintiffs fail to establish that they have standing or irreparable harm.

**B.     Plaintiff Tormey Lacks Standing to Bring A Pre-Enforcement Challenge and Fails to Demonstrate that He Will Be Harmed Irreparably by the Rule**

Plaintiff Tormey, the lone individual plaintiff, also fails to establish that he has standing, much less that he will be irreparably harmed by the Rule going into effect. Because Tormey exclusively seeks prospective and declaratory relief (as do the other plaintiffs), *see* Compl. 45, Demand for Relief, he "must demonstrate . . . a real and immediate threat of repeated injury in the future." *James v. Hegar*, 86 F.4th 1076, 1081 (5th Cir. 2023) (citation omitted). That is, he must show that any alleged future injury is "certainly impending," or that there is a "substantial risk" that such injury "will occur." *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

Tormey's alleged injury here hinges on the potential enforcement of the Rule's interpretation of the GCA against him for engaging in the business of dealing firearms without a license. More specifically, Tormey alleges that he has "occasionally bought and sold firearms through private sales" to "enhance" his personal firearms collection, and he "fear[s]" that if he continues to engage in this "purely private and non-commercial activit[y]" after the Rule becomes effective, he will at some point be "subject[ed] to an overreaching administrative action, civil forfeiture, an ATF cease-and-desist letter, or even arrest and criminal indictment." Dec. of Jeffrey W. Tormey ¶¶ 10, 17, ECF No. 16-3 ("Tormey Decl."). Potential future enforcement amounts to an Article III injury, however, only if Tormey establishes that he (1) "inten[ds] to engage in a course of conduct"; (2) that intended future

13

conduct is "arguably proscribed" by the Rule's interpretation of the GCA; and (3) "the threat of future enforcement" of the law "is substantial." *Susan B. Anthony List*, 573 U.S. at 161-64 (citation omitted). Tormey fails to satisfy this standard on multiple fronts.

For one, Tormey fails to clearly demonstrate that he has "a serious intention to engage in conduct" that is actually "proscribed" by the Rule's interpretation of the GCA. *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018); *see Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 n.8 (5th Cir. 2008) ("[P]laintiffs must demonstrate a serious interest in acting contrary to a statute." (cleaned up)).

The Rule will impact Tormey only if his firearms-related conduct potentially amounts to being "engaged in the business" of dealing firearms under the Rule's implementation of the GCA, such that he would be required to obtain a federal firearms license or otherwise face consequences for unlicensed dealing. *See* 18 U.S.C. §§ 922(a)(1)(A), 923(a). But the conduct described in Tormey's declaration does not rise to the level of being "engaged in the business" and would not subject him to any enforcement action. Tormey avers that he "presently ha[s] a large personal collection of firearms" that he has "accumulated over many years" as a "collector" and "hobbyist," and he uses those firearms to "engaging in regular shooting activities," including "recreation, competitive shooting, hunting, and training." Tormey Decl. ¶¶ 4-5. "[F]or a number of years," Tormey has, "on average, . . . sold at least a couple, or even several, firearms per year, through various mediums," including gun shows. *Id.* ¶¶ 8-9. These sales involved "getting rid of guns [he] no longer want[ed]"; "freeing up funds for guns" he does want; or "trading up to nicer models as funds permit," to "enhance" his personal firearms collection. *Id.* ¶ 9.

Under the Rule's express terms, such occasional "purely private and non-commercial" sales made for the purpose of "enhancing" a personal firearms collection, *id.* ¶¶ 8, 10, *do not* qualify as being "engaged in the business" of firearms dealing. The Rule defines a "personal collection" of firearms

APPX. 745

to include "[p]ersonal firearms that a person accumulates . . . for a hobby (e.g., noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, . . . or noncommercial firearms safety instruction)," Rule, 89 Fed. Reg. at 29,090, which describes Tormey's firearms collection almost to the letter, *see* Tormey Decl. ¶ 5. And both the Rule and the GCA explicitly exclude from the "engaged in the business" definition "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of the person's personal collection of firearms." Rule, 89 Fed. Reg. at 29,091; *see* 18 U.S.C. § 921(a)(21)(C); *see also* Rule, 89 Fed. Reg. at 29,092 ("A person *shall not be presumed to be engaged in the business* of dealing in firearms when reliable evidence shows that the person is only reselling or otherwise transferring firearms . . . [o]ccasionally to obtain more valuable, desirable, or useful firearms for the person's *personal collection*") (emphasis added). Thus, such occasional sales and purchases of firearms to enhance a personal collection would not trigger a licensing requirement under the statute as explained by the Rule, or otherwise subject Tormey to potential civil or criminal penalties for unlicensed firearms dealing. Because there is no "realistic danger" that the Rule's "operation or enforcement" will "direct[ly] injur[e]" Tormey in any meaningful way, he lacks standing. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see Zimmerman*, 881 F.3d at 389 (concluding that a plaintiff who took no steps that would have "demonstrate[d] a serious intent to violate the statute" he was challenging lacked standing).

Given that his planned conduct does not potentially implicate the Rule, Tormey cannot manufacture an injury by claiming to be confused by the Rule's terms. He suggests that "the Rule arbitrarily defines 'collection' so narrowly that I am not even certain if my firearms collection still qualifies," Tormey Decl. ¶ 13, but as just discussed, the terms of the GCA and the Rule make clear that Tormey is not engaged in the business based on the facts described in his declaration. And beyond that assertion, Tormey contends only that the Rule "makes portions of [his] perfectly lawful

15

activity seem suspect," Tormey Decl. ¶ 12, without identifying any particular presumption that could plausibly apply to him. Those vague assertions cannot suffice to show standing to challenge any particular presumption. Tormey's assertion that the Rule is "so convoluted, vague, and ambiguous that [he] cannot determine what is prohibited versus what is allowed," *id.* ¶ 15, is precisely the sort of "naked legal conclusion" that the Court "cannot credit" for purposes of standing. *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 485 (W.D. Tex. 2022) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Tormey's assertion is also inaccurate. The GCA, as amended by the BSCA, establishes what firearms-related conduct is prohibited (e.g., engaging in the business of firearms dealing without a license) and permissible (e.g., making "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby," 18 U.S.C. § 921(a)(21)(C)) under federal law. And the Rule — far from creating ambiguity or confusion — clarifies these general statutory provisions by, among other things, setting forth concrete fact patterns that help members of the public determine whether they are engaged in the business and require a license under the GCA.

Tormey lacks standing to bring a pre-enforcement challenge for a second reason: Tormey fails to clearly demonstrate a credible threat that he would be subject to any sanctions as a result of his conduct. *See Susan B. Anthony List*, 573 U.S. at 164 (requiring that the "threat of future enforcement" against a plaintiff bringing a pre-enforcement challenge be "substantial").

The GCA prohibits any person other than a "licensed dealer" from "engag[ing] in the business of . . . dealing in firearms." 18 U.S.C. § 922(a)(1)(A). To be criminally liable under § 922(a)(1)(A), however, an individual must "*willfully*" engage in the business of dealing firearms without a license. *See id.* § 924(a)(1)(D) (emphasis added); *see also United States v. Tyson*, 653 F.3d 192, 200 (3d Cir. 2011) ("To obtain a conviction under [§ 922(a)(1)(A)], the government must show that the defendant (1) engaged in the business of dealing in firearms; (2) was not a federally licensed firearms dealer; and (3) *acted*

16

*willfully*." (emphasis added)).[9] That distinction matters. Far from ensnaring "unwitting" violators, the GCA imposes criminal liability only on those individuals who (1) engage in the business of unlicensed firearms dealing *and* (2) "act[] with knowledge that [such] conduct [is] unlawful." *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (citation omitted); *see United States v. Lipp*, 533 F. App'x 418, 421-422 (5th Cir. 2013).

Per Tormey's declaration, however, his firearms-related conduct could not be considered a willful violation of the GCA. Despite merely being a firearms "collector and hobbyist" who maintains a "personal collection" for recreational purposes and "occasionally" sells firearms solely "to enhance" that collection — conduct that, as explained above, does not qualify as being "engaged in the business" — Tormey still purportedly "fear[s]" that the Rule might at some point result in his "arrest" or "criminal indictment." Tormey Decl. ¶¶ 4-5, 10, 17. Yet the fact that Tormey's alleged conduct so closely matches the "personal collection" exclusion to the GCA's "engaged in the business" definition, *see* 18 U.S.C. § 921(a)(21)(C), combined with his professed uncertainty as to whether his conduct is "prohibited" or "allowed" under the Rule's interpretation of that definition, Tormey Decl. ¶ 15, renders any prospect of Tormey being subject to criminal liability for *willfully* engaging in unlicensed firearms dealing largely "imaginary" and "speculative." *Susan B. Anthony List*, 573 U.S. at 159-60 (requiring that a plaintiff bringing a pre-enforcement challenge allege a "credible threat of prosecution") (citations omitted).[10] Nor does Tormey suggest that ATF has done anything to threaten

---

[9] Similarly, civil forfeiture of firearms involved in unlicensed dealing requires showing a "willful" violation, 18 U.S.C. § 924(d)(1), and prior violations of the GCA or its implementing regulations can warrant the denial of a federal firearms license application only if those violations were committed "willfully," *id.* § 923(d)(1)(C).

[10] This does not suggest, of course, that a conviction under 18 U.S.C § 921(a)(1)(A) would be precluded by an individual's purported ignorance of the scope of federal firearms regulations. Whether someone engaged in the business of dealing in firearms without a license and did so "with knowledge that [such] conduct was unlawful" is inherently a fact-intensive inquiry. *Tyson*, 653 F.3d at 200-01 (acknowledging that determining whether a defendant was "engaged in the business" is "subject to the idiosyncratic nature of the fact pattern presented"). The relevant question here is whether Plaintiff Tormey has

APPX. 748

enforcement of the Rule against him in any way. *Cf. id.* at 165 (finding standing in part because the "specter of" civil enforcement against the specific plaintiff was "substantial").

### C. The Organizational Plaintiffs Also Lack Standing and Fail to Demonstrate Irreparable Harm From the Rule

Plaintiffs' request for a preliminary injunction cannot be saved by GOA, GOF, TFA, or VCDL because they too lack standing and fail to establish irreparable harm. None of these organizations alleges that it is directly harmed by the Rule in any way. Rather, they all bring suit on behalf of their respective members. *See, e.g.,* Compl. ¶ 13 (alleging that many of GOA's members "are being irreparably harmed by the [Rule]"). But the organizational plaintiffs have failed to satisfy the basic requirement of identifying a member who "independently meet[s] the Article III standing requirements." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006); *see Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (explaining that associational standing "require[s] plaintiff-organizations to make specific allegations establishing that at least one identified member" has suffered or will suffer harm).[11]

The organizational plaintiffs collectively identify only two members with any degree of specificity. The first is Plaintiff Tormey. *See* Compl. ¶ 12 (alleging that Tormey is a member of GOA, TFA, and VCDL). Yet as explained above, he lacks standing to challenge the Rule in his own right. The second is "one GOA member" whose federal firearms license was "recently revoked"; who

---

clearly shown that his firearms-related conduct will subject him to a credible risk of prosecution, *see Susan B. Anthony List*, 573 U.S. at 159, and he has not.

