# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF UTAH, JEFFREY W. TORMEY, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, and VIRGINIA CITIZENS DEFENSE LEAGUE,** *Plaintiffs,* | § § § § § § § § § § § | |
| **v.** | § § | **CIVIL ACTION NO.2:24-CV-00089-Z** |
| **BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, UNITED STATES DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity as Attorney General of the United States, *and* STEVEN M. DETTELBACH, in his official capacity as Director of ATF,** *Defendants.* | § § § § § § § § § § § | |

## PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

Table of Contents ................................................................................................................ ii

Table of Authorities ........................................................................................................... iii

Argument ...............................................................................................................................1

    I.    Defendants Fail to Undermine Plaintiffs' Standing. ..........................................1

        A.    Texas, Louisiana, Mississippi, and Utah Have Standing: The Rule Directly and Predictably Harms Their Collection of Specific Tax Revenues. ..................1

        B.    Tormey Has Standing. ........................................................................... 8

        C.    GOA, GOF, TFA, and VCDL Have Standing...................................................14

        D.    GOF Has Standing. ...............................................................................19

    II.    The Rule Violates the APA. ................................................................................ 22

        A.    The Rule Conflicts with the Text and Undermines Express Congressional Intent. .................................................................................................... 22

        B.    The Rule's Presumptions Are Unlawful..................................................36

        C.    The Rule of Lenity Applies. ...................................................................41

    III.    The Rule is Unconstitutional. ...........................................................................41

        A.    The Rule Violates the Second Amendment....................................................41

        B.    The Rule Violates the Fourth Amendment..................................................... 44

        C.    The Rule Is Unconstitutionally Vague. ......................................................... 48

        D.    The Rule Violates the Separation of Powers. ..................................................... 48

    IV.    This Circuit's Default Rule is Vacatur, Not "Appropriate[] Limit[ation]"............ 49

Conclusion ...................................................................................................................... 50

Certificate of Service.............................................................................................................53

TABLE OF AUTHORITIES

## Cases

*ACLU v. Santillanes,*
    506 F. Supp. 2d 598 (D.N.M. 2007), rev'd on merits, 546 F.3d 1313 (10th Cir. 2008) .................... 14

*Am. Airlines, Inc. v. TSA,*
    665 F.3d 170 (D.C. Cir. 2011) ........................................................................................................ 11, 21

*Am. Legal Found. v. FCC,*
    808 F.2d 84 (D.C. Cir. 1987) ................................................................................................................. 25

*Antonyuk v. James,*
    2024 U.S. App. LEXIS 26958 (2d Cir. Oct. 24, 2024) ............................................................. 16, 17

*Apalachicola Riverkeeper v. Taylor Energy Co., L.L.C.,*
    113 F. Supp. 3d 870 (E.D. La. 2015) .................................................................................................. 23

*Block v. Meese,*
    793 F.2d 1303 (D.C. Cir. 1986) .............................................................................................................. 4

*Braidwood Mgmt., Inc. v. Becerra,*
    104 F.4th 930 (5th Cir. 2024) ......................................................................................................... 57, 59

*Brigham City v. Stuart,*
    547 U. S. 398 (2006) .......................................................................................................................... 56, 57

*Bryant v. Woodall,*
    1 F.4th 280 (4th Cir. 2021) ................................................................................................................... 16

*Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024) ........................................................................................................ passim

*Carpenter v. United States,*
    138 S. Ct. 2206 (2018) ........................................................................................................................... 54

*Carpenters Indus. Council v. Zinke,*
    854 F.3d 1 (D.C. Cir. 2017) .................................................................................................................... 8

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015) .......................................................................................................................... 53, 56

*Clark v. Scouffas,*
    2000 U.S. Dist. LEXIS 633 (N.D. Ill. Jan. 18, 2000) ....................................................................... 35

*Clinton v. City of New York,*
    524 U.S. 417 (1998) ............................................................................................................................... 14

*Cole v. United States Dep't of Agric.,*
    33 F.3d 1263 (11th Cir. 1994) .............................................................................................................. 42

*Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*,
   686 F. Supp. 2d 663 (E.D. La. 2010) .................................................... 24, 25

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. System*,
   144 S. Ct. 2440 (2024) .................................................................................. 59

*Crossroads Grassroots Pol'y Strategies v. FEC*,
   788 F.3d 312 (D.C. Cir. 2015) ...................................................................... 14

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008) ........................................................................................ 9

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) .................................................................................... 3, 4

*Dep't of Comm. v. U.S. House of Reps.*,
   525 U.S. 316 (1999) ........................................................................................ 9

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ...................................................................... 48, 49, 52

*Do No Harm v. Pfizer Inc.*,
   96 F.4th 106 (2d Cir. 2024) ............................................................................ 2

*Donovan v. Dewey*,
   452 U.S. 594 (1980) ...................................................................................... 55

*El Paso Cnty. v. Trump*,
   982 F.3d 332 (5th Cir. 2020) .......................................................................... 5

*Feuer v. NLRB*,
   786 F. App'x 1014 (Fed. Cir. 2019) ...................................................... 11, 21

*Florida v. Jardines*,
   569 U.S. 1 (2013) .................................................................................... 54, 55

*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
   129 F.3d 826 (5th Cir. 1997) .................................................................. 23, 25

*Gen. Land Office v. Biden*,
   71 F.4th 264 (5th Cir. 2023) ........................................................................... 6

*Harrell v. Fla. Bar*,
   608 F.3d 1241 (11th Cir. 2010) .................................................................... 16

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ...................................................................................... 24

*Johnson v. Smith*,
   104 F.4th 153 (10th Cir. 2024) .................................................................... 54

*Kappa Alpha Theta Fraternity, Inc. v. Harv. Univ.*,
   397 F. Supp. 3d 97 (D. Mass. 2019) ............................................................ 23

**iv**

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ............................................................................................ 42

*Larson v. Valente*,
456 U.S. 228 (1982) ............................................................................................ 10

*Lewis v. United States*,
385 U.S. 206 (1966) ............................................................................................ 55

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .............................................................................................. 3

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................................................... 2

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ............................................................................................... 2

*Manhattan Gen. Equip. Co. v. Commissioner*,
297 U.S. 129 (1936) ............................................................................................ 41

*Marshall v. Barlow's, Inc.*,
436 U.S. 307 (1978) ............................................................................................ 54

*Marszalek v. Kelly*,
2021 U.S. Dist. LEXIS 107613 (N.D. Ill. June 9, 2021) ................................... 19

*McCulloch v. Maryland*,
17 U.S. 316 (1819) .............................................................................................. 24

*McRorey v. Garland*,
99 F.4th 831 (5th Cir. 2024) .......................................................................... 50, 51

*Mollan v. Torrance*,
22 U.S. (9 Wheat.) 537 (1824) ............................................................................. 9

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ........................................................................... 16, 48, 50, 52

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
2024 U.S. Dist. LEXIS 131012 (N.D. Tex. July 23, 2024) ............................... 47

*Nat'l Ass'n of Mfrs. v. United States SEC*,
105 F.4th 802 (5th Cir. 2024) ............................................................................. 58

*Nat'l Mining Ass'n v. United States Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) .......................................................................... 58

*Nat'l Wildlife Fed'n v. Burford*,
835 F.2d 305 (D.C. Cir. 1987) .............................................................................. 2

*Natl. Infusion Ctr. Ass'n v. Becerra*,
116 F.4th 488 (5th Cir. 2024) ........................................................................... 6, 8

v

*New York v. Burger*,
    482 U.S. 691 (1987) ................................................................................................ 56

*New York v. Yellen*,
    15 F.4th 569 (2d Cir. 2021) ...................................................................................... 2

*NRDC v. NHTSA*,
    894 F.3d 95 (2d Cir. 2018) .................................................................................... 6, 7

*Paxton v. Dettelbach*,
    105 F.4th 708 (5th Cir. 2024) ................................................................................ 13

*Range v. Att'y Gen.*,
    69 F.4th 96 (3d Cir. 2023), *granted, vacated, remanded sub nom. Garland v. Range*,
    144 S. Ct. 2706 (2024) ........................................................................................... 49

*Rigby v. Jennings*,
    630 F. Supp. 3d 602 (D. Del. 2022) ...................................................................... 49

*Smith v. Sperling*,
    354 U.S. 91 (1957) .................................................................................................... 8

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) .................................................................................. 16

*Speech First, Inc. v. Killeen*,
    968 F.3d 628 (7th Cir. 2020) .................................................................................... 2

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008) .................................................................................................. 6

*State v. Biden*,
    10 F.4th 538 (5th Cir. 2021) .................................................................................... 6

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ......................................................................................... 9, 14, 17

*Tex. Med. Ass'n v. U.S. Dept. of Health and Human Servs.*,
    110 F.4th 762 (5th Cir. 2024) ................................................................................ 57

*Texas v. BATFE*,
    700 F. Supp. 3d 556 (S.D. Tex. 2023) ................................................................... 25

*Texas v. DHS*,
    2024 U.S. App. LEXIS 30192 (5th Cir. 2024) ...................................................... 33

*Texas v. Mayorkas*,
    2024 WL 455337 (N.D. Tex. Feb. 6, 2024) ............................................................ 9

*Texas v. Rettig*,
    987 F.3d 518 (5th Cir. 2021) ............................................................................ 18, 26

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) .................................................................................... 5

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ...................................................................................10, 6, 9

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ........................................................................................................ 2

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*,
    837 F.3d 678 (6th Cir. 2016) ........................................................................................ 49

*United States v. Arwady*,
    No. 4:14-cr-00090 (S.D. Tex. Feb. 3, 2015) ................................................................ 21

*United States v. Ayala*,
    711 F. Supp. 3d 1333 (M.D. Fla. 2024) ....................................................................... 49

*United States v. Baptiste*,
    607 F. App'x 950 (11th Cir. 2015) ............................................................................... 30

*United States v. Biswell*,
    406 U.S. 311 (1972) ................................................................................................53, 55

*United States v. Carter*,
    801 F.2d 78 (2d Cir. 1986) ........................................................................................... 29

*United States v. Cerri*,
    753 F.2d 61 (7th Cir. 1985) .......................................................................................... 55

United States v. Collins,
    478 F.2d 837 (5th Cir. 1973) ........................................................................................ 20

*United States v. Daniel*,
    982 F.2d 146 (5th Cir. 1993) ........................................................................................ 53

*United States v. Davis*,
    588 U.S. 445 (2019) ...................................................................................................... 41

*United States v. Flores*,
    652 F. Supp. 3d 796 (S.D. Tex. 2023) ......................................................................... 35

*United States v. Gray*,
    470 F. App'x 468 (6th Cir. 2012) ................................................................................. 28

*United States v. Jones*,
    565 U.S. 400 (2012) ...................................................................................................... 53

*United States v. King*,
    735 F.3d 1098 (9th Cir. 2013) ...................................................................................... 30

*United States v. Lopez*,
    704 F.2d 1382 (5th Cir. 1983) ...................................................................................... 41

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ........................................................................................... 49

*United States v. Mulholland,*
   702 Fed. Appx. 7 (2d Cir. 2017) ................................................................ 44

*United States v. Murphy,*
   852 F.2d 1 (1st Cir. 1998) ................................................................ 29, 30

*United States v. Nadirashvili,*
   655 F.3d 114 (2d Cir. 2011) ................................................................ 30

*United States v. Ochoa,*
   726 F. App'x 651 (9th Cir. 2018) ................................................................ 44

*United States v. Rahimi,*
   144 S. Ct. 1889 (2024) ................................................................ 51, 49, 51

*United States v. Shan,*
   361 F. App'x 182 (2d Cir. 2010) ................................................................ 28

*United States v. Shipley,*
   546 F. App'x 450 (5th Cir. 2013) ................................................................ 34

*United States v. Shirling,*
   572 F.2d 532 (5th Cir. 1978) ................................................................ 34

*United States v. Strunk,*
   551 F. App'x 245 (5th Cir. 2014) ................................................................ 35

*United States v. Tarr,*
   589 F.2d 55 (1st Cir. 1978) ................................................................ 29

*United States v. Tyson,*
   653 F.3d 192 (3d Cir. 2011) ................................................................ 34, 35

*United States v. Valdes,*
   681 F. App'x 874 (11th Cir. 2017) ................................................................ 34

*United States v. Wilmoth,*
   636 F.2d 123 (5th Cir. Unit A 1981) ................................................................ 29

*United States v. Zheng Jian Shan,*
   80 F. App'x 31 (9th Cir. 2003) ................................................................ 29

*Usery v. Turner Elkhorn Mining Co.,*
   428 U.S. 1 (1976) ................................................................ 45

*VanDerStok v. Garland,*
   86 F.4th 179 (5th Cir. 2023) ................................................................ 41

*Vitagliano v. Cnty. of Westchester,*
   71 F.4th 130 (2d Cir. 2023) ................................................................ 17

*Wendt v. 24 Hour Fitness USA, Inc.,*
   821 F.3d 547 (5th Cir. 2016) ................................................................ 14

*Wis. Cent. Ltd. v. United States,*
    585 U.S. 274 (2018) ............................................................................. 57

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ............................................................................. 2

**Statutes**

5 U.S.C. § 706(2) ............................................................................................. 59

18 U.S.C. § 921(a)(21)(C) ...................................................................... 12, 26

18 U.S.C. § 921(a)(22) ................................................................................... 36

18 U.S.C. § 922(a)(1)(a) ................................................................................. 8

18 U.S.C. § 922(g)(1) .................................................................................... 49

18 U.S.C. § 922(g)(4) .................................................................................... 49

18 U.S.C. § 924(a)(1)(D) ................................................................................ 8

Tex. Tax Code § 151.051 ................................................................................ 5

**Rules & Regulations**

Fed. R. Civ. P. 56(c)(1)(A) ............................................................................. 2

N.D. Tex. L.R. Civ P. 56.6 ............................................................................. 2

**Other Authorities**

S. Rep. No. 98-583 (1984) ............................................................................ 29

**ARGUMENT**

## I.    DEFENDANTS FAIL TO UNDERMINE PLAINTIFFS' STANDING.

Defendants attack Plaintiffs' standing, rehashing arguments which this Court already rejected. *See* PA399[1] (finding "Plaintiffs Texas, Tormey, and affiliated organizations have sufficiently demonstrated standing"); PA548 (finding "[a]ll Plaintiffs have standing" following supplemental briefing). Defendants reiterate that Tormey's conduct simply "does not amount to being 'engaged in the business,'" that the organizational Plaintiffs' claims likewise fail because they have offered no member with standing, and that the States' harm is "too attenuated" from the Rule and "unsupported by record evidence."[2] ECF 90 at 15, 34.[3] Previously unavailing, those arguments do not move the needle now, and Defendants offer no reason to disturb this Court's prior conclusions. Defendants' only addition is the *non sequitur* that the Article III standing requirement "becomes gradually stricter" towards summary judgment. *Id.* at 20. But simply because this case has moved to summary judgment does not mean that Plaintiffs' initial showing of standing is insufficient now. Even so, Plaintiffs' voluntary inclusion of additional declarations naming various organizational members further confirms this Court's prior holdings.

### A.    Texas, Louisiana, Mississippi, and Utah Have Standing: The Rule Directly and Predictably Harms Their Collection of Specific Tax Revenues.