[11] GOF lacks associational standing for an additional reason: It has not demonstrated itself to be the sort of membership organization that can invoke such standing in the first place. *See Summers*, 555 U.S. at 494 ("It is common ground that . . . organizations can assert the standing of their *members*." (emphasis added)). Plaintiffs do not allege that GOF has any members and instead describe it as a "nonprofit legal defense and educational foundation" that is purportedly "supported by gun owners across the country." Compl. ¶ 14. An association without "traditional members" can still establish standing "by proving that is has 'indicia of membership'" — namely, "its members elect leadership, serve as the organization's leadership, and finance the organization's activities, including . . . litigation costs." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) (citation omitted). But GOF provides no evidence of such indicia of membership.

allegedly transferred "well over 1,000 firearms" from their "business inventory" to their "personal collection" before their license termination; and who "now fears that," under the Rule, they will allegedly be "unable lawfully to dispose of these firearms . . . without being presumed by ATF to be engaged in the business, and potentially criminally charged, and subject to forfeiture." Decl. of Erich M. Pratt ¶¶ 17, 21-23, ECF No. 16-4 ("Pratt Decl."). Yet because an "identified member" with standing is required to establish associational standing, *Summers*, 555 U.S. at 498, GOA cannot establish standing based on an unnamed member. *See Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 115-119 (2d Cir. 2024) (holding that an association must "identify . . . by name" a member with standing).

Moreover, the purported injury this unnamed member describes is not sufficient for standing (much less irreparable harm) for the simple reason that it is both "highly speculative," *Clapper*, 568 U.S. at 410 — *i.e.*, the member *might* dispose of their firearms at some point in the future, ATF *might* deem such a disposition as being "engaged in the business" under the Rule, and the member *might potentially* face civil or even criminal sanctions as a result — and does not involve conduct that would actually be proscribed by the Rule, *see Susan B. Anthony List*, 573 U.S. at 159-60. Indeed, contrary to the unnamed member's assertions about not being able to "lawfully" dispose of firearms in their personal collection, Pratt Decl. ¶ 23, the Rule expressly provides that once one year has passed after the transfer of firearms from business inventory to a personal collection, a former licensee will generally "no longer be presumed to be engaged in the business without a new license if they later liquidate all or part of [that] personal collection." Rule, 89 Fed. Reg. at 29,035; *see id.* at 29,092 ("A person shall not be presumed to be engaged in the business . . . when reliable evidence shows that the person is only reselling or otherwise transferring firearms . . . [t]o liquidate (without restocking) all or part of the person's personal collection."). Additionally, since Plaintiffs give no indication as to when the unidentified GOA member's firearms transfer took place, there is no way of knowing whether the member's ability to liquidate his personal collection of firearms would be affected by this presumption.

That leaves the organizational plaintiffs' other unnamed members, who, according to each organization's boilerplate declaration, "will be directly impacted" by the Rule "because they have in the past bought and resold firearms, and wish to do so in the future without being improperly labeled as a 'dealer' in firearms." Pratt Decl. ¶ 13; *see* Decl. of C. Richard Archie ¶ 10, ECF No. 16-5 ("Archie Decl."); Decl. of Philip Van Cleave ¶ 10, ECF No. 16-6. Yet the Supreme Court has unequivocally explained that this sort of vague assertion that some unidentified members somewhere in the United States might engage in some unidentified firearms-related conduct and, as a result of the Rule, suffer some sort of non-specific harm is wholly inadequate to establish associational standing. *Summers*, 555 U.S. at 498 (noting that such a "novel approach to the law of [associational] standing would make a mockery of [the Court's] prior cases").

Indeed, the organizational plaintiffs fail to even mention — let alone clearly establish with evidence, *Barber*, 860 F.3d at 355 (reversing a preliminary injunction because the plaintiffs did not "clearly show[] injury-in-fact") — the frequency of their members' purported firearms sales; the number of firearms sold during those transactions; the types of firearms being sold; whether the circumstances indicate that the sellers are "devot[ing] time, attention, and labor to dealing in firearms"; or whether the circumstances further indicate that such sales are being made with the intent to "predominantly earn a profit." In short, the organizational plaintiffs make no effort to demonstrate whether their unnamed members are engaging in a conduct arguably proscribed by the Rule, let alone whether that conduct would be subject to a "credible threat of prosecution." *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted).

Because the organizational plaintiffs fail to identify even a single member who would "otherwise have standing to sue in their own right," all of them lack standing to seek preliminary injunctive relief here. *Speech First, Inc.*, 979 F.3d at 330. And by definition, all of them fail to establish that they would be irreparably harmed by the Rule becoming effective as well.

20

## II.    Venue Is Improper in this District Because No Plaintiff with Standing Resides Here

The fact that no plaintiff residing in this District has Article III standing also means that venue is improper in this district. *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1205 (11th Cir. 2018) (transferring a case for improper venue where the only party that satisfied venue lacked standing); *Miller v. Albright*, 523 U.S. 420, 427 (1998) ("[T]he District Court concluded that Mr. Miller did not have standing and dismissed him as a party. Because venue in Texas was therefore improper, . . . the court transferred the case to [another district where a defendant resided]." (citation omitted)); *see also Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 95 (3d Cir. 2018) ("We agree that threshold disputes over venue and jurisdiction should be resolved before merits disputes.").

In a civil action in which the defendant is the federal government, venue is proper "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, . . . or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). Given that none of the federal defendants "resides" in Texas and that none of the "events . . . giving rise" to the Rule's promulgation took place in the state, the only possible basis for venue in the Northern District of Texas appears to be the fact that Texas is nominally a Plaintiff, *see* Compl. ¶ 8 (alleging only that Texas is a "sovereign state of the United States"), and that Plaintiff Tormey resides in Amarillo, *see id.* ¶ 12. As explained in detail above, however, both plaintiffs lack standing, which requires that they be dismissed from the case. *See, e.g., Associated Gen. Contractors of Am., Inc. v. Fed. Acquisition Regul. Council*, ---F. Supp. 3d---, 2024 WL 1078260, at *7 (W.D. La. Mar. 12, 2024) ("[T]he Court concludes that the Individual Plaintiffs do not have standing under Article III . . . , and they will be dismissed from this lawsuit without prejudice."). And the remaining Plaintiffs—none of whom have standing in any event—reside elsewhere.[12] And

---

[12] The other State plaintiffs obviously do not reside in Texas. And each organizational plaintiff alleges that it resides outside of Texas. *See* Compl. ¶ 13 (GOA is a California corporation with a principal

as various federal courts—including ones in this circuit—have held, when the plaintiffs that serve as the sole basis for venue in a particular judicial district lack standing, venue in turn is improper.[13]

Because no plaintiff with standing resides in this district, venue is improper, and Plaintiff's motion for preliminary injunction should be denied as a result.

## III. Plaintiffs Are Not Likely to Succeed on the Merits of their Claims

### A. The Rule Is Consistent with the GCA and ATF's Authority

Plaintiffs raise a host of arguments as to why the Rule allegedly exceeds ATF's authority or is inconsistent with the GCA. *See* Mot. 17-26. But Plaintiffs are not likely to succeed on any of these arguments. The Rule lawfully exercises ATF's authority to prescribe regulations necessary to carry out the GCA, and the Rule construes statutory terms consistently with the GCA's text.

1. Plaintiffs first argue that the Rule is unlawful because several of the statutory terms addressed in the Rule are defined in the GCA. *Id.* at 17-18. Plaintiffs argue that the Rule therefore exceeds ATF's and the Attorney General's authority to promulgate regulations "necessary" to implement the GCA. 18 U.S.C. § 926(a). However, "[b]ecause § 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some

---

place of business in Virginia); *id.* ¶ 14 (GOF is a Virginia corporation with a principal place of business in Virginia); *id.* ¶ 15 (TFA is based in Tennessee); *id.* ¶ 16 (VCDL is based in Virginia).

[13] *See, e.g., Ga. Republican Party,* 888 F.3d at 1205; *Mich. Ass'n of Pub. Sch. Acads. v. United States Dep't of Educ.,* ---F. Supp. 3d---, 2024 WL 455079 (W.D. Mich. Jan. 10, 2024) (finding that "the Western District of Michigan is no longer the venue best suited to adjudicate this matter" where the only Michigan plaintiff "lack[ed] standing" and the remaining plaintiffs were residents of Ohio and West Virginia); *Keane v. Velarde,* No. 3:20-cv-00977, 2021 WL 4248896, at *5 (D. Conn. Sept. 17, 2021) (transferring a case to the Southern District of New York because the "only party residing in Connecticut" was dismissed for lack of standing); *Inst. of Certified Pracs., Inc. v. Bentsen,* 874 F. Supp. 1370, 1372 (N.D. Ga. 1994) ("Having found that the Institute lacks standing to bring this action and has failed to state a claim upon which relief can be granted, plaintiff cannot manufacture venue by adding the Institute as a party."); *A.J. Taft Coal Co. v. Barnhart,* 291 F. Supp. 2d 1290, 1304 (N.D. Ala. 2003) ("Venue is proper in this court because at least one Alabama plaintiff had standing."); *see also Associated Gen. Contractors,* 2024 WL 1078260, at *7 (finding venue improper where the only plaintiffs who resided in the district lacked standing); *Nat'l Infusion Ctr. Ass'n v. Becerra,* ---F. Supp. 3d---, 2024 WL 561860, at *5 (W.D. Tex. Feb. 12, 2024) (same), *appeal filed,* No. 24-50180 (5th Cir. Mar. 14, 2024).

measure of discretion to determine what regulations are in fact 'necessary.'" *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990). In *Brady*, the court approved as "necessary" ATF regulations defining terms in the GCA. *See id.* at 480-81 (upholding ATF regulations defining "business premises" and "gun show or event").

Here, ATF concluded that this Rule was necessary to provide "clarity" regarding when a federal firearms license was required and "deter[]" unlawful unlicensed dealing, NPRM, 88 Fed. Reg. at 61,996, given that "ATF observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA," Rule, 89 Fed. Reg. at 29,086. ATF further determined that the Rule would "improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring firearms and allowing law enforcement officers to trace firearms involved in crime." *Id.* at 28,987. These are unquestionably valid regulatory objectives that justified providing further clarity regarding the operation of statutory terms. *Brady*, 914 F.2d at 479; *see also Gardner v. Grandolsky*, 585 F.3d 786, 793 (3d Cir. 2009) (holding that agency regulation was lawful because it furthered "legitimate" objective of "protecting the public safety"); *Licon v. Ledezma*, 638 F.3d 1303, 1311 (10th Cir. 2011) (regulation was lawful because agency reasonably explained that it promoted "public safety"). Indeed, elsewhere Plaintiffs argue that the Rule does not provide *enough* clarity. Mot. 24-26. But without the benefit of the Rule, Plaintiffs would have *less* guidance and clarity regarding how the GCA operates, not more. *See infra*, pp. 29-32. Plaintiffs cite cases stating the unremarkable proposition that an agency cannot define a statutory term inconsistently with unambiguous statutory text. *See* Mot. 18. Those cases are inapposite because, for the reasons explained elsewhere in this brief, the Rule is consistent with the GCA's text.