Texas, Louisiana, Mississippi, and Utah (the "States") stand to suffer a direct injury to their fiscs based on a decrease in tax revenue from reduced gun show attendance and decreased sales by FFLs and non-FFLs alike. Simply put, as the States have shown, the Rule shrinks the firearms market, lowers attendance at gun shows, and denies the States taxable revenue. *See* ECF

---

[1] Citations to "PA___" are to Plaintiffs' Appendix, ECF 83-1.

[2] *But see, e.g.*, Declaration of Darwin Boedeker PA488 ¶¶10, 14 (gun show promoter reporting "a loss of about $150,000 over the last six weeks" because "[p]eople are confused about what they can and cannot do anymore because of the Final Rule"); PA493–95 ¶¶10, 15 (Texas official explaining how "ATF's estimate of decreased firearms sales by unlicensed vendors and persons by 10% is conservative" and Texas will "experience a loss of … tax revenue," should the Rule go into effect).

[3] All citations to the Electronic Case Filing (ECF) number use the page numbers assigned by the ECF system appearing at the top page of the document.

83 at 22 (collecting record cites).[4] This kind of monetary harm "obvious[ly]" qualifies as injury that confers standing. *TransUnion LLC v. Ramirez,* 594 U.S. 413, 425 (2021). Indeed, courts have repeatedly held that states have standing to challenge federal policies that cause them to lose specific tax revenues. *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992); *New York v. Yellen*, 15 F.4th 569, 576 (2d Cir. 2021).

The Rule's predictable effect is to force unlicensed firearms sellers out of the marketplace, directly diminishing taxable transactions at gun shows and other venues. This loss translates into tangible harm to the States' fiscs. Defendants do not seriously contest that such losses, if traceable to the Rule, constitute a cognizable injury. Instead, they argue that the States' standing theory is "too attenuated" and "too speculative," hinging on alleged downstream effects of the Rule on firearms sales and gun show activity. ECF 90 at 33–37. They also assert that the States lack sufficient record evidence to support their claims. *Id.* at 37–40. These arguments twist the rules for Article III standing and ignore the Rule's own admissions. The States' theory of injury rests on a simple causal chain, backed by the Rule's text, and proven by unrebutted evidence.

---

[4] Defendants object to the States' reliance on preliminary injunction briefing and evidence at this stage. *See* ECF 90 at 34 n.10. But the Court does not need to "speculate" about the referenced arguments and evidence. Each cited record document was not only included in the appendix but also cited to with specific page numbers, in compliance with federal and local rules. Fed. R. Civ. P. 56(c)(1)(A); N.D. Tex. L.R. Civ P. 56.6. More than that, the States' reliance on their preliminary injunction evidence proving standing (especially in a case with no open discovery period) is not "standing on old standing." *Contra* ECF 90 at 34 n.10. The States showed standing at the preliminary injunction stage, where "the specificity required for standing allegations" is "no less than that required on a motion for summary judgment." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring); *see also Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 114 (2d Cir. 2024); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990). In other words, just as at the preliminary injunction stage, the States are not "rest[ing] on such 'mere allegations,' [as would be appropriate at the pleading stage] but [have] 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of [this] summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal citations omitted).

### i. The Rule is Substantially Likely to Decrease Specific State Tax Revenues by Forcing Unlicensed Sellers out of the Marketplace.

The States collect sales tax on taxable items sold—including guns sold at gun shows. The Rule targets unlicensed firearms sellers and admits that at least 10% of these sellers will exit the marketplace. *See* PA087. Driving a segment of the taxable population from the marketplace is substantially likely to harm the States' fiscs. Defendants argue that the States' theory of harm fails because the causal chain is "too attenuated," (ECF 90 at 33–37) involving independent actions by third parties. While showing harm from a regulations' effect on third parties can be harder, it is not a "black swan." *Texas v. U.S. Dept. of Homeland Sec.*, ("*Parole in Place*") No. 6:24-CV-00306, 2024 WL 4711951, at *20 (E.D. Tex. Nov. 7, 2024). Standing still exists if the evidence shows "that third parties will likely react in predictable ways" to the defendant's challenged conduct. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Certainty is not required, so long as the likely reaction "does not rest on mere speculation." *Id*. Nor is proximate causation required. Rather, the inquiry is whether the harm on third parties is "fairly traceable" to the challenged action and whether it is "substantially likely" as opposed to speculative. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014); *accord Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.) (noting that standing "requires no more than *de facto* causality").

The Supreme Court's decision in *Department of Commerce v. New York* shows this point. There, multiple states had standing to challenge the inclusion of a citizenship question on the 2020 census, even though the harm depended on a multi-step causal chain involving two sets of third parties: census recipients and funds-granting agencies. Nevertheless, the Court upheld standing because the census design predictably caused response rates to decline, which predictably reduced federal funding. *See, e.g., Dep't of Com.*, 588 U.S. at 759–60, 767–68 (holding that states had standing to challenge a census question because the question could lead to lower participation in the census, which could lead to a population undercount, which could lead to New York receiving less funding from the federal government).

Here, the causal chain is far simpler. The Rule's admitted aim is to force a segment of unlicensed sellers out of the firearms marketplace through threat of civil and criminal penalties. Fewer people selling guns means less taxes collected on those transactions. Defendants' reliance on *El Paso Cnty. v. Trump*, 982 F.3d 332 (5th Cir. 2020), and *FDA v. Alliance for Hippocratic Med.* *("Alliance")* 602 U.S. 367 (2024) are misplaced. ECF 90 at 35–37. For starters, the plaintiff in *El Paso* was a county, not a state. In other words, "El Paso County [was] not directly harmed by the cancellation" of the military base project because "no part of the $20 million *would be paid to the county itself*." *El Paso Cnty.*, 982 F.3d at 338 (emphasis added). Yet here, state sales tax is paid *directly to* the States. *See, e.g.*, PA494 ¶ 13; Tex. Tax Code § 151.051. Beyond that, the *El Paso* plaintiff did not allege the challenged federal policy would cost it specific tax revenues. Rather, it asserted generally "that the economy of the county at large will be harmed, resulting in a reduction in general tax revenues for the county." *El Paso Cnty.*, 982 F.3d at 340. But the States' injuries are not so general. Rather, the States have provided evidence showing a likely reduction in the collection of a specific type of tax revenue—state sales tax—caused by a reduction in a specific kind of sale—guns—which will be caused by the Rule. PA470–476, 487–490, 491–96, 503–04; *see also Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022) ("In *El Paso*, we expressly noted that 'the loss of a specific tax revenue' could establish standing'") (quoting *El Paso*, 982 F. 3d at 341).

And in *Alliance,* private plaintiffs lacked standing to challenge FDA's approval of mifepristone, which plaintiffs did not prescribe, based on their desire that *other* providers would not prescribe it either. *Alliance*, 602 U.S. at 374. Relevant here, *Alliance* reaffirmed that standing is established if the States show "a predictable chain of events leading from the government action to the asserted injury." *Id*. at 385. The States have done so. Indeed, the Rule admits that a segment of unlicensed sellers will exit the market.[5] PA087; *see also NRDC v. NHTSA*, 894 F.3d 95, 104–05

---

[5] The Court does not need to put an exact number on this percentage, as even "a dollar or two" of fairly predictable costs as a result of agency action show standing. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008).

(2d Cir. 2018) (proof of predicable reaction of third parties in standing analysis shown "by the agency's own pronouncements"); *Parole in Place*, 2024 WL 4711951, at *31 (same).

Without the Rule taking effect, the States would not suffer a loss to their fiscs since unlicensed sellers and other potential purchasers of firearms would not be forced from the marketplace through threat of civil and criminal penalties. *See Natl. Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 499 (5th Cir. 2024) (finding traceability based on changing "incentives" that are likely to make third parties act in 'predictable ways.'") (quoting *Alliance,* 602 U.S. at 383).[6]

### ii.    The States Need Only Show a Substantial Likelihood of Fiscal Harm, Not Actualized Losses.

Defendants argue (ECF 90 at 37–40) the States lack evidence that the Rule has reduced sales tax revenues or gun show attendance. But the States are not required to show an injury has actualized—just that it is substantially likely one will occur. To that end, this argument ignores both the Rule's admissions and the unrebutted record evidence. The Rule admits that 10% of unlicensed sellers will leave the market due to its requirements. Far from speculative, that is the Rule's intended effect. Courts routinely accept such agency admissions as evidence of causation. *See, e.g., NRDC*, 894 F.3d at 104–05.

Defendants also argue (ECF 90 at 38) that the removal of unlicensed sellers will not reduce overall firearm sales because buyers can simply turn to FFLs or other sellers. But this overlooks the basic reality of how markets operate. The Rule will drive a segment of sellers out of business, leading to a reduction in taxable transactions. The agency itself acknowledges that 10% of unlicensed sellers will exit the market because they are "unwilling or *unable*" to obtain an FFL. PA087 (emphasis added). A marketplace with fewer sellers is not the same marketplace. And it is as least substantially likely that fewer sellers will mean fewer opportunities for sales, which means

---

[6] Indeed, the Fifth Circuit has repeatedly found standing to challenge agency action based on proof of how regulated (or regulable) third parties will predictably respond. *See, e.g., Gen. Land Office v. Biden*, 71 F.4th 264, 271–75 (5th Cir. 2023) (recognizing Texas's standing based on an agency action's predictable consequences on aliens' participation in state-funded programs); *State v. Biden*, 10 F.4th 538, 545–49 (5th Cir. 2021) (same); *Texas v. United States*, ("*DAPA*") 809 F.3d 134, 151 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (same).

less specific tax revenues collected on those specific transactions.

The States have also presented unrebutted declarations from state officials and industry participants evidencing the injuries that will occur to the state fiscs because of the Rule. *See* PA470–476, 487–490, 491–96, 503–04. For example, Texas gun show organizer Darwin Boedeker detailed significant declines in vendor participation and attendance, directly tied to the looming enforcement of the Rule. *See* PA489–90 ¶¶ 21–26.[7] Defendants (ECF 90 at 39) dismiss this evidence since these losses predate the Rule's effective date. But that is the point: these declines reflect a predictable response to the anticipated enforcement of a Rule expanding a statute that threatens severe civil and criminal penalties. *See, e.g., Nat'l Infusion Ctr. Ass'n*, 116 F.4th at 499.[8] Put simply, it is "common-sense," *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (Kavanaugh, J.), that some unlicensed sellers unable or unwilling to obtain an FFL would, preemptively exit the marketplace rather than risk up to five years in prison, a $250,000 fine, or both.[9]

Next, Defendants assert (ECF 90 at 39–40) that the States must prove actual revenue losses in non-party jurisdictions to establish standing. But this argument misreads Article III's requirements. To be sure, the States bear the burden of demonstrating standing. But any alleged lack of harm from the Rule suffered by non-party States, as well as events after the complaint was

---

[7] The electronic signature of Mr. Boedeker was removed when the appendix was uploaded. This document is the same signed document in the record. *See* ECF 61–1. Still, Plaintiffs have supplemented the appendix with the signed declaration. *See* ECF 91.

[8] The ATF's actions in a similar context leaves gun owners like Mr. Boedeker with little appetite for playing chicken with the Rule's effective date. On March 19, 2024, just weeks before this case was filed, ATF agents conducted a pre-dawn, no-knock raid of the Malinowski home in Little Rock, Arkansas, alleging unlicensed firearm sales. *See Released search warrant affidavit shows details of ATF case against Little Rock Airport executive Bryan Malinowski*, KARK, (Mar. 21, 2024) https://www.kark.com/crime/released-search-warrant-affidavit-shows-details-of-atf-case-against-little-rock-airport-executive-bryan-malinowski/(last visited Dec. 11, 2024). Agents disabled the family's doorbell camera and initiated an armed confrontation. Believing intruders threatened his family, Mr. Malinowski tried to defend his home but was shot in the head and died two days later. Austin Gelder, *Attorney releases video, says airport exec killed in early morning raid likely mistook ATF agents for intruders*, ARKANSAS TIMES (Apr. 7, 2024) https://arktimes.com/arkansas-blog/2024/04/07/attorney-says-airport-exec-killed-in-early-morning-raid-likely-mistook-atf-agents-for-intruders (last visited Dec. 11, 2024).

[9] 18 U.S.C. § 922(a)(1)(a); 18 U.S.C. § 924(a)(1)(D).

filed, cannot undercut the standing of the named parties here. *See Smith v. Sperling*, 354 U.S. 91, 93 (1957) ("It is quite clear, that the jurisdiction of the Court depends upon the state of things at the time of the action brought, and that after vesting, it cannot be ousted by subsequent events.") (citing *Mollan v. Torrance*, 22 U.S. 537, 539 n.1, 9 Wheat. 537 (1824)); *Texas v. Mayorkas*, 2024 WL 455337, at *2 (N.D. Tex. Feb. 6, 2024) (Kacsmaryk, J.) ("[A]ny data subsequent to the Rule's enactment purporting to show a stasis or decrease in illegal immigration is irrelevant to the standing inquiry").[10]

Rather, the States need only prospectively show a substantial likelihood of injury from the Rule—not actual harm. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (holding that a substantially likely injury "need not be actualized" to satisfy Article III); *Dep't of Comm. v. U.S. House of Reps.*, 525 U.S. 316, 332–33 (1999) (holding that plaintiffs had standing "on the basis of the expected effects" of the challenged census conduct "on intrastate redistricting" because particular jurisdictions "were substantially likely. . . [to] suffer vote dilution in state and local elections" even though the substantially likely even was years away at the time plaintiffs filed their complaint); *see also Dep't of Com.* at 320; *Contra* ECF 90 at 40 ("State plaintiffs' reduced-revenue theory of injury depends entirely on whether the States will *actually* experience" a decrease in tax revenue) (emphasis added). The States have done so here.

Last, Defendants infer (ECF 90 at 40) that potential offsets—such as discretionary income being spent on other taxable goods—could undercut the States' injuries. Beyond this argument being speculative, the Fifth Circuit has repeatedly held that standing is not an accounting exercise and that a plaintiff's injury cannot be offset by gains that may turn up elsewhere. *See, e.g., DAPA*,

---

[10] In the same way, the States need not prove a decrease in aggregate firearms sales in these other jurisdictions to show standing. *Contra* ECF 90 at 38 n. 13. Article III requires only a concrete and particularized injury that is fairly traceable to the challenged action. The Rule's own admissions, coupled with the States' evidence, demonstrate a clear causal connection between the Rule and the States' fiscal injuries. The difficulty of quantifying these effects does not render the injuries speculative. *See DAPA*, 809 F.3d at 155.

809 F.3d at 155 (holding that Texas's increased costs of issuing more driver's licenses created standing regardless of whether the drivers would generate auto-registration income for Texas or increase Texas's tax revenues). The same is true in assessing redressability. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury.").

In the end, the States have standing. The Rule cuts directly into specific tax revenues by shrinking the firearms market, reducing gun show attendance, and driving down sales by licensed and unlicensed sellers. These injuries are predictable; they are grounded in unrebutted evidence and the Rule's own admissions. Defendants' attempts to label these harms as speculative ignore the simple causal chain at play and misreads controlling precedent. The Rule is substantially likely to cost the States money because it targets unlicensed sellers of firearms and predictably drives them from the market. For these reasons, the States have met their burden, and the Court should confirm their standing.