**2.** Plaintiffs next criticize the Rule for defining certain subsidiary terms, such as "purchase" and "sale." *Id.* at 19. Plaintiffs do not contend that ATF's definitions are inconsistent with the statutory text or ordinary meaning. *See* Rule, 89 Fed. Reg. at 28,974 nn.49-50 (citing dictionary

23

definitions).  They instead suggest that these definitions are unnecessary because the terms "purchase" and "sale" are unambiguous, but ATF explained that it defined these terms to "clarify" that these terms cover exchanges for any kind of valuable consideration, "even where no money is exchanged." *id.* at 28,975, citing cases upholding convictions for unlicensed dealing based on exchanges for the specific types of other consideration listed as examples in the Rule (such as other firearms, ammunition, services, or controlled substances), *id.* at 28,974-75 nn.51-56 (collecting cases).  This case law showing that parties have frequently tried to evade the GCA's licensing requirements by using forms of consideration other than money as a medium of exchange underscores why ATF acted within its authority when it defined these terms.[14]

3.  Plaintiffs next argue that the Rule violates the rule of lenity.  Mot. 19-20.  But the rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended."  *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citations omitted).  Here, Plaintiffs invoke the rule of lenity in the abstract, but they identify no "grievous ambiguity" that the Rule construes against potential criminal defendants.

4.  Plaintiffs also argue that the Rule conflicts with the GCA because, in Plaintiffs' view, the GCA's definition of "engaged in the business" requires that a dealer obtain actual profit from dealing in firearms.  Mot. 21-22.  But if a person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business," 18 U.S.C. § 921(a)(21)(C), all that the GCA requires is that the person has a predominant *intent* to earn a profit through repetitive purchases and resales.

---

[14] Plaintiffs also criticize ATF for stating that the words "occasional" and "repetitively" should be read according to their "ordinary meaning," Mot. 19 (quoting Rule, 89 Fed. Reg. at 28,992), but ATF cited dictionary definitions of these words in the Rule's preamble.  *See* Rule, 89 Fed. Reg. at 28,992 & nn.123-24.  Plaintiffs do not explain why it would be necessary for ATF to provide further elucidation of these words.  *See Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1291 (10th Cir. 2024) (in upholding an agency statutory interpretation, explaining that "[d]ictionary definitions are useful touchstones to determine the ordinary meaning of an undefined statutory term") (citation omitted).

Plaintiffs argue that the language "to predominantly earn a profit" signifies that actual profit is required. *Id.* But the statute specifically defines the phrase "to predominantly earn a profit" to refer to *intent*, not actual profit: "[t]he term 'to predominantly earn a profit' means that *the intent* underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to *other intents*, such as improving or liquidating a personal firearms collection." *Id.* § 921(a)(22) (emphasis added). Plaintiffs point to another clause in the same provision, which notes that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.* Plaintiffs seek to draw the "negative implication" that proof of actual profit is required outside of transactions for criminal purposes or terrorism. Mot. 22. But such a reading would contradict the clear language in the same provision that "to predominantly earn a profit" refers to "the intent underlying the sale or disposition of firearms," 18 U.S.C. § 921(a)(22), violating the principle that courts should "fit, if possible, all parts [of a statute] into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)). In contrast to Plaintiffs' internally contradictory construction, the Rule's construction of this provision harmonizes its language as signifying that a predominant intent to profit is generally required, but such intent to profit is not required when the purpose of firearms transactions is criminal purposes or terrorism. *See* Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(d)).

Plaintiffs' reading of "to predominantly earn a profit" conflicts not only with clear statutory text, but also with the BSCA's purposes. In the BSCA, Congress replaced the phrase "with the principal objective of livelihood and profit" with "to predominantly earn a profit," to *broaden* the definition of engaged in the business by replacing one intent requirement with a broader intent requirement that did not include an intent to earn a "livelihood." *See* Rule, 89 Fed. Reg. at 28,972 & nn.30-31 (discussing BSCA's legislative history). Yet Plaintiffs erroneously interpret the BSCA as

*narrowing* the definition by introducing a new requirement of actual profit — and try to blame the Rule, rather than the statute, for broadening the definition. Their disagreement is with Congress, not ATF.

**5.** Understanding that the phrase "to predominantly earn a profit" refers to predominant intent, rather than actual profit, disposes of Plaintiffs' related argument that multiple successful purchases and sales of firearms are required. Plaintiffs derive this supposed requirement by reading the phrase "repetitive purchase and resale of firearms," Mot. 20-21, out of context. But "[s]tatutory language . . . 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). The language Plaintiffs highlight occurs at the end of the following phrase: "to predominantly earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). Because, as shown above, "to predominantly earn a profit" means that a person's predominant *intent* is pecuniary gain, this phrase as a whole means that a person has the predominant intent of obtaining pecuniary gain by repetitively purchasing and reselling firearms. To be sure, the first part of the statutory definition of engaged in the business — "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business," *id.* — refers to action, not intent. But if a person engages in the requisite actions with the requisite intent, that person is engaged in the business of dealing in firearms, regardless of whether the person's devotion of time, attention, and labor to dealing in firearms successfully results in actual sales and actual profit.[15]

---

[15] *See, e.g., United States v. King*, 735 F.3d 1098, 1107 n.8 (9th Cir. 2013) (upholding conviction where defendant attempted to sell one firearm and represented that he could purchase more for resale and noting that "Section 922(a)(1)(A) does not require an actual sale of firearms"); *United States v. Valdes*, 681 F. App'x 874, 877 (11th Cir. 2017) (to show unlicensed dealing, the government "does not need to show 'the defendant's primary business was dealing in firearms or that [she] necessarily made a profit from dealing'") (quoting *United States v. Wilmoth*, 636 F.2d 123, 125 (5th Cir. Unit A Feb. 1981)); *see also* 89 Fed. Reg. at 28,976 n.67, 28,981 n.96 (collecting additional cases).

**6.** Next, Plaintiffs erroneously argue that the Rule misreads the GCA in defining the term "personal collection," Mot. 22-24, but the Rule faithfully construes the GCA. The GCA defines "engaged in the business" of dealing in firearms to exclude "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). The Rule reproduces this definition, *see* Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)), and further effectuates this provision by defining "personal collection" to mean:

> Personal firearms that a person accumulates for study, comparison, exhibition (*e.g.,* collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.,* noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit (*e.g.,* primarily for a commercial purpose or financial gain, as distinguished from personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, but which the person may also intend to increase in value). In addition, the term shall not include firearms accumulated primarily for personal protection: *Provided,* that nothing in this definition shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use.

*Id.* at 29,090 (27 C.F.R. § 478.11).

Plaintiffs argue that this definition is too narrow, but it is consistent with ordinary meaning and dictionary definitions. *See, e.g.,* Webster's Third New International Dictionary 444, 1075, 1686 (1971) (defining the term "personal" to include "of or relating to a particular person," "collection" to include "an assembly of objects or specimens for the purposes of education, research, or interest", and "hobby" as "a specialized pursuit . . . that is outside one's regular occupation and that one finds particularly interesting and enjoys doing"); *see also* Rule, 89 Fed. Reg. at 28,980 n.88, 29,038 n.216 (collecting additional definitions).

The Rule's definition of "personal collection" is also consistent with the GCA's definition of "collector" as meaning "any person who acquires, holds, or disposes of firearms as curios or relics, as

the Attorney General shall by regulation define." 18 U.S.C. § 921(a)(13).[16]   Courts have rejected

arguments "that the definition of a gun 'collection' in § 921(a)(21)(c) should be read more broadly

than the definition of a gun 'collector'" because "[t]here is no case authority to suggest that there is a

distinction between the definition of a collector and of a collection in the statute."  *United States v.*

*Idarecis*, 164 F.3d 620, 1998 WL 716558, at *3-4 (2d Cir. 1998) (table); *see also* Rule, 89 Fed. Reg. at

29,038 n.217 (collecting cases).

Therefore, the phrase "personal collection or for a hobby" cannot be read to mean any

firearms that a person possesses for any lawful purpose.  Rather, consistent with dictionary definitions,

a "personal collection" refers to personal firearms "accumulate[d] for study, comparison, exhibition,"

and a "hobby" refers to "noncommercial recreational activities for personal enjoyment." *Id.* at 29,090

(27 C.F.R. § 478.11); *see A.V. v. Plano Indep. Sch. Dist.*, 585 F. Supp. 3d 881, 899 (E.D. Tex. 2022) (citing

"ordinary meaning" and "dictionary definitions" as valid tools to construe "an undefined statutory

term") (quoting *Camacho v. Ford Motor Co.*, 993 F.3d 308, 312 (5th Cir. 2021)).[17]

Plaintiffs complain that the Rule excludes from the definition of "personal collection" those

"firearms accumulated primarily for personal protection."  Mot. 23 (quoting Rule, 89 Fed. Reg. at

29,090).  But firearms accumulated primarily for personal protection fit with neither the ordinary

---

[16] "Curios and relics" are defined by regulation as: "Firearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended for sporting use or as offensive or defensive weapons.  To be recognized as curios or relics, firearms must fall within one of the following categories: (a) Firearms which were manufactured at least 50 years prior to the current date, but not including replicas thereof; (b) Firearms which are certified by the curator of a municipal, State, or Federal museum which exhibits firearms to be curios or relics of museum interest; and (c) Any other firearms which derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event. Proof of qualification of a particular firearm under this category may be established by evidence of present value and evidence that like firearms are not available except as collector's items, or that the value of like firearms available in ordinary commercial channels is substantially less." 27 C.F.R. § 478.11.

[17] Plaintiffs complain that the Rule groups together the concepts of "personal collection" and "hobby" within a single regulatory definition.  Mot. 22-23.  But as the Rule's preamble explains, that definition recognizes and gives effect to the independent meaning of "hobby."  *See* Rule, 89 Fed. Reg., at 29,039.

meaning of "collection," *see* Webster's Third New International Dictionary 444 ("an assembly of objects or specimens for the purposes of education, research, or interest"), nor the GCA's definition of "collector," 18 U.S.C. § 921(a)(13) ("any person who acquires, holds, or disposes of firearms as curios or relics"). Again, Plaintiffs' disagreement is with the terms used by Congress. In addition, while firearms acquired primarily for personal protection do not fall within the personal collection *exclusion* from the definition of engaged in the business, that does not mean that a person is necessarily engaged in the business of dealing when he sells a firearm that he acquired for personal protection. Under the Rule, being engaged in the business still requires that a person "devote[] time, attention, and labor to dealing in firearms as a regular course of trade or business" with the predominant intent "of obtaining pecuniary gain" "through the repetitive purchase and resale of firearms." *Id.* at 29,091 (27 C.F.R. § 478.13(a), (d)(1)); *accord* 18 U.S.C. § 921(a)(21)(C). An individual selling firearms acquired for personal protection will not be considered as engaged in the business unless those requirements are met. And in all events, the Rule's interpretation does not burden the ability of individuals to acquire and use firearms for self-defense. The Rule explicitly states that it shall not "be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use." Rule, 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11).