### B. Tormey Has Standing.

Defendants dispute Tormey's standing, claiming his desired course of conduct conclusively does not "amount[] to being 'engaged in the business' of dealing in firearms." ECF 90 at 21. But this is nothing more than "[a]n agency's post-hoc and self-serving determination" which "cannot override textual evidence to the contrary." *Am. Airlines, Inc. v. TSA*, 665 F.3d 170, 174 (D.C. Cir. 2011); *see also Feuer v. NLRB*, 786 F. App'x 1014, 1018 (Fed. Cir. 2019) (cleaned up) ("Courts do not defer to an agency's convenient litigating position or *post hoc* rationalization advanced to defend past agency action against attack."). Indeed, after citing the very allegations which satisfied this Court of Tormey's standing two times before, Defendants fault Tormey for omitting "any statement indicating that he sells or intends to sell firearms with the predominant intent to 'earn a profit' – an essential element of being 'engaged in the business' of firearms dealing." ECF 90 at 22. But the main issue with the Rule is that it *presumes one engages in the business*

8

and *presumes an intent to earn a profit* even without any *actual intent* to do so. At no point do Defendants acknowledge this central concern.

Even so, Tormey's collecting activities bear emphasis. As Tormey stated in his declarations, he "maintain[s]" a "large personal collection of firearms" which he has "enhanc[ed]" partly through attending "local gun shows for many years," where he "previously purchased a table" on several occasions to facilitate private sales. PA207 ¶¶4, 5, 8. Indeed, "maintenance and enhancement" of Tormey's "'personal collection' of firearms includes buying and selling firearms through private sales, from time to time." PA416 ¶3. Tormey maintains his collection for the "necess[ity]" of a "free state," for "self-defense," and for other lawful purposes. PA207 ¶4; PA416 ¶4. He intuitively understands "all" such firearms to belong to his "personal collection." PA416 ¶4.

Overall, Tormey has "sold at least a couple, or even several, firearms per year, through various mediums, for a number of years." PA207–08. As he explained, "[t]his is due to a number of factors, including getting rid of guns I no longer want, freeing up funds for guns that I do want, or trading up to nicer models as funds permit, all in order to enhance [my] collection of firearms...." *Id.* Indeed, Tormey occasionally changes his self-defense firearms in response to "rapid[] changes" in firearms technology such as "more compact designs, ... various sights or optics, ... reliability, ergonomics, and recoil management." PA417. For example, Tormey currently is "in the process of upgrading [*i.e.*, selling] some of [his] Generation 3 Glocks to the Generation 5 Glocks that are 'MOS' models" capable of installing pistol optics. *Id.* ¶7. And sometimes after purchasing a firearm for self-defense, Tormey decides it is "not for [him]" after "carrying it for a bit," at which point he sells it. *Id.* ¶9. In other words, Tormey has "sold firearms and in the future plan[s] to sell firearms in an effort to upgrade and enhance [his] collection of self-defense firearms." *Id.* ¶8.

Tormey's stated conduct falls within the Rule's orbit in a number of ways. First, by virtue of his having purchased tables at gun shows to facilitate his occasional sales, the Rule already presumes Tormey "inten[ded] to predominantly earn a profit" from those sales by "[r]epetitively

… purchas[ing] … temporary physical space to display firearms [he] offer[ed] for resale, including … a table or space at a gun show. . . . " PA124 (PEP presumption 2). Second, while the statute expressly protects Tormey's "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection" via its safe harbor provision, 18 U.S.C. § 921(a)(21)(C), the Rule excises "firearms accumulated primarily for personal protection" from his "personal collection," thereby removing Tormey's explicit statutory protection for their "occasional sale[], exchange[] or purchase[]." PA123. The Rule's default warning that "even a single firearm transaction or offer to engage in a transaction. . . may require a license" therefore threatens Tormey with a licensing requirement for his multiple sales from his personal collection. PA124. And third, Tormey finds the Rule's unpredictable "[f]act-specific" edicts to be "so convoluted, vague, and ambiguous" that even he, a lawyer, "fear[s] that … the Final Rule will be wielded as a weapon against" him. *Id.*; PA208–09. Indeed, the Rule forces Tormey to "question whether [his] private purchasing and selling of … personal firearms is in fact criminal activity. . . . " PA417. Tormey therefore fears enforcement action if he is "to continue to engage" in the occasional sales "that the statute allows. . . . " PA209.

Consequently, Defendants' assertion that Tormey's repetitive purchasing of tables at gun shows "does not come close to amounting to '[*r*]*epetitively or continuously* purchas[ing]' or 'rent[ing] … physical space to display firearms … for resale'" is meritless. ECF 90 at 23. Demanding to know "exactly when and how frequently" Tormey purchased tables, *id.*, Defendants ignore their *own definitions* of the term "repetitive" contained within the Rule, which make no mention of precise timing or frequency. Indeed, according to Defendants, the term's "ordinary meaning" simply is "containing repetition" and "the act or instance of repeating or being repeated." PA025 n.124. If that was enough for the Rule, how can it be any different now?

Defendants' argument that Tormey cannot challenge the Rule's "single firearm transaction or offer" warning also fails. ECF 90 at 23; *see also* PA124. Claiming Tormey omitted "any 'other evidence' that might even arguably show" he has standing, ECF 90 at 23, Defendants fail to acknowledge that the Rule's warning provides *exempli gratia*, leaving entirely up to ATF just

what that "*other evidence*" may be. *See also* PA124 (conceding an amorphous "[f]act-specific inquiry"). Tormey certainly can challenge the Rule's replacement of statutory certainty (purchases and resales) with ambiguity.

Next, Defendants rely on *Paxton v. Dettelbach*, 105 F.4th 708 (5th Cir. 2024), for the proposition that "merely selling a firearm does not give Tormey (or any other person) standing to challenge the Rule." ECF 90 at 23. But as Defendants note, the *Paxton* plaintiffs failed to allege that they wished to make silencers *in violation of the very law they were challenging. Paxton,* 105 F.4th 708 at 10–11. Defendants' comparison therefore falls flat, as it merely repackages their argument that Tormey's conduct is not in violation of the Rule. In contrast, Tormey has alleged that his conduct falls within the scope of the Rule and thus is unlawful. PA209 ¶17; PA417 ¶¶9, 11. *Paxton* therefore *supports* Plaintiffs by implying that they *do* have standing here.

Defendants next claim that Tormey lacks standing to challenge the loss of safe harbor protection for his "personal collection" sales of self-defense firearms because he "does not satisfy the express elements of being 'engaged in the business' of dealing in firearms." ECF 90 at 25. Defendants thus purport to require something *more* than their removal of statutory protection to challenge that removal – *i.e.*, that Tormey show that he *is* "engaging in the business" to challenge loss of the statute's declaration of when he *is not* engaged in the business. *Id.* at 11–12. But "[n]othing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law," *Susan B. Anthony List*, 573 U.S. at 163, and courts have long held that the removal of a benefit alone confers standing. *See, e.g.*, *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 552 (5th Cir. 2016) (cleaned up) ("[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing."); *see also Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) ("a denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result."); *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 317 (D.C. Cir. 2015) (finding "a sufficient injury in fact where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's

benefit."); *ACLU v. Santillanes*, 506 F. Supp. 2d 598, 620 (D.N.M. 2007) (loss of statutory option to vote in person at polling place is injury that confers standing), *rev'd on merits*, 546 F.3d 1313 (10th Cir. 2008). Here, Congress created a clear statutory protection of which Plaintiffs wish to avail themselves. Defendants deprived Plaintiffs of that protection in the vast majority of cases.[11] Nothing more is needed to challenge that deprivation.

Next, Defendants recount that "Plaintiffs pointed to a 2014 criminal prosecution of a former FFL [Mr. Arwady] who was charged with unlawfully selling firearms without a license as evidence that there was a 'genuine threat' of the Rule being enforced against Tormey." ECF 90 at 25 n.3; *cf.* PA554 (finding "Mr. Arwady's case and that of Tormey are relevantly similar in at least three ways"). Defendants then claim that Plaintiffs omitted mention of Mr. Arwady for summary judgment "presumably because they recognize that a prosecution that predated the Rule by a decade says nothing about what conduct *the Rule* encompasses...." ECF 90 at 25 n.3. Not so. Plaintiffs discussed Mr. Arwady's prosecution twice more for summary judgment, specifically mentioning him as a reason Plaintiffs have standing (ECF 83 at 9–10), and then in explaining why "former licensee inventory" contravenes the statute (*id.* at 24 n.22). But more importantly, Mr. Arwady's prosecution absolutely informs "what conduct *the Rule* encompasses" (ECF 90 at 25 n.3), because Defendants *themselves* admit the Rule is "grounded in decades of case law and law enforcement experience" (*id.* at 1) – but apparently not *that* case law or *that* enforcement experience.

Next, Defendants disclaim any credible threat of prosecution against Tormey, claiming he "offers no examples of the Rule being applied to gunowners who, like him, only occasionally sell firearms for the purpose of upgrading their private collections." ECF 90 at 25. *Au contraire*, as Defendants once again omit their prosecution of GOA member Arwady, as well as the GOA

---

[11] *See* PA561–62 ("Defendants maintain their interpretation despite acknowledging that 'two thirds of Americans report owning firearms primarily for "defense" or "protection"' – thereby necessitating the absurdity that the statute's safe harbor provision provides *no safe harbor at all* for the majority of gun owners.").

member Plaintiffs identified who ATF accused of "engaging in the business." *See* ECF 83 at 20 (citation omitted) ("GOA spoke with one of its members who recently reported visits from ATF agents claiming the member is engaged in the business, based on a small number of sales during the past year that "were never to make a profit. In other words, the Rule is being enforced against GOA members."). Moreover, Defendants ignore that the Rule has been enjoined in four states and as against millions of members of the organizational Plaintiffs – members who follow organizational news, are involved in the legal process, and therefore are more likely to wish to sell firearms in the first place. PA565. It is thus unclear exactly who Defendants would prosecute without risking violating this Court's order. And irrespective of Defendants' request for "examples," "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity[12] by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020); *see also Antonyuk v. James*, 2024 U.S. App. LEXIS 26958, at *125 (2d Cir. Oct. 24, 2024) ("[W]e 'presume … intent [to enforce the law] in the absence of a disavowal by the government or another reason to conclude that no such intent existed.'"); *Harrell v. Fla. Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010) ("If a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred."); *Bryant v. Woodall*, 1 F.4th 280, 286 (4th Cir. 2021) ("[L]aws that are 'recent and not moribund' typically do present a credible threat."). The Rule is about as "non-moribund" as it gets, and Defendants' vigorous defense of it speaks volumes as to their intent to enforce it.

Finally, Defendants dispute the imminence of Tormey's harms, maintaining that Tormey's declarations "lack the necessary detail to establish" his "'professed intent' to sell firearms in the future. . . . " ECF 90 at 26; *see also id.* (characterizing Tormey's allegations as

---

[12] *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022) (holding the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees'").

"'some day' intentions"). But the "Supreme Court has repeatedly found plausible allegations of injury" based even "on relatively vague future intentions," *Antonyuk*, 2024 U.S. App. LEXIS 26958, at *190, and courts routinely hold that "a plaintiff asserting a pre-enforcement challenge … does not necessarily require specification of the date and time she plans to do something of constitutional significance." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 137 (2d Cir. 2023). Defendants' demand that Plaintiffs identify "prospective buyers" and the exact "prices [Tormey] expects to charge" (ECF 90 at 26) amounts to precisely the sort of specifics which standing law does *not* require. *See also Susan B. Anthony List*, 573 U.S. at 163 ("Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law.").

Moreover, Defendants simply fail to engage with Tormey's allegations. Belying Defendants' claim that Tormey "provides no information about the specific firearms he intends to sell," Tormey explained that he is "in the process of upgrading some of [his] Generation 3 Glocks that are 'MOS' models. . . . " ECF 90 at 26; PA417 ¶7. Likewise, while Defendants claim Tormey does not "specify *when* any such future sales are to take place," ECF 90 at 26, Tormey explained he is "*in the process*" of selling those firearms now, an activity that has been his regular course of conduct for years.; PA417 ¶7 (emphasis added); PA207–08 ¶9. Tormey need not be any more regular or specific. *Cf. Antonyuk*, 2024 U.S. App. LEXIS 26958, at *144 (finding standing to challenge a firearm restriction in zoos when a plaintiff averred that he visits "at least once or twice every fall"). All told, Tormey has standing, as this Court has twice determined.

### C.  GOA, GOF, TFA, and VCDL Have Standing.

Because Tormey has standing, this Court need not revisit its prior standing analysis as to the organizational Plaintiffs because "[i]f one plaintiff has standing for a claim, then Article III is satisfied as to all plaintiffs." *Texas v. Rettig*, 987 F.3d 518, 528 (5th Cir. 2021). Even so, this Court's prior findings that Plaintiffs GOA, GOF, TFA, and VCDL all had standing were correct at each

stage of this litigation, and Defendants' present arguments to the contrary fall flat. *See* PA400–402; PA554–58.

As this Court already concluded, GOA, TFA, and VCDL each have standing to challenge the Rule as traditional membership organizations seeking relief on behalf of their members. Each organizational Plaintiff identified "specific members" aside from "Tormey – who has standing" – "who will be impacted" by the Rule in various ways, as detailed in the declarations of Erich M. Pratt (GOA/GOF), C. Richard Archie (TFA), and Philip Van Cleave (VCDL). PA555. Even though Plaintiffs' prior showing for preliminary relief remains sufficient to maintain standing now, Plaintiffs further supplemented their already supplemental declarations for summary judgment, going beyond that which precedent requires by *naming* the previously identified members in new declarations. *See* PA710-17.[13]

Even so, Defendants now bemoan that Plaintiffs' newest declarations "simply provide the names of these previously unidentified members and otherwise repeat the same allegations...." ECF 90 at 27 n.4. But this is precisely what Defendants *demanded* when opposing preliminary relief in the first place – a point this Court noted but ultimately declined to require. PA556–57. ("Defendants next argue that the organizations must identify their members by *name* to have associational standing. … [S]ome other Circuits require a named member. … But this Circuit does not."). In other words, Defendants complain that they got what they wanted.

Next, Defendants advance iterations of the same arguments they raised before, beginning with an insistence that the organizational Plaintiffs lack standing because they do not identify any members with standing to Defendants' liking. ECF 90 at 27. But this Court already found Plaintiffs' declarations to identify members with standing in their own right, PA556-68, and so

---

[13] Defendants note that the Davis declaration lacks a signature and date (PA715) and that the Hughes declaration lacks a date (PA717). ECF 90 at 17 n.6, 18 n.8. When preparing the Appendix to Plaintiffs' Motion for Summary Judgment, ECF 83-1, the fully signed and dated copies of these declarations were digitally "flattened" using Adobe, which caused certain handwritten features sporadically to disappear from view. *See also supra* n.7. Plaintiffs apologize for the oversight and have supplemented the appendix with the signed declarations. ECF 92–93.

Defendants' objections amount to nothing more than "respectful[] disagree[ment]" at this stage. *See, e.g.*, ECF 90 at 53.