**7.** Finally, Plaintiffs wrongly argue that the Rule is unconstitutionally vague. Mot. 24-26. Under the Fifth Amendment's Due Process Clause, a criminal or quasi-criminal law is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "[F]acial vagueness challenges, in particular" — which Plaintiffs bring here — "are generally 'disfavored for several reasons,' including but not limited to, the fact that facial invalidity claims often 'rest on speculation.'" *Magee v. City of S. Padre Island*, 463 F. App'x 377, 380 (5th Cir. 2012) (quoting *Wash. State Grange v. Wash. State Republican*

29

*Party*, 552 U.S. 442, 450 (2008)). "Accordingly, '[i]n determining whether a law is facially invalid, [courts] must be careful not to go beyond the statute's facial requirements and speculate about hypothetical or imaginary cases.'" *Id.* (quoting *Wash. State Grange*, 552 U.S. at 449-50). Instead, to establish that a law is unconstitutionally vague on its face, "the complainant must demonstrate that the law is impermissibly vague in all of its applications," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982), "including its application to the party bringing the vagueness challenge," *United States v. Clark*, 582 F.3d 607, 612-13 (5th Cir. 2009).

Plaintiffs cannot make that showing. Far from being vague, the Rule provides clarity by setting forth specific circumstances that give rise to presumptions that a person is engaged in the business of dealing in firearms or has the predominant intent to earn a profit, while also setting forth specific types of conduct that do not constitute being engaged in the business of dealing and can be used to rebut the presumptions. Rather than demonstrating vagueness, Plaintiffs simply list provisions of the Rule with which they disagree. For example, Plaintiffs highlight a provision stating that a person is presumed to be engaged in the business if he "[r]epetitively resells or offers for resale firearms— . . . Within one year after the person purchased the firearms if they are— . . . New, or like new in their original packaging." Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(3)(ii)(A)); *see* Mot. 24 n.16. That provision is quite clear and even sets forth a specific time limitation.[18] As another example, Plaintiffs highlight the provision stating that a person is presumed to have the intent to predominantly earn a profit if the person "[m]akes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale." Rule, 89 Fed. Reg. at 29,091 (27 C.F.R.

---

[18] Plaintiffs note that the Rule's preamble explains that a person may be engaged in the business of dealing "who intentionally stockpiles and sells new or like-new firearms . . . with an intent to evade the one-year turnover limitation." Rule, 89 Fed. Reg. at 29,016. That statement does not "walk[] back" the regulatory presumption, as Plaintiffs assert. Mot. 24 n.16. It merely reflects that a person may satisfy the standard for being engaged in the business of dealing even in some circumstances in which none of the presumptions apply.

§ 478.13(d)(2)(iii)).  Although Plaintiffs argue (incorrectly) that this provision "makes little sense," Mot. 24 n.17,[19] they fail to explain how it is vague.  Incredibly, Plaintiffs cite as evidence of the Rule's vagueness that in enacting the Rule, ATF clarified several provisions of the proposed rule based on comments that found certain provisions of the proposed rule insufficiently clear.  *Id.* at 25 n.20.  Using the notice-and-comment process to clarify a final rule in response to commenters' concerns is not evidence of vagueness but rather of the rulemaking process working as intended.

Plaintiffs try to demonstrate vagueness by arguing that there could be some borderline cases in which it might be difficult to determine how the Rule applies.  But even if that were true, that is true of almost any statute or rule and is no reason to hold a rule constitutionally vague on its face. Indeed, the statutory definition (which Plaintiffs do not contend is unconstitutionally vague) uses general language that could undoubtedly lead to close cases, such as "devotes time, attention, and labor" and "regular course of trade or business."  18 U.S.C. § 921(a)(21)(C).

And in any event, the Fifth Circuit has explained that "for [a provision] to pass constitutional muster" under the void-for-vagueness doctrine, it need not "delineate the exact actions a [regulated party] would have to take to avoid liability," *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008), or, conversely, "describe every possible permutation" of conduct that would constitute a violation, *United States v. Abbate*, 970 F.3d 601, 604 (5th Cir. 2020) (quoting *United States v. Paul*, 274 F.3d 155, 167 (5th Cir. 2001)).  Indeed, "most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions."  *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952).  The Supreme Court and the Fifth Circuit have rejected vagueness challenges to criminal laws imposing standards as open-ended as: "near" a courthouse, *Cox v. Louisiana*, 379 U.S.

---

[19] As the Rule's preamble explains, keeping records to calculate profits and losses generally indicates a predominant intent to earn a profit because "[t]he point of making or maintaining such a record is to document profits or other pecuniary gain from firearms transactions."  Rule, 89 Fed. Reg. at 29,048.

559, 568 (1965); "immoral purposes," *Clark*, 582 F.3d at 612; "unreasonably low prices," *United States v. Nat'l Dairy Prod. Corp.*, 372 U.S. 29, 31-33 (1963); and "unreasonable noise," including noise "which, under the circumstances of time, place, and manner in which it is produced . . . annoys . . . a reasonable person of normal sensitivities," *Munn v. City of Ocean Springs*, 763 F.3d 437, 438-39 (5th Cir. 2014) (emphasis and citation omitted). The Rule, by setting forth numerous specific examples of conduct that presumptively does constitute or does not constitute being engaged in the business of dealing in firearms, is even more precise and therefore not void for vagueness.

### B. The Rule's Presumptions Are a Proper Exercise of ATF's Authority

#### 1. ATF Is Authorized to Create Regulatory Presumptions to Interpret and Enforce the Gun Control Act

As explained above and in the Rule itself, ATF identified certain activities that give rise to rebuttable presumptions in civil and administrative proceedings that an individual is engaged in the business as defined in the GCA, pending consideration of additional evidence. *See supra* pp. 8-9; Rule, 89 Fed. Reg. at 29,091. These presumptions help effectuate the GCA as revised and provide increased clarity, deter unlicensed dealing, and improve public safety. *See supra* p. 23.

Challenging these presumptions, Plaintiffs first contend that ATF lacks authority to create them at all. The Supreme Court has said otherwise, and decades of precedent across the country have followed. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 804-05 (1945)) (for "a statutory presumption or one established by regulation, the validity . . . depends upon the rationality between what is proved and what is inferred."). ATF, like any other federal agency, has general authority to promulgate regulations to effectuate its administration of the statutes it is charged with administering. Such regulations can include presumptions when such presumptions establish a rational nexus between the facts found and the facts to be presumed. *U.S. Steel Corp.*, 495 F.3d at 1284 ("Preliminarily, administrative agencies may establish presumptions, as long as there is a rational nexus between the proven facts and the presumed facts.") (citation omitted); *see also, e.g., USX Corp. v. Barnhart*, 395 F.3d

32

161, 171 (3d Cir. 2004) ("Presumptions may, of course, be established both by legislative bodies and by administrative agencies, but their validity depends as a general rule upon a rational nexus between the proven facts and the presumed facts.") (citation omitted)); *Cole v. USDA*, 33 F.3d 1263, 1267 (11th Cir. 1994) ("The law is well established that presumptions may be established by administrative agencies, as long as there is a rational nexus between the proven facts and the presumed facts."); *Holland Livestock Ranch v. United States*, 655 F.2d 1002, 1005 (9th Cir. 1981) ("Administrative agencies are entitled to create evidentiary presumptions.").

As the cases above firmly establish, the creation of presumptions is an *inherent* power authorized to issue regulations or conduct adjudications to administer a statute, regardless of whether the particular statute explicitly addresses presumptions. Moreover, "in challenging the validity of [a] regulatory presumption . . . [the Plaintiff] bears the heavy burden of demonstrating that there is no rational connection between the fact proved and the ultimate fact to be presumed." *Cole*, 33 F.3d at 1267; *id.* at 1268 ("It is the party challenging the validity of the presumption who must demonstrate that it is irrational.").

Plaintiffs also contend that the presumptions are improper because ATF generally has limited authority to promulgate regulations. But Congress's explicit grant of authority to the Attorney General to promulgate necessary regulations belies this contention. *See supra* pp. 22-23. Plaintiffs cite no case law supporting their related argument that ATF has somehow waived its authority to engage in rulemaking by previously stating that the older statutory text alone was sufficient in a particular context. *See* Mot. 28. In any event, the statutory language was since amended by the BSCA to expand the definition of engaged in the business of dealing in firearms, further supporting the need for regulatory clarity. *See supra*, pp. 5-6.

Plaintiffs' argument that the Rule's presumptions create impermissible bright-line rules also fails for multiple reasons. First, the presumptions are rebuttable by reliable evidence and therefore by

33

APPX. 764

definition are not bright-line rules.  Second, the case Plaintiffs rely upon for the proposition that bright-line rules are improper in the "engaged in the business" context is inapposite.  *United States v. Brenner*, 481 F. App'x 124 (5th Cir. 2012), is a criminal case applying a different and elevated evidentiary standard from the presumptions, which are limited to civil and administrative contexts.  Moreover, the *Brenner* court actually concluded that "the jury must examine all of the circumstances" to convict a defendant of a crime based on being engaged in the business of dealing.  *Id.* at 127.  As noted above, a fact-specific inquiry considering the totality of the circumstances, including the presumptions and any rebuttal evidence, is exactly what the Rule requires.

Finally, Plaintiffs argue that ATF cannot rely on its "unexplained experience" as the sole justification for regulatory presumptions.  For this proposition, they cite to the unremarkable observation that presumptions "cannot be a matter of [agency] *ipse dixit*." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 251 (5th Cir. 2024).  But Plaintiffs make no effort to identify which presumptions, if any, constitute *ipse dixit*.  And as the rule reflects, none of the presumptions suffers from a failure of explanation.  All of the presumptions are supported either by case law — developed before Congress expanded the statutory language — holding that evidence of the conduct set forth in the presumptions is sufficient to uphold a conviction for unlicensed dealing, *see* Rule, 89 Fed. Reg. at 28,977-79, 28,981-82 & nn.72, 74-80, 82, 97-104, or other evidence demonstrating that a rational nexus exists..  As ATF also explained in detail in the Rule, *see infra*, pp. 35-40, and Plaintiffs do not address, the rational nexus linking the conduct identified in the presumptions to the likelihood of being engaged in the business of dealing or intending predominantly to profit from the resale of firearms is further supported by statutory interpretation and common sense, confirmed by decades of ATF's enforcement experience.

34

### 2. The Rule's Engaged in the Business (EIB) Presumptions Are Permissible

Plaintiffs contend that the Rule's presumptions that a person is engaged in the business of dealing firearms, Rule 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)), are impermissible for two general reasons: (1) the presumptions contradict the statutory text and (2) the presumptions rely on conduct that is otherwise lawful. The first argument is inaccurate and the second misunderstands the nature of presumptions. ATF has determined, as it is entitled to do, that proof an individual is engaged in any of the conduct identified in the EIB presumptions renders that individual's likelihood of being engaged in the business of dealing "so probable that it is sensible" to conclude they are in fact engaged in the business of dealing, absent rebuttal evidence. *See Career Colls.*, 98 F.4th at 251 (quoting *Chem. Mfrs. Ass'n v. Dep't of Transp.*, 105 F.3d 702, 705 (D.C. Cir. 1997)). A rational nexus based on legal precedent, common sense, and ATF's history of administering and enforcing the GCA underlies each of these presumptions and Plaintiffs, for the most part, have not even challenged those connections. It is facially rational, for example, to presume that individuals holding themselves out to be dealers of firearms, Rule, 89 Fed. Reg. at 29091 (27 C.F.R. § 478.13(c)(1)), purchasing for resale or offering to resell through illegal means or with illegal firearms, *id.* (27 C.F.R. § 478.13(c)(2)), or repetitively offering to resell certain firearms within short periods of time, *id.* (27 C.F.R. § 478.13(c)(3)), are engaged in the business of dealing firearms absent reliable evidence to the contrary.