Defendants next fault Plaintiffs for relying on previously submitted declarations while "facing a more stringent standing burden at the summary judgment stage...." *Id.* at 27. But this is a *non sequitur*, as Defendants do not cite – and Plaintiffs likewise are unaware of – any authority requiring a plaintiff to submit *more* material on standing for summary judgment, for its own sake, when prior declarations already were sufficient. This Court should reject Defendants' invitation to craft a new rule of pleading.

Defendants then fall back on their previous hearsay objection to the contents of Plaintiffs' declarations, claiming Plaintiffs "ask the Court to accept the leaders' summaries of . . . conversations as proof that the members are, in fact, injured by the Rule . . . ." *Id.* at 28. But as this Court already noted, "the declarations provide concreteness and detail, not mere fears that the Final Rule will affect the declarants in *some* way." PA557. Notably absent from Defendants' reliance on general hearsay cases is *any* case standing for the proposition that representational standing (which unambiguously does *not* require individual participation of members) nevertheless requires their individual participation to avoid a hearsay objection. On the contrary, at least one court has found "organizations' descriptions of their membership [to be] supported by declarations from their officers. The Court has no reason to doubt the truthfulness of these declarations." *Marszalek v. Kelly*, 2021 U.S. Dist. LEXIS 107613, at *12 (N.D. Ill. June 9, 2021).

But once Plaintiffs proved the contents of their earlier declarations by naming the previously identified members discussed therein and having them reiterate their statements personally, PA710–17, Defendants still object. ECF 90 at 29–32. Thus, it would seem that Defendants only will be satisfied if Plaintiffs submit every affected person, each with his own declaration, as a named plaintiff. But if that were the case, it is unclear what Defendants would hope to do with such voluminous evidence. Indeed, the purpose of the general rule against hearsay is to ensure that evidence may be tested, live, for its reliability. *See, e.g.*, *United States v. Collins*, 478 F.2d 837, 838 (5th Cir. 1973). But Defendants have not sought to depose or otherwise cross-

examine any declarants here, but merely object for objection's sake.

Fourth, although Defendants keep shifting the goalposts – first demanding naming, and upon naming then objecting on hearsay grounds – this is all beside the point. Plaintiffs supplied this Court with declarations from Tormey, Archie, Crump, Davis, and Hughes, which clearly support the organizational Plaintiffs' standing. For each, a by-now-familiar theme runs through Defendants' counterarguments – Defendants simply ordain each individual's conduct to not rise to the level of "engaging in the business" because no individual claimed a "predominant intent to earn a profit." *See, e.g.*, ECF 90 at 22 ("Absent from Tormey's declarations, however, is … the predominant intent to 'earn a profit'...."), 23 (Tormey "does not identify … evidence that he would make such sales with the requisite intent to earn a profit"), 29 (Archie "expressly disclaims any intent to sell firearms 'for a profit'...."), 30 ("There is … no evidence that Crump otherwise sells firearms with the predominant intent to earn a profit...."), *id.* ("Nowhere does Davis indicate that he makes such sales with the intent to profit."), 31 (Hughes "does not assert that he sold any firearms at that show, let alone with the intent to earn a profit."). But under the Rule, *that is the whole point*. The Rule presumes an "intent to predominantly earn a profit," PA124, based on certain fact patterns, *even when there is no actual intent to profit*. Thus, irrespective of one's intent or lack thereof, the mere fulfillment of a factual condition establishes the *presumption of intent* and accordingly subjects the gun owner to enforcement action. Defendants' argument against standing therefore fails – Plaintiffs remain subject to the Rule's presumptions and attendant enforcement actions even if they "expressly disclaim[] any intent to sell" for a profit. ECF 90 at 29.

Defendants then attack GOA's use of the Arwady prosecution, claiming that "[m]any of the statements describing this member are … hearsay" and not "competent summary judgment evidence." *Id.* But the information contained within also is reflected in the case's public criminal docket, and this Court can judicially notice those facts. *See* Indictment, *United States v. Arwady*, No. 4:14-cr-00090 (S.D. Tex. Feb. 3, 2015), ECF 65 (confirming that Mr. Arwady was an FFL, *id.* ¶¶2–4, that he subsequently surrendered his license, *id.* ¶5, and that firearm sales occurred after his license surrender, *id.* ¶¶10-14). And to the extent Defendants claim a "decade-old enforcement

proceeding ... says nothing about ... *the Rule*[]" (ECF 90 at 29), Defendants once again speak from both sides of their mouths, claiming elsewhere within the same brief that the Rule is "grounded in *decades of ... law enforcement experience*" (*id.* at 1) (emphasis added).

Turning to Crump, Defendants seem to acknowledge that the plain text of a presumption applies to him by virtue of his use of a spreadsheet to track firearm data, but they demur that "the Rule's preamble" disclaims application of the presumption to "general recordkeeping" and "tracking of 'the *cost of obtaining* [his] firearms.'" ECF 90 at 30 (emphasis added). But Crump tracks not only purchase prices but also the "*sold price*" (PA711–12 ¶ 11), and Defendants' self-serving characterization of Crump's "occasional" sales as not being "repetitive" is inapposite. ECF 90 at 30; *see Am. Airlines, Inc.*, 665 F.3d at 174; *Feuer*, 786 F. App'x at 1018.

As for Davis, Defendants once again claim no "intent to profit" and therefore no "engaging in the business." ECF 90 at 30. But then, Defendants add: "*Nor does selling ten firearms over the course of several years* constitute 'devot[ing] time, attention, and labor to dealing in firearms as a regular course of trade or business.'" *Id.* (emphasis added). Unfortunately, Defendants' assurance binds no one. First, having been made without qualification, this statement would seem to include even sales made with the *intent to profit* as not constituting "engaging in the business," even though Defendants simultaneously insist that intent to profit is a predicate to "engaging in the business." And second, Defendants' sudden offer of specific numbers (ten firearms over several years) contravenes the Rule's own acknowledgement that "the Department does not believe there is currently a sufficient evidentiary basis ... to support a specific minimum number of firearms bought or sold for a person to be considered 'engaged in the business.'" PA009. Defendants simply cannot make the assurance they purport to make with respect to Davis's activities.

And with Hughes, Defendants dispute the application of the Rule's gun show table presumption to him, claiming Hughes "does not assert *that he sold* any firearms at that show, let alone with the intent to earn a profit." ECF 90 at 31 (emphasis added). But the Rule requires neither a sale nor profit for the *presumption* of intent to apply. *See* PA124 ("Repetitively ... rents

… to secure permanent or temporary physical space to display firearms they offer for resale, including … a table or space at a gun show . . . .")). And Defendants' claim that "Hughes' infrequent sales activity would not trigger the presumption" (ECF 90 at 31) is similarly unavailing, as they had just noted that Hughes "does not state how frequently such sales take place" (*id.*). In other words, Defendants simultaneously profess to have no idea as to the frequency of Hughes' sales, but apparently enough of an idea to know they are *infrequent*.

Defendants conclude with their pièce de resistance – a purportedly "fatal flaw[]" in Plaintiffs' case, because "the Rule has been in effect for over six months," yet no Plaintiff "states in his declaration that he has stopped selling firearms,[14] … faced any consequence under the Rule for selling firearms, … or otherwise been concretely injured by the Rule in some way during that time. . . ." ECF 90 at 31. Apparently lost on Defendants is the fact that these people are either named Plaintiffs or members of the organizational Plaintiffs with a preliminary injunction *from this Court* preventing ATF from enforcing this Rule against them. These persons are expressly permitted to engage in the conduct that is lawful under the statute but which the Rule presumes unlawful.

### D. GOF Has Standing.

Finally, Defendants dispute GOF's standing. ECF 90 at 32–33. But Defendants do nothing to undermine this Court's prior analysis, which correctly held that, although not a traditional membership organization, GOF has sufficient "indicia of membership" to effectively represent its supporters' interests in litigation. PA555–56. Claiming GOF "satisfies only the third requirement" of the "indicia of membership" test (ECF 90 at 32), Defendants misconstrue the test as imposing conjunctive requirements – *i.e.*, elements – rather than non-exhaustive factors – *i.e.*, "*indicia*" –

---

[14] *But see* PA712 ¶12 (Crump declaring that, "if the Rule takes effect, I no longer will sell firearms from my private collection, even occasionally, because the spreadsheet that I maintain … could expose me to liability").

which definitionally are not conjunctive.[15] Indeed, Defendants cannot find such a rule within their own case law (ECF 90 at 32), which, in *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997), saw the fulfillment of only two non-exhaustive "indicia of membership" factors originally discussed in *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977).

Next, Defendants claim a lack of evidence "that GOF's supporters otherwise exert any degree of formal control over the organization's activities," ECF 90 at 32, but none of their cited cases – not even *Hunt* – requires that supporters "*control*" the organization. *See id.* at 19–20. Rather, as one of Defendants' cited cases made clear, "[t]he purpose of the inquiry is to determine whether the association provides the means by which its members 'express their collective views and protect their collective interests.'" *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 675 (E.D. La. 2010). GOF does just that. *See* PA446 ¶¶50, 52 ("Our supporters contribute to GOF specifically so that we can bring litigation like this. Many have donated to GOF specifically in order to fund this litigation . . . .GOF's supporters desire that GOF be involved in this case . . . ."); *cf. Hunt*, 432 U.S. at 344 ("they alone finance its activities, including the costs of this lawsuit"). GOF's supporters therefore have the power of the *purse* – perhaps the most control one *can* exert, to the extent "control" even is required. Indeed, just as how "the power to tax involves the power to destroy," *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819), so too is the "power over the purse … the most complete and effectual weapon … [to] arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." The Federalist No. 58 (Madison). If GOF's supporters disagree with its mission or activities, they simply can withhold funding and cease its

---

[15] Even applying the same test, courts often list additional "indicia" which vary from case to case and court to court. *See, e.g.*, *Apalachicola Riverkeeper v. Taylor Energy Co., L.L.C.*, 113 F. Supp. 3d 870, 876 (E.D. La. 2015) (identifying "associating with the organization voluntarily" and "providing sworn testimony of membership" as additional indicia and noting that "[t]his is a holistic test"); *Kappa Alpha Theta Fraternity, Inc. v. Harv. Univ.*, 397 F. Supp. 3d 97, 104 (D. Mass. 2019) (enumerating "to have the individual's views and interests expressed and promoted collectively through the organization" as a fourth indicator of membership while omitting mention of those other indicia identified by the Eastern District of Louisiana in *Apalachicola Riverkeeper*).

operations altogether. This Court already found as much. *See* PA556 ("Indeed, because GOF is a nonprofit organization, it receives all its funding from supporters."). GOF's supporters accordingly "exert … control over the organization's activities," contrary to Defendants' insistence otherwise.

Defendants' criticism of GOF's purportedly "passive touchpoints" with supporters likewise misses the mark, as "[c]orporate formalities and formal membership structure are not constitutional requirements for associational standing." ECF 90 at 33; *Concerned Citizens*, 686 F. Supp. 2d at 675. Even so, the Fifth Circuit has found "the 'practice of considering all those who gave a donation, as well as those who had a donation made in their name, to be members' was a 'clearly articulated and understandable membership structure.'" *Concerned Citizens*, 686 F. Supp. 2d at 675 (quoting *Friends of the Earth*, 129 F.3d at 827, 829); *cf.* PA446 ¶50 ("GOF's supporters provide the funds directly used to support GOF's litigation efforts…."); PA445 ¶46 (referring to donors as "GOF supporter[s]"). Nor is membership terminology dispositive, as the D.C. Circuit made clear in *Am. Legal Found. v. FCC*, 808 F.2d 84 (D.C. Cir. 1987). *See id.* at 90 (finding no standing for an organization purporting to represent "supporters," not because they were not called "members" but rather because, *inter alia*, the "supporters" played no role in "guiding [its] activities, or financing those activities"). GOF's relationship with its supporters therefore "suffice[s] for GOF's associational standing," PA556, which is consonant with the Southern District's observation that, despite "find[ing] that it ha[d] not sufficiently identified them [t]here," "GOF could have representational standing on behalf of its supporters" if it "allege[d] an identifiable set of members" elsewhere. *Texas v. BATFE*, 700 F. Supp. 3d 556, 567 (S.D. Tex. 2023). Defendants' footnote citation to that "[]other case" (ECF 90 at 33 n.9) does not preclude (and in fact arguably anticipates) a contrary holding based on GOF's supplemented showing here.

All told, analysis of the organizational Plaintiffs' standing ultimately is unnecessary because Tormey has standing, and he is a member or supporter of each. Accordingly, "Article III is satisfied as to all plaintiffs." *Rettig*, 987 F.3d at 528.

## II.    THE RULE VIOLATES THE APA.

### A.  The Rule Conflicts with the Text and Undermines Express Congressional Intent.

#### i.    The Statute Requires Proof of Repetitive Purchases and Resales.

Noting that "federal law does not set a numerical threshold for the number of firearms a person must sell, or the number of firearms sales transactions" to be engaged in the business, Defendants opine that the actual number of each must be *zero*. ECF 90 at 41; *see also id.* at 43 (criticizing that "Plaintiffs do not clarify what number of completed sales is necessary"). But while it is true that the statute imposes no fixed numbers (for example, ten per year), Plaintiffs have explained and this Court has preliminarily found (PA559–60) that more than one (and certainly more than zero) transaction involving more than one firearm (and certainly more than zero) must occur. Indeed, on its face the statute requires "the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). Anything beyond that is to be determined by the unique facts and circumstances of each case.

Defendants disagree. Arbitrarily splitting Section 921(a)(21)(C)'s definition into two halves despite no comma appearing, Defendants claim that a person is engaged in the business if he "(1) 'devotes time, attention, and labor to dealing in firearms as a regular course of trade or business'" and does so "(2) 'to predominantly earn a profit' through the repetitive purchase and resale of firearms." ECF 90 at 41. Thus, according to Defendants, the statute's key foci are "time, attention and labor" – "the required action" – and "to predominantly earn a profit" – "the required intent." *Id.* Thus, according to Defendants, "the relevant question is not the number of completed firearms sales transactions, but whether a person has devoted effort … with the predominant purpose of profiting . . . ." *Id.* Disagreeing with this Court's preliminary conclusion, Defendants resist all statutory indicators that more is required. *See* PA560 (reaching that conclusion).

Applying their theory, Defendants posit that, "a person may have put forth effort to sell firearms … and thus require a license … even if they have not yet sold a firearm...." ECF 90 at 41

(licensure required if a person "incorporates a gun store, purchases inventory for resale, rents a storefront to display the inventory, advertises the availability of guns at the store, and contracts with a payments processor...."). Thus, Defendants posit that "there is no 'first sale is license-free' exception to the GCA's licensing requirement...." *Id.* at 41–42. But this theory – that a person can be a dealer without ever selling a firearm – is impossible to square with Section 921(a)(11), defining a "dealer" as a "person engaged in the business of ***selling*** firearms...." Thus, the statute regulates "*engaging*" in the business, not *planning to* engage in the business. Defendants' hypothetical does not track with the text. *See* ECF 83 at 25–30 (offering nine textual arguments).