Plaintiffs also raise specific attacks against most of the EIB presumptions, but those are likewise without merit. Plaintiffs object to presuming that a person is engaged in the business as a dealer because they offer to resell firearms and demonstrate a willingness or ability to resell additional firearms, Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(1)), because, they contend, the statute requires actual sales. Mot. 29. It does not; the GCA requires devotion of time, attention, and labor to dealing firearms as a regular course of trade or business with the predominant *intent* of earning profit *through* repetitive sales. *See supra*, pp. 24-26. In any event, contrary to Plaintiffs' assertion, the

35

presumption does not render the specified conduct a violation of the statute but rather presumes that individuals engaged in that conduct are sufficiently likely to actually be engaged in the business of dealing, pending reliable evidence to the contrary. Courts have frequently held that repetitively holding oneself out as a source of firearms for resale supports a conclusion that a person is engaged in the business of dealing. *See* Rule, 89 Fed. Reg. 28,977 & n.72.[20] Again, however, even in that scenario, the seller would be able to introduce any reliable rebuttal evidence to show that he was not in fact engaged in the business.

Plaintiffs also contend that presuming a person is engaged in the business as a dealer because they repetitively purchase, offer, or resell firearms unlawfully (*e.g.*, stolen firearms or firearms sold to straw purchasers), *id.* at 29,091 (27 C.F.R. § 478.13(c)(2)), contravenes the statute because the statute requires both purchase and resale. Mot. 29. This argument fails for the same reason. Moreover, courts have long held that the GCA covers such activities, even before the BSCA. *See* Rule, 89 Fed. Reg. at 28,977-78 & nn.74-77, 79;[21] *id.* at 29,030.

Plaintiffs argue that presuming a person is engaged in the business as a dealer when they repetitively resell or offers to resell firearms within 30 days of purchase, *id.* at 29,091 (27 C.F.R. § 478.13(c)(3)(i)), ignores the non-business reasons a person might behave in that manner, but this argument also fails. Mot. 29. ATF considered these non-business reasons and explained why such

---

[20] *See, e.g.*, *United States v. Ochoa*, 726 F. App'x 651, 652 (9th Cir. 2018) ("[section] 922(a)(1)(A) reaches those who hold themselves out as sources of firearms."); *United States v. Mulholland*, 702 F. App'x 7, 12 (2d Cir. 2017); *King*, 735 at 1107; *United States v. Kevin Shan*, 361 F. App'x 182, 183 (2d Cir. 2010); *United States v. Zheng Jian Shan*, 80 F. App'x 31, 32 (9th Cir. 2003); *United States v. Carter*, 801 F.2d 78, 82 (2d Cir. 1986)).

[21] The numerous cases cited in these footnotes include *United States v. Fleischli*, 305 F.3d 643, 652 (7th Cir. 2002) ("In short, a convicted felon who could not have legitimately obtained a manufacturer's or dealer's license may not obtain access to machine guns by setting up a sham corporation."); *United States v. Fields*, 608 F. App'x 806, 809 (11th Cir. 2015) (unlicensed dealing conviction for selling stolen firearms); *United States v. Ilarraza*, 963 F.3d 1, 6 (1st Cir. 2020) (unlicensed dealing conviction for selling firearms with obliterated serial numbers); *United States v. Fridley*, 43 F. App'x 830, 831-32 (6th Cir. 2002) (unlicensed dealing conviction for selling unregistered machineguns).

non-business reasons were unlikely to be the underlying reason for *repetitively* reselling firearms within such a short period; for example, many firearms sellers allow returns within 30 days, so repetitive resales within 30 days are more likely to represent dealing in firearms than an effort to unload firearms after suffering buyer's remorse. *See* Rule, 89 Fed. Reg. at 29,031 & n.204; *id.* at 28978-79 & nn.80-81. And, of course, if an individual has genuine non-business reasons for repetitively reselling firearms within 30 days, he may present them as rebuttal evidence in a civil or administrative proceeding.

Plaintiffs also take issue with the presumption that a person is engaged in the business when they repetitively resell firearms in new condition or the same model of firearm within one year of purchase. Mot. 29-30; *see also* Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(3)(ii)). Plaintiffs contend that this presumption is impermissibly vague and improperly incorporates the preamble to the Rule. Mot. 29-30. But this presumption is clear: it applies to resales "[w]ithin one year" of purchase. 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(3)(ii)). Moreover, this presumption does not "incorporate" the preamble at all. The Rule's preamble notes that a person may be engaged in the business of dealing if she "intentionally stockpiles and sells new or like-new firearms, or the same make and model or variants thereof, with an intent to evade the one-year turnover limitation," *id.* at 29,016, but in that circumstance, the *presumption would not apply* because resales would by definition occur after the one-year limit. Rather, if the individual resold *after* a year had elapsed the factfinder would consider all the relevant facts without applying a presumption at all. *Id.* at 29,091 (27 C.F.R. § 478.13(a)).

### 3. The Rule's Intent to Predominantly Earn a Profit Presumptions Are Permissible

As explained, some of the Rule's presumptions concern individuals' intent to predominantly earn a profit. The Rule lawfully presumes that if an individual is engaged in certain conduct, it is sufficiently probable that they intend to predominantly earn a profit that it is sensible to assume so absent contrary evidence. *See* Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(d)); *Career Colls.*, 98

F.4th at 251.  Additionally, as explained *supra*, pp. 24-26, the statute does not require that ATF prove an individual in fact gained a profit to be engaged in the business of dealing, but only that their primary underlying intent was to profit.

Three presumptions infer an intent predominantly to profit from the resale of firearms where a person repetitively promotes a firearms business, exchanges anything of value for physical space to display firearms for resale, or makes records of profits and losses from firearms purchased for resale. Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(d)(2)(i)-(iii)).  Plaintiffs argue that these presumptions undermine the statute's exception for individuals who "sell[] all or part of [their] personal collection of firearms," because the Rule's definition of "resale" is too broad.  18 U.S.C. § 921(a)(21)(C). Plaintiffs misapprehend the structure of the statute.  Section 921(a)(21)(C) indicates that even if a person's conduct were to satisfy each of the conditions of the engaged in the business definition, the statutory "term shall not include a person . . . who sells all or part of his personal collection of firearms."  Consistent with this statutory exclusion, the Rule makes clear that selling firearms to liquidate a personal collection does not constitute engaging in the business of dealing, and that evidence of such conduct can rebut the presumptions.  Rule, 89 Fed. Reg. at 29,091-93 (27 C.F.R. § 478.13(a), (e)(4), (f)).

Perhaps these presumptions may capture some individuals who contend that they are repeatedly selling parts of their personal collection, but that is why the presumptions are rebuttable. *See id.* at 29,092 (27 C.F.R. § 478.13(e)(4)) (evidence that a person is liquidating all or part of a personal collection would rebut the presumptions).  Numerous court cases support the common-sense conclusion that that a person who repetitively promotes a firearms business, purchases physical space to display firearms for resale, or records profits and losses from firearms resales likely intends to profit

38

APPX. 769

from firearms resales. *Id.* at 28,981 nn.97-99;[22] *see also id.* at 28,981 (citing, in addition, ATF's "decades-long body of experience"); *id.* at 29,046.

Another presumption applies to people who purchase merchant services, such as credit card transaction services, as a business with the intention to repetitively accept payments for firearms transactions. Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(d)(2)(iv)). Plaintiffs contend that the presumption may improperly reach businesses unrelated to firearms. Mot. 31. But it is facially reasonable to presume, pending contrary evidence, that a business that secures merchant services with the intent to repetitively accept payments for firearms transactions is intending to predominantly profit from the resale of firearms. Pre-BCSA cases support this presumption, relying on the use of such financial services as evidence to infer that a person operating as a business intends to profit rather than having some other purpose for engaging in firearms transactions. Rule, 89 Fed. Reg. at 28,981-82 at n.100;[23] *see also id.* at 28,981 (finding additional support in ATF's "decades-long body of experience"). Plaintiffs' concern that "unrelated" business might become regulated as dealers, Mot. 31 (emphasis omitted), is unfounded. As noted, intending predominantly to profit from the resale of firearms is not sufficient, without more, to satisfy the statutory definition of being engaged in the business. *See* Rule, 89 Fed. Reg. at 29,049.[24] If such non-dealing businesses do not "devote time,

---

[22] *See, e.g., United States v. Caldwell*, 790 F. App'x 797, 799 (7th Cir. 2019) (defendant repetitively placed advertisements on a website devoted to gun sales); *United States v. Wilkening*, 485 F.2d 234, 235 (8th Cir. 1973) (defendant set up a glass display case and displayed for sale numerous firearms); *United States v. Dettra*, 238 F.3d 424, 2000 WL 1872046, at *2 (6th Cir. 2000) (table) ("Dettra carefully recorded the cost of each firearm he acquired, enabling him to later determine the amount needed to sell the item in a profitable manner.")

[23] *See, e.g., Dettra*, 2000 WL 1872046, at *2 ("Dettra's . . . acceptance of credit payment provide[s] further reason to infer that he was conducting his firearms activity as a profitable trade or business, and not merely as a hobby.")

[24] Plaintiffs also assert that this presumption is overbroad and therefore improper because it may "sweep up lawful activity." Mot. 31 n.32. This argument neglects to account for the facts that the presumption is rebuttable, and predominant intent to earn a profit is just one element of being engaged in the business of dealing firearms.

attention, and labor to dealing in firearms as a regular course of trade or business," *id.* at 29,091 (27 C.F.R. § 478.13(a)), the Rule does not consider them to be engaged in the business of dealing.

Under the Rule, ATF will presume a person who secures business security services to protect firearm assets and repetitive firearms transactions has the predominant intent to earn a profit. *Id.* at 29,091 (27 C.F.R. § 478.13(d)(2)(v)). As ATF explained, there is a rational nexus between expending resources in this manner and an intent to predominantly profit from the resale of firearms. *Id.* Pre-BSCA precedent supports this common-sense presumption. *Id.* at 28,981-82 & n.102; *id.* at 29,049-50. Plaintiffs' assertion that a narrow category of security companies that are not firearms businesses might incidentally trigger this presumption does not disprove the connection for every other type of case, and that is the sort of evidence that could be used to rebut this presumption. Nor is there a meaningful risk that this narrow category of businesses "would be forced to defend against charges of unlawful dealing," Mot. 32, if they are indeed not otherwise engaged in the business of dealing firearms because the predominant intent to profit is just one element of the definition of engaged in the business.[25]

### 4. Conduct That the Rule Identifies as Not Supporting a Presumption Does Not Contradict the Statute

Plaintiffs also incorrectly contend that the Rule "water[s] down" or "neuters" the personal collection-related statutory exclusion from being engaged in the business by clarifying that evidence supporting this exclusion can be used to rebut presumptions under the Rule. Mot. 32-33. The Rule

---

[25] It is unclear what Plaintiffs mean when they state that the terms of the "sixth PEP presumption" would "reach[]" security companies that purchase and sell firearms for employee use." Mot. 32. The remaining two presumptions in this section of the Rule are for a person who "establishes a business entity, trade name, or online business account . . . through which the person makes or offers to make, repetitive firearms transactions," Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(d)(2)(vi)), and a person who "[s]ecures or applies for a State or local business license to purchase for resale or to resell merchandise that includes firearms," *id.* at 29091-92 (27 C.F.R. § 478.13(d)(2)(vii)). Plaintiffs do not challenge these two presumptions and both sets of conduct have a rational nexus to the predominant intent to profit from the resale of firearms.

tracks the statute exactly in excluding from the definition of engaged in the business "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)); *accord* 18 U.S.C. § 922(a)(21)(C). ATF separately added conduct that satisfies this statutory exclusion as conduct that cannot be presumed to be engaged in the business and could be used to rebut the presumptions, Rule, 89 Fed. Reg. at 29,092 (27 C.F.R. § 478.13(e)(2), (4)), in response to commenters who thought the proposed rule was insufficiently protective of personal collection-related activity, *id.* at 29,020, 29,022. This belt-and-suspenders approach of protecting such activity in two distinct parts of the Rule effectuates the statutory exclusion and helps, rather than hurts, regulated parties.