Nor does Defendants' theory comport with the alleged "twin goals" of the Gun Control Act which, as they describe, are "'keep[ing] guns out of the hands of criminals ... and ... assist[ing] law enforcement authorities in investigating serious crimes.'" ECF 90 at 1. Of course, there can be no "harm to public safety inflicted by unlicensed dealing in firearms" (*id.*) unless and until a person *actually deals* in firearms. Until firearms are sold, a person does not "meet the transferee in person," "verify the transferee's identity, and submit the transferee's information" for a background check. *Id.* at 15–16. Nor can a person who has never sold a firearm "maintain records of ... dispositions" and, without having made sales, there is no "tracing of firearms recovered from crime scenes ...." *Id.* at 3. Because "these requirements serve the 'twin goals'" of the GCA – requirements which are not triggered until a licensee *actually sells* firearms – the Rule's licensure-before-sale requirement fulfills neither stated goal. Defendants never explain the public safety harm caused by a law-abiding person acquiring firearms *and then never selling any*.[16]

No matter, Defendants say, because "courts have recognized this principle for decades...." ECF 90 at 42. But *United States v. Gray*, 470 F. App'x 468 (6th Cir. 2012), an unpublished decision, does not say that a person can be engaged in the business by selling one firearm – or none. Rather,

---

[16] Defendants' hypothetical is equally unclear as to just what sort of gun dealer, defined by Section 921(a)(11) as a "person engaged in the business of selling firearms *at wholesale or retail*," would acquire firearms *prior to licensure – i.e.*, by going to a dealer, filling out an ATF Form 4473, and paying retail prices (or hefty transfer fees). A business model premised on *buying at retail and then selling at retail* could hardly be said to be one with a "profit motivation." *See* ECF 90 at 33.

that case involved a former FFL who let his license lapse but continued to operate his store. He sold "an undercover ATF agent" a "Remington 12-gauge shotgun for $400," and told the agent that he "got [handguns] all the time" in the store." *Id.* at 470. A few days later, "another undercover ATF agent … purchased a Bersa .380 handgun for $250." *Id.* And a few days after that, "a third undercover ATF agent … purchased [a shotgun] for $225." *Id.* ATF subsequently "used a convicted felon" to "purchase two guns." *Id.* ATF also had testimony at trial from patrons who "sold" firearms to Gray, one of which he flipped the same day. *Id.* at 471; *see also* GOA Comments, PA314 (further recounting the facts of *Gray*, who advertised, displayed, purchased, and sold numerous firearms over many months).

Defendants' other cases are no more helpful. For example, in *United States v. Shan*, 361 F. App'x 182 (2d Cir. 2010), another unpublished opinion, the Second Circuit provided a single sentence of analysis based entirely on the Court's prior opinion in *United States v. Carter*, 801 F.2d 78 (2d Cir. 1986), a decision where the court declined to "apply … retroactively" the then-new definition of "dealer" in FOPA. *Id.* at 83. In other words, *Carter* interpreted the *prior* version of the statute, not FOPA's added definition, which was expressly designed to override and "substantially narrow" the various tests that had developed in the federal courts. *See* ECF 83 at 13, 32. Similarly, the Ninth Circuit's unpublished decision in *United States v. Zheng Jian Shan*, 80 F. App'x 31 (9th Cir. 2003), relied entirely on the line of authority stemming from *United States v. Wilmoth*, 636 F.2d 123, 125 (5th Cir. Unit A 1981), another pre-FOPA case cited by Defendants (ECF 90 at 42 n.16). But *Wilmoth* was specifically enumerated and then expressly repudiated in the FOPA Senate Report. S. Rep. No. 98-583, at 8 (1984) (FOPA "would substantially narrow these broad parameters"). Finally, *United States v. Murphy*, 852 F.2d 1 (1st Cir. 1998), relied on that court's pre-FOPA decision *United States v. Tarr*, 589 F.2d 55, 59 (1st Cir. 1978). *Id.* at 7–8.

Not to mention, the defendant in *Tarr* sold "102 rifles, a missile, [and] ammunition . . . ."[17] *Id.* at 8; *see also United States v. Baptiste*, 607 F. App'x 950, 952–53 (11th Cir. 2015) (unpublished) (finding that the jury was justified in concluding, based on "circumstantial evidence," that the Defendant was "engaged in the business" when he was repeatedly "purchasing guns ... and flying to Haiti," after "suggest[ing]" he send shipments of firearms for his co-conspirators to sell).

Finally, Defendants' lynchpin case, *United States v. King*, 735 F.3d 1098 (9th Cir. 2013) – the only case of which Plaintiffs are aware that involved *no sales* – involved particularly egregious facts (*see* ECF 83 at 26 n.9), and relied on the Second Circuit's decision in *United States v. Nadirashvili*, 655 F.3d 114 (2d Cir. 2011), on which Defendants also rely (ECF 93 at 42 n.17). But *Nadirashvili* relied exclusively on pre-FOPA standards. *Nadirashvili*, 655 F.3d at 119 (citing *Carter*, discussed *supra*, which had declined to "apply ... retroactively" the then-new definition of "dealer" in FOPA). Moreover, Defendants' own administrative record discredits *Nadirashvili* and *King* as having ignored FOPA and being "in tension with the statute . . . ." PA685.

Despite Plaintiffs having pointed out numerous times that Defendants' cases are inapposite (*see, e.g.*, PA289–91; PA377 n.6; ECF 83 at 26 n.9), Defendants never engage with this criticism. Rather, they continue to boldly proclaim that the case law supports them. ECF 90 at 42, 46, 66. But all roads lead to pre-FOPA cases or flawed pre-FOPA analysis. Defendants have not offered this Court a single credible authority on which to base reversal of its preliminary holding.

Next, Defendants respond to Plaintiffs' text-based arguments which show that the statute requires multiple purchases and multiple resales. *See* ECF 90 at 43–45. Most of Defendants' responses center around their argument that the statute requires only "devot[ing] time, attention, and labor," but no actual purchases or resales. *See id.* at 43–44 (relying on that phrase in response to i, ii, iii, and iv). None of Defendants' rebuttals is convincing.

---

[17] With respect to whether a single transaction, such as occurred in *Tarr*, would require licensure, Defendants cannot get their story straight. At one point, Defendants claim that "a single firearms transaction may be of sufficient size and complexity to" constitute being engaged in the business, only to assert two sentences later that "'a 'single firearm transaction' may require a license only when 'combined with other evidence'. . . .'" ECF 90 at 42–43.

First, Defendants resist the common meaning of "dealing," which means "to transact business" by "buying and selling; the purchase and exchange of something for profit," by a "dealer" who "purchases goods or property for sale to others, a retailer." ECF 83 at 25. Rather than explain why those understandings are erroneous, Defendants merely assert that "the statute does not require that a person has successfully *dealt* in firearms . . . ." ECF 90 at 43 (emphasis added). In other words, according to Defendants, "dealing" does not require "deal[ing]."

Second, Plaintiffs explained that being "engaged in the business" means "to take part in *commercial transactions*." ECF 83 at 26 (emphasis added). Defendants respond by saying that they "do not quarrel with th[e] notion that … 'engage in the business' [means] to take part in *commercial activity*," but claim this "raises the question of what activity is required." ECF 90 at 43 (emphasis added). Defendants claim that "the required activity is 'devot[ing] time, attention, and labor' … not completing multiple sales." *Id.* Defendants find confirmation that a person "must get a license *before* beginning to sell firearms" in Section 923(a)'s requirement that a person not engage in the business "until he has filed an application … and received a license . . . ." *Id.* But the statute plainly does not require licensure merely for "sell[ing] firearms," but only for "engaging in the business."

Third, Plaintiffs explained that the statute's repeated use of the plural term "firearms" mandates more than one sale and more than one firearm. ECF 90 at 26–27. In response, Defendants regurgitate that the statute is not focused on sales of firearms *at all*, but rather "substantial effort" and "intent" to "profit." ECF 90 at 43. This argument is rebutted, *supra*.

Fourth, Plaintiffs noted that a "regular course of trade or business" means a "series of events … *e.g.*, multiple sales of goods over a period of years." ECF 83 at 27. Defendants admit that the statute requires "a series of events," but argue that "devot[ing] substantial effort" even though "not successfully consummating transactions" counts. ECF 90 at 44. But again, a person does not "engage" in a "trade or business" merely by planning to do so.

Fifth, Plaintiffs argued that the statutory term "repetitive" means "more than once," that "purchase and resale" is "a conjunctive requirement," and that the word "resale" is something

more than a sale – akin to a car dealer, not a car collector.[18] ECF 83 at 27–29 & n.15; *see also* PA559–590. Defendants claim these arguments are "misguided" because those words "modif[y] the definition's *intent* requirement, and do[] not refer to required *action*." ECF 90 at 44 (citing Reading Law at 152). But even if Defendants' reading were correct – that each subsequent prepositional phrase modifies only the one before it – then that would apply to the statute's entire series of phrases, not just the two Defendants have selected. Thus, under Defendants' construction, "through the repetitive purchase and resale of firearms" is *how* a person acts "to predominantly earn a profit," which is *how* a person engages in "a regular course of trade or business," which describes *how* "a person who devotes time, attention, and labor **to dealing in firearms**."  In other words, to be "engaged in the business," a person still must be "dealing in firearms," words of action meaning to "transact business" through "an act of buying and selling; the purchase and exchange of something for profit." ECF 83 at 25. This reality is confirmed by Section 921(a)(22)'s definition of "profit" as that "underlying the sale or disposition" (actual events), and Section 921(a)(11)'s definition of "dealer" as "any person engaged in the business of *selling* firearms at wholesale or retail."  There is no reasonable way to contort the statute to reach Defendants' preferred result – that no purchases, resales, or profit is required.

Sixth, Plaintiffs had noted that the statute's safe harbor for multiple "sales, exchanges, or purchases of firearms for the enhancement of a person collection or for a hobby" accommodates multiple of each without reaching the level of "engaged in the business." ECF 83 at 29. In response, Defendants argue that, even though the exception allows for *multiple commercial transactions* to occur without arising to dealing, "the definition itself" requires *no commercial transactions* at all to be dealing. ECF 90 at 45. This is a curious reading, which simply does not track

---

[18] Defendants resist any such "contemporaneity requirement" in "resale," arguing that a dealer may not sell a firearm without a background check merely because it has remained unsold in inventory for some time. ECF 90 at 45 n.19. But that is not what Plaintiffs said. Rather, they explained that a gun owner who purchases a collection of firearms as investment does not "resell" them when he cashes in decades down the line. ECF 83 at 29. Otherwise, anyone who purchased a pre-1986 machinegun registered in the National Firearms Registration and Transfer Record (a limited commodity that historically have increased greatly in value) would be guilty of unlawful dealing.

from the statute's repeated focus on *actual business* through completed commercial transactions.

Seventh, Plaintiffs found further confirmation in Section 921(a)(22)'s description of prohibited "intent underlying the sale or disposition of firearms," reflecting that actual "sales or dispositions" *must underlie* an impermissible profit motivation. ECF 83 at 30. In response, Defendants posit that "'intent' … describes the required intent, not the required action." ECF 90 at 45. This circular reasoning ignores Plaintiffs' point that something more than "intent" must "underl[ie]," and the statute says just what that is – a "sale or disposition of firearms."

### ii.    The Statute Requires Proof of Actual Profit.

Next, disputing that the statute requires proof of profit, Defendants focus entirely on "intent, not actual profit." ECF 90 at 46. First, Defendants claim again that the proviso that "proof of profit" is not required in cases of "criminal purposes or terrorism" *really* means that "proof of *intent to* profit" is not required. *Id.* (emphasis added). Defendants conspicuously ignore their blatant addition of words to the statute in order to obtain their preferred meaning. *See* ECF 83 at 21 ("proof of intent to profit … plainly is not what the statute says"). Instead, Defendants claim (at 46) that their textual revision is "reinforced by the statutory definition as a whole." But courts do not "'effectively rewrite the statute' by reading words into it." *Texas v. DHS*, 2024 U.S. App. LEXIS 30192, at *20 (5th Cir. 2024) ("We cannot rewrite § 702 to say 'a federal action' when Congress only wrote 'an action.'").

Second, Defendants claim (ECF 90 at 46–47) that "courts have consistently" agreed that no actual profit is required. But these cases do not save the Rule. Indeed, Defendants again rely on *King* and *Wilmoth*, pre-FOPA cases which are inapplicable. *See* ECF 90 at 25. Defendants also cite *United States v. Shipley*, 546 F. App'x 450 (5th Cir. 2013), but fail to note that it was an unpublished opinion and is "not precedent" (*id.* at 452 n.*) and nonbinding. Moreover, *Shipley* provides scant

reason to adopt the government's position here, having relied on pre-FOPA *Wilmoth*.[19] Not to mention, Shipley had both transactions *and* profit – he "began dealing in firearms … to supplement his lawful income," and he "engaged in a regular course of dealing firearms for profit for a number of years." *Id.* at 452, 454 (finding that "[t]he jury … was entitled to disbelieve [Shipley's] evidence" that he had "suffer[ed] a net loss"). In a single sentence, the court opined (without analysis) that the statute "does not require that [a defendant] succeeded in" making a profit. *Id.* But *Shipley* certainly conducted no comprehensive statutory analysis, and its reliance on pre-FOPA cases undermines its conclusion.

Defendants next cite to *United States v. Valdes*, 681 F. App'x 874 (11th Cir. 2017), another unpublished opinion which relied entirely on *Wilmoth*'s pre-FOPA analysis. ECF 90 at 46. Moreover, *Valdes* made actual sales netting her actual profit, "600 [firearms] in 7 years," to be precise. 681 F. App'x at 878. And *United States v. Tyson*, 653 F.3d 192 (3d Cir. 2011), is an even more slender reed. *See* ECF 90 at 46. There, the Third Circuit noted that "a defendant engages in the business of dealing in firearms when his principal motivation is economic (i.e., 'obtaining livelihood' and 'profit') *and he pursues this objective* through the repetitive purchase and resale of firearms." 653 F.3d at 200 (emphasis added). In other words, *Tyson* supports Plaintiffs' position that the statute requires actual sales leading to actual profit. Indeed, Tyson "purchas[ed] a significant quantity of firearms in his home state … and then transport[ed] those weapons … for resale," keeping records with "columns labeled 'Spent' and 'Profit'" – making $1,500 profit from selling an "AK," and $1,300 profit from selling an "AR." *Id.* at 195, 198–99. *Tyson* hardly supports Defendants' notion that no profit is required.[20]

---

[19] *Wilmoth*, in turn, cited to *United States v. Shirling*, 572 F.2d 532, 533 (5th Cir. 1978), which explained that "the [then-existing] definition doesn't say anything about making a profit. You can be a dealer in firearms and sell them for less than you paid for them." FOPA's definition explicitly rejected this holding.

[20] Contrary to Defendants' claim that no showing of profit is required, a Texas district court recently explained that "[t]he government can only convict a defendant of this offense by showing that he sold guns at wholesale or retail *for profit* (or to facilitate crimes)." *United States v. Flores*, 652 F. Supp. 3d 796, 799 n.14 (S.D. Tex. 2023) (emphasis added); *see also United States v. Strunk*, 551 F. App'x 245, 245-46 (5th Cir. 2014) ("Strunk … engaged in a regular course of selling firearms," and "retained money collected on the

Next, Defendants posit (ECF 90 at 47) that Plaintiffs' theory of profit could not "sensibly be enforced." Claiming that "profit" should be determined by reference to the entire profit and loss statement of a business rather than the margin on any particular sale, Defendants note that "many [businesses] take months or years to earn a profit." *Id.* Thus, according to Defendants, the profit inquiry must focus on motivation, not culmination. This argument is meritless. Indeed, the Third Circuit in *Tyson* did not discuss the presence of some overarching business profit or loss, but instead noted the defendant's "profit-seeking behavior" was evidenced by "notations" on "a pad" including "two columns labeled 'Spent' and 'Profit'" for each firearm he sold. *Tyson,* 653 F.3d at 195, 198–99. Even the Rule's PEP presumptions discuss "document[ing], track[ing], or calculat[ing] profits and losses from firearms repetitively purchased for resale." PA124; *see also* PA081 (referencing "document[ing] profits or other pecuniary gain from firearms transactions").