### C. The Rule Appropriately Regulates Former Licensees' Inventory

Plaintiffs incorrectly contend that the Rule contravenes the GCA by improperly creating a category of former licensees and imposing restrictions on former licensees' business stock of firearms that the statute does not authorize. But the Rule does not invent the concept of former licensees; former licensees are an inherent feature of the GCA's licensing scheme. Absent the Rule, a former licensee is prohibited from engaging in the business in the same ways and to the same extent as anyone else who is not currently licensed. *See* 18 U.S.C. § 921(a)(21)(C); *see also* 27 C.F.R. §§ 478.57(c) & (d); 478.78(c) & (d) (stating that former licensees are barred from continuing to engage in the business of dealing firearms and that any resale of their inventory not covered by exceptions will be subject to the general engaged in the business presumptions of § 478.13). Thus, contrary to Plaintiffs' arguments that the Rule improperly constrains former licensees in disposing of firearms, Mot. 33-34, the Rule actually interprets the GCA to provide them with a way to dispose of their inventory lawfully. Specifically, under the revised 27 C.F.R. §§ 478.57(b); 478.78(b), former licensees are authorized to

41

liquidate or transfer their firearms inventories in manners which would otherwise constitute engaging in the business of dealing.

Plaintiffs' challenges to the specific presumptions applicable to former licensees fail for the same reasons as their challenges to the Rule's other presumptions, *see supra* pp. 32-34. ATF is authorized to promulgate regulations including presumptions so long as those presumptions rely on a rational nexus between the proven fact and the inference. There is a clear rational nexus underlying each of these presumptions and Plaintiffs have not invalidated them.

First, Plaintiffs assert that the Rule imposes a new requirement on former licensees prohibiting them from selling firearms transferred to a personal collection until one year has passed. Mot. 33-34. They contend that the statute imposes this condition only on current licensees and that ATF lacks the authority to expand it to former licensees. *Id.* Plaintiffs once again misunderstand the basic concept of the Rule; it does not render any conduct unlawful but rather permits ATF to presume individuals are engaged in the business of dealing firearms based on conduct with a rational nexus to the regulated conduct. It is reasonable to conclude that a person reselling firearms in a manner prohibited by the statute for licensees after surrendering or losing their license is likely engaged unlawfully in the business of dealing firearms. *See* Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(5)(ii)). The rational nexus supporting this presumption is based on ATF's common-sense interpretation of the GCA. *Id.* at 29033-34.[26]

Second, GCA licensees are prohibited from reselling firearms that were transferred with the intent to willfully evade the GCA restrictions on licensees. *See* 18 U.S.C. § 923(c). Plaintiffs contend

---

[26] Plaintiffs also assert that the various sections of the Rule related to former licensees "cannot be the law" because they make it difficult for former licensees to sell firearms that they possess without engaging in the business of unlicensed dealing. Mot. 35. However, the entire purpose of the statute and the Rule is to prevent unlicensed individuals from engaging in the business of dealing firearms. Giving former licensees free rein to engage in the business of dealing their inventories after they surrender their license (or have it revoked) would run contrary to the statute's text and purposes.

that ATF lacks authority to prohibit the resale by a former licensee of firearms that were transferred before the termination of a license with such intent because that unlawful conduct "does not taint the firearms themselves or support a presumption that unlawful dealing continues." Mot. 34. That presumption is manifestly sensible. Willfully evading federal firearms regulations is equally impermissible for licensees and non-licensees. The rational nexus supporting this presumption is patently clear and is supported by ATF's common-sense interpretation of the GCA. *See*, Rule 89 Fed. Reg. 29,035-36.

Third, Plaintiff's contention that, under the Rule, firearms that were never transferred from a business inventory while an individual was licensed "remain forever in purgatory, and any attempt to transfer them leads to the presumption of unlawful dealing," is inaccurate. Mot. 34. The presumption itself states that the former licensee will not be presumed to be engaged in the business of dealing if they resell or offer to resell to "a licensee in accordance with §478.57 or §478.78." Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(4)). And as explained *supra*, p. 41, the statute itself does not permit any unlicensed person to resell firearms in a manner that would satisfy the conditions of being engaged in the business of dealing. Moreover, the Rule construes the GCA to allow former licensees with business inventory, which the Rule calls "former licensee inventory," to dispose of such inventory lawfully. Specifically, under 27 C.F.R. §478.57(b) and §478.78(b), former licensees must liquidate or transfer their former licensee inventory "within 30 days, or such additional time period approved by the Director for good cause." Purchasing inventory while licensed does not in any sense "serve as a predicate offense for a charge of *unlicensed* dealing," Mot. 34, but rather the circumstances as a whole inform the presumption that the former licensee continues to engage in the business of dealing firearms.[27]

---

[27] Plaintiffs also assert without explanation that "if a 'former licensee' merely sells inventory acquired while licensed to do just that, the statute permits that activity." Mot. 34. The statute clearly does not

43

## D. Plaintiffs Are Not Likely to Succeed on their Second Amendment Claim

The Rule comports with the Second Amendment. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court made clear that "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures," *id.* at 626-27 & n.26, and the Fifth Circuit has held that the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), "did nothing to disturb that part of *Heller*." *McRorey v. Garland*, ---F.4th---, 2024 WL 1825398, at *3 (5th Cir. Apr. 26, 2024).

In *Bruen*, both the majority opinion and Justice Kavanaugh's concurrence affirmed the constitutionality of "'shall-issue' licensing regimes," in which the right to carry weapons is conditioned on passing a "background check" and obtaining a license. *Bruen*, 597 U.S. at 39 n.9; *see also id.* at 80 (Kavanaugh, J., concurring). And the Fifth Circuit recently held that the background check requirements of the BSCA are constitutional, even though those background checks may delay an individual's ability to purchase a firearm. *McRorey*, 2024 WL 1825398, at *5-6. A requirement that firearms dealers be licensed has an even more attenuated relationship to the right protected by the Second Amendment's text (*i.e.*, the right to "keep and bear arms," U.S. Const. amend. II) than such requirements, and it is no surprise that courts both before and after *Bruen* have regularly rejected arguments that the Second Amendment precludes regulation of those engaged in the business of dealing firearms. *See, e.g.*, *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc); *United States v. Flores*, 652 F. Supp. 3d 796 (S.D. Tex. 2023).[28]

---

permit such activity, however, as there is no temporal requirement attached to the various conditions for meeting the definition of being engaged in the business of dealing. A former licensee would almost without exception have met this definition while acquiring the firearms at issue and may not evade the restrictions by becoming unlicensed before reselling.

[28] *See United States v. Duncan*, Case No. 7:20-cr-00167-M-3, 2023 WL 7346042, at *3 (E.D.N.C. Nov. 7, 2023) ("impos[ing] a condition, namely licensing, on firearms commerce . . . does not violate the Second Amendment"); *United States v. King*, 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022) ("the Second Amendment does not protect the *commercial* dealing of firearms"); *United States v. McNulty*, ---F

Plaintiffs cite several cases in support of their Second Amendment claim, Mot. 36-37, but none held that the Second Amendment guaranteed a right to engage in the business of dealing firearms without regulation. One case cited by Plaintiffs held that the Second Amendment's text "confers a right on the 'people' who would keep and use arms, not those desiring to sell them." *Teixeira*, 873 F.3d at 683. Another case reasoned that "the Second Amendment right to keep and bear arms for self-defense necessarily includes the right to acquire a firearm, and that this right is implicated by local laws directly or functionally banning firearm sales." *Kole v. Vill. of Norridge*, No. 11 C 3871, 2017 WL 5128989, at *9 (N.D. Ill. Nov. 6, 2017).[29] But Plaintiffs do not and cannot claim that the Rule functionally bans any firearm sales. There are currently more than 49,000 federally licensed firearms dealers,[30] and the Rule is likely to lead to more people and businesses becoming licensed. Individuals can also acquire firearms from unlicensed parties whose firearms sales activity falls short of being engaged in the business of dealing under the Rule. Another case cited by Plaintiffs quoted a Virginia state statute that conferred a right to engage in the "sale, or transfer of firearms" as a matter of state law, not federal constitutional law. *Lynchburg Range & Training, LLC v. Northam*, 105 Va. Cir. 159, 2020 WL 8817562, at *3 (2020) (quoting Va. Code § 44-146.15(3)).

The GCA's modest requirements for commercial sales are, moreover, "consistent with this

---

Supp.3d ---, 2023 WL 4826950, at *4 (D. Mass. July 27, 2023); *United States v. Tilotta*, Case No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022).

[29] *See also Reese v. Bureau of Alcohol Tobacco Firearms & Explosives*, 647 F. Supp. 3d 508, 521 (W.D. La. 2022) ("while sales restrictions do not explicitly infringe the right to 'keep or bear Arms,' a complete restriction on the sale of firearms could effectively gut the right to own or possess firearms by foreclosing the ability of 'the people' to legally purchase firearms"); *Altman v. Cnty. of Santa Clara*, 464 F. Supp. 3d 1106, 1125 (N.D. Cal. 2020) (recognizing a "right to *acquire* firearms," but noting that the case did not concern a right to "*sell* them"). In *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), the court noted in dicta that there may be a "constitutional defect in prohibiting the commercial sale of firearms," but the court did not suggest that mere regulations on commercial sales would implicate the Second Amendment. *Id.* at 92 n.8.

[30] *See* ATF, Complete Federal Firearms Listings, https://www.atf.gov/firearms/listing-federal-firearms-licensees/complete. In the Excel spreadsheet linked on that page, rows with "01" for "LIC_TYPE" in Column D are licensed dealers in firearms other than destructive devices.

Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. As ATF explained in the Rule's preamble, "there is a robust historical tradition supporting the Government's authority to require licenses and inspection of firearms sellers." Rule, 89 Fed. Reg. at 29,002. For example, in 1794, Congress enacted a law temporarily making it unlawful "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenades, gunpowder, sulpher, or saltpetre," Act of May 22, 1794, 1 Stat. 369, ch. 33, § 1, making clear that the Founding generation believed that it was constitutionally permissible to regulate arms sales.