Doubling down on their theory that the statute's "intent" requirement swallows all its other acts, Defendants curiously posit (ECF 90 at 47) that "'*intent*' to profit determines whether a person *engages* in conduct" (emphases added), and that this interpretation absolves the government of having to prove profit in criminal-purpose or terrorism cases. Likewise rejecting the "negative implication canon," Defendants say that "[n]o canon of interpretation is absolute," and that here its strict application conflicts with the "harmonious-reading canon." *Id*. at 48 (citing Reading Law at 59, 180). Of course, the harmonious-reading canon might have application *only if one adopts Defendants' reading* of the statute. If not, then *all* canons support Plaintiffs.

Finally, Defendants obliquely claim that the "temporal sequence of amendments to 18 U.S.C. § 921(a)(22)" confirms the statute's focus on "intent" to profit, "not actual profit." *Id*. at 48–49 (noting that Congress added the "criminal purposes or terrorism" only after initially providing a definition that did not include it). But this confirms the definition *always* included a requirement of proof of profit, then Congress later removed the requirement in certain cases.

---

sale of others' firearms."); *Clark v. Scouffas*, 2000 U.S. Dist. LEXIS 633, at *7-8 (N.D. Ill. Jan. 18, 2000) (applicant not a dealer when he "'sold' only three pistols … [f]rom the years 1990 to 1999," and "[n]o profit was made").

### iii.    The Rule's "Former Licensee" Regulations Conflict with the Statute.

Criticizing Plaintiffs' characterization of the Rule as "impos[ing] unique burdens on" so-called "former licensees," Defendants reimagine the Rule as a "benefit[]" to the previously licensed, "authoriz[ing]" them to act "in manners that would otherwise constitute engaging in the business of dealing." ECF 90 at 50 As Defendants see it, "[w]ithout the Rule, such former licensees are prohibited from engaging in the business in the same ways and to the same extent as anyone else. . . ." *Id.* at 49. But even if it were true that the Rule is a boon to former dealers, Defendants cite no authority allowing them to exempt anyone from the statute's operation.

Of course, and entirely unsurprisingly, the Rule is not the blessing Defendants claim. Rather, it mandates that firearms previously in a former FFL's inventory, but transferred to a personal collection, cannot be sold by a "until one year has passed – an atextual "waiting period" that "the statute imposes … only on current licensees...." ECF 90 at 50; ECF 83 at 34; PA123–24. Indeed, under the statute there are only the *licensed* and the *unlicensed* – not the *formerly licensed*. *See* ECF 83 at 32. And, once a license expires or is revoked, a "former licensee" is free to liquidate prior inventory without restriction (indeed, the statutory safe harbor protects just that). Defendants see things differently. Claiming that the Rule's restriction on "former licensees" is a "common-sense interpretation," Defendants theorize (ECF 90 at 51) that, without the Rule, former licensees could engage in "willful evasion of the GCA")—presumably, by acquiring guns while licensed, surrendering the license, and then selling the firearms without restriction. But even if this imaginary situation were possible, that is a result of the statute Congress enacted, and neither ATF nor this Court are free to conjure a new "common-sense" regulatory scheme.

Plaintiffs also objected to the Rule's ban on a former licensee *ever* selling a firearm that was purportedly transferred out of inventory improperly. ECF 83 at 34–35. Defendants do not engage with this point, other than to claim that this prohibition is a "patently clear" and "common-sense interpretation of the GCA," which purportedly already contains that requirement. ECF 90 at 51.

31

But Defendants do not point to where the statute prohibits a person from ever selling former licensee inventory, even if those firearms were transferred improperly.

Next, disagreeing that former dealer inventory that was "never transferred" to a personal collection "remain[s] forever in purgatory" and is unsalable (ECF 83 at 35), Defendants note that the Rule creates a narrow 30-day grace period with extensions for "good cause." ECF 90 at 52. But Defendants do not deny that, after this atextual grace period expires, "purgatory" is precisely the legal status of such firearms, which may never again be transferred. *See* PA084 (conceding that "the former licensee … [is] placed in a difficult situation").

Finally, Plaintiffs had noted that an "engaged in the business" charge cannot lie where a former licensee is merely disposing of (reselling) firearms acquired "*while licensed to do just that.*" ECF 83 at 34. Defendants object, promising that "purchasing inventory while licensed does not 'form the predicate acts'" for subsequently engaging in the business. ECF 90 at 52. Rather, Defendants claim that "*sale* of prior business inventory … supports the presumption" that a former licensee is engaged in the business. *Id.* But again, the statute requires not only repetitive "*resale*" but also "*purchase*" – something that this Court has found. PA560 (calling them "a conjunctive requirement"). Just how it is that "sales" by former licensees demonstrate that they have made both "purchases *and* resales," Defendants do not explain.

### iv.    The Rule Eviscerates the Statute's Safe Harbor.

Characterizing the statutory safe harbor as a "narrow exclusion" from being engaged in the business, Defendants (ECF 90 at 52–53) reiterate their claim that "many firearms owners are not included in" the broad exception Congress created. Rather, according to Defendants, the "intended purpose of the statutory exclusion" was to exempt only a small "subset of firearms collectors or hobbyists" (*id.* at 53), while "provid[ing] *no safe harbor at all* for the majority of gun owners" (PA561–62). Defendants (ECF 90 at 53) reiterate that their position is "consistent with ordinary meaning and "dictionary definitions." On the contrary, as this Court already concluded

at the preliminary stage, Plaintiffs' understanding of the statute (and reliance on ordinary definitions) "is more consonant with 'common meaning'" than the restrictive and specialized definitions on which Defendants rely. PA561. Defendants offer no reason for this Court to depart from that prior conclusion.

Indeed, not only does "common meaning" support a broad reading of the statutory safe harbor, but also Congress explicitly stated its corollary intent in the statute. *See* ECF 83 at 38 (explaining that FOPA was expressly intended not to "place any undue or unnecessary Federal restrictions" on "acquisition, possession, or use of firearms" for "personal protection," the very category of firearms Defendants say the safe harbor does not cover). Defendants relegate this elephant in the room to a footnote, maligning Plaintiffs' point as "baseless" because FOPA did many things and therefore a "general preamble" expressing "general intent" cannot inform the meaning of the text. ECF 90 at 56 n.25. But Defendants never explain *why* it is unreasonable to assume that a Congress *specifically focused* on guaranteeing Americans' access to "personal protection" firearms would have exempted from criminal liability the ability to buy and sell "personal protection" firearms. Indeed, such a conclusion seems self-evident.

Defendants again offer up Section 921(a)(13)'s definition of a "collector" of "curio or relic" firearms, as if that somehow informs the scope of Section 921(a)(21)(C)'s "personal collection" of firearms. ECF 90 at 54, 56. But as Plaintiffs noted, Section 921(a)(13) drills down on a *particular kind of firearm* (curio or relic), not a particular kind of collector. ECF 83 at 39. If anything, the fact that Section 921(a)(13) applies to collectors *of curios or relics* undermines Defendants' position, implying that Section 921(a)(21)(C), and its protection of "firearms" and "personal collections" generally, was meant to sweep far more broadly.

Plaintiffs also challenged the Rule's assertion that a "personal collection" cannot include any firearm purchased for eventual "financial gain" – indeed, many (if not most) ordinary gun owners purchase firearms knowing they will maintain or appreciate in value. But as Plaintiffs explained, this does not make them dealers. *Id.* at 27; *see also id.* at 28 (noting that the term "resale" incorporates a "contemporaneity requirement" which distinguishes a dealer looking for a quick

profit from a gun owner who invests in guns to possibly be sold decades down the road). Defendants respond by admitting that a collector may at times "be motivated by financial gain," but that those particular firearms "could not benefit from the statutory exclusion." ECF 90 at 55. On the contrary, the statute exempts all firearms in a gun owner's "personal collection."

Finally, Defendants concede that the statute protects a "personal collection" and a "hobby" separately, admitting that the protections are "disjunctive in the statute." *Id*. Yet Defendants claim that the Rule somehow "preserves the distinction" *by lumping them together*. *Id*. Defendants do not further explain this obvious *non sequitur*. On the contrary, the Rule blatantly conflates two distinct statutory protections, further indicating that Defendants have departed from the text.

### v. ATF May Not Replace Congress's Definitions with Its Own, or Define Unambiguous Words.

Disabusing Plaintiffs of the notion that an agency may not define what Congress already has defined, or sow ambiguity by defining unambiguous words, Defendants assert that they may promulgate all "necessary" regulations – and that they alone get to determine which regulations are necessary. ECF 90 at 57. Announcing that they felt the Rule to be necessary, Defendants claim its definitions thus are entirely appropriate because they are designed to "improve public safety" and "provid[e] further clarity," – both "unquestionably valid regulatory objectives," according to Defendants. *Id.* at 58. But that is the very sort of "just trust us" argument that this Court already rejected. *See* PA563.

Undaunted, Defendants assert that Plaintiffs have "take[n] out of context" the claim that ATF may "further define [a] term" that Congress has already defined. ECF 90 at 59. Defendants explain that what they really meant was that ATF may "utilize its expertise … to further define terms … that are necessary to implement the GCA." *Id*. But that is the same way of saying the same thing. Because Congress provided a comprehensive definition "dealer," "engaged in the business," and "to predominantly earn a profit" – the essence of what constitutes the crime – ATF has no authority to further "provid[e] … necessary clarification." *Id*. Indeed, if "clarification" of

a criminal statute were "necessary," as Defendants claim, then that would make the statute unconstitutional, because ordinary people could not understand what was proscribed without reference to the Rule.[21] But Defendants have not claimed that the statute is unclear, and so they are left with the definitions that Congress established. ATF may not add to, subtract from, or otherwise "clarify" what constitutes criminal activity. Any regulatory definition that diverges from Congress's definition is, as a matter of law, "contrary to statutory text." *See* ECF 90 at 58 n.26. A regulation that "operates to create a rule out of harmony with the statute, is a mere nullity." *Manhattan Gen. Equip. Co. v. Commissioner*, 297 U.S. 129, 134 (1936).

In addition to defining statutory terms that Congress already defined, Plaintiffs objected that the Rule defines statutory language that is unambiguous and in need of no "clarification." *See* ECF 83 at 41–42. In response, Defendants claim that it was necessary to provide "additional considerations beyond Plaintiffs' colloquial understanding," on the theory that some criminal defendants have claimed no "sale" occurred because items such as drugs (instead of money) changed hands. ECF 90 at 59–60. But simply because clever defense attorneys have sought to read ambiguity into the statute does not give ATF the regulatory license to define unambiguous terms that courts have had no trouble enforcing.

At bottom, Defendants have offered no authority for either proposition – *i.e.*, that an agency may replace a statutory definition with its own, or that an agency may supplement simple and unambiguous words with complex, multi-part definitions. This Court should reject ATF's attempts to rewrite the statute.

---

[21] *See United States v. Davis*, 588 U.S. 445, 447–48 (2019) ("[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws."); *VanDerStok v. Garland*, 86 F.4th 179, 196 (5th Cir. 2023) ("Only Congress can actually criminalize behavior."); *see also id.* n.25 ("It is for the legislative branch of a state or the federal government to determine … the kind of conduct which shall constitute a crime."); *United States v. Lopez*, 704 F.2d 1382, 1386-87 (5th Cir. 1983) ( "it is for Congress to say what shall be a crime and how that crime shall be punished; it is not the prerogative of" other branches, and "we resolve the issue in favor of a defendant if we have doubt that Congress intended for the conduct in question to be covered by the statute").

### B. The Rule's Presumptions Are Unlawful.

#### i. ATF Has No "Inherent" Authority to Create Presumptions.

According to Defendants, the power of agencies to create presumptions is "*inherent*." ECF 90 at 60–61, 63 (emphasis added). But none of the cases Defendants cite (*id*. at 60–61) support that bold claim. Rather, as Plaintiffs explained, nothing about administrative power is "inherent," and courts routinely reject the notion that bureaucrats possess "inherent" authority to take any action without statutory authorization. *See* ECF 83 at 23 n.6 (citing cases); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act … unless and until Congress confers power upon it."); *cf.* ECF 90 at 61 ("Congress had no need to expressly authorize or instruct ATF to create presumptions," because ATF's "authority … is inherent."). Indeed, the Eleventh Circuit case on which Defendants rely, *Cole v. United States Dep't of Agric.*, 33 F.3d 1263 (11th Cir. 1994), referenced that court's prior opinion that rejected an agency's claim "that it had 'inherent authority …' without the necessity of express statutory authority." *Id.* at 1268 & n.7. In other words, ATF must find authority for the Rule's presumptions *in the statute*, not in the ether.

Defendants urge that the presumptions are "necessary" to enforce the statute. ECF 90 at 61. First, they claim that "ATF determin[ed] that including presumptions in its Rule would be necessary . . . ." *Id.* But again, this Court has rejected this type of "just trust us" argument.[22] PA563. Second, Defendants claim (ECF 90 at 61) that "ATF has faced substantial difficulties in enforcing the GCA over many years with frequent attempts by individuals to evade the licensure requirements of the statute." Yet as ATF explains, the cases on which the Rule relies are ones "*upholding* convictions for unlicensed dealing . . . ." *Id.* at 59 (emphasis added). This history of prosecutorial effectiveness does not demonstrate that ATF has had difficulty enforcing the law.

---

[22] *See also Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 229 (5th Cir. 2024) (rejecting rebuttable presumptions that certain "act[s] or omission[s] … affected each member of [a] group," even when Congress explicitly instructed that the Department of Education "shall specify in regulations which acts or omissions … a borrower may assert"). ATF certainly has nothing approaching that level of explicit instruction here.

### ii.    The Rule's Presumptions Are without Legal Authority.

Defendants criticize this Court's conclusion that the Rule's presumptions "requir[e] firearm owners to prove innocence rather than the government prove guilt." PA562; ECF 90 at 62. As Defendants see it, the Rule's presumptions "do not change the basic requirement that the government demonstrate violation of the statute by a preponderance of the evidence." *Id.* But this Court's preliminary conclusion is in good company. Writing for the Fifth Circuit, Judge Jones recently rejected an identical argument by the government that "none of the presumptions change the burden of persuasion which will still require proof by a preponderance of the evidence." *Career Colls.*, 98 F.4th at 251. Rather, as the Fifth Circuit explained, even if a defendant had "'full opportunity' to rebut a presumption," this "does not remedy the harm" because, "by its terms, a rebuttable presumption displaces the ordinary burden of proof and means that if the evidence is of equal weight between the parties, the [defendant] will lose because it has failed to rebut the presumption." *Id.* There is no reason to depart from this Court's preliminary conclusion and the Fifth Circuit's guidance in *Career Colleges.*

Defendants also disagree that "the Rule ultimately distills the highly fact-specific case law it cites down to *single factors*, factors whose sole satisfaction is used to presume satisfaction of *all elements* of the statute." ECF 83 at 42. Rather, according to Defendants, "[t]he Rule explicitly requires consideration of the totality of the circumstances...." ECF 90 at 62 and at n.27 ("a fact-specific inquiry considering the totality of the circumstances ... is exactly what the Rule requires."). But this doublespeak has no basis in the text of the Rule. Simply *permitting* "rebutta[l] by reliable evidence" does not "*require*[] consideration of the totality of the circumstances." *Id*. at 62. On the contrary, the whole point of a presumption is that, *unless and until it is rebutted*, it alone is sufficient to prove guilt or liability.