Colonies and states in the early republic also regulated firearms commerce. Several states or colonies, including Massachusetts in 1651 and 1809, Connecticut in 1775, New Jersey in 1776, required licenses or inspection to export or sell gunpowder, which was necessary to operate a firearm.[31] Massachusetts in 1805 and Maine in 1821 required pistol barrels to be "proved," meaning inspected and marked, before they could be sold.[32] In concluding that "[t]he historical record confirms that the right to sell firearms was not within the 'historical understanding of the scope of the [Second

---

[31] *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126, Powder (1890) (1651 statute requiring license to export gunpowder); 2 General Laws of Massachusetts from the Adoption of the Constitution to February, 1822, at 198-200, ch. 52, An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-Powder, secs. 1, 8 (1823) (1809 statute providing for the appointment of an "inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder," and imposing penalties for any sale or export of gunpowder "before the same has been inspected and marked"); 15 The Public Records of the Colony of Connecticut, from May, 1775, to June, 1776, Inclusive 191, An Act for Encouraging the Manufactures of Salt Petre and Gun Powder (1890) (1775 Connecticut law establishing, among other things, that no gunpowder manufactured in the colony "shall be exported out" of the colony "without [an applicable] licence"); Acts of the General Assembly of the State of New-Jersey, at a Session Begun at Princeton on the 27th Day of August 1776, and Continued by Adjournments 6, ch. 6, An Act for the Inspection of Gun-Powder, § 1 (1877) (No person shall offer any gunpowder for sale "without being previously inspected and marked as is herein after directed."); Laws of the State of New Hampshire; With the Constitutions of the United States and of the State Prefixed 276-78, An Act to Provide for the Appointment of Inspectors and Regulating the Manufactory of Gunpowder, secs. 1, 8 (1830) (authorizing "inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state" and imposing penalties for any sale or disposition of gunpowder "before the same has been inspected and marked").
[32] *See* 3 Laws of the Commonwealth of Massachusetts, from November 28, 1780, to February 28, 1807, at 259–61 (1807); 1 Laws of the State of Maine 546 (1830).

APPX. 777

Amendment] right,'" *Teixeira*, 873 F.3d at 683 (citations omitted), the Ninth Circuit cited additional historical materials showing that many colonies enacted restrictions on commercial sales of firearms to Indians, and Connecticut and Virginia "controlled more generally where colonial settlers could transport or sell guns," *id.* at 685.[33]

Plaintiffs ask the Court to disregard this history of regulation of firearms dealing because historical laws did not regulate firearms dealing in quite the same way as the Rule does.  Mot. 37-38.  Plaintiffs improperly demand a "historical *twin*," when the Supreme Court has made clear that a "historical *analogue*" is sufficient to sustain a modern firearms regulation.  *Bruen*, 597 U.S. at 30.

### E.     The Rule Is Consistent with the Fourth Amendment

Plaintiffs' claim that the Rule violates the Fourth Amendment is meritless.  The GCA expressly authorizes ATF to periodically inspect federal firearms licensees for compliance with the GCA's requirements.  *See* 18 U.S.C. § 923(g)(1)(B)(ii); 27 C.F.R. § 478.23.  More specifically, ATF "may inspect or examine the inventory and records of" a licensee "without . . . reasonable cause or warrant" to "ensur[e] compliance with" the GCA's "recordkeeping requirements."  18 U.S.C. § 923(g)(1)(B); *see* 27 C.F.R. § 478.23(b) (providing that compliance inspections be conducted "during business hours").  Such inspections, however, may take place "not more than once during any 12-month period."  18 U.S.C. § 923(g)(1)(B)(ii)(I).

Plaintiffs argue that the Rule violates the Fourth Amendment by requiring "thousands of gun owners to seek" a federal firearms license in order to sell "portions of their personal [firearms] collections," and then subjecting these "new, home-based licensees to the GCA's warrantless inspection regime."  Mot. 38-39.  Plaintiffs are mistaken for at least two reasons.

---

[33] Contrary to Plaintiffs' assertion, Mot. 37, the historical laws discussed in *Teixeira* were not all limited to the provision of arms to Indians.  A Connecticut law "banned the sale of firearms by its residents outside the colony," and a Virginia law prohibited traveling within three miles of an Indian town with more arms or ammunition than needed for personal use, "even if he was not actually bartering, selling, or otherwise engaging with the Indians."  *Teixeira*, 873 F.3d at 685.

As a threshold matter, Plaintiffs fail to demonstrate that they have standing to challenge the Rule on Fourth Amendment grounds. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[P]laintiffs must demonstrate standing for each claim that they press . . . ."). Plaintiffs' theory of Fourth Amendment injury hinges on currently unlicensed individuals (1) "apply[ing] for and receiv[ing]" a federal firearms license and (2) subsequently being subjected to a warrantless compliance search by ATF at some unknown time in the future. Compl. ¶ 200. The only individuals who could conceivably suffer such an injury are Plaintiff Tormey and unlicensed gun owners who are members of the organizational plaintiffs. *See Carpenter v. United States*, 585 U.S. 296, 303 (2018) (explaining that the Fourth Amendment "safeguard[s] the privacy and security of *individuals* against arbitrary invasions by government officials" (emphasis added) (citation omitted)). Yet nothing in Tormey's declaration indicates that he intends to seek a federal firearms license — a prerequisite to being subject to an ATF compliance inspection, *see* 18 U.S.C. § 923(g)(1)(B) — once the Rule goes into effect. *See* Tormey Decl. ¶ 11 ("I believe my activities have always been lawful under federal law, and I wish to continue to alter, improve, or even be able to liquidate my personal collection . . . *without becoming a licensed dealer*." (emphasis added)); *see id.* ("Indeed, I am not even sure if I could become licensed, due to zoning restrictions, etc."). And the organizational plaintiffs' declarations similarly fail to specifically demonstrate whether any of their members would even need to obtain a license under the Rule; whether the members who do are even eligible for a license, *see* 18 U.S.C. § 923(d)(1) (listing the eligibility requirements); and whether any eligible members would actually apply for a license, *see, e.g.,* Archie Decl. ¶ 4 ("[M]any other TFA members do not consider themselves to be firearms dealers, and have opted not to apply for any category of federal firearms license").

In any event, precedent squarely forecloses Plaintiffs' Fourth Amendment claim. The Supreme Court has made clear that "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an

APPX. 779

enterprise." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) (citation omitted); *see New York v. Burger*, 482 U.S. 691, 700 (1987) (observing that an expectation of privacy "is particularly attenuated in commercial property employed in 'closely regulated' industries"). Consequently, "a warrantless inspection of commercial premises" engaged in such a "closely regulated" industry "may well be reasonable within the meaning of the Fourth Amendment." *Id.* at 702; *see Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 967 (5th Cir. 2023) ("For such an industry, the threshold for whether a search is reasonable for purposes of the Fourth Amendment is much lower."). And it is well settled that "firearms dealing" is one such closely regulated industry. *See City of L.A. v. Patel*, 576 U.S. 409, 424 (2015); *United States v. Biswell*, 406 U.S. 311, 316 (1972) ("When a [firearms] dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection.").

Indeed, the Supreme Court has explicitly held that ATF's compliance inspection procedures are consistent with the Fourth Amendment. *See Biswell*, 406 U.S. at 316-17; *see also Giragosian v. Bettencourt*, 614 F.3d 25, 29 (1st Cir. 2010) (rejecting a Fourth Amendment challenge to an ATF compliance search conducted pursuant to 18 U.S.C. § 923(g)(1)(B)(ii) (citing *Biswell*, 406 U.S. at 317)); *Spinelli v. City of New York*, 579 F.3d 160, 168 (2d Cir. 2009) (holding that a warrantless search of a gun store "conducted pursuant to established regulatory authority" did not violate the Fourth Amendment (citing *Biswell*, 406 U.S. at 316)). Thus, if Plaintiff Tormey or an unnamed member-gun owner acquires a license and is then subjected to an ATF compliance inspection, that inspection would be reasonable under the Fourth Amendment. *See Biswell*, 406 U.S. at 317.[34] Plaintiffs' Fourth Amendment claim therefore fails as a matter of law and cannot justify the extraordinary relief they seek.

---

[34] Plaintiffs speculate that the current Supreme Court "would probably not decide *Biswell* similarly today." Mot. 39. But "[i]nferior courts must follow directly applicable Supreme Court precedent that has not been overruled or modified." *United States v. Vargas*, 74 F.4th 673, 680 (5th Cir. 2023).

### F.     Plaintiffs' Separation-of-Powers Claim Lacks Merit

Plaintiffs' separation-of-powers claim also lacks merit.  Plaintiffs contend that the Rule represents an effort by "unelected bureaucrats" at ATF to "amend federal gun laws without involving Congress."  Mot. 41-42; *see* Compl. ¶ 205 (alleging that the Rule "usurp[s] legislative powers").  As explained above, the Rule implements, rather than "amends," the provisions of the GCA.  In promulgating the Rule, moreover, ATF exercised authority delegated to it by an elected and democratically accountable Congress.  *See* 18 U.S.C. § 926(a); *see also* 28 U.S.C. § 599A(b)(1) (delegating responsibility for enforcing the GCA to ATF).  The Rule "implement[s]" a "statutory change" to the GCA that was likewise enacted by an elected and democratically accountable Congress (*i.e.*, the BSCA).

The gravamen of Plaintiffs' separation-of-powers claim is that ATF, in issuing the Rule, allegedly "contravene[d] congressional intent."  Mot. 41 n.6.  Put another way, Plaintiffs effectively claim that the Rule is "in excess of" ATF's "statutory . . . authority" or "otherwise not in accordance with law" — a theory of relief that is indistinguishable from their APA claims.  5 U.S.C. § 706(2).  Plaintiffs' separation-of-powers claim thus amounts to little more than an attempt to repackage a statutory claim as a constitutional one and should therefore be rejected.  *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) ("[I]t is a well-established principle . . . that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." (citation omitted)).

## IV.     The Balance of Equities and Public Interest Disfavor Injunctive Relief

The balance of the equities and public interest merge when the government is a party.  *Nken*, 556 U.S. at 435.  In this case the balance tips decidedly against preliminary injunction of the regulation.  Plaintiffs bear the burden of establishing each of the preliminary injunction factors, and in addition to demonstrating no likelihood of success on the merits, they have not established any harm to themselves in allowing the Rule to take effect during the pendency of this case.  Plaintiffs identify no

benefit to the public generally of enjoining the Rule.  Nor as they claim, Mot. 44, does the Rule actually make any changes to the statutory scheme or introduce additional uncertainty for potentially regulated parties, *see supra* pp. 29-32.  Consequently, Plaintiffs have placed nothing at all on their side of the balance.

Conversely, here ATF has exercised its authority to issue regulations to effectuate laws enacted by Congress to reduce violent crime.  Congress specifically amended the definition of "engaged in the business" to encompass more conduct and to reduce the volume of unlicensed dealing in firearms.  Under such circumstances, if the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).  Moreover, courts have long recognized that regulation of "dealers in firearms" is "undeniably of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders." *Biswell*, 406 U.S. at 315; *see also, e.g.*, *United States v. Hosford*, 82 F. Supp. 3d 660, 667 (D. Md. 2015) ("[R]egulating firearms dealers . . . furthers the Government's substantial interest in protection the community."), *aff'd*, 843 F.3d 161 (4th Cir. 2016); *Chambered Grp. USA LLC v. Babcock*, No. CV-23-01850-PHX-SPL, 2023 U.S. Dist. LEXIS 173796, at *13-14 (D. Ariz. Sept. 27, 2023) ("A licensee's failure to follow the GCA regulations jeopardizes public interest because it poses a danger to society.").  Therefore, granting the requested preliminary injunction would significantly harm the government's interest in law enforcement and public safety.  The public consequences of continuing to permit what Congress and ATF have identified as a significant source of unlicensed dealing in firearms weighs heavily against granting an injunction.