Next, Defendants dispute that *Career Colleges* has any impact here. *See* ECF 90 at 63–64. According to Defendants, the Fifth Circuit employed the "rational nexus test ... in substance"

even if not by name. *Id.* at 63. On the contrary, the Fifth Circuit's decision rejects outright the use of presumptions in situations that are by nature "highly fact-specific" (ATF admits EIB inquiries are, *see* PA124) and "too discrete to justify a universal presumption" (ATF's non-correlating research proves that much, *see* ECF 83 at 44). And as the Court explained, not only were the presumptions in that case "unreasonable," but also the agency "ha[d] no statutory authority to create evidentiary requirements" in the first place. *Career Colls.*, 98 F.4th at 250.

Shifting gears, Defendants assert that "none of [the Rule's] presumptions suffers from a failure of explanation," claiming that each "is supported either by case law … or other evidence demonstrating that a rational nexus exists," and is not merely based on the sort of "unexplained 'experience'" and "department ipse dixit" that the Fifth Circuit rejected. ECF 90 at 63–64. But, as explained *supra*, Defendants' cases largely either predate FOPA or rely on pre-FOPA analysis. *See, e.g., United States v. Ochoa*, 726 F. App'x 651, 652 (9th Cir. 2018) (unpublished) (citing *King*); *United States v. Mulholland*, 702 Fed. Appx. 7, 12 (2d Cir. 2017) (citing *Nadirashvili*). Relying on cases that Defendants' own record admits are "in tension with the statute" hardly justifies the Rule's presumptions.

Finally, Defendants take issue (ECF 90 at 64) with Plaintiffs' critique of "ATF's own research," which Plaintiffs argued "demonstrates that there is no nexus between the various presumptions and cases of criminal liability. . . . " First, Defendants project onto Plaintiffs the argument that "each presumption" must "correlate. . . more than 50% of the time." *Id*. On the contrary, Plaintiffs criticized presumptions that "were found to correlate with actual criminal cases at a rate of *one percent or less*," which is "hardly a 'nexus' of any sort...." ECF 83 at 44. To be sure, Plaintiffs questioned "[h]ow a less-than-one-percent correlation constitutes 'more likely than not'" (*id.*), but it is Defendants who explain that "the government [must] demonstrate violation of the statute by a preponderance of the evidence," ECF 90 at 62, and claim that "persons who are engaged in certain … activities are *more likely than not* to be 'engaged in the business.'" PA008.

A Supreme Court case is instructive. In *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976) (citation omitted), the Court reiterated that it is "essential that there shall be some rational

connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate," something the Court termed a "highly empirical" inquiry. *Id.* at 28. In that case, there was "medical evidence before Congress indicating the noticeable incidence" between 10 years of mining and pneumoconiosis. *Id.* at 29 and n.1 (noting that "the disease rate was 10% for then, active coal miners, and 20% for inactive coal miners"). In contrast, only one of the Rule's presumptions (EIB1, 16 percent) has a similar correlation rate. PA652. Meanwhile, nearly half of the Rule's presumptions were found to have occurred at or under *one percent* of the time. *See id.* (seven presumptions ranging from .08 percent to 1.32 percent). The Rule's presumptions are thus worlds apart from what Congress found to constitute a "rational connection."[23]

### iii.    The Rule's Presumptions Conflict with the Statute.

Sensitive to the problems with "ATF's own research," Defendants demur that "the Rule's presumptions [are not] premised in significant part on this single, limited research project." ECF 90 at 65. But neither are Plaintiffs' criticisms of the Rule. Indeed, as this Court noted, "several presumptions conflict with the statutory text." PA562. Defendants disagree. ECF 90 at 65.

First, asserting that the statute does not "require[] actual sales," Defendants opine that "offer[ing] to resell firearms and demonstrat[ing] a willingness or ability to resell additional firearms" makes it "sufficiently likely" a person is engaged in the business.[24] *Id.* Of course, this is something every gun owner (including Tormey) who has sold more than one firearm has done –

---

[23] Defendants note that they do not "believe[] the presumptions to be overbroad." ECF 90 at 65 n.28. But Plaintiffs have offered numerous declarations explaining precisely how overinclusive the Rule's presumptions are. *See* PA415–17 (Tormey); PA424–31 (Archie); PA459–62 (Van Cleave); PA710–12 (Crump); PA713–15 (Davis); PA716-17 (Hughes) (explaining how ordinary conduct falls under the Rule's presumptions).

[24] Defendants theorize (ECF 90 at 66) that "[c]ourts have frequently held" as much, but those cases uniformly were pre-FOPA or rely on pre-FOPA analysis .*See also id.* (arguing, with respect to the second EIB presumption, that "courts have long held" that no purchases *or* sales (*or* profit) is required).

offer to sell firearms and been able to sell more. In fact, Tormey intends to do just that. PA416–17. So *regardless* of whether he meets the other elements of the statute (like profit motive), his behavior is enough to put him on the defense under the Rule. But again, this Court has already determined that the statute requires *actual* sales netting *actual* profit (PA559–560), and Defendants offer no meritorious reason to diverge from that preliminary holding. Thus, the first EIB presumption conflicts with the statute.

Next, assuming for the sake of argument that the statute requires both purchase and resale, Defendants opine that "the presumptions need not include both," so long as individuals who meet the presumptions are "sufficiently likely to be actually engaged in the business. . . . " ECF 90 at 66. But that is the sort of flawed reasoning that led to ATF's failed Arwady prosecution (PA217–18), and upon which ATF seeks to rely to prosecute former licensees who merely sell off former inventory. Defendants claim that, "[r]egardless of how an individual might have acquired various firearms, if that individual is reselling or offering to resell them in the manners identified in these three presumptions it is rational to presume they are engaged in the business of dealing absent evidence to the contrary." ECF 90 at 66. But as shown by Erich Pratt's declaration, one GOA member inherited a large number of firearms and now wishes to sell them. PA441. It is hardly "rational" to assume anyone selling bequeathed guns is unlawfully dealing.[25]

At bottom, the Rule's presumptions were promulgated without any statutory authority, have no "rational nexus" to the ultimate fact to be proved, and conflict with the plain text of the statute. In addition, they were politically motivated, suggested to ATF by the radical anti-gun group Everytown for Gun Safety (*see* ECF 83 at 46 n.36), and promulgated to achieve the Biden Administration's agenda to eliminate the market for private sales of firearms (PA351). The Fifth Circuit recently rejected presumptions with a similar genesis. *See Career Colls.*, 98 F.4th at 252 (rejecting "evidentiary presumptions … not designed to further the truth-seeking process" but

---

[25] Defendants also object to Plaintiffs' overarching criticism of the presumptions on the basis of the statute requiring "*actual* profit from *actual* purchases and resales . . . ." ECF 90 at 66–67. But those arguments merely repeat from elsewhere, and Plaintiffs do not repeat their rebuttal here.

rather "policy-driven mechanisms designed to selectively target"). This Court should similarly reject ATF's presumptions here.

### C. The Rule of Lenity Applies.

Defendants resist the rule of lenity, on the grounds that they – like Plaintiffs – believe the statute is clear and unambiguous. ECF 90 at 67 (arguing that "the best reading of the statute favors Defendants). But Defendants promulgated the Rule to "clarify" and "provide additional guidance" about the meaning of the statute. PA001, 006. The only reason a statute needs "clarif[ication]" is if ordinary people cannot read and understand it. In other words, precisely the sort of situation where the rule of lenity would apply. *See Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 2024 U.S. Dist. LEXIS 131012, at *62 n.118 (N.D. Tex. July 23, 2024) (holding, in the alternative, that even "[i]f [the statute] were ambiguous, the rule of lenity would surely apply").

### III.    THE RULE IS UNCONSTITUTIONAL.

### A. The Rule Violates the Second Amendment.

Defendants offer four theories why the Rule passes Second Amendment muster. None is availing. First, Defendants latch onto "commercial sale" dicta from *District of Columbia v. Heller*, 554 U.S. 570 (2008), claiming the Rule is "presumptively lawful." ECF 90 at 67–68. But as Defendants rightly note, *Heller* only assumed certain "*longstanding* … laws imposing conditions and qualifications on the commercial sale of arms" might survive its textual and historical test, once challenged. *Id.* at 54. Neither the Rule nor the Gun Control Act is "longstanding" under *Heller* and *Bruen*, 597 U.S. 1 (2022), nor is the Rule commercial in nature, being a collection of *presumptions* of culpability for innocuous conduct that, at least in Plaintiffs' case, is entirely *non*commercial in nature. *See* ECF 83 at 53("Defendants must show that the Founders sought to license *private*, *noncommercial* sellers....").

Defendants disagree, insisting that the Rule merely tracks the statute, regulating only commercial activity in the hopes that *Heller*'s dicta might apply. ECF 90 at 71 n.31 (claiming "[t]he

Rule matches the GCA in limit[ed] … application….'"). But if Defendants are wrong – and the Rule instead reaches private, noncommercial activity – then the Rule cannot be a "condition[]" or "qualification[] on the *commercial sale* of arms." *Heller*, 554 U.S. at 627 (emphasis added). This Court already concluded that the Rule regulates conduct that is not "engaging in the business" under the statute (PA558), and so it cannot be a "commercial" regulation.

But even if the Rule were a "condition[]" or "qualification[] on the commercial sale of arms," *Heller*, 554 U.S. at 627, that phrase is no magic talisman to ward off historical analysis. Indeed, noting that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment," *id.* at 626, the *Heller* Court *expressly invited* future challenges even to those presumptive traditions it had identified in dicta. *Id.* at 635 ("[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.").[26] Needless to say, an invitation to perform historical analysis cannot support Defendants' claim that such analysis is not "necessary." ECF 90 at 71. Indeed, once tested on their merits, a number of *Heller*'s previously assumed historical traditions already have been shown to be erroneous.[27] If use of Supreme Court dicta in lieu of the *Bruen* framework was appropriate, none of these successful challenges would have cleared the starting gate. Defendants' reliance on dicta does not support insulating firearm regulations from historical analysis.

Second, Defendants point to *Bruen*'s purported "affirm[ance]" of "'shall-issue' licensing

---

[26] *See also United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) ("Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment . . . .If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under Heller."); *United States v. Ayala*, 711 F. Supp. 3d 1333, 1351 (M.D. Fla. 2024) ("Reading the passage as the United States urges would put … dicta in direct contradiction with *Bruen*'s holding."); *Rigby v. Jennings*, 630 F. Supp. 3d 602, 613 (D. Del. 2022) ("Of course, not every regulation on the commercial sale of arms is presumptively lawful.").

[27] *See, e.g.*, *Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (successful as-applied challenge to 18 U.S.C. § 922(g)(1) (felons)), *granted, vacated, remanded sub nom. Garland v. Range*, 144 S. Ct. 2706 (2024) (ordering further consideration in light of *United States v. Rahimi*, 144 S. Ct. 1889 (2024)); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (allowing a challenge to 18 U.S.C. § 922(g)(4) (mentally ill) to proceed).

regimes" to reason that, "[i]f it is permissible to require a license to *bear* arms, a right listed in the Second Amendment, there is no reason that it would violate the Second Amendment to require a license to *deal* firearms, an activity not mentioned in the amendment's text." ECF 90 at 68 (emphasis original). But at the outset, *Bruen* never "affirmed" the constitutionality of licensing regimes not before the Court, but merely contrasted regimes which "contain only 'narrow, objective, and definite standards' guiding licensing officials" with regimes "requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion'. . . . " *Bruen*, 597 U.S. at 38 n.9. More importantly, *Bruen* unequivocally held that all "firearm regulation[s]" would be subject to its textual and historical test, reiterating that "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court" find the regulation constitutional. *Id.* at 17, 24. Becuase *Bruen* establishes the "[o]nly" way to uphold the constitutionality of the Rule, Defendants cannot escape their historical burden through dicta shortcut.

Third, Defendants rely on *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024), an opinion affirming the denial of a preliminary injunction, to posit that the Rule only may be subject to *Bruen*'s historical test if it "amounts to a *de facto* prohibition on acquisition or sale of firearms." ECF 90 at 69. But as *McRorey* made clear, "[a]ll we now decide is that plaintiffs have not met the burden for a preliminary injunction. Through further development of the record, they might end up showing that the challenged provisions have been put toward abusive ends." *McRorey*, 99 F.4th at 839 n.19 (emphasis added). This case is on an entirely different posture – final judgment on the merits allowing for full development of the record – and not a preliminary review "during the *Bruen-Rahimi* interregnum." *Id.* at 833–34. Moreover, *United States v. Rahimi*, 144 S. Ct. 1889 (2024), further clarified that, to so much as "delineate the contours of the right" protected by the Second Amendment, *Bruen* "directed courts to examine our 'historical tradition of firearm regulation'. . . . " *Id.* at 1897. Indeed, *Bruen* applies to all regulations of "arms-bearing conduct." *Id.* Acquisition and disposition fit the bill.

Fourth, Defendants finally attempt (ECF 90 at 70) to bear their historical burden by rehashing rebutted analogues. *See* ECF 83 at 52–53. Now modifying their argument by claiming

*Rahimi* allows "'[t]ak[ing] together' disparate strands of historical laws" to fabricate a historical tradition which never existed, it is Defendants' argument which "runs afoul of the Supreme Court's clarification...."  ECF 90 at 71.[28]  Indeed, "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring). All Defendants have done is support the general proposition that the government historically has had *some* sort of regulatory power over firearms. *See* ECF 90 at 71 (asserting that "governments can regulate commerce in firearms, including to protect public safety."). That is about as "high [a] level of generality" as it gets. But once again, Defendants failed to provide a historical analogue even relevantly similar to the Rule under *Bruen*'s "how" and "why." *See* 597 U.S. at 29. First, Defendants point to a 1794 federal law which "*temporarily*" restricted arms exports. ECF 90 at 70 (emphasis added). But this law "deserve[s] little weight because" it was "short lived." *Bruen*, 597 U.S. at 69. It also fails *Bruen*'s "how" and "why," restricting *exports* – not *domestic* sales – in order to *retain* arms within the country – not to *restrict* access or prevent 'gun violence.' Second, Defendants rely on early gunpowder laws, ECF 90 at 70, which regulated gunpowder "for fire-safety reasons," *Heller*, 554 U.S. at 684 (Breyer, J., dissenting) – an entirely different "why." Third, Defendants cite early "restrictions on commercial sales of firearms to Indians." ECF 90 at 70. But Indians were not at the time "members of the political community," and thus not "the people" under the Second Amendment. *Heller*, 554 U.S. at 580, 581. Defendants thus have failed to meet their historical burden, and the Rule therefore violates the Second Amendment.

### B. The Rule Violates the Fourth Amendment.

Defendants advance two theories in an attempt to justify the Rule under the Fourth Amendment. First, they claim Plaintiffs lack Fourth Amendment "standing" to challenge the Rule

---

[28] Rather than "'[t]ak[ing] together' disparate strands of historical laws," *Rahimi* relied on "surety and going armed laws," which were both closely linked to the principle that, "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." 144 S. Ct. at 1901. Defendants' disparate analogues have no such unifying principle.

because only FFLs are subject to compliance inspections and "[a]ny risk of Tormey or those members imminently facing a 'warrantless invasion' of their homes by ATF … is thus wholly imaginary at this stage." ECF 90 at 72. But as Plaintiffs already observed, the Rule has a massive "affected population" – those whose conduct necessitates licensure and its accompanying warrantless searches. ECF 83 at 53 n.45. Following Defendants' logic, an agency action directly causing complained-of constitutional violations could not be challenged as their source. On the contrary, "the term 'standing' has been used by courts … as shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993). Plaintiffs have a privacy interest in remaining free from government licensure and oversight merely for engaging in private firearm transactions, and they certainly have standing to challenge the Rule on that front.

Second, Defendants reiterate that gun dealers are a "highly regulated industry" and thus no warrant is required to inspect them. ECF 90 at 72–73; *see* ECF 83 at 55 ) (pointing to prior case law on the topic, which Defendants claim "squarely forecloses" Plaintiffs' challenge). But Defendants do not address Plaintiffs' point that "what has always been a narrow exception [now] swallow[s] the rule." *See City of Los Angeles v. Patel*, 576 U.S. 409, 424-25 (2015). Indeed, an exception to the warrant requirement that historically has been justified by its narrow application cannot be extended (through bureaucratic fiat) to tens (or hundreds) of thousands of ordinary gun owners nationwide. In short, the Rule sweeps so broadly that it sweeps away any cover ATF inspections may once have had under this exception to the warrant requirement.

Defendants also fail to engage with *Bruen*, which held that *all* firearm regulations (including administrative searches) must be part of a historical tradition, and *United States v. Biswell*, 406 U.S. 311, 315 (1972), which noted that "[f]ederal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control" of other industries. Just how it is that *Biswell* "forecloses" a *Bruen* analysis at this intersection of constitutional rights, Defendants do not say. And as Plaintiffs have explained, the "historical tradition" of firearm "inspection" by British agents led to the exchange of gunfire. *See* ECF 83 at 45.

Similarly, by focusing exclusively on Plaintiffs' "reasonable expectation of privacy, ECF 90 at 73, Defendants fail to grapple with the Supreme Court's decent decisions in *United States v. Jones*, 565 U.S. 400 (2012),[29] and *Florida v. Jardines*, 569 U.S. 1 (2013), which returned Fourth Amendment analysis to its private property roots, and relegated a "reasonable expectation of privacy" to secondary analysis only. *See Jardines*, 569 U.S. at 11 ("we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy"). Because government invasion of a home is unquestionably a search (*id.* at 5), the government must obtain a warrant based upon probable cause unless it has a superior property right (like a warrant) to be there. Although pre-*Jones* cases like *Biswell* and its progeny permitted administrative searches on the theory that "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy" exists, *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978), such privacy analysis is irrelevant to the intrusion of foundational property rights.[30]

Finally, and relatedly, Defendants ignore that the Supreme Court's "highly regulated industry" cases have all applied to commercial establishments – not the home – going out of their way to note that the home is an entirely different animal. Indeed, most of those who must be licensed under the Rule do not operate a commercial premises, meaning any ATF compliance inspection will take place in their private homes and personal gun safes. Defendants seem to concede as much. PA090. And although the Rule acknowledged the unique sanctity of the home (PA037), Defendants now claim that "'no reasonable expectation of privacy could exist'" in

---

[29] *See id.* at 405 ("Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century," but "[o]ur later cases ... deviated from that exclusively property-based approach," thus returning to "an 18th-century guarantee against unreasonable searches, which we believe must provide at *a minimum* the degree of protection it afforded when it was adopted." *Jones*' historical focus corresponds nicely to *Bruen*'s historical analysis.

[30] *See Carpenter v. United States*, 138 S. Ct. 2206, 2239 (2018) (Thomas, J., dissenting) (discussing the Fourth Amendment's "close connection to property" and observing that, at the founding, "privacy" was "not part of the political vocabulary" but was understood "largely in terms of property rights") (citations omitted). *But see Johnson v. Smith*, 104 F.4th 153, 167 (10th Cir. 2024) (rejecting a *Jones*/*Jardines* property rights challenge to the highly regulated industry exception by conflating cases holding that searches of highly regulated industries are "reasonable in part because of the lesser reasonable expectation of privacy in that context," and noting that the Court's later 2015 *Patel* decision "gave no hint of a revised approach....").

Plaintiffs not wanting ATF entering their homes unannounced and rummaging through their gun collections. ECF 90 at 73. But Plaintiffs are not aware of any binding precedent applying the highly regulated industry exception *within private homes*.[31]

To the contrary, permitting a compliance inspection of "a pawn shop operator" in *Biswell*, the Court explained that "the threat to privacy [was] not of impressive dimensions" in the commercial premises as issue there. 406 U.S. at 317. Later permitting "warrantless inspections of underground and surface mines" in *Donovan v. Dewey*, 452 U.S. 594 (1980), the Court noted that, "*unlike searches of private homes*, which generally must be conducted pursuant to a warrant … legislative schemes authorizing *warrantless administrative searches of commercial property* do not necessarily violate the Fourth Amendment." *Id*. at 596, 598 ("the expectation of privacy" in "commercial property … differs significantly from the *sanctity accorded an individual's home*"). And in *New York v. Burger*, 482 U.S. 691 (1987), involving a "warrantless search of an automobile junkyard, the Court reiterated that "[a]n expectation of privacy in commercial premises … is *different from, and indeed less than, a similar expectation in an individual's home*." *Id*. at 693, 699. *See also Patel*, 576 U.S. at 431 (explaining that "even the presumption that the search of a home without a warrant is unreasonable 'is subject to certain exceptions,'" but citing *Brigham City v. Stuart*, 547

---

[31] To be sure, the Seventh Circuit has held that a gun dealer doing business "out of … his home … turned … the home into premises for selling guns. This made them places to which government agents had a right of access under the authority of section 923(g). *United States v. Cerri*, 753 F.2d 61, 63 (7th Cir. 1985). But that decision relied on *Lewis v. United States*, 385 U.S. 206 (1966), which held that "when … the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business … A government agent, *in the same manner as a private person*, may *accept an invitation* to do business and may enter upon the premises for the very purposes contemplated by the occupant." *Id*. at 211 (emphasis added). Plaintiffs submit that the Seventh Circuit misread *Lewis*, which did not hold that government agents may not enter a home *against the wishes of the owner* merely because some commercial activity occurs there. *See Jardines*, 569 U.S. at 21 (police without a warrant may "do no more than any private citizen might do"). That was the issue in *Lewis*, which did not authorize entry of a home against its owner's wishes.

U. S. 398, 403 (2006) which lists as exceptions firefighting, evidence destruction, hot pursuit, and serious injury – not compliance inspections).[32]

### C.  The Rule Is Unconstitutionally Vague.

Opposing Plaintiffs' Fifth Amendment vagueness challenge, Defendants insist that "the Rule provides clarity," "standards," and "numerous specific examples," and that because of this purported clarification, a facial vagueness challenge must fail. ECF 90 at 74, 76. But at no point do Defendants address Plaintiffs' discussion of the several areas where the Rule and its statute simply depart on meaning. *See* ECF 83 at 56. Thus, how a Rule muddying a statute's provisions and weakening its safe harbor protection places the public on notice of how the law will be enforced, Defendants never say.

### D.  The Rule Violates the Separation of Powers.

Defendants dismiss Plaintiffs' separation-of-powers claim as merely a "wholly duplicative … attempt to repackage a statutory claim as a constitutional one. . . . " ECF 90 at 76. Accordingly, Defendants incorporate their argument that the Rule comports with the statute and they leave it at that. But Defendants' get crossways with themselves. On the one hand, they argue that Plaintiffs' separation of powers challenge is inextricable with their claim that the Rule is "in excess of statutory … authority." *Id*. But on the other hand, Defendants claim that not every agency action, "in excess of … statutory authority is ipso facto in violation of the Constitution." *Id*. Here, ATF – not Congress – has expanded the scope of the criminal law. If this is to occur at all, such expansion

---

[32] Even if the Court were to reject Plaintiffs' arguments as to why the "highly regulated industry" exception does not apply (at all), the warrantless inspections mandated by the Rule would still need to pass muster under *Burger*'s three part test: "(1) 'there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made'; (2) 'the warrantless inspections must be 'necessary' to further [the] regulatory scheme'; and (3) 'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" *Patel*, 576 U.S. at 426 (quoting *Burger*, 482 U.S. at 402–03).

is constitutionally within the purview of Congress alone. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018).

## IV.    THIS CIRCUIT'S DEFAULT RULE IS VACATUR, NOT "APPROPRIATE[] LIMIT[ATION]."

On finding a rule violates the APA, "universal vacatur" under § 706 is "required in this circuit." *Tex. Med. Ass'n v. U.S. Dept. of Health and Human Servs.*, 110 F.4th 762, 780 (5th Cir. 2024). Indeed, by its nature, the "scope" of vacatur under § 706 is "'nationwide . . . not party-restricted' and 'affects all persons in all judicial districts equally.'" *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930 (5th Cir. 2024) (quotations omitted). Acknowledging that vacatur is the "default" remedy in this circuit, Defendants (ECF 90 at 77) seek to "preserve the argument" that relief should be limited only to the parts of the Rule that are unlawful and severable, and limited to the Plaintiffs. But the former is possible only if this Court were to find some small remnant of the Rule that did not violate the statute (or the Constitution), and which ATF would have promulgated on its own. *See Nat'l Ass'n of Mfrs. v. United States SEC*, 105 F.4th 802, 816 (5th Cir. 2024) (weighing if "there is 'substantial doubt' that 'the agency would have adopted the same disposition regarding the unchallenged portion [of the rule] if the challenged portion were subtracted' … [and] 'whether the remaining parts can 'function sensibly without the stricken provision.'"). As Defendants recognize, the latter is plainly not the law in the Fifth Circuit (or elsewhere), where vacatur of unlawful agency rules is the "default." *See Nat'l Mining Ass'n v. United States Army Corps of Eng'rs,* 145 F.3d 1399, 1409 (D.C. Cir. 1998) (citation omitted) ("when … agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is proscribed."). Last, Defendants argue that the default rule of universal vacatur would be "particularly harmful" given other lawsuits challenging the Rule. ECF 90 at 78. But Defendants' "protests against nationwide relief are incoherent in light of"

their "use of the Rule to prescribe uniform federal standards." *Career Colls.*, 98 F.4th at 255.[33] The Rule should be universally vacated.

CONCLUSION

For the reasons stated, the Court should grant Plaintiffs' Motion for Summary Judgment, vacate the Rule, and permanently enjoin its enforcement.

---

[33] In fact, any argument that this Court should consider the equities and public interests before vacating this unlawful Rule falls flat. Even setting aside clear Fifth Circuit precedent holding vacatur is required and not party-restricted, at this stage, equities give way to the text of the APA that commands courts "*shall*" set aside unlawful agency action. 5 U.S.C. § 706(2) (emphasis added); *Loper Bright* at, 2262 ("The text of the APA means what it says."); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. System,* 144 S. Ct. 2440, 2467 (2024) (Kavanaugh, J., concurring) ("The Government has contended that equitable relief is ordinarily limited to the parties in a specific case. Therefore, nationwide injunctions would be permissible only if Congress authorized them. But in the APA, Congress did in fact depart from that baseline and authorize vacatur."); *Braidwood Mgmt.*, 104 F.4th at 952 ("[W]e do not read our precedent to require consideration of the various equities at stake before determining whether a party is entitled to vacatur."). In other words, the meaning of "set aside" in § 706 cannot mean "vacatur," *Id.* at 951, only some of the time, or whenever the balance of equities or public interest favor a universal remedy.

Date: December 17, 2024

Respectfully submitted.

**KEN PAXTON**
Attorney General

*/s/Garrett Greene*
**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**KATHLEEN HUNKER**
Special Counsel
Texas Bar No. 24118415

**AUSTIN KINGHORN**
Deputy Attorney General for Legal Strategy

**RYAN D. WALTERS**
Chief, Special Litigation Division

**OFFICE OF THE ATTORNEY GENERAL OF TEXAS**
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
garrett.greene@oag.texas.gov
kathleen.hunker@oag.texas.gov

**COUNSEL FOR PLAINTIFF STATE OF TEXAS**

**LYNN FITCH**
Attorney General of Mississippi

**LIZ MURRILL**
    ATTORNEY GENERAL OF LOUISIANA

*/s/Justin L. Matheny*
**JUSTIN L. MATHENY** (MS Bar 100754)
Deputy Solictor General
**OFFICE OF THE ATTORNEY GENERAL**
P.O Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
Fax: (601) 359-2003
justin.matheny@ago.ms.gov

*/s/ Kelsey L. Smith*
**KELSEY L. SMITH**
    *Deputy Solicitor General*
Texas Bar No. 24117070

**COUNSEL FOR PLAINTIFF STATE OF MISSISSIPPI**

**LOUISIANA DEPARTMENT OF JUSTICE**
1885 N. Third Street
Baton Rouge, LA 70804
(225) 428-7432
smithkel@ag.louisiana.gov
*Counsel for State of Louisiana*

**COUNSEL FOR PLAINTIFF STATE OF LOUISIANA**

**SEAN D. REYES**
Utah Attorney General

*/S/ Andrew Dymek*
**ANDREW DYMEK**
Assistant Solicitor General

**UTAH OFFICE OF THE ATTORNEY GENERAL**
350 North State Street, #230
P.O. Box 142320
Salt Lake City, Ut 84114-2320
Tel.: 801-366-0533
adymek@agutah.gov

**COUNSEL FOR PLAINTIFF STATE OF UTAH**

*/s/ John I. Harris III*
**JOHN I. HARRIS III (TN # 12099)**

**SCHULMAN, LEROY & BENNETT PC**
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

**COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE**

*/s/ Stephen D. Stamboulieh*
**STEPHEN D. STAMBOULIEH**

**STAMBOULIEH LAW, PLLC**
NDTX#: 102784MS
MS Bar No. 102784
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us

**COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE**

*/s/ Brandon W. Barnett*
**BRANDON W. BARNETT**
Texas Bar No. 24053088

**BARNETT HOWARD & WILLIAMS PLLC**
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
817-993-9249 (T)
817-697-4388 (F)
barnett@bhwlawfirm.com

**LOCAL COUNSEL FOR COUNSEL FOR JEFFERY W. TORMEY, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, TENNESSEE FIREARMS ASSOCIATION, AND VIRGINIA CITIZENS DEFENSE LEAGUE**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on December 17, 2024 and that all counsel of record were served by CM/ECF.


*/s/Garrett Greene*
Garrett Greene