## V.    Any Relief Should Be Limited

For the reasons explained above, no relief is warranted.  But in the event the Court were to award any relief, such relief should be no broader than necessary to remedy any demonstrated harms

of the Plaintiffs in this case.  "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  "A district court abuses its discretion if it does not 'narrowly tailor an injunction to remedy the specific action which gives rise to the order.'" *ODonnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) (quoting *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)), *overruled on other grounds by Daves v. Dallas Cnty.*, 64 F.4th 616 (5th Cir. 2023).

*First*, the Court should decline to issue a so-called "nationwide injunction" that bars application of the Rule to any party nationwide.  The Fifth Circuit recently counseled that "judicial restraint" is warranted when crafting injunctive relief, and district courts should consider "whether one district court should make a binding judgment for the entire country."  *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021).  Since then, three Justices of the Supreme Court concluded that a "district court's universal injunction defied . . . foundational principles" that "a federal court may not issue an equitable remedy 'more burdensome to the defendant than necessary to [redress]' the plaintiff's injuries." *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., joined by Thomas, J., and Alito, J., concurring in the grant of the stay) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also id.* at 931 (Kavanaugh, J., joined by Barrett, J., concurring in the grant of the stay) ("prohibiting nationwide or statewide injunctions may turn out to be the right rule as a matter of law"). Nationwide injunctions "short-circuit the decisionmaking benefits of having different courts weigh in on vexing questions of law and allowing the best ideas to percolate to the top," *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring), a concern especially salient here given that challenges to the Rule are pending in two other cases in different circuits.[35]  Nationwide injunctions

---

[35] *See Kansas v. Garland*, Case No. 2:24-cv-88 (E.D. Ark.); *Florida v. ATF*, Case No. 8:24-cv-1041 (M.D. Fla.).

also "sometimes give States victories they do not want." *Id.* at 396. That is the case here, where twenty states and the District of Columbia submitted a comment in support of the Rule, concluding that the Rule is lawful and would promote public safety within their jurisdictions. Comment of Attorney General of New York, et al., Definition of "Engaged in the Business" as a Dealer in Firearms, Docket No. ATF 2022R-17 (Dec. 7, 2023), https://ag.ny.gov/sites/default/files/letters/multistate-comment-on-nprm-eitb-atf-rule.pdf.

The fact that Plaintiffs invoke § 705 of the Administrative Procedure Act (APA) does not change the inadvisability of a universal remedy. That section provides: "On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. In limiting such relief "to the extent necessary to prevent irreparable injury," the statute directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties. Indeed, the House Report for the APA indicates that relief under § 705 should "normally, if not always, be limited to the parties complainant." *Administrative Procedure Act*, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946).[36]

*Second*, relief should extend only to Plaintiffs that the Court concludes have demonstrated both standing and irreparable harm. "Article III does not give federal courts the power to order relief to any uninjured plaintiff." *TransUnion*, 594 U.S. at 431 (citation omitted). If the Court agrees with Defendants' arguments in part and concludes that only some Plaintiffs have demonstrated injury-in-fact and irreparable harm, the Court should (indeed, must) exclude from any relief the Plaintiffs who

---

[36] *See id.* ("[t]he authority granted is equitable and should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy" and that "[s]uch relief would normally, if not always, be limited to the parties complainant and may be withheld in the absence of a substantial question for review").

have not made that showing.

       *Third*, if the Court concludes that Plaintiffs are likely to succeed in showing that only certain provisions or aspects of the Rule are unlawful, the Court should limit relief to the provisions or aspects held likely unlawful. The Rule contains a "[s]everability" section expressing ATF's intent that the Rule's provisions be severable to the maximum extent possible, such that if any aspect of the Rule is held unlawful, the remainder "shall not be affected and shall be construed so as to give them the maximum effect permitted by law." Rule, 89 Fed. Reg. at 29,070. Typically, "[w]hether the offending portion of a regulation is severable depends upon [1] the intent of the agency *and* [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *accord Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating only "the portions of the final rule" the court decided were unlawful). The Rule's severability section makes clear ATF's intentions with respect to severability. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). Thus, any "objectionable provision[s]" should be temporarily enjoined while the others remain in place. *Id.*

## CONCLUSION

       The Court should deny Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction.

APPX. 785

DATED: May 14, 2024                     Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        BRIGHAM J. BOWEN
                                        Assistant Director, Federal Programs Branch

                                        _/s/ Jeremy S.B. Newman_
                                        JEREMY S.B. NEWMAN
                                        KERI L. BERMAN
                                        ZACHARY W. SHERWOOD
                                        Trial Attorneys
                                        Civil Division, Federal Programs Branch
                                        U.S. Department of Justice
                                        1100 L Street, NW
                                        Washington, DC 20005
                                        Phone: (202) 532-3114
                                        Fax: (202) 616-8470
                                        Email:  jeremy.s.newman@usdoj.gov

                                        _Attorneys for Defendants_

APPX. 786

## <u>CERTIFICATE OF SERVICE</u>

On May 14, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Jeremy S.B. Newman*

unlicensed firearms dealer. This shooter had previously attempted to buy from a licensed firearms dealer, but was rejected by the licensed firearms dealer because the National Instant Criminal Background Check System ("NICS") flagged he was a prohibited person. Through a detailed investigation, federal prosecutors convicted the unlicensed firearm dealer of a federal crime, and he was sentenced to two years in federal prison. Our legislation aims at preventing someone who is disqualified from owning or possessing a firearm from shopping around for an unlicensed firearm dealer.

The "engaged in the business" provision in the BSCA does not provide for a specific number of firearms, transactions, or amount of profit that would trigger the requirement for someone to have or obtain a federal firearms dealers license. This would lead to absurd results and structuring of transactions to skirt the law. Implementation and enforcement of the law should not be on how the sale was conducted—through the internet, for example—but on the underlying substance of the sale as it relates to a series of transactions over a period of time to determine if someone is engaged in the business of dealing firearms.

As the legislation spells out, it does not require those who engage in occasional sales, the liquidation of firearms, or those who buy and sell firearms to support their firearm-related hobbies to obtain a federal firearms license. It is critical that any agency interpretation and enforcement of this law provide substantial protections and clarity to folks who are merely hobbyists, choose to liquidate firearms, or want to buy and sell firearms to improve and replenish their own personal collections. This is also not a way to target anyone and everyone who shows up at a gun show to sell his or her firearms. Again, it is critical to look at the substance of the transactions over an extended period of time and the underlying profit motive to determine if someone is engaged in the business of dealing firearms.

While it is our understanding that this law will encourage an incremental number of folks to obtain a federal firearms dealers license, it is imperative that agency regulations and implementation do not overstep the statute's text to attempt to control all commercial sales. Given the BSCA bill changed existing law, it is critical that agencies account for innocent mistakes, provide clear education and notice to federal firearms dealers and others connected to the industry, and apply heightened evidentiary standards, including a heightened *mens rea* element of willfulness, when evaluating compliance. Under its new leadership, the ATF must focus its resources on stopping legitimate threats to public safety – the trigger pullers – and not on driving honest licensees out of business for paperwork errors and mistakes that do not truly or legitimately threaten public safety. Unfortunately, that is what is happening now under this Administration's so-called "zero tolerance" policy. Indeed, federal firearms dealers report that the ATF is reopening up old investigations and issuing Notice of Revocations after they were previously closed or



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Washington DC*

www.atf.gov

# IMPORTANT NOTICE

**Selling Firearms AFTER Revocation, Expiration, or Surrender of a Federal Firearms License**

Former Federal Firearms licensees (FFLs) who continue to sell firearms after the revocation, expiration, or surrender of their license are subject to the same rules as persons who have never been licensed, in determining whether they are "engaged in the business" of selling firearms without a license in violation of 18 U.S.C. § 922(a)(l)(A), and 27 CFR 478.11 and 478.41. Accordingly, former licensees who wish to dispose of any remaining business inventory must adhere to the statutory and regulatory restrictions that are applicable to all unlicensed persons selling firearms.

All firearms formerly in the business inventory must be disposed of by the former FFL in a manner that, objectively, does not constitute being engaged in the business of dealing in firearms, using the same facts and circumstances test that would apply to persons who have never been licensed.

The preferred manner of disposition of firearms is for the former licensee to:

- Arrange for another FFL to purchase the business inventory; or
- Consign the inventory of firearms to another FFL to sell on consignment, or at auction.

Should a former FFL decide against those options, he/she should be aware that future firearms sales – whether from his/her personal firearms collection or otherwise – will be evaluated for a potential violation of 18 U.S.C. § 922(a)(l)(A), just as would occur with a person who had never been licensed.

If a former FFL is disposing of business inventory, the fact that no firearms purchases are made after the date of license revocation, expiration, or surrender does not immunize him/her from potential violations of 18 U.S.C. § 922(a)(l)(A). Instead, business inventory acquired through repetitive purchases while licensed are attributed to the former FFL when evaluating whether subsequent firearms sales constitute engaging in the business of dealing in firearms without a license.

ATF remains committed to assisting former licensees in complying with Federal firearms laws. If you have questions, please contact your local ATF office.

Megan A. Bennett
Deputy Assistant Director (Industry Operations)
Field Operations

ATF 013427

Appx. 789



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Washington, DC_

www.atf.gov

## IMPORTANT NOTICE

### Selling Firearms AFTER Revocation, Expiration, or Surrender of an FFL

Former Federal Firearms licensees (FFL's) who continue to sell firearms after the revocation, expiration, or surrender of their license are subject to the same rules as persons who have never been licensed in determining whether they are "engaged in the business" of selling firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A). Accordingly, former licensees who wish to dispose of any remaining business inventory must adhere to the following guidance:

Business inventory must be disposed of by the former FFL in a manner that, objectively, does not constitute being engaged in the business of dealing in firearms using the same facts and circumstances test that would apply to persons who have never been licensed.

The preferred manner of disposition is for the former licensee to:

- Arrange for another FFL to purchase the business inventory (and other assets) of the business; or
- Consign the inventory to another FFL to sell on consignment, or at auction.

Should a former FFL decide against those options, he/she should be aware that future sales – whether from his/her personal firearms collection or otherwise – will be evaluated for a potential violation of 18 U.S.C. § 922(a)(1)(A), just as would occur with a person who had never been licensed.

If a former FFL is disposing of business inventory, the fact that no purchases are made after the date of license revocation, expiration, or surrender does not immunize him/her from potential violations of 18 U.S.C. § 922(a)(1)(A). Instead, business inventory acquired through repetitive purchases while licensed are attributed to the former FFL when evaluating whether subsequent sales constitute engaging in the business of dealing in firearms without a license.

ATF remains committed to assisting former licensees in complying with Federal firearms laws. If you have questions, please contact your local ATF office.

Andy R. Graham
Deputy Assistant Director (Industry Operations)
Field Operations

ATF 013428

Appx. 